**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 9:19-cv-81160-RS**

APPLE INC.,

                Plaintiff,

   v.

CORELLIUM, LLC,

                Defendant.

**DECLARATION OF JASON NIEH IN SUPPORT OF
PLAINTIFF APPLE INC.'S MOTION TO COMPEL TECHNICAL
DISCOVERY FOR THE ENTIRE CORELLIUM APPLE PRODUCT (ECF NO. 68)**

1. My name is Jason Nieh. I am over the age of 21. I have personal knowledge of the facts contained herein, which are true and correct. If called as a witness, I could competently testify to these statements.

**Qualifications**

2. I am a Professor of Computer Science and co-Director of the Software Systems Laboratory at Columbia University. My research spans a broad range of software systems, including operating systems, virtualization, thin-client computing, cloud computing, mobile computing, multimedia, Web technologies, and performance evaluation. I joined Columbia University as an Assistant Professor of Computer Science in 1999 and was promoted to Professor in 2014.

3. My research and teaching interests at Columbia University have included the development of research prototypes and coursework focused on virtualization and mobile computing platforms, including iOS and Android platforms and operating systems. This includes research on operating system virtualization which led to Linux containers, a widely-used form of

1

virtualization built into the Linux operating system; file system layers and the virtual layered file system which are now widely-used as part of Docker; architectural support for virtualization which has been included in the latest ARM architecture, used in billions of smartphones, tablets, and servers; the development and deployment of the KVM/ARM hypervisor, the first ARM hypervisor to use ARM hardware virtualization support and the most widely-used ARM hypervisor today; and the first course to use virtualization as a pedagogical tool, which has become standard practice for computer science courses at many universities around the world.

4. Honors for my research include being named a Fellow of the IEEE and a Fellow of the ACM. I also received the Sigma Xi Young Investigator Award (awarded once every two years in the physical sciences and engineering), a National Science Foundation Career Award, a Department of Energy Early Career Award, multiple IBM Faculty and Shared University Research Awards, six Google Research Awards, and various best paper awards, including from MobiCom, SIGCSE, SIGMETRICS, and SOSP—all of which were for research related to virtualization and mobile computing.

5. While a Columbia professor, I have also been involved in various companies and corporate research and development related to virtualization. I was previously Chief Scientist of Cellrox, an Android virtualization startup, and Chief Scientist of DeskTone, where my responsibilities included investigating and standardizing technical solutions for remote display and desktop virtualization. I also served as the first Scholar in Residence for VMware, where my research included various aspects of virtualization.

6. I have published over one hundred scholarly articles and research papers. For example, I am a co-author (along with E. Bugnion, D. Tsafrir) of a book entitled, "Hardware and Software Support for Virtualization," published by Morgan & Claypool in 2017. This book provides an introduction to virtualization and describes various virtualization technologies.

7. I have served on over seventy program committees, including as program chair of the USENIX Annual Technical Conference, the SIGMETRICS/Performance conference, and the ACM International Conference on Mobile Systems, Applications, and Services (MobiSys). I have been invited to speak and have given keynote addresses at various conferences including VMworld, the largest virtualization-related event in the world, and VEE, the primary academic conference focused on virtualization. I am a named inventor on eleven issued patents, including patents directed to virtualization and mobile computing technologies.

8. My complete curriculum vitae is attached as Exhibit A hereto.

**My Engagement in This Matter**

9. I have been retained by Apple Inc. ("Apple") in this matter as an expert witness. In this capacity, Apple has asked that I formulate opinions regarding the Corellium Apple Product based on the facts and information I have been provided in this matter. Specifically, I have been asked to determine whether the Corellium Apple Product reproduces, modifies, distributes, or publicly displays the copyrighted works listed at Appendix A of Apple's First Amended Complaint in this matter (ECF No. 56-1). I have also been asked to determine whether the Corellium Apple Product circumvents one or more of Apple's technological protection measures that control access to, or reproduction, modification, distribution, and public display of, the copyrighted works listed at Appendix A of Apple's First Amended Complaint in this matter (ECF No. 56-1). On March 3, 2020, I completed my opening expert report containing my opinions regarding these issues.

10. I have also been asked to formulate opinions to respond to certain aspects of the expert opinions of Dr. James Olivier and Mr. Alexander Stamos, which they provided on behalf of Corellium on March 3, 2020. I understand that rebuttal expert reports in this matter are due on April 3, 2020. ECF No. 66.

11. I understand that the Court has provided the following definition of the "Corellium Apple Product" for purposes of discovery in this case: "All products developed, offered for sale, or sold by Corellium that create virtual versions of iOS-operated devices," and that the definition excludes "Corellium products that are based on other mobile operating systems." ECF No. 211 at 2.

12. I understand that to date, the Court has not required Corellium to produce its hypervisor source code and technical documentation, and that the Court intends to rule at a later date whether the definition of "Corellium Apple Product" includes Corellium's hypervisor platform. *Id.* at 2–3. I further understand that the Court requested statements from the parties' experts "stating their respective positions and rationale as to whether Apple requires additional discovery on Corellium's hypervisor." *Id.* at 2. I have prepared this declaration in response to the Court's request.

**Brief Technical Background**

13. An "operating system," very generally, is software that manages the resources of a computer and provides a platform from which users may interacts with other computer applications. The operating system acts as an intermediary between the applications that a user interacts with and the underlying hardware, including the processor, memory, and input/output devices like displays or keyboards.

14. A "virtual machine" is an abstraction of a complete computing environment through the combined virtualization of the processor, memory, and input/output components of a computer. A virtual machine provides software-based "hardware" that looks and acts like real hardware to a processor. In a virtual machine, an operating system like iOS will fully operate as if it running on real hardware like an iPhone, even though it is not actually running on that hardware.

15. A "hypervisor" is a specialized piece of system software that creates and manages one or more virtual machines. In other words, the hypervisor allocates and schedules the hardware resources of the computer among the virtual machines. From the perspective of an individual operating system on a virtual machine, the "hardware" it interacts with is, in fact, the hypervisor software.

16. The figure below, reproduced from a document prepared by software company VMWare as an introduction to a virtualization system,[1] depicts an example of a virtualized computer environment. Starting at the top, the figure shows a typical non-virtualized machine. The "system before virtualization" contains an operating system—in this example case, Windows—and applications running directly on the computer's hardware, including the central processing unit (CPU), memory, video card, disk memory, and network card. In the middle, a virtualized version of the same system is depicted. The system uses the same computer hardware, but the operating system now runs on a virtual machine that interfaces with the computer hardware through a hypervisor. At the bottom, the same computer hardware now includes five additional virtual machines, each running their own operating system with their own applications.

---

[1] VMware, Inc., *VMware vSphere Basics*, at 8 (2011), https://pubs.vmware.com/vsphere-50/topic/com.vmware.ICbase/PDF/vsphere-esxi-vcenter-server-50-basics-guide.pdf.



17.     Virtualization requires the hypervisor. The only purpose of the hypervisor is to create and manage virtual devices, acting like the hardware in a physical machine. The hypervisor manages the memory and processing resources, and it generally decides where data gets put in memory and on the disk. It also generally manages and directs the visual output of the operating system.

**Summary of Materials I Have Reviewed That Corellium Has Provided So Far in Discovery**

18.     To assist in forming my opinions, Apple's outside counsel has provided me with numerous documents produced by Corellium in this case. The documents I have considered include the documents listed in the "Materials Considered" appendix to my March 3, 2020 expert report, attached as Exhibit B hereto. While exact Bates numbers are provided in Exhibit B, a high-level description of documents I have considered include:

5

**Corellium CONFIDENTIAL – ATTORNEYS' EYES ONLY Material**

**Corellium CONFIDENTIAL Material**

- Various source code documents produced by Corellium through its typical electronic discovery process
- Corellium release notes
- Corellium patch lists
- Corellium user guide
- Documents describing advanced features and options

19. Corellium provided credentials that permitted me to access one version of the cloud version of the Corellium Apple Product in connection with this litigation. I understand Corellium has made approximately ▮▮▮▮ previous versions of this product, but only one was made available to me to access. *See, e.g.,* ECF No. 188-2 at 4–10. In preparation of my March 3 expert report, I accessed Corellium's cloud product using these credentials.

20. On March 10, 2020, Apple's counsel provided me with the following image from Corellium's counsel, also attached as Exhibit C. I understand that Corellium's counsel sent this image to Apple's counsel on March 10, 2020. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This is the first document I have reviewed from Corellium that claims to show the architecture of its product. From my discussions with Corellium's Chief Technology Officer Chris Wade and Corellium's counsel Justin Levine on March 12, 2020, I understand that Corellium added the pink shading to certain boxes in this diagram to indicate what Corellium claims to be the only "iOS-specific Corellium code" that Corellium determined it is obligated to produce in this case. I further understand that the limited amount of source code Corellium has so far produced in discovery falls under the pink-shaded boxes in this diagram, and that Corellium has not produced any source code for any aspect of the non-shaded boxes. Corellium's counsel was unable to confirm on March 12, 2020 whether all source code files represented by the pink shaded boxes have been produced.

**Corellium CONFIDENTIAL – ATTORNEYS' EYES ONLY Material**



21.     I understand from Apple's counsel that on March 5, 2020, Corellium offered to make a source code computer available to allow the inspection of Corellium's source code in this case.  I also understand that the Protective Order entered by the Court requires certain procedures to be followed for making source code available for review.  On March 12, 2020, I traveled to the offices of Corellium's outside counsel in West Palm Beach, Florida to review the source code contained on the computer.

22.     The source code files presented for my review were made available through Corellium's outside counsel's electronic discovery platform, Everlaw.  They were not provided in a software repository that would actually be utilized by software developers, such as GitHub or Bitbucket.  Such software repositories typically have features that enable the convenient search, review, and inspection of source code, and they typically contain *all* versions of documents in a particular body of source code, making it simple for a software engineer to view and navigate among multiple versions of a source code document and appreciate their differences.

23.     Corellium's source code computer appeared to contain the source code files that had previously been produced to Apple in this litigation.  Through the Everlaw interface, I was able to view the text of the source code files, the file names, and the file structure of the code Corellium has produced.  I was able to search the text of the files using Everlaw's search interface. The source code computer did not, however, have conventional source code review tools, like ones

that provide an ability to compare, or "diff," two different files. The source code computer also did not allow me to view the files in a source-code editor program such as Notepad++ or Emacs, which would provide common software editing and review features that would aid my review, such as syntax highlighting and indentation. It also did not allow me to readily see how the different modules of code may "call" or otherwise interact with each other. In other words, instead of making the code available for review using programs that software engineers or computer scientists would typically use to explore and review a code base, Corellium put the code on lawyers' e-discovery software, which lacks a number of features useful for reviewing source code.

24. The source code files Corellium has produced in this matter, including the files stored on the source code machine, have not been provided in their native or unaltered form. Instead, they appear to have been edited specifically for review in this case. In numerous files, for example, Corellium has deleted certain sections of code and replaced the native code with comments such as "/* redacted non−iOS */". These "comments" (which is a software term used to describe prose written into code that a human can read, but is not actually written in a computer language and does not reflect instructions for the computer) appear to reflect Corellium's decision to delete sections of code that it determined was not relevant for purposes of discovery. A few examples include:

- A source code file natively titled ▇▇▇▇▇ with a notation in the text of the code stating "/* redacted − ▇▇▇▇ */". Corellium-022219.
- A source code file natively titled ▇▇▇▇ with multiple notations throughout stating "/* redacted non−iOS */", including a function called ▇▇▇▇ which ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Correllium-022069. ▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.
- A source code file that contains ▇ notations stating "/* redacted non−iOS */" ▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇. Correllium-025093.
- A source code file that contains ▇ notations stating "/* redacted non−iOS */" ▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇. Correllium-022019.

25. These deletions appear to be extensive. I have identified ▇▇▇▇ files produced by Corellium that contain identical or similar notations.

**Corellium CONFIDENTIAL Material**

26. I understand, from my discussions with Mr. Wade and Mr. Levine on March 12, 2020, that Mr. Wade or other Corellium employees altered the native source code files to remove "non-iOS" information from the source code, at Corellium's own discretion and judgment, before Corellium made these files available in discovery for my review. I further understand from our discussions that Mr. Wade, or other Corellium employees, replaced these segments of code with the "redacted" comments described above. Because unknown amounts of code were deleted and replaced with the "redacted" comments, I have no way of knowing, and cannot even make a guess, as to how much code Mr. Wade or other Corellium employees deleted, what its content was, or how it interacts with the remaining source code I was able to review.

27. Corellium's counsel stated on March 12, 2020 that this information was removed supposedly because it was "not responsive" to Apple's discovery requests according to Corellium's interpretation of the Court's discovery order. Corellium's counsel also stated that there exists no log or record of the information removed from the produced source code files.

28. Mr. Wade also represented to me on March 12, 2020 that the source code files that have been produced represent the single most current version of both the cloud and on-premises versions of the Corellium Apple Product. Corellium's counsel further represented on March 12, 2020 that there are at least ▮▮▮ prior versions of the code that, to date, have not been produced. This is not consistent with what I read in Corellium's interrogatory responses, which indicate that there are at least ▮▮▮ prior versions of the code. *See, e.g.,* ECF No. 188-2 at 4–10. In either event, only one version (not ▮▮▮ or ▮▮▮) has been produced for my review to date.

29. Although Mr. Wade stated to me on March 12, 2020 that fundamentally, the older versions of the code do not work any differently than the most current version of the code, I have no way of verifying this myself because Corellium has only provided a single version of the code for my inspection. I also understand from Apple's counsel that Corellium has not stipulated that prior versions of the Corellium Apple Product work in the same way.

30. In addition to providing the above version of the Corellium Apple Product code, the source code computer also provided two other folders containing a small subset of the overall code base specifically pertaining to a user interface change I understand Corellium made around February 2020, at which time Corellium changed its product from one in which users could select a version of iOS from a drop-down menu, to one in which users are required to load their own IPSW file containing iOS. One folder was named "old" and the other was named "new."

<u>**Corellium CONFIDENTIAL – ATTORNEYS' EYES ONLY Material**</u>

Corellium's counsel represented that the contents of the "new" folder contained a subset of the larger code set described above. According to Corellium's counsel, that subset of code specifically pertains to the user interface code representing the way the cloud version of the Corellium Apple Product required the user to upload their own IPSW file as implemented after approximately February 2020. Corellium's counsel represented that the contents of the "old" folder contained the user interface code representing the way the cloud version of the Corellium Apple Product previously allowed the user to select a version of iOS from a drop-down box prior to approximately February 2020.

31. I understand from Apple's counsel that on March 6, 2020, Corellium's counsel offered to provide access to the on-premises version of the Corellium Apple Product, in the format in which it existed before Corellium altered it in February 2020, and with an administrator account. On March 12, 2020, I traveled to Corellium's office in Boynton Beach, Florida, to review the products Corellium made available for inspection. On March 12, 2020, Corellium made available for inspection a computer running what Corellium represented was a current version of the on-premises Corellium Apple Product on a private server. Corellium separately made available for inspection an internet browser with access to what Corellium represented as an "old" version of the cloud version of the Corellium Apple Product, prior to the changes made around February 2020.

32. I spent a total of about 3.5 hours inspecting the products Corellium made available, between approximately 2:00 p.m. and 5:30 p.m. Initially, Corellium and its outside counsel limited my interaction with the products in that I was only able to direct Mr. Wade to operate the products. However, Corellium and its outside counsel later agreed to let me to operate the product, and I was ultimately able to personally review and interact with both the on-premises product and the "old" version of the cloud product. I was able to take screenshots of my interaction with both products. I was able to use the on-premises product as an administrator. Corellium provided a corporate representative, Mr. Wade, who answered many of my questions about the operation of the products provided. At the instruction of his counsel, however, Mr. Wade declined to answer some of my questions about the capabilities of the product and Corellium's development of their product, including whether Corellium uses a GitHub repository for their code, and what ARM servers Corellium supports ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

33. Mr. Wade and Corellium's counsel Mr. Levine were present for the entirety of my

inspection. I was not allowed to review the products without their presence and observation. I was not allowed to review the products alone with Apple's outside counsel.

34. During my review, Mr. Levine stated that Corellium did not intend to make the on-premises version of the Corellium Apple Product available for inspection again.

**Insufficiency of Corellium's Production for My Analysis**

35. Although Corellium has provided additional information that has supplemented my understanding of the Corellium Apple Product since March 3, when I submitted my opening report, Corellium's technical production to date still does not provide me with the information I need in order to fully and effectively evaluate the accused product in this case.

36. If the proof is in the pudding, as they say, Corellium has not let me see all of its different puddings, much less the recipes for how it makes them. Instead, I have seen lawyers' descriptions of the pudding (*e.g.*, the interrogatory responses); I have been allowed to sample a selection of the many ingredients that go into one version of the pudding (*e.g.*, the limited source code); I have been told that there is a long list of ingredients in the pudding, many of which I may not see, much less know how they are used (*e.g.*, the deleted source code); and I have been briefly shown a few (far from all) completed versions of the pudding (*e.g.*, the limited inspections of the on-premises and cloud products). This is insufficient for me to fully substantiate the analysis I was retained to do.

37. ***First,*** in my opinion, Corellium's view of what constitutes the "Corellium Apple Product" is very narrow. Apparently based on that view, Corellium has not provided a full or complete set of source code or other technical information that would enable me or any computer scientist to gain a meaningful understanding of how the accused product works. The deficiencies in the documents and information Corellium has provided extend far beyond the lack of information regarding Corellium's hypervisor. As described above, during my review on March 12, 2020, Corellium's counsel stated that Corellium has not produced *any* code or other documents that relate to what Corellium deemed to be "non-iOS" parts of the accused product. It is my understanding that in applying Corellium's interpretation of the term "Corellium Apple Product," Corellium has *only* produced code and other technical information about the parts of the accused product that directly and specifically handle the iOS operating system. I further understand that Corellium has not produced code or documents relating to any other aspect of the accused product,

11

including, *e.g.*, generic aspects of its product that might pertain to iOS, as well as Android, virtual machines. So, for example, if the Corellium Apple Product includes a generic function that copies data from one section of the disk to another section of the disk, I understand Corellium has not produced code and documents about that function because, according to Corellium, it is a "non-iOS" function. This restriction necessarily limits my ability to evaluate whether the Corellium Apple Product makes copies of or displays iOS by using generic functions, and it limits my ability to evaluate any circumvention of technological protection measures performed by any generic aspects of the accused product.

38.     The restrictions and limitations Corellium has apparently imposed on the technical information it has made available significantly impedes my ability to review and evaluate the Corellium Apple Product. Corellium appears to have used its restrictive interpretation of "Corellium Apple Product" to at least (1) withhold source code (even aside from its hypervisor code) that would be highly relevant to my understanding of how the product operates, (2) delete portions of the source code it has produced, fundamentally altering the evidence of how its product would normally operate, and (3) withhold technical documents about the design, architecture, and operation of the product that would likely provide some of the clearest evidence about the operation of the product.

39.     The image provided by Corellium in Exhibit C demonstrates that Corellium has withheld large swaths of source code, even beyond the hypervisor code. ███████████████████████████████████████████████████████████████████████████████████████

**Corellium CONFIDENTIAL – ATTORNEYS' EYES ONLY Material**

[figure redacted]

40.     As described above, I understand that Corellium has not produced any code relating to the unshaded portions of the figure above, including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Corellium's counsel also could not tell me during my visit whether the full universe of code represented by the shaded boxes has been produced, or whether only a subset of code for those functional blocks has been produced.

41.     Additionally, as described above, prior to producing the source code Corellium has made available for my inspection, Mr. Wade or other Corellium employees altered and deleted some of the underlying source code by removing portions of individual files that he or Corellium deemed irrelevant. Because the underlying native files were modified before they were produced, I have no way to tell how much code was removed, or what the deleted portions contain. In order to evaluate the source code that Corellium has produced in this matter, I need to be able to see the code as it actually exists. Because of the deleted source code, I cannot tell how the missing code may have interacted with the remaining code, or vice versa.

42.     It is also my opinion that Corellium possesses, but has not made available for me

13

to review, certain key technical documents that would help me or any software engineer more fully understand and analyze how the Corellium Apple product copies, modifies, or displays Apple's copyrighted works or circumvents one or more Apple-implemented technological measures.

43. To date, with the sole exception of the single image shown in Exhibit C, I have not received or reviewed any engineering specifications, requirements documents, design documents, block diagrams, flowcharts, models, technical manuals, architecture and functional descriptions, and any other technical documents or schematics showing the design or operation of the Corellium Apple Product. Generally, I would expect most software companies would create and maintain at least some basic internal descriptions and designs for a complex software product. While, as described above, I have received and reviewed certain user guides and manuals, I have not reviewed any Corellium-internal technical design or architecture documents that are likely to have more comprehensive details about the product.

44. Without access to the code and technical documentation about the Corellium Apple Product, my analysis necessarily has been limited. For the purposes of my opening expert report, for example, I primarily relied on circumstantial evidence of copying, modification, distribution and display of iOS, because I was not provided with direct evidence—the source code and other technical descriptions of the Corellium Apple Product—that would confirm exactly how the Corellium Apple Product actually operates. Even today, after reviewing the limited amount of code for the one version of the accused product that Corellium has made available, I still am left in the dark about many aspects of how the product operates in that version, and have no insight into any of the other versions for which no code has been provided.

45. In preparing my opening expert report in the absence of such evidence, I was limited to relying on evidence such as Corellium's responses to Apple's interrogatories, my observations about the currently existing version of the cloud version of the Corellium Apple Product, and slides about Corellium that were produced by Apple in this matter. While this circumstantial evidence all strongly indicates that the Corellium Apple Product copies, modifies, distributes, and displays the copyrighted iOS works and circumvents Apple's technological protections, Corellium's code and other technical documentation regarding the design and operation of the Corellium Apple Product would provide the most direct evidence of infringement and circumvention.

46. As I discussed with Corellium and Corellium's counsel on March 22, at the very

Corellium CONFIDENTIAL – ATTORNEYS' EYES ONLY Material
Corellium CONFIDENTIAL Material

least, I need the full code paths for all parts of the Corellium Apple Product that (a) ■■■■■■■■■■; (b) are used to create and instantiate iOS virtual devices, including loading a virtual device into random access memory; (c) are used to take, save, and restore a snapshot; (d) are used to clone a device; and (e) are used to pipe the output display of a virtual device to the Corellium Apple Product's user interface. The deficiencies in the documents and code produced to date do not allow me to identify, much less evaluate, these code paths.

47. *Second*, to date, Corellium has produced a set of code for only one version of its product. Corellium has at least ■■■, and potentially more than ■■■, different prior versions of the Corellium Apple Product in its software repository. *See, e.g.,* ECF No. 188-2 at 4–10.

48. Without access to prior versions of the Corellium Apple Product code, and without a stipulation from Corellium that prior versions of the Corellium Apple Product function in exactly the same way as the version that was produced, I am left without the ability to review the direct evidence—which should still exist in Corellium's software repository—of how earlier versions of the product copy, modify, distribute, or display the copyrighted work and circumvent one or more of Apple's technological protection measures.

49. *Third*, while Corellium has provided representative versions of the cloud-based and on-premises versions of the Corellium Apple Product for my review, the products that Corellium has provided to date are inadequate for me to form a fully informed opinion about the functionality of all versions of the product.

50. Corellium has not committed to providing access to the on-premises product at all going forward, so I am therefore unable to explore additional aspects of the product that I may learn about as discovery proceeds.

51. My access to the on-premises version of the Corellium Apple Product for 3.5 hours was insufficient for me to comprehensively inspect and understand the on-premises version of the Corellium Apple Product. The Corellium Apple Product has many different options and configurations that a user and administrator can tinker with. Additionally, Apple has asserted copyrights for twelve different versions of iOS in this matter. Even in an environment free from the observation of Corellium and its counsel, it is unlikely I could fully explore the effect of the various options on the creation and operation of numerous iOS virtual devices in half a day, or even a full day. Additionally, I was unable to confer meaningfully with Apple's counsel while inspecting the product, given Corellium's refusal to permit me to access the on-premises product

**Corellium CONFIDENTIAL Material**

without Corellium's counsel being present. For example, if I had wanted to point out a specific running process or file on the server to Apple's counsel, Corellium and its counsel would have been able to clearly see the aspects of the product I was identifying. Similarly, Apple's counsel could not identify to me any particular aspects she wanted me to consider in my review, at least not without identifying the same to Corellium and Corellium's counsel.

52. While, to date, I still have credentials to access the cloud-based version of the Corellium Apple Product, the on-premises product provides significantly more insight into the product than the cloud product due to the fact that a customer of an on-premises product is able to use administrator privileges to perform advanced operations, see the underlying file structure of the server, and observe the details of running processes.

53. I see no obvious barrier that would prevent Corellium from simply providing the on-premises Corellium Apple Product for discovery purposes, just as it delivers such products to its customers. During my review on March 12, Corellium and its counsel contended that they could not leave me alone with the product because the server was hooked up to Corellium's internal network, and they apparently feared that I could somehow access or damage the company's internal network. I would never do this, but if Corellium is truly concerned about that risk, there is an easy and obvious solution: Corellium can simply turn over an on-premises version of its product in this matter in discovery rather than host it at Corellium. Then, Apple's counsel or I could presumably install the product on our own internal network, and no one would have access to Corellium's internal network.

54. Additionally, similar to the versioning issues with the source code, I have evaluated few versions of the overall product. Corellium and its counsel represented that the version of the on-premises product that I reviewed, and the version of the cloud-based product that I have continuing access to, each represent the current versions of the Corellium Apple Product. However, Corellium has at least ▬▬, and potentially more than ▬▬, different prior versions of the Corellium Apple Product. Without access to prior versions of the Corellium Apple Product, and without a stipulation from Corellium that prior versions of the Corellium Apple Product function in the same way as the versions that I reviewed, I am unable to evaluate direct evidence regarding whether any version of the product, aside from the most recent version, functions in the ways that I have observed.

55. **Fourth**, Corellium's format of producing the source code in this case has hampered

16

**Corellium CONFIDENTIAL Material**

my analysis. Instead of producing code in its native software repository, as I understand Apple requested and as anticipated by the Protective Order, Corellium first produced its source code files as processed, Bates-stamped electronic discovery files, just as it produced other documents that are not source code. This format restricted my analysis because, in general, and as explained above, legal electronic discovery platforms generally do not provide an efficient way of reviewing code.

56. When Corellium later provided the code on a source code computer, it still did not provide the code in its native software repository. Instead, it produced the code files in Corellium's counsel's electronic discovery platform. While I was able to have basic navigation and search functions for the code using that platform, the a legal e-discovery platform is still inadequate for purposes of an effective and efficient review of the source code.

57. Corellium's failure to provide the source code in a source code repository eliminates my ability to effectively view and inspect different versions of the various files contained within the code provided, because standard comparison functions are not available. Accordingly, I am unable to look back to previous versions of the same file in the repository to see the previous version, run a comparison of the file against other versions, see when the file was changed, or see who it was changed by. Corellium has stated in its interrogatory responses that it has released at least ▮▮▮ different versions of the product. *See, e.g.,* ECF No. 188-2 at 4–10. I am currently limited to merely viewing the content of the one version of the code provided by Corellium. If and when Corellium produces prior versions of its code, instead of easily selecting a previous version of the same file, I will have to manually search through many layers of folders in order to find the equivalent file, and then will need to manually perform a visual inspection to find the differences between the two. A code repository tool—one that Corellium almost certainly already uses to store its code—would eliminate the significant burden of performing these needless operations.

58. Corellium's production of code on a lawyer's e-discovery platform, without a source code editor with basic features and tools like syntax highlighting, indentation, and the ability to compare or "diff" two files, also makes Corellium's code more difficult to read and interpret. Source code editors like Notepad++ or Emacs are very common in the software industry and easy to install on any computer.

59. Producing its code in a code repository on a source code computer pursuant to the

17

procedures in the Protective Order should not be burdensome for Corellium. Software programmers generally use some sort of software repository to store and track various versions of source code. In fact, when Corellium releases code publicly, it does so on GitHub, a software repository site that provides versioning and tracking capabilities. *See* https://github.com/corellium. ▮

▮ *See, e.g.,* Correllium-014712. If Corellium keeps its code on a private GitHub repository, for example, it could simply create a new GitHub account and grant it read-only privileges, and make it accessible only from Corellium's source code computer.

60. ***Fifth***, with respect to the hypervisor specifically, this is the core of the Corellium Apple Product. The only purpose of Corellium's hypervisor—like any hypervisor—is to manage virtual devices. As Corellium itself states, the hypervisor is ▮

▮ Correllium-025432 at 3.

61. Corellium's hypervisor, by definition, creates, runs, and interacts with the iOS virtual devices at issue in this matter—that is, the virtual copies of Apple's operating system. The hypervisor decides where copies of iOS are placed in memory or on the disk, it directs the visual output of iOS to Corellium's graphical user interface, and it makes modifications in order to fool an iOS virtual device into thinking it is running on real Apple hardware.

62. When the Corellium Apple Product makes a copy of iOS (including Corellium's "snapshot" capability) or shows a display of the virtualized iOS to a user, the hypervisor is the software that necessarily does at least some of that work. I would have to learn more about the overall architecture and design of the Corellium Apple Product to evaluate how much of that work is actually performed by the hypervisor.

63. Corellium's figure in Exhibit C confirms my conclusion that evidence demonstrating the operation of the hypervisor would inform any analysis of copying, modification, display, or distribution of iOS. ▮

**Corellium CONFIDENTIAL – ATTORNEYS' EYES ONLY Material**

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

64. It is certainly possible that there are some portions of the hypervisor code that may not directly relate to Corellium's copying, modifying, or displaying iOS or circumventing of Apple's security measures. But it is virtually certain that portions of Corellium's hypervisor code necessarily are involved in copying, display, and modifications of iOS because the hypervisor is the only interface to the resources of the computer. In that sense, the entire hypervisor is unquestionably relevant to issues of infringement and circumvention. At the very least, I need access to the parts of the hypervisor that connect the underlying resources to the other functions in the Corellium Apple product that complete the code paths discussed in paragraph 46 above.

65. Without access to code or technical documentation about Corellium's hypervisor, my analysis will remain necessarily limited. For the purposes of my opening expert report, for example, I primarily relied on circumstantial evidence of copying, modification, distribution and display of iOS while being deprived of the best, most direct evidence of how Corellium's hypervisor actually operates: the hypervisor design documents and source code. As explained above, the evidence to which I was limited includes Corellium's responses to Apple's interrogatories, my observations about the currently existing version of the cloud version of the Corellium Apple Product, and slides about Corellium that were produced by Apple in this matter. While this evidence all strongly shows that the Corellium Apple Product copies, modifies, distributes and displays the copyrighted iOS works, code and technical documents describing Corellium's hypervisor—in conjunction with the other code and technical documentation for the Corellium Apple Product—would provide the best and most direct evidence of infringement and circumvention.

66. I understand that this morning, Corellium's counsel informed Apple that Corellium is retracting three documents Corellium had provided earlier in discovery and which are listed in my "Materials Considered" list attached as Exhibit B to this declaration because according to Corellium, the documents "relate to the hypervisor" and Corellium believes they are exempt from discovery. To be clear, I have not relied on those three documents in preparing my opinions stated in this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 15, 2020
in New York, NY.

Jason Nieh
Professor of Computer Science
Columbia University