```
 1                 UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2                  WEST PALM BEACH DIVISION
             CASE NO.  19-81160-CIV-SMITH/Matthewman
 3

 4    APPLE, INCORPORATED,

 5                   Plaintiff,

 6         vs.

 7                                   West Palm Beach, Florida
                                     March 16, 2020
 8    CORELLIUM, LLC,                Pages 1-116

 9                   Defendant.
      _____

10              TRANSCRIPT OF TELEPHONIC MOTION HEARING
11            BEFORE THE HONORABLE WILLIAM MATTHEWMAN
                  UNITED STATES MAGISTRATE JUDGE
12

13    APPEARANCES:

14    FOR THE PLAINTIFF:
                         Latham & Watkins, LLP
15                       BY:  JESSICA STEBBINS BINA, ESQ.
                         BY:  GABRIEL S. GROSS, ESQ.
16                       10250 Constellation Boulevard
                         Suite 1100
17                       Los Angeles, California 90067

18                       Lash & Goldberg
                         BY:  EMILY PINCOW, ESQ.
19                       Miami Tower
                         100 Southeast 2nd Street
20                       Suite 1200
                         Miami, Florida 33131
21
      FOR THE DEFENDANT:
22                       Cole, Scott & Kissane, P.A.
                         BY:  JUSTIN LEVINE, ESQ.
23                       BY:  LIZZA CONSTANTINE, ESQ.
                         Esperante Building
24                       222 Lakeview Avenue
                         Suite 120
25                       West Palm Beach, Florida 33401
```

**FOR THE THIRD PARTY DEFENDANTS:**

*Holland & Knight*
BY:  BENJAMIN A. TAORMINA, ESQ.
BY:  ADOLFO E. JIMENEZ, ESQ.
515 East Las Olas Boulevard
Suite 1200
Fort Lauderdale, Florida 33301

TRANSCRIBED BY:        DAWN M. SAVINO, RPR
Official Court Stenographer
400 N. Miami Avenue, 10S03
Miami, Florida  33128
Telephone:  305-523-5598

P-R-O-C-E-E-D-I-N-G-S

THE COURT:  All right.  Let's call the case.

COURTROOM DEPUTY:  Calling case number

19-81160-CV-Smith/Matthewman.  Apple, Incorporated versus

Corellium, LLC.

THE COURT:  All right.  So this is Judge Matthewman,

and originally this was going to be an in-court, in-person

hearing, but in light of all the issues surrounding the

coronavirus matters, the Court has converted it to a telephonic

hearing and it will be briefer than it was going to be.  Shorter

in time.

Now, as far as the ground rules go, one of the problems

with telephonic hearings is that parties tend to jump in and

talk over each other, and I don't want that happening.  So I'm

going to go through each party at the appropriate time and I'll

ask counsel to advise me what your position is, but please don't

speak out.  You will all get a position to talk.  You don't need

1    to jump in while somebody else is talking or while there is a

2    break in the talking.  Everybody will get a chance to speak.

3         Additionally, when you do speak, since you're not here

4    in court and we are making a record of this, in the event it

5    ever needs to be transcribed, when you do speak, if I state your

6    name, that's sufficient.  But when you do start speaking, please

7    make sure that you're properly identified on the record so

8    whatever you have to say on behalf of your client is properly

9    captured.

10        All right.  So that all being said, let's start off

11   first of all and find out who is here for the Plaintiff Apple,

12   Inc.

13        MS. STEBBINS BINA:  Good morning, Your Honor.  This is

14   Jessica Stebbins Bina with Latham.  My partner, Gabe Gross, is

15   also on the line, and local counsel Emily Pincow from Lash and

16   Goldberg.

17        THE COURT:  All right.  All right.  Good morning to all

18   of you.

19        And Ms. Bina, are you going to be primarily arguing for

20   Apple?

21        MS. STEBBINS BINA:  Yes, Your Honor.  Mr. Gross may

22   weigh in on some of the matters related to the hypervisor as he

23   has more expertise than I do, but I will be the primary arguer.

24        THE COURT:  All right.  That's fine.  All right.

25        Then who do we have here for the Defendant Corellium,

```
1    LLC?

2              MR. LEVINE:  Good morning, Your Honor.  Justin Levine

3    from Cole, Scott and Kissane on behalf of Corellium.  I also

4    have with me Lizza Constantine from the same law firm.

5    Depending on the subject matter will dictate who the attorney

6    is.  I also -- depending on the issue.

7              I also brought with me Cole Scott's director of ESI,

8    he's a software engineer, Manny Delgado, and also to assist with

9    speaking on some of the technical issues.  On the hypervisor, in

10   addition to the affidavits that were provided, I have the chief

11   technical officer from Corellium, Chris Wade as well.

12             THE COURT:  All right.  And then is Amanda Gorton also

13   on the line?

14             MR. LEVINE:  She's on the line and in the room, but

15   likely will not have a role in today's hearing, Your Honor.

16             THE COURT:  All right.  And what is her position again

17   with Corellium?

18             MR. LEVINE:  Chief executive officer.

19             THE COURT:  Okay.  Thank you.  All right.

20             And who do we have here on behalf of the nonparty

21   L3Harris?

22             MR. TAORMINA:  Good morning, Your Honor.  This is

23   Benjamin Taormina and Adolfo Jimenez from Holland and Knight on

24   behalf of L3 Technologies and Azimuth.  I, Benjamin Taormina,

25   will be doing the primary argument, but Adolfo Jimenez may
```

1    present as well.

2          THE COURT:  All right.  And you're here on behalf of

3    both L3Harris and Azimuth; is that right?

4          MR. TAORMINA:  That's correct, Your Honor.  L3Harris

5    owns Azimuth.

6          THE COURT:  Right.  They're the parents, correct?

7          MR. TAORMINA:  Correct.

8          THE COURT:  All right.  Great.  And did I miss anybody?

9    Is anybody else on the line?  All right.

10         Hearing nothing, I have all the appearances here and

11   we're going to do the best we can here by phone today.  It's

12   sort of a -- there's some complex issues that make it a little

13   unwieldy by telephone.  However, in light of the coronavirus

14   concerns, I think it's important that we proceed by telephone

15   here today so all of you can stay hopefully safe and healthy.

16         So the hearing today is a discovery hearing and a

17   motion hearing on the nonparty L3Harris Technology, Inc.'s

18   motion to quash Plaintiff subpoenas to produce documents and for

19   deposition, which is at Docket Entry 184.  And I've read all of

20   the responses, replies, et cetera, regarding that.  I know there

21   was a notice of a filing under seal of a joint notice and the

22   joint notice is at Docket Entry 227.  The sealed version of it.

23   And that's a joint notice regarding L3 Technology's motion to

24   quash, and outstanding discovery disputes between Apple and

25   Corellium.

1          So I think probably the first thing to start out with

2     is L3Harris Technology's motion to -- motion to quash, and I do

3     have the joint notice here which seems to lay out the issues.

4     Now since that is a motion filed by the nonparty, I'll first

5     turn to counsel for L3Harris, either Mr. Taormina or

6     Mr. Jimenez, and just let me know which one of you is speaking

7     and tell me what you believe the primary issue is that needs to

8     be addressed on this motion.

9          MR. TAORMINA:   Thank you, Judge. This is Benjamin

10    Taormina.  Just as a house cleaning -- keeping issue, L3Harris

11    and Azimuth have continued to confer with Apple since the filing

12    of the notice, the joint notice, and so we believe that we are

13    clear and have come to an agreement on two issues, so I'll just

14    lay those out for the Court.

15         For the first issue, we had agreed, L3 and Azimuth had

16    agreed to withdraw our geographical objection and in exchange

17    for that, Apple had agreed to withdraw its argument about --

18    that Azimuth had not responded and to accept that Azimuth

19    jointly responded with L3Harris, and also along with that is L3

20    and Azimuth's agreement that any documents provided, that we

21    would search both Azimuth and L3Harris to produce any documents

22    that exist.  And then obviously if this Court was to mandate

23    depositions go forward, that we would obviously comply with

24    that.

25         On the second issue is related to request, I believe

1    it's Number 6 -- Number 7 sorry, Request Number 4 which had to

2    do with the communications of between Mr. Wade and Azimuth, and

3    that Apple had agreed to limit the -- the scope of the request

4    to the time of September 2017 to the present, and limited to the

5    relevance of the Corellium Apple product.  So I believe that

6    those -- and that we would agree to those parameters as well

7    when looking for documents and producing documents.  We would

8    still discuss that we would like to redact our employee names

9    from those communications, so I'm finding now that it's

10   represented that Apple agreed to that.  But other than that

11   redaction issue, I believe those two issues had been agreed upon

12   by the parties.

13          THE COURT:  All right.  So if I'm clear, according to

14   L3, L3 and Azimuth have agreed to withdraw the geographical

15   objection, first of all.

16          Now, what was that geographical objection?  Just

17   explain that to me again?

18          MR. TAORMINA:  Sure.  It was a technical objection that

19   under Rule 45 there has to be -- the subpoena has to provide a

20   place for compliance within 100 miles of -- let me pull the

21   exact language.  Within 100 miles of where the person resides,

22   is employed or regularly transacts business in person.  So the

23   argument on behalf of L3 was that the place for compliance was

24   outside of its headquarters -- it was beyond 100 miles of

25   Melbourne where it transacts business.

```
 1          THE COURT:  Okay.  All right.  So -- all right.  Then
 2   in response to that, Apple will withdraw its argument that
 3   Azimuth has not responded, Azimuth being the subsidiary of L3;
 4   is that correct?  According to you?
 5          MR. TAORMINA:  That's correct, according to L3 and
 6   Azimuth.
 7          THE COURT:  All right.  And then L3 will search for
 8   documents relating to both L3Harris and Azimuth?
 9          MR. TAORMINA:  That's correct.  Based on our
10   discussions, it seems like there's really only going to be
11   documents and communications from Azimuth, but we will still
12   check with L3 as well.
13          THE COURT:  All right.  And then in the event that the
14   Court orders the deposition to proceed, then L3 will comply with
15   that, correct?
16          MR. TAORMINA:  That's accurate.
17          THE COURT:  And then Request Number 4 dealing with Mr.
18   Wade and Azimuth communications, according to you, Apple agrees
19   to limit the scope or time period of that request from September
20   2017 to the present regarding the Corellium Apple product, and
21   of course as defined by the Court at this point.  And the
22   nonparty will search and produce relevant documents in that time
23   frame, correct?
24          MR. TAORMINA:  That's correct.
25          THE COURT:  And then the issues that you believe are
```

1    remaining, first of all, you wish to redact your employee names.

2    Are there any other issues, big issues or important issues, that

3    you see that still remain on the motion to quash?

4              MR. TAORMINA:  Yes, Your Honor.  There are -- the

5    largest issue that we need to address are our trade secrets

6    which would be the identities of the two customers that Azimuth

7    has resold the Corellium Apple product to.  Along with those --

8    revealing those customers implicates issues of national

9    security, and then generally there are other issues as well

10   within the request such as the request for Azimuth's employee's

11   identities which we -- which our position is that Apple has

12   limited that request to -- the need for the employee identities

13   is limited to Azimuth's use of the Corellium product, the

14   Corellium Apple product, and that Azimuth does not use the

15   Corellium Apple product, and -- so there are a few other issues.

16   And so if you would like, I could go through my argument for

17   each of those issues.

18             THE COURT:  No, I mean, I'm just trying to figure, get

19   an outline initially and then I'll hear from the other side and

20   then we can see where we go from there.

21             So the main issues you see that you wish to redact

22   employee names, that would be Azimuth employees or L3 employees?

23             MR. TAORMINA:  I think that it's probably limited to

24   Azimuth employees, but to the extent that there are any L3

25   employees that are involved in any communications, we don't know

1    that there are, but to the extent there are, we would include L3

2    in that request as well.

3         THE COURT:  All right.  And then you wish to withhold

4    the identities of the two customers that Azimuth has resold the

5    Corellium Apple product to; is that correct?

6         MR. TAORMINA:  That's correct.

7         THE COURT:  And then finally, as far as Azimuth's

8    employee's identity, you do not want to include those, and I

9    think your argument is that Apple has limited its request to

10   Azimuth employees who worked on the Corellium Apple product and

11   you're saying there were none?  Is that the position?

12        MR. TAORMINA:  Yes.  The position is that Apple had

13   requested the employees' identities who use the Corellium Apple

14   product and that -- or, excuse me, that Azimuth does not use the

15   Corellium Apple product.  That Corellium or -- excuse me, that

16   if Azimuth, the normal course of use would be to develop its own

17   technology from it, and Azimuth has not developed its own

18   technology from the Corellium Apple product.

19        THE COURT:  All right.  So would those be the big

20   issues that are outstanding on the motion to quash?

21        MR. TAORMINA:  Yes.  That's correct, Your Honor.

22        THE COURT:  All right.  So let me go ahead at this time

23   and let me turn to counsel for Plaintiff.  Who wishes to respond

24   to that on behalf of Apple?

25        MS. STEBBINS BINA:  Ms. Bina.  I will, Your Honor.

1          THE COURT:  All right.  And that is Ms. Bina?

2          MS. STEBBINS BINA:  Yes, Your Honor.

3          THE COURT:  All right.  Go ahead, Ms. Bina.

4          MS. STEBBINS BINA:  So on the first two points, I think

5     that counsel has correctly represented our agreement in terms of

6     the geographic objection and the Azimuth, whether they've

7     properly responded issue.

8          With respect to the communications with Mr. Wade, I

9     believe that's also correct.  We will limit it to the Corellium

10    Apple product, however that ends up being defined, although I

11    want to put a small pin in that issue because I don't think that

12    Azimuth would necessarily have anything that would fall within

13    the category that the Court has excluded, because I don't think

14    they would have hypervisor source code or anything similar.  So

15    it would be communications related to the Corellium Apple

16    product between September 2017 and the present.

17         THE COURT:  Okay.  So it looks like Apple's in

18    agreement that L3 and Azimuth have agreed to withdraw their

19    geographical objection as explained on the record, and that

20    Apple will withdraw its argument that Azimuth has not responded,

21    correct?

22         MS. STEBBINS BINA:  Correct, Your Honor.

23         THE COURT:  All right.  And you agree that in response

24    to the subpoena, L3 will search for both L3Harris and Azimuth

25    responsive documents?

1        MS. STEBBINS BINA:  Yes, Your Honor.  Essentially what
2   we understand is that we will treat the motion to quash as
3   though it had been filed by L3Harris and Azimuth, and they will
4   both respond to the subpoenas that were served on them as
5   however the Court orders.
6        THE COURT:  Okay.
7        MS. STEBBINS BINA:  So it will be basically as though
8   they had both moved, and Your Honor's orders will apply equally
9   to both of them and they'll both respond.
10       THE COURT:  All right.  And then L3Harris will comply
11  with submitting to a depo or Azimuth will comply with submitting
12  to a depo if the Court orders a deposition to go forward as
13  opposed to just documents being produced, correct?
14       MS. STEBBINS BINA:  Yes, Your Honor.
15       THE COURT:  And as far as Request Number 4 dealing with
16  Mr. Wade and Azimuth communications, Apple agrees to limit the
17  scope of time from September 2017 to the present regarding
18  communications, regarding the Corellium Apple product and the
19  nonparty will search and produce any relevant documents during
20  that time frame with that limitation.  Correct?
21       MS. STEBBINS BINA:  Yes, Your Honor.
22       THE COURT:  All right.  Now, the issues that counsel
23  indicated was, first of all, that they wished to redact any
24  employee names from Azimuth responses and, if any apply, L3
25  responses.  Would you agree that's an issue that needs to be

1    resolved?

2         MS. STEBBINS BINA:  Yes, Your Honor.  We think that

3    employees who are involved in using or selling the Corellium

4    Apple product should be identified.  We're not looking for all

5    of their employees or employees who are involved in other areas,

6    but to the extent the employees are using the product and

7    there's a dispute over whether they are, and to the extent that

8    the employees -- you know, Azimuth has a sub-distributor

9    agreement with Corellium that requires, amongst other things,

10   their employees to promote and market and distribute the

11   products, and we need to know who those employees are who are

12   doing that.

13        THE COURT:  All right.  And then the next issue that

14   counsel mentioned was identities of two customers that Azimuth

15   has resold the Corellium Apple product to.  And they don't want

16   to disclose those customers, they allege issues of national

17   security.  Do you agree that's an issue?

18        MS. STEBBINS BINA:  Yes, Your Honor.  We believe that

19   the end users of the Corellium Apple product are critically

20   important to evaluating the case and, you know, as we explained

21   before and we'll explain again, we need to know who those

22   entities are.

23        THE COURT:  All right.  And then finally, as far as the

24   Azimuth's employee identities, you have limited your request to

25   employees' identities who used the Corellium Apple product, and

1    opposing counsel is stating that Azimuth does not use the

2    Corellium Apple product.  What's the issue there?

3         MS. STEBBINS BINA:  Well, so there's two different

4    categories of employees.  One is the employees who deal with the

5    customers, those were addressed a moment ago.  But then we're

6    also interested in employees who are using the product.  They

7    claim they don't use the product.  We have evidence that

8    suggests otherwise, including a substantial number of

9    communications with Azimuth employees as well as Azimuth

10   purchasing a copy of the product for its own use.  So we're not

11   certain that it's correct that they don't use the product.

12        Counsel, a moment ago, said well, the normal course

13   would be to use it to develop its own product.  We're interested

14   in any use, not just using it to develop its own product, if

15   they're using it to search for exploits or using it to advertise

16   or market it, whatever they're using it for, we're interested in

17   that use and those employees' identities.

18        THE COURT:  All right.  And then what other, if any,

19   issues do you see in addition to those?

20        MS. STEBBINS BINA:  I think those are the big ones,

21   Your Honor.  Knowing who the customers are and getting the

22   communications with those customers to the extent they relate to

23   the Corellium Apple product given Corellium's -- given Azimuth's

24   status as a sub-distributor of the product from Corellium, as

25   well as the communications and identities of the pertinent

1    employees.

2         THE COURT:  All right.  Thank you.  So let me just go

3    now to counsel for Corellium and ask you if you have anything

4    you needed to add or if you adopt anybody's position in regard

5    to this motion to quash by L3 and Azimuth.

6         MR. LEVINE:  Good morning, Your Honor.  This is Justin

7    Levine on behalf of Corellium.  We filed a notice of joinder for

8    the motion to quash so we do, and I'll say it again on the

9    record, that we do adopt the position of L3Harris and Azimuth.

10        I would like to add additional -- a couple of brief

11   additional points.  Initially the -- we've recently come into

12   the information with Plaintiffs that they're not going to be

13   seeking any monetary or actual damages or -- excuse me, I should

14   be a little bit more clear.  They're not going to be seeking any

15   damages based upon lost profits or revenues, and therefore I

16   think that would make any kind of values that would be produced

17   irrelevant going forward.

18        Second, I would like to clarify that communications

19   between -- as it relates to Chris Wade, any communications in

20   his personal capacity, I think this Court has already ruled are

21   not relevant to this case, so I would proffer that the only

22   communications that are relevant to this case are of Chris Wade

23   in his chief technology officer capacity, so I would like to put

24   that on the record.

25        Finally, in light of the sensitivity of both the

1    national security interests, the interests of L3Harris and

2    Azimuth, the interests of Corellium, all relating to national

3    security, as well as the highly sensitive and highly proprietary

4    information that is looking to be turned over here, Corellium

5    would request that any documents to be produced from L3 or

6    Azimuth would be produced to counsel for Corellium first so that

7    if there are any further objections based upon those documents,

8    we can then assert those and bring those issues to the Court.

9             Again, there is some very highly proprietary

10   information that is at stake Here.  Apple has shown a history of

11   being an entity who wants this technical information and who

12   cannot get it and who is willing to pay a lot of money to get

13   it.  And so before any of this information which Corellium --

14   and I don't know if there is any information, but which

15   Corellium may have shared as part of a sensitive and

16   confidential business relationship with L3Harris, that any of

17   those documents be turned over to Corellium's counsel first for

18   review.

19             THE COURT:  All right.  Thank you.  So I think I've

20   defined the issues, or at least the major issues.  So the first

21   issue deals with redacting the employee names of Azimuth or L3.

22   So I think the easiest way to handle this is for the Court to go

23   to each counsel and get your brief position and argument on

24   that, and then we'll go to the next issue.  So why don't I start

25   with -- first of all, since it is L3's motion, I'll start with

1    counsel for L3.  Why -- what's this issue about redacting the

2    employee names of Azimuth L3 and why should the Court permit you

3    to make those redactions?

4         MR. TAORMINA:  Thank you, Judge.  This is Benjamin

5    Taormina.  First, I'm just going to give you a little bit of a

6    background on the business just so it helps bring safety

7    concerns that are at issue.

8         So the only role that is at issue here that's really

9    relevant is Azimuth's role as a defense and intelligence

10   contractor with domestic and foreign governments.  Azimuth's

11   only customers are governmental security agencies from the Five

12   Eyes countries, which is it's five countries that include the

13   United States that have a multilateral agreement for joint

14   cooperation in intelligence, military intelligence, human

15   intelligence, that type of security arena.  And Azimuth's

16   contractual agreements with these agencies is strictly to

17   provide them with products that assist them on national security

18   missions as well as other law enforcement capabilities, and

19   L3Harris really does not have any business with Corellium or the

20   Corellium Apple product.

21        And so what's important for Your Honor's consideration

22   is that -- so Azimuth is not a party to the dispute.  It only

23   resells the Corellium Apple product to two government agencies

24   from the Five Eyes relationship.  And the customers require the

25   highest level of discretion and require that the services and

1   products that Azimuth provides do not -- they cannot be

2   disclosed to anybody.  They have confidentiality agreements

3   within their agreements with these governmental agencies.  And

4   so just generally, this community is small and Azimuth's

5   business relies on the customer's trust and confidence in them

6   and that without that trust and confidence, their business

7   essentially, you know, could be destroyed.

8        And so how it relates to Azimuth's employees is that

9   their employees are engaged in this highly sensitive area, not

10  just with the Corellium Apple product but with several other

11  products, and they travel internationally through hostile

12  countries.  And Azimuth goes to great lengths to protect the

13  identities of these employees.  And so if anybody requests -- it

14  makes pretty clear that the only relevance in the request for

15  the identities is for employees who use the Corellium Apple

16  product, and Azimuth has made very clear to us that they do not

17  use and have not used the Corellium Apple product.

18       So as I had said before, Azimuth's normal practice if

19  they're using the product would be to develop its own technology

20  and then sell that own technology to a governmental entity for

21  law enforcement, national security issues.  Azimuth did not do

22  that here.  They resold the Corellium Apple product just to only

23  two customers over the last two years.  Azimuth did -- Ms. Bina

24  is correct that Azimuth did purchase its own copies of the

25  Corellium Apple product, but those are solely for the evaluation

1    to determine if they could sell it to their customers and to

2    troubleshoot any issues for the end customers.  So they have not

3    developed any technology of their own from it, and they're

4    simply for evaluation and troubleshooting issues.  It's strictly

5    middleman, this product to the two customers.

6         THE COURT:  All right.

7         MR. TAORMINA:  And so I -- just a little bit more, Your

8    Honor, if I may, is that with needing to identify the employees

9    -- the redacting the employees' names would not deprive Apple of

10   documents showing, you know, their negotiations with Corellium

11   or, you know, discussions about the Corellium Apple product,

12   it's strictly for their safety and protection as they travel

13   with the world and work with governmental agencies, and these

14   employees could be at risk of being detained and interrogated

15   while traveling internationally.  And the main purpose of

16   protecting their identities, aside from the fact that they don't

17   use it, is for their -- because their safety would be put at

18   risk and they could become targets for purposes of, you know,

19   converting them to foreign assets or extracting information

20   that's relevant to this really sensitive information.

21         Thank you, Judge.

22         THE COURT:  All right.  Now, this goes hand in hand, I

23   think, with the other issue which is the identities of the two

24   customers that Azimuth has resold the Corellium Apple product

25   to.  So why don't you -- while you're arguing this issue about

1   redacting the employee names, tell me your argument as to why

2   you believe that Azimuth L3 can withhold the names or identities

3   of the two customers that Azimuth has resold the Corellium Apple

4   product to.

5          MR. TAORMINA:  Of course.  The main reason to withhold

6   the two customer names is that these two customer names are

7   Azimuth's trade secrets.  And under Rule 45 B 3 B 1, this Court

8   has authority to quash a subpoena where compliance would

9   disclose trade secret or confidential information.  And as I'm

10  sure Your Honor is aware, trade secret arguments involve a

11  three-step inquiry.  The first step is to determine whether such

12  information is a trade secret.  The second step is to determine

13  whether disclosure would be harmful, and then if one and two are

14  established, the requesting party here, Apple, has to establish

15  a substantial need that can't be met without undue burden and

16  that the nonparty here, Azimuth, would be reasonably compensated

17  for the disclosure of its trade secrets.

18         And Your Honor, in our motion we cited to multiple

19  cases that are clear that customer lists have been treated

20  repeatedly as trade secrets and similar to the nonparty in the

21  *Fadalla versus Life Automotive Products* case that we cited, and

22  that was a Middle District of Florida case with a cite of 258

23  F.R.D. 501.

24         THE COURT:  How do you spell Fadalla for the record?

25         MR. TAORMINA:  Of course.  F-A-D-A-L-L-A.

1        THE COURT:  Go ahead.

2        MR. TAORMINA:  And so similar to the *Fadalla* case,

3   Azimuth's general manager in our matter executed a declaration

4   which explained why the customer names are trade secret and why

5   they would be harmed by the disclosure of those trade secrets.

6   At Paragraph 6, the declaration explained that its only

7   customers of the Corellium Apple product were two governmental

8   agencies.  That the contractual arrangement with these customers

9   are highly sensitive, and disclosing those contracts and

10  specifically their identities would violate confidentiality

11  agreements, that's at Paragraph 7 E.  And that competitors

12  obtaining the identities would harm Azimuth's business and would

13  undermine national security interests and impede law enforcement

14  missions.  The declaration is clear that Azimuth's entire

15  business is predicated on trust and confidentiality, and if

16  Azimuth is forced to disclose those customer identities, that

17  trust and confidence would be destroyed and there is a very

18  strong chance that without that trust and confidence, those

19  customers would find alternative suppliers and people to do

20  business with, and that Azimuth would lose all of that business

21  because their only customers are the governmental agencies.

22        THE COURT:  So let me ask you, Counsel, you had

23  indicated that there's a three-step inquiry for trade secret.

24  The first one is is it a trade secret; the second one is whether

25  disclosure would be harmful.  Tell me what you believe the third

1    one is?

2           MR. TAORMINA:  The third one is that if we satisfy --

3    if Azimuth satisfies the first two as you just explained, then

4    Apple would have to demonstrate a substantial need that cannot

5    be met without an undue burden, and that there be reasonable

6    compensation to Azimuth for having to disclose its trade

7    secrets.  And Apple does not even attempt to address a

8    substantial need in its response to our motion.  And it's

9    exactly what happened in *Fadalla*.  The requesting party did not

10   address need, the requesting party did not address reasonable

11   compensation, and the court took that in consideration and said

12   because they did not even attempt to address need or

13   compensation, that they did not meet their burden to force the

14   nonparty to provide their trade secrets.

15          And here, there is no need because I understand this is

16   a very complicated case and, you know, we're not in the weeds

17   with everybody, but it's our understanding that Corellium has

18   multiple other customers and that we're just one of the few

19   customers.  There's a good chance that it would be futile and

20   that if the government agency would be forced to come in, that

21   they probably would not provide that information.

22          But the important part is that we've established that

23   there is a trade secret because customers with our trade secrets

24   establish that they would be harmed because it could potentially

25   destroy our entire business, and it would violate

1    confidentiality agreements which is exactly what the court in

2    *Fadalla* said was enough to establish harm.

3          And Your Honor, an important -- two other important

4    considerations that are identified by the court in *Fadalla*, that

5    the court must balance the need for discovery versus the burden

6    and interest in keeping the information confidential.  As I

7    explained before, Apple doesn't even address need and Azimuth's

8    interest is incredibly significant.  They would lose the trust

9    and confidence that is essential in their industry and

10   imperative to their business.  They have a significant interest

11   in assisting national security measures, to assist in the

12   counter-terrorist attacks and assist law enforcement.  We all

13   have that interest to not impede those efforts, and Azimuth's

14   interest in all of that greatly outweighs Apple's failure to

15   identify any of the need, any need at all.

16          And the second consideration specifically identified by

17   *Fadalla* is that Azimuth's status as a nonparty weighs in favor

18   against disclosure.  Here, Azimuth is a nonparty.  It's not

19   involved in this lawsuit, and that should be considered -- that

20   should weigh against disclosing its trade secrets.

21          In addition to the trade secret arguments, there are

22   serious concerns with the national security, and those concerns

23   include that just the fact of the governmental agencies, I'd say

24   targets or counterparts to the -- the targets of their law

25   enforcement efforts, the fact that they would know what

1  capabilities the governmental agencies are using to target them

2  creates a huge disadvantage.  Knowing that your enemy on the

3  battlefield, what his capabilities are, absolutely allows the

4  enemy to game-plan against what those capabilities are.  And

5  specifically identifying those customers and allowing the enemy

6  to know what those governmental agency's capabilities are is a

7  very serious concern that would be -- that would be lost by the

8  disclosure of their identities.

9         And it could also make those agencies a target for

10  other bad actors.  Our understanding is that this is -- this

11  product would be useful not only in the hands of governmental

12  agencies that use it for good, but also bad actors that target

13  those governmental agencies could weaponize that technology and

14  use it for bad, and we would like to avoid that as well.

15         THE COURT:  So I have two questions for you.  I have

16  two questions.  Stop talking for a moment.

17         My first question to you is if it's such a national

18  security concern, then why hasn't the government filed a motion

19  or intervened in this case?

20         MR. TAORMINA:  My response to that, Your Honor, is

21  because that alone would force them to reveal their identities.

22  And if it comes to it, I'm certain that they will.  But at that

23  point, Azimuth's trade secrets are now lost.  So Azimuth's trade

24  secrets are the identities of its customers, and forcing the

25  governmental agencies to come in and defend their position

1   *(inaudible)* destroys the trade secrets of Azimuth.  And if

2   they're coming in and identifying themselves and asserting

3   those, you know, arguments on behalf of themselves, that creates

4   the entire issue of now they have been identified and now the --

5   you know, the bad actors or the targets of them know that these

6   are the agencies with those capabilities and that protection has

7   been lost as well.

8        THE COURT:  Well, first of all in response to that, a

9   federal prosecutor or a government attorney could come in and

10  seek permission to not reveal the name of the agency and could

11  also seek permission to file a sealed ex-parte submission.  None

12  of that has been accomplished.  So I'm not sure I buy your

13  argument there.

14       The second question I have for you is just in general,

15  in this case, Apple is alleging that there was a copyright

16  violation, that the Corellium Apple product violates copyrights

17  and other statutes.  Now, just in general, if you assume that

18  there's a copyright violation, are you saying that the trade

19  secret protection allows a company to violate a copyright and

20  then fail to disclose who they sold that violated copyright

21  material to based on trade secret?  Is that your argument?

22       MR. TAORMINA:  That is part of the argument is that we

23  are unaware that a copyright infringement automatically

24  eviscerates trade secret protection when the nonparty has

25  established that they are trade secrets, and that the requesting

1    party has asserted no argument that there is a substantial need.

2    And so they have not even attempted to satisfy their burden

3    within the trade secret analysis.

4              THE COURT:  So let me ask you, just following up on

5    that, what would prevent a company from violating a copyright,

6    selling the copyrighted material and then coming in and saying

7    well, the other side can't get who we sold to because it's now a

8    trade secret?  Do you see a problem there?

9              MR. TAORMINA:  I think that goes back to the fact that

10   we are nonparties to this matter, and that has to be considered.

11   And it goes back to the fact that Apple has to show that

12   substantial need for this information and Apple has not done

13   that.  Just by asserting a copyright claim does not demonstrate

14   substantial need to obtain trade secrets from a nonparty.  Here,

15   they have not even attempted to establish their substantial

16   need.

17             THE COURT:  All right.  And before I turn to Ms. Bina,

18   or to counsel for Apple, anything else that you wanted to

19   respond to?

20             MR. TAORMINA:  The only -- the last issue would be that

21   the protective order -- I know Apple has suggested that the

22   protective order will allow sufficient protection of our -- of

23   Azimuth's trade secrets, and we disagree for several reasons.

24   First and foremost is that the disclosure of our customers'

25   identities in any form, whether pursuant to a protective order,

1    attorneys' eyes only, no matter what disclosure, any damage is

2    done.  Our trust is lost with these governmental agencies.  Our

3    confidentiality agreements are breached.  The damage will be

4    done.  The protective order also does not waive Apple's required

5    showing of substantial need.

6         And in addition to producing these, if we were forced

7    to produce these pursuant to attorneys' eyes only, now these

8    customer names are in Apple's computers, their *(inaudible)*

9    systems, they're in, you know, expert systems.  The

10   dissemination becomes strong and wide, and that doesn't mean

11   that Apple can't come in and then challenge those designations

12   which could further risk it.  And our understanding is that this

13   case has been widely publicized in media outlets and even in

14   attorneys' profiles who are in this case.  So they're subject to

15   hacking.  These are very sensitive and very capable targets of

16   the governmental agencies.  And so just by this protective order

17   does not alleviate any of the security concerns, and first and

18   foremost it does not get past Apple's need to establish

19   substantial need, which they have not even attempted to do here.

20        That's it, Your Honor.  Thank you.

21        THE COURT:  All right.  Thank you.

22        Ms. Bina.

23        MS. STEBBINS BINA:  Thank you, Your Honor.  So I want

24   to start off with the idea that this is all so horribly secret

25   that, you know, the mere association of Azimuth with Corellium

1    is somehow going to fatally hurt Azimuth because Azimuth has put

2    itself out publicly and repeatedly as a Corellium customer.

3    They've been quoted in *Forbes*, they've been quoted on *Vice*.

4    They said Corellium is great, we love Corellium.  When we served

5    them with subpoenas, which is a private process, somehow

6    immediately either Corellium's counsel or Azimuth's counsel went

7    to the media saying Apple is a terrible person, they've served

8    Azimuth and L3Harris with subpoenas.  And Corellium's counsel is

9    actually quoted in the media on that very topic.  So the idea

10   that somehow, you know, we are the ones aggressively putting

11   Azimuth out there as a customer of Corellium is simply, you

12   know, a fiction.

13          In addition, you know, Corellium has not made any

14   showing that the identity of two customers, if it is two, and I

15   put that pin in if it is two, because Azimuth's -- I mean, I'm

16   sorry, Corellium's records show four instances of resale to

17   Azimuth.  So it may have been multiple instances to the same

18   customer, but I'm not sure if it's two customers or four

19   customers.

20          But the case that they're relying on, *Fadalla*, talks

21   about -- first off, it's not a copyright case.  It's a violation

22   of a confidentiality employment case, poaching case, I believe,

23   and it was seeking all customer information as well as business

24   plans and all sorts of other kind of information.  The courts in

25   that instance under those facts they demonstrated a trade

1    secret.  I don't know of any authority that says two customers

2    who bought a specific product alleged to be infringing is a

3    trade secret.  Under Florida's trade secret law, it has to be

4    information that derives independent economic value, actual

5    potential from not being generally known and not being readily

6    ascertainable by proper means, and that other persons can obtain

7    economic value from its disclosure or use.  Again, an entire

8    customer list for a company being disclosed to a competitor,

9    that would be the typical instance and that's the *Fadalla*

10   framework.  We're talking about two customers from a company

11   that, as far as I know, Azimuth and L3Harris have not alleged

12   that they compete with Apple, and we're talking about, you know,

13   two customers.  I don't believe that there is independent

14   economic value that's being lost here.  I also note that Azimuth

15   has been publicly associated with a number of customers.

16          The other instance is that the other requirement for a

17   trade secret is that you have to show that it's the subject of

18   efforts that are reasonable under the circumstances to maintain

19   its secrecy.  So, you know, in a *Vice* article last year, Azimuth

20   was reported by multiple sources to have as a client the

21   Australian signals directorate as well as the governments of the

22   UK and Canada.  You know, the governments in that case did not

23   return request for comment but, you know, it's been publicly

24   reported.  In addition, two sources there said Azimuth dealt

25   with the FBI.  So this isn't a situation where there is really

1    any secrecy here.

2            We also pointed out that in Corellium's marketing

3    materials to Apple, when Corellium was looking to be acquired by

4    Apple, they included a PowerPoint that listed a number of quote,

5    unquote, actual Corellium customers. Many of those customers

6    were government agencies who Corellium has not identified now as

7    its own customers.  So the presumption, since Azimuth is

8    Corellium's only reseller, is that those entities are Azimuth

9    customers.  In other words, you know, Corellium puts on this

10   PowerPoint, here are our customers.  Then in discovery we ask

11   them to list all their customers, they leave these entities off,

12   and now they're saying well, we can't go and find out if these

13   people are actually their customers or not.  This is important

14   to the case for all of the obvious reasons, including not the

15   least of which the linchpin of Corellium's defense is that this

16   is fair use.  This is fair use in part because we only sell to

17   the good guys, and our product is only useable by the good guys

18   and we make the world more secure as a result of our sales of

19   this product in the national security space.

20           And one of Corellium's experts, Alexander Stamos

21   specifically relies on Azimuth Security, and I'm quoting here

22   from Paragraph 32 of that Stamos report which is Exhibit 7 to

23   our opposition.  There is an ecosystem of research groups that

24   provide vulnerabilities to governments allied with the United

25   States.  One such company is Azimuth Security founded by Mark

1   Dowd, a respected security researcher and coauthor of "The Art

2   of Software Security Assessment".  Azimuth is currently owned by

3   L3Harris Technologies in Melbourne, Florida.  L3Harris is a

4   well-known defense contractor supplying the United States

5   government and its allies.  Page 21 of the L3Harris annual

6   report states that approximately 75 percent of L3Harris'

7   revenues consist of sales to or through the United States

8   government.  Azimuth is an open-acknowledged customer of

9   Corellium.  So Corellium is trying to use its relationship with

10  Azimuth, which is substantial.

11          And I need to pause here for a moment because, Your

12  Honor, there are portions of our opposition that Corellium did

13  not allow us to show to Azimuth under Corellium's AEO objection.

14  I'm not sure how to handle arguing about those issues.  Should I

15  just speak them?  Should we --

16          THE COURT:  Are those filed under seal?

17          MS. STEBBINS BINA:  They were filed under seal, Your

18  Honor, and they -- and we were not able to share them with

19  Azimuth, but I do need to refer to them in argument.

20          THE COURT:  Why don't you tell me which docket entry

21  and which page numbers you're talking about.

22          MS. STEBBINS BINA:  Sure, Your Honor.  So let me see if

23  I can obliquely refer to it.

24          THE COURT:  Well, if you just tell me what is the

25  docket entry that's the sealed docket entry and the page numbers

1   that you're referring to, I can certainly take a look at that.

2          MS. STEBBINS BINA:  It's the opposition, and I'm

3   looking for the docket entry number which is not on my copy so

4   --

5          MR. LEVINE:  Your Honor, this is Justin Levine, counsel

6   for Corellium.  Just to be clear, that document was ultimately

7   shared with counsel for L3Harris, so they do have it.

8          THE COURT:  All right.

9          MS. STEBBINS BINA:  Okay.  They told us -- so I can

10  quote from it, Justin, without any issues?

11         MR. LEVINE:  Yes.  Yes, you can.  The only thing is I

12  believe were the interrogatories sent?  They were.  They were.

13  So both the interrogatories as well as the response was sent to

14  L3Harris's counsel, so long as that was not forwarded to

15  L3Harris or Azimuth itself.

16         THE COURT:  Hold on.  Hold on.  Everybody hold on.

17  This is why I don't like phone conferences.

18         Ms. Bina, go ahead.

19         MS. STEBBINS BINA:  Thank you, Your Honor.  So what I

20  was going to say is Azimuth is not an ordinary customer of

21  Corellium.  So after this motion was fully briefed, Corellium

22  provided us with the Azimuth sub-distributor agreement that it

23  has with Azimuth.  And so this is not in the record but it --

24  this is Corellium-004772 and I'm quoting from Page 000003.

25         MR. LEVINE:  This is Justin Levine, I'm very sorry to

1  interrupt.  If there's going to be any attorneys' eyes only or

2  confidential information, while it can be shared with counsel

3  for Harris, I would like to make the Court aware that -- I don't

4  know if the recording is going and if the Court can make any

5  necessary accommodation to the currently ongoing record.

6  THE COURT:  Well, here's the situation.  Okay?  The

7  recording is going because this is a public proceeding.  So what

8  I'm going to do -- I don't want all these interruptions.  What

9  I'm going to do, Ms. Bina, is make your argument.  If you have

10  to refer to something that is not -- you believe is not going to

11  be in the public record, don't make the argument.  And if

12  necessary, later, if there's a sufficient showing, then we can

13  have some argument on a sealed record.  But you can refer me to

14  what you're talking about if it's in the record and I can look

15  at it later.  But just let's make the argument.  I mean, counsel

16  for L3 Azimuth was able to make their whole argument without

17  having to get into a back and forth about sealed or confidential

18  documents, so I would like you to try and do the same.  And if

19  you can't, then before you start saying something that should be

20  sealed, explain to me why you can't.

21  So let's see if we can deal with these two issues which

22  are redacting employee names of Azimuth L3 and withholding names

23  of two customers that Azimuth has resold the Corellium Apple

24  product to.

25  Go ahead, Ms. Bina.

1          MS. STEBBINS BINA:  Thank you, Your Honor.  And I'm

2     going to speak in broad generalities and refer you to the

3     specifics in our brief.  I think that will be the easiest way to

4     address it.

5          So Azimuth is not an ordinary customer of Corellium.

6     They account for a very substantial percentage of Corellium's

7     revenues, and they have a sub-distributor agreement with them.

8     They are engaged in actively and affirmatively marketing the

9     Corellium Apple product to third parties which places them in a

10    very unique position, different from other Corellium customers,

11    substantially different because most of the other Corellium

12    customers -- to our understanding, Azimuth is the only reseller

13    of the Corellium Apple product.  So they are actively engaged in

14    marketing this product, in selling it.  They tested it out to

15    use for others, which means that they are most likely, under our

16    complaint, a contributory infringer, and they are most likely

17    engaged in trafficking in the circumvention of the Corellium

18    Apple product and -- sorry, trafficking in the tools of

19    circumvention and furthering Corellium's trafficking of the

20    tools of circumvention.  They are also, according to Corellium's

21    own expert, critically important to the evaluation of the Fair

22    Use defense.  So Your Honor, I would submit that we have

23    submitted and demonstrated a very strong need for this

24    discovery.

25          If you would refer, Your Honor, to Exhibit 1 of our

1    opposition which is the -- which is Corellium's discovery

2    responses, if you look at their answer to Interrogatory Number

3    9, that details the economic relationship with Azimuth.  And one

4    of the issues here, Your Honor, is that Azimuth reports paying

5    Corellium substantially less than Corellium reports receiving

6    from Azimuth.  I don't know which figure is correct, Your Honor,

7    but in either instance, and especially if you credit the

8    Corellium figures, it's a very substantial relationship.

9            THE COURT:  Let me ask you a question if I could, Ms.

10   Bina.

11           MS. STEBBINS BINA:  Sure.

12           THE COURT:  You indicate that the relevancy of this

13   information, which are the employee names of Azimuth L3 and the

14   names of the two customers that Azimuth has resold the Corellium

15   Apple product to, you say it's relevant because -- and you have

16   a strong need for it because Azimuth is the only reseller of the

17   Corellium Apple product, and you say that Azimuth is a

18   contributory infringer and is furthering Corellium's

19   trafficking.  Can you explain a little bit about how you're

20   doing that and if that's the case, why Azimuth is not a party to

21   the lawsuit?

22           MS. STEBBINS BINA:  Well Your Honor, in part

23   Azimuth is not a party to the lawsuit because we learned that

24   they were a reseller of the product after the time to amend had

25   nearly run, and in part because we don't know what their role

1    is.  It's Corellium that is contributing to Azimuth's

2    infringement.  I may have misspoke there.  In other words, we

3    have a contributory infringement claim against Corellium and

4    therefore, to the extent that Corellium is enabling others to

5    infringe, that is part and parcel of our claim against

6    Corellium.  Whether or not we join Azimuth in the lawsuit, you

7    know, we don't know yet what Azimuth's role is here.  We don't

8    know whether they're innocent or intentional.  We don't know

9    what representations Corellium made to them about the product or

10   about permissions from Apple or any of those things.  So our

11   claim is against Corellium.

12          But one of our arguments is that Corellium is

13   contributing to other's infringing Apple's work by providing

14   them a product that enables them to infringe those works

15   directly and indirectly through the unauthorized display and

16   copying, and also through under Section 1201, circumventing

17   Apple's technical protection measures.  So there's a direct

18   relationship between what Azimuth is doing and our claims, our

19   affirmative claims in this case, particularly our claim for

20   contributory infringement.

21          There is also the question of Corellium's defense,

22   right?  Corellium is arguing substantially and with great effort

23   that many of the reasons that it believes its infringement is

24   okay is that it believes that it's engaged in fair use, and one

25   of the linchpins of its fair use argument as outlined in the

37

1    Stamos expert report is its assertion that it's -- it is selling

2    to good people, including Azimuth, who they claim sells to good

3    government.  Well, we have no way to test that presumption, that

4    assertion without discovery from Azimuth, and Azimuth is

5    attempting to withhold the very information that Corellium's

6    expert is relying on, which is that Azimuth sells to good

7    entities essentially.

8         So on the one hand, we have Mr. Stamos in an expert

9    report saying this is fair use because Azimuth sells to good

10   government, and on the other hand we have Azimuth saying we

11   can't possibly tell you who we sell to.  And that puts us in a

12   difficult position because we have no way to evaluate or respond

13   to Mr. Stamos' argument.

14        THE COURT:  Let me ask you a question.  Let me ask you

15   a question.  How is Apple prejudiced if Apple knows that

16   Azimuth's two customers are government agencies, but does not

17   know the specific names of those two agencies?

18        MS. STEBBINS BINA:  Well Your Honor, for a number of

19   reasons.  One is that agencies have -- government agencies have

20   different approaches to security and to privacy.  So for

21   instance, you know, the United States has a government that is

22   probably more protective of user privacy than many others.

23   Europe in turn has -- many European countries have greater

24   individual privacy rights, but also a greater allowance for

25   government to intrude on those privacy rights.  Countries like

1    Singapore, in turn, have a stronger national -- stronger view of

2    the national interest in intruding in its private citizen rights

3    and, you know, countries like China have a very different view

4    as well in terms of what is acceptable and that at what point

5    it's permissible essentially for government to hack its own

6    citizens' work.

7         And one of the issues here is, you know, in some of the

8    other expert reports that Corellium filed or -- I'm sorry,

9    Corellium served, you know Corellium is taking the view that

10   essentially forcibly opening up Apple's copyrighted works and

11   allowing people to tinker with display, et cetera, creates a

12   public good because it's making the world a more secure place.

13   Some governments may be using Corellium's technology to hack

14   their own citizens.  They may be using them to hack American

15   citizens.  We don't know.  But different governments are

16   differently situated, and I think juries, amongst others, would

17   view provisions to one government entity substantially different

18   from another.  You know, it's different if it's the United

19   States versus Australia versus China.  I don't think just

20   knowing they're government agencies is sufficient.

21         THE COURT:  So let me just follow up on that.  So how

22   would knowing the names of the two government agencies who

23   purchased the Corellium Apple product from Azimuth, how would

24   that tell you whether or not China is using the Corellium Apple

25   product in an improper or not a fair use manner, for example?

1          MS. STEBBINS BINA:  Well, so for instance, Your Honor,

2     I think part of this, again, is to counter their own arguments,

3     right.  They're saying that this is an affirmative public good

4     and that provision to these governments is an affirmative public

5     good.  And so for instance, if one of the customers is China, I

6     think that a lot of people would be quite skeptical over whether

7     provision of this technology to the Chinese government is an

8     affirmative public good, and that's something that our experts

9     could comment on.  If it's someone in the middle, you know, or

10    someone who has -- you know, our view frankly is that no foreign

11    government should be using technology to hack the iPhones of

12    American citizens, but I think that is something our experts

13    could comment on; you know, does this government in particular

14    have a reputation for security, do they have a reputation for

15    intruding on user's privacy.  You know, how secure is the

16    Government.  Is it somewhere where we believe -- you know,

17    because part of what they're saying is that this is a controlled

18    product, and part of what we're saying is when you create a tool

19    like this, you're opening it to the world.  And so knowing

20    specifically who it's gone to is a very important part of

21    evaluating that claim.

22          THE COURT:  So let me ask you, how would knowing the

23    names of the two government agencies tell you that, where it

24    went to?  In other words, whether it went to China or any other

25    country?

 1          MS. STEBBINS BINA:  Well Your Honor, it would tell us

 2     which two countries specifically Azimuth gave it to.  You know,

 3     we have -- our understanding is that they're not the United

 4     States government.  It may be that they are, but our

 5     understanding that it's two foreign government agencies, so that

 6     would at least tell us the two countries that the product has

 7     gone to.

 8          THE COURT:  All right.  Go ahead.

 9          MS. STEBBINS BINA:  So turning to the issue of trade

10     secrets, Your Honor, I don't believe they've met their burden

11     here to demonstrate that the provision of these two customer

12     entities is something that, you know, would somehow

13     independently damage the value of Azimuth.  There is an

14     attorneys' eyes only protective order in place here.  Counsel

15     for L3Harris said well, this information would go to Apple and

16     be on Apple's computers.  That's not correct.  You know, Apple

17     is -- our attorneys' eyes only order is outside counsel only.

18     It is secure, Your Honor.  We comply with the protective order.

19     I don't have any reason to believe that any information in this

20     case is going to be produced outside of the protective order.

21     So I think -- and again, this happens all the time, including in

22     instances where there actually is even US Government

23     information, and we cited some of those cases in our opposition

24     papers.  But simply because something implicates a trade secret

25     doesn't mean that it's immune from discovery, particularly when

1    there's a robust protective order that every party in the case

2    can be relied upon to comply with.

3          THE COURT:  Let me ask you a question.  If I could --

4    if I could just ask you a question.  What if Corellium was

5    precluded from arguing that its fair use defense includes use by

6    government agencies to do good?  In other words --

7          MS. STEBBINS BINA:  Well, I think that would certainly

8    reduce our need for this information.  But that's in three of

9    their four expert reports.  It's a pillar of their claim.

10         THE COURT:  Because then I'll hear from the other

11   parties, but one of the concerns I have is allowing one side

12   such as Corellium to argue our fair use defense involves

13   providing this product to government agencies who further the

14   social good, the betterment of society, and then precluding the

15   other side, Apple, from knowing who the government agencies are

16   it was provided to, who those were, so that Apple can make its

17   own argument as to whether or not that does in fact further the

18   public good.  So I'm a little concerned about that.

19         And there are several ways to skin that cat.  One is

20   the information gets produced; another is that Corellium is

21   precluded from relying on its fair use defense to the extent

22   that it argues that government agencies utilize this product for

23   the public good.  Those are two ways that are possible, and I

24   just want the parties to discuss those issues because again, I

25   want to be fair to all sides in this case and I want to make

1   sure that number one, that Corellium gets the discovery it

2   needs, that Apple gets the discovery it needs, and then I also

3   want to take whatever steps I need to do to protect a nonparty

4   such as L3Harris or Azimuth.

5          So go ahead, Ms. Bina.

6          MS. STEBBINS BINA:  Thank you, Your Honor.  And Your

7   Honor, I think if that theory of Corellium's were precluded, we

8   might not then need to know the names of the end users because

9   the purposes of our case, you know, the names of the end users

10  in particular as opposed to just the fact that there are end

11  users is most critical to evaluating this "we're using our

12  product for good on the government agencies" issue.

13         I want to address briefly again the employees issue.

14  Your Honor, we believe that those are fact witnesses, they are

15  people who have affirmatively, you know, acted with the

16  Corellium Apple product.  They are people who have used it, who

17  have potentially used it to display and copy iOS.  Several of

18  them have already been identified to us by Corellium.  I have

19  the names of at least three or four Azimuth employees from

20  Corellium's documents.  I don't see a basis for withholding the

21  names of persons who addressed the Corellium Apple product

22  specifically.  I don't think that that is a trade secret or

23  frankly, there's not been any showing in anything other than the

24  most conclusory of statements that there's any harm from

25  identifying under an AEO protective order the names of the

1   Azimuth employees who specifically dealt with and used this

2   product.

3        Again, you know, our understanding is that the

4   relationship between Corellium and Azimuth is extensive.  There

5   are over 100 entries on Corellium's privilege log addressing

6   communications between the two, and I do think we're going to

7   need to know the names of those employees in order to continue

8   discovery in this case.

9        THE COURT:  All right.  Anything else you wanted to

10  add, Ms. Bina, on those first two issues?

11       MS. STEBBINS BINA:  No, Your Honor.

12       THE COURT:  Thank you.  So let me go ahead now and turn

13  to counsel for Corellium.

14       MR. LEVINE:  Thank you, Your Honor.

15       Just going through my notes here.  There were a lot of

16  points addressed.

17       So as it relates to the identity of L3 employees, I

18  just wanted to add one additional point.  Mr. Taormina, on

19  behalf of L3, raised a number of issues of why raising those

20  employees such as their international travel and their safety is

21  an issue.  And just one additional point is that foreign

22  entities and foreign agencies that come within the information

23  of names of government agents and assets can employ recruitment

24  efforts as well to those entities, and if these products at

25  issue are being used for that, then that's certainly an

1    additional concern as to the other three or four that

2    Mr. Taormina raised.

3          I wanted to also reiterate that -- Mr. Taormina's

4    argument that, again, this is a copyright action, and merely if

5    -- and I'm not saying it is; in fact, we strongly deny that it

6    is, but even if there was any copyright issue in place, that

7    does not eviscerate other party's privileges.  So that's

8    something that I think is well-taken and should be reiterated.

9          THE COURT:  All right.  Let me ask you a question while

10   you're looking at your notes.  Corellium has joined in and

11   adopted the argument of L3Harris Azimuth.  And the argument as

12   to nonproduction of the names of the customers of Azimuth, who

13   are two government agencies it appears, you've adopted that

14   argument.

15         Why is it fair for the Court to allow Corellium to

16   assert a fair use argument which argues that you have -- as part

17   of your fair use argument, that this product, the Corellium

18   Apple product, is sold to government agencies who further the

19   public good, and at the same time you want to prevent Apple from

20   finding out who these government agencies are to investigate its

21   own self as to whether or not that's a true assertion.  Doesn't

22   that seem to be a sword and a shield issue there?

23         MR. LEVINE:  No, Your Honor.  And I'm very familiar

24   with the Sword and Shield Doctrine.  No.

25         So point number one, Corellium sells this product --

1    let me -- I've considered this argument before, and I think an

2    analogy with Home Depot is something that I tend to come back

3    to.  If you have a hammer manufacturer LLC and they manufacturer

4    hammers and they sell those hammers to Home Depot, and now there

5    is an issue about the design or the trademark of those hammers

6    and the relationship between the hammer manufacturer and Home

7    Depot, that case would be about the design manufacture of the

8    hammer.  And Home Depot would be Azimuth in this case, and the

9    manufacturer would be Corellium in this case.

10       Now, the hammer manufacturer sells those hammers to

11   Home Depot for one purpose and one purpose only, to resell to

12   its customers to bang nails into wood.  Now, if one of the other

13   customers were to buy a hammer and commit a crime with it, then

14   that's something that's used outside of the intended use and

15   what the product was actually designed for.

16       So this case, though, is not about that.  There's no

17   claims about what the end users are doing.  There's no

18   allegations that anything was used that was wrong.  The only

19   allegation that is at issue here is whether there was

20   copyrighted code or copyrighted elements in the design and

21   production of the Corellium Apple product.  And so therefore,

22   the fair use only extends to the Home Depot, if you will.  It's

23   only the intent of the product.  So that's one aspect.

24       THE COURT:  Hold on.  Hold on right there for a second.

25   But your fair use defense is specifically not saying that.  Your

 1    fair use defense is specifically saying that the people who are

 2    purchasing it from Azimuth are government agencies doing the

 3    public good.  So you're going far beyond saying that your sale

 4    to Home Depot is in the public good.  You're saying that the

 5    people who are purchasing it from Home Depot are also in the

 6    public good.

 7              MR. LEVINE:  No, Your Honor.  I don't think it goes

 8    that far.  So the sale is in the public good.  The sale is for

 9    the -- the sale to Azimuth is for the resale to its customers

10    for security reasons.  There can be no denial in this case

11    whatsoever that this product was built, designed and is being

12    sold and has only been sold for security, research and testing

13    and so it's that -- that's the fair use.  The fair use is the

14    security, research and testing, and that's what the public good

15    is for.

16              Now, if that product is ultimately used on the back end

17    for some unintended purpose that Corellium has no control over

18    at all, same thing with a car, a car can be used as a deadly

19    weapon.  That doesn't mean that a fair use argument wouldn't

20    apply.  The car manufacturer is still selling it as it is

21    intended.  And so same thing here.

22              THE COURT:  So wait, Mr. Levine, let me just ask you a

23    question.  Do you intend to argue to the jury that Azimuth's

24    resale of this product was to good actors, government agencies,

25    who only used it for the public good?

1          MR. LEVINE:  I don't know if that far downstream is

2     relevant to this case, Your Honor, and I think that's the point.

3          THE COURT:  Well, what are you going to argue though?

4     Because don't your expert reports say that?

5          MR. LEVINE:  The end use is security, research and

6     testing, and that is what Corellium has designated and designed

7     this product for.  That is what the end use and that is for a

8     public good.

9          THE COURT:  Okay.  And so if you've resold it to

10    Azimuth and -- just arguing and playing this issue out, and I'm

11    not adopting one side or the other, but if Azimuth then takes

12    that product and sells it to a government agency that is doing

13    harm or is not using it in a proper manner, and yet you're

14    arguing that this is totally for the public good and you are the

15    one asserting the fair use defense, you're the one bringing this

16    issue to the fore.  You're saying on behalf of Corellium that

17    this is all done for security research, all in the public good,

18    and you're going to rely on the fact that it's only sold to

19    government agencies, that Azimuth only sells it to two

20    government agencies.  What if one of those government agencies

21    is not using it in the public good?  Doesn't Apple have the

22    right to investigate that and respond to your fair use defense

23    in that regard?

24          MR. LEVINE:  So inherently in that question, Your

25    Honor, I think outlies the absurdity of trying to seek this

1    information.  To suggest that a government agency is using an

2    app testing technology for harm to its citizens, it's just a

3    nonstarter here.

4              THE COURT:  What about China?  What about a country

5    like China?  You don't think that's a possibility?

6              MR. LEVINE:  No, Your Honor.  The attorney for L3Harris

7    has already stated that its customers are Five Eyes customers.

8    If I know correctly, that is Australia, the United States,

9    Britain, France and I think -- oh, and Canada, and that's it.

10   You know, this would be akin to saying Lockheed Martin is

11   selling secret technology to China and again it's just -- it

12   really illustrates the absurdity of this request.

13             THE COURT:  All right.  So your position -- let me just

14   -- and I'm trying to clarify this because we have to move on.

15   Your position is that the only five countries that Azimuth would

16   have resold this to would be Australia, the United States,

17   Britain, France or Canada and that none of them could possibly

18   be bad actors.

19             MR. LEVINE:  I don't know about that because I am not

20   privy to the knowledge of who these customers are.  However, and

21   I don't want to speak on behalf of L3Harris' counsel, but I

22   would suggest that maybe a middle ground here is that they could

23   provide an affidavit that these customers are good actors and

24   that they would not inherently be selling to bad actors.  That

25   would be against their entire business interest to do something

1    like that.

2         The other thing -- well, I'm sorry.  So, I mean, I

3    think those are the points that really outline this entire

4    thing.  You know, L3 has already stated who its customers are.

5    I think it's very, very clear what this product was designed and

6    is being used for.  I think there's no question that it's being

7    used for positive public benefit.

8         And then to suggest that we're selling to an entity

9    that would be doing harm to our citizens or a very close ally

10   such as Canada, I think, again belies the absurdity.

11        THE COURT:  All right.  Anything else, Mr. Levine?

12        MR. LEVINE:  A couple things, yes, Your Honor.  We kind

13   of jumped down the list here.  You know, Apple has -- you know,

14   the thing is is that it's Corellium's fair use defense that is

15   at the center of the supposed need of this information, but

16   Corellium doesn't even need to rely on this information for its

17   defense.  There's an entire list, of my understanding, of 22

18   customers, all of which who have been deemed good customers that

19   Corellium can use to establish its defense.  Azimuth itself is

20   its direct customer, and Azimuth itself, and that is who we sell

21   the product to, is a good entity.

22        THE COURT:  Let me ask you a question then.  If I could

23   ask you a question.  Will Corellium agree and stipulate that it

24   will not rely on this information to establish or prove its fair

25   use affirmative defense?

1          MR. LEVINE:  So I have to confer about that with my

2     client Your Honor -- or yes, with my clients, Your Honor.  If

3     you can give me one minute.

4          THE COURT:  Sure.  Actually, we'll probably take a

5     break in a little while and you can certainly discuss that.  I

6     don't want to rush you but, I mean, it may, and I'm not saying

7     it will, but it may resolve the issue.  If Corellium agrees to

8     not rely on that information to establish its fair use defense,

9     that may or may not resolve the issue or help to resolve the

10    issue.  So I'll just leave that as an open matter.  So you can

11    go ahead, Mr. Levine.

12          MR. LEVINE:  I'm just reviewing my notes.  Bear with me

13    one second.  That may be the end.  I think that's it, Your

14    Honor.

15          THE COURT:  Okay.  Thank you.

16          So let me go back to L3Harris, Azimuth's counsel,

17    Mr. Taormina.  And if you'd like to just briefly respond to some

18    of the arguments that were made.

19          MR. TAORMINA:  Yes.  Thank you, Your Honor.  The very

20    first important point to note is that Azimuth has not disclosed

21    its customers to anybody.  The suggestion that there are these

22    media outlets that reported and have speculated on who their

23    customers are, none of that has been confirmed by any government

24    and none of that was confirmed by Azimuth.

25          And the suggestion and Ms. Bina's reliance upon a

1    PowerPoint that -- allegedly by Corellium that allegedly

2    identified Azimuth's customers was also not correct, and my

3    understanding is that Corellium will explain that Azimuth never

4    told them who their customers are.  Corellium does not know who

5    Azimuth's customers are.

6          Another important point is that Ms. Bina relied on

7    Corellium's interrogatories for the value of the amount received

8    from Azimuth to Corellium, and my understanding is that

9    Corellium has since clarified that issue with Apple and that

10   they have -- I think their exact words were that they -- it just

11   wasn't -- perfectly worded, but it suggested that the revenue

12   from Azimuth was way more than it actually is.  As we stated

13   before, there are only two customers, these governmental

14   agencies.  And the amount of money that Azimuth sold them for

15   was around a million dollars.

16         Ms. Bina also didn't address the need -- first of all,

17   we don't think that they've established the need for this

18   information, and L3 and Azimuth have explained that we provided

19   general descriptions of these customers.  You know, if it's

20   issues *(unintelligible)*, we provided a general description, and

21   Mr. Levine is accurate that our only customers are governmental

22   agencies from the Five Eyes countries which is US, Canada,

23   Australia, the UK and New Zealand,

24         THE COURT:  Hold on one second.  Hold on just one

25   second.  The Five Eyes countries you referred to are Australia,

1    the United States, the United Kingdom, New Zealand and Canada?

2         MR. TAORMINA:  That's correct, Your Honor.  The two

3    customers in there are customers from two of those five

4    countries.

5         And I think the final two points are that the Corellium

6    Apple product -- and just to clarify that we *(unintelligible)*

7    about a million dollars in sales of the Corellium Apple product

8    as opposed to, I think, the $20 million number in the

9    interrogatories.  But if Corellium needs to correct that, I will

10   let them do that, but that's just one issue that Ms. Bina relied

11   on that's incorrect.

12        THE COURT:  I thought in reading the joint notice, that

13   issue had been clarified and resolved.  But go ahead.

14        MR. TAORMINA:  That's correct, Your Honor.  And the

15   Corellium Apple product is a real small fraction of Azimuth's

16   business with these Five Eyes countries, and forcing the

17   disclosure of their customers and their employees would cause

18   serious collateral damage to all of its other businesses which

19   has to be taken into consideration when the Court balances the

20   need that, again, Apple never raises in its papers versus the

21   interest in keeping the trade secret protected.

22        And again, this just all ignores the fact that these

23   customer lists are protected by trade secrets.  The affidavit

24   and the declaration covers what was sufficient in *Fadalla* to

25   establish that they are trade secret, and Apple has not -- not

1    only have they not satisfied their obligation or even argued in

2    their papers substantial need, they also never addressed the

3    fact that they would have to reasonably compensate Azimuth for

4    the forced disclosure of their trade secret.

5              Thank you, Your Honor.

6              THE COURT:  All right.  Thank you.

7              Ms. Bina, I'll go back to you for any brief rebuttal.

8              MS. STEBBINS BINA:  Very brief, Your Honor.  One, I

9    just want to note something counsel just said.  The agreement

10   was about the future revenues.  In other words, counsel for

11   Corellium clarified that their response had not been intended to

12   state future revenues from Azimuth, but there is a current

13   discrepancy between what Azimuth reports as revenue they have

14   paid to Corellium and what Corellium reports as revenues they

15   have actually received from Azimuth, and that's a fairly

16   substantive -- it's off by an order of magnitude.  So there is

17   still a difference of opinion between how much these two

18   entities have paid one another.

19             Two brief comments.  One, and I don't want to get into

20   the geopolitical issues, but it's not conceded in the world that

21   the Five Eyes is a uniform good.  If anybody remembers, you

22   know, seven, eight years ago, there was a big issue with Edward

23   Snowden showing that this guy had been spying on American

24   citizens and providing information indirectly.  So I just want

25   to say that these issues are complicated, and I don't think we

1  can assume that just because there are certain governments at

2  issue, it's undisputed that everything those governments do is

3  good.

4       In terms of the trade secrets, you know, again, I go

5  back to we're not looking for their entire customer list.  The

6  authority that they cite talks about when the list itself has

7  independent economic value or when you're looking for customer

8  strategies or things of that nature.  We're only asking for

9  people who bought one product, and we're asking for it because

10  it is the linchpin of Corellium's defense and I don't -- you

11  know, we have three expert reports that are all about how

12  they're making a public good, because government agencies are

13  using this product.  Corellium doesn't have those agencies as

14  its customers, so presumably this is all coming vis-a-vis

15  Azimuth, and I don't know how we're supposed to defend ourselves

16  against that claim without this information.

17       THE COURT:  All right.  Thank you.

18       So let me finally go to Mr. Levine.  Any brief

19  rebuttal?

20       MR. LEVINE:  Very brief, Your Honor.  Again, I'll have

21  to confer with my client, but I think that we would be able to

22  stipulate that we do not need to know very limitedly the

23  identities of Azimuth's customers.  We do not currently know

24  those identities, and I do not think that those two items of

25  information are critical to our defense.  The fact that they are

1   government or Five Eyes, I think, is very important because it

2   does go to show that these are allies of the country.

3         THE COURT:  Well, wait a minute.  Wait a minute.  Hold

4   on just a second.  If your position is that you are going to

5   argue that you have a fair use because the Corellium Apple

6   product was resold by Azimuth to a government agency of one of

7   these five countries, then I'm more inclined to require

8   production of the government agencies.  If your stipulation is

9   that you will not rely in your fair use defense in any way that

10  Azimuth resold this Corellium Apple product to a government

11  agency, then I'm more inclined to sustain the objection.  So I

12  think you need to speak with Azimuth's counsel and your client

13  and decide how you wish to respond to that, because I don't --

14  and I'm not deciding this, it's a very thorny issue, but I don't

15  think that your client, Corellium, can have it both ways.  I

16  don't think you can get up and argue that you have a fair use

17  defense which includes reliance on Azimuth selling to good

18  actors, when you then preclude Apple from finding out who those

19  alleged good actors were and investigating that.  I'm concerned

20  about the fairness here to both sides.  I'm not saying I'm

21  deciding the issue, but I think it would be something that you

22  may wish to consider on behalf of Corellium that your fair use

23  defense can include whatever it wants to include, except

24  reliance on resale by Azimuth to good actor government agencies.

25        So you can think about that, you can think about that

1    and decide how you want to respond, but it's one of the factors

2    that I'm taking into account because it does seem to me that

3    Corellium wants to have its cake and eat it too.

4            MR. LEVINE:  I understand your point, Your Honor.  I

5    would just add in brief rebuttal that, you know, I think that

6    could be an issue for the jury, that the defense would be that

7    the product has been resold to certain Five Eyes nations and

8    that the jury can determine whether that grouping of nations can

9    be held accountable for good or bad.  As Ms. Bina just raised an

10   argument, that would be the other side.  So again, I would

11   propose that I do not think -- and certainly in light of the

12   current sensitivities here as well as the trade secrets, that

13   again, I would reiterate are not eviscerated nearly by an

14   allegation of copyright infringement in light of the trade

15   secrets here, that merely the identities do not need to be

16   disclosed.

17           And I do not think that this is Corellium having its

18   cake and eating it too.  I think we can just rely on that Five

19   Eyes nations are customers, and it goes there and the parties

20   can make their arguments.

21           There's a couple other brief points, but I will confer

22   with my clients and counsel for L3Harris on that point and

23   inform the Court of the direction.

24           THE COURT:  All right.  Thank you.

25           MR. LEVINE:  Just a couple of other brief points.  A

1    PowerPoint presentation was raised earlier on.  The customers

2    and identities of these were not raised in that PowerPoint, and

3    there were some entities raised, but they were other entities

4    that were related and just don't have anything to do with this

5    issue.  So I just don't think that's a point here.  I wanted to

6    confirm again that Corellium does not know the identities of

7    Azimuth's customers.

8         And another minor point.  Apple who has been relying

9    almost every step along the way throughout its briefings and

10   papers on numerous different *Vice* articles, and Ms. Bina raised

11   it here on the record.  And I just wanted to point it out for

12   the Court's context and consideration that it's our

13   understanding that these *Vice* articles have all been written by

14   the same gentleman.  And in fact, recently as it relates to the

15   subpoenas going into the media, again, it's our understanding

16   that the media reporter also reached out to Apple and Apple's

17   counsel and they just simply declined to comment.

18        We think that more substantively though, we think that

19   Apple is trying to expand the copyright nature of this case in

20   both this issue as well as entirely in discovery, and we'll get

21   into some of that later on as some of the issues play here.  But

22   many of the issues here appear to be closer to trade secret

23   marks as well as just, you know, just general expansion of the

24   law and go well beyond the copyright issue and again, the fair

25   use, because the fair use goes to the public good.  And I just

1    don't think that the purpose and intent of this product can

2    really be disputed here.

3           That's it, Your Honor.  Thank you.

4           THE COURT:  All right.  Thank you.  So here's what

5    we're going to do.  We're going to take a break now.  It's

6    almost 12, it's 11:42.  I think we'll take a lunch break until

7    1:00, and then we'll pick up with the phone hearing at 1 p.m.

8    Mr. Levine, that will give you a chance to discuss that issue

9    with your client and with Azimuth's counsel if you wish to, and

10   with Apple's counsel if you wish to.  We'll come back and we'll

11   hear any other argument that I need to hear on this motion to

12   quash, and then we'll move on to some of the other issues.  All

13   right?

14          So before we break, anything else that I need to hear

15   before we take a lunch break from counsel for Azimuth?  Or L3?

16          MR. TAORMINA:  No, sir.

17          THE COURT:  What about Apple?  Counsel for Apple?

18          MS. STEBBINS BINA:  Just a logistical question, Your

19   Honor.  Should we hang up and dial back in ten minutes before 1,

20   or keep the line open and on mute?

21          THE COURT:  No, call in at ten minutes before 1,

22   please.

23          MS. STEBBINS BINA:  Thank you, Your Honor.

24          THE COURT:  All right.  Anything on behalf of counsel

25   for Corellium?

1          MR. LEVINE:  No, Your Honor.  Thank you.

2          THE COURT:  All right.  Thank you.  I'll be back at

3    1:00.  Please call in about five to ten minutes before the

4    hearing.  Have a good lunch.

5          MS. STEBBINS BINA:  Thank you, Your Honor.

6          MR. TAORMINA:  Thank you.

7          THE COURT:  All right.  Good afternoon, everybody.  And

8    we're back here in the Apple versus Corellium matter, case

9    number 19-81160-CV-Judge Smith, Judge Matthewman.

10          Let's see if we have everybody on the line.  Now for

11   the Plaintiff, Apple, do we have Ms. Bina, Mr. Gross and Ms.

12   Pincow?

13          MS. STEBBINS BINA:  Your Honor, you have Ms. Bina and

14   Ms. Pincow.  Mr. Gross had another urgent matter he had to

15   attend to, so it will just be us for the rest of the afternoon.

16          THE COURT:  All right.  So that's fine.  For Plaintiff

17   Apple, we have on the phone Ms. Bina and Ms. Pincow, correct?

18          MS. STEBBINS BINA:  Yes, Your Honor.

19          THE COURT:  Great.  Okay.

20          Now for the Defendant, Corellium, do we have

21   Mr. Levine, Ms. Constantine, Ms. Gorton, Mr. Wade and

22   Mr. Delgado?

23          MR. LEVINE:  Yes, Your Honor.

24          THE COURT:  Okay.  Great.  And then for L3Harris and

25   Azimuth, do we have Mr. Taormina and Mr. Jimenez?

```
 1              MR. TAORMINA:  Yes, we're here, Your Honor.
 2              THE COURT:  Great.  Okay.  So I think we had addressed
 3    several of the issues dealing with the motion to quash, and I
 4    know the parties were going to talk over the lunch break, and
 5    then I think there was another issue dealing with employees'
 6    identities who used the Corellium Apple product.  Azimuth says
 7    there are no such employees, and apparently Apple is seeking
 8    employees who dealt with customers and employees who used the
 9    product.
10              So let me just start out, I'll start out the way I
11    started out earlier to see if there are any more issues
12    regarding this motion to quash that need to be addressed by
13    L3Harris or Azimuth.  So I'll ask Mr. Taormina, anything else
14    that we need to address on this motion?
15              MR. TAORMINA:  Yes, Your Honor.  I'm not sure if you
16    wanted me to, you know, summarize -- have a couple of additional
17    points to the customer issue, but I'll let you respond to that
18    in a minute.  But I just want to say, additional issues that I
19    think we need to discuss are whether or not communications with
20    our customers would be discoverable; whether or not the
21    agreements with our customers would be discoverable, as well as
22    the necessity of depositions.  So I believe those three issues
23    are also outstanding.
24              THE COURT:  All right.  So according to you then, some
25    of the issues are communications with Azimuth's customers,
```

1    whether those are discoverable by this subpoena, whether any

2    agreements with Azimuth's customers are discoverable here, and

3    then whether a deposition needs to be taken or just documents,

4    correct?

5              MR. TAORMINA:  That's correct, sir.

6              THE COURT:  All right.  So let me turn to Ms. Bina on

7    behalf of Apple and hear what you have to say on any other

8    issues and anything else that needs to get resolved, or anything

9    else that was resolved over the lunch break.

10             MS. STEBBINS BINA:  I haven't spoken to anyone over the

11   lunch break so nothing resolved on my part.  I would agree that

12   the issues that counsel from L3Harris and Azimuth raised do need

13   to be addressed.

14             There was another point that I don't think is in

15   dispute, but I would appreciate counsel confirming, which is

16   communications between Azimuth and Corellium relating to the

17   Corellium Apple product.  To my understanding, I would like to

18   confirm L3Harris Azimuth will produce those.  The only issue is

19   whether they will redact employee names, but they will produce

20   those communications.  If that's not the case, then I think we

21   also need to address that.

22             THE COURT:  What communications were those?  Between

23   who?

24             MS. STEBBINS BINA:  Between Corellium and Azimuth and

25   L3Harris relating to the Corellium Apple product.  So separate

1    from the customer communications, this is between the Defendant

2    and the parties.

3          THE COURT:  All right.  So the first issue then

4    according to you would be communications with Azimuth's

5    customers, whether that's discoverable.  The second would be

6    agreements with Azimuth's customers, whether that's

7    discoverable.  The third would be the necessity of a deposition,

8    and then the fourth would be communications between Corellium

9    and Azimuth, L3Harris regarding the Corellium Apple product,

10   correct?

11         MS. STEBBINS BINA:  Yes.  And on the last, only to the

12   point that there's any disagreement with what I just said, which

13   I don't think there is, but I'm not positive.  So I'd like to

14   confirm that.

15         THE COURT:  All right.  That's fine.

16         And then let me turn then to counsel for Corellium.

17   Mr. Levine, any other issues or anything else you want to

18   address?

19         MR. LEVINE:  Yes, Your Honor.  Before we broke for

20   lunch, Your Honor asked myself to confer with my client and

21   potentially L3Harriss counsel regarding a stipulation.  I'd like

22   to lay out, I believe, the position we have been placed into for

23   the record.  We've been placed with a decision.  We either

24   provide confidential names or information that's not really up

25   to us to provide, or that information is either provided, or on

1    the other hand, Corellium is forced to be prejudiced as to one

2    of its defenses.  And I think that's a poor position that my

3    client has now been placed into.  Corellium is willing to prove

4    this case on the information that it currently has, and that

5    information is that the -- you know, the customers of Azimuth

6    are Five Eyes.  What it appears is that what's happening with

7    this decision now is that it seems to have almost a functional

8    equivalent of a motion in limine whereas, you know, if all of

9    the trade secret and the other arguments are simply going to be

10    discarded, or -- not discarded, and the information is not

11    provided, then Corellium will be precluded from raising this

12    aspect of its fair use argument, and I think that is extremely

13    prejudicial and again, I think it's having the functional

14    equivalent of a motion in limine.

15          THE COURT:  I think that -- Mr. Levine, I think you've

16    jumped the gun.  I asked you to inquire and I told you there had

17    been no decision made.  So I understand if you want to try and

18    --

19          MR. LEVINE:  Okay.  My apologies.

20          THE COURT:  I understand if you want to try and make

21    some record here on the record, but it's not advancing the ball

22    at all because I simply asked you to inquire to see if you would

23    stipulate or not.  I'm gathering from what your response is that

24    you're not stipulating, and you don't have to stipulate.  I will

25    rule and make a decision that's appropriate under the law.

1          So anything else you want to add?

2          MR. LEVINE:  Understood.  And please take my sincerest

3     apologies, Your Honor.  I did not mean to jump the gun and maybe

4     I was misunderstood.  So in light of that, then yes, I don't

5     think I can recommend to my clients to stipulate to have any of

6     their defenses limited at this time, Your Honor.

7          THE COURT:  Okay.  That's fine.  Any other issues that

8     you believe other than the ones that have been addressed by

9     counsel for L3Harris, Azimuth and Apple that need to be

10    addressed on just this motion?

11         MR. LEVINE:  No, Your Honor.  I think we recognize that

12    the four items that Ms. Bina laid out are issues that still need

13    to be addressed.  One proposal, and again maybe this is just for

14    the record or for Your Honor's consideration, one proposal as it

15    relates to the first issue that we were talking about that I

16    think I may still be jumping the gun is that to preclude the

17    identity of the two clients; however, recommend that it could be

18    said that two of them are at least within the Five Eyes and to

19    treat all Five Eyes as one of the -- as the clients.  And so if

20    something would apply to two of them, it would apply to all.

21    And I think that's actually a middle ground that would be giving

22    Apple even more information than it's looking for without

23    actually having to disclose specific information, while

24    simultaneously not precluding or limiting any of Corellium's

25    defense.

1              And with that, I'll sit down.  Thank you, Your Honor.

2              THE COURT:  All right.  What you're saying is that

3     basically one of the customers is the government agency of one

4     of the five countries?

5              MR. LEVINE:  Well, that both of the customers -- both

6     of the customers would be an agency from one of the five.  And

7     we could effectively stipulate that, you know, if you say

8     Customer Number 2, that that would have the equivalent

9     application to any of the five.  So it would -- yeah, okay.

10             Thank you, Your Honor.

11             THE COURT:  All right.  I understand.  Thank you.  All

12    right.

13             So let's go back then on these four issues and I think

14    we'll take them all at the same time.

15             So Mr. Taormina, could you address your position

16    briefly on those four issues?

17             MR. JIMENEZ:  Your Honor, it's Adolfo Jimenez.  Before

18    I turn it over to Mr. Taormina, I just want to clarify a little

19    bit the proposal that we made while we were during the break

20    with counsel for Corellium.  What we are proposing is that

21    counsel for Apple would essentially be able to raise any issues

22    or defense that would be applicable to any government entity

23    from any of the five countries.  So it would essentially be

24    provided the opportunity to use any issues, any facts against

25    Corellium if they apply to any of the five countries.  That

1    would essentially provide Apple with a larger pool, if you will,

2    of arguments to make, whether they are the actual customers or

3    not, and still protect the identity of the actual two customers.

4              So I just wanted to clarify that point.

5              THE COURT:  All right.  Thank you Mr. Jimenez.  All

6    right.

7              And Mr. Taormina, now the four issues that we were

8    addressing, the first one is communications with Azimuth's

9    customers.  I know your position is that it's not discoverable.

10   Does Azimuth only have two customers or does Azimuth have a lot

11   of customers, or what are we talking about here?

12             MR. TAORMINA:  That's correct, Your Honor.  Only with

13   respect to Corellium Apple products, there are only two

14   customers.  So our position would be -- and so there are only

15   two agreements.  And so our position would be similar to what we

16   had already advanced that, you know, these are protected by

17   trade secrets and that they shouldn't be discoverable either.

18   And just -- I know you've heard exhaustively our position on it,

19   but I just wanted to highlight a couple short points if that's

20   all right with Your Honor.

21             THE COURT:  Sure.

22             MR. TAORMINA:  Which would be that there's been a lot

23   of talk about fairness and that, you know, it's only fair that

24   Apple gets to respond and properly develop its response to

25   Corellium's defense and at the same time, Corellium defendants

1  ask that they be allowed to put up and develop their defense.

2  But I think that fairness to Azimuth also has to be considered,

3  and the fairness includes that Azimuth is independent and not in

4  this fight, and it's an enumerated factor within relevant case

5  law in this circuit.

6         And in addition to that, the identities of who these

7  customers are is not important.  The who isn't important.  There

8  hasn't been a need demonstrated for the specific who or the

9  employees in reality.  We're going to produce documents that

10  show how much in sales there were, we're going to show when it

11  was sold and we're going to give general descriptions of these

12  government agencies from two of the Five Eyes countries which,

13  if the stipulation were as Mr. Jimenez just explained would

14  actually give Apple a broader chance to develop responses to

15  Corellium's defenses.

16         And my last point on the trade secrets is I just want

17  to read for Your Honor straight from Rule 45 that says that -

18  it's Rule 45 excuse me, B 3 C, and this is -- and it talks about

19  how in the circumstances described above which essentially

20  discuss what are trade secret, the court may, instead of

21  quashing or modifying a subpoena, order appearance or production

22  under specified conditions if the serving party, one:  Shows

23  substantial need for the testimony or material that cannot

24  otherwise be met without undue hardship and ensure that the

25  subpoenaed person will be reasonably compensated.  So I won't go

1    into it again that we don't think they've established need

2    without undue hardship, because I know you've heard that enough.

3    But they never addressed the ensure that the subpoenaed person

4    be reasonably compensated.

5        And I would also like to quote the Eleventh Circuit

6    case of *Clay V All Defendants*, and that's at 425 F.3.D. 977 and

7    that's the Eleventh Circuit from 2005.  And it specifically

8    discusses that this rule requires reasonable compensation for a

9    loss caused by the production of confidential material and

10   quote, if the enforcement of the subpoena under Rule 45 causes

11   no loss, then the amount of compensation reasonably would be

12   zero.  If the loss to the owner of the information is

13   substantial, then so is the amount of compensation, even if the

14   gain to the taker of the information is slight.

15       And I'd just like to emphasize again that I believe

16   Corellium's customers are a lot more than just Azimuth, and

17   Azimuth only has two governmental customers, and we'd provide

18   information that they're from these two of the five countries,

19   so there's a small lead there of these two limited customers,

20   but the collateral damage to Azimuth could potentially be the

21   entire company, it could be devastating.  And when you compare

22   that to the relevance of these two small customers that -- in

23   our position, that has not been an assertion of need.  It

24   certainly wasn't in their papers.  That the balancing act that

25   the Court must perform weighs in favor of Azimuth's interest in

1  not disclosing this confidential information as opposed to the

2  need.  But that's the first issue, the customer contracts and

3  communications.

4       Just to streamline the fourth point Ms. Bina mentioned,

5  the communications with the Corellium, we both *(unintelligible)*

6  agreement we will produce communications with Corellium

7  regarding the Corellium Apple product.  We would like to redact

8  the employees' identifications as we discussed before.  So I

9  agree with Ms. Bina, we're on the same page, but the only issue

10 is just the redaction of the employee identification which I

11 think Your Honor has heard our arguments on.

12      THE COURT:  All right.  And let me just ask you, as far

13 as the -- I understand the issue on the communications with

14 Azimuth's customers, that would basically be the same issue as

15 disclosing the names of the agencies because the communications

16 would be with the agencies, correct?

17      MR. TAORMINA:  That's correct, sir.

18      THE COURT:  And the second issue is the agreement with

19 Azimuth's customers.  Again, the agreement would be between

20 Azimuth and the two government agencies, correct?

21      MR. TAORMINA:  That's correct.  And just as a note, our

22 understanding of these contracts is that these master agreements

23 then govern a lot more business between the two of them than

24 this very limited Corellium Apple product within the -- within

25 the contract.  And our understanding as well is that these

1  contracts are held on -- I probably won't do this justice, but

2  very sensitive or very protected servers, that they're held on

3  Azimuth's customers' servers because there's such a concern

4  about the security, and that generally we've been told that they

5  don't even send the contracts via normal e-mail because of

6  encryption issues and the potential for hacking.  So that's just

7  a little bit of a background on how sensitive those contracts

8  are, and how much irrelevant information is within those

9  contracts.

10       THE COURT:  All right.  And then the only other issue

11  would have been the deposition issue, and your position is that

12  production of the documents is sufficient, there shouldn't have

13  to be a deposition taken of Harris or Azimuth?

14       MR. TAORMINA:  That's correct, Your Honor.  And then

15  even especially in the L3Harris' situation, because they don't

16  have these customer contracts, the customer relationships are

17  with Azimuth, but you summarized my point accurately.

18       THE COURT:  All right.  Anything else that you wanted

19  to add?

20       MR. TAORMINA:  No, that's it.  Thank you, Your Honor.

21       THE COURT:  Thank you.  All right.

22       Ms. Bina, what about these issues?  I know you want the

23  communications with Azimuth's customers, you believe it's

24  discoverable.  You want the agreements with Azimuth's customers,

25  you believe that's discoverable.  Why is that?  Ms. Bina?

1    MS. STEBBINS BINA:  Sorry, Your Honor.  I had forgotten

2    to take the phone off mute.  Can you hear me now?

3    THE COURT:  Yes.  Did you hear my question?

4    MS. STEBBINS BINA:  I did, Your Honor, I just -- you

5    couldn't hear my answer so I'll start over.  I apologize.

6    THE COURT:  All right.

7    MS. STEBBINS BINA:  So Your Honor, with respect to the

8    issue of the agreements, we're only interested in customer

9    agreements insofar as they relate to the Corellium Apple

10   product.  So if they're talking about broad agreements that

11   relate to an entire relationship with a customer, only some

12   small part of which is the Corellium Apple product, I don't know

13   that we actually need those.  What we need are any restrictions

14   that Azimuth and/or Corellium puts on their customers with

15   respect to the use or resale or things of that nature.  So for

16   instance, you know, does Azimuth prevent its customers from

17   reselling the Corellium Apple product to others.  Do they

18   prevent them from using them in an unlawful way.  Those are the

19   kinds of things we're interested in, because they relate to the

20   core of the Fair Use Defense.  I don't need an entire agreement

21   with a government that covers lots and lots of different issues,

22   so I just want to be clear on that point.  We're really narrowly

23   focused on the Corellium Apple product and its use, its sale and

24   how it's been addressed.

25   With respect to the communications with customers,

1    again, we're only seeking communications related to the

2    Corellium Apple product.  You know, to the extent those are --

3    those disclose customer identities, it relates to the same issue

4    which I'll discuss in a moment and we talked about at length

5    this morning, so I'll be brief.  But again, we're not seeking

6    broad communications with these customers in general; we're only

7    seeking communications that relate to the Corellium Apple

8    product, its use, its functionality, things of that nature.

9                THE COURT:  Okay.

10               MS. STEBBINS BINA:  So turning to the point about trade

11   secrets, just to briefly address it, again and you know, can't

12   we just say it's all Five Eyes, et cetera.  So Your Honor,

13   there's a lot of argument here, but there's not much evidence

14   that the disclosure of two of Azimuth's many customers under an

15   AEO protective order to Latham and Watkins only would somehow be

16   devastating to Azimuth's business, and I'm having a hard time

17   figuring out how it would be.  The declaration they submitted

18   says if this was disclosed to our competitors, it would hurt our

19   business; or if this were to become publicly known, it might

20   hurt us in some way.  But again, you know, this isn't their

21   entire customer base, this isn't their entire product.  They

22   haven't made any showing that the disclosure of these two

23   customers would somehow have any significant financial impact or

24   any impact.

25               Moreover, of course Your Honor, if there were some

1   impact under Rule 45, even assuming that these were found to be

2   trade secrets, and we would be addressing whatever the

3   compensation is appropriate.  I mean, Apple is not unwilling to

4   address -- to pay compensation, but I've yet to hear anything

5   that suggests there would be any actual harm in, you know,

6   myself and my colleagues learning the names of these two

7   customers.

8           In terms of can't we just say it's all the Five Eyes;

9   it's not all the Five Eyes, it's some particular entities and

10  there's a difference in terms of how jurors and how case law and

11  how state secrets are evaluated, whether they're United States

12  or some other entity.  Different countries handle things

13  differently.  So to the extent that Corellium is going to

14  continue to go very, very deep on this "our customers do good

15  things with our product", I think we have to be able to test

16  that.  I don't see how we can fight blind when -- you know, when

17  their argument is that, you know, all of this is good and well

18  and everything is fine.

19          I want to turn briefly to the issue of depositions.  I

20  suspect that it's unlikely we would need a deposition from

21  L3Harris.  We haven't seen any documents yet, obviously because

22  they haven't produced anything.  But to the extent they're

23  telling the truth about not being involved in the Corellium

24  Apple product, not selling it, not receiving it, not using it, I

25  can't imagine why we would need a deposition.

1      With respect to Azimuth however, I think the situation

2  is quite different.  Azimuth, I think he's president or CEO,

3  Mark Dowd, has been publicly quoted in the media multiple times

4  endorsing the Corellium Apple product, describing his

5  relationship with Corellium.  There's a number of documents that

6  have been either produced or logged on Corellium's privilege log

7  that demonstrate the strength and scope of this relationship.

8  For example, there is one from Mr. Wade to an Azimuth employee

9  asking where the IPSW files are stored on the Corellium Apple

10  product.

11      So one of the major disputes in this case, Your Honor,

12  is whether the Corellium Apple product is storing copies of the

13  IPSW files.  That e-mail suggests that it is and it suggests

14  that Azimuth has knowledge regarding that.

15      Similarly there is a withheld document on the privilege

16  log, and the notation on the log is invoice 09, Azimuth exploit

17  sale.  So one of the questions in this case, Your Honor, is

18  whether these are really just being used for good faith security

19  research, or whether people are selling exploits; exploits being

20  harmful ways to break into Apple's secure system.  So something

21  titled "exploit sale" obviously catches my attention.  Corellium

22  has withheld that on customer privacy grounds, but again, I

23  think these are questions I would ask an Azimuth witness about,

24  and I would want to know whether Azimuth is in the business of

25  selling exploits contained from the Corellium Apple product or

1    similar things.

2           Again, Azimuth isn't just a customer, it's a reseller.

3    It markets, it sells, it carries out the sales of this product

4    and it represents a very, very substantial portion of

5    Corellium's overall business.  So I do think I'll need a

6    deposition of Azimuth.

7           And I think that's all Your Honor, unless you have

8    further questions.

9           THE COURT:  Yeah, could you clarify the need on your

10   view for the customers' identifications now that we know it's

11   one of the five countries?  Do you intend to seek additional

12   discovery from the government agencies?

13          MS. STEBBINS BINA:  Potentially, Your Honor.  I think

14   for one, it's important that we know whether it's the United

15   States or not the United States.  That makes a difference on the

16   legal issues, as well as I think how juries perceive the

17   question, particularly given the issue that's happened in the

18   past where some of the Five Eyes entities have been hacking

19   American customer accounts and then disclosing them back to the

20   United States.  So I do think there are issues there, whether

21   it's the United States or whether it's some other entity.  To be

22   frank, I don't know the difference in security and disclosure

23   policies enough amongst the four entities, but I don't believe

24   they're identical.  For instance, I think there are differences

25   between the United Kingdom and Australia in terms of government

security and privacy concerns.  So I'm not -- I think it's still

fighting somewhat blind to just say well, it's one or more of

these five entities.  I think we need to know whether it's the

US or not the US or the US and someone else, and I still

believe, Your Honor, that it's going to be difficult for us to

respond to these four expert declarations extolling the virtues

of Corellium selling this product to good government entities

without knowing who those entities are.

THE COURT:  Okay.  Thank you.  Let me just go back for

a second to Mr. Taormina on behalf of Harris and Azimuth.  The

counsel for Apple makes an argument that even if all the

communications with Azimuth's customers, all the agreements with

Azimuth's customers are not produced, what she wants to have is

at least restrictions -- documents reflecting restrictions that

Azimuth places on its customers' use of the Corellium Apple

product.  Can that be produced without disclosing the names of

the customers?

MR. TAORMINA:  I think that it probably could, Your

Honor.  And to the extent that they do place restrictions or any

of that, we don't know if they do, but that seems like that's

something that we could provide.

THE COURT:  All right.  And what about this issue

involving the exploit sales that, according to Apple's counsel,

that Azimuth is making exploit sales possibly of these -- of the

Corellium Apple product or what's discovered?

1          MR. TAORMINA:  I'm not aware of that, Judge.  I don't

2     know if they're not *(unintelligible)* to us that it's just been

3     two sales of the Corellium Apple product to these customers.  We

4     haven't heard anything about, you know, any exploits or any --

5     I'm not as technically literate as Ms. Bina is, but we're not

6     aware of that.  We have basically been told that it was a very

7     limited transaction with these two customers that they sold the

8     Apple product to them, and that -- I think that was it.  Our

9     understanding is that it was very limited, so I don't really

10    know, but our understanding is that that doesn't seem like it's

11    related -- that's not what's been represented to us.

12         THE COURT:  All right.  And then following up, what

13    about disclosing whether or not the United States is one of the

14    countries that it was sold to?  In other words, even if you did

15    not have to disclose specifically which of the five countries

16    government agencies it was sold to, whether you disclose, if or

17    if not, the United States is one of the two.

18         MR. TAORMINA:  I think that we have to go back and

19    confirm that with our customer, and the only reason I say that

20    is because of the whole trust and confidence issue that is

21    really paramount to their business.  I'm not sure if naming the

22    country specifically destroys that trust, it may not.  But that

23    -- but it could, and I know that that might be sensitive as

24    well.  But we could ask that.

25         THE COURT:  All right.  I want you to follow-up and

```
 1    then see if you could at least name which of the two countries
 2    it is and we can address that point, but I would like you to
 3    follow-up on that, all right?
 4              MR. TAORMINA:  Absolutely, I'll do that, Your Honor.
 5              THE COURT:  All right.  Let me go to Mr. Levine.
 6    Anything else you wanted to add on behalf of Corellium?
 7              MR. LEVINE:  Yes, Your Honor.  Only that Ms. Bina
 8    addressed that they were interested in the contracts and
 9    agreements for the sale to look at any, you know, limitations,
10    restrictions that they're listing.  And candidly Your Honor,
11    those limitations and restrictions exist.  The ones that exist
12    in the contracts have already been produced to the Plaintiff
13    with the exception of, I think, a couple that we meant to
14    produce.  And just due to some administrative oversight, they
15    were not, but they will be produced imminently, and the other
16    restrictions are available on Corellium's public disclosures.
17    So the restriction, for example, you cannot use this product for
18    any illegal activity, that's one of the restrictions and that is
19    available on the public disclosure and the agreements which have
20    been provided to Apple.  I wanted to make that point.
21              The only other point that I'll address, most of them
22    have been addressed by Mr. Taormina, is that if Your Honor
23    remembers there was some government issues that had been raised
24    about Mr. Wade's personal life, his involvement, that took up a
25    significant amount of the Court's time earlier on.  That
```

1    information was information -- what stemmed that whole thing was

2    information that had been provided only to the attorneys at

3    Latham and Watkins, yet that resulted in a significant amount of

4    unnecessary discovery and a huge burden and cost on the parties.

5         So that being said, in light of the sensitivities that

6    Mr. Taormina has raised about his clients, disclosing that

7    information under the protective order only to the attorneys at

8    Latham and Watkins, as has already been established in this

9    case, can have significant collateral impact.

10        THE COURT:  Okay.  Thank you.  Ms. Bina, I have one

11   more question for Mr. Taormina, but before I do, anything that

12   you wanted to add very briefly?

13        MS. STEBBINS BINA:  Very briefly, Your Honor.  First of

14   all on the contracts point, we're not interested from Azimuth in

15   the contracts between Corellium and Azimuth; we're looking for

16   any contractual restrictions that Azimuth imposes on its own

17   customers which we understand Corellium does not have.  So I'll

18   make that point clear.

19        With respect to the second point, it's a red herring.

20   Counsel was referring to something where his former co-counsel

21   told us that something would materially impact the case.  That

22   turned out not to be true, but we believed it was based on his

23   co-counsel's representations.  We served discovery and then they

24   moved for protective order.  So that's really I think not -- the

25   suggestion that somehow telling Latham and Watkins something

1    under seal, which by the way that information was not, is

2    somehow going to open a Pandora's box is just unfair and

3    unwarranted.

4              THE COURT:  All right.  Thank you.

5              Mr. Taormina, I have one question for you.  How long

6    will it take you to determine whether or not you would be

7    willing to produce the names of the two countries involved as

8    opposed to just one of the five?  In other words, whether it's

9    United States and Australia; whether it's United States and

10   Canada, or whether it's Canada and Australia, et cetera.  How

11   long will it take you to determine that and how would that harm

12   anything if you only were disclosing the names of the two

13   countries?

14             MR. TAORMINA:  I think that if you can give us maybe

15   two days, we can get that answer for you.  And the only reason

16   that it might take two days is because the prime contact is in

17   Australia.  And obviously just with all the coronavirus concerns

18   we don't know -- I know a lot of people are putting out fires in

19   every industry about everything.  So about two days should be

20   okay.  And how would you like us to provide that information to

21   you?

22             THE COURT:  Just -- I'll tell you what, I'll give you

23   until Thursday, and just file a notice with the Court stating

24   that your position is that you either you would agree to provide

25   the names of the two countries without having to specify them in

1   the public record, or you would not.

2           MR. TAORMINA:  Understood.  That's fine, Your Honor.

3   Thank you.

4           THE COURT:  All right.  I just want to hear from you on

5   that before I rule on this -- on all the issues related to the

6   motion.  The motion, it's an interesting motion, and I agree

7   with you that I want to be fair to the third party, the nonparty

8   as well, Harris Azimuth, and I want to be fair to the parties

9   involved in the litigation here, Apple and Corellium.  So I'm

10  trying to determine what's reasonable and necessary and to

11  protect everybody's interests here, so I think that would help

12  me if you advise me of that.  I don't know how I'll rule, but it

13  might help me at least in analyzing the situation.  I'm still

14  going to want to go back and review the expert reports filed by

15  Corellium or produced by Corellium and take a look at those

16  further, and some additional case law, so I am going to take the

17  motion under advisement and I will rule at a future point.  But

18  if you could file that by Thursday and let me know.

19          MR. TAORMINA:  Of course.  Thank you for your

20  consideration, Your Honor.

21          THE COURT:  All right.  So that takes care of the

22  motion to quash argument.  And the next issues are discovery

23  disputes between Apple and Corellium, and I will tell counsel

24  for Harris and Azimuth, if you want to stay, you're welcome to

25  stay.  If you want to leave, you're also welcome to leave.  How

1    would you like to play that?

2            MR. TAORMINA:  We're going to drop off, Your Honor.

3    Thank you very much for your thoroughness and allowing us to

4    explain our position.

5            THE COURT:  All right.  Have a good day.

6            MR. TAORMINA:  You too.

7            THE COURT:  All right.  So we should just now have on

8    the record, we should just have counsel for Apple and counsel

9    for Corellium.  And I'm looking at the joint notice and it would

10   seem to be we start at the bottom of Page 9 of the joint notice

11   where Apple talks about two categories of discovery disputes

12   that remain.  Would that -- let me just ask Ms. Bina, would that

13   be correct?  Is that where we need to go now?

14           MS. STEBBINS BINA:  That's a perfectly good place to

15   start, Your Honor.

16           THE COURT:  All right.  Mr. Levine, do you think that

17   makes sense?

18           MR. LEVINE:  Yes, Your Honor.  And I think Ms.

19   Constantine is going to be taking a fair amount of the argument

20   here.

21           THE COURT:  All right.  And this is -- this was Apple's

22   motion, I believe, to compel discovery responses, if I'm not

23   mistaken; is that correct, Ms. Bina?

24           MS. STEBBINS BINA:  Yes.  Originally this was our

25   motion to compel discovery responses, that's been heard at a few

1    different hearings now.

2         THE COURT:  Right.  So why don't we talk about these

3    issues that you say the first issue, and I'm looking at Docket

4    Entry 227, the sealed version Page 13, and you say that first

5    disputes remain with respect to productions related to the

6    Corellium Apple product.  These disputes involve the changes

7    Corellium has made to the Corellium Apple product.  I thought I

8    had ruled on that before.  And then you say Apple's request for

9    the production of source code and the question whether Corellium

10   will be required to produce discovery related to the hypervisor

11   portion of the Corellium Apple product.  And I know that relates

12   to the experts' affidavits that have been filed, and you say the

13   parties are continuing to confer regarding these issues and

14   Apple's expert is continuing to review the evidence, and of

15   course we'll be filing an affidavit on Sunday, March 15th, which

16   I know you did.

17        So let's talk about the first part of that first issue

18   which is changes Corellium has made to the Corellium Apple

19   product.  Because I think I ruled on that before.  So what's the

20   issue that you see on that?

21        MS. STEBBINS BINA:  Your Honor, my understanding had

22   been that you had essentially ruled that Corellium should

23   produce everything other than what related exclusively to the

24   hypervisor, and that included raising whether the Corellium

25   Apple product was modifying or editing or displaying or copying

1    Apple's copyrighted works.

2            Where we ran into trouble, and this is laid out in the

3    -- in the expert declaration of Dr. Nie that we filed is that

4    they haven't really done that.  They provided what they call the

5    patches to the Apple product, but those patches are incomplete

6    sets of code and they've self-edited the code.  So instead of

7    providing the full code and redacting it or providing the full

8    code which would have been the more appropriate thing to do,

9    there's entire sections that are missing, and Corellium's staff

10   as I understand it, it's technical employees, have just actually

11   replaced the code with things that say "not related to iOS".

12   And so even -- and again, this is detailed in Dr. Nie's

13   affidavit.  They have a chart of their whole architecture, and

14   there's a portion of it that is the hypervisor, but then there's

15   dozens of things that ride on top of the hypervisor, of those

16   they produced only a small fraction and they haven't produced

17   what they're considering are the generic products, parts of it

18   that can run Android or iOS, even though those parts are, to our

19   understanding, directly involved in copying and displaying and

20   snapshotting iOS.

21           And so separate and apart from the hypervisor issue

22   which remains live, we don't believe we've been provided with

23   what Your Honor has already ordered that we should be provided

24   with.  And there's a related issue which is that they're still

25   withholding the joint notice of 8,500, but they've produced

1    4,000 or so documents a couple of days ago, I think Thursday or

2    Friday.  But there's still about 5,000 documents that they are

3    withholding on the basis of quote, unquote privacy and trade

4    secret grounds that don't appear to relate in any way, shape or

5    form exclusively to the hypervisor.

6          So for example, if you'll bear with me one moment, I

7    just want to grab my notes I've got here.

8          THE COURT:  Well, if you could hold on a second because

9    I'm trying to break this up and understand the issues.  The

10   first issue was whether changes to the Corellium Apple product

11   have been produced by Corellium.  Have they been -- have the

12   changes been produced or not?

13         MS. STEBBINS BINA:  Yes, in part.  They produced --

14   they allowed us to inspect briefly two sets of code that they

15   claim is the change with edits in it taking out things they

16   claim were noniOS specific.  They also allowed our expert to

17   briefly access a cloud version of how the product supposedly

18   worked in the past.  So they have done that in part, but with

19   pieces missing from the code.

20         THE COURT:  And which pieces are missing, according to

21   you?

22         MS. STEBBINS BINA:  We don't know.  There were over 50

23   notations that just say taken out, not iOS related, and there's

24   no evidence of how much was taken out, how much was left in.

25   You know, we've got fragments of code, but we don't have the

1    whole system and that's what's challenging because without the

2    larger framework with which those pieces rest, it's virtually

3    impossible for our expert to tell whether what we have is

4    everything that modifies iOS.  We know we don't have everything

5    that copies and displays iOS so --

6            THE COURT:  All right.  So let me ask you this, what

7    about the production of the source code and the hypervisor

8    portion of the Corellium Apple product?  I know the experts have

9    filed affidavits on that, but what is your -- in a very quick

10   summary, why do you need that and what is your -- why does your

11   expert, what does your expert say about whether you need the

12   source code and the hypervisor portion of the Corellium Apple

13   product?

14           MS. STEBBINS BINA:  So there's a couple -- I'll be as

15   brief as possible, Your Honor.  There's a couple of different

16   issues, the hypervisor being the last one.  The first is that

17   separate and apart from the hypervisor, they haven't produced

18   most of their code.  So we had understood that they were going

19   to produce everything with the hypervisor, they haven't.

20   Instead, they've produced a very tiny amount.  And so we still

21   don't have, separate and apart from the hypervisor, all of their

22   code or a full understanding of how their system displays,

23   copies, modifies, addresses things.  So apart from the

24   hypervisor, we don't have code sufficient to understand how

25   their product works.

 1          Second, and in particular how it works with iOS.  If
 2     you look at Paragraph 40 of Mr. Dr. Nie's declaration, I think
 3     that contains confidential information, so I'm not going to
 4     describe it here, but it addresses some of our issue with us not
 5     having nonhypervisor code because of these edits and cuts and
 6     their self-limiting of what should be provided.
 7          Second, they've only produced one version of the
 8     Corellium Apple product.  According to their discovery
 9     responses, there are 16 different versions, they have told us
10     there are 12, we've got one, so that's a major problem.  We
11     either need some kind of declaration that the others were
12     exactly the same, or we need access to all of the prior versions
13     which we haven't received.
14          Third, we've had very limited time with the product and
15     all of it was being supervised by Corellium's attorneys, so our
16     expert and our attorney, you know, had basically a half day to
17     look at the product, and they weren't allowed to be alone or
18     play with the product at all, absent supervision.  And that's
19     just not an adequate amount of time for our expert to complete
20     his review.
21          Then finally with respect to the hypervisor, that's the
22     core of the product.  It creates, runs, interacts with the
23     virtual system at issue, and Corellium's expert, you know,
24     acknowledges that it executes operating system commands which
25     means it's the hypervisor that makes a copy of iOS in its RAM

1    and runs it.  So we need access to the hypervisor to determine
2    how Corellium is copying and running iOS and in fact, there's
3    probably evidence in that hypervisor that it is in fact copying
4    and running iOS.

5        There's another portion of the sealed Olivier
6    declaration, that's the declaration from Corellium's counsel.
7    In Paragraph 4 that also talks about what the hypervisor does
8    with respect to an iPhone which directly relates to it getting
9    around our security features and copying.  So the hypervisor is
10   involved at least in displaying, circumventing and copying iOS
11   and we need to understand that.  And all of this is detailed at
12   Paragraph 60 through 65 of Dr. Nie's declaration.  I'm mindful
13   of trying to not say too much into the record.

14        THE COURT:  All right.  Thank you.  So let me turn to
15   counsel for Corellium.  It will be, I believe, Ms. Constantine.
16   What about this first category regarding -- regarding changes
17   that Corellium made to the Apple product that, according to
18   Apple, there's 12 to 16 versions and only one version has been
19   produced, and then the issue regarding the source code and the
20   hypervisor portion of the Corellium Apple product.  What's
21   Corellium's position on that?

22        MR. LEVINE:  This is Justin Levine, Your Honor.  Ms.
23   Constantine is going to take some of the other more pointed
24   discovery issues, some related to privilege log and other
25   specific requests.  As it relates to this issue, I'll be

1    providing argument.

2              THE COURT:  All right.

3              MR. LEVINE:  Just about everything Ms. Bina stated now

4    is not based on fact.  So the -- what was the first issue that

5    Your Honor wanted me to address?

6              THE COURT:  The first issue is dispute regarding the

7    changes that Corellium has made to the Corellium Apple product

8    that they're asserting that only one version of the Corellium

9    Apple product was produced, and there are 12 to 16 versions that

10   you haven't produced all the code or how the system changes and

11   modifies things.

12             MR. LEVINE:  Yes, Your Honor.  Okay.  So there are two

13   different sets of two different -- of different versions.  Now,

14   let me explain.  On the one hand, Corellium is currently

15   operating a current version of the product and we'll call that,

16   for the purposes of this conversation, the new version.  At the

17   start of the lawsuit, Corellium was operating a different

18   version, we'll call that for this purpose, the old version.

19             Very briefly, as you are aware, the -- yeah, the IPSW

20   files which contain iOS are loaded into the Corellium Apple

21   product.  At some point during this lawsuit, those files that

22   are located and obtained on the Apple website and Apple servers

23   became instable and in that instability, Corellium's customers

24   began experiencing shutdowns, errors and other issues with the

25   product.  And so that mandated during the course of business

1   that a small change had been to be made.  And basically that

2   small change was that at one aspect of building the virtual

3   device, it was where there was a dropdown box it was simply

4   changed to a drag and drop here box, and that was the only

5   change.  So that's one of the -- when we're talking about the

6   different versions of Corellium Apple product, that's one.  So

7   there's the old and the new.

8         And then there are the other versions where Ms. Bina is

9   talking about the 13 or 15 prior versions, and those, if Your

10   Honor has an iPhone, you'll know that every once in a while you

11   have to do an update to the iPhone or any of the apps will come

12   out with various updates.  You know, if a bug is found or an

13   issue is found, the manufacturer will put out a fix and they

14   send out that update where you have to update your app or your

15   phone.  That is basically those kind of things are the 13 or 15

16   versions that Ms. Bina is talking about on that aspect.  So as

17   it relates to what has been produced, on the right hand what I

18   first spoke about, the old and the new version, both of those

19   versions have been produced.

20         In addition, not only have they both been produced, but

21   as Your Honor ordered during the last hearing, Dr. Nie and an

22   attorney from Latham Watkins, they have access to both the old

23   and they have access to the new version.  So that's on the one

24   hand.

25         On the other hand, with all of the prior versions I

1   believe, I'll confirm with my clients, but I believe they're
2   willing to stipulate to the fact that all of the prior versions
3   are functionally the same with -- just as I mentioned, just some
4   minor changes, and it was discussed with Dr. Nie on the 12th
5   when he came and visited Corellium, that it was agreed by
6   Corellium to produce all of that code to him if you wanted. I
7   think the best way around it, and he agreed with us, in the
8   presence of the Latham attorney, that just a simple stipulation
9   that the older versions were fundamentally the same, that would
10  save everybody a lot of time. Now, we are happy and we told him
11  and we will agree here on the record that if he wants all that
12  code, the relevant code for those versions, then we can produce
13  it. But I just simply think that's going to waste a lot of
14  time.
15          Now, I would like to briefly address that meeting among
16  some other issues. So Ms. Bina stated that Dr. Nie was only
17  permitted a brief amount of time to review the code. Frankly,
18  Dr. Nie was permitted all of the time he wanted. Dr. Nie
19  decided to get up after about an hour and a half and leave
20  himself. In fact, you know, I was upstairs at the time and I
21  had actually -- I was going to run down and ask him something,
22  and I learned at that point in time that he had left about five
23  minutes ago.
24          And in fact, I'll rewind the clock 24 hours from there.
25  When Dr. Nie and the lawyer from Latham came to the offices of

1    Cole, Scott, I asked if they needed to retain -- if the IT staff

2    here at our offices needed to retain the computer set-up on into

3    Friday because I needed to know whether to reserve the

4    conference room on into Friday, and they said they don't know

5    but they'll let us know.  And so the point is is that he didn't

6    briefly have an amount of time and he wasn't limited.  In fact,

7    we were prepared to host him for two full days.  So when he came

8    and reviewed and he left, that is on Latham and Apple, that is

9    not on us.

10         After he visited Cole Scott's office, he then -- him

11   and the Latham attorney then came to the Corellium office where

12   the Corellium team had worked tirelessly over the last couple of

13   days to make sure that they had re-deployed the old version and

14   the on-site version of Corellium for Dr. Nie's use.  Dr. Nie was

15   there for about four hours.

16         Now, I don't know if Your Honor has really delved into

17   actually looking at some of the You Tube videos of this product,

18   this product, you can go from about end to end of it in about 15

19   minutes or less.  This would basically be the equivalent of

20   riding a bike around one of the small Bahamian islands in about

21   20 minutes.  It's not a very big thing, and there's only so far

22   you can dig into this.  He was there for about four hours and

23   asked four hours of questions with Mr. Wade directly and

24   answering almost all of his questions.  It was effectively a

25   second deposition, although granted, of course, there was none

1   of the formalities.  But the Latham Watkins attorney was taking

2   very copious notes of every word that was stated.  I would be

3   willing to bet that she was probably outlining her deposition of

4   Mr. Wade coming up, so we basically gave them their deposition

5   outline.  He had four hours to play around on the site.  Some of

6   the code was very readable and accessible beyond what we had

7   provided beforehand, and this opportunity provided him with

8   access to the old version which, again, it's really no different

9   from the new version, but he got it anyway, and it also gave him

10  access to the new version, just as Your Honor had ordered as a

11  customer would have.

12          Now, the only reason that Mr. Wade in the very

13  beginning had to do a couple of the actions on his own without

14  Dr. Nie -- no, Dr. Nie was right there looking and watching,

15  sitting right next to him, but Mr. Wade was doing it himself is

16  because that particular server -- and these are very large, very

17  expensive, very sensitive servers, and Your Honor ordered that

18  we had to set up an on-site version, which means that the server

19  is there on-site, and so they did that.  In order to do that,

20  they had to take away from some of the ongoing businesses and

21  they had to hook up one of their test servers to enable this

22  product to go forward, and because of that, the server had

23  direct access to Corellium's internal network.  And that's the

24  only reason why Mr. Wade did the first couple of initial steps

25  on his own.  And so that's that.

```
 1              It's also very, very worth noting that not only did Dr.
 2    Nie have over four hours with this product, probably over four
 3    hours with this product and all of the hundreds of questions,
 4    and Mr. Wade answered almost every single one of them, they drew
 5    Dr. Nie diagrams.  Not only was all of that the case, but myself
 6    personally, probably at least 15 times, told Dr. Nie our goal
 7    here today is to make sure that you have every single thing that
 8    you need when you leave here today so that when we go to the
 9    court, we can represent to the court that you wanted one, two,
10    three, however many things you need.  And so I kept reiterating
11    that, because I knew it was going to be an issue at this
12    hearing.  I kept reiterating that all the way through these four
13    hours with Dr. Nie.  And at the end of this meeting, Dr. Nie
14    took about a 20 minute time with his counsel alone in the
15    conference room, and when they emerged, we came back into the
16    room and they provided an area of -- four areas that he needed
17    to establish this case for Apple and those four areas -- and I
18    have them written down.  Those four areas are the code relating
19    to snapshots, to cloning, to creation and to rendering.  And
20    while we believe that those four areas are beyond the scope of
21    this case, beyond any of the Court's order and beyond discovery,
22    Mr. Wade permitted me to agree to provide that information and
23    that code to Dr. Nie.
24              So I want to be very, very clear that at the end of
25    this entire day, first beginning at Cole, Scott's office and
```

1    then ending up for over four hours at Corellium's office, those

2    four areas were what Apple's own expert stated he needed and

3    Corellium has agreed to provide that code to Dr. Nie.  None of

4    that code relates to or connects to -- I shouldn't say connects

5    to, but none of that code relates to the hypervisor.  The

6    hypervisor was not something that Apple's expert stated he

7    needed to provide his report.

8         Furthermore, in Dr. Nie's report, the -- or, excuse me,

9    let me be clear, the declaration that was provided for the

10   purposes of this hearing, not his actual report, he states in

11   there that he does not have enough information to -- you know,

12   to write his or to make an opinion and render his report in this

13   case.  You know, I was puzzled by that because on March 2nd when

14   the expert reports came out, Dr. Nie provided a 325-page report,

15   and that's just text.  The exhibits to that report start at Page

16   326.  So -- and that's not including CV, that is actual report

17   text.  So for Dr. Nie to now say that he doesn't have enough

18   information to render an opinion in this case, it is in stark

19   contrast to the over 300-page report that he has.

20        In addition, on Page 5 of Dr. Nie's affidavit that he

21   provided for this case, he clearly states the only purpose, and

22   I'm quoting here for the record, the only purpose of the

23   hypervisor is to create and manage virtual devices acting like

24   hardware in a physical machine.  He qualifies that with "the

25   only purpose".  There's nothing contained in hardware or a

1    physical machine that relates to iOS and software code.  It just

2    doesn't exist.  They are not two things that cross over one

3    another.

4            Furthermore, on Page 11, he very clearly states that

5    Corellium has only produced code and other technical

6    information, and this is the part that we need to emphasize

7    about the parts of the accused product that directly and

8    specifically handle iOS.  That's precisely correct.  That's what

9    this case is about.  This case is about the portions and parts

10   that directly and specifically handle iOS.  That is on Page 11.

11           Now, what Apple's attorneys are trying to do is expand

12   this case into a patent case.  They're trying to learn the

13   underlying operability of the entire product, except that's not

14   copyright and it makes sense now because when I met Ms.

15   Victorson who is a Latham attorney who attended the day-long

16   session with Dr. Nie and Corellium, she told me that she is a

17   patent lawyer and she's not a copyright lawyer, and that makes a

18   lot of sense now why this gross expansion into the entire

19   business of Corellium has become such an issue.  This case is a

20   copyright case and it's a copyright case related to iOS.

21   Everything else is simply irrelevant, and that is why the code

22   that has been provided has been provided. Now again, being for

23   the record that we've already now provided to -- agreed above

24   and beyond or provided above and beyond the code that's needed.

25           Dr. Nie also states on Page 14 that he's received and

1  reviewed certain user guides and manuals.  I'll state for the

2  record that as it relates to the Corellium Apple product, there

3  are not a lot of specific guides and manuals and diagrams that

4  relate simply to iOS; again, what this case is about, and that

5  is why only a limited amount of them have been provided.  But

6  what is in existence has been provided.

7        And I'll take it a step further.  Even what was not in

8  existence has also been provided.  The Corellium team has gone

9  out of their way to design and draft multiple diagrams, one of

10 which Latham and Watkins has included in Dr. Nie's declaration

11 in this case, providing to the court exactly where iOS is and

12 lives in this product and showing -- not just showing that.  And

13 I have Mr. Wade here today to provide the technical information

14 if Your Honor likes.  I have Mr. Delgado here today who runs the

15 ESI division in Cole, Scott and he can provide additional

16 information as to the following statement that I'm about to

17 make, that all of the code that has been required and requested

18 in this case has been provided.  And all of the relevant code in

19 this case has already been provided.

20        Now, before Dr. Nie showed up to Cole, Scott's office

21 that day, I sat with Jonathan Vine, who is the partner in this

22 case, as well as Mr. Delgado who, as I mentioned, is the

23 software engineer and ESI director at Cole, Scott, and we went

24 through the definitions of all the discovery requests, we went

25 through the transcripts of the prior court hearings, and we

1    concluded at that point in time that we were in complete

2    compliance with all of the code that was -- that had been

3    requested and ordered at that point in time.  We also clarified

4    with Ms. Victorson at the time that it in fact *(unintelligible)*

5    the shortcomings as to -- the alleged shortcoming of production

6    of code and whether it had been provided in a useable native

7    format was actually on Latham.  They failed to locate this, and

8    I may be butchering this term, but they failed to locate the

9    file paths that was produced through Everlaw, a sanctioned ESI

10   tool, and we confirmed that all of that information in the

11   native and useable code had been provided.  Now, can they build

12   a hypervisor from that code?  No, they can't build the product.

13   But that's not what this case is about, and that is way too --

14   that is way too broad as far as the scope of what is needed.

15         THE COURT:  All right.  Let me ask you some questions

16   please.  I need to ask you some questions.  I have another

17   hearing at 3:00 and I have to break here in a little while, so I

18   would like to get to the issues directly.

19         Apple makes the allegation that you have not produced

20   the source code.  What is your response to that?

21         MR. LEVINE:  All source code that has been requested

22   and ordered by the Court has been produced in a native, useable

23   format.

24         THE COURT:  All right.  They also make the allegation

25   that you have not produced discovery related to the hypervisor

1    portion of the Corellium Apple product.  Can you address that?

2            MR. LEVINE:  That is correct.  I believe there are some

3    minor documents that were inadvertently produced as it relates

4    to that, but other than that, I believe that's correct, Your

5    Honor.

6            THE COURT:  Okay.  And the reason you can't produce

7    anything related to the hypervisor portion of the Corellium

8    Apple product in a nutshell is what?

9            MR. LEVINE:  Because the hypervisor has no connection

10   to iOS.  The hypervisor is -- in a brief way, the hypervisor is

11   a piece of hardware.  Now it's software, but it is effectively a

12   piece of hardware.  And so if Your Honor thinks that the plastic

13   and the glass and the metal that makes up an iPhone would

14   contain iOS code, that just doesn't meet the bounds of physics.

15   That's just not a possible thing, and Dr. Nie stated in his

16   report, as I mentioned earlier, the only purpose of the

17   hypervisor is to create and manage virtual devices acting like

18   hardware in a physical machine.  It's effectively a hard device

19   just in software.

20           THE COURT:  Okay.  Let me ask you, I have not carefully

21   gone through the competing experts' affidavits regarding these

22   issues.  Do both of the expert affidavits address whether or not

23   either side needs to produce or not produce or obtain the

24   hypervisor portion of the Corellium Apple product?

25           MR. LEVINE:  Yes, Your Honor.  So as you would imagine,

1    both experts have competing affidavits.  Our expert says that

2    there's no relevance and no connection.  Dr. Nie states that he

3    does need it.

4            Two brief points.  One, our expert has looked through

5    the code of the hypervisor and has confirmed in his affidavit

6    that there's nothing in there relating to iOS code.

7            The second thing is that Dr. Nie's position, as now

8    stated in his declaration, is in staunch contrast to his

9    representation to us after meeting with his counsel on Thursday

10   of last week that there was no need for any hypervisor code.

11           THE COURT:  All right.  And let me -- as far as the

12   first issue, which is the different versions or changes

13   Corellium has made to the Corellium Apple product, your

14   position, just so I'm clear, is that you've produced the new

15   version of the Corellium Apple product which is what is being

16   used now; you've produced the old version of the Corellium Apple

17   product which was in effect at the time of the litigation and

18   the issues of these 12 to 16 versions, those are really, in

19   effect, minor changes that were made to the Corellium Apple

20   product dealing with, I guess, functionality; and that you will

21   produce, if requested, all of those 12 to 16 updates, but that

22   you will also, in lieu of producing those 12 to 16 updates,

23   agree and stipulate that they made no significant changes or

24   they only made minor changes to the Corellium Apple product.

25           Do I have that all correct?

1          MR. LEVINE:  Precisely, Your Honor.

2          THE COURT:  Okay.  So on that issue, on that first

3     issue that we've been talking about before we get to some of the

4     other issues here, let me ask Ms. Bina, what about that?  They

5     say that the old Corellium Apple product has been produced, the

6     new Corellium Apple product has been produced; that these 12 to

7     16 versions are mere updates; that your expert said they really

8     didn't need them but if you really want them, they'll produce

9     them, or they'll agree that they were just simply minor updates

10    of really no moment.

11          What's your response to that?

12          MS. STEBBINS BINA:  All right.  So I'll take the last

13    first, Your Honor.  We'd actually previously proposed that they

14    stipulate, and they declined to do so.  So a stipulation of that

15    kind may well take care of the prior versions if in fact it's

16    correct.

17          So on that issue of the 12 versus 16, if things

18    continue to work in the way they always have, we may not

19    necessarily need to review all of them.

20          THE COURT:  Okay.

21          MS. STEBBINS BINA:  Excuse me.  But again, we would

22    need a very clear stipulation on that point which we don't

23    currently have and have not previously provided despite our

24    request to get after last week's meeting.

25          Secondarily, in terms of what they've produced, they

1    have not produced source code in a native repository which is

2    the way it would typically be produced.  So typically Your

3    Honor, it would come through GitHub, or something like that,

4    which is a tool that allows source code to be compared to other

5    source code very easily, so you can immediately see the changes

6    without manually comparing them.  So it has comparison tools.

7    They haven't done that.  Instead Your Honor, they've produced it

8    via their e-discovery platform which does allow us to look at

9    the code, but doesn't have any of those native tools.  The

10   source code protective order requires that it be produced in the

11   way it's typically kept and functional, and instead they've

12   piped everything through this e-discovery platform so that we

13   can't.  So for instance, they've produced not the full code, but

14   a snippet of code relating to iOS that they claim shows the old

15   and the new, but we can't easily compare them, we have to

16   manually compare them because they haven't produced them in a

17   typical platform that they would normally produce them in.

18          THE COURT:  All right.  So you're saying that the

19   source code wasn't produced in a platform that allows

20   comparison.

21          MS. STEBBINS BINA:  Not easy comparison, Your Honor.

22   Typically you would be getting a source code computer with

23   access to something like GitHub which is, as I understand, a

24   common repository that I believe Corellium uses.  And we would

25   be able to look at it in that format and Dr. Nie could readily

1    compare one version to another.  Instead, we have this fairly

2    clunky e-discovery tool that allows him to look at both versions

3    but comparisons are much harder and more time-consuming.

4           THE COURT:  And what's the format you're saying?  Can

5    you spell it for me?

6           MS. STEBBINS BINA:  G-I-T-H-U-B, or whatever their

7    normal repository is.  Corellium doesn't keep its code in this

8    Everlaw e-discovery platform, they keep it in some other form

9    and that's the form that it would typically be reviewed in in a

10   normal source code review.

11          THE COURT:  All right.  And what about the hypervisor

12   portion of the Corellium Apple product?  Are you still insisting

13   on that and just very briefly, what do the two expert

14   declarations or affidavits say about why it is or isn't

15   producible?

16          MS. STEBBINS BINA:  So Your Honor, I have to back up

17   one step because there's a very serious disagreement amongst the

18   parties over whether they've already produced everything that

19   relates to iOS.  In fact, they've taken this extraordinarily

20   narrow view that even things that are not the hypervisor, unless

21   they contain specifically the word "iOS" or are directly

22   modifying iOS, that they're not going to produce it.  So that

23   means that portions of their product that display iOS, portions

24   of their product that copy iOS, they haven't produced.

25          Dr. Nie did not say there were only four things that he

 1  absolutely needed.  He said he needed at least those four things

 2  which they say -- they're saying now they're going to produce,

 3  but they still haven't.  We've been coming in here for a month

 4  now, a little more than a month, and each time Corellium has

 5  said we've given them everything, we've given them everything,

 6  and it's just not the case that they've given us everything and

 7  that's detailed at length in Dr. Nie's report.

 8          So there are a lot of things before we even get to the

 9  hypervisor that display, that copy, that manipulate iOS that

10  have not been produced, and there's zillions, technical terms,

11  zillions, there's about 5,000 e-mails that they withheld on

12  hypervisor grounds that include titles like iOS Virtualization

13  Demo or Core --

14          THE COURT:  I understand that.  I'm going to get to

15  that in a second.  I'm trying to deal with this one step at a

16  time.

17          So the first issue is changes to the Corellium Apple

18  product, and I'm going to direct the parties to try and work out

19  that stipulation regarding the 12 to 16 versions.  If you can

20  agree on a stipulation, great.  If not, then I'm going to

21  require Corellium to produce those 12 to 16 updates to Apple,

22  but I think it makes more sense to try and work out a

23  stipulation.

24          The second issue is production of the source code.  I'm

25  hearing two totally divergent things.  I'm hearing from

1    Mr. Levine that his client has produced everything regarding the

2    source code, and then I'm hearing from you, Counsel for Apple,

3    that portions of the product that display or copy or manipulate

4    iOS have not been produced, that all the source code hasn't been

5    produced.  Is that issue as to whether or not the source code

6    has or has not been produced addressed in the two competing

7    expert's declarations?

8            MS. STEBBINS BINA:  It certainly addresses in Dr. Nie's

9    declaration, he describes in detail what he doesn't have and why

10   he needs it.  I don't know that it's addressed in Dr. Olivier's

11   declaration.  He's focused primarily on the hypervisor because

12   obviously he wouldn't know specifically what Corellium has and

13   hasn't produced.

14           THE COURT:  All right.

15           MR. LEVINE:  Your Honor, the --

16           THE COURT:  Hold on.  Hold on.  As far as the source

17   code, Ms. Bina, is it primarily that you're saying that portions

18   of the product that display, copy or manipulate iOS have not

19   been produced?  Is that really what the fight here is about or

20   is it about something else?

21           MS. STEBBINS BINA:  There's three primary issues.  One,

22   it's not produced in the format in which it's typically kept and

23   easily comparable, which would be GitHub or something similar.

24           Two, it's been edited.  There are big chunks missing

25   even from what's been produced, with just a notation that says

1    "does not relate to iOS, therefore we're cutting it", so our

2    expert can't see the code in context because they've taken

3    things out, and I think they've done that around 50 times.

4          Three, there are lots and lots of areas separate and

5    apart from the hypervisor that we have reason to believe, based

6    on the evidence, copy, modify or circumvent Apple security

7    measures that have not been produced at all.

8          THE COURT:  All right.  Hold on a second.  All right.

9          Mr. Levine, can you respond to that briefly?

10         MR. LEVINE:  Yes, Your Honor.  As it relates to the

11   repository, we produced everything in an accredited repository

12   that the protective order, on Page 14, the top line, requires a

13   repository for the viewing and searching of the code produced.

14   We have used a normal standard ESI repository.  In fact, in

15   addressing these concerns, we actually called the engineers at

16   Everlaw and they confirmed for us that this is a certified

17   repository for the review and searching and maintaining of code.

18   If Apple wants it in GitHub, I mean, they can produce their

19   stuff in Github, but Corellium doesn't retain its code in

20   Github, and the protective order and the ESI repository here

21   meets all the qualifications that's necessary.

22         One other issue though is that if they're claiming that

23   it's inconvenient the way that -- for the tools that Everlaw

24   provides, we actually went above and beyond.  The protective

25   order only requires us to produce code here at our office.  The

107

1    large majority or actually all the code that has been produced

2    to date has actually been provided directly to Apple.  So if

3    they're talking about convenience, they don't have to jump on an

4    airplane and come to West Palm; they can look at it on their own

5    repository, do whatever they want with it where it is.  So that

6    addresses that point.  Again, the tools on Everlaw are most

7    efficient for what's called for by the protective order.

8             Let's see.  As far as the edited code, there is

9    redacted code, but that's because some of the redacted code

10   deals with Linux or Android or other issues that, as the

11   redactions state, have no connection to iOS.  They just -- they

12   literally have no bounds in this lawsuit whatsoever and that's

13   an important thing.

14            You know, Your Honor has to remember that Dr. Nie --

15   even providing some of this code to Dr. Nie, Dr. Nie himself is

16   a competitor in this field to Corellium.  Dr. Nie is a

17   specialist in virtualization.  He is the owner of 11 patents in

18   the field, and we've been having to draw him diagrams and

19   explain to him our proprietary technology.  And even if it's

20   this code and the secret sauce, if you will, has been provided

21   to Dr. Nie in this case, now another prominent figure in the

22   field after this case is done has the thinking, the thoughts,

23   the proprietary innovation of Corellium to then apply to his own

24   work, even if he's just doing it quietly and to himself.

25            And, you know, I know Your Honor is under a time

 1   crunch, but I would go so far as to say how do we even know that

 2   Apple hasn't retained Dr. Nie to build a version of this for

 3   them.  Apple has wanted this product, they've offered millions

 4   of dollars for it, and something as outlandish as that, and to

 5   file a lawsuit to try to get this kind of proprietary

 6   information would not be above them.  Just today, Apple was

 7   fined $1.1 billion in Europe for breaking antitrust violations,

 8   and just last month they were fined $25 million for misleading

 9   customers.  So, you know, the protection of this very highly

10   sensitive and proprietary information is critical.

11        THE COURT:  Let me ask you a question.  I need to ask

12   you a question.  What about portions of the product that

13   display, copy or manipulate iOS?  Has that all been produced or

14   not?

15        MR. LEVINE:  Those portions have been produced.

16        THE COURT:  So there's no withheld portions that

17   display, copy or manipulate iOS?

18        MR. LEVINE:  The only other areas are the four areas

19   that Dr. Nie stated at the end of the meeting, which we have

20   agreed to produce.  Now, Ms. Bina stated that we have not

21   produced it, except the problem is that only happened Thursday

22   and we agreed to produce those areas.  But if Ms. Bina isn't

23   content with us providing the code to them, then we will follow

24   the protective order to the "T", and that means that Dr. Nie has

25   to fly back to Cole, Scott and he has to provide us with a

109

1    request within seven days so we can have our IT department set

2    up this special computer again so that he can review that code.

3    He hasn't made that request.

4              THE COURT:  What about the fact that they're making an

5    argument that the code has been edited approximately 50 times?

6              MR. LEVINE:  Judge, I just addressed that.  So that

7    code relates to things that are outside this case such as

8    Android or Linux or other issues that don't deal with iOS.  And

9    the reason I got into Dr. Nie being a competitor is that the

10   only thing at issue in this case is copyright as it relates to

11   iOS.  And if that code relates to -- does not relate in any

12   stretch, then it's a serious concern even providing it to

13   Apple's expert because he is a direct competitor in this

14   industry.  And so those items that have been redacted are beyond

15   any order of the court, and they're beyond any requests and

16   they're beyond any allegation or claim or defense in this case,

17   and therefore they're redacted from site.

18             THE COURT:  All right.  So here's what I'd like to do

19   is this.  First of all, as far as the changes made to the

20   Corellium Apple product, I've already ruled on that.  Either

21   work out a stipulation or produce the 12 to 16 updates, prior

22   versions, whatever you want to call them.

23             The second issue is I am ordering that Corellium must

24   produce portions of the product that display, copy or manipulate

25   iOS.  It's up to Corellium to make sure that they comply in good

1    faith with that order, but that is my order.

2           As far as the source code and the hypervisor portion of

3    the Corellium Apple product, I'm going to review the experts'

4    affidavits, and I will rule further on that after I've had time

5    to review the experts' affidavits regarding the editing of the

6    code or the whether or not the source code has been fully

7    produced and whether or not the hypervisor portion of the

8    Corellium Apple product must be produced.

9           MR. LEVINE:  Your Honor, may I make a very brief point?

10          THE COURT:  Sure.  Go ahead.

11          MR. LEVINE:  The first point relates to the two

12   affidavits provided by the experts.  The Court's order at the

13   last hearing was to only provide an affidavit as it relates to

14   why the hypervisor should or should not be produced, and that's

15   why Dr. Olivier's declaration only goes to that issue.

16          The issue of the source code, and basically I think

17   about 15 or 16 pages of Dr. Nie's declaration, is all beyond the

18   scope of what the Court ordered, so I just wanted to make that

19   issue clear.

20          The other issue is on your Court's second ruling that

21   all source code that relates to copying, modifying, et cetera,

22   as the Court said, I just want to make it very clear that we

23   agreed to produce that on Thursday, and we're perfectly okay

24   with providing all of that to Apple.  And I tell you this to

25   show you about that that stuff which we are perfectly okay with

1    producing and agreed to do so last Thursday has no connection to

2    the hypervisor.  We can't be in agreement to produce those items

3    that you just ruled, but also sit here at the same time and

4    state that the hypervisor is not relevant and should be

5    withheld, and that's why I just want to make it clear that there

6    is actually clear line between those and that's why anything

7    related to the hypervisor should not be produced in this case,

8    Your Honor.  Thank you.

9          THE COURT:  All right.  No, I understand your position

10   and -- I'll get to you in a second, Ms. Bina.

11         But your position, Mr. Levine, is the hypervisor is off

12   limits according to you, and you don't want the hypervisor

13   produced, but that you have and have agreed to produce all

14   portions of the product that display, copy or manipulate iOS,

15   and that you agreed to that a few days ago and you're willing to

16   produce that because I am ordering that.

17         As far as the code editing where Apple says it's been

18   edited 50 times and you say that it's basically just redactions

19   of noniOS matters, all I can say is that I've ordered that the

20   portions of the product that display, copy or manipulate iOS be

21   produced and also, any edits of the code, any redactions from

22   the code that would be relevant to this case would be improper.

23   So I want to make sure that you take a look at that and that you

24   have redacted what is properly redacted because if not, it could

25   be a problem down the road.

1          So Ms. Bina, I know you wanted to respond.  What did

2     you want to respond, Ms. Bina?

3          MS. STEBBINS BINA:  Just very briefly, Your Honor.

4     Mr. Levine has spoken extensively, and I know that Your Honor

5     has another hearing so I'm going to try to be brief, but there's

6     a lot that he said that is vigorously disagreed with, not the

7     least of which when he accused me of unethically using an expert

8     to steal code.  That is not something that is happening here.

9     Dr. Nie is a retained expert through my law firm, in good faith

10    attempting to understand Corellium's product.  But they have

11    taken such a narrow view of what is relevant and they are

12    self-editing on their side.  I had understood that after our

13    last hearing, Your Honor, that we would essentially get

14    everything but the hypervisor, and instead they're giving us

15    little dribs and drabs that no expert can put together in a

16    sensible way.  Dr. Nie's affidavit addresses those issues

17    because before he can even get to whether we need the hypervisor

18    or not, there's huge chunks of information that are just missing

19    and that they have not produced and they have not made

20    available.  So this is something I encourage Your Honor to read

21    the affidavit very, very carefully.  I know that you will, but

22    this is not us trying to game the system or take some advantage

23    or steal Corellium's product, it's us trying to identify how the

24    product copies our product, displays our product, circumvents

25    our products technical protections.  And there are portions of

1    Dr. Olivier's affidavit that specifically discuss in paragraphs,

2    I believe it's four and 11, things that the hypervisor does that

3    in fact demonstrate that the hypervisor is involved in

4    circumventing Apple security measures, because the hypervisor is

5    involved in tricking iOS into thinking it's being displayed on

6    an iPhone.  That's critical to our 1201 claim.  So I just want

7    to make those points, Your Honor.

8            I'm concerned about time and I don't want to unduly

9    belabor the point, but there are very significant differences

10   here of opinion as to what Corellium has produced, and they've

11   taken this extraordinarily narrow view that is very

12   significantly impeding our ability to prosecute this case.  And

13   we've been trying for a month, and each time they say we'll give

14   you a little more, we'll give you a little more and each time,

15   they've not given enough.

16           And I do want to note just one other point about the

17   inspection last week.  Dr. Nie was only able to attend on

18   Thursday, he had another commitment on Friday.  We asked if he

19   could come back at a later point and Corellium's counsel said

20   no, this is a one-time only shop.  We will leave it open through

21   tomorrow, but if you don't stay through tomorrow, we're never

22   putting it up again, you won't have another opportunity to view

23   the source code on-site.  So there's very a different version of

24   events that's happening in reality than the one that is being

25   presented to Your Honor, and I don't want to drag Your Honor

1      into discovery disputes between the parties any more than

2      necessary, but this is a significant and important issue to

3      Apple because we're not getting enough to understand what

4      they're doing to our product.

5              THE COURT:  All right.  I understand.

6              MR. LEVINE:  Very briefly.

7              THE COURT:  Hold on.  Hold on.  Hold on just a second.

8      No.  I'm at the end of the day.

9              So here's what I'm going to tell the parties.  Okay.

10     I've tried to be very reasonable with the parties up to now, and

11     I seem to be getting nothing but combativeness.  I'm telling you

12     right now, I'm issuing orders, I've said that I want all

13     portions of the product that display, copy or manipulate the iOS

14     to be produced.  I've said that I want all discovery produced

15     other than the hypervisor portion of the Corellium Apple

16     product.  I'm going to review the experts affidavits on that.

17     If I find at a future time that either side has withheld

18     discovery, I can assure you the sanctions will be severe.

19             Do you understand that, Counsel?

20             MS. STEBBINS BINA:  Yes, Your Honor.

21             THE COURT:  Mr. Levine?

22             MR. LEVINE:  Yes, Your Honor.

23             THE COURT:  All right.  I want Corellium to be

24     producing discovery in good faith to Apple.  I don't want it in

25     dribs and drabs, I don't want it withheld and I don't want games

1    being played.  If Dr. Nie needs to go back, he's going to go

2    back.  I want discovery to be cooperative and I want it to take

3    place, and I can tell you that I'm going to review everything,

4    I'm going to enter any additional orders and any further

5    hearings that we need.  But if I run into more problems in this

6    case and if I find that anybody is withholding anything

7    improperly, playing games in this case, arguing some technical

8    argument, trying to avoid discovery or trying to get discovery,

9    I am going to impose sanctions on the offending party and the

10   offending attorney.

11           So I'm going to terminate the hearing now.  I would

12   suggest the parties consult with each other and cooperate in

13   good faith and if they don't, I will enter the orders that are

14   necessary to make sure that discovery gets produced in this

15   case.

16           The hearing is concluded, I'll enter a further order

17   later.

18           MS. STEBBINS BINA:  Thank you, Your Honor.

19           MR. LEVINE:  Your Honor --

20           THE COURT:  I'm concluding the hearing.

21           MR. LEVINE:  I understand.  I need to put on the record

22   for my clients, the way Your Honor has ordered that all aspects

23   of the code -- of the product that copy or modify or change or

24   whatever of the product, we do not agree that any part of the

25   product actually does that.  So we will produce the code, we

PROCEEDINGS RECORDED BY THE COURT'S DIGITAL AUDIO RECORDER
TRANSCRIPT PRODUCED BY MANUAL STENOGRAPHY
AND COMPUTER-AIDED TRANSCRIPTION

 1    recognize what Your Honor is saying, but I have to put on the

 2    record that the product does not actually copy, modify or alter

 3    or any of that.  So that's all.  Thank you, Your Honor.

 4            THE COURT:  That may be your position and that's an

 5    issue that may have to be decided at summary judgment or trial,

 6    it's not a discovery issue.  All right.  The hearing is

 7    concluded.

 8            MR. LEVINE:  Understood.

 9            MS. STEBBINS BINA:  Thank you, Your Honor.

10            MR. LEVINE:  Thank you, Your Honor.

11            (PROCEEDINGS CONCLUDED)
                      * * * * *

12                    C E R T I F I C A T E

13    I certify that the foregoing is a correct transcript from the
      digital audio recording of proceedings in the above-entitled

14    matter.

15
      3/19/2020            /s/ Dawn M. Savino

16    Date                 DAWN M. SAVINO, RPR

17

18

19

20

21

22

23

24

25