UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO: 9:19-cv-81160-RS

APPLE INC.,

    Plaintiff,

v.

CORELLIUM, LLC,

    Defendant.

_____/

**CORELLIUM'S *EXPEDITED CERTIFIED* MOTION FOR PARTIAL RECONSIDERATION OF THE COURT'S OMNIBUS ORDER PROVIDING DISCOVERY RULINGS AFTER THE MARCH 16, 2020 DISCOVERY HEARING**

Defendant, Corellium, LLC ("Corellium"), pursuant to Federal Rule of Civil Procedure 59(e), 28 U.S.C. 636(b)(1)(A), and Local Rules 4(a)(1) and 7.1, hereby moves this Honorable District Court, on an *Expedited* basis (Local Rule 7.1(d)(2)), to reconsider the certain portions of the Honorable Magistrate's March 20, 2020 Omnibus Order [D.E. 249] ordering 1) ordering Corellium to produce the "On-Premises" CAP to Plaintiff Apple Inc. ("Apple"), and 2) expanding the definition of the CAP to include the hypervisor.[1] In support of this Motion, Corellium states as follows:

---

[1] On March 22, 2020 Corellium initiated negotiations with Apple to stipulate to the logistical and monetary issues that have risen due to the Omnibus Order in an effort to comply with the order. Below is Corellium's latest effort to comply, sent to Apple on March 26, 2020. Apple responded on March 27, 2020 informing "we are exploring a possible compromise proposal, and expect to be back in touch with you on it shortly."

"Initially, as I have mentioned earlier today and in my prior email, it is a logistical impossibility for Corellium to comply with the Court's order regarding shipping the On-Premises version within the timeframe. That is ignoring the significant issues related to costs that I informed of on the phone (parts, labor, loss of a server, etc.). In light of trying to comply as much as possible in this regard, we propose the following for providing Remote Desktop access to both the code to be produced as well as providing the On-Premises version of the Product to Apple:

CASE NO: 9:19-cv-81160-RS

## **SUMMARY OF THE ARGUMENT**

This case stems from Apple's claims of copyright infringement and Digital Millennium Copyright Act ("DMCA") violations against Corellium. On March 20, 2020, the Court entered an Omnibus Order ("Omnibus Order") ordering Corellium to produce, among other things,

1. To ship and install the "On-Premise" Corellium Apple Product ("CAP") to Apple; and
2. All documents and source code under the expanded definition of CAP by including the hypervisor.

Corellium and Apple (collectively the "Parties") have been diligently working to complete discovery during the current discovery period. The Parties entered into an Agreed Protective Order Regarding the Disclosure and Use of Discovery Material [D.E.50] (Protective Order") in order to facilitate the production of trade secret, proprietary and other confidential documents. Moreover, the Parties with the assistance of the Court have worked through different definitions of the CAP to encompass the definition of the product at issue in this Lawsuit.

On March 16, 2020, the Court held its third discovery hearing in this matter via telephone, due to the COVID-19-related limitations, during which, the Court mostly heard argument in connection with non-party, L3Harris Technologies, Inc.'s Motion to Quash [D.E. 184] and some arguments about pending discovery issues between the Parties. Not fully addressed, however, were the issues related to the production of the "On-Premises" version of the CAP as well as whether the hypervisor should be deemed discoverable in this case. The Court should reconsider its ruling

---

1. By the 31st, we will provide Remote Desktop to the code in the local git repository that we discussed by phone earlier today,
2. By the 31st, we will provide Remote Desktop access to the On-Premises Product, including the extra features it offers versus the Cloud and administrator access that it comes with,
3. Dr. Nieh can access this at Latham's office with a camera facing his direct side so that the keys and monitor cannot be seen but his general actions may be monitored,
4. His required tools will be provided on the Remote Desktop computer,
5. An affidavit from him and Latham that no screen shots may be taken,
6. Any printing that is done must be limited to those limits stated in the protective order,
7. Corellium will provide an affidavit that states that Dr. Nieh's keystrokes and access will not be monitored on the remote side,
8. All other requirements of the Protective Order are complied with."

Case 9:19-cv-81160-RS   Document 255   Entered on FLSD Docket 03/28/2020   Page 3 of 20

CASE NO: 9:19-cv-81160-RS

as to these two issues because 1) Corellium's business will be severely impacted by incurring expenses of over ▇▇▇▇, in addition to its significant loss of profits that would result from the loss of resources in producing the "On-Premises" version of the CAP, and 2) Corellium would be forced provide its highly proprietary technology, which Apple has sought to better understand since it tried to purchase Corellium, by expanding the definition of the CAP to include the hypervisor, when such expansion is neither appropriate nor necessary for this case.

For the numerous reasons set forth below, the Court, to prevent manifest injustice and under the consideration of new information it has not yet had the benefit of having, should reconsider its recent ruling on these two issues.

## BACKGROUND

### I. General Factual Background.

On February 12, 2020, the Court held a hearing to address the Parties' Motions to Compel and initial discovery disputes ("First Discovery Hearing"). One issue in particular that the Court addressed was the definition of the Corellium Apple Product. Specifically, the Court, at the agreement of the Parties, held that, for the purposes of this litigation, the Corellium Apple Product "includes only those components of the Corellium platform that are responsible for handling iOS" as agreed by the Parties. *See*, Order Apple's Motion to Compel Production, D.E. 149 ¶ 2. It is Corellium's position that this definition still naturally encompasses everything that would be necessary for copyright and DMCA analyses. Indeed, as discussed further below, a patent law analysis is not required in this case. Accordingly, and in compliance with both the Protective Order and the Court's Order, Corellium produced its source code, in native format, via the Everlaw repository. *See*, Declaration Of Manuel Delgado In Support Corellium's *Certified* Motion For Partial Reconsideration Of The Court's Omnibus Order ("Delgado Decl."), attached hereto as **Exhibit 1**, ¶¶4, 5. Indeed, Corellium produced its source code directly to Apple, which was beyond what was called for by the Protective Order—that Corellium was only obligated to provide the source code for review at its counsel's Florida office. *See*, Protective Order, ¶11.

On February 27, 2020 the Court held a second discovery hearing pertaining to any new discovery issues and pending discovery matters ("Second Discovery Hearing"). During the Second Discovery Hearing, Apple's counsel alleged that the source code provided by Corellium was not in compliance with the Protective Order. This allegation was later determined to be untrue

3
**COLE, SCOTT & KISSANE, P.A.**
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 120 - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

as it appears that it was Apple's own counsel that did not forward the proper file paths of the code to their expert. *See*, Delgado Decl., ¶15, 16. This corrected allegation was never able to be informed to the Court. Also at issue during the Second Discovery Hearing, was the discussion of a previous version of the Corellium Apple Product that had not been produced. At the Hearing, it was explained that the "older version[2]" was simply a minor change that did not affect the functionality or output of the Corellium Apple Product. This notwithstanding, Corellium complied with the Court's Order thereafter and provided all <u>native</u> source code for the "old version" in a way that again went beyond what was required in the Protective Order, by providing it directly to Apple, rather than forcing Apple to fly to the office of Corellium's counsel. *See*, Protective Order, ¶11; *see also*, *See*, Delgado Decl., ¶6.

Also at the Second Discovery Hearing, the Court ordered the Parties' Experts to "submit affidavits on or before noon on March 15, 2020, stating their respective positions and rationale on the limited issue of whether Apple requires additional discovery on Corellium's hypervisor." *See* D.E. 211, ¶2. The Court did not order the Parties' Experts to provide opinions relative to the other Parties' alleged non-compliance of prior discovery orders. Accordingly, Corellium never had the opportunity to address the vast majority of "opinion" contained within Dr. Nieh's Affidavit relative to issues that did not relate to the hypervisor [D.E. 233]. Corellium was completely unaware that Dr. Nieh's Affidavit would raise issues relating to source code or otherwise unrelated to the hypervisor. Moreover, the affidavits were due one day before the March 16, 2020 third discovery hearing ("Third Discovery Hearing") and Corellium was never provided the opportunity, or time at the Third Discovery Hearing, to rebut those issues within Dr. Nieh's Affidavit. Thus, those claims, through no fault of Corellium, went completely unrebutted. It is notable that Corellium was still prepared at the hearing to rebut those allegations by having Mr. Delgado and Mr. Wade present and prepared to testify, but Corellium was never afforded that opportunity. Manuel Delgado is Cole Scott & Kissane's Litigation Support Manager and Christopher Wade is the Chief Technology Officer of Corellium.

---

[2] The change, as relayed to the Court was merely the change of one item from a drop-down file selection menu to a drag-and-drop upload file, done only to address an issue with the files (external to Corellium) being uploaded. *See*, Hearing Transcript February 27, 2020, 30:11-25 to 31:1-13 [D.E. 204].

On March 12, 2020, when Apple's counsel visited the Offices of Corellium and Corellium's counsel, Apple's counsel insisted that the source code production was still deficient and that it required production of the hypervisor. But the source code production was not deficient. Rather, Apple's counsel had missed the file paths in Corellium's production. *See*, Delgado Decl., ¶16. Indeed, all Orders and discovery obligations at this point had been fully complied with by Corellium, and Everlaw, despite Apple's claims is a proper and sufficient repository for the production of source code. During the Third Discovery Hearing, the Court mostly addressed the issues pertaining to non-party, L3Harris Technologies, Inc.'s Motion to Quash and provided only a short time to hear arguments on the outstanding discovery issues pertaining to the Corellium's Privilege Log, the competing expert declarations required by the Court, and the production of source code. Unfortunately, due to the current COVID-19 outbreak, the hearing was held telephonically and Corellium's counsel was not able to provide the testimony of Mr. Delgado, despite him attending the telephonic hearing. Mr. Delgado was going to provide testimony as to the production of the source code in native format and testify to Corellium's complete compliance with all Court Orders and its eDiscovery obligations. Moreover, Mr. Wade was also in attendance, and was anticipating on also providing testimony as to Corellium's discovery compliance as well as to technical aspects of the hypervisor to assist the Court as to why the hypervisor is not relevant for either the copyright or DMCA analyses required in this case. Unfortunately, the Court, under time constraints, terminated the Third Discovery Hearing without hearing several arguments relating to the pending discovery issues. Corellium now provides Mr. Delgado's attached affidavit as well as this instant Motion being *Certified* by Mr. Wade, under penalty of perjury, to take the place in part, of the testimony they were to provide to the Court at the Third Discovery Hearing.

In particular, at the Third Discovery Hearing, the Court did not discuss or hear argument on the issues pertaining to:

- Corellium's full compliance with the Protective Order as to the disclosure of source code;
- Corellium's on-site product and whether it was feasible to order the installation of the on-site product on Apple's premises;

- Portions of the source code were redacted because they relate to Android/Linux products that have no relation to the instant matter and that they fell outside of what the Court had ordered;

- Production of source code via GitHub or Bitbucket directly contradicts the Protective Order in place, and Apple has not made a proper request for software tools based on the Protective Order; and

- The hypervisor and the pending affidavits from the Parties' Experts.

The Court entered an Omnibus Order based on the Third Discovery Hearing and issues not discussed during the Hearing ("Omnibus Order") [D.E. 249], attached hereto as **Exhibit 2**. The rulings made in the Omnibus Order at issue for reconsideration in this Motion pertain to the following two issues:

1. The order for Corellium to produce an "On-Premises" version of the Corellium Apple Product to Apple will create an extreme burden and expense to Corellium. *See* Omnibus Order, ¶ 3(d);

2. The order for Corellium to produce all of the hypervisor is overbroad; *See* Omnibus Order, ¶ 3(e).

Corellium prepares this Motion to provide additional information, to the best it can as it was anticipating providing verbal testimony and other argument to the Court for its consideration for the above two issues. Corellium does so to prevent manifest injustice, and therefore, moves this Court to reconsider these two prior rulings made in its Omnibus Order.

## II. Corellium Has Been, And Has Remained Within, Compliance Of Its Discovery Obligations.

Notwithstanding Corellium's prior productions of source code <u>directly</u> to Apple, an act that goes beyond what is called for in the Protective Order, Corellium also made its source code available for inspection on March 12, 2020 in compliance with the Protective Order. Counsel for Corellium even contacted Apple's counsel beforehand and asked if they wanted Corellium to keep the source code computer available for a second day through March 13, 2020 as well. Apple never took advantage of this. In perfect compliance with the Protective Order, Corellium provided Apple and its Expert the source code "in a secure room on a secured computer without Internet access" and with the "tools sufficient for viewing and searching, on the platform produced." *Id.*, ¶ 11(c)(i);

*see also*, Delgado Decl., ¶¶8, 13, 15. In fact, in order to ensure that Corellium complied with producing its source code in native format as it is kept in the ordinary course of business, Corellium provided Apple the file names, file path and file structure of the source code files. *See*, Delgado Decl., ¶16. By taking these additional measures, Corellium wanted to make certain that, with only reasonable effort, Apple could locate and examine the source code it sought.

> Rule 34 does not obligate a producing party to per se organize and label usable documents for the requesting party's *convenience*, a party exercising Rule 34's option to produce records as they are kept in the usual course of business should "organize the documents in such a manner that [the requesting party] may obtain, with reasonable effort, the documents responsive to their requests."

*Armor Screen Corp. v. Storm Catcher, Inc.*, 2009 WL 291160, at *2 (S.D. Fla. Feb. 5, 2009). Additionally, Corellium provided Apple and its expert with a separate "Notetaking Computer for purposes" of notetaking because Apple "may not copy the Source Code into the notes." *See* Protective Order, ¶ 11(c)(ii) *see also*, Delgado Decl., ¶14.  Lastly, Corellium's counsel was in the room with Apple and its Expert because the Protective Order allows for the Producing Party to "visually monitor the activities of the Receiving Party's representative during any Source Code review." *Id*., ¶ 11(c)(iv). As such, Corellium complied with the Parties' Agreed Protective Order for the disclosure of source code.

Moreover, under the Protective Order, a Party is allowed to request that certain "software *tools* for viewing and searching code" be installed on the "secured computer without internet access," given such request is timely made and the proper license is provided to the Producing Party by the Requesting Party. *See* Protective Order, ¶ 11(c)(i).  Apple never made any such request.  Accordingly, Dr. Nieh was provided, through the Everlaw platform and as <u>expressly contemplated by the Protective Order</u>, "tools that are sufficient for <u>viewing</u> and <u>searching</u> the code produced" as required by the Protective Order. *Id*. (emphasis added), *see also*, Delgado Decl., ¶13, 14, 15.  Indeed, Corellium has been relying upon the language of the Protective Order to guide its discovery conduct.  To be sure, Dr. Nieh even affirmed that, "I was able to <u>view</u> the text of the source code files, the file names, and the file structure of the code Corellium has produced. I was able to <u>search</u> the text of the files using Everlaw's search interface." *See* Dr. Nieh's Affidavit, ¶ 23 (emphasis added). Dr. Nieh's own statements establish Corellium's direct compliance with the

Protective Order. To the contrary, it is not Corellium's responsibility, or even permissible by the Protective Order, to provide software tools that would allow for "editing" or that "provide an ability to compare" source code in a way suggested by Dr. Nieh. *Id*., ¶ 23, *see* Protective Order 11(c)(i). Instead, the Protective Order explicitly calls for tools "sufficient for viewing and searching code." *Id*., ¶ 23, *see* Protective Order 11(c)(i). That is exactly what Corellium provided. *See*, Delgado Decl., ¶13, 14, 15. Despite this, Everlaw still contains a visualization toll which permits code comparisons, which was shown to Dr. Nieh. *See*, Delgado Decl., ¶15.

Finally, in an effort to produce all of the requested source code in its native format, Corellium redacted certain portions of the code that did not meet the definition "those components of the Corellium platform that are responsible for handling iOS".[3] These redactions, despite Apple's claims, were within compliance of all Court Orders and directions at the time, because at that time, the hypervisor was not within the definition of CAP and Android/Linux code have never been relevant to iOS or this case. For clarity, Corellium provided source code in native format, along with the corresponding file paths as well as the file structure of the code. *See* Dr. Nieh's Affidavit, ¶ 23; *see also*, Delgado Decl., ¶4, 5, 6, 15, 16. "Under the Local Rules, a party may produce documents requested pursuant to Rule 34 as they are kept in the usual course of business." *Dependable Component Supply Corp. v. Lear Corp.*, at *2 (S.D. Fla. Oct. 23, 2007). (stating that "the responding party is not required to rearrange or reorganize the materials . . ."). Thus, Corellium has now produced its highly-sensitive and proprietary source code twice. The first time without the protections of the Protective Order, and the second time by inspection as agreed by the Parties pursuant the Protective Order. Notably, Corellium has produced over 180,000 lines of code, in native format, through Everlaw directly to Apple. Apple has received the benefit of having Corellium's source code available at all times and without any restrictions, access to Corellium's protected files without the protections afforded by the Protective Order,

Accordingly, for purposes of production of its source code, Corellium has fully complied with the Protective Order and the Court's Order to provide source code in native format.

---

[3] This fact certified by C. Wade.

CASE NO: 9:19-cv-81160-RS

# LEGAL MEMORANDUM

## I. Legal Standard

While an order compelling discovery is not an appealable final judgement, such an interlocutory order is subject to reconsideration under Federal Rule of Civil Procedure 59(e). *See The Porto Venezia Condominium Association, Inc. v. WB Fort Lauderdale, LLC*, 926 F.Supp.2d 1330 at 1332 (S.D. Fla. 2013). A rule 59(e) motion for reconsideration of an order may be granted on the grounds of newly discovered evidence or manifest errors of law or fact. *Id.* "In particular, there are three major grounds which justify reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice." *Burger King Corp. v. Ashland Equities,* 181 F.Supp.2d 1366, 1369 (S.D.Fla.2002). Indeed, reconsideration is appropriate to when newly discovered evidence becomes available. *Jallali v. Nat'l Bd. of Osteopathic Med. Examiners, Inc.*, No. 12-60548-CIV, 2012 WL 4089894, at *1 (S.D. Fla. Sept. 17, 2012), aff'd, 518 F. App'x 863 (11th Cir. 2013). "A motion to reconsider would be appropriate where, for example, the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Mierzwicki v Citigroup, Inc.*, 2015 WL 13388667, at *1 (S.D. Fla. Oct. 13, 2015).

Moreover, "[w]hen a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, *he shall so state in writing in such order*. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however*, that application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order." *See*, 28 USC § 1292(b) (emphasis added).

On the basis of manifest injustice as well as manifest errors of fact, Corellium moves this Court to reconsider the portions of its Omnibus Order that relate to the forced production of the "On-Premises" version of the product and the production of information and code relevant to the

9

hypervisor. *See Mierzwicki,* 2015 WL 13388667, at *2 ("[C]lear error or manifest injustice occurs where the Court 'has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension.").

**II.    Compliance With The Court's Omnibus Order Relative To Providing The On-Premises Version Is Logistically Not Possible, And Moreover, The Cost, Loss Of Business, And Absolute Burden Imposed Upon Corellium Is Terribly Prejudicial With Virtually No Benefit To This Case.**

"The only grounds for granting a motion for reconsideration with regard to a judgment of the Court are newly-discovered evidence or manifest errors of law or fact." *Farrell v. Flecha*, 2013 WL 12139327, at *1 (S.D. Fla. July 25, 2013). The installation of the "On-Premises" version of CAP will impose extreme manifest injustice upon Corellium. Initially, as stated above, this discussion was not able to be had at the Third Discovery Hearing as the Court ran out of time. Indeed, Corellium had brought with them Mr. Wade who could have testified to this matter had the Hearing not run out of time.[4] Mr. Wade was never afforded the opportunity.

*First*, for Corellium to order parts and assemble one of their industrial ARM servers to provide to Apple would take 10 business days, as it does in the ordinary course of business.[5] This makes it impossible to comply with the Court's production deadline of March 31, 2020. To be more specific, Corellium prepares a specialized server by adding to the server hardware components to run the product, such as GPUs (graphical processing units), SSDs (solid state drives), RAM (random access memory), SATA drives, PCIE cards, and server rails.[6] Recall, however, that Corellium is only a start-up company with nine employees.[7] Thus, as with the rest of this case, significant time will be taken from Corellium's efforts of trying to keep their business operational while complying with the obligations of this case.

*Second*, the cost of the parts and labor required just to assemble the server will cost between ███████████████████████.[8] Apple has declined to assume the cost.

---

[4] This fact certified by C. Wade.
[5] This fact certified by C. Wade.
[6] This fact certified by C. Wade.
[7] This fact certified by C. Wade.
[8] This fact certified by C. Wade.

***Third,*** the Corellium Apple Product is designed for an enterprise datacenter, not a home residence. The server itself weighs 75 lbs. and is approximately 4 feet long by 2 feet wide and is very loud when operating with the sound similar to a small jet engine. Apple has stated that Dr. Nieh is self-isolating at home and is not able to travel even to local counsel offices. As such, the Corellium Apple Product would have to be set up at his home, but he will not be able to do so. Home residences do not have the requisite networking infrastructure. Further, during his March 12 visit to inspect the On-Premises product, Dr. Nieh required Mr. Wade's assistance in navigating parts of the server, demonstrating a fundamental lack of understanding of the technologies used. If Corellium ships the On-Premise Product to Dr. Nieh, he will not be able to set it up to use it.

***Fourth***, and more important than the three factors above, the industrial and specialized ARM severs required for the Corellium Apple Product are no longer produced by the manufacturer.[9] The Corellium product runs on specialty ARM servers[10] that were never released for public sale and have since been discontinued.[11]  Corellium acquired a limited amount of these servers prior to their discontinuation.[12] As such, Corellium ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[13] Forcing Corellium ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ will cause Corellium to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.[14] The sheer loss of opportunity cost to provide Apple with the On-Premises product, which provides minimal, if any, benefit to a copyright or DMCA analysis above what Apple already has via its direct access to Corellium's Cloud-based version, would be extreme.[15] Indeed, Corellium has already provided Apple's Expert with credentials to the Cloud-based version of the CAP which, in conjunction with the source code, provides everything necessary to for Apple to understand and show a jury whether the Corellium Apple Product copies, displays, or makes modifications to iOS as the Court has deemed necessary. *See* Omnibus Order, at 9; *see also*, Dr. Nieh's Affidavit, ¶ 52 ("I still have credentials to access the cloud-based version



---

[9] This fact certified by C. Wade.
[10] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
[11] This fact certified by C. Wade.
[12] This fact certified by C. Wade.
[13] This fact certified by C. Wade.
[14] This fact certified by C. Wade.
[15] This fact certified by C. Wade.

of the Corellium Apple Product"). The On-Premises version provides no further helpful information in that regard.[16]

Apple has stated that it will simply return the server afterwards. However, Corellium cannot sell a server that has been used[17], especially one that has been used by an adversary that is very capable in the tech industry. It is unclear what will be done to the server while in Apple's possession. But more importantly, Corellium's customers ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for previously tampered with industrial machinery, especially that which is supposed to be used for security research in a controlled environment.[18] This plan simply is not reasonable, particularly when a more reasonable option of remote access to one of Corellium's test servers is possible to implement immediately.

Corellium was not able to provide the above information to the Court at the recent hearing because the Court ran out of time and because this issue was never actually raised prior to Dr. Nieh's Affidavit—including not being raised during any meet and confers, the joint notice, or on Apple's 11-page March 9, 2020 Correspondence to Corellium in anticipation of the Hearing. *See* Joint Notice [D.E. 224] and Apple's March 9, 2020 Correspondence to Corellium [D.E. 224-1]. Thus, Corellium was not aware that the "On-Premises" version of the CAP was still an issue. To the exact contrary, after spending hours answering nearly all of Dr. Nieh's numerous questions and agreeing to provide the four additional areas of code that he requested—and Dr. Nieh leaving completely satisfied—Corellium was under the impression that there would be no issue at all.[19] Corellium was entirely unaware that the Court would order the production and installation of its "On-Premises" version of the CAP without argument or the opportunity to rebut from Corellium.

However, in an effort to comply, Corellium has offered to set the "On-Premises" version of the CAP back up on one of its test servers, like it did when Dr. Nieh visited Corellium on March 12, 2020, and has offered to make access available to Apple through Remote Desktop, with the appropriate protective measures in place. On March 26, 2020, the following proposal has been offered to Apple:

---

[16] This fact certified by C. Wade.
[17] This fact certified by C. Wade.
[18] This fact certified by C. Wade.
[19] This fact certified by C. Wade.

1. By the 31st, we will provide Remote Desktop to the code in the local git repository that we discussed by phone earlier today,
2. By the 31st, we will provide Remote Desktop access to the On-Premises Product, including the extra features it offers versus the Cloud and administrator access that it comes with,
3. Dr. Nieh can access this at Latham's office with a camera facing his direct side so that the keys and monitor cannot be seen but his general actions may be monitored,
4. His required tools will be provided on the Remote Desktop computer,
5. An affidavit from him and Latham that no screen shots may be taken,
6. Any printing that is done must be limited to those limits stated in the protective order,
7. Corellium will provide an affidavit that states that Dr. Nieh's keystrokes and access will not be monitored on the remote side,
8. All other requirements of the Protective Order are complied with.

The Omnibus Order's ruling to provide the On-Premises version of the CAP to Apple may cause Corellium to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, it will hinder Corellium's resources for over a week, and it is a logistical impossibility to effectuate in light of the deadline currently imposed by the Court. Accordingly, this Court should grant Corellium's Motion for Reconsideration as to the production of the on-site CAP as there is newly provided evidence that shows the significant manifest injustice Corellium will suffer in producing the same.

**III. Enlarging the Definition of the CAP to Include the Hypervisor Will Constitute Manifest Injustice to Corellium.**

Forcing Corellium to have to produce the code, or documents or information, related to the hypervisor will cause manifest injustice, because 1) this is not a patent case, thus, no functional analysis of the hypervisor, which models *hardware* (not copyrightable software), needs to be done for the full adjudication of the claims of copyright and DMCA at issue here, 2) Apple's expert, Dr. Nieh, concluded himself that that hypervisor is not necessary for him to render his opinions in this case, and 3) Dr. Nieh is an active academic and author in the field, and thus, providing him with intimate knowledge of a proprietary cutting-edge technology in the field, even under the Protective Order, is not something that can be undone, thereby giving him a competitive advantage in the field, especially given that a review of the hypervisor is not necessary for the legal analysis in this case.

*First*, this is not a patent case, thus, the functional and operational aspects of the entire propriety product are neither appropriate nor necessary for the legal analysis in this case. Instead,

copyright infringement requires violation of one of the specific exclusive rights of a copyright owner: the right to reproduce the work, prepare derivative works, distribute copies, perform, or display. *See Jaggon v. Rebel Rock Entm't, Inc.*, 2010 WL 3468101, at *2 (S.D. Fla. Sept. 1, 2010) ("The exclusive rights under section 106 include the right to reproduce the copyrighted work, to prepare derivative works, to distribute copies to the public, to perform the work publicly, and to display the work publicly."); *see also Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984); *Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc.*, 445 F. Supp. 875, 877 (S.D. Fla. 1978); *see also*, *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 434, 104 S. Ct. 774, 785, 78 L. Ed. 2d 574 (1984) (finding that respondents' standing to sue for copyright infringement existed only to the extent the accused work infringed the respondents' specific copyrights, the additional functions and operation of the accused work, independent of the respondents' copyrights, were not relevant).

To the contrary, "[t]he Patent Act grants patentees the 'right to exclude others from making, using, offering for sale, or selling [their] invention[s].'" *Impression Prod., Inc. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523, 1526 (2017); *see also*, 35 U.S.C. § 154(a); *see also*, *Merck KGaA v. Integra Lifesciences I, Ltd.*, 545 U.S. 193, 195 (2005). A patent "[i]nfringement analysis under the doctrine of equivalents proceeds element-by-element; a generalized showing of equivalency between the claim as a whole and the allegedly infringing product or process is not sufficient." *Zamora Radio, LLC v. Last.FM, Ltd.*, 758 F. Supp. 2d 1273, 1278 (S.D. Fla. 2010). Determining literal patent infringement requires one to compare every claim in the underlying patent to the entirety of the accused device or process to determine if all the claims match exactly. *Id.* This is not the case with copyright law.

"The two areas of the law, naturally, are not identical twins, and we exercise the caution which we have expressed in the past in applying doctrine formulated in one area to the other." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 (1984); *see also*, *Mazer v. Stein*, 347 U.S. 201, 218 (1954) (finding that respondents could not prevent others from using the idea of their work; instead, respondents could only prevent the copy of their specific work); *see also*, *Baker v. Selden*, 101 U.S. 99, 102–03, 25 L. Ed. 841 (1879) (finding that the difference between patent and copyrights exists in the fact that copyrights do not provide the owner exclusive rights to the subject matter of the work, whereas patents, which protect inventions involving "new

art, manufacture, or composition of matter," do provide rights to the subject matter, specifically through the invention.).

The hypervisor is effectively virtual hardware—not software.[20] Forcing Corellium to produce the hypervisor is equivalent to forcing them to produce the inner workings of a newly invented <u>physical</u> device, which, by its very nature, relates to patent law, not copyright law. As Apple's expert, Dr. Nieh, explains in his Declaration, "[f]rom the perspective of an individual operating system on a virtual machine, the 'hardware' it interacts with is, in fact, the hypervisor software." *See*, Nieh Decl., at ¶15. It acts "like the hardware in a physical machine." *Id.*, at ¶17. Given this apt description of a hypervisor in general, it is curious that Dr. Nieh contradicts this definition in his assessment of Corellium's hypervisor. For Corellium's hypervisor, Dr. Nieh states, *without* evidence, support, or reason, that "[t]he hypervisor <u>decides</u> where copies of iOS are placed in memory or on the disk, it <u>directs</u> the visual output of iOS to Corellium's graphical user interface, and it <u>makes modifications</u> in order to fool an iOS virtual device into thinking it is running on real Apple hardware." (Emphasis added). However, this assessment is directly opposed to Dr. Nieh's own conclusion that a hypervisor is "like the hardware of a physical machine."

Physical hardware neither "decides," "directs," nor "makes modifications" to the software running on it.[21] Physical hardware has no decision-making input; it is rather the *recipient of instructions*.[22] Hardware simply does what it is told to do by the operating system.[23] The hypervisor – "like the hardware of a physical machine" – behaves precisely in this same way.[24] Indeed, as Dr. Nieh states, that is the very purpose of a hypervisor, to act "like the hardware in a physical machine." *Id.*, at ¶17. Accordingly, as no patent analysis is to be done in this case, the forced production of the proprietary hypervisor is simply improper and would cause manifest injustice to Corellium.

*Second*, it would further be manifestly unjust to force the production of a highly proprietary technology after Apple's own expert expressly concluded on March 12, 2020 that it is <u>not</u>

---

[20] This fact certified by C. Wade.
[21] This fact certified by C. Wade.
[22] This fact certified by C. Wade.
[23] This fact certified by C. Wade.
[24] This fact certified by C. Wade.

necessary to form his opinions in this case.[25] During Dr. Nieh's March 12, 2020 visit to Corellium, Mr. Wade and Mr. Levine (counsel for Corellium) repeatedly asked Dr. Nieh what information he needed to perform his expert evaluation and write his report.[26] After approximately four hours of interaction[27] with the product, access to unredacted source code, and taking approximately 20-30 minutes at the end of the day to consult alone with Apple's counsel, Dr. Nieh emerged and identified that the full code path for the <u>following four components</u> were needed for him to form his opinions in this case:

1. The creation of a virtual device,
2. The creation of a snapshot,
3. The cloning of a snapshot,
4. The display of a virtual device.[28]

Notably absent is anything related to the hypervisor. On the spot, and without Court intervention, Corellium agreed to produce the code of all four items.[29] Dr. Nieh further clarified to Mr. Wade that, based on his observation of the code, he did <u>not</u> believe he would need access to the hypervisor.[30]

Indeed, Corellium attempted to inform the Court of this interaction at the recent hearing, and, at the time of the Court's Omnibus Order, Corellium had already provided these four areas of code to its attorneys for disclosure under the Protective Order. Dr. Nieh's statements in his declaration, only three days later, stand in stark contrast to what he directly represented to Corellium, after spending hours interacting with the product, as to what information was necessary to form his opinions in this case. Instead, it was only after the preparation of his declaration that Dr. Nieh suddenly required the hypervisor. In short, it would be manifestly unjust to require the production of this technology that appears to only be pursued—not actually by the expert—but instead by the Party itself (who previously offered ▇▇▇▇▇▇▇ to purchase Corellium).

---

[25] This fact certified by C. Wade; *see also*, Declaration of Justin B. Levine, Esq., attached hereto as **Exhibit 3**, at ¶¶9, 11, 12.
[26] This fact certified by C. Wade; *see also*, Declaration of Mr. Levine, ¶8.
[27] Three plus hours of which were Dr. Nieh directly at the controls.
[28] This fact certified by C. Wade; *see also*, Declaration of Mr. Levine, ¶9.
[29] This fact certified by C. Wade; *see also*, Declaration of Mr. Levine, ¶10.
[30] This fact certified by C. Wade.

*Third*, forcing Corellium to give up the code, *even under the Protective Order*, would be manifestly unjust, given that Plaintiff's expert, Dr. Nieh, is one of the virtualization field's leading writers and academics. Corellium has built something that no one else in the field has been able to do—Dr. Nieh included. To provide this working understanding and information to Dr. Nieh, who frequently thinks, writes, and speaks about virtualization, would give him information that, by the very nature of him possessing that knowledge, would give him an unfair advantage in the field. Again, this is not a patent case and the information as to how the hypervisor works, which is effectively hardware) is simply irrelevant to any copyright or DMCA legal analysis. What is worse, there is virtually no way to police whether Corellium's proprietary knowledge will be later used by Dr Nieh in his academic work. Once Dr, Nieh has the knowledge and understanding of Corellium's hypervisor, he cannot simply ignore the fact that he now knows how it works. In other words, this is not something that he can use "solely for this case,[31]" and then discard once the litigation is over. Thus, in consideration of the fact that discovery of the hypervisor is not necessary for any legal analysis of this case, it would be an irreversible mistake, and cause significant manifest injustice, to discard Corellium's trade secret objections and force Corellium to produce its hypervisor—even under the Protective Order.

## CONCLUSION

WHEREFORE, and for the reasons set forth above, Corellium respectfully requests that this Court grant this Motion for Reconsideration in 1) reconsidering its Order to produce and ship the "On-Premises" version of the CAP to Apple, or in the alternative, permit for the "On-Premises" version of the CAP to be provided remotely via Remote Desktop access in accordance with the terms above, 2) reconsidering the exclusion of the hypervisor from the definition of the CAP, 3) if any portion of this Motion is denied, to issue an Order in accordance with 28 USC § 1292(b), 4) if the Court denies reconsideration of the Order instructing Corellium to send the server to Apple for the "On-Premises" version of the CAP, then to grant Corellium its reasonable reimbursement of expenses and lost business revenue, which will be ▇▇▇▇▇▇▇▇▇▇▇▇▇, and 5) granting any other relief this Court deems proper and just.

---

[31] *See*, Protective Order, at ¶ 1(a) ("Protected Material designated under the terms of this Protective Order shall be used by a Receiving Party solely for this case and shall not be used directly or indirectly for any other purpose whatsoever, including any commercial purpose.").

CASE NO: 9:19-cv-81160-RS

**CERTIFICATION UNDER PENALTY OF PERJURY OF CHRISTOPHER WADE IN SUPPORT OF THE CERTAIN FACTUAL STATEMENTS MADE HEREIN**

"I certify under penalty of perjury under the laws of the United States of America that the foregoing factual assertions, as specifically indicated above by the note: "This fact certified by C. Wade," are true and correct."

Executed on March 27, 2020.

By: */s/ Christopher Wade*
CHRISTOPHER WADE

**LOCAL RULE 7.1(A)(3) CERTIFICATION**

Pursuant to Local Rule 7.1(a)(3), prior to the filing of the instant Motion the undersigned counsel verifies that counsel for Defendant conferred via telephone call with counsel for Plaintiff on March 26/27, 2020, regarding multiple issues, including the hypervisor and the "On-Premises" version of the Corellium Apple Product. Plaintiff opposes the relief seeking to exclude the hypervisor from the Court's new definition of Corellium Apple Product, but counsel for the Parties are currently working to see if a compromise can be reached relative to the "On-Premises" version of the Corellium Apple Product and the logistic issues Corellium has raised related thereto. The undersigned will update the Court should any agreement be reached.

**LOCAL RULE 7.1(d)(2) CERTIFICATION**

Corellium requests this District Court for an *Expedited* ruling on the instant Motion contained herein, pursuant to Local Rule 7.1(d)(2) because pursuant to the Omnibus Order, Corellium has until March 31, 2020 to comply with that Order. The *Expedited* ruling is necessary by March 31, 2020 to avoid Corellium having to incur expenses of over ████, in addition to its significant loss of profits that would result from the loss of resources in producing the "On-Premises" version of the CAP, and being forced to provide its highly proprietary technology, Should Corellium not have a ruling on this instant Motion Corellium will be forced to produce highly proprietary material that Corellium believes is highly improper to be deemed discoverable

in this case and will incur ▮▮▮▮▮▮▮▮ in expenses, loss of profit and resources. Moreover, Corellium asserts that is not logistically possible to comply with portions of the Omnibus Order, particularly by providing Apple with the "On-Premises" CAP, by the date provided for—March 31, 2020.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 28th day of March, 2020, a true and correct copy of the foregoing has been furnished by electronic filing with the Clerk of the court via CM/ECF, which will send notice of electronic filing to all counsel of record.

Dated: March 28, 2020                              Respectfully submitted,

                                          COLE, SCOTT & KISSANE, P.A.
*Counsel for Defendant CORELLIUM, LLC*
Esperante Building
222 Lakeview Avenue, Suite 120
West Palm Beach, Florida 33401
Telephone (561) 612-3459
Facsimile (561) 683-8977
Primary e-mail: justin.levine@csklegal.com
Secondary e-mail: lizza.constantine@csklegal.com

By:   *s/ Justin B. Levine*
JONATHAN VINE
Florida Bar. No.: 10966
JUSTIN B. LEVINE
Florida Bar No.: 106463
LIZZA C. CONSTANTINE
Florida Bar No.: 1002945
MICHAEL A. BOEHRINGER
Florida Bar No.: 1018486

*and*

PIERCE BAINBRIDGE BECK PRICE & HETCH, LLP
*Counsel for Defendant*
277 Park Avenue, 45th Floor

> New York, NY 10172
> Telephone (646) 779-5315
> Facsimile (646) 968-4125
> David Hecht, *Pro hac vice*
> E-mail: dhecht@nortonrosefulbright.com
> Maxim Price, *Pro hac vice*
> E-mail: mprice@piercebainbridge.com
> Melody McGowin, *Pro hac vice*
> E-mail: mmcgowin@pierbainbridge.com
> Wen Wu, *Pro hac vice*
> E-mail: wwu@pierbainbridge.com
> Minyao Wang, *Pro hac vice*
> E-mail: mwang@pierbainbridge.com