# EXHIBIT C

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                     WEST PALM BEACH DIVISION
                    CASE NO. 19-81160-CIVIL-SMITH
 3

 4   APPLE, INC.,                      West Palm Beach, Florida

 5              Plaintiff,             February 12, 2020
                                          -and-
 6        vs.                          February 13, 2020

 7   CORELLIUM, LLC,

 8              Defendant.             Pages 1 to 368

 9   _____

10                         MOTION HEARING
          BEFORE THE HONORABLE WILLIAM MATTHEWMAN,
11              UNITED STATES MAGISTRATE JUDGE
          (TRANSCRIBED FROM THE DIGITAL AUDIO RECORDING)
12
     APPEARANCES:
13

14   FOR THE PLAINTIFF:     JESSICA STEBBINS BINA, ESQ.
                            LATHAM & WATKINS, LLP
15                          10250 Constellation Boulevard
                            Suite 1100
16                          Los Angeles, California 90067

17
                            ELANA NIGHTINGALE DAWSON, ESQ.
18                          LATHAM & WATKINS, LLP
                            555 Eleventh Street, Northwest
19                          Suite 100
                            Washington, DC 20004
20

21                          EMILY PINCOW, ESQ.
                            LASH & GOLDBERG, LLP
22                          100 Southeast Second Street
                            Suite 1200
23                          Miami, Florida 33131

24

25
```

1    itself.  And that is what copyright is.

2           The second is the copyright infringements of what are

3    called in close form as GUI elements, or G-U-I, which is

4    graphic user interface.  And in layperson's terms, if you look

5    at an iPhone, your Honor, the graphic user interfaces are the

6    four apps that run across the screen or on a computer.  It's

7    the icons that you can click on to open up Word or Microsoft

8    Outlook, what have you.

9           Those are the two items that are at issue here.  And

10   that's --

11          THE COURT:  Let me ask you:  Isn't Apple's iOS iTunes

12   and the GUI elements at issue?

13          MR. LEVINE:  ITunes is an app within iOS, if I'm

14   stating that correctly.  And so while it can be accessed

15   through iOS, iOS is really the operating system.

16          So if you will, you can have the operating system,

17   which is iOS, which is almost the platform, and you can load

18   things onto it such as downloading applications, programs, or

19   you can take those things off.

20          And so it's the -- it's the functionality of iOS which

21   Apple is claiming that's being infringed.

22          And then also it's the -- it's the arrangement and the

23   reproduction of the graphic user interface elements.

24          And those two points are really critical, as I'll get

25   into in some of the interrogatory issues and some of the

```
 1    requests for production.  But in brief, your Honor, Apple is
 2    seeking carte blanche access into Corellium's product.  And if
 3    I can try --
 4         THE COURT:  When you say Corellium's product, you mean
 5    Corellium's Apple product?
 6         MR. LEVINE:  So no.  And that's the distinction that I
 7    want to make.
 8         Corellium prepared on its own what's called a
 9    hypervisor.  The hypervisor is what Corellium sells.  The
10    hypervisor is a software program that enables the
11    virtualization of something.
12         For example, the most simplistic form that I've been
13    able to come up with:  Your Honor probably has a calculator on
14    your computer.  It's not a Texas Instruments hard device, but
15    when you open up your computer, you can open up the calculator
16    program.  That's a virtualized calculator.  That does
17    everything that a calculator can do.  There's a software
18    program within the operating system on your computer that
19    enables that virtualized calculator to appear to operate or to
20    operate.
21         Corellium built that.  Corellium built the actual
22    product that merely facilitates what would appear to be the
23    operation of something else.
24         So Corellium's product actually does other things.  It
25    does -- it virtualizes Android; it virtualizes different
```

```
 1    Google-related software; it can virtualize iOS.  So it's not
 2    isolate -- it's not a product in itself.
 3           THE COURT:  Well, isn't -- but isn't the lawsuit about
 4    Corellium's Apple product?
 5           MR. LEVINE:  That's what -- that's a name that Apple
 6    has dubbed it.  I think we've receded from that name due to --
 7    due to technicalities.  But I guess for ease of conversation,
 8    we can certainly agree to that.
 9           But I just want to make clear that there's the
10    Corellium product, and that's what Corellium sells.  And it's
11    kind of a service in itself.  And it can --
12           THE COURT:  What does Corellium call it?
13           MR. LEVINE:  I think the Corellium service and
14    product -- they call it the hypervisor.  But for lay people
15    like us, your Honor, I think we would probably reduce it to the
16    Corellium product, maybe.
17           But in a tech world, I think they call it the
18    hypervisor or the Corellium hypervisor.
19           And the Corellium hypervisor can -- you can upload
20    things to it and then you can use them virtually.  IOS is one
21    of those things.
22           And so the joining of Corellium's hypervisor with
23    uploading an iOS file to it is what Apple is collectively
24    calling the Corellium Apple product.
25           And so, you know, there's a large effort here to gain
```

```
 1   complete access to what I guess I can call for clarity is the
 2   hypervisor.  And that has nothing to do with iOS.
 3        Now, it can in my layman's terms play iOS on it.  But
 4   it has nothing to do and it uses no code and it has no
 5   connection specifically to iOS.
 6        And that's where the DMCA issue comes into play in this
 7   case, is that in order to virtualize iOS, the Corellium
 8   customer has to go out and get an iOS file.  It's not provided
 9   by Corellium.
10        So they have to download an iOS file from Apple right
11   on Apple's website.  They download it and then they can upload
12   it to Corellium's hypervisor.  It's that joining that Apple is
13   dubbing the Corellium Apple product.
14        THE COURT:  Well, let me ask you, and then I'll ask the
15   other side too when I give them a chance to reply.  But is the
16   Corellium Apple product as Apple calls it or the hypervisor or
17   Corellium product as you describe it -- is it composed of both
18   hardware and software?
19        MR. LEVINE:  No.  It runs on hardware, but the product
20   or service itself is Corellium's code, which is software.
21        THE COURT:  Does it contain a modified version of
22   Apple's proprietary operating system, the iOS?
23        MR. LEVINE:  So the answer -- the technical answer to
24   that is no.  It does not contain any version of iOS.
25        But if -- your Honor, I can explain, because it can be
```

 1    a little bit more complicated than that.

 2          THE COURT:  Right.

 3          Because the concern -- I mean, I'm trying to understand

 4    what's at issue here.  And it seems like there's allegations

 5    that what Apple refers to as the Corellium Apple product does

 6    contain a lightly modified version of Apple's proprietary

 7    operating system, iOS, that it displays copyrighted GUI

 8    elements.

 9          And I think those are issues that are important to hear

10    from both sides on.  And whether or not Apple's whether or not

11    the product, Corellium's product, does it modify Apple's

12    software to allow it to operate on non-Apple hardware?  And is

13    Corellium profiting off something that is Apple's proprietary

14    information?  So I'm trying to understand what Corellium's

15    issue is.

16          And I understand a lot of this is fair use doctrine,

17    which would of course be under Section 107 of the Copyright

18    Act.  But, you know, the fair use doctrine -- I don't think the

19    fair use doctrine is for profit.  You can discuss that with me,

20    if you'd like.

21          But if somebody is using the fair use product, isn't

22    that often for either criticism or comment or news reporting or

23    educational purposes or something of that nature as opposed to

24    taking some product which is allegedly copyrighted or protected

25    and somehow modifying it and selling it?  I mean, I'm trying to

```
 1    understand the different positions of the parties here.

 2              MR. LEVINE:  I'm happy to elaborate on that.

 3              So respectfully, your Honor, profit and commerce is not

 4    a bar to the application of fair use.  And there are a number

 5    of ways that one can have a fair use argument and still profit

 6    on it.

 7              One of the most recent and most notable is the *Authors*

 8    *Guild* matter, where Google was using their new -- their new

 9    database to make books searchable.

10              THE COURT:  Right.  But isn't there a balancing test?

11    In other words --

12              MR. LEVINE:  Sure.

13              THE COURT:  -- the Court -- what the Courts normally do

14    is apply a balancing test.

15              I mean, it doesn't mean that all nonprofit education or

16    all noncommercial uses are fair and all commercial uses are not

17    fair.  What it means is there's balancing that goes on.  And if

18    a big motivation here is making money, I think that -- and your

19    contention on behalf of Corellium is that it's not; it's not

20    educational, and trying to find out bugs and security issues --

21    I think those are issues that the parties are entitled to at

22    least discover.

23              MR. LEVINE:  I agree in that there's a balancing act.

24    I 100 percent agree with that, your Honor.

25              Just to -- for a very simple example again, parity
```

1   falls well within -- well within the fair use doctrine.  But

2   obviously, parity and things like movie reviews and book

3   reviews, those are all commercial -- commercial enterprises

4   that have been deemed okay in fair use.

5         So, you know, Corellium -- whether there's a discussion

6   today as to what the pure motivations of Corellium are and the

7   balancing between commerce and my client's just pure love for

8   this -- for this software and what they can present to the

9   industry, I don't know if that's proper today.  I can tell you,

10  I guess, off the record that I know my clients and that their

11  absolute love for this technology is their entire life.

12        THE COURT:  Right.  No.  I'm just trying to get an

13  overview as to the parties' positions so -- to the extent that

14  it informs what's discoverable and what isn't.

15        MR. LEVINE:  Right.

16        THE COURT:  And that's what I'm trying to -- because as

17  you know, under 26(b)(1), we look at what's relevant and what's

18  proportional in reference to the claims and the defenses in the

19  case.

20        MR. LEVINE:  So --

21        THE COURT:  And so I'm trying to cabin the discovery

22  within the parameters of 26(b)(1).

23        MR. LEVINE:  So let me frame what is appropriate, I

24  think, for discovery, your Honor.

25        As I mentioned earlier, there's the hypervisor.

1    There's the core product that Corellium makes or the service

2    that they provide that doesn't strictly relate to iOS.

3         Once a file is uploaded onto the Corellium hypervisor,

4    and then that access is provided to Corellium's then client,

5    that stuff we would concede.  That relationship we would

6    concede is subject to discovery.

7         Corellium's core product is not, because it does so

8    many other things.  And it's so highly sensitive and the -- as

9    I mentioned, given who the clients are and the way that they

10   are using this product for discovery -- not for discovery --

11   for research and security research, that just carte blanche

12   access into a product that has nothing to do with Apple, I

13   think, is just far too broad, especially in the consideration

14   of who the two entities are, both Apple and Corellium.

15        Corellium has a highly sensitive code that it provides

16   to highly sensitive clients.  And if that code or that product

17   was to get into the hands of a highly capable entity like

18   Apple, especially given the history of Apple's longstanding

19   desire to obtain this information and to obtain this product, I

20   think that is -- falls well beyond the discovery.

21        And I truly believe that this Court must take into

22   consideration the sensitivities in this case.

23        That being said, we concede that the aspects that

24   relate to iOS are subject to discovery.

25        Now I'd like to touch on a point that your Honor

 1   brought up that I didn't get to get to and whether there's iOS

 2   contained within the iOS -- or the hypervisor product and how

 3   that whole distinction works or the connection, if you will.

 4        In order to what I would say play an iOS file on

 5   hypervisor, there have to be some slight modifications.  It's

 6   not an equal blend or match-up because of the way that Apple --

 7   because of the way these files are offered online publicly.

 8        And so there are some patches that have to be done that

 9   simply make that connection possible, make something

10   compatible, if you will.

11        Again, Corellium would concede that that aspect is

12   subject to discovery.

13        That being said, the -- and this goes in -- quite a bit

14   into the transformative argument:  This product that Apple is

15   calling the Apple Corellium product -- this product is used

16   entirely for research and security research and app testing and

17   software testing.  That is it.  And the facts of this case

18   establish that.

19        The -- again, the Apple Corellium product cannot -- so,

20   you know, a virtual iPhone, if you will, you have this on your

21   computer.  Initially, it's not a physical device.  In order to

22   use it, you would have to hold your monitor up to your head,

23   and that's just not -- obviously, that's just an absurd

24   argument.

25        More importantly, the Apple Corellium virtual device,

1    the virtue iPhone, cannot make phone calls; it cannot access

2    iTunes; it cannot send emails; it cannot send text messages; it

3    cannot take pictures.

4              THE COURT:  But it can be sold.

5              MR. LEVINE:  But it can...?

6              THE COURT:  But it can be sold.

7              MR. LEVINE:  The -- see, it's the virtualization itself

8    that can be sold.  A DVD can be sold.  And if you put that in

9    your DVD player and you reproduce the image, that can be

10   watched.  But then the DVD player itself is an entirely

11   separate entity.

12             THE COURT:  What if you had a -- what if you had a

13   copyrighted book and you uploaded it and modified it and sold

14   it?  Is that okay?

15             MR. LEVINE:  That's the *Authors Guild* case, your Honor.

16             THE COURT:  Okay.

17             MR. LEVINE:  And the Court did find that that was fair

18   use.

19             Corellium sells the facilitation of virtualization.

20   And that's why Corellium concedes that any aspect of that

21   product that relates to iOS does fall within the discovery

22   standard.

23             But any part of Corellium that relates to Android or

24   Google or anything else that they're doing just has nothing to

25   do with Apple, especially their common code.  It just doesn't.

1    important "but" -- we did get the 3,000-page privilege log last

2    night.  I would guesstimate that half of that is based on a

3    trade secret objection rather than attorney-client or work

4    product.  And so there's very large numbers of documents that

5    appear to be withheld on the trade secret, which isn't really a

6    privilege; it's more of an objection based on confidentiality.

7            So it's not clear whether they're producing in full to

8    this request or -- other than privilege or whether they're

9    withholding on the basis of trade secrets.

10           THE COURT:  All right.  Now, when you're referring to

11   iOS firmware files in 2 and iOS firmware files in 3 and iOS in

12   4, is it redundant to call that Apple proprietary?  In other

13   words, is iOS only exclusive to Apple?

14           MS. STEBBINS BINA:  I believe we defined it to be the

15   Apple product.  And we're certainly not interested in any

16   non-Apple products.

17           IOS, I believe, is exclusive to Apple.  There may be

18   some underlying technologies that they've licensed from

19   somewhere else for parts of it.  But we're only asking about

20   our product.

21           And I think that --

22           THE COURT:  All right.  So what I'm going to do to --

23   because there are so many of these that are at issue -- just

24   give me a brief argument as to why I should grant the motion to

25   compel as to 1 through 4 and then I'll hear from the defense

1      side and then -- before we go on any further.

2              MS. STEBBINS BINA:  Certainly, your Honor.

3              1 through 4 are the core of this case.  We need to know

4      what their product is, how it operates, how it's making copies

5      of, displaying and modifying our product.  And that's what

6      we're asking for in Requests 1 through 4.

7              THE COURT:  Okay.  Thank you.

8              Let me hear from defense counsel on their Requests 1

9      through 4.  I think they're all -- they all go together.

10             MR. LEVINE:  Good afternoon, your Honor.

11             As it relates to these four requests, initially, my

12     understanding is that the hypervisor does not make copies, make

13     any copies.

14             And again, just for the Court's understanding, the iOS

15     file is simply uploaded and the virtualization software merely

16     facilitates what I call the playing of that file.

17             So as it relates to this, these documents -- so I

18     disagree with Ms. Bina in that they defined it only as it

19     relates to iOS.  So actually the definition -- the definition

20     includes all products developed, produced or sold by Corellium

21     that can enable creation of at least one virtual device.

22             That's everything Corellium.

23             THE COURT:  Right.

24             MR. LEVINE:  As I've already --

25             THE COURT:  I'm not going to allow that.  I can tell

1    you what my inclination is, Mr. Levine, on Nos. 1 through 4.

2    It's to grant the motion to compel to the extent it relates to

3    the Corellium Apple product, the Apple items at issue.

4         And, for example, in Request For Production No. 2, I'm

5    inclined to put "Apple proprietary" before iOS firmware files;

6    I'm also inclined to put "Apple proprietary" before iOS

7    firmware file in 3 and put "Apple's proprietary" in front of

8    iOS in No. 4.

9         I do think it's relevant and I think it's proportional.

10   I think it does go to this case, what they're alleging.

11   They're alleging that Corellium's Apple product violates their

12   copyrights.  You're saying it doesn't.

13        In order for that to be determined, I think there's

14   going to have to be design, structure and operation of the

15   Corellium Apple product documents to show how it works, how it

16   operates, and then the Court can make a decision at some point

17   whether or not it does violate a copyright or whether it's not

18   violative.  I don't know the answer to that.  It's much too

19   early to tell.

20        But I do think 1 and 4 limited to the Apple proprietary

21   information needs to be produced.

22        MS. STEBBINS BINA:  And just for clarity, your Honor,

23   iOS is defined in our requests as --

24        MR. LEVINE:  That's the definition he was reading.

25        MS. STEBBINS BINA:  Right.

```
 1              I'm talking about the definition in the request means

 2    Apple's iOS mobile operating system and other Apple operating

 3    systems, including iPad OS, MacOS, Watch OS and TV OS,

 4    operating systems.  This term includes any and all versions of

 5    iOS.

 6              So this is Apple proprietary -- our requests already

 7    limited it to Apple proprietary.

 8              THE COURT:  I'm not -- in all of these discovery

 9    rulings, I'm not going to allow Apple to get into Corellium's

10    other business.

11              MR. LEVINE:  Thank you.

12              The term that was at issue was Corellium Apple product.

13    And that is included in 1 through 4, and that was the

14    definition.  And thank you, your Honor.  I think you addressed

15    it here.

16              THE COURT:  Okay.  So I'm going to grant the motion to

17    compel 1 through 4 with the proviso that it deals with the

18    Corellium Apple product and Apple's proprietary firmware.  All

19    right?

20              MR. VINE:  That's not the way they defined it.

21              MR. LEVINE:  Your Honor, just to be clear, not the way

22    that it's been defined as Apple -- Corellium Apple product,

23    because that inherently -- I think that's the issue here, is

24    that inherently involves everything Corellium.

25              THE COURT:  Right.
```

```
 1              And so what I want the parties to do is over lunch to

 2    see if you can agree on a definition for the Corellium Apple

 3    product in the interrogatory because it's not going to include

 4    everything that Corellium does.  It's just not.

 5              MR. LEVINE:  Thank you, your Honor.

 6              MR. VINE:  Thank you.

 7              THE COURT:  It is going to include everything that's at

 8    issue in this lawsuit, which is Apple's allegations that

 9    Corellium has taken copyrighted-protected material from Apple

10    and has done something with it improper that violates the

11    copyright.

12              MS. STEBBINS BINA:  Your Honor, if I could briefly be

13    heard on that.

14              We have --

15              THE COURT:  Sure.  But why don't you come up to the

16    microphone so I can -- I can hear you.

17              MS. STEBBINS BINA:  My apologies.

18              We have already attempted to confer on this topic.

19    We're certainly not interested in an Android product or

20    something like that.

21              But where we keep getting stuck is that we do believe

22    the hypervisor technology is part and parcel of our claim.

23              And their argument is:  No.  We don't have to give you

24    the hypervisor software.  We only have to give you whatever

25    software we use the modify the Apple product.  We don't have to
```

```
 1    show how it works with our underlying product.

 2          And again, we don't have any way to know exactly how

 3    that product works without the materials.

 4          But in our view, the Corellium Apple product includes

 5    the hypervisor because it's necessary to make the Corellium

 6    Apple product display.  In other words, you can't get just

 7    their Apple software.  It will do nothing without the

 8    hypervisor as part of it.

 9          THE COURT:  All right.

10          MR. LEVINE:  May I respond, your Honor?

11          THE COURT:  Sure.

12          MR. LEVINE:  So first of all, there's no allegation --

13    first of all, there's no allegations as it relates to the

14    hypervisor.

15          The allegations in this case is around the iOS and the

16    display and virtualization of iOS.  That's the first point.

17          The second point is that there is a way to check.  This

18    case is a copyright case.  Copyright is the expression of an

19    idea on a tangible medium.

20          And so there is a way to check:  You look at it.  You

21    don't need -- you know, I've used this DVD player thing before.

22    If we provide the DVD player, you don't need to break the DVD

23    player down and look at the internals to know whether it's

24    playing an exact copy, a modified copy, a derivative copy on

25    the television of the movie.
```

```
 1              And so if there are some patches or, you know, whatever
 2   that's required to make that DVD compatible with the DVD
 3   player, that would be discoverable.  But you don't need to
 4   break the DVD player apart because -- simply because it plays
 5   PlayStation games, Xbox games, everything else, and that's the
 6   idea.
 7              So we concede the -- excuse me.
 8              THE COURT:  Is what you're calling a hypervisor, is
 9   that software or hardware?
10              MR. LEVINE:  Software.
11              THE COURT:  And the hypervisor was developed by
12   Corellium?
13              MR. LEVINE:  100 percent.
14              THE COURT:  And what you're saying is Apple's iOS
15   system, et cetera, is put onto the hypervisor software?
16              MR. LEVINE:  It's similar to a DVD.  The hypervisor
17   merely facilitates the viewing and use to a certain extent --
18   again, transformative, taking it apart --
19              THE COURT:  But doesn't it do that by, for example,
20   taking away certain permissions or what you referred to as
21   patches and preventing it from working the way it would have
22   worked?
23              MR. LEVINE:  No.  So that's separate code.  And that
24   Corellium would concede would be discoverable.
25              That -- so a similar code would be needed to run an
```

1   Android operating system or a Sony operating system or

2   something else.  And so it's -- the hypervisor is the product

3   or service here.  There's -- you can play certain files on

4   that.  Anything related to those files, whether it's

5   compatibility, the changing of options or features, the

6   downloading of that, all of that would fall directly within the

7   scope.

8           But again, your Honor, I would like to reiterate, this

9   is a copyright case, not a patent case.  This is not the

10  stealing or theft of an invention.  This is the display, the

11  wrongful display or reproduction.  So you can test this merely

12  by looking at it and using the end product.

13          THE COURT:  Well, here's what I'm going to do:  I'm

14  requiring the production for 1 through 4 as I've indicated.

15  What I'm going to do is, over lunch, I'm going to ask both of

16  you to try and agree on a definition of the Corellium Apple

17  product that the parties can live with for purposes of these

18  interrogatories.  If you cannot, then I want you each to draft

19  up and give me this afternoon what your definition is to be

20  used in these interrogatories.

21          MR. LEVINE:  Yes, your Honor.

22          THE COURT:  All right?  Because I want to get this

23  issue resolved.  And one of the problems is, I really don't

24  have any affidavits or technical experts that are telling me

25  which is correct.  So you're asking me to rule on this in a

1    manner that is not easy.

2         And I want to be protective of Corellium if they have a

3    real trade secret or something developed.  On the other hand, I

4    want to make sure Apple gets full discovery that they're

5    entitled to.  So if the parties can try to work out a

6    definition, great.  If you can't, then I'm just going to have

7    to pick one and the parties are going to have to live with it.

8    Okay?

9         All right.  Let's go to Interrogatory 7.

10        MR. VINE:  The request for production, you mean.

11        THE COURT:  I'm sorry?

12        MR. VINE:  The request for production.

13        THE COURT:  I keep saying interrogatory.

14        MR. VINE:  I got it.  I just want to make sure the

15   record is clear, you know.

16        THE COURT:  Thank you.

17        RTP, Request For Production or Request to Produce 7.

18        MS. STEBBINS BINA:  Your Honor --

19        THE COURT:  Let me hear from Ms. Bina on that.  All

20   documents relating to the functionality and design of all

21   hardware used by or in conjunction with the Corellium Apple

22   product, including engineering specs, requirements, documents,

23   et cetera, et cetera, user manuals and source code.

24        MS. STEBBINS BINA:  Your Honor, before we get to 7, I

25   do want to raise 6, which wasn't raised in our original motion

1   because they --

2          THE COURT:  I don't see that as being raised at all.

3          MS. STEBBINS BINA:  It's raised -- it is raised in the

4   reply.  It's one where they originally raised it and they

5   originally agreed to produce it and then changed it from a

6   "will" to a "won't" in their amended responses.

7          THE COURT:  Okay.  So why are we arguing about 6 if the

8   Defendants have previously agreed to produce the information?

9          MS. STEBBINS BINA:  Because they changed it.  In the

10  amended response, they changed it from "will produce" to "won't

11  produce."

12         THE COURT:  All right.  So --

13         MS. STEBBINS BINA:  So we filed a motion at a time

14  where they had agreed to produce it and then they changed it to

15  say they're not producing it.

16         THE COURT:  All right.  Mr. Levine?  I mean, I think

17  bypassing security measures in iOS seems to be highly relevant

18  to this lawsuit.

19         MR. LEVINE:  One moment, your Honor.  Let me just look

20  at this a little bit more closely.

21         THE COURT:  All right.

22         MR. LEVINE:  Yeah.  Candid --

23         MR. VINE:  We're going to confer.

24         MR. LEVINE:  I'd like to confer with my client, your

25  Honor.

```
 1   little hard to tell whether they're -- whether they're

 2   representing it accurately or not.

 3          But here, the issue is, they've said they'll produce

 4   non-privileged documents.  But again, they're claiming trade

 5   secret as a privilege.  So it's not clear what they've agreed

 6   to produce and what they haven't.

 7          THE COURT:  All right.  Let me hear from Mr. Levine.

 8   What about No. 7?  What are you producing and what's your

 9   objection?

10          MR. LEVINE:  Your Honor, this goes back, I think, to

11   our original argument.  Frankly, I think this definition that

12   we're going to be coming up with over lunchtime is probably

13   going to put a huge dent in a lot of these.

14          THE COURT:  Okay.

15          MR. LEVINE:  So --

16          THE COURT:  So I can defer on that and we can go to

17   some other ones, because I do think that -- I can understand

18   now that the definition of a Corellium Apple product is really

19   being fought here.

20          MR. LEVINE:  I think it's paramount.

21          THE COURT:  And I think the parties have to realize

22   that there's going to be discovery.  So I think it's better if

23   both sides, who know their cases better than I do, can agree on

24   a definition and, you know, whatever I rule today, if more

25   discovery is needed later or if any relief is needed later, I
```

1    can always consider that.  But I want to get discovery going.

2    I want to make sure both sides are producing discovery so we're

3    not at a stalemate.  All right?

4            MR. LEVINE:  Thank you, your Honor.

5            THE COURT:  All right.  No. 8 and 9.  Let's talk about

6    8.

7            MS. STEBBINS BINA:  Your Honor --

8            THE COURT:  Yes.

9            MS. STEBBINS BINA:  -- I think a lot of these do relate

10   to the same issue.  You know, because they've said they'll

11   produce -- so, for instance, for 8, they've produced documents

12   relating to the functionality of their software.

13           But we have a dispute over what software that is.

14           We also have a dispute over what they've agreed to

15   produce, because we've asked about the design of the product as

16   well as its functionality.

17           And their argument literally is:  You can look at it

18   and see that it's displaying Apple's iOS; and therefore, you

19   don't need any discovery on how it operates or what it is.

20   And, you know, other than what you can see, essentially.

21           And I don't think that's right.  I think we do --

22           THE COURT:  No.  And I agree with you there.  I think

23   you need something more than that.

24           The question is:  How much more than that do you need?

25   And so I agree with you there.  I don't -- I agree with the

1    Defendant that you're not entitled to get into their entire

2    business and everything that they do and everything they

3    create.

4          But there's got to be -- like I said, I'm happy to

5    decide it, and I'll decide it as fairly as I can.  But these

6    are a lot of things that perhaps counsel can also try and work

7    out to some degree when we take a break.

8          MS. STEBBINS BINA:  Right.

9          And I think that that does go to the core issue, your

10   Honor.  My understanding is not that they sell a hypervisor and

11   then you load the Apple package on it.  At least as I

12   understand it, they sell a product that includes both the

13   hypervisor package and the -- and the Apple package.  I don't

14   know that those are separate things in my view, in my

15   understanding.

16         THE COURT:  So you think that they take the Apple

17   proprietary information and incorporate it into their

18   hypervisor and sell that?

19         MS. STEBBINS BINA:  Well, into their software product

20   in any way.  It may be a combination of what they call

21   hypervisor and what they call the Apple software.  But I think

22   they're selling it as a package.  And that package is what

23   we're interested in.

24         We're not interested in an Android package or --

25         THE COURT:  Right.  That would be of no use to you.

1          MS. STEBBINS BINA:  Right.  Or a hypervisor that

2     doesn't apply the Apple product.

3          We're interested in what they do to play the Apple

4     product.  But that includes, I believe, some of this hypervisor

5     technology.

6          THE COURT:  Right.

7          MS. STEBBINS BINA:  And that's where we're getting

8     stuck.

9          THE COURT:  I think it might include -- I think it

10    probably includes some of it.

11         MS. STEBBINS BINA:  Yeah.

12         THE COURT:  Maybe not all of it.

13         MS. STEBBINS BINA:  And again --

14         THE COURT:  And that's why I really think that, you

15    know, we need to -- because, you know, let's face it:  This

16    issue -- we need to get through discovery so at some point the

17    Court can get to summary judgment or trial.  I mean, that's

18    really what you want to do.  We don't want to be spending an

19    inordinate amount of time on discovery because it's really the

20    end result that the parties want.

21         MS. STEBBINS BINA:  I completely agree, your Honor.

22    And we have expert reports due on March 3rd.  And I have none

23    of their software to give to my software expert, let alone all

24    of it.

25         So, you know, 8, I think that, setting aside the issue

```
 1    of the Corellium Apple product, I think we do need design as
 2    well as functionality.
 3             Same thing for 9.
 4             THE COURT:  I agree that you need design and
 5    functionality.
 6             MS. STEBBINS BINA:  Same thing for 10.  All of these
 7    are about design and functionality.
 8             But for 10, they have -- they've said -- 10 is design
 9    and development.  Again, I think we need to know -- I think
10    that's fair for the product that's at issue, whatever your
11    Honor decides that is.
12             THE COURT:  Well, I certainly think you need design and
13    how it's applied, how it's utilized.
14             MS. STEBBINS BINA:  And I think 11 is the same thing,
15    architecture and structure of the product.
16             12:  testing and analysis of the product.
17             THE COURT:  Why would you need anything on 12?  Why
18    would you need anything about testing?  I mean, what difference
19    does it make as far as testing?
20             MS. STEBBINS BINA:  Well, I think considering that,
21    your Honor, it's probably less -- less core relevance.  You
22    know, I think what we want to know in terms of testing and
23    analysis, one of the issues here is we believe they have
24    potentially used Apple code in developing the product and/or
25    gathered Apple code from a jailbroken iPhone or a dev  -- what
```

```
 1    Apple calls dev-fused phones, which are a special kind of
 2    iPhone that's offered to security researchers.
 3          So our concern is that they may have used our product
 4    in developing their product and in testing it and that there
 5    may be infringement incorporated into that.  So that's the
 6    thinking behind that request.
 7          THE COURT:  Right.
 8          And I think that whether or not Corellium has used the
 9    Apple code or Apple codes in development of the product I think
10    is probably relevant in this lawsuit.
11          I don't know if all testing done by them or anybody
12    else is relevant.
13          MR. LEVINE:  Can I respond, your Honor?
14          THE COURT:  Yes.
15          MR. LEVINE:  Initially, Apple doesn't provide a
16    hypervisor.  There's -- we can't use that code.  Even if we
17    did -- and we didn't, my client -- but there's no code to use,
18    because we're not providing an operating system -- I keep
19    saying "we" -- Corellium provides a virtualization product.
20          Apple doesn't have that, which inherently debunks this
21    entire case.
22          It's -- and I'll tell you just from the start, the idea
23    behind copyright is that we're using the same product, yet
24    Apple has offered millions and millions of dollars to buy it.
25    If it's exactly the same thing or even just a close derivative
```

```
1    of it, there wouldn't be the value behind that.

2              THE COURT:  Right.  And I understand.

3              But aren't we getting into what the decision will be at

4    summary judgment?

5              MR. LEVINE:  Yes.  Yes.

6              THE COURT:  And they have to be able to counter that

7    argument by getting discovery.

8              MR. LEVINE:  Right.

9              But the point here -- and what's going on right now,

10   unfortunately, is I think this process -- and with 100 percent

11   respect to the other side right now, I think the discovery

12   process is being plagued by just an inherent misunderstanding

13   or not understanding the technology.

14             The --

15             THE COURT:  But how can they understand it if you don't

16   produce anything to them?

17             MR. LEVINE:  Because there's no -- there's no code to

18   use.  That would be like somebody saying, We're trying to clone

19   a -- or develop a human fetus in a lab using parts from a

20   chair.

21             It's -- and they're saying, Well, if we don't have a

22   DNA sample from the fetus, how will we know that there's no

23   wheels from the chair being used?

24             THE COURT:  So why can't Corellium answer and state:

25   We have used no code at any time of Apple?
```

```
 1            MR. LEVINE:  We can probably put that in the affidavit,

 2    sir.

 3            THE COURT:  I mean, if they're concerned about that.

 4            But the problem I'm having is you seem to accept your

 5    client's position as gospel and your argument seems to be:

 6    This is the way it is.  Therefore, Apple has no right to

 7    discover into any other alternative explanation of what

 8    Corellium is doing.

 9            And that's not the way it works.  Apple has a right to

10    find out this product that they're alleging is infringing on

11    their copyright.  They have a right to understand what

12    Corellium has done by taking their iOS or utilizing their

13    files, their proprietary information and what they've done with

14    this inside Corellium that violated copyright.

15            And I understand you're saying that this is a virtue --

16    a visualization project or a virtualization product.  But they

17    need to get sufficient discovery in order for them to determine

18    if that argument is correct or not.

19            MR. LEVINE:  Right.

20            So I think the point that I've made consistent

21    throughout today's proceedings as well as through our

22    conferrals is that we concede that code, function, design, use

23    as it relates to the virtualization of iOS would be -- would be

24    discoverable.

25            Anything relating to their core product, hypervisor,
```

```
 1    simply is not.  And that's the distinction.

 2         So we're --

 3         THE COURT:  So what you're saying is their core

 4    product, hypervisor, is totally separate from the code,

 5    function, design, use relating to the virtualization of iOS?

 6         MR. LEVINE:  Yes.  The iOS file is merely a file you

 7    can play on the hypervisor.  It's --

 8         THE COURT:  Right.  But don't they have a right to

 9    determine what that hypervisor is doing to their proprietary

10    information?

11         MR. LEVINE:  I would concede that to the extent it

12    relates to iOS, yes.  And that's what I was talking about

13    earlier, is the patches.

14         So the patches, what I referred to, are the

15    compatibility fixes, if you will, that permit the iOS file to

16    be -- and I keep using the word "played" -- on the hypervisor.

17    Those, yes.  And those we've conceded to produce.

18         THE COURT:  All right.  Well, here's what I'm going to

19    do, because it's already past time we were going to take a

20    lunch break, and I have to give my staff lunch.

21         So here's what I want you to do:  We're going to take a

22    break -- it's 12:40 now -- in order to give you time to get

23    something to eat and talk.  I'm going to take a break until

24    2:00.  All right?  We'll come back at 2:00, and hopefully you

25    can resolve some of these issues.
```

1          I'm also considering the possibility of perhaps, if the

2    parties are available, to continue the hearing tomorrow.  And I

3    want the parties to talk about that among themselves.  I know

4    there may be travel plans and all.  But again, I'm going to

5    emphasize that if these issues don't get resolved -- and

6    they're complicated issues -- you all are going to be in a

7    difficult position come April and then come the -- I believe

8    it's an August trial date.

9          So I'm trying to do what I can to manage discovery.

10   But these are complex issues.  And some of the other issues

11   that are coming are not as complex, and I can rule on those

12   pretty quickly.

13         But as far as these discovery issues that Apple is

14   moving to compel on and that Corellium is moving to compel on,

15   they're complex; and we need to get them resolved so that

16   discovery can get produced.

17         So talk about it over the lunch break.  See if you can

18   resolve some of these issues, any of the other issues that are

19   out there.  We'll come back at 2:00.  And then I'm considering

20   starting again tomorrow at 10:00.

21         So I want the parties to look at their schedules and

22   report back to me at 2:00 whether that's doable, because we

23   really -- if we're going to get this discovery under way, we

24   need to spend some time on it.  We have not even gotten to

25   Corellium's motion to compel on three different requests --

1    don't get them until March 6th.  We're going to need ten days

2    from March 6th, not ten days from March 3rd.

3         MR. VINE:  But we --

4         THE COURT:  Well, here's the problem --

5         MR. VINE:  Your Honor has said that it's going to have

6    to be with the other judge, the other -- Smith.

7         THE COURT:  Yes.  What you'll have to do is file a

8    written motion on this, because it affects the scheduling

9    deadlines.  And the Court will have to consider that.  I

10   understand your position.

11        So the definition is that the Corellium Apple product

12   includes only those components of the Corellium platform that

13   are responsible for handling iOS.  Correct?

14        MS. STEBBINS BINA:  Yes, your Honor.  But I will have

15   one caveat:  We can get that motion on file probably tomorrow.

16        THE COURT:  Okay.

17        MS. STEBBINS BINA:  But if it's denied by Judge Smith,

18   I'm going to need to come back in here a lot sooner than the

19   28th in order not to prejudice our --

20        THE COURT:  All right.  And the -- let me just -- we'll

21   get to that in a second.

22        So that's the definition.

23        The Plaintiff will review the discovery produced by the

24   Defendant in response to Apple's first request for production

25   and determine if it believes that definition is sufficient.

1      Additionally, Defendant shall provide credentials to

2  Plaintiff's expert who will be allowed access to the Corellium

3  Apple product.  Is that what it is?

4      MS. STEBBINS BINA:  Yes, your Honor.  He'll basically

5  be able to interact with it as though he were a customer.

6      THE COURT:  All right.  And then Plaintiff shall be

7  permitted to seek discovery on a broader definition of the

8  Corellium Apple product if it feels -- if it believes in good

9  faith that Defendant's production per the above definition of

10  the Corellium Apple product is insufficient after it reviews

11  the discovery and its expert advises on its -- on his or her

12  interaction with the Corellium Apple product.

13      MS. STEBBINS BINA:  Yes, your Honor.

14      THE COURT:  Hold on just a second.

15      All right.  And what I would want to do is have the

16  production due by the same date we said before.

17      What day was that, Ken?

18      THE COURTROOM DEPUTY:  Give me one second.

19      MR. LEVINE:  February 24th, your Honor.

20      THE COURT:  Right.  That's correct.  Production due

21  2-24-20.

22      And as far as the expert issue, explain that to me one

23  more time.

24      MS. STEBBINS BINA:  So, your Honor, we have an expert

25  report due March 3rd.

```
 1              My concern is that if we come back here on the 28th and
 2    need more information, obviously, our expert will prepare the
 3    report with the information he has available.
 4              THE COURT:  Your expert report is due when?
 5              MS. STEBBINS BINA:  March 3rd.
 6              THE COURT:  All right.  And --
 7              MS. STEBBINS BINA:  So --
 8              THE COURT:  Go ahead.
 9              MS. STEBBINS BINA:  What we would like is leave to
10    submit a supplemental report addressing any later-produced
11    material within ten days of that later-produced material being
12    produced.
13              THE COURT:  All right.  So you're going to submit your
14    initial expert report on March 3rd.  But you will seek leave to
15    supplement that report upon receipt of the additional -- upon
16    receipt and review of the additional discovery?
17              MS. STEBBINS BINA:  Essentially, your Honor, if you --
18    yes.  If you grant more discovery on the 28th, we'll just need
19    some time --
20              THE COURT:  Okay.
21              MS. STEBBINS BINA:  -- between the 28th and the 3rd,
22    because that's, like, two days.
23              MR. VINE:  And that --
24              THE COURT:  Hold on just one second.
25              And Defendant will not oppose that request?
```

 1    soon after that, that has to be factored into whether somebody

 2    can try to restart the clock on a subsequent request.

 3         And the idea is not to give a moving party two or three

 4    bites at the apple; it's to get discovery disputes resolved

 5    quickly so that we're not running into a problem where they're

 6    being filed at the last minute on the eve of the discovery

 7    cutoff.

 8         So I understand that it is discretionary; and there are

 9    times where I will say that if it was a short, inadvertent

10    delay that's not harming anybody, I may overlook it.  And I've

11    done that before.

12         But then there are other times where if the party's

13    trying to get a second bite at the apple or we're coming up on

14    a hard discovery cutoff or a supplemental motion deadline or

15    whatever, that I don't allow it.

16         So --

17         MR. LEVINE:  That's fair, your Honor.

18         I would say that --

19         THE COURT:  -- it depends on the facts.

20         MR. LEVINE:  So the facts in this case, as Ms. Bina

21    mentioned, is that we had 30 days and that it was 40 days.  It

22    was ten days after that this was conferred about, and it's

23    being resolved here with all the other discovery.

24         So I would say there's absolutely no delay at all and

25    there's certainly no prejudice to either side because it's

1    being resolved.  In fact, it's being resolved before our

2    motions to compel.

3         So I would just -- I would argue that, your Honor.

4         Now, Ms. Bina mentioned that this -- you know, that we

5    can't argue that the hypervisor isn't relevant on one hand, but

6    then want to see Apple's product on the other.  So that's

7    entirely not true.

8         The hypervisor is code.  We're not looking to see

9    Apple's code.  We're looking, as I mentioned in the first part

10   of my discussion, as to the efficiency and the end user

11   efficiency infrastructure, that stuff.  We're not looking at

12   their code.

13        Corellium has no interest in whatever Apple's producing

14   because, frankly, Corellium's product does something very

15   differently than what Apple's product does.

16        It's about the end user and how they are able to

17   provide robust security.  And it's about the ability to provide

18   it to the client.

19        So we have no interest in the code and that's -- so I

20   think our argument stands there.

21        We are -- and in that respect, we've just conceded or

22   agreed to provide their expert with a demonstration, a demo.

23   We're going to, you know, provide him with access to the

24   Corellium Apple product.

25        THE COURT:  I mean, I will say, a demo is a lot

1    different than going into somebody's office, into their

2    business, into their computer files, into their systems,

3    et cetera.  I mean, that's --

4            MR. LEVINE:  I don't think we're asking for that,

5    though.

6            THE COURT:  Well, it seems like you were.

7            MR. LEVINE:  We're asking for what would -- what would

8    look to be -- again, your Honor, this is about the process.

9    This is not about the code.  So I can state on the record:

10   We're not looking to go into the code.

11           We're looking to do only the same thing that their

12   expert is doing to our stuff.  The only difference is, Apple

13   can't provide it virtually.  And so if it wasn't for the

14   inherent transformativeness of our product, their expert would

15   have to come to our -- our offices and do this.

16           And so that's the idea behind this, is that we're only

17   looking to look at that facial top level just to show that ours

18   at the end of the day can provide more robust security efforts

19   and it can be provided to the consumer on a more efficient

20   basis, which brings the cost down.  And those have public

21   interest implications.

22           So, you know, Ms. Bina mentioned that we, you know,

23   shouldn't look to how it's made.

24           Now, I would like to draw the distinction here.  Again,

25   we have no interest in the code or any of that hard-line

```
1     soon as we get them all done.

2          And then just keep in mind we need to be back here --

3     we need to have all this production done by the 24th and then

4     we'll be back here on the 27th at 10:00 a.m.  All right?

5          MR. LEVINE:  Thank you, your Honor.

6          MS. STEBBINS BINA:  Your Honor, thank you.

7          THE COURT:  Have a good day.

8          MS. STEBBINS BINA:  Thank you.

9          THE COURT:  Court's in recess.

10         (Proceedings concluded.)

11

12

13                   C E R T I F I C A T E

14

15         I hereby certify that the foregoing is an

16    accurate transcription of the proceedings in the

17    above-entitled matter to the best of my ability.

18

19

20    _____        /s/Lisa Edwards
         DATE             LISA EDWARDS, RDR, CRR
21                        (305) 439-7168
                          Reporterlisaedwards@gmail.com
22

23

24

25
```