# EXHIBIT D

```
 1                     UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF FLORIDA
 2                      WEST PALM BEACH DIVISION
                       CASE NO. 19-81160-CIVIL-SMITH
 3

 4   APPLE, INC.,                        West Palm Beach, Florida

 5              Plaintiff,               February 27, 2020

 6         vs.                          10:03 a.m.

 7   CORELLIUM, LLC,

 8              Defendant.               Pages 1 to 199

 9   _____

10                        DISCOVERY HEARING
            BEFORE THE HONORABLE WILLIAM MATTHEWMAN,
11               UNITED STATES MAGISTRATE JUDGE
          (TRANSCRIBED FROM THE DIGITAL AUDIO RECORDING)

12   APPEARANCES:

13

14   FOR THE PLAINTIFF:        JESSICA STEBBINS BINA, ESQ.
                               LATHAM & WATKINS, LLP
15                             10250 Constellation Boulevard
                               Suite 1100
16                             Los Angeles, California 90067

17                             EMILY PINCOW, ESQ.
                               LASH & GOLDBERG, LLP
18                             100 Southeast Second Street
                               Suite 1200
19                             Miami, Florida 33131

20
     FOR THE DEFENDANT:        JUSTIN B. LEVINE, ESQ.
21                             LIZZA CAROLA CONSTANTINE, ESQ.
                               COLE, SCOTT & KISSANE
22                             222 Lakeview Avenue
                               Suite 120
23                             West Palm Beach, Florida 33401

24

25
```

1    Honor.

2         I thought we had an agreed definition of the Corellium

3    Apple product that we were working with at the moment.  Our

4    side does have some concerns with how that's played out.

5         But I -- my understanding from our hearing last time

6    was, subject to that definition, they would be fully producing

7    everything.

8         They've now come back refusing to produce a number of

9    things even with that narrow definition and maintaining trade

10   secret objections even with that narrowed definition.

11        So part of our concern is that they're still not

12   producing and we don't know what they're withholding.  So it's

13   a bit broader than the definition.

14        THE COURT:  Is the definition that was tentatively

15   agreed to at the last hearing -- I know that the way it worked

16   out was that the parties tentatively agreed to that definition

17   and then -- that was the definition Corellium wanted and then

18   Apple would use that definition and determine whether it was

19   sufficient once it got its production.

20        So where are we on that?  Does the Court need to decide

21   a definition of the Corellium Apple product?  Because if I do,

22   I'm prepared to do that.  If not, then what's at dispute --

23   what's in dispute on the request for production?

24        MS. STEBBINS BINA:  Can I be heard again?

25        THE COURT:  Ms. Bina.

1          MS. STEBBINS BINA:  So there's two -- there's two kinds

2    of issues.  One is the definition of the Corellium Apple

3    product.

4          And when we left last time, your Honor said that they

5    would give access to the product to our expert so he could use

6    it and play around with it and try it out, and they would also

7    provide everything responsive under their definition of the

8    Corellium Apple product.

9          So the first issue with respect to the expert,

10   apparently sometime in the last couple of weeks after we

11   designated our expert, they changed how the cloud-based version

12   of the product works.

13         So up until sometime less than a month ago, if you used

14   the cloud-based version of the Corellium Apple product, it

15   would load and populate and you would have a choice of iPhones

16   to choose from and you could click "I want an iPhone 10,

17   jailbroken," and it would load that all for you.

18         THE COURT:  This cloud-based version of the Corellium

19   Apple product, what's it called in your view?

20         MS. STEBBINS BINA:  I would call it the cloud-based

21   version of the Corellium Apple product.

22         THE COURT:  Okay.

23         MS. STEBBINS BINA:  They have a house install version

24   where they actually put, like, equipment in your house and then

25   they have a cloud version that you can access on the cloud.  So

  1   they've changed how that works, your Honor.

  2          And now, instead of preloading all of those Apple

  3   iPhone iOS devices, it's just a blank and you're supposed to

  4   upload your own iOS device.  And they served amended

  5   interrogatory responses this morning that don't say when that

  6   change was made and they're still using the other version on

  7   their -- on their home-based product, their on-premises

  8   installation.

  9          So essentially, they've just taken away from our expert

 10   his ability to actually find out how the system worked for the

 11   entire time it's been on the market until maybe two, three

 12   weeks ago.

 13          THE COURT:  So if I understand what your position is --

 14   and I'll hear from Corellium -- but your position is that the

 15   cloud-based version of the Corellium Apple product was one

 16   version up until after the last hearing when your expert was

 17   going to be provided access to the cloud-based version, and

 18   then after that it was modified so that it's a different type

 19   of cloud-based version that your expert cannot determine

 20   what -- how it was operating prior to the change?

 21          MS. STEBBINS BINA:  Your Honor, I don't know exactly

 22   what date it was modified.  But within last month is my

 23   understanding.  It may have been after the hearing.  But it

 24   was -- it may have been before the hearing, but it was after we

 25   gave our expert designation.

1          MR. LEVINE:  Your Honor, I can cut this short.  We're

2    happy to produce it.  This thing is a very recent day.  I can

3    be very clear on all these issues.  Everything other than this

4    little bit of code that was just changed and brought to our

5    attention in the couple of last days has been produced.

6          Everything objected to, the retention of the objection

7    on trade secret, is everything relating to the rest of the

8    company outside of the Corellium product, the Android stuff,

9    the hypervisor, the stuff outside the Corellium product.

10          Everything relating to inside the Corellium definition

11   has been -- Apple product definition has been produced other

12   than this a little bit of code, which is a brand-new issue,

13   which we will produce.

14          MS. STEBBINS BINA:  Your Honor, that's not true.

15          The protective order provides a particular method for

16   producing source code.  The source code is supposed to be made

17   available along with tools that are sufficient for viewing and

18   searching the code produced on the platform produced if such

19   tools exist and are presently used in the ordinary course of

20   the producing party's business.  That's ECF 50 at 13.

21          They gave us .pdfs of the source code, your Honor, with

22   no organizing setup, no explanation of what the .pdfs were for,

23   no way for our expert to match up one thing to another or find

24   out how the system is organized as a whole.  And that may be

25   because they're trying to hide their hypervisor product.

1        But essentially, what they gave our expert is

2   completely useless.  He can't look through it and determine

3   what they've done, how their product works.  Between the change

4   they made to the cloud-based version of the product and the

5   .pdf source code, we don't have what we need to understand how

6   this product works.

7        THE COURT:  So what is it that you say you need?

8        MS. STEBBINS BINA:  Well, so, your Honor, I think at a

9   minimum we would need the source code in a useable form.  I

10  think we would need access to an on-premises version of a

11  Corellium Apple product, since that is the only version that's

12  now functioning in a way that it did historically.

13        I also think, you know, what Mr. Levine just said is

14  that they're only objecting on trade secrets based on the

15  hypervisor.  But there are a number of RFPs -- and let me check

16  on my laptop -- where they've just refused to produce

17  altogether.

18        So, for instance, RFP No. 9:  They've produced to --

19  produced functionality, but not design.

20        Your Honor ruled last time that for the design of the

21  Corellium Apple product as defined by the Court, they had to

22  produce design materials.

23        They're still refusing to produce that and calling that

24  a trade secret.

25        For No. 12, you know, we talked -- that's testing.  We

1  talked about last time, that we needed to confirm that there

2  was no Apple product used in testing and development.

3          They're refusing to produce anything in response to No.

4  12.  They're refusing to produce anything at all in response to

5  No. 13.

6          THE COURT:  All right.  But let's stick with one issue

7  at a time.

8          The first issue is, as I recall at the last hearing,

9  Corellium was going to be providing some sort of sample of the

10 Corellium Apple product so that your expert could test it.  Let

11 me find which portion of my order that was.

12         MS. STEBBINS BINA:  Yes, your Honor.

13         THE COURT:  So it's Paragraph 2 at Docket Entry 149,

14 Page 2.  It says:  "On or before February 24th, 2020, Corellium

15 has also agreed to provide Apple's expert with the necessary

16 credentials so that Apple's expert can interact with the

17 Corellium Apple product as if the expert were a customer of

18 Corellium."

19         Now, you're saying because of the change in the

20 Corellium Apple product, your expert cannot interact with the

21 product as if it were a customer of Corellium?  Is that what

22 you're saying?

23         MS. STEBBINS BINA:  Your Honor, it may be that he can

24 interact as though he were a customer post- whatever change

25 they did.  But what he can't do is figure out what it looked

1  like prior to last week.  There's no way to do that from the

2  product that he's been given.

3       THE COURT:  All right.  So let me turn to Corellium's

4  counsel.

5       What about that?  I understood that the expert,

6  according to the agreement the parties arrived at at the last

7  hearing, that he would be able to interact with the Corellium

8  Apple product as if the expert were a customer of Corellium.

9       And now I'm hearing that he can only interact with the

10 new version and not the old version.

11      MR. LEVINE:  So I'm going to briefly discuss the

12 technical aspect to inform the Court, your Honor, and then I'll

13 let Lizza take the actual discovery aspect of it.

14      As I've learned in the last couple days, a week or two

15 ago or very recently, there became some instability in the

16 files that are used in the Apple Corellium product.

17      There was -- there were a bunch of complaints by the

18 customers to Corellium saying:  Your product is messing up and

19 not working correctly.

20      And so they ran some tests, and it turned out that the

21 product was working fine, that it was some instability.

22      And so they looked at this ipsw.me website and they did

23 some research on Twitter and it appeared that people not even

24 related to this case or Corellium were downloading these files

25 that are available were experiencing the same but very random

1    instability.  And they were causing systems all over the place

2    to go down and not work properly.

3          So that being said, somewhere in the midst of all of

4    this, we were provided with the credentials which we forwarded

5    on to Apple's counsel and their expert; and because of the

6    inoperability and the bugs that were occurring in Corellium's

7    Apple product, they did an update to fix it and they changed

8    the system just a little bit so that you could deal with the

9    instability of these files that were bringing in.  And I can

10   explain very, very simply what it is.

11         The Corellium Apple product works exactly the same as

12   it has.  The one difference, the one isolated difference, is

13   that it used to -- what would happen is that when you as a

14   client would log onto the Corellium Apple product and you would

15   be building your iPhone or whatever and then you would -- there

16   would be a drop-down menu that says, "Which iOS would you like

17   to -- would you like to load into your device, your virtual

18   device?"  And then you would go down and you would select the

19   iOS.

20         Once you would select it, a request -- and that's

21   actually really important -- a request would go out to the

22   Apple website, would go out to the ipsw.me website, and that

23   request candidly would be about simultaneously granted for the

24   download of the ipsw.

25         That would then download into the Corellium Apple

```
 1      product, and off you go.

 2              With the instability of the IPSW accounts, that

 3      automated request and download system was hanging up the

 4      product.

 5              So what they did was they simply removed that drop-down

 6      bar or menu and they simply put a "drag here" box.  And so now

 7      the customer has to go into and get the ipsw file on its own

 8      and then simply drag it onto the Corellium.  That's the only

 9      change.

10              And it was simply done in the course of business only

11      because of the instability that the product was experiencing

12      due to these downloads of files.  That is not related -- or not

13      isolated to Corellium.

14              THE COURT:  Let me just stop you for a second.  I

15      understand your argument.  I'm sure Apple is suspicious of your

16      argument.

17              How is it possible to get the expert who at the last

18      hearing was agreed that he can interact or she can interact

19      with the Corellium Apple product as if the expert were a

20      customer of Corellium -- how can that expert gain access to

21      interact with the new version and the version that was at issue

22      during most of this lawsuit?

23              MR. LEVINE:  Two ways:  One, we're happy to produce the

24      code.  We have the code stored from the prior version.  Happy

25      to produce the code as it relates to that.
```

1          THE COURT:  Okay.

2          MR. LEVINE:  Second way:  The reason Apple found this

3     is because there's a ton of videos on YouTube about how the

4     Corellium product works.  And so their expert was comparing the

5     current version with -- on YouTube, and apparently that's how

6     they found it.

7          So the old version, which again is merely the omission

8     of a drop-down and it's just simply an addition of a box that

9     says "drag here" -- the old version is all on YouTube.  And

10    that's how the expert found it.  And so that one little

11    isolated incident, he can watch a two-second clip on YouTube.

12    The rest of the product is identical.  And again, we're happy

13    to provide the code.

14         THE COURT:  So will Corellium provide the code and the

15    old and new version of the Corellium Apple product to Apple so

16    that their expert can access it?

17         MR. LEVINE:  Yes, your Honor.

18         THE COURT:  All right.  When will that get done?

19         MR. LEVINE:  I think -- can you give me until tomorrow?

20    I think today.  But if we can have until tomorrow.

21         THE COURT:  Until tomorrow's fine.

22         Ms. Bina, did you have anything to add to that?

23         MS. STEBBINS BINA:  Your Honor, I mean, it needs to be

24    provided in a useable format consistent with the protective

25    order, not in .pdf.  It needs to be on a source code machine

1    viewable so that the expert can actually interact with it.

2         MR. LEVINE:  If I can comment, actually, because

3    counsel -- co-counsel just brought up an important point:  The

4    old code, the expert can review it and read it.  But it's not

5    something that can be implemented.  The system -- the action

6    was forced to make a change.  It's not something like we used.

7    But they're happy to look at it.  And again, it's all

8    memorialized on YouTube.

9         THE COURT:  Well, is it going to be produced in a

10   useable format?

11        MR. LEVINE:  They can look at it.  But there's not

12   going to be anything they can plug it into.

13        THE COURT:  Isn't there an old version somewhere that

14   they can roll out and produce?

15        MR. LEVINE:  They would have to -- and I don't know

16   this for sure.  But my understanding is that they would have to

17   stop the actual product and revert it back to the broken

18   version, which then I can't even say that it's going to work

19   properly for the expert.

20        But they'll have to --

21        THE COURT:  Well, but is the old version at issue in

22   this case?

23        MR. LEVINE:  It --

24        THE COURT:  I mean, if the old version is at issue in

25   this case, and if Corellium has done something to make the old

```
 1            I don't want there to be unfounded suspicions by Apple

 2    that, you know, this has been done to frustrate discovery.  But

 3    I don't also want it to go untested.  Do you understand?  So

 4    I'm trying to figure out a way that the current version can be

 5    made access to for Apple's expert and that Apple's expert can

 6    satisfy him or herself that the prior version operated in

 7    whatever manner it operated.

 8            Do you understand what I'm saying?

 9            MR. LEVINE:  So the operation of the Corellium Apple

10    product has not been changed.

11            What is at issue in this case is the reproduction, as

12    Apple alleges, the copying, which doesn't occur, but as Apple

13    alleges, the copying, the reproduction display of iOS.

14            None of that has changed.  It is merely the way that

15    the file is simply loaded into -- it's uploaded now versus

16    downloaded.  And for some tech reason, that has fixed this bug

17    problem.

18            There's got to be a burden analysis done here.  So we

19    are willing to provide the actual code that their expert can

20    review.

21            THE COURT:  What format?  In a useable format or in

22    .pdf?

23            MR. LEVINE:  So I don't know if I know the distinction.

24    We will provide it in native format.  But I don't know if the

25    expert has a -- I don't know.  But again, I mean, this is akin
```

1    to, you know, a huge construction building at issue and someone

2    changing a hinge on a door and then claiming that now there's

3    huge foundational issues and they've got to rebuild the

4    building just to see if this hinge changed something.

5         THE COURT:  Right.  And you know what?  You may be

6    right.  And if that's the case, then it's not going to amount

7    to much.  But during the discovery process, I just want to be

8    certain that the parties, both sides, have the right to argue

9    what this change did.  It may be a change that is of no moment

10   according to you.

11        MR. LEVINE:  They can see that.  They've got the --

12   they've got full access to the product.

13        THE COURT:  All right.  Well, I'm going to want -- I

14   want -- as far as the agreement that was reached the last time

15   so that Apple's expert can interact with the Corellium Apple

16   product as if the expert were a customer of Corellium --

17        MR. LEVINE:  Which he can.

18        THE COURT:  As of today.  But I'd also want him to be

19   able to do that as of the time the lawsuit was filed.

20        MS. STEBBINS BINA:  Your Honor, if I may, their

21   interrogatory responses served this morning state that for the

22   on-premises version, the prior loading system is still

23   available for -- on a subscription plan.

24        So maybe we could get an on-premises installation copy

25   or something.  I don't know.

```
1              THE COURT:  I'm going to leave that up to the parties.

2          All I can say is this:  I want pursuant to the prior

3     order at Docket Entry 149, Paragraph 2, and the parties'

4     agreement, I want Apple's expert to have the necessary

5     credentials so that they can interact with the Corellium Apple

6     product as if the expert were a customer at this time and also

7     at the time prior to the change.  I mean, because that was the

8     version that was at issue while this lawsuit has been going on;

9     and I don't want there to be some issue hanging out in the air.

10             Whatever way you decide to do that among yourselves is

11    fine with me.  I'm not going to get involved in the technology

12    nuts and bolts of it.  But, you know, if the code is produced

13    in native format or in useable format or in whatever other

14    format, then that should solve the problem.  But I can't get

15    into the specifics of a highly technological issue.

16             MR. LEVINE:  I struggle with it, too, your Honor.

17             So a couple brief issues:  One, again, we are happy to

18    provide the code.  If that resolves the issue -- and we are

19    happy to provide it in native format, so -- which is as useable

20    and as native as it comes.

21             So if that resolves the issue, we can get that done,

22    like I said --

23             THE COURT:  Why don't we do that and let's see what

24    Apple's expert has to say about that --

25             MR. LEVINE:  Okay.
```

1          THE COURT:  -- when Apple's expert looks at it.

2          MR. LEVINE:  So it was just brought to my attention,

3     Apple's expert may be precluded entirely from using this as it

4     was because the system -- this is a report, apparently, that's

5     run -- and that the system is failing on the basis of the

6     files, not the Corellium Apple product.

7          So I don't know if any customer could ever again use it

8     as it was because the system no longer works in that manner.

9          And if I can approach the Court, I just got --

10         THE COURT:  No.  That's okay.  I will accept your

11    representation.  And that may be the case.  But I want the

12    other side to be able to verify that.

13         MR. LEVINE:  I'm happy to provide the code in useable

14    format, your Honor.

15         THE COURT:  And if they verify that and they raise

16    other issues, they'll raise other issues.

17         But let me hear from Ms. Bina.

18         MS. STEBBINS BINA:  Yes, your Honor.

19         I'd also ask that they reproduce the code they've

20    already produced in a useable format and they do that

21    forthwith.

22         And I'd like to --

23         THE COURT:  They're agreeing to do that.

24         MR. LEVINE:  Yeah.  I was under the impression that it

25    was.  So if it was not, I'm happy to do that.

```
 1            MS. STEBBINS BINA:  And I'd like to reserve all rights

 2    to come back on the hypervisor issue.  We still haven't been

 3    able to see what they promised to provide last time.

 4            THE COURT:  And the hypervisor issue goes back to the

 5    definition.  Right?

 6            MS. STEBBINS BINA:  Yes, your Honor.

 7            THE COURT:  So why don't we talk about the definition

 8    for a few minutes?  Maybe that would help.

 9            And let me ask the parties, from what I can gather, the

10    Corellium Apple product virtualizes physical devices, including

11    Apple mobile devices, and enables users to execute the various

12    device operating systems in a simple unified environment.

13            Would everybody agree that that's correct?

14            MS. STEBBINS BINA:  I think so, generally, your Honor.

15    I don't know how simple it is, personally.

16            But --

17            THE COURT:  Okay.  Now, the Corellium Apple product

18    technology certainly utilizes portions of Apple's technology.

19    Would everybody agree on that?

20            MS. STEBBINS BINA:  Yes, your Honor.

21            MR. LEVINE:  No, your Honor.

22            THE COURT:  You would not?

23            MR. LEVINE:  No.

24            THE COURT:  Do you have your answer there?  Could you

25    locate your answer, Docket Entry 64?
```

 1             MR. LEVINE:  The --

 2             THE COURT:  Yes.  Corellium's answer to the --

 3             MR. LEVINE:  I do not have that with me.  And I don't

 4     have that -- I can't get online on my computer.

 5             THE COURT:  Let's see.

 6             MR. LEVINE:  If you can read it into the record, I can

 7     respond, your Honor.

 8             THE COURT:  Hold on a second.

 9             All right.  So Corellium's answer, affirmative defenses

10     and counterclaims to Apple's first amended complaint are found

11     at Docket Entry 64.  And in going through it, at Page 6, it

12     says:  "Instead, Corellium's technology utilizes portions of

13     Apple's technology for entirely distinct purposes, which

14     provides significant societal benefits."

15             So my question was:  Doesn't the Corellium Apple

16     product utilize portions of Apple's technology?

17             MR. LEVINE:  So I guess maybe I wasn't clear on the

18     definition of "use."

19             So I would still say no.  However, the Corellium Apple

20     product again, as I explained in the last hearing, it's

21     simply -- it's a file that's loaded on.  It doesn't use any

22     aspect of Apple's technology; it's merely a file.  Just like if

23     you -- if you purchased a computer and the computer came

24     without the Adobe program and you loaded the Adobe program onto

25     it --

```
 1              THE COURT:  Well, then why --

 2              MR. LEVINE:  -- there's no operation in that computer.

 3              THE COURT:  Then why, counsel, does your answer say:

 4    "Instead, Corellium's technology utilizes portions of Apple's

 5    technology"?

 6              Now, it goes on and it says "for entirely distinct

 7    purposes, which provide significant societal benefits."

 8              But I think -- isn't that the crux of the issue in this

 9    case?  In other words, while Corellium says that its technology

10    utilizes Apple's technology for entirely distinct purposes and

11    to provide societal benefits, Apple seems to claim that

12    Corellium's technology influences -- or infringes on Apple's

13    copyrights and violates the DMCA, the Digital Millennium

14    Copyright Act.  And Apple alleges in effect digital piracy.

15    And this seems to be the crux of the dispute, where -- and this

16    is the problem I'm having:  I mean, I ask you a question about

17    whether Corellium's technology utilizes portions of Apple's

18    technology, and you say no.

19              And then I look at your answer and it says that it

20    does, but for different reasons.

21              And I just -- I don't understand what's going on here.

22    And we have to have a clear definition of what we're talking

23    about.

24              So it just seems to me -- and I'm going to ask both

25    sides to correct me if I'm wrong -- it seems to me that
```

```
 1    Corellium is utilizing Apple's technology.  Corellium says it's
 2    utilizing it for really good purposes, for beneficial purposes
 3    to society; Apple says:  No; it's using it for bad purposes to
 4    engage in digital piracy and copyright violations.
 5            I mean, is that the crux of this case?
 6            MS. STEBBINS BINA:  Yes, in our view, your Honor.  I
 7    mean, they have this hypervisor, whatever they want to call it.
 8    But it's sold as a single product.  And that product that their
 9    customers buy or buy access to gives them the ability to open
10    up a copy of iOS, explore it, display it on a computer in
11    violation of our license agreements.
12            And I don't know --
13            THE COURT:  And that's your position.  Their position
14    is they're doing it to -- for security reasons and to help
15    society.  And that's really what's going to have to be decided
16    in this case, isn't it?
17            MS. STEBBINS BINA:  Yes.  And they're saying this is
18    completely transformative because they're doing it in a totally
19    different way; and that transformativeness, they're claiming,
20    is due to the hypervisor, which is what they claim is this
21    incredible technological achievement that enables something
22    that didn't happen, you know, previously, and that's why
23    they're claiming it's fair use and transformative and all of
24    those things.
25            So to me, it's a single product and we're disputing its
```

1    purpose and nature.

2           THE COURT:  All right.  Let me hear from Mr. Levine on

3    that.

4           MR. LEVINE:  Okay.  I was being very careful with the

5    word "use."  And maybe it could have been articulated a little

6    bit better in the answer.

7           The definition that came up during the last -- and it

8    was resolved at the last hearing --

9           THE COURT:  Well, it was tentatively resolved.

10          MR. LEVINE:  -- tentatively resolved at the last

11   hearing, I think, was more well put by discussion with the --

12   with the client.  That definition uses the word "handle."

13          THE COURT:  Right.  I have it right here.  It says:

14   "It includes only those components of the Corellium platform

15   that are responsible for handling iOS."

16          MR. LEVINE:  Precisely.

17          THE COURT:  That's your proposed definition.

18          MR. LEVINE:  Correct.

19          So maybe we could have been -- the lawyers could have

20   been more articulate in the answer.  I was being careful around

21   the word "use" because Apple has been accusing that we've been

22   copying and that we've stolen things from Apple.  And that's

23   not the case.

24          So do we use it in that you can upload a file and then

25   it is displayed, as Ms. Bina actually just put?  I would agree

1    with that.  That is exactly how the product works.

2            Is it used in the code of the hypervisor?  Absolutely

3    not.

4            Is there any aspect of the hypervisor that is dedicated

5    at all to the iOS?  There are those patch portions, and that

6    has been provided.  And if we haven't provided the native, we

7    can get that done immediately.

8            That's why the definition works.

9            Now, I'm not surprised that they're receding.  I would

10   make the same argument that the hypervisor is not related to

11   the iOS -- the hypervisor can do many other things -- and that

12   it's only as the person uses it as a customer, which is the

13   relevant portion.

14           So we have provided everything that relates to and

15   handles iOS.  That is what this case relates to.  There's

16   nothing in the complaint about any other aspects of the

17   company.  It is highly, highly sensitive information and very

18   proprietary.

19           And --

20           THE COURT:  Well, let me ask you, I understand that.

21   Let me ask you this, because I want to get this definitional

22   issue resolved because the discovery closes April 20th.  And

23   the parties need to get this issue resolved.  We have a lot of

24   other issues to resolve today.

25           But it seems to me that the Corellium Apple product

1    very well would include this definition:  All products

2    developed, offered for sale or sold by Corellium that create

3    virtual versions of iOS-operated devices.  This does not

4    include Corellium products that are based on other mobile

5    operating systems.

6          Now, can both sides live with that definition?  And

7    I'll read it again if you need me to.

8          MR. LEVINE:  With some further clarity, possibly.

9          THE COURT:  The definition possibly -- and I'm going

10   to -- since the parties can't agree on a definition, I'm

11   imposing one today, just so everybody knows.  Whether you like

12   it or not, that's going to be the definition.  These are

13   technological issues.

14         I've asked the parties to confer.  I've asked the

15   parties to work it out.  It doesn't happen.  So I'm imposing a

16   definition today, and the parties are going to have to live

17   with it whether they like it or not.

18         So the first proposal that I'm going to suggest is:

19   All products developed, offered for sale or sold by Corellium

20   that create virtual versions of iOS-operated devices.  This

21   does not include Corellium products that are based on other

22   mobile operating systems.

23         And then the question then becomes whether this

24   definition does or does not include the hypervisor.

25         MR. LEVINE:  That's the question.

1          THE COURT:  All right.  So why would that not include

2     the hypervisor?  Isn't the hypervisor part of all products

3     developed, offered for sale or sold by Corellium that create

4     virtual versions of iOS-operated devices?  Or is it not?

5          MR. LEVINE:  I would say no, your Honor.  You know,

6     it's not -- again, this is -- so the Corellium Apple product is

7     just this:  It is the -- now it is the upload versus the

8     download of Apple files, the ipsw files.

9          The Corellium Apple product relates to only so far as

10    the patches that make that file compatible and useable on the

11    hypervisor.

12         That stuff has already been produced.

13         Providing the hypervisor, which is in no way isolated

14    to the iOS and related to really anything on any of the --

15    whether it's iOS or Android or Google or any, it's not

16    connected; it's merely the -- the iOS aspect has to be made

17    compatible to be used by the hypervisor.  But the Corellium

18    Apple product is specifically limited to the iOS aspect of it.

19         THE COURT:  Right.  And so can't your production be

20    limited to that part of the hypervisor that only deals with

21    iOS-operated devices?

22         MR. LEVINE:  It already -- that is.  That is the case.

23    And that's what the definition -- the prior definition did, was

24    only the aspects of the Corellium platform, the platform being

25    the hypervisor, that handle iOS.  And that stuff has been

1    produced.

2          THE COURT:  So then if the definition were:  "All

3    products developed, offered for sale or sold by Corellium that

4    create virtual versions of iOS-operated devices.  This

5    definition does not include Corellium products that are based

6    on other mobile operating systems.  This definition does

7    include the hypervisor to the extent that it creates -- it

8    assists in creating virtual versions of iOS-operated devices"?

9          MR. LEVINE:  So the way I'm hearing that, the second

10   aspect of that definition is it does include any aspects of the

11   hypervisor that relate to iOS.

12         The way I interpret that is that in my understanding of

13   the technology, which is generally pretty good for a layperson,

14   is that is the patches.  That is the portion that makes the

15   ipsw files able to work with the generic hypervisor.  And those

16   aspects have already been produced.

17         And we -- if the native format has not, we agree to do

18   it here on the record.

19         THE COURT:  All right.  Let me hear from Ms. Bina on

20   this.

21         MS. STEBBINS BINA:  Your Honor, they don't sell an

22   Apple patch "Bring your own hypervisor; you can use it."

23         They sell a product as a whole, and that product

24   enables their users to look at our technology and display it

25   without a license.

1          When you talk about products that are offered for sale

2     that display iOS devices, I don't understand how you can

3     separate the one from the other.

4          You know, I tried to give them some wiggle room last

5     time, saying maybe we can live with what they give us; let's

6     look at it.  But if you're asking me, Does their product

7     include the hypervisor, I think it does, because they don't

8     sell the Apple patch if you happen to have a hypervisor.  They

9     sell the Corellium Apple product.  They give cloud access to

10    it; they install home premises of it.  And they sell the whole

11    product.

12         And it's the whole product that is what is enabling the

13    infringement here, in our view.

14         THE COURT:  So then in your view, the definition that

15    the Court has proposed, which is:  "All products developed,

16    offered for sale or sold by Corellium that create virtual

17    versions of iOS-operated devices.  This definition does not

18    include Corellium products that are based on other mobile

19    operating systems.  This definition does include the hypervisor

20    included in the package that Corellium sells"?

21         MS. STEBBINS BINA:  Yes, your Honor.  I don't know if

22    they have one hypervisor or two hypervisors.  In other words, I

23    don't know if they have a different hypervisor for Android

24    devices.  Obviously, if they do, we don't have any interest in

25    that.

```
 1          But if it's one hypervisor and it can run both things,

 2   but they're selling it and they're -- and people are accessing

 3   iOS devices through it, then I think it is -- falls within that

 4   definition.  Yes.

 5          THE COURT:  All right.  Mr. Levine?  So that was the

 6   definition I was proposing.  And I'm trying to -- I'm trying to

 7   get to the heart of this issue because I understand the

 8   parties' positions pretty well now.  And I think we have to

 9   have a firm definition that production and everything else is

10   based upon.

11          So let me hear from you further on that.

12          MR. LEVINE:  Corellium sells the platform.  If the

13   current definition that your Honor is proposing is used, Apple

14   gets everything.  They get the entire company.  The whole

15   thing.

16          Apple sells the platform.  On that platform, you can do

17   certain things.  Some things are not related to iOS by any

18   stretch.  One thing is:  the iOS aspect of it.  Everything

19   related to iOS has been produced.

20          If we provide all products that are sold -- and I don't

21   even know if it's deemed a product, you know.  And I think that

22   might come down the road later on, so I want to reserve on

23   whether it's a service or product.

24          But providing all products, that's it.  They get the

25   entire thing.
```

1          Now, one -- it's just that simple.  You know, there's

2     some grave concerns.  Apple is, as your Honor is aware -- has

3     been after this technology for years now.  They don't have it.

4     They do not have the ability to get it at this point in time.

5          By providing this -- once again, there's just no

6     relevance.  It's -- the prior -- I hate to say it, because I

7     don't want to come off as biased and an advocate.  But truly,

8     the definition that was provided at the last hearing genuinely

9     gives everything there is that relates to and is associated

10    with the iOS.

11         Corellium sells the platform.  That's their bread and

12    butter.  That's everything.  And you can do certain things on

13    that.

14         To give up everything, it's just -- you know, Apple is

15    just prying into every little thing.

16         For example, you know, the subpoenas -- you know, the

17    trial periods and the potential customers, Apple's now going to

18    go on this rampage of serving subpoenas to people that have

19    already been subpoenaed, you know.  They are just digging and

20    digging and digging and digging and digging and digging.  To

21    give up the whole kitchen sink when the majority of it and the

22    entire platform is just not related and it has no bearing on

23    the reproduction, the display, the alleged copying of the iOS

24    when all of that stuff is already in their expert's hands, it's

25    just -- it's way too overbroad.

```
 1          THE COURT:  So let me ask you, if the Corellium Apple

 2   product includes the platform, how does the other side test

 3   whether that platform is being used to engage in copyright or

 4   digital piracy as opposed to what you allege, which is a

 5   good-faith security investigation to help society and to help

 6   make the product better?  How does Apple investigate that

 7   without having access to the platform?

 8          MR. LEVINE:  So they -- let me split up two separate

 9   things:  They do have access to the platform.  That's what we

10   discussed earlier today, you know, relating to this minor

11   change.  They have access.

12          What it's used for, they're now going to get our even

13   potential.  They're going to get people who aren't even

14   customers.

15          That is how they -- the code, the source code, has

16   nothing to do with what it's being used for.  The source code

17   is just the skeleton.  It's what they can't -- their engineers

18   can't get.

19          So they now have client lists.  They now have "people

20   who are not even clients" lists.  They're going to get people

21   who are on trial basis; they're going to subpoena those people,

22   which they've already started doing.  They can determine and

23   depose our clients to determine what they're being used for.

24   They've got access to the actual product.  Their expert's on

25   there, playing around.  They've got YouTube.  They know what
```

1   it's being used for.

2          To have to produce the code -- and they already have

3   the code that encompasses and encapsulates everything iOS.  So

4   to give them code that relates in no way specifically to iOS,

5   that's merely the platform, again, would simply -- to just give

6   up the ship, when it just -- there's nothing there.  They --

7   there's no copying of Apple's code because Apple doesn't have

8   this technology.  That's why they wanted to buy it for millions

9   of dollars.

10          THE COURT:  Is the hypervisor a platform?

11          MR. LEVINE:  That's -- that's Corellium.  It's what is

12   sold.  It's the --

13          THE COURT:  I mean, is hypervisor designated as some

14   sort of platform?

15          MR. LEVINE:  The hypervisor is, I think, what maybe

16   Corellium would call its platform.  Yes.

17          And as I mentioned, the aspects -- let me be clear:

18   Every aspect that relates specifically to iOS has been

19   provided.  To give up the entire ship, it just -- it's giving

20   everything up to an aggressor, candidly, with all due respect,

21   who cannot get this technology and has offered millions of

22   dollars to buy it.

23          We're already providing them the bugs that we've found

24   that they're supposed to be paying us for.

25          THE COURT:  No, no.  I don't --

1          MR. LEVINE:  Well, I just --

2          THE COURT:  -- think you are.  You're advising the

3     numbers of the bugs.

4          You know, you keep making these arguments, trying to

5     make it seem like my decisions are one-sided when they're not.

6     I didn't say you had to provide those bugs; I said you had to

7     provide the number.

8          MR. LEVINE:  The problem --

9          THE COURT:  And when I asked you earlier about whether

10    Corellium's technology utilizes portions of Apple's technology,

11    you tell me no, even though it's in your answers.  So, you

12    know, I'm getting conflicting arguments from you.  And all I'm

13    trying to do is get this discovery under control.

14         I've never seen a case where the parties can't agree on

15    a definition to the extent of this case.  I'm trying to be

16    sensitive to Corellium's claims that its hypervisor is so

17    sensitive and so trade secret and so important -- I'm trying to

18    be sensitive to that.  But I am getting absolutely no

19    cooperation from counsel.  I'm not getting any assistance from

20    the parties.

21         And I am not -- you know, I'm going to make a

22    definition and the parties are going to have to live with it,

23    whether they like it or not.  So I'm trying to be fair to both

24    sides.  But you're making it -- the parties in this case,

25    counsel, all in this case, are making it extremely difficult

```
 1    for me to do that.  It's not my problem; it's your problem.
 2         MR. LEVINE:  Fair enough, your Honor.  And my
 3    apologies.  Again, maybe I'm not being as articulate as I
 4    could.  I was being very careful earlier with the word "use"
 5    because it's Apple's allegations that -- you know -- I'm being
 6    careful.
 7         I would again agree that the ipsw files are displayed
 8    on the -- you know, on the Corellium Apple product displayed --
 9    it's played on it.  The display is a product of its own file.
10    It's not copied or anything.
11         So if that's the definition of "use," then I would
12    concede to that, your Honor.  I was just trying to be careful.
13         That being said, I don't know how to be -- I'm really
14    not trying to be difficult, your Honor.  I don't know how to be
15    more clear that every aspect that relates to iOS as it relates
16    to Corellium in my knowledge has been provided.
17         THE COURT:  Okay.  So let me just go through, because
18    this is my perception:  Corellium's definition, what you want
19    to use as the definition of the Apple Corellium product from
20    the last hearing, is that the Corellium Apple product includes
21    only those components of the Corellium platform that are
22    responsible for handling iOS.
23         Apple's definition from its discovery requests is "All
24    products developed, produced or sold by Corellium that can
25    enable creation of at least one virtual device.  Unless
```

1    otherwise specified, this term includes any and all versions of

2    such products separately or inclusively."

3          My concern is that Corellium's definition is too narrow

4    and that Apple's definition is too broad, because it almost

5    seems like Apple's definition would get into --

6          MS. STEBBINS BINA:  Your Honor, we carefully defined

7    virtual device to be only iOS devices.

8          THE COURT:  Okay.  I'm just concerned that it would get

9    into non-iOS devices.

10          So what I'm trying to do is to come up with a

11    definition that is consistent with the allegations in the case

12    by you, by Apple, the answers, the claims, the counterclaims,

13    everything.

14          MR. LEVINE:  I think -- here's the issue, your Honor --

15          THE COURT:  Well, let me just see.  Let me read this

16    definition:  "All products developed, offered for sale or sold

17    by Corellium that create virtual versions of iOS-operated

18    devices.  This definition does not include Corellium products

19    that are based on other mobile operating systems.  This

20    definition does include the hypervisor platform included in the

21    Corellium Apple product sold by Corellium to the extent it

22    relates to iOS."

23          That's the definition that seems to me to make sense.

24    And I'll hear from either side if it doesn't make sense.  But

25    that's the definition that seems to make sense.  And then you

```
 1    all can -- you know, will have to produce or not produce
 2    whatever is within that definition.
 3            MS. STEBBINS BINA:  Your Honor --
 4            MR. LEVINE:  Let me -- so I think --
 5            THE COURT:  I'll hear from Mr. Levine first; then I'll
 6    hear from Ms. Bina.
 7            MR. LEVINE:  I think the issue here is the word
 8    "product."
 9            Corellium sells a platform.  It sells one thing.  So
10    all products that do X, Y and Z, Corellium sells one thing.
11            THE COURT:  Well, then, you could answer that.  In
12    other words, the definition says "all products developed,
13    offered for sale or sold by Corellium that create virtual
14    versions of iOS-operating devices."
15            If your answer is the only one we have is that
16    Corellium product, that's it, there are no others, then there
17    are no others.
18            MR. LEVINE:  The --
19            THE COURT:  But anything that creates virtual versions
20    of iOS operating devices seems to me to be fair game in this
21    case.  I mean, is that the gravamen of the allegation here?
22            MR. LEVINE:  No.  The -- well, yeah.  The gravamen is
23    the iOS.  And all that has been produced.
24            Again, Corellium sells one thing.  There is -- you can
25    upload and play iOS files on that.  Every aspect of that has
```

 1    been produced.

 2           To do -- to come into this definition would literally

 3    give up everything of Corellium.  Everything.

 4           THE COURT:  Limit it to iOS.

 5           MR. LEVINE:  It -- all products developed -- there's

 6    one product.  We sell the access to a platform.  If a client

 7    wants to test an iOS product, it goes on and it gets iOS files

 8    and it does that.  If it wants to test an Android product, it

 9    goes on and gets those files and it does that.  If it wants to

10    test a Google product or a Sony product, whatever product, it

11    goes on and does that.

12           We sell access to the platform.  So by saying "all

13    products developed," that is the entire Corellium.

14           THE COURT:  Well, the problem is this:  There's

15    allegations that Corellium has violated Apple's copyrights and

16    engaged in what's commonly referred to as digital piracy.

17           Your position is:  We didn't, and this Corellium Apple

18    product doesn't do that.  But you can't look at it.

19           MR. LEVINE:  No.  You can.

20           THE COURT:  But what you're saying is, it's so

21    sensitive and it's such a trade secret, it's almost like saying

22    that, well, even if we did steal it, which we say we don't, but

23    even if we did, and even if we are copyrighting it and even if

24    we are engaging in digital piracy, you can't look at it because

25    it's so sensitive and it's so protected and it's such a trade

```
1    secret.
2            It seems to be -- I'm trying to understand your
3    argument and why it would be that if -- you know, if the claim
4    is that this product is violating Apple's copyrights and is
5    engaging somehow in digital piracy and your claim is that it's
6    not, it's just finding bugs for the good of society, et cetera,
7    why Apple can't look at that to make a determination from their
8    expert just like your expert will look at it and make their own
9    opinion.
10           MR. LEVINE:  They can.  Let me explain.
11           Apple sells access to a platform.
12           THE COURT:  Right.
13           MR. LEVINE:  That's what they sell:  access to the
14   platform.
15           THE COURT:  You mean Corellium.
16           MR. LEVINE:  Yeah.  The Corellium hypervisor --
17           THE COURT:  I think you said "Apple" sells.
18           MR. LEVINE:  Oh, excuse me.  I'm sorry.
19           Corellium sells access to a platform.  It sells it to a
20   client who's doing security app testing.
21           If that client wants to test iOS -- Corellium doesn't
22   dictate what they're testing.  They merely give them access to
23   this platform which can do five or six different things.  If
24   that client at that point in time wants to test an Android app,
25   then the client loads up the Android app onto the platform and
```

1    the platform engages its Android stuff, which I would call the

2    patches that allow the Android to -- the Android file to be

3    compatible on Corellium's single platform.

4         If the client says, I don't want to do Android; I want

5    to do Apple, iOS stuff, they upload the iOS file and the iOS

6    aspect of the Corellium hypervisor lights up and engages that

7    product.

8         If they want to the next day do a different product,

9    then the Corellium hypervisor engages those aspects of it.

10        THE COURT:  So what I'd want produced to Apple would be

11   the product that somebody buys that can then test an iOS

12   device, because you're saying it's merely testing to find bugs

13   and they're saying it's being copyrighted, et cetera.

14        So that's what needs to be produced.  Whatever that

15   product is that a customer purchases and then uses that portion

16   of the platform to test or copy or whatever it is they're

17   doing, an iOS device.

18        MR. LEVINE:  Very respectfully, your Honor, I still

19   question whether you're understanding exactly how this works.

20   And I'm really -- in the interest of my client, I need to be

21   very, very clear.

22        THE COURT:  All right.  So what you told me is

23   Corellium sells access to a platform.

24        MR. LEVINE:  One product.

25        THE COURT:  All right.

1           MR. LEVINE:  They sell one product.

2           THE COURT:  But do you agree?  Corellium sells access

3    to a platform?

4           MR. LEVINE:  That is the product.

5           THE COURT:  Okay.  One product.  Okay.

6           Now, I as the customer can decide what to do as far as

7    testing on that one product.

8           MR. LEVINE:  Yes.

9           THE COURT:  I can test an Android app or I can test an

10   iOS device, according to you.

11          MR. LEVINE:  Yes.

12          THE COURT:  If I want to test or copy or whatever it is

13   that's being done to an iOS device, Apple has the right to look

14   at that customer's testing of the iOS device, copying of the

15   iOS device, et cetera, via the platform.

16          What else is complicated about that?  Explain that to

17   me.

18          MR. LEVINE:  That's the issue.  So we've produced every

19   aspect of that product that relates to iOS.

20          The problem with this definition is "all products."  We

21   only sell one product.  There's certain aspects of that product

22   that only relate to iOS.  There's other aspects of the product

23   that relate to other things.  But we only sell one thing.

24   We --

25          THE COURT:  But I'm saying "all products that relate to

1    iOS-operated devices."  Doesn't that limit it?

2            MR. LEVINE:  We only sell one product, though.  That's

3    the thing.  The customer only buys -- there isn't -- I can't --

4    as Corellium, I can't go to the product [sic] and say:  Hi.

5    You're interested in our service?

6            Yes, we are.

7            Okay.  Fine.  Are you interested in Android or are you

8    interested in iOS or are you interested in anything else?

9            Well, I'm interested in iOS.  I'd like to buy the Apple

10   product.

11           That's not the way it works.  It's not isolated.

12           There is one product that is sold and then there's

13   certain aspects of that that relate to the iOS.  And that's

14   what's already been produced.

15           So this definition that says "all products," again, we

16   only sell -- or Corellium sells one thing.  So by producing all

17   product, we only sell one product.  That would literally be

18   giving up the entire shop.

19           Everything that relates to this case can be limited by

20   the definition that's already there, "all aspects of the

21   Corellium platform."  And I think for purposes of this

22   discussion, "platform" and "product" can be interchanged.

23           So it's all aspects of the one thing that we sell that

24   relate to iOS.  And that, the code has been produced; the

25   access so that the expert can use it, so they can see how it's

```
 1    used, has been done.  To get code that -- again, we only sell

 2    one thing.

 3              THE COURT:  I understand.

 4              MR. LEVINE:  But to get code that doesn't relate to

 5    iOS, it's --

 6              THE COURT:  Well, I don't know how many more times I

 7    can be more clear, counsel.  I have said it only relates to

 8    iOS.  I don't know how more clear I can -- I even put in my

 9    definition that it doesn't relate to any product of Corellium,

10    any portions of any product of Corellium, that are based on

11    other mobile operating systems.

12              Now, if Corellium chose to make a product that

13    allegedly infringes on a lot of different types of devices,

14    well, they may have to live with that.  They may have to

15    produce it.  I don't know.

16              MR. LEVINE:  Well --

17              THE COURT:  Maybe they didn't infringe; maybe it's just

18    testing.  I don't know.  I'm not deciding the ultimate issue

19    here.

20              But it seems to me that Corellium has developed this

21    product; and to the extent it allows copying or allegedly

22    violating a copyright of an iOS system, Apple has a right to

23    look at it.

24              MR. LEVINE:  So this product -- merely because there's

25    an allegation, that's not at issue in this complaint.  So
```

```
 1    initially, the Android side of things is all open source.  So

 2    it's impossible to have copying and copyright protection.  This

 3    is not some criminal enterprise.

 4            THE COURT:  But the Android is not at issue in this

 5    case.

 6            MR. LEVINE:  I agree.  So this aspect should not be

 7    produced.

 8            THE COURT:  I don't want you to produce anything about

 9    the Android.  I only want you to produce iOS.  Are you not

10    understanding my English?

11            MR. LEVINE:  I am.  The problem is, "all products"

12    means everything goes.

13            So let me ask this question:  Under this definition,

14    would the hypervisor have to be produced?

15            THE COURT:  To the extent -- to the extent that it

16    allows copying of the iOS-operated devices, yes.

17            MR. LEVINE:  Under that definition, I think we would

18    concede and we've already complied with that definition.

19            THE COURT:  Okay.  Let me hear from Ms. Bina on this

20    issue.

21            MS. STEBBINS BINA:  Yes, your Honor.  A couple of

22    things:

23            One, you know, I think they're right.  They offer one

24    product.  And that's where we keep getting stuck.  Right?

25            THE COURT:  Okay.
```

```
 1            MS. STEBBINS BINA:  Because they have a hypervisor and

 2    the hypervisor has a couple of different patches and they have

 3    an Apple patch and they have an Android patch.

 4            THE COURT:  All right.

 5            MS. STEBBINS BINA:  We don't need the Android patch.

 6    They've given us the Apple patch.  They say -- they say they

 7    have.  We can't read it, but we'll fix that.

 8            The question is:  Is the hypervisor part of what they

 9    have to give when you need the hypervisor to run the Apple

10    patch?

11            And I don't know of any way -- and part of my problem

12    here is their fair-use defense.  Right?  If it was a

13    straightforward, "Does their product display our product," you

14    know, maybe we could answer that.

15            But every time we turn, they're saying, "This is

16    transformative.  We have this breakthrough technology that no

17    one else had and it's transforming the industry and it's

18    incredibly important and that is why our product qualifies as a

19    fair use," because if they just had -- if their only product

20    was something that turned off Apple's security, which is what

21    their Apple patch does, I don't think there would be any

22    question that that was a straight-up DMCA violation.

23            So their whole transformative argument turns on their

24    hypervisor.

25            THE COURT:  So let me just ask you, the Apple patch
```

 1     that Corellium represents are the Apple patches --

 2              MS. STEBBINS BINA:  Yes.

 3              THE COURT:  -- or Apple patch.  You're still testing to

 4     make sure that's correct.

 5              Your position is that the Apple patch can't be used

 6     without access to the hypervisor or it can't be tested or

 7     examined by your expert without access to the hypervisor.

 8              Their position is:  You have everything you need.

 9              MS. STEBBINS BINA:  Right.  Well, I think that's

10     probably right, your Honor.

11              I want to make a couple of additional points on the

12     hypervisor idea:  You know, if the -- their product didn't

13     start off as Apple, Android, et cetera.  It started off selling

14     the Apple product only.  And the reason that it's gotten so

15     much attention is, as they say, Android is open source.  The

16     fact that they are virtualizing iOS is what is flashy about

17     their product.  It's what they're arguing is transformative and

18     we're arguing is infringement.

19              I'm sensitive to their sensitivities about code.  You

20     know, they say Apple has their whole customer list.  Apple

21     doesn't have their whole customer list; I have their customer

22     list.  They haven't even allowed me to share it with a single

23     in-house counsel person at Apple.  It's under lock and key.

24              And so obviously, if we have access to any of their

25     code, we will keep it under similar lock and key.  We're not

1    trying through litigation to steal their property.

2           But it is a case where we're trying to assert our legal

3    rights.  And it's really hard because they say, "Well, just the

4    patch is at issue," but then they turn around and say, "But

5    this is fair use; it's transformative."

6           And the patch is clearly not transformative in and of

7    itself.  So they're relying on the hypervisor, but they won't

8    show it to us.  And that's where I keep getting stuck.

9           THE COURT:  Okay.  All right.  Mr. Levine?

10           MR. LEVINE:  Your Honor, the definition "produce

11    anything related to iOS," if they're alleging that we display,

12    reproduce, copy, pirate, steal, all the worst things in the

13    world, the definition "anything that handles or related to iOS"

14    would encapsulate that.  They can look to see if the code is

15    stolen; they can look to see -- I mean, that's the question of

16    the code.  Then look to see if it's stolen.

17           As it relates to use, even if we give them the code,

18    that's not -- they would have to then make the product.

19           For example, you know, co-counsel here just gave me

20    this analogy, and I think it's a very good one:  If there's an

21    engine that can run on ethanol, gas, diesel, to produce all

22    products related to diesel would inherently give up the entire

23    thing.

24           If they're concerned that we're stealing parts of that

25    engine that permit the running of diesel, and we say:  Fine.

1      We will give you every aspect of that engine that relates to

2      diesel.  Here are all the parts.  See if they're stolen; see if

3      they look like your parts; use it.

4              Then -- so that's the aspect of the stealing.

5              Then there's the use, the fair use.  The code doesn't

6      have anything to do with use, the production of the code.  Even

7      if we gave them the code, they would have -- that would be

8      giving them all the parts individually of this engine.  The

9      expert would then have to go build it and use it himself.

10             That's not it.  We've already given him a simulated --

11     it's not even simulated; we've given him access to the product.

12     So he can see how it's used.

13             The code doesn't relate to the use.  The only thing the

14     code is used for is so that their expert can see if it's

15     stolen.

16             And the definition "anything that relates to iOS,

17     anything at all that relates solely to iOS," he would have

18     everything that he needs to check to see if it's stolen.

19             THE COURT:  How does he test the patch?  You say that

20     the Apple patch has been provided.  They say it's in .pdf.  How

21     does he in any way --

22             MR. LEVINE:  We've given the expert --

23             THE COURT:  How does the expert testified the patch?

24             MR. LEVINE:  By his use of the actual product.  Again,

25     there's the code to see if it's stolen and then there's the

1   use.  Testing, he doesn't test on the code.  That's not what it

2   is.  They test by the use of the product on the actual platform

3   itself, which has been provided.

4          The code is merely to put Apple's code up on the wall

5   and then just to the right of it put Corellium's code up on the

6   wall and see if there's any identical parts.  And if there are,

7   you've stolen it; that's infringement; done.

8          They have all of that already.  And if we need to

9   provide it in native, they are right; we are wrong; we should

10  have done that and we'll get that done immediately.

11         Providing --

12         THE COURT:  Here's the situation:  We have another

13  hearing coming up here, as I've already established, on March

14  16th.  From what I understand, there's going to be more access

15  provided to Apple's expert to the product, the Corellium Apple

16  product, as we discussed earlier.  You're going to be providing

17  the Apple patch in native or the other material that you

18  provided in native or useable format.

19         What I would be inclined to do is to at this point

20  define the Corellium Apple product as "All products developed,

21  offered for sale or sold by Corellium that create virtual

22  versions of iOS-operated devices.  This does not include

23  Corellium products that are based on other mobile operating

24  systems."

25         As far as whether that does or does not include the

1   hypervisor platform --

2         MR. LEVINE:  That's the question.

3         THE COURT:  -- then I would want Apple's expert to get

4   this native information, look at the patch, look at the access

5   that's provided to test the Corellium Apple product, and then

6   before the hearing on March 16th, get an affidavit from your

7   expert as to whether that's sufficient or not and an affidavit

8   from your expert as to whether it's sufficient or not.  And

9   then I can decide on March 16th whether hypervisor is --

10  whether there needs to be a more expansive definition to

11  include hypervisor.

12        But the Court needs some technological expert to tell

13  me why it is that Apple says they absolutely have to have this

14  and why it is that you say if you give this, you're giving up

15  the farm.  Okay?

16        MS. STEBBINS BINA:  Your Honor?

17        THE COURT:  Yes, Ms. Bina.

18        MS. STEBBINS BINA:  Can I ask an important clarifying

19  question?

20        THE COURT:  Sure.

21        MS. STEBBINS BINA:  Because there's two issues here.

22  One is the source code for their hypervisor.  I understand the

23  sensitivities on that.  I think it does make sense to have

24  expert testimony on that issue.

25        But the Corellium Apple product definition is in dozens

```
 1    of requests.  And they've refused to produce anything relating

 2    to -- anything beyond the patches.  So communications with

 3    their customers.  You know, as they said, they only sell one

 4    product.

 5             So they're saying:  Oh, we're not going to produce

 6    anything that's relating to the hypervisor.  We're not going to

 7    submit invoices or customer inquiries.

 8             THE COURT:  Well, that's not going to be allowed.

 9             MS. STEBBINS BINA:  Okay.  That's just --

10             THE COURT:  We're going to have to -- if we have to go

11    through these requests for production today one by one, then

12    that's what we're going to do.

13             MR. LEVINE:  Your Honor, customers that relate to

14    Android -- communications that --

15             MS. STEBBINS BINA:  Not Android customers.

16             THE COURT:  You don't have to produce that.

17             MR. LEVINE:  That's what we're not -- everything that

18    relates to iOS from Corellium has been produced.  Everything.

19             THE COURT:  I'm hearing from the other side that you

20    haven't produced -- that you've objected to communications

21    involving iOS.

22             MR. LEVINE:  No.  No.  She said hypervisor.

23             THE COURT:  No.  You said -- no.  There are objections

24    to iOS communications in here.

25             MR. LEVINE:  We'll address -- I can tell you, your
```

```
 1    resolve many of our differences.  I'd like to read into the
 2    record what the resolutions of those are and then tee up the
 3    few that need to be heard.
 4              THE COURT:  Okay.  Go ahead.
 5              MS. STEBBINS BINA:  The good news is we got from about
 6    47 to I think about three.
 7              THE COURT:  Oh, good.  That's much better.  I
 8    appreciate that.
 9              MS. STEBBINS BINA:  So hopefully it'll be a more
10    manageable amount.  Sorry.  I'm trying to look at two things at
11    once and that's not working well.
12              So with a number of requests, we're going to confirm
13    that "Corellium Apple product" will be as defined by the Court.
14    And Plaintiffs will -- Defendants will amend their response
15    from "won't produce" to "will produce."  And there are a number
16    of other requests where the Defendants have just confirmed that
17    they're not actually withholding any documents.
18              So I'll go through those with those sort of general
19    categories.
20              So Request 1:  Defendants have confirmed based on the
21    definition of the Corellium Apple product by the Court they're
22    not withholding any documents other than privilege, which will
23    be properly logged.
24              The same as to -- for Request No. 3 and 4 and 7, 8 and
25    9.
```

```
 1              For 9, there is -- there is probably still an open

 2    issue with respect to the hypervisor.  But I think we can defer

 3    that to the next hearing.

 4              The same -- for Nos. 12 and 13, the Defendants will

 5    produce any documents or testing that related to iOS, which is

 6    in connection with the Corellium Apple product.

 7              For Request 14, it was ordered --

 8              THE COURT:  Hold on a second.

 9              As far as 12 and 13, the Defendant shall produce any

10    documents or testing relating to --

11              MS. STEBBINS BINA:  To iOS.

12              THE COURT:  All right.

13              MS. STEBBINS BINA:  So they called for a testing or

14    analysis of the Corellium Apple product or any associated

15    hardware.  We've clarified that at this point they will produce

16    related to iOS.

17              THE COURT:  Okay.

18              MS. STEBBINS BINA:  All of these with reservation on if

19    the Court makes a different ruling on the hypervisor, then we

20    can reopen as necessary.

21              THE COURT:  I understand.

22              MS. STEBBINS BINA:  14, your Honor ruled on earlier.

23              15 is already answered.  They've confirmed that they're

24    not withholding anything based on the Court's definition of the

25    Corellium Apple product and they're changing "will not" to
```

1    "will."

2          For 18, I believe the case is the same.

3          THE COURT:  What's that now?

4          MS. STEBBINS BINA:  18 and 19 I believe are the same.

5    They've confirmed that they are producing -- they've produced

6    all materials as to the Court's definition of the Corellium

7    Apple product.

8          THE COURT:  Okay.

9          MS. STEBBINS BINA:  For Request 20, we've agreed that

10   the request rather than calling for all documentation and

11   communication -- documents and communications relating to

12   Corellium's obtaining any of Apple's products, it will instead

13   relate only to iPhones used for product testing purposes,

14   ispw.me [sic] files, anything else that's used in the Corellium

15   Apple product as defined by the Court or in testing the

16   Corellium Apple product as defined by the Court that is an

17   Apple product --

18         THE COURT:  All right.  Hold on a second.

19         As far as 20, it relates only to iPhones used for

20   testing products?

21         MS. STEBBINS BINA:  Right.

22         THE COURT:  What else?

23         MS. STEBBINS BINA:  Ispw.me files.

24         THE COURT:  Ipsw.me files.

25         MS. STEBBINS BINA:  Thank you.  "Ipsw."  I said it

```
1              That would only leave us with 52 and 78.  Right?
2              MS. CONSTANTINE:  Your Honor, if I may.
3              THE COURT:  Yes.  Ms. Constantine.
4              MS. CONSTANTINE:  Just to clarify on 41, it's limited
5    to the definition of the Corellium Apple product.  Correct?
6              THE COURT:  Yes.
7              MS. CONSTANTINE:  Thank you, your Honor.
8              MS. STEBBINS BINA:  Again, your Honor, just to clarify
9    on what Corellium Apple product here means:  We've already
10   talked about they don't sell separately the Apple patches.
11             THE COURT:  Right.
12             MS. STEBBINS BINA:  So it will be the agreements that
13   relate to their purchase of the product and their resale of the
14   product that includes the Corellium Apple product.  Correct?
15             THE COURT:  Well, I know we spent a lot of time on this
16   today as far as the definition of the Corellium Apple product.
17             Now, here's what I understand, because this is -- I can
18   see what's driving a lot of the dispute here.  We spent a lot
19   of time discussing the definition of the Corellium Apple
20   product.  And I think that was necessary because the parties
21   have been fighting over the proper definition of the Corellium
22   Apple product for months and months and months in this case.
23             What it seems to me to boil down to is that Corellium
24   does not want to produce the source code for the Corellium
25   hypervisor.  That's what it seems to boil down to.
```

```
 1              Would counsel agree that that's the issue?

 2         MS. CONSTANTINE:  That --

 3         MR. LEVINE:  To -- not the source code, nor if there's

 4    something -- if there's correspondence relating to iOS or just

 5    if there's a question about the hypervisor that doesn't relate

 6    to iOS correspondence, things related to --

 7         THE COURT:  But the main thing as far as the trade

 8    secret, it's really the source code for the hypervisor?

 9         MS. STEBBINS BINA:  I think what --

10         MR. LEVINE:  Yeah.  I think -- so that's the most

11    sensitive, yes.  But I don't want to come out and say there are

12    not.

13              I mean, certainly there are things where we are

14    consulting maybe -- and I don't know if this is true, but maybe

15    if we're consulting with someone just as it relates to the

16    hypervisor; it has no connection to iOS, but it's the

17    communication, technical communication, about something

18    hypervisor, I would think that --

19         THE COURT:  Right.  But I understood that your

20    fundamental objection was that you didn't want to have to

21    produce the source code for the hypervisor.  I thought that was

22    your fundamental proprietary objection.

23         MR. LEVINE:  Yes.

24         THE COURT:  And it would seem to me in effect that what

25    I wanted Corellium to produce would be pretty much everything
```

1    else regarding iOS in useable or native format, including

2    giving access to the Corellium Apple product, except the source

3    code for the hypervisor.  And then the Court will later hear

4    from the experts as to whether anything else has to be

5    produced.

6         I think that is explaining it in a nutshell.  Would you

7    agree?

8         MR. LEVINE:  I agree.

9         MS. CONSTANTINE:  Yes.

10        MS. STEBBINS BINA:  And in terms of the business side

11   of Corellium, I think that may be a slight additional thing

12   where it -- I understand the Court's position.

13        Our position is that because they sell the unified

14   product, to the extent that there's invoices or contracts that

15   cover that product, like these Azimuth contracts, cover that

16   product as a whole, and it includes the Corellium Apple

17   product, those should be produced unless of course they have

18   for some reason the source code of the hypervisor in them,

19   which would seem unlikely.

20        But because they don't parcel off and sell just a part,

21   I think we need the full contracts to understand.  And I

22   believe they've done that for every other customer but Azimuth

23   or they've represented that they have.

24        THE COURT:  Well, they just said they're going to

25   produce the Azimuth contract.

```
 1              MR. LEVINE:  No, no.  So the sale contract, I agree.

 2   And --

 3              MS. STEBBINS BINA:  Reseller contracts as well.

 4              MR. LEVINE:  I'm pretty sure -- I don't know if we have

 5   that.  But no.  I cannot agree to that.  And that's going to be

 6   a big issue on March 16th.

 7              THE COURT:  What is that?

 8              MR. LEVINE:  The reseller contracts.

 9         So Azimuth has its customers, and I think that's going

10   to be a big issue on March 16th.

11              THE COURT:  I'm sure that's part of their motion for

12   protective order.

13              MS. STEBBINS BINA:  I'm asking for your contract with

14   them, not their contract with their customers.

15              MR. LEVINE:  Right.

16              THE COURT:  Right.

17              MR. LEVINE:  I just said that.

18              THE COURT:  I've already heard that Corellium is going

19   to produce Corellium's contracts with Azimuth.

20              MR. LEVINE:  That's agreed.

21              MS. STEBBINS BINA:  So let me just clarify, then.

22         You said Corellium's sales contract with Azimuth.

23              MR. LEVINE:  Right.

24              THE COURT:  My understanding is that Corellium also has

25   a reseller contract with Azimuth that authorizes Azimuth to
```

1

2

             C E R T I F I C A T E

3        I hereby certify that the foregoing is an

4   accurate transcription of the proceedings in the

5   above-entitled matter.

6

7

                      /s/Lisa Edwards
8   _____    LISA EDWARDS, RDR, CRR
       DATE           (305) 439-7168
9                     Reporterlisaedwards@gmail.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25