# EXHIBIT E

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
2                WEST PALM BEACH DIVISION
           CASE NO.  19-81160-CIV-SMITH/Matthewman
3


4    APPLE, INCORPORATED,

5                    Plaintiff,

6         vs.

7                                    West Palm Beach, Florida
                                     March 16, 2020
8    CORELLIUM, LLC,                 Pages 1-116

9                    Defendant.
     _____

10              TRANSCRIPT OF TELEPHONIC MOTION HEARING
11           BEFORE THE HONORABLE WILLIAM MATTHEWMAN
                UNITED STATES MAGISTRATE JUDGE
12


13   APPEARANCES:

14   FOR THE PLAINTIFF:
                         Latham & Watkins, LLP
15                       BY:  JESSICA STEBBINS BINA, ESQ.
                         BY:  GABRIEL S. GROSS, ESQ.
16                       10250 Constellation Boulevard
                         Suite 1100
17                       Los Angeles, California 90067

18                       Lash & Goldberg
                         BY:  EMILY PINCOW, ESQ.
19                       Miami Tower
                         100 Southeast 2nd Street
20                       Suite 1200
                         Miami, Florida 33131
21
     FOR THE DEFENDANT:
22                       Cole, Scott & Kissane, P.A.
                         BY:  JUSTIN LEVINE, ESQ.
23                       BY:  LIZZA CONSTANTINE, ESQ.
                         Esperante Building
24                       222 Lakeview Avenue
                         Suite 120
25                       West Palm Beach, Florida 33401

PROCEEDINGS RECORDED BY THE COURT'S DIGITAL AUDIO RECORDER
        TRANSCRIPT PRODUCED BY MANUAL STENOGRAPHY
              AND COMPUTER-AIDED TRANSCRIPTION

1    to jump in while somebody else is talking or while there is a

2    break in the talking.  Everybody will get a chance to speak.

3         Additionally, when you do speak, since you're not here

4    in court and we are making a record of this, in the event it

5    ever needs to be transcribed, when you do speak, if I state your

6    name, that's sufficient.  But when you do start speaking, please

7    make sure that you're properly identified on the record so

8    whatever you have to say on behalf of your client is properly

9    captured.

10         All right.  So that all being said, let's start off

11    first of all and find out who is here for the Plaintiff Apple,

12    Inc.

13         MS. STEBBINS BINA:  Good morning, Your Honor.  This is

14    Jessica Stebbins Bina with Latham.  My partner, Gabe Gross, is

15    also on the line, and local counsel Emily Pincow from Lash and

16    Goldberg.

17         THE COURT:  All right.  All right.  Good morning to all

18    of you.

19         And Ms. Bina, are you going to be primarily arguing for

20    Apple?

21         MS. STEBBINS BINA:  Yes, Your Honor.  Mr. Gross may

22    weigh in on some of the matters related to the hypervisor as he

23    has more expertise than I do, but I will be the primary arguer.

24         THE COURT:  All right.  That's fine.  All right.

25         Then who do we have here for the Defendant Corellium,

LLC?

MR. LEVINE:  Good morning, Your Honor.  Justin Levine from Cole, Scott and Kissane on behalf of Corellium.  I also have with me Lizza Constantine from the same law firm. Depending on the subject matter will dictate who the attorney is.  I also -- depending on the issue.

I also brought with me Cole Scott's director of ESI, he's a software engineer, Manny Delgado, and also to assist with speaking on some of the technical issues.  On the hypervisor, in addition to the affidavits that were provided, I have the chief technical officer from Corellium, Chris Wade as well.

THE COURT:  All right.  And then is Amanda Gorton also on the line?

MR. LEVINE:  She's on the line and in the room, but likely will not have a role in today's hearing, Your Honor.

THE COURT:  All right.  And what is her position again with Corellium?

MR. LEVINE:  Chief executive officer.

THE COURT:  Okay.  Thank you.  All right.

And who do we have here on behalf of the nonparty L3Harris?

MR. TAORMINA:  Good morning, Your Honor.  This is Benjamin Taormina and Adolfo Jimenez from Holland and Knight on behalf of L3 Technologies and Azimuth.  I, Benjamin Taormina, will be doing the primary argument, but Adolfo Jimenez may

1   present as well.

2           THE COURT:  All right.  And you're here on behalf of

3   both L3Harris and Azimuth; is that right?

4           MR. TAORMINA:  That's correct, Your Honor.  L3Harris

5   owns Azimuth.

6           THE COURT:  Right.  They're the parents, correct?

7           MR. TAORMINA:  Correct.

8           THE COURT:  All right.  Great.  And did I miss anybody?

9   Is anybody else on the line?  All right.

10          Hearing nothing, I have all the appearances here and

11  we're going to do the best we can here by phone today.  It's

12  sort of a -- there's some complex issues that make it a little

13  unwieldy by telephone.  However, in light of the coronavirus

14  concerns, I think it's important that we proceed by telephone

15  here today so all of you can stay hopefully safe and healthy.

16          So the hearing today is a discovery hearing and a

17  motion hearing on the nonparty L3Harris Technology, Inc.'s

18  motion to quash Plaintiff subpoenas to produce documents and for

19  deposition, which is at Docket Entry 184.  And I've read all of

20  the responses, replies, et cetera, regarding that.  I know there

21  was a notice of a filing under seal of a joint notice and the

22  joint notice is at Docket Entry 227.  The sealed version of it.

23  And that's a joint notice regarding L3 Technology's motion to

24  quash, and outstanding discovery disputes between Apple and

25  Corellium.

84

1    Apple's copyrighted works.

2            Where we ran into trouble, and this is laid out in the

3    -- in the expert declaration of Dr. Nie that we filed is that

4    they haven't really done that.  They provided what they call the

5    patches to the Apple product, but those patches are incomplete

6    sets of code and they've self-edited the code.  So instead of

7    providing the full code and redacting it or providing the full

8    code which would have been the more appropriate thing to do,

9    there's entire sections that are missing, and Corellium's staff

10   as I understand it, it's technical employees, have just actually

11   replaced the code with things that say "not related to iOS".

12   And so even -- and again, this is detailed in Dr. Nie's

13   affidavit.  They have a chart of their whole architecture, and

14   there's a portion of it that is the hypervisor, but then there's

15   dozens of things that ride on top of the hypervisor, of those

16   they produced only a small fraction and they haven't produced

17   what they're considering are the generic products, parts of it

18   that can run Android or iOS, even though those parts are, to our

19   understanding, directly involved in copying and displaying and

20   snapshotting iOS.

21           And so separate and apart from the hypervisor issue

22   which remains live, we don't believe we've been provided with

23   what Your Honor has already ordered that we should be provided

24   with.  And there's a related issue which is that they're still

25   withholding the joint notice of 8,500, but they've produced

1    4,000 or so documents a couple of days ago, I think Thursday or

2    Friday.  But there's still about 5,000 documents that they are

3    withholding on the basis of quote, unquote privacy and trade

4    secret grounds that don't appear to relate in any way, shape or

5    form exclusively to the hypervisor.

6          So for example, if you'll bear with me one moment, I

7    just want to grab my notes I've got here.

8          THE COURT:  Well, if you could hold on a second because

9    I'm trying to break this up and understand the issues.  The

10   first issue was whether changes to the Corellium Apple product

11   have been produced by Corellium.  Have they been -- have the

12   changes been produced or not?

13         MS. STEBBINS BINA:  Yes, in part.  They produced --

14   they allowed us to inspect briefly two sets of code that they

15   claim is the change with edits in it taking out things they

16   claim were noniOS specific.  They also allowed our expert to

17   briefly access a cloud version of how the product supposedly

18   worked in the past.  So they have done that in part, but with

19   pieces missing from the code.

20         THE COURT:  And which pieces are missing, according to

21   you?

22         MS. STEBBINS BINA:  We don't know.  There were over 50

23   notations that just say taken out, not iOS related, and there's

24   no evidence of how much was taken out, how much was left in.

25   You know, we've got fragments of code, but we don't have the

1    whole system and that's what's challenging because without the

2    larger framework with which those pieces rest, it's virtually

3    impossible for our expert to tell whether what we have is

4    everything that modifies iOS.  We know we don't have everything

5    that copies and displays iOS so --

6          THE COURT:  All right.  So let me ask you this, what

7    about the production of the source code and the hypervisor

8    portion of the Corellium Apple product?  I know the experts have

9    filed affidavits on that, but what is your -- in a very quick

10   summary, why do you need that and what is your -- why does your

11   expert, what does your expert say about whether you need the

12   source code and the hypervisor portion of the Corellium Apple

13   product?

14         MS. STEBBINS BINA:  So there's a couple -- I'll be as

15   brief as possible, Your Honor.  There's a couple of different

16   issues, the hypervisor being the last one.  The first is that

17   separate and apart from the hypervisor, they haven't produced

18   most of their code.  So we had understood that they were going

19   to produce everything with the hypervisor, they haven't.

20   Instead, they've produced a very tiny amount.  And so we still

21   don't have, separate and apart from the hypervisor, all of their

22   code or a full understanding of how their system displays,

23   copies, modifies, addresses things.  So apart from the

24   hypervisor, we don't have code sufficient to understand how

25   their product works.

1          Second, and in particular how it works with iOS.  If

2      you look at Paragraph 40 of Mr. Dr. Nie's declaration, I think

3      that contains confidential information, so I'm not going to

4      describe it here, but it addresses some of our issue with us not

5      having nonhypervisor code because of these edits and cuts and

6      their self-limiting of what should be provided.

7          Second, they've only produced one version of the

8      Corellium Apple product.  According to their discovery

9      responses, there are 16 different versions, they have told us

10     there are 12, we've got one, so that's a major problem.  We

11     either need some kind of declaration that the others were

12     exactly the same, or we need access to all of the prior versions

13     which we haven't received.

14         Third, we've had very limited time with the product and

15     all of it was being supervised by Corellium's attorneys, so our

16     expert and our attorney, you know, had basically a half day to

17     look at the product, and they weren't allowed to be alone or

18     play with the product at all, absent supervision.  And that's

19     just not an adequate amount of time for our expert to complete

20     his review.

21         Then finally with respect to the hypervisor, that's the

22     core of the product.  It creates, runs, interacts with the

23     virtual system at issue, and Corellium's expert, you know,

24     acknowledges that it executes operating system commands which

25     means it's the hypervisor that makes a copy of iOS in its RAM

88

1   and runs it.  So we need access to the hypervisor to determine

2   how Corellium is copying and running iOS and in fact, there's

3   probably evidence in that hypervisor that it is in fact copying

4   and running iOS.

5            There's another portion of the sealed Olivier

6   declaration, that's the declaration from Corellium's counsel.

7   In Paragraph 4 that also talks about what the hypervisor does

8   with respect to an iPhone which directly relates to it getting

9   around our security features and copying.  So the hypervisor is

10  involved at least in displaying, circumventing and copying iOS

11  and we need to understand that.  And all of this is detailed at

12  Paragraph 60 through 65 of Dr. Nie's declaration.  I'm mindful

13  of trying to not say too much into the record.

14            THE COURT:  All right.  Thank you.  So let me turn to

15  counsel for Corellium.  It will be, I believe, Ms. Constantine.

16  What about this first category regarding -- regarding changes

17  that Corellium made to the Apple product that, according to

18  Apple, there's 12 to 16 versions and only one version has been

19  produced, and then the issue regarding the source code and the

20  hypervisor portion of the Corellium Apple product.  What's

21  Corellium's position on that?

22            MR. LEVINE:  This is Justin Levine, Your Honor.  Ms.

23  Constantine is going to take some of the other more pointed

24  discovery issues, some related to privilege log and other

25  specific requests.  As it relates to this issue, I'll be

1    providing argument.

2           THE COURT:  All right.

3           MR. LEVINE:  Just about everything Ms. Bina stated now

4    is not based on fact.  So the -- what was the first issue that

5    Your Honor wanted me to address?

6           THE COURT:  The first issue is dispute regarding the

7    changes that Corellium has made to the Corellium Apple product

8    that they're asserting that only one version of the Corellium

9    Apple product was produced, and there are 12 to 16 versions that

10   you haven't produced all the code or how the system changes and

11   modifies things.

12          MR. LEVINE:  Yes, Your Honor.  Okay.  So there are two

13   different sets of two different -- of different versions.  Now,

14   let me explain.  On the one hand, Corellium is currently

15   operating a current version of the product and we'll call that,

16   for the purposes of this conversation, the new version.  At the

17   start of the lawsuit, Corellium was operating a different

18   version, we'll call that for this purpose, the old version.

19          Very briefly, as you are aware, the -- yeah, the IPSW

20   files which contain iOS are loaded into the Corellium Apple

21   product.  At some point during this lawsuit, those files that

22   are located and obtained on the Apple website and Apple servers

23   became instable and in that instability, Corellium's customers

24   began experiencing shutdowns, errors and other issues with the

25   product.  And so that mandated during the course of business

1    that a small change had been to be made.  And basically that

2    small change was that at one aspect of building the virtual

3    device, it was where there was a dropdown box it was simply

4    changed to a drag and drop here box, and that was the only

5    change.  So that's one of the -- when we're talking about the

6    different versions of Corellium Apple product, that's one.  So

7    there's the old and the new.

8            And then there are the other versions where Ms. Bina is

9    talking about the 13 or 15 prior versions, and those, if Your

10   Honor has an iPhone, you'll know that every once in a while you

11   have to do an update to the iPhone or any of the apps will come

12   out with various updates.  You know, if a bug is found or an

13   issue is found, the manufacturer will put out a fix and they

14   send out that update where you have to update your app or your

15   phone.  That is basically those kind of things are the 13 or 15

16   versions that Ms. Bina is talking about on that aspect.  So as

17   it relates to what has been produced, on the right hand what I

18   first spoke about, the old and the new version, both of those

19   versions have been produced.

20           In addition, not only have they both been produced, but

21   as Your Honor ordered during the last hearing, Dr. Nie and an

22   attorney from Latham Watkins, they have access to both the old

23   and they have access to the new version.  So that's on the one

24   hand.

25           On the other hand, with all of the prior versions I

 1    believe, I'll confirm with my clients, but I believe they're

 2    willing to stipulate to the fact that all of the prior versions

 3    are functionally the same with -- just as I mentioned, just some

 4    minor changes, and it was discussed with Dr. Nie on the 12th

 5    when he came and visited Corellium, that it was agreed by

 6    Corellium to produce all of that code to him if you wanted.   I

 7    think the best way around it, and he agreed with us, in the

 8    presence of the Latham attorney, that just a simple stipulation

 9    that the older versions were fundamentally the same, that would

10    save everybody a lot of time.   Now, we are happy and we told him

11    and we will agree here on the record that if he wants all that

12    code, the relevant code for those versions, then we can produce

13    it.   But I just simply think that's going to waste a lot of

14    time.

15            Now, I would like to briefly address that meeting among

16    some other issues.   So Ms. Bina stated that Dr. Nie was only

17    permitted a brief amount of time to review the code.   Frankly,

18    Dr. Nie was permitted all of the time he wanted.   Dr. Nie

19    decided to get up after about an hour and a half and leave

20    himself.   In fact, you know, I was upstairs at the time and I

21    had actually -- I was going to run down and ask him something,

22    and I learned at that point in time that he had left about five

23    minutes ago.

24            And in fact, I'll rewind the clock 24 hours from there.

25    When Dr. Nie and the lawyer from Latham came to the offices of

1   Cole, Scott, I asked if they needed to retain -- if the IT staff

2   here at our offices needed to retain the computer set-up on into

3   Friday because I needed to know whether to reserve the

4   conference room on into Friday, and they said they don't know

5   but they'll let us know.  And so the point is is that he didn't

6   briefly have an amount of time and he wasn't limited.  In fact,

7   we were prepared to host him for two full days.  So when he came

8   and reviewed and he left, that is on Latham and Apple, that is

9   not on us.

10          After he visited Cole Scott's office, he then -- him

11  and the Latham attorney then came to the Corellium office where

12  the Corellium team had worked tirelessly over the last couple of

13  days to make sure that they had re-deployed the old version and

14  the on-site version of Corellium for Dr. Nie's use.  Dr. Nie was

15  there for about four hours.

16          Now, I don't know if Your Honor has really delved into

17  actually looking at some of the You Tube videos of this product,

18  this product, you can go from about end to end of it in about 15

19  minutes or less.  This would basically be the equivalent of

20  riding a bike around one of the small Bahamian islands in about

21  20 minutes.  It's not a very big thing, and there's only so far

22  you can dig into this.  He was there for about four hours and

23  asked four hours of questions with Mr. Wade directly and

24  answering almost all of his questions.  It was effectively a

25  second deposition, although granted, of course, there was none

1    of the formalities.  But the Latham Watkins attorney was taking

2    very copious notes of every word that was stated.  I would be

3    willing to bet that she was probably outlining her deposition of

4    Mr. Wade coming up, so we basically gave them their deposition

5    outline.  He had four hours to play around on the site.  Some of

6    the code was very readable and accessible beyond what we had

7    provided beforehand, and this opportunity provided him with

8    access to the old version which, again, it's really no different

9    from the new version, but he got it anyway, and it also gave him

10   access to the new version, just as Your Honor had ordered as a

11   customer would have.

12          Now, the only reason that Mr. Wade in the very

13   beginning had to do a couple of the actions on his own without

14   Dr. Nie -- no, Dr. Nie was right there looking and watching,

15   sitting right next to him, but Mr. Wade was doing it himself is

16   because that particular server -- and these are very large, very

17   expensive, very sensitive servers, and Your Honor ordered that

18   we had to set up an on-site version, which means that the server

19   is there on-site, and so they did that.  In order to do that,

20   they had to take away from some of the ongoing businesses and

21   they had to hook up one of their test servers to enable this

22   product to go forward, and because of that, the server had

23   direct access to Corellium's internal network.  And that's the

24   only reason why Mr. Wade did the first couple of initial steps

25   on his own.  And so that's that.

1           It's also very, very worth noting that not only did Dr.

2     Nie have over four hours with this product, probably over four

3     hours with this product and all of the hundreds of questions,

4     and Mr. Wade answered almost every single one of them, they drew

5     Dr. Nie diagrams.  Not only was all of that the case, but myself

6     personally, probably at least 15 times, told Dr. Nie our goal

7     here today is to make sure that you have every single thing that

8     you need when you leave here today so that when we go to the

9     court, we can represent to the court that you wanted one, two,

10    three, however many things you need.  And so I kept reiterating

11    that, because I knew it was going to be an issue at this

12    hearing.  I kept reiterating that all the way through these four

13    hours with Dr. Nie.  And at the end of this meeting, Dr. Nie

14    took about a 20 minute time with his counsel alone in the

15    conference room, and when they emerged, we came back into the

16    room and they provided an area of -- four areas that he needed

17    to establish this case for Apple and those four areas -- and I

18    have them written down.  Those four areas are the code relating

19    to snapshots, to cloning, to creation and to rendering.  And

20    while we believe that those four areas are beyond the scope of

21    this case, beyond any of the Court's order and beyond discovery,

22    Mr. Wade permitted me to agree to provide that information and

23    that code to Dr. Nie.

24          So I want to be very, very clear that at the end of

25    this entire day, first beginning at Cole, Scott's office and

1  then ending up for over four hours at Corellium's office, those

2  four areas were what Apple's own expert stated he needed and

3  Corellium has agreed to provide that code to Dr. Nie.  None of

4  that code relates to or connects to -- I shouldn't say connects

5  to, but none of that code relates to the hypervisor.  The

6  hypervisor was not something that Apple's expert stated he

7  needed to provide his report.

8          Furthermore, in Dr. Nie's report, the -- or, excuse me,

9  let me be clear, the declaration that was provided for the

10  purposes of this hearing, not his actual report, he states in

11  there that he does not have enough information to -- you know,

12  to write his or to make an opinion and render his report in this

13  case.  You know, I was puzzled by that because on March 2nd when

14  the expert reports came out, Dr. Nie provided a 325-page report,

15  and that's just text.  The exhibits to that report start at Page

16  326.  So -- and that's not including CV, that is actual report

17  text.  So for Dr. Nie to now say that he doesn't have enough

18  information to render an opinion in this case, it is in stark

19  contrast to the over 300-page report that he has.

20          In addition, on Page 5 of Dr. Nie's affidavit that he

21  provided for this case, he clearly states the only purpose, and

22  I'm quoting here for the record, the only purpose of the

23  hypervisor is to create and manage virtual devices acting like

24  hardware in a physical machine.  He qualifies that with "the

25  only purpose".  There's nothing contained in hardware or a

1   physical machine that relates to iOS and software code.  It just

2   doesn't exist.  They are not two things that cross over one

3   another.

4            Furthermore, on Page 11, he very clearly states that

5   Corellium has only produced code and other technical

6   information, and this is the part that we need to emphasize

7   about the parts of the accused product that directly and

8   specifically handle iOS.  That's precisely correct.  That's what

9   this case is about.  This case is about the portions and parts

10   that directly and specifically handle iOS.  That is on Page 11.

11            Now, what Apple's attorneys are trying to do is expand

12   this case into a patent case.  They're trying to learn the

13   underlying operability of the entire product, except that's not

14   copyright and it makes sense now because when I met Ms.

15   Victorson who is a Latham attorney who attended the day-long

16   session with Dr. Nie and Corellium, she told me that she is a

17   patent lawyer and she's not a copyright lawyer, and that makes a

18   lot of sense now why this gross expansion into the entire

19   business of Corellium has become such an issue.  This case is a

20   copyright case and it's a copyright case related to iOS.

21   Everything else is simply irrelevant, and that is why the code

22   that has been provided has been provided. Now again, being for

23   the record that we've already now provided to -- agreed above

24   and beyond or provided above and beyond the code that's needed.

25            Dr. Nie also states on Page 14 that he's received and

1   reviewed certain user guides and manuals.  I'll state for the

2   record that as it relates to the Corellium Apple product, there

3   are not a lot of specific guides and manuals and diagrams that

4   relate simply to iOS; again, what this case is about, and that

5   is why only a limited amount of them have been provided.  But

6   what is in existence has been provided.

7        And I'll take it a step further.  Even what was not in

8   existence has also been provided.  The Corellium team has gone

9   out of their way to design and draft multiple diagrams, one of

10  which Latham and Watkins has included in Dr. Nie's declaration

11  in this case, providing to the court exactly where iOS is and

12  lives in this product and showing -- not just showing that.  And

13  I have Mr. Wade here today to provide the technical information

14  if Your Honor likes.  I have Mr. Delgado here today who runs the

15  ESI division in Cole, Scott and he can provide additional

16  information as to the following statement that I'm about to

17  make, that all of the code that has been required and requested

18  in this case has been provided.  And all of the relevant code in

19  this case has already been provided.

20        Now, before Dr. Nie showed up to Cole, Scott's office

21  that day, I sat with Jonathan Vine, who is the partner in this

22  case, as well as Mr. Delgado who, as I mentioned, is the

23  software engineer and ESI director at Cole, Scott, and we went

24  through the definitions of all the discovery requests, we went

25  through the transcripts of the prior court hearings, and we

1  concluded at that point in time that we were in complete

2  compliance with all of the code that was -- that had been

3  requested and ordered at that point in time.  We also clarified

4  with Ms. Victorson at the time that it in fact *(unintelligible)*

5  the shortcomings as to -- the alleged shortcoming of production

6  of code and whether it had been provided in a useable native

7  format was actually on Latham.  They failed to locate this, and

8  I may be butchering this term, but they failed to locate the

9  file paths that was produced through Everlaw, a sanctioned ESI

10 tool, and we confirmed that all of that information in the

11 native and useable code had been provided.  Now, can they build

12 a hypervisor from that code?  No, they can't build the product.

13 But that's not what this case is about, and that is way too --

14 that is way too broad as far as the scope of what is needed.

15         THE COURT:  All right.  Let me ask you some questions

16 please.  I need to ask you some questions.  I have another

17 hearing at 3:00 and I have to break here in a little while, so I

18 would like to get to the issues directly.

19         Apple makes the allegation that you have not produced

20 the source code.  What is your response to that?

21         MR. LEVINE:  All source code that has been requested

22 and ordered by the Court has been produced in a native, useable

23 format.

24         THE COURT:  All right.  They also make the allegation

25 that you have not produced discovery related to the hypervisor

1    portion of the Corellium Apple product.  Can you address that?

2             MR. LEVINE:  That is correct.  I believe there are some

3    minor documents that were inadvertently produced as it relates

4    to that, but other than that, I believe that's correct, Your

5    Honor.

6             THE COURT:  Okay.  And the reason you can't produce

7    anything related to the hypervisor portion of the Corellium

8    Apple product in a nutshell is what?

9             MR. LEVINE:  Because the hypervisor has no connection

10   to iOS.  The hypervisor is -- in a brief way, the hypervisor is

11   a piece of hardware.  Now it's software, but it is effectively a

12   piece of hardware.  And so if Your Honor thinks that the plastic

13   and the glass and the metal that makes up an iPhone would

14   contain iOS code, that just doesn't meet the bounds of physics.

15   That's just not a possible thing, and Dr. Nie stated in his

16   report, as I mentioned earlier, the only purpose of the

17   hypervisor is to create and manage virtual devices acting like

18   hardware in a physical machine.  It's effectively a hard device

19   just in software.

20            THE COURT:  Okay.  Let me ask you, I have not carefully

21   gone through the competing experts' affidavits regarding these

22   issues.  Do both of the expert affidavits address whether or not

23   either side needs to produce or not produce or obtain the

24   hypervisor portion of the Corellium Apple product?

25            MR. LEVINE:  Yes, Your Honor.  So as you would imagine,

100

```
 1    both experts have competing affidavits.  Our expert says that
 2    there's no relevance and no connection.  Dr. Nie states that he
 3    does need it.
 4            Two brief points.  One, our expert has looked through
 5    the code of the hypervisor and has confirmed in his affidavit
 6    that there's nothing in there relating to iOS code.
 7            The second thing is that Dr. Nie's position, as now
 8    stated in his declaration, is in staunch contrast to his
 9    representation to us after meeting with his counsel on Thursday
10    of last week that there was no need for any hypervisor code.
11            THE COURT:  All right.  And let me -- as far as the
12    first issue, which is the different versions or changes
13    Corellium has made to the Corellium Apple product, your
14    position, just so I'm clear, is that you've produced the new
15    version of the Corellium Apple product which is what is being
16    used now; you've produced the old version of the Corellium Apple
17    product which was in effect at the time of the litigation and
18    the issues of these 12 to 16 versions, those are really, in
19    effect, minor changes that were made to the Corellium Apple
20    product dealing with, I guess, functionality; and that you will
21    produce, if requested, all of those 12 to 16 updates, but that
22    you will also, in lieu of producing those 12 to 16 updates,
23    agree and stipulate that they made no significant changes or
24    they only made minor changes to the Corellium Apple product.
25            Do I have that all correct?
```

1          MR. LEVINE:  Precisely, Your Honor.

2          THE COURT:  Okay.  So on that issue, on that first

3    issue that we've been talking about before we get to some of the

4    other issues here, let me ask Ms. Bina, what about that?  They

5    say that the old Corellium Apple product has been produced, the

6    new Corellium Apple product has been produced; that these 12 to

7    16 versions are mere updates; that your expert said they really

8    didn't need them but if you really want them, they'll produce

9    them, or they'll agree that they were just simply minor updates

10   of really no moment.

11          What's your response to that?

12          MS. STEBBINS BINA:  All right.  So I'll take the last

13   first, Your Honor.  We'd actually previously proposed that they

14   stipulate, and they declined to do so.  So a stipulation of that

15   kind may well take care of the prior versions if in fact it's

16   correct.

17          So on that issue of the 12 versus 16, if things

18   continue to work in the way they always have, we may not

19   necessarily need to review all of them.

20          THE COURT:  Okay.

21          MS. STEBBINS BINA:  Excuse me.  But again, we would

22   need a very clear stipulation on that point which we don't

23   currently have and have not previously provided despite our

24   request to get after last week's meeting.

25          Secondarily, in terms of what they've produced, they

1    have not produced source code in a native repository which is

2    the way it would typically be produced.  So typically Your

3    Honor, it would come through GitHub, or something like that,

4    which is a tool that allows source code to be compared to other

5    source code very easily, so you can immediately see the changes

6    without manually comparing them.  So it has comparison tools.

7    They haven't done that.  Instead Your Honor, they've produced it

8    via their e-discovery platform which does allow us to look at

9    the code, but doesn't have any of those native tools.  The

10   source code protective order requires that it be produced in the

11   way it's typically kept and functional, and instead they've

12   piped everything through this e-discovery platform so that we

13   can't.  So for instance, they've produced not the full code, but

14   a snippet of code relating to iOS that they claim shows the old

15   and the new, but we can't easily compare them, we have to

16   manually compare them because they haven't produced them in a

17   typical platform that they would normally produce them in.

18            THE COURT:  All right.  So you're saying that the

19   source code wasn't produced in a platform that allows

20   comparison.

21            MS. STEBBINS BINA:  Not easy comparison, Your Honor.

22   Typically you would be getting a source code computer with

23   access to something like GitHub which is, as I understand, a

24   common repository that I believe Corellium uses.  And we would

25   be able to look at it in that format and Dr. Nie could readily

103

1   compare one version to another.  Instead, we have this fairly

2   clunky e-discovery tool that allows him to look at both versions

3   but comparisons are much harder and more time-consuming.

4              THE COURT:  And what's the format you're saying?  Can

5   you spell it for me?

6              MS. STEBBINS BINA:  G-I-T-H-U-B, or whatever their

7   normal repository is.  Corellium doesn't keep its code in this

8   Everlaw e-discovery platform, they keep it in some other form

9   and that's the form that it would typically be reviewed in in a

10  normal source code review.

11             THE COURT:  All right.  And what about the hypervisor

12  portion of the Corellium Apple product?  Are you still insisting

13  on that and just very briefly, what do the two expert

14  declarations or affidavits say about why it is or isn't

15  producible?

16             MS. STEBBINS BINA:  So Your Honor, I have to back up

17  one step because there's a very serious disagreement amongst the

18  parties over whether they've already produced everything that

19  relates to iOS.  In fact, they've taken this extraordinarily

20  narrow view that even things that are not the hypervisor, unless

21  they contain specifically the word "iOS" or are directly

22  modifying iOS, that they're not going to produce it.  So that

23  means that portions of their product that display iOS, portions

24  of their product that copy iOS, they haven't produced.

25             Dr. Nie did not say there were only four things that he

1    absolutely needed.  He said he needed at least those four things

2    which they say -- they're saying now they're going to produce,

3    but they still haven't.  We've been coming in here for a month

4    now, a little more than a month, and each time Corellium has

5    said we've given them everything, we've given them everything,

6    and it's just not the case that they've given us everything and

7    that's detailed at length in Dr. Nie's report.

8           So there are a lot of things before we even get to the

9    hypervisor that display, that copy, that manipulate iOS that

10   have not been produced, and there's zillions, technical terms,

11   zillions, there's about 5,000 e-mails that they withheld on

12   hypervisor grounds that include titles like iOS Virtualization

13   Demo or Core --

14          THE COURT:  I understand that.  I'm going to get to

15   that in a second.  I'm trying to deal with this one step at a

16   time.

17          So the first issue is changes to the Corellium Apple

18   product, and I'm going to direct the parties to try and work out

19   that stipulation regarding the 12 to 16 versions.  If you can

20   agree on a stipulation, great.  If not, then I'm going to

21   require Corellium to produce those 12 to 16 updates to Apple,

22   but I think it makes more sense to try and work out a

23   stipulation.

24          The second issue is production of the source code.  I'm

25   hearing two totally divergent things.  I'm hearing from

1    Mr. Levine that his client has produced everything regarding the

2    source code, and then I'm hearing from you, Counsel for Apple,

3    that portions of the product that display or copy or manipulate

4    iOS have not been produced, that all the source code hasn't been

5    produced.  Is that issue as to whether or not the source code

6    has or has not been produced addressed in the two competing

7    expert's declarations?

8            MS. STEBBINS BINA:  It certainly addresses in Dr. Nie's

9    declaration, he describes in detail what he doesn't have and why

10   he needs it.  I don't know that it's addressed in Dr. Olivier's

11   declaration.  He's focused primarily on the hypervisor because

12   obviously he wouldn't know specifically what Corellium has and

13   hasn't produced.

14           THE COURT:  All right.

15           MR. LEVINE:  Your Honor, the --

16           THE COURT:  Hold on.  Hold on.  As far as the source

17   code, Ms. Bina, is it primarily that you're saying that portions

18   of the product that display, copy or manipulate iOS have not

19   been produced?  Is that really what the fight here is about or

20   is it about something else?

21           MS. STEBBINS BINA:  There's three primary issues.  One,

22   it's not produced in the format in which it's typically kept and

23   easily comparable, which would be GitHub or something similar.

24           Two, it's been edited.  There are big chunks missing

25   even from what's been produced, with just a notation that says

1    "does not relate to iOS, therefore we're cutting it", so our

2    expert can't see the code in context because they've taken

3    things out, and I think they've done that around 50 times.

4           Three, there are lots and lots of areas separate and

5    apart from the hypervisor that we have reason to believe, based

6    on the evidence, copy, modify or circumvent Apple security

7    measures that have not been produced at all.

8           THE COURT:  All right.  Hold on a second.  All right.

9           Mr. Levine, can you respond to that briefly?

10          MR. LEVINE:  Yes, Your Honor.  As it relates to the

11   repository, we produced everything in an accredited repository

12   that the protective order, on Page 14, the top line, requires a

13   repository for the viewing and searching of the code produced.

14   We have used a normal standard ESI repository.  In fact, in

15   addressing these concerns, we actually called the engineers at

16   Everlaw and they confirmed for us that this is a certified

17   repository for the review and searching and maintaining of code.

18   If Apple wants it in GitHub, I mean, they can produce their

19   stuff in Github, but Corellium doesn't retain its code in

20   Github, and the protective order and the ESI repository here

21   meets all the qualifications that's necessary.

22          One other issue though is that if they're claiming that

23   it's inconvenient the way that -- for the tools that Everlaw

24   provides, we actually went above and beyond.  The protective

25   order only requires us to produce code here at our office.  The

1    large majority or actually all the code that has been produced

2    to date has actually been provided directly to Apple.  So if

3    they're talking about convenience, they don't have to jump on an

4    airplane and come to West Palm; they can look at it on their own

5    repository, do whatever they want with it where it is.  So that

6    addresses that point.  Again, the tools on Everlaw are most

7    efficient for what's called for by the protective order.

8           Let's see.  As far as the edited code, there is

9    redacted code, but that's because some of the redacted code

10   deals with Linux or Android or other issues that, as the

11   redactions state, have no connection to iOS.  They just -- they

12   literally have no bounds in this lawsuit whatsoever and that's

13   an important thing.

14          You know, Your Honor has to remember that Dr. Nie --

15   even providing some of this code to Dr. Nie, Dr. Nie himself is

16   a competitor in this field to Corellium.  Dr. Nie is a

17   specialist in virtualization.  He is the owner of 11 patents in

18   the field, and we've been having to draw him diagrams and

19   explain to him our proprietary technology.  And even if it's

20   this code and the secret sauce, if you will, has been provided

21   to Dr. Nie in this case, now another prominent figure in the

22   field after this case is done has the thinking, the thoughts,

23   the proprietary innovation of Corellium to then apply to his own

24   work, even if he's just doing it quietly and to himself.

25          And, you know, I know Your Honor is under a time

1    crunch, but I would go so far as to say how do we even know that
2    Apple hasn't retained Dr. Nie to build a version of this for
3    them.  Apple has wanted this product, they've offered millions
4    of dollars for it, and something as outlandish as that, and to
5    file a lawsuit to try to get this kind of proprietary
6    information would not be above them.  Just today, Apple was
7    fined $1.1 billion in Europe for breaking antitrust violations,
8    and just last month they were fined $25 million for misleading
9    customers.  So, you know, the protection of this very highly
10   sensitive and proprietary information is critical.
11             THE COURT:  Let me ask you a question.  I need to ask
12   you a question.  What about portions of the product that
13   display, copy or manipulate iOS?  Has that all been produced or
14   not?
15             MR. LEVINE:  Those portions have been produced.
16             THE COURT:  So there's no withheld portions that
17   display, copy or manipulate iOS?
18             MR. LEVINE:  The only other areas are the four areas
19   that Dr. Nie stated at the end of the meeting, which we have
20   agreed to produce.  Now, Ms. Bina stated that we have not
21   produced it, except the problem is that only happened Thursday
22   and we agreed to produce those areas.  But if Ms. Bina isn't
23   content with us providing the code to them, then we will follow
24   the protective order to the "T", and that means that Dr. Nie has
25   to fly back to Cole, Scott and he has to provide us with a

1    request within seven days so we can have our IT department set

2    up this special computer again so that he can review that code.

3    He hasn't made that request.

4         THE COURT:  What about the fact that they're making an

5    argument that the code has been edited approximately 50 times?

6         MR. LEVINE:  Judge, I just addressed that.  So that

7    code relates to things that are outside this case such as

8    Android or Linux or other issues that don't deal with iOS.  And

9    the reason I got into Dr. Nie being a competitor is that the

10   only thing at issue in this case is copyright as it relates to

11   iOS.  And if that code relates to -- does not relate in any

12   stretch, then it's a serious concern even providing it to

13   Apple's expert because he is a direct competitor in this

14   industry.  And so those items that have been redacted are beyond

15   any order of the court, and they're beyond any requests and

16   they're beyond any allegation or claim or defense in this case,

17   and therefore they're redacted from site.

18        THE COURT:  All right.  So here's what I'd like to do

19   is this.  First of all, as far as the changes made to the

20   Corellium Apple product, I've already ruled on that.  Either

21   work out a stipulation or produce the 12 to 16 updates, prior

22   versions, whatever you want to call them.

23        The second issue is I am ordering that Corellium must

24   produce portions of the product that display, copy or manipulate

25   iOS.  It's up to Corellium to make sure that they comply in good

1    faith with that order, but that is my order.

2          As far as the source code and the hypervisor portion of

3    the Corellium Apple product, I'm going to review the experts'

4    affidavits, and I will rule further on that after I've had time

5    to review the experts' affidavits regarding the editing of the

6    code or the whether or not the source code has been fully

7    produced and whether or not the hypervisor portion of the

8    Corellium Apple product must be produced.

9          MR. LEVINE:  Your Honor, may I make a very brief point?

10          THE COURT:  Sure.  Go ahead.

11          MR. LEVINE:  The first point relates to the two

12    affidavits provided by the experts.  The Court's order at the

13    last hearing was to only provide an affidavit as it relates to

14    why the hypervisor should or should not be produced, and that's

15    why Dr. Olivier's declaration only goes to that issue.

16          The issue of the source code, and basically I think

17    about 15 or 16 pages of Dr. Nie's declaration, is all beyond the

18    scope of what the Court ordered, so I just wanted to make that

19    issue clear.

20          The other issue is on your Court's second ruling that

21    all source code that relates to copying, modifying, et cetera,

22    as the Court said, I just want to make it very clear that we

23    agreed to produce that on Thursday, and we're perfectly okay

24    with providing all of that to Apple.  And I tell you this to

25    show you about that that stuff which we are perfectly okay with

1    producing and agreed to do so last Thursday has no connection to

2    the hypervisor.  We can't be in agreement to produce those items

3    that you just ruled, but also sit here at the same time and

4    state that the hypervisor is not relevant and should be

5    withheld, and that's why I just want to make it clear that there

6    is actually clear line between those and that's why anything

7    related to the hypervisor should not be produced in this case,

8    Your Honor.  Thank you.

9         THE COURT:  All right.  No, I understand your position

10   and -- I'll get to you in a second, Ms. Bina.

11        But your position, Mr. Levine, is the hypervisor is off

12   limits according to you, and you don't want the hypervisor

13   produced, but that you have and have agreed to produce all

14   portions of the product that display, copy or manipulate iOS,

15   and that you agreed to that a few days ago and you're willing to

16   produce that because I am ordering that.

17        As far as the code editing where Apple says it's been

18   edited 50 times and you say that it's basically just redactions

19   of noniOS matters, all I can say is that I've ordered that the

20   portions of the product that display, copy or manipulate iOS be

21   produced and also, any edits of the code, any redactions from

22   the code that would be relevant to this case would be improper.

23   So I want to make sure that you take a look at that and that you

24   have redacted what is properly redacted because if not, it could

25   be a problem down the road.

112

1      So Ms. Bina, I know you wanted to respond.  What did

2 you want to respond, Ms. Bina?

3      MS. STEBBINS BINA:  Just very briefly, Your Honor.

4 Mr. Levine has spoken extensively, and I know that Your Honor

5 has another hearing so I'm going to try to be brief, but there's

6 a lot that he said that is vigorously disagreed with, not the

7 least of which when he accused me of unethically using an expert

8 to steal code.  That is not something that is happening here.

9 Dr. Nie is a retained expert through my law firm, in good faith

10 attempting to understand Corellium's product.  But they have

11 taken such a narrow view of what is relevant and they are

12 self-editing on their side.  I had understood that after our

13 last hearing, Your Honor, that we would essentially get

14 everything but the hypervisor, and instead they're giving us

15 little dribs and drabs that no expert can put together in a

16 sensible way.  Dr. Nie's affidavit addresses those issues

17 because before he can even get to whether we need the hypervisor

18 or not, there's huge chunks of information that are just missing

19 and that they have not produced and they have not made

20 available.  So this is something I encourage Your Honor to read

21 the affidavit very, very carefully.  I know that you will, but

22 this is not us trying to game the system or take some advantage

23 or steal Corellium's product, it's us trying to identify how the

24 product copies our product, displays our product, circumvents

25 our products technical protections.  And there are portions of

114

1    into discovery disputes between the parties any more than

2    necessary, but this is a significant and important issue to

3    Apple because we're not getting enough to understand what

4    they're doing to our product.

5         THE COURT:  All right.  I understand.

6         MR. LEVINE:  Very briefly.

7         THE COURT:  Hold on.  Hold on.  Hold on just a second.

8    No.  I'm at the end of the day.

9         So here's what I'm going to tell the parties.  Okay.

10   I've tried to be very reasonable with the parties up to now, and

11   I seem to be getting nothing but combativeness.  I'm telling you

12   right now, I'm issuing orders, I've said that I want all

13   portions of the product that display, copy or manipulate the iOS

14   to be produced.  I've said that I want all discovery produced

15   other than the hypervisor portion of the Corellium Apple

16   product.  I'm going to review the experts affidavits on that.

17   If I find at a future time that either side has withheld

18   discovery, I can assure you the sanctions will be severe.

19        Do you understand that, Counsel?

20        MS. STEBBINS BINA:  Yes, Your Honor.

21        THE COURT:  Mr. Levine?

22        MR. LEVINE:  Yes, Your Honor.

23        THE COURT:  All right.  I want Corellium to be

24   producing discovery in good faith to Apple.  I don't want it in

25   dribs and drabs, I don't want it withheld and I don't want games

1  being played.  If Dr. Nie needs to go back, he's going to go

2  back.  I want discovery to be cooperative and I want it to take

3  place, and I can tell you that I'm going to review everything,

4  I'm going to enter any additional orders and any further

5  hearings that we need.  But if I run into more problems in this

6  case and if I find that anybody is withholding anything

7  improperly, playing games in this case, arguing some technical

8  argument, trying to avoid discovery or trying to get discovery,

9  I am going to impose sanctions on the offending party and the

10  offending attorney.

11        So I'm going to terminate the hearing now.  I would

12  suggest the parties consult with each other and cooperate in

13  good faith and if they don't, I will enter the orders that are

14  necessary to make sure that discovery gets produced in this

15  case.

16        The hearing is concluded, I'll enter a further order

17  later.

18        MS. STEBBINS BINA:  Thank you, Your Honor.

19        MR. LEVINE:  Your Honor --

20        THE COURT:  I'm concluding the hearing.

21        MR. LEVINE:  I understand.  I need to put on the record

22  for my clients, the way Your Honor has ordered that all aspects

23  of the code -- of the product that copy or modify or change or

24  whatever of the product, we do not agree that any part of the

25  product actually does that.  So we will produce the code, we

1    recognize what Your Honor is saying, but I have to put on the

2    record that the product does not actually copy, modify or alter

3    or any of that.  So that's all.  Thank you, Your Honor.

4          THE COURT:  That may be your position and that's an

5    issue that may have to be decided at summary judgment or trial,

6    it's not a discovery issue.  All right.  The hearing is

7    concluded.

8          MR. LEVINE:  Understood.

9          MS. STEBBINS BINA:  Thank you, Your Honor.

10         MR. LEVINE:  Thank you, Your Honor.

11         (PROCEEDINGS CONCLUDED)

                    * * * * *

12

                C E R T I F I C A T E

13   I certify that the foregoing is a correct transcript from the
    digital audio recording of proceedings in the above-entitled

14   matter.

15   3/19/2020         /s/ Dawn M. Savino

16   Date           DAWN M. SAVINO, RPR

17

18

19

20

21

22

23

24

25