```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2
                          CASE NO. 19-CV-81160-RS
 3
      APPLE, INC.,
 4                                     West Palm Beach, Florida
                   Plaintiff(s),
 5                                     March 16, 2020
             vs.
 6
      CORELLIUM, LLC,
 7
                   Defendant(s).      Pages 1 – 123
 8    ------------------------------------------------------------

 9                              HEARING
                   TRANSCRIBED FROM DIGITAL AUDIO RECORDING
10             BEFORE THE HONORABLE WILLIAM MATTHEWMAN
                    UNITED STATES MAGISTRATE JUDGE
11
      APPEARANCES:
12
      FOR THE PLAINTIFF(S):  JESSICA S. BINA, ESQ.
13                           LATHAM & WATKINS, LLP
                             10250 Constellation Blvd.
14                           Los Angeles, CA 90067
                             (424) 653-5500
15                           jessica.stebbinsbina@lw.com

16                           GABRIEL S. GROSS, ESQ.
                             LATHAM & WATKINS, LLP
17                           140 Scott Drive
                             Menlo Park, CA 94025
18                           (650) 463-2628
                             gabe.gross@lw.com
19
                             EMILY L. PINCOW, ESQ.
20                           LASH & GOLDBERG, LLP
                             100 SE 2nd Street
21                           Miami, FL 33131
                             (305) 577-3140
22                           epincow@lashgoldberg.com

23

24

25
```

```
1   APPEARANCES (CONT'D)

2   FOR THE DEFENDANT(S):   JUSTIN B. LEVINE, ESQ.
                            LIZZA C. CONSTANTINE, ESQ.
3                           COLE, SCOTT AND KISSANE
                            222 Lakeview Avenue
4                           West Palm Beach, FL 33401
                            (561) 383-9200
5                           justin.levine@csklegal.com
                            lizza.constantine@csklegal.com
6

7   FOR THE NONPARTY:       BENJAMIN A. TAROMINA, ESQ.
    L3Harris Technologies   ADOLFO E. JIMENEZ, ESQ.
8                           HOLLAND & KNIGHT
                            515 E Las Olas Blvd
9                           Fort Lauderdale, FL 33301
                            (954) 525-1000
10                          benjamin.taromina@hklaw.com
                            adolfo.jimenez@hklaw.com
11

12  TRANSCRIBED BY:         Joanne Mancari, RPR, CRR, CSR
                            Court Reporter
13                          jemancari@gmail.com

14

15

16

17

18

19

20

21

22

23

24

25
```

1    Thereupon,

2    the following proceedings were held:

3                (Telephone conference)

4                THE DEPUTY CLERK:  Calling case No. 19 81160, CV,

5    Smith/Matthewman.  Apple, Inc. v. Corellium, LLC.

6                THE COURT:  All right.  So this is Judge Matthewman.

7                Originally this was going to be an in-court, in-person

8    hearing, but in light of all the issues surrounding the

9    Coronavirus matters, the court has converted it to a telephonic

10   hearing.  It will be briefer than it was going to be.  Shorter

11   in time.

12               Now, as far as the ground rules go, one of the

13   problems with telephonic hearings is that parties tend to jump

14   in and talk over each other, and I don't want that happening.

15   So I am going to go through each party at the appropriate time

16   and I will ask counsel to advise me what your position is.  But

17   please don't speak out.  You will all get a position to talk.

18   You don't need to jump in while somebody else is talking or

19   while there is a break in the talking.  Everybody will get a

20   chance to speak.

21               Additionally, when you do speak, since you're not here

22   in court and we are making a record of this in the event it

23   ever needs to be transcribed, when you do speak, if I state

24   your name, that's sufficient, but when you do start speaking,

25   please make sure that you are properly identified on the record

1   so whatever you have to say on behalf of your client is

2   properly captured.

3          All right.  So that all being said, let's start off,

4   first of all, and find out who is here for the plaintiff Apple,

5   Inc.

6          MS. BINA:  Good morning, your Honor.  This is Jessica

7   Stebbins Bina, with Latham.  My partner Gabe Gross is also on

8   the line, and our local counsel Emily Pincow from Lash &

9   Goldberg.

10         THE COURT:  Good morning to all of you.

11         Ms. Bina, are you going to be primarily arguing for

12  Apple?

13         MS. BINA:  Yes, your Honor.  Mr. Gross may weigh in on

14  some of the matters related to the hypervisor as he has more

15  technical expertise than I do, but I will be the primary

16  arguer.

17         THE COURT:  All right.  That's fine.

18         Then who do we have here for the defendant Corellium,

19  LLC?

20         MR. LEVINE:  Good morning, your Honor.  Justin Levine,

21  from Cole Scott & Kissane, on behalf of Corellium.  I also have

22  with me Lizza Constantine from the same law firm.  Depending on

23  the subject matter will dictate who the attorney is.

24         I also, depending on the issue, I also brought with me

25  Cole Scott's director of ESI, who is a software engineer, Manny

1    Delgado.  And also to assist with speaking on some of the

2    technical issues on the hypervisor in addition to the

3    affidavits that were provided, I have the chief technical

4    officer from Corellium Chris Wade as well.

5             THE COURT:  All right.  And then is Amanda Gorton also

6    on the line?

7             MR. LEVINE:  She is on the line and in the room, but

8    likely will not have a role in today's hearing, your Honor.

9             THE COURT:  All right.  And what is her position again

10   with Corellium?

11            MR. LEVINE:  Chief executive officer.

12            THE COURT:  OK.  Thank you.

13            And who do we have here on behalf of the nonparty

14   L3Harris?

15            MR. TAORMINA:  Good morning, your Honor.  This is

16   Benjamin Taormina and Adolfo Jimenez, from Holland & Knight, on

17   behalf of L3 Technologies and Azimuth.

18            I, Benjamin Taormina, will be doing the primary

19   argument, but Adolfo Jimenez may present as well.

20            THE COURT:  All right.  And you are here on behalf of

21   both L3Harris and Azimuth, is that right?

22            MR. TAORMINA:  That's correct, your Honor.  L3Harris

23   owns Azimuth.

24            THE COURT:  Right.  They're the parents, correct?

25            MR. TAORMINA:  Correct.

1          THE COURT:  All right.  Great.  OK.  And did I miss

2     anybody?  Is anybody else on the line?  All right.  Hearing

3     nothing, I have all the appearances here.

4          We are going to do the best we can here by phone

5     today.  It is sort of a -- there are some complex issues that

6     make it a little unwieldy by telephone.  However, in light of

7     the Coronavirus concerns, I think it's important that we

8     proceed by telephone here today so all of you can stay

9     hopefully safe and healthy.

10         So the hearing today is a discovery hearing and a

11    motion hearing on the nonparty L3Harris Technology, Inc.'s

12    motion to quash plaintiff's subpoenas to produce documents and

13    for deposition, which is at docket entry 184, and I've read all

14    of the responses, replies, etc., regarding that.

15         I know there was a notice of -- a filing under seal of

16    a joint notice, and the joint notice is at docket entry 227,

17    the sealed version of it.  That's a joint notice regarding

18    L3Harris Technologies' motion to quash and outstanding

19    discovery disputes between Apple and Corellium.

20         So I think probably the first thing to start out with

21    is the L3Harris Technologies' motion to quash, and I do have

22    the joint notice here which seems to lay out the issues.

23         Now, since that is a motion filed by the nonparty, I

24    will first turn to counsel for L3Harris, either Mr. Taormina or

25    Mr. Jimenez, and just let me know which one of you is speaking.

1    Tell me what you believe the primary issues are that need to be

2    addressed on this motion.

3          MR. TAORMINA:   Thank you, Judge.   This is Benjamin

4    Taormina.

5          Just as a housekeeping issue, L3Harris and Azimuth

6    have continued to confer with Apple since the filing of the

7    notice, the joint notice, and so we believe that we are clear

8    and have come to an agreement on two issues.   So I will just

9    lay those out for the court.

10         For the first issue we had agreed, L3 and Azimuth had

11   agreed, to withdraw our geographical objection.   In exchange

12   for that Apple had agreed to withdraw its argument about, that

13   Azimuth had not responded and to accept that Azimuth jointly

14   responded with L3Harris.   And also along with that was L3 and

15   Azimuth's agreement that any documents provided that we would

16   search both Azimuth and L3Harris to produce any documents that

17   exist, and then obviously if this court was to mandate

18   depositions go forward that we would obviously comply with

19   that.

20         The second issue is related to request, I believe it

21   is No. 6 -- No. 7.   I'm sorry.   Request No. 4, which has to do

22   with the communications with Christopher -- between Mr. Wade

23   and Azimuth, and that Apple had agreed to limit the scope of

24   the request to the time of September 2017 to the present and

25   limited to the relevance of the Corellium Apple product.   So I

1   believe that those -- and that we would agree to those

2   parameters as well as looking for documents and producing

3   documents.

4          We know still -- discuss that we would like to redact

5   our employee names from those communications.  So finding out

6   if it is represented that Apple agrees to that.  But other than

7   that redaction issue, I believe those two issues have been

8   agreed upon by the parties.

9          THE COURT:  All right.  So if I'm clear, according to

10  L3, L3 and Azimuth have agreed to withdraw the geographical

11  objection, first of all.

12         Now, what was that geographical objection?  Just

13  explain that to me again.

14         MR. TAORMINA:  Sure.  It was a technical objection

15  that under Rule 45 there has to be -- the subpoena has to

16  provide a place for compliance within 100 miles of -- I'll pull

17  the exact language -- within 100 miles of where the person

18  resides, is employed, or regularly transacts business in

19  person.

20         So the argument on behalf of L3 was that the place for

21  compliance was outside of its headquarters, was beyond 100

22  miles of Melbourne where it transacts business.

23         THE COURT:  OK.  All right.  And then in response to

24  that Apple will withdraw its argument that Azimuth has not

25  responded, Azimuth being the subsidiary of L3.  Is that

1    correct, according to you?

2              MR. TAORMINA:  That is correct according to L3 and

3    Azimuth.

4              THE COURT:  All right.  Then L3 will search for

5    documents relating to both L3Harris and Azimuth?

6              MR. TAORMINA:  That's correct.  Based on our

7    discussions it seems like there are really only going to be

8    documents and communications from Azimuth, but we would still

9    check with L3 as well.

10             THE COURT:  All right.  And then in the event that the

11   court orders the deposition to proceed, then L3 will comply

12   with that, correct?

13             MR. TAORMINA:  That's accurate.

14             THE COURT:  And then request No. 4 dealing with

15   Mr. Wade and Azimuth communications, according to you Apple

16   agrees to limit the scope or time period of that request to

17   from September 2017 to the present regarding the Corellium

18   Apple product, and of course as defined by the court at this

19   point, and the nonparty will search and produce relevant

20   documents in that time frame, correct?

21             MR. TAORMINA:  That's correct.

22             THE COURT:  And then the issues that you believe are

23   remaining, first of all, you wish to redact your employee

24   names.  Are there any other issues, big issues or important

25   issues that you see that still remain on the motion to quash?

1        MR. TAORMINA:  Yes, your Honor.  The largest issue

2   that we need to address are our trade secrets, which would be

3   the identities of the two customers that Azimuth has resold the

4   Corellium Apple product to and, along with those, revealing

5   those customers implicates issues of national security.  And

6   then generally there are other issues as well within the

7   request, such as the request for Azimuth's employees'

8   identities, which our position is that Apple has limited that

9   request to -- that the need for employee identities is limited

10   to Azimuth's use of the Corellium product, the Corellium Apple

11   product, and that Azimuth does not use the Corellium Apple

12   product.

13        So there are a few other issues.  So if you'd like, I

14   could go through my argument for each of those issues.

15        THE COURT:  No.  I'm just trying to get an outline

16   initially and then I will hear from the other side and then we

17   can see where we go from there.

18        So the main issues you see, you wish to redact

19   employee names.  That would be Azimuth employees or L3

20   employees?

21        MR. TAORMINA:  I think that it's probably limited to

22   Azimuth employees.

23        THE COURT:  All right.

24        MR. TAORMINA:  But to the extent that there are any L3

25   employees that are involved in any communications -- we don't

1    know that there are -- but to the extent there are, we would

2    include L3 in that request as well.

3         THE COURT:  All right.  Then you wish to withhold the

4    identities of the two customers that Azimuth has resold the

5    Corellium Apple product to.  Is that correct?

6         MR. TAORMINA:  That's correct.

7         THE COURT:  And then finally, as far as Azimuth's

8    employees' identities, you do not want to include those, and I

9    think your argument is that Apple has limited its request to

10   Azimuth employees who worked on the Corellium Apple product,

11   and you're saying there were none.  Is that the position?

12        MR. TAORMINA:  Yes.  The position is that Apple had

13   requested the employees' identities who use the Corellium Apple

14   product and that Azimuth does not use the Corellium Apple

15   product, that Corellium -- or excuse me, that Azimuth, their

16   normal course of use would be to develop its own technology

17   from it, and Azimuth has not developed its own technology from

18   the Corellium Apple product.

19        THE COURT:  All right.  So would those be the big

20   issues that are outstanding on the motion to quash?

21        MR. TAORMINA:  Yes.  That's correct, your Honor.

22        THE COURT:  All right.  So let me go ahead at this

23   time and let me turn to counsel for plaintiff.

24        Who wishes to respond to that on behalf of Apple?

25        MS. BINA:  Ms. Bina.  I will, your Honor.

```
1              THE COURT:  All right.  That is Ms. Bina?

2              MS. BINA:  Yes, your Honor.

3              THE COURT:  All right.  Go ahead, Ms. Bina.

4              MS. BINA:  So on the first two points I think that

5    counsel has correctly represented our agreement in terms of the

6    geographic objection and the Azimuth's, whether they have

7    properly responded issue.

8              With respect to the communications with Mr. Wade, I

9    believe that's also correct.  We will limit it to the Corellium

10   Apple product, however that ends up being defined.  Although I

11   want to put a small pin in that issue because I don't think

12   that Azimuth would necessarily have anything that would fall

13   within the category that the court has excluded because I don't

14   think they would have hypervisor source code or anything

15   similar.  So it would be communications related to the

16   Corellium Apple product between September 2017 and the present.

17             THE COURT:  OK.  So it looks like Apple's in agreement

18   that L3 and Azimuth have agreed to withdraw their geographical

19   objection as explained on the record and that Apple will

20   withdraw its argument that Azimuth has not responded.  Correct?

21             MS. BINA:  Correct, your Honor.

22             THE COURT:  All right.  And do you agree that in

23   response to the subpoena Azimuth or L3 will search for both

24   L3Harris and Azimuth responsive documents?

25             MS. BINA:  Yes, your Honor.  Essentially what we
```

1    understand is that we will treat the motion to quash as though

2    it had been filed by L3Harris and Azimuth and they will both

3    respond to the subpoenas that were served on them as however

4    the court orders.

5              THE COURT:  OK.

6              MS. BINA:  So it will be basically as though they had

7    both moved and your Honor's orders will apply equally to both

8    of them and they will both respond.

9              THE COURT:  All right.  And then L3Harris will comply

10   with submitting to a depo or Azimuth will comply with

11   submitting to a depo if the court orders a deposition to go

12   forward as opposed to just documents being produced, correct?

13             MS. BINA:  Yes, your Honor.

14             THE COURT:  All right.  And as far as request No. 4

15   dealing with Mr. Wade and Azimuth commissions, Apple agrees to

16   limit the scope of time from September 2017 to the present

17   regarding communications regarding the Corellium Apple product

18   and the nonparty will search and produce any relevant documents

19   during that time frame with that limitation, correct?

20             MS. BINA:  Yes, your Honor.

21             THE COURT:  All right.  Now the issue that counsel

22   indicated was, first of all, that they wished to redact any

23   employee names from Azimuth responses and, if any apply, L3

24   responses.  Would you agree that is an issue that needs to be

25   resolved?

1          MS. BINA:  Yes, your Honor.  We think that employees

2     who are involved in using or selling the Corellium Apple

3     product should be identified.  We're not looking for all of the

4     employees or employees who are involved in other areas, but to

5     the extent the employees are using the product, and there is a

6     dispute over whether they are, and to the extent that the

7     employees -- Azimuth has a sub-distributor agreement with

8     Corellium that requires, amongst other things, their employees

9     to promote and market and distribute the products and we need

10    to know who those employees are who are doing that.

11         THE COURT:  All right.  And then the next issue that

12    counsel mentioned was identities of two customers that Azimuth

13    has resold the Corellium Apple product to, and they don't want

14    to disclose those customers.  They allege issues of national

15    security.

16         Do you agree that is an issue?

17         MS. BINA:  Yes, your Honor.  We believe that the end

18    users of the Corellium Apple product are critically important

19    to evaluating the case and, as explained before and we will

20    explain again, we need to know who those end users are.

21         THE COURT:  All right.  Then finally as far as the

22    Azimuth's employee identities, you have limited your request to

23    employees' identities who used the Corellium Apple product, and

24    opposing counsel is saying that Azimuth does not use the

25    Corellium Apple product.  What is the issue there?

1          MS. BINA:  Well, so there's two different categories

2     of employees.  One is the employees who deal with the

3     customers.  Those were addressed a moment ago.  But then we're

4     also interested in employees who are using the product.  They

5     claim they don't use the product.  We have evidence that

6     suggests otherwise, including a substantial number of

7     communications with Azimuth employees as well as Azimuth

8     purchasing a copy of the products for its own use.  So we are

9     not certain that it is correct that they don't use the product.

10          Counsel a moment ago said, well, the normal course

11    would be to develop its own product.  We're interested in any

12    use, not just using it to develop its own product.  If they're

13    using it to search for exploits or using it to advertise or

14    market it, whatever they're using it for we're interested in

15    that use and we're interested in those employees' identities.

16          THE COURT:  All right.  Then what other, if any,

17    issues do you see in addition to those?

18          MS. BINA:  I think those are the big ones, your Honor.

19    Knowing who the customers are and getting the communications

20    with those customers to the extent they relate to the Corellium

21    Apple product given Corellium's status -- given Azimuth's

22    status as a sub-distributor of the product from Corellium, as

23    well as the communications and identities of the pertinent

24    employees.

25          THE COURT:  All right.  Thank you.

1          So let me just go now to counsel for Corellium and ask

2      you if you have anything you needed to add or if you adopt

3      anybody's position in regards to this motion to quash by L3 and

4      Azimuth.

5          MR. LEVINE:  Good morning, your Honor.  This is Justin

6      Levine on behalf of Corellium.

7          We filed a notice of joinder for the motion to quash,

8      so we do, and I'll say it again on the record, that we do adopt

9      the position of L3Harris and Azimuth.  I would like to add a

10     couple of brief additional points.

11         We have recently come into the information with

12     plaintiff that they are not going to be seeking any monetary or

13     actual damages or, excuse me, I should be a little bit more

14     clear.  They are not going to be seeking any damages based upon

15     lost profits or revenues and, therefore, I think that would

16     make any kind of values that would be produced irrelevant going

17     forward.

18         Second, I would like to clarify that communications

19     between -- as it relates to Chris Wade, any communications in

20     his personal capacity I think this court has already ruled are

21     not relevant to this case.  So I would proffer that the only

22     communications that are relevant to this case are of Chris Wade

23     in his chief technology officer capacity.  So I would like to

24     put that on the record.

25         Finally, in light of the sensitivity of both the

1   national security interests, the interests of L3Harris and

2   Azimuth, the interests of Corellium, all relating to national

3   security, as well as the highly sensitive and highly

4   proprietary information that is looking to be turned over here,

5   Corellium would request that any documents to be produced from

6   L3 or Azimuth would be produced to counsel for Corellium first

7   so that if there are any further objections based upon those

8   documents, we can then assert those and bring those issues to

9   the court.

10          Again, there is some very highly proprietary

11  information that is at stake here.  Apple has shown a history

12  of being an entity who wants this technical information and who

13  cannot get it and who is willing to pay a lot of money to get

14  it.  So before any of this information, which Corellium -- and

15  I don't know if there is any information, but which Corellium

16  may have shared as part of a sensitive and confidential

17  business relationship with L3 or Harris, that any of those

18  documents be turned over to Corellium's counsel first for

19  review.

20          THE COURT:  All right.  Thank you.

21          So I think I've defined the issues or at least the

22  major issues.  So the first issue deals with redacting the

23  employee names of Azimuth or L3.  So I think the easiest way to

24  handle this is for the court to go to each counsel and get your

25  brief position and argument on that and then we will go to the

```
 1    next issue.

 2            So why don't I start with, first of all, since it is

 3    L3's motion, I will start with counsel for L3.  What is this

 4    issue about redacting the employee names of Azimuth, L3, and

 5    why should the court permit you to make those redactions?

 6            MR. TAORMINA:  Thank you, Judge.  This is Benjamin

 7    Taormina.

 8            First I'm just going to give you a little bit of a

 9    background on their business just so it helps frame the safety

10    concerns that are at issue.

11            So the only role that is at issue here that is really

12    relevant is Azimuth's role as a defense and intelligence

13    contractor with domestic and foreign governments.  Azimuth's

14    only customers are governmental security agencies from The Five

15    Eyes countries, which is five countries, including the United

16    States, that have a multilateral agreement for joint

17    cooperation and intelligence, military intelligence, that type

18    of security arena.

19            Azimuth's contractual business with these agencies is

20    strictly to provide them with products that assist them on

21    national security missions as well as other law enforcement

22    capabilities.  L3Harris really does not have any business with

23    Corellium or the Corellium Apple product.

24            So what is important for your Honor's consideration is

25    that Azimuth is not a party to the dispute.  It only resells
```

```
1   the Corellium Apple product to two government agencies from The
2   Five Eyes country, from The Five Eyes relationship.  The
3   customers require the highest level of discretion and require
4   that the services and products that Azimuth provides, they
5   cannot be disclosed to anybody.  They have confidentiality
6   agreements within their agreements with these governmental
7   agencies.
8            So just generally this community is small and
9   Azimuth's business relies on the customer's trust and
10  confidence in them, and that without that trust and confidence
11  their business essentially could be destroyed.
12           So how it relates to Azimuth's employees is that their
13  employees are engaged in this highly sensitive area not just
14  with the Corellium Apple product but with several other
15  products.  They travel internationally through hostile
16  countries, and Azimuth goes to great lengths to protect the
17  identities of these employees.
18           So in the request it makes pretty clear that the only
19  relevance in the request for the identities is for employees
20  who use the Corellium Apple product, and Azimuth has made very
21  clear to us that they do not use and have not used the
22  Corellium Apple product.
23           So as I have said before, Azimuth's normal practice if
24  they're using the product would be to develop its own
25  technology and then sell that own technology to a governmental
```

```
 1    entity for law enforcement, national security issues.
 2            Azimuth did not do that here.  They resold the
 3    Corellium Apple product just to only two customers over the
 4    last two years.  Azimuth did -- Ms. Bina is correct that
 5    Azimuth did purchase its own copies of the Corellium Apple
 6    product but those are solely for the evaluation to determine if
 7    they could surely sell it to their customers and to
 8    troubleshoot any issues for the end customers.  So they have
 9    not developed any technology of their own from it and it is
10    simply for evaluation and troubleshooting issues.  It is
11    strictly middleman, this product, to the two customers.
12            THE COURT:  All right.
13            MR. TAORMINA:  And so I just -- just a little bit
14    more, your Honor, if I may, is that we don't see the meaning to
15    identify the employees.  Redacting the employees' names would
16    not deprive Apple of documents showing the negotiation with
17    Corellium or discussions about the Corellium Apple product.  It
18    is strictly for their safety and protection as they travel the
19    world and work with governmental agencies.
20            These employees could be at risk of being detained and
21    interrogated while traveling internationally.  And the main
22    purpose of protecting their identities, aside from the fact
23    that they don't use it, is because their safety would be put at
24    risk and they could become targets for purposes of converting
25    them to foreign assets or to extracting information that is
```

1    relevant to this really sensitive information.

2          Thank you, Judge.

3          THE COURT:  Now this goes hand-in-hand I think with

4    the other issue, which is the identities of the two customers

5    that Azimuth has resold the Corellium Apple product to.  So why

6    don't you, while you're arguing this issue about redacting the

7    employee names, tell me your argument as to why you believe

8    that Azimuth, L3 can withhold the names or identities of the

9    two customers that Azimuth has resold the Corellium Apple

10   product to.

11         MR. TAORMINA:  The main reason to withhold the two

12   customer names is that these two customer names are Azimuth

13   trade secrets, and under Rule 45(d)(3)(B)(i) this court has

14   authority to quash a subpoena where compliance would disclose

15   trade secret or confidential information.

16         As I am sure your Honor is aware, trade secret

17   arguments involve a three-step inquiry.

18         The first step is to determine whether such

19   information is a trade secret.

20         The second step is to determine whether disclosure

21   would be harmful.

22         Then if one and two are established, the requesting

23   party here, Apple, has to establish a substantial need that

24   can't be met without undue burden and that the nonparty -- here

25   Azimuth -- would be reasonably compensated for the disclosure

1    of its trade secret.

2            Your Honor, in our motion we cited to multiple cases

3    that are clear that customer lists have been treated repeatedly

4    as trade secrets.  And similar to the nonparty in the Fadalla

5    v. Life Automotive Products case that we cited, and that was a

6    Middle District of Florida case, with the cite of 258 F.R.D.

7    501.

8            THE COURT:  How do you spell Fadalla for the record?

9            MR. TAORMINA:  Of course.  F-A-D-A-L-L-A.

10           THE COURT:  Go ahead.

11           MR. TAORMINA:  And so similar to the Fadalla case,

12   Azimuth's general manager in our matter executed a declaration

13   which explained why the customer identities are trade secret

14   and why they would be harmed by the disclosure of those trade

15   secrets.

16           At paragraph 6, the declaration explained that its

17   only customers of the Corellium Apple product were two

18   governmental agencies, that the contractual arrangements with

19   these customers are highly sensitive, and disclosing those

20   contracts, and specifically their identities, would violate

21   confidentiality agreements at that paragraph 70, and that

22   competitors obtaining the identities would harm Azimuth's

23   business and would undermine national security interests and

24   key law enforcement missions.

25           The declaration is clear that Azimuth's entire

1    business is predicated on trust and confidentiality and that if

2    Azimuth is forced to disclose those customer identities that

3    trust and confidence would be destroyed, and there is a very

4    strong chance that without that trust and confidence those

5    customers would find alternative suppliers and people to do

6    business with and that Azimuth would lose all of that business

7    because their only customers are the governmental agencies.

8         THE COURT:  So let me ask you, counsel, you had

9    indicated that there is a three-step inquiry for trade secret.

10   The first one is, is it a trade secret.  The second one is

11   whether disclosure would be harmful.  Tell me what you believe

12   the third one is.

13        MR. TAORMINA:  The third one is that if we satisfy --

14   if Azimuth satisfies the first two, as you just explained, then

15   Apple would have to demonstrate a substantial need that cannot

16   be met without an undue burden and that there be reasonable

17   compensation for Azimuth for having to disclose its trade

18   secrets.

19        Apple does not even attempt to address a substantial

20   need in its response to our motion.  It is exactly what

21   happened in Fadalla.  The requesting party did not address

22   need; the requesting party did not address reasonable

23   compensation.  The court took that into consideration and said,

24   because they did not even attempt to address need or reasonable

25   compensation that they did not meet their burden to force the

1    nonparty to provide their trade secrets.

2            Here, there is no need because -- I understand this is

3    a very complicated case and we are in the weeds with everybody,

4    but our understanding is that Corellium has multiple other

5    customers and that we weren't just one of the few customers,

6    and that there is a good chance that it would be futile and if

7    the government agency would be forced to come in that they

8    probably would not provide that information.

9            But the important part is that we have established

10   that there is a trade secret because customer lists are trade

11   secrets.  We have established that there would be harm because

12   it could potentially destroy our entire business, and it would

13   violate confidentiality agreements, which is exactly what the

14   court in Fadalla said was enough to establish harm.

15           Your Honor, two other important considerations that

16   are identified by the court in Fadalla are that the court must

17   balance the need for discovery versus burden and interest in

18   keeping the information confidential.  As I said before, Apple

19   doesn't even address need.  And Azimuth's interest is

20   incredibly significant.  They would need the trust and

21   confidence that is essential in their industry and imperative

22   to their business.

23           They have a significant interest in assisting national

24   security measures, to assist in the counterterror attacks and

25   assist law enforcement.  We all have that interest to not

1    impede those efforts.  And Azimuth's interests in all of that

2    greatly outweighs Apple's failure to identify any need at all.

3           The second consideration specifically identified by

4    Fadalla is that Azimuth's status as a nonparty weighs in favor

5    against disclosure.  Here, Azimuth is a nonparty.  It is not

6    involved in this lawsuit.  That should be considered -- and

7    that should weigh against disclosing its trade secrets.

8           In addition to the trade secret arguments, there are

9    serious concerns with the national security.  Those concerns

10   include that -- just the fact of the governmental agencies, I

11   would say targets or counterparties to the -- the targets of

12   their law enforcement efforts, the fact that they would know

13   what capabilities the governmental agencies are using to target

14   them creates a huge disadvantage.  Knowing what your enemy on

15   the battlefield, what his capabilities are absolutely allows

16   the enemy to game plan against what those capabilities are.

17   And specifically identifying those customers and allowing the

18   enemy to know what those governmental agencies' capabilities

19   are is a very serious concern that could be lost by the

20   disclosure of their identities.

21          It could also make those agencies a target for other

22   bad actors.  Our understanding is that this product would be

23   useful not only in the hands of governmental agencies that use

24   it for good but also bad actors and targets of those

25   governmental agencies could weaponize that technology and use

1    it for bad.  We would like to avoid that as well.

2              THE COURT:  So I have two questions for you.

3              MR. TAORMINA:  Of course.

4              THE COURT:  Stop talking for a moment.

5         My first question to you is if it is such a national

6    security concern, then why hasn't the government filed a motion

7    or intervened in this case?

8              MR. TAORMINA:  My response to that, your Honor, is

9    because that alone would force them to reveal their identities.

10   If it comes to it, I am certain that they will, but at that

11   point Azimuth's trade secrets are now lost.  So Azimuth's trade

12   secrets are the identities of its customers, and forcing the

13   governmental agencies to come in and defend their position and

14   assert these destroys the trade secrets of Azimuth.

15             If they're coming in and identifying themselves and

16   asserting those arguments on behalf of themselves, that creates

17   the entire issue of now they have been identified and now the

18   bad actors or the targets of them know that these are the

19   agencies with those capabilities and that protection has been

20   lost as well.

21             THE COURT:  Well, first of all, in response to that a

22   federal prosecutor or a government attorney could come in and

23   seek permission to not reveal the name of the agency and could

24   also seek permission to file a sealed *ex parte* submission.

25   None of that has been accomplished.  So I'm not sure I buy your

```
 1    argument there.

 2          The second question I have for you is, just in

 3    general, in this case Apple is alleging that there was a

 4    copyright violation, that the Corellium Apple product violates

 5    copyrights and other statutes.

 6          Now, just in general, if you assume that there's a

 7    copyright violation, are you saying that the trade secret

 8    protection allows a company to violate a copyright and then

 9    fail to disclose who they sold that violated copyright material

10    to based on trade secret?  Is that your argument?

11          MR. TAORMINA:  That's in part of the argument, is that

12    we are unaware that a copyright infringement automatically

13    eviscerates trade secret protection when the nonparty has

14    established that they are trade secrets and that the requesting

15    party has asserted no argument that there is a substantial

16    need.  So they have not even attempted to satisfy their burden

17    within the trade secret analysis.

18          THE COURT:  So let me ask you, just following up on

19    that, what would prevent a company from violating a copyright,

20    selling the copyrighted material, and then coming in and

21    saying, well, the other side can't get who we sold to because

22    it's now a trade secret.  Do you see a problem there?

23          MR. TAORMINA:  I think that goes back to the fact that

24    we are nonparties to this matter and that has to be considered,

25    and it goes back to the fact that Apple has to show that
```

1    substantial need for this information, and Apple has not done

2    that.  Just by asserting a copyright claim does not demonstrate

3    substantial need to obtain trade secrets from a nonparty.

4    Here, they have not even attempted to establish their

5    substantial need.

6         THE COURT:  All right.  Before I turn to Ms. Bina or

7    to counsel for Apple, anything else that you wanted to respond

8    to?

9         MR. TAORMINA:  The only -- the last issue would be the

10   protective order.  I know Apple has suggested that the

11   protective order will allow sufficient protection of Azimuth's

12   trade secrets.  We disagree for several reasons.

13        First and foremost is that the disclosure of our

14   customers' identities in any form, whether pursuant to a

15   protective order, attorneys' eyes only, no matter what,

16   disclosure and the damage is done; our trust is lost with these

17   governmental agencies; our confidentiality agreements are

18   breached.  The damage will be done.

19        The protective order also does not waive Apple's

20   required showing of substantial need.  And in addition to

21   producing these -- if we were forced to produce these pursuant

22   to attorneys' eyes only, now these customer names are in

23   Apple's computers, their systems, they're in expert systems.

24   The dissemination becomes strong and wide.  That doesn't mean

25   that Apple can't come in and then challenge those designations,

1    which could further risk it.

2          Our understanding is that this case has been widely

3    publicized in media outlets and even in attorneys' profiles who

4    are in this case.  So they are subject to hacking.  These are

5    very sensitive, very capable targets of the governmental

6    agencies.  So just by this protective order does not alleviate

7    any of the security concerns and, first and foremost, it does

8    not get past Apple's need to establish substantial need, which

9    they have not even attempted to do here.

10         That's it, your Honor.  Thank you.

11         THE COURT:  All right.  Thank you.

12         Ms. Bina.

13         MS. BINA:  Thank you, your Honor.  So I want to start

14   off with the idea that this is all so horribly secret that the

15   mere association of Azimuth with Corellium is somehow going to

16   fatally hurt Azimuth, because Azimuth has put itself out

17   publicly and repeatedly as a Corellium customer.  They have

18   been quoted in Forbes, they have been quoted on Vice.  They

19   have said:  Corellium is great.  We love Corellium.

20         When we served them with subpoenas, which is a private

21   process, somehow immediately, either Corellium's counsel or

22   Azimuth's counsel went to the media saying Apple is a terrible

23   person, they served Azimuth and L3Harris with subpoenas.  And

24   Corellium's counsel was actually quoted in the media on that

25   very topic.  So the idea that somehow we are the ones

1    aggressively putting Azimuth out there as a customer of

2    Corellium is simply a fiction.

3          In addition, Corellium has not made any showing that

4    the identity of two customers, if it is two -- and I put that

5    pin in "if it is two" because Azimuth's -- I'm sorry,

6    Corellium's records show four instances of resale through

7    Azimuth.  So it may have been multiple instances to the same

8    customer, but I'm not sure if there's two customers or four

9    customers.

10          The case that they're relying on, <u>Fadalla</u>, talks

11   about -- first off, it is not a copyright case.  It is a

12   violation of a confidentiality employment case, poaching case,

13   I believe.  And it was seeking all customer information as well

14   as business plans and all sorts of other kinds of information.

15   The court said in that instance under those facts they had

16   demonstrated a trade secret.

17          I don't know of any authority that says two customers

18   who bought a specific product alleged to be infringing is a

19   trade secret.  Under Florida's trade secret law it has to be

20   information that derives independent economic value, actual or

21   potential, from not being generally known and not being readily

22   ascertainable by proper means and that other persons can obtain

23   economic value from its disclosure or use.

24          Again, an entire customer list for a company being

25   disclosed to a competitor, that would be the typical instance

1        in the Fadalla framework.  When we are talking about two

2        customers from a company that -- as far as I know, Azimuth and

3        L3Harris have not alleged that they compete with Apple -- and

4        we're talking about two customers, I don't believe there is

5        independent economic value that is being lost here.

6               I also note that Azimuth has been publicly associated

7        with a number of customers.

8               The other instance is that -- the other requirement

9        for a trade secret is you have to show that it is the subject

10       of efforts that are reasonable under the circumstances to

11       maintain its secrecy.  So in a Vice article last year, Azimuth

12       was reported by multiple sources to have as a client the

13       Australian Signals Directorate as well as the governments of

14       UK, of the UK and Canada.  The governments in that case did not

15       return requests for comment, but it's been publicly reported.

16       In addition, two sources there said Azimuth dealt with the FBI.

17              So this isn't a situation where there is really any

18       secrecy here.

19              We also pointed out that in Corellium's marketing

20       materials to Apple, when Corellium was looking to be acquired

21       by Apple, they included a PowerPoint that listed a number of,

22       quote-unquote, actual Corellium customers.  Many of those

23       customers were government agencies whom Corellium has not

24       identified now as its own customers.

25              So the presumption, since Azimuth is Corellium's only

1    reseller, is that those entities are Azimuth customers.

2          In other words, Corellium puts on this PowerPoint:

3    Here are our customers.  Then in discovery we ask them to list

4    all their customers.  They leave these entities off.  And now

5    they're saying, well, we can't go and find out if these people

6    are actually their customers or not.

7          This is important to the case for the obvious reasons,

8    including not the least of which the linchpin of Corellium's

9    defense is that this is fair use.  This is fair use in part

10   because we only sell to the good guys and our product is only

11   usable by the good guys and we make the world more secure as a

12   result of our sales of this product in the national security

13   space.  And one of Corellium's experts, Alexander Stamos,

14   specifically relies on Azimuth's security, and I'm quoting here

15   from paragraph 32 of that Stamos report, which is Exhibit 7 to

16   our opposition.

17          "There is an ecosystem of research groups that provide

18   vulnerabilities to governments allied with the United States.

19   One such company is Azimuth Security, founded by Mark Dowd, a

20   respected security research and coauthor of The Art of Software

21   Security Assessment.  Azimuth is currently owned by L3Harris

22   Technologies in Melbourne, Florida.  L3Harris is a well-known

23   defense contractor supplying the United States government and

24   its allies."

25          Page 21 of the L3Harris annual report states that

```
 1    approximately 75 percent of L3Harris's revenues consist of

 2    sales to or through the United States government.  Azimuth is

 3    an openly acknowledged customer of Corellium.

 4          So Corellium is trying to use its relationship with

 5    Azimuth, which is substantial -- and I need to pause here for a

 6    moment because, your Honor, there are portions of our

 7    opposition that Corellium did not allow us to show to Azimuth

 8    under Corellium AEO objection.  I'm not sure how to handle

 9    arguing about those issues.

10          Should I just speak them?  Should we --

11          THE COURT:  Are those under seal?

12          MS. BINA:  They were filed under seal, your Honor.

13          THE COURT:  All right.

14          MS. BINA:  And we were not able to share them with

15    Azimuth, but I do need to refer to them in argument.

16          THE COURT:  Why don't you tell me which docket entry

17    and which page numbers you're talking about.

18          MS. BINA:  Sure, your Honor.  So let me see if I can

19    obliquely refer to it.

20          THE COURT:  Well, I mean, if you just tell me what is

21    the docket entry that is the sealed docket entry and the page

22    numbers that you're referring to, I can certainly take a look

23    at it.

24          MS. BINA:  It is the opposition, and I'm looking for

25    the docket entry number, which is not on my copy.
```

```
 1              MR. LEVINE:  Your Honor, this is Justin Levine,
 2    counsel for Corellium.
 3              Just to be clear, that document was ultimately shared
 4    with counsel for L3Harris.  So they do have it.
 5              THE COURT:  All right.
 6              MS. BINA:  Oh, OK.  They told us to send a redaction.
 7              So I can quote from it, Justin, without any issues?
 8              MR. LEVINE:  Yes.  Yes, you can.
 9              The only thing is, I believe -- were the
10    interrogatories sent?  They were.  They were.
11              So both the interrogatories as well as the response
12    was sent to L3Harris's counsel, so long as that was not
13    forwarded on to L3Harris or Azimuth itself.
14              THE COURT:  Hold on.  Hold on.  Everybody, hold on.
15    This is why I don't like phone conferences.
16              Ms. Bina, go ahead.
17              MS. BINA:  Thank you, your Honor.
18              So what I was going to say is Azimuth is not an
19    ordinary customer of Corellium.  So after this motion was fully
20    briefed, Corellium provided us with the Azimuth sub-distributor
21    agreement that it has with Azimuth.  And so this is not in the
22    record, but it requires -- this is Corellium-004772, and I'm
23    quoting from page 000003.
24              MR. LEVINE:  This is Justin Levine.  I'm very sorry to
25    interrupt.
```

1          If there is going to be any attorneys' eyes only or

2     confidential information, while it can be shared with L3Harris,

3     we would just like to make the court aware -- I don't know if

4     the recording is going, but the court can make any necessary

5     accommodations to the currently ongoing record.

6          THE COURT:  Here's the situation.  OK.  The recording

7     is going because this is a public proceeding.  So what I am

8     going to do -- I don't want all these interruptions.  What I am

9     going to do, Ms. Bina, is make your argument.  If you have to

10    refer to something that you believe is not going to be in the

11    public record, don't make the argument and if necessary later,

12    if there is a sufficient showing, then we can have some

13    argument on a sealed record.

14         You can refer me to what you are talking about if it

15    is in the record and I can look at it later, but just let's

16    make the argument.  I mean, counsel for L3, Azimuth was able to

17    make their whole argument without having to get into a back and

18    forth about sealed or confidential documents.  So I'd like you

19    to try and do the same.  If you can't, then before you start

20    saying something that should be sealed, explain to me why you

21    can't.

22         So let's see if we can deal with these two issues,

23    which are redacting employee names of Azimuth, L3 and

24    withholding names of two customers that Azimuth has resold the

25    Corellium Apple product to.

```
1              Go ahead, Ms. Bina.

2              MS. BINA:  Thank you, your Honor.  I'm going to speak

3    in broad generalities and refer you to the specifics in our

4    brief.  I think that will be the easiest way to address it.

5              So Azimuth is not an ordinary customer of Corellium.

6    They account for a very substantial percentage of Corellium's

7    revenues and they have a sub-distributor agreement with them.

8    They are engaged in actively and affirmatively marketing the

9    Corellium Apple product to third parties which places them in a

10   very unique position different from other Corellium customers,

11   substantially different, because most of the other Corellium

12   customers -- to our understanding, Azimuth is the only reseller

13   of the Corellium Apple product.  So they are actively engaged

14   in marketing this product, in selling it.

15             They tested it out to use for others, which means that

16   they are most likely, under our complaint, a contributory

17   infringer and they are most likely engaged in trafficking in

18   the circumvention of the Corellium Apple product and -- sorry,

19   trafficking in the tools of circumvention and furthering

20   Corellium's trafficking of the tools of circumvention.

21             They are also, according to Corellium's own expert,

22   critically important to their evaluation of the fair use

23   defense.

24             So, your Honor, I would submit that we have

25   demonstrated a very strong need for this discovery.
```

1          If you would refer, your Honor, to Exhibit 1 of our

2     opposition, which is Corellium's discovery responses, if you

3     look at their answer to interrogatory No. 9, that details the

4     economic relationship with Azimuth.

5          One of the issues here, your Honor, is that Azimuth

6     reports paying Corellium substantially less than Corellium

7     reports receiving from Azimuth.  I don't know which figure is

8     correct, your Honor, but in either instance, and especially if

9     you credit the Corellium figures, it's a very substantial

10    relationship.

11         THE COURT:  Let me ask you a question, if I could, Ms.

12    Bina.

13         MS. BINA:  Sure.

14         THE COURT:  You indicate that the relevancy of this

15    information, which are the employee names of Azimuth, L3 and

16    the names of the two customers that Azimuth has resold the

17    Corellium Apple product to, you say it's relevant because, and

18    you have a strong need for it, because Azimuth is the only

19    reseller of the Corellium Apple product and you say that

20    Azimuth is a contributory infringer and is furthering

21    Corellium's trafficking.

22         Can you explain a little bit about how you're doing

23    that, and if that is the case why Azimuth is not a party to the

24    lawsuit?

25         MS. BINA:  Well, your Honor, in part Azimuth is not a

1    party to the lawsuit because we learned that they were a

2    reseller of the product after the time to amend had nearly run

3    and in part because we don't know what their role is.  It's

4    Corellium that is contributing to Azimuth's infringement.  I

5    may have misspoke there.

6          In other words, we have a contributory infringement

7    claim against Corellium and, therefore, to the extent that

8    Corellium is enabling others to infringe, that is part and

9    parcel of our claim against Corellium.

10         Whether or not we join Azimuth in the lawsuit, we

11   don't know yet what Azimuth's role is here.  We don't know

12   whether they're innocent or intentional.  We don't know what

13   representations Corellium made to them about the product or

14   about permissions from Apple or any of those things.  So our

15   claim is against Corellium.

16         But one of our arguments is that Corellium is

17   contributing to others infringing Apple's work by providing

18   them a product that enables them to infringe those works

19   directly and indirectly through the unauthorized display and

20   copying and also through, under Section 1201, circumventing

21   Apple's technical protection measures.

22         So there is a direct relationship between what Azimuth

23   is doing and our claims, our affirmative claims in this case,

24   particularly our claim for contributory infringement.

25         There is also the question of Corellium's defense,

1    right.  Corellium is arguing substantially and with great

2    effort that much of the reason that it believed its

3    infringement is OK is that it believes that it is engaged in

4    fair use, and one of the linchpins of its fair use argument, as

5    outlined in the Stamos expert report, is its assertion that it

6    is selling to good people, including Azimuth, who it claims

7    sells to good governments.

8         Well, we have no way to test that presumption, that

9    assertion, without discovery from Azimuth, and Azimuth is

10   attempting to withhold the very information that Corellium's

11   expert is relying on, which is that Azimuth sells to good

12   entities essentially.

13        So on the one hand we have Mr. Stamos in an expert

14   report saying this is fair use because Azimuth sells to good

15   governments and on the other hand we have Azimuth saying we

16   can't possibly tell you who we sell to.  That puts us in a

17   difficult position because we have no way to evaluate or

18   respond to Mr. Stamos' argument.

19        THE COURT:  Let me ask you a question.  Let me ask you

20   a question.  How is Apple prejudiced if Apple knows that

21   Azimuth's two customers are government agencies but does not

22   know the specific names of those two agencies?

23        MS. BINA:  Well, your Honor, for a number of reasons.

24   One is that agencies have, government agencies have different

25   approaches to security and to privacy.  So, for instance, the

1    United States has a government that is probably more protective

2    of user privacy than many others.  Europe in turn has, and the

3    European countries, have greater individual privacy rights but

4    also a greater allowance for governments to intrude on those

5    privacy rights.  Countries like Singapore in turn have a

6    stronger national, a stronger view of the national interest in

7    intruding in its private citizens' rights.  And countries like

8    China have a very different view as well in terms of what is

9    acceptable and what may be -- at what point it's permissible,

10   essentially, for a government to hack its own citizens' work.

11        One of the issues here is, and in some of the other

12   expert reports, that Corellium filed or, sorry, Corellium

13   served -- Corellium is taking the view that essentially

14   forcibly opening up Apple's copyrighted works and allowing

15   people to tinker with, display, etc. creates a public good

16   because it is making the world a more secure place.

17        Some governments may be using Corellium's technology

18   to hack their own citizens.  They may be using them to hack

19   American citizens.  We don't know.  But different governments

20   are differently situated and I think juries, amongst others,

21   would view provision to one government entity substantially

22   different from another.  It's different if it is the United

23   States versus Australia versus China.  I don't think just

24   knowing their government agencies is sufficient.

25        THE COURT:  So let me just follow up on that.  So how

1    would knowing the names of the two government agencies who

2    purchased the Corellium Apple product from Azimuth, how would

3    that tell you whether or not China is using the Corellium Apple

4    product in an improper or not a fair use manner, for example?

5          MS. BINA:  Well, so, for instance, your Honor, I think

6    part of this, again, is to counter their own arguments, right.

7    They're saying that this is an affirmative public good and that

8    provision to these governments is an affirmative public good.

9    So, for instance, if one of the customers is China, I think

10   that a lot of people would be quite skeptical over whether

11   provision of this technology to the Chinese government is an

12   affirmative public good, and that is something our experts

13   could comment on.

14         If it is someone in the middle or someone -- our view,

15   frankly, is that no foreign government should be using

16   technology to hack the iPhones of American citizens.  But I

17   think that some of our experts could comment on, does this

18   government in particular have a reputation for security, do

19   they have a reputation for intruding on user's privacy, how

20   secure is the government, is it somewhere where we believe --

21   because part of what they're saying is that this is a

22   controlled product, and part of what we're saying is when you

23   create a tool like this you're opening it to the world.  So

24   knowing specifically who it's gone to is a very important part

25   of evaluating that claim.

1      THE COURT:  So let me ask you, how would knowing the

2 names of the two government agencies tell you that -- where it

3 went to?  In other words, whether it went to China or any other

4 country.

5      MS. BINA:  Well, your Honor, it would tell us which

6 two countries specifically Azimuth gave it to.

7      Our understanding is they're not the United States

8 government.  It may be that they are, but our understanding is

9 it is two foreign government agencies.  So that would at least

10 tell us two countries that the product has gone to.

11      THE COURT:  All right.  Go ahead.

12      MS. BINA:  So turning to the issue of trade secrets,

13 your Honor, I don't believe they've met their burden here to

14 demonstrate that the provision of these two customer entities

15 is something that -- would somehow independently damage the

16 value of Azimuth.

17      There is an attorneys' eyes only protective order in

18 place here.  Counsel for L3Harris said, well, this information

19 would go to Apple and be on Apple's computers.  That is not

20 correct.  Our attorneys' eyes only order is outside counsel

21 only.  It is secure, your Honor.  We comply with the protective

22 order.  I don't have any reason to believe that any information

23 in this case is going to be produced outside of the protective

24 order.  Again, this happens all the time, including in

25 instances where there is even U.S. government information, and

1    we cited some of those cases in our opposition papers.

2            But simply because something implicates a trade secret

3    doesn't mean that it is immune from discovery, particularly

4    when there is a robust protective order that every party in the

5    case can be relied upon to comply with.

6            THE COURT:  Let me ask you a question.

7            MS. BINA:  In addition, your Honor -- yes.

8            THE COURT:  If I could just ask you a question.

9            MS. BINA:  Please.

10           THE COURT:  What if Corellium was precluded from

11   arguing that its fair use defense includes use by government

12   agencies to do good?  In other words --

13           MS. BINA:  Well, I think that would certainly reduce

14   our need for this information, but that is in three of their

15   four expert reports.  It is a pillar of their claim.

16           THE COURT:  Because then I'll hear from the other

17   parties, but one of the concerns I have is allowing one side,

18   such as Corellium, to argue our fair use defense involves

19   providing this product to government agencies who further the

20   social good, the betterment of society, and then precluding the

21   other side, Apple, from knowing who the government agencies it

22   was provided to, who those were, so that Apple can make its own

23   argument as to whether or not that does in fact further the

24   public good.  So I am a little concerned about that, and there

25   are several ways to skin that cat.

```
 1              One is the information gets produced.  Another is that
 2    Corellium is precluded from relying on its fair use defense to
 3    the extent that it argues that government agencies utilized
 4    this product for the public good.  Those are two ways that are
 5    possible.  I just want the parties to discuss those issues
 6    because, again, I want to be fair to all sides in this case and
 7    I want to make sure that, number one, that Corellium gets the
 8    discovery it needs, that Apple gets the discovery it needs, and
 9    then I also want to take whatever steps I need to do to protect
10    a nonparty such as L3Harris or Azimuth.
11              So go ahead, Ms. Bina.
12              MS. BINA:  Thank you, your Honor.
13              Your Honor, I think if that theory of Corellium's were
14    precluded we might not then need to know the names of the end
15    users, because for purposes of our case, the names of the end
16    users in particular, as opposed to just the fact that there are
17    end users, is most critical to evaluating this we're using our
18    product for good on the government agency issue.
19              I want to address briefly the identity of the
20    employees' issue.
21              Your Honor, we believe that those are fact witnesses.
22    They are people who have affirmatively interacted with the
23    Corellium Apple product.  They are people who have used it, who
24    have potentially used it to display and copy iOS.  Several of
25    them have already been identified to us by Corellium.  I have
```

1    the names of at least three or four Azimuth employees from

2    Corellium's documents.  I don't see a basis for withholding the

3    names of persons who addressed the Corellium Apple product

4    specifically.  I don't think that that is a trade secret or,

5    frankly, there has not been any showing in anything other than

6    the most conclusory of statements that there is any harm from

7    identifying under an AEO protective order the names of the

8    Azimuth employees who specifically dealt with and used this

9    product.

10          Again, our understanding is that the relationship

11   between Corellium and Azimuth is extensive.  There are over 100

12   entries on Corellium's privilege log addressing communications

13   between the two, and I do think we are going to need to know

14   the names of those employees in order to continue discovery in

15   this case.

16          THE COURT:  All right.  Anything else you wanted to

17   add, Ms. Bina, on those first two issues?

18          MS. BINA:  No, your Honor.

19          THE COURT:  Thank you.  So let me go ahead now and

20   turn to counsel for Corellium.

21          MR. LEVINE:  Thank you, your Honor.  I am just going

22   through my notes here.  There were a lot of points addressed.

23          So as it relates to the identity of L3 employees, I

24   just wanted to add one additional point.  Mr. Taormina on

25   behalf of L3 raised a number of issues of why raising those

1  employees, such as their international travel and their safety

2  is an issue, and just one additional point is that foreign

3  entities and foreign agencies that come within the information

4  of names of government agents and assets can employ recruitment

5  efforts as well to those entities, and if these products at

6  issue are being used for that, then that certainly is an

7  additional concern as to the other three or four that

8  Mr. Taormina raised.

9          I wanted to also reiterate that, Mr. Taormina's

10  argument that, again, this is a copyright action and merely

11  if -- and I'm not saying it is.  In fact, we strongly deny that

12  it is -- even if there was any copyright issue in play, that

13  that does not eviscerate other parties' privileges.  So that's

14  something that I think is well-taken and should be reiterated.

15          THE COURT:  All right.  Let me ask you a question

16  while you are looking at your notes.

17          Corellium has joined in and adopted the argument of

18  L3Harris, Azimuth, and the argument as to nonproduction of the

19  names of the customers of Azimuth, who are two government

20  agencies it appears, you've adopted that argument.

21          Why is it fair for the court to allow Corellium to

22  assert a fair use argument which argues that, as part of your

23  fair use argument, that this product, the Corellium Apple

24  product, is sold to government agencies who further the public

25  good and at the same time you want to prevent Apple from

1    finding out who these government agencies are to investigate

2    its own self as to whether or not that's a true assertion.

3    Doesn't that seem to be a sword and a shield issue there?

4              MR. LEVINE:  No, your Honor, and I'm very familiar

5    with the sword and shield doctrine.  No.

6              So point number one, Corellium sells this product.  I

7    have considered this argument before and I think an analogy

8    with Home Depot is something that I tend to come back to.

9              If you have a hammer manufacturer LLC and they

10   manufacture hammers and they sell those hammers to Home Depot

11   and now there is an issue about the design or the trademark of

12   those hammers and the relationship between the hammer

13   manufacturer and Home Depot, that case would be about the

14   design and manufacture of the hammer.  Home Depot would be

15   Azimuth in this case and the manufacturer would be Corellium in

16   this case.

17             Now, the hammer manufacturer sells those hammers to

18   Home Depot for one purpose and one purpose only, and resells to

19   its customers to bang nails into wood.  Now, if one of the

20   other customers were to buy a hammer and commit a crime with

21   it, then that is something that is used outside of the intended

22   use and what the product was actually designed for.

23             So this case, though, is not about that.  There is no

24   claims about what the end users are doing.  There is no

25   allegation that anything was used that was wrong.  The only

1    allegation that is at issue here is whether there was

2    copyrighted code or copyrighted elements in the design and

3    production of the Corellium Apple product.  So therefore, the

4    fair use only extends to the Home Depot, if you will.  It is

5    only the intent of the product.

6            So that's one aspect.

7            THE COURT:  Hold on.  Hold on right there for a

8    second.

9            But your fair use defense is specifically not saying

10   that.  Your fair use defense is specifically saying that the

11   people who are purchasing it from Azimuth are government

12   agencies doing the public good.  So you're going far beyond

13   saying that your sale to Home Depot is in the public good.

14   You're saying that the people who are purchasing it from Home

15   Depot are also in the public good.

16           MR. LEVINE:  No, your Honor, I don't think it goes

17   that far.

18           So the sale is in the public good.  The sale to

19   Azimuth is for the resale to its customers for security

20   research.  There can be no denial in this case whatsoever that

21   this product was built, designed, and is being sold and has

22   only been resold for security research and testing.  So that's

23   the fair use.  The fair use is the security research and

24   testing.  And that's what the public good is for.

25           Now, if that product is ultimately used on the back

1    end for some unintended purpose, that Corellium has no control

2    over at all -- same thing with a car.  A car can be used as a

3    deadly weapon -- that doesn't mean that a fair use argument

4    wouldn't apply.  The car manufacturer is still selling it as it

5    is intended.  So same thing here.

6          THE COURT:  Mr. Levine, let me just ask you a

7    question.  Do you intend to argue to the jury that Azimuth's

8    resale of this product was to good actors, government agencies

9    who only used it for the public good?

10         MR. LEVINE:  I don't know if that far downstream is

11   relevant to this case, your Honor, and I think that's the

12   point.

13         THE COURT:  Well, what are you going to argue, though?

14   Because don't your experts' reports say that?

15         MR. LEVINE:  The end user is security research and

16   testing and that is what Corellium has designated and designed

17   this product for.  That is what -- is the use, and that is for

18   a public good.

19         THE COURT:  OK.  And so if you have resold it to

20   Azimuth and -- just arguing and playing this issue out, and I'm

21   not adopting one side or the other -- but if Azimuth then takes

22   that product and sells it to a government agency that is doing

23   harm or is not using it in a proper manner and yet you are

24   arguing that this is totally for the public good and you are

25   the one asserting the fair use defense, you are the one

1    bringing this issue to the floor.

2           You're saying on behalf of Corellium that this is all

3    done for security research, all in the public good, and you're

4    going to rely on the fact that it's only sold to government

5    agencies, that Azimuth only sells it to two government

6    agencies.  What if one of those government agencies is not

7    using it in the public good?  Doesn't Apple have the right to

8    investigate that and respond to your fair use defense in that

9    regard?

10          MR. LEVINE:  So inherently in that question, your

11   Honor, I think outlies the absurdity of trying to seek this

12   information.  To suggest that a government agency is using an

13   app-testing technology for harm to its citizens, it is just a

14   nonstarter here.

15          THE COURT:  What about China?  What about a country

16   like China?  You don't think that is a possibility?

17          MR. LEVINE:  No, your Honor.  The attorney for

18   L3Harris has already stated that its customers are Five Eyes

19   customers.  If I note correctly, that is Australia, the United

20   States, Britain, France, and Canada.  And that's it.

21          This would be akin to saying Lockheed Martin is

22   selling secret technology to China.  Again, it really

23   illustrates the absurdity of this request.

24          THE COURT:  All right.  So your position is -- I'm

25   trying to clarify this because we have to move on.  Your

1    position is that the only five countries that Azimuth would

2    have resold this to would be Australia, the United States,

3    Britain, France or Canada and that none of them could possibly

4    be bad actors?

5              MR. LEVINE:  I don't know about that because I am not

6    privy to the knowledge of who these customers are.  However,

7    and I don't want to speak on behalf of L3 Harris' counsel, but

8    I would suggest that maybe a middle ground here is that they

9    could provide an affidavit that these two customers are good

10   actors and that they would not inherently be selling to bad

11   actors.  That would be against their entire business interest

12   to do something like that.

13             The other thing -- well, I'm sorry.  I thought you

14   were going to jump in.

15             So those are the points that really outline this

16   entire thing.

17             L3 has already stated who its customers are.  I think

18   it's very, very clear what this product was designed and is

19   being used for.  I think there is no question that it is being

20   used for positive public benefit.  And then to suggest that

21   we're selling to an entity that would be doing harm to our

22   citizens or a very close ally such as Canada I think again just

23   belies the absurdity.

24             THE COURT:  All right.  Anything else, Mr. Levine?

25             MR. LEVINE:  A couple of things.  Yes, your Honor.  We

1    kind of jumped down the list here.

2          Apple has -- the thing is that it's Corellium's fair

3    use defense that is at the center of the supposed need of this

4    information.  But Corellium doesn't even need to rely on this

5    information for its defense.  There is an entire list of, my

6    understanding is, 22 customers, all of which, who have been

7    deemed good customers, that Corellium can use to establish its

8    defense.

9          Azimuth itself is its direct customer and Azimuth

10   itself, and that is who we sell the product to, is a good

11   entity.

12         THE COURT:  OK.  Let me ask you a question.  If I

13   could ask you a question.  Will Corellium agree and stipulate

14   that it will not rely on this information to establish or prove

15   its fair use affirmative defense?

16         MR. LEVINE:  So I would have to confer with my client,

17   your Honor.  Yes, with my clients, your Honor.  If you can give

18   me one minute.

19         THE COURT:  Sure.  Actually, we will probably take a

20   break in a little while and you can certainly discuss that.  I

21   don't want to rush you.  It may, and I'm not saying it will, it

22   may resolve the issue.  If Corellium agrees to not rely on that

23   information to establish its fair use defense, that may or may

24   not resolve the issue or help to resolve the issue.  So I'll

25   just leave that as an open matter.

```
1              So you can go ahead, Mr. Levine.

2              MR. LEVINE:  I'm just reviewing my notes.  Bear with

3    me one second.  That may be the end.

4              I think that's it, your Honor.

5              THE COURT:  All right.  Thank you.

6              So let me go back to L3Harris, Azimuth's counsel,

7    Mr. Taormina.  If you would like to just briefly respond to

8    some of the arguments that were made.

9              MR. TAORMINA:  Yes.  Thank you, your Honor.

10             The very first important point to note is that Azimuth

11   has not disclosed its customers to anybody.  The suggestion

12   that there are these media outlets that reported and have

13   speculated on who their customers are, none of that had been

14   confirmed by any governments and none of that was confirmed by

15   Azimuth.  And the suggestion and Ms. Bina's reliance upon a

16   PowerPoint that allegedly -- by Corellium -- that allegedly

17   identified Azimuth's customers was also not correct, and my

18   understanding is that Corellium will explain that Azimuth never

19   told them who their customers are.  Corellium does not know who

20   Azimuth's customers are.

21             Another important point is that Ms. Bina relied on

22   Corellium's interrogatories for the value of the amount

23   received from Azimuth to Corellium, and my understanding is

24   that Corellium has since clarified that issue with Apple and

25   that they had -- I think her exact words were that it just
```

```
1    wasn't perfectly worded but it suggested that the revenue from
2    Azimuth was way more than it actually is.
3              As we stated before, there are only two customers,
4    these governmental agencies, and the amount of money that
5    Azimuth resold them for was around a million dollars.
6              Ms. Bina also didn't address the need -- first of all,
7    we don't think that they have established their need for this
8    information, and L3, Azimuth has explained that we will provide
9    a general description of these customers, if this issue still
10   goes forward, we will provide a general description.  And,
11   Mr. Levine's accurate that our only customers are governmental
12   agencies from The Five Eyes countries, which is U.S., Canada,
13   Australia, the UK, and New Zealand.  Not France.  New Zealand.
14   But the description of the --
15             THE COURT:  Hold on one second.
16             MR. TAORMINA:  Go ahead.
17             THE COURT:  The Five Eyes countries you referred to
18   are Australia, the United States, the United Kingdom, New
19   Zealand, and Canada.
20             MR. TAORMINA:  That's correct, your Honor.
21             THE COURT:  Go ahead.
22             MR. TAORMINA:  The two customers in this are customers
23   from two of those five countries.
24             I think the final two points are that the Corellium
25   Apple product -- just to clarify that we had said it was about
```

1    a million dollars in sales of the Corellium Apple product as

2    opposed to, I think, the $20 million number is in the

3    interrogatories.  If Corellium needs to correct that, I would

4    let them do that, but that is just one issue that Ms. Bina

5    relied on that is incorrect.

6         THE COURT:  I thought in reading the joint notice that

7    issue had been clarified and resolved.  But go ahead.

8         MR. TAORMINA:  That's correct, your Honor.

9         This whole Corellium Apple product is a really small

10   fraction of Azimuth's business with these Five Eyes countries,

11   and forcing the disclosure of their customers and their

12   employees would cause serious collateral damage to all of its

13   other businesses, which has to be taken into consideration when

14   the court balances the need -- that, again, Apple never raises

15   in its papers -- versus the interest in keeping this to be

16   trade secret protected.

17        Again, this just all ignores the fact that these

18   customer lists are protected by trade secrets.  The affidavit

19   and declaration covers what was sufficient in Fadalla to

20   establish that they are trade secret and Apple has not -- not

21   only have they not satisfied their obligation or even argued in

22   their papers substantial need, they also never addressed the

23   fact that they would have to reasonably compensate Azimuth for

24   the forced disclosure of their trade secrets.

25        Thank you, your Honor.

```
 1                THE COURT:  All right.  Thank you.

 2                Ms. Bina, I'll go back to you for any brief rebuttal.

 3                MS. BINA:  Very brief, your Honor.  One, I just want

 4       to note something counsel just said.  The agreement was about

 5       the future revenues.  In other words, counsel for Corellium

 6       clarified that their response had not been intended to state

 7       future revenues from Azimuth, but there is a current

 8       discrepancy between what Azimuth reports as revenues they have

 9       paid to Corellium and what Corellium reports as revenues they

10       have actually received from Azimuth.  That's a fairly

11       substantive -- it's off by an order of magnitude.  So there is

12       still a difference of opinion of how much the two entities have

13       paid one another.

14                Two brief comments.

15                One, and I don't want to get into the political

16       issues, but it's not conceded in the world that the Five Eyes

17       is a uniform good.  If anybody remembers seven, eight years

18       ago, there was a big issue with Edward Snowden showing that The

19       Five Eyes had potentially been spying on American citizens and

20       providing information indirectly.

21                So I just want to say that these issues are

22       complicated and I don't think we can assume that just because

23       there are certain governments at issue it is undisputed that

24       everything those governments do is good.

25                In terms of the trade secrets, again, I go back to
```

1   we're not looking for their entire customer list.  The

2   authorities they cite talk about when the list itself has

3   independent economic value or when you're looking for customer

4   strategies or things of that nature.  We are only asking for

5   people who bought one product and we're asking for it because

6   it is the linchpin of Corellium's defense.

7           We have three expert reports that are all about how

8   they're making the public good because government agencies are

9   using this product.  Corellium doesn't have those agencies as

10  its customers so presumably this is all coming vis-a-vis

11  Azimuth, and I don't know how we're supposed to defend

12  ourselves against that claim without this information.

13          THE COURT:  All right.  Thank you.

14          So let me finally go to Mr. Levine.  Any brief

15  rebuttal?

16          MR. LEVINE:  Very brief, your Honor.  Again, I will

17  have to confer with my client, but I think that we would be

18  able to stipulate that we do not need to know, very limitedly,

19  the identities of Azimuth's customers.  We do not currently

20  know those identities and I do not think that those two items

21  of information are critical to our defense.

22          The fact that they are government or Five Eye I think

23  is very important because it does go to show that these are

24  allies of the country.

25          THE COURT:  Well, wait a minute.  Wait a minute.

1          MR. LEVINE:  The --

2          THE COURT:  Hold on just a second.

3          If your position is that you are going to argue that

4     you have a fair use because the Corellium Apple product was

5     resold by Azimuth to a government agency of one of these five

6     countries, then I'm more inclined to require production of the

7     government agencies.  If your stipulation is that you will not

8     rely in your fair use defense in any way that Azimuth resold

9     this Corellium Apple product to a government agency, then I am

10    more inclined to sustain the objection.

11         So I think you need to speak with Azimuth's counsel

12    and your client and decide how you wish to respond to that

13    because I don't -- and I'm not deciding this.  It is a very

14    thorny issue -- but I don't think that your client, Corellium,

15    can have it both ways.  I don't think you can get up and argue

16    that you have a fair use defense which includes reliance on

17    Azimuth selling to good actors when you then preclude Apple

18    from finding out who those alleged good actors were and

19    investigating that.

20         I'm concerned about the fairness here to both sides.

21    I'm not saying I am deciding the issue, but I think it would be

22    something that you may wish to consider on behalf of Corellium,

23    that your fair use defense can include whatever it wants to

24    include except reliance on resale by Azimuth to good actor

25    government agencies.

1              So you can think about that.

2              MR. LEVINE:  I understand.

3              THE COURT:  You can think about that and decide how

4    you want to respond, but it is one of the factors that I am

5    taking into account because it does seem to me that Corellium

6    wants to have its cake and eat it too.

7              MR. LEVINE:  I understand your point, your Honor.  I

8    would just add in brief rebuttal that I think that could be an

9    issue for the jury, that the defense would be that the product

10   has been resold to certain Five Eye nations and that the jury

11   can determine whether that grouping of nations can be held

12   accountable for good or bad, as Ms. Bina just raised an

13   argument that would be the other side.

14             So again, I would propose that I do not think, and

15   certainly in light of the current sensitivities here as well as

16   the trade secret, that again I would reiterate are not

17   eviscerated merely by an allegation of copyright infringement

18   in light of the trade secrets here, that merely the identities

19   do not need to be disclosed, and I do not think this is

20   Corellium having its cake and eating it too.  I think we can

21   just rely on that Five Eye nations are customers and it goes

22   there and the parties can make their arguments.

23             There are a couple of other brief points.  But I will

24   confer with my clients and counsel for L3Harris on that

25   point --

```
 1              THE COURT:  All right.  Thank you.

 2              MR. LEVINE:  -- and inform the court of the direction.

 3         Just a couple of other brief points.

 4              A PowerPoint presentation was raised earlier on.  The

 5    customers and identities of these were not raised in that

 6    PowerPoint and -- there were some entities raised but there

 7    were other entities that were relayed and they just don't have

 8    anything to do with this issue.  So I just don't think that is

 9    a point here.

10              I wanted to confirm again that Corellium does not know

11    the identities of Azimuth's customers.

12              Another minor point.  Apple, who has been relying

13    almost every step along the way throughout its briefings and

14    papers on numerous different Vice articles, and Ms. Bina raised

15    it here on the record, and I just want to point out for the

16    court's context and consideration that it is our understanding

17    that these Vice articles have all been written by the same

18    gentleman.  And in fact recently as it relates to the subpoenas

19    going into the media, again, it is our understanding that the

20    media reporter also reached out to Apple and Apple's counsel

21    and they just simply declined to comment.

22              We think that more substantively, though, we think

23    that Apple is trying to expand the copyright nature of this

24    case in both this issue as well as entirely in discovery, and

25    we will get into some of that later on as some of the issues at
```

```
 1    play here.
 2            Many of the issues here appear to be closer to trade
 3    secret marks as well as just a general expansion of the law and
 4    go well beyond the copyright issue and, again, the fair use,
 5    because the fair use goes to the public good.  I just don't
 6    think that the purpose and intent of this product can really be
 7    disputed here.
 8            That's it, your Honor.  Thank you.
 9            THE COURT:  All right.  Thank you.
10            So here's what we are going to do.  We are going to
11    take a break now.  It's almost 12.  It's 11:42.  I think we
12    will take a lunch break until 1:00 and then we will pick up
13    with the phone hearing at 1 p.m.
14            Mr. Levine, that will give you a chance to discuss
15    that issue with your client and with Azimuth's counsel, if you
16    wish to, and with Apple's counsel if you wish to.  We will come
17    back and we will hear any other argument that I need to hear on
18    this motion to quash and then we'll move on to some of the
19    other issues.
20            All right.  So before we break, anything else that I
21    need to hear before we take a lunch break from counsel for
22    Azimuth or L3?
23            MR. TAORMINA:  No, sir.
24            THE COURT:  What about Apple, counsel for Apple?
25            MS. BINA:  Just a logistical question, your Honor.
```

1   Should we hang up and dial back in ten minutes before 1 or keep

2   the line open and on mute?

3          THE COURT:  No, call in at 10 minutes before 1,

4   please.

5          MS. BINA:  Thank you, your Honor.

6          THE COURT:  All right.  Anything on behalf of counsel

7   for Corellium?

8          MR. LEVINE:  No, your Honor.  Thank you.

9          THE COURT:  All right.  Thank you.

10          I will be back at 1:00.  Please call in about five to

11   ten minutes before the hearing.

12          Have a good lunch.

13          MS. BINA:  Thank you, your Honor.

14          MR. LEVINE:  Thank you.

15          (Luncheon recess)

16

17

18

19

20

21

22

23

24

25

```
 1            AFTERNOON SESSION
 2            THE COURT:  All right.  Good afternoon, everybody.  We
 3   are back here in the Apple v. Corellium matter, case No.
 4   19-81160, CV, Judge Smith, Judge Matthewman.
 5            Let's see if we have everybody on the line.
 6            Now for the plaintiff Apple, do we have Ms. Bina,
 7   Mr. Gross and Ms. Pincow?
 8            MS. BINA:  Your Honor, you have Ms. Bina and
 9   Ms. Pincow.  Mr. Gross had another urgent matter he had to
10   attend to.  So it will just be us for the afternoon.
11            THE COURT:  All right.  That is fine.
12            So for plaintiff Apple we have on the phone Ms. Bina
13   and Ms. Pincow, correct?
14            MS. BINA:  Yes, your Honor.
15            THE COURT:  OK.  Great.
16            Now for the defendant Corellium, do we have
17   Mr. Levine, Ms. Constantine, Ms. Gorton, Mr. Wade and
18   Mr. Delgado?
19            MR. LEVINE:  Yes, your Honor.
20            THE COURT:  OK.  Great.
21            Then for L3Harris and Azimuth, do we have Mr. Taormina
22   and Mr. Jimenez?
23            MR. TAORMINA:  Yes, we're here, your Honor.
24            THE COURT:  Great.
25            OK.  So I think we had addressed several of the issues
```

1    dealing with the motion to quash, and I know the parties were

2    going to talk over the lunch break.

3         Then I think there was another issue dealing with

4    employees' identities who used the Corellium Apple product.

5    Azimuth says there are no such employees and apparently Apple

6    was seeking employees who dealt with customers and employees

7    who used the product.

8         So let me just start out, I'll start out the way I

9    started out earlier, to see if there are any more issues

10   regarding this motion to quash that need to be addressed by

11   L3Harris or Azimuth.

12        So I will ask Mr. Taormina, anything else that we need

13   to address on this motion?

14        MR. TAORMINA:  Yes, your Honor.  I'm not sure if you

15   wanted me to summarize or just have a couple of additional

16   points to the customer issues.  I'll let you respond to that.

17        I just want to say additional issues that I think we

18   need to discuss are whether or not communications with our

19   customers would be discoverable, whether or not the agreements

20   with our customers would be discoverable, and as well as the

21   necessity of depositions.  So I believe those three issues are

22   also outstanding.

23        THE COURT:  All right.  So according to you, then,

24   some of the issues are communications with Azimuth's customers,

25   whether those are discoverable by this subpoena, whether any

1    agreements with Azimuth's customers are discoverable here, and

2    then whether a deposition needs to be taken or just documents,

3    correct?

4             MR. TAORMINA:  That's correct, sir.

5             THE COURT:  All right.  So let me turn to Ms. Bina on

6    behalf of Apple and hear what you have to say on any other

7    issues and anything else that needs to get resolved or anything

8    else that was resolved over the lunch break.

9             MS. BINA:  I haven't spoken to anyone over the lunch

10   break.  So nothing resolved on my part.

11            I would agree that the issues that counsel from

12   L3Harris and Azimuth raised do need to be addressed.

13            There is another part that I don't think is in dispute

14   but I would appreciate counsel confirming, which is

15   communications between Azimuth and Corellium relating to the

16   Corellium Apple product.  To my understanding, I would like to

17   confirm L3Harris, Azimuth will produce those.  The only issue

18   is whether they will redact employee names but they will

19   produce those communications.  If that's not the case, then I

20   think we also need to address that.

21            THE COURT:  All right.  What communications were

22   those?  Between who?

23            MS. BINA:  Between Corellium and Azimuth and L3Harris

24   relating to the Corellium Apple product.  So separate from the

25   customer communications.  This is between the defendant and the

1    parties.

2              THE COURT:  All right.

3              MS. BINA:  And all parties.

4              THE COURT:  The first issue, then, according to you,

5    would be communications with Azimuth customers, whether that's

6    discoverable.  The second would be agreements with Azimuth's

7    customers, whether that's discoverable.  The third would be

8    necessity of a deposition.  And then the fourth would be

9    communications between Corellium and Azimuth, L3Harris

10   regarding the Corellium Apple product.  Correct?

11             MS. BINA:  Yes.  And on the last only to the point

12   that there is any disagreement with anything I just said, which

13   I don't think there is, but I'm not positive so I would like to

14   confirm that.

15             THE COURT:  All right.  That's fine.

16             Then let me turn then to counsel for Corellium.

17   Mr. Levine, any other issues or anything else you want to

18   address?

19             MR. LEVINE:  Yes, your Honor.  Before we broke for

20   lunch your Honor asked myself to confer with my client and

21   potentially L3Harris's counsel regarding a stipulation.  I'd

22   like to lay out, I believe, the position we have been placed

23   into for the record.

24             We have been placed with a decision.  We either

25   provide confidential names or information, that is not really

1    up to us to provide, or that information is either provided or,

2    on the other hand, Corellium is forced to be prejudiced as to

3    one of its defenses.  I think that is a poor position that my

4    client has now been placed into.

5           Corellium is willing to prove this case on the

6    information that it currently has, and that information is that

7    the customers of Azimuth are Five Eyes.

8           What it appears is that -- what is happening with this

9    decision now is it seems to have almost the functional

10   equivalent of a motion in limine, whereas if all of the trade

11   secret and the other arguments are simply going to be discarded

12   or -- not discarded -- and the information is not provided,

13   then Corellium will be precluded from raising this aspect of

14   its fair use argument, and I think that is extremely

15   prejudicial and, again, I think it is having the functional

16   equivalent of a motion in limine.

17          THE COURT:  Mr. Levine, I think you have jumped the

18   gun.  I asked you to inquire and I told you there had been no

19   decision made.  So I understand if you want to try and --

20          MR. LEVINE:  OK.  My apologies.

21          THE COURT:  I understand if you want to try to make

22   some record here on the record, but it is not advancing the

23   ball at all because I simply asked you to inquire to see if you

24   would stipulate or not.

25          MR. LEVINE:  OK.

1          THE COURT:  I am gathering from what your response is

2    that you're not stipulating, and you don't have to stipulate.

3    I will rule and make a decision that is appropriate under the

4    law.

5          So anything else you want to add?

6          MR. LEVINE:  Understood, and please take my sincerest

7    apologies, your Honor.  I did not mean to jump the gun, and

8    maybe I misunderstood.

9          So in light of that, then, yes, I don't think I can

10   recommend to my clients to stipulate to have any of their

11   defenses limited at this time, your Honor.

12         THE COURT:  OK.  That's fine.

13         Any other issues that you believe other than the ones

14   that have been addressed by counsel for L3Harris, Azimuth and

15   Apple that need to be addressed on just this motion?

16         MR. LEVINE:  No, your Honor.  I think we recognize

17   that the four items that Ms. Bina just laid out are still

18   issues that need to be addressed.

19         One proposal -- and, again, maybe this is just for the

20   record or for your Honor's consideration -- one proposal as it

21   relates to the first issue that we were talking about, that I

22   think I may still be jumping the gun, is to preclude the

23   identity of the two clients, however recommend that it could be

24   said that two of them are at least within the Five Eyes and to

25   treat all Five Eyes as the client.  So if something were to

1    apply to two of them, it would apply to all.

2           I think that is actually middle ground, that it would

3    be giving Apple even more information than it is looking for

4    without actually having to disclose the specific information

5    while simultaneously not precluding and limiting any of

6    Corellium's defense.

7           With that, I will sit down.  Thank you, your Honor.

8           THE COURT:  All right.  What you are saying is that

9    basically one of the customers is a government agency of one of

10   the five countries.

11          MR. LEVINE:  Well, that both of the customers would be

12   an agency from one of the five and we could effectively

13   stipulate that if you say customer number two, that that would

14   have the equivalent application to any of the five.

15          THE COURT:  OK.

16          MR. LEVINE:  So it would -- yes, OK.  Thank you, your

17   Honor.

18          THE COURT:  All right.  I understand.  Thank you.

19          All right.  So let's go back, then, on these four

20   issues.  I think we'll take them all at the same time.

21          So, Mr. Taormina, could you address your position

22   briefly on those four issues.

23          MR. JIMENEZ:  Your Honor, it is Adolfo Jimenez.

24   Before I turn it over to Mr. Taormina, I just wanted to clarify

25   a little bit the proposal that we made while we were during the

1    break with counsel for Corellium.

2            What we are proposing is counsel for Apple would

3    essentially be able to raise any issues or defense that would

4    be applicable to any government entity from any of the five

5    countries.  So they would essentially be provided the

6    opportunity to use any issues and facts against Corellium if

7    they applied to any of the five countries.  That will

8    essentially provide Apple with a larger pool, if you will, of

9    arguments to make, whether they are the actual customers or

10   not, and still protect the identity of the actual two

11   customers.

12           I just wanted to clarify that point.

13           THE COURT:  All right.  Thank you, Mr. Jimenez.

14           All right.  Mr. Taormina, now the four issues that we

15   were addressing, the first one is communications with Azimuth's

16   customers.  I know your position is that it is not

17   discoverable.

18           Does Azimuth only have two customers or does Azimuth

19   have a lot of customers, or what are we talking about here?

20           MR. TAORMINA:  That's correct, your Honor.  Only with

21   respect to Corellium Apple product there are only two

22   customers.  So our position would be -- and so there are only

23   two agreements.  So our position would be similar to the -- on

24   what we had already advanced, that these are protected by trade

25   secrets and that they shouldn't be discoverable either.

1      Just like I know you have heard our position on it,

2  but I just wanted to highlight a couple of short points, if

3  that is all right with your Honor.

4      THE COURT:  Sure.

5      MR. TAORMINA:  Which would be that there's been a lot

6  of talk about fairness and that it's only fair that Apple gets

7  to respond and properly develop its response to Corellium's

8  defense, and then at the same time Corellium, in the fairness

9  hat, that they're allowed to put up and develop their defense.

10  But I think that fairness to Azimuth also has to be considered,

11  and the fairness includes that Azimuth is independent and not

12  in this fight, and it's an enumerated factor within relevant

13  case law in this Circuit.

14      In addition to that, the identities of who these

15  customers are is not important.  The who is important.  There

16  hasn't been a need demonstrated for the specific who or the

17  employees in reality.

18      We are going to produce documents that show how much

19  in sales there were.  We are going to show when it was sold,

20  and we are going to give general descriptions of these

21  government agencies from two of the Five Eyes countries, which,

22  if the stipulation worked as Mr. Jimenez just explained, would

23  actually give Apple a broader chance to develop responses to

24  Corellium's defenses.

25      My last point on the trade secrets is, I just want to

1    read for your Honor straight from Rule 45 that says that -- it

2    is Rule 45(3) -- excuse me -- (b)(3)(C).  It talks about how in

3    the circumstances described above, which essentially discusses

4    what are trade secrets, the court may, instead of quashing or

5    modifying a subpoena, order appearance or production under

6    specified conditions if the serving party:  (i) shows a

7    substantial need for the testimony or material that cannot

8    otherwise be met without undue hardship; and ensures that the

9    subpoenaed person will be reasonably compensated.

10          So I won't go into it again that we don't think they

11    have established need without undue hardship because I know you

12    have heard that enough.  But they never addressed the ensured

13    that the subpoenaed person would be reasonably compensated.

14          I would also like to quote the Eleventh Circuit case

15    of Klay v. All Defendants, and that's at 425 F.3d 977, and that

16    is the Eleventh Circuit from 2005.

17          It specifically discusses that this rule requires

18    reasonable compensation for a loss caused by the production of

19    confidential material and, quote, If the enforcement of the

20    subpoena under Rule 45 causes no loss, then the amount of

21    compensation that is reasonably owed will be zero.  If the loss

22    to the owner of the information is substantial, then so will

23    the amount of compensation even if the gain to the taker of the

24    information is slight.

25          I would just like to emphasize again that I believe

1    Corellium's customers are a lot more than just Azimuth, and
2    Azimuth only has two governmental customers and we will provide
3    information that they are from two of the five countries.  So
4    there is a small need there of these two limited customers, but
5    the collateral damage to Azimuth could potentially be the
6    entire company.  It could be devastating.
7         When you compare that to the relevance of these two
8    small customers and our position that there has not been an
9    assertion of need -- it certainly wasn't in their papers --
10   that the balancing act that the court must perform weighs in
11   favor of Azimuth's interest in not disclosing its confidential
12   information as opposed to the need.
13        So that is the first issue of the customer contracts
14   and communications.
15        Just to streamline the fourth point, Ms. Bina
16   mentioned the communications with the Corellium -- we thought
17   part of the agreement was we will produce communications with
18   Corellium regarding the Corellium Apple product.  We would like
19   to redact the employees' identifications as we discussed
20   before.  So I agree with Ms. Bina, we are on the same page, but
21   the only issue is just the redaction of the employee
22   identification, which I think your Honor has heard our
23   arguments on.
24        THE COURT:  All right.  And let me just ask you, as
25   far as the -- I understand the issue on the communications with

1    Azimuth's customers.  That would basically be the same issue as

2    disclosing the names of the agencies because the communications

3    would be with the agencies, correct?

4         MR. TAORMINA:  That's correct, sir.

5         THE COURT:  And the second issue is the agreement with

6    Azimuth's customers.  Again, the agreement would be between

7    Azimuth and the two government agencies, correct?

8         MR. TAORMINA:  That's correct.  And just as a note,

9    our understanding of these contracts is that there are these

10   master agreements that govern a lot more business between the

11   two of them than this very limited Corellium Apple product

12   within the contract.  Our understanding as well is that these

13   contracts are held on -- I probably won't do this justice --

14   very sensitive or very protected servers that our customer --

15   they are held on Azimuth's customers' servers because there is

16   such a concern about the security and that generally, we have

17   been told, that they don't even send these contracts via normal

18   e-mail because of encryption issues and the potential for

19   hacking.

20        So that is just a little bit of background on how

21   sensitive those contracts are and how much irrelevant

22   information is within those contracts.

23        THE COURT:  All right.  And then the only other issue

24   I think would have been the deposition issue, and your position

25   is that production of the documents is sufficient, there

```
 1   shouldn't have to be a deposition taken of Harris or Azimuth?

 2           MR. TAORMINA:  That's correct, your Honor.  And then

 3   even in, especially in L3Harris's situation, because they don't

 4   have these customer contracts, the customers come -- the

 5   customer relationships are with Azimuth, but you summarized my

 6   point accurately.

 7           THE COURT:  All right.  Anything else that you wanted

 8   to add?

 9           MR. TAORMINA:  No.  That's it.  Thank you, your Honor.

10           THE COURT:  Thank you.

11           All right.  Ms. Bina, what about these issues?  I know

12   you want the communications with Azimuth's customers.  You

13   believe it is discoverable.  You want the agreements with

14   Azimuth's customers.  You believe it is discoverable.  Why is

15   that?

16           Ms. Bina.

17           MS. BINA:  Sorry, your Honor.  I had to take the line

18   off mute.  Can you hear me now?

19           THE COURT:  Yes.

20           Did you hear my question?

21           MS. BINA:  I did, your Honor.  You couldn't hear my

22   answer.  So I will start over.  I apologize.

23           THE COURT:  All right.

24           MS. BINA:  So, your Honor, with respect to the issue

25   of the agreements, we're only interested in customer agreements
```

1    insofar as they relate to the Corellium Apple product.  So if

2    they're talking about broad agreements that relate to an entire

3    relationship with a customer only some small part of which is

4    the Corellium Apple product, I don't know that we actually need

5    those.

6          What we need are any restrictions that Azimuth and/or

7    Corellium puts on their customers with respect to the use or

8    resale or things of that nature.  So, for instance, does

9    Azimuth prevent its customers from reselling the Corellium

10   Apple product to others?  Do they prevent them from using them

11   in an unlawful way?  Those are the kind of things we're

12   interested in because they relate to the core of the fair use

13   defense.

14         I don't need an entire agreement with a government

15   that covers lots and lots of different issues.  So I just want

16   to be clear on that point.

17         THE COURT:  OK.

18         MS. BINA:  We really narrowly focused on the Corellium

19   Apple product and its use, its sale, and how it's been

20   addressed.

21         With respect to the communications with customers,

22   again, we're only seeking communications related to the

23   Corellium Apple product.  To the extent those are -- those

24   disclose customer identity, it relates to the same issue which

25   I will address in a moment and we talked about at length this

1    morning so I will be brief.  But again, we are not seeking

2    broad communications with these customers in general; we're

3    only seeking communications that relate to the Corellium Apple

4    product, its use, its functionality, things of that nature.

5            THE COURT:  OK.

6            MS. BINA:  So turning to the point about trade

7    secrets, just to briefly address it again, and can't we just

8    say it's all Five Eyes, etc.  So, your Honor, there's a lot of

9    argument here but there is not much evidence that the

10   disclosure of two of Azimuth's many customers under an AEO

11   protective order to Latham & Watkins only would somehow be

12   devastating to Azimuth's business, and I'm having a hard time

13   figuring out how it would be.

14           The declaration they submitted says if this was

15   disclosed to our competitors it would hurt our business, or if

16   this were to become publicly known it might hurt us in some

17   way.  But again, this isn't their entire customer base.  This

18   isn't their entire product.  They haven't made any showing that

19   the disclosure of these two customers would somehow have any

20   significant financial impact or any impact.

21           Moreover, of course, your Honor, if there were some

22   impact under Rule 45, even assuming that these were found to be

23   trade secrets, we would be addressing whatever the compensation

24   is appropriate.  I mean, Apple is not unwilling to pay

25   compensation.  But I have yet to hear anything that suggests

1   there would be any actual harm in myself and my colleagues

2   learning the names of these two customers.

3         In terms of can't we just say it's all the Five Eyes,

4   it's not all the Five Eyes.  It's some particular entities.

5   There is a difference in terms of how jurors and how case law

6   and how state secrets are evaluated, whether they are United

7   States or some other entity.  Different countries handle things

8   differently.  So to the extent that Corellium is going to

9   continue to go very, very deep on this our customers do good

10  things with our product, I think we have to be able to test

11  that.  I don't see how we can fight blind when their argument

12  is all of this is good and well and everything is fine.

13        I want to turn briefly to the issue of depositions.

14        I suspect that it is unlikely we would need a

15  deposition from L3Harris.  We haven't seen any documents yet.

16  Obviously because they haven't produced anything.  But to the

17  extent they're telling the truth about not being involved in

18  the Corellium Apple product, not selling it, not receiving it,

19  not using it, I can't imagine why we would need a deposition.

20        With respect to Azimuth, however, I think the

21  situation is quite different.  Azimuth's, I think he is

22  president or CEO Mark Dowd has been publicly quoted in the

23  media multiple times endorsing the Corellium Apple product,

24  describing his relationship with Corellium.  There are a number

25  of documents that have been either produced or logged on

1   Corellium's privilege log that demonstrate the strength and

2   scope of this relationship.

3          For example, there is one from Mr. Wade to an Azimuth

4   employee asking where the IPSW files are stored on the

5   Corellium Apple product.

6          So one of the major disputes in this case, your Honor,

7   is whether the Corellium Apple product is storing copies of the

8   IPSW files.  That e-mail suggests that it is and it suggests

9   that Azimuth has knowledge regarding that.

10          Similarly, there is a document on the privilege log

11   and the notation on the log is Invoice 09 Azimuth Exploit Sale.

12   So one of the questions in this case, your Honor, is whether

13   these are really just being used for good faith security

14   research or whether people are selling exploits.  Exploits

15   being harmful ways to break into Apple's secure system.  So

16   something titled Exploits obviously catches my attention.

17          Corellium has withheld that on customer privacy

18   grounds.  But again, I think these are questions I would ask an

19   Azimuth witness about and I would want to know whether Azimuth

20   is in the business of selling exploits obtained from the

21   Corellium Apple product or similar things.

22          Again, Azimuth isn't just a customer, it's a reseller.

23   It markets, it sells, it carries out the sales of this product

24   and it represents a very, very substantial portion of

25   Corellium's overall business.  So I do think I will need a

1    deposition of Azimuth.

2           I think that is all, your Honor, unless you have

3    further questions.

4           THE COURT:  Yes.  Could you clarify the need in your

5    view for the customers' identifications now that we know it is

6    one of the five countries?  Do you intend to seek additional

7    discovery from the government agencies?

8           MS. BINA:  Potentially, your Honor.  I think for one

9    it's important that we know whether it is the United States or

10   not the United States.  That makes a difference on legal issues

11   as well as I think how juries perceive the question,

12   particularly given the issue that has happened in the past

13   where some of the Five Eyes entities have been hacking American

14   customer accounts and then disclosing them back to the United

15   States.  So I do think there are issues there, whether it is

16   the United States or whether it is some other entity.

17          To be frank, I don't know the difference in security

18   and disclosure policies enough amongst the four entities, but I

19   don't believe they're identical.  For instance, I think there

20   are differences between the United Kingdom and Australia in

21   terms of government security and privacy concerns.

22          So I think it is still fighting somewhat blind to just

23   say, well, it's one or more of these five entities.  I think we

24   need to know whether it is the U.S. or not the U.S. or the U.S.

25   and someone else.

1        I still believe, your Honor, that it is going to be

2   difficult for us to respond to these four expert declarations

3   extolling the virtues of Corellium selling this product to good

4   government entities without knowing who those entities are.

5        THE COURT:  All right.  Thank you.

6        Let me just go back for a second to Mr. Taormina on

7   behalf of Harris and Azimuth.

8        The counsel for Apple makes an argument that even if

9   all the communications with Azimuth's customers, all the

10  agreements with Azimuth's customers are not produced, what she

11  wants to have is at least restrictions, documents reflecting

12  restrictions that Azimuth places on its customers' use of the

13  Corellium Apple product.

14       Can that be produced without disclosing the names of

15  the customers?

16       MR. TAORMINA:  I think that it probably could, your

17  Honor, to the extent that they do place restrictions or any of

18  that.  We don't know if they do, but that seems like that is

19  something that we can provide.

20       THE COURT:  All right.  What about this issue

21  involving the exploit sales that, according to Apple's counsel,

22  that Azimuth is making exploit sales possibly of the Corellium

23  Apple product or of what's discovered?

24       MR. TAORMINA:  I'm not aware of that, Judge.  I don't

25  know -- it's been represented to us that it's just been two

1    sales of the Corellium Apple product to these customers.  We

2    haven't heard anything about any exploits or any -- I'm not as

3    technically literate as Ms. Bina is, but we're not aware of

4    that.

5         We basically have been told that it was a very limited

6    transaction with these two customers, that they sold the Apple

7    product to them and I think that was it.

8         Our understanding is that it was very limited.  So I

9    don't really know, but our understanding is that that doesn't

10   seem like it's related -- that that is not what has been

11   represented to us.

12        THE COURT:  Then following up, what about disclosing

13   whether or not the United States is one of the countries that

14   it was sold to?  In other words, even if you did not have to

15   disclose specifically which of the five countries, government

16   agencies it was sold to, whether you disclose if or if not the

17   United States is one of the two?

18        MR. TAORMINA:  I think that we'd have to go back and

19   confirm that with our customer, and the only reason I say that

20   is because of the whole trust and confidence issue that is

21   really paramount to their business.  I'm not sure if naming the

22   country specifically destroys that trust.  It may not, but it

23   could, and I know that that might be sensitive as well.  But we

24   could ask for that.

25        THE COURT:  I want you to follow up on that and see if

1    you could at least name which of the two countries it is and we

2    can address that point.  But I would like you to follow up on

3    that.  All right?

4           MR. TAORMINA:  Absolutely I will do that, your Honor.

5           THE COURT:  All right.

6           Let me go to Mr. Levine.  Anything else you wanted to

7    add on behalf of Corellium?

8           MR. LEVINE:  Yes, your Honor.  Only that Ms. Bina

9    addressed that they were interested in the contracts and

10   agreements for the sale to look at any limitations or

11   restrictions that they're listing, and, candidly, your Honor,

12   those limitations and restrictions exist, the ones that exist

13   in the contracts have already been produced to the plaintiff

14   with the exception, I think, of a couple that we meant to

15   produce and just due to some administrative oversight they're

16   not, but they will be produced imminently.  And the other

17   restrictions are available on Corellium's public disclosures.

18          So for example, you cannot use this product for any

19   illegal activity.  That is one of the restrictions.  And that

20   is available on the public disclosure and the agreements which

21   have been provided to Apple.

22          I wanted to make that point.

23          The only other point that I will address -- most of

24   them have been addressed by Mr. Taormina -- is that if your

25   Honor remembers, there were some government issues that had

1    been raised about Mr. Wade's personal life and his involvement.

2    That took up a significant amount of the court's time earlier

3    on.  That information was information -- what stemmed that

4    whole thing was information that had been provided only to the

5    attorneys at Latham & Watkins, yet that resulted in a

6    significant amount of unnecessary discovery and a huge burden

7    and cost on the parties.

8         So that being said, in light of the sensitivity that

9    Mr. Taormina has raised about his clients, disclosing that

10   information under the protective order only to the attorneys at

11   Latham & Watkins as has already been established in this case

12   can have significant collateral impact.

13        THE COURT:  All right.  Thank you.

14        Ms. Bina, I have one more question for Mr. Taormina,

15   but before I do, anything that you wanted to add very briefly?

16        MS. BINA:  Very briefly, your Honor.  First of all, on

17   the contracts point, we are not interested in Azimuth in the

18   contracts between Corellium and Azimuth.  We're looking for any

19   contractual restrictions that Azimuth imposes on its own

20   customers, which we understand Corellium does not have.  I just

21   want to make that point clear.

22        With respect to the second point, it's a red herring.

23   Counsel is referring to something where his former cocounsel

24   told us that something would materially impact the case.  That

25   turned out not to be true, but we believed it was based on his

1    cocounsel's representation.  We served discovery and then they

2    moved for protective order.  So that is really, I think, not --

3    the suggestion that somehow telling Latham & Watkins something

4    under seal, which, by the way, that information was not, is

5    somehow going to open Pandora's box is just unfair and

6    unwarranted.

7            THE COURT:  All right.  Thank you.

8            Mr. Taormina, I have one question for you.  How long

9    will it take you to determine whether or not you'd be willing

10   to produce the names of the two countries involved as opposed

11   to just one of the five?  In other words, whether it's United

12   States and Australia, whether it's United States and Canada, or

13   whether it's Canada and Australia, etc.  How long will it take

14   you to determine that and how would that harm anything if you

15   only were disclosing the names of the two countries?

16           MR. TAORMINA:  I think that if you could give us maybe

17   two days we could get that answer for you, and the only reason

18   I might say two days is because our prime contact is in

19   Australia, and obviously just with all the Coronavirus concerns

20   we don't know -- I know a lot of people are putting out fires

21   in every industry about everything.  So if about two days could

22   be OK.

23           How would you like us to provide that information to

24   you?

25           THE COURT:  I tell you what, I will give you until

1    Thursday.  Just file a notice with the court stating that your

2    position is that either you would agree to provide the names of

3    the two countries without having to specify them in the public

4    record or you would not.

5        MR. TAORMINA:  Understood.  That's fine, your Honor.

6    Thank you.

7        THE COURT:  I just want to hear from you on that

8    before I rule on this, on all the issues related to the motion.

9        The motion is an interesting motion.  I agree with you

10   that I want to be fair to the third party, the nonparty as

11   well, Harris, Azimuth, and I want to be fair to the parties

12   involved in the litigation here, Apple and Corellium.  So I'm

13   trying to determine what is reasonable and necessary and to

14   protect everybody's interest here.

15       So I think that would help me if you advised me of

16   that.  I don't know how I'll rule, but it might help me at

17   least in analyzing the situation.

18       I am still going to want to go back and review the

19   expert reports filed by Corellium or produced by Corellium and

20   take a look at those further, and some additional case law.

21       So I am going to take the motion under advisement and

22   I will rule at a future point.  But if you could file that by

23   Thursday and let me know.

24       MR. TAORMINA:  Of course.  Thank you for your

25   consideration, your Honor.

```
 1              THE COURT:  All right.  So that takes care of the

 2    motion to quash argument.

 3              The next issue are discovery disputes between Apple

 4    and Corellium.  I will tell counsel for Harris and Azimuth, if

 5    you want to stay, you're welcome to stay.  If you want to

 6    leave, you are also welcome to leave.  How would you like to

 7    play that?

 8              MR. TAORMINA:  We are going to drop off, your Honor.

 9    Thank you very much for your thoroughness in allowing us to

10    explain our position.

11              THE COURT:  All right.  Have a good day.

12              MR. TAORMINA:  You too.

13              THE COURT:  All right.  So we should just now have on

14    the record counsel for Apple and counsel for Corellium.

15              I'm looking at the joint notice and it would seem to

16    be we start at the bottom of page 9 of the joint notice where

17    Apple talks about two categories of discovery disputes that

18    remain.

19              Let me just ask Ms. Bina, would that be correct?  Is

20    that where we need to go now?

21              MS. BINA:  I think that is a perfectly good place to

22    start, your Honor.

23              THE COURT:  All right.  Mr. Levine, do you think that

24    makes sense?

25              MR. LEVINE:  Yes, your Honor, and I think
```

1    Ms. Constantine is going to be taking a fair amount of the

2    argument here.

3              THE COURT:  All right.  And this was Apple's motion, I

4    believe, to compel discovery responses, if I'm not mistaken.

5              Is that correct, Ms. Bina?

6              MS. BINA:  Yes.  Originally this was our motion to

7    compel discovery responses, that's been heard at a few

8    different hearings now.

9              THE COURT:  Right.  So why don't we talk about these

10   issues that you say the first issue, and I'm looking at docket

11   entry 227, the sealed version, page 13, and you say that,

12   first, disputes remain with respect to productions related to

13   the Corellium Apple product.  These disputes involve the

14   changes Corellium has made to the Corellium Apple product.

15             I thought I had ruled on that before.

16             Then you say:  Apple's request for the production of

17   source code and the question whether Corellium will be required

18   to produce discovery related to the hypervisor portion of the

19   Corellium Apple product, and I know that relates to the

20   experts' affidavits that have been filed.

21             You say:  The parties are continuing to confer

22   regarding these issues and Apple's expert is continuing to

23   review the evidence, and of course will be filing an affidavit

24   on Sunday, March 15th, which I know you did.

25             So let's talk about the first part of that first issue

1    which is changes Corellium has made to the Apple, Corellium

2    Apple product, because I think I ruled on that before.

3           So what is the issue that you see on that?

4           MS. BINA:  So, your Honor, my understanding had been

5    that you had essentially ruled that Corellium should produce

6    everything other than what related exclusively to the

7    hypervisor, and that included ways in which the Corellium Apple

8    product was modifying or editing or displaying or copying

9    Apple's copyrighted works.

10          Where we ran into trouble, and this is laid out in the

11   expert declaration of Dr. Nee that we filed, is that they

12   haven't really done that.  They provided what they call the

13   patches to the Apple product, but those patches are incomplete

14   sets of code and they have self-edited the code.  So instead of

15   providing the full code and redacting it or providing the full

16   code, which would have been the more appropriate thing to do,

17   there are entire sections that are missing, and Corellium's

18   staff, as I understand it, its technical employees, have

19   actually just replaced the code with things that say "not

20   related to iOS."

21          So again, this is detailed in Dr. Nee's affidavit.

22          They have a chart of their whole architecture, and

23   there is a portion of it that is the hypervisor, but then there

24   are dozens of things that ride on top of the hypervisor.  Of

25   those they have produced only a small fraction.  And they

1    haven't produced what they're considering the generic products,

2    parts of it that can run Android or iOS, even though those

3    parts are, to our understanding, directly involved in copying

4    and displaying and snapshotting iOS.

5         So separate and apart from the hypervisor issue, which

6    remains live, we don't believe we have been provided what your

7    Honor has already ordered that we should be provided with.

8         There is a related issue, which is that they are still

9    withholding -- the joint notice of 8500 that they produced

10   4,000 or so documents a couple of days ago, I think Thursday or

11   Friday, but there's still about 5,000 documents that they are

12   withholding on the basis of, quote-unquote, privacy and trade

13   secret grounds that don't appear to relate in any way, shape or

14   form exclusively to the hypervisor.

15        So, for example -- if you will bear with me one

16   moment, I just want to grab my notes I have got here.

17        THE COURT:  Well, if you could hold on a second

18   because I'm trying to break this up and understand the issues.

19        The first issue was whether changes to the Corellium

20   Apple product have been produced by Corellium.

21        Have the changes been produced or not?

22        MS. BINA:  Yes, in part.  They produced -- they

23   allowed us to inspect briefly two sets of codes that they claim

24   is the change with edits in it, taking out things that they

25   claim were non-iOS specific.  They also allowed our expert to

1    briefly access a Cloud version of how the product supposedly

2    worked in the past.

3          So they have done that in part, but with pieces

4    missing from the code.

5          THE COURT:  Which pieces are missing, according to

6    you?

7          MS. BINA:  We don't know.  There were over 50

8    notations that just say "taken out, not iOS related."  There's

9    no evidence of how much was taken out, how much was left in.

10   We've got fragments of code but we don't have the whole system,

11   and that's what is challenging.  Because without the larger

12   framework with which those pieces rest, it is virtually

13   impossible for our expert to tell whether what we have is

14   everything that modifies iOS.  We know we don't have everything

15   that copies and displays iOS.

16         THE COURT:  So let me ask you this.  What about the

17   production of the source code and the hypervisor portion of the

18   Corellium Apple product -- I know the experts have filed

19   affidavits on that -- but in a very quick summary, why do you

20   need that and what does your expert say about whether you need

21   the source code and the hypervisor portion of the Corellium

22   Apple product?

23         MS. BINA:  So there are a couple of different -- I

24   will be as brief as possible, your Honor.  There's a couple of

25   different issues.  The hypervisor being the last one.

1           The first is that separate and apart from the

2    hypervisor they haven't produced most of their code.  So we had

3    understood that they were going to produce everything but the

4    hypervisor.  They haven't.  Instead they have produced a very

5    tiny amount.  So we still don't have, separate and apart from

6    the hypervisor, all of their code or a full understanding of

7    how their system displays, copies, modifies, addresses things.

8           So apart from the hypervisor, we don't have code

9    sufficient to understand how their product works.

10           Second -- and in particular how it works with iOS.  If

11    you look at paragraph 40 of Dr. Nee's declaration -- I think

12    that contains confidential information so I am not going to

13    describe it here, but it addresses some of our issue with us

14    not having non-hypervisor code because of these edits and cuts

15    and their self-limiting of what should be provided.

16           Second, they have only produced one version of the

17    Corellium Apple product.  According to their discovery

18    responses there are 16 different versions.  They have told us

19    there are 12.  We have got one.  So that's a major problem.  We

20    either need some kind of declaration that the others were

21    exactly the same or we need access to all of the prior

22    versions, which we haven't received.

23           Third, we have had very limited time with the product,

24    and all of it was being supervised by Corellium's attorneys.

25    So our expert and our attorney had basically a half day to look

1    at the product and they weren't allowed to be alone or play

2    with the product at all absent supervision, and that is just

3    not an adequate amount of time for our expert to complete his

4    review.

5         Then finally, with respect to the hypervisor, that's

6    the Corellium of the product.  It creates, runs, interacts with

7    the virtual system at issue.  And Corellium's expert

8    acknowledges that it executes operating system commands, which

9    means it is the hypervisor that makes a copy of iOS in its RAM

10   and runs it.  So we need access to the hypervisor to determine

11   how Corellium is copying and running iOS, and in fact there's

12   probably evidence in that hypervisor that it is in fact copying

13   and running iOS.

14        There is another portion of the sealed Olivier

15   declaration -- that is the declaration from Corellium's

16   counsel -- in paragraph 4 that also talks about what the

17   hypervisor does with respect to an iPhone which directly

18   relates to it getting around our security features and to

19   copying.

20        So the hypervisor is involved at least in displaying,

21   circumventing, and copying iOS, and we need to understand that.

22   And all of this is detailed at paragraph 60 through 65 of

23   Dr. Nee's declaration.  I am mindful of trying to not say too

24   much onto the record.

25        THE COURT:  All right.  Thank you.

1          All right.  So let me turn to counsel for Corellium.

2    I believe Ms. Constantine.

3          What about this first category regarding changes that

4    Corellium made to the Apple product that, according to Apple,

5    there's 12 to 16 versions and only one version has been

6    produced, and then the issue regarding the source code and the

7    hypervisor portion of the Corellium Apple product.  What is

8    Corellium's position on that?

9          MR. LEVINE:  This is Justin Levine, your Honor.

10   Ms. Constantine is going to take some of the other more pointed

11   discovery issues, some related to the privilege log and other

12   specific requests.  As it relates to this issue, I will be

13   providing argument.

14         THE COURT:  All right.

15         MR. LEVINE:  Just about everything Ms. Bina stated now

16   is not based on fact.

17         So what was the first issue that your Honor wanted me

18   to address?

19         THE COURT:  The first issue is dispute regarding the

20   changes that Corellium has made to the Apple, Corellium Apple

21   product that they are asserting that only one version of the

22   Corellium Apple product was produced and there are 12 to 16

23   versions that you haven't produced all the code or how the

24   system changes and modifies things.

25         MR. LEVINE:  Yes, your Honor.  OK.  So there are two

1    different sets of two different -- of different versions.  Now

2    let me explain.

3           On the one hand Corellium is currently operating a

4    current version of the product, and we will call that for the

5    purposes of this conversation the new version.  At the start of

6    the lawsuit Corellium was operating a different version.  We

7    will call that for this purpose the old version.

8           Very briefly, as you are aware, the IPSW files, which

9    contain iOS, are loaded into the Corellium Apple product.  At

10   some point during this lawsuit those files, that are located

11   and obtained on the Apple website and Apple servers, became

12   instable.  Due to that instability, Corellium's customers began

13   experiencing shutdowns, errors, and other issues with the

14   product.

15          So that mandated during the course of business that a

16   small change had to be made.  Basically that small change was

17   that that one aspect of building the virtual device, it was --

18   where there was a dropdown box, it was simply changed to a drag

19   and drop here box.  That was the only change.

20          So that is one of the -- when we are talking about the

21   different versions of the Corellium Apple product, that's one.

22   So there is the old and the new.

23          Then there are the other versions where Ms. Bina is

24   talking about the 13 or 15 prior versions.  If your Honor has

25   an iPhone, you will know that every once in a while you have to

1    do an update to the iPhone or any of the apps will come out

2    with various updates.  If a bug is found or an issue is found,

3    the manufacturer will put out a fix and they send out that

4    update where you have to update your app or your phone.  That

5    is basically the -- those kind of things are the 13 or 15

6    versions that Ms. Bina is talking about on that aspect.

7         So as it relates to what has been produced, on the

8    right hand, what I first spoke about, the old and the new

9    version, both of those versions have been produced.  In

10   addition, not only have they both been produced but, as your

11   Honor ordered during the last hearing, Dr. Nee and an attorney

12   from Latham & Watkins, they have access to both the old and

13   they had access to the new version.  So that is on the one

14   hand.

15        On the other hand, with all of the prior versions, I

16   believe, and I will have to confirm with my clients, but I

17   believe they are willing to stipulate to the fact that all of

18   the prior versions are functionally the same with just, as I

19   mentioned, just some minor changes.  It was discussed with

20   Dr. Nee on the 12th, when he came and visited Corellium,

21   that -- it was agreed by Corellium to produce all of that code

22   to him if he wanted.

23        I think the best way around it -- and he agreed with

24   us, in the presence of the Latham attorney, that just a simple

25   stipulation that the older versions were fundamentally the same

1      and it was going to save everybody a lot of time.

2              Now, we are happy and we told him and we will agree

3      here on the record that if he wants all that code, the relevant

4      code for those versions, then we can produce it, but I just

5      simply think that is going to waste a lot of time.

6              Now, I would like to briefly address that meeting

7      among some other issues.

8              So Ms. Bina stated that Dr. Nee was only permitted a

9      brief amount of time to review the code.  Frankly, Dr. Nee was

10     permitted all of the time he wanted.  Dr. Nee decided to get up

11     after about an hour and a half and leave himself.  In fact, I

12     was upstairs at the time and I had actually -- I was going to

13     run down and ask him something and I learned at that point in

14     time that he had left about five minutes ago.  In fact -- I

15     will rewind the clock 24 hours from there.

16             When Dr. Nee and the lawyer from Latham came to the

17     offices of Cole Scott, I asked if they needed to retain -- if

18     the IT staff here at our offices here needed to retain the

19     computer setup on into Friday because I needed to know whether

20     to reserve the conference room on into Friday, and they said

21     they don't know but they will let us know.

22             So the point is that he didn't briefly have an amount

23     of time and he wasn't limited.  In fact, we were prepared to

24     host him for two full days.  So when he came and reviewed and

25     left, that is on Latham and Apple.  That is not on us.

1          After he visited Cole Scott's office, he then, him and
2     the Latham attorney then came to the Corellium office where the
3     Corellium team had worked tirelessly over the last couple of
4     days to make sure that they had redeployed the old version and
5     the on-site version of Corellium for Dr. Nee's use.
6          Dr. Nee was there for about four hours.
7          Now, I don't know if your Honor has really delved into
8     actually looking at some of the YouTube videos of this product.
9     This product, you can go from about end to end of it in about
10    15 minutes or less.  This would basically be the equivalent of
11    riding a bike around one of the small Bahamian islands in about
12    20 minutes.  It is not a very big thing and there is only so
13    far you can dig into this.
14         He was there for about four hours and asked four hours
15    of questions with Mr. Wade directing and answering almost all
16    of his questions.  It was effectively a second deposition,
17    although granted, of course, there were no formalities.  But
18    the Latham & Watkins attorney was taking very copious notes of
19    every word that was stated.  I would be willing to bet that she
20    was probably outlining her deposition of Mr. Wade coming up.
21    So we basically gave them their deposition outline.
22         He had four hours to play around on the site.  Some of
23    the code was fully readable and accessible beyond what we had
24    provided to beforehand, and this opportunity provided him with
25    access to the old version, which, again, it's really no

1    different from the new version, but he got it anyway, and it

2    also gave him access to the new version, just as your Honor had

3    ordered, as a customer would have.

4         Now, the only reason that Mr. Wade in the very

5    beginning had to do a couple of the actions on his own without

6    Dr. Nee -- no, Dr. Nee was right there looking and watching.

7    He was sitting right next to him, but Mr. Wade was doing it

8    himself -- was because that particular server, and these are

9    very large, very expensive and very sensitive servers, and your

10   Honor ordered that we had to set up an on-site version, which

11   means that the server is there on site.  So they did that.

12        In order to do that they had to take away from some of

13   the ongoing businesses and they had to hook up one of their

14   test servers to enable this product to go forward.  And because

15   of that, the server had direct access to Corellium's internal

16   network.  And that is the only reason why Mr. Wade did the

17   first couple of initial steps on his own.  And so that's that.

18        It's also very, very worth noting that not only did

19   Dr. Nee have over four hours of this product -- it was probably

20   around four hours with this product -- and all of the --

21   hundreds of questions, and Mr. Wade answered almost every

22   single one of them, drew Dr. Nee diagrams.  Not only was all of

23   that the case, but myself personally, probably at least 15

24   times, told Dr. Nee, Our goal here today is to make sure that

25   you have every single thing that you need when you leave here

1    today so that when we go to the court we can represent to the

2    court that you wanted, one, two, three, however many things you

3    need.  So I kept reiterating that because I knew it was going

4    to be an issue at this hearing.  I kept reiterating that all

5    the way through these four hours with Dr. Nee.

6          At the end of this meeting Dr. Nee took about a

7    20-minute time with his counsel alone in the conference room,

8    and when they emerged we came back into the room and they

9    provided an area of four areas that he needed to establish this

10   case for Apple.  Those four areas -- and I have them written

11   down -- those four areas are the code relating to snapshots, to

12   cloning, to creation, and to rendering.

13         While we believe that those four areas are beyond the

14   scope of this case, beyond any of the court's orders and beyond

15   discovery, Mr. Wade permitted me to agree to provide that

16   information and that code to Dr. Nee.

17         So I want to be very, very clear that at the end of

18   this entire day -- first beginning at Cole Scott's office and

19   then ending up for four hours at Corellium's office -- those

20   four areas were what Apple's own expert stated he needed and

21   Corellium had agreed to provide that code to Dr. Nee.

22         None of that code relates to or connects to -- I

23   shouldn't say connects to.  None of that code relates to the

24   hypervisor.  The hypervisor was not something that Apple's

25   expert stated he needed to provide his report.

1          Furthermore, in Dr. Nee's report or –- excuse me.  Let

2    me be clear.  The declaration that was provided for the

3    purposes of this hearing, not his actual report.  He states in

4    there that he does not have enough information to write or to

5    make an opinion and render his report in this case.

6          I was puzzled by that because on March 2nd, when the

7    expert reports came out, Dr. Nee provided a 325-page report,

8    and that's just text.  The exhibits to that report start at

9    page 326, and that is not including CV.  That is actual report

10   text.

11         So for Dr. Nee to now say that he doesn't have enough

12   information to render an opinion in this case is in stark

13   contrast to the over 300-page report that he has.

14         In addition, on page 5 of Dr. Nee's affidavit that he

15   provided for this case, he clearly states, "The only

16   purpose" –- and I'm quoting here for the record –- "The only

17   purpose of the hypervisor is to create and manage virtual

18   devices acting like hardware in a physical machine."

19         He qualifies that with "the only purpose."

20         There is nothing contained in hardware or a physical

21   machine that relates to iOS and software code.  It just doesn't

22   exist.  They are not two things that cross over one another.

23         Furthermore, on page 11, he then clearly states that

24   Corellium has only produced code and other technical

25   information –- and this is the part that we need to

1   emphasize -- about the parts of the accused product that

2   directly and specifically handle iOS.

3          That's precisely correct.  That is what this case is

4   about.  This case is about the portions and parts that directly

5   and specifically handle iOS.  That is on page 11.

6          Now, what Apple's attorneys are trying to do is expand

7   this case into a patent case.  They are trying to learn the

8   underlying operability of the entire product.  Except that is

9   not copyright.  It makes sense now because when I met

10  Ms. Victorson, who is a Latham attorney, who attended the

11  day-long session with Dr. Nee at Corellium, she told me that

12  she's a patent lawyer and she is not a copyright lawyer.  And

13  that makes a lot of sense now why this gross expansion into the

14  entire business of Corellium has become such an issue.

15         This case is a copyright case and it's a copyright

16  case related to iOS.  Everything else is simply irrelevant, and

17  that is why the code that has been provided has been provided.

18         Now, again, for the record, we have already now

19  provided to agree above and beyond, or provide above and beyond

20  the code that's needed.

21         Dr. Nee also states on page 14 that he has received

22  and reviewed certain user guides and manuals.  I will state for

23  the record that as it relates to the Corellium Apple product

24  there are not a lot of specific guides and manuals and diagrams

25  that relate simply to iOS.  Again, what this case is about.

1    And that is why only a limited amount of them have been

2    provided.  But what is in existence has been provided.

3         I will take it a step further.  Even what was not in

4    existence has also been provided.  The Corellium team has gone

5    out of their way to design and draft multiple diagrams, one of

6    which Latham & Watkins has included in Dr. Nee's declaration

7    for this case, providing to the court exactly where iOS is and

8    lives in this product and showing -- just showing that.

9         I have Mr. Wade here today to provide the technical

10   information if your Honor likes.  I have Mr. Delgado here today

11   who runs the ESI division in Cole Scott, and he can provide

12   additional information as to the following statement that I am

13   about to make, that all of the code that has been required and

14   requested in this case has been provided, and all of the

15   relevant code in this case has already been provided.

16        Now, before Dr. Nee showed up to Cole Scott's office

17   that day, I sat with Jonathan Vine, who is the partner in this

18   case, as well as Mr. Delgado who, as I mentioned, is the

19   software engineer and ESI director at Cole Scott and we went

20   through the definitions of all the discovery requests, we went

21   through the transcripts of the prior court hearings, and we

22   concluded at that point in time that we were in complete

23   compliance with all of the code that had been requested and

24   ordered at that point in time.

25        We also clarified with Ms. Victorson at the time that

```
1    it in fact -- the reason of the shortcomings as to, the alleged

2    shortcoming of production of code and whether it had been

3    provided in a usable native format was actually on Latham.

4    They failed to locate this, and I may be butchering this term,

5    but they failed to locate the file paths that was produced

6    through Everlaw, a sanctioned ESI tool, and we confirm that all

7    of that information in the native and usable code had been

8    provided.

9         Now, can they build a hypervisor from that code?  No,

10   they can't build the product.  But that is not what this case

11   is about and that is way too broad as far as the scope of what

12   is needed.

13        THE COURT:  All right.  Let me ask you some questions,

14   please.  I need to ask you some questions.  I have another

15   hearing at 3:00 and I have to break here in a little while so I

16   would like to get to the issues directly.

17        Apple makes the allegation that you have not produced

18   the source code.  What is your response to that?

19        MR. LEVINE:  All source code that has been requested

20   and ordered by the court has been produced in a native usable

21   format.

22        THE COURT:  All right.  They also make the allegation

23   that you have not produced discovery related to the hypervisor

24   portion of the Corellium Apple product.  Can you address that?

25        MR. LEVINE:  That is correct.  I believe there are
```

1    some minor documents that were inadvertently produced as it

2    relates to that, but other than that I believe that's correct,

3    your Honor.

4            THE COURT:  OK.  And the reason you can't produce

5    anything related to the hypervisor portion of the Corellium

6    Apple product in a nutshell is what?

7            MR. LEVINE:  Because the hypervisor has no connection

8    to iOS.  The hypervisor is, in a brief way, the hypervisor is a

9    piece of hardware.  Now, it's software, but it is effectively a

10   piece of hardware.  So if your Honor thinks that the plastic

11   and the glass and the metal that makes up an iPhone would

12   contain iOS code, that just doesn't meet the bounds of physics.

13   This is not a possible thing.

14           As Dr. Nee stated in his report, as I mentioned

15   earlier, the only purpose of the hypervisor is to create and

16   manage virtual devices acting like hardware in a physical

17   machine.  It's effectively a hard device just in software.

18           THE COURT:  OK.  Let me ask you -- I have not

19   carefully gone through the competing experts' affidavits

20   regarding these issues -- do both of the expert affidavits

21   address whether or not either side needs to produce or not

22   produce or obtain the hypervisor portion of the Corellium Apple

23   product?

24           MR. LEVINE:  Yes, your Honor.  So as you would

25   imagine, both experts have competing affidavits.  Our expert

1    says that there's no relevance and no connection.  Dr. Nee
2    states that he does meet it.
3            Two brief points.  One, our expert has looked through
4    the code of the hypervisor and has confirmed in his affidavit
5    that there is nothing in there relating to iOS code.
6            The second thing is that Dr. Nee's position, now
7    stated in his declaration, is in staunch contrast in his
8    representation to us after meeting with his counsel on Thursday
9    of last week that there was no need for any hypervisor code.
10           THE COURT:  All right.  As far as the first issue,
11   which is the different versions or changes Corellium has made
12   to the Corellium Apple product, your position, just so I'm
13   clear, is that you've produced the new version of the Corellium
14   Apple product which is what's being used now.  You've produced
15   the old version of the Corellium Apple product, which was in
16   effect at the time of the litigation.  And the issues of these
17   12 to 16 versions, those are really, in effect, minor changes
18   that were made to the Corellium Apple product dealing with, I
19   guess, functionality and that you will produce, if requested,
20   all of those 12 to 16 updates but that you will also, in lieu
21   of producing those 12 to 16 updates, agree and stipulate that
22   they made no significant changes or they only made minor
23   changes to the Corellium Apple product.  Do I have that all
24   correct?
25           MR. LEVINE:  Precisely, your Honor.

1          THE COURT:  OK.  So on that issue, on that first issue

2     that we have been talking about, before we get to some of the

3     other issues here, let me ask Ms. Bina, what about that?

4          They say that the old Corellium Apple product has been

5     produced, the new Corellium Apple product has been produced,

6     that these 12 to 16 versions are mere updates, that your expert

7     said they really didn't need them, but if you really want them

8     they will produce them or they will agree that they were just

9     simply minor updates of really no moment.

10         What is your response to that?

11         MS. BINA:  All right.  I will take the last first,

12    your Honor.  We actually previously proposed that they

13    stipulate and they declined to do so.  So a stipulation of that

14    kind may well take care of the prior versions if in fact it's

15    correct.  So on that issue of the 12 versus 16, if things

16    continue to work in the way they always have, we may not

17    necessarily need to review all of them.

18         THE COURT:  OK.

19         MS. BINA:  Excuse me.  But again, we would need a very

20    clear stipulation on that point, which we don't currently have

21    and they have not previously provided despite our request after

22    last week's meeting.

23         Secondarily, in terms of what they have produced, they

24    have not produced source code in a native repository, which is

25    the way it would typically be produced.  So typically, your

1    Honor, it would come through GitHub or something like that,

2    which is a tool that allows source code to be compared to other

3    source code very easily.  So you can immediately see the

4    changes without manually comparing them.  So it has comparison

5    tools.

6          They haven't done that.  Instead, your Honor, they

7    have produced it via their eDiscovery platform, which does

8    allow us to look at the code but doesn't have any of those

9    native tools.  The source code protective order requires that

10   it be produced in the way it's typically kept and functional.

11   Instead, they have piped everything through this eDiscovery

12   platform so that we can't.

13         So, for instance, they have produced not the full code

14   but a snippet of code relating to iOS that they claim shows the

15   old and the new, but we can't easily compare them.  We have to

16   manually compare them because they haven't produced them in the

17   typical platform that they would normally produce them in.

18         THE COURT:  So you're saying that the source code

19   wasn't produced in a platform that allows comparison.

20         MS. BINA:  Not easy comparison, your Honor.

21         Typically we would be given a source code computer

22   with access to something like GitHub, which is, as I

23   understand, a common repository that I believe Corellium uses,

24   and we would be able to look at it in that format and Dr. Nee

25   could readily compare one version to another.  Instead, we have

1    this fairly clunky eDiscovery tool that allows him to look at

2    those versions but comparisons are much harder and more

3    time-consuming.

4            THE COURT:  And what is the format you're saying?  Can

5    you spell it for me?

6            MS. BINA:  G-I-T-H-U-B, or whatever their normal

7    repository is.

8            Corellium doesn't keep its code in this Everlaw

9    discovery, eDiscovery platform.  They keep it in some other

10   form, and that's the form that it would typically be reviewed

11   in in a normal source code review.

12           THE COURT:  And what about the hypervisor portion of

13   the Corellium Apple product, are you still insisting on that?

14   And, just very briefly, what do the two expert declarations or

15   affidavits say about why it is or isn't producible?

16           MS. BINA:  So, your Honor, I have to back up one step

17   because there's a very serious disagreement amongst the parties

18   over whether they have already produced everything that relates

19   to iOS.  In fact, they have taken this extraordinarily narrow

20   view that even things that are not the hypervisor, unless they

21   contain specifically the word iOS or are directly modifying

22   iOS, then they are not going to produce it.  So that means

23   portions of their product that display iOS, portions of their

24   product that copy iOS they haven't produced.

25           Dr. Nee did not say there are only four things that he

1    absolutely needed.  He said he needed at least those four

2    things, which they are saying now they are going to produce but

3    they still haven't.

4         We have been coming in here for a month now, a little

5    more than a month, and each time Corellium has said, we've

6    given them everything, we've given them everything, and it is

7    just not the case that they have given us everything, and that

8    is detailed at length in Dr. Nee's report.

9         So there are a lot of things, before we even get to

10   the hypervisor, that display, that copy, that manipulate iOS

11   that have not been produced, and there are zillions --

12   technical term.  There are about 5,000 e-mails that they have

13   withheld on hypervisor grounds that include titles like iOS

14   virtualization demo or corsac iOS Cloud --

15        THE COURT:  I understand that.  We are going to get to

16   that in a second.

17        MS. BINA:  OK.

18        THE COURT:  I'm trying to deal with this one step at a

19   time.

20        So the first issue is changes to the Corellium Apple

21   product, and I am going to direct the parties to try and work

22   out that stipulation regarding the 12 to 16 versions.  If you

23   can agree on a stipulation, great.  If not, then I am going to

24   require Corellium to produce those 12 to 16 updates to Apple,

25   but I think it makes more sense to try and work out a

1    stipulation.

2         The second issue is production of the source code.

3    I'm hearing two totally divergent things.  I'm hearing from

4    Mr. Levine that his client has produced everything regarding

5    the source code, and then I'm hearing from you, counsel for

6    Apple, that portions of the product that display or copy or

7    manipulate iOS have not been produced, that all the source code

8    hasn't been produced.

9         Is that issue as to whether or not the source code has

10   or has not been produced addressed in the two competing

11   experts' declarations?

12        MS. BINA:  It's certainly addressed in Dr. Nee's

13   declaration.  He describes in detail what he doesn't have and

14   why he needs it.  I don't know that it is addressed in

15   Dr. Olivier's declaration.  He is focused primarily on the

16   hypervisor because obviously he wouldn't know specifically what

17   Corellium has and hasn't produced.

18             THE COURT:  All right.  So as far --

19             MR. LEVINE:  Your Honor, the --

20             THE COURT:  Hold on.  Hold on.

21        As far as the source code, Ms. Bina, is it primarily

22   that you're saying that portions of the product that display,

23   copy, or manipulate iOS have not been produced?  Is that really

24   what the fight here is about, or is it about something else?

25             MS. BINA:  There's three primary issues.  One, it is

1   not produced in the format in which it's typically kept and

2   easily comparable, which would be GitHub or something similar.

3          Two, it's been edited.  There are big chunks missing

4   even from what's been produced with just a notation that says,

5   does not relate to iOS, therefore, we're cutting it.  So our

6   expert can't see the code in context because they have taken

7   things out, and I think they have done that around 50 times.

8          Three, there are lots and lots of areas separate and

9   apart from the hypervisor that we have reason to believe, based

10  on the evidence, copy, modify, or circumvent Apple security

11  measures that have not been produced at all.

12          THE COURT:  All right.  Hold on just a second.

13          All right.  Mr. Levine, can you respond to that

14  briefly.

15          MR. LEVINE:  Yes, your Honor.  As it relates to the

16  repository, we have produced everything in an accredited

17  repository that the protective order on page 14, the top line,

18  requires a repository for the viewing and searching of the code

19  produced.

20          We had used a normal standard ESI repository.  In

21  fact, in addressing these concerns we actually called the

22  engineers at Everlaw and they confirmed for us that this is a

23  certified repository for the review and searching and

24  maintaining of code.

25          If Apple wants it in GitHub, I mean, they can produce

1   their stuff in GitHub, but Corellium doesn't retain its code in

2   GitHub and the protective order and the ESI repository here

3   meets all the qualifications that's necessary.

4          One other issue, though, is that if they're claiming

5   that it is inconvenient the way that -- for the tools that

6   Everlaw provides, we actually went above and beyond.  The

7   protective order only requires us to produce code here at our

8   office.  The large majority of code -- actually, all the code

9   that has been produced to date has actually been provided

10  directly to Apple.  So if they're talking about convenience,

11  they don't have to jump on an airplane and come to West Palm.

12  They can look at it on their own repository, do whatever they

13  want with it where it is.

14         So that addresses that point.

15         Again, the tools on Everlaw are more than sufficient

16  for what is called for by the protective order.

17         Let's see.  As far as the edited code, there is

18  redacted code, but that is because some of the redacted code

19  deals with Lenox or Android or other issues that, as the

20  redaction states, has no connection to iOS.  They just -- they

21  literally have no bounds on this lawsuit whatsoever.  That's an

22  important thing.

23         Your Honor has to remember that Dr. Nee, even

24  providing some of this code to Dr. Nee, Dr. Nee himself is a

25  competitor in this field to Corellium.  Dr. Nee is a specialist

1    in virtualization.  He is the owner of 11 patents in the field.

2    We have been having to draw him diagrams and explain to him our

3    proprietary technology.  So even if this code and the secret

4    sauce, if you will, has been provided to Dr. Nee for this case,

5    now another prominent figure in the field after this case is

6    done has the thinking, the thoughts, the proprietary innovation

7    of Corellium to then apply to his own work, even if he is just

8    doing it quietly and to himself.

9         I know your Honor is under a time crunch, but I would

10   go so far as to say, how do we even know that Apple hasn't

11   retained Dr. Nee to build a version of this for them.  Apple

12   has wanted this product.  They have offered millions of dollars

13   for it, and something as outlandish as that and to file a

14   lawsuit to try to get this proprietary information would not be

15   above them.

16        Just today Apple was fined $1.1 billion in Europe for

17   breaking antitrust violations, and just last month they were

18   fined $25 million for misleading customers.  So the protection

19   of this very highly sensitive and proprietary information is

20   critical.

21        THE COURT:  Let me ask you a question.  I need to ask

22   you a question.

23        What about portions of the product that display, copy,

24   or manipulate iOS, has that all been produced, or not?

25        MR. LEVINE:  Those portions have been produced.

1          THE COURT:  So there is no withheld portions that

2     display, copy or manipulate iOS?

3          MR. LEVINE:  The only other areas are the four areas

4     that Dr. Nee stated at the end of the meeting, which we have

5     agreed to produce.

6          Now, Ms. Bina stated that we have not produced it,

7     except the problem is that only happened Thursday, and we have

8     agreed to produce those areas.  But if Ms. Bina isn't content

9     with us providing the code to them, then we will follow the

10    protective order to the T, and that means that Dr. Nee has to

11    fly back to Cole Scott and he has to provide us with a request

12    within seven days so that we can have our IT department set up

13    this special computer again so that he can review that code.

14    He hasn't made that request.

15         THE COURT:  All right.  What about the fact that

16    they're making an argument that the code's been edited

17    approximately 50 times?

18         MR. LEVINE:  So I just addressed that.  So that code

19    relates to things that are outside this case, such as Android

20    or Lenox or other issues that don't deal with iOS.  And the

21    reason I got into Dr. Nee being a competitor is that the only

22    thing at issue in this case is copyright as it relates to iOS.

23    And if that code relates -- does not relate in any stretch,

24    then it is a serious concern even providing it to Apple's

25    expert because he is a direct competitor in this thing, in this

```
 1    industry.

 2              So those items that have been redacted are beyond any

 3    order of the court and they are beyond any requests and they

 4    are beyond any allegation or claim or defense in this case and

 5    therefore they are redacted from sight.

 6              THE COURT:  All right.  So what I'd like to do is

 7    this.  First of all, as far as the changes made to the

 8    Corellium Apple product, I've already ruled on that.  Either

 9    work out a stipulation or produce the 12 to 16 updates, prior

10    versions, whatever you want to call them.

11              The second issue is I am ordering that Corellium must

12    produce portions of the product that display, copy, or

13    manipulate iOS.  It's up to Corellium to make sure that they

14    comply in good faith with that order, but that is my order.

15              As far as the source code and the hypervisor portion

16    of the Corellium Apple product, I'm going to review the

17    experts' affidavits and I will rule further on that after I

18    have had time to review the experts' affidavits regarding the

19    editing of the code or whether or not the source code has been

20    fully produced and whether or not the hypervisor portion of the

21    Corellium Apple product must be produced.

22              Now --

23              MR. LEVINE:  Your Honor, very brief points.

24              THE COURT:  Sure.  Go ahead.

25              MR. LEVINE:  The first point relates to the two
```

1    affidavits provided by the experts.  The court's order at the

2    last hearing was to only provide an affidavit as it relates to

3    why the hypervisor should or should not be produced, and that

4    is why Dr. Olivier's declaration only goes to that issue.

5         The issue of the source code -- basically, I think

6    about 15 or 16 pages of Dr. Nee's declaration is all beyond the

7    scope of what the court ordered.  So I just wanted to make that

8    issue clear.

9         The other issue is that on the court's second ruling

10   that all source code that relates to copying, modifying, etc.,

11   what the court said, I just want to make it very clear that we

12   agreed to produce that on Thursday, and we are perfectly OK

13   with providing all of that to Apple, and I tell you this to

14   show you about -- that that stuff, which we are perfectly OK

15   with producing and agreed to do so last Thursday, has no

16   connection to the hypervisor.

17        We can't be in agreement to produce those items that

18   you just ruled but also sit here at the same time and state

19   that the hypervisor is not relevant and should be withheld.

20   That is why I just want to make it clear that there is actually

21   a clear line between those and that is why anything related to

22   the hypervisor should not be produced in this case, your Honor.

23        Thank you.

24        THE COURT:  No, I understand.

25        MS. BINA:  That --

1          THE COURT:  I will get to you in a second, Ms. Bina.

2          MS. BINA:  Thank you, your Honor.

3          THE COURT:  Your position, Mr. Levine, is that the

4     hypervisor is off limits according to you and you don't want

5     the hypervisor produced, but that you have agreed to produce

6     all portions of the product that display, copy, or manipulate

7     iOS and that you agreed to that a few days ago and you're

8     willing to produce that, because I am ordering that.

9          As far as the code editing, where Apple says it's been

10    edited 50 times, and you say it's basically just redactions of

11    non-iOS matters, all I can say is that I have ordered that the

12    portions of the product that display, copy, or manipulate iOS

13    be produced, and also any edits of the code, any redactions

14    from the code that would be relevant to this case would be

15    improper.  So I want to make sure that you take a look at that

16    and that you have redacted what is properly redacted, because

17    if not, it could be a problem down the road.

18         So, Ms. Bina, I know you wanted to respond.

19         MR. LEVINE:  Thank you, your Honor.

20         THE COURT:  What did you want to respond, Ms. Bina?

21         MS. BINA:  Just very briefly, your Honor.  Mr. Levine

22    has spoken extensively, and I know that your Honor has another

23    hearing, so I am going to try to be brief, but there is a lot

24    that he said that is vigorously disagreed with, not the least

25    of which when he accused me of unethically using an expert to

1    steal code.  That is not something that is happening here.

2          Dr. Nee is a retained expert through my law firm in

3    good faith attempting to understand Corellium's product.  But

4    they have taken such a narrow view of what is relevant and they

5    are self-editing on their side.  I had understood after our

6    last hearing, your Honor, that we would essentially get

7    everything but the hypervisor and instead they're giving us

8    little dribs and drabs that no expert can put together in a

9    sensible way.

10         Dr. Nee's affidavit addresses those issues because

11   before he can even get to whether we need the hypervisor or

12   not, there's huge chunks of information that is just missing

13   and that they have not produced and they have not made

14   available.

15         So this is something I encourage you to read, your

16   Honor, to read the affidavit very, very carefully.  I know that

17   you will.  But this is not us trying to game the system or take

18   some advantage or steal Corellium's product.  It is us trying

19   to identify how the product copies our product, displays our

20   product, circumvents our product's technical protections, and

21   there are portions of Dr. Olivier's affidavit that specifically

22   discuss, in paragraphs, I believe it is 4 and 11, things that

23   the hypervisor does that in fact demonstrate that the

24   hypervisor is involved in circumventing Apple's security

25   measures because the hypervisor is involved in tricking iOS

1    into thinking it's being displayed on an iPhone.  That is

2    critical to our 1201 claim.

3           So I just want to make those points, your Honor.

4           I'm concerned about time, and I don't want to unduly

5    belabor the point, but there are very significant differences

6    here of opinion as to what Corellium has produced, and they've

7    taken this extraordinarily narrow view that is very

8    significantly impeding our ability to prosecute this case.  We

9    have been trying for a month and each time they say, we will

10   give you a little more, we will give you a little more, and

11   each time they have not given enough.

12          I do want to note just one other point about the

13   inspection last week.

14          Dr. Nee was only able to attend on Thursday.  He had

15   another commitment on Friday.  We asked if he could come back

16   at a later point and Corellium's counsel said, No, this is a

17   one-time-only shop.  We will leave it open through tomorrow.

18   But if you don't stay through tomorrow, we are never putting it

19   up again, you won't have another opportunity to view source

20   code on site.

21          So this is a very different version of events that is

22   happening in reality than the one that is being presented to

23   your Honor.  And I don't want to drag your Honor into discovery

24   disputes between the parties any more than necessary, but this

25   is a significant and important issue to Apple because we are

```
1    not getting enough to understand what they are doing to our

2    product.

3              THE COURT:  All right.

4              MR. LEVINE:  Very briefly.

5              THE COURT:  Hold on just a second.

6              MR. LEVINE:  Very --

7              THE COURT:  No, I am at the end of the day.

8         So here's what I am going to tell all the parties.  I

9    have tried to be very reasonable with the parties up until now

10   and I seem to be getting nothing but combativeness.  I'm

11   telling right now, I'm issuing orders.  I have said that I want

12   all portions of the product that display, copy, or manipulate

13   the iOS to be produced.  I have said that I want all discovery

14   produced other than the hypervisor portion of the Corellium

15   Apple product.  I am going to review the experts' affidavits on

16   that.

17        If I find at a future time that either side has

18   withheld discovery, I can assure you the sanctions will be

19   severe.

20             Do you understand that, counsel?

21             MS. BINA:  Yes, your Honor.

22             THE COURT:  Mr. Levine.

23             MR. LEVINE:  Yes, your Honor.

24             THE COURT:  All right.  I want Corellium to be

25   producing discovery in good faith to Apple.  I don't want it in
```

1   dribs and drabs.  I don't want it withheld.  And I don't want

2   games being played.

3          If Dr. Nee needs to go back, he is going to go back.

4   I want discovery to be cooperative and I want it to take place.

5          I can tell you that I am going to review everything.

6   I am going to enter any additional orders and any further

7   hearings that we need.  But if I run into more problems in this

8   case and if I find that anybody is withholding anything

9   improperly, playing games in this case, arguing some technical

10  argument trying to avoid discovery or trying to get discovery,

11  I am going to impose sanctions on the offending party and the

12  offending attorney.

13         So I am going to terminate the hearing now.  I would

14  suggest the parties consult with each other and cooperate in

15  good faith and if they don't, I will enter the orders that are

16  necessary to make sure that discovery gets produced in this

17  case.

18         The hearing is concluded.  I will enter a further

19  order later.

20         MS. BINA:  Thank you, your Honor.

21         MR. LEVINE:  Thank you, your Honor.

22         Your Honor.

23         THE COURT:  I have concluded the hearing.

24         MR. LEVINE:  I understand.  I need to put on the

25  record for my client that while your Honor has ordered that all

```
 1    aspects of the code of the product that copy or modify or

 2    change or whatever of the product, we do not agree that any

 3    part of the product actually does that.

 4          So we will produce the code.  We recognize what your

 5    Honor is saying, but I have to put on the record that the

 6    product does not actually copy, modify, alter, or any of that.

 7          That is all.  Thank you, your Honor.

 8          THE COURT:  That may be your position and that is an

 9    issue that may have to be decided at summary judgment or trial.

10    It is not a discovery issue.

11          All right.  The hearing is concluded.

12          MR. LEVINE:  Understood.

13          Thank you, your Honor.

14          MS. BINA:  Thank you, your Honor.

15          (Adjourned)

16

17

18

19

20

21

22

23

24

25
```

C E R T I F I C A T E


        I hereby certify that the foregoing is an accurate

transcription to the best of my ability of the digital audio

recording in the above-entitled matter.


March 26, 2020              s/ Joanne Mancari
                            Joanne Mancari, RPR, CRR, CSR
                            Court Reporter
                            jemancari@gmail.com