# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

APPLE, INC.,

CASE NO: 9:19-CV-81160-RS

Plaintiff/Counter-Defendant,

v.

CORELLIUM, LLC,

Defendant/Counter-Plaintiff
_________________________________/

Fourth Expert Report of
Stewart L. Appelrouth, CPA, ABV, CVA, CrFAC, CFE
April 27, 2020

I have been engaged, by the Defendant/Counter-Plaintiff, to provide consulting on behalf of the Defendant/Counter-Plaintiff relating to the above referenced litigation matter.

The opinions and conclusions expressed in this report are based on the documents I have reviewed and the procedures I have performed to date. I reserve the right to update this report if additional information becomes available or if additional procedures are performed. While these opinions are valid with respect to the information available today, more information may become available which could alter the opinions expressed herein.

This action relates to the alleged damages, if liability is found, suffered by Apple, Inc. ("Apple" or "Plaintiff/Counter-Defendant") as a result of the alleged actions of Corellium, LLC ("Corellium" or "Defendant/Counter-Plaintiff"). Apple is seeking damages based on three claims of relief including Direct Federal Copyright Infringement (Computer Programs), Direct Federal Copyright Infringement (Graphical User Interface Elements), and Contributory Federal Copyright Infringement under Title 17 of the United States Code, Section 501.

This action also relates to the damages, if liability is found, suffered by Corellium as result of the actions of Apple. Corellium is seeking damages based on Unjust Enrichment/Quantum Meruit (Count I) and Unlawful/Unfair Business Practice (Count II).

# TABLE OF CONTENTS

SECTION 1: INTRODUCTION ..... 3
SECTION 2: DOCUMENTS CONSIDERED ..... 3
SECTION 3: CONNELLY REPORT ..... 4
SECTION 4: STATUTORY DAMAGES ..... 6
SECTION 5: COSTS AND EXPENSES ..... 8
SECTION 6: GROSS REVENUE ALLOCATION ..... 11
SECTION 7: CONCLUSION ..... 12
EXHIBIT 1: STEWART APPELROUTH – CURRICULUM VITAE ..... 13
EXHIBIT 2: CASES TESTIFIED OR DEPOSITION GIVEN ..... 21
EXHIBIT 3: DOCUMENTS PRODUCED BETWEEN APRIL 22, 2020 AND APRIL 27, 2020 ..... 23

# SECTION 1: INTRODUCTION

The purpose of this supplemental report is to present my findings on the analysis of the Supplemental Expert Report of Mr. David B. Connelly ("Mr. Connelly" or "Connelly") dated April 20, 2020 and the documents provided to me as presented within Section 2 below.

This report addresses additional and/or updated opinions provided within the supplemental and rebuttal report of David B. Connelly dated April 20, 2020. Specifically, we have addressed Mr. Connelly's revised statutory damage calculations, addressed our understanding related to the revenue allocation burden and noted any and all changes.

Additionally, I offer an updated analysis on my findings resulting from additional documentation that has been provided to me as a supplement or additional support for the costs and expenses for Corellium.

No additional information has been presented as a supplement or update to my preliminary expert report dated March 3, 2020 including my opinions on the documents provided in support for Corellium's damages based on the bounty program bug submissions and outstanding receivables resulting therefrom.

# SECTION 2: DOCUMENTS CONSIDERED

- Complaint dated August 15, 2019,
- Corellium's Answer, Affirmative Defenses, and Counterclaims dated November 8, 2019,
- Corellium's Answers to Interrogatories dated November 18, 2019,
- Corellium's First amended answers to Interrogatories dated January 16, 2020,
- Corellium's Second amended answers to Interrogatories dated February 24, 2020,
- Corellium's Third amended answers to Interrogatories dated February 27, 2020,
- Corellium's Fourth amended answers to Interrogatories dated March 9, 2020,
- Corellium's Fifth amended answers to Interrogatories dated April 18, 2020,
- Expert Report of David B. Connelly dated March 3, 2020 and Exhibit B for Materials Considered, Referenced/Bates Stamped Documents only,
- Corellium's Supplemental Rule 26 Production dated April 9, 2020,
- Berger Singerman Invoices dated 9/4/19, 10/11/19, 11/5/19, 12/3/19, and 1/7/19,
- Deposition Transcript of Chris Wade dated April 13, 2020.
- Deposition Transcript of Amanda Gorton dated March 25, 2020,
- Supplemental & Rebuttal Report and Exhibits of David B. Connelly dated April 20, 2020;
- Deposition transcript of David B. Connelly dated April 23, 2020;
- Additional documents received after April 21, 2020 and shown on Exhibit 3.

# SECTION 3: CONNELLY REPORT

Mr. Connelly's Supplemental and Updated report dated April 20, 2020 was issued in response to, and/or to address additional documentation and developments, including:

- Amended financial interrogatory answers;
- Numerous transaction documents concerning its revenues, costs, expenses and profits;
- Deposition testimony of Corellium's CEO and VP of Sales & Development; and,
- My Second Expert Report dated April 13, 2020.

Mr. Connelly contends that it is necessary to substantiate all of Corellium's costs and expenses, whereas a total of [redacted] has been supported with invoices and other underlying transaction documentation. Requesting Corellium to produce 100% of invoices and underlying transaction documentation appears to exceed the scope of his engagement ("assess and quantify the actual damages Apple has suffered as a result of Corellium's infringing activities"). Further, the contention to require all of the expense support appears to be inconsistent with other methods employed throughout his analysis. I was not engaged to audit the books and records of Corellium. Therefore, any implication that I should be performing similar procedures or justifying any unsupported costs is peculiar, especially when many of the expenses reflected at Exhibit D of Mr. Connelly's report are immaterial and many descriptions speak for themselves. I have provided an update to my analysis only as it relates to the nature and application of costs and expenses. Refer to Section 5 below for additional information.

It is Mr. Connelly's opinion that Corellium has not met its burden under the provisions of 17 U.S.C. §504(b) to prove deductible expenses and the elements of profit. However, as I have explained in my prior report, this analysis could not be completed due to Mr. Connelly's failure or lack of attempt to determine the total amount of revenues which would be attributable to the alleged Apple infringement. It is my understanding that "gross revenue" under the provisions of 17 U.S.C. §504(b), "refers only to revenue reasonably related to the infringement" where the copyright owner has the burden of demonstrating some causal link between the infringement and the particular profit stream.[1] Counsel has provided me with case law to support this understanding, whereas "a copyright holder must show more than the infringer's total gross revenue from *all* of its profit streams"[2] and only those profits attributable to the infringement are recoverable under the Copyright Act."[3] Mr. Connelly notes the challenge of attributing revenue in his initial report without accepting that the challenge is directly related to the Plaintiff's burden provided within 17 U.S.C. §504(b) to present proof of the infringer's gross revenue.

Mr. Connelly points out that Corellium sells only one product, where this single product exclusively provided iOS related services from its inception in Fall 2017 until its Release 2.0 on or around March 5, 2019. This is not disputed. However, the existence of a single product should not preclude the necessity to allocate revenues. Any revenues attributable to Release 2.0 or any further releases or products, thereafter, would not be generated solely due to the application or availability of iOS related capabilities. Therefore, attributing 100% of revenues generated from a product with multiple capabilities, would be granting Apple a benefit unrelated to its allegations, if liability is found.

---

[1] Bonner v. Dawson, 404 F3rd 290 (2005)
[2] MGE UPS Systems, Inc v. GE Consumer and Indus., Inc., 622 F.3d 361 (2010)
[3] Polar Bear Prods. V. Timex Corp., 384 F3d 700 (9th Cir.2004)

I have not been provided with any information related to the testimony or opinions of Dr. Jason Nieh. Therefore, I cannot provide an opinion on the analysis relating to the "database of firmware" or the amount of entries for Apple and Android files. Mr. Connelly's suggests that any allocation of revenues would result in a *de minimus* result and provides an estimate of [redacted] for gross revenues related to iOS. No supporting information was provided for this estimate, and the suggestion that any revenues is *de minimus* is speculative and unfounded.

The StatCounter Global Stats data presented within my prior report is intended to provide an example of research related to worldwide operating system market share, whereas similar research could have been performed to meet the Plaintiff's burden in identifying gross revenue reasonably related to and attributable to the infringement. The research is not intended to be final, absolute or form any conclusions, but to demonstrate Mr. Connelly's failure to consider any attempts to complete his analysis. His references to marketing materials and pricing adjustments does not meet this standard.

Mr. Connelly notes the criticisms presented in my initial rebuttal report. However, he simply states that they are unsupported and repeats his prior statements without any further explanation or support. To date, Mr. Connelly has not explained how he "adopted" the highest revenue amount alternative other than identifying where the information was obtained.

Additionally, Connelly once again just identifies where the information was obtained when addressing criticisms relating to his projections. He explains that [redacted] he simple acceptance of an interrogatory response does not meet the criteria or standard of an independent analysis or scientific method to calculating projected gross revenues. Mr. Connelly's general scrutiny and desire to substantiate each expense and amount must be noted here, where this does not meet the same level of review and scrutiny as he applies to costs and expenses.

By definition, a financial <u>projection</u> is based on "hypothetical assumptions" which leads to the understanding that the acceptance of Corellium's interrogatory response should require some form of analysis or adjustment prior to acceptance, or to sanitize those projections to more realistically reflect the company's future financial results.

As a supplement, and possible response to the criticisms related to subjectively doubling revenues, he offers a more conservative alternative which is to maintain the 2019 levels as a projection for 2020. Despite his efforts, this too is speculative although it may be conservative. However, since no analysis has been performed, it is impossible to determine whether this amount should be higher or lower. There is no fundamental analysis or scientific method utilized to calculate the offered alternative.

Items identified in Section III.A of Mr. Connelly's report have been addressed with Corellium, where such items have been mistakenly excluded. To fix inconsistencies or errors, Corellium has produced updated Profit and Loss documentation to properly include these items.

# SECTION 4: STATUTORY DAMAGES

In Mr. Connelly's initial report dated March 3, 2020, he includes statutory damages under Section 504(c)(1), Section 504 (c)(2) and Section 1201 (c)(3)(A). Calculated statutory damages are based on Apple's 22 copyright registrations and Corellium's product sales ("per product") for Section 504 damages and Section 1201 damages, respectively. Apple's 22 copyright registrations were obtained from Apple's First Amended Complaint. Corellium's product sales were obtained from Corellium's response to Apple's interrogatory No. 9.

Mr. Connelly now suggests that the "per product" methodology "would result in a significant understatement of appropriate damages (Connelly Report at page 17)." Mr. Connelly then suggests using a "per component" methodology using an estimated number of virtual devices that can be created by each Corellium product sold. He uses some of the opinions provided by Dr. Nieh, of which I have not been able to review. Connelly's summary of Dr. Nieh's opinions lead to the assumption that every time a virtual device is made, it circumvents technical protection measures, and a virtual device is made on the Corellium product every time the customer virtually turns on the virtual device. Therefore, the methodology now shifts to "per virtual device."

A summary of Mr. Connelly's Section 1201 calculations is provided below by category.



**Summary of Section 1201 Statutory Damage Calculations**

| Description |
|---|
| On-Premises Sales |
| Cloud Sales |
| Trial Accounts & Demos |
| **Total** |

After Mr. Connelly assumes that Corellium "intentionally" chooses not to track virtual devices, he explains how his estimates are prepared utilizing the number of cores required to create an infringing device. I cannot opine on the technicalities related to creating a virtual device. However, there seems to be numerous assumptions made to estimate the amount of these virtual devices without support. Mr. Connelly notes some assumptions including the following.

- Where information is not available, 60 cores are used.
- Older sales contain 60 cores due to the implication of the price.
- Only late-model simulations were created using 6 cores per device.

In addition to the noted assumptions specifically made by Mr. Connelly, many additional assumptions might include the assumption that no additional hardware purchases were made by customers, no additional software purchases were made by customers and no technical or physical changes were made by customers. Furthermore, it assumes that customers made at least one virtual device since their purchase. In consultation with Mr. Chris Wade (Corellium CTO), he shared his knowledge about one customer which has purchased the Corellium product but has not used it.

Finally, Mr. Connelly makes another unsubstantiated assumption that each customer replaces these devices on average once per month. This gives Mr. Connelly the opportunity to apply a multiple of 12 to achieve a much higher result.

The assumptions are the same for on-premises and cloud sales. However, Mr. Connelly uses the testimony of Stephen Dyer  I have not been provided with the deposition transcripts of Mr. Stephen Dyer.

Mr Connelly continues to build on his assumptions and resulting damage estimates by adding "prospective" customers who "were likely" to be granted trial accounts or product demonstrations, further adding to his speculative and overblown analysis.

Based on the number of noted assumptions alone, this analysis is highly speculative. Furthermore, it appears as though Mr. Connelly has completed an analysis of statutory damages based on his own interpretation of Section 1203, whereas case law provided to me specifically references "each device sold"[4] and "per download basis."[5] In other cases, reference is made specific to the defendant's conduct "regardless of the number of end-recipients."[6] This is critical, as Mr. Connelly is speculating on the number of virtual devices that the "end-recipient" is creating.

*The remainder of this page is left blank intentionally.*

[4] Coxcom, Inc. v. Chafee and Sony Computer Entm't Am., Inc. v. Filipiak
[5] Stockwire Research Group, Inc. v. Lebed
[6] McClatchey v. Associated Press, 2007 WL 1630261, at *6 (W.D.Pa.2007)

## SECTION 5: COSTS AND EXPENSES

In my second and third expert reports, I provide my analysis relating to the reconciliation of costs and expenses between the interrogatory responses and the general ledger detail provided by and for Corellium. In this Fourth report I update my costs and expenses with the new updated Profit and Loss statement as provided by Corellium. I have now separated my expenses into two. Those costs and expenses from Inception through March 5, 2019, the date of the CORSEC 2.0 release to support Android and the second from March 6, 2019 through April 20, 2020.

The schedule below details all the COGS and Expenses as elaborated on the P&L detail from inception, October 6, 2017 – March 5, 2019.

**Corellium Cost of Goods Detail and Expenses (October 6, 2017 through March 5, 2019)**



Mr. Connelly addresses items related to travel, including, but not limited to expenses paid for trips to meet with Apple, Inc representatives in California and Caesars Palace expenses related to a private event held during a professional conference in Las Vegas, Nevada. Corellium's business model was to build the business with an expectation to eventually sell the entity. As such, any promotional or travel expenses relating to promoting the business or meetings to discuss potential sale opportunities should be considered normal operating expenses.

The schedule below details all the COGS and Expenses as elaborated on the P&L detail from March 6, 2019 – April 20, 2020.

**Corellium Cost of Goods Detail and Expenses (March 6, 2017 through April 20, 2020)**



An amount of

*The remainder of this page is left blank intentionally.*

After speaking to counsel, we have been advised that the [redacted] and thus should be removed as non-operating expenses. The same applies to [redacted] after the litigation began. After an analysis of the expenditures from [redacted] have been identified and removed. [redacted] that was determined to be litigation related by the client, but my office has not received the actual invoice as of the date of this report. Lastly, I have also removed the Mediator FedArb. As such, I have removed and updated those four categories from the below schedule to show what the operating expenses of Corellium are for the period of March 6,2019 through April 20, 2020. The client has an outside CPA who does their tax work, for 2019 that has not been completed as of the date of this report. Expenditures, as described among the Office Setup" account have been left as an expense with the assumption that the CPA would have elected a Section 179 deduction and/or bonus depreciation for those fixed assets in their entirety. I have not reclassified those expenditures as a result.

| Corellium Cost of Goods Detail and Expenses (March 6, 2017 through April 20, 2020) Net of Non-Operating expenses |
|---|
| [redacted] |

## SECTION 6: GROSS REVENUE ALLOCATION

The below schedule shows the Net profit for the period from inception through March 5, 2019, the date when Corellium released CORSEC 2.0 with Android support. As such, if liability is found, net profit may be 100% allocated to iOS for that period.

Mr. Connelly has presented an amount of gross revenues equal to [redacted], which would be related to iOS for the period from March 6, 2019 through April 20, 2020. Additionally, he states that “as much as [redacted] of Corellium’s revenues after March 2019 have concerned Android features and/or services” would be a doubtful assumption. He bases these assumptions on marketing brochures and product pricing changes. He also presents an indication that installed entries of Apple and Android files may represent a limited support for Android. None of these assumptions have been supported with facts, research or other support.

In my second expert report dated April 13, 2020, an example of research relating to the mobile operating system market share worldwide is presented. The Statcounter research shows a 21.74% of iOS [100% - 21.74% = **78.26%** Android and other platforms] worldwide market share for the period from October 2017 through February 2020. While this research is not intended to conclusively establish a nexus with the Corellium product revenues and alleged infringement, it reaches a similar, if not higher standard of support than those assumptions or allocations presented by Mr. Connelly.

For the period from March 6, 2019 through April 20, 2020 an allocation has not been determined by Plaintiff’s expert and as such we have not made any allocation to IOS.

**Corellium Revenue and Expense Allocation Schedule**





| **Category** | **Inception through March 5, 2019** | **March 6, 2019 through April 20, 2020** | | |
|---|---|---|---|---|
| | *IOS Related* | *IOS Related* | *Android & Other* | **100% Un-Allocated Profits** |
| **Percentage Allocation** | [redacted] | ***Allocation Needed*** | ***Allocation Needed*** | |
| Revenues | [redacted] | ***A reasonable allocation to the infringement must be made.*** | | [redacted] |
| Operating Costs & Expenses | [redacted] | | | [redacted] |
| **Net Profit** | [redacted] | | | [redacted] |

Currently, I am not providing an opinion as to the allocation of gross revenues attributable to the infringement as I do not have the substantive support to do so. If the court decides on a percentage allocation which would be reasonably related to the infringement, then the allocation would be applied to the revenues and operating expenses for “IOS related” with the balance of revenues and expenses to “Android and other” on a percentage basis.

*The remainder of this page is left blank intentionally.*

## SECTION 7: CONCLUSION

As of the date of this report, Mr. Connelly has still failed to make a realistic attempt to allocate gross revenues to the Corellium product. The recent attempt included within his Supplemental report dated April 20, 2020 is without basis or support. Based on the lack of support provided to make such an allocation, I have presented total Net Profit of [REDACTED] for the period from inception through March 5, 2019 and an [REDACTED] for the period from March 6, 2019 through April 20, 2020 related to Corellium and the CORSEC product, which should be further separated by those profits only attributable to the infringement, if liability is found.

Mr. Connelly failed to address my rebuttal in his report. He simply repeats his explanations and identifies the source for which his figures or direction was obtained. This applies to his selection of revenues and his methods to project 2020.

Mr. Connelly fails to properly address and/or present reasonable conclusions within the scope of his assignment as identified within his report, specifically to perform an investigation and analysis "to assess and quantify damages Apple has suffered as a result of Corellium's infringing activities" including his recent statutory damages calculation under 17 U.S.C. § 1203 (c)(3)(A) where he appears to try and maximize potential damages with embellished assumptions, speculation and statute interpretation. As such, these calculations should not be considered upon awarding damages, if liability is found.

- Attached as **Exhibit 1** is my Curriculum Vitae.
- Attached as **Exhibit 2** is the list of the cases I have been deposed in or gave testimony in the last 4 years.
- Attached as **Exhibit 3** is the list of documents that have been produced between April 22, 2020 and April 27, 2020.
- My hourly compensation rate is $550 per hour.

The ultimate conclusions reported herein are that of Stewart L. Appelrouth, CPA/ABV, CFE, CRFAC, CVA. All judgments made in the development of the conclusions are that of Mr. Appelrouth. Thomas E. Garland, CPA, CFE, CVA, CRFAC Litigation and Valuation Services Senior Manager & Nicholas Landera, CPA, CFE, CVA, AMLCA Litigation and Valuation Services Manager, provided significant professional assistance to Mr. Appelrouth in the performance of this report. All of Mr. Garland's and Mr. Landera's efforts were under Mr. Appelrouth's direction and supervision.

I reserve the right to update this report if any additional information becomes available.

Respectfully Submitted,

*Stewart L. Appelrouth*

Stewart L. Appelrouth CPA, ABV, CVA, CrFAC, CFE