# EXHIBIT D

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2
                     CASE NO. 9:19-CV-81160-RS
 3

 4

 5   APPLE INC.,
 6             Plaintiff,
 7   vs.
 8   CORELLIUM, LLC,
 9             Defendant.
10   _____/
11
                                   999 Ponce de Leon Blvd.
12                                 Coral Gables, Florida
                                   April 22, 2020
13                                 10:08 a.m. - 4:51 p.m.
14

15

16       VIDEOTAPED DEPOSITION OF STEWART APPELROUTH
17                     VIA TELECONFERENCE
18

19

20      Taken on behalf of the Plaintiff before
21   Alice J. Teslicko, RMR, Notary Public in and for the
22   State of Florida at Large, pursuant to a Notice of
23   Taking Deposition in the above cause.
24

25

                                                    Page 1
```

```
 1   APPEARANCES:
 2
         LATHAM & WATKINS, LLP        (Via Teleconference)
 3       BY:  JESSICA STEBBINS BINA, ESQ.
         10250 Constellation Blvd., Suite 1100
 4       Los Angeles, CA 90067
         (424) 653-5500
 5       jessica.stebbinsbina@lw.com
         Attorneys for the Plaintiff
 6
 7       COLE, SCOTT & KISSANE, P.A.  (Via Teleconference)
         BY:  JUSTIN B. LEVINE, ESQ.
 8       222 Lakeview Avenue, Suite 120
         West Palm Beach, FL 33401
 9       (561) 383-9200
         justin.levine@csklegal.com
10       Attorneys for the Defendant
11
         Also Present via Teleconference:
12
                    David Connelly
13                  Chris McMillan - Videographer
14                         - - -
15
16
17
18
19
20
21
22
23
24
25
                                                Page 2
```

```
 1                        I N D E X
 2    WITNESS                                            PAGE
 3
 4    STEWART APPELROUTH
 5    Direct Examination by Ms. Stebbins Bina               8
 6    Cross Examination by Mr. Levine                     209
 7    Redirect Examination by Ms. Stebbins Bina           212
 8    Certificate of Oath                                 214
 9    Errata Sheet                                        218
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                 Just bear with me one moment.  It takes a
 2     second to mark the exhibit and move it into the
 3     folder.
 4          A    You'll get to see how good the technology
 5     works for me, huh?
 6          Q    Yeah, I just have to move it into your
 7     "Marked Exhibits" folder and it should be there now if
 8     you refresh.  You should be able to see it.
 9                 (Whereupon a document/item was marked for
10            identification as Plaintiff's Exhibit 1.)
11          A    Perfect, I'm there.
12          Q    So if you could turn with me to Exhibit 2 --
13     well, first off, is this your report?
14          A    So every time you do something -- I just got
15     a message that says "remove comments, tasks," blah,
16     blah, "preview" -- I guess I just click on this thing.
17                 I got another one.  "All the preview options
18     are now available in toolbox" -- got it, okay.  Am I
19     going to get that every time?
20          Q    Yeah, it's probably just because it's your
21     first time using it.  It should just pop up the
22     exhibit without any other paraphernalia.
23                 If you could turn to Exhibit 2, which is
24     near the end of the PDF, this is a list of testimony
25     given in the past four years.
```

```
 1        A    Okay.
 2        Q    And is this a complete and accurate list of
 3   cases where you've testified in the past four years?
 4        A    Yes.
 5        Q    I'm going to go through these and then I'll
 6   ask you some questions about other cases.
 7        A    Okay.
 8        Q    Were any of these copyright cases or cases
 9   involving the Digital Millennium Copyright Act?
10        A    No.
11        Q    Prior to this one, have you ever given
12   testimony in a case -- in a copyright or DMCA case?
13        A    Yes.
14        Q    Which one was that or ones?
15        A    Now you're going to test my memory.
16             Years ago I had one.  I don't remember the
17   name of the case.  It was in Texas.  I don't remember.
18   There was a -- it was called "Permanent Makeup."
19   There was another one.  I think it was called "Pal's
20   Group."
21             I think those are the three.  I had a
22   feeling you were going to ask about them.  I tried to
23   figure out what I've done.  Once I'm done with a case,
24   I'm done with a case.  I don't remember that stuff,
25   so --
```

Page 12

```
 1        Q    Understood.
 2        A    I'll remember this one, though.
 3        Q    I'm going to test your memory a little bit
 4   nonetheless.
 5             So you said there was a Texas case.  Was
 6   that a copyright case or a Digital Millennium
 7   Copyright Act case or both?
 8        A    I just don't remember.  I just don't
 9   remember.
10        Q    Do you remember generally what the case was
11   about?
12        A    I remember it dealt with some formula, some
13   like medication, I think.  That's what I remember.
14   It's a while ago.
15             I'm sure you may have the case.  You
16   probably pulled it up.  So if you could help me out,
17   that would be great.
18        Q    I actually don't have it.  You know, you
19   testified in a lot of cases, so -- do you remember
20   which side you testified for?
21        A    I don't remember, because -- if I do
22   remember, there were all kinds of, I guess
23   countercomplaints or all that stuff.  So I guess
24   sometimes you're the plaintiff and sometimes you're
25   the defense.
```

```
 1                I just don't remember.  It's a long time
 2   ago.
 3        Q    And do you remember the name of the party
 4   that retained you?
 5        A    It was -- there were multiple lawyers in
 6   that one.  There was, I remember -- I don't remember
 7   the Texas counsel's name, but the Miami counsel's name
 8   was -- I think it was Becker Poliakoff, Steve Davis.
 9        Q    Becker what?
10        A    Becker Poliakoff was I think the Miami
11   counsel and I don't remember why it was out in Texas.
12   It was just in Texas.
13        Q    Any chance it was a patent case?
14        A    I just don't remember.
15        Q    Anything else you remember, as you sit here
16   today, about that case?
17        A    No.
18        Q    And did you testify at trial in that case or
19   only in deposition?
20        A    Trial.
21        Q    And do you remember what the outcome of the
22   case was?
23        A    Again, if I remember right, I think they
24   found for the other side, with reduced damages, if I'm
25   remembering the right case.  That's what I think
```

Page 14

```
 1   happened.
 2        Q    And I know it was a long time ago.  Can you
 3   give me a ballpark how long ago?
 4        A    No, no.
 5        Q    More than five years?
 6        A    Yeah, it was more than five years.  That's
 7   for sure.
 8        Q    More than ten?
 9        A    I just don't -- I just don't remember.
10        Q    All right.  No worries.
11             The next one you said was Pal's Group?
12        A    Yeah, and I don't -- I don't remember what
13   that was.  They settled.  I didn't take a deposition.
14   They settled that case.
15        Q    And do you remember anything about that
16   case, like what the claims were about?
17        A    No.
18        Q    And do you remember who retained you in that
19   case?
20        A    No.
21        Q    I'm going to quickly go through this list.
22             First one is Prendes v. Prendes.  Did you
23   testify in court in that case?
24        A    I don't remember.  That sounds like a
25   divorce case to me.
```

Page 15

```
 1        A    No.
 2        Q    More than five?
 3        A    Yes.
 4        Q    More than 20?
 5        A    In the past five years?
 6        Q    Four years.
 7        A    Yes.
 8        Q    Are there any where you're giving an opinion
 9   on the value of intellectual property, other than this
10   one?
11        A    No, not that comes to mind, no.
12        Q    Okay.  I think I did find the Permanent
13   Makeup case.  Was that Permanent Makeup by Mary vs.
14   Eclipse Esthetics, LLC?
15        A    I don't know.  Could be.
16        Q    I have that as a makeup trademark
17   infringement case.
18        A    Okay.
19        Q    Do you know whether it was a trademark or a
20   copyright case, as we sit here today?
21        A    Like I told you, I just don't remember.
22        Q    Do you have any idea whether you gave a
23   deposition in that case or whether it was just a
24   report?
25        A    I just don't remember.
```

Page 31

1           Audit, you know, there's sampling stuff.
2   You're not verifying everything.  In a fraud matter
3   you're delving closer in more detailed stuff, because
4   it's fraud.  So it's an open-ended question.
5        Q    So your answer, if I understand it
6   correctly, is that it's always important to be
7   accurate and not to willfully misstate anything, but
8   be -- the thoroughness of a review will depend on the
9   scope of the engagement and the purpose of the
10  engagement, correct?
11       A    That's correct.
12            MR. LEVINE:  Object to the form.
13       Q    Have you ever had -- can you give me an
14  estimate of the percentage of your clients that are
15  technology companies?
16            Your personal clients, not the firm's
17  clients.
18       A    Technology is broad-based, so two percent?
19  I'm just guessing.  I'm just guessing.
20       Q    Okay.  Other than this case, have you ever
21  calculated a case, given an opinion on the value of
22  things submitted to a security guarantee program?
23       A    No.
24       Q    What is your understanding of Corellium's
25  business at a high level?

Page 47

1  A  They have a product that they sell.  It's a
2  technology product that they sell, hardware and
3  software, that is over several platforms.  They're to
4  do various items technologically.
5  Q  When you say "over several platforms," what
6  do you mean?
7  A  Well, you have an Android platform, iOS
8  platform, Linux platform.  There's other platforms, so
9  the product that they sell is over several platforms.
10  Q  And do you know whether it's one product
11  that supports multiple platforms or whether they have
12  several customizable products?
13      MR. LEVINE:  Object to the form.
14  A  My understanding is it's one product.
15  Q  And do you know what that product does
16  vis-a-vis Apple's products?
17  A  Are we done with the CV?
18  Q  For the moment.  I might come back to it,
19  but I'm done with it for the moment.
20  A  I'm sorry, ask the question again.
21  Q  I said, do you know what they do with
22  respect to Apple's products?
23      MR. LEVINE:  Object to the form.
24  A  I don't understand what you mean, "what they
25  do."

Page 48

```
 1   report, which is "Summary of Mr. Connelly's Expert
 2   Opinions and Analysis," Section 3.  I should say the
 3   next section of your report.
 4           In this section you summarize Mr. Connelly's
 5   analysis?
 6       A   That's correct.
 7       Q   You first note that Mr. Connelly has used
 8   gross revenues from Corellium's responses to
 9   Interrogatory Number 10, right?
10       A   Yes.
11       Q   And you mention that Mr. Connelly has
12   selected this source for revenues without any
13   explanation as to why the amended responses to
14   Interrogatory 10 are more accurate than the other
15   sources, correct?
16       A   Correct.
17       Q   In your view, what are the most accurate
18   figures to base the calculation of Corellium's gross
19   revenues on?
20       A   Well, I didn't do any analysis relative to
21   the revenues.  So since I didn't do that, I can't
22   elicit an opinion relating to that.
23       Q   So you don't have an opinion as to what
24   Mr. Connelly should have relied upon?
25       A   No.  You mind if I jump around a little to
```

Page 136

```
 1   BY MS. STEBBINS BINA:
 2        Q    And the reason -- sorry, it's the lag -- the
 3   reason that you gave for the revenues being inaccurate
 4   is that Mr. Connelly had not allocated any portion of
 5   the revenues that are attributable to things other
 6   than iOS, right?
 7        A    That is correct.
 8        Q    So as I understand it, what you're saying on
 9   this page of your report is that Mr. Connelly should
10   have done either research relating to the iOS platform
11   usage or demand worldwide or records from Apple Inc.
12   relating to usage or demand worldwide of the Apple
13   operating system, correct?
14            MR. LEVINE:  Object to the form, the
15        characterization.
16        A    Yes, and there could have been other ways he
17   could have done it too, but these are two of the ways.
18        Q    And so I'm asking how would Mr. Connelly
19   doing either one or two help him estimate or allocate
20   Corellium's revenues apportionable to their Corellium
21   Apple product?
22        A    Well, for example, as I'm sure you'll get
23   into afterwards, we were looking at universally how
24   many -- what percentage of people use iOS versus other
25   platforms.  That might lead you down to make that
```

Page 174

```
1      A     I'm not a lawyer.  I'm not a lawyer.
2      Q     And the reason I ask is because you state in
3   this report that it's plaintiff's burden to prove the
4   profits here, right?
5      A     I think revenues.
6      Q     The revenues.  So I'm just going to read
7   Section 504 and I'm going to specifically read Section
8   504(b), the second half of it, the second sentence:
9            "In establishing the infringer's profits,
10  the copyright owner is required to present proof only
11  of the infringer's gross revenue, and the infringer is
12  required to prove his or her deductible expenses and
13  the elements of profit attributable to factors other
14  than the copyrighted work."
15           So that second clause, "and the elements of
16  profit attributable to factors other than the
17  copyrighted work," that's the apportionment concept
18  we've been discussing, right?
19     A     Well, that is an apportionment, yes.
20     Q     Well, that's what you're complaining that
21  Mr. Connelly didn't do, right?
22           You're complaining -- "complaining" is the
23  wrong word.  You're critiquing that he didn't attempt
24  to apportion the gross revenues into a part that's
25  attributable to the infringing work and not
```

Page 180

```
 1   attributable to the infringing work, right?
 2        A    Right, because he should have done
 3   something, correct.
 4        Q    But under Section 504, that's actually
 5   Corellium's burden to do that?
 6        A    No.
 7        Q    No?
 8        A    No.
 9        Q    And what's your basis for believing that
10   it's not Corellium's burden to apportion the profits?
11        A    So in reading Mr. Connelly's report -- as I
12   said, I perused it and when I saw that section,
13   because I knew I was correcting this, I called counsel
14   for the case law on the matters and within the case
15   law, which you're going to find -- or what I found
16   from reading in the case law is it is incumbent upon
17   in this case Apple or the expert for Apple to have
18   done some form of analysis relative to splitting it
19   out; splitting it out or an allocation.
20        Q    So you reviewed case law?
21        A    Yes, I did.  I read it.
22        Q    And you clearly relied on that case law for
23   your opinion, right?
24        A    Well, no.  I knew what I was doing before,
25   but I asked -- once Mr. Connelly brought up the
```

Page 181

1   matter, I asked him for the case law relating to it.
2       Q   So you've just testified that you relied on
3   case law provided to you by counsel in determining who
4   has the burden of proof in this case.
5       A   No, that's not what I said.  That's not what
6   I said.  That's not what I said, okay.  That's exactly
7   not what I said.
8           I said once I got Mr. Connelly's report,
9   which I got Monday, okay, I called the lawyers up,
10  because I knew -- I knew what I was doing, but now I'm
11  going to need the proof.
12          It's similar to, I guess, if I'm driving my
13  car and I run a red light, all right.  I know it's
14  against the law, but now if I have to go into the
15  court, I got to go pull out the statutes and cases and
16  all that stuff.
17          But I knew, I knew --
18      Q   So --
19      A   -- I knew what I was supposed to do and I
20  knew what Mr. Connelly was supposed to do.
21      Q   So your supplemental report will include all
22  this case law that you relied upon?
23      A   The supplemental will have that in it,
24  probably.
25          MR. LEVINE:  Okay object.  That's fine.

Page 182

```
 1              You say "every version."  I know what you're
 2   after.  I'm just not going to opine on "every version"
 3   of something going out.
 4        Q    Isn't it the case that the only allocation
 5   Mr. Connelly actually has to do is separating out the
 6   revenue attributable to the product at issue in the
 7   case and revenue that's attributable to some other
 8   income stream?
 9              MR. LEVINE:  Object to the form, calls for a
10        legal conclusion.  He has to --
11              MS. STEBBINS BINA:  Well, he's testified on
12        the law.
13              MR. LEVINE:  He's testified to what he read.
14              THE WITNESS:  Right, exactly.
15              MS. STEBBINS BINA:  Right, so based on his
16        understanding of what he read.
17        A    I'm confused.  Could you ask me that
18   question again?
19        Q    Sure.  Isn't it the case that what
20   Mr. Connelly actually had to do is what he did, which
21   is identify revenues attributable to the CORSEC
22   product, not attributable to some other product line
23   offered by Corellium?
24              MR. LEVINE:  Object to the form of the
25        question.
```

```
 1      A    The answer is no, he did not.
 2      Q    So it's your opinion that under the law,
 3 which counsel has provided to you, he needs to do some
 4 kind of suballocation that attempts to determine how
 5 much of Corellium's one product -- that effectively
 6 splits a single product into multiple component parts?
 7           MR. LEVINE:  Object to the form of the
 8      question, the characterization of the way it's
 9      phrased, as well as calling for a legal
10      conclusion.
11      A    So the wording is not correct.  He's not
12 doing a suballocation.  He's doing an allocation.
13      Q    But Corellium offers one CORSEC product,
14 right?
15      A    Correct.
16      Q    And that's available in the on-premises
17 version and a Cloud version?
18      A    That's my understanding.
19      Q    And that product supports iOS --
20      A    And others.
21      Q    -- to use Corellium's words.
22           But all versions -- and I understand he used
23 the technical version, but what I'm asking is to your
24 understanding of the product, is it your understanding
25 that there's any CORSEC product that does not support
```

```
 1    iOS?
 2              MR. LEVINE:  Object to the form of the
 3         question.
 4         A    The answer is, my understanding is no, the
 5    same way as it's not a product that doesn't support
 6    Android.
 7              You know, you're going back and forth.
 8    You've used the same position if you were representing
 9    Android.  Now you say, well, iOS.  So that's the
10    reason for the allocation.
11         Q    Right.  I'd appreciate if you'd just answer
12    the question asked --
13         A    You see, you hit it right on the head, the
14    reason.
15         Q    Which is -- yeah.
16              Going back -- and again, I don't want to
17    have a prolonged argument on the law with you.
18         A    I'm not a lawyer.
19         Q    Right.  So it's your understanding that
20    Section 504 requires the plaintiff to take a single
21    product, one product, and try to break that into
22    component revenues that are and are not attributable
23    to the copyrighted work?
24         A    That's correct.  They have to --
25              MR. LEVINE:  Object to the form, calls for a
```

Page 194