# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**Case No. 9:19-cv-81160-RS**

APPLE INC.,

                               Plaintiff,

        v.

CORELLIUM, LLC,

                           Defendant.

# PLAINTIFF APPLE INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

**TABLE OF CONTENTS**

**Page**

I.      Introduction ................................................................................................1

II.     Relevant Facts ...........................................................................................2

        A.      The Security Measures Protecting Apple's Copyrighted Computer
                Programs ......................................................................................2

        B.      The Corellium Apple Product ....................................................4

        C.      Corellium's Marketing and Sale of the Corellium Apple Product .............6

        D.      Interactions Between Corellium and Apple ................................6

III.    Legal Standard ..........................................................................................7

        A.      The DMCA's Anti-Trafficking Provisions ................................7

        B.      Summary Judgment ....................................................................9

IV.     The Undisputed Facts Demonstrate That Corellium Violates 17 U.S.C.
        §§ 1201(a)(2) and 1201(b)(1) ...................................................................9

        A.      Corellium Traffics a Tool to Circumvent iOS's Access and Rights
                Controls.........................................................................................9

        B.      Corellium Lacks Any Defenses to Its Unlawful Trafficking....................13

V.      Conclusion ...............................................................................................20

REQUEST FOR HEARING ...................................................................................21

## **TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*321 Studios v. MGM Studios, Inc.*,
  307 F. Supp. 2d 1085 (N.D. Cal. 2004) ...................................................................8, 14, 15, 16

*American Broad. Cos., Inc. v. Aereo, Inc.*,
  573 U.S. 431 (2014)......................................................................................................................13

*Apple Inc. v. Psystar Corp.*,
  673 F. Supp. 2d 931 (N.D. Cal. 2009) ............................................................................ *passim*

*Cont'l Cas. Co. v. Wendt*,
  205 F.3d 1258 (11th Cir. 2000) .................................................................................................9

*Disney Enters., Inc. v. Hotfile Corp.*,
  No. 11-20427-CIV, 2013 WL 6336286 (S.D. Fla. Sept. 20, 2013)........................................19

*Disney Enters. Inc. v. VidAngel, Inc.*,
  371 F. Supp. 3d 708 (C.D. Cal. 2019) ......................................................................................15

*JCW Software, LLC, v. Embroidme.com, Inc.*,
  No. 10-80472-CIV, 2012 WL 13015051 (S.D. Fla. May 29, 2012)................................11, 15

*LEGO A/S v. Best-Lock Constr. Toys, Inc.*,
  404 F. Supp. 3d 583 (D. Conn. 2019)......................................................................................19

*MDY Indus. LLC v. Blizzard Entm't, Inc.*,
  629 F.3d 928 (9th Cir. 2010) .............................................................................................8, 9, 15

*Office of Thrift Supervision v. Paul*,
  985 F. Supp. 1465 (S.D. Fla. 1997) ....................................................................................13, 14

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
  572 U.S. 663 (2014)......................................................................................................................19

*Rayo v. BP Expl. & Prod. Inc.*,
  No. 19-21263-CIV, 2019 WL 7376775 (S.D. Fla. Nov. 15, 2019) .........................................9

*Realnetworks, Inc. v. DVD Copy Control Ass'n*,
  641 F. Supp. 2d 913 (N.D. Cal. 2009) ......................................................................................15

*Sony Computer Entm't Am., Inc. v. Divineo, Inc.*,
  457 F. Supp. 2d 957 (N.D. Cal. 2006) .................................................................................14, 16

*State Farm Mut. Auto Ins. Co. v. Med. Serv. Ctr. of Florida, Inc.*,
    103 F. Supp. 3d 1343 (S.D. Fla. 2015) ...................................................................13

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001) ...................................................................................16

*Universal City Studios, Inc. v. Reimerdes*,
    111 F. Supp. 2d 294 (S.D.N.Y. 2000) ....................................................................16

*Vergara Hermosilla v. The Coca-Cola Co.*,
    717 F. Supp. 2d 1297 (S.D. Fla. 2010) ...................................................................20

## STATUTES

17 U.S.C.
    § 101..........................................................................................................................13
    § 1201 ................................................................................................................ *passim*
    § 1201(a) ....................................................................................................................8
    § 1201(a)(1)(E) ........................................................................................................15
    § 1201(a)(2) .................................................................................................1, 8, 9, 15
    § 1201(a)(2)(A) ........................................................................................................14
    § 1201(a)(3)(A) ..........................................................................................................8
    § 1201(a)(3)(B) ..........................................................................................................8
    § 1201(b) ....................................................................................................................8
    § 1201(b)(1) ........................................................................................................ *passim*
    § 1201(b)(2)(A) ..........................................................................................................8
    § 1201(b)(2)(B) ..........................................................................................................8
    § 1201(f) ..................................................................................................................16
    § 1201(f)(1)–(3) ......................................................................................................16
    § 1201(g) ..................................................................................................................16
    § 1201(g)(3)(C) ........................................................................................................18
    § 1201(g)(4) ..............................................................................................................17
    § 1201(g)(4)(B) ........................................................................................................18
    § 1201(j) .......................................................................................................16, 18, 19
    § 1201(j)(4) ..............................................................................................................18

## RULES

Fed. R. Civ. P. 56(a) .........................................................................................................9

## REGULATIONS

83 Fed. Reg. 54010, 54011 (Oct. 26, 2018).....................................................................15

## OTHER AUTHORITIES

A Statement from Amanda Gorton, CEO of Corellium, regarding Apple DMCA
    filing, https://corellium.com/statement-dmca/ (Dec. 29, 2019)..................................2

S. Rep. No. 105-190.............................................................................................................17

S. Rep. No. 105-190 (1998)...............................................................................................7

S. Rep. No. 105-190 (1998).............................................................................................16

Plaintiff Apple Inc. respectfully moves for summary judgment as described below.

## I.    INTRODUCTION

Corellium's business is selling virtual iPhones.  Not devices that resemble iPhones in certain respects, but real, working digital replicas of iPhones, created using real, working copies of Apple's proprietary operating system, iOS.  The "Corellium Apple Product," as it has come to be called, is an operational version of Apple's copyrighted computer software, hosted on servers that Corellium controls, owns, and sells.  Corellium's position is that Apple and the courts alike are powerless to stop this conduct.

Corellium is wrong.  Its product infringes Apple's rights several times over.  Through this motion, Apple seeks summary judgment on just one of its claims—specifically that Corellium's commercialization of its perfect digital facsimile of the iPhone violates the "anti-trafficking" provisions of the Digital Millennium Copyright Act.  In the course of discovery, Corellium has frankly admitted to all the elements of liability.  The statute at issue—17 U.S.C. § 1201(a)(2) and (b)(1)—prohibits selling digital "lock picks," *i.e.*, tools that are designed to get around security measures that protect copyrighted works like iOS from unauthorized copying and use.  As it is impossible to sell virtual iPhones without circumventing countless security measures that Apple has implemented, there is no question that the Corellium Apple Product does precisely what the law forbids.  In the words of Corellium's own expert witness, Alexander Stamos:

> Corellium is marketed as allowing you to emulate iOS.  In doing so, they have to circumvent what you might call security protections since Apple has designed their systems to make it very . . . difficult to run iOS except on authorized Apple hardware.

SOF ¶ 64.  And Corellium itself has conceded the same essential facts in its written discovery responses:



SOF ¶ 40.  Simply put, that is what sections 1201(a)(2) and (b)(1) prohibit.

Apple believes that these statutory provisions should be invoked only sparingly, in certain unusual cases.  The only other time it has done so in litigation was against a company called Psystar, which was similarly in the business of selling access to live, working versions of an Apple operating system to its own customers.  *See Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 931, 941 (N.D. Cal. 2009) (granting summary judgment on claims under sections 1201(a)(2) and (b)(1)).

This case is just like that one: it concerns the commercialization of a product that consists in large measure of the unlicensed copying and use of Apple's software, which is flatly illegal.

Corellium has responded to the operative Complaint in part by mounting a public relations campaign that mischaracterizes Apple's claims, implying that through this action Apple seeks to outlaw security research, or impose liability on the development and sale of security exploits, or control all security research on its platform such that the fruits of that work can be provided or sold only to Apple.[1]  None of that is true.  This case and this motion are about what Corellium is doing. It is not about the lawfulness of security exploits as a general matter, but Corellium's conduct in defeating security mechanisms specifically for the purpose of making a profit by enabling unauthorized copying and use of iOS.  With respect to security exploits *vel non*, as repugnant as Apple finds it when they are sold and deployed against iPhone users (not least because the targets are often journalists and activists), they are not tools that enable unauthorized copying and use of iOS in the way that Corellium does.  Accordingly, Apple has not brought a claim, nor sought relief, on a theory that would prevent security researchers from doing their valuable work, just as they have for many years before Corellium started infringing Apple's rights.

But with respect to what Corellium concedes it has done, Apple respectfully asks the court to grant summary judgment on the claims addressed herein, consistent with the common-sense conclusion that the law does not permit one company to sell the use of another company's copyrighted software to the public.

## II.     RELEVANT FACTS

### A.     The Security Measures Protecting Apple's Copyrighted Computer Programs

The Apple iPhone is one of the most ubiquitous and iconic mobile devices available to the public today.  One of the key features of the iPhone is its revolutionary but intuitive operating system known as iOS.  Statement of Facts ("SOF") ¶¶ 1–2.  An operating system is the software that manages a computer's most basic functions, including the user's interaction with the device. SOF ¶¶ 2, 4.  Apple distributes iOS to its customers both on Apple devices (*e.g.*, the iPhone) and over the internet (in what are called "IPSW" files).  SOF ¶¶ 7–8.  Since iOS's release more than a decade ago, Apple has continuously improved it by releasing new versions of the software.  SOF ¶ 5.

---

[1] *See*, *e.g.*, A Statement from Amanda Gorton, CEO of Corellium, regarding Apple DMCA filing, https://corellium.com/statement-dmca/ (Dec. 29, 2019).

Apple has gone to great lengths to protect iOS in various ways.  First, every version of iOS is protected by a registered copyright.  SOF ¶ 6.  Copyrights in computer programs cover two types of computer code—source code and object code[2]—as well as the dynamic visual display that the software generates, which is known as the graphical user interface (or "GUI").  The iOS GUI includes the look and layout of an iPhone's home screen, featuring various application icons, along with the interaction afforded by the elements working together in response to the user's commands.

Second, Apple famously designs and sells its mobile devices and iOS as an integrated hardware/software system.  SOF ¶¶ 10, 12.  To protect the integrity of that system, Apple has implemented a series of technological control measures ("TCMs") that, in the ordinary course of operation, ensure that iOS runs only on Apple devices, and that Apple devices run only authentic, unmodified versions of iOS.  SOF ¶ 13.  The TCMs also prevent people from copying and displaying iOS.  SOF ¶ 11.  As Corellium's expert testified, "Apple has designed [its] systems to make it . . . very difficult to run iOS except on authorized Apple hardware."  SOF ¶ 64.

The TCMs that "make it very difficult to" run iOS on non-authorized hardware include, among others:

- The "**authorization server validation check**": In the ordinary course of operation, this TCM prevents installation of iOS on a non-Apple device.  SOF ¶ 14.  When iOS is installed, the device communicates with an Apple "authorization server," sending information to Apple about both the device itself and the version of iOS that the user seeks to install.  *Id.*  The authorization server examines this information, and if it checks out, returns a cryptographic signature, authorizing installation on the device.  SOF ¶ 15.  iOS will not install unless it has a valid signature from Apple's authorization server.  SOF ¶ 16.

- The "**secure boot chain**": When iOS is "booted up" on an Apple device, it goes through a series of steps that confirm that the device is authorized to run the exact version of the software that is about to load.  SOF ¶ 17.  That is, one where the iPhone is a legitimate iPhone and the software is a legitimate copy of iOS that is currently offered.  *Id.*  These steps are known as "signature checks."  *Id.*  In the ordinary course of operation, this TCM prevents iOS from loading unless each step in the secure boot chain verifies that the Apple code running on the iPhone is authentic and authorized for installation on the particular iPhone at issue.  *Id.*

- The "**Buddy program**": The Buddy program is another TCM that, in the ordinary course, restricts access to and protects rights in iOS by requiring a user to agree to Apple's software license agreement before using iOS on the user's Apple device.  SOF

---

[2] Source code is code that a human writes when creating the computer program.  Before the program can operate, the source code must be converted into object code, which is code that a computer processor can understand.

¶ 19.  That software license agreement, in turn, provides that iOS may be used only on a single Apple-branded device, and prohibits distributing or making iOS available over a network.  SOF ¶ 20.  If the user does not accept the software license agreement, the Buddy program prevents the user from further accessing iOS.  SOF ¶ 19.

- The "**trust cache**": The trust cache is a list of programs that Apple has approved for execution on iOS.  SOF ¶ 21.  In the ordinary course, the trust cache prevents users from installing and operating unapproved applications in iOS.  *Id.*; PEX 1 ¶ 22.

This is just a representative sample.  Apple has also adopted a series of other complex measures that perform similar roles—ensuring that only Apple hardware is used to run iOS, and preventing iOS from being displayed and copied.  *See, e.g.*, SOF ¶¶ 22–23 (describing Apple's implementation of "pointer authentication codes" ("PAC") in newer versions of iOS).

### B.    The Corellium Apple Product

Corellium sells a product—the Corellium Apple Product—consisting of "virtual Apple iPhones" that include the same visual display as real Apple iPhones, and run the same exact iOS operating system as a real iPhone.[3]  Corellium is able to incorporate iOS into its product only by evading the technological control measures that protect Apple's copyrights in iOS.  At its core, the Corellium Apple Product is a series of highly sophisticated digital "lock picks" that allow the Corellium Apple Product to "unlock" the "locks" that protect Apple's copyrighted works—that is, every version of iOS—and copy, display, and profit from them.  The result is a product that serves up a range of virtual Apple devices, running a range of iOS versions.  SOF ¶¶ 33–38.[4]  This includes the newest iPhone models running the newest iOS versions.  SOF ¶ 36.

It is undisputed that, to create these virtual Apple devices, the Corellium Apple Product must circumvent Apple's security protections.  SOF ¶ 64, *see id.* ¶¶ 40–49.  As Corellium's own experts and engineers have explained, Corellium "████████████████████████ ████████████████████████████████████████" on machines that Corellium itself controls, owns, and sells.  SOF ¶ 40; PEX 51 at 286:1–21.  The Corellium Apple

---

[3] Corellium also offers the ability to create other virtual Apple devices, such as a virtual iPad and a virtual iPod touch.  For simplicity, this motion refers primarily to virtual iPhones—but all of its arguments apply equally to the other virtual devices created by the Corellium Apple Product.

[4] Corellium provides both a cloud-based product available to anyone with an internet connection and a Corellium account, and an "on-premises" product, which is a computer server containing the Corellium Apple Product that is installed and maintained at a customer's location.  SOF ¶ 34.  With limited exceptions, the on-premises product operates in substantially the same way and has substantially the same functionality as the cloud product.  SOF ¶ 35.

Product evades the TCMs that ordinarily prohibit installation of iOS on non-Apple hardware in at least the following ways:



As Apple's TCMs have become more advanced, Corellium has updated its product to pick those new digital locks as well. *See* SOF ¶ 22 (describing Apple's addition of PAC in certain versions of iOS 12); SOF ¶ 48 (████████████████████████████████████████████████ ██████████████).

After the Corellium Apple Product has broken through or otherwise evaded Apple's TCMs, the product is able to create virtual Apple devices—complete with functioning versions of iOS— that run on non-Apple hardware. To create those devices, the Corellium Apple Product makes copies of iOS and its components that cannot be made when Apple's TCMs are in place. SOF ¶¶ 40–50; PEX 3, Nieh Decl. ¶ 27. The Corellium Apple Product makes at least ████ ████ ████████████████████████████████ on Corellium's server hardware—a copy the product could not have made if Apple's TCMs were in effect. SOF ¶ 55. The Corellium Apple Product ██████████████████████████████████████████████████████████████ ██████████████████████████████. SOF ¶ 55. Again, that copy could not have been made if Apple's TCMs were still in effect. SOF ¶ 40. The end result of this copying is the creation of a virtual Apple iPhone, running iOS, displaying iOS's graphical user interface, and generally functioning the way iOS functions on a physical iPhone. SOF ¶¶ 36–38.

The Corellium Apple Product also contains a "clone" feature that specifically enables even more unauthorized copying of iOS. That feature makes a new copy of the entire contents of a Corellium-created virtual iPhone, including the copyrighted iOS code in each virtual iPhone. SOF ¶ 56. Such cloning cannot be done when iOS is installed on a physical iPhone. SOF ¶ 11.

**C.** **Corellium's Marketing and Sale of the Corellium Apple Product**

Corellium makes no secret that its product is specifically designed to provide users with a digital Apple iPhone running Apple's copyrighted operating system without the expense or limitations that come with buying and using a real iPhone with an authorized version of iOS. Corellium proudly boasts that its product runs "real iOS."  SOF ¶ 63.  And it emphasizes all of the reasons why the Corellium Apple Product—with "real iOS" that Corellium has *never* paid for—is better than and should be purchased instead of actual Apple devices.  Its marketing materials highlight:



- ███████████████████████████████████████████████████████

- ███████████████████████████

- ████████████████████████████████████████████████████.[5]

- ███████████████████████████████████████████████

- ██████████████████████████████████████████████

All of this is impossible when Apple's TCMs are in place.  ████████████████████ ████ that the Corellium Apple Product would not exist if it did not bypass and impair Apple's TCMs.  SOF ¶¶ 41–44, 46–49.  Indeed, Corellium specifically markets the Corellium Apple Product as a████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████

Corellium has made ███████ selling access to an Apple product whose use Apple has not authorized or licensed.  SOF ¶ 69.  Corellium has made that money without knowledge of, or the ability to track or control, what its customers do with its version of Apple's product.  SOF ¶ 60.

**D.** **Interactions Between Corellium and Apple**

In early 2018, when Corellium was in its infancy, Corellium co-founder and Chief

---

[5] All emphases added unless otherwise stated.

Technology Officer, Chris Wade, began pitching the start-up as an acquisition target to Apple. SOF ¶ 28–29.  During Mr. Wade's acquisition talks with Apple, he met with various Apple employees over the course of several months to discuss what he and other Corellium employees could offer to Apple.  SOF ¶ 28; PEX 55 at 9.  He demonstrated the Corellium Apple Product to Apple, but did not get into the details of how the product's underlying technology worked or the specifics of how it circumvented Apple's TCMs.  SOF ¶ 28.  Ultimately, the talks ceased with no agreement being reached.  SOF ¶ 31.

Corellium claims that, during these acquisition talks, Apple encouraged Corellium's development of its technology.  ECF No. 64 at 10.  It is undisputed, however, that no one at Apple ever told Mr. Wade that he could publicly commercialize a product consisting of a working virtual iPhone.  SOF ¶¶ 26, 76, 78.  To the contrary, the record shows that Corellium and its principals understood that Corellium did not have a license or permission from Apple to take to market the tool they had created, which was essentially just a way to sell access to Apple's own software:

- Corellium and Mr. Wade entered multiple agreements with Apple, all stating Apple's silence or conduct does not amount to a license.  SOF ¶¶ 27, 29–30.

- In a previous venture, Mr. Wade developed iOS emulation technology (similar to Corellium Apple Product) that he sold to Citrix.  SOF ¶ 73.  During discussions including Mr. Wade, Citrix CEO Mark Templeton, and Apple, Mr. Templeton emailed Apple expressing the understanding that Citrix could not commercialize Wade's technology "because Apple does not license iOS."  SOF ¶ 74.  Mr. Wade was then a ██████████████████████████████████ was copied on that email.  Mr. Templeton, no longer with Citrix, ████████████████████ SOF ¶¶ 74–75.

- In late June 2018, Corellium CEO Amanda Gorton ████████████████████████ ██████████████████████████████████████████████ ████████████████████████████ SOF ¶ 76.

- In 2018 and 2019, Corellium's ████████████████████████████ ██████████████████████████████████████████████ ████████████████████ SOF ¶ 77.

Corellium nevertheless chose to forge ahead.

## III.   LEGAL STANDARD

### A.   The DMCA's Anti-Trafficking Provisions

Congress enacted the DMCA to bolster the rights of copyright owners in the digital age by creating special protections for technical measures that insulate copyrighted works from piracy. S. Rep. No. 105-190, at 10–11 (1998).  To do so, Congress made it illegal to traffic in "digital lock

picks" that evade technological protections that prevent unauthorized copying, displaying, and use of copyrighted works.  A company that sells such tools violates federal law and is liable for damages and subject to injunctive relief.

The DMCA contains two "anti-trafficking" provisions.  Together, they prohibit selling tools to circumvent measures that protect access to, or rights in, copyrighted material, if the tools: (a) are "primarily designed or produced for the purpose of circumventing a technological measure that effectively" controls access to or protects rights in a copyrighted work; (b) have "only limited commercially significant purpose or use other than to circumvent a technological measure that effectively" controls access to or protects rights in a copyrighted work; or (c) are "marketed . . . for use in circumventing a technological measure that effectively" controls access to or protects rights in a copyrighted work.  17 U.S.C. § 1201(a)(2), (b)(1).

To "effectively control access to" a copyrighted work, a TCM must, "in the ordinary course of its operation, require[] the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work."  *Id.* § 1201(a)(3)(B).  Such controls are known as "access controls."  One example of an access control is a requirement that a customer enter a password before entering a video streaming website.  To "effectively protect" a copyright owner's rights in a copyrighted work, a TCM must "in the ordinary course of its operation, prevent[], restrict[], or otherwise limit[] the exercise of a right of a copyright owner under this title."  *Id.* § 1201(b)(2)(B).  Such protections are known as "rights controls."  One example of a rights control is a measure that prevents a person from making an extra copy of a downloaded movie.  Circumvention, in turn, includes "avoiding, bypassing, removing, deactivating, or otherwise impairing a technological measure."  *Id.* § 1201(b)(2)(A); *see also id.* § 1201(a)(3)(A).

Often, TCMs both control access to and protect the rights in a copyrighted work.  For example, if a copyrighted work cannot be accessed *or* copied without the use of a password, then the requirement for a password is *both* an access control and a rights control.  *See, e.g.*, *321 Studios v. MGM Studios, Inc.*, 307 F. Supp. 2d 1085, 1094–95 (N.D. Cal. 2004).  As a result, "if a copyright owner puts in place an effective measure that both (1) controls access and (2) protects against copyright infringement, a defendant who traffics in a device that circumvents that measure could be liable under both § 1201(a) and (b)."  *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 946 (9th Cir. 2010).

### B.    Summary Judgment

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party bears the initial burden of establishing the nonexistence of a triable fact issue." *Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258, 1261 (11th Cir. 2000) (citation omitted). "Once this initial burden is met, 'the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf.'" *Rayo v. BP Expl. & Prod. Inc.*, No. 19-21263-CIV, 2019 WL 7376775, at *1 (S.D. Fla. Nov. 15, 2019) (citation omitted).

## IV.   THE UNDISPUTED FACTS DEMONSTRATE THAT CORELLIUM VIOLATES 17 U.S.C. §§ 1201(A)(2) AND 1201(B)(1)

The undisputed material facts show Corellium violates the DMCA by trafficking in a tool that circumvents both the access and rights controls that protect iOS. Corellium has no valid defense to its acts of trafficking. Summary judgment should thus be granted in Apple's favor.

### A.    Corellium Traffics a Tool to Circumvent iOS's Access and Rights Controls

Corellium violates both section 1201(a)(2) (addressing tools that circumvent access controls) and section 1201(b)(1) (addressing tools that circumvent rights controls). The elements necessary to demonstrate liability under these provisions are largely the same. A party violates one or both provisions by: (1) manufacturing, importing, offering to the public, providing, or otherwise trafficking in (2) a technology, product, service, device, component or part thereof (3) that is primarily designed or produced for, has only limited commercially significant use other than for, or is marketed for use in (4) circumventing a technological measure that (5) either effectively protects access to a copyrighted work (under section 1201(a)(2)), or effectively protects an exclusive right in a copyrighted work or a portion thereof (under section 1201(b)(1)). *See MDY Indus.*, 629 F.3d at 953.

Each of these elements is established by the undisputed facts. To begin with, Corellium admits it manufactures, offers to the public, and provides the Corellium Apple Product to customers, SOF ¶¶ 33–34, 52–54, 66–68, 77, and the Corellium Apple Product is plainly a technology, product, or service. SOF ¶¶ 25, 35–39. That leaves only the question of whether the Corellium Apple Product meets any one of six separate and independent grounds for liability:

1. Is the Corellium Apple Product, or a part thereof, *primarily designed or produced* for circumventing *access controls* on iOS?

9

2. Does the Corellium Apple Product, or a part thereof, *have only limited commercially significant use* other than to circumvent *access controls* on iOS?

3. Is the Corellium Apple Product, or a part thereof, *marketed for use* in circumventing *access controls* on iOS?

4. Is the Corellium Apple Product, or a part thereof, *primarily designed or produced* for circumventing *rights controls* on iOS?

5. Does the Corellium Apple Product, or a part thereof, *have only limited commercially significant use* other than to circumvent *rights controls* on iOS?

6. Is the Corellium Apple Product, or a part thereof, *marketed for use in* circumventing *rights controls* on iOS?

Answering any *one* of these questions in the affirmative is sufficient to conclude that Corellium has violated the DMCA. The undisputed evidence in this case, however, shows that the answer to *all six* questions is "Yes."

> **1.    Corellium's Product Is Primarily Designed or Produced, Has Only Limited Commercially Significant Purpose Other Than, and Is Marketed For Use in Circumventing Apple's Access Controls**

The Corellium Apple Product (a) is designed and produced, (b) has only limited commercially significant use other than, *and* (c) is marketed for use in circumventing Apple's access controls in iOS. Apple's TCMs effectively control access to Apple's copyrighted works by preventing the interactive iOS software and all its components, including the dynamic display of its integrated GUI elements, from being accessed on anything other than an Apple device. Apple's software license agreements reinforce these restrictions, limiting use of iOS to "*a single Apple-branded iOS Device*" and prohibiting "*distribut[ing] or mak[ing] the iOS Software available over a network*." SOF ¶ 20; PEX 28–33, iOS SLAs ¶ 2(a)–(b).

This is not the first time that Apple has had to turn to the courts to stop such blatant unauthorized commercialization of an Apple operating system. In *Psystar Corp.*, the operating system at issue was Mac OS X, which runs Mac computers. 673 F. Supp. 2d at 933–34. As with iOS, "Apple's license agreements restricted the use of Mac OS X to Apple computers, and specifically prohibited customers from installing the operating system on non-Apple computers." *Id.* at 933. As with iOS, Apple reinforced this restriction by using "lock-and-key technological measures to prevent Mac OS X from operating on non-Apple computers." *Id.* at 934. In the face of those measures, Psystar developed a product that ran Mac OS X on non-Apple computers by engaging in acts of circumvention that are virtually identical to those that the Corellium Apple Product undertakes. For instance, Psystar "modified" Mac OS X by "replac[ing] the Mac OS X

10

'bootloader,'" without which "Mac OS X would not operate." *Id.* at 934. On those facts, the court granted summary judgment to Apple on its DMCA claim, concluding that Psystar violated both section 1201(a)(2) and section 1201(b)(1). *Id.* at 940–42.

The material undisputed facts here are the same. They demonstrate that the Corellium Apple Product (or at least a part thereof) is primarily designed and produced, and has only limited commercially significant use other than, to circumvent Apple's TCMs. Just as in *Psystar*, the Corellium Apple Product gives Corellium's users the ability to access iOS on non-Apple hardware, without authorization from Apple. SOF ¶¶ 41–48. And just as in *Psystar*, the Corellium Apple Product could not provide that access without evading Apple's TCMs—TCMs that effectively control access to iOS because they prevent "ordinary customer[s]" from doing what the Corellium Apple Product allows. *See JCW Software, LLC, v. Embroidme.com, Inc.*, No. 10-80472-CIV, 2012 WL 13015051, at *10 (S.D. Fla. May 29, 2012). As explained above, in their ordinary course of operation, Apple's TCMs prevent a user from operating iOS on any hardware other than an authorized Apple iPhone. SOF ¶¶ 13–23. If an ordinary iPhone user downloads an IPSW file, he cannot run the programs contained in that file except on his own legitimate Apple device. SOF ¶¶ 9, 13, 23. He cannot load the iOS home page, he cannot launch the search function, he cannot browse the internet, and he cannot use any default applications. *See* SOF ¶¶ 9, 13–23.

A user of the Corellium Apple Product, however, can do all of those things, and more. SOF ¶¶ 33–38. She can view and interact with iOS on a virtual iPhone via a web browser much like a user of a legitimate physical iPhone would interact with iOS. SOF ¶ 38. She can access parts of iOS that would ordinarily be inaccessible to a user of a legitimate physical iPhone. SOF ¶ 65. And she can run unapproved code in the iOS environment, and thereby install programs that would not otherwise be able to access iOS. SOF ¶¶ 21, 46.

The reason any of this is possible is because the Corellium Apple Product circumvents the TCMs that prevent users from accessing iOS on anything other than Apple hardware. Indeed, every virtual iOS device the Corellium Apple Product creates necessarily evades Apple's TCMs when it is created and when it is accessed. SOF ¶¶ 40–49. As Corellium's expert Dr. James Olivier explained, ███████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████"—that is, run in the Corellium Apple Product. SOF ¶ 40; PEX 51 at 286:1–21. These include, as noted above, ███████
████████████████████████████████████████████████████████████████████



SOF ¶¶ 40–48.

These facts are undisputed.  As Corellium's expert Alexander Stamos testified, for the Corellium Apple Product to work, "*they have to circumvent what you might call security protections since* Apple has designed their systems *to make it very . . . difficult to run iOS except on authorized Apple hardware*."  SOF ¶ 64.  If Corellium did not circumvent Apple's TCMs to access iOS, there could be no Corellium Apple Product.  That is dispositive of Corellium's liability under section 1201(a)(2).

Moreover, as detailed above, the Corellium Apple Product is explicitly marketed as a means of running "real iOS" in a virtual environment, without the restrictions imposed by Apple's TCMs.  *See supra* Section II.C.  Corellium not only markets its ability to create an unlimited number of virtual iPhones; it also stresses the fact that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."  SOF ¶ 59; *see also* SOF ¶ 58 ("▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮").  Any one of these pieces of marketing would be sufficient on its own to demonstrate a violation of section 1201(a)(2).  Together, they constitute overwhelming and uncontroverted evidence of Corellium's liability.

### 2. Corellium's Product Is Primarily Designed or Produced, Has Only Limited Commercially Significant Purpose Other Than, and Is Marketed For Use in Circumventing Apple's Rights Controls

The Corellium Apple Product circumvents Apple's *rights* controls just as it circumvents Apple's *access* controls.  Again, an ordinary iPhone user cannot "clone" his device or otherwise copy a working version of iOS that is installed on his iPhone.  And he cannot publicly display iOS on non-Apple hardware.  SOF ¶¶ 11, 14–16.  The Corellium Apple Product user, in contrast, can do all of those things.  SOF ¶¶ 37, 39, 50–56.

While the ordinary iPhone user can load iOS only on his own physical iPhone, the Corellium user can ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  SOF ¶ 56.  The Corellium user can create and save her virtual device to a Corellium server, creating multiple copies.  SOF ¶ 56.  Then, she can "clone" any virtual iOS device, instantly creating an identical, virtual iOS device.  *Id.*  And a Corellium user can publicly display iOS by ▮▮▮▮▮▮▮



██████████████████████████████████.[6] SOF ¶ 61.  Each of these acts violates Apple's exclusive rights in its copyrighted works—███████████████████████████████████

██████████████████████████ ██████████████████████████████

███████████████████████████████████████████████████████.  SOF ¶¶ 40, 50, 55.  *See Psystar*, 673 F. Supp. 2d at 941 ("Psystar's circumvention technology has not only provided access but also resulted in copies in RAM.  Although Apple's technological measure may have been primarily aimed at controlling access, it also effectively protected its right to copy, at least for the copy made in RAM.").  It is thus undisputed and indisputable that the Corellium Apple Product (or at least a part thereof) is primarily designed and produced to, and has limited commercially significant purpose other than to, circumvent the TCMs that protect Apple's exclusive rights in its copyrighted works.[7]

In addition, and once again, the Corellium Apple Product is marketed for its ability to do just that.  █████████████████████████████████████████████████████ ███████████████████ Apple's copyrighted works to unlimited users, *e.g.*, █████████ ██████████████████████; "██████████████████████████████."  SOF ¶¶ 56, 59–61; PEX 62.  The undisputed evidence demonstrates that the Corellium Apple Product—which at its core is just Apple's product served up by Corellium—is marketed specifically for circumvention in violation of section 1201(b)(1).

## B.    Corellium Lacks Any Defenses to Its Unlawful Trafficking

Corellium does not dispute the foregoing facts regarding what its product does and how it operates.  Instead, Corellium relies on various legal arguments regarding the interpretation of the DMCA, as well as certain affirmative defenses.  Corellium's legal arguments lack merit.  And Corellium bears the burden of proof on its affirmative defenses.  *Office of Thrift Supervision v. Paul*, 985 F. Supp. 1465, 1470 (S.D. Fla. 1997).  Apple need only show that there is an "absence of evidence" supporting the defenses.  *State Farm Mut. Auto Ins. Co. v. Med. Serv. Ctr. of Florida, Inc.*, 103 F. Supp. 3d 1343, 1349 (S.D. Fla. 2015).  Corellium, in contrast, must show both that its

---

[6] Display need not be simultaneous to qualify as "public."  *See* 17 U.S.C. § 101 (work can be displayed at the "same time or different times"); *American Broad. Cos., Inc. v. Aereo, Inc.*, 573 U.S. 431, 449 (2014) ("'[T]he public' need not be situated together, spatially or temporally.").

[7] Indeed, every single virtual iOS device requires the unlicensed reproduction of iOS, SOF ¶ 55, and every single virtual iOS device includes a derivative work—a copy of iOS modified to bypass TCMs and run on Corellium's platform.  SOF ¶¶ 40, 50–56.

affirmative defenses are "applicable" and that there is evidence to support those defenses.  *Paul*, 985 F. Supp. at 1470.  Corellium cannot do so.

1.    **Corellium Has No Defense Under the DMCA's Plain Language**

a.    **"Primarily Designed" Speaks to Technological Features, Not Higher Purpose**

Corellium argues that it does not violate the DMCA's anti-trafficking provisions because its product is "primarily designed" for use in activities like app testing and research, and not for circumvention.  ECF No. 64 at 3–6.  This is like saying that a tool to get around TCMs preventing unauthorized use of a DVD is "primarily designed" to let people enjoy movies, rather than pick digital locks.  The law is not so credulous: if a product cannot work without circumventing TCMs, then under the DMCA, it is primarily designed, in whole or relevant part, to circumvent TCMs. *See, e.g.*, *Sony Computer Entm't Am., Inc. v. Divineo, Inc.*, 457 F. Supp. 2d 957, 965–66 (N.D. Cal. 2006) (granting summary adjudication and default judgment on section 1201 claim notwithstanding conclusory assertion, made in the face of contrary evidence, that product was not "primarily designed" for circumvention).  To the extent that even part of the Corellium Apple Product was specifically designed to circumvent Apple's TCMs—and it is beyond dispute that at least part of it was—the DMCA condemns at least *that portion*.  *See 321 Studios*, 307 F. Supp. 2d at 1098 (holding that, because it was "undisputed that a part of [defendant's] software is solely for the purpose of circumventing" the operative TCMs, "this portion of the software, therefore violates 17 U.S.C. § 1201(a)(2)(A)").  Whether the Corellium Apple Product *also* allows people who ultimately circumvent those TCMs to do other things is beside the point.

b.    **Apple's TCMs Are "Effective" Access and Rights Controls**

Corellium has also suggested that Apple's access and rights controls are not "effective" because Apple makes its IPSWs available online and does not encrypt the entirety of their contents. That argument fails.  It is undisputed that iOS ordinarily cannot be installed or accessed on non-Apple hardware without the Corellium Apple Product.  SOF ¶¶ 13–23.  That alone is sufficient to demonstrate as a matter of law that Apple's TCMs effectively control access to and protect Apple's rights in iOS.  *See Psystar*, 673 F. Supp. 2d at 940–42 (holding that TCM preventing installation of Mac OS X on non-Apple computers was an effective protection measure).

The fact that a person can download an IPSW file and browse through its contents on a computer is irrelevant.  It is undisputed that an "ordinary consumer" cannot actually *use* iOS— that is, interact with its dynamically displayed elements through the graphical user interface—

unless the IPSW either is installed on an authorized Apple device *or Apple's TCMs are circumvented.*  SOF ¶ 9.  Again, that alone shows that the TCMs effectively control access to the copyrighted work, iOS.  *JCW Software*, 2012 WL 13015051, at * 10 (explaining that a TCM is "effective" if it prevents intrusion by an "ordinary consumer"); *see also MDY Indus.*, 629 F.3d at 954–55 (holding that DMCA liability can attach to circumvention tools that give unauthorized access to the running version of software).  Courts have recognized such TCMs are "effective" under section 1201 even if the underlying computer code is visible to the user in the ordinary course without circumventing TCMs.  *See 321 Studios*, 307 F. Supp. 2d at 1097 (rejecting argument that TCM was not "effective" because DVD's encrypted data could be copied because copying the encrypted data "is not particularly useful, as any copy made without circumventing [the TCM] could not be accessed or viewed") (internal quotations omitted); *see also JCW Software*, 2012 WL 13015051, at *10 (theoretical ability to access work in a cumbersome way unlikely to be discovered by ordinary consumers did not render controls ineffective).

### 2.   Corellium Has No Defense Under the DMCA Regulations

Corellium invokes two regulations that the Librarian of Congress has adopted under the DMCA, 37 C.F.R. § 201.40(b)(6) and 37 C.F.R. § 201.40(b)(11).  ECF No. 64 at 27.  But these regulations are irrelevant as a matter of law.  They only create exceptions to a *different* provision of the DMCA: section 1201(a)(1), which makes it unlawful to engage in certain *acts of circumvention*.  Apple has not brought claims under section 1201(a)(1) in this case.  Instead, the claims here are brought under the provisions that ban *trafficking in circumvention tools*, sections 1201(a)(2) and 1201(b)(1).  But as the Librarian of Congress explained, the Librarian "*has no authority* to adopt exemptions for the anti-trafficking prohibitions contained in section 1201(a)(2) or (b)."  83 Fed. Reg. 54010, 54011 (Oct. 26, 2018); *see also* 17 U.S.C. § 1201(a)(1)(E).  By their terms, the regulations Corellium has invoked do not apply here.

### 3.   Corellium Does Not Have a Fair Use Defense

Corellium similarly asserts a fair use defense.  But fair use is not a defense to claims under the DMCA—even if Corellium could otherwise establish such a defense, which it cannot.  "Neither the text of § 107 [which codifies the fair use defense to a copyright infringement claim] nor the nature of the conduct targeted by the DMCA (circumvention) supports applying the fair use defense to a DMCA violation."  *Disney Enters. Inc. v. VidAngel, Inc.*, 371 F. Supp. 3d 708, 715 (C.D. Cal. 2019); *see also Realnetworks, Inc. v. DVD Copy Control Ass'n*, 641 F. Supp. 2d 913,

942 (N.D. Cal. 2009) ("Fair use is not a defense to trafficking . . . under sections 1201(a) or (b), respectively."); *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 322 (S.D.N.Y. 2000) ("If Congress had meant the fair use defense to apply to such actions, it would have said so."). To the contrary, the DMCA "targets the circumvention of digital walls guarding copyrighted material (and trafficking in circumvention tools), but does not concern itself with the use of those materials after circumvention has occurred." *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 443 (2d Cir. 2001). Thus, as many courts have recognized, even if downstream users of the product might have a fair use defense to a copyright infringement claim, fair use simply does not apply to section 1201 claims. *See*, *e.g.*, *Sony Computer Entm't Am.*, 457 F. Supp. 2d at 965 ("[D]ownstream customers' lawful or fair use of circumvention devices does not relieve [defendant] from liability for trafficking in such devices under the DMCA."); *accord 321 Studios*, 307 F. Supp. 2d at 1097 ("[T]he downstream uses of the software by the customers of 321, whether legal or illegal, are not relevant to determining whether 321 itself is violating the statute.").

### 4.       Corellium Has No Defenses under Sections 1201(f), (g), or (j)

Corellium also relies on the statutory defenses in 17 U.S.C. § 1201(f), (g), and (j). ECF No. 64 at 26–27. While these defenses play an important role in limiting the scope of the DMCA's prohibitions, they do not apply here because what Corellium has chosen to do—sell virtual Apple devices to run iOS—is not authorized by any enumerated statutory exception.

***The "reverse engineering exemption" in section 1201(f) does not apply.*** Section 1201(f) exempts certain reverse engineering activities from liability when the "sole purpose" is to achieve "interoperability" between a TCM-protected program and an "independently created computer program." *See* 17 U.S.C. § 1201(f)(1)–(3). Importantly, for this exemption to apply, a person must have "lawfully obtained the right to use a copy" of the TCM-protected program. *Id.* § 1201(f)(1). This means the program must have been "acquired from a legitimate source, along with any necessary serial codes, passwords, or other such means as may be necessary to be able to use the program as it was designed to be used by a consumer of the product." S. Rep. No. 105-190, at 32 (1998). But here, neither Corellium nor its users have "lawfully obtained the right to use a copy" of iOS from Apple. To the contrary, Apple's software license agreements unambiguously prohibit the use of iOS except *on Apple devices*. SOF ¶¶ 9, 19–20; PEX 28–33, iOS SLAs ¶ 2(a)–(b). Downloading an IPSW file from the internet does not give you the right to use iOS on non-Apple hardware, nor does that file by itself come with the "means . . . necessary

16

to be able to use the program as it was designed to be used by a consumer of the product."  S. Rep. No. 105-190, at 32.

In addition, the Corellium Apple Product does not enable "interoperability," which the statute defines as "the ability of computer programs to exchange information, and of such programs mutually to use the information which has been exchanged."  17 U.S.C. § 1201(f)(4).  This does not in any respect describe the operation of Corellium's product.  The Corellium Apple Product is not a tool for enabling interoperability between two computer programs.  It is a circumvention tool for running one program—iOS—without permission.  Nor could the Corellium Apple Product *itself* be considered an "independently created computer program" within the meaning of section 1201(f).  If that argument were correct, *any* circumvention tool could be shielded from liability, because the trafficker could simply argue that the tool "interoperates" with the TCM-protected program in that it allows users to run that program by circumventing the TCMs that protect it.

Corellium cannot meet the other requirements for eligibility for this exemption either.  Section 1201(f)(3) permits circumvention tools to be "made available to others," but—crucially—"*solely* for the purpose of enabling interoperability of an independently created computer program with other programs."  *Id.* § 1201(f)(3).  Corellium is facially ineligible for this defense because its product does not circumvent Apple's TCMs for the *sole purpose* of obtaining interoperability; rather, Corellium disseminates the Corellium Apple Product for its customers to do "whatever they want" with it.  SOF ¶ 66.

***The "encryption research" exemption in section 1201(g) does not apply.***  Section 1201(g) provides another carefully circumscribed defense for those who develop and provide tools used for acts of "good faith encryption research" subject to certain defined parameters.  17 U.S.C. § 1201(g)(4).  As an initial matter, even if this defense did apply, it would not bar liability entirely: it creates an exception to liability *only* for section 1201(a)(2), *not* section 1201(b)(1).  17 U.S.C. § 1201(g)(4) ("Notwithstanding the provisions of *subsection (a)(2)* . . . .").  And, in any event, the section 1201(g) defense similarly fails for a number of separate and independent reasons.

The gravamen of section 1201(g) is to allow distributing tools to enable certain forms of research into "encryption technology," which the statute defines as "the scrambling and descrambling of information using mathematical formulas or algorithms."  *Id.* § 1201(g)(1)(B).  The exemption is limited by such considerations as whether "the information derived from the encryption research [is] disseminated . . . in a manner reasonably calculated to advance the state

17

of knowledge" in the field, and "whether the person [conducting the research] provides the copyright owner of the work to which the technological measure is applied with notice of the findings and documentation of the research." *Id*. § 1201(g)(3)(A), (C).  None of this has anything to do with Corellium.  For one thing, there is no evidence that the Corellium Apple Product enables research into "encryption technology."  In fact, ████████████████████████████████ ████████████████████████████████████.  SOF ¶ 49.  Moreover, under this exemption, any otherwise qualifying tool may be distributed only to "another person with whom he or she is working collaboratively," 17 U.S.C. § 1201(g)(4)(B).  Corellium cannot make such a showing because it does not even know ██████████████████████████.  SOF ¶ 68. This exemption is therefore inapplicable, like the preceding one.

> **The "security testing" exemption in section 1201(j) does not apply.**  Finally, Corellium's invocation of the "security testing" defense in 17 U.S.C. § 1201(j) is also unavailing.  Again, even if this defense did apply, it would not bar liability entirely: it creates an exception to liability *only* for section 1201(a)(2), *not* section 1201(b)(1).  17 U.S.C. § 1201(j)(4) ("Notwithstanding the provisions of *subsection (a)(2)* . . . .").

And this section, too, is wholly inapplicable.  Section 1201(j) authorizes the development and distribution of circumvention tools for the "sole purpose of performing" "security testing"— that is, "accessing a computer, computer system, or computer network, solely for the purpose of good faith testing, investigating, or correcting, a security flaw or vulnerability, with the authorization of the owner or operator of such computer, computer system, or computer network." *Id*. § 1201(j)(1), (4).  This defense thus allows the trafficking of tools that circumvent access controls (such as antivirus and firewall software) that protect a computer, computer system, or computer network, only if (a) the circumvention is for the sole purpose of testing the security of *that computer, computer system, or computer network*, and (b) the testing is *authorized* by the computer, computer system, or computer network's owner or operator.

There is no plausible claim here that circumvention of Apple's TCMs is necessary to test the security of *Corellium's* computers, systems, or networks.  Corellium's claim thus seems to be that its product enables security testing of *iOS*.  But even if true, iOS is a piece of software, not a "computer, computer system, or computer network."  And even were that not a bar here, Corellium's conduct would not be covered by this exemption.  For this defense to apply, Corellium would have to show not only that Apple authorized users of the Corellium Apple Product to do the

"security testing" that Corellium claims its product is used for but also that the product is distributed *solely* for the purpose of such testing. ████████████████████████████████ ████████████████████████████████████████████████████████████████████████ SOF ¶¶ 61, 66–67.  And Corellium certainly cannot show that Apple has *authorized* use of the Corellium Apple Product its users.  This is fatal to Corellium's claim that section 1201(j) applies.

### 5. Corellium Cannot Establish Estoppel

Corellium likewise cannot establish equitable estoppel.  Courts have assumed without deciding that equitable estoppel applies to claims brought under the DMCA.  *See Disney Enters., Inc. v. Hotfile Corp.*, No. 11-20427-CIV, 2013 WL 6336286, at *24 (S.D. Fla. Sept. 20, 2013). However, equitable estoppel is available only "when a copyright owner engages in intentionally misleading representations concerning his abstention from suit, and the alleged infringer detrimentally relies on the copyright owner's deception."  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 684 (2014).  Mere *inaction*, standing alone, does not create estoppel.  *Id.* at 683–84; *LEGO A/S v. Best-Lock Constr. Toys, Inc.*, 404 F. Supp. 3d 583, 619–20 (D. Conn. 2019).

Corellium can establish neither "intentionally misleading representations concerning [Apple's] abstention from suit" nor detrimental reliance.  The record is clear that Apple never affirmatively or expressly authorized Corellium's trafficking in products that circumvented Apple's access and rights controls.  SOF ¶¶ 26–30, 74–78.  Corellium instead relies on Apple's silence and general "encouragement" in the context of demonstrations of Corellium's product during discussions of a potential acquisition by Apple.  ECF No. 64 at 10.  But silence and an alleged delay in bringing suit alone are insufficient to support an estoppel claim in a copyright case.  *LEGO*, 404 F. Supp. 3d at 619–20; *cf. Petrella*, 572 U.S. at 682 ("[T]here is nothing untoward about waiting to see whether an infringer's exploitation undercuts the value of the copyrighted work, has no effect on the original work, or even complements it.").  Nor would reliance on silence be reasonable here, given that every written agreement between Corellium/Wade and Apple expressly states that Apple's silence or conduct does not amount to a license.  SOF ¶¶ 27, 29–30.[8]

---

[8]  The acquisition talks ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████."  SOF ¶¶ 28–29; PEX 36, Acquisition NDA ¶ 10.  Before

Moreover, the record demonstrates that Corellium was not misled into relying on any supposed promise by Apple not to sue. As late as summer 2018—after multiple meetings with Apple to discuss acquisition—Corellium CEO Amanda Gorton confessed ███████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████" SOF ¶¶ 28, 76. This was consistent with what Templeton and Wade understood from Apple in 2014, when both were at Citrix, that "Apple does not license iOS" for products like Corellium's. SOF ¶ 74. Nothing Apple said or did in the intervening years changed the Corellium principals' understanding with respect to the legality of the Corellium Apple Product.[9] Corellium cannot point to a single admissible document or record reflecting otherwise.

### 6.     Corellium Cannot Establish Any Other Defenses

Corellium's Answer lists 25 affirmative defenses. ECF No. 64 at 20–28. Those not discussed here are not asserted as to Apple's DMCA claims, are inapposite, or lack any supporting evidence. Corellium cannot establish any defenses to its flagrant violations of section 1201.

## V.     CONCLUSION

For the foregoing reasons, the Court should enter summary judgment for Apple on the issue of Corellium's liability under Apple's Fourth Cause of Action, violation of 17 U.S.C. § 1201. If the Court is inclined to deny summary judgment on any element or defense, Apple respectfully seeks partial summary judgment on the balance of the claim, to streamline and simplify trial.

---

that, Corellium entered into the Apple Enterprise Developer Agreement providing that "[a]ll licenses not expressly granted in this Agreement are reserved and no other licenses, immunity or rights, express or implied are granted by Apple, by implication, estoppel, or otherwise." SOF ¶ 27. And Mr. Wade himself entered into a similar agreement. SOF ¶ 30. These provisions alone belie any claim that Apple intended to mislead Corellium into thinking it was authorized to traffic in a digital lock pick for iOS.

[9] Corellium also asserted an implied license defense, but as a defense to Apple's infringement claims, not the DMCA claim. *See* ECF No. 64 at 23 ("Apple impliedly . . . licensed . . . Corellium's allegedly *infringing* use of Apple's works.")). Even if Corellium intended to assert an implied license defense against Apple's DMCA claim, it would fail for the same reason as Corellium's estoppel defense: the undisputed evidence is that Apple never gave Corellium permission to use iOS. In any event, such a defense would not apply to any conduct that occurred after this lawsuit, as an implied license "is revocable unless and until consideration is accepted by the licensor." *Vergara Hermosilla v. The Coca-Cola Co.*, 717 F. Supp. 2d 1297, 1303 (S.D. Fla. 2010). It is undisputed that Corellium never paid Apple to license iOS for the Corellium Apple Product.

**REQUEST FOR HEARING**

Pursuant to Local Rule 7.1(b)(2), Apple respectfully requests a hearing on its motion for partial summary judgment.  Apple believes that the opportunity to present the arguments herein during a hearing will aid the Court's resolution of the issues presented in this motion.  Apple estimates that such a hearing will require one hour of the Court's time.

Dated: May 11, 2020

Michele D. Johnson*
*michele.johnson@lw.com*
LATHAM & WATKINS LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
(714) 540-1235 / (714) 755-8290 Fax

Sarang Vijay Damle*
*sy.damle@lw.com*
Elana Nightingale Dawson*
*elana.nightingaledawson@lw.com*
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200 / (202) 637-2201 Fax

Andrew M. Gass*
*andrew.gass@lw.com*
Joseph R. Wetzel*
*joe.wetzel@lw.corm*
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600 / (415) 395-8095 Fax

Jessica Stebbins Bina*
*jessica.stebbinsbina@lw.com*
LATHAM & WATKINS LLP
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
(424) 653-5500 / (424) 653-5501 Fax

Gabriel S. Gross*
*gabe.gross@lw.com*
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
(650) 463-2628 / (650) 463-2600 Fax

*Admitted pro hac vice*

Respectfully Submitted,

*s/ Martin B. Goldberg*

Martin B. Goldberg
Florida Bar No. 0827029
*mgoldberg@lashgoldberg.com*
*rdiaz@lashgoldberg.com*
Emily L. Pincow
Florida Bar.  No. 1010370
*epincow@lashgoldberg.com*
LASH & GOLDBERG LLP
100 Southeast Second Street
Miami, FL 33131
(305) 347-4040 / (305) 347-4050 Fax

*Attorneys for Plaintiff* APPLE INC.