EXHIBIT 41

FOR THE CASE OF

# Apple vs. Corellium, et al.

TRANSCRIPT OF

# Steve Smith

March 17, 2020

## Martell Associates

PO Box 172718

Tampa, FL 33672

800-636-1136

This transcript is intended for your law firm's own use. If you wish to share this transcript with an outside law firm, log back in to your CasePlannerPro account and click the **Share** button.

For questions, call 800-636-1136
or send an email to info@martellassociates.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


APPLE INC.,

       Plaintiff,

vs.                                        No. 9:19-cv-81160-RS

CORELLIUM, LLC,

       Defendants.

_____/




DEPOSITION OF STEVE SMITH



Date:          Tuesday, March 17, 2020

Time:          10:02 a.m.

Location:      All parties via
               videoconference


Stenographically reported by:

               Nina Pavone, CSR
               License No. CSR-7802




* * * *

```
 1                         APPEARANCES

 2        For the Plaintiff:

 3                  LATHAM & WATKINS LLP
                    BY:  JESSICA STEBBINS BINA,
 4                       ATTORNEY AT LAW
                    10250 Constellation Blvd., Suite 1100
 5                  Los Angeles, CA 90067
                    424.653.5525
 6                  jessica.stebbinsbina@lw.com
                    (Via videoconference)
 7
          and
 8
                    LATHAM & WATKINS LLP
 9                  BY:  ELANA NIGHTINGALE DAWSON,
                         ATTORNEY AT LAW,
10                  555 Eleventh Street, NW, Suite 1000
                    Washington, D.C. 20004
11                  202.637.2303
                    elana.nightingaledawson@lw.com
12                  (Via videoconference)

13        For the Defendants:

14                  COLE, SCOTT & KISSANE, P.A.
                    BY:  JUSTIN LEVINE,
15                       ATTORNEY AT LAW
                    222 Lakeview Avenue, Suite 120
16                  West Palm Beach, FL  33401
                    561.383.9222
17                  justine.levine@csklegal.com
                    (Via videoconference)
18
          Also present:
19
                    Chris Wade, Amanda Gorton, Manuel Delgado,
20                  Jess Koehler  (Via videoconference)

21

22

23

24

25
```

Page 3



1            I N D E X   O F   E X A M I N A T I O N S

2                                                            PAGE

3      EXAMINATION BY MR. LEVINE                                7

4

5                  I N D E X   O F   E X H I B I T S

6

7

       NUMBER              DESCRIPTION                        PAGE

8      Exhibit 1           ████████████████                    37

9

10

11     Exhibit 2           ████████████████                    54

12

13     Exhibit 3           E-mail between Chris Wade and        57
14                         Amanda Gorton, Bates stamped
                           CORRELLIUM-001456
15     Exhibit 4           E-mail between Chris Wade and        58
16                         Steve Smith, cc Amanda Gorton,
                           Bates stamped CORRELLIUM-001454
17                         through 1455

18     Exhibit 5           (Exhibit number not used)            58

19     Exhibit 6           ████████████████                    101

20

21     Exhibit 7           ████████████████                    105

22

23

24

25

1                    INDEX OF EXHIBITS (CONTINUED)

2        NUMBER            DESCRIPTION                       PAGE

3        Exhibit 8                      106

4

5

6        Exhibit 9                                          107

7

8

9        Exhibit 10                                         109

10

11       xhibit 11                                          118

12

13       Exhibit 12                                         118

14

15       Exhibit 13                                         120

16

17

18       Exhibit 14        Event:  Accepted:  Call with     123
                           Steve Smith, Bates stamped
19                         CORRELLIUM-001457

20       Exhibit 15                                         124

21

22       Exhibit 16                                         125

23

24       Exhibit 17                                         127

25

1        INDEX OF EXHIBITS (CONTINUED)

2    NUMBER          DESCRIPTION                    PAGE

3    Exhibit 18                                     128

4

5    Exhibit 19                                     129

6

7    Exhibit 20                                     130

8    Exhibit 21                                     131

9

10   Exhibit 22                                     132

11

12   Exhibit 23                                     133

13

14   Exhibit 24                                     135

15

16   Exhibit 25                                     136



17

18

19

20        CERTIFIED PORTION OF TRANSCRIPT

21           PAGE 79, LINES 2-11

22

23

24

25

1                          -oOo-

2                       PROCEEDINGS

3

4          THE REPORTER:  Before we proceed, I will ask

5     counsel to agree on the record that under the current

6     National Emergency, due to COVID-19, that there is no

7     objection to this deposition officer administering the

8     oath to the witness via remote video conference.  Please

9     state your agreement on the record.

10         MS. BINA:  On behalf of Latham & Watkins,

11    counsel for Apple, we agree.

12         MR. LEVINE:  I'm not sure I understood every

13    word, but I think I got the gist.  No objection in

14    connection to this deposition being a video deposition

15    due to the Coronavirus?

16         THE REPORTER:  That I can swear in the witness

17    via remotely.

18         MR. LEVINE:  Yes, no objection.

19

20                       --oOo--

21                     STEVE SMITH,

22              having been first duly sworn by the

23              Certified Shorthand Reporter to tell

24              the truth, the whole truth, and nothing

25              but the truth, testified as follows:

1                          EXAMINATION

2      BY MR. LEVINE:

3          Q.  Good morning,  Mr. Smith.  My name is Justin

4      Levine from the law firm of Cole, Scott & Kissane.  I

5      represent Corellium in this matter.

6               Can you please state your full name for the

7      record?

8          A.  Steven Robert Smith.

9          Q.  Who is your current employer?

10         A.  Apple, Inc.

11         Q.  What is your business address?  What is your

12     current employer, Mr. Smith?

13         A.  Apple, Inc.

14              MR. LEVINE:  Is that okay, Nina?

15              THE REPORTER:  Yes.

16     BY MR. LEVINE:

17         Q.  What is your current business address,

18     Mr. Smith?

19         A.  1 Apple Parkway, Cupertino, California,

20     94014 -- no, 95014.

21         Q.  Have you ever had your deposition taken before,

22     Mr. Smith?

23         A.  No.

24         Q.  I'll go over some ground rules.  Today, I'm

25     going to be asking you some questions.

1          This is a little bit of an unusual situation in

2     light of the current circumstance going across the

3     country, so we're on a video deposition today doing this

4     from remote portions of the country.

5          So as the court reporter previously stated,

6     it's going to be very, very critical that you and I

7     don't speak over each other.

8          So if you can try your best to allow me to get

9     my question out first and then I'll do my best to allow

10    you to answer to the fullest extent without stepping

11    over you.

12          Is that understood?

13     A.  Yes.

14     Q.  The court reporter is recording everything that

15    we say.  So at the end of every question, I'll need an

16    actual audible response from you, an answer such as yes

17    or no.  An uh-huh or shaking or nodding of the head is

18    not something that can be accurately reflected in the

19    record.  So I'll need an audible response from you.

20          Do you understand that?

21     A.  Yes.

22     Q.  Ms. Bina had already mentioned we may need a

23    lunch break coming up.  That's okay, so long as this

24    proceeds quickly and smoothly, with straightforward

25    answers, I don't think this deposition will be very

1   long, but we'll address a lunch break if necessary as it

2   moves forward.

3         If there is any question that you don't

4   understand or don't hear accurately either it's because

5   of the way I'm speaking or because of the video

6   technology, then I would ask you to ask me to clarify or

7   rephrase the question.

8         Is that okay?

9     A.  Yes.

10    Q.  If you respond to my question and you don't ask

11  me to repeat it or rephrase, can I assume you've

12  understood the question?

13    A.  Yes.

14    Q.  If we need a break today -- excuse me, if you

15  need a break today, then we're happy to accommodate.

16  But if we happen to be in the middle of a question, then

17  I would just ask that that particular question be

18  answered and then we can go ahead and accommodate the

19  break.  Okay?

20    A.  Okay.

21    Q.  I would ask that because we're on video and you

22  are now under oath that you don't look at any cellphone

23  or access any websites or anything behind the actual

24  video browsers.

25        Is that all right?

1       A.  Yes.

2       Q.  Are you on any medications that may impair your

3  memory today?

4       A.  No.

5       Q.  Is there any reason why you can't answer my

6  questions today truthfully and honestly?

7       A.  No.

8       Q.  Tell me what you did to prepare for this

9  deposition, if anything.

10       A.  There was a meeting or conversation that I had

11  with our internal counsel, external counsel some number

12  of weeks or months ago.  And then we had a conversation

13  with external and internal counsel yesterday to prepare.

14       Q.  Did you look at any documents?

15       A.  Documents were provided to me to review, yes.

16       Q.  Did you speak to anybody about this deposition

17  other than internal or external counsel?

18       A.  I let my wife know and my co-workers as well.

19       Q.  Which co-workers were those?

20       A.  My manager, Adrian Perica, and others on my

21  team.

22       Q.  Who is exactly on your team?

23       A.  There is Matt Clare, Eleanor Jiang, Jessica

24  Lukrich, Andy Bean, Sid Das, Nittai Matchin, Aliza

25  Braunstein and Naman Gupta.

1    Q.  Did you review any documents in preparation for

2    this deposition?

3    A.  I reviewed the documents that were presented to

4    me yesterday.

5    Q.  Do you recall which documents those were?

6    A.  Some number of e-mails and a document --

7    documents that were presented or shared with Corellium

8    Virtual as well as an internal document.

9    Q.  Are you aware whether all of those documents

10   have been produced in this case?

11   A.  I am not.

12   Q.  So they were e-mails.  Approximately how many

13   e-mails?

14   A.  I don't have a recollection.  About 25.

15   Q.  And were you either an author or recipient on

16   all those e-mails?

17   A.  Yes.

18   Q.  You said there was an internal document that

19   you saw?

20   A.  Yes.

21   Q.  What do you mean by "internal document"?

22   A.  A document that was prepared in support of an

23   ███████████████████████.

24   Q.  ████████████████████.  All right, Mr. Smith.  I

25   appreciate you joining us today.  I will do my best to

1    not keep you here very long.

2              Apple -- so I guess you're working from home

3    today?

4         A.   Correct.

5         Q.   A question, is that your own decision or did

6    Apple direct you to work from home today?

7         A.   I believe it's a decision of the San Mateo

8    County Health Department.

9         Q.   Did you have any direction from Apple relative

10   to working from home today?

11        A.   I'm sure there was, but none that I recall

12   specifically.

13        Q.   Did you receive a direction from Apple to

14   simply stay at home but not do work or is Apple still

15   expecting you to do work at home?

16        A.   Apple is still expecting me to conduct work, to

17   do work, yes.

18        Q.   Is that across the board for Apple employees?

19        A.   I don't know.

20             MS. BINA:   This is Ms. Bina.   I said objection.

21   Speculation.

22   BY MR. LEVINE:

23        Q.   Mr. Smith, are you aware of any direction by

24   Apple for its employees, while they may work at home, to

25   just not do work?

```
 1        A.  Can you repeat the question?

 2        Q.  Are you aware of any instruction by Apple to

 3   its employees that while they may work from home to not

 4   do any work during the day?

 5        A.  No.

 6        Q.  And what is your role at Apple?

 7        A.  I am a senior director in our corporate

 8   development team.

 9        Q.  What is corporate development?

10        A.  Our job is primarily to execute acquisitions.

11        Q.  Does Apple acquire a lot of companies per year?

12        A.  We acquire around █████████████████████

13        Q.  And for other similar companies, you know, the

14   magnitude of Apple, call it Amazon, Google, Yahoo,

15   similar tech companies that are roughly the size, maybe

16   Microsoft, ██████████████████ is that comparatively

17   high?  Average?  Low?  What would you say?

18             MS. BINA:  Objection.  Foundation.

19             THE WITNESS:  I don't have a perspective on

20   what's appropriate or what other companies do in terms

21   of their acquisition strategies.

22   BY MR. LEVINE:

23        Q.  So you have no -- even a generic understanding

24   of what similar companies may acquire throughout a year?

25        A.  I don't have any understanding as to the number
```

Page 14

1    of companies other companies acquire.

2         Q.   Who do you report to?

3         A.   Adrian Perica.

4         Q.   Does Apple have acquisition protocols?

5         A.   Can you be more specific about what protocols

6    means?

7         Q.   So generally, there's a track of how a company

8    is discovered by presumably somebody at Apple to the

9    point where it is acquired and if I'm wrong, correct me,

10   but I would presume that there's a certain number of

11   protocols that fall in between those two time periods

12   such as due diligence, meetings, meetings with certain

13   officials in Apple, discussions about where that company

14   or its employees or technology or whatever it is it may

15   be selling or servicing might fall into Apple, maybe

16   there's a valuation done of the company.

17         Are there protocols as to the acquisition

18   process within Apple?

19         A.   ██████████████████████████████████████

20   ████████████████████████████████████

21         Q.   ████████████████████████████████

22         A.   ██████████████████████████████████████

23   ████████████████████████████████████████

24   ██████████████████████████████████████████

25   ████████████████████████████████████████████

Page 15



23          Q.  What does Apple typically look for when looking

24     to acquire a company?

25               MS. BINA:  Objection.  Vague.

```
 1              THE WITNESS:  Sorry?
 2              MS. BINA:  I just made an objection for the
 3       record.
 4       BY MR. LEVINE:
 5          Q.  You didn't do anything wrong.
 6          A.  ██████████████████████████████████████
 7       █████████████████████████████████████████████
 8       █████████████████████████████████████████████
 9       █████████████████████████████████████████████
10       █████████████████████████████
11          Q.  Are you looking for -- █████████████████
12       you're also looking for technology that would add value
13       to Apple?
14          A.  ███████████████████████████████
15          Q.  Is that an important element?
16          A.  ████████████████████████████████████████
17          Q.  What other things does Apple look for in
18       companies when it's seeking to acquire a company?
19          A.  █████████████████████████████
20       █████████████████████████████████████████████
21       ████████████████████████████████████
22       ██████████████
23          Q.  Are there -- excuse me -- strike that.
24              Is there more than one acquisition team at
25       Apple?
```





1

2

3

4

5

6        Q.   What kinds of things does the corporate

7    development team do on a daily basis?

8

9

10

11

12

13

14

15

16

17        Q.   Can you give me some insight as to how Apple

18    might investigate or evaluate the team that Apple is

19    looking to bring on board?

20

21

22

23

24        Q.   What kind of things does Apple do to

25    investigate the technology that it's looking to bring on

1    board?



16        Q.  Are there potential -- companies that are

17   potentially to be acquired, that their technology or

18   their use could be used across teams or groups within

19   Apple?

20        A.  Can you rephrase the question or repeat it?

21   Sorry, I didn't catch it.

22        Q.  Absolutely.  Are there companies that Apple is

23   looking to acquire where their technology or their team

24   could be useful among several different groups within

25   Apple?



Q.  Does Apple do a valuation of the company that it's looking to acquire?

A.  I'm guessing that's valuation, maybe, rather than --

Q.  Yes -- yes, does Apple conduct a valuation of the company that it is looking to acquire?

A.  Sorry for asking another clarification.  What would you consider a valuation?

Q.  What does a valuation mean to you?

A.  It means a method of valuing a company using metrics, financials, other variables to arrive at a value.

Q.  Okay.  So you arrive at a financial value; is that correct?

A.  I'm sorry, can you ask the question so that I

```
1     can answer correctly?  Sorry.

2           Q.  Sure.  So does Apple arrive, after the -- after

3     your explanation of ████████████████████████████████████

4     ██████████████████████████████ just -- I don't think I

5     heard the last couple of words in the sentence.

6           Does Apple arrive at a financial value of a

7     company?

8     ████████████████████████████████████████████████████████

9     ████████████████████████████████████████████████████████

10    ████████████████████████████████████████████████████████

11    ████████████████████████████████████████████████████████

12    ████████████████████████████████████████████████████████

13    ████████████████████████████████████████████████████████

14    ████████████████████████████████████████████████████████

15    ███████████████████████ isn't that correct?

16          A.  If what you're --

17          MS. BINA:  Objection.  Vague.

18    BY MR. LEVINE:

19          Q.  Do you need me to repeat the question?

20          A.  Sure, that would be helpful.  Thank you.

21    ████████████████████████████████████████████████████████

22    ████████████████████████████████████████████████████████

23    ████████████████████████████████████████████████████████

24    ████████████████████████████████████████████████████████

25    ████████████████████████████████████████████████████████
```

Page 21

1   ██████████████████████████████████

2   ██████████████████████████████████

3   ██████████████████████████████████

4        Q.   And why does Apple -- strike that.

5             What are the ████████████████████

6   ████████████████████████████████

7             MS. BINA:   Objection.   Ambiguous as to ████

8   ████████

9   BY MR. LEVINE:

10       Q.   Mr. Smith, you testified earlier that ████

11  ████████████████████████████████████████████

12  █████████████████████ is that correct?

13       A.   I believe so.

14       Q.   █████████████████████████████████████

15  ████████████████

16       A.   I think you're asking -- so the question --

17  I'll let you re-ask the question.   Sorry.   Go ahead.

18       Q.   Okay.   Let me strike the last question.

19             What are ████████████████████████████

20  ████████████

21  ██████████████████████████████████

22  ██████████████████████████████████

23  ██████████████████████████████████

24  ██████████████████████████████████

25  ██████████████████████████████████

1   

2        Q.   Is the factor of how much that company or the

3   technology would be worth to Apple, is that a factor in

4   the analysis?

5

6

7

8

9        Q.   Maybe my question was poor.  I don't think that

10   answered my question.

11        My question was:  Is the factor of how much the

12   new company or technology, how much that it's worth to

13   Apple, is that a factor when Apple arrives at its

14   valuation of that company?

15

16

17

18

19        MS. BINA:  Counsel, I'm allowing these general

20   questions without an attorneys' designation only, but if

21   you're getting into specifics of particular valuation or

22   what work Apple did, that would fall under our AEO

23   designation.

24        So I want to note that in caution, if you're

25   going to get into specifics, we need to ask the

```
 1    witnesses to leave the room.

 2              MR. LEVINE:  Absolutely.  These are general for

 3    now, but feel free to stop me if I get into anything

 4    specific and we can discuss.

 5    BY MR. LEVINE:

 6         Q.  So Mr. Smith, is a technology or company's

 7    worth, what Apple believes that technology to be worth

 8    to Apple, is that a factor that's considered in Apple's

 9    valuation?

10         A.  Can you repeat or rephrase the question?  I

11    think it was a little unclear in the beginning what the

12    question was.  Sorry.

13         Q.  In looking to acquire a technology, is what

14    Apple deems that technology to be worth, is that a

15    factor when Apple arrives at its valuation, what the

16    company is worth?

17

18

19

20

21

22

23

24

25              MS. BINA:  Objection.  Argumentative.
```

1          MR. LEVINE:  It's not.  I just asked the

2     question a couple of times.

3          MS. BINA:  Justin, I think we're getting into

4     confidential information here, so I'd ask Mr. Wade to

5     leave the room.

6          MR. LEVINE:  That's fine.

7          MS. BINA:  Apologies.

8     BY MR. LEVINE:

9       Q.  So Mr. Smith, are you familiar with the concept

10    of worth?

11      A.  Worth?

12      Q.  Worth.

13      A.  I'm not quite -- I'm not quite sure what you're

14    asking.  Am I familiar with the word "worth"?  Yes.

15      Q.  Okay.  So I'm asking a factor -- I'm asking

16    whether it is a factor, when Apple determines its

17    valuation of the company, if Apple considers what that

18    technology may be worth.

19

20

21

22

23      Q.  Does Apple acquire companies that it believes

24    to be worthless?

25

Page 25

Q. So is that analysis taken into consideration
when a valuation is placed upon a company that is to be
acquired or potentially acquired?

A. We --

MS. BINA: Objection. Vague as to valuation,
just to be consistent with the distinction he's already
given.

BY MR. LEVINE:

Q. What was your answer, Mr. Smith?

A. Can you repeat the question? Sorry.

MR. LEVINE: The court reporter can please
repeat the question back.

(The record was read by the Reporter.)

MS. BINA: Justin, I noticed that someone just
walked into the room. Given that we are proceeding

1    under a confidential designation, can you confirm

2    whether the person who walked in is authorized to hear

3    confidential testimony and tell us who it is, please?

4           MR. LEVINE:  Sure.  The person who walked in is

5    Manny Delgado.  He was at the hearing yesterday.  He is

6    the Cole, Scott & Kissane ESI director.  He's assisting

7    with some of the technology on our end for the

8    deposition today.

9           MS. BINA:  So is he an attorney at your law

10   firm?

11          MR. LEVINE:  He's a software engineer helping

12   with the exhibits that are going to be passed back and

13   forth.  He's an employee of the law firm.

14          MS. BINA:  Okay.  Thank you.

15   BY MR. LEVINE:

16

17

18

19

20

21          Q.  Can you identify for me some of the other

22   factors that Apple considers when determining a purchase

23   price?

24

25



Page 27

8          MS. BINA:  Objection.  Argumentative.

9    BY MR. LEVINE:

10          Q.  You can answer.  It was just a question.

11          A.  Can you repeat the question?

12          Q.  Sure.  I think I understood your testimony that

13    it was basically

1      Q.   Does Apple ever acquire technologies of the

2  company without acquiring the people?

3      A.   ███████████████████████████████

4      Q.   What other factors go into the determination of

5  a purchase price or a value?

6      A.   Those are --

7      Q.   So actually, if I can actually interrupt you.

8  I'm sorry.  This is my fault.

9           So right now, just to recap, we've discussed

10  the ████████████████████████████████████████████

11  ████████████████████████████████████████████

12  ███████████

13  ██████████████████████████████████████████████

14      Q.   Okay.  So then, are there any other factors

15  that Apple considers?

16  ███████████████████████████████████████████

17      Q.   Are there any other non-primary factors?

18  ████████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ████████████████████████████████████████████████

23      Q.   Were you involved in the Beats acquisition?

24      A.   I was not.

25  ██████████████████████████████████████



Page 29

5    Q.  Are you familiar at least with that

6  acquisition?

7    A.  To a certain degree, yes.

8    Q.  Was the -- in that acquisition was the team

9  that Apple -- strike that.

10     Did Apple acquire the team that was in

11  connection with the Beats acquisition?

1

2

3      Q.  How many times have you met Chris Wade in

4   person?

5      A.  I don't know off the top of my head.  I would

6   say a handful.

7      Q.  More than five?

8      A.  I don't know.

9      Q.  Let me ask:  Who was involved in the valuation

10   of Corellium?

11         MS. BINA:  Objection.  Vague as to valuation.

12         MR. LEVINE:  I'll strike the question.

13   BY MR. LEVINE:

14      Q.  So you don't know whether it was more than five

15   times you met with Mr. Wade?

16      A.  I don't recall, no.

17      Q.  Do you recall approximately how many times you

18   spoke with him?

19      A.  No.  Many more than five times.

20      Q.  More than fifteen?

21      A.  I don't know.

22      Q.  Do you know who Amanda Gorton is?

23      A.  Yes, the COO of Corellium.

24      Q.  Have you ever met Ms. Gorton?

25      A.  Yes.

1        Q.  How many times have you met Ms. Gorton?

2        A.  I believe once or twice, but I don't recall

3    exactly.

4        Q.  Do you recall what you spoke about?

5        A.  No.

6        Q.  Do you recall when that meeting was?

7        A.  I believe it was in early 2018, but I may be

8    mistaken.  January 2018, I believe, but I may be

9    mistaken.

10       Q.  Thank you.  Jonathan Vine just entered the

11   room.

12            Stan Skowronek, S-K-O-W-R-O-N-E-K, do you know

13   who he is?

14       A.  I believe he is an employee or co-founder of

15   Corellium.

16       Q.  Have you ever met with Mr. Skowronek?

17       A.  Not that I recall.

18       Q.  Have you ever spoken with him?

19       A.  Not that I know of, no, or not that I recall.

20       Q.  How about David Wang?

21       A.  No, I don't believe I've met him or spoken to

22   him.

23       Q.  Has Apple ever acquired a company during your

24   employment simply to take it off the market?

25   ███████████████████████████████████████



```
1
2
3
4
5          Q.  Did Apple ever have any interest in acquiring
6     Virtual?
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



1

2

3

4

5

6

7

8

9

10

11

12

13       Q.   Were any discussions about a purchase price

14   ever had

15       A.

16

17

18

19

20

21

22

23

24

25



```
 1

 2

 3

 4

 5          MS. BINA:  Justin, two people just entered the

 6     room.  Who were they?

 7          MR. LEVINE:  Right.  For the record, Chris Wade

 8     just walked back in and Manny just opened the door for

 9     him.

10          MS. BINA:  These are still confidential

11     discussions if we're talking about acquisition prices,

12     so Mr. Wade should not be in the room if you're going to

13     continue this line of questioning.

14          MR. LEVINE:  So Mr. Smith said ███████████████

15     ████████████████████ so that can't be confidential to

16     Mr. Wade.

17          And he also just talked about ███████████████

18     ████████████████████████████████████████████████████████

19     █████████

20     So if it's confidential for anybody, your

21     client would be the one who has the leave the room.  Am

22     I wrong?

23          MS. BINA:  Well, you are also asking him about

24     whether there were any other internal discussions, et

25     cetera.  I don't know what he's going to answer.
```

```
 1            MR. LEVINE:  No, I didn't.  I didn't ask him

 2       that at all.

 3            MS. BINA:  You're inquiring into a line of

 4       questioning that the Court has ruled is irrelevant.

 5            I'm tolerating it for now, but if you're going

 6       to continue, Mr. Wade needs to be excused.

 7            MR. LEVINE:  I think the Court, and I can

 8       double-check, but I think the Court ruled that this is a

 9       topic that's more appropriate for depositions.

10            MS. BINA:  We disagree on that and I believe

11       that, pending ruling after yesterday's hearing.  So for

12       the time being, we're going to maintain our position on

13       that.

14            THE REPORTER:  Counsel, can you repeat that?

15            MS. BINA:  I said I'm allowing some leeway to

16       hopefully avoid the need for motion practice, but I

17       don't want Mr. Wade in the room while that subject is

18       being discussed.

19       BY MR. LEVINE:

20          Q.   Why was Apple interested in ███████████████

21       ██████████

22            MS. BINA:  Again, if you're continuing this

23       line of questioning, Mr. Wade needs to be excused,

24       please.

25            MR. LEVINE:  Okay.  He'll step out.
```

1      MS. BINA:  Thank you.

2      THE WITNESS:  Should I wait until he leaves?

3      MS. BINA:  Yes.

4      MR. LEVINE:  Three seconds.

5  BY MR. LEVINE:

6      Q.  Okay.  You can answer.

7  ███████████████████████████████████████████████

8  ███████████████████████████████████████████████

9      Q.  Do you recall what the technology was?

10     A.  Based on my conversations with our engineering

11  team at the time, it was my understanding -- it was my

12  understanding that the technology enabled iOS to run on

13  servers or non-iOS devices.

14     Q.  Was the technology a significant -- strike

15  that.

16        Was the technology a consideration at all for

17  the ████████████████████████

18     A.  ██████████████████████████████████████████

19  █████████████████████████████████████████████████

20     Q.  ███████████████████████████

21     A.  █████████████████████████████████████████████

22  ██████████████████████ ████████████████████████████

23     Q.  █████████████████████████████████████████

24  ███████████████████████████

25     A.  ████████

Page 37

1      Q. ███████████████████

2      A. ██████████████████████████

3   ██████████

4      Q. ██████████████████████████

5      A. ████████████████████████████

6   ██████████████████████████

7   ██████████████████████████

8   ██████

9      Q.  Bear with me one second.  In a couple of

10  seconds, we're going to send what I'm going to mark as

11  Defense Exhibit 1.  Just bear with us.

12       MS. BINA:  Justin, I'm sure you're planning on

13  doing this, but let's read all Bates numbers and provide

14  all other information.  I think that's particularly

15  important given the court reporter won't be able to mark

16  things in realtime as would be typically done.

17       MR. LEVINE:  The Bates number is from Apple's

18  production Bates 0082.

19       MS. BINA:  Thank you.

20       MR. LEVINE:  It will first be sent to Jessica

21  and Elana and Nina and then, it will be sent to

22  Mr. Smith.

23       (Whereupon, Exhibit 1 was marked for

24  identification.)

25  BY MR. LEVINE:



```
 1
 2
 3
 4
 5
 6
 7
 8     Q.  ▮▮▮▮▮▮▮▮▮▮▮▮ -- that document should
 9   be on its way in a minute.
10         During the ▮▮▮▮▮▮▮▮▮▮ do you
11   recall ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13     A.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14     Q.  ▮▮
15
16
17
18
19
20
21     Q.  Do you know what a slide deck is?
22     A.  I do.
23   ▮▮  ▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮
24   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25   ▮▮▮▮▮▮▮▮
```

1        A.    ████████████████████████████████████

2    ███████

3              MR. LEVINE:  Counsel, can we send the document

4    to the witness?

5              MS. BINA:  Yes, although I'll note that this

6    has an Apple AEO designation.

7              So Ms. Gorton -- this document is designated

8    attorneys' eyes only by Apple and Ms. Gorton will need

9    to leave the room before it's discussed.

10             MR. LEVINE:  Okay.  Ms. Gorton is out of the

11   room.

12   BY MR. LEVINE:

13       Q.   Mr. Smith, have you received the document?

14       A.   From Manuel Delgado, yes.

15       Q.   Correct.

16       A.   Yes.

17       Q.   If you can open it up, take your time to

18   review, but I'll direct your attention to the second

19   e-mail, the one that you are -- or that you are a

20   recipient of it.

21             MS. BINA:  Justin, we've been going around an

22   hour.  I don't know if you have a long line of questions

23   on this document.  Would it make sense to take a break

24   before or after?

25             MR. LEVINE:  Why don't we finish this document

Page 40

1          and then we'll take a break.

2                    MS. BINA:   Thank you.

3          BY MR. LEVINE:

4                    Q.   Are you ready, Mr. Smith?

5                    A.   Yes.





```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18          Q.   What is Core OS Engineering?

19          A.   Core OS Engineering is a team at Apple.

20          Q.   What do they do?

21          A.   They work on our software.

22          Q.   Can you give me any more specific explanation

23     other than just work on their software?

24          A.   I don't have any more detail on what they work

25     on besides the operating system and the components of
```

1     the operating systems of Apple.

2          Q.   You were just the business guy?

3          A.   I work in corporate development, so that would

4     seem to be the case, yes.

5          Q.   What is WWDR?

6          A.   Worldwide developer relations.

Page 44



9          MR. LEVINE:  And excuse me, for the record,

10     Mr. Delgado just exited briefly and then re-entered the

11     room.

12          MS. BINA:  Thank you.

13     BY MR. LEVINE:

1

2

3

4

5        Q.   And you recall that the technology -- that

6    Virtual's technology was a similar technology in the

7    security engineering space?

8        A.   Similar to what?

9        Q.   Excuse me, maybe my question wasn't clear.

10       MS. BINA:   I didn't hear the question.   I was

11   just going to ask if you could repeat it.

12   BY MR. LEVINE:

13       Q.   I'll rephrase.   Is it also your recollection,

14   Mr. Smith, that Virtual's technology was also a

15   technology in the security engineering space?

16       A.   It was my understanding that what Virtual had

17   built would be helpful in security engineering, but

18   that's my understanding, sort of the totality of my

19   understanding.

20       MR. LEVINE:   Jessica, I think now is an okay

21   time to break.

22       MS. BINA:   Should we take five minutes, ten

23   minutes?

24       MR. LEVINE:   Oh, I thought you were -- maybe I

25   was wrong.   At the pace of this, I think this is going

1       to be a little bit longer than three hours.

2               So if you need five minutes or do you want to

3       keep trucking forward to lunch?

4               MS. BINA:  I'm going to need a five-minute

5       break at least.

6               MR. LEVINE:  Okay.  Why don't we take five

7       minutes and we'll try to minimize lunch as much as

8       possible and try to accommodate whatever everybody

9       needs.

10              MS. BINA:  With the current transit issues,

11      we're going to need an hour for lunch.  I don't want to

12      unduly make things stretch out, but we're going to need

13      time to get food.

14              MR. LEVINE:  Okay.  Fair enough.  Why don't we

15      take a quick five-minute break.

16              MS. BINA:  Thanks.

17              MR. LEVINE:  Thank you.

18              (Whereupon, a break was taken.)

19      BY MR. LEVINE:

20          Q.  So we're back on the record.  As it relates to

21      Virtual, who do you recall -- strike that.

22

23

24

25

Page 47



6          MR. LEVINE:  And Jessica, just for clarity,

7     Ms. Gorton and Mr. Wade are both out of the room.

8          MS. BINA:  Okay.  Thank you.  Please let me

9     know if they come back again.

10          MR. LEVINE:  Absolutely.

11     BY MR. LEVINE:

12     Q.   Mr. Smith, what about Jon Andrews?  Do you

13     recall speaking with him

14     A.   I don't.

15     Q.   What about Craig Federighi, do you recall any

16     conversations with him?

17     A.   No.

25     Q.   Who discovered Chris Wade at Apple?

Page 48

1        A.   I don't know.



9        Q.   What was his role

10

11       A.

12

13       Q.

14

15       A.

16       Q.

17       A.

18

19       Q.   And what is his team?

20       A.   Software engineering.

21       Q.   Can you explain to me or to the jury exactly

22  what software engineering is?

23       A.   It's my understanding that it's developing

24  applications and operating systems and software to run

25  on devices.

Page 49



6    Q.   Was Chris Wade -- excuse me.   Strike that.

Page 50



10      Q.  Well, my question was:  Is it a requirement?

11  So in any cases, is that a requirement?

12      A.  Can you repeat the question?

16      A.  I'm having a hard time understanding the

17  question.  Can you rephrase?  Sorry.

24      Q.  In the Apple hierarchy where does Jon Andrews

25  sit in relation to Mr. Federighi?

```
 1          A.  I believe Jon Andrews reports to Craig

 2     Federighi right now.

 3          Q.  And where does Mr. Marineau sit in connection

 4     with Jon Andrews?

 5          A.  I believe they are peers currently.

 6          Q.  So Mr. Marineau would also report to

 7     Mr. Federighi?

 8          A.  Correct.

 9          Q.  Do you recall if what -- what involvement

10     Mr. Federighi had ████████████████████████████████

11          MS. BINA:  Objection.  Asked and answered.

12          THE WITNESS:  Sorry.

13     BY MR. LEVINE:

14          Q.  You can go ahead and answer.

15          A.  Can you repeat the question?  Sorry.

16          MR. LEVINE:  Ms. Court Reporter, if you can

17     read back the question.

18          (The record was read by the reporter.)

19          THE WITNESS:  ██████████████████████████████

20     ████████████████████████████████████████████████████

21     ████████████████

22     BY MR. LEVINE:

23          Q.  ███████  ████████████████████████████████

24     █████████████████████████

25            ██████████████████████████████
```

Page  52



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22      Q.  Do you know if anybody at Apple ever raised a

23  concern about copyright infringement to anybody at

24  Virtual in connection with the Virtual technology?

25      A.  I do not.

Page 53

1          MS. BINA:  Objection.  Just -- I didn't hear

2     the question.

3          Were you asking if it was communicated to

4     Virtual?

5          MR. LEVINE:  I think the question was -- no, I

6     think the question was just is he aware of whether any

7     concern about copyright infringement was, I think,

8     provided to anybody at Virtual.

9          MS. BINA:  No objection.  Sorry.  I wanted to

10     clarify the question.

11     BY MR. LEVINE:

12          Q.  Your answer was that you were not aware?

13          A.  Correct.

14          Q.  Are you aware of any encouragements provided by

15     anybody at Apple to anybody at Virtual in connection

16     with developing the Virtual technology?

17          A.  No, I'm not.

18          Q.  Would Apple ever look to acquire -- strike

19     that.

20          Would Apple ever seek to acquire a company that

21     it knew was violating some of Apple's intellectual

22     property rights?

23          A.  ███████████████████████████████

24          MS. BINA:  I'm going to object to the extent

25     that calls for privileged communications.  I think

1       there's a chance that it could.

2               So the witness can answer to the extent that it

3       doesn't reveal communications with counsel, but to the

4       extent that an answer would reveal communications with

5       counsel, I will instruct him not to answer.

6       BY MR. LEVINE:

7          Q.  Mr. Smith, you can go ahead and answer so long

8       as any answer you have was not something derived from a

9       communication with any of Apple's internal or external

10      lawyers.

11              You can answer.

12      

13      

14         Q.  Would Apple ever -- strike that.

15              MR. LEVINE:  I'm going to enter in Defense

16      Exhibit 2, Apple Bates 00356.

17              (Whereupon, Exhibit 2 was marked for

18      identification.)

19              MR. LEVINE:  Jessica?

20              MS. BINA:  Yes.

21              MR. LEVINE:  If this is an Apple Bates number

22      do you have any concern with me simply sending it to

23      Mr. Smith in addition to everybody at the same time?

24              MS. BINA:  That's fine as long as you don't

25      question him on it until after I confirm receipt, but

1    you can send one e-mail.

2           MR. LEVINE:  Thank you.

3    BY MR. LEVINE:

4        Q.  Just let me know once you've received it.

5           MS. BINA:  I'm watching my e-mail.  Coming

6    through on my phone, but not yet on my computer.

7           Okay.  I have it.  No objection to this being

8    sent to the witness.

9    BY MR. LEVINE:

10       Q.  Have you ever seen this document before?

6

4          Q.  Who is Dallas De Atley?

5          A.  He is or was an Apple engineer who I believe

6     was responsible for security engineering.

7          Q.  Who did he report to?

8          A.  I believe he may have reported to Sebastien,

9     but I don't know.

10         Q.  Is he still an employee of Apple?

11         A.  I don't know.

12         Q.  How many employees does Apple have?

13         A.  I don't know exactly, but somewhere on the

14    order of 125, 130,000 people.

17         MR. LEVINE:  Jessica, the next one is an

18    Corellium document.  Do you want me to send it to you

19    first and skip Mr. Smith?  It's just a telephone invite.

20         MS. BINA:  It's fine to send to everyone.  Is

21    it marked AEO or confidential?

22         MR. LEVINE:  No, it's not.

23         MS. BINA:  Okay.  Thank you.

24         Can you read the Bates number in for the

25    record, Justin?

```
 1              MR. LEVINE:  Corellium 001456.

 2              MS. BINA:  001456?

 3              MR. LEVINE:  Correct.

 4              (Whereupon, Exhibit 3 was marked for

 5         identification.)

 6    BY MR. LEVINE:

 7         Q.  Mr. Smith, if you need a minute, go ahead and

 8    take a minute.

 9         A.  No, I'm fine.  Thank you.

10              MS. BINA:  I don't have it yet.

11              MR. LEVINE:  Yes, it's coming.

12              MS. BINA:  I just got it.

13    BY MR. LEVINE:

14         Q.  Do you have it, Mr. Smith?

15              What does this document reflect on its face?

16         A.  It seems to be, though I have never seen a

17    document like this, an acceptance of a phone call or the

18    acceptance of an invitation to a phone call.

19         Q.  On what date?

20         A.  February 6, 2018.

21         Q.  Do you recall having a telephone call with

22    Chris Wade on that date?

23         A.  No, I do not.

24         Q.  All right.  Do you dispute that it would have

25    happened or that it did not happen?
```

```
 1          A.  Yeah, it could have happened.

 2          Q.  Do you know by this time if you had spoken to

 3     him on the phone before?

 4          A.  I had spoken to Chris ███████████████

 5     ██████████████████████████nd that was quite some

 6     time ago.

 7          Q.  Okay.  All right.  Why don't we do --

 8          MR. LEVINE:  Jessica, what time are you

 9     thinking about for lunch?  I'm thinking we might --

10     during lunch, we'll compile an e-mail with a number of

11     exhibits just to send in one shot.

12          MS. BINA:  I think we can break whenever is

13     convenient for you in the next half hour.  So if now is

14     a good time to break, we can break now or any time in

15     the next 30 minutes.

16          MR. LEVINE:  Okay.  So why don't we go through

17     the document that was just sent.  This was another

18     Corellium document Bates number 001454.

19          MS. BINA:  That's going to be Defense

20     Exhibit 4?

21          MR. LEVINE:  Correct.

22          MS. BINA:  No objection to it being shown.

23          (Whereupon, Exhibit 4 was marked for

24     identification.)

25     BY MR. LEVINE:
```

1       Q.  Mr. Smith, do you recognize this series of

2    e-mails?

3

4

5

6

7

8       Q.  It shows down at the bottom -- you know what,

9    this Exhibit 4, this was in 2018.  Strike this.  This

10   was supposed to be for later.  So we'll keep it for

11   Defense Exhibit 4, but this was out of order for some

12   reason.

13            MR. LEVINE:  Why don't we break for lunch.  If

14   we can do 45 minutes, great, but if you need an hour, we

15   can do an hour.

16            MS. BINA:  I think we're going to need an hour

17   with deliveries and whatnot.

18            MR. LEVINE:  That's fine.  If you need that,

19   that's fine.  So break for an hour.

20            (Lunch recess taken.)

21

22

23

24

25

```
 1                     AFTERNOON SESSION:

 2               MR. LEVINE:  Back on the record.

 3               Ms. Gorton is currently in the room.  I think

 4      Mr. Wade is going to be coming back.

 5               MS. BINA:  Just let us know when --

 6               MR. LEVINE:  I think you can see, but I'll

 7      alert you.

 8               MS. BINA:  Thank you.

 9      BY MR. LEVINE:

10          Q.  Mr. Smith, are you familiar with Corellium?

11          A.  I know what Corellium is or who Corellium is,

12      the company Corellium, yes.

13          Q.  What is Corellium?

14               MR. LEVINE:  And for the court reporter, do you

15      have the spelling of that?

16               THE REPORTER:  Yes.

17      BY MR. LEVINE:

18      ████████████████████████████████████████████

19      ████████████████████████████████████████████

20      ████████████████████████████████████████████

21      ████████████████████████████████████████████

22      ████████████████████████████████████████████

23          Q.  Why was Apple -- -- strike that.

24      ████████████████████████████████████████████

25      ████████████████████████████████████████████
```

Page 61



```
21          MS. BINA:  Objection.

22          Mr. Wade is still out of the room, correct?

23          MR. LEVINE:  Mr. Wade is out of the room, yes.

24          MS. BINA:  Okay, thank you.  Sorry to

25     interrupt.
```

Page 62

1      THE WITNESS:  Can you repeat the question?

2   Sorry.

3   BY MR. LEVINE:

4      Q.  In what ways could the -- did Apple believe the

5   Corellium product could assist with Apple's iOS testing

6   efforts?

7

8

9

10

11

12

13

14      Q.  Could it be used for security research?

15

16

17

18

19

20

21

22

23

24

25   A.

Page 63

1

2

3     Q.  Hang on one second.  I'm just going to get

4  Chris back in.

5     Did you have involvement with the acquisition

6  efforts with Corellium?

7     A.  Did I have involvement?

8     Q.  Yes.

9     A.  Yes, I was involved in the acquisition efforts

10  with Corellium.

11

12

13

14

15

16

17

18

19

20

21

22

23

24     Q.  I think before I was speaking about Virtual.

25  So when you answered, were you speaking about the

1    meetings in total?

2         A.   Yes.

3         Q.   Can you give me a percentage as to those

4    meetings what was attributable to Virtual and what was

5    attributable to Corellium?

6         A.   Probably half/half.

7         Q.   Did you ever meet with Mr. Wade face-to-face

8    for any reason other than as it related to Virtual or

9    Corellium?

10        A.   Not that I recall.

11        Q.   As it relates to the meetings with Corellium --

12   strike that.

13             How many times have you spoken on the phone

14   with Mr. Wade as it relates to Corellium?

15        A.   I don't recall the exact number, but more than

16   ten times.

17        Q.   And these were all in the efforts as it relates

18   to -- as relates to acquisition?

19

20

21

22

23

24

25



Page 66

1   █████████████

2        Q.  Was Tim Cook ever aware of either the company

3   Virtual or Corellium?

4        A.  █████████████

5            MS. BINA:  Objection.  Foundation.

6            Sorry, I'll try to speak up.

7   BY MR. LEVINE:

8        Q.  You can answer.



Page 67



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25    Q.  Are you aware of any offers that were made to

Page 68

1    Corellium?

2

3

4         Q.  Are you aware if any verbal offers were made to

5    Corellium?

6

7

8

9         Q.  Are you aware of any purchase prices being

10   discussed with anybody at Corellium?

11

12

13

14

15

16

17

18

19         MS. BINA:  Is Mr. Wade back in the room or is

20   he still outside?

21         MR. LEVINE:  Mr. Wade is in the room.

22         MS. BINA:  If we're going to be discussing the

23   details of internal Apple material here, then he'll need

24   to leave.  If we're discussing what was discussed with

25   Corellium, he can stay.

Page 69

1          MR. LEVINE:  We'll have him leave for the next

2     couple of questions.

3          MS. BINA:  Thank you.

4          THE WITNESS:  Sorry, I don't know what

5     happened.

6          MR. LEVINE:  I can still see you and hear you.

7          THE WITNESS:  If you can hear the radio, too, I

8     don't know what this --

9          MS. BINA:  Is it on your computer screen?

10         THE WITNESS:  Hold on a second.

11         MR. LEVINE:  No problem.

12         THE WITNESS:  I swear I'm not doing anything

13    wrong.

14         MR. LEVINE:  We can go off the record.

15         (Whereupon, there was a discussion off the

16    record.)

17    BY MR. LEVINE:

18

19

20

21

22

23

24

25



```
 5          Q.  Were other numbers considered within Apple?

 6              MS. BINA:  Before we answer that question --

 7              MR. LEVINE:  I'll withdraw the question for

 8      now.

 9              MS. BINA:  Is Mr. Wade still in the room or did

10      he leave?

11              MR. LEVINE:  He left.

12              MS. BINA:  Thank you.

13              MR. LEVINE:  Ms. Gorton is still here.

14      BY MR. LEVINE:
```



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

20      Q.   And the Corellium company, it's your

21  understanding, the Corellium company owned the Corellium

22  product?

23      A.   That was my understanding, yes.

24

25





1

2

3

4        ▮▮▮▮▮▮▮▮▮▮▮   So was there a portion of the --

5             MS. BINA:  Objection.

6             You can finish the question.  I'll make the

7        objection.

8             MR. LEVINE:  Thank you.

9        BY MR. LEVINE:

10

11

12

13

14             MS. BINA:  And I'm going to object.  Vague and

15        compound.

16        BY MR. LEVINE:

17            Q.  Do you understand the question, Mr. Smith?

18

19

20

21

22

23

24

25            Q.  Okay.  So let me ask the question again because

1       that would be the answer that I got previously and

2       that's not exactly what I was going for.

3

4

5

6

7

8

9

10

11

12

13

14

15              MS. BINA:  Objection.  Vague.

16      BY MR. LEVINE:

17          Q.  You can answer if you understand the question.

18

19

20

21

22

23

24

25

Page 75



6       Q.  What are the components of the company?

7       A.  Sorry, the team, the physical assets,

8  computers, the customer relationships, technology, those

9  are some components --

10       Q.  The intellectual property?

11       A.  Sure.

12       Q.  Is the intellectual property --

13       A.  Intellectual property could be a component of

14  the company, yes.

Page 76



```
 6          MR. LEVINE:  Ms. Court Reporter, can you please

 7     read back my question?

 8          (The record was read by the Reporter.)

 9          THE WITNESS:  Is that -- are you repeating the

10     question to me or did I --

11     BY MR. LEVINE:

12       Q.  Yes, yes.  If you could please answer that

13     question, that particular question.

14          MS. BINA:  Objection.  Argumentative.  He

15     already answered the question.

16          But you can answer again.

17          THE WITNESS:  Can you repeat it?

18          THE REPORTER:  Would you like me to read it

19     again?

20          MR. LEVINE:  Yes.

21          (The record was read by the Reporter.)
```

1

2

3    BY MR. LEVINE:

4         Q.  Are you aware if Apple has any virtualization

5    technology that is similar --

6              MS. BINA:  Objection.

7              MR. LEVINE:  Strike that.

8    BY MR. LEVINE:

9         Q.  Are you aware if Apple has any virtualization

10   technology?

11             MS. BINA:  I'm going to object.  Counsel, this

12   is the subject of a court order already and irrelevant.

13             If you're talking about things they offer to

14   the public, I'll entertain that line of questioning, but

15   if you're talking about internal Apple testing and

16   development, I'll consider instructing the witness not

17   to answer and I'll -- I apologize, Madam Court Reporter.

18   I'm not sure what you caught.

19             What I was saying is Ms. Gorton will need to

20   leave the room for questions on internal information.

21             In addition, depending on how far Mr. Levine is

22   planning on going with this, I may instruct the witness

23   not to answer, since it's the subject of a court order

24   already.

25             At least Ms. Gorton should leave for now and

```
 1        I'll consider it on a question-by-question basis whether

 2        to instruct.

 3               MR. LEVINE:  Ms. Gorton is leaving the room.

 4               MS. BINA:  Thank you.

 5        BY MR. LEVINE:

 6          Q.  Okay.  If you can answer the question, whether

 7        Apple has any virtualization technology.

 8          A.  I --

 9               MS. BINA:  I'm going to object and instruct the

10        witness to answer only as to outward-facing technology

11        and not anything internal in development.

12        ████████████████████████████████████████████████████

13        ████████████████████████████████████████████████████

14        BY MR. LEVINE:

15          Q.  Okay.  So based upon the instruction, I'm going

16        to take that answer as it relates to what counsel stated

17        as outward-facing.  I assume that to mean anything

18        that's sold out on the open market.

19               My question is:  The Corellium technology, had

20        Apple acquired that technology, was Apple intending to

21        use that on an internal basis or to sell out on the

22        market?

23        ████████████████████████████████████████████████████

24        ████████████████████████████████████████████████████

25        ████████████████████████████████████████████████████
```

1      Q.  Okay.

2           MR. LEVINE:  So then, Ms. Bina, I think that

3      internal virtualization is certainly relevant in this

4      context now.  Would you disagree?

5           MS. BINA:  I disagree, Mr. Levine.  This is not

6      a case about internal testing development or about the

7      Corellium/Apple negotiations and the Court's already

8      ruled on this issue.

9           MR. LEVINE:  Okay.  So I believe that this area

10     is certainly relevant.  I'll go ahead and certify this

11     area so that we can address it with the Court.

12          All right.  I'm going to talk to Mr. Wade.

13          MS. BINA:  We may, however, with respect to

14     this witness be able to establish that he doesn't have

15     any knowledge at all on the topic.

16          If you want to ask him questions as to whether

17     he could answer the questions as to internal technology

18     and make a record on that, it might save us the trouble

19     of having to move to compel with respect to him.

20          (Whereupon, there was a discussion off the

21     record.)

22     BY MR. LEVINE:

23     Q.  Mr. Smith, do you have any knowledge whatsoever

24     of Apple's internal virtualization technology?

25     ██████████████████████████████

```
 1          Q.   Do you have any knowledge as to any -- what

 2     Ms. Bina classified as external or outward-facing

 3     virtualization technology?

 4          A.   Yes.

 5          Q.   Do you know what she means by outward-facing?

 6          A.   I believe this relates to something that would

 7     be offered to the public.

 8          Q.   Okay.  One second.

 9     ████████████████████████████████████████████████████

10     ████████████████████████████████████████████████████

11     ████████████████████████████████████████████████████

12     ████████████████████████████████████████████████████

13          Q.   Who was that phone call with?

14          A.   I don't recall, but I believe it was between

15     █████████████████.

16          Q.   Just ████████.

17          A.   ██████████████████████████████████████.

18     ████████████████████████████████████████████████████

19     ████████████████████████████████████████████████████

20     ████████████████████████████████████████████████████

21     ████████████████████████████████████████████████████

22     ████████████████████████████████████████████████████

23     ████████████████████████████████████████████████████

24          Q.   How many meetings did you attend with

25     Mr. Wade -- strike that.
```



Page 81

1    Did you attend -- you stated earlier that ▓▓▓▓

2    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

3    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

4        A.   ▓▓▓▓▓▓▓▓

5        Q.   In any of those meetings, were any other people

6    in attendance?

7    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

8    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

9    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

10       Q.   And what do you recall about that meeting?

11   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

12   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

13   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

14   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

15       Q.   Do you recall in any meeting with anyone from

16   Corellium a discussion occurring relative to ways that

17   Apple could stop or shut down Corellium?

18       A.   I want to make sure I get the question all the

19   way.  Can you repeat it?

20       Q.   Do you recall, at any of the meetings with

21   anyone from Corellium, a conversation where Corellium

22   provided information as to how Apple could stop it or

23   shut it down?

24   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

25   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Page 82



10    Q.  How many times a day do you speak to Craig

11  Federighi on average?

12    A.  Sorry?

13    Q.  How many times a day do you speak with Craig

14  Federighi on average?

15    A.  Zero.

16    Q.  So it's a rare occasion you and Mr. Federighi

17  speak?

18    A.  Correct, yes.

1      Q.   What does your group do other than

2   acquisitions?



11      Q.   I thought you said that --

12      A.   Did I lose you?

13          MS. BINA:  Mr. Levine, we can't hear you.

14          (Interruption in the proceedings.)

15          MR. LEVINE:  Ms. Court Reporter, what was the

16   last question?  Actually, I remember.

17   BY MR. LEVINE:



         Q.   And you mentioned that you've met Mr. Wade a

handful of times?

         A.   In person, yes.

         Q.   Do you like him?

         A.   Do I like him?

         Q.   Yes.   Is he a nice person?

         A.   Yeah, he's nice enough.



```
1

2

3

4

5

6

7              MS. BINA:  I'm going to object to that.  That's

8        something the Court has already ruled on.

9              I don't remember if Mr. Wade and Ms. Gorton are

10       in the room.

11             MR. LEVINE:  They are in the room.

12             MS. BINA:  I will allow the question to be

13       answered, Justin, after they leave the room at this high

14       level.

15             MR. LEVINE:  So I'll have them stay.  I'll come

16       back to the question.

17       BY MR. LEVINE:

18          Q.  How much effort and work did you personally put

19       into the acquisition effort upfront?

20          A.  What I would consider to be a standard amount

21       of effort.

22          Q.  Okay.  So not a little, but not a lot?

23          A.  It's usually a lot, but that's standard.

24          Q.  Is there -- you mentioned that -- correct me if

25       I'm wrong, you mentioned earlier that Apple acquires
```

Page 86



1    approximately ███ companies a year?

2         A.    ██████████    yes.

3         Q.    And those ████████████████████

4    ████████████████████████████████████████

5    ██████

6         A.    ██████████  ██████████  ██████████

7         Q.    Would you say that Craig's group tends to have

8    a lower acquisition rate than other groups within Apple?

9         A.    ████████████████████████████████

10   ████████████████████████████████████████

11        Q.    ███████████████████████████  ████

12   █████████████████████████

13        A.    ████████████████████████████

14   ████████████████████████████████████████

15   ██████████████

16   █████████████████████  ██████████

17   ████████  ███████████████

18        Q.    ██████████  ████████████████

19   ████████████████████████████████████████

20   ██████

21        A.    ████████████████████████████████

22   ████████████████  ████████████████████████

23   ████████████

24        Q.    Not to you?

25        A.    Not to me, no.  Not that I recall, no.

1    Q.   And you were never in a meeting where Chris

2    Wade and Craig Federighi were both in attendance?

3        A.   No, not that I recall, no.

14       Q.   Did Apple -- strike that.

15            In its investigation of Corellium during its

16   acquisition efforts, did Apple ever compare Corellium's

17   products to any other products that Apple has?

18       A.   Not that I'm aware of.

19       Q.   When Apple was looking to acquire Corellium,

20   was Mr. Wade held in high regard at Apple?

25       Q.   What about now?

```
 1          A.  I don't have any insight as to how Chris is
 2     regarded internally.
 3          Q.  Okay.  But you had insight as he was regarded
 4     in 2018, though; isn't that right?
 5          A.  Correct.  Based upon --
 6          Q.  You just have no -- you have no knowledge right
 7     now as to --
 8          MS. BINA:  I don't think -- sorry, I don't
 9     think the witness finished his answer.  So if you could
10     let him finish his answer to the first question and then
11     ask the second one.
12          MR. LEVINE:  My apologies.
13     BY MR. LEVINE:
14          Q.  I thought you were done.
15
16
17
18
19
20
21          Q.  Have you spoken to anybody in Apple about
22     Mr. Wade in the last six months?
23          A.  I believe so.  Most notably our in-house
24     counsel and -- and I believe --
25          Q.  I don't --
```

1    A.  Yes.

2    Q.  I don't want to know any conversations that

3    you've had with lawyers about Mr. Wade.  So let me limit

4    my question to anybody that is not a lawyer.

5    A.  I believe so, but I believe that all of those

6    conversations had an Apple lawyer at Apple.

7    MS. BINA:  I'm going to instruct the witness

8    not to answer any questions about discussions that were

9    held with a lawyer.

10    MR. LEVINE:  I agree.

11    BY MR. LEVINE:

12    Q.  Were there any conversations that were held

13    about Mr. Wade or any member of Corellium where a lawyer

14    was not present?

15    A.  I don't recall any.

16    Q.  How about Corellium, same question just as it

17    relates to Corellium?

18    A.  I don't recall.

19    MR. LEVINE:  Could we take a quick five-minute

20    break?

21    MS. BINA:  Sure.

22    MR. LEVINE:  Thank you.

23    (Whereupon, a break was taken.)

24    BY MR. LEVINE:

25    Q.  Mr. Smith, at any point in time during the

1    acquisition efforts of Corellium, were you frustrated in

2    how the efforts were moving along?

3

4

5

6

7

8         Q.  And can I ask, as a side note, you don't have

9    any kind of messaging system up on your computer or

10   communications with any other lawyer or any other

11   person, right?

12        A.  No.

13        Q.  No, you do not?

14        A.  Correct, I do not.

15        Q.  Okay.  Have you had anything like that or any

16   form of communication up on your computer at any point

17   in this depo?

18        A.  I have not, except for the e-mails that you

19   sent me as it relates to this.

20        Q.  Fair enough.  Those are permissible.

21            I think we're going to get into some of the

22   exhibits now.

23            MS. BINA:  The next will be Defense Exhibit 5?

24            MR. LEVINE:  I believe so.  Well, actually he's

25   going to be sending an e-mail with a number of exhibits.

1              So I think only remaining, there are going to

2      be two e-mails; one is going to have exhibits relating

3      to 2014 and one is going to be exhibits related to 2018.

4              So we'll send 2014 first.

5              MS. BINA:  Just mark each one as you use it,

6      then.

7              MR. LEVINE:  I will.  I think this will be --

8              MS. BINA:  Thank you.

9              THE REPORTER:  This is Exhibit 5?

10             MR. LEVINE:  No.  I'll tell you when Exhibit 5

11     is coming in.  We sent an e-mail that has a number of

12     exhibits attached.  I'll let you know when Exhibit 5 is

13     coming in.

14             MS. BINA:  And Justin, if you could let me know

15     who is currently in the room with you.

16             MR. LEVINE:  Everyone is currently in the room.

17     Jonathan Vine is not in the room.

18             MS. BINA:  Mr. Delgado and yourself?

19             MR. LEVINE:  Correct.

20             MS. BINA:  I just got the first set of

21     exhibits.  Do you want me to review them all now or look

22     at them briefly as you introduce it?

23             MR. LEVINE:  Why don't we go one-by-one.

24             MS. BINA:  Okay.

25     BY MR. LEVINE:

1      Q.  Before we get to exhibits, Mr. Smith, how many

2    times -- strike that.

3           Is it -- well, in your -- in your approximate

4    ██████████) companies that are acquired, and I know we're

5    talking about approximate numbers here, for the

6    offers -- how many offers does Apple make that are

7    ultimately rejected for -- by potentially-acquired

8    companies?

9      A.  ██████████████████████████████████████)

10   █████████████████████████████)

11     Q.  You put it far more articulate than I did.

12          MR. LEVINE:  Let me go to Apple document 408.

13   This is an attorneys' eyes only document.

14          So I'm going to ask Mr. Wade and Ms. Gorton to

15   step out of the room.

16          MS. BINA:  Thank you.

17          THE WITNESS:  So I don't know which document

18   this is.  I'm imagining it's -- I received -- I received

19   an e-mail with a lot of documents in there.  It's in

20   there, I'm guessing?

21   BY MR. LEVINE:

22     Q.  They should be named with the Bates numbers.

23   It should say 408 towards the end of the file name.

24          MS. BINA:  Justin, I believe it's

25   21_APL-CORELLIUM_0000408 and it goes on from there.

1           Is that the right document?

2           MR. LEVINE:  Yes.

3           MS. BINA:  So it starts at 21?

4           MR. LEVINE:  Hang on.  I'm going to have Manny

5    come speak.  He's the only one left in the room.

6           MR. DELGADO:  All you have to do is the 1

7    through whatever, it's just basically those are how I

8    exported them out.  The Bates number comes right after

9    it.

10          MS. BINA:  Great.  I want to make sure the

11   witness has the right document in front of him.  The

12   important part I understand is the 408 that's in the

13   middle?

14          MR. LEVINE:  408 to 410.

15          THE WITNESS:  Yes, correct, I have it.

16   BY MR. LEVINE:

17      Q.  All right.  Do you recognize this string of

18   e-mails?

19      A.  Yes, I believe I do.

20

21

22

23

24

25

Page 94



7          Do you see that?

8     A.   I do, yes.

9     Q.   Did you ever connect with Chris at that point

10   in time?

11    A.   I don't remember.



Page 96



```
12        Q.  My question -- in fact, you are involved in
13   that, you're in the commercial development area, aren't
14   you?
15        A.  Corporate development, yeah, I work in
16   corporate development.
17        Q.  Corporate development, yes, sir.
18            So you are involved in bringing people into
19   Apple; isn't that right?
20        A.  True, I am, in certain instances, involved in
21   acquiring companies via which we hire teams of people,
22   yes.
23        Q.  And in those instances in which you're
24   involved, have you experienced that it's Apple's
25   practice to bring on and hire engineers and other
```

Page 97

1      entities that have worked previously to reduce the

2      security of software?

3          A.  I guess I'm having a hard time understanding

4      your question in all its parts.

5              So you're saying -- can you maybe break it

6      apart for me and repeat it?

7          Q.  Yes.  In your experience as being involved with

8      bringing companies and teams into Apple, have you

9      witnessed and experienced that it is Apple's practice to

10     bring in people that have previously weakened the

11     security of software?

12             MS. BINA:  Objection.  Vague and compound.

13             THE WITNESS:  I don't know.  I honestly don't

14     know how to answer the question in the form that it was

15     asked.  Are you asking if maybe -- I don't know how to

16     answer.

17     BY MR. LEVINE:

18



19

20

21

22

23

24

25

Page 98

1

2

3

4       Q.   So in that experience that you had, have you

5   seen that it's Apple's practice to bring in people who

6   have previously harmed or had actions to harm the

7   security and privacy of software or their individuals,

8   such as people from the jailbreaking community?

9

10

11

12

13

14

15

16

17       Q.   Oh.   So you don't recall at all whether Apple

18   even considers whether somebody's doing positive or

19   negative contributions to the community before they hire

20   them?

21

22

23

24

25

1

2

3

4      Q.   So here's at least one where Apple was

5   considering hiring somebody from a community that you

6   deemed to be harming modern technology and the privacy;

7   isn't that correct?

8      A.   Sorry, I didn't quite understand.

9      Q.   What do you not understand about the question,

10   Mr. Smith?

11      A.   The question itself, I don't understand what

12   the question is.   Can you repeat it?

13      Q.   My question is:   Was Apple looking at hiring

14   somebody from a community that you believe to be harming

15   security and privacy in this case?

16

17

18

19

20

21

22

23      Q.   Do you know if that was something that was even

24   considered?

25

1  ████████████████████████████████████

2        Q.  If we can look at what's labeled as Bates

3  number 337.

4             MS. BINA:  That one starts with 20 in my

5  packet.  That's 377, not 337, sorry.

6             MR. LEVINE:  You're right, my apologies.

7             THE WITNESS:  So 377?

8             MR. LEVINE:  377.

9             MS. BINA:  So that's going to be Exhibit 6 --

10  APL-CORELLIUM 0377?

11             MR. LEVINE:  This is Defense 6.

12             MS. BINA:  Sorry, I thought I said Exhibit 6.

13             MR. LEVINE:  Yes.

14             THE WITNESS:  Can I ask just a logistical

15  question of potentially Manny, are the exhibits you're

16  going to go -- the exhibits, are they sequentially

17  attached to the e-mail?

18             MR. DELGADO:  They're by Bates numbers.

19  There's a mixture between Apple and Corellium's.

20             Hold on.

21             MR. LEVINE:  I think the answer is probably no.

22             THE WITNESS:  I'm saying this -- it doesn't

23  matter.  We'll get to it when we get to it.  All right.

24  Let's go.

25             MR. DELGADO:  If you ignore the first number,

1    which is going to be like what was exported out and look

2    at the numbers afterwards, those are the Bates numbers.

3    It will either start with APL-CORELLIUM or CORELLIUM.

4    That's how they start.

5            THE WITNESS:  Great.  Thank you.

6            (Whereupon, Exhibit 6 was marked for

7    identification.)

8    BY MR. LEVINE:

9        Q.  Do you recognize this document?

10       A.  I do.

11

12

13

14

15

16

17

18

19

20

21

22           MS. BINA:  Vague to the question.  You said

23   that this was not -- there was a double negative.  I

24   think the question is whether he believes he wrote the

25   e-mail.  I just want a clean record on that.

Page 102

```
1    BY MR. LEVINE:
2         Q.  Is there any reason to dispute -- no, I think
3    my question was right.
4              Is there any reason to dispute that you did not
5    write this e-mail?
6              MS. BINA:  Sorry, dispute that he didn't write
7    it?
8              MR. LEVINE:  Right, is there a reason to
9    dispute that he did not write this e-mail?
10             MS. BINA:  I thought he did write it.
11             MR. LEVINE:  Fine.
12   BY MR. LEVINE:
13        Q.  Is there any reason to dispute that you did
14   write this e-mail?
15        A.  No.
16
17
18
19
20
21
22
23
24
25
```

Page 103





9    Q. You stated that a number of times today. I

10   think you've made that abundantly clear that it is ▮

11   ▮

12       My question was: ▮

13   ▮

14       MS. BINA: Objection. Asked and answered and

15   argumentative.

16   BY MR. LEVINE:

17   Q. I didn't hear an answer. ▮

18   ▮

19   ▮

20   A. ▮

21   ▮

22   ▮

23   ▮

24   ▮

25   Q. ▮

1

2

3

4

5

6          MR. LEVINE:  The next exhibit I'd like to enter

7     is Defense 7.  Again, it's an Apple document, 115.

8          (Whereupon, Exhibit 7 was marked for

9     identification.)

10         THE WITNESS:  I've got it.

11         MS. BINA:  I'm still looking for it, but you

12    can go ahead.

13    BY MR. LEVINE:

14        Q.  Do you recognize this string of e-mails,

15    Mr. Smith?

16        A.  I'm reviewing it right now.  So -- I'm looking

17    at it right now.  I don't recall.

18        Q.  Actually, I'm -- if I can just direct your

19    attention to the second page.

20        A.  Okay.

21

22

23

24

25



14          MR. LEVINE:  Let me direct you to Apple 358.

15          MS. BINA:  So will that be Exhibit 7?

16          MR. LEVINE:  This will be defense 7, yes.

17          MS. BINA:  Is it 7 or 8?  I believe this is

18     Defense 8, not Defense 7 because I think that 115 was

19     Defense 7.

20          MR. LEVINE:  My apologies.

21          (Whereupon, Exhibit 8 was marked for

22     identification.)

23          MR. LEVINE:  This is Defense 8.

24     BY MR. LEVINE:

25          Q.  Do you have this in front of you, Mr. Smith?

1          A.  358?

2          Q.  Correct.

3          A.  Yes.

4          Q.  Do you recall having a meeting with

5     Mr. Marineau relative to Chris Wade connection in 2014?

6          A.  I do not, no.

7          Q.  What is Murphy's Law?

8          A.  A conference room, the name of a conference

9     room, I believe.  Yeah, conference room.

10          Q.  Next one is Apple 140.

11              MR. LEVINE:  This is going to be Defense 9.

12              (Whereupon, Exhibit 9 was marked for

13     identification.)

14              THE WITNESS:  I've got it.

15     BY MR. LEVINE:

16

17

18

19

20

21

22

23

24

25

1

2          MR. LEVINE:  Ms. Bina's face is getting

3    crinkled up.

4    BY MR. LEVINE:

5

6

7

8          Q.  I never took English in law school.

9

10

11

12

13

14

15          Q.  There's a number of exhibits here that reflect

16    a number of different calls or meeting.

17          Do you have any reason to believe that if they

18    were reflected in the document -- any reason to doubt

19    that they actually happened?

20          A.  No.

21          Q.  Let me point your attention to Defense 10, I

22    think, Bates 468.

23          MS. BINA:  Is that Apple 468 or Corellium 468?

24          MR. LEVINE:  It should be the only 468 you

25    have, but it's Apple.

1          MS. BINA:  Thanks.

2          (Whereupon, Exhibit 10 was marked for

3     identification.)

4     BY MR. LEVINE:

5          Q.  Let me know when you have that up.

6          A.  I don't have that yet, sorry.

7          MS. BINA:  Starts with 22.

8          THE WITNESS:  Sorry.  Okay.  I have it.

9     BY MR. LEVINE:

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 110



19          MS. BINA:  Objection.  Misstates the document.

20          Actually, I withdraw it.  Well, I'm going to

21     maintain the objection, but you can ask the question.

22          THE WITNESS:  ████████████████████████████████

23     ████████████████████████████████

24     BY MR. LEVINE:

25          Q.  Let me interrupt you for a second.

Page 111



```
 1          Just for the record, we're looking at the

 2     sentence that states ████████████████████████████

 3     ██████████████████████████████████████████████████

 4     ██████████████████████████████████

 5          A.   Yes, I see that sentence.

 6          Q.   Okay.  Go ahead.

 7          A.   I think --

 8          Q.   Okay.  What were you saying?

 9          A.   ████████████████████████████████████

10     ██████   █████████████████████████████

11          Q.   █████████████████████████

12          A.   ████████████████████████████████████

13          Q.   ████████████████████████████████████

14     ██████████████████████████████████████████████

15     ██████████████████████████████████████████████████

16     ██████

17     ██████████████████████████████████████████████████
18     ██████████████████████████████████████████████████
19     ██████████████████████████████████████████████████
20     ██████████████████████████████████████████████████

21          Q.   Okay.  Fair enough.

22          A.   I don't know.

23     ██████████████████████████████████████████████████
24     ██████████████████████████████████████████████████
25     ██████████████████████████████████████████████████
```

Page 112



Q.  Do you see that language?

A.  I do.

MS. BINA:  Objection.  Vague as to ▮▮▮▮

▮▮▮▮▮

Page 113

1              THE WITNESS:  I -- sorry.  Can you repeat the

2       question?  Sorry.

3       BY MR. LEVINE:



Page 114



15    Q.  So then, it would appear from the writing on

16  the face of the document that ████████████████████

17  ████████████████████████████████████████████████████

18  ████████████████████████

19        MS. BINA:  Objection.  Misstates the document.

20  BY MR. LEVINE:

21    Q.  Is that a fair statement, just upon the plain

22  reading of the document?

23    A.  That what?  Sorry.

24    Q.  ████████████████████████████████████████████

25  ████████████████████  Based upon a plain reading of the

Page 115

1    document, is that a fair statement?

2

3

4

5         Q.   What do you interpret

6

7

8         What do you interpret that to mean?

9         A.

10

11        Q.

12        A.

13        Q.   Okay.  So back to my original question, when

14   taking that into account, how do you interpret

15

16

17        A.   How do I interpret it in relation to what?

18

19

20

21

22

23

24        Q.   Okay.  You're prepared to testify as to that to

25   a jury about that language?

```
 1              MS. BINA:  Objection.  Argumentative.

 2              MR. LEVINE:  It's not argumentative.

 3              MS. BINA:  It is.  The witness is copied on

 4      this e-mail.  He's not going to be testifying about the

 5      language in this e-mail, the meaning of this language.

 6              MR. LEVINE:  This e-mail went to him.  I

 7      disagree.  ████████████████████████████████████████

 8      ██████████████████████████████████████████████

 9      ██████████████████████████

10              That will be a conversation that we'll have

11      later.

12              MS. BINA:  Your opinion is your opinion, but

13      the witness is giving his testimony.

14              MR. LEVINE:  I agree.  This whole line of

15      questioning is now on the record.  That's perfectly

16      okay.

17      BY MR. LEVINE:

18          Q.  Mr. Smith, if I can ask you, do you have

19      another screen up now?

20          A.  I have the e-mail that you sent me, the

21      document.

22          Q.  Okay.  All right.  Thank you.  Look at the

23      second page of that exhibit.

24          A.  Yes.

25          Q.  ████████████████████████████████████████████
```



4          Do you see that?

5     A.  I do, yes.

6     Q.  What does that mean to you?

17         MS. BINA:  Just to be clear, we're now dealing

18     with [REDACTED]?

19         MR. LEVINE:  That was correct.  That's correct.

20         MS. BINA:  Thank you.

21   BY MR. LEVINE:

22     Q.  What is a sync up?

23     A.  In what context?

24     Q.  Okay.  So look at next exhibit I think it's

25   Defense 11, Bates number 0078.

1          MS. BINA:  Apple 0078?

2          THE WITNESS:  Okay.  Got it.

3          (Whereupon, Exhibit 11 was marked for

4     identification.)

5     BY MR. LEVINE:

6          Q.  You see "Chris Wade sync up" at the top of that

7     document?

8          A.  I do.

9          Q.  What is a sync up?

10         A.  I imagine it was a conversation to discuss

11    Chris Wade.

12         Q.  Do you recall that conversation?

13         A.  I do not.

14         Q.  What about Defense 12 Bates number 00363.

15         (Whereupon, Exhibit 12 was marked for

16    identification.)

17         MS. BINA:  Apple 363?

18         MR. LEVINE:  These are all Apple.

19         MS. BINA:  I just want to make sure we have a

20    clean record when we go back to look for them later.

21         THE WITNESS:  I have it.

22    BY MR. LEVINE:

23         Q.  What is a ███████████

24         A.  ████████████████████████████████████

25         Q.  What is ███████

Page 119



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24        Q.   Looking at these Apple 0041, that e-mail.
25             Is it in the e-mail?
```

1          A.   I have 0041, yes.

2          Q.   Okay.

3               MS. BINA:  So that's Defense 13?

4               MR. LEVINE:  Yes.

5               (Whereupon, Exhibit 13 was marked for

6     identification.)

7     BY MR. LEVINE:

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 121

1 ████████████████████████████████

2        A.  Before we do that, can I close this screen?

3 Are we done with this?

4        Q.  Yes.

5        ████████████████████████████████

6        MS. BINA:  Just to be clear, Mr. Wade and

7 Ms. Gorton are still out of the room, correct?

8        MR. LEVINE:  Yes.

9        ████████████████████████████████████

10 BY MR. LEVINE:

11        Q.  Yes.

12 ████████████████████████████████████████

13 ████████████████████████████████████████

14 ████████████████████████████████████████

15        Q.  Do you know why that was ██████████

16 ████████████████████████████████████████

17 ████████████████████████████████████████

18        Q.  Was that the reason why Corellium was not --

19 that's Manny leaving the room.  There's nobody else in

20 the room right now.

21 ████████████████████████████████████████

22 ████████████████████████████████████████

23 ████████████████████████████████████████

24 ████████████████████████████████████████

25 ████████████████████████████████████████

1

2

3        Q.  What's your education?  Where did you go to

4  undergrad?

5        A.  Princeton.

6        Q.  And what's your degree in?

7        A.  Economics.

8        Q.  And do you have a graduate degree?

9        A.  I do.

10        Q.  In what?

11        A.  I have a Master's in business, an MBA.

12        Q.  Okay.  Do you have any other degrees other than

13  the MBA?

14        A.  No.

15        Q.  And prior to working at Apple, where were you

16  working?

17        A.  I worked at Credit Suisse First Boston, Allied

18  Capital and Unova Automation Systems.

19        Q.  At Credit Suisse, what was your role there?

20        A.  I was an investment banking analyst.

21        Q.  For how long?

22        A.  Two years.

23        Q.  All right.

24        MR. LEVINE:  Why don't we take a quick break.

25  Manny may need to send out the second of two e-mails.

Page 123

 1    It will be the last e-mail with a number of exhibits,

 2    but he just stepped out of the room and I may need to

 3    run through those exhibits quickly.  I would say ten.

 4    Is that okay?

 5         MS. BINA:  Yes.  Do you have a sense of how

 6    much time is left, just ballpark?

 7         MR. LEVINE:  Frankly, not much.  I would say

 8    probably less than an hour once we get back on.

 9         MS. BINA:  Okay.  Ten minutes and we'll come

10    back.

11         (Whereupon, a break was taken.)

12         MR. LEVINE:  I'd like to enter in Defense 14,

13    that's Corellium Bates number 1457.

14         (Whereupon, Exhibit 14 was marked for

15    identification.)

16    BY MR. LEVINE:

17         Q.  Mr. Smith, do you have that in front of you?

18         A.  I do, yes.

19         Q.  Do you recall, is this -- do you recall a

20    conversation with both Amanda and Chris on February 7th,

21    2018?

22         A.  I do not.

23         Q.  Do you have any reason to dispute that this

24    happened?

25         A.  No.

Page 124

1        Q.  Next I'd like to flip to Corellium 1478, I

2    think this is Defense 14.

3            MS. BINA:  15.

4            (Whereupon, Exhibit 15 was marked for

5    identification.)

6            MR. LEVINE:  15.

7            THE WITNESS:  I have it in front of me.

8    BY MR. LEVINE:

24        Q.  Look down at the bottom of the page of 1478.

25    Do you see you have an e-mail there that starts

Page 125

1    ████████████████████████████████████████████

2    ████████████████████████████████████████████

3       Q.  Right under that, what does SW mean?

4       A.  Software.

5       Q.  So it appears that ████████████████████

6    ██████████████████████████is that right?

7       A.  █████████████████████████████████████

8       Q.  Do you have any recollection of ███████

9    ████

10      A.  ███████████

11      Q.  I'd like to turn your attention to -- or enter

12   Defense 16.  It's going to be Corellium Bates 1484.

13          (Whereupon, Exhibit 16 was marked for

14   identification.)

15          THE WITNESS:  Got it.

16   BY MR. LEVINE:

17      Q.  You see there's ███████████████████████

18   █████████████████████████████████████

19   █████

20          Do you recall that ██████████████████████

21   ███████████

22      A.  ███████████████████████████████

23   ████████████████████████████████

24      Q.  Do you have any reason to doubt that ██████

25   ███████████





1

2

3

4

5

6

7              MS. BINA:  I'm going to object as vague.  Are

8       you asking

9

10             MR. LEVINE:

11             THE WITNESS:

12

13      BY MR. LEVINE:

14          Q.  Who -- never mind.  Strike that.

15             MR. LEVINE:  Enter in Defense 17 which is an

16      Apple document Bates 0032.

17             (Whereupon, Exhibit 17 was marked for

18      identification.)

19             THE WITNESS:  Okay.

20      BY MR. LEVINE:

21

22

23

24

25

Page 128

1              MR. LEVINE:  I'd like to enter Defense 18,

2        Corellium document 001381.

3              (Whereupon, Exhibit 18 was marked for

4        identification.)

5              THE WITNESS:  I have it.

6        BY MR. LEVINE:

7           Q.  Do you have that in front of you?

8           A.  I do.

9           Q.  Do you recognize this ████████

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 129

8          MR. LEVINE:  Enter Defense 19, an Apple

9     document 374.

10          (Whereupon, Exhibit 19 was marked for

11     identification.)

12     BY MR. LEVINE:

13          Q.  Let me know when you have that in front of you.

14          A.  I have it.

15          Q.  Do you recognize this document?

16          A.  No, I don't.

17          Q.  What is

Page 130



MR. LEVINE:  I'd like to enter Defense 20, which is an Apple document 044.

(Whereupon, Exhibit 20 was marked for identification.)

BY MR. LEVINE:

Q.  Let me know when you have it in front of you.

A.  I have it.



```
13        MR. LEVINE:  I'd like to enter Defense

14   Exhibit 21.

15        (Whereupon, Exhibit 21 was marked for

16   identification.)

17        MS. BINA:  What's the Bates number for that?

18        MR. LEVINE:  Excuse me, Apple 372.

19        MS. BINA:  Thank you.

20   BY MR. LEVINE:
```



MR. LEVINE:  I'd like to enter Defense Exhibit

22.  This is an Apple document Bates 373.

(Whereupon, Exhibit 22 was marked for

identification.)

THE WITNESS:  I got it.

BY MR. LEVINE:

Do you see that?

A.  I do.

Page 133



```
23              MR. LEVINE:  Enter Defense 23.

24              (Whereupon, Exhibit 23 was marked for

25        identification.)
```

Page 134

```
 1      BY MR. LEVINE:

 2           Q.   It's Apple Bates 368.

 3           A.   Got it.

 4

 5

 6

 7

 8                THE WITNESS:   Sorry, Ms. Court Reporter, Madam

 9      Court Reporter, do you have a clarification?

10                (Reporter clarification.)

11

12

13

14      BY MR. LEVINE:

15

16

17

18

19

20

21

22

23

24

25
```

Page 135



9          MR. LEVINE:  I'd like to enter Defense 24.

10          (Whereupon, Exhibit 24 was marked for

11    identification.)

12    BY MR. LEVINE:

13        Q.  Apple Bates 369.

14        A.  Got it.

15        Q.  It says a

16          What is that?

Page 136

              MR. LEVINE:  I'd like to enter Defense Exhibit

25, that's Corellium Bates number 1287.

              (Whereupon, Exhibit 25 was marked for

identification.)

BY MR. LEVINE:

      Q.  Let me know when you have it.

      A.  I have it.

      Q.  Do you recall this e-mail?

      A.  I recall receiving this e-mail, yeah.



         A.   I believe a EULA is an end user license

    agreement.

         Q.   Do you recall ever using a EULA with any member

    of Corellium?

         A.   No, I do not.

         Q.   Do you recall ever discussing anything relating

    to copyrights with any member of Corellium?

         A.   I do not.

1          Q.  Do you recall ever discussing any legal issues

2     or any potential legal issues with any member of

3     Corellium?

4          A.  I do not.

5          Q.  Do you recall ever discussing with any member

6     of Corellium that Corellium may be violating any laws?

7          A.  No, I do not recall any.

8          Q.  How often do you see Tim Cook?  How regularly?

9          A.  I see him probably when he's in the office most

10    days, I would say.

11         Q.  Do you sit close by him or your office?

12         A.  I do.

13         Q.  How far away are you from Mr. Cook's office?

14         A.  200 yards.

15         Q.  What is Adrian's last name?

16         A.  Perica.

17         Q.  And he's your direct supervisor?

18         A.  Yes, he's my manager.

19         Q.  And who does he report to?

20         A.  Tim Cook.

21         Q.  Would Apple ever acquire a company or acquire a

22    technology that it was not familiar with?

23         A.  It would be very unlikely for us to acquire a

24    company that we were not familiar, but I can't say

25    what's going to happen in the future.

1      Q.  To the best of your knowledge, was Apple

2    familiar with Corellium's technology?

3      A.  It's hard for me to say how familiar we were

4    with Corellium's technology.

5      Q.  Why is it hard for you to say that?

6      A.  Because I'm not technical.

7      Q.  Do you have any reason to believe that Apple

8    was not familiar with Corellium's technology by the end

9    of the acquisition efforts?

10      A.  I don't have any reason to believe that we

11    weren't.

12      Q.  Was Adrian involved in any way in the Corellium

13    acquisition efforts?

14      A.  He was aware of the acquisition efforts, but I

15    think that was the extent of his involvement.

16            MR. LEVINE:  No further questions.

17            MS. BINA:  Let me take ten minutes.  I don't

18    believe I'll have redirect, but I want to go through my

19    notes to be sure.

20            MR. LEVINE:  Sure.

21            MS. BINA:  Let's go off the record for two or

22    three minutes.

23            (Whereupon, a break was taken.)

24            MS. BINA:  Okay.  So we're back on the record

25    and I have no questions for the witness.

```
 1              MR. LEVINE:  Do you need me to or do you want

 2      to instruct him as to reading or waiving, Jessica?

 3              MS. BINA:  You can do whatever is typical for

 4      your firm in terms of -- this is my first under the

 5      California -- under the Florida rule.  I'm happy to have

 6      you do it.

 7              MR. LEVINE:  Mr. Smith, we close out these

 8      depositions by generally questions that we would you

 9      like to read or waive.

10              As you know, the transcript has been compiled

11      by the court reporter throughout this time.  The lawyers

12      will get a copy of the transcript.

13              You have an opportunity to go through that

14      transcript and make any non-material or non-substantive

15      changes.  It's basically an effort to correct any type

16      of typographical errors or errors that may have been

17      misheard especially in this case where the testimony was

18      taken over video line.

19              So you have the option to read the deposition

20      transcript and then submit what's called an errata sheet

21      to make an -- indicate to the Court any of those changes

22      that you're making.

23              Otherwise, witnesses can also waive that and

24      just -- the transcript will read as it is.

25              THE WITNESS:  I'd defer to my counsel on this.
```

Page 141

1          MS. BINA:  We will review the transcript and

2     provide it to the witness and give him an opportunity to

3     review and correct.

4          MR. LEVINE:  Okay.  Thank you.  Mr. Smith,

5     you're free to go.  And then hang on one second.

6          We can go off the record.

7          (Off record discussion.)

8          THE REPORTER:  Would you like to order a

9     certified copy of this deposition?

10          MS. BINA:  Yes, we'll order a copy on whatever

11     timetable defendant's counsel orders it on.

12          MR. LEVINE:  We'll order it today.

13          We'll order standard.

14          MS. BINA:  Okay.

15          I don't think we need a rough.  Thank you.

16          MR. LEVINE:  Neither party needs a rough draft.

17     Just a standard order.

18          (The deposition of STEVE SMITH was concluded at

19     3:57 p.m.)

20

21

22

23

24

25

Page 142

1                   CERTIFICATE OF WITNESS

2

3        I, STEVE SMITH, hereby declare that I have read the

4    foregoing testimony pages 1 through 143, inclusive.  I

5    hereby state there are:

6

7            (check one)

8

9            _____ no corrections

10           _____ corrections per attached

11

12

13    _____

      STEVE SMITH

14

15    _____

16    DATE

17

18                  ---oOo---

19

20

21

22

23

24

25

Page 143

1        I, NINA PAVONE, a Certified Shorthand

2    Reporter, hereby certify that the witness in the

3    foregoing deposition was by me duly sworn to tell the

4    truth, the whole truth, and nothing but the truth in the

5    within-entitled cause;

6        That said deposition was taken down in

7    shorthand by me, a disinterested person, at the time and

8    place therein stated, and was hereafter transcribed, by

9    computer, into typewriting, under my direction and

10   supervision;

11       That before completion of the deposition

12   review of the transcript ( x) was requested ( ) was not

13   requested.  If requested, any changes made by the

14   deponent (and provided to the reporter) are appended

15   hereto.

16       I further certify that I am not of counsel,

17   nor attorney for any of the parties in the foregoing

18   deposition and caption named, nor in any way interested

19   in the outcome of the cause named in said caption, and

20   that I am not related to any of the parties hereto.

21

22   DATE: March 30, 2020

23   _____

24              NINA PAVONE, CSR #7802

25