**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**


**Case No. 9:19-cv-81160-RS**


APPLE INC.,

                     Plaintiff,

     v.

CORELLIUM, LLC,

                Defendant.


**PLAINTIFF APPLE INC.'S RESPONSE TO DEFENDANT CORELLIUM'S MOTION**
**TO EXCLUDE LEGAL OPINIONS AND CORRESPONDING TESTIMONY**
**<u>OF APPLE'S EXPERT DAVID CONNELLY</u>**

# **TABLE OF CONTENTS**

**Page**

I.      The *Daubert* Standard ................................................................................................2

II.     Mr. Connelly is Qualified To Opine On Damages .................................................3

III.    Mr. Connelly's Reports And Corellium's Discovery Failures .............................4

IV.     Mr. Connelly's Challenged Opinions Are Admissible. ........................................6

        A.      Mr. Connelly's Opinion with Respect to Gross Revenues Is Admissible. ..............7

                1.      Corellium Misrepresents The Law With Respect To Gross
                        Revenues. ......................................................................................................8

                2.      Mr. Connelly's Allocation of Revenues Is Likewise Appropriate. ...........12

        B.      Mr. Connelly's Opinions with Respect to Future Revenues Are
                Admissible. ........................................................................................................14

        C.      Mr. Connelly's Method for Calculating Statutory Damages Pursuant to 17
                U.S.C. § 1203 Is Admissible ................................................................................16

        D.      The Calculation of 17 U.S.C. § 504 Statutory Damages Is Admissible. ...............19

V.      Mr. Connelly's Remaining Opinions Are Likewise Admissible. ......................20

VI.     Conclusion. ...........................................................................................................20

## **TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*Aerospace Servs. Int'l v. LPA Grp., Inc.*,
   57 F.3d 1002 (11th Cir. 1995) ...............................................................9

*Allison v. McGhan Med. Corp.*,
   184 F.3d 1300 (11th Cir. 1999) .............................................................3

*Andreas v. Volkswagen of Am., Inc.*,
   336 F.3d 789 (8th Cir. 2003) ...............................................................10

*Armstrong v. HRB Royalty, Inc.*,
   No. 03-0148-WS-C, 2005 WL 6007684 (S.D. Ala. Oct. 14, 2005) .................15, 17

*BC Tech., Inc. v. Ensil Int'l Corp.*,
   464 F. App'x 689 (10th Cir. 2012) .........................................................20

*Blizzard Entm't, Inc. v. Bossland GmbH*,
   No. CV 16-1236, 2017 WL 7806600 (C.D. Cal. Mar. 31, 2017) .........................19

*Blizzard Entm't, Inc. v. Reeves*,
   No. CV-09-7621, 2010 WL 4054095 (C.D. Cal. Aug. 10, 2010).........................19

*Bonner v. Dawson*,
   404 F.3d 290 (4th Cir. 2005) .....................................................9, 10, 11

*Bostick v. State Farm Mut. Auto. Ins. Co.*,
   No. 8:16-cv-1400, 2017 WL 2644616 (M.D. Fla. June 20, 2017) .........................16

*City of Tuscaloosa v. Harcros Chems., Inc.*,
   158 F.3d 548 (11th Cir. 1998) ..............................................................20

*Craigslist, Inc. v. Kerbel*,
   No. C-11-3309, 2012 WL 3166798 (N.D. Cal. Aug. 2, 2012) .............................19

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993)..........................................................................2

*Dig. Filing Sys., L.L.C. v. Aditya Int'l*,
   323 F. Appx. 407 (6th Cir. 2009)............................................................14

*Grand Reserve of Columbus, LLC v. Prop.-Owners Ins. Co.*,
   721 F. App'x 886 (11th Cir. 2018) .........................................................19

*Habersham Plantation Corp. v. Molyneux*,
  No. 10-61526-CIV, 2011 WL 13214323 (S.D. Fla. Sept. 13, 2011)......................................20

*Home Design Servs., Inc. v. Park Square Enters., Inc.*,
  No. 6:02-cv-637-ORL-28JGG, 2005 WL 1027370 (M.D. Fla. May 2, 2005) ......................10

*Lorentz v. Sunshine Health Prods. Inc.*,
  No. 09-61529-CIV, 2010 WL 11492992 (S.D. Fla. Sept. 7, 2010)......................................10

*Maiz v. Virani*,
  253 F.3d 641 (11th Cir. 2001) ...........................................................................................3

*Mamani v. Sanchez Berzain*,
  No. 07-22459-CIV, 2018 WL 1090546 (S.D. Fla. Feb. 28, 2018)........................................20

*Montgomery v. Noga*,
  168 F.3d 1282 (11th Cir. 1999) ..........................................................................................9

*Netdragon Websoft Inc. v. Toft*,
  No. CV-11-1037, 2012 WL 13008123 (C.D. Cal. Apr. 24, 2012) .........................................19

*On Davis v. The Gap, Inc.*,
  246 F.3d 152 (2d Cir. 2001)..........................................................................................9, 10

*Oravec v. Sunny Isles Luxury Ventures L.C.*,
  469 F. Supp. 2d 1148 (S.D. Fla. 2006), *aff'd*, 527 F.3d 1218 (11th Cir.
  2008) ..................................................................................................................9, 10, 11, 12

*Pleasant Valley Biofuels, LLC v. Sanchez-Medina, Gonzalez, Quesada, Lage,
  Crespo, Gomez & Machado LLP*,
  No. 13-23046-CIV, 2014 WL 2855062 (S.D. Fla. June 23, 2014)........................................15

*Polar Bear Products v. Timex Corp.*,
  384 F.3d 700 (9th Cir. 2004) .....................................................................................9, 10, 12

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
  326 F.3d 1333 (11th Cir. 2003) .................................................................................3, 15, 17

*Reinsdorf v. Skechers U.S.A.*,
  922 F. Supp. 2d 866 (C.D. Cal. 2013) .............................................................................4, 11

*Reinsdorf v. Skechers U.S.A., Inc.*,
  296 F.R.D. 604 (C.D. Cal. 2013).............................................................................................4

*Scholz v. United States*,
  No. 16-CV-1052, 2019 WL 2303769 (E.D. Wis. May 30, 2019) ...........................................20

*Sensonics, Inc. v. Aerosonic Corp.*,
    81 F.3d 1566 (Fed. Cir. 1996)................................................................................14

*Thornton v. J. Jargon Co.*,
    580 F. Supp. 2d 1261 (M.D. Fla. 2008)................................................................10

*In re Trasylol Prods. Liab. Litig.*,
    No. 08–MD–01928, 2010 WL 1489793 (S.D. Fla. Feb. 24, 2010) .............................3, 15, 17

*United Fire & Cas. Co. v. Whirlpool Corp.*,
    704 F.3d 1338 (11th Cir. 2013) ........................................................................20

*United States v. Barton*,
    909 F.3d 1323 (11th Cir. 2018) .........................................................................3

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) .........................................................................3

*United States v. Lundy*,
    809 F.2d 392 (7th Cir. 1987) ..........................................................................19

*University of Colorado Foundation, Inc. v. American Cynamid Co.*,
    196 F.3d 1366 (Fed. Cir. 1999)..........................................................................9

## STATUTES

17 U.S.C.
    § 504 .............................................................................................. *passim*
    § 504(b) ........................................................................................... *passim*
    § 504(c) .............................................................................................2, 6
    § 1201 ............................................................................................2, 8, 16
    § 1203.............................................................................................7, 16
    § 1203(c) ...............................................................................................6
    § 1203(c)(2) .......................................................................................8, 20
    § 1203(c)(3) .......................................................................................8, 16

Digital Millennium Copyright Act..............................................................5, 7, 8, 19

## RULES

Rule 26 .................................................................................................3

Rule 702 ..............................................................................................2, 3

Corellium's motion, which seeks to exclude the entirety of Apple Inc.'s damages expert David Connelly's testimony in this case, should be denied as unwarranted and contrary to law. If a theme can be derived from Corellium's disparate attacks on Mr. Connelly's testimony, it might best be described as "Corellium did not produce evidence, and thus Apple cannot claim damages." This, of course, is not the law, and Corellium does not identify any genuine basis for exclusion. Corellium acknowledges that Mr. Connelly, who is both a Certified Public Accountant and a (non-practicing) attorney, is qualified to opine on damages. And Corellium's motion does not challenge the majority of Mr. Connelly's reports—which demonstrate, among other things, that Corellium selectively edited its books and records prior to producing them in discovery, and that Corellium inappropriately attempted to deduct hundreds of thousands of dollars expended in this litigation from its profits otherwise payable as damages to Apple. Instead, Corellium moves to exclude the *entirety* of Mr. Connelly's testimony based on four unrelated objections to various portions of Mr. Connelly's opinions. Each of these objections fails by its own terms as a matter of black-letter law. Moreover, none remotely justifies the proposed remedy of striking the entirety of Mr. Connelly's testimony. Corellium's motion should be denied.

*First*, Corellium asserts that Mr. Connelly's calculation of Corellium's gross revenues pursuant to 17 U.S.C. § 504 should be excluded because Corellium contends that Mr. Connelly did not reasonably apportion sales from Corellium's Apple Product amongst amounts attributable to Corellium's users making Android virtual devices with the same product. Mr. Connelly's opinion regarding gross revenues, however, was based on substantial evidence, including the verified interrogatory responses and testimony of Corellium's own witnesses. Furthermore, section 504(b) of the Copyright Act places the burden on *Corellium*, not Apple, to apportion elements not attributable to infringement. Mr. Connelly properly calculated Corellium's gross revenues attributable to the Corellium Apple Product, which is all section 504(b) requires Apple to do.

*Second*, Corellium challenges Mr. Connelly's two alternative methods of projecting Corellium's future revenues—the first based on Corellium's own projections and the second based on Corellium's historic income. Corellium asserts that it was unreasonable for Mr. Connelly to rely on Corellium's own projected revenues set forth in *Corellium's own verified interrogatory responses*, because Corellium's projections were speculative. The law, however, does not require Mr. Connelly to ignore Corellium's estimates of its profitability, and both the jury and Mr. Connelly are entitled to rely on Corellium's admissions under oath. Unsatisfied there, Corellium

also moves to exclude Mr. Connelly's alternative calculation of future revenues, which is based on *Corellium's past income*, as lacking foundation.  Not only is Corellium's position nonsensical (it is perfectly appropriate to use a company's most recent prior income as a method to estimate future income), Corellium's argument that the opinion has "no scientific reasoning" is baseless.  Despite possessing Mr. Connelly's workpapers, which show Mr. Connelly considered several different possible methods of calculating Corellium's future revenues, Corellium never asked Mr. Connelly what his reason was for selecting 2019 revenue, rather than some other method, and cannot complain it does not know Mr. Connelly's basis for choosing this method.

*Third*, Corellium argues that one of Mr. Connelly's alternative methods of calculating statutory damages for Corellium's violations of 17 U.S.C. § 1201 is unreasonably speculative because Mr. Connelly used the data available to him (a list of Corellium's customers, the specific number of "cores" ordered by each, and the length of their respective contracts) to conservatively estimate the number of virtual devices created by each Corellium customer.  Corellium contends that it is unreasonable for Mr. Connelly to assume that Corellium's customers used the product for its intended and advertised purpose—*i.e.*, to create virtual iOS devices.  Mr. Connelly's estimates, however, were methodical and conservative.  And Corellium's alternative contention—that because Corellium itself makes it impossible to document the exact number of virtual devices created by its customers, no damages evidence should be admitted—is contrary to law.

*Fourth*, Corellium contends that Mr. Connelly's calculation of statutory damages under 17 U.S.C. § 504(c), which it admits is accurate, is unhelpful to the jury because it is "basic math." But there is no basis to exclude Mr. Connelly's testimony merely because one calculation is less complex than others: Apple's damages expert should be permitted to testify in full to whichever damages theory Apple elects to pursue at trial.

Finally, there is no reason whatsoever to exclude the remainder of Mr. Connelly's testimony, which Corellium does not challenge on any basis and which indisputably meets the *Daubert* standard.  Corellium's motion should be denied in full.

## I.        THE *DAUBERT* STANDARD

In determining the admissibility of expert testimony under Rule 702, the Court must consider whether (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable under the inquiry mandated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596–

97 (1993); and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to under the evidence the evidence or determine a fact in issue. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).[1]  A district court's gatekeeper role under *Daubert* "is not intended to supplant the adversary system or the role of the jury."  *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999).  "Notwithstanding its critical gatekeeping function, the trial court is just that—a gatekeeper—and Rule 702 is a *screening* procedure, not an opportunity to substitute the trial court's judgment for that of a jury."  *United States v. Barton*, 909 F.3d 1323, 1332 (11th Cir. 2018).

In evaluating expert opinions related to damages, courts in this Circuit consider such factors as the education and experience of the expert and the complexity of the damages model.  *See, e.g.*, *Maiz v. Virani*, 253 F.3d 641, 665–66 (11th Cir. 2001) (finding expert was qualified based on education, experience, and "substantial background in estimating damages").  Challenges to the foundations of the expert's opinion, rather than the methodology, are best addressed through cross-examination rather than exclusion.  *See id.*; *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345–46 (11th Cir. 2003) ("[O]bjections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.")  "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."  *In re Trasylol Prods. Liab. Litig.*, No. 08–MD–01928, 2010 WL 1489793, at *6 (S.D. Fla. Feb. 24, 2010).

## II.     MR. CONNELLY IS QUALIFIED TO OPINE ON DAMAGES

Mr. Connelly is a Certified Public Accountant with nearly 40 years' experience.  Ex. 4 at 1.  He is a number of numerous professional organizations, including the American Institute of Certified Public Accountants and the California Society of Certified Public Accountants.  *Id.* at 2.  He holds a Juris Doctor (*cum laude*) from the Willamette University College of Law, and a Bachelor of Science in business administration (accounting) from the University of Oregon.  *Id.* He is a Vice President and Shareholder of Freeman & Mills, a forensic accounting company, and has worked in the fields of forensic accounting investigations and damages analysis for 27 years.  *Id.* at 1.  He has given presentations in the fields of accounting, forensic accounting, fraud investigation, and calculation of damages.  *Id.* at 2–3.  And he has testified as an expert witness with respect to damages in federal and state cases, providing deposition testimony and/or Rule 26

---

[1] Internal quotations and citations omitted throughout.

reports in more than two dozen matters.  *Id.* at 4–6.  Corellium, appropriately, does not challenge Mr. Connelly's qualifications or expertise, and thus the first prong of *Daubert* is satisfied.[2]

## III.    MR. CONNELLY'S REPORTS AND CORELLIUM'S DISCOVERY FAILURES

Before delving into the two grounds Corellium *does* challenge—Mr. Connelly's methodology (with respect to three opinions), and helpfulness (with respect to the fourth)—some background on Mr. Connelly's reports and the testimony that Corellium does *not* challenge is instructive.  Mr. Connelly submitted three reports in this case: (1) an initial report dated March 3, 2020 (the "Initial Report"); (2) a supplemental report dated April 20, 2020 (the "Supplemental Report");[3] and (3) a second supplemental report dated April 27, 2020 (the "Second Supplemental Report").  Exs. 1–3.

The preparation of Mr. Connelly's Initial Report, and to some degree his Supplemental and Second Supplemental Reports, was substantially hindered by Corellium's inadequate discovery responses at the time.  In October 2019, Apple served financial discovery on Corellium.  In particular, Apple asked Corellium to identify all sales and licenses of each installation or version of the Corellium Apple Product (Interrogatory No. 9) as well as all revenues received, by quarter, for the Corellium Apple Product (Interrogatory No. 10).  Apple also asked Corellium to identify its costs of goods sold for private installations of the Corellium Apple Product, its standard costs, its research and development costs attributable to the Corellium Apple Product, its per-sale/license profits, and its total profits from sales of the Corellium Apple Product (Interrogatory No. 10).  Apple also asked Corellium to identify its projected revenues, projected costs, and projected per-

---

[2] Corellium spends portions of its brief discussing a supplemental report that a California district court struck in connection with an unrelated summary judgment motion in 2013, unfairly implying that this Court should reject Mr. Connelly's testimony here.  The Court should ignore Corellium's attempt to malign Mr. Connelly's testimony in this case with matters not relevant here.  Moreover, Corellium fails to mention many pertinent facts, including: (1) Mr. Connelly's original report and primary opinions in the case were not stricken; and (2) *all* experts' supplemental reports in the case were stricken due to a failure by counsel in the case to conduct sufficient discovery to support those experts' opinions (which led to the attorneys' firing and a belated attempt to reopen discovery).  *See Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 877–81 (C.D. Cal. 2013); *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 620–21 (C.D. Cal. 2013) (describing inadequate discovery conducted by prior counsel).

[3] In connection with his Second Supplemental Report, Mr. Connelly submitted an errata Supplemental Report that corrected minor typographical errors in the Supplemental Report, dated April 26, 2020; *see* Ex. 5.  Mr. Connelly also corrected a small clerical error in an exhibit to his Second Supplemental report via errata on May 4, 2020.

sale profits for at least five years into the future (Interrogatory No. 11). Corellium ultimately served *six* different versions of its responses to these interrogatories (on November 18, 2019, January 16, 2020, February 24, 2020, February 27, 2020, March 9, 2020, and April 18, 2020), each with a different set of answers giving Corellium different gross and net revenue figures. Exs. 6–11. The figures also differed from one another, such that one could not add up the responses in Interrogatory 9 to match the totals in Interrogatory 10, and from Corellium's eventually produced accounting records, which were excerpts from its QuickBooks (and of which Corellium *also* produced multiple, inconsistent versions, *see* Ex. 2 at 6–9; Ex. 3 at 8–10).

Apple also requested documents supporting all of the foregoing figures. Ex. 12 at 16–17 (Requests for Production 47–49). Corellium resisted discovery for months, and Corellium eventually produced, in no particular order, documents confirming substantially all of its revenues, but less than half of its claimed costs. Ex. 2 at 3–4; Ex. 3 at 3. The first set of such documents was produced in late February 2020—just days before Mr. Connelly's first report was due—and the most substantial production was made April 9, 2020—eleven days before fact discovery closed. In addition, Corellium produced three different excerpts from QuickBooks, each an update of the last—purporting to show its revenues and expenses. Corellium produced one such set on April 18, 2020 (two days before Mr. Connelly's supplemental report was due), and the last such set on **April 27, 2020** (the close of expert discovery and a week **after** the close of fact discovery). *See* Ex. 2 at 8; Ex. 3 at 9. Those QuickBooks, however, were edited and incomplete, excluding revenues otherwise accounted for in Corellium's interrogatory answers, and identifying different costs. *See* Ex. 2 at 2 ("[M]y team and I have recently identified certain Corellium transaction documents that demonstrate that Corellium's partial QuickBooks accounting records that have thus far been produced are not only incomplete as to the nature of the records, but also did not include or record certain identified revenue transactions.").

In the face of the ever-changing and conflicting information provided by Corellium over the course of discovery, Mr. Connelly nonetheless performed an in-depth analysis of Corellium's claimed gross revenues attributable to the Corellium Apple Product. He provided an initial report based on the limited information then available to him, and then, after Corellium produced information supporting its gross revenues, provided a detailed analysis of Corellium's gross revenues and its profits attributable to infringement and attributable to Corellium's violations of the DMCA. Ex. 1 at 3–7; Ex. 2 at 6–16; Ex. 3 at 3, 5–8. Specifically, Mr. Connelly was able to

further identify and corroborate Corellium's gross revenues, and ultimately identified at least ▮▮▮▮▮▮ in revenues attributable to the "sale or licensing of [Corellium's] infringing Apple Product." Ex. 3 at 3. He reached this conclusion by conducting a detailed, forensic review of the documents produced by Corellium as well as the testimony of various witnesses, including Courtney Smith of Azimuth Security, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 5–8. Mr. Connelly explained that, based on the totality of the evidence presented, there remained significant omissions and discrepancies in Corellium's reported revenues; thus, his figure was the minimum amount that could be definitively determined to come from the Corellium Apple Product. *Id.* at 3–8 & n.4, 9, 10–11; *see also* Ex. 2 at 6–16.

In each of his reports, Mr. Connelly also explained why he could not use Corellium's stated costs figures to calculate Corellium's net profits. He explained that Corellium had not produced sufficient evidence to substantiate most of the costs (in the final report, more than 60% of the costs were not substantiated with any documentary support), and that numerous claimed costs were not in fact costs properly attributable to the Corellium Apple Product. This included ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 3 at 12– 16. Notwithstanding these deficiencies, Mr. Connelly attempted to calculate Corellium's gross profits (revenues net of costs of goods sold) and net profits (revenues net of costs and appropriately chargeable expenses). Ex. 2 at 11–15 & Ex. C; Ex. 3 at 12–16 & Exs. C, C1, C2. He further conducted an exhaustive analysis of Corellium's costs, determining which were supported, which were supportable, and which are not reasonable. *Id.*; *see also* Ex. 2 at Ex. D; Ex. 3 at Ex. D.

## IV.    MR. CONNELLY'S CHALLENGED OPINIONS ARE ADMISSIBLE.

Corellium does not challenge Mr. Connelly's calculations in its motion. It neither disputes his methodology for calculating Corellium's gross revenues, nor his analysis of Corellium's claimed costs. Nor does it challenge the accuracy of his calculation of statutory damages under 17 U.S.C. 504(c), or the first of three alternative methods he provided for calculating statutory damages under 17 U.S.C. 1203(c), which was based on sales of individual units of and licenses to the Corellium Apple Product. *See* Ex. 2 at 17. Nonetheless, Corellium moves to exclude the entirety of Mr. Connelly's testimony, on four bases, two related to Mr. Connelly's opinion of actual

damages, and two related to Mr. Connelly's alternative opinion of statutory damages.  With respect to Mr. Connelly's actual damages opinion, Corellium challenges two analyses conducted by Mr. Connelly: (1) his initial decision not to sub-allocate the revenues Corellium earned from its Apple Product into revenues attributable to infringement and to other factors, and his subsequent opinion—in response to Corellium's expert—that any such allocation would reduce those revenues by no more than ten percent, and only for the period after March 2019; and (2) his estimate of Corellium's *future* revenues that would be earned between April and October 2020.  Corellium challenges both of these opinions as unreliable.  ECF No. 454 at 7, 9–16.

With respect to Mr. Connelly's statutory damages opinions, Corellium likewise brings two challenges.  First, it challenges Mr. Connelly's estimate with respect to virtual devices as a method of awarding damages under section 1203 as unreliable; and second, it argues that Mr. Connelly's calculation of statutory damages under the Copyright Act should be excluded, not because it is wrong, but because it is too simple and thus unhelpful.  ECF No. 454 at 16–19.

Corellium's motion should be rejected on all grounds.

## A.      Mr. Connelly's Opinion with Respect to Gross Revenues Is Admissible.

First, Corellium argues that Mr. Connelly's calculation of gross revenues, pursuant to 17 U.S.C. § 504(b), should be excluded because Mr. Connelly did not, in Corellium's view, discount Corellium's revenues to account for Corellium customers using the Corellium Apple Product to make virtual Android devices.  ECF No. 454 at 7, 9–14.

But Corellium's argument is premised on a significant misrepresentation of Mr. Connelly's opinion.  Mr. Connelly did not initially offer an opinion on gross revenues under section 504(b) and then revise that opinion of Corellium's gross revenues.  Rather, Mr. Connelly's opinion regarding Corellium's gross revenues is consistent throughout his reports: *all* sales of the Corellium Apple Product constitute revenues attributable to Corellium's infringement because every single unit of, or license to, the Corellium Apple Product results in infringement of iOS.[4]

---

[4] Similarly, with respect to the DMCA, Mr. Connelly opines that all sales of the Corellium Apple Product constitute revenues attributable to Corellium's violations of the DMCA, because the purpose of the Corellium Apple Product is to enable access to, copying, distribution, and public display, of iOS in violation of Apple's security measures that would in the ordinary course prevent such access, copying, distribution, and public display.  Ex. 3 at 15–16 & n.7.  Mr. Connelly explained that the two measures of damages are often different but converge in this case because the Corellium Apple Product functions as intended only by circumventing Apple's security

Ex. 1 at 4–7, 9; Ex. 2 at 6–9, 12, 15–16, 24–26; Ex. 3 at 5–7, 10–11 & n.5. Mr. Connelly did not, as Corellium claims, initially offer the above opinion regarding *gross* revenues attributable to sales/licenses of the Corellium Apple Product and then change it to apportion some element of those sales to Android. Rather, in response to Corellium's expert's assertion that it was Apple's burden to perform this allocation (an assertion that is, as explained below, wrong as a matter of law), Mr. Connelly provided a supplemental opinion responding directly to Corellium's expert confirming his original opinion and explaining that, in his view, any revenues from those sales attributable to Android are *de minimis*. Ex. 2 at 24–26; Ex. 3 at 10–11 & n.5. Both Mr. Connelly's primary opinion and his supplemental opinion are based on reliable methodology and are admissible under *Daubert*.

### 1.   Corellium Misrepresents The Law With Respect To Gross Revenues.

Corellium does not dispute that Mr. Connelly included in his calculation of "gross revenues" only those revenues linked directly, by Corellium's attestation or other evidence, to the allegedly infringing Corellium Apple Product. ECF No. 454 at 9, 12 (referencing Mr. Connelly's reliance on Corellium's interrogatory responses and marketing materials). Indeed, Corellium concedes that Mr. Connelly's "gross revenues" figures include only revenues ***attributable to the Corellium Apple Product***. *Id.* at 9; *see also* Ex. 13 at 4 (Corellium's expert conceding it is undisputed that revenues come from Corellium Apple Product). But Corellium asserts that Mr. Connelly fails to establish that such revenues have a "causal connection" to Corellium's alleged infringement and are thus inadmissible. *Id.* at 9–14. The premise of Corellium's argument is that

---

measures, and thus the revenues attributable to the Corellium Apple Product are attributable to the violation of section 1201. *Id.*

In its motion, Corellium appears to challenge only Mr. Connelly's calculation of Corellium's profits pursuant to 17 U.S.C. § 504, but not his parallel calculation pursuant to 17 U.S.C. § 1203(c)(2), which likewise used Corellium's revenues from sale of its Apple Product as the initial input from which to subtract Corellium's costs of goods sold to determine Corellium's profits attributable to its violations of section 1201. Though Corellium's motion briefly cites section 1203(c)(2) in its introduction, it offers no argument or other support for striking Mr. Connelly's opinions on that front, and thus fails its burden as the moving party. (For example, when discussing the "legal standard" for damages under the DMCA, Corellium discusses *only* statutory damages pursuant to 17 U.S.C. § 1203(c)(3), ignoring actual damages pursuant to 17 U.S.C. § 1203(c)(2) and the appropriate calculation thereof. *See* ECF No. 454 at 8.) Although the legal analysis under section 1203(c)(2) is different than under 504(b), the outcome is the same with respect to Mr. Connelly's opinion: he reasonably allocated Corellium's profits attributable to Corellium's violations of section 1201, and should be permitted to testify to the same.

Mr. Connelly erred in using revenue attributable to the Corellium Apple Product to calculate "gross revenues" within the meaning of 17 U.S.C. § 504(b) because he did not discount those revenues for amounts attributable to Corellium customers' use of the product to create Android virtual devices. This fundamentally misstates the law. Section 504(b) of the Copyright Act provides, in pertinent part:

> In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the ***infringer is required to prove*** his or her deductible expenses and ***the elements of profit attributable to factors other than the copyrighted work.***

17 U.S.C. § 504(b) (emphasis added). The law is clear that the burden of allocating Corellium Apple Product revenues "to factors other than" Corellium's infringement of iOS falls on squarely on Corellium, not on Apple.

Corellium contends the statute means the opposite of what it says, relying on three out-of-circuit authorities: *Bonner v. Dawson*, 404 F.3d 290 (4th Cir. 2005); *Polar Bear Products v. Timex Corp.*, 384 F.3d 700 (9th Cir. 2004); and *University of Colorado Foundation, Inc. v. American Cynamid Co.*, 196 F.3d 1366 (Fed. Cir. 1999). None of these cases, however, supports Corellium's position. Rather, each stands only for the unexceptional proposition that, while the Eleventh Circuit has not yet ruled on this issue,[5] courts in other circuits have held that the plaintiff in a copyright case must establish some broad causal link between either infringement or infringing activity and a "particular profit stream" before the burden-shifting provisions of Section 504(b) apply. *See, e.g. Bonner*, 404 F.3d at 294; *Polar Bear Prods.*, 384 F.3d at 710–11; *Cynamid*, 196 F.3d at 1375. "For example, a plaintiff cannot show a causal connection by simply lumping *all* sales revenues of a retailer together, ***if the retailer's infringement relates only to one item that is a small part of overall sales***." *Oravec v. Sunny Isles Luxury Ventures L.C.*, 469 F. Supp. 2d 1148, 1175 (S.D. Fla. 2006), *aff'd*, 527 F.3d 1218 (11th Cir. 2008) (emphasis added); *see also On Davis v. The Gap, Inc.*, 246 F.3d 152, 160–61 (2d Cir. 2001) (burden did not shift by identifying entirety

---

[5] Courts in this circuit have disagreed whether any such rule should apply, or whether Section 504 should be read to require a plaintiff only to produce only the infringer's entire gross revenues (i.e., revenues linked to the infringing product *and* any other revenues) *Cf. Montgomery v. Noga*, 168 F.3d 1282, 1294–96 (11th Cir. 1999) (finding that plaintiff "went well beyond" statutory obligation by presenting evidence of total sales of four CD–ROM titles and profits after expenses); *Aerospace Servs. Int'l v. LPA Grp., Inc.*, 57 F.3d 1002, 1004 (11th Cir. 1995) (finding that actual damages were properly measured as portion of total fees that defendants received from the use of two documents containing the infringing material).

of The Gap's $1.668 billion in revenue when infringement related to advertisements for only certain products and stores); *Cynamid*, 196 F. 3d at 1375 (plaintiff failed to link copyrighted article to sales alleged not to infringe the article, but a related *patent*).

These cases are inapposite to Corellium's argument because Mr. Connelly never included *all* Corellium revenues in his calculations, only those specifically identified as attributable to the Corellium Apple Product. Ex. 2 at 6–9, 12, 15–16, 24–26; Ex. 3 at 5–7, 10–11 & n.5.[6]  Section 504 does not place the burden of allocating an infringer's revenues within a *single product line* to copyright plaintiffs, as Corellium claims.  To the contrary, courts interpreting section 504 have universally held that where, as here, there is a single alleged infringing product line, it is sufficient for the plaintiff to identify revenues from that product line, and the burden shifts to the *defendant* to attempt to allocate within-product-line revenues.  In *On Davis*, for example, the Second Circuit explained that, for infringement of a single poem, it would be insufficient for the plaintiff to identify a publisher's gross revenues from hundreds of books, "including trade books, textbooks, cookbooks, etc."  246 F.3d at 160.  However, it *would* be sufficient to identify revenues from the single infringing anthology, even though that anthology contained hundreds of non-infringing poems.  *Id.*  The defendant publisher would then bear the burden of demonstrating the revenues from that anthology attributable to the other poems therein rather than the infringing poem.  *Id.*

Other circuits—including in the decisions cited by Corellium—have all held the same.  *See, e.g.*, *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 796 (8th Cir. 2003) (burden of proving initial "nexus" is plaintiff's; "burden of proving apportionment (i.e., the contribution to profits of elements other than the infringed property) is the defendant's"); *see also Polar Bear Prods.*, 384 F.3d at 711 ("Polar Bear was not required to separate the gross profits resulting from the infringement from the profits resulting from other sources."); *Bonner*, 404 F.3d at 294; *Oravec*, 469 F. Supp. 2d at 1175–76.

---

[6] *Compare Home Design Servs., Inc. v. Park Square Enters., Inc.*, No. 6:02-cv-637-ORL-28JGG, 2005 WL 1027370, at *4 (M.D. Fla. May 2, 2005) ("Notwithstanding the plain language of Section 504(b), Defendants maintain that, to survive summary judgment, Home Design must proffer 'non-speculative evidence' which supports a causal link between Defendants' profits and [ ] their alleged infringing activities.  As there is no basis here to depart from the plain language of a statute, Defendants' argument fails.") *with Lorentz v. Sunshine Health Prods. Inc.*, No. 09-61529-CIV, 2010 WL 11492992, at *7 (S.D. Fla. Sept. 7, 2010) (noting lack of in-circuit authority, following circuits holding that some minimal nexus between infringing product and revenues is required); *Thornton v. J. Jargon Co.*, 580 F. Supp. 2d 1261, 1279–80 (M.D. Fla. 2008) (same).

The Fourth Circuit in *Bonner* explained that the copyright owner's burden is limited to "demonstrating *some* causal link between the infringement and the particular profit stream."  404 F.3d at 294 (emphasis added).  The *Bonner* court explained that this causal link was easily met by demonstration of the defendant's leasing revenue of a single building, which the plaintiff alleged was built based on an infringing design.  *Id.*  Reversing the trial court's finding that the lease revenues were not sufficiently connected to the design (since all sorts of things besides a building's design affect the value of a lease), the *Bonner* court explained that the district court "misinterpreted the level of connection between infringement and profits that is required" to shift the burden under Section 504(b).  *Id.*  The court held it was sufficient for plaintiff to identify total revenues from the allegedly infringing building, and then the burden of apportionment shifted to defendant.  *Id.*  Similarly, in *Oravec*, the district court held that it was sufficient for plaintiff to identify sales from a building alleged to have an infringing exterior design, and the burden shifted to the defendant to identify revenues attributable to something other than that design, because the "exterior design is so interwoven with the building as a whole.  469 F. Supp. 2d at 1175–76.  Thus, the court explained, "like the anthology which contains the infringing poem, sale of the building amounts to sale of the infringing design in a way to meet the needed 'conceivable connection' standard . . . ."  *Id.* at 1176.

The same is true here.  It is undisputed that every single version of the Corellium Apple Product offers the ability for Corellium's customers to make virtual iOS devices—the basis for Apple's copyright claim.  *See* ECF No. 455 at ¶¶ 34–36; ECF No. 457 at ¶¶ 44, 47; Ex. 13 at 4; Ex. 14 at 47:24–48:14, 193:13–194:10.[7]  Corellium's own verified interrogatory responses, and the testimony of its CEO, identify the revenues at issue in Mr. Connelly's report as revenues attributable *to the Corellium Apple Product*. Ex. 6 at 22–31; Ex. 7 at 22–32; Ex. 8 at 24–32; Ex. 9 at 23–32; Ex. 10 at 23–34; Ex. 11 at 24–35; Ex. 15 at 200:13–25, 203:12–204:13.  Moreover, Corellium's throwaway statement that Mr. Connelly "simply relied on Corellium's interrogatory answers" is incorrect.  Mr. Connelly reviewed documentation supporting substantially all of the revenues in question and used a combination of documents and deposition testimony to confirm each individual financial statement entry's traceability to the Corellium Apple Product.  *See* Ex. 2 at  6–10 and Ex. D; Ex. 3 at 5–8 and Ex. D.  This provides more than a sufficient nexus to

---

[7] For this reason, the case is wholly distinguishable from *Reinsdorf*, 922 F. Supp. 2d at 881, which involved revenues attributable to a number of product lines and to no product line in particular.

Corellium's infringing activity, and the burden to "parse out which revenues are attributable to [Apple's iOS] and which are attributable to other elements" now "falls on Defendant[] by operation of the burden shifting mechanism of § 504(b)." *Oravec*, 496 F. Supp. 2d at 1176.

Corellium's argument that the burden of apportioning its gross revenues from the Corellium Apple Product lies with Apple—the predicate for its motion to strike Mr. Connelly's opinions—thus rests on a misstatement of law. Mr. Connelly's testimony appropriately establishes Corellium's gross revenues that have a causal link to Corellium's acts of infringement, and is therefore relevant and admissible under the *Daubert* standard.

### 2.       Mr. Connelly's Allocation of Revenues Is Likewise Appropriate.

Corellium next argues that Mr. Connelly's supplemental opinion that the vast majority of Corellium's revenues are attributable to iOS, and not Android, is unsupported because Mr. Connelly did not personally survey each of Corellium's customers to determine exactly how much each customer valued the iOS aspects of the Corellium Apple Product versus the Android aspects. Though Apple "was not required to separate the gross profits resulting from the infringement from the profits resulting from other sources," *Polar Bear Prods.*, 384 F.3d at 711, because that "burden falls on Defendants by operation of the burden shifting mechanism of § 504(b)," *Oravec*, 469 F. Supp. 2d at 1176, Mr. Connelly's supplemental opinion doing so is nonetheless reliable under *Daubert* and admissible, and particularly helpful to the factfinder, given Corellium's abdication of its own burden under section 504.

Ironically, Corellium moves to strike this opinion even though it concedes that at least 2/3 of its revenues can ***only*** be attributable to iOS because they were earned prior to March 2019, and thus before Corellium offered any Android support at all. ECF No. 454 at 13; Ex. 13 at 4. In other words, there was no allocation to be made for revenues earned before March 2019, regardless of whose burden it was. ***All*** Corellium product revenues during that period were indisputably tied to Corellium's infringement of iOS.[8]

---

[8]   Indeed, even if one were to conservatively allocate a full 50% of Corellium's revenues from March 2019—when Android support was introduced—to the present to Android, nearly ███████████ ███████████████ s of April 2020, Corellium's total revenues are calculated by Mr. Connelly to be ████████████████████████ were earned before Corellium supported Android devices in any form (even beta testing). Ex. 2 at 26. If the remaining ████████ were split evenly, that would leave ███████████████ of the total revenues, attributable to iOS.

Corellium nevertheless argues that Mr. Connelly's opinion that he would allocate a ███—is a bridge too far. But Mr. Connelly's opinion has plenty of factual support. His opinion was based on (a) Corellium's verified interrogatory responses attributing the relevant revenues fully to the sale or licensing of the Corellium Apple Product;[9] (b) Corellium CEO Amanda Gorton's testimony that ████████████████ (c) the fact that Corellium as launched and marketed from inception in Fall 2017 through March 2019 supported iOS **only**; and (d) the fact that each and every unit of or subscription to the Product enables Corellium's customers to create virtual iOS devices. Ex. 2 at 25.

Mr. Connelly further based his opinion on the facts that (a) even today, the Corellium Apple Product ████████████████ (c) Corellium's ████; and (d) Corellium's prices ████████, when Corellium added support for Android (something that would not be expected if, in fact, the Android product added significant value). *Id.* at 26. Based on these facts, Mr. Connelly concluded that it would be reasonable to attribute ████████████████. *Id.*

The evidence relied upon by Mr. Connelly in assessing revenues attributable to iOS infringements is typical of evidence a damages expert relies upon in assessing the impact of changes in a product on its revenue stream—namely, the change in price (████████), the portion of the product dedicated to the new use (here, ████████), and the impact of the modification on the product's advertising (again, ████████). Mr. Connelly was not, as Corellium contends, required to "state with personal knowledge" exactly the amount of value each Corellium customer attributed to iOS versus Android. ECF No. 454 at 14. Indeed, if anything, the opposite is true: the value Corellium's users

---

[9] Of note, Corellium's verified responses incorporate this Court's definition of Corellium Apple Product, *see* Ex. 6 at 22–31; Ex. 7 at 22–32; Ex. 8 at 24–32; Ex. 9 at 23–32; Ex. 10 at 23–34; Ex. 11 at 24–35, which includes only "products developed, offered for sale, or sold by Corellium that create virtual versions of iOS-operated devices." *See* ECF No. 249 at 8.

[10] *See* Ex. 15 at 203:12–204:25.

attribute to various aspects of its product is something much more accessible to *Corellium*, not Apple, which is precisely why the law places the burden on Corellium to perform such an allocation. Yet Corellium made no attempt whatsoever to carry its burden; to the contrary, by failing to separately account for any portion of its product, it made it far more difficult to do so. Ex. 13 at 11; Ex. 11 at 35 (verified responses stating ██████████████████████████ ████████████████████████████████████████████████████████████████ ████████████). Corellium should not be able to bar Apple from presenting expert testimony regarding damages attributable to Corellium's infringing product simply because it has, by its own actions, made those damages more difficult to calculate. *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1572–73 (Fed. Cir. 1996) ("[If] evidence available from the infringer is inadequate, damages may be estimated on the best available evidence, taking cognizance of the reason for the inadequacy of proof and resolving doubt against the infringer."; *Dig. Filing Sys., L.L.C. v. Aditya Int'l*, 323 F. Appx. 407, 418–19 (6th Cir. 2009) (applying *Sensonics* to copyright case, "[p]laintiff should not otherwise be penalized in assessing damages where it does not have the ability to verify or contest representations by the liable infringer."). Mr. Connelly's choice to allocate ██████████ ██████████████████████████████████████████████████████████ is well within the range of acceptable expert opinion, and is subject to cross-examination, not exclusion.

### B.    Mr. Connelly's Opinions with Respect to Future Revenues Are Admissible.

Corellium's challenge to Mr. Connelly's projection of Corellium's future revenues also should fail. Corellium is a two-and-a-half year old company that began offering trial accounts and selling its signature product, the Corellium Apple Product, in January 2018. *See, e.g.*, Ex. 15 at 61:11–14, 71:5–19; Ex. 11 at 25. In addition to calculating Corellium's nascent revenues from the sale and license of this product from 2018 through the close of fact discovery in April 2020, Mr. Connelly also provided two alternative calculations to project Corellium's *future* revenues for the period between the close of discovery and trial in October 2020. The first method relies on Corellium's *own projections* cited in its verified interrogatory responses. Ex. 1 at 7–8; Ex. 2 at 10–11. Those projections, made in second quarter 2019 (shortly before this action was filed), anticipated that Corellium's revenues from the Corellium Apple Product in 2020 would be ██████ ████████. Ex. 7 at 31. Using that projection as a base, Mr. Connelly calculated Corellium's 2019 revenues, ██████████, and then adjusted the amount to prorate it to account both for income received January to April 2020 and from October 2020 to December 2020. Ex. 1 at 7–8; Ex. 2 at

10–11.  Mr. Connelly also offered an alternative, more conservative, analysis that assumed that Corellium's revenues for 2020 would be flat relative to Corellium's 2019 revenues.  *Id.* at 11.  Again, Mr. Connelly prorated that number for the period from April to October 2020.  *Id.*

Corellium contends that it is unreasonable for Mr. Connelly to base his estimate of Corellium's future income on *either* Corellium's own estimates *or* Corellium's historic income.  Specifically, Corellium claims that it was unreasonable for Mr. Connelly to rely on Corellium's own projections, because those projections were unrealistic and optimistic, ECF No. 454 at 14–15, but that it was *also* unreasonable for Mr. Connelly to rely on Corellium's historic income, because there is "no justification" for relying on that income, *id.* at 16.

Corellium's arguments lack merit.  Corellium merely challenges the input selected by Mr. Connelly to calculate future revenues, not his methodology in actually calculating those revenues based on that input.  Corellium's challenge thus is not appropriately made in a *Daubert* motion, as it goes to credibility or weight, not reliability, and is for the jury to determine.  *See Quiet Tech.*, 326 F.3d at 1345–46 ("[F]ailure to include variables will affect the analysis' probativeness, not its admissibility" as the "identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination."); *Armstrong v. HRB Royalty, Inc.*, No. 03-0148-WS-C, 2005 WL 6007684, *6–7  (S.D. Ala. Oct. 14, 2005) ("[P]lugging incorrect numbers into a reliable formula serves only to impugn the accuracy of [the expert's] results," and such "a dispute over variables" is "an inappropriate basis for exclusion".) (alterations in original); *see also In re Trasylol*, 2010 WL 1489793, at *6 (discussing "general rule that the 'factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility").

In all events, Corellium's arguments fail on the merits.  While it may not be reasonable for an expert to rely on his *own* client's optimistic projections, it is perfectly appropriate for Mr. Connelly to rely on *Corellium's* verified interrogatory responses and its own pre-litigation projections.  *See, e.g.*, *Armstrong*, 2005 WL 6007684 at *7 (finding it was appropriate for expert to rely on opposing company's testimony that it planned to open ten offices in the next ten years, without conducting an independent feasibility analysis, when such testimony was not "facially unreasonable"); *see also Pleasant Valley Biofuels, LLC v. Sanchez-Medina, Gonzalez, Quesada, Lage, Crespo, Gomez & Machado LLP*, No. 13-23046-CIV, 2014 WL 2855062, at *6  (S.D. Fla. June 23, 2014) ("Though [the expert's] reliance upon [plaintiff's] own projections again provides

fodder for cross-examination, a damages expert's reliance upon data provided by the parties generally does not require exclusion of the resulting opinions.").

Mr. Connelly's second calculation, based on Corellium's historical income, is likewise reasonable. Indeed, it is quite routine for financial experts to base estimates of future income on recent past income. *See, e.g.*, *Bostick v. State Farm Mut. Auto. Ins. Co.*, No. 8:16-cv-1400, 2017 WL 2644616, at \*2 (M.D. Fla. June 20, 2017) ("[Experts] have calculated the expected value of [plaintiff's] future lost income by looking at W–2 tax forms, merit increase forms, and pay stubs from the University of Tampa. Their methodology is a standard one, generally used by forensic economists in litigation matters."). Mr. Connelly's actual projection is manifestly reasonable and not subject to exclusion under *Daubert*.[11]

### C. Mr. Connelly's Method for Calculating Statutory Damages Pursuant to 17 U.S.C. § 1203 Is Admissible.

The same is true with respect to Mr. Connelly's methods of calculating statutory damages pursuant to 17 U.S.C. § 1203(c)(3). Section 1203(c)(3) permits a successful plaintiff to recover an award of statutory damages for each violation of section 1201 "in the sum of not less than $200 or more than $2,500 per act of circumvention, device, product, component, offer, or performance of service, as the court considers just." As explained above, Mr. Connelly provided three alternative methods of calculating damages under section 1203, which track the flexibility provided by the statute to award damages on a "per product" or a "per component" basis as fits the facts of each case.

Mr. Connelly's first method, unchallenged by Corellium, was a straightforward calculation based on each sale of or license to the Corellium Apple Product—*i.e.*, each purchase of an on-premises unit and each license of a cloud product multiplied by the statutory rate. Ex. 2 at 17. Mr. Connelly opined, however, that using this "per product" method to calculate damages "would result in a significant understatement of appropriate damages," and that a "per component" method, based on the number of virtual iOS devices that can be created by each Corellium Apple

---

[11] In addition to the projection he relied upon, Mr. Connelly also considered a projection that averaged Corellium's 2018 and 2019 revenues (the only two years for which Corellium had meaningful revenues) to determine the 2020 projection. Ex. 19. However, averaging 2018 and 2019 ███████████████████████████████████████████████████████████████ Ex. 2 at 11. Corellium chose not ask Mr. Connelly his basis for using 2019 revenues, and not a blended 2018/2019 revenue at his deposition, and cannot complain about it now.

Product, is a better fit for the facts of the case. *Id.* Specifically █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. *Id.* at 18. Since each unit of the Product creates multiple virtual devices, █████████████████████████, Mr. Connelly determined that a "per component" damages theory based on an estimate of virtual devices created would be more appropriate than a "per unit" calculation. *Id.*

Corellium does not take issue with this general method of calculating damages, but again challenges the specific inputs relied upon by Mr. Connelly to create his estimate of virtual devices. ECF No. 454 at 17–18. Again, however, such a challenge to Mr. Connelly's inputs goes to credibility and weight, not reliability, because inputs can be readily challenged on cross-examination when the methodology itself is sound. *See Quiet Tech.*, 326 F.3d at 1345–46; *Armstrong*, 2005 WL 6007684 at *6–7; *see also In re Trasylol*, 2010 WL 1489793, at *6. Moreover, and contrary to Corellium's claims, Mr. Connelly's estimate is careful and conservative, and does not lack foundation. Indeed, Corellium does not quibble with Mr. Connelly's assessment of the *capacity* of each Corellium Apple Product or its determination of the number of Corellium on-premises, cloud, and trial customers. *See* Ex. 2 at Exs. E, E1–E3. Corellium does not challenge Mr. Connelly's assignment of the core capacity for each device. *See* ECF No. 454 at 16–18. Mr. Connelly also used Corellium's document and the testimony of Corellium's witnesses to establish the total number of Corellium customers, Ex. 2 at 18–22 and Exs. E-E3; *see also* Ex. 11 at 24–34; Ex. 15 at 52:23–53:4, 56:3–11, 94:7–8, 98:13–99:17, 160:2-16; Ex. 18 at 53:15–54:24, 58:14–18, 85:3–106:2, which Corellium *also* does not challenge, ECF No. 454 at 16–18.[12] Rather than challenging any of the underlying data, Corellium asserts that Mr. Connelly erred in estimating the number of virtual devices created by each Corellium user.

---

[12] To determine these numbers, Mr. Connelly conducted a detailed analysis of records produced by Corellium. *See* Ex. 2 at 18–22, Exs. E-E3. The Corellium Apple Product is sold on a "per-core" basis, and, depending on the model of iOS device, █████████████████████████ Ex. 17 at 2. Mr. Connelly carefully examined each customer agreement to determine the number of cores each customer had and the length of the customer's contract (for on premises) or subscription (for cloud access) to determine core capacity for paying customers, and used the testimony of Corellium witnesses to establish the core capacity for trial customers. Ex. 2 at Ex. E1. He also relied on witness testimony to establish the number of cores that could actually be utilized to create virtual devices. *Id.*

Essentially, Corellium contends that because it deliberately does not track the *actual* number of virtual devices created by each customer ███████████████████████████, *see* Ex. 20 at 9; Ex. 15 at 97:23–98:8; ECF No. 354-1 at 2), Mr. Connelly's estimates are *per se* unreasonable.

But Mr. Connelly did not, as Corellium claims, assume that every Corellium customer "used the Product to the fullest extent possible." ECF No. 454 at 17. The Corellium Apple Product allows each user to create an ***unlimited*** number of virtual devices, changing them daily or even hourly. Mr. Connelly did not assume daily or hourly changes; rather, his analysis assumes either *no* changes (the first analysis), or a conservative change of only once a month (the second analysis). Corellium asserts these estimates are too high, but they are in fact deeply conservative. A typical Corellium on-premises customer pays ███████████████ for a custom installation of the Corellium Apple Product, obtains ████████ that can support up to █ virtual devices at one time, and that the customer ████████████████████. Each such customer receives a ██████████████████ Ex. 2 at 20 & n.13; Ex. 17 at 4; Ex. 15 at 94:7–23. Mr. Connelly's first analysis assumes that such a user creates just █ virtual iOS devices total,[13] and his second assumes that the customer turns over the █ devices just once a month. *See* Ex. 2 at 20 ██████████████████████████). Similarly, a Corellium cloud customer pays a monthly subscription fee for the right to use a certain number of cores, typically █ that can support up to █ virtual devices at one time. Ex. 17 at 2; Ex. 18 at 58:11–19. Mr. Connelly's first analysis assumes that such a cloud customer creates just █ iOS device total, and the second analysis assumes that the customer creates ████ iOS device per month during their entire subscription. Ex. 2 at Ex. E2). Finally, for both analyses, Mr. Connelly assumed that each trial customer created only ***one*** iOS device ever. Ex. 2 at Ex. E3.

Corellium offers no evidence whatsoever that these estimates are high, and the available evidence suggests the opposite. For instance, Corellium confirmed that in April 2020, it had ██ cloud devices in use, only █ of which were Corellium test devices, meaning there were █ customer virtual devices, at a time when Mr. Connelly's estimates suggested there would be only █. Ex.

---

[13] Mr. Connelly assumed that each customer made only high-core virtual devices ████████████████, resulting in a small number of devices, rather than low-core virtual devices ████████████████████████████████████████████████ Ex. 2 at 21 nn. 17, 20, even though ████████████████████████████████████████████████████████████ ████ Ex. 18, Dyer Tr. at 58:16–59:11.

2 at 19 & n.12, Ex. E2; ECF No. 354-1 at 2.[14]  Instead, Corellium argues that because no one can state *exactly* how many virtual iOS devices were created (because Corellium ███████████ ██████, estimates are forbidden.  *See* ECF No. 454 at 16–18.   Corellium argues in essence that it is unreasonable to assume that Corellium customers actually used the product for its intended purpose.  This is not the law.  Rather, the Court has "wide discretion in determining the amount of statutory damages to be awarded," and courts regularly allow estimates of exactly this kind. *Netdragon Websoft Inc. v. Toft*, No. CV-11-1037, 2012 WL 13008123, at *4  (C.D. Cal. Apr. 24, 2012) (finding it reasonable to conclude that each customer used the defendant's product "on at least one occasion"); *accord Blizzard Entm't, Inc. v. Bossland GmbH*, No. CV 16-1236, 2017 WL 7806600, (C.D. Cal. Mar. 31, 2017), at *9–10 (DMCA damages estimate based on percentage of downloads attributable to infringement); *Craigslist, Inc. v. Kerbel*, No. C-11-3309, 2012 WL 3166798, at *17 (N.D. Cal. Aug. 2, 2012) (awarding statutory DMCA damages based on estimate of website offers); *Blizzard Entm't, Inc. v. Reeves*, No. CV-09-7621, 2010 WL 4054095, at *3 (C.D. Cal. Aug. 10, 2010) (using two snapshots of usage to conclude that it was reasonable to estimate that all users circumvented technical protection measures).  Mr. Connelly's estimates regarding virtual devices are based on sound methodology, and he should be permitted to testify.

### D.    The Calculation of 17 U.S.C. § 504 Statutory Damages Is Admissible.

Finally, Corellium challenges Mr. Connelly's calculation of the range of statutory damages attributable to Corellium's infringement on a "per work" basis pursuant to 17 U.S.C. § 504, solely because that calculation requires only multiplication and thus is not "helpful" under the third *Daubert* prong.  This objection is frivolous, and Corellium's only cited authority, *United States v. Lundy*, 809 F.2d 392 (7th Cir. 1987), is inapposite.[15]  It is well established that damages are an appropriate subject for expert testimony.  *See, e.g.*, *Grand Reserve of Columbus, LLC v. Prop.-*

---

[14] For the same reason, Corellium's concern that this estimate does not "reflect non-iOS devices" is misplaced.  Because the estimate is so conservative, reflecting extremely low usage across the board, there is no need for further adjustment to reflect Android use for the approximately 13 months the Corellium Apple Product has permitted users to make Android as well as iOS devices. Indeed, even if 80 percent of the ██ cloud devices in use in April 2020 were Android devices, Mr. Connelly's estimate would *still* be conservative, as a 20 percent allocation would be ██ devices, and Mr. Connelly allocates only ██  And again, this is a challenge to inputs, which goes to weight, and not admissibility under the *Daubert* standard.

[15] In *Lundy*, the Court upheld technical expert testimony against a challenge that it was not sufficiently beyond common understanding.  809 F.2d at 395.

*Owners Ins. Co.*, 721 F. App'x 886, 888 (11th  Cir. 2018) (affirming district court admission of expert testimony on damages); *BC Tech., Inc. v. Ensil Int'l Corp.*, 464 F. App'x 689, 703–04 (10th Cir. 2012) (same); *Habersham Plantation Corp. v. Molyneux*, No. 10-61526-CIV, 2011 WL 13214323, at *2–3 (S.D. Fla. Sept. 13, 2011) (admitting expert on copyright damages).  And even the most complex damages analyses will often include straightforward calculations applying the expert's opinions to the relevant facts.  But that does not mean damages experts must deliver stilted or incomplete testimony limited to only the most complex aspects of their opinions.   Mr. Connelly's calculation of the potential range of statutory damages for each work infringed under the Copyright Act, while perhaps not the most complex mathematical analysis ever, is part and parcel of his multifaceted damages analysis in this case and, in any event, is sufficiently beyond "basic" to assist the trier of fact in evaluating the evidence.

## V.    MR. CONNELLY'S REMAINING OPINIONS ARE LIKEWISE ADMISSIBLE.

Finally, and in addition to the foregoing, there is no basis whatsoever to exclude the *entirety* of Mr. Connelly's testimony, including his unchallenged analysis of Corellium's gross revenues, his detailed assessment of Corellium's costs, his calculation of actual damages pursuant to 17 U.S.C. § 1203(c)(2), or his alternative 1203(c)(3) damages.  Doing so would throw out the baby with the bathwater, even assuming Corellium's arguments have merit (which they do not).  *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 564–67 (11th Cir. 1998) (holding that "the district court abused its discretion in excluding admissible portions of [the expert's] testimony by ruling that [the expert's] testimony in its entirety was inadmissible" even where parts of testimony were properly excluded); *Mamani v. Sanchez Berzain*, No. 07-22459-CIV, 2018 WL 1090546, at *3–5 (S.D. Fla. Feb. 28, 2018) (excluding only portions of expert's opinion that relied on other expert's inadmissible opinions); *see also United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341–42 (11th Cir. 2013) (holding district court erred in excluding all of expert's testimony when only portion of testimony was inadmissible); *Scholz v. United States*, No. 16-CV-1052, 2019 WL 2303769, at *3 (E.D. Wis. May 30, 2019) (finding that appropriate remedy for rebuttal report containing opinion outside scope of rebuttal "is to strike the parts of the report that are not proper rebuttal" not "to strike the entire report").  The Court should not exclude *any* of Mr. Connelly's testimony, but there is no basis whatsoever to exclude *all* of it.

## VI.    CONCLUSION.

For the foregoing reasons, the Court should deny Corellium's motion in full.

Dated: May 26, 2020

Michele D. Johnson*
*michele.johnson@lw.com*
LATHAM & WATKINS LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
(714) 540-1235 / (714) 755-8290 Fax

Sarang Vijay Damle*
*sy.damle@lw.com*
Elana Nightingale Dawson*
*elana.nightingaledawson@lw.com*
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200 / (202) 637-2201 Fax

Andrew M. Gass*
*andrew.gass@lw.com*
Joseph R. Wetzel*
*joe.wetzel@lw.com*
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600 / (415) 395-8095 Fax

Jessica Stebbins Bina*
*jessica.stebbinsbina@lw.com*
LATHAM & WATKINS LLP
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
(424) 653-5500 / (424) 653-5501 Fax

Gabriel S. Gross*
*gabe.gross@lw.com*
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
(650) 463-2628 / (650) 463-2600 Fax

*Admitted pro hac vice*

Respectfully Submitted,

*s/ Martin B. Goldberg*

Martin B. Goldberg
Florida Bar No. 0827029
*mgoldberg@lashgoldberg.com*
*rdiaz@lashgoldberg.com*
Emily L. Pincow
Florida Bar No. 1010370
*epincow@lashgoldberg.com*
*gizquierdo@lashgoldberg.com*
LASH & GOLDBERG LLP
100 Southeast Second Street
Miami, FL 33131
(305) 347-4040 / (305) 347-4050 Fax

*Attorneys for Plaintiff* APPLE INC.

21