# EXHIBIT 2

SUPPLEMENTAL & REBUTTAL
REPORT OF

DAVID B. CONNELLY

On Behalf of Plaintiff

Under Federal Rules of Civil Procedure 26(a)(2)(B)

In the Matter of

APPLE INC.

Plaintiff,

v.

CORELLIUM, LLC

Defendant

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No.: 9:19-cv-81160-RS

The Honorable Rodney Smith, Judge Presiding

## I.      ASSIGNMENT

I understand that plaintiff Apple Inc. ("Apple") has filed suit against defendant Corellium, LLC ("Corellium"), alleging copyright infringement in violation of 17 U.S.C. § 501, and unlawful trafficking of a product used to circumvent security measures in violation of 17 U.S.C. § 1201. Specifically, I understand that Apple alleges that Corellium has infringed on Apple's copyrighted works by, among other things, providing customers with a digital facsimile of a broad range of Apple's market-leading devices (Corellium's "Apple Product"), in the process infringing on Apple's copyrighted works, including its iOS operating system, various software "application" programs that run on its operating system and graphic design elements ("GUI Elements") that make Apple device interfaces visually attractive to customers.  Further, I understand that Apple alleges that Corellium, through its Apple Product, has engaged in unlawful trafficking activities designed to circumvent Apple's significant technological protection measures that control access to, and protect Apple's exclusive rights in, its copyrighted works.

My firm and I have been retained to perform an investigation and analysis concerning the federal copyright damages Apple is entitled to under 17 U.S.C. § 504(b) and § 1203(b)(3) and (c)(2), or in the alternative, statutory damages under 17 U.S.C. § 504(c) and § 1203(c)(3), for Corellium's infringement of, and unlawful trafficking activities concerning, Apple's copyrighted and protected works.  Specifically, we have been asked to examine financial records and documents that Corellium has produced, in order to assess and quantify the actual damages Apple has suffered as a result of Corellium's infringing activities, and in particular, the profits Corellium has generated from its infringing efforts, and to calculate the alternative statutory damages available to Apple under both statutes.

I previously issued a report in this matter dated March 3, 2020 that set forth my observations and conclusions drawn through that date.  Subsequent to the issuance of that report,

Corellium has further amended its pertinent financial interrogatory answers in an apparent effort to harmonize its prior inconsistent responses, has produced numerous transaction documents concerning its revenues, costs, expenses and profits that are attributable to its infringing Apple Product, and its CEO and VP of Sales & Development have provided deposition testimony on pertinent damages issues that were the subject of my prior report.   Further, Mr. Stewart L. Appelrouth, Corellium's designated damages expert in this matter, has recently issued a Second Expert Report dated April 13, 2020 ("Appelrouth" or "Appelrouth Report") that addressed the statements, opinions and conclusions set forth in my prior report.   Accordingly, this supplemental report serves to (i) restate and supplement my March 3, 2020 report for our observations drawn from examining and considering these recently produced documents and testimony; and (ii) present my observations and conclusions drawn from my review of the Appelrouth Report.

This report is based upon information now available and upon such investigation as we were reasonably able to undertake.   Based on my review of documents provided to date, I believe that Corellium has still not provided significant financial information that has been requested, including information concerning its revenues, costs, expenses and profits that are attributable to its infringing Apple Product.   Further, my team and I have recently identified certain Corellium transaction documents that demonstrate that Corellium's partial QuickBooks accounting records that have thus far been produced are not only incomplete as to the nature of the records, but also did not include or record certain identified revenue transactions.   Even on the eve of the issuance of this report, Corellium continues to produce records and documents that identify additional, previously unreported Correlium revenues, and suggest that even Corellium's fifth amended interrogatory answers (that were served two days ago on April 18, 2020) are not complete.   For example, the electronic file "Correllium-03110.csv," that I understand Corellium produced on

April 19, 2020, appears to list several invoices that were not included in Corellium's fifth amended interrogatory answers that were served one day before the electronic file was produced.

Accordingly, I reserve the right to supplement, modify or otherwise change this report should Corellium produce additional financial information that impacts my analysis.  I may also develop additional opinions based on any opinions, work or testimony that may be further offered by Appelrouth (who was still reviewing invoices as of the date of his report) or other experts retained by Corellium, as well as based on experts retained by Apple, and on any further evidence, including testimony, presented and made available to me.  I am aware of my continuing obligation to supplement my report under Rule 26 of the Federal Rules of Civil Procedure. I reserve the right to supplement, modify, or otherwise change this report as necessary and appropriate based upon any further information that becomes available, and/or upon additional or different analysis of existing information.

## II.   EXPERT OPINIONS

At trial, I intend to testify regarding the federal copyright and DMCA damages Apple is entitled to under 17 U.S.C. § 504(b) and § 1203(b)(3) and (c)(2), or in the alternative, statutory damages under 17 U.S.C. § 504(c) and § 1203(c)(3), for Corellium's infringement of, and unlawful trafficking activities concerning, Apple's copyrighted and protected works.  Specifically, I intend to testify regarding the following summary opinions, as well as the bases for such opinions that are set forth herein.  I may rely on demonstrative exhibits, including pictures, figures, and drawings at trial.

(i)     Although Corellium's "moving target" of repeatedly modified, inconsistent interrogatory responses has made it difficult to identify gross revenues from its infringing activities, I have been able to identify, and to a large extent corroborate, Corellium's gross revenues

from the sale or licensing of its infringing Apple Product totaling at least ██████ for the periods from Corellium's formation in August 2017 through April 18, 2020;

(ii)     Corellium's estimated gross revenues from the sale or licensing of its infringing Apple Product range between ████████████ for the periods from the Company's formation in August 2017 through the trial of this matter in October 2020;

(iii)     I have not been able to fully assess and substantiate Corellium's anticipated (but yet to be asserted) deduction claims because Corellium has not produced invoices and other underlying transaction documentation for 52% of its total reported costs of goods sold and expenses during the periods from August 2017 through April 18, 2020, and we have identified more than ████ in reported, non-deductible legal fees and other expenses that serve to question the integrity of Corellium's reported expenditures;

(iv)     Although Corellium (and Appelrouth) has not met its burden under the provisions of 17 U.S.C. § 504(b) to prove deductible expenses and the elements of profit attributable to factors other than the copyrighted works, I have nonetheless prepared an initial calculation that, assuming the accuracy and propriety of Corellium's reported cost of goods sold, indicates that Corellium's profits from the sale or licensing of its infringing Apple Product totaled at least ████ for the period from Corellium's formation in August 2017 through April 18, 2020;

(v)     On the basis of my calculation of Corellium's profits for the periods through April 18, 2020, I have prepared an initial calculation projecting that Corellium's estimated profits from the sale or licensing of its Apple Product, pursuant to 17 U.S.C. § 504(b) and 17 U.S.C. § 1203(b)(3) & (c)(2),  will fall within an estimated range between ████ ████ for the period from Corellium's formation in August 2017 through trial in October 2020;

(vi)     Alternatively, Apple is entitled to an award of statutory damages that could total as much as $3,300,000 for willful infringement under 17 U.S.C. § 504(c), and/or at least as much as

████████, and potentially a substantially greater amount up to ████████ under the provisions of 17 U.S.C. § 1203(c)(3).

(vii)   The Appelrouth Report reveals that Appelrouth has erroneously dismissed the infringer's burden of proof requirements under 17 U.S.C. § 504(b) concerning revenue attribution and deductible expenses, in favor of an unwarranted iOS worldwide market analysis, and has misstated various facts in addressing unsupported criticisms of my original report.

## III.   ANALYSIS, OBSERVATIONS AND CONCLUSIONS

Our investigation and analysis to date has primarily involved the examination of availiable financial and other pertinent documents.   In particular, we have examined the following: Corellium's "Profit and Loss Detail" QuickBooks general ledger type and other accounting records; transaction documents, including agreements, billings, invoices, purchase orders, price lists, and other documents that concern Corellium's revenues, costs, expenses and profits attributable to its infringing Apple Product transactions; deposition transcripts; interrogatory and other written discovery responses; pleadings; and expert reports that have been submitted in this matter.   The documents that I and my team have considered and relied upon in forming my opinions set forth in this report are listed in the attached Exhibit F.

Corellium's recent financial document productions have still not provided significant information that has been requested, including detailed records, documents and information that concern, and corroborate, the revenues, costs, expenses and profits attributable to Corellium's infringing Apple Product, or elements of Corellium's profits that may be attributable to factors other than the copyrighted work.   Further, the revenue transaction documents and other information that Corellium has recently produced have served to confirm **that Corellium's produced "Profit and Loss Detail" QuickBooks records are not complete and do not include all pertinent sales revenue transactions**.   In addition, it still bears noting that Corellium's

produced partial QuickBooks records do not include the company's balance sheet accounts and associated transactions, and thus do not disclose, among other things, transactions concerning capitalized costs, liabilities, and LLC member capital account transactions.

### A.  CORELLIUM'S GROSS REVENUE FROM INFRINGING APPLE PRODUCT

The actual damages provisions of 17 U.S.C. § 504(b) and § 1203(c)(2) provide for the recovery of an infringer's profits (that are attributable to the infringement, in the case of Section 504(b), or to the violation of Section 1201, with respect to Section 1203(c)).  17 U.S.C. § 504(b) provides, in pertinent part:  "In establishing the infringer's profits, the copyright owner is required to present proof only of the **infringer's gross revenue**, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." (emphasis added).

However, as further detailed in my March 3, 2020 report, Corellium has made it difficult to identify gross revenue from the sales of its infringing Apple Product, by presenting a **"moving target" of repeatedly modified interrogatory responses**.  For example, in Corellium's various answers to Apple's Interrogatory No. 10, it initially reported total revenue in 2019 of ███████ from sales or licensing of its Apple Product, then increased its reported 2019 revenue to ███████ in its amended answer on January 16, 2020, and then subsequently decreased its reported 2019 revenue to ███████ in its second amended answer on February 24, 2020.

In addition to these changing iterations within particular interrogatory questions, Corellium's answers to various interrogatories regarding its sales revenues are inconsistent with one another.  For example, while Corellium's second (and third) amended answers to the aforementioned Apple's Interrogatory No. 10 reported total revenues of ███████ for all periods from August 2017 through November 15, 2019, its second (and third) amended answers to Apple's

Interrogatory No. 9, concerning sales detail by customer, reported a substantially reduced total of ███████, almost ████████████, for the same collective periods.

　　　As set forth in the attached Exhibit A (Revised), after I submitted my initial report, Corellium's fourth amended answers dated March 9, 2020 to Apple's Interrogatories Nos. 9 and 10 included adjustments to both interrogatories that were designed to harmonize Corellium's inconsistent responses (*see* ██████████████ deposition transcript at 195:11–196:24). As indicated in note **[1]** to Exhibit A, Corellium's adjustments that were first reported in its fourth amended answer to Apple's Interrogatory No. 10 eliminated previously reported revenues attributable to its ██████████████████████████████████; specifically, its previously reported ████████████████████████████ ██████████████████████████████████ ███████████████████████████████ Although previously included in Corellium's various responses to Apple's Interrogatory No. 10, it is important to note that these now-excluded ██████████████ **revenues were not recorded in Corellium's partial QuickBooks accounting records** that have been produced in this matter. It bears noting that I also identified a ████████████████████████████ ██████████████████████████████████ ██████████████████████. I understand that Corellium's CEO, Amanda Gorton, testified that ██████████████████████████.[1]

　　　Although Corellium's recent adjustments were designed to resolve Corellium's inconsistent interrogatory answers, discrepancies still remain. Corellium's now fifth amended answers continue to report 2018 On-Site sales totaling ████████ for Interrogatory No. 10, versus █████████ reported in response to Apple's Interrogatory No. 9. The **additional** ████████ **On-**

---

[1] *See* Gorton March 25, 2020 deposition transcript at 142:25–144:1, 193:8–13.

**Site revenue reported in Corellium's responses to Apple's Interrogatory No. 10 represents Corellium's sales of** ▮▮▮▮▮▮▮▮▮▮▮ on March 9, 2018 ▮▮▮▮▮, and ▮▮▮▮ on June 20, 2018 ▮▮▮▮▮).  In addition to the exclusion of these sales from Corellium's responses to Apple's Interrogatory No. 9 (and similar to the ▮▮▮ ▮▮▮▮▮" revenues noted above), they were also erroneously **not recorded in Corellium's partial QuickBooks accounting records** that have been produced in this matter.

Notwithstanding these challenges, **I have been able to identify and, to a large extent, corroborate Corellium's gross revenues totaling** ▮▮▮▮ for the periods from August 2017 through April 18, 2020 (as set forth in the attached Exhibit C), by performing a detailed examination of the recently produced revenue transaction documents. As set forth in the attached Exhibit B, I have identified **Corellium's Apple Product revenues (non-Cloud sales) totaling** ▮▮▮▮ for all periods from August 2017 (inception) through April 18, 2020.  Such revenues included **On-Site revenues totaling** ▮▮▮▮ from Corellium's sale or licensing of its Apple Product during the periods from August 2017 (inception) through April 18, 2020.  These On-Site revenues were detailed in Corellium's fifth amended answer to Apple's Interrogatory No. 9 (and prior answers), and I was able to examine agreements, invoices and purchase order documents that corroborated most of these revenues.  In addition, and as addressed above, my examination of the recently produced transaction invoices served to identify ▮▮▮▮ **in additional, unrecorded Corellium revenues from** ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ for the following: Apple iOS ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮

Our detailed examination of the recently produced revenue transaction documents also served to identify additional, apparently **unrecorded Corellium revenues from** ▮▮▮▮ ▮▮▮▮ not included in any of Corellium's answers to Interrogatories, totaling at least ▮▮▮▮▮

that included the following:  (i) Corellium invoice no. 33 dated January 22, 2019 to 

(ii) Corellium invoice no. INV-10193 dated July 17, 2019 to ); (iii) Corellium invoice no. INV-10258 dated December 22, 2019 to and (iv) Corellium invoice no. 1008 dated August 20, 2018 to Pending further confirmation, these additional revenues have not been added to Corellium's Apple Product gross revenues totaling through April 18, 2020, though I reserve the right to add them to the total should the evidence warrant.[2]

Corellium's Apple Product gross revenues also include **Cloud sales revenues totaling** for all periods from August 2017 (inception) through April 18, 2020.  These Cloud revenues were detailed in Corellium's fifth amended answer to Apple's Interrogatory No. 9 (and prior answers), as well as Corellium's partial QuickBooks records, and we were able to examine training agreements, and some invoices[3] and purchase order documents that corroborated approximately half of these revenues.

In addition to the foregoing, I understand that Corellium has agreed to produce, but has not yet produced: (i) non-cash income (*e.g.*, stock rights, in-kind income, etc.) attributable to its Apple

---

[2] We also identified an executed

[3] In many instances, Correlium's produced invoice documentation merely consisted of "Invoiced.com" notification emails, with non-descript references to, and a link to examine underlying invoice documents.  I understand that Corellium has not provided the requisite username and password to enable access to the underlying invoice documents (*see* Corellium-006543).

Product; and (ii) income attributable to its sale or use of exploits developed through the use of its Apple Product.[4]   Production of documents relating to these additional sources of income attributable to the infringing work may require a further adjustment to my analysis.

### B.   CORELLIUM'S PROJECTED GROSS REVENUES THROUGH TRIAL

I have projected Corellium's gross revenues through the October 2020 trial date (and as of October 31, 2020), on the basis of Corellium's admitted Q2 2019 projection that its Apple Product revenues for 2020 ███████████) would more than ██████████████████████         ███████████), as reported in Corellium's second amended (and prior) responses to Apple's Interrogatory No. 11.[5] Corellium's recent assertion that it "██████████████████████████████████████████████ ████████████████████████████████████████████ as set forth in its fourth and fifth amended answers to Apple's Interrogatory No. 11, does not comport with its prior admission.

Applying this approach, I have computed projected gross revenues of ██████████ for 2020 by ██████████████████████████ total of ██████████ and prorating the amount through October 31, 2020 (based on days in year).   In sum, and on the basis of Corellium's Q2 2019 projection, I have determined that Corellium's estimated, infringing **gross revenues will total approximately ██████████ for all periods from August 2017 through October 31, 2020**.   This derived total is comprised of Corellium's reported gross revenues that totaled ██████████ from August 2017 through 2019, plus projected gross revenues totaling ██████████ for the first 10 months of 2020.

---

[4] ██████████████████████████████████████████████████████████████████████ ██████████████████ Gorton March 25, 2020 deposition transcript █████████████

[5] It is not clear from Corellium's second amended and prior responses to Apple's Interrogatory No. 11 whether the referenced revenue projections only concerned ██████████████████████ or Corellium's entire revenues.

I have also applied a more conservative, alternative approach on the premise that Corellium's gross revenues in 2020 will be consistent with its ██████ total for 2019. Under this more conservative approach, Corellium's estimated, infringing **gross revenues will total approximately** ██████ **for all periods from August 2017 through October 31, 2020.** This derived total is comprised of Corellium's reported gross revenues that totaled ██████ from August 2017 through 2019, plus projected gross revenues totaling ██████ for the first 10 months of 2020.

Together, these computations provide a range of Corellium gross revenues totaling between ██████ and ██████ for all periods from inception through October 31, 2020.

## C.    CORELLIUM'S COSTS AND EXPENSES ATTRIBUTABLE TO THE APPLE PRODUCT, AND RESULTING PROFITS

In accordance with the provisions of 17 U.S.C. § 504(b), and having presented proof of Corellium's gross revenue from its infringing activities, the burden now shifts to Corellium to prove its "deductible expenses and the elements of profit attributable to factors other than the copyrighted work." It would appear that these cost and expense attribution determinations could be particularly challenging in this matter, as Corellium has stated the following in its each of its answers to Apple's Interrogatory No. 10:



Absent product line profit and loss statements, and supporting cost and expense attribution records, the burden for identifying and proving deductible costs and expenses should rest with Corellium. However, with respect to revenues as described further herein, this appears to be a distinction

without a difference, as **the available evidence demonstrates that Corellium sells only a single product, and the overwhelming majority of its revenues are attributable to that product**.

Unfortunately, in his April 13, 2020 Report, Appelrouth has not even attempted to determine such costs or deductions and has admitted that he is still reviewing invoices.  Further, Corellium has not produced sufficient accounting records or supporting transaction documents to permit Apple to fully corroborate, or confirm any claimed cost or expense deduction totals that it may ultimately submit.  To date, Corellium has merely disclosed a putative annual cost of goods sold and expense totals set forth in its varying responses to Apple's Interrogatory No. 10.  In its most recent fifth amended answer to this interrogatory dated April 18, 2020, Corellium reported costs of goods sold totaling ████████ and expenses totaling ██████████ for a combined costs and expense total of ████████ for the periods from August 2017 through April 18, 2020.

This putative expense allocation, however, is not supported by available evidence, for two reasons: (1) it includes inappropriate costs that are not properly deductible from its revenues to calculate its profits; and (2) Corellium has not produced documents sufficient to support more than half the claimed costs.  With respect to (1), my review of the produced Corellium accounting records, and in particular the transactions reported in the QuickBooks cost of goods sold and expense accounts, served to identify over ████████ in expenditures for ██████████████████ ██████████████████████████████████████████, which should not be deducted when determining its profits from infringement.  Specifically, I identified ██████████████ ██████████ that were paid in 2019 and 2020, including ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████.  Further, I identified ██████████████

███████████████████████████████████████████ for services rendered after this suit

was filed in mid-August 2019, ███████████████████████.[6]

  These ████████████████████████████ █████████████████████████

██████████████████████████████, and should not be deducted when

determining Corellium's profits from infringement.  Mr. Appelrouth states that he agrees with my

analysis with respect to ██████████████████████████████, but has been

instructed not to deduct ████████████████████████████████████

██████████ (Appelrouth Report at page 12).  However, I understand that ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████.[7]  In addition, ██████████████████████████

██████████████████████████ on August 19, 2019 (Corellium has not yet

produced supporting documentation for this payment, ██████████████████████

██████████████████  Based on these invoices, it is clear that Appelrouth was

misadvised, and ████████████████████████████████████ when

determining Corellium's profits from infringement.

  With respect to (2), we examined the copies of invoices and other documents that

Corellium has produced thus far concerning its cost of goods sold and expense transactions during

the periods from August 2017 through January 2020.  In sum, these produced invoices and other

transaction documents, which include Corellium's most recent productions on March 19 and April

10, 2020, concern transactions that **collectively totaled** ████████ **or a mere 48% of the**

---

[6] *See* Corellium-012284.000001.
[7] *See* Corellium-029219, Corellium-029224, Corellium-029235, Corellium-029239, and
Corellium-029268.

█████ total costs of goods sold and expenses (for the periods 2017 through January 2020) that were reported in Corellium's fifth amended answer to Apple's Interrogatory No. 10, dated April 18, 2020.  Furthermore, our examination of the produced transaction documents identified certain expenses, in addition to the above-identified legal expenses, that should not serve as deductions to Corellium's sales (or licensing) of its infringing Apple Product.  These identified expenses, that are not attributable to Corellium's infringing sales, included the following: (i)



█████.  In sum, **I have not been able to substantiate Corellium's apparent claim for over** █████ **in deductions,** for costs of goods sold and expenses attributable to its infringing sales from 2017 through January 2020, because **Corellium has not produced** invoices and other underlying transaction documentation for approximately 52% of its total reported costs of goods sold and expenses during such period.  Further, our identification of more than █████ █████ serves to raise significant questions concerning the integrity of Corellium's thus far reported cost and expense claims.

As set forth in the attached Exhibit C, and assuming the accuracy and propriety of Corellium's cost of goods sold totaling █████ as reported in its most recent answer to Apple's Interrogatory No. 10, I have prepared an initial calculation indicating that **Corellium's profits**

from the sales or licensing of its Apple Products totaled ███████ for the periods from inception in August 2017 through April 18, 2020.

Further, as set forth in the attached Exhibit C1, I have prepared an initial calculation indicating that **Corellium's projected profits from its Apple Product** will fall within an **estimated range between** ███████████████ **for all periods from inception through trial**. This projection calculation is based on my initial Corellium profits calculation set forth in Exhibit C, my aforementioned (alternative) projections of Corellium's gross revenues through trial, and an estimated ████ Corellium profit margin for the periods from April 19, 2020 through October 31, 2020.

I understand that every sale of Corellium's Apple Product is alleged to profit from violation of both Apple's exclusive rights under Section 501 (because each product infringes Apple's copyrights by unlawfully reproducing, displaying, distributing, and modifying the copyrighted works), and under Section 1201 (because each product enables the circumvention of access and copying controls that would otherwise prevent the works from operating on a non-iOS device, and that would otherwise prevent users of iOS from being able to reproduce, display, distribute, or modify iOS).[8] Thus, while I understand that Apple alleges that Corellium has engaged in distinct acts violating both statutes, and that those acts cause distinct harms to Apple, the profits attributable to Corellium under Section 1203(c)(3) for its violations of Section 1201 largely overlap with the profits attributable to Corellium's infringement under Sections 501 and 504, and thus I adopt the foregoing analysis with respect to Apple's damages under Section 1203(c)(3) as well. For the reasons discussed above, including, but not limited to, the disarray in Corellium's recordkeeping enabling me to review less than half of its claimed expenses, the inclusion of clearly disallowable expenses in the putative costs included in Corellium's interrogatory responses, and

---

[8] *See generally* Initial and Rebuttal Reports of Dr. Jason Nieh.

the presence of questionable expenses that do not appear to be clearly related to the Apple Product, I believe that my initial profits calculation above, deducting the ███████ in costs of goods sold but not the other claimed expenses, also represents an appropriate calculation of profits for purposes of Section 1203(c)(3). I reserve the right to update this calculation should Corellium provide further support for its claimed costs. I also reserve the right to update this report my opinion should further information regarding Corellium's income become available, including, but not limited to, information demonstrating that revenues Corellium claims are not attributable to its acts of infringement and circumvention are in fact so attributable.

### D.    STATUTORY DAMAGES

As an alternative to actual damages and profits, the provisions of 17 U.S.C. § 504(c) and 17 U.S.C. § 1203(c)(3) entitle Apple to seek recovery of statutory damages.

The provisions of 17 U.S.C. § 504(c) entitle Apple to seek recovery of statutory damages based on the number of its works infringed, with statutory damage amounts ranging from not less than $750 or more than $30,000 per work infringed, or up to $150,000 for willful infringements. Applying these ranges to Apple's 22 U.S. Copyright registrations (as listed in Exhibit A to Apple's First Amended Complaint) results in **statutory damages ranging from not less than $16,500 to not more than $660,000 under Section 504(c)(1)**, or **not more than $3,300,000 for willful infringements under Section 504(c)(2)**. I reserve the right to amend these amounts if the number of infringed works changes, as determined through further discovery in this matter. I understand that Apple's other experts will opine on the scope and nature of the infringement, and the testimony of fact witnesses will also establish this, and I reserve the right to opine whether an award at the higher or lower of end of this range is most appropriate based in part on that testimony.

Further, the provisions of 17 U.S.C. § 1203(c)(3)(A) entitle Apple to seek recovery of statutory damages for each violation of Section 1201, "in the sum of not less than $200 or more

than $2,500 per act of circumvention, device, product, component, offer, or performance of service, as the court considers just." There are thus potentially several different ways to calculate statutory damages based on Corellium's violations of Section 1201, several of which I explored in my prior report, at which time I explained that I did not have sufficient information to identify a principled basis to calculate such damages and thus provided only a minimum based on the number of Corellium's customers. Having now obtained greater information regarding the operation of Corellium's Apple Product, we update my initial minimum and also provide below an alternate method of calculating such damages based on the components of the Apple Product, which appears to be more appropriate given the nature of the Product.

In my prior report, I noted Corellium's responses to Apple's Interrogatory No. 9 identify ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████ Since my prior report, Corellium has now provided a fifth amended answer to Apple's Interrogatory No. 9 that now identifies ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████ Applying the DMCA statutory ranges to these ██████████████████████ ████████████████████████████ results in **statutory damages ranging from not less than** ██████████████████████████ **for the Section 1201 violations**.

I believe, however, that using a "per product" method to calculate Section 1201 damages in this case would result in a significant understatement of appropriate damages. Rather, as explained further below, I believe a "per component" method—in particular, a method based on the number of virtual Apple devices that can be created by each Corellium Apple Product—is the better fit for the facts of this case.

First, I understand that another expert in the case, Dr. Jason Nieh, is providing the opinion that the evidence produced to date by Corellium indicates that every time a customer directs the Corellium Apple Product to create a new virtual device, Corellium ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████. This is true for both on-premises installations and cloud subscriptions. I understand that the purpose of both the on-premises and cloud versions of the Corellium Apple Product is to provide Corellium's customers with the ongoing ability to make, display, modify, and clone virtual devices. Based on the above-cited analysis of Dr. Nieh, I understand that in each such instance in which a virtual device is made, the Corellium Apple Product would ████████████████████████████████████

███████████████████████. I thus conclude that a "per virtual device" measure is a reasonable "per component" measure of damages under Section 1203.

I understand that Corellium ██████████████████████████████████

█████████████████████████ either its on-premises product or its cloud product.[9] To the contrary, Corellium was able to provide only a single snapshot of this information for its cloud product—that there were ███ such devices in existence as of March 28, 2020—but was unable to

---

[9] *See* Corellium's Answers to Apple's 2d Set of Interrogatories, No. 22. (██████████████████

███████████████████████████████████

provide any historic use data for the cloud product and was unable to provide any information at all for the on-premises products.[10]

Since Corellium has, ███████████████████████████████████████

█████████████████, we have prepared estimates of the creation of such devices based on the evidence available to me. Specifically, each version of the Corellium Apple Product comes with a particular number of cores available to the Corellium customer.  ██████████████████████

█████████████████████████████[1]   Accordingly, we have prepared estimates of the number of infringing virtual devices created over time for each installation of the Corellium Apple Product based on the number of cores available to each customer and the length of access.  Our calculations can be split into different categories: (1) the on-premises customers Corellium discloses; (2) the cloud customers Corellium discloses; and (3) customers granted product demonstrations and trial accounts.  Notably, these categorizations do not include the devices that may have been created by Corellium for its own testing, product development, and other purposes.[12]

The first category is the customers that Corellium discloses in its fifth amended answers to Apple's Interrogatory No. 9 as having purchased an on-premises server to run the Corellium Apple Product or renewed an annual license for the same.  Corellium sells all the hardware and software needed to run the Corellium Apple Product to these customers and delivers this hardware to the customer's location.  This sale also ████████████████████████████████████████

---

[10] *Id.* ████████████████████████████████████████████████████████████ *See id.*

[11] *See* Correllium-008963.000002.

[12] Corellium ███████████████████████████████
Corellium's Answers to Apple's 2d Set of Interrogatories, No. 22.  Given that Corellium disclosed only █ current cloud customers on March 28, 2020 (*see* Corellium's 5th Amended Answers to Apple's 1st Set of Interrogatories, No. 9), but identified █ devices, it appears that Corellium's own use of the product for testing purposes may be quite substantial.

██████████████████████████████████.[13]  However, even after expiration of the license, the customer ████████████████████████████████████████████████████████ ████████████████████████████████████████████.[14]  This potential use in excess of the license is not included in our calculations; we did include, however, the ███████████ identified in Apple's Interrogatory No. 9.  I understand that each on-premises product includes a server containing a specified number of processing cores.  Where information is available, we have recorded the number of processing cores on the servers purchased by each customer.  Where that information was not available, we assumed ████████████████████████████████ ███████████████████[15] and for the older sales, the price paid implies a sale of at least █████ Based on this analysis, we estimated that the ███ on-premises sales (including renewals) comprised a total of ████ cores (and possibly more).  As noted above, creating an infringing device required ██████ cores depending on the device.[16]  Assuming most conservatively that only late-model simulations were created using ██████ per device, then these █████ cores could simultaneously virtualize █████ devices (the approximate number of devices that would be generated if each customer created the maximum number of late-model devices once and never deleted any of those devices to make new ones during the term of the license).  If each customer replaced these devices on average only once per month, then during the ██████████ term of each license, a total of ████ devices would be created.  Applying the DMCA statutory ranges to these █████ devices results in **statutory damages ranging from not less than** █████████████████████████████ **for**

---

[13] *See* Correllium-008963.000004.

[14] Gorton March 25, 2020 deposition transcript at 98:13–99:17.

[15] Gorton March 25, 2020 deposition transcript at 94:7–8 ██████████████████████████ ████████████████████████████ ).

[16] *See* Correllium-008963.000002.

**Section 1201 violations based on on-premises sales**.[17]  The details of this calculation are set forth in the attached Exhibit E1.

The second category of customers that Corellium discloses in its fifth amended answers to Apple's Interrogatory No. 9 are those that purchased a cloud-based subscription to the Corellium Apple Product.  We integrated the subscription information from Corellium's interrogatory answers, the deposition of Stephen Dyer,[18] and the limited set of transaction documents that Corellium produced.  We used this information to determine or estimate the number of cores allocated to each cloud user and for how long.  While it could be a larger number, we have determined that Corellium allocated at least ███ cores to ███ subscriptions of various lengths.  Assuming most conservatively that only late-model simulations were created using █ cores per device, then these ███ cores could simultaneously emulate ███ devices. For subcriptions lasting longer than one month, we assumed that devices are replaced ratably every 30 days.[19] This yields an estimate that ███ cloud based devices have been generated through the date of this report.  Applying the DMCA statutory ranges to these ███ devices results in **statutory damages ranging from not less than ████████████████████ for § 1201 violations based on cloud sales**.[20]  The details of this calculation are set forth in the attached Exhibit E2.

---

[17] This approach is conservative.  The same cores could support ███ early-model virtual devices, or ███ such devices assuming turnover once a month, for a statutory damages range of

[18] *See* Dyer March 27, 2020 deposition transcript at 85:3–106:2 (Dyer is asked about each Cloud subscriber in turn).

[19] I have not assumed any device recycling for ██████████████████ for training purposes that last longer than one month.

[20] Again, this approach is conservative; if we assumed early-model devices of █ cores per device, the total devices would be ███, for a damages range of ████████████.

Finally, we considered the prospective customers who were likely granted trial accounts and/or product demonstrations and/or beta test trial accounts[21] based on the aforementioned July 2018 pitch deck and the depositions of Stephen Dyer and Amanda Gorton.  Each shipment of, or provision of access to, these potential customers of the Corellium Apple Product is likewise a violation of Section 1201 attributable to Corellium, as are any additional customer trial accounts that Corellium provided since its formation.  Our analysis concludes that there are ▮ entities that have likely been granted demonstrations and/or trials based on this information (excluding entities which appear to have eventually become paying Corellium customers). ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮.[22]  It is possible that many devices are created during the demonstration and trial process for each prospective customer.  For this analysis, we conservatively assumed that only ▮ device is created during the demo/trial process for each of the ▮ identified prospective customers.  Applying the DMCA statutory ranges to these ▮ devices results in **statutory damages ranging from not less than ▮▮▮▮▮▮▮▮▮▮ for these trial customer Section 1201 violations**. The details of this calculation are set forth in the attached Exhibit E3.

In conclusion, for the three (non-exhaustive) categories of infringing device creation identified above, we have conservatively estimated that Corellium caused the creation of a total of ▮ devices.  Applying the DMCA statutory ranges to these ▮ devices results in **statutory damages ranging from not less than ▮▮▮▮▮▮▮▮ for all Section 1201 violations**. These calculations are summarized in the attached Exhibit E.  I also note that this range is based on the conservative assumption that each device emulated is a late-model requiring ▮ cores. If ▮ cores, reflecting a mix of models, then the statutory maximum  would increase to

---

[21] *See* Gorton March 25, 2020 deposition transcript at 52:23–53:4, 160:2–16.

[22] *See* Dyer March 27, 2020 deposition transcript at 53:15-54:24, 58:14-18.

██████ If █ cores, then this maximum would increase to ███████ . Again, I understand that both fact witnesses and Apple's other experts will provide testimony relating to the scope and nature of Corellium's violations of Section 1201, and I reserve the right to opine whether an award at the higher or lower of end of this range is most appropriate based in part on that evidence.

I must also reserve the right to modify the foregoing based on any further evidence that is made available to me in discovery or at trial. The one and only real-life data point provided to date by Corellium in this matter suggest that all the device estimates discussed above could be based on severely conservative assumptions. Corellium has represented that there were █ virtual devices on the cloud platform as of March 28, 2020.[23] According to Corellium's fifth amended answer to Apple's Interrogatory 9, there were only ███████████ on March 28, 2020, and our estimates assign only ██████ combined to those customers,[24] meaning that only ██████ devices could be in use by those customers. The fact that █ devices resided in Corellium's cloud on that day means our methods of estimation are highly conservative, perhaps underestimating the number of cores allocated to customers in addition to entirely omitting the devices created by Corellium for its own purposes. It also seems possible that some of the █ devices may be attributable to trial accounts granted to prospective customers. In any event, this snapshot on March 28, 2020—when the assumptions underlying our calculations yield only █ cloud devices— suggests that our estimates could be too conservative by nearly a ██████ .

I understand that under prevailing law, there are limits on recovering under different legal theories where the underlying conduct is the same. I understand that Apple contends, based on the evidence presented to it in discovery, that Corellium's conduct in violation of Section 501 is distinct from Corellium's conduct in violation of Section 1201, with different impacts to Apple. I

---

[23] Corellium's Answers to Apple's 2d Set of Interrogatories, No. 22.

[24] *See* Exhibit D2 attached to this report.

further understand, however, that Apple may ultimately need to elect from amongst the actual and statutory damages regimes as discussed above.  I reserve the right to update this report, or my testimony at trial, and provide a final calculation to the extent necessary if and when Apple elects from amongst alternative, available remedies to the extent the underlying conduct overlaps.

### E.    APPELROUTH REPORT

Appelrouth, serving as Corellium's designated damages expert in this matter, has recently issued a Second Expert Report dated April 13, 2020 that addressed the statements, opinions and conclusions set forth in my prior March 3, 2020 report.

**Attribution of Revenue.**  The principal criticism set forth in the Appelrouth Report is that my prior report "failed to demonstrate any attempt to allocate revenues specific to iOS related products."  As a threshold matter, for the damages claimed under Section 504 of the Copyright Act, the burden for allocating any non-infringing revenues rests with Corellium and Appelrouth. 17 U.S.C. § 504(b) provides, in pertinent part:

> In establishing the infringer's profits, the copyright owner is required to present proof **only of the infringer's gross revenue**, and the infringer is required to prove his or her deductible expenses and the **elements of profit attributable to factors other than the copyrighted work**. (emphasis added).

Setting aside the question of burden, I disagree with the implied assertion that there is a necessity to allocate revenues beyond what was done in my initial report, and which I have repeated in this supplemental report.  In its various responses to Apple's Interrogatories Nos. 9 and 10 (each of which expressly and specifically concerned solely revenues from sales or licensing of the "Corellium Apple Product"), Corellium has reported its On-Site and Cloud gross revenues for its **Apple Product** that were set forth in my prior report and Exhibit A thereto.  Further, Amanda Gorton (who certified these interrogatory responses) testified during her deposition on March 25, 2020 ███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████  Had

Appelrouth read the Gorton deposition transcript, which he admits that he did not (Appelrouth Report at page 13), he would have known that further allocation efforts, including his iOS worldwide sales market research analysis, were not warranted.

Moreover, it bears noting that Corellium sells only one product,[25] and that single product exclusively provided iOS related services from its inception in Fall 2017 until its Release 2.0 on around March 5, 2019, when for the first time it began supporting some Android related features and/or services (*see* Corellium's 5th Amended Answers to Apple's 1st Set of Interrogatories, No. 1). Corellium does not offer an Android-only product, or separate its sole product into component parts with different price points.[26]  Rather, each and every on-premises installation of the product, and each and every cloud subscription to the product, enables Corellium's customers to create virtual iOS devices.  It therefore seems to me, as it also ████████████████████, that there is no principled basis to attempt to artificially separate out Android revenue from the sales of Corellium's single, infringing product.

Moreover, even if one were to attempt to perform such an allocation, one would not perform the unwarranted procedures that Appelrouth suggests at page 8 of his report, which have no bearing on the sale of Corellium's Apple Product.  Rather, one might examine the timing and amount of Corellium's gross revenue collections, as detailed in Corellium's fifth amended answer

---

[25] As admitted by Corellium's counsel Justin Levine at discovery hearing in this matter on February 27, 2020 (*see* February 27, 2020 Discovery hearing transcript at 57:5–6, 60:2–62:2)

[26] *See, e.g.*, Corellium-011246, Corellium-009103, Corellium-013916, Corellium-009405, Corellium-013629, Corellium-004708 (reflecting ████████████████████████ █████████████)

to Apple's Interrogatory No. 9 (and its partial QuickBooks records that have been produced in this matter). These interrogatory responses (and other documents/records) reveal that Corellium's gross revenues from its inception through March 2019, that can only relate solely to iOS, total ████████████████████████████████ total gross revenues to date. I further understand from Dr. Jason Nieh that ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████.[27] Similarly, a review of Corellium's marketing brochures demonstrate support for a ████████████████ of iOS than Android devices.[28] And those same brochures demonstrate that Corellium's prices ████████████████████████

████████████████████████████████████████

██████████████████████████[29] Even assuming that as much as 10% of Corellium's revenues after March 2019 have concerned Android features and/or services, an assumption that seems doubtful given the ████████████████████████████████,

I have estimated that at least ████████████ of Corellium's gross revenues to date have related to iOS. Accordingly, its seems clear that any non-infringing revenue allocation that Appelrouth may ultimately offer would be *de minimis*.

**Corellium's Deductible Costs**. As noted in Section III.C above, Appelrouth concedes that ████████████████████████████████████████

---

[27] Email from Dr. Jason Nieh dated April 20, 2020.

[28] *See, e.g.*, Corellium-011246, Corellium-009103, Corellium-013916, Corellium-009405, Corellium-013629, Corellium-004708 (reflecting single price for product offering access to iOS and Android).

[29] *Compare* Corellium-011246 *with* Corellium-009103, Corellium-009405, and Corellium-004708.

███████████████████████████████████   However, Appelrouth makes no attempt to

verify Corellium's costs himself.  Instead, he states the following:

> I cannot complete my analysis until the Plaintiff is able to provide
> an allocation of revenues for [iOS] worldwide use as it relates to
> Corellium.  This is a necessary step prior to completing an allocation
> for the corresponding expenses.

This statement makes no sense.  As discussed above, under Section 504(b), it is Corellium's burden

to establish an allocation of costs. Appelrouth has not even attempted to determine Corellium's

deductible costs and expensesthat are attributable to its Apple Product.[30]  Furthermore, for the

reasons discussed above, no such allocation is necessary.   Nor does Appelrouth address

Corellium's failure to support more than half its claimed costs.

It should also be noted that, had Appelrouth examined the actual ████████████████

████████ discussed in Section III.C above (and listed in footnote 7), and not simply relied on

counsel's instruction, he would have seen than that substantially all of the ████████████████

████████████████████, and counsel had incorrectly advised him to include those

services in Corellium's deductible costs.

**<u>Other Criticisms of My Report.</u>**      Finally,  Appelrouth  also  makes  a  number  of

miscellaneous criticisms of my original report that are not supported.  First, he accuses me of

cherry-picking a higher gross revenue amount, and erroneously alleges that I utilized the highest

gross revenue amount in my prior report "without an explanation to support [my] selection" or a

supporting analysis (Appelrouth Report at page 7).  This assertion is not correct, as I concluded

my gross revenue discussion at Section III.A of my prior report by noting that I had at that time

adopted the ████████ total (set forth in Corellium's amended answers to Apple's Interrogatory

No. 10), "[p]ending the production of further information that might clarify" Corellium's differing

---

[30] He is still reviewing these costs and expenses as of the date of his report.  Appelrouth Report
at page 12.

reported amounts.  Now that Corellium has produced transaction documents concerning its gross revenues, I have been able to confirm that my prior reliance on the response to Apple's Interrogatory No. 10 was correct (as set forth in Section III.A above of this report).

Similarly, Appelrouth wrongly asserts that my projection of Corellium's gross revenues for the first 10 months of 2020 was "made without any basis" (Appelrouth Report at page 3), "arbitrarily calculated" (Appelrouth Report at page 5), and claims that my ████████ of ████████████████ "is speculative at best" (Appelrouth Report at page 7).  In fact, however, as I stated in the first paragraph of Section III.B of my prior report, I based this project on **Corellium's own then-current projections**:

> I have projected Corellium's gross revenues through the October 2020 trial date (and as of October 31, 2020), on the basis of Corellium's ████████████████████████████████████
>
> 
>
> ████████████████████████████.

Corellium's then-current third amended answer to Apple's Interrogatory No. 11 expressly stated that "████████████████████████████████████████████████████████████ ████████████████ Contrary to Appelrouth's claims, Corellium's ████████████████ ████████████ provides a sound and reasonable basis for my projection calculations.

### F.   ATTORNEY'S FEES

Finally, my report does not address any attorneys' fees and costs that are awarded as costs of suit pursuant to Sections 505 and 1203(b).  I understand that Apple is seeking such attorneys' fees and costs, and will document them as appropriate in the event Corellium is held to have engaged in violations of 17 U.S.C. § 501 and §§ 1201(a)(2) and 1201(b).

## IV.   QUALIFICATIONS

I am licensed as both a Certified Public Accountant and an attorney at law in the State of California.  I am a Vice President with the financial litigation consulting firm Freeman & Mills,

Inc.  I have over 35 years of collective financial investigation, audit and legal experience, and for the past 27 years I have specialized in complex forensic accounting investigations and damages analysis.  I have previously served as an expert in federal copyright damages matters, including *Reinsdorf v. Skechers U.S.A., Inc., et al., USDC C Ca Case No. CV10-7181-DDP (SSx)*, and *Inter-Avid Productions v. Ventura Content, LTD, et al., USDC C Ca Case No. 11-CV-05119 GHK (VBK)*.

A copy of my current professional resume, which further describes my experience, publications, prior testimony, previous professional positions and professional affiliations, was attached as Exhibit C to my March 3, 2020 report.

## V.    COMPENSATION

My hourly billing rate for investigation and analysis on this matter is $520 per hour.  The hourly billing rates for my assistants on this engagement range from $295 to $195 per hour.  Our billings for services rendered through March 31, 2020 have collectively totaled $54,265.  The positions articulated herein are my own. My payment is not contingent on my findings or on the outcome of this case.

Executed this 20th day of April 2020, in Los Angeles, California.

David B. Connelly, CPA, JD

EXHIBIT A
(REVISED)

APPLE v. CORELLIUM
CORELLIUM GROSS REVENUE
APPLE PRODUCT SALES OR LICENSING
2017 THRU APRIL 18, 2020

APPLE v. CORELLIUM

**CORELLIUM APPLE PRODUCT REVENUES (NON-CLOUD)**



CORELLIUM - CONFIDENTIAL - AEO

**EXHIBIT C**

**APPLE v. CORELLIUM**
**CORELLIUM PROFITS FROM**
**APPLE PRODUCT SALES OR LICENSING**
**2017 THRU APRIL 18, 2020**



CORELLIUM - CONFIDENTIAL - AEO

APPLE v. CORELLIUM
CORELLIUM PROFITS FROM
APPLE PRODUCT SALES OR LICENSING
PROJECTIONS THRU OCTOBER 31, 2020



CORELLIUM - CONFIDENTIAL - AEO

**APPLE v. CORELLIUM**

**CORELLIUM COSTS EXPENSES**
**TRANSACTION DOCUMENTS PRODUCED**
**2017 THRU APRIL 18, 2020**

EXHIBIT D

CORELLIUM - CONFIDENTIAL - AEO

APPLE v. CORELLIUM
CORELLIUM COSTS EXPENSES
TRANSACTION DOCUMENTS PRODUCED
2017 THRU APRIL 18, 2020



CORELLIUM - CONFIDENTIAL - AEO

APPLE v. CORELLIUM
CORELLIUM COSTS EXPENSES
TRANSACTION DOCUMENTS PRODUCED
2017 THRU APRIL 18, 2020

EXHIBIT D



CORELLIUM - CONFIDENTIAL - AEO

APPLE v. CORELLIUM
**CORELLIUM COSTS EXPENSES**
**TRANSACTION DOCUMENTS PRODUCED**
**2017 THRU APRIL 18, 2020**



CORELLIUM - CONFIDENTIAL - AEO

**APPLE v. CORELLIUM**
**CORELLIUM COSTS EXPENSES**
**TRANSACTION DOCUMENTS PRODUCED**
**2017 THRU APRIL 18, 2020**

EXHIBIT D

CORELLIUM - CONFIDENTIAL - AEO

**APPLE v. CORELLIUM**
**CORELLIUM COSTS EXPENSES**
**TRANSACTION DOCUMENTS PRODUCED**
**2017 THRU APRIL 18, 2020**

CORELLIUM - CONFIDENTIAL - AEO

**APPLE v. CORELLIUM**
**CORELLIUM COSTS EXPENSES**
**TRANSACTION DOCUMENTS PRODUCED**
**2017 THRU APRIL 18, 2020**

CORELLIUM - CONFIDENTIAL - AEO

**APPLE v. CORELLIUM**
**CORELLIUM COSTS EXPENSES**
**TRANSACTION DOCUMENTS PRODUCED**
**2017 THRU APRIL 18, 2020**

CORELLIUM - CONFIDENTIAL - AEO

EXHIBIT E

**APPLE v. CORELLIUM**
**DMCA DAMAGES ANALYSIS**
**SUMMARY OF DAMAGES**



CORELLIUM - CONFIDENTIAL - AEO

**APPLE v. CORELLIUM**
**DMCA DAMAGES ANALYSIS**



CORELLIUM - CONFIDENTIAL - AEO

DMCA DAMAGES ANALYSIS
ON-PREMISES SALES

Notes (continued):

[2]   

[3]   Correllium-008850.

[4]   Correllium-008713.

[5]   Correllium-006180.

[6]   Correllium-006200.000013.

[7]   Correllium-004655.000012.

[8]   Correllium-006450.

[9]   Correllium-004675.000002.

[10]  Correllium-009413.000001.

[11]  Correllium-006559.

[12]  AZI000517.

[13]  Correllium-004660.000001.

[14]

[15]

CORELLIUM - CONFIDENTIAL - AEO

EXHIBIT E2



[3]   Correllium-014016.

[4]   Correllium-009709.

[5]   Correllium-013913.000001.

CORELLIUM - CONFIDENTIAL - AEO

APPLE v. CORELLIUM
DMCA DAMAGES ANALYSIS
CLOUD SALES

Notes (continued):

[6]   Correllium-013505.000001.

[7]   

[8]

[9]   Correllium-013084.000001.

[10]  Correllium-009472.000001.

[11]  Correllium-005871.

[12]  Correllium-008893.000001.

[13]  Correllium-014345.

[14]  Correllium-012745.000001.

[15]

[16]

[17]

[18]

[19]

[20]

[21]

CORELLIUM - CONFIDENTIAL - AEO

**APPLE v. CORELLIUM**                                   **EXHIBIT E3-1**
**DCMA DAMAGES ANALYSIS**
**TRIAL ACCOUNTS & DEMOS**

**CATEGORY 1: Confirmed Trial Accounts**



CORELLIUM - CONFIDENTIAL - AEO

APPLE v. CORELLIUM                              EXHIBIT E3-2
DCMA DAMAGES ANALYSIS
TRIAL ACCOUNTS & DEMOS

**CATEGORY 2: Likely Trial Accounts and/or Product Demonstrations**

CORELLIUM - CONFIDENTIAL - AEO

**APPLE v. CORELLIUM**　　　　　　　　　　**EXHIBIT E3-2**
**DCMA DAMAGES ANALYSIS**
**TRIAL ACCOUNTS & DEMOS**

**CATEGORY 2 (continued):**



CORELLIUM - CONFIDENTIAL - AEO

**APPLE v. CORELLIUM**          **EXHIBIT E3-3**
**DCMA DAMAGES ANALYSIS**
**TRIAL ACCOUNTS & DEMOS**

CORELLIUM - CONFIDENTIAL - AEO

## <u>CERTIFICATE OF SERVICE</u>

I, Jessica Stebbins Bina, do hereby certify that on April 20, 2020 I caused a copy of the

foregoing Exhibits to Supplemental and Rebuttal Report of David B. Connelly to be served via

email upon:


S. Jonathan Vine
Justin B. Levine
Lizza C. Constantine
Michael Alexander Boehringer
COLE, SCOTT & KISSANE, P.A.
Esperante Building
222 Lakeview Avenue, Suite 120
West Palm Beach, Florida 33401
jonathan.vine@csklegal.com
justin.levine@csklegal.com
lizza.constantine@csklegal.com
michael.boehringer@csklegal.com

David L. Hecht
Maxim Price
Minyao Wang
Conor B. McDonough
HECHT PARTNERS LLP
20 West 23rd St. Fifth Floor
New York, NY 10010
dhecht@hechtparntersllp.com
mprice@hechtpartnersllp.com
mwang@hechtpartnersllp.com
cmcdonough@hechtpartners.com



*s/ Jessica Stebbins Bina*
Jessica Stebbins Bina