# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

---

APPLE INC.,

       Plaintiff,

  v.

CORELLIUM, LLC,

       Defendant.

---

Case No. 9:19-cv-81160-RS

**EXPERT REPORT OF MICHAEL D. SIEGEL, PH.D**

**MARCH 3, 2020**

**RED UNDERLINED = CORELLIUM CONFIDENTIAL – ATTORNEYS' EYES ONLY**

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................3

      A.   Qualifications ...........................................................................................3

      B.   Case Background ......................................................................................5

      C.   Assignment ...............................................................................................7

      D.   Materials Relied Upon ..............................................................................7

      E.   Substantial Limitations Of Report ...........................................................7

II.   SUMMARY OF OPINIONS ..................................................................................8

III.  OVERVIEW OF THE SECURITY RESEARCH INDUSTRY .............................9

      A.   Security Researchers Conduct Research To Discover Vulnerabilities
           And Exploits In Software.........................................................................10

      B.   Software Vulnerabilities And Exploits Can Be Used For Offensive Or
           Defensive Purposes .................................................................................12
           1.   Offensive Uses Of Vulnerabilities And Exploits..............................16
           2.   Defensive Uses Of Vulnerabilities And Exploits .............................18

IV.   PRACTICING GOOD-FAITH SECURITY RESEARCH IS ESSENTIAL
      FOR THE SOFTWARE INDUSTRY AND FAILING TO DO SO WILL
      REDUCE SECURITY AND SAFETY ...................................................................19

      A.   Good-Faith Security Research Requires Responsible Disclosure .............19

      B.   Industry Standards For Good-Faith Research Require Responsible
           Disclosure ...............................................................................................22

      C.   Incentive Systems Like Bug Bounty Programs Promote Good-Faith
           Security Research And Responsible Disclosure .......................................25

V.    CORELLIUM'S BUSINESS PRACTICES DO NOT ENSURE GOOD-
      FAITH SECURITY RESEARCH ..........................................................................27

      A.   Background Of The Corellium Apple Product .........................................28

      B.   Corellium Recognizes The Potential For Bad-Faith, Offensive Use Of
           Its Product, And Encourages Rather Than Stops Such Conduct ...............29
           1.   Corellium Does Not Require Or Encourage Responsible Disclosure To
                Apple   ..........................................................................................30
           2.   Corellium Does Not Limit What Users May Do With Vulnerabilities ...............31
           3.   Corellium Openly Advocates For Uses Inconsistent With Good-Faith
                Research .......................................................................................33

## I.   INTRODUCTION

### A.  Qualifications

1.   I am a Principal Research Scientist in the Information Technology Group at MIT's Sloan School of Management. I am currently Director of Cybersecurity at MIT Sloan, a research consortium focused on management, strategy and organizational issues related to cybersecurity. I have also been a Senior Lecturer at the Sloan School of Management.

2.   I have been a research faculty member in MIT's Information Technologies Group for more than thirty years. I have also been co-director of MIT's International Finance Research Center, a Senior Lecturer for courses in Finance and Information Technology, and the Director of the Digital Health Special Interest Group at the MIT Center for Digital Business.

3.   I hold degrees in Engineering (B.S. and M.S.) from Trinity College (Hartford, CT) and University of Wisconsin (Madison) respectively, and Computer Science (M.A. and Ph.D.) from Boston University. In addition to my thirty years on the research faculty at MIT, I have been a Visiting Professor at Northeastern University, a Research Associate at Boston University, and a Research Assistant at the Solar Energy Laboratory at the University of Wisconsin at Madison.

4.   I have researched and lectured extensively on subjects relating to information technologies, information integration, distributed software systems, and management of information systems and cybersecurity. I am the author or co-author of over 70 journal articles and reports related to these areas. My research has been applied to a number of business areas including, but not limited to, Financial Services, Digital Business, Healthcare, Cybersecurity, Software Development and Maintenance, Industrial Controls Systems Cyber Security, Systems Integration, and Risk Management.

5.  As a Principal Research Scientist at the Sloan School of Management, I have focused on issues that combine the use of information technology with business strategy and operations, with a particular emphasis on security.

6.  I have extensive experience on the management, strategy, technology, and organizational issues related to cybersecurity with specific interest in database, distributed systems, vulnerability markets, cyber risk metrics, bug bounty programs, business models connected to cyberattacks, "Internet of Things" endpoint security, cybersecurity workforce development, and educating management in cybersecurity. I have also conducted extensive research into social media, information, and its effects on society. For example, I have examined the effect of Twitter on state stability. I have numerous publications in these and related areas.

7.  My research at MIT Sloan School of Management keeps me in close contact with industry and governmental leaders on issues related to cybersecurity. Cybersecurity at MIT Sloan has had over 40 different industrial partners, most from Fortune 500 companies, and my research related to national security is relevant for numerous US government organizations, governments around the world, and non-government organizations (NGOs). As part of this activity, I have had discussions with hundreds of Chief Information Security Officers (CISOs) or equivalent from Fortune 500 companies and government agencies, as well as many small and medium-sized enterprises, concerning cybersecurity. Through these interactions, I have gained extensive insight into cybersecurity practices and standards at a wide variety of leading companies.

8.  I have developed and presented numerous lectures related to cybersecurity. These have been attended by a wide range of audiences including undergraduate and graduate students,

executives, government organizations, and NGOs. I have been part of several executive education programs offered by MIT including three specifically in cybersecurity. These and other lectures have been viewed by students, academics, industry, and governments worldwide.

9.   I am the co-inventor on three patents related to distributed systems, metadata, web-based data extraction, and information integration:

- U.S. Patent No. 6,282,537, entitled "Querying and Retrieving Semi-Structured Data from Heterogeneous Sources by Translating Structured Queries." This patent issued in 2001.
- U.S. Patent No. 5,913,214, entitled "Data Extraction from World Wide Web Pages." This patent issued in 1999.
- U.S. Patent No. 5,953,716, entitled "Querying Heterogeneous Data Sources Distributed over a Network Using Context Interchange." This patent issued in 1999.

10.  Appendix A provides my Curriculum Vitae, which includes my publications.

## B.  Case Background

11.  Apple Inc. ("Apple") is a leading designer and manufacturer of mobile communication devices, personal computers, and media devices. Apple's products and services include mobile devices such as iPhone® and iPad®, as well as software that is used on those devices, including the iOS operating system. I understand that Apple has alleged that its iOS operating system is protected under federal copyright law.[1]

---

[1]   FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL, *Apple Inc. v. Corellium, LLC,* Case 9:19-cv-81160-RS, December 20, 2019, ¶ 17.

12.   Corellium, LLC ("Corellium") offers a product that creates virtual versions of Apple's iOS-operated devices that are accessible on a web browser or via an on-premises platform.[2] This product is referred to in this report as the Corellium Apple Product. I understand that Apple alleges in its complaint that the Corellium Apple Product uses Apple's copyrighted works, including the iOS operating system.

13.   I further understand that Apple has alleged that it has not licensed use of its copyrighted works to Corellium and that Corellium's use of Apple's copyrighted works constitutes infringement of Apple's copyrights.[3] I also understand that Apple alleges that Corellium's trafficking of the Corellium Apple Product also violates federal law.[4]

14.   I understand that one of Corellium's defenses in this litigation is based on Corellium's claim that the Corellium Apple Product is designed, marketed, and used for good-faith security research.[5]

15.   I am being compensated at the rate of $850 per hour for the time I incur on this matter. In preparation of this report, I have been assisted by certain employees of Analysis Group, who provided me support and assistance under my direction. The positions articulated herein are my own. My payment is not contingent on my opinions or on the outcome of this case.

---

[2]   Lorenzo Franceschi-Bicchierai, "The Prototype iPhones That Hackers Use to Research Apple's Most Sensitive Code," *Motherboard Tech by Vice*, March 6, 2019, available at https://www.vice.com/en_us/article/gyakgw/the-prototype-dev-fused-iphones-that-hackers-use-to-research-apple-zero-days.

[3]   FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL, *Apple Inc. v. Corellium, LLC*, Case 9:19-cv-81160-RS, December 20, 2019, ¶¶ 51–57.

[4]   FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL, *Apple Inc. v. Corellium, LLC*, Case 9:19-cv-81160-RS, December 20, 2019, ¶¶ 74–77.

[5]   DEFENDANT'S NOTICE OF SERVING AMENDED ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, *Apple Inc. v. Corellium, LLC,* Case 9:19-cv-81160-RS, January 16, 2020, p. 46.

### C. Assignment

16.    Provide an overview of the security research industry and opine on what constitutes "good-faith" security research, referencing industry examples and regulations.

17.    Provide a high-level overview of Corellium's business and, in particular, the Corellium Apple Product, with attention to agreements with its customers and any restrictions on use put in place, and opine on whether Corellium is ensuring that the Corellium Apple Product is used specifically for "good-faith" security research.

### D. Materials Relied Upon

18.    In preparation for this report, I have reviewed the materials listed in Appendix B.

### E. Substantial Limitations Of Report

19.    I have prepared this report to the best of my ability, based on the documents provided to me by Apple. I note, however, that there are a number of documents about Corellium and its business practices that I have not been provided with and that, if made available by Corellium, may be relevant to and inform my opinion.

20.    In particular, I have been provided with few, if any, of the following materials: (1) Corellium's agreements with its customers; (2) Corellium's communications with its customers; (3) Corellium's agreements with the resellers of its product; (4) Corellium's communications with the resellers; and (5) Corellium's marketing and pitch materials for potential customers. These materials, if provided, would likely shed substantial light on Corellium's practices with respect to good-faith security research, including Corellium's endorsed uses of its product, and its lack of restrictions regarding the use of its product.

21.     The opinions I have given herein are thus necessarily limited to the materials I have had available to me. I thus reserve the right to amend or supplement this report based on additional documents produced by Corellium or to the extent such further materials are otherwise made available for my review.

## II.     SUMMARY OF OPINIONS

22.     Based on my expertise, review of Corellium's business practices, and the materials described in Appendix B, I have reached the following opinions:

a.   It is my opinion that, for security research to be considered "good-faith security research," it must be done solely for the purpose of testing, investigating, and/or correcting a security flaw or vulnerability; it must be carried out in an environment designed to avoid any harm to individuals or the public; the information derived from the research must not be used or maintained in a manner that facilitates illegal activity; and finally, and most critically, the information derived from the research must be properly and responsibly disclosed to the vendor of the product that contains the software flaw or vulnerability.

b.   Security research that does not result in responsible disclosure of security flaws or vulnerabilities to the researched company would not be considered good-faith security research.

c.   I have considered Corellium's business practices and concluded that the do not ensure good-faith security research. Specifically, Corellium recognizes the potential for bad-faith uses of the Corellium Apple Product but has chosen to do nothing to stop such bad-faith uses, either contractually or through other restrictions. To the

contrary, in many instances Corellium has specifically encouraged conduct that is contrary to the requirements of good-faith security research.

d.  It is my opinion that Corellium's business practices are not designed to ensure that the Corellium Apple Product is used solely for good-faith security research, and Corellium's actual business activities confirm that Corellium cannot represent that its product is used only or even primarily for good-faith security research. This conclusion is based on the fact that I have seen no evidence to date that Corellium limits the sale of the Corellium Apple Product to only those engaged in good-faith security research, and I also have not seen any evidence to date that Corellium places meaningful restrictions on how the product is used. Also relevant is the fact that Corellium does not require that vulnerabilities discovered with its product be disclosed back to anyone, let alone to Apple. This contradicts one of the core principles of good-faith security research: responsible disclosure for the purpose of facilitating the correction of security flaws and vulnerabilities. Finally, several public statements made by the founder and Chief Technology Officer of Corellium, Chris Wade, are contrary to the tenets of good-faith security research and thus support my conclusion.

## III.   OVERVIEW OF THE SECURITY RESEARCH INDUSTRY

23.   Cyber-attacks are a tremendous threat to today's digital society, targeting individuals, companies, governments and NGOs. In order to contextualize how tools such as the Corellium Apple Product may be used within this landscape, it is important to understand the security research industry. This involves understanding what software vulnerabilities

9

and exploits are, how they can be used, and the offensive and defensive markets in which vulnerabilities can be disclosed, bought, and sold.

24.     In this section, I give an overview of the security research industry and vulnerabilities. Specifically, in Section III.A I describe the discovery of vulnerabilities and the participants in the industry. In Section III.B I describe offensive and defensive uses of vulnerabilities and exploits, and opine on the responsibilities of security researchers who wish to contribute to ensuring software security.

### A.  Security Researchers Conduct Research To Discover Vulnerabilities And Exploits In Software[6]

25.     A software **bug** is an error, mistake, defect, or fault that may cause a failure or deviation from the software's expected results.[7] **Vulnerabilities** are software bugs that create a security weakness in the design, implementation, or operation of a system or application.[8] The two are not always the same thing, as software can have a bug without that bug creating an opening for that software to be hacked or exploited. For example, if a website allowed users to add items to their shopping cart by clicking a button, but the item was not added to the cart, this would be a bug. The code would fail to operate as expected—but the failure may not have any security implications.

26.     Cyber-attacks rely not just on the existence of vulnerabilities, but also on the mechanism with which they are used. Once a vulnerability is discovered, an **exploit** must be developed

---

6    Although vulnerabilities can exist in both software and hardware, this report focuses specifically on vulnerability in software.

7    "Software Bug Definition," *techopedia*, January 27, 2017, available at https://www.techopedia.com/definition/24864/software-bug.

8    "The Defender's Dilemma: Charting a Course Toward Cybsersecurity," *RAND Corporation* (2015), p. 42.

to take advantage of the weakness and turn the vulnerability into an actual way to breach a system. This turns a vulnerability into a viable method to launch a cyber-attack.[9] For example, a vulnerability might exist such that unauthorized users can see records in a database system. A successful exploit of the vulnerability could provide an attacker with the means to collect or extract all of the records from that database.[10]  For example, in 2017, hackers from China exploited a vulnerability in an Equifax web application system to hack into Equifax's system and gain access to personal data on over 145 million Americans in what has been described as a "historic data breach."[11]

27.    A **security researcher** is someone who finds flaws or vulnerabilities in software, and conducts research on known vulnerabilities.[12] Security researchers can take a variety forms, including individual independent researchers, small academic teams, security firms, large tech companies, and governments.[13] There are a wide range of reasons why people and entities engage in security research. Some are looking to improve the security and stability of consumer products; some are looking to further their own interests, such as governments that use vulnerabilities and exploits to breach privacy protections; some are looking to profit from the sale of information about vulnerabilities and exploits for financial gain; and some

---

[9]    "The difference between and exploit and vulnerability," *Live Hacking*, November 20, 2012, available at http://www.livehacking.com/2012/11/20/the-difference-between-an-expoit-and-vulnerability/.

[10]    "Threats, Vulnerabilities and Exploits - oh my!," *ICANN*, August 10, 2015, available at https://www.icann.org/news/blog/threats-vulnerabilities-and-exploits-oh-my.

[11]    "What Equifax Is Still Teaching Us About Security," *Dice*, February 18, 2020, available at https://insights.dice.com/2020/02/18/what-equifax-still-teaching-us-cybersecurity/.

[12]    Wilson et al., "Bugs in the System," *New America*, July 2006, p. 6.

[13]    Wilson et al., "Bugs in the System," *New America*, July 2006, p. 2.

are interested in using vulnerabilities and exploits to do harm in other ways (e.g., cyber-attacks).

28.     The existence of vulnerabilities is inevitable, and the vulnerabilities discovered by security researchers can vary in their complexity, difficulty to remediate, and security risk. Once a vulnerability is found, it can either be patched (i.e., fixed), exploited (i.e., used in an attack), bought/sold/rented (i.e., purchase/sale of vulnerability details), or stockpiled (i.e., saved for later use).[14] Which of these happens depends greatly upon the action taken by the security researcher who discovers the vulnerability, and to whom they choose to disclose the vulnerability.

29.     For example, some security researchers may disclose the presence of a vulnerability to the software vendor—the entity that developed the product and is responsible for maintaining it—so that it can be fixed. Others may choose to disclose the vulnerability to state actors. Others may choose to disclose the vulnerability to criminals. And still others may choose not to disclose the vulnerability to anyone. Each of these choices has real-world consequences, and only one of them—disclosure to the organization that developed the product so that it can be fixed—is consistent with good-faith security research.

**B.  Software Vulnerabilities And Exploits Can Be Used For Offensive Or Defensive Purposes**

30.     To understand what can happen with vulnerabilities and exploits after they are discovered, it is important to understand the offensive and defensive marketplaces for them. The market

---

[14]  Lillian Ablon, Andy Bogart, "Zero Days, Thousands of Nights: The Life and Times of Zero-Day Vulnerabilities and Their Exploits," *RAND Corporation* (2017). p. 2, 6, 22, 23.

for software vulnerabilities has existed as long as software itself, but it has seen significant

changes over time.[15] When early security researchers found and reported vulnerabilities to

the vendors of early software, the process was often done less for financial gain and more

for recognition from other industry participants and a desire to make software more secure.[16]

However, over time, software has become more complex, the pool of qualified security

researchers has grown, and economic incentives for finding vulnerabilities have increased

rapidly.[17] Vulnerability markets have developed so that vulnerabilities (and their associated

exploits) can also be bought, sold, traded, or rented.[18]

31.    Vulnerabilities "can be used to craft new malicious attacks and exploits (offense), or they

can be fixed through patches and updates (defense)."[19] Much of cybersecurity can be seen as

a race between two parties: software developers and security researchers discovering and

patching vulnerabilities, on the one hand, and groups that want to discover and exploit

vulnerabilities to do harm or use them for personal benefit, on the other. One major

shortcoming in the race is the asymmetry: black-hat researchers (explained further below)

need only one unknown vulnerability to do harm, while software developers need to protect

against all vulnerabilities.

---

[15]   Adam Segal, "Using Incentives to Shape the Zero-Day Market," *Council on Foreign Relations*, September 19, 2016, available at https://www.cfr.org/report/using-incentives-shape-zero-day-market.

[16]   Adam Segal, "Using Incentives to Shape the Zero-Day Market," *Council on Foreign Relations*, September 19, 2016, available at https://www.cfr.org/report/using-incentives-shape-zero-day-market.

[17]   Adam Segal, "Using Incentives to Shape the Zero-Day Market," *Council on Foreign Relations*, September 19, 2016, available at https://www.cfr.org/report/using-incentives-shape-zero-day-market.

[18]   "The Defender's Dilemma: Charting a Course Toward Cybsersecurity," RAND Corporation (2015), p. 45.

[19]   Ryan Ellis, Keman Huang, Michael Siegel, Katie Moussouris, James Houghton, "Chapter 4 - Fixing a Hole: The Labor Market for Bugs," *New Solutions for Cybersecurity*, 2017, p. 143.

32.     The offense uses its capabilities, researchers, tools, and techniques to discover vulnerabilities to stockpile for later or to deploy for exploitation (either directly or by transferring to others). Similarly, the defense uses its capabilities, researchers, tools, and techniques to discover undisclosed vulnerabilities and patch them before they are discovered by the offense, or to discover undisclosed vulnerabilities stockpiled by the offense and to patch them before they are deployed for harm.[20]

33.     Competing "offensive" and "defensive" markets have been created for the exchange of these vulnerabilities. The main difference between these two markets "relates to how—or *if*—the newly discovered vulnerability is disclosed to the impacted vendor and patched."[21]

34.     Traditionally, security researchers are thought about in three categories, depending on the types of activities they undertake. Security researchers may act in the interest of ensuring the security of software and the public (white-hat researchers), maliciously (black-hat researchers), or somewhere in between (grey-hat researchers).[22]

   a.   **White-hat security researchers** participate in defensive marketplaces for security vulnerabilities. Upon finding a vulnerability or exploit, they nearly always disclose the issue directly to the vendor who will be able to fix it, and at times work directly with the vendor. They may participate in bug bounty programs and other contests, and often receive recognition for their contributions to improving security.[23]

---

[20]   Ryan Ellis, Keman Huang, Michael Siegel, Katie Moussouris, James Houghton, "Chapter 4 - Fixing a Hole: The Labor Market for Bugs," *New Solutions for Cybersecurity*, 2017, p. 143.

[21]   Ryan Ellis, Keman Huang, Michael Siegel, Katie Moussouris, James Houghton, "Chapter 4 - Fixing a Hole: The Labor Market for Bugs," *New Solutions for Cybersecurity*, 2017, p. 143.

[22]   "The Defender's Dilemma: Charting a Course Toward Cybsersecurity," *RAND Corporation* (2015) p. 44.

[23]   "The Defender's Dilemma: Charting a Course Toward Cybsersecurity," *RAND Corporation*, (2015), pp. 44-45, 48.

b.  **Black-hat researchers** search for vulnerabilities or exploits for malicious, and often criminal purposes.[24] They perform security research with the intent of identifying exploits that they or their associates can deploy via cyber-attacks, or to stockpile and sell or rent vulnerabilities and exploits in offensive markets for financial gain. Vulnerabilities and exploits discovered by black-hat researchers have great potential to do harm, as these vulnerabilities are usually kept secret from those with the power to fix them.[25]

c.  **Grey-hat security researchers**, as the name suggests, are between white-hat and black-hat researchers on the spectrum of security researchers. Grey-hat security researchers typically focus on how they can personally benefit from their discoveries.[26] They may work for various clients in the offensive market, such as "nation states looking to develop sophisticated exploits and attacks in the service of espionage and sabotage, criminals looking to develop intrusions for profit, and brokers that serve as middle-men between relevant parties," in order to sell exploits for profit.[27] Such buyers may require vulnerabilities be kept private and not be disclosed to the original product developer in order for the researcher to receive a

---

[24]  "The Defender's Dilemma: Charting a Course Toward Cybsersecurity," *RAND Corporation*, (2015), p. 44.

[25]  "The Defender's Dilemma: Charting a Course Toward Cybsersecurity," *RAND Corporation*, (2015), pp. 44-45, 48.

[26]  "What is the Difference Between Black, White, and Grey Hat Hackers?," *Norton*, available at https://us norton.com/internetsecurity-emerging-threats-what-is-the-difference-between-black-white-and-grey-hat-hackers.html.

[27]  Ryan Ellis, Keman Huang, Michael Siegel, Katie Moussouris, James Houghton, "Chapter 4 - Fixing a Hole: The Labor Market for Bugs," *New Solutions for Cybersecurity*, 2017, p. 143.

payment.[28] In addition, if a grey-hat researcher finds a vulnerability, it may become part of the offensive stockpile, waiting to be used against an unsuspecting party. One example of grey-hat researchers is the agencies within the United States government. While an agency might inform an affected company of the vulnerability in some instances, it might instead "save the secret weakness in order to use it to launch attacks against enemies."[29]

35.     Below, I discuss offensive and defensive marketplaces and incentives for vulnerability and exploit disclosure in more detail.

### 1.   Offensive Uses Of Vulnerabilities And Exploits

36.     The "offensive" market is the place where black-hat and grey-hat researchers sell vulnerabilities and exploits to interested parties, such as parties looking for exploits to use in an attack or for building their offensive stockpile. The "offensive market" is characterized by non-disclosure. Purchased vulnerabilities are not disclosed to the relevant vendor, "but rather are kept secret for later use as part of an exploit or attack."[30] In the offensive market, vulnerabilities and their fully developed exploits can also be provided as a service offering paid for on a commission basis.[31]

---

[28]   *E.g.,* Zerodium, a company that describes themselves as "the world's leading exploit acquisition platform" for zero-day vulnerabilities will only pay a bounty for "original and previously unreported" vulnerabilities. "Our Exploit Acquisition Program," *Zerodium,* available at https://zerodium.com/program.html.

[29]   James Doubek, "Government Outlines When It Will Disclose Or Exploit Software Vulnerabilities," *NPR*, November 17, 2017, available at https://www.npr.org/sections/alltechconsidered/2017/11/17/564755961/government-outlines-when-it-will-disclose-or-exploit-software-vulnerabilities.

[30]   Ryan Ellis, Keman Huang, Michael Siegel, Katie Moussouris, James Houghton, "Chapter 4 - Fixing a Hole: The Labor Market for Bugs," *New Solutions for Cybersecurity*, 2017, p. 143.

[31]   Keman Huang, Michael Siegel, and Stuart Madnick, "Systematically Understanding the Cyber Attack Business: A Survey ACM Computer Surveys," *ACM Computing Surveys* Vol. 51, No. 4 (2018): 70:27.

37.  Attacks that target an unknown software vulnerability are known as "zero-day" (or 0day) exploits.[32] Because the attacker finds the vulnerability before the software vendor, these exploits are highly likely to succeed as "[a]ttacks and exploits that take advantage of a previously unknown and undisclosed flaw can be very difficult to detect or prevent."[33] Finding these zero-day exploits can also be quite lucrative. For example, exploit-trade companies, like Zerodium, will offer security researchers up to $2.5 million for their zero-day exploits.[34]

38.  When multiple participants in the offensive market have access to the same tool or tools that facilitate the discovery of vulnerabilities, the speed at which vulnerabilities are exploited is likely to increase. The reason for this is that, when particularly effective tools for vulnerability discovery proliferate, the likelihood that another participant in the offensive market will also find the same vulnerability increases as well—a concept known as rediscovery.[35] Increased chances of rediscovery place pressure on offensive players (who may be aware that other offensive players have the same tool and understand the increase in likelihood of rediscovery) to more quickly exploit those vulnerabilities so they can take advantage of the vulnerability before someone else does so.[36]

---

[32]  "The Defender's Dilemma: Charting a Course Toward Cybersecurity," *RAND Corporation* (2015), p. xvi.

[33]  Ryan Ellis, Keman Huang, Michael Siegel, Katie Moussouris, James Houghton, "Chapter 4 - Fixing a Hole: The Labor Market for Bugs," *New Solutions for Cybersecurity*, 2017, p. 143; "What is a zero-day (0day) exploit," *imperva*, 2020, available at https://www.imperva.com/learn/application-security/zero-day-exploit/.

[34]  "Our Exploit Acquisition Program," *Zerodium*, available at https://zerodium.com/program html.

[35]  Kim Zetter, "Malware Attacks Used By The U.S. Government Retain Potency For Many Years, New Evidence Indicates," *The Intercept*, March 10, 2017, available at https://theintercept.com/2017/03/10/government-zero-days-7-years/.

[36]  Bruce Schneier, "Disclosing vs. Hoarding Vulnerabilities," *Schneier on Security*, May 22, 2014, available at https://www.schneier.com/blog/archives/2014/05/disclosing_vs_h.html.

### 2. *Defensive Uses Of Vulnerabilities And Exploits*

39.   In the "defensive" market, bug bounty programs work to incentivize the disclosure and subsequent patching of discovered vulnerabilities. These programs offer financial rewards to researchers that disclose vulnerabilities directly to the vendors they affect and create a safe environment for disclosure.[37] White-hat security researchers participate in these marketplaces and work to find bugs before black-hat or grey-hat researchers find them (or rediscover those already found). These programs became mainstream and continue to develop because there is "a competing offensive market in play," and so bug bounty programs exist to bolster the defensive market against the offensive force.[38]

40.   As of 2017, over 100 different companies offered bug bounty programs and thousands of researchers participated in these programs, earning anywhere from a few dollars to hundreds of thousand dollars for a single bug.[39] Some security researchers have made in excess of $1 million through bug bounty programs.[40] The goal of these bug bounty programs is to limit the offensive stockpile of vulnerabilities and thus improve security and safety of the public at large.

---

[37]   "History of Bug Bounties," *bugcrowd*, available at
https://web.archive.org/web/20161208162145/https://bugcrowd.com/resources/history-of-bug-bounties.

[38]   "On Bounties and Boffins," *Trail of Bits Blog*, January 14, 2019, available at
https://blog.trailofbits.com/2019/01/14/on-bounties-and-boffins/.

[39]   Ryan Ellis, Keman Huang, Michael Siegel, Katie Moussouris, James Houghton, "Chapter 4 - Fixing a Hole:
The Labor Market for Bugs," *New Solutions for Cybersecurity*, 2017, p. 124; "Microsoft Bug Bounty Program,"
*Microsoft*, available at https://www.microsoft.com/en-us/msrc/bounty

[40]   "Six Hackers Break Bug Bounty Record, Earning over $1 Million Each on Hackerone," *HackerOne*, August 29,
2019, available at https://www.hackerone.com/press-release/six-hackers-break-bug-bounty-record-earning-
over-1-million-each-hackerone.

IV.   **PRACTICING GOOD-FAITH SECURITY RESEARCH IS ESSENTIAL FOR THE SOFTWARE INDUSTRY AND FAILING TO DO SO WILL REDUCE SECURITY AND SAFETY**

41.   The interaction of these offensive and defensive markets is important to the concept of good-faith security research, as essentially good-faith security research is research that enables the fixing of security flaws or vulnerabilities, rather than the exploitation of them.

   **A.  Good-Faith Security Research Requires Responsible Disclosure**

42.   This case involves a tool, the Corellium Apple Product, that its creator states can be used for security research of iOS. But when such a research tool is made available to those engaged in security research, steps must be taken to ensure it is used only for good-faith security research. This requires placing restrictions on who the tool is given to and how it is used. Such restrictions are particularly important because the financial rewards for participants in offensive markets—that is black-hat and grey-hat researchers—are as many as ten times those available in the defensive market, and so affirmative restrictions must be in place to protect against the use of research tools for the offensive market.[41] Companies that impose little to no restrictions are not, in my opinion, providing research tools solely for good-faith security research nor can such companies say that their tools are being used solely for good-faith security research.

43.   Rather, it is my opinion, based on my experience, that for research to qualify as "good-faith security research," the research must satisfy at least the following criteria:

---

[41]   "The Defender's Dilemma: Charting a Course Toward Cybsersecurity," *RAND Corporation* (2015), p. 44.

    a.   The research is done solely for the purpose of testing, investigating, and/or correcting a security flaw or vulnerability.

    b.   The research is carried out in an environment designed to avoid any harm to individuals or the public.

    c.   The information derived from the research is not used or maintained in a manner that facilitates illegal activity.

    d.   The information derived from the research is properly and responsibly disclosed to the vendor of the product that contains the software flaw or vulnerability.

44.    My opinion regarding good-faith research is supported by the security research industry. As described further below, industry standards and published materials establish that "responsible disclosure" of vulnerabilities to the impacted software vendor is a critical requirement for good-faith security research, and security research that does not include this critical requirement cannot be considered good-faith security research. That is because finding these vulnerabilities and informing affected parties is "essential to protect our economy and citizens."[42]

45.    In the security research industry, it is generally understood that responsible disclosure involves the following essential steps:

    a.   "The security researcher who found the vulnerability to confidentially report it to the impacted company.

    b.   The security researcher and company work in good faith to establish an agreed upon period of time for the vulnerability to be patched.

---

[42] "Vulnerability Disclosure Attitudes and Actions," *National Telecommunications and Information Administration* (2016).

    c.   Once the agreed upon time period expires and the vulnerability is patched or the patch is available for installation by the users of the software, the security researcher can publicly disclose the vulnerability."[43]

46.    It is also generally understood that, during the agreed-upon period allowed for the affected company to fix the vulnerability, the security researcher will not notify other parties of the vulnerability, but rather will maintain confidentiality so that the vulnerability can be fixed without harm to the software company or its users.[44]

47.    Disclosure of vulnerabilities directly to an affected technology company, rather than to the public at large, is particularly important because black-hat security researchers "can typically exploit the vulnerability when publicly disclosed much more quickly than those who are attacked can fix the issue."[45] Responsible disclosure is thus critical because it ensures that such companies can keep their products safe and operational, which in turn protects the users of those companies' technology. That is why many companies actively encourage responsible disclosure in sponsored security research or testing operations like bug bounty programs.

48.    While good-faith research requires responsible disclosure, by contrast, black-hat researchers do not typically disclose vulnerabilities to affected companies *at all*. Grey-hat researchers, in turn, may disclose certain vulnerabilities to affected companies, they may sell

---

[43]   Jonathan Trull, "Responsible Disclosure: Cyber Security Ethics," *CSO Online*, February 26, 2015, available at https://www.csoonline.com/article/2889357/responsible-disclosure-cyber-security-ethics html.

[44]   *E.g.,* Tesla's responsible disclosure guidelines ask that security researchers "[g]ive Tesla a reasonable time to correct the issue before making any information public." "Product Security," *Tesla*, available at https://www.tesla.com/about/security.

[45]   Jonathan Trull, "Responsible Disclosure: Cyber Security Ethics," *CSO Online*, February 26, 2015, available at https://www.csoonline.com/article/2889357/responsible-disclosure-cyber-security-ethics html

vulnerabilities on the offensive market, or they may stockpile vulnerabilities for later use. But a grey-hat researcher's decision to save vulnerabilities for its own use, even if not intended to harm the public, may nevertheless lead to public harm. As discussed above, when security researchers use the same set of research tools, the chance for rediscovery of vulnerabilities increases. In other words, if a grey-hat researcher (like agencies of the U.S. government) can find such vulnerabilities with commonly available tools, there is a higher likelihood that malicious actors using the same tool will find such vulnerabilities too (if they have not already) and will develop exploits based on those vulnerabilities. In such cases, a grey-hat hacker acting in good faith should disclose the vulnerability to the vendor, because the alternative—simply stockpiling the vulnerability—creates a high risk of public harm. If these researchers fail to disclose the vulnerability to the affected company, then security researchers in these markets are not engaged in good-faith security research.

### B. Industry Standards For Good-Faith Research Require Responsible Disclosure

49. Because of the importance of good-faith security research, and the corresponding harm that can result when research is not undertaken in good faith, technology companies and policy makers alike, both domestic and abroad, have made significant efforts to study and develop standards that inform what it means to be engaged in good-faith security research, including standards that govern responsible disclosure of vulnerabilities.

    a. One such policy making entity is the National Telecommunications and Information Administration (NTIA) of the Department of Commerce—the "Executive Branch agency that is principally responsible by law for advising the President on

telecommunications and information policy issues."[46] As part of that mandate, NTIA has undertaken significant efforts to study and develop policies to improve cybersecurity.[47] Particularly relevant here, in 2015, NTIA convened a "multi-stakeholder process to investigate software vulnerability disclosure and handling practices."[48]  That process resulted in a published report, detailing responsible disclosure (which NTIA called "coordinated vulnerability disclosure"), which is defined as follows.

    i.   "[S]ecurity researchers report vulnerabilities either directly to the relevant technology provider/operator or to a coordinating third party, such as an appropriate government entity.

    ii.   The technology provider/operator then coordinates and communicates with the reporter of the vulnerability throughout the investigation and remediation of the vulnerability.

    iii.   Finally, the researcher and technology provider/operator coordinate in disclosing the vulnerability publicly."[49]

b.  Similarly, in 2017, the Forum of Incident Response and Security Teams (FIRST), an NGO that had worked with the NTIA on its efforts related to responsible

---

[46]  "National Telecommunications and Information Administration," *U.S. Department of Commerce*, available at https://www.commerce.gov/bureaus-and-offices/ntia.

[47]  "Cybersecurity," *National Telecommunications and Information Administration*, available at https://www.ntia.doc.gov/category/cybersecurity.

[48]  "Vulnerability Disclosure Attitudes and Actions," *National Telecommunications and Information Administration* (2016), p. 2.

[49]  "Vulnerability Disclosure Attitudes and Actions," *National Telecommunications and Information Administration* (2016), p. 5.

disclosure, released "Guidelines and Practices for Multi-Party Vulnerability Disclosure." These Guidelines focus extensively on the critical role disclosure plays in addressing vulnerabilities and the ways industry stakeholders can support best practices with respect to disclosure.[50]

   c.   In 2018, the International Organization for Standardization (ISO), "an independent, non-governmental organization with a membership of 164 national standards bodies,"[51] likewise released standards that provide a number of new "normative provisions" to help ensure proper vulnerability disclosure, again reinforcing the importance of responsible disclosure to good-faith security research.[52]

50.   Actions within the technology industry likewise reinforce the critical role that responsible disclosure plays in any understanding of good-faith security research. In 2018, for example, disclose.io was launched as a "cross-industry, vendor-agnostic standardization project for safe harbor best practices to enable good-faith security research."[53] disclose.io thus provides templates for policies that encourage good-faith security research. Notably, its templates include in the "ground rules" the requirement to "[r]eport any vulnerability you've discovered promptly," and to "[a]void violating the privacy of others, disrupting our systems, destroying data, and/or harming user experience."[54]

---

[50]  "Guidelines and Practices for Multi-Party Vulnerability Coordination and Disclosure," *Forum of Incident Response and Security Teams*, 2017, available at https://www.first.org/global/sigs/vulnerability-coordination/multiparty/FIRST-Multiparty-Vulnerability-Coordination-latest.pdf?20180320.

[51]  "About Us," *the International Organization for Standardization*, available at https://www.iso.org/about-us.html.

[52]  "Information technology — Security techniques — Vulnerability disclosure," *International Standard*, ISO/IEC 29147:2018(E).

[53]  "disclose.io Home Page," *disclose.io*, available at https://disclose.io/.

[54]  "disclose.io Core Terms," *Github*, available at https://github.com/disclose/disclose/blob/master/terms/core-terms-USA/core-terms-USA.md

51.     In sum, significant effort has been invested into the development of policy infrastructure surrounding security research. The results of these efforts reinforce and confirm my opinion of what constitutes good-faith security research, including the critical importance of vulnerability disclosure to good-faith security research.

### C.  Incentive Systems Like Bug Bounty Programs Promote Good-Faith Security Research And Responsible Disclosure

52.     The role good-faith security research plays in protecting companies as well as consumers, along with the central role responsible disclosure plays in good-faith security research, are perhaps best seen in the bug-bounty programs that many companies have created to incentivize good-faith security research. These programs are often run by software companies to encourage the discovery and responsible disclosure of vulnerabilities.

53.     Bug bounty programs can vary considerably, "including how they define market access (who can participate as a seller), program duration (when will sales be accepted), and compensation (what is offered as a reward)."[55] Programs also vary as to whether they are in-house or third-party. However, the paramount feature of all such programs is responsible disclosure.

54.     A current example of a third-party platform that encourages responsible disclosure is HackerOne, which provides researchers with the resources to test for bugs and partners with vendors to ensure that any discovered bugs get properly disclosed and addressed.[56] HackerOne's website states that "more security teams use HackerOne to manage

---

[55]   Ryan Ellis, Keman Huang, Michael Siegel, Katie Moussouris, James Houghton, "Chapter 4 - Fixing a Hole: The Labor Market for Bugs," *New Solutions for Cybersecurity*, 2017, p. 125.

[56]   "Hackerone Home Page," *hackerone*, available at https://www.hackerone.com/.

vulnerability disclosure and bug bounty programs than any other platform."[57] Its goal is not just to help researchers get rewarded, but to help ensure that responsible disclosure to the proper parties is carried out.

55.    Figure 1 demonstrates the structure of in-house and third-party bug bounty programs, and where the security researcher fits into the flow of responsible disclosure. In each case, the security researcher is agreeing to legal terms that their testing will result in disclosure, which helps assure good-faith security research.

**Figure 1 -**
**Flow from security researcher to vendor, given the existence of a third-party provider**



56.    Bug bounty programs can vary in many ways, but all reflect the same expectation of good-faith research and responsible disclosure. This can be seen in the companies' terms and conditions, which lay out the actual rules. For example, I analyzed the Terms and Conditions of the bug bounty programs for Facebook, Github, and Tesla: one company that produces software, one company that hosts software, and one car manufacturer that relies

---

[57]   "Hackerone Home Page," *hackerone*, available at https://www.hackerone.com/.

heavily on software for the operation of its vehicles. Each of these programs specifically requires responsible disclosure back to the respective company. For example, within the "Responsible Disclosure of Security Vulnerabilities" subsection of its site policy, Github notes that after discovering a security vulnerability, the next step for security researchers should be "disclosing it to [Github] in a responsible manner."[58] As a prerequisite for security researchers to report vulnerabilities through its program, Facebook outlines its "Responsible Research and Disclosure Policy," which includes giving the company reasonable time to investigate and mitigate reported issues before publicly disclosing any information related to the report.[59] Furthermore, Tesla's terms are grounded in its "Responsible Disclosure Guidelines," highlighting disclosure as the *key* for good-faith security research under its program.[60]

57.   By requiring responsible disclosure and specifying the goals of the programs, bug bounty programs are effectively monitoring the use of the program's services and engaging in practices that support good-faith security research.

## V.   CORELLIUM'S BUSINESS PRACTICES DO NOT ENSURE GOOD-FAITH SECURITY RESEARCH

58.   As explained in Section I.E, the following analysis is necessarily preliminary given the limited information provided to date. However, the information that is available demonstrates that the Corellium Apple Product is not a tool limited to good-faith security research. Because Corellium does not require responsible disclosure, and indeed publicly

---

[58]   "Responsible Disclosure of Security Vulnerabilities," *Github*, available at https://help.github.com/en/github/site-policy/responsible-disclosure-of-security-vulnerabilities.

[59]   "Whitehat Information," *Facebook*, October 15, 2019, available at facebook.com/Whitehat/info/.

[60]   "Product Security," *Tesla*, available at https://www.tesla.com/about/security.

encourages its users *not* to engage in responsible disclosure, the Corellium Apple Product cannot be considered a good-faith security research tool.

### A. Background Of The Corellium Apple Product

59.    Corellium provides a "mobile device virtualization" tool[61]—the Corellium Apple Product—that allows users to run Apple's iOS software on "virtual" hardware. Virtualization involves "creating a virtual version of any [o]perating system, storage, server, network, network resources, or desktop rather than the actual version."[62] Corellium promotes its product as an effective tool for uncovering security vulnerabilities.[63]

60.    Corellium offers the Corellium Apple Product in two forms. It offers an on-premises version, which allows an on-site installation of a server running the Corellium Apple Product, and a cloud-based version, which allows the user to log in to Corellium's servers and create a virtual iPhone.[64] Corellium charges prices of up to ███████████████ ████████████████████████████████████████████[65] For purposes of this section, I will refer to both the on-premises and the cloud version of Corellium's product as the Corellium Apple Product.

---

[61]    "Corellium Home Page," *Corellium*, available at https://corellium.com/.

[62]    Deeksha Agarwal, "What Happens When You Use Virtualization In Software Testing?," *LambdaTest*, October 12, 2017, available at https://www.lambdatest.com/blog/happens-use-virtualization-software-testing/.

[63]    *See, e.g.*, Twitter, "@cmwdotme Tweet," January 7, available at https://twitter.com/cmwdotme/status/1082293278840508416, Correllium-015318 ("If you're doing vulnerability research and haven't tried [Corellium] now is a great time.").

[64]    FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL, *Apple Inc. v. Corellium, LLC*, Case 9:19-cv-81160-RS, December 20, 2019, p. 7.

[65]    ████████████████████████████████ Correllium-016999.

61.    In my opinion, Corellium's business practices with respect to the Corellium Apple Product
do not constitute or ensure good-faith security research. Rather, as described below,
Corellium recognizes the potential for its product to be used for offensive purposes rather
than good-faith security research, and does nothing to stop such uses. Nor does Corellium
require that its users engage in responsible disclosure by reporting vulnerabilities found
using its product back to Apple. Instead, Corellium has taken steps to encourage uses of its
product that are contrary to the key tenets of good-faith security research. Consistent with
that encouragement, I have seen no evidence to date that Corellium limits the sale of its
product to only those engaged in good-faith security research or that it places any material
restrictions on the use of its product whatsoever.

### B.  Corellium Recognizes The Potential For Bad-Faith, Offensive Use Of Its Product, And Encourages Rather Than Stops Such Conduct

62.    The materials I have reviewed to date, though limited, indicate that Corellium is well aware
of the potential for misuse of the Corellium Apple Product and is familiar with the market
for vulnerabilities for those who do not engage in responsible disclosure. Rather than take
steps to encourage such disclosure, Corellium has instead made statements that actively
encourage the non-disclosure and monetization of vulnerabilities. This is contrary to good-
faith security research.

63.    Specifically, based on the materials I have reviewed to date:  (i) Corellium does not require
or encourage responsible disclosure to Apple; (ii) Corellium does not impose any
requirements regarding what users of its products may do with the vulnerabilities they
uncover using the Corellium Apple Product; and (iii) Corellium openly advocates for uses
of its product that are inconsistent with good-faith security research.

*1.   Corellium Does Not Require Or Encourage Responsible Disclosure To Apple*

64.    As discussed above, a critical element of any good-faith security research product or

program is responsible disclosure. However, I have seen no evidence to date that Corellium

requires responsible disclosure to Apple or encourages such disclosure in any way.

65.    It is my understanding that Corellium has not yet produced the majority of its customer

contracts in discovery. However, I was able to review one such agreement, ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

66.    Corellium is almost certainly aware that there are users of its product that have *never*

reported a bug back to Apple. The co-founder of Corellium's first ███████████,

Azimuth Security, has publicly admitted that it has never reported a bug found in iOS to

Apple.[67] In light of public statements like that one, it is clear that Corellium's ██████

██████ has no intention of engaging in responsible disclosure of discovered vulnerabilities

to Apple. Yet Corellium ████████████████████████████████████

███████████████

67.    As a point of comparison, I have reviewed the terms of use for Metasploit—a security

research tool used to verify vulnerabilities, manage security assessments, and organize

---

[66]   Corellium, "Corellium Purchase and License Agreement," Correllium-014309.

[67]   Lorenzo Franceschi-Bicchierai, "iPhone Emulation Company Sued by Apple Says It's Making iPhones Safer," *Motherboard Tech by Vice*, October 29, 2019, available at https://www.vice.com/en_us/article/8xw7gx/iphone-emulation-company-sued-by-apple-says-its-making-iphones-safer.

penetration testing.[68] The software is used to simulate attacks on a network using a database of exploits.[69] Metasploit's end user license agreement explicitly states that its software "may only be used for the purposes of good-faith testing, investigation, and/or correction of security flaws, exposures, or vulnerabilities in order to advance the security or safety of devices, machines, or networks of those who use such devices, machines, or networks."[70] Metasploit's license agreement demonstrates that, if Corellium wanted to, it could license its product in such a way that comports with the requirements of good-faith research.

██████████████████████████████████████████

██████████████████████████████ further demonstrates that Corellium is not taking the steps necessary to ensure that users of its product are engaged in good-faith security research.

### 2. *Corellium Does Not Limit What Users May Do With Vulnerabilities*

68.     I have not seen any evidence to date that Corellium limits its customer base to those who use the Corellium Apple Product for good-faith security researchers.

69.     I likewise have seen no evidence to date that Corellium imposes any requirements regarding what users of its products do with the vulnerabilities they uncover using the Corellium Apple Product. To the contrary, as Corellium itself has stated in briefing in this litigation, "the bugs that are found by any clients of Corellium are not then given back to Corellium.

---

[68]   "metasploit Home Page," *metasploit*, available at https://www metasploit.com/.

[69]   "metasploit Product," *rapid7*, available at https://www rapid7.com/products/metasploit/.

[70]   Metasploit is owned by the analytics company Rapid7. "Rapid7 End User License Agreement," *rapid7*, available at https://www.rapid7.com/legal/eula/.

Corellium gives its clients the ability to find these bugs through its virtualization program but does not require disclosure back to them of what is found."[71]

70.   

71.   Corellium's lack of limits on product use is showcased in an article by Forbes (based on interviews with Corellium's founders) where it is noted that Corellium's users can try "whatever they want" with the virtualization software.[72] Corellium's CEO, Amanda Gorton, then promoted the article on Twitter.[73]

72.   Corellium's co-founder, Chris Wade, has also demonstrated that he is well aware of the offensive market for vulnerabilities.

---

[71]   DEFENDANT CORELLIUM, LLC'S, RESPONSE TO PLAINTIFF'S MOTION TO COMPEL TO PROVIDE COMPLETE RESPONSES TO INTERROGATORIES, *Apple Inc. v. Corellium, LLC*, Case 9:19-cv-81160-RS, January 21, 2020, p. 4.

[72]   Thomas Brewster, "This Super Stealth Startup Built An Apple Hacker's Paradise," *Forbes*, February 15, 2018, available at https://www forbes.com/sites/thomasbrewster/2018/02/15/corellium-virtual-apple-iphones-for-hacking/#19ee3e4a4a3b.

[73]   Twitter, "@amandalgorton Tweet," February 15, 2018, available at https://twitter.com/amandalgorton/status/964197366223040512, Correllium-015320.



73.     In addition, ███████████████ Azimuth Security, ███████████████ of the

Corellium Apple Product, is publicly reported to be in the business of developing, "zero-day

exploits, according to six sources."[76] ██████████████████████████

████████████████████████████████████████

████████████████████

*3. Corellium Openly Advocates For Uses Inconsistent With Good-Faith Research*

74.     Not only is Corellium aware of the offensive market for software vulnerabilities, but

Corellium's founder Chris Wade has actually encouraged participation in that market. When

appearing on a podcast, for example, Wade suggested that, if anyone is able to develop a

particular type of exploit of iOS 12, "they might want to keep it to themselves, because it

will be worth a lot of money to a lot of people."[77]

75.     Wade again openly encouraged non-disclosure of vulnerabilities in favor of monetization in

January 2019. At that time, Zerodium, a company that pays bounties for "premium zero-day

exploits," tweeted: "We are increasing our bounties for almost every product. We're now

paying $2,000,000 for remote iOS jailbreaks, $1,000,000 for

---

[74] ████████████████████████████, APL-CORELLIUM_00018664.

[75] ████████████████████████████, APL-CORELLIUM_00018664.

[76] Joseph Cox, Lorenzo Frenceschi-Bicchierai, "How a Tiny Startup Became The Most Important Hacking Shop You've Never Heard Of," *Motherboard Tech by Vice*, February 7, 2018, https://www.vice.com/en_us/article/8xdayg/iphone-zero-days-inside-azimuth-security.

[77] "Risky Business feature: iOS exploits just got a lot more expensive," *Risky.Biz*, September 21, 2018, available at https://risky.biz/RB514_feature/, 13:45 - 13:55.

WhatsApp/iMessage/SMS/MMS RCEs, and $500,000 for Chrome RCEs."[78] In response, Chris Wade tweeted "If you're doing vulnerability research and haven't tried [Corellium] now is a great time."[79]

76.    In light of all of the evidence that has been made available to me to date, along with my expertise and experience in this area, I am of the opinion that Corellium does not promote or sell the Corellium Apple Product solely (or even primarily) for good-faith security research. As noted above, this opinion is based on the evidence available to me to date, and will be supplemented upon the receipt of additional evidence for my review.

---

[78]   Twitter, "@cmwdotme Tweet", January 7, available at
       https://twitter.com/cmwdotme/status/1082293278840508416, Correllium-015318.

[79]   Twitter, "@cmwdotme Tweet", January 7, available at
       https://twitter.com/cmwdotme/status/1082293278840508416, Correllium-015318.

* * *

Signed on the 3rd day of March 2020.

Michael Siegel

# APPENDIX A
# CURRICULUM VITAE

**Michael D. Siegel**
Principal Research Scientist
Director Cybersecurity at MIT Sloan
Sloan School of Management
Massachusetts Institute of Technology
Cambridge, MA 02139
(617) 620-6294 (m)
msiegel@mit.edu

*Education*

1989        Ph.D. in Computer Science, Boston University, Boston, MA.

1985        M.A. in Computer Science, Boston University, Boston, MA.

1980        M.S. in Engineering, Department of Mechanical Engineering, University of Wisconsin-Madison.

1977        BS in Engineering, Trinity College, Hartford, CT.

*Academic and Research Positions*

1993-       Principal Research Scientist, Sloan School of Management, Massachusetts Institute of Technology. Research areas include cyber security, databases, distributed systems, vulnerability markets, cyber risk metrics, bug bounty programs, business models connected to cyberattacks, "Internet of Things" endpoint security, cybersecurity workforce development, intelligent integration of information systems, data analytics, data semantics, web-based information extraction and integration, global risk management, information security, financial applications, improving operations and management using dynamic modeling, and health information systems.

1998        Senior Lecturer, Sloan School of Management, Massachusetts Institute of Technology, " Information Technology for Financial Services."

1989-1993   Research Scientist, Sloan School of Management, Cambridge, MA. Research areas include distributed heterogeneous information systems, knowledge discovery, technology and risk management, and management of data semantics. Instructor for Information Technology II.

1989        Research Associate, Boston University, Boston, MA. Post-doctoral research position. Research areas: rule-based semantic query optimization, intelligent database systems and knowledge discovery in databases.

| 1987 | Member Technical Staff, Knowledge-Based Systems Department, GTE Laboratories, Waltham, MA. Research and design of heterogeneous database systems. |
|---|---|
| 1985-1986 | Lecturer, Northeastern University, Boston, MA. Instructor for the graduate course in database theory. |
| 1985 | Computer Scientist, Computer Corporation of America (Xerox Advanced Information Technology), Cambridge, MA. Research and design of highly available distributed database systems. |
| 1983-1989 | Research Assistant, Boston University, Boston, MA. Research under National Science Foundation Grants IST-8214662, IST-8408551 and IST-8710137. Research areas: query optimization, distributed database systems, natural language database updates, and knowledge discovery in databases. |
| 1978-1980 | Research Assistant, Solar Energy Lab, University of Wisconsin-Madison. Research areas: systems analysis, simulation and development of simplified design methods for photovoltaic systems. |

*Administrative Positions*

| 2017- | Director, Cybersecurity at MIT Sloan (CAMS), Sloan School of Management, Massachusetts Institute of Technology. |
|---|---|
| 2014-2016 | Associate Director of the Interdisciplinary Consortium for Improving Critical Infrastructure Cybersecurity (IC)[3], Sloan School of Management, Massachusetts Institute of Technology. |
| 2006-2010 | Director Special Interest Group on Digital Health. Center for Digital Business at MIT |
| 2001-2004 | Director Global Financial Services Special Interest Group. Center for eBusiness at MIT |
| 1996-1999 | Co-Director, Finance Research Center (FRC). |
| 1992-1996 | Associate Director, International Financial Research Services Center (IFSRC). |
| 1992- | Associate Director, Productivity from Information Technology (PROFIT). |
| 1992 | Co- Director, Working Group on Risk Management, International Financial Services Research Center. |

*Journal, Book, and Conference Publications*

2019    Matthew Maloney, Elizabeth Reilly, Michael Siegel, and Gregory Falco, "Cyber Physical IoT Device Management", *The 12th IEEE International Conference on Internet of Things (iThings-2019)* July 2019

2019    Keman Huang, Michael Siegel, Keri Pearlson, Stuart Madnick, "Casting the Dark Web in a New Light" , Sloan Management Review (SMR), June 2019.

2019    Elizabeth Reilly, Matthew Maloney, Michael Siegel, Gregory Falco, A Smart City IoT Integrity-First Communication Protocol via an Ethereum Blockchain Light Client" , *1st International Workshop on Software Engineering Research & Practices for the Internet of Things (SERP4IoT 2019)*

2019    Mohammad S. Jalali, Jessica P. Kaiser, Michael Siegel, and Stuart Madnick, "The Internet of Things Promises New Benefits and Risks: A Systematic Analysis of Adoption Dynamics of IoT Products" (IEEECRS)

2018    Siegel, M. et. al, *Cyber Insurance as a Risk Mitigation Strategy*, The Geneva Association, MIT, and The Boston Consulting Group. https://www.genevaassociation.org/sites/default/files/research-topics-document-type/pdf_public/cyber_insurance_as_a_risk_mitigation_strategy.pdf

2018    Mohammad S. Jalali, Michael Siegel, Stuart Madnick, "Decision-making and biases in cybersecurity capability development: Evidence from a simulation game experiment" , *The Journal of Strategic Information Systems,* September 2018.

2018    Huang, K. Siegel, M, Madnick, S. "A Framework for Systematically Understanding the Cyber Attack Business", *ACM Computer Surveys,* Volume 51 Issue 4, August 2018.

2018    Ellis, R., Huang, K., Siegel, M., Moussouris, K., Houghton, J. Chapter 4, "Fixing a Hole: The Labor Market for Bugs", *New Solutions for Cybersecurity,* MIT Press, January 2018

2017    Madnick, S. Jalali, M. Siegel, M. et al, "Measuring Stakeholders' Perceptions of Cybersecurity for Renewable Energy Systems," *International Workshop on Data Analytics for Renewable Energy Integration (DARE 2016)*, Springer International Publishing AG 2017, W.L. Woon et al. (Eds.): DARE 2016, LNAI 10097, pp. 67–77, 2017.

2016        Houghton, J., Siegel, M., Jalali, M., Campbell, A., and Fialho, D., "The
            Impact of Sales-practice Startup Dynamics on Sales-force Productivity,"
            The Proceedings of the 34st International Conference of the System
            Dynamics Society. Delft, Netherlands, July 2016.

2016        Houghton, J., Siegel, M., Madnick, et al, "Beyond Keywords: Tracking
            the Evolution of Conversational Clusters in Social Media", Sociological
            Methods and Research, October 2017.

2016        Huang, K. Siegel, M. et al S, "Poster: Diversity or Concentration?
            Hackers' Strategy for Working across Multiple Bug Bounty Programs,"
            IEEE Symposium on Security and Privacy 2016 (IEEE S&P 2016)

2015        Houghton, James, and Siegel, M. "Advanced Data Analytics for System
            Dynamics Models using PySD " In the Proceedings of the 33rd
            International Conference of the System Dynamics Society. Cambridge,
            MA. July 2015

2014        Houghton, J., Siegel, M., and Vukovic, M. "Towards a Model for
            Resource Allocation of API Value Networks" The Intelligent Service
            Cloud Workshop, 2014.

2014        Houghton, J., Siegel, M., Wirsch, A., Moulton, A., Madnick, S. ,
            Goldsmith, D. "A Survey of Methods for Data Inclusion in System
            Dynamics Models." In the Proceedings of the 32nd International
            Conference of the System Dynamics Society. Delft, Netherlands, 2014.

2013        Houghton, J., Goldsmith, D., and Siegel, M. "Modeling the Influence of
            Narratives on Collective Behavior." In the Proceedings of the 31st
            International Conference of the System Dynamics Society. Cambridge,
            MA, July 21 – 25, 2013.

2012        Goldsmith, D., and Siegel, M. "Cyber Politics: Understanding the use of
            Social Media for Dissident    Movements in an Integrated State Stability
            Framework." Proceedings of the 2012 International Conference on
            Advances in Social Networks Analysis and Mining - Workshop on Multi-
            Agent Systems and Social Networks. Istanbul, Turkey.

2011        Goldsmith, D., and Siegel, M. "Improving Health Care Management
            Through the Use of Dynamic Simulation Modeling and Health
            Information Systems." Proceedings of the 29th International Conference
            of the System Dynamics Society. Washington, DC, July 24 – 28, 2011

2010        Goldsmith, D., and Siegel, M. "Improving Strategic Management of
            Hospitals: Addressing Functional Interdependencies within Medical

Care." *International Journal of Information Technologies and Systems Approach*, October 2010.

2010    Siegel, M., and Goldsmith, D. "Simulation Modeling for Cyber Resilience." *Proceedings of the MIT-Harvard Conference on Cyber International Relations: Emergent Realities of Conflict and Cooperation.*

2008    Hongwei Zhu, Stuart E. Madnick, Michael D. Siegel, Enabling global price comparison through semantic integration of web data, International Journal on Electronic Business, IJEB 6(4), 319-353.

2008    Gannon, T, Siegel, M., Madnick, S., Sabbouth, M., Moulton, A., Zhu, H. "Framework for the Analysis of the Adaptability, Extensibility, and Scalability of Semantic Information Integration and the Context Mediation Approach," *Hawaii International Conference on System Sciences - 42*, Hawaii, 2008

2008    Masanori, A., Goldsmith, D., Siegel, M. "Improving Strategic Management of Hospitals: Addressing Functional Interdependencies within Medical Care," *American Medical Informatics Association Conference*, Washington, D.C., 2008

2008    Morrison, B., Goldsmith, D. "Grappling with Dynamic Complexity in Military Planning: The System Dynamics Approach," *International System Dynamics Conference*, Athens, Greece, 2008

2007    Choucri, N., Goldsmith, D., Madnick, S., Morrison B., Siegel, M. "Using System Dynamics to Model and Better Understand State Stability," *System Dynamics Conference*, Cambridge, MA, 2007

2007    Masanori, A., Goldsmith, D., Siegel, M. "Improving Hospital Operations Using Bar-Code Capture Data and System Dynamics Modeling Techniques," *System Dynamics Conference*, Cambridge, MA, January 2007

2006    Choucri, N., Electris, C., Goldsmith, D., Mistree, D., Madnick, S., Morrison, J., Siegel, M., Sweitzer-Hamilton, M. "Understanding & Modeling State Stability: Exploiting System Dynamics, " *System Dynamics Conference*, Cambridge, MA, 2006

2006    Nazli Choucri, Christi Electris, Daniel Goldsmith, Dinsha Mistree, Stuart Madnick, J. Bradley Morrison, Michael Siegel, Margaret Sweitzer-Hamilton, "Understanding & Modeling State Stability: Exploiting System Dynamics, " *System Dynamics Conference*, Cambridge , MA, January 2006

2005    Nazli Choucri., S. Madnick, M. Siegel, "Linkage Between Pre- and Post-Conflict: Exploiting Information Integration & System Dynamics, " *IEEE Aerospace Conference*, Big Sky , MT, March 2005

2004    Zhu, H., S. Madnick, M. Siegel et al, "Effective Data Integration in the Presence of Temporal Semantic Conflicts" Conference on Temporal Representation and Reasoning, July 2004.

2004    Choucri, N., S. Madnick, A. Moulton, M. Siegel, H Zhu, "Information Integration for Counter Terrorism: The Requirement for Context Mediation" *IEEE Aerospace Conference*, Big Sky , MT, March 2004.

2002    Zhu, H., S. Madnick, M. Siegel. "The Interplay of Web Aggregation and Regulations" (with H. Zhu and M. Siegel), *Proceedings of the IASTED International Conference on Law and Technology* (LAWTECH 2002), Cambridge, MA, November 6-8, 2002 [CISL #2002-17].

2002    Fujii, H., T. Okano, S. Madnick, M. Siegel. "E-Aggregation: The Present and Future of Online Financial Services in Asia-Pacific", *Proceedings of the Sixth Pacific Asia Conference on Information Systems* (PACIS-2002), Tokyo, Japan, September 3-4, 2002 [CISL #2002-06].

2002    Hansen, M., S. Madnick, M. Siegel. "Process Aggregation using Web Services", *Proceedings of the Workshop on Web Services, e-Business, and the Semantic Web: Foundations, Models, Architecture, Engineering and Applications*, (WseBT'02, Toronto, Canada), May 2002 [CISL #2002-05], also to be published in *Lecture Notes in Computer Science*, Springer-Verlag, New York.

2002    Moulton, A., S. Madnick, M. Siegel. "Semantic Interoperability in the Securities Industry: Context Interchange Mediation of Semantic Differences in Enumerated Data Types", *Proceedings of the Second International Workshop on Electronic Business Hubs: XML, Metadata, Ontologies, and Business Knowledge on the Web* (WEBH2002), Aix En Provence, France, September 6, 2002 [CISL #2002-10].

2002    Moulton, A., S. Madnick, M. Siegel. "Context Interchange Mediation for Semantic Interoperability and Dynamic Integration of Autonomous Information Sources in the Fixed Income Securities Industry", *Proceedings of the Workshop on Information Technology and Systems* (WITS), Barcelona, Spain, December 14-15, 2002 [CISL #2002-20].

2001    Moulton, A., S. Madnick, M. Siegel. "Cross-Organizational Data Quality and Semantic Integrity: Learning and Reasoning about Data Semantics with Context Interchange Mediation" (with A. Moulton and M. Siegel), *Proceedings of the Americans Conference on Information Systems* (AMCIS, Boston), August 2001 [SWP #4167:4183-01, CeB #108, CISL #01-04.

2001        *Madnick, Stuart and M Siegel, "Seizing the Opportunity : Exploiting Web Aggregation,"* MISQ Executive, *Vol 1, No. 1, March 2002, pp. 35-46. [SWP #4351, CeB #144, CISL #01-13].*

2000        Bresson, Stephane, C. Goh, N. Levina, A. Shah, and M. Siegel, "Context Knowledge Representation and Reasoning in the Context Interchange System," The International Journal of Artificial Intelligence, Neutral Networks, and Complex Problem-Solving Technologies, Volume 12, Number 2, September 2000, pp. 165-180, [SWP #4133, CISL #00-04].

1999        Goh, Cheng, Stephane Bresson, Stuart Madnick, and Michael Siegel , "Context Interchange: New Features and Formalisms for the Intelligent Integration of Information," *Transactions on Information Systems*, Publication expected in July 1999.

1998        Moulton, Allen, Stephane Bressan, Stuart Madnick, and Michael Siegel , "Using an Active Conceptual Model for Mediating Analytic Information Interchange in the Fixed Income Securities Industry," *Proceedings of the 17th International Conference on Conceptual Modeling (ER'98)*, Singapore.

1998        Moulton, Allen, Stuart Madnick, and Michael Siegel , "Context Interchange on Wall Street," *Proceedings of the International Conference on Cooperative Information Systems (CoopIS'98)*, N.Y.

1997        Marshall, Chris and Michael Siegel , "Value at Risk: Implementing a Risk Measurement," *Journal of Derivatives*, Spring, 1997.

1997        Bressan, Stephane, Cheng Goh, Tom Lee, Stuart Madnick and Michael Siegel, "A Procedure for Mediation of Queries to Sources in Disparate Contexts*," Proceedings of the International Logic Programming Symposium*, Port Jefferson, N.Y.

1997        Madnick, S., S. Bressan, K. Fynn, C. Goh, T. Pena, and M. Siegel, "Overview of a Prolog Implementation of the Context Interchange Mediator," Proceedings of the Fifth International Conference and Exhibition on the Practical Applications of Prolog, London, England.

1996        Lee, Jacob and Michael Siegel , " An Ontological and Semantical Approach to Source-Receiver Interoperability," *Decision Support Systems*, Vol. 18, No. 2.

1996        Marshall, Chris and Michael Siegel , "VaR: Implementing a Risk Measurement Standard," *Wharton Conference on Risk Management in Banking*, Philadelphia, Pa.

1996    Lee, Jacob, Stuart Madnick, and Michael Siegel, "Conceptualizing Semantic Interoperability: A Perspective from the Knowledge Level," *International Journal on Cooperative Information Systems*, Accepted for publication.

1995    Goh, Cheng, Stuart Madnick, and Michael Siegel, "Context Interchange: Overcoming the Challenges of Large-Scale Interoperable Database Systems in a Dynamic Environment," In *Proceedings of the Third International Conference on Information and Knowledge Management*, Gaithersburg, MD, pp 337--346.

1994    Sciore, Edward, Michael Siegel and Arnie Rosenthal, "Using Semantic Values to Facilitate Interoperability Among Heterogeneous Information Systems," *ACM Transactions on Database Systems*, Vol. 19, No. 2.

1994    Siegel, Michael, Edward Sciore and Stuart Madnick, "Context Interchange in a Client-Server Architecture," *Journal of Systems and Software*, Volume 27, No. 3.

1992    Siegel, Michael, Edward Sciore and Sharon Salveter, "Automatic Rule Derivation for Semantic Query Optimization," *ACM Transactions on Database Systems*, Vol. 17, No. 4.

1992    Sciore, Edward, Michael Siegel and Arnon Rosenthal, "Context Interchange using Meta-Attributes," In *Proceedings of the First International Conference on Information and Knowledge Management*, Baltimore, MD.

1991    Siegel, Michael and Stuart Madnick, "A Metadata Approach to Resolving Semantic Conflicts," In *Proceedings of the 17th International Conference On Very Large Databases*, Barcelona, Spain (Also Sloan School of Management Working Paper #3252-91-MSA).

1990    Sciore, Edward and Michael Siegel, "Heuristic-Based Semantic Query Optimization," In *Proceedings of the Fifth Jerusalem Conference on Information Technology*, Jerusalem, Israel.

1988    Siegel, Michael, "Automatic Rule Derivation for Semantic Query Optimization," In *Proceedings of the Second International Conference on Expert Database Systems*, Tysons Corner, VA.

1986    Lynch, Nancy, Barbara Blaustein and Michael Siegel, "Correctness Conditions for Highly Available Distributed Database Systems," In *Proceedings on Distributed Computing*, Calgary, Canada (Also MIT Tech Report TR-364).

1982        Siegel, Michael and Peter Deduck, "A Methodology for Determining
            Preferred Residential Passive Solar Systems," In *Proceedings of the*
            *American Section Meeting of the International Solar Energy Society*,
            Houston, TX.

1981        Siegel, Michael and William Beckman,"A Simplified Design Method for
            Photovoltaic Systems," *Solar Energy Journal*, Pergamon Press, England,
            Vol.26, No.5.

1980        Siegel, Michael and William Beckman, "Simplified Design Methods for
            Photovoltaic Systems," In *Proceedings of the American Section Meeting*
            *of the International Solar Energy Society*, Phoenix, AZ.


*Workshop Publications*

2003        Siegel, M. et al , "COntext INterchange (COIN) System Demonstration",
            *Workshop on Semantic Integration, Second International Semantic Web*
            *Conference*, Sanibel Island, Florida. October 2003.

2000        Firat, A. , Madnick, S., Siegel, M. , "The Caméléon Web Wrapper
            Engine", *Proceedings of the VLDB2000 Workshop on Technologies for E-*
            *Services,* September 14-15, 2000 [SWP #4128, CISL #00-03].

2000        Firat, A. , Madnick, S., Siegel, M. , "The Caméléon Approach to the
            Interoperability of Web Sources and Traditional Relational Databases,"
            *Proceedings of the Workshop on Information Technology and Systems*,
            December 2000.

1995        Kon, Henry, Stuart Madnick, and Michael Siegel, "Good Answers from
            Bad Data: a Data Management Strategy," In *Proceedings of the 5th*
            *International Workshop on Information Technologies and Systems*,
            Amsterdam, Netherlands.

1995        Daruwala, Adil, Cheng Goh, Scott Hofmeister, Karim Hussein, Stuart
            Madnick, and Michael Siegel, "The Context Interchange Network
            Prototype," In *Proceedings of the IFIP WG2.6 Sixth Working Conference*
            *on Database Semantics (DS-6)*, Atlanta, GA.

1994        Lee, Jacob and Michael Siegel, "An Ontological and Semantical
            Approach to Source-Receiver Interoperability," In *Proceedings of the 4th*
            *International Workshop on Information Technologies and Systems*,
            Vancouver, B.C.

1993        Reddy, Malireddy, Michael Siegel, and Amar Gupta, "Towards An
            Active Schema Integration Architecture for Heterogeneous Database

Systems," In *Proceedings of the International Workshop on Research Issues on Data Engineering: Interoperability in Multidatabase Systems (RIDE-IMS93),* Vienna, Austria.

1992    Sciore, Edward, Michael Siegel and Arnon Rosenthal, "Using Semantic Values for Semantic Interoperability," In *Proceedings of the Scientific Database Management Workshop*, Salt Lake City, UT.

1991    Heiler, Sandra, Michael Siegel and Stanley Zdonik, "Heterogeneous Information Systems: Understanding Integration," In *Proceedings of the First International Workshop on Interoperability in Multidatabase Systems*, Kyoto, Japan.

1991    Rosenthal, Arnon and Michael Siegel, "An Architecture for Practical Metadata Integration," In *Proceedings from the Workshop on Information Technologies and Systems.*

1991    Siegel, Michael, Stuart Madnick and Amar Gupta, "Composite Information Systems: Resolving Semantic Heterogeneities", In *Proceedings from the Workshop On Information Technologies and Systems*, Boston, MA (Also Sloan School of Management Working Paper #3357-91-MSA).

1989    Siegel, Michael and Stuart E. Madnick, "Schema Integration using Metadata," In *Proceedings from the NSF Workshop on Heterogeneous Database Systems*, Chicago, IL (Also Sloan School of Management Working Paper #3092-88-MS).

1989    Stuart E. Madnick, Y. Richard Wang, Michael Siegel et al, "Composite Information Systems," In *Proceedings from the NSF Workshop on Heterogeneous Database Systems*, Chicago, IL (Also Sloan School of Management Working Paper #3157-90).

*Miscellaneous Publications and Invited Lectures*

2015    Moussouris, K. and Siegel, M., "The Wolves of Vuln Street: The 1st Dynamic Systems Model of the 0day Market," RSA Conference, April, 2015

2010    Siegel, M., and Goldsmith, D. ""Managing and Valuing a Corporate IT Portfolio Using Dynamic Modeling of Software Development and Maintenance Processes" MIT Center for Digital Business Research Brief, Volume XII.

2010    Masanori, A., Goldsmith, D., Siegel, M. "Improving Hospital Operations Using Hospital Information Systems and System Dynamics Modeling Techniques" MIT Center for Digital Business Research Brief, Volume XI

2005    Hongwei Zhu, Stuart Madnick, Michael Siegel, "Policy for the Protection and Reuse of Non-Copyrightable Database Contents, "

2002    Melo de Brito Carvalho, T.C., M. Siegel. "Return on Investment from Online Banking Services: An Analysis of Financial Account Aggregation", Cambridge, MA, August 2002 [SWP #4384-02, CISL #2002-12].

2001    Choucri, N., Hagseta, F., Madnick, S., Moulron, A. Siegel, M. and H. Zhu, "Laboratory for Information Globalization and Harmonization Technologies: A New Research Initiative", November 2001 [CISL #01-12].

2000    Madnick, S., Siegel, M. , Frontini, M. , Khemka, S., Chan, S., Pan, H., "Aggregators: Traveling the *Fast Lane* on the Information Highway", February 2000 [SWP #4139, CISL #00-06].

2000    Madnick, S., Siegel, M. , Frontini, M. , Khemka, S., Chan, S., Pan, H., "Surviving and Thriving in the New World of Web Aggregators", submitted to *Harvard Business Review*, December 2000 [SWP #4138, CISL #00-07].

1998    Michael Siegel, "Evolution of Financial Applications, " Latin American Conference on Banking Automation," Lima, Peru, November 1998.

1997    Marshall, Chris and Michael Siegel , "Value at Risk: Implementing a Risk Measurement," Chapter in *VaR Undertanding and Applying Value-at-Risk*, Risk Publications, London, England.

1997    Marshall, Chris and Michael Siegel , "Value at Risk: Implementing a Risk Measurement," Invited Speaker, Federal Reserve Conference on Banking Structure and Competition, Chicago, IL., May 1997.

1997    Bressan, S., C. Goh, K.Fynn, M. Jacobisiak, K. Hussein, H. Kon, T. Lee, S. Madnick, T. Pena, J. Qu, A. Shum and M. Siegel, "The Context Interchange Mediator Prototype," *SIGMOD 1997*.

1996    Marshall, Chris and Michael Siegel, "Implementing Value at Risk: Vendors' Perspectives," *Risk Magazine: Special Edition on Value-at-Risk*, May 1996.

| 1991 | Siegel, Michael, Edward Sciore and Sharon Salveter, "Knowledge Discovery in a Self-Adaptive Database System," *Knowledge Discovery in Databases*, AAAI Press. (Also in *Proceedings from the Workshop on Knowledge Discovery in Databases* IJCAI-89). |
|------|------|
| 1991 | Siegel, Michael and Stuart Madnick, "Context Interchange: Sharing the Meaning of Data," *Sigmod Record Special Issue on Semantic Heterogeneity*, Vol. 20, No. 4. |
| 1990 | Siegel, Michael and Stuart E. Madnick, "Identification and Resolution of Semantic Conflicts using Metadata," Sloan School of Management Working Paper #3102-89-MSA. |
| 1989 | Siegel, Michael and Stuart E. Madnick, "Maintaining Valid Schema Integration in Evolving Heterogeneous Database Systems," *IEEE Office Knowledge Engineering: Special Issue on Information Sharing in Heterogeneous Data and Knowledge Base Systems*, Vol. 3, No. 2. |
| 1987 | Siegel, Michael, "A Survey of Heterogeneous Database Systems," *GTE Laboratories Technical Note TN87-174.1* and Boston University Report TR87-011. |

*Other Professional Positions*

| 2004- | Expert consulting, financial services software, patent litigation (provided separately) |
|------|------|
| 2003-2005 | Advisor for Life Harbor Portfolio Management software firm. Acquired by Vestmark. |
| 2000 | Executive Education sessions for British Telecom, Willis Insurance, Program for the Americas |
| 2000 | Chief Scientist, Web Aggregation Software, Arsdigita Corporation |
| 1999 | Founder, iAggregate (merged with Arsdigita in 2000) |
| 1998 | Consultant, Analysis Group Inc. System analysis. |
| 1996-1997 | Consultant, American Management Systems. Risk Management Practice. |
| 1997 | Arriva Software, Founder, Vice President. |

| | |
|---|---|
| 1996 | Consultant, Deutsche Bank, Morgan Grenfeld. Analysis of Foreign Exchange Trading Systems. |
| 1995 | Course development and presentation, Sequent Computing, Executive course on information technology and business. |
| 1993-1994 | Consultant, ABN Amro Bank. Analysis of Financial Risk Management Systems. |
| 1992 | Speaker, Digital Equipment Corporation Seminar Series. Presentations on information technology requirements for risk management and the FDICIA Act of 1991. Attendees include major banks, law and accounting firms, and federal regulators. |
| 1991-1992 | Consultant, EJV Partners, N.Y., N.Y. Assist in the development of an object-oriented fixed income database system for use by member firms; Goldman Sachs, Morgan Stanley, First Boston, Citicorp, Shearson-Lehman, and Salomon Brothers. |
| 1990 | Consultant, General Motors, Detroit, MI. Analysis of distributed database management system for production, marketing and sales. |
| 1990-1997 | Information Technology Associates, President. |
| 1990 | Consultant, Xerox Advanced Information Systems, Cambridge, MA. Heterogeneous database systems research and applications. |
| 1989 | Consultant, Evaluation Associates, Inc., Norwalk CT. Database design, financial software specification and distributed system design. |
| 1989 | Consultant, Dawai Securities of America, New York, NY. Design and development of a database management system and application program to assist warrant traders. |
| 1987-1989 | Consultant, Investment Management Controls, New York, NY. Managed the conversion of operations from a time-sharing system to a local area network, database design, financial software specification, and management responsibilities. |
| 1985-1987 | Seminar Instructor, Digital Equipment Corporation, Educational Services Division, Bedford, MA. Instruction in OPS5, expert system development and artificial intelligence. |
| 1985-1986 | Database Consultant, Gradient Corporation, Cambridge, MA. Designed and developed databases for Environmental Protection Agency Superfund projects. |

| | |
|---|---|
| 1983-1985 | Computer Graphics and Database Consultant, Cambridge Analytical Associates, Boston, MA. Designed and prepared computer graphics and databases for Environmental Protection Agency Superfund projects. |
| 1981-1983 | Staff Engineer, JBF Scientific, Wilmington, MA. Simulation and analysis of electrical and thermal energy systems, prepared proposals, reports and seminars. |
| 1983 | Professional Engineer, State of Wisconsin No. E-22176. |
| 1977-1978 | Project Engineer, E. F. Siegel & Associates, Ltd., Baltimore, MD. Designed and supervised the installation of heating and air-conditioning systems for commercial and industrial buildings. |

*Patents*

| | |
|---|---|
| 2001 | "Querying and Retrieving Semi-Structured Data from Heterogeneous Sources," PAT. NO. 6,282,537, 1999. |
| 1999 | "Data Extraction from World Wide Web Pages" with Stuart Mandick, PAT. NO. 5,913,214, 1996. |
| 1999 | "Querying Heterogeneous Data Sources Distributed over a Network Using Context Interchange" with Stuart Madnick, PAT. NO. 5,953,716, 1996. |

**Michael D. Siegel**
224 Walnut St
Brookline, MA 02445
(617) 620-6294 (M)
msiegel@mit.edu

**Legal Cases 2014 – 2020**

| | |
|---|---|
| 2019 | *Signature Systems, LLC v.  American Express Co.* Patent case **(Deposition)** |
| | <u>Smith, Gambrell & Russell, LLP</u>, 1055 Thomas Jefferson St. NW, Suite 400, Washington, DC |
| 2015-2016 | *Avid Tech, Inc v. Media Gobbler Inc., No14-13746 (D. Mass.).* Serving as an expert for defendant Avid Technology.  **(Deposition)** |
| | <u>Jones Day </u>901 Lakeside Ave. Cleveland, Ohio  44114 |
| 2014-2016 | *Thermo Fischer Scientific - US-PTO post grant proceeding - Patent 6996538.* Serving as expert for Thermo Fischer Scientific. Claims found unpatentable. **(Deposition)** |
| | <u>Oblon, Spivak, McClelland, Maier & Neustadt, L.L.P.</u> 1940 Duke Street Alexandria, Virginia 22314 |
| 2013- 2014 | *Pi-Net International, Inc. v.  JPMorgan Chase & Co*. Civil Action No. 12-282-RGA (D. Del). Serving as expert for defendant JPMorgan Chase concerning U.S. Patent Nos. 5,987,500, 8,037,158, and 8,108,492 relating to applications running on the internet. Case decided in favor of defendant by summary judgment. **(Deposition)** |
| | <u>Skadden, Arps, Slate, Meagher & Flom LLP</u> Four Times Square, New York, 10036-6522 |
| 2013-2014 | *S*A*P America, Inc. et al. v. Versata Development Group, Inc.* Patent Trial and Appeal Board Case *CBM2013-00042.*  Serving as an expert for petitioner in covered business method reviews of U.S. Patent *5,878,400* relating to hierarchical data and automatic pricing methods.  **(Deposition)** |
| | <u>Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P.,</u> Two Freedom Square, 11955 Freedom Drive, Reston, VA 20190-5675. |

# APPENDIX B
# MATERIALS CONSIDERED

**Bates Stamped Documents**

████████████████, APL-CORELLIUM_00018056.

████████████████████, APL-CORELLIUM_00018137.

████████████████████, APL-CORELLIUM_00018155.

████████████████████, APL-CORELLIUM_00018200.

████████████████████, APL-CORELLIUM_00018320.

████████████████████, APL-CORELLIUM_00018554.

████████████████████, APL-CORELLIUM_00018575.

████████████████████, APL-CORELLIUM_00018623.

████████████████████, January 26, 2018, APL-CORELLIUM_00018664.

Corellium, "Corellium Purchase and License Agreement," Corellium-014309.

Corellium, "Order Form," Corellium-014333.

Corellium, ████████████ December 2018, Corellium-016999.

Corellium, ████████████," Corellium-014356.

Corellium, "████████████████," Corellium-014360.

Corellium, "████████████████," Corellium-014367.

Corellium, "██████████████," Corellium-014372.

Corellium, "███████████████," Corellium-014375.

Corellium, "███████████████," Corellium-014379.

Corellium, "██████," Corellium-014386.

Corellium, ███████████," Corellium-014463.

Corellium, "█████," Corellium-014521.

Corellium, "████████████," Corellium-014900.

Corellium, "███████████████," Corellium-017021.

Corellium, "████████████████," Corellium-018289.Twitter, "@amandalgorton Tweet," February 15, 2018, available at https://twitter.com/amandalgorton/status/964197366223040512, Corellium-015320.

Twitter, "@cmwdotme Tweet," January 7, 2019, available at https://twitter.com/cmwdotme/status/1082293278840508416, Corellium-015318.

Twitter, "@CorelliumHQ Tweet," January 22, 2019, available at https://twitter.com/CorelliumHQ/status/1087817867431739392, Corellium-015316.

**Court Documents**

DEFENDANT CORELLIUM, LLC'S, RESPONSE TO PLAINTIFF'S MOTION TO COMPEL TO PROVIDE COMPLETE RESPONSES TO INTERROGATORIES, *Apple Inc. v. Corellium, LLC,* Case 9:19-cv-81160-RS, January 21, 2020.

DEFENDANT'S NOTICE OF SERVING AMENDED ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, *Apple Inc. v. Corellium, LLC,* Case 9:19-cv-81160-RS, January 16, 2020.

DEFENDANT'S NOTICE OF SERVING SECOND AMENDED ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, *Apple Inc. v. Corellium, LLC,* Case 9:19-cv-81160-RS, February 24, 2020.

DEFENDANT'S NOTICE OF SERVING THIRD AMENDED ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, *Apple Inc. v. Corellium, LLC,* Case 9:19-cv-81160-RS, February 27, 2020.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL, *Apple Inc. v. Corellium, LLC,* Case 9:19-cv-81160-RS, December 20, 2019.


**Publicly Available Documents**

"About Us," *the International Organization for Standardization*, available at https://www.iso.org/about-us.html.

Adam Segal, "Using Incentives to Shape the Zero-Day Market," *Council on Foreign Relations*, September 19, 2016, available at https://www.cfr.org/report/using-incentives-shape-zero-day-market.

Billy Ellis, "Live Kernel Debugging on iOS 12, Virtualised iPhones | Corellium Hands-on Demo," YouTube (June 25, 2018), available at https://www.youtube.com/watch?v=9sZZZhPnunY.

Bruce Schneier, "Disclosing vs. Hoarding Vulnerabilities," *Schneier on Security*, May 22, 2014, available at https://www.schneier.com/blog/archives/2014/05/disclosing_vs_h.html.

"Corellium Home Page," *Corellium*, available at https://corellium.com/.

"Cybersecurity," *National Telecommunications and Information Administration,* available at https://www.ntia.doc.gov/category/cybersecurity.

Deeksha Agarwal, "What Happens When You Use Virtualization In Software Testing?," *LambdaTest*, October 12, 2017, available at https://www.lambdatest.com/blog/happens-use-virtualization-software-testing/.

"disclose.io Core Terms," *Github*, available at https://github.com/disclose/disclose/blob/master/terms/core-terms-USA/core-terms-USA.md.

"disclose.io Home Page," *disclose.io*, available at https://disclose.io/.

"Guidelines and Practices for Multi-Party Vulnerability Coordination and Disclosure," *Forum of Incident Response and Security Teams*, 2017, available at https://www.first.org/global/sigs/vulnerability-coordination/multiparty/FIRST-Multiparty-Vulnerability-Coordination-latest.pdf?20180320.

"Hackerone Home Page," *hackerone*, available at https://www.hackerone.com/.

"History of Bug Bounties," *bugcrowd*, available at https://web.archive.org/web/20161208162145/https://bugcrowd.com/resources/history-of-bug-bounties.

"Information technology — Security techniques — Vulnerability disclosure," *International Standard*, ISO/IEC 29147:2018(E).

James Doubek, "Government Outlines When It Will Disclose Or Exploit Software Vulnerabilities," *NPR*, November 17, 2017, available at https://www.npr.org/sections/alltechconsidered/2017/11/17/564755961/government-outlines-when-it-will-disclose-or-exploit-software-vulnerabilities.

Jonathan Trull, "Responsible Disclosure: Cyber Security Ethics," *CSO Online*, February 26, 2015, available at https://www.csoonline.com/article/2889357/responsible-disclosure-cyber-security-ethics.html.

Joseph Cox, Lorenzo Frenceschi-Bicchierai, "How a Tiny Startup Became The Most Important Hacking Shop You've Never Heard Of," *Motherboard Tech by Vice*, February 7, 2018, https://www.vice.com/en_us/article/8xdayg/iphone-zero-days-inside-azimuth-security.

Keman Huang, Michael Siegel, and Stuart Madnick, "Systematically Understanding the Cyber Attack Business: A Survey ACM Computer Surveys," *ACM Computing Surveys* Vol. 51, No. 4 (2018).

Kim Zetter, "Malware Attacks Used By The U.S. Government Retain Potency For Many Years, New Evidence Indicates," *The Intercept*, March 10, 2017, available at https://theintercept.com/2017/03/10/government-zero-days-7-years/.

Lillian Ablon, Andy Bogart, "Zero Days, Thousands of Nights: The Life and Times of Zero-Day Vulnerabilities and Their Exploits," *RAND Corporation* (2017).

Lorenzo Franceschi-Bicchierai, "iPhone Emulation Company Sued by Apple Says It's Making iPhones Safer," *Motherboard Tech by Vice*, October 29, 2019, available at https://www.vice.com/en_us/article/8xw7gx/iphone-emulation-company-sued-by-apple-says-its-making-iphones-safer.

Lorenzo Franceschi-Bicchierai, "The Prototype iPhones That Hackers Use to Research Apple's Most Sensitive Code," *Motherboard Tech by Vice*, March 6, 2019, available at

https://www.vice.com/en_us/article/gyakgw/the-prototype-dev-fused-iphones-that-hackers-use-to-research-apple-zero-days.

"metasploit Home Page," *metasploit*, available at https://www.metasploit.com/.

"metasploit Product," *rapid7*, available at https://www.rapid7.com/products/metasploit/.

"Microsoft Bug Bounty Program," *Microsoft*, available at https://www.microsoft.com/en-us/msrc/bounty.

"National Telecommunications and Information Administration," *U.S. Department of Commerce*, available at https://www.commerce.gov/bureaus-and-offices/ntia.

"On Bounties and Boffins," *Trail of Bits Blog*, January 14, 2019, available at https://blog.trailofbits.com/2019/01/14/on-bounties-and-boffins/.

"Our Exploit Acquisition Program," *Zerodium*, available at https://zerodium.com/program.html.

"Product Security," *Tesla*, available at https://www.tesla.com/about/security.

"Rapid7 End User License Agreement," *rapid7*, available at https://www.rapid7.com/legal/eula/.

"Responsible Disclosure of Security Vulnerabilities," *Github*, available at https://help.github.com/en/github/site-policy/responsible-disclosure-of-security-vulnerabilities.

"Risky Business feature: iOS exploits just got a lot more expensive," *Risky.Biz*, September 21, 2018, available at https://risky.biz/RB514_feature/.

Ryan Ellis, Keman Huang, Michael Siegel, Katie Moussouris, James Houghton, "Chapter 4 - Fixing a Hole: The Labor Market for Bugs," *New Solutions for Cybersecurity*, 2017.

"Six Hackers Break Bug Bounty Record, Earning over $1 Million Each on Hackerone," *HackerOne*, August 29, 2019, available at https://www.hackerone.com/press-release/six-hackers-break-bug-bounty-record-earning-over-1-million-each-hackerone.

"Software Bug Definition," *techopedia*, January 27, 2017, available at https://www.techopedia.com/definition/24864/software-bug.

"The Defender's Dilemma: Charting a Course Toward Cybsersecurity," *RAND Corporation* (2015).

"The difference between and exploit and vulnerability," *Live Hacking*, November 20, 2012, available at http://www.livehacking.com/2012/11/20/the-difference-between-an-expoit-and-vulnerability/.

Thomas Brewster, "This Super Stealth Startup Built An Apple Hacker's Paradise," *Forbes*, February 15, 2018, available at https://www.forbes.com/sites/thomasbrewster/2018/02/15/corellium-virtual-apple-iphones-for-hacking/#19ee3e4a4a3b.

"Threats, Vulnerabilities and Exploits - oh my!," *ICANN*, August 10, 2015, available at https://www.icann.org/news/blog/threats-vulnerabilities-and-exploits-oh-my.

"Vulnerabilities, Exploits, and Threats," *rapid7*, available at https://www.rapid7.com/fundamentals/vulnerabilities-exploits-threats/.

"Vulnerability Disclosure Attitudes and Actions," *National Telecommunications and Information Administration* (2016).

"What Equifax Is Still Teaching Us About Security," *Dice*, February 18, 2020, available at https://insights.dice.com/2020/02/18/what-equifax-still-teaching-us-cybersecurity/.

"What is a zero-day (0day) exploit," *imperva*, 2020, available at https://www.imperva.com/learn/application-security/zero-day-exploit/.

"What is the Difference Between Black, White, and Grey Hat Hackers?," *Norton*, available at https://us.norton.com/internetsecurity-emerging-threats-what-is-the-difference-between-black-white-and-grey-hat-hackers.html.

"Whitehat Information," *Facebook*, October 15, 2019, available at facebook.com/Whitehat/info/.

Wilson et al., "Bugs in the System," *New America*, July 2006.

## <u>CERTIFICATE OF SERVICE</u>

I, Elana Nightingale Dawson, do hereby certify that on March 3, 2020 I caused a copy of

the foregoing Expert Report of Michael D. Siegel, Ph.D to be served via email upon:

Brett C. Govett
Robert Greeson
Jacqueline G. Baker
NORTON FULBRIGHT US LLP
2200 Ross Ave., Suite 3600
Dallas, Texas 75201
brett.govett@nortonrosefulbright.com
robert.greeson@nortonrosefulbright.com
jackie.baker@nortonrosefulbright.com

David L. Hecht
Maxim Price
Melody L. McGowin
Minyao Wang
Yi Wen Wu
PIERCE BAINBRIDGE BECK PRICE &
HECHT LLP
277 Park Ave 45th Floor
New York, NY 10172
dhecht@piercebainbridge.com
mprice@piercebainbridge.com
mmcgowin@piercebainbridge.com
mwang@piercebainbridge.com
wwu@piercebainbridge.com

S. Jonathan Vine
Justin B. Levine
Lizza C. Constantine
Michael Alexander Boehringer
COLE, SCOTT & KISSANE, P.A.
Esperante Building
222 Lakeview Avenue, Suite 120
West Palm Beach, Florida 33401
jonathan.vine@csklegal.com
justin.levine@csklegal.com
lizza.constantine@csklegal.com
michael.boehringer@csklegal.com

Gavin Cunningham Gaukroger
BERGER SINGERMAN LLP
350 East Las Olas Blvd.
Suite 1000
Fort Lauderdale, FL 33301
ggaukroger@bergersingerman.com

_s/ Elana Nightingale Dawson_____
Elana Nightingale Dawson