# EXHIBIT 6

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA
### CA No. 9:19-cv-81160-RS

| | |
|---|---|
| **Apple Inc.,** | § |
| | § |
| **Plaintiffs,** | § |
| | § |
| **vs.** | § |
| | § |
| **Corellium, LLC.,** | § |
| | § |
| **Defendant and Counterclaimant** | § |

---

## REBUTTAL EXPERT REPORT AND DECLARATION OF ALEXANDER STAMOS

---

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1 | INTRODUCTION | 1 |
| 2 | DR. SIEGEL'S DEFINITION OF GOOD-FAITH SECURITY RESEARCH | 2 |
| 3 | DR. SIEGEL PROPOSES A STANDARD THAT NO SOFTWARE TOOL CAN REALISTICALLY MEET | 4 |
| 4 | APPLE IS MORE INTERESTED IN ITS OWN PUBLIC RELATIONS THAN IN "GOOD-FAITH SECURITY RESEARCH" | 9 |
| 5 | THE BAD ACTORS DO NOT NEED CORELLIUM'S SOFTWARE, GOOD FAITH RESEARCHERS DO | 9 |
| 6 | CONCLUSION | 11 |

# 1 INTRODUCTION

1. I present this report and declaration in rebuttal to the Expert Report of Michael D. Siegel, PH.D., dated March 3, 2020 and provided to me by counsel to Corellium. I have been provided Dr. Siegel's report and the cited attachments.

2. When originally engaged by Corellium as an expert witness, it was my intention to charge reasonable and standard expert witness fees. Upon seeing this expert report and recognizing the danger of Apple's arguments to the existence of an open and healthy security research community, I have decided to provide my services pro bono. I will be asking for travel and other reasonable expenses, but I will not be billing Corellium or their counsel for any of my previous or future work on this matter.

3. Dr. Siegel's arguments are well-cited and well-written. But they are also highly academic, unrecognizable to working security professionals, detached from the reality of building production software for billions of people, and ignorant of the complexities of the current geopolitical environment.

4. The arguments presented by Dr. Siegel, if accepted by the court, would have a massive negative impact on the existence of legitimate security research in the United States. Such a ruling, however, would in no way improve the security of Apple's devices or the safety of their users globally. Restricting the use of multi-purpose research tools could create a massive imbalance between the vulnerability research capabilities of the American security community and researchers working with US adversaries. Forcing the creators of multi-purpose research tools to enforce the rules that Dr. Siegel sets forth with respect to his definition of "good faith research" is both futile and dangerous. Doing so in this case would mean a drastic change to public policy in the United States

accomplished through copyright law rather than actual public discourse and legislative intent with respect to security research.

## 2    DR. SIEGEL'S DEFINITION OF GOOD-FAITH SECURITY RESEARCH

5. Dr. Siegel spends much of his report defining his concept of "good-faith security research." While Dr. Siegel is entitled to his own opinion on how to define "good-faith," his definition does not reflect the opinion of the entire security research community and only incorporates the interests of large software vendors. His report does not capture all of the purposes of security research or the reasons why these debates are so inflammatory, nor is his definition of "good faith security research" found in the Library of Congress's "DMCA security research exemption for consumer devices."[1]

6. As I discussed in my own report, there is a long history of arguments between large software vendors and security researchers. Many of these arguments arose from a lack of perceived urgency on behalf of software vendors to address known security flaws. In paragraph 34 of his report, Dr. Siegel defines "White-hat security researchers" as those who "act in the interest of ensuring the security of software and the public." Even if we accept this definition, you will find that actual, practicing white-hat researchers differ greatly in their interpretation of how best to ensure the security of software and the public. These differences are reflected in the variety of models used. Dr. Siegel's definition of "good faith security research" ignores that ongoing public debate.

---

[1] "DMCA security research exemption for consumer devices," *FTC*, available at https://www.ftc.gov/news-events/blogs/techftc/2016/10/dmca-security-research-exemption-consumer-devices

7. Personally, I am a big fan of the coordinated-disclosure model. As CISO of Yahoo and Facebook, my teams oversaw bug bounty programs that paid millions of dollars out to researchers who responsibly and confidentially reported software flaws. I believe this is the most functional model for cooperation between researchers and companies.

8. However, even as a CISO I had to recognize that there were competing definitions of responsible activity by security researchers, and our teams had to live with the reality that not all researchers trust large corporations to act in the best interest of users. This is not an ahistorical view, as there is a long history of software vendors ignoring known issues until public disclosure.

9. While I am an advocate for coordinated disclosure, at no time have I ever advocated for general purpose security, reverse engineering, or virtualization tools to be declared illegal. Apple's position is extreme and unique among the major American software vendors.

10. In addition, there are many uses for Corellium's Apple product other than what Dr. Siegel defines as "good faith security research" into Apple's software. These uses include:

    i) Testing ones-own applications using multiple versions of iOS to understand their true security properties;

    ii) Testing third party applications using multiple versions of iOS to understand their true security properties;

    iii) Looking for security flaws in non-Apple iOS applications;

    iv) Understanding patched vulnerabilities to help build detection and mitigation mechanisms;

> v) Studying the behavior of applications in the App Store, such as looking for privacy violating behaviors;
>
> vi) Improving one's skills at reverse engineering and security testing;
>
> vii) Teaching. I currently teach an introduction to cybersecurity course using virtualized Windows systems that students can attack, a product like Corellium makes training students on mobile security much more practical;
>
> viii) Investigation: Investigating previously-fixed vulnerabilities to determine what exploits may have been used and what data may have been lost; or
>
> ix) To criticize Apple, publicly or otherwise, including for prior security failures that have been patched or disclosed.

## 3  DR. SIEGEL PROPOSES A STANDARD THAT NO SOFTWARE TOOL CAN REALISTICALLY MEET

11. Tools that are useful in understanding how software operates can be used for multiple purposes. As a result, the definition of "security tool" is extremely broad and encompasses thousands of free and paid software products.

12. Even if we accept Apple's definition of "good-faith security research", Dr. Siegel's report proposes a standard that is not met and could not be realistically met by almost any security research tools.

13. In Paragraph 67, Dr. Siegel references terms in Metasploit's license agreement requiring the product to be used for "for the purposes of good-faith testing, investigation, and/or correction of security flaws, exposures, or vulnerabilities in order to advance the security or safety of devices, machines, or networks of those who use such devices, machines, or networks."

14. Metasploit is not an analogous product to Corellium, as the former is a tool containing fully-working exploits and the latter a general-purpose platform for running and analyzing software. Corellium allows individuals to understand how iOS and iOS applications operate, which can lead to the discovery of new security flaws. Metasploit allows users to reliably find and exploit known vulnerabilities and contains modules that allow the user to perform unambiguously malicious actions such as taking control of a targeted computer.

15. Despite the inclusion of this requirement in their license, Metasploit has been used repeatedly in a manner that Dr. Siegel would define as outside of the bounds of "good-faith security research" and that seem plainly incompatible with this license.

16. Metasploit has been repeatedly used by professional attackers, including state actors, to facilitate their "black hat" activity. Mandiant/FireEye, a well-respected incident response firm, has learned that "Metasploit is used by pentesters, security enthusiasts, script kiddies, and even malicious actors."[2] They attribute the use of Metasploit as well as other commercial tools to the fact that "…experienced actors may resort to using known tools and exploits to conceal their identity or maximize their budget.."[3]

---

[2] "Shikata Ga Nai Encoder Still Going Strong," *Fire Eye*, available at https://www.fireeye.com/blog/threat-research/2019/10/shikata-ga-nai-encoder-still-going-strong.html; *see also* "How a bank got hacked," *CSO,* available at https://www.csoonline.com/article/3454443/how-a-bank-got-hacked-a-study-in-how-not-to-secure-your-networks.html

[3] "Monitoring ICS Cyber Operation Tools and Software Exploit Modules To Anticipate Future Threats," *Fire Eye*, available at https://www.fireeye.com/blog/threat-research/2020/03/monitoring-ics-cyber-operation-tools-and-software-exploit-modules.html

17. Clearly, Metasploit's inclusion of a handful of lines of legal language in their licensing agreement does little, if anything, to deter those who would use this tool illegally and outside of the bounds of what Dr. Siegel believes to be "good faith." This is not the fault of Metasploit; any piece of software that allows the user to better understand the operation of computer hardware, software or networks can be used in both helpful and harmful circumstances. This situation does, however, demonstrate the futility of requiring any specific terms of use language as a measure of the legitimacy of a tool, whether those terms prohibit "illegal use," as Corellium does, or purport to have stricter use limitations.

18. Many other important security tools have no such language limiting their use, and it would be impractical to believe that the makers of such tools could enforce any such language. For instance, a researcher could confidentially disclose a vulnerability to a vendor using one handle and then secretly sell an exploit of that vulnerability under a different handle on the dark web.

19. VMWare[4] produces multiple products that run virtualized copies of the Microsoft Windows, Linux, Apple OS X, and other operating systems. Just as with Corellium, VMWare's virtualization tools can be used for security research that ends in either malicious use or coordinated disclosure. VMWare's licenses do not restrict use to "good faith" security research. Even if it did, it would be practically impossible to enforce.

20. Nmap[5], known as the "network Swiss Army Knife", is the world's most popular network scanning tool. It is available under both an open source and commercial license,

---

[4] https://www.vmware.com/
[5] https://nmap.org/

C.A. No. 9:19-cv-81160-RS, Alex Stamos Rebuttal Report and Declaration                                                                 6

neither of which restrict its use to "good faith" security research. Even if it did, it would be practically impossible to enforce.

21. PortSwigger's BURP Proxy[6] is one of the world's most important web security testing toolkits, alongside ZAP from the Open Web Application Security Project. Neither tool has licensing language restricting use to "good faith" security research. Even if they did, it would be practically impossible to enforce.

22. MITMProxy[7] is one of the most important tools for intercepting and breaking encrypted connections to study the operation of network connected software. It does not have a license that restricts use to "good faith" security research. Even if it did, it would be practically impossible to enforce.

23. Kali Linux[8] is a distribution of the Linux operating system specifically designed for people who reconnoiter, explore and exploit remote computer systems. It contains a multitude of hacking tools that can be used for both good and evil purposes. It does not have a license that restricts use to "good faith" security research. Even if it did, it would be practically impossible to enforce.

24. Ghidra[9] is a software reverse engineering suite developed and distributed by the US National Security Agency. Since its release, Ghidra has become an extremely popular tool for reverse engineering all manner of software, including Apple software such as

---

[6] https://portswigger.net/burp
[7] https://mitmproxy.org
[8] https://www.kali.org/
[9] https://ghidra-sre.org/

    iOS[10]. Ghidra is distributed for free by the United States government and is not licensed in a manner that restricts its use. Even if it was restricted, it would be practically impossible to enforce.

25. The above-listed tools do not lack restricted licenses because their makers are malicious. The makers of these tools, having practical experience in the reality of network attack and defense, understand that it is impossible to determine the state of mind and motivations of a person performing a basic task, such as virtualization of an operating system or mapping of a network.

26. In paragraph 42, Dr. Siegel states "Companies that impose little to no restrictions are not, in my opinion, providing research tools solely for good-faith security research nor can such companies say that their tools are being used solely for good faith security research."

27. Dr. Siegel's opinion seems to call into question almost every tool used by security researchers, corporate defenders, government agencies, and software security teams. I expect that almost all the software used by Apple's in-house security team does not live up to this standard. Apple is arguing, via Dr. Siegel, that all these tools are illegitimate as they lack restrictions on their use. This is a novel and very dangerous standard.

---

[10] https://github.com/OWASP/owasp-mstg/blob/master/Document/0x06c-Reverse-Engineering-and-Tampering.md

## 4    APPLE IS MORE INTERESTED IN ITS OWN PUBLIC RELATIONS THAN IN "GOOD-FAITH SECURITY RESEARCH"

28. Dr. Siegel spends a great deal of time defining what he would consider "good faith security research", which implies that he believes that security research should be allowed if the motives of the researchers are pure, solely per his definition.

29. Apple does not, however, allow for any official method to emulate or debug iOS, iPadOS or tvOS. As I discussed in my report, running software in a controlled environment is a standard part of security testing for products such as mobile operating systems. Microsoft and Google both allow and facilitate such testing.

30. In contrast, Apple has moved to eliminate any legal means of security research on iOS, both with this action against Corellium and against providers of jailbreak capabilities.

31. As I discussed in my report, Apple promised the security research community that they would make a special version of the iPhone available for security research in August of 2019. There have been no updates from Apple since then.

32. The combination of Dr. Siegel's arguments and Apple's actions lead me to believe that Apple's goal is not to stop what they consider illegitimate security research, but all research into flaws in iOS where they cannot tightly control the public narrative.

## 5    BAD ACTORS DO NOT NEED CORELLIUM'S SOFTWARE, GOOD FAITH RESEARCHERS DO

33. A significant omission from Dr. Siegel's report is any acknowledgement of the vulnerability research that has occurred outside of Corellium's customers and that has led to serious damage and suffering around the world.

34. As I detailed in my report, flaws[11] in Apple's software have reportedly been used to spy upon and suppress Uyghur Muslims in the People's Republic of China[12], attack a New York Times reporter critical of the Saudi royal family[13], and been used against numerous civil rights activists[14].

35. The research teams that are likely behind these flaws are not customers of Corellium. It is reasonable to assume, considering the repeated success of the Chinese government and Israel's NSO Group in finding flaws in Apple iOS, that capabilities equivalent to those provided by Corellium are already readily available to those groups.

36. The People's Liberation Army or NSO Group will not be influenced by Dr. Siegel's definition of "good faith security research." A legal finding that eliminates the ability for American and other western security researchers to perform their work will not impede these groups. In fact, it will reduce the possibility that the United States or an allied government will discover and report a flaw to Apple. It will reduce the possibility that an American or allied researcher will discover a flaw using Corellium and report it to Apple via their bug bounty program.

37. Bad actors would still find ways to find vulnerabilities and create exploits without Corellium's software, just as they are able to find iOS vulnerabilities without Corellium's assistance today. State actors and researchers driven by the high price of stable iOS exploits can afford fleets of test devices or simply build their own

---

[11] https://info.lookout.com/rs/051-ESQ-475/images/pegasus-exploits-technical-details.pdf
[12] https://googleprojectzero.blogspot.com/2019/08/a-very-deep-dive-into-ios-exploit.html
[13] https://citizenlab.ca/2020/01/stopping-the-press-new-york-times-journalist-targeted-by-saudi-linked-pegasus-spyware-operator/
[14] https://citizenlab.ca/2016/08/million-dollar-dissident-iphone-zero-day-nso-group-uae/

virtualization software. Giving Apple exclusive control of the research tools available legally in the United States, restrictions on Corellium would likely harm good faith research more than it would harm bad actors.

38. Dr. Siegel's academic definitions of ethical researcher behavior is distant from the dark, messy reality of how Apple's products are being exploited regularly to cause real human harm.

## 6   CONCLUSION

39. Software has invaded every aspect of our lives, and along with the benefits that brings comes the reality that all software has flaws.

40. As a result, security research is a critical function for our society.

41. Like a crowbar, video recording device, lock pick, or automobile, almost all security tools can be used to both benefit and harm society.

42. Almost no security tool vendor claims to be able to restrict the actions of the user of that tool strictly to actions that are legal. Laws and law enforcement are responsible for that. The one example provided by Dr. Siegel, Metasploit, has plainly failed to enforce their advertised restriction.

43. We must allow multi-use security tools to exist to ensure that there is a path for legitimate security research, just as we allow crowbars to exist. It is the action of the users that we must punish by law or, in the case of democratic governments, constrain via public policy.

44. My opinions are based upon the information that I have considered to date. I reserve the right to supplement or amend my opinions as permitted in response to opinions expressed by Apples' experts, any new claims that Apple is permitted to add into this

45. litigation, in light of any additional evidence, testimony, or other information that may be provided to me after the date of this report.

46. I hereby declare under the penalty of perjury under the laws of the United States of America that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true.

47. Executed this 13th day of April 2020 in Redwood City, CA.

_____
Alexander Stamos