# EXHIBIT 8

## Declaration and Expert Report of Clark Asay

### Biography

1. My name is Clark Asay, and I am a Professor of Law, with tenure, at the J. Reuben Clark Law School at Brigham Young University in Provo, Utah. I have taught at BYU Law School since 2014. Before coming to BYU Law School, I was a Visiting Assistant Professor from 2012-2014 at Penn State Law in University Park, Pennsylvania. I primarily teach, research, and write about intellectual property laws, including patents, trade secrecy, trademarks, and copyright.

2. Before joining the legal academy, I was a technology transactions attorney in Silicon Valley, California from 2007-2012. I worked both at a law firm, Wilson Sonsini Goodrich & Rosati, as well as inhouse at Amazon's Lab126. In both roles, I regularly advised clients on intellectual property, privacy, and contractual matters. Since joining the legal academy, I have occasionally provided clients with legal advice relating to intellectual property, contractual, and privacy issues.

3. I have a JD from Stanford Law School, a Masters in Philosophy from the University of Cambridge in England, and a BA from Brigham Young University.

4. Below I provide responses in accordance with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.

**A complete statement of all opinions the witness will express and the basis and reasons for them.**

### Overview

5. The United States Constitution authorizes Congress to enact copyright laws in order to "promote the progress of Science and useful Arts." Art. I, § 8, cl. 8. This constitutional purpose behind copyright justifies both the rights that we grant authors as well as several important limitations on those rights. For instance, without copyright protections in place, many authors may be reluctant to create socially beneficial things for fear that they would have difficulty recouping their costs of creating those things. We thus provide copyright as an economic incentive for parties to create socially beneficial works of authorship. *See* Jeanne C. Fromer, *An Information Theory of Copyright Law*, 64 EMORY LAW JOURNAL 71, 74 (2014).

6. On the other hand, that same constitutional purpose behind copyright justifies a number of significant limitations on the rights that we grant copyright holders. As the Supreme Court has stated, "the primary objective of copyright is not to reward the labor of authors," but instead to promote societal progress by allowing use of copyrighted works when courts deem doing so results in overall societal benefit. *Feist Publications, Inc. v.*

1

*Rural Telephone Service Co., Inc.*, 499 U.S. 340, 349 (1991). Hence, under the fair use doctrine courts allow uses of copyrighted works when overall society benefit is found because a contrary finding would mean that copyright law is "stifl[ing] the very creativity [it was] designed to foster." *Campbell v. Acuff-Rose Music, Inc.*, 114 S. Ct. 1164, 1170 (1994). Similarly, under the copyright misuse doctrine, courts refuse to allow copyright holders to enforce their rights against third parties when the copyright holders attempt to use their copyright "in a manner violative of the public policy embodied in the grant of a copyright." *Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970, 978 (4th Cir. 1990). And statutory enactments such as the Digital Millennium Copyright Act (DMCA) include specific limitations meant to restrict that Act's applicability to situations where authors' economic rights under copyright are in danger. *See* Timothy K. Armstrong, *Fair Circumvention*, 74 BROOKLYN LAW REVIEW 1 (2008).

7. In my opinion and having used the Corellium product firsthand, Corellium's use of Apple's products clearly "promotes the progress of Science and useful Arts" by providing society with vital tools for researching and testing security risks relating to Apple's products. And importantly, that use does nothing to undermine Apple's economic incentives to create socially beneficial original works of authorship in a manner that copyright law countenances. The applicable legal doctrines clearly support these positions. First, Corellium's use of Apple's products is a clear fair use of them, thus excusing Corellium from any copyright infringement liability. Second, Corellium is also free from liability under the DMCA because Corellium's product falls outside the scope of the DMCA's prohibitions. And finally, Apple's actions in this case constitute copyright misuse because Apple has sought to leverage its copyright rights to protect interests that copyright law does not cover, in a manner that violates the public policy embodied in the grant of copyright.

**Fair Use**

8. Corellium's use of Apple's products is a fair use of them because: (1) Corellium's use is for research, comment, criticism, and scholarship purposes, all of which are highly favored purposes under the fair use doctrine; (2) Corellium's use is highly transformative because Corellium uses the Apple products for an entirely distinct purpose from the purposes for which Apple built the products, in an entirely different setting together with vast amounts of socially beneficial technology that Corellium has independently created; (3) Apple's products are highly functional in nature, meaning that the scope of copyright for them is thinner than in other contexts, and third parties such as Corellium have greater leeway in making use of them, particularly when those uses are transformative; (4) Corellium has only taken as much of Apple's products as is necessary to carry out its transformative, socially beneficial purposes; and (5) Corellium's highly transformative use of the Apple products in no way competes with or undermines the market for Apple's products in a manner that copyright law countenances. Below I provide an overview of the fair use doctrine, followed by my analysis and elaboration of each of the points made above.

2

9.  The fair use doctrine is a balancing test that courts use to allow uses of copyrighted works that, overall, encourage rather than stifle creativity. Without the defense, the Supreme Court has opined, copyright law would frequently "stifle the very creativity [it] is designed to foster." *Campbell v. Acuff-Rose Music, Inc.*, 114 S. Ct. 1164, 1170 (1994). The fair use doctrine is thus meant to provide for "breathing space within the confines of copyright" so that follow-on creators may more liberally utilize copyrighted works in their own innovative, socially beneficial efforts. *Id.* at 1171.

10. The fair use doctrine consists primarily of four factors that courts assess in determining whether a use is fair. The statute in which the doctrine is codified, Section 107 of the Copyright Act, also includes a preamble that courts often, perhaps typically, consider in assessing fair use. Although Section 107 indicates that the four factors listed in the statute are not exhaustive, courts typically mostly focus on them. Below I provide an analysis of the four factors (including their most important subfactors), as well as the preamble, as applied to the *Apple v. Corellium* case. I then assess a few additional factors that courts sometimes examine beyond the four-factor test.

11. Section 107's preamble states: "Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright."

12. By way of legal background, courts in the past have typically not treated Section 107's preamble as dispositive. Hence, just because a purported fair use fits into one of the preamble's categories does not mean the use is automatically fair. But if a purported use does fit into one of the listed categories, courts typically weigh that in the defendant's favor.

13. In Corellium's case, its use of Apple's products easily fits into the research category, as research is the very – indeed, the only – purpose of the Corellium product. Corellium's use also fits into the criticism, comment, and scholarship categories, because in important respects the Corellium product is meant to enable others to investigate Apple's products in ways that allow for comment, criticism, and scholarship relating to those products (and more generally for security research, too). In my opinion, this subfactor of the overall fair use test thus weighs heavily in Corellium's favor.

14. Following Section 107's preamble, the statute provides the fair use test's four core factors. Factor one asks courts to assess "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." In empirical studies on the fair use test, factors one and four have been found to be the most important factors in determining overall fair use outcomes. That is, outcomes under factors one and four strongly correlate with overall fair use outcomes. Essentially, if a defendant wins both factors one and four, the defendant will almost certainly win the

case (over 90% of the time). *See* Clark D. Asay, *Is Transformative Use Eating the World?*, 61 BOSTON COLLEGE LAW REVIEW 1 (forthcoming 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3332682.

15. Factor one has been interpreted to include several subfactors, the most important of which, according to the Supreme Court, is whether the use is "transformative." *Campbell v. Acuff-Rose Music, Inc.*, 114 S. Ct. 1164, 1171 (1994). While the Supreme Court has acknowledged that a finding of transformative use is "not absolutely necessary for a finding of fair use," it has opined that the "goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works" and that "[s]uch [transformative] works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright." *Id.* at 1164. In line with the Supreme Court's admonition to focus on the transformative use question, empirical studies show that the transformative use inquiry is one of the most important questions, if not the most important question, in the overall fair use inquiry. Clark D. Asay, *Is Transformative Use Eating the World?*, 61 BOSTON COLLEGE LAW REVIEW 1 (forthcoming 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3332682. Below I discuss each of factor one's subfactors in turn, starting with the all-important transformative use inquiry.

16. The central investigation under transformative use is whether "the new work merely 'supersede[s] the objects' of the original creation, . . . or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell v. Acuff-Rose Music, Inc.*, 114 S. Ct. 1164, 1171 (1994). Despite the Supreme Court providing this standard, subsequent case law has not settled on a clear definition of what constitutes transformative use. Merely adding material to a preexisting work is generally insufficient to count as transformative. But the most defined, clear examples of transformative uses are when parties take a preexisting work and utilize it for a different purpose than the purposes to which the copyright owner put the work. For instance, the Fourth Circuit has found that using copyrighted essays to help develop a plagiarism detection tool was transformative because using the essays for such a purpose was entirely different than the purpose for which the students wrote the essays. *Vanderhye v. IParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009). Similarly, the Second Circuit has found that Google's copying of tens of millions of copyrighted books in their entirety into its Google Books project was transformative because the company used those copies as part of an innovative software product that served entirely different purposes than the purposes animating the books' creation. *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214, 216-17 (2d Cir. 2015) (opining that "transformative uses tend to favor a fair use finding because a transformative use is one that communicates something new and different from the original or expands its utility, thus serving copyright's overall objective of contributing to public knowledge").

17. In this case, I believe Corellium's use of Apple's products is highly transformative because Corellium uses the Apple products for an entirely distinct purpose from the purposes for which Apple built the products. And that purpose – enabling high-powered research of

security vulnerabilities in the technologies that hundreds of millions of people use on a daily basis – is centered on providing society with significant benefits that it would otherwise not enjoy, further demonstrating the product's transformative nature. The Corellium product is not being used to displace the Apple products on the market in any way. Users cannot use the Corellium products to avoid purchasing Apple products for their intended purposes. If users wish to use the Apple products as intended, they must purchase the Apple products. The Corellium product was built with an entirely distinct, incredibly socially beneficial purpose in mind—to allow for research centered on identifying vulnerabilities in the Apple products. Indeed, having used the products myself, that is the only purpose for which Corellium's product can be used.

18. While Apple has recently begun providing some physical "pre-hacked" devices for security-related research, those devices appear to fall well short of what Corellium has accomplished with its product. Users can perform research activities using the Corellium product that they simply can't do with Apple's physical devices, including a live look at the software code executing on the device and the ability to pause that execution for more thorough inspection. *See* CHARLES EDGE & RICH TROUTON, APPLE DEVICE MANAGEMENT 532 (2020). Part of Apple's approach seems to be by design – Apple wishes to strictly control the research environment for its products. Corellium's product thus far surpasses anything Apple has been able or willing to provide security researchers, providing yet another reason why the Corellium product is transformative (and does not harm the market for Apple's products, as discussed more under factor four below).

19. Although adding material to a preexisting work is typically insufficient, on its own, to a finding of transformative use, it can certainly help buttress a transformative use claim. In this case, Corellium has invested millions of dollars building technologies for use in conjunction with the Apple products. And importantly, that added, new expression is meant to help Corellium users achieve entirely different purposes – ones that further copyright's constitutional aims – than the purposes for which Apple built and sells its products.

20. Courts also often connect the transformative use subfactor to the fair use test's important factor four. When a use is deemed transformative, courts often find that this means that the use does not harm the copyrighted work's market because of the different purposes that the copyrighted work and transformative work serve. I will examine this dynamic in greater detail below.

21. Fair use's factor one also includes the so-called "commerciality" inquiry. This subfactor of factor one looks to whether a party's use of a copyrighted work is for commercial purposes, or is instead directed to nonprofit activities. This subfactor is often recited in the case law, but typically doesn't end up playing much of a role in determining outcomes. Part of the reason for this is that the Supreme Court has explicitly stated that simply because a defendant's product is for commercial purposes does not foreclose the possibility of a fair use. *Campbell v. Acuff-Rose Music, Inc.*, 114 S. Ct. 1164, 1174 (1994).

Other factors, including the transformative use inquiry and the market impact analysis under factor four, typically dwarf this consideration.

22. In this case, the Court may deem that this subfactor weighs slightly against Corellium simply because it is a commercial enterprise. However, as alluded to above, even when courts make such a finding, they often assign this subfactor little to no weight when the use is transformative, as the case is here. Furthermore and related, because Corellium's use is for research purposes, courts are more likely to discount the commercial nature of its use. Courts are typically mostly concerned with whether the purported fair use is competing in the marketplace with the original copyrighted work. That is in no way the case here, as the Apple products and Corellium product serve entirely different markets.

23. Factor one also sometimes includes a court's assessment of the good or bad faith of the defendant. However, the case law on this subfactor is quite inconsistent, and it is not entirely clear what either good faith or bad faith entails. Furthermore, the Supreme Court has placed this subfactor's relevancy in some doubt with its *Campbell* decision (see footnote 18 of that decision), and courts often, as a result, do not place much weight on this subfactor (or even analyze it, for that matter). Furthermore, it is clear that failure to take a license for the copyrighted work does not mean that the defendant acted in bad faith.

24. In this case, I believe the Court would be hard pressed to find that Corellium acted in bad faith, particularly because its product is transformative and does not compete with Apple's products in the marketplace. Instead, if anything, Corellium would seem to have acted in good faith in light of the encouragement and enthusiasm that Apple personnel showed early on in its interactions with Corellium and its founders. Overall, I believe that the Court should either find that Corellium acted in good faith or not assign this subfactor any weight at all—perhaps not even considering it—in the overall fair use analysis.

25. Finally, courts sometimes, but not always, assess the preamble under factor one, presumably because this factor focuses on the purpose and character of the use, and the preamble's categories relate to the purpose and character of the use. My analysis of the preamble factor as applied to this case is above. The only thing I will add here is that courts are more likely to find uses specified under the preamble to be transformative. In other words, courts often look to the preamble for clues about what is a transformative use. The research, commentary, criticism, and scholarship purposes behind Corellium's product are thus yet another reason why the Court should consider Corellium's use transformative.

26. Factor two of the fair use test examines "the nature of the copyrighted work." Factor two is by far the least influential factor within the fair use test. Empirical studies show that it is very rarely correlated with overall fair use outcomes. Clark D. Asay, *Is Transformative Use Eating the World?*, 61 BOSTON COLLEGE LAW REVIEW 1 (forthcoming 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3332682. Courts sometimes, but

6

not always, consider two subfactors within the factor two inquiry: whether the copyrighted work is creative or factual in nature, and whether the work is unpublished. Courts frequently ignore the latter subfactor, however.

27. Under the "creative or factual" prong of factor two, courts generally assess whether the copyrighted work is highly creative—i.e., the type of work that copyright law is meant to encourage—or is instead mostly factual or utilitarian. If works are highly creative, then courts are more likely to weigh this factor in favor of plaintiffs. If works are mostly factual or utilitarian in nature, courts are more likely to grant a broader scope of fair use. Note, however, that even when courts find that this factor weighs against a defendant because the court finds that the work is highly creative, courts almost universally discount this factor when they deem the use to be transformative. This is because, as the Supreme Court has instructed, transformative uses almost invariably make use of substantial portions of highly creative works. *Campbell v. Acuff-Rose Music, Inc.*, 114 S. Ct. 1164, 1175 (1994).

28. The second subfactor of factor two concerns whether the copyrighted work has been published. If the work has been published, a court is more likely to find fair use, whereas if the copyright owner has not yet published the work, a court is less likely to find fair use. Courts often omit this subfactor entirely.

29. In this case, factor two should weigh in favor of Corellium. On the one hand, although the Apple products could be said to require a high level of creativity in their creation, they are also software products whose utilitarian ends could push this factor in favor of fair use. In fact, previous case law in other circuits involving software has often assigned this factor greater weight in the overall fair use analysis, with that weight pushing in favor of fair use due to the utilitarian nature of software. *See Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1524-26 (9th Cir. 1992); *Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000). Furthermore, because the Apple products have been published, that subfactor of factor two should also weigh in favor of Corellium.

30. It is also not clear how much of the Apple products are its own. The iOS kernel software, for instance, includes many third-party software products, including various pieces of open source software. Those third-party components are licensed under various open source software terms. Because it isn't entirely clear which portions of its products constitute Apple's copyrighted works, it is difficult to claim, as Apple does, that its copyrighted works are highly creative. This is another reason why fair use's second factor may favor Corellium.

31. But even if the Court were to deem that this factor weighs against Corellium because it determines that the Apple products consist of highly creative expression, other factors within the overall fair use test, including, importantly, that the use is transformative, should trump whatever findings the Court makes with respect to factor two.

32. The fair use test's factor three examines "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." This factor includes several subfactors as well. The first focuses on the quantitative amount that the defendant took. In essence, the more a defendant takes, the less likely it becomes that a court will find fair use. The second is a qualitative assessment: even if the defendant didn't take much in terms of quantity, taking the so-called "heart" of the work, or the most important expression in the copyrighted work, may lead a court to weigh this factor against a party claiming fair use. Note, however, that the Supreme Court has been clear that when a transformative use is involved, courts should assess factor three differently. *Campbell v. Acuff-Rose Music, Inc.*, 114 S. Ct. 1164, 1175-77 (1994). This is because transformative uses must often make use of significant portions of copyrighted works in order to bring about their transformative purposes. Consequently, the case law includes many findings of fair use even where entire works were used, primarily in cases where the court found the use to be transformative. In fact, even when courts formally weigh this factor in favor of plaintiffs because the defendant made use of an entire work, courts in transformative use cases also typically explicitly indicate that factor three simply does not carry much weight in the overall fair use test because of the Supreme Court's instruction to discount the factor when transformative uses are involved.

33. In this case, my understanding is that it was necessary for Corellium to have used the portions of Apple's products that it did in order to bring about Corellium's transformative purposes. Indeed, as I understand it and having used the product, Corellium's product would not work as intended without using the portions of Apple's products that are included; leaving out significant portions would undermine the very research purposes for which Corellium's product is intended. Hence, even if the Court were to formally weigh this factor against Corellium, the Court should discount the weight of factor three in the overall analysis because of Corellium's highly transformative purposes.

34. It also bears repeating that it is not clear what portions of Apple's products the company actually has copyright in due to the presence of third-party open source software components in those products. Until the company clearly shows its products' provenance, it is difficult for the company to make accurate claims about the amount of its copyrighted works Corellium (or anyone else) has used.

35. Finally, factor four of the fair use test assesses "the effect of the use upon the potential market for or value of the copyrighted work." Factor four is considered one of the most important factors within the overall fair use analysis. Empirical studies show that overall fair use outcomes tend to follow factor four outcomes very closely, so much so that some scholars believe that factor four is simply a space where the court synthesizes its findings under the preceding three factors. *See* Barton Beebe, *An Empirical Study of U.S. Copyright Fair Use Opinions, 1978-2005*, 156 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 549, 621 (2008).

36. Factor four largely focuses on whether the purported fair use acts as an economic substitute for the copyrighted work in the marketplace. To answer this question, courts

often ask what the market opportunities for the copyrighted work would be if the purported fair use were to become widespread. Courts also often focus on "traditional, reasonable, or likely to be developed [by the copyright owner] markets" in order to help focus the inquiry on the economic substitution question. *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013). Sometimes courts fall prey to circular reasoning, deeming that a fair use resulted in a negative economic effect simply because the copyright owner lost out on licensing fees. But other courts have repudiated this reasoning, as it elides the very question factor four is meant to answer. Importantly, the Supreme Court has been explicit that transformative uses are unlikely to have negative market effects. *Campbell v. Acuff-Rose Music, Inc.*, 114 S. Ct. 1164, 1177-78 (1994). This is so because transformative uses, with their distinct purposes, are unlikely to act as economic substitutes for the copyrighted work. Finally, it is important to note that not all negative market effects are relevant within the fair use inquiry. For instance, parodying a song may negatively affect its market, but that effect is entirely permissible and should not be considered within factor four analyses. In fact, as some courts have pointed out, it may even be a desirable effect from a copyright law and policy perspective.

37. In my opinion, this factor strongly favors Corellium. The transformative nature of its use means that Corellium's product in no way acts as an economic substitute for Apple's products. Consumers who wish to use Apple's products for their intended purposes must continue to purchase products from Apple; Corellium's product can in no way satisfy those consumer wishes. Furthermore, even if Corellium's product decreases demand for Apple's products by, for instance, helping show Apple products to be inferior in a number of security-related ways, factor four does not concern itself with that type of market harm. In fact, this latter type of "harm" is actually the type of benefit that fair use is meant to enable, all in pursuit of copyright's overarching goal of societal progress.

38. Apple may make the argument that the Corellium product is an economic substitute for the "pre-hacked" physical research devices that the company has recently announced it will make available to limited audiences. But it is not a true substitute. One of the primary theoretical rationales for fair use is to address market failure, i.e., to allow for uses that are unlikely to occur in the market without a finding of fair use. *See* Wendy J. Gordon, *Fair Use as Market Failure: A Structural and Economic Analysis of the Betamax Case and Its Predecessors*, 89 COLUMBIA LAW REVIEW 1600 (1982). This lawsuit is a clear case of market failure that the fair use doctrine is perfectly suited to address. Apple failed in its bid to purchase Corellium the company and thereby control the Corellium product. Its "pre-hacked" devices do not approach the Corellium product in terms of functionalities or capabilities (*see* CHARLES EDGE & RICH TROUTON, APPLE DEVICE MANAGEMENT 532 (2020)), and that seems to be by design. The company appears to simply want to control which third parties investigate its technologies, only within the parameters that it sets. This approach is consistent with Apple's overall "wall-gardened" approach to technological development. Hence, the Corellium product is in no way a substitute to the Apple products, but instead provides the market with a much needed security research product beyond anything Apple is willing or capable of developing itself.

39. Courts often stick with the four factors discussed above. But the statute is clear that the four factors are non-exhaustive, and courts sometimes do include more general policy discussions within their fair use assessments. To that end, a central reason in support of Corellium's fair use argument, referenced throughout the discussion of the four fair use factors above, is that its product brings about tremendous societal benefits. Indeed, a significant purpose behind fair use, and copyright law more generally, is to allow for follow-on creativity with significant societal benefits. Corellium's use of Apple's products is just such an example. The product, rather than simply mimicking what Apple's products do, allows for research opportunities of a kind that no other existing technology provides, including Apple's own physical research devices. Corellium's product thus facilitates significant societal benefits by allowing users of its product to research and improve upon Apple's products, which hundreds of millions of people use worldwide. Indeed, by facilitating research into software security concepts more generally, Corellium's product is likely to contribute to paths of security innovation that go beyond even Apple's product ecosystem. This kind of research is of utmost importance as the use and misuse of technology skyrockets in every facet of modern life.

40. In summary, Corellium's use of Apple's products in building its own products is a quintessential fair use. Vitally, the use is highly transformative, putting Apple's products to a completely different use than the purposes for which Apple makes and sells its products. In order to bring about these transformative purposes, Corellium necessarily used portions of Apple's products, as the Corellium product would otherwise not work as intended. The Supreme Court has sanctioned uses of entire works when transformative uses demand as much. Finally and importantly, the transformative nature of Corellium's use makes quite clear that Corellium's product is in no way an economic substitute for Apple's products, including its limited physical research devices. And while Corellium's product may dissuade some consumers from purchasing Apple products (because, for instance, it shows that Apple's products are not as secure as Apple claims), the fair use test does not concern itself with such economic harms. In fact, the very purpose of fair use, and copyright more generally, is to encourage the types of creative activities in which Corellium has engaged.

**Digital Millennium Copyright Act (DMCA)**

41. Corellium's product does not run afoul of DMCA Sections 1201(a)(2) or 1201(b), as Apple claims, because (1) Corellium does not traffic in circumvention tools that enable its users to circumvent either access or copy controls within the meaning of the statute; (2) Corellium does not otherwise traffic in circumvention tools that the DMCA prohibits, as its product's primary, commercially significant, and marketed purpose is to enable high-end security research, not to circumvent access or copy controls; and (3) Corellium's fair use of Apple's products means that Corellium has not infringed Apple's copyright rights, and several important circuit court decisions have found that purported violations of the DMCA must have a nexus to a protected right under the Copyright Act. Below I provide

an overview of the DMCA, followed by my analysis and elaboration of each of these three points.

42. Enacted in 1998, the DMCA provides copyright holders with several rights. Section 1201(a)(1) prohibits third parties from circumventing technological measures that effectively control access to copyrighted works ("access controls"). Access controls are defined by stringing together several definitions from the DMCA. First, to "circumvent a technological measure" means "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." As some scholars have observed, this definition is overly broad, because, even absent extra technological protections, using any digital media for their ordinary purposes involves decrypting or descrambling the content (i.e., converting the digital content from a series of 1's and 0's into human-consumable content). *See* Timothy K. Armstrong, *Fair Circumvention*, 74 Brooklyn Law Review 1, 37 (2008). What it means to circumvent a technological measure that falls within the DMCA's scope is thus far from clear.

43. Second, a technological measure "effectively controls access to a work" if "the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." This definition is also mired in ambiguities, and courts have struggled to find a consistent interpretation of it. For instance, must a control be of a certain strength to "effectively" control access to a work? Some courts have said no. See *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294 (S.D.N.Y. 2000). Other courts, meanwhile, have determined that a technological measure does not effectively control access to a work if the work is otherwise available to a party without the need to circumvent technological measures. See *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 546-47 (6th Cir. 2004).

44. In sum, based on the statute alone, it is not entirely clear what types of access control circumventions the DMCA prohibits. However, the run-up to the DMCA's enactment, including the legislative history and treaties that the DMCA implemented, strongly indicate that the primary concern the DMCA was meant to address was copyright infringement, particularly wide-spread digital piracy. The statute itself also gives credence to this overriding concern, as it is littered with references to "protected works" under the Copyright Act, as well as other copyright concepts. *See* Timothy K. Armstrong, *Fair Circumvention*, 74 Brooklyn Law Review 1, 27-39 (2008). Consequently, courts have often interpreted the DMCA in light of that purpose. *Id.* Such an interpretation makes sense in light of copyright's overarching goal of promoting "progress of Science and useful Arts."

45. Access controls are distinct from copy controls, which are defined as "protection[s] afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof." In essence, copy controls are measures whose purpose is to prevent parties from exercising any of a copyright owner's rights in

a work (such as copying or making a derivative of the work). The DMCA does not prohibit circumventing copy controls, though it does prohibit trafficking in tools that enable others to circumvent copy controls (more on that below). Furthermore, copyright owners often merge copy and access controls in the same digital rights management system, sometimes making it impossible to circumvent one without also circumventing the other. Not surprisingly, courts have sometimes struggled to distinguish between the two types.

46. Every three years, the Librarian of Congress grants exemptions to Section 1201(a)(1)'s prohibition on circumventing access controls. Some of the more important recent ones relate to circumventing access controls to "jailbreak" phones and conduct "good-faith security research." Notably, Apple does not claim that Corellium has violated Section 1201(a)(1).

47. Section 1201(a)(2), which Apple claims Corellium violates, prohibits third parties from trafficking in tools that allow others to circumvent access controls. Unlike Section 1201(a)(1), this prohibition is not subject to the Librarian of Congress exemption process mentioned above. Because the plain language of the DMCA is not clear about what constitutes circumventing access controls, courts have often interpreted 1201(a)(2)'s trafficking ban with copyright infringement in mind. Hence, some courts have found that if the trafficked tools do not facilitate copyright infringement, then they are not the type of tool that the DMCA prohibits. *See The Chamberlain Group v. Skylink Technologies, Inc.,* 381 F.3d 1178, 1195 (Fed. Cir. 2004). Relatedly, the court in *Universal City Studios, Inc. v. Reimerdes,* 111 F. Supp. 2d 294 (S.D.N.Y. 2000) found that the DMCA prohibited trafficking in the technology in question because it allowed third parties to decrypt DVDs and thereby make unauthorized copies of them (a clear form of copyright infringement).

48. Section 1201(b), which Apple claims Corellium also violates, prohibits third parties from trafficking in tools that allow others to circumvent copy controls. This prohibition is also not subject to the Librarian of Congress exemption process mentioned above. Determining what it means to traffic in such tools involves stringing together several statutory definitions. First, to "circumvent protection afforded by a technological measure" means avoiding, bypassing, removing, deactivating, or otherwise impairing a technological measure. And a technological measure "effectively protects a right of a copyright owner under this title" if the measure, in the ordinary course of its operation, prevents, restricts, or otherwise limits the exercise of a right of a copyright owner under this title. Similar to the discussion above, the precise meaning of these provisions is not entirely clear. But the animating purpose of the DMCA suggests that they are primarily concerned with prohibiting tools that facilitate copyright infringement, particularly digital piracy.

49. In fact, the DMCA's definitions of what it means to traffic in circumvention tools provide additional support for interpreting 1201(a)(2) and 1201(b) with copyright infringement in mind. For instance, trafficking in circumvention tools is defined as when parties "manufacture, import, offer to the public, provide, or otherwise traffic in any technology,

product, service, device, component, or part thereof, that is primarily designed or produced for the purpose of circumventing" either access or copy controls; "has only limited commercially significant purpose or use other than to circumvent" either access or copy controls; or "is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing" either access or copy controls.

50. Thus, the trafficking bans only apply if the tools in question are primarily concerned with, or whose primary commercial significance lies in, circumventing either access or copy controls (or which are marketed accordingly). As discussed above, it is not entirely clear what circumventing either access or copy controls means. Nonetheless, tools that may allow for circumvention of access or copy controls, but which have primary, commercially significant, and marketed purposes beyond those capabilities fall outside the ban. Hence, Congress in enacting the DMCA clearly wished to help combat widespread digital copyright infringement, as the legislative history, treaties that the DMCA implemented, and clues within the DMCA itself suggest, and put the bans in place as part of that scheme. But the provisions' limitations also clearly indicate that not all access and copy control circumvention tools fall under their umbrella.

51. Note that Section 1201(c) indicates that "[n]othing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title." Indeed, in the DMCA's legislative history, one of the relevant committees indicated that the new law "does not amend section 107 of the Copyright Act, the fair use provision," because "section 107, as written, is technologically neutral, and therefore, the fair use doctrine is fully applicable in the digital world as in the analog world." Report of the Senate Comm. on the Judiciary, S. Rep. No. 105-190, at 23-24 (1998).[1]

---

[1] Finally, note also that the DMCA includes a number of specific exemptions to the prohibition on trafficking in circumvention tools. Under Section 1201(f)(2)-(3), a person may "develop and employ technological means to circumvent" access and copy controls pertaining to a lawfully obtained copy of a computer program in order to achieve interoperability of an independently created computer program with other programs, notwithstanding 1201(a)(2) and 1201(b). Such persons may also provide those means to others so long as they do so in order to enable interoperability as provided in 1201(f). Under Section 1201(g)(4), parties may, despite 1201(a)(2), "develop and employ technological means to circumvent" access controls, and provide those means to others, so long as the sole purpose relating to such activities is to perform or verify one's acts of "good faith encryption research," as further defined under 1201(g)(2). And under Section 1201(j)(4), parties may develop and distribute technological means for the sole purpose of performing security testing, in spite of Section 1201(a)(2)'s prohibition on trafficking in access control circumvention tools. The term "security testing" is defined as "accessing a computer, computer system, or computer network, solely for the purpose of good faith testing, investigating, or correcting, a security flaw or vulnerability, with the authorization of the owner or operator of such computer, computer system, or computer network." This report does not examine these exceptions' applicability to Apple's claims.

52. With this overview in mind, it is my opinion that Corellium's product does not violate Sections 1201(a)(2) and 1201(b), per Apple's lawsuit. Below I provide an analysis of three reasons why the DMCA's prohibitions do not apply to Corellium's product.

53. First, Corellium does not traffic in circumvention tools because its product does not enable its users to circumvent either access or copy controls within the meaning of the statute. Corellium's product only enables its users to conduct high-end security research relating to Apple's products in an environment constrained by that purpose. For instance, Corellium users cannot gain unfettered access to Apple's products through the Corellium product. Nor can they use the Corellium product to make unrestricted copies of Apple's products, modify them as they see fit, distribute them to others, or publicly perform or display them. In other words, Corellium's product is not a decryption technology that allows its users to access Apple's products in a way that facilitates copyright infringement. Instead, users can only use the Corellium product to conduct high-end security research relating to the Apple products. And that research must occur within the confines of Corellium's product.

54. Apple's iOS-related products, in fact, are widely available on the Internet for download, which availability some courts have found to bar certain claims under the DMCA. For instance, the Sixth Circuit in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004) found that the defendant had not violated the DMCA's ban on trafficking in tools that enable circumvention of access controls because the technological measures did not actually control access to the relevant copyrighted works; the copyrighted works were available to anyone that purchased a printer containing them. The technological measures' true purpose was to protect the plaintiff's commercial interests by preventing others from competing with the plaintiff in selling printer cartridges. In other words, the controls' purpose had nothing to do with access to the copyrighted works except for the purpose of preventing competition. Hence, even though the defendant circumvented technological measures for a purpose of which the plaintiff disapproved, the fact that the copyrighted works were otherwise available defeated the plaintiff's DMCA claim under 1201(a)(2). Similarly here, Apple's iOS-related products are widely available for download. Apple may claim that the controls it uses on its products are meant to prevent access to its products, but the widespread availability of its products suggests otherwise. Apple simply does not like how Corellium is using its products. But that is not an absolute protection that the DMCA grants the company.

55. In providing its product to users, Corellium, rather than its users, may have needed to bypass access and copy controls to Apple's products. This report does not analyze whether Corellium has, in fact, done so, because that question is not directly at issue. But it is relevant to Apple's claim. For instance, as discussed above, the DMCA does not restrict Corellium from circumventing Apple's copy controls. Nor does the DMCA restrict

Corellium from circumventing access controls for a number of reasons, including in order to "jail-break" iPhones and conduct "good-faith security research" on Apple's products.

56. Knowing that Corellium is free to circumvent its access and copy controls for these and other reasons, Apple has not pressed claims under Section 1201(a)(1). Instead, the company has attempted to invent a new cause of action under Sections 1201(a)(2) and (b) by shoehorning activities permitted under Section 1201(a)(1) and the rest of the DMCA into Sections 1201(a)(2) and (b). But those sections were meant to stop parties from providing third parties with tools that enable illegitimate access to and piracy of copyrighted works. Corellium's product simply does not provide its users with such capabilities.

57. Second, Corellium does not traffic in circumvention tools within the DMCA's meaning because its product's primary, commercially significant, and marketed purpose is to enable high-end security research, not circumvention of either access or copy controls. Consequently, the Corellium product does not meet the conditions set forth in Sections 1201(a)(2) and 1201(b). For instance, Corellium's product is not "primarily designed or produced for the purpose of circumventing [access controls] to a work protected under [the Copyright Act]." 17 U.S.C. 1201(a)(2)(A). The primary purpose of Corellium's product is to enable high-end security research. It is not to enable access to Apple's copyrighted works that users do not otherwise enjoy. It thus makes no sense to claim that the Corellium product's primary purpose is to help others circumvent access controls to Apple's iOS, iTunes, and GUI Elements so that users are now able to enjoy those products without paying Apple for them. In fact, Apple makes its iOS and iTunes products widely available for download, as discussed above. The Corellium product does not provide access to those works in a way that allows them to be used for their normal purposes. Instead, the Corellium product's primary, and only, purpose is for high-end security research.

58. Comparing Corellium's product with those that are more clearly within the scope of this subsection drives home this point. For instance, the clear intent of Section 1201's prohibitions on circumvention was to stop piracy. See 144 Cong. Rec. H7093, H7094-5 (Aug. 4, 1998); Senate Judiciary Comm., S. Rep. 105-190 (1998) at 29; Judiciary Comm., H. Rep. 105-551 Pt 1 (1998) at 18; House Commerce Comm., H. Rep. 105-551 Pt 2 (1998) at 38. As part of that effort, Congress put in place Sections 1201(a)(2) and (b)'s bans on trafficking in tools that help defeat anti-piracy technologies. Piracy has nothing to do with Corellium's purposes; the company's product does not enable its users to get free access to an actual iPhone or other Apple product. Its product's sole purpose, as discussed above, is security research, and users of its product are strictly limited to that purpose.

59. It might be argued that the Corellium product's primary purpose is to circumvent access controls, because circumventing access controls is necessary to use the product as intended. But that argument has at least two problems. First, even if the Court found that the Corellium product enables circumvention of access controls, that purpose is clearly

subservient to the product's primary purpose – high-end security research. Hence, it would still be inaccurate to describe the tool's primary purpose as circumventing access controls; if anything, that purpose, to the extent applicable, is a means to an end. Second and related, that very argument also shows that the product's primary purpose has nothing to do with copyright infringement or digital piracy, the DMCA's animating rationales.

60. Corellium's product also has more than a "limited commercially significant purpose or use other than to circumvent [access controls] ... to a work protected under [the Copyright Act]." 17 U.S.C. 1201(a)(2)(B). As discussed above, it is quite clear that the Corellium product's commercial significance has nothing to do with allowing third parties to circumvent access controls so that those parties can use Apple products as they wish. Instead, the Corellium product's commercially significant purpose centers exclusively on allowing users to conduct high-end security research. Again, even if circumvention of access controls is a purpose of the Corellium product (a dubious proposition for the reasons discussed above), the Corellium product clearly has much more commercially significant purposes than simple circumvention of access controls. Users of the Corellium product are not purchasing it in order to gain unfettered access to Apple's products. Instead, users license the Corellium product for its commercially significant research uses.

61. Corellium's product is also not "marketed ... for use in circumventing [access controls] to a work protected under [the Copyright Act]." 17 U.S.C. 1201(a)(2)(C). Again, Corellium does not market its product as a means to circumvent Apple's access controls so that third parties can gain access to and use Apple's products without paying Apple. As discussed above, Apple's products are widely available for download all across the Internet. Corellium's product does not enable piracy or illegitimate access; it enables high-end security research. And Corellium naturally markets its product accordingly.

62. Moving on to 1201(b), Corellium's product is not "primarily designed or produced for the purpose of circumventing [copy controls] in a work or portion thereof." 17 U.S.C. 1201(b)(1)(A). Similar to the analysis above, the primary purpose of the Corellium product is not to enable evasion of copy controls so that third parties can pirate Apple's products, modify them, distribute them to others, and publicly perform and display them, all without paying Apple. As is quite clear, the primary, and only, purpose of the Corellium product is to allow its users to conduct high-end security research.

63. Again, even if the Court were to find that the Corellium product enables circumvention of copy controls, that purpose is still only a means to an end: high-end security research, the product's primary purpose. The DMCA does not prohibit all types of tools that enable circumvention of access and copy controls, only those without important, commercially significant purposes. Corellium's product simply does not meet the DMCA's requirements.

64. Corellium's product also has more than a "limited commercially significant purpose or use other than to circumvent [copy controls] ... in a work or portion thereof." 17 U.S.C. 1201(b)(1)(B). The analysis under this subsection is similar to that provided above under 1201(a)(2)(B). It is clearly not the case that Apple is worried about the Corellium product because Apple fears that it will be used to displace its products in the marketplace. In fact, Apple makes its products widely available, as discussed throughout. Instead, Apple appears to be worried about Corellium's product precisely because it realizes that the product's primary commercial significance – allowing for high-end security research – may not align with its preferences.

65. Corellium's product is also not "marketed ... for use in circumventing [copy controls] in a work or portion thereof." 17 U.S.C. 1201(b)(1)(C). The analysis under this subsection is similar to that provided above under 1201(a)(2)(C). Corellium does not market its product as a means by which to circumvent Apple's copy controls so that third parties can do what they will with Apple's products. It makes no sense that Corellium would market its product in that way, because that's not what its product enables. For instance, Corellium's product does not allow third parties to modify and distribute Apple's products as the users see fit. Understandably, then, Corellium does not market its products for such uses. Instead, Corellium markets its product for its sole purpose: conducting high-end security research.

66. In sum, as noted copyright scholar David Nimmer has indicated, "[b]y its limited application to works that are designed for infringement or have only limited commercial significance other than to infringe, the ban on trafficking 'is designed to protect copyright owners, and simultaneously allow the development of technology.' Thus, it is 'not aimed at products that are capable of commercially significant noninfringing uses.'" David Nimmer, *A Riff on Fair Use in the Digital Millennium Copyright Act*, 148 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 687-89 (2000) (quoting the DMCA's legislative history, which indicates that 1202(b)'s ban is subject to similar limitations). Corellium's product is not intended for facilitating illegal access or infringement, but instead is squarely focused on allowing security research. Indeed, even if a court were to find that the product enables its users to circumvent access and copy controls (a dubious conclusion for the reasons stated above), it is still simply not the case that those purposes are the primary, commercially significant purposes for which Corellium markets its product. If relevant, they are at most merely means to the Corellium product's research ends. The product is thus clearly outside of Sections 1201(a)(2) and (b)'s scope.

67. Third, Corellium's product is outside the scope of the DMCA's prohibitions because the product enables a fair use of Apple's products (as discussed above), and courts in several circuits have found that purported violations of the DMCA must have a nexus to a protected right. Hence, even if the Court were to find that Corellium otherwise meets the standards under Sections 1201(a)(2) and (b), the Corellium product is free from liability under the DMCA because of the fair use that it enables.

17

68. For instance, courts in several circuits have found that purported violations of the DMCA, including the anti-trafficking bans under Sections 1201(a)(2) and (b), must relate to copyright infringement. As the Federal Circuit in *The Chamberlain Group v. Skylink Technologies, Inc.*, 381 F.3d 1178, 1195 (Fed. Cir. 2004) held, the "[s]tatutory structure and legislative history both make clear that Section 1201 applies only to circumventions reasonably related to protected rights." Hence, those "whose circumvention devices do not facilitate infringement are not subject to Section 1201 liability" because of "the significant differences between defendants whose accused products enable copying and those . . . whose accused products enable only legitimate uses of copyrighted software." *Id.* at 1195, 1198. As discussed above, this interpretation gains additional support when considering that the plain text of the DMCA's trafficking bans only apply to devices whose primary purpose and commercial significance is to evade access and copy controls and thereby commit copyright infringement (and which are advertised for such purposes). *See* David Nimmer, *A Riff on Fair Use in the Digital Millennium Copyright Act*, 148 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 687-89 (2000). The Corellium product is far from such a device.

69. The *Chamberlain* decision concerns the Federal Circuit's application of Seventh Circuit law. In addition to the Seventh Circuit, courts applying First Circuit law have also found that violations of the DMCA must have a nexus to a protected right under the Copyright Act. *See Storage Tech. Corp. v. Customer Hardware Engineering & Consulting, Inc.*, 421 F.3d 1307 (2005) (applying First Circuit law). Courts applying Seventh Circuit law have also pointed to Second Circuit case law as supporting their interpretation of the DMCA. *See The Chamberlain Group v. Skylink Technologies, Inc.*, 381 F.3d 1178, 1197-1202 (Fed. Cir. 2004). Because Corellium's use of Apple's products is a quintessential fair use of them, there is no protected right at play, and thus no nexus to one. There is, consequently, also no violation of the DMCA.

70. These holdings also make sense in light of Section 1201(c)'s admonition that "[n]othing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title." The DMCA's legislative history also reinforces the meaning of this subsection by indicating that the fair use defense is just as applicable in the digital world as in an analog one.

71. In sum, Corellium's product does not violate Sections 1201(a)(2) or (b), because the Corellium product is, quite simply, not a tool that users can utilize to bypass access and copy controls within the meaning of the statute. Apple has attempted to use Sections 1201(a)(2) and (b) to prohibit what Corellium is clearly permitted to do under Section 1201(a)(1), the rest of the DMCA, and copyright law more generally. In fact, the Corellium product's primary, commercially significant purpose is to enable high-end security research, not evasion of access or copy controls. And that is precisely how Corellium markets the product; doing otherwise would make no sense given the Corellium product's actual uses. This case is far from the types of anti-piracy defeating tools Congress envisioned when it enacted the DMCA's trafficking bans. And even if the Court were to find that Corellium's product otherwise satisfies Sections 1201(a)(2) and (b)'s conditions,

it must still grapple with Section 1201(c), the DMCA's legislative history, and significant court decisions in multiple circuits indicating that legitimate uses of copyrighted works fail to trigger the DMCA's prohibitions.

**Copyright Misuse**

72. Finally, Apple's assertion of copyright in this case is copyright misuse because (1) the company's assertions undermine the public policy behind the grant of copyright by seeking to prevent a clear fair use of its copyrighted works and thereby provide Apple with greater legal protection than copyright is meant to afford; and (2) Apple is attempting to use its copyright rights to gain control over properties and areas that its copyright grants do not cover. Because of this misuse of its copyrights, Apple is unable to enforce its copyrights against Corellium. Below I first provide a brief overview of the copyright misuse defense, followed by a more detailed analysis of how it applies to the instant case.

73. Copyright misuse is a common law doctrine that several federal circuit courts have endorsed. While the Eleventh Circuit "has not [clearly] recognized . . . misuse as a defense for infringement suits," neither has it rejected it. *Telecom Tech. Servs. Inc. v. Rolm Co.*, 388 F.3d 820, 831 (11th Cir. 2004). District courts in the Eleventh Circuit have thus entertained and even recognized the viability of the copyright misuse doctrine in a number of cases. *See, e.g., PK Studios, Inc. v. R.L.R. Investments, LLC,* Case No. 2:15-cv-389-FtM-99CM (M.D. Florida 2016); *Home Design Services, Inc. v. Park Square Enterprises, Inc.* 2005 WL 1027370 (M.D. Florida 2005) ("[T]he Court recognizes copyright misuse as a viable defense to copyright infringement.").

74. Copyright misuse comes in two basic strands. One strand treats copyright misuse as a means to police parties that attempt to use their copyright rights in a manner that violates antitrust law. In these cases, courts rely on antitrust law's rules to assess the purported misconduct. But several courts, including those behind some of the leading copyright misuse decisions, have rejected this limited approach because it would mean the doctrine simply replicates antitrust law. Instead, in the second strand, courts have gone beyond antitrust law to indicate that the copyright misuse doctrine prevents copyright owners from using their rights "in a manner violative of the public policy embodied in the grant of a copyright." *Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970, 978 (4th Cir. 1990). Hence, the copyright misuse doctrine "forbids a copyright holder from using a copyright to 'secure an exclusive right or limited monopoly not granted by the Copyright Office and which it is contrary to public policy to grant.'" *Home Design Servs., Inc. v. Hibiscus Homes of Fla., Inc.*, 2005 WL 3445522 1, 10 (M.D. Florida 2005) (quoting *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 792 (5th Cir. 1999)); and it "bar[s] recovery for a copyright owner who attempts to extend its limited copyright rights to property not covered by the copyright." *Id.* In this second strand of the copyright misuse doctrine, courts may still sometimes apply the defense on the basis of perceived anti-competitive effects. But even when courts do so, they do not require demonstration of market power or asses the

complained-of behavior's actual effects on competition, because those are requirements of antitrust law, not the copyright misuse doctrine.

75. Hence, in this broader view of the copyright misuse doctrine, leading commentators have indicated that copyright misuse is "applicable where litigation is threatened in an effort to extract a licensing fee or other profit when there is no reasonable basis for supposing that the threatener's copyright has been infringed." William F. Patry & Richard A. Posner, *Fair Use and Statutory Reform in the Wake of Eldred*, 92 CALIFORNIA LAW REVIEW 1639, 1658-59 (2004). In other words, the "intent and effect of such behavior are to give the copyright owner more legal protection than copyright law is designed to do," including by way of "[e]xaggerating the substantive rights of a copyright owner by denying in effect the fair use privilege." *Id.*

76. Some of the classic copyright misuse cases deal with copyright owners using restrictive licensing terms to enlarge their rights beyond what copyright permits. *See* Brett Frischmann & Dan Moylan, *The Evolving Common Law Doctrine of Copyright Misuse: A Unified Theory and Its Application to Software*, 15 BERKELEY TECHNOLOGY LAW JOURNAL 865, 888-93 (2000) (summarizing these classic cases). The doctrine does not prevent copyright owners from "using conditions to control use of copyrighted material, but it does prevent copyright holders from using the conditions to stifle competition." *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150 (9th Cir. 2011). Hence, in several of the classic cases, courts found that the plaintiffs had misused their copyright rights because they attempted to leverage their copyrights to prevent others from developing and using products that competed with their own.

77. In the instant case, Apple's assertion is copyright misuse for at least two reasons. First, Apple is misusing its copyrights because the company's assertions undermine the public policy behind the grant of copyright by seeking to prevent a clear fair use of its copyrighted works and thereby provide Apple with greater legal protection than copyright is meant to afford the company. Apple seeks with its lawsuit to prevent unsanctioned research of security vulnerabilities in its software. But as discussed above, Corellium's use of Apple's copyrighted works for this purpose is a fair use of the products. The "intent and effect" of Apple's behavior are thus to afford Apple with more legal protection than its copyright rights provide. Indeed, allowing Apple to enforce its copyright against parties such as Corellium would undermine the public policy behind the grant of copyright, which is precisely what the copyright misuse doctrine is meant to guard against. It would violate that public policy because, as discussed in paragraphs 5 and 6 above, copyright's goal is societal progress, and both its grant of rights and limitations are vital to achieving that goal. Using its copyrights in an attempt to deny a clear fair use of its products, a use that in no way harms its economic rights under copyright, thus violates the public policy behind copyright.

78. Indeed, Apple's lawsuit does not appear to be motivated by a desire to safeguard the ongoing commercial viability of its products. Corellium's product, after all, is in no way a

replacement for any of the products that Apple sells to everyday consumers. Instead, Apple appears to simply wish to have absolute control over how its products are used. But while Apple is free to impose restrictions on the use of its copyrighted materials to protect its economic interests, its copyright rights do not provide the company with unfettered control over its products, as the fair use doctrine and other limitations on copyright make clear. The copyright misuse doctrine is meant to help preserve that intended balance.

79. Second, Apple's assertions of copyright against Corellium constitute copyright misuse because Apple is attempting to use its copyright rights to gain control over properties and areas that its copyright grants do not cover. After all, Apple's copyright assertions, if enforced, would effectively mean that it controls the market for research and testing tools relating to its products, including technologies such as Corellium's that cost millions of dollars to develop. This control over such products would arise if Apple were able to enforce its copyright rights against the likes of Corellium because it is literally impossible to build such tools without utilizing Apple's copyrighted materials for the limited purposes that Corellium does.

80. But by design, copyright does not grant its holders such vast powers. Indeed, as the Supreme Court has stated, the "primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and the useful Arts.' Art. 1, § 8, cl. 8." *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 349 (1991). The copyright misuse doctrine furthers that purpose by preventing copyright holders from enforcing their rights in ways that would grant them power over things for which their grant of copyright was not intended.

81. The deleterious societal effects of allowing Apple to enforce its copyrights against the likes of Corellium come into sharper focus when considering that the security risks relating to technologies such as Apple's have never been greater. There has, therefore, never been a greater need to build tools to combat those risks. Allowing Apple to enforce its copyright in the instant case would severely undermine society's ability to protect itself against such threats, effectively leaving Apple as the sole safeguard against them. Fortunately, the copyright misuse doctrine is meant to stop such circumstances from arising by preventing copyright holders from using their copyright rights to gain control over areas outside the scope of their copyright grant.

82. Apple has announced that it will soon make available limited devices for security research purposes. But it will undoubtedly control who is able to have access to such devices. Nor will those devices provide as many capabilities as the Corellium product, as the market response to the Corellium product shows. Indeed, the recency of their introduction – around the time the Corellium lawsuit was instituted – may suggest ulterior motives. But even assuming that Apple is sincerely worried that the Corellium product competes with its limited research devices, the copyright misuse doctrine prevents Apple from leveraging

its copyrights to control that market and its associated technologies, including Corellium's product.

83. In sum, Apple's assertions of copyright in this case constitute copyright misuse for at least two reasons. First, its assertions violate the public policy behind copyright by seeking to deny a clear fair use of its products and thereby extend its rights to effectively swallow copyright's constitutionally grounded limitations. Second, the company's copyright assertions seek to extend Apple's control over areas and property for which its copyright rights were not intended. Allowing Apple to misuse its copyright in these ways would undermine the very purposes for which Congress was authorized to enact copyright laws.

**The facts or data considered by the witness in forming them.**

84. My opinions stated above are based on a number of sources of facts and data.

85. First, I have taught copyright law in law schools since 2012, and those classes include coverage of fair use, the DMCA, and copyright misuse. My general familiarity with these doctrines from having taught them for nearly a decade are thus a substantial basis for my opinions in this report.

86. My opinions relating to the case's fair use questions are largely based on the statutory language, relevant Supreme Court decisions, and an empirical study that I conducted reviewing every fair use decision published by Westlaw between early 1991 and the end of 2017. *See* Clark D. Asay, *Is Transformative Use Eating the World?*, 61 BOSTON COLLEGE LAW REVIEW (forthcoming 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3332682. My analysis of the fair use question earlier in this report also includes a number of internal citations, which cited materials also informed my opinions in this report.

87. My opinions relating to the case's DMCA questions are largely based on reading the statutory language and various cases' interpretation of that language, as cited to earlier in this report. I have also consulted law review articles on the topic, most prominently Timothy K. Armstrong, *Fair Circumvention*, 74 BROOKLYN LAW REVIEW 1 (2008); and David Nimmer, *A Riff on Fair Use in the Digital Millennium Copyright Act*, 148 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 673 (2000).

88. My opinions relating to the copyright misuse doctrine are largely based on a reading of relevant case law in various circuits, including the Eleventh, as well as several law review articles summarizing the doctrine's historical development. These include Brett Frischmann & Dan Moylan, *The Evolving Common Law Doctrine of Copyright Misuse: A Unified Theory and Its Application to Software*, 15 BERKELEY TECHNOLOGY LAW JOURNAL 865, 888-93 (2000); William F. Patry & Richard A. Posner, *Fair Use and Statutory Reform in the Wake of Eldred*, 92 CALIFORNIA LAW REVIEW 1639, 1658-59 (2004), both of which are cited to above; Michael A. Rosenhouse, *Sufficiency of Copyright Misuse Defense to Allegations*

*of Copyright Infringement Pursuant to Federal Copyright Law*, 185 A.L.R. FED. 123 (2003); and WILLIAM F. PATRY, 5 PATRY ON COPYRIGHT § 17:128 (Sept. 2019 Update).

**Any exhibits that will be used to summarize or support them.**

89. First, Corellium's use of Apple's products is a fair use of them because: (1) Corellium's use is for research, comment, criticism, and scholarship purposes, all of which are highly favored purposes under the fair use doctrine; (2) Corellium's use is highly transformative because Corellium uses the Apple products for an entirely distinct purpose from the purposes for which Apple built the products, in an entirely different setting together with vast amounts of socially beneficial technology that Corellium has independently created; (3) Apple's products are highly functional in nature, meaning that the scope of copyright for them is thinner than in other contexts, and third parties such as Corellium have greater leeway in making use of them, particularly when those uses are transformative; (4) Corellium has only taken as much of Apple's products as is necessary to carry out its transformative, socially beneficial purposes; and (5) Corellium's highly transformative use of the Apple products in no way competes with or undermines the market for Apple's products in a manner that copyright law countenances.

90. Second, Corellium's product does not run afoul of DMCA Sections 1201(a)(2) or 1201(b), as Apple claims, because (1) Corellium does not traffic in circumvention tools that enable its users to circumvent either access or copy controls within the meaning of the statute; (2) Corellium does not otherwise traffic in circumvention tools that the DMCA prohibits, as its product's primary, commercially significant, and marketed purpose is to enable high-end security research, not to circumvent access or copy controls; and (3) Corellium's fair use of Apple's products means that Corellium has not infringed Apple's copyright rights, and several important circuit court decisions have found that purported violations of the DMCA must have a nexus to a protected right under the Copyright Act.

91. Finally, Apple's assertion of copyright in this case is copyright misuse because (1) the company's assertions undermine the public policy behind the grant of copyright by seeking to prevent a clear fair use of its copyrighted works and thereby provide Apple with greater legal protection than copyright is meant to afford; and (2) Apple is attempting to use its copyright rights to gain control over properties and areas that its copyright grants do not cover. Because of this misuse of its copyrights, Apple is unable to enforce its copyrights against Corellium.

**The witness's qualifications, including a list of all publications authored in the previous 10 years.**

92. Below I provide a list of my academic publications.

93. **Articles and Essays:** *Rethinking Copyright Harmonization* (work-in progress, currently under review); *Is Transformative Use Eating the World?*, 61 BOSTON COLLEGE LAW REVIEW

(forthcoming 2020); *Artificial Stupidity*, 61 WILLIAM & MARY LAW REVIEW (forthcoming 2020); *Patent Schisms*, 104 IOWA LAW REVIEW 45 (2018); *Saving Software's Fair Use Future*, 31 HARVARD JOURNAL OF LAW & TECHNOLOGY 535 (2018) (with Pamela Samuelson); *Patenting Elasticities*, 91 SOUTHERN CALIFORNIA LAW REVIEW 1 (2017); *Patent Pacifism*, 85 GEORGE WASHINGTON LAW REVIEW 101 (2017); *Transformative Use in Software*, 69 STANFORD LAW REVIEW ONLINE (2017); *Software's Copyright Anticommons*, 66 EMORY LAW JOURNAL 265 (2017); *The Informational Value of Patents*, 31 BERKELEY TECHNOLOGY LAW JOURNAL 259 (2016) (selected for inclusion in the 2017 Intellectual Property Law Review, an anthology published annually by Thomson Reuters (West) of the best law review articles related to intellectual property law within the last year); *Intellectual Property Law Hybridization*, 87 UNIVERSITY OF COLORADO LAW REVIEW 65 (2015); *Copyright's Technological Interdependencies*, 18 STANFORD TECHNOLOGY LAW REVIEW 189 (2015); *Enabling Patentless Innovation*, 74 *Maryland Law Review* 431 (2015) (reprinted in INTELLECTUAL PROPERTY AND INNOVATION (Shubha Ghosh, ed. 2017)); *Ex Post Incentives and IP in* Garcia v. Google *and Beyond*, 67 STANFORD LAW REVIEW ONLINE 37 (2014); *A Case for the Public Domain*, 74 OHIO STATE LAW JOURNAL 753 (2013); Kirtsaeng *and the First-Sale Doctrine's Digital Problem*, 66 STANFORD LAW REVIEW ONLINE 17 (2013); *Consumer Information Privacy and the Problem(s) of Third-Party Disclosures*, 11 NORTHWESTERN JOURNAL OF TECHNOLOGY & INTELLECTUAL PROPERTY 321 (2013); *The General Public License Version 3.0: Making or Breaking the FOSS Movement?*, 14 MICHIGAN TELECOMMUNICATIONS & TECHNOLOGY LAW REVIEW 265 (2008) (reprinted in OPEN SOURCE SOFTWARE AND COMMON CONCERNS 73 (A.G. Aravind Reddy ed., 2009)).

94. **Solicited Works:** *Risk Taking and Rights Balancing in Intellectual Property Law*, 53 AKRON LAW REVIEW (forthcoming 2020) (invited contribution to the Law Review's annual IP Scholar's Roundtable Symposium); *Independent Creation in a World of AI*, 14 FLORIDA INTERNATIONAL UNIVERSITY LAW REVIEW (forthcoming 2020) (invited contribution to the Law Review's symposium on intelligent entertainment); *The Informational Effects of Patent Pledges, in* PATENT PLEDGES - GLOBAL PERSPECTIVES ON PATENT LAW'S PRIVATE ORDERING FRONTIER (2017) (invited contribution to book on patent pledges); *Keeping Low Sanctions Low*, 66 FLORIDA LAW REVIEW FORUM 5 (2015) (invited response to Irina D. Manta, *The High Costs of Low Sanctions*, 66 FLORIDA LAW REVIEW 157 (2015)); *Does Innovation Mean Patent Licensing Demands?*, 101 IOWA LAW REVIEW ONLINE 74 (2016) (invited response to Robin Feldman & Mark A. Lemley, *Do Patent Licensing Demands Mean Innovation?*, 101 IOWA LAW REVIEW 137 (2015)).

**A list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition.**

95. None.

**A statement of the compensation to be paid for the study and testimony in the case.**

96. Three hundred and seventy-five dollars ($375) per hour, plus reimbursement of reasonable and necessary expenses.

97. I reserve the right to supplement my declarations and opinions herein based on new information.

I declare under penalty of perjury that the foregoing is true and correct. Executed on ___2/24/20___.


Clark Asay