UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO: 9:19-cv-81160-RS

APPLE INC.,

      Plaintiff,

v.

CORELLIUM, LLC,
      Defendant.

_____/

**DEFENDANT CORELLIUM, LLC'S MEMORANDUM IN OPPOSITION TO
PLAINTIFF APPLE INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

I.      Summary of Argument ................................................................................................... 1

II.     Statement of Material Facts ........................................................................................... 2

        A.      APPLE DISTRIBUTES IOS ONLINE, FREE AND UNENCRYPTED ............................ 2

        B.      CORELLIUM SELLS A TOOL THAT ENABLES ITS USERS TO CONDUCT
                HIGH-END SECURITY RESEARCH .................................................................... 3

III.    Arguments and Authorities ........................................................................................... 3

        C.      Legal Standard ............................................................................................... 3

                1.      Standard .............................................................................................. 3

                2.      Digital Millennium Copyright Act ...................................................... 4

        D.      APPLE'S FREE UNENCRYPTED DISTRUBUTION OF IOS ONLINE WITH
                ZERO TECHNOLOGICAL MEASURES IS FATAL TO ITS DMCA CLAIMS ........... 5

                1.      Under 1201(a) iOS Object Code is Accessed when an IPSW is Downloaded,
                        Unencrypted, from Apple ...................................................................... 5

                2.      No Technological Measures Prevent the Public from Copying, Editing,
                        Distributing, Performing, or Displaying the Contents of an IPSW file ................ 7

        E.      APPLE'S ALLEGED TCMS ARE NOT IN THE IPSW DISTRIBUTED ONLINE ........ 8

        F.      EVEN IF APPLE'S TCMS EXISTED IN THE IPSW AND WERE EFFECTIVE,
                THEY WOULD ACTIVATE AFTER ACCESS, COPYING, AND USE ..................... 11

        G.      APPLE HAS FAILED TO PROVE THAT CORELLIUM "TRAFFICS" IN
                CIRCUMVENTION
                TOOLS ........................................................................................................... 13

        H.      APPLE'S FAILURE TO MOVE FOR SUMMARY JUDGEMENT ON ITS
                INFRINGEMENT CLAIM IS ALSO FATAL TO ITS MOTION ................................ 14

        I.      APPLE'S POSITION WOULD LEAD TO THE DEATH OF FAIR USE ..................... 16

        J.      CORELLIUM IS ENTITLED TO A FAIR USE DEFENSE ...................................... 17

i

K.     CORELLIUM'S DEFENSES UNDER SECTIONS 1201(F), (G), AND (J) ARE VALID AND IN MATERIAL DISPUTE ....................................................................................... 17

     1.     Reverse Engineering, 1201(f) ............................................................. 18

     2.     Security Testing and Encryption Research, 1201(g), (j) .................................... 19

L.     APPLE CAUSED CORELLIUM TO SPEND SUBSTANTIAL MONEY AND TIME AND SHOULD BE ESTOPPED FROM ASSERTING THE DMCA ........................... 19

IV.     Conclusion .................................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*Allen v. Tyson Foods, Inc.*,
   121 F.3d 642 (11th Cir. 1997) ................................................................4

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................3

*Apple, Inc. v. Psystar Corp.*,
   673 F. Supp. 2d 931 (9th Cir. 2009) .......................................................7

*Bateman v. Mnemonics, Inc.*,
   79 F.3d 1532 1539 ....................................................................5, 6, 12

*Chamberlain Grp., Inc. v. Skylink Techs., Inc.*,
   381 F.3d 1178 (Fed. Cir. 2004)....................................................... *passim*

*Fed. Deposit Ins. Corp. v. Harrison*,
   735 F.2d 408 (11th Cir. 1984) ...............................................................19

*Garcia v. Vanguard Car Rental USA, Inc.*,
   540 F.3d 1242 (11th Cir. 2008) .............................................................15

*HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*,
   240 F.3d 982 (11th Cir. 2001) .................................................................3

*HGI Assocs., Inc. v. Wetmore Printing Co.*,
   427 F.3d 867 (11th Cir. 2005) ...............................................................19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   387 F.3d 522 (6th Cir. 2004) ......................................................... *passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)................................................................................4

*MDY Ind's, LLC v. Blizzard Entertainment, Inc.*,
   629 F.3d 928 (9th Cir. 2010) .................................................................15

*NNG, KFT. v. AVA Enterprises, Inc.*,
   2015 WL 5442725 (C.D. Cal. July 8, 2015)..........................................13

*Nordstrom Consulting, Inc. v. M & S Techs., Inc.*,
   2008 WL 623660 (N.D. Ill. Mar. 4, 2008)............................................15

*Online Policy Group v. Diebold, Inc.*,
   337 F. Supp. 2d 1195 (N.D. Cal. 2004) .................................................15

*Sega Enterprises Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir.1992) ........................................................................6

*Suntrust Bank v. Houghton Mifflin Co.*,
    268 F.3d 1257 (11th Cir. 2001) .................................................................16

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001)........................................................................16

**Statutes**

17 U.S.C. §§ 101 ................................................................................................4

17 U.S.C. § 102 ..................................................................................................4

17 U.S.C. § 106 .......................................................................................4, 12, 15

17 U.S.C. §§ 107 ................................................................................................4

17 U.S.C. § 1201 ...................................................................................... *passim*

**Rules and Regulations**

Fed. R. Civ. Pro. Rule 56 ...................................................................................1

Local Rule 56.1 ...................................................................................................1

**Reports**

H.R. Rep. 105–551(II), (1998)..........................................................................15

S. REP. 105-190 (1998) ......................................................................................6

**Other Authorities**

David Nimmer, *A Riff on Fair Use in the Digital Millennium Copyright Act*,
    PA L. REV. 673, 687-89 (2000) ...................................................................15

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, Defendant Corellium, LLC ("Corellium") hereby opposes Plaintiff Apple Inc.'s ("Apple") Motion for Partial Summary Judgment, ECF No. 453, (the "Motion" or "Mot.").

## I.    SUMMARY OF ARGUMENT

Corellium's product neither circumvents nor enables any of its users to circumvent a single one of Apple's alleged technological control measure ("TCM"). Apple's alleged TCMs protect iOS on an iPhone or iPad only. The IPSW file that Apple makes freely available separately online is left completely unencrypted, unprotected, unlocked, and out in the open for the public to access, copy, edit, distribute, perform, and display. Relying on its own Software License Agreement ("SLA") and circular logic, Apple expects people to assemble the TCMs found only in the iPhone and thus retroactively lock themselves out of the IPSW file that they already have the ability to access, copy, edit, distribute, perform, and display. There are no TCMs in an IPSW.

Apple makes four main legal errors in its Motion, each one of which is fatal to Apple's Motion. *First*, Apple stretches the meaning of the term "access" to include everything that one can do with a computer program, including running it and interacting with the results of the execution of code. The meaning of access is much narrower. *Second*, Apple conflates the restrictions in its own SLA with the copyrights protected under Title 17. Apple cannot use the DMCA to secure for itself extra property rights that the Copyright Act does not convey. *Third*, Apple frames its analysis of "effective" TCMs under the DMCA around the TCMs that protect an iPhone. But the correct frame of analysis is the TCMs that prevent access to the IPSW file, containing iOS, that Apple distributes online, for free, and without any protection whatsoever. And *fourth*, Apple did not move for summary judgment on its claim of infringement, which alone is fatal to Apple's DMCA claim.

Furthermore, Apple's argument relies entirely on the false premise that it presents in its opening sentence—one that embodies the very core dispute in this matter: "Corellium's business is selling virtual iPhones." Mot. at 1. The statement is not just materially disputed, it is patently false. Corellium sells a high-end security research platform. That platform, which includes a suite of security research tools, is capable of running portions of iOS with limited functionality in an environment that is only suitable for such research. The platform is not, however, usable as a substitute for a smartphone or tablet computer. Apple makes this false comparison because all of the TCMs that Apple alleges in this case require an actual, physical iPhone or iPad to function. These TCMs rely on a combination of software and hardware found only in the physical iPhone

and iPad itself. Those measures are built into the chips that are soldered inside those devices, and they do not exist in iOS files that Apple distributes freely online. Corellium does not sell a "virtual replica iPhone" and, as a result, Apple's entire argument falls apart.

The primary purpose, commercial use, and marketing of Corellium's product is singularly about operating system research focusing almost exclusively on iOS security research. Corellium created its own advanced computer program that provides security researchers with much needed tools to interoperate with and study operating systems including Linux, Android, and iOS. Corellium presents these tools in an internet browser. An iPhone is a physical portable smartphone and an iPad is a tablet computer. The use cases for these products have zero intersection. Apple has presented no evidence that even one person mistook Corellium's product for an iPhone or iPad or purchased Corellium's product thinking it was an Apple product or would have otherwise purchased one of Apple's devices. Corellium's use of iOS, even if Corellium enabled the circumvention of one of Apple's alleged TCMs (it did not), is quintessential fair use.

Apple claims that Corellium's product replaces rows of iPhones that researchers sometimes use to conduct their research. It is important to note that such rows of iPhones are violative of the terms of Apple's iOS SLA and, under Apple's interpretation, is a DMCA violation. In any event, even Apple's own engineers do not believe that the Corellium product is a replacement for iPhones.

Corellium has other defenses discussed below, but the heart of this dispute is that Apple is using this litigation against Corellium as a stalking horse in a bid to enforce the terms of its SLA, even where the user never agrees to those terms, through the DMCA. If successful, the effect on fair use, security research, testing, and competition would be unconscionable.

## II.     STATEMENT OF MATERIAL FACTS

### A.     APPLE DISTRIBUTES iOS ONLINE, FREE AND UNENCRYPTED

There is no dispute in this case that Apple distributes iOS online, for free, unencrypted, and with no password protection. Def.'s SMF[1] ¶ 93. One need only click a link or enter an address into a browser for Apple to automatically, and without any questions, serve an IPSW file containing any one of the currently-active versions of iOS of your choosing. *Id.* ¶¶ 93-94. There is

---

[1] References to "Def.'s SMF" are to Defendant Corellium, LLC's Response to Plaintiff Apple Inc.'s Statement of Material Facts in Support of Apple's Motion for Partial Summary Judgment on 17 U.S.C. § 1201 and Response Statement of Additional Material Facts in Opposition Thereof, filed concurrently with this Opposition.

also no dispute that these IPSW files contain mostly unencrypted files that comprise iOS and are immediately available to browse, edit, copy, and re-distribute, publicly display, and publicly perform without restriction. *Id.* ¶¶ 9, 99. Likewise, there is no dispute that Corellium does not unencrypt or in any way use any of the encrypted portions of the IPSW files. *Id.* ¶¶ 55, 84, 86. Finally, there is no dispute that third parties download every version of these IPSW files from Apple that has ever been released and redistribute them on their own websites. *Id.* ¶ 93.

## B.   CORELLIUM SELLS A TOOL THAT ENABLES ITS USERS TO CONDUCT HIGH-END SECURITY RESEARCH

The Corellium product is specialty software built by Corellium to facilitate security research into operating systems including Linux, Android, and iOS. Def.'s SMF ¶ 115. Among its many unique features, Corellium's product provides the ability for researchers to 1) visualize in real time the input and output processes of the operating systems that are being researched; 2) freeze the processes in the operating system and study a specific state of those processes; 3) step backwards and forward in time at will to closely monitor system activity using CoreTrace; 4) make and test their own kernels; and 5) run multiple experiments from the same starting point. *Id.* ¶ 114.

Corellium does not sell anything similar to a consumer iPhone or iPad product. Even if a security researcher, for some reason, wanted to use an instance of iOS running on Corellium in a way that resembled the use of a consumer iPhone or iPad, they could not. *Id.* ¶¶ 36, 91. Corellium's virtual environment cannot be used, for example, to make calls, receive text messages, take photos, use iTunes, download apps from the App Store, navigate with GPS, or pair Bluetooth devices. *Id.* It lacks the processing power to play video games and, perhaps most importantly, Corellium does not sell a portable electronic device. *See id.* ¶¶ 36, 115.

## III.   ARGUMENTS AND AUTHORITIES

### C.   LEGAL STANDARD

#### 1.   Standard

Summary judgment is appropriate when "the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247 (1986); *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co*., 240 F.3d 982, 991 (11th Cir. 2001). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come

forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). A Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc*., 121 F.3d 642, 646 (11th Cir. 1997) (quoting *Anderson*, 477 U.S. at 251-52)).

### 2.      Digital Millennium Copyright Act

Section 1201(a)(2) of the Digital Millennium Copyright Act (DMCA) states that

> No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that:
>
> (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a **work protected under this title**;
>
> (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a **work protected under this title**; or
>
> (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a **work protected under this title**.

17 U.S.C. § 1201(a)(2) (emphasis added); Section 1201(b) is very similar to Section 1201(a)(2). It focuses on measures that protect "a **right of a copyright owner under this title in a work** or a portion thereof." 17 U.S.C. §§ 1201(b) (emphasis added). The "right[s] of a copyright owner under this title in a work" refers to the copyrights granted under Title 17. *See* 17 U.S.C. §§ 101,102,106, and 107. Notably, "idea, procedure, process, system, method of operation, concept, principle, or discovery" are carved out of the subject matter of copyright protection by Section 102(b) as is fair use under Section 107. *Id.*; 17 U.S.C. §§ 102(b), 107 (1999). Section 106 grants a copyright owner the exclusive rights to reproduce, prepare derivative works, distribute copies, publicly perform, and publicly display such a copyrighted works. 17 U.S.C. §§ 106, 107.

Section 1201(c) states that:

> (1) Nothing in this section shall affect rights, remedies, **limitations, or defenses to copyright infringement**, **including fair use**, under this title.

(2) Nothing in this section shall enlarge or diminish vicarious or contributory liability for copyright infringement in connection with any technology, product, service, device, component, or part thereof. . .

(4) Nothing in this section shall enlarge or diminish any rights of free speech or the press for activities using consumer electronics, telecommunications, or computing products.

17 U.S.C. § 1201(c)(1),(2), and (4) (emphasis added).

### D.   APPLE'S FREE UNENCRYPTED DISTRUBUTION OF iOS ONLINE WITH ZERO TECHNOLOGICAL MEASURES IS FATAL TO ITS DMCA CLAIMS

#### 1.   Under 1201(a) iOS Object Code is Accessed when an IPSW is Downloaded, Unencrypted, from Apple

The correct frame of reference for the DMCA analysis here is the publicly available IPSW file alone, not the capabilities and TCM built into an iPhone or an iPad. Apple makes iOS available online for free and unencrypted in what are called "IPSW" files—a format akin to a ZIP file archive. *See* Pls.'s SMF[2] ¶ 8. There is no TCM that stands between the download link to Apple's server and any person in the world who wants to download an IPSW. *Id*. Corellium does not pull IPSW files from an iPhone or iPad, but rather obtains the IPSW file from these Apple servers, just like anyone else in the world can. Def.'s SMF ¶ 93.

"Because the statute refers to 'control[ling] access to a work protected under this title,' it does not naturally apply when the 'work protected under this title' is otherwise accessible." *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 387 F.3d 522, 546–47 (6th Cir. 2004). "[O]ne would not say that a lock on the back door of a house 'controls access' to a house whose front door does not contain a lock . . . and it seems clear that this provision does not naturally extend to a technological measure that restricts one form of access but leaves another route wide open." *Id*. at 547. The IPSW is a route left wide open.

Apple's iOS is "access[ed]" by a Corellium user when it is downloaded in unencrypted form directly from Apple. Computer programs are considered "literary works" under copyright law, though they are afforded less protection than traditional literary works. *See Bateman v.*

---

[2] References to "Pls.'s SMF" are to Apple Inc's Statement of Material Facts in Support of Apple's Motion for Partial Summary Judgment, ECF No. 455.

*Mnemonics, Inc.*, 79 F.3d 1532 1539, n.18. (11th Cir. 1996); *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1526 (9th Cir.1992). Copyrighted code is protected in the form of either source code or object code. *Lexmark*, 387 F.3d at 533. "[A]ccess" to copyrighted object code occurs, if at all, when iOS is downloaded in unencrypted form from the internet. By Apple's own admission, Corellium does not provide any tools to unencrypt or use any of the encrypted files in the IPSW files. Pls.'s SMF ¶ 49. *See also* Def.'s SMF ¶¶ 49, 55, 86. Only files that are already unencrypted are used for security research. Def.'s SMF ¶ 55. Thus, the inquiry under 1201(a) ends. *See Chamberlain Grp., Inc. v. Skylink Techs., Inc.,* 381 F.3d 1178, 1196, n.13 (Fed. Cir. 2004) ("[Section] 1201(a)(2) trafficking liability cannot exist in the absence of § 1201(a)(1) violations"); *See also* H.R. REP. 105-551, 39; S. REP. 105-190, 29 ("This definition applies to subsection (a) only, which covers protections against unauthorized initial access to a copyrighted work.").

After a copyright is "access[ed]," all future possible forms of access are irrelevant. *See Lexmark*, 387 F.3d at 547. ("The authentication sequence, it is true, may well block one form of 'access'—the 'ability to…make use of' the Printer Engine Program by preventing the printer from functioning. But it does not block another relevant form of 'access'—the 'ability to [ ] obtain' a copy of the work or to 'make use of' the literal elements of the program (its code). Because the statute refers to 'control[ling] access to a work protected under this title,' it does not naturally apply when the 'work protected under this title' is otherwise accessible.")

Apple contends that even after the IPSW has been accessed online, running or executing portions of it is also "access" under the DMCA. But, again, Apple is wrong. The "work protected under this title," to the extent any copyrightable material even exists therein, comprises object code and the icons and wallpaper images—all things that are unencrypted and available immediately upon downloading an IPSW. *See* Def.'s SMF ¶¶ 40, 99. Critically, the execution of iOS code results in the output of a computer program, which is purely functional and not protected by copyright. *Bateman*, 79 F.3d at 1547 n.33 ("In no case [] should copyright protection be extended to functional results obtained when program instructions are executed. . . .").[3]

---

[3] Apple's alleged copyrights in the look, feel, layout, interactions, interactive elements, and responses to a users' commands of its home screen are not at issue in this case. *See* Mot. at 3. No such copyright registrations have been asserted here that cover these, nor could such a copyright registration exist that protects such a broad list of every earthly kind of intellectual property including trademark, trade dress, and patent.

Apple sidesteps the issue of its expansion of "access" by citing *Psystar*. Apple misleadingly summarizes *Psystar* to imply that the court found that Psystar violated the DMCA by replacing the bootloader. Mot. at 10-11. The court did no such thing. *Apple, Inc. v. Psystar Corp.*, 673 F. Supp. 2d 931, 940-942 (9th Cir. 2009). The court found a violation of sections 1201(a)(2) and (b)(1) only because Psystar decrypted Apple's encrypted macOS X files. *Id.* at 931, 938-939. Here, no such decryption takes place. The court does not mention the bootloader once in its DMCA analysis. *Id.* at 938-939. Instead, the bootloader only played a role in the infringement analysis, as it should. Because Corellium, unlike Psystar, does not decrypt Apple's allegedly copyrighted works protected by encryption, *Psytar* is inapposite.[4]

Because iOS is made available online unencrypted in IPSW files and because access is achieved the moment an IPSW file is downloaded, Apple's 1201(a) claim fails as a matter of law.

### 2.    No Technological Measures Prevent the Public from Copying, Editing, Distributing, Performing, or Displaying the Contents of an IPSW file

The IPSW and any portion of its files or folders can be copied, distributed, changed, altered, edited, manipulated, and publicly performed, and displayed without encountering any TCMs. Def.'s SMF ¶¶ 40, 55. This IPSW file contains the entirety of Apple's allegedly copyrighted iOS object code, icons, and wallpapers. As a result, Apple's 1201(b) claim also fails.

Notably, Apple relies heavily on the opinion of the one expert in this case who has not signed on to the protective order and has not had access to or the ability to review any of the technology actually at issue in this case—Corellium's security research industry expert Mr. Stamos. Mot. at 1, 3, 12; Pls.'s SMF ¶¶ 64, 66; Def.'s SMF ¶¶ 23, 64. While Mr. Stamos noted that his opinions were "drawn upon [his] technical experience" and that he understood at a high-level concepts such as the utility of "virtualization and debugging to the finding and reporting of security flaws in operating systems" generally, he was clear that his opinion was focused on the "operation of the security research community and how that community interacts with large tech companies like Facebook or an Apple," a concise summary that notably omits any mention of opinions on the way the technology at issue here operates "under-the-hood." Def.'s SMF ¶ 116. It

---

[4] The *Psystar* court cited to *Chamberlain* in its discussion of DMCA liability. *Psystar* 673 F. Supp. 2d at 941. In relevant part, *Chamberlain* states that "the DMCA . . . . created trafficking liability . . . under § 1201(b) for facilitating **infringement**." *Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1195–96 (Fed. Cir. 2004) (emphasis added). Apple has not moved for summary judgement on its infringement claim.

is telling that Apple must lean so heavily on inadmissible evidence from someone with no direct, technical knowledge of how Corellium's technology operates. *E.g. id.* ¶¶ 23, 64. In any event, this inadmissible evidence is irrelevant because the security of the iPhone is not at issue here; only the non-existent security of the IPSW file is at issue.

**E.    APPLE'S ALLEGED TCMs ARE NOT IN THE IPSW DISTRIBUTED ONLINE**

Apple relies on the following alleged TCMs to support its 1201(a)(1) and (b)(1) claims:



These alleged TCMs do not "effectively control…access" nor protect "rights of a copyright owner" for three reasons: (1) they only exist on an iPhone, not in an IPSW; (2) they are not there to restrain access to protect Apple's cognizable copyrights; and (3) if they did exist in the IPSW, they would not be encountered until well after access, copying, editing, distribution, public performance and public display was already possible.

The first three alleged TCMs exist only in a physical iPhone or iPad and protect neither access nor copyrights in an IPSW file. *See* Def.'s SMF ¶¶ 16, 17, 19, 41, 43, 44, 48, 83, 92, 97, 98. This is why, throughout its Motion, Apple misleadingly shifts back and forth from "iOS" to "an iOS device" or an "iPhone" when doing so is convenient.





---

[5] References to "PEX" are to Plaintiffs' Exhibits. *See* Plaintiff Apple Inc.'s Index of Exhibits in Support of Its Motion for Partial Summary Judgment (filed under seal).



These three alleged TCMs do not exist in the IPSW file and are thus ineffective. *See Lexmark*, 387 F.3d at 547 ("one would not say that a lock on the back door of a house 'controls access' to a house whose front door does not contain a lock."). Apple's alleged TCMs in the IPSW are just a series of hopeful suggestions for how to assemble Apple's lock. Many of the pieces that would form such a lock are missing from the IPSW because they are only hard coded into iPhones and iPads. *See, e.g.*, Def.'s SMF ¶ 7. Apple seems to believe that the strictures of its SLA require people who download the IPSW to surrender their ability to access and copy the IPSW that they otherwise already have and, instead, complete and assemble the lock according to Apple's specifications by placing the IPSW in an iPhone or iPad. Essentially, Apple leaves the door open with a note asking whoever walks in to build a lock and close the door behind themselves from the outside.

Apple's logic is circular: *You cannot install iOS on non-Apple hardware because Apple hardware would prevent you from installing iOS on non-Apple hardware. Thus, if you try to install iOS on non-Apple hardware, Apple hardware would prevent you from installing.* To fix this obvious logical flaw, Apple relies on the terms "unauthorized copying" or "unauthorized use" throughout its brief instead of the more strict actual statutory requirements for TCMs that protect

"access" or the "rights of a copyright owner under this title." *Compare* Mot. at 1, 2, 5, 6, 7, 8 *with* 17 U.S.C. §§ 1201(a)(2), (b)(1). By doing so, Apple breaks the circular logic loop with its own SLA. Apple's position is that the IPSW is not authorized on non-Apple hardware and, as a result, it *must* be installed on Apple hardware. But the DMCA concerns itself with TCMs at the point of access or copyright exercise, not license agreement terms.

The remaining alleged TCMs—the trust cache and PAC—also have nothing to do with access to iOS or protecting Apple's rights as the owner of copyrights in iOS. These technologies █████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ The **trust cache** controls the installation of **other apps** into iOS, not iOS itself: the ████ ███████████████████████████████████████████████████████████████████ ████████████ Pls.'s SMF ¶ 21. ████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████ By Apple's own admission, it is not an effective control on access to or copyright in Apple's works protected by the asserted copyrights. But this case is about access to and copying of iOS, not ████████. Apple has no right—stemming from the DMCA or otherwise—to ████ █████████████████████████████ for fair use purposes outside the context of an iPhone, especially where iOS has been transformed for the fair use purposes of security research.

Similarly, **pointer authentication codes** are irrelevant here. By Apple's own admission, the PAC ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ Def.'s SMF ¶ 22 (quoting Apple's responses to interrogatories). Again, only iOS in the IPSW is at issue here, not third-party apps. And changing an app's code after it is already running is not "access[ing]" iOS code nor is it a cognizable right under Title 17.

**F.   EVEN IF APPLE'S TCMs EXISTED IN THE IPSW AND WERE EFFECTIVE, THEY WOULD ACTIVATE AFTER ACCESS, COPYING, AND USE**

Even if Apple's TCMs existed in the IPSW file and functioned the way Apple claims they do, which they do not, there are only a finite set of actions that constitute "access" to works and use of "rights of a copyright owner" in an IPSW file. And each of this entire set of actions occurs before the operation of a single one of the alleged TCMs, even if it occurred on Apple hardware.

Apple fails to name a single TCM that Corellium would have to circumvent to perform any copying, transformations, distribution, and displaying of an IPSW. Mot. at 5. For a few seconds, Corellium stores IPSW files and their constituent components for unpacking. Def.'s SMF ¶ 106. This storage "is intended to be as transient as possible to enable the creation of the virtual device model." *Id*. Those files (and all IPSW extractions) are stored "on the disk partition of the virtual device drive. . . ." *Id.* The original IPSW file is then permanently deleted. *Id*. Some of the files from the IPSW are then stored in RAM for functionality. *Id*. The software is then automatically transformed and loaded into memory. *Id*. At this stage in Corellium's processing of an IPSW file, none of Apple's five alleged TCMs would have activated.

Downloading an IPSW also gives unencumbered access to what Apple has dubbed its copyrighted "Graphical User Interface." Pls.'s SMF ¶ 6. Clever naming aside, the "Graphical User Interface" copyrights that Apple asserts here cover nothing but a few wallpaper images and compilations of icon images arranged in generic rows to fit on the registration page, and not like a smartphone user interface. Def.'s SMF ¶ 117. These same wallpapers and icon images sit unencrypted in folders in IPSWs, available to anyone to view, copy, edit, distribute, perform, and display without the need to circumvent any TCMs.

Apple's alleged right to keep others from "running" its publicly distributed iOS program, which program necessarily displays an interactive user interface, is not a right recognized under copyright law or the DMCA. *See* 17 U.S.C. §§ 102(b), 106; *Bateman*, 79 F.3d at 1547 n.33 ( "In no case [] should copyright protection be extended to functional results obtained when program instructions are executed. . . ."); *see also Lexmark*, 387 F.3d at 548 ("The copyrightable expression in the Printer Engine Program, by contrast, operates on only one plane: in the literal elements of the program, its source and object code. Unlike the code underlying video games or DVDs, 'using' or executing the Printer Engine Program does not in turn create any protected expression. Instead, the program's output is purely functional. . ."). At its core, a copyright is the right to make copies. 17 U.S.C. § 106. Under a DMCA analysis, Apple is limited to the rights granted to it by Title 17 protecting its allegedly copyrighted object code and some image files as they are found in an IPSW file—and nothing more. Apple's attempt to reach beyond those rights is a misuse of its copyrights.

### G.      APPLE HAS FAILED TO PROVE THAT CORELLIUM "TRAFFICS" IN CIRCUMVENTION TOOLS

Corellium sells the Corellium product, not a circumvention tool. The primary purpose, commercial uses of, and marketing for, Corellium's product is demonstrably *not* a circumvention tool. *See* 17 U.S.C. § 1201(a)(2)(A),(B), and (C); 17 U.S.C. § 1201 (b)(1)(A)(B), and (C). Corellium does not sell a circumvention tool, it sells a high end security research tool. Def.'s SMF ¶¶ 110, 114, 115. Ignoring, *arguendo*, all of the arguments presented above, Corellium's product would let users *use* a circumvention tool for the specific purpose of creating a virtual machine in Corellium's virtual environment for the purposes of security research. *Id.* ¶ 115. Importantly, Corellium users cannot buy or take any alleged Corellium circumvention tool and use it themselves on their own copy of iOS running on a computer, iPhone, or iPad. If there is any circumvention here, it is applied automatically for the user in a virtual environment tied to a physical server or to Corellium's website. The alleged circumvention tool is therefore not "trafficked" at all. This is in contrast to a tool like deCSS that can decrypt a DVD, and which was distributed as a tool that anyone could use on actual DVDs to gain access to the copyrighted work.

Corellium does not traffic. If, theoretically, Corellium trafficked in circumvention tools, Corellium customers would have their own circumvention tools, that they obtained from Corellium, that permit them to access Apple's code in the wild or copy, distribute, make derivative works, publicly perform, or publicly display Apple's code in the wild. Corellium users cannot use any alleged circumvention tool on their or someone else's iPhone nor to make their own iOS machine. The Corellium product is a purpose-built security research tool that is limited to the Corellium platform. Def.'s SMF ¶¶ 114, 115. If Corellium picks locks, it does not sell a lock pick nor instruct how to pick a lock. That is not the "trafficking" in a circumvention tool under DMCA.

Several courts have already squarely addressed this issue. S*ee Chamberlain*, 381 F.3d at 1197–98 ("Chamberlain's proposed construction of the DMCA ignores the significant differences between defendants whose accused products enable copying and those, like Skylink, whose accused products enable only legitimate uses of copyrighted software. Chamberlain's repeated reliance on language targeted at defendants trumpeting their 'electronic civil disobedience,' apparently led it to misconstrue significant portions of the DMCA."); *NNG, KFT. v. AVA Enterprises, Inc*., 2015 WL 5442725, at *5 (C.D. Cal. July 8, 2015) ("the purpose of § 1201(a)(2) [is] to prevent the **trafficking of devices that allow consumers to conduct the circumvention**

**themselves**. . . . Consumers do not purchase the Infringing Units so that they can then circumvent NNG's navigation software, but instead purchase the Infringing Units to utilize the pirated software already installed. There is no allegation that this 'piece of code' can be removed and then used by consumers to circumvent NNG's access control measures–**the circumventing is complete before the infringing units are trafficked."**) (internal citations omitted, emphasis added).

Because no Corellium user can ever take any alleged circumvention measure out of the Corellium environment, there is no "trafficking" and this is an independent grounds on which Apple's Motion for partial summary judgment must be denied as to both DMCA claims.

## H.    APPLE'S FAILURE TO MOVE FOR SUMMARY JUDGEMENT ON ITS INFRINGEMENT CLAIM IS ALSO FATAL TO ITS MOTION

By not moving for summary judgment on infringement, Apple has failed to properly put before this court a significant issue of law that this circuit has yet to consider—namely the interplay between infringement and the DMCA. To support its claim that the DMCA is not in any way bound by an infringement analysis, Apple cites to a few district court cases. Mot. at 15-16. The Federal Circuit disagrees as to 1201(a):

> First, as the Supreme Court recently explained, 'Congress' exercise of its Copyright Clause authority must be rational.' *Eldred v. Ashcroft*, 537 U.S. 186, 205 n. 10, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003). In determining whether a particular aspect of the Copyright Act 'is a rational exercise of the legislative authority conferred by the Copyright Clause ... we defer substantially to Congress. It is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors ... in order to give the public appropriate access to their work product.' Id. at 204–05, 123 S.Ct. 769 (citation omitted) (emphasis added). Chamberlain's proposed construction of § 1201(a) implies that in enacting the DMCA, Congress attempted to "give the public appropriate access" to copyrighted works by allowing copyright owners to deny all access to the public. . . . That apparent irrationality, however, is not the most significant problem that this second regime implies. Such a regime would be hard to reconcile with the DMCA's statutory prescription that "[n]othing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title." 17 U.S.C. § 1201(c)(1). . . . [T]he DMCA would allow virtually any company to attempt to leverage its sales into aftermarket monopolies—a practice that both the antitrust laws, see *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 455, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), and the doctrine of copyright misuse,

> *Assessment Techs. of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640, 647 (7th Cir.2003), normally prohibit.
>
> We conclude that 17 U.S.C. § 1201 prohibits only forms of access that bear a reasonable relationship to the protections that the Copyright Act otherwise affords copyright owners.

*Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1199–200 (Fed. Cir. 2004); *See also* David Nimmer, *A Riff on Fair Use in the Digital Millennium Copyright Act*, 148 U. PA L. REV. 673, 687-89 (2000) ("Those 'whose circumvention devices do not facilitate infringement are not subject to Section 1201 liability' . . . .") (internal citations omitted).

Much like Apple, the plaintiff in *Chamberlain* relied on the *Reimerdes* decision. Mot. at 16. And much like in *Chamberlain,* Apple's reliance is misplaced. *See Chamberlain*, 381 F.3d at 1197–98 ("[I]t is the differences between the cases, rather than their similarities, that is most instructive in demonstrating precisely what the DMCA permits and what it prohibits. Chamberlain's proposed construction of the DMCA ignores the significant differences between defendants whose accused products enable copying and those, like Skylink, whose accused products enable only legitimate uses of copyrighted software.") (internal citations omitted).

The same is true as to 1201(b). *See MDY Ind's, LLC v. Blizzard Entertainment, Inc*., 629 F.3d 928, 945 (9th Cir. 2010) ("We read § 1201(b)(1)'s language—'right of a copyright owner under this title'—to reinforce copyright owners' traditional exclusive rights under § 106 by granting them an additional cause of action against those who traffic in circumventing devices that facilitate infringement."); *Online Policy Group v. Diebold, Inc*., 337 F. Supp. 2d 1195 (N.D. Cal. 2004) (use of DMCA notices to suppress fair use led to damages being imposed on copyright owner); *Nordstrom Consulting, Inc. v. M & S Techs., Inc*., 2008 WL 623660, at *9 (N.D. Ill. Mar. 4, 2008) ("Plaintiffs have failed to show that Defendants' circumvention of the password protection to gain access to the NCI Software infringed or facilitated infringing on Plaintiffs' rights under the Copyright Act.")

Congressional intent is also instructive on this point. *Garcia v. Vanguard Car Rental USA, Inc.*, 540 F.3d 1242, 1246 (11th Cir. 2008) (Courts "may consult legislative history to elucidate a statute's ambiguous or vague terms."). "This provision is not aimed at products that are capable of commercially significant non-infringing uses, such as consumer electronics, telecommunications, or computer products [...] used by businesses and consumers for perfectly legitimate purposes." H.R. Rep. 105–551(II), at 38 (July 22, 1998)).

Apple also cites *Corley* for the proposition that a fair use defense does not exist here. Mot. at 16 (*citing Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 443 (2d Cir. 2001)). Again, the *Corley* court was dealing with very different facts. In *Corley*, a reporter posted links to a tool that decrypts encrypted DVDs. *Corley*, 273 F.3d at 452 (2d Cir. 2001). That court's construction of Section 1201 focused on First Amendment issues as a matter of first impression. *Id*. The court did not have before it a clear case of both fair use and copyright misuse. This matter is very different.

Apple's interpretation of the statute is wrong. Moreover, because the Eleventh Circuit has not addressed this issue, by failing to move for summary judgment on the copyright infringement claim that Apple has asserted here, Apple has failed to properly bring the matter before the Court to address the circuit split. Apple's Motion should be denied on these grounds as well.

## I.   APPLE'S POSITION WOULD LEAD TO THE DEATH OF FAIR USE

Apple's reading of the DMCA leads to an absurd result. Apple argues that the mere existence of its SLA that limits the use of iOS—e.g. prohibiting customers from running iOS on any anything other than an "Apple- branded iOS Device," Mot. at 10; Pls.'s SMF ¶ 20—gives Apple a "copyright" to exclude others from executing its iOS code and by doing so present the iOS graphical user interface, even for fair use purposes. Because Apple does not agree to those uses, they are ipso facto "unauthorized." *Id*. p. 15-16. But the DMCA does not create any new property rights, nor does it permit software vendors to create their own. Apple's stance that "fair use is not a defense to claims under the DMCA" flies in the face of over two hundred years of this country's jurisprudence balancing the rights of copyright holders, freedom of speech, and the promotion of arts and sciences. *Compare* Mot. at 15 *with Suntrust Bank v. Houghton Mifflin Co*., 268 F.3d 1257, 1264 (11th Cir. 2001) *and Chamberlain*, 381 F.3d at 1193–94.

Like in *Chamberlain,* under Apple's proposed reading "products containing copyrighted software to which a technological measure controlled access [would be] per se illegal under the DMCA unless the manufacturer provided consumers with explicit authorization. [It would] therefore grant manufacturers broad exemptions from both the antitrust laws and the doctrine of copyright misuse. Such an exemption, however, is only plausible if the anticircumvention provisions established a new property right capable of conflicting with the copyright owner's other legal responsibilities—[] they do not." *Chamberlain*, 381 F.3d 1178, 1193–94 (Fed. Cir. 2004).

The absurdity of Apple's position is that Apple claims the full scope of copyright law plus additional property rights. On the one hand, whoever agrees to Apple's SLA may only run iOS on

Apple hardware or face a breach of contract claim. On the other hand, whoever declines or avoids Apple's SLA is, by the mere existence of the SLA, in violation of the DMCA. If Apple is correct, all software vendors can secure for themselves a property right with the power to grant and revoke authorization for fair uses of software at will and with impunity. *See* supra, § E; Pls.'s SMF ¶¶ 19, 22. The result is that Apple and all software vendors are granted an exemption from antitrust laws and copyright misuse laws and can read the terms of their own SLA into the copyright statute as exclusive rights. Such a result is untenable. *See Chamberlain*, 381 F.3d at 1193–94 ("[T]he DMCA emphatically did not 'fundamentally alter' the legal landscape governing the reasonable expectations of consumers or competitors; did not 'fundamentally alter' the ways that courts analyze industry practices; and did not render the pre-DMCA history [] irrelevant.").

Apple also argues in its Motion, when discussing 1201(j), that there is *no* exemption anywhere in the DMCA for security testing of software, only of computers, computer systems, and networks. Mot. at 18. This, combined with Apple's position on fair use under the DMCA, would put an end to all legal independent security research into Apple software—and every other computer program with similar SLA language—in this country. Apple submits that even if an exemption for software security research did exist and even if Corellium qualified for it, 1201(b)(1) would *still* result in liability. *Id.* Apple is suggesting a catch-22 that renders 1201(j)(4) superfluous.

## J.    CORELLIUM IS ENTITLED TO A FAIR USE DEFENSE

Corellium, on the other hand, has moved for summary judgment on infringement, including its fair use defense. *See* Def.'s SMF ¶ 5 (citing ECF No. 456 pp. 9 -15) To the extent this court is inclined to side with the current majority view of other circuit courts on this question, Corellium has properly teed up such a decision. As set forth in Corellium's motion for summary judgment, Corellium's security research platform makes fair use of iOS. However, by making no arguments on the merits of Corellium's fair use defense in its motion for summary judgment, Apple has at the very least conceded that questions of fact remain as to such a defense.

## K.    CORELLIUM'S DEFENSES UNDER SECTIONS 1201(f), (g), AND (j) ARE VALID AND IN MATERIAL DISPUTE

Even if Corellium created circumvention tools and trafficked in them, which it does not, sections 1201(f), (g), and (j) provide defenses that require detailed findings of fact that are in material dispute here. *See* 17 U.S.C. 1201(f),(g), and (j). The provisions of 1201(f) provides an

exemption from liability under both (a)(2) and (b). *Id*. at 1201(f)(2). The provisions of 1201(g) and (j) provide an exemption from liability under (a)(2).

The Federal Circuit found that "[f]or obvious reasons, § 1201(a)(2) trafficking liability cannot exist in the absence of § 1201(a)(1) violations—much as this court has often explained that "indirect [] infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement, though the direct infringer is typically someone other than the defendant accused of indirect infringement." *Chamberlain*, 381 F.3d at 1196 n.13.

### 1.     Reverse Engineering, 1201(f)

The "reverse engineer" defense is applicable here. 17 U.S.C. 1201(f). Corellium independently created a computer program built to conduct research on operating systems including Linux, Android, and iOS. Def's. SMF ¶ 115 Corellium's program is made entirely of Corellium's own code that combines virtualized hardware with security research tools. *Id*. ¶¶ 86, 110, 114, 115, 118, 119. When a researcher wishes to study iOS, Corellium's computer program must be able to communicate back and forth with iOS and exchange data. Def.'s SMF ¶¶ 114, 120; *see also* 17 U.S.C. 1201(f)(4) ("[T]he term 'interoperability' means the ability of computer programs to exchange information, and of such programs mutually to use the information which has been exchanged."). It must also permit installation of security researcher's tools and apps. *Id*. This defense is applicable even where, as here, the alleged circumvention tool is alleged to "contain exact copies of [the allegedly circumvented] Programs." *Lexmark*, 387 F.3d at 550-551.

Apple argues that Corellium has not "lawfully obtained the right to use a copy" because the IPSWs available online do not have the "means…necessary to be able to use the program as it was designed to be used by a consumer of the product." Mot. at 16 (citing S. Rep. No. 105-190, at 32 (1998)). First, Apple reads these words into the statute from the congressional history. *Id*. Having done so, Apple incorrectly assumes that "lawfully obtained the right to use" refers to an iPhone rather than the IPSW file.

Furthermore, to the extent Corellium circumvents any TCMs, that function is made available "solely for purpose of enabling interoperability" with Corellium's independently created security research program. Def.'s SMF ¶¶ 105, 120. Neither the alleged circumvention functions nor any version of iOS can be removed from Corellium's system and used for any purpose; they can only be used within Corellium so that Corellium can communicate with iOS and vice versa. *Id.* Thus, Corellium is entited to a defense under section 1201(f).

### 2.    Security Testing and Encryption Research, 1201(g), (j)

With respect to its arguments that Corellium is not entitled to defenses under sections 1201(g) and (j), Apple substitutes attorney argument for undisputed facts. Mot. at 17-18 Corellium's customers conduct good faith cryptography research and good faith security research and Corellium knows its customers. Def's. SMF ¶¶ 67-68, 109-110. The fact that Corellium's customer ████████████████████████████ is irrelevant; ████████████████████ ████████████████████ Finally, to determine whether Corellium's customers are engaged in good faith security research, the DMCA includes lists of non-exclusive factors that Apple does not address. *See* 17 U.S.C. §§ 1201(j)(3)(A), and (B); 1201(g)(3)(A)(B), and (C). Apple presents no facts to support a finding under these factors. Apple's instead argues that "Corellium would have to show…that Apple authorized users of the Corellium Apple product to do the 'security testing.'" Mot. at 19. This misunderstanding of the statute underpins Apple's entire motion.

### L.    APPLE CAUSED CORELLIUM TO SPEND SUBSTANTIAL MONEY AND TIME AND SHOULD BE ESTOPPED FROM ASSERTING THE DMCA

While Apple castigates Corellium in its Motion, for years it praised Corellium's development. Def.'s SMF ¶ 103. Apple was aware of Corellium's allegedly infringing product, including that Corellium intended to sell its services by way of a subscription model, since 2017. Def.'s SMF ¶¶ 101. Apple become further aware of the capabilities of the Corellium product during three demonstrations and months of technical due diligence. *Id.* ¶¶ 28, 102. Corellium had a right to believe—based on exhaustive technical due diligence, acquisition conversations, Apple's continuous encouragement of Corellium's development, and the time and energy that Apple put into negotiations—that Apple intended Corellium to continue to develop its products. *Id.* ¶ 87. Corellium was ignorant of Apple's hidden intentions because Apple avoided expressing to anyone at Corellium its alleged belief that the Corellium product infringes its copyrights or violates the DMCA. *Id.* ¶ 113. Corellium relied on Apple's conduct to its own detriment. With Apple's encouragement, Corellium continued to develop its products, investing millions of dollars and years of sweat equity while Apple schemed to pull the rug out from under them. *Id.* ¶ 103.

Estoppel has long been recognized as an equitable remedy in the 11th Circuit. *See Fed. Deposit Ins. Corp. v. Harrison*, 735 F.2d 408, 410 (11th Cir. 1984); *See also HGI Assocs., Inc. v. Wetmore Printing Co.*, 427 F.3d 867, 875 (11th Cir. 2005). Apple cites to *Lego* for the proposition that one may lie in wait "to see whether an infringer's exploitation undercuts the value of the

copyright work." Mot. at 19. Apple did much more than lie in wait. Apple brought Corellium in for observation and discussion under an NDA. Pls.'s SMF ¶ 29; *see also* Def.'s SMF ¶¶ 28, 102. By doing so, Apple caused Corellium to further its product and business strategy. Corellium relied on Apple's misleading actions to its detriment. Apple must be estopped from causing further harm. At the very least, disputes of material fact still exist as to the egregiousness of Apple's conduct.

## IV.    **CONCLUSION**

For the reasons stated above, Apple's Motion should be denied. Corellium does not traffic in a circumvention tool in violation of the DMCA sections 1201(a) or (b) because no technological control measures exist here—no circumvention is necessary. Even if circumvention did occur, no trafficking occurs and the doctrine of fair use stands against Apple's attempt to read the terms of its own Software License Agreement into Title 17. Apple cannot take from the public the right to conduct security research on software after having left its iOS software unlocked on the internet for anyone to download. Finally, Corellium has several defenses and exemptions that raise issues of disputed material fact. Accordingly, Corellium, LLC respectfully requests that this Court deny Apple's motion for partial summary judgment in its entirety, and grant any other relief that this Court deems proper and just.

Dated: May 26, 2020                    Respectfully submitted,


                                       COLE, SCOTT & KISSANE, P.A.
                                       *Counsel for Defendant CORELLIUM, LLC*
                                       Esperante Building
                                       222 Lakeview Avenue, Suite 120
                                       West Palm Beach, Florida 33401
                                       Telephone (561) 612-3459
                                       Facsimile (561) 683-8977
                                       Primary e-mail: justin.levine@csklegal.com
                                       Primary e-mail: lizza.constantine@csklegal.com

                              By:    *s/ Justin B. Levine*
                                       JONATHAN VINE
                                       Florida Bar. No.: 10966
                                       JUSTIN B. LEVINE
                                       Florida Bar No.: 106463
                                       LIZZA C. CONSTANTINE
                                       Florida Bar No.: 1002945

MICHAEL A. BOEHRINGER
Florida Bar No.: 1018486
*and*

HECHT PARTNERS LLP
*Counsel for Defendant CORELLIUM, LLC*
20 West 23rd St. Fifth Floor
New York, NY 10010
Telephone (212) 851-6821
David Hecht, *Pro hac vice*
E-mail: dhecht@hechtpartners.com
Maxim Price, *Pro hac vice*
E-mail: mprice@hechtpartners.com
Minyao Wang, *Pro hac vice*
E-mail: mwang@hechtpartners.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of May, 2020, a true and correct copy of the foregoing has been furnished by electronic filing with the Clerk of the court via CM/ECF, which will send notice of electronic filing to all counsel of record.

Dated: May 26, 2020         Respectfully submitted,

COLE, SCOTT & KISSANE, P.A.
*Counsel for Defendant CORELLIUM, LLC*
Esperante Building
222 Lakeview Avenue, Suite 120
West Palm Beach, Florida 33401
Telephone (561) 612-3459
Facsimile (561) 683-8977
Primary e-mail: justin.levine@csklegal.com
Secondary e-mail: lizza.constantine@csklegal.com

By:  *s/ Justin B. Levine*
    JONATHAN VINE
    Florida Bar. No.: 10966
    JUSTIN B. LEVINE
    Florida Bar No.: 106463
    LIZZA C. CONSTANTINE
    Florida Bar No.: 1002945
    MICHAEL A. BOEHRINGER
    Florida Bar No.: 1018486
*and*

HECHT PARTNERS LLP
*Counsel for Defendant CORELLIUM, LLC*
20 West 23rd St. Fifth Floor
New York, NY 10010
Telephone (212) 851-6821
David Hecht, *Pro hac vice*
E-mail: dhecht@hechtpartners.com
Maxim Price, *Pro hac vice*
E-mail: mprice@hechtpartners.com
Minyao Wang, *Pro hac vice*
E-mail: mwang@hechtpartners.com