DEX 6

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 9:19-cv-81160-RS

**APPLE INC.,**

      **Plaintiff,**

**v.**

**CORELLIUM, LLC,**

      **Defendant.**

### EXPERT REPORT AND DECLARATION OF ALEXANDER STAMOS

I, Alexander Stamos, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury:

1. My name is Alexander Stamos. I am over the age of twenty-one (21), under no legal disability, and have never been convicted of a felony or a crime involving moral turpitude. The facts stated herein are true and correct, and based upon my personal knowledge and/or on documents, depositions, and materials I have reviewed in connection with my work on this case. I am fully competent to make this declaration, and if called to testify, I would testify as follows:

2. I have been retained by Corellium, LLC's ("Corellium") attorneys in this case to, among other things, provide background and general opinions regarding the security research

**EXPERT REPORT AND DECLARATION OF ALEXANDER STAMOS**       Page 1

industry, and to provide comments and opinions regarding Corellium's technology and its impact on that industry.

3. I hold a Bachelor of Science degree in Electrical Engineering and Computer Science from the University of California, Berkeley.

4. I currently serve as the Director of the Stanford Internet Observatory, a cross-disciplinary program of the Freeman-Spogli Institute for International Studies at Stanford University. I am also a lecturer in the Computer Science department at Stanford University and a Visiting Scholar at the Hoover Institution.

5. Prior to serving in these roles, I served as Chief Security Officer at Facebook, Inc. and Chief Information Security Officer at Yahoo, Inc. At both companies I supervised large teams of engineers, researchers, investigators, and analysts responsible for identifying, preventing, and responding to software security risks to the company and its customers.

6. While at Facebook and Yahoo, I oversaw company responses to several high-profile security threats. For instance, while at Yahoo, I oversaw the company's response to the 2013 Edward Snowden disclosures and our investigation and response to an intrusion by hackers working for the government of the Russian Federation. During my time at Facebook, I led the company's investigation into foreign interference in the 2016 election and helped pioneer several successful protections against advanced security threats.

7. For much of my career, I worked as a software security consultant to some of the largest American companies, such as Microsoft, JP Morgan Chase, Goldman Sachs, Google, Visa and American Express. I did this work as an employee at the security consultancy @stake and, starting in 2004, as a co-founder of iSEC Partners. After the acquisition of iSEC Partners in 2010, I held a variety of technical leadership roles at the acquiring company, NCC Group PLC.

**EXPERT REPORT AND DECLARATION OF ALEXANDER STAMOS**  **Page 2**

8.     I have spoken at various security conferences to present original security research and to discuss the issues facing the technology industry. Those conferences include the Munich Security Conference, NATO CyCon, Web Summit, DEF CON, CanSecWest, and Black Hat.

9.     I have also been involved in efforts to improve the security of the US election system. Specifically, I have served as a contributor to Harvard's Defending Digital Democracy Project, a member of the Aspen Institute's Cyber Security Task Force, the Bay Area CSO Council, and the Council on Foreign Relations. I served as a commissioner on the Kofi Annan Commission on Elections and Democracy in the Digital Age (our final report is available at http://kofiannan.ch/KACEDDAREPORT) and I serve on the advisory board to NATO's Collective Cybersecurity Center of Excellence in Tallinn, Estonia.

10.    I am the inventor on five patents granted by the US Patent and Trademark Office, all related to cybersecurity (patent numbers 9,083,727, 8,799,482, 8,990,392, 9,106,661 and 9,264,395).

11.    Through this declaration, I am providing my expert opinion on Corellium's product, its capabilities, its usefulness to the security research community and the downstream benefits to Apple users globally. My conclusion and opinion is that Corellium represents one of the few options available for responsible research into Apple's critical operating mobile operating system, iOS, and is an important part of the security ecosystem around Apple's iOS devices.

12.    While it is understandable that Apple would desire to be able to control the ability for security researchers to find flaws in its products, most responsible companies have adopted a much more open and progressive approach to protecting their users.

**EXPERT REPORT AND DECLARATION OF ALEXANDER STAMOS**              **Page 3**

13. For the reasons set out in this declaration, I believe that if Apple is successful in shutting down Corellium and the security research it powers, the security of Apple's users around the world will be negatively impacted.

14. I also believe that an adverse ruling against Corellium, specifically on the issues raised by the Digital Millennium Copyright Act (DMCA), would have strong negative impacts on responsible security research across the United States and would harm the security of people around the world.

15. Since the emergence of the consumer software industry in the 1970s, there has been a mix of conflict and cooperation between large software vendors and independent security researchers. Building software is not like other forms of engineering. First off, the tenets of what makes a trustworthy software project are not based upon physical law in the way that civil engineers can apply physics to building a trustworthy bridge. Security flaws are found and exploited by intelligent adversaries, not inanimate forces of nature such as fire or gravity. Civil engineers do not wake up to find out that an intelligent earthquake has found a new way to topple a skyscraper, but as the result of academic and independent security research the equivalent challenge is a normal part of software engineering. As a result, software that is considered secure at the moment of its creation is often considered horribly flawed just a few years later.

16. More than any other field of computing, security has benefited from the existence of a large, diverse, unofficial community of researchers and practitioners. I can think of few advancements in semiconductor design that did not originate in a well-funded corporate or academic lab, but a majority of the advancements in finding and fixing security flaws over the last two decades has come from the "security research community." This community includes well-compensated professional researchers at large companies, credentialed academics as well as

a motley crew of savant drop-outs, entrepreneurs, members of hacker collectives and a whole host of researchers at small companies. The output of this community can be found in peer-reviewed publications from organizations such as USENIX and the Association of Computing Machinery, as well as in talks at conferences like Black Hat, Defcon, Recon, Infiltrate and CanSecWest.

17. The late-1990's and early-2000's was a pivotal time for the software industry. During this time, corporate and personal systems were being hooked up to the Internet for the first time ever, leading to long-dormant security flaws being exploited from across the planet for fun and profit. Software engineers were bombarded with the revelation of completely new classes of security flaws multiple times per year, and automated worms such as Code Red, Nimda and SQL Slammer caused billions of dollars of damage. During this era, relations between large software companies (such as Microsoft, Oracle and Adobe) and the security research community were often contentious and destructive. The investigation and even arrest of security researchers were a common occurrence, and lawsuits were regularly threatened to silence security researchers wishing to present their findings in public. The security community was torn between two models of dealing with companies: responsible disclosure, where the details of a bug could be held for months while the vendor worked on a fix, and full disclosure, where details of flaws were immediately announced to give defenders the best chance to stop attacks. The lack of financial incentive and risk of working with companies pushed many well-intentioned researchers into the latter camp, leading to chaos for security teams and vendors alike.

18. A major turning point occurred in 2002, when Bill Gates recognized the existential risk insecure software posed to Microsoft. Gates sent out what is now called the "Trustworthy Computing Memo" (located at https://www.wired.com/2002/01/bill-gates-trustworthy-computing/), in which he laid out a vision of how Microsoft could become a leader in security

**EXPERT REPORT AND DECLARATION OF ALEXANDER STAMOS**         **Page 5**

instead of a constant target of derision. Over the course of the next several years, Microsoft retrained all of its engineers on secure software development, built new kinds of tools to find security flaws, and worked diligently to repair its rocky relationship with the security community. This included bringing in "ex-hackers" as consultants to break their software, and creating processes to properly intake and handle security reports. I was fortunate enough to be a part of this first wave of hackers Microsoft retained during this period, and I witnessed a huge change in internal culture over the subsequent eight years.

19. Microsoft was not the only software company to change during this period, and the subsequent generation of internet giants embraced an open relationship to the security community from day one. Google, for example, has paid security researchers to encourage them to report flaws since 2010 and provides free hardware as well as open access to their software for testing.

20. The open bug bounty has become the standard industry wide. Of the large US consumer tech companies known as FAAMG (Facebook, Apple, Amazon, Microsoft and Google) only Amazon does not run a paid bug bounty program.

21. In December 2019, Apple announced that it would no longer require pre-approval for security research and would allow any security researcher to report flaws for payment. The advertised payment schedule for these bugs is consistent with industry standards, but Apple's model of mobile computing has created a completely new set of challenges for security researchers and professional defenders. Since the announcement of the original iPhone in 2007, Apple has utilized its tight control of both the hardware and software to establish a monopoly on the ability to load applications on iOS devices. This has raised competitive issues that are outside the scope of this declaration and report.

**EXPERT REPORT AND DECLARATION OF ALEXANDER STAMOS**               **Page 6**

22. Contrast this situation to that of the world's two most popular consumer operating systems: Google Android and Microsoft Windows. Android is open-source, and any interested security researcher can examine the core operating system components and be paid up to $1,000,000.00 (one million dollars) for a serious security flaw. Microsoft Windows is easily commercially available, and although Microsoft does not publicly post the source code to Windows most security researchers have well-developed toolchains for reverse engineering Windows code to find flaws. Most importantly, both Android and Windows can be run on unlocked hardware or in virtual machines, which allows security researchers to inspect the code and its operation in a controlled environment.

23. Apple does not provide any capability for the legal owner of an iOS device to perform security testing equivalent to that which is easily available on Microsoft Windows or Google Android. At the Black Hat USA conference in August 2019, Apple announced the future availability of special security testing devices for pre-vetted researchers. It is assumed that any researchers receiving these devices would be required to sign restrictive NDAs, and as of today there are no public reports of such devices actually being made available.

24. Corellium is the only product available that gives researchers the same capabilities to understand the operation of iOS that they already have for Windows, Android, Linux and almost all other available commercial software. It serves a critical function, in that it allows these researchers to safely examine how iPhones operate in a controlled environment, where they can monitor what information leaves the emulated device, how software interacts on the device and the operation of Apple's built-in apps.

25. Without Corellium, security researchers are required to hack the operating system of physical devices to obtain access to the underlying software in order to conduct their research.

**EXPERT REPORT AND DECLARATION OF ALEXANDER STAMOS**             **Page 7**

In so doing, security researchers essentially must make changes to the operating system, which makes research on those devices less accurate and/or more easily detectable by malware. Because security researchers must use vulnerabilities to gain access in the first place, researchers using physical devices are incentivized to hold back and not report these vulnerabilities. With Corellium, however, the virtual device does not have to be hacked in the same way.

26. Corellium makes security research more mobile and less costly.

27. It is also one of the few mechanisms by which researchers can accurately examine software that runs on iOS devices. Recent news stories have focused on the privacy issues inherent in mobile applications that include code from multiple untrusted sources, some of which violate the privacy of users by recording location or usage data in the background. Corellium can be used by security and privacy researchers to examine the behavior of mobile applications that Apple has allowed past security checks but continue to violate user privacy expectations. For example, independent security research was critical in the discovery that ToTok, a popular chat application in the Middle East, is actually a spy tool built for the government of the United Arab Emirates (https://www.nytimes.com/2019/12/22/us/politics/totok-app-uae.html). Apple allowed this application to be downloaded by millions of their users and did not move to protect them until notified by the New York Times. The existence of a rich community of external application researchers is critical in preventing the spread of malicious mobile applications, but such research requires the ability to run and examine apps with methods that Apple does not officially support.

28. This is a literal life and death issue. Last year, researchers from Google Project Zero announced that they had discovered the use of custom exploit chains utilizing multiple new vulnerabilities in Apple's iOS (https://googleprojectzero.blogspot.com/2019/08/a-very-deep-dive-into-ios-exploit.html). These exploit chains were discovered on websites frequented by the Uyghur

**EXPERT REPORT AND DECLARATION OF ALEXANDER STAMOS**  Page 8

ethnic minority of the People's Republic of China, and would give the authors of the malware full control over every aspect of the affected devices, including the ability to download locally stored data and turn on the phone's microphone remotely. Google attributed this malware to the security services of the PRC government. It has been widely reported that Uyghurs have been arrested, "re-educated" or even killed by the PRC government (https://www.nytimes.com/interactive/2019/11/16/world/asia/china-xinjiang-documents.html). It is an unfortunate possibility that electronic surveillance via exploits in Apple devices is playing a key role in this oppression.

29. Another famous purveyor of iOS exploits is NSO Group, an Israeli cyber-weapons dealer that has sold high-quality malware to countries such as the Kingdom of Saudi Arabia (https://citizenlab.ca/2020/01/stopping-the-press-new-york-times-journalist-targeted-by-saudi-linked-pegasus-spyware-operator/). NSO's "Pegasus" malware is known to be one of the most effective pieces of high-end iOS malware, and has been implicated in attacks against hundreds of members of civil society as well as, allegedly, the murder of journalist Jamil Khashoggi. (David D. Kirkpatrick, *Israeli Software Helped Saudis Spy on Khashoggi, Lawsuit Says*, N.Y. TIMES (Dec. 2, 2018), https://www.nytimes.com/2018/12/02/world/middleeast/saudi-khashoggi-spyware-israel.html).

30. There have been claims made that Corellium makes the safety issue worse by allowing the discovery of flaws by people not gated by Apple. This is an old argument, and one that has been made time and time again by large corporations looking to prioritize their public relations efforts over the safety of their users. It is certainly possible for any security tool to be misused to find flaws that are sold to oppressive regimes for profit instead of reported to the

**EXPERT REPORT AND DECLARATION OF ALEXANDER STAMOS**          **Page 9**

vendor. However, most other major tech companies have found that the existence of open security research has improved their products.

31. Large, well-funded adversaries with financial or political motivations can afford to build capabilities equivalent to Corellium. Corellium has not provided their product to the security services of the People's Republic of China or NSO Group, both of which have been very successful in finding security flaws and building malware to attack Apple's users. It is likely that these groups, as well as other offensive units belonging to adversaries of the United States, have built their own unauthorized iOS emulation frameworks to provide equivalent capabilities to Corellium.

32. There is an ecosystem of research groups that provide vulnerabilities to governments allied with the United States. One such company is Azimuth Security, founded by Mark Dowd, a respected security researcher and co-author of The Art of Software Security Assessment. Azimuth is currently owned by L3Harris Technologies of Melbourne, Florida. L3Harris is a well-known defense contractor supplying the United States government and its allies (*2019 Annual Report*, L3Harris, at 3 (2019), https://www.l3harris.com/documents/L3Harris-2019-Annual-Report.pdf ). Page 21 of the L3Harris Annual Report states that approximately 75% of L3Harris's revenues consists of sales to or through the United States government. Azimuth is an openly acknowledged customer of Corellium.

33. There are concerns by tech companies about the use of such vulnerabilities by the United States and its allies and a belief by many engineers and activists that such flaws should be fixed immediately instead of patched. These concerns led to the development of the Vulnerabilities Equities Process (VEP) by the Obama Administration as a mechanism for weighing potential value of a new exploit to the United States against the risk of it being patched.

**EXPERT REPORT AND DECLARATION OF ALEXANDER STAMOS**  Page 10

34. While there are legitimate issues to be addressed between Apple, other major tech companies and the intelligence services of the United States, there is no upside to Apple or its users to eliminating the ability of Azimuth and other Western research groups to perform vulnerability research. Ceding the field to the intelligence services of the Russian Federation and People's Republic of China, as well as mercenaries such as NSO Group, only guarantees that any vulnerabilities they find first will be used offensively instead of being reported to Apple.

35. Apple has validated the value of Corellium's research by recognizing Corellium through the bug bounty program. Those instances are publicly available and found here: *About the security content of iOS 13.3 and iPadOS 13.3*, APPLE.COM (Dec. 10, 2019), https://support.apple.com/en-us/HT210785; *About the security content of iOS 13.3.1 and iPadOS 13.3.1*, APPLE.COM (Jan. 28, 2020), https://support.apple.com/en-us/HT210918; *About the security content of macOS Catalina 10.15.3, Security Update 2020-01 Mojave, Security Update 2020-001 High Sierra*, APPLE.COM (Jan. 28, 2020), https://support.apple.com/en-us/HT210919.

36. The fact Apple recognizes Corellium is contrary to its position in this lawsuit that Corellium is doing something other than engaging in or enabling security research.

37. The Corellium product has limited use: software research, application debugging and application testing. No consumer would purchase Corellium to replace an iPhone to talk, text, use Facetime, browse Facebook, or perform any of the normal functions of an iOS device. Corellium is making use of compiled code that Apple provides as a public download and this use is significantly in the public's interest – to assure a safer, more private and reliable iOS operating system.

38. All software has vulnerabilities, and it is very difficult to think of a computing platform that hasn't been attacked by authoritarian governments in service of suppression of local

**EXPERT REPORT AND DECLARATION OF ALEXANDER STAMOS**      **Page 11**

dissent. Apple should not be blamed for the existence of software flaws. However, their insistence on controlling the narrative around security on their products, which has suppressed the ability for independent researchers to find these flaws and report them responsibly, is ethically questionable and has possibly led to real risks for their users. Apple is failing to protect the privacy of their users on their own; allowing the rest of the security community to use Corellium to test their products is the least they can do for the more than one billion iOS users around the world.

39. It is my opinion that the Corellium product constitutes fair use of iOS—the copyrighted works at issue in this lawsuit. In order to properly investigate security issues in iOS, you must have access to a system that allows for execution, inspection and debugging. From my personal experience using the Corellium system, I know that Corellium provides security researchers a mechanism to study and work with iOS and iOS applications.

40. I understand the fair use analysis consists of the following factors, which are non-exclusive and non-exhaustive, found in 17 U.S.C. § 107: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. I have been provided a copy of the Supreme Court's decision in *Campbell v. Acuff-Rose, Inc.*, 510 U.S. 569 (1994) on fair use to understand how this statute works. The below analysis takes this into account.

41. With respect to the first element, Corellium is a security research tool. It is used for research, criticism, and comment to improve iOS. It allows users to work with iOS in ways that did not exist before the creation of Corellium. My opinion is that the Corellium product is transformative.

**EXPERT REPORT AND DECLARATION OF ALEXANDER STAMOS**        **Page 12**

42. There are numerous public comments confirming the transformative nature of Corellium – a few are found here:

- "For security researchers, [Corellium's] software-only versions of the Apple operating system are incredibly valuable. For instance, it's possible to use Corellium to pause the operating system and analyze what's happening at the code level. Some in the industry have called it 'magic,' as it should help security. researchers uncover vulnerabilities with greater ease and speed than having to work with a commercial iPhone." Thomas Brewster, *Apple Sues Cybersecurity Startup for 'Illegally Replicating' iPhone for iOS*, FORBES (Aug. 15, 2019), https://www.forbes.com/sites/thomasbrewster/2019/08/15/apple-is-suing-a-cybersecurity-startup-for-illegally-replicating-iphones/#7d0ff994522b.

- "Just got my hands on @CorelliumHQ—saying that my mind is blown is an understatement. This is the future of iOS security research. (and my eternal fear of bootlooping my physical devices is gone) Huge thanks to @cmwdotme and @chronic!" Umang Raghuvanshi (@umanghere), TWITTER (July 5, 2018), https://twitter.com/umanghere/status/1014869509910523905.

- "There are now Go builders on build.goloang.org for android/arm, android/arm64, Darwin/arm64 (iOS) running on virtual @CorelliumHQ devices. Thanks to @steeve and @zenlyapp we might soon get rid of slow and unreliable physical test devices." Elias Naur (@eliasnaur), TWITTER (May 8, 2019), https://twitter.com/eliasnaur/status/1126015232478986242.

43. Because Corellium is so transformative, my understanding is that other factors such as the commercial nature of Corellium's product are of less significance. I am also aware of Article I, Section 8, Clause 8 of the United States Constitution, which states that the purpose of copyright law is to "promote the Progress of Science and useful Arts." Given the above—including Apple's recognition of Corellium—it is apparent that Corellium is promoting the progress of science and useful arts. The commercial nature of Corellium does not carry much significance as the Supreme Court explained in the *Campbell* decision.

44. The second factor of fair use is "the nature of the copyrighted work." The copyrighted work here is iOS and other Apple operating system software. In order to research

software one must have access to the software and the ability to execute it in a controlled environment. Corellium provides a user an improved platform to research, study and work with the Apple software at issue. The nature of the Apple copyrighted work being software should not weigh against a finding of fair use. It should weigh in favor of it due to the entirely different environment in which Corellium operates—security research.

45.     The third fair-use factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." Security researchers desire the ability to examine all of the security relevant portions of iOS in as accurate an environment as possible. Corellium uses a substantial portion of iOS because an accurately emulated environment is needed for comprehensive security research. It also transforms iOS to be able to operate in a virtualized environment. In addition, Corellium provides third-party research tools and its own research tool, CoreTrace, to enable research in its virtual environment. These additions advance security research—they provide ways to research iOS that did not exist previously. The Supreme Court explained in *Campbell* that "the extent of permissible copying varies with the purpose and character of the use." With Corellium, the purpose and character of the use is security research, app design and testing. Full access to iOS is needed to do those things, which weighs in favor of fair use.

46.     The fourth fair-use factor is "the effect of the use upon the potential market for or value of the copyrighted work." Corellium does not duplicate the iPhone, iPad or any other Apple device. If an Apple user wants to talk, text, email, use apps or get on the Internet—while walking down the street or otherwise—Corellium will not fill that need. To my knowledge, Apple has not lost a single iPhone or iPad sale due to the Corellium product.

**EXPERT REPORT AND DECLARATION OF ALEXANDER STAMOS**              **Page 14**

47. The physical devices (like iPhones) that are used for security research are often "second-hand" devices, and it is likely that security researchers utilizing Corellium will continue to keep libraries of such devices to verify their findings on actual Apple hardware.

48. The potential existence of Apple's "dev fused" debug devices do not change my opinion on the usefulness of Corellium to the security research community. As mentioned previously, Apple's special debug devices will be released on an invite-only basis, and, I believe, will be subject to strict non-disclosure agreements. This seems like an intentional decision to exclude some of the most effective iOS security researchers, such as those working for Google's Project Zero team whom discovered the use of iOS flaws against Chinese citizens. Despite a summer 2019 announcement by Apple, the debug devices have yet to be released and no further details have been provided to the security research community. While nobody outside of Apple has been able to examine these devices, it is quite possible that research on a physical debug iPhone will still be inferior to research on the virtualized Corellium platform. Due to these current and likely future limitations, I believe that it is in the public interest to find fair use and keep Corellium available for security research.

49. It is my opinion that the Corellium product's use of iOS is fair.

50. I also understand that Apple has sued Corellium for violations of the Digital Millennium Copyright Act. I have been provided with the applicable law along with Apple's First Amended Complaint and Demand for Jury Trial alleging Unlawful Trafficking violations per 17 U.S.C. §§ 1201(a)(2), 1201(b), and 1203. I fail to see how Apple can make this claim in light of my analysis above along with my understanding of the history of the Digital Millennium Copyright Act. The Corellium product is designed for security research, app design and testing. The Corellium product is not designed for circumventing a technological measure; it has a significant

purpose (i.e. security research, app design and testing) other than circumventing a technological measure, and it is not marketed by Corellium for use in circumventing a technological measure. It is marketed for security research and to enable more rapid development of mobile applications.

51. The fact that certain uses of Corellium allow for "jailbreaking" does not change my opinion. It is well known by security researchers that one method to research iOS flaws is to use a combination of iOS flaws to "jailbreak" the phone. Because Corellium is "jailbreaking" a phone in the virtual environment it does not have the same impact as a "jailbreak" that would occur on a physical device. The Corellium modifications occur inside of the emulated research environment and are made only to allow for proper operation and inspection of the system. Apple knows this and, in my opinion, is stretching the DMCA to techniques that are necessary for basic security research.

52. Any ruling in Apple's favor would serve no purpose other than to chill security research, and such a ruling could be used by a variety of irresponsible software vendors to suppress research instead of participating in responsible coordinated disclosure. My opinion and understanding is that such an effect was never the intent behind the DMCA and that such a ruling would have a negative impact on the safety of iOS users. These opinions are relevant to Section 1201(a)(2).

53. With respect to Apple's claim for violation of Section 1201(b), a similar analysis applies. The Corellium product does not fit the criteria set forth in Section 1201(b)(1)(A), (B), or (C). It is not designed to circumvent protection afforded by a technological measure, has a significant purpose of security research (which Apple publicly acknowledges), and it is not marketed for use in circumventing protection afforded by a technological measure. Corellium's modifications to iOS are confined to the virtual devices hosted on Corellium's servers and can

**EXPERT REPORT AND DECLARATION OF ALEXANDER STAMOS**     **Page 16**

have no impact on iOS running on physical device. I do not see how Corellium can "traffic" in any circumventions given the manner in which it operates.

54. Corellium is offering to security researchers a transformative platform that provides unique and important capabilities. In my opinion as a security researcher reading the DMCA provisions at issue, and understanding their applicability, I see no violations given my first-hand knowledge of Corellium.

55. Finally, I am aware of 17 U.S.C. § 1201(c)(1) stating that "[n]othing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title." It is my firm opinion that the Corellium product represents fair use as described above.

56. I reserve the right to supplement, amend, or update this declaration and report based on further information made available to me. I am aware there are depositions and documents being taken and exchanged in this case which I have yet to consider. I would like the right to consider any pertinent information and add to my opinions, if necessary. In addition, to the extent I testify at trial, I reserve the right to comment on any testimony placed before the jury which is not known at this time and may not be known until trial.

57. My rate of compensation for expert witness work is $600 per hour plus reimbursement of reasonable and necessary expenses.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 28th day of February 2020 in Stanford, CA.

*[signature]*

Alexander Stamos