DEX  19

1              UNITED STATES DISTRICT COURT

             SOUTHERN DISTRICT OF FLORIDA

2

              CASE NO. 9:19-cv-81160-RS

3

4   APPLE INC.

5       Plaintiff,

6   vs.

7   CORELLIUM, LLC,

8       Defendant.

   _____/

9

10

11                  Zoom, Virtual Deposition

                Friday, 9:31 a.m.-3:26 p.m.

12                March 27, 2020

13         ATTORNEY'S EYES ONLY

14     VIDEOTAPED DEPOSITION OF STEPHEN DYER

15

16      Taken on Behalf of the Plaintiff before

17   Lisa Gerlach, Court Reporter, Notary Public

18   in and for the State of Florida at Large,

19   pursuant to Plaintiff's Notice of Taking

20   Deposition in the above cause.

21

22

23

24

25

                                  Page 1

ATTORNEYS' EYES ONLY

```
 1          Virtual Appearances through Zoom:
 2            Counsel for the Plaintiff:
 3            JESSICA STEBBINS BINA, ESQUIRE
              Latham & Watkins, LLP
 4            10250 Constellation Boulevard
              Suite 1100
 5            Los Angeles, CA 90067
              424-653-5525
 6            jessica.stebbinsbina@lw.com
 7
              Counsel for the Defendant and Witness:
 8
              JONATHAN VINE, ESQUIRE
 9            Cole Scott & Kissane
              222 Lakeview Avenue
10            Suite 120
              West Palm Beach, FL 33401
11            561-383-9203
              jonathan.vine@csklegal.com
12
13            Present with the witness:
14            Amanda Gorton
15
16
17
18
19
20
21
22
23
24
25
```

Page 2

ATTORNEYS' EYES ONLY

```
 1                        INDEX

 2   WITNESS          EXAMINATION                PAGE

 3   Stephen Dyer

 4          Direct by Ms. Bina                    5

 5

 6

 7

 8

 9                  PLAINTIFFS' EXHIBITS

10                        None

11                  DEFENDANTS' EXHIBITS

12   Exhibit 16     LinkedIn Profile, Stephen Dyer   12

13   Exhibit 17     Correllium-026345 through 026456  37

14   Exhibit 18     Correllium-014521              63

15   Exhibit 19     Correllium-008119              64

16   Exhibit 20     Correllium-005799             133

17   Exhibit 21     Correllium-012078             139

18   Exhibit 22     Correllium-013523             146

19   Exhibit 23     Correllium-012128             148

20   Exhibit 24     Correllium-013280             162

21

22

23

24

25

                                          Page  3
```

ATTORNEYS' EYES ONLY

```
 1              THE VIDEOGRAPHER:  Good morning.  We're
 2         going on the record at 9:31 a.m. Eastern time
 3         on March 27, 2020.  Please note the
 4         microphones are very, very sensitive and may
 5         pick up whispering.  Please try and speak
 6         slowly, keeping your voices up at all times.
 7         Please silence all cell phones and place them
 8         away from the microphones, as they may
 9         interfere with the audio.  All audio and
10         video will take place until all parties agree
11         to go off the record.
12              This is media number one of the
13         video-recorded deposition of Stephen Dyer,
14         taken by counsel for plaintiff, in the matter
15         of Apple Inc. vs. Corellium, LLC, filed in
16         the United States District Court, Southern
17         District of Florida, Case Number
18         9:19-cv-81160-RS.
19              This deposition is taking place via Zoom
20         Virtual.  All participants are attending
21         remotely.  My name is Brandon Miller, from
22         the firm Veritext Legal Solutions, and I'm
23         the videographer.  The court reporter is Lisa
24         Gerlach, from the firm Veritext Legal
25         Solutions.  I'm not related to any party in
```

Page 4

ATTORNEYS' EYES ONLY

```
 1        this action, nor am I financially interested
 2        in the outcome.
 3             Counsel and everyone attending remotely
 4        will now state their appearances and
 5        affiliations for the record, and then the
 6        reporter will swear in the witness.  Thank
 7        you.  You may proceed.
 8             MS. BINA:  I'm Jessica Stebbins Bina,
 9        Latham & Watkins, on behalf of plaintiff,
10        Apple.
11             MR. VINE:  This is Jonathan Vine.  I'm
12        with the law firm of Cole Scott & Kissane.  I
13        represent Corellium and the witness.
14   THEREUPON,
15                     STEPHEN DYER,
16        A Witness herein, acknowledged after having
17   been duly sworn and testified upon his oath as
18   follows:
19             THE WITNESS:  Yes.
20                 DIRECT EXAMINATION
21   BY MS. BINA:
22        Q.  Good morning, Mr. Dyer.
23        A.  Good morning.
24        Q.  How are you this morning?
25        A.  I'm doing well.  Yourself?
```

Page 5

ATTORNEYS' EYES ONLY

```
 1        Q.   Doing okay.  It's early here.

 2             Have you ever been deposed before?

 3        A.   I have not.

 4        Q.   Do you understand that you're under oath,

 5   just like you would be if you were testifying in

 6   court?

 7        A.   I do.

 8        Q.   And I'm going to go through a few sort of

 9   basic deposition principles to make sure you and I are

10   on the same page.

11             Before that, I did want to note for the

12   record -- is there someone in the room with you today?

13        A.   Yes.

14        Q.   Who is that?

15        A.   Amanda Gorton.

16        Q.   I'm sure that you and Ms. Gorton are both

17   well aware of this, but, during the deposition, I'm

18   going to ask that you not consult with anyone other

19   than your attorneys regarding your testimony, so we

20   can be certain that your testimony today is your own.

21             Is that fair?

22        A.   That's fair.

23        Q.   So, this deposition is being recorded by

24   audio and video, so I'm going to ask questions and

25   you're going to answer them.  It's very important that
```

Veritext Legal Solutions
866 299-5127

ATTORNEYS' EYES ONLY

```
 1    we don't do that at the same time, because the court
 2    reporter is taking down what we say and she needs to
 3    have a good record.
 4           So, we've noticed that, with video
 5    depositions, sometimes there's a bit of a lag.  If I
 6    start to speak and you're not finished with your
 7    question [sic], please, just let me know that.  I
 8    won't intentionally interrupt you, but sometimes, if
 9    you pause, the video takes a moment to catch up.
10           So, can you let me know at any point today if
11    you're not finished with an answer?
12        A.  Sure.
13        Q.  And it's important also that you give verbal
14    answers to the questions so that the court reporter
15    can take them down, rather than gestures or uh-huhs or
16    uh-uhs.
17           Can you make sure that all of your answers
18    are words?
19        A.  Yes.
20        Q.  If at any point you don't understand a
21    question, please, let me know.  Because, if you answer
22    it, I'm going to assume that you understood it.  Okay?
23           Can you let me know if you don't understand a
24    question?
25        A.  Yes.
```

Page  7

ATTORNEYS' EYES ONLY

```
 1        Q.  I apologize.  I thought I closed out of that
 2   program that was making noise.
 3             MR. VINE:  I've got to say, Jessica, the
 4        clarity is much better today than it was in
 5        the past depositions.
 6             MS. BINA:  Right now, I have the ear
 7        piece on.  So, hopefully, it won't fritz up
 8        on us.  That will make everything better.
 9        Each time we do this, Jonathan, I'm trying a
10        new method of connecting.
11             MR. VINE:  Awesome.  God willing.
12        Absolutely.
13   BY MS. BINA:
14        Q.  Mr. Dyer, if, at any point, you can't hear
15   me, please let me know that as well.  There have been
16   some technical challenges with these remote
17   depositions.
18        A.  Okay.
19        Q.  Without telling me any conversation you had
20   with your attorneys, can you tell me what, if
21   anything, you did to prepare for today's deposition?
22        A.  I met yesterday with our attorney, Jonathan.
23        Q.  Anything else?
24        A.  No.
25        Q.  How long did you meet with Mr. Vine for?
```

Page 8

ATTORNEYS' EYES ONLY

```
 1          A.  About an hour or so.

 2          Q.  Did you review any documents with him?

 3          A.  No.

 4          Q.  Have you otherwise reviewed any documents in

 5     connection with today's deposition?

 6          A.  No.

 7          Q.  Prior to today, had you met with Mr. Vine to

 8     prepare for testimony?

 9          A.  No.

10          Q.  Prior to yesterday, did you speak with anyone

11     other than your attorney to prepare for your

12     deposition?

13          A.  No.

14          Q.  Have you discussed this deposition with

15     anyone other than your attorney?

16          A.  No.

17          Q.  What is your current title at Corellium?

18          A.  Vice-president of sales and business

19     development.

20          Q.  Has that been your title the entire time

21     you've been at Corellium?

22          A.  Yes.

23          Q.  How long have you worked there?

24          A.  I started in early 2019.

25          Q.  By the way, I forgot one point out of the
```

Page 9

ATTORNEYS' EYES ONLY

```
 1    preamble earlier.  If, at any point, you need a break,

 2    please, just let me know and we can go off the record.

 3    The only time I'll ask -- I ask, if there's a question

 4    pending, that you answer my question before we go off

 5    the record.  Otherwise, you can take a break at any

 6    time.  Okay?

 7         A.  Okay.

 ▮        ▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  LLC?

 ▮        ▮    ▮▮▮▮▮▮▮

10         MR. VINE:  Objection.  Jessica?  Fine.

11    Go ahead.

12         MS. BINA:  You said "objection," right?

13         MR. VINE:  I was going to clarify

14    something about the word "member."  He may

15    not have the same understanding of member as

16    you do.  By all means, go ahead.

17         MS. BINA:  I'll ask him.

18    BY MS. BINA:

19         Q.  Just so we have a clear record, are you a

20    member of the LLC, like an LLC member?  When you say

21    "member," you just mean you're an employee of the

22    company?

23         A.  I'm not a member.  I'm an employee.  I should

24    have specified that earlier.

25         Q.  No worries.  I think that's why your counsel
```

Page 10

ATTORNEYS' EYES ONLY

```
 1    objected, just so we have a clear record here.
 2           Mr. Dyer, do you have in front of you the
 3    exhibit application?
 4       A.  No.  I have just the Zoom window.  And I can
 5    access -- if I need to, I can pull up maybe e-mails.
 6           Are you able to e-mail this to me?
 7       Q.  No.  We need to use the exhibit application
 8    so everything goes into the record.
 9           MR. VINE:  Let me interrupt, Jessica.  I
10           was going say, Amanda has the icon from her
11           deposition, so she'll know exactly where to
12           go.
13           MS. BINA:  Let's go off the record for
14           three or four minutes and get the witness set
15           up.  Then we can go back on.
16           MR. VINE:  Steve, I can send you the
17           link, absolutely.
18           MS. BINA:  Great.  Can we go off the
19           record just for a second and he'll get that
20           sorted?
21           MR. VINE:  Yes.
22           THE VIDEOGRAPHER:  Going off the record
23           at 9:41 a.m.
24           (Off record.)
25           THE VIDEOGRAPHER:  We are back on the
```

Veritext Legal Solutions
866 299-5127

ATTORNEYS' EYES ONLY

```
 1          record at 9:45 a.m.  This marks the beginning

 2          of media number two in the deposition of

 3          Stephen Dyer.

 4                You are able to proceed, Counsel.

 5                (Plaintiff's Exhibit 16 was marked for

 6          identification.)

 7     BY MS. BINA:

 8          Q.  Mr. Dyer, what I've marked as Exhibit 16, if

 9     you can please open that?  I believe it's your

10     LinkedIn profile, but I'm going to ask you to confirm

11     that for me.

12          A.  Okay.  Yes, it appears to be my LinkedIn

13     profile.

14          Q.  Is this an accurate record of your employment

15     and education history?

16                MR. VINE:  Objection.

17          A.  It appears so.

18     BY MS. BINA:

19          Q.  Are there any significant post-college

20     employments that are not reflected on this document?

21     I notice that there's a gap between graduation from

22     university and Best Buy, which appears to be the

23     earliest employment date.

24                Is there anything else before that time

25     period?
```

Page 12

ATTORNEYS' EYES ONLY

1     A.  Yes.  It's not necessarily significant, but

2   when I graduated from college, to give myself

3   management experience, I took a job as a front-end

4   manager at Walmart in Gainesville, Florida, which is

5   not listed, and I probably assume, due to spacing on

6   here, is why I left that out.

7     Q.  Understood.  Anything else that you've done

8   since graduation from college, employment-wise?

9     A.  No.  This appears to be an accurate work

10  history to my knowledge.

11    Q.  Your educational background was in economics?

12    A.  That's correct.  I studied economics at the

13  University of Florida.

14    Q.  You had a double minor in finance and

15  business administration?

16    A.  Yes.  I studied finance and business

17  administration, along with the economics degree.

18    Q.  So I would assume that it included accounting

19  and finance courses and business courses?

20    A.  Yes.  Something to that effect.

21    Q.  Did you take any marketing courses?

22    A.  Not that I recall.  Nothing specific to

23  Marketing 201 or anything like that.

24    Q.  Do you personally have any background in

25  technical computer programming or engineering --

Page 13

ATTORNEYS' EYES ONLY

1    software engineering?

2        A.   No.

3        Q.   I mean formal or informal here; not just

4    formal education.

5        A.   No, not in the engineering aspect.

6        Q.   Is it fair to say that your role at Corellium

7    is not a technical computer engineering role?

8        A.   That's fair to say.

9        Q.   How did you come to join Corellium, LLC?

10       A.   I would say it started a number of years back

11   when I met Chris Wade.  I met Chris Wade when I was

12   working at Best Buy.  He was a client of mine.

13       Q.   Was he a corporate client on behalf of

14   Corellium or an individual client?

15       A.   At the time I met Chris Wade, he was an

16   individual client, or a customer, to put it simply.

17       Q.   Do you remember approximately when that was?

18       A.   I don't remember approximately, but I would

19   say it was at least three years ago at a minimum.

20       Q.   Was Mr. Wade a frequent customer?

21       A.   Yes.

22       Q.   How did your relationship evolve from him

23   being a customer of Best Buy to you going to work at

24   Corellium?

25       A.   When I initially met Chris -- I mentioned

ATTORNEYS' EYES ONLY

1    earlier, at Best Buy, he was a customer -- he was

2    purchasing product for -- in a category that I share a

3    similar passion with.  So in the course of regular

4    interactions with Chris, I learned that he shared the

5    same passion for this product line.  As he was going

6    through an extensive period of build-out, as we would

7    call it, where you -- as an employee at Best Buy at

8    the manager level that I was at, I often had to

9    frequently meet with customers, and that could be

10   whether it was in-store or at their home.

11          So, over the course of a number of months, I

12   met Chris numerous times and we had a common bond or

13   passion for this product line.  We merged or formed a

14   relationship from just business to more of a

15   friendship over the course of him purchasing product.

16        Q.  What product line was that?

17            MR. VINE:  Objection.

18        A.  It's home theater product things, like audio

19   equipment and audio-video components, projectors,

20   things like that.

21   BY MS. BINA:

22        Q.  About how long would you say that you and

23   Mr. Wade were interacting through this customer

24   relationship at Best Buy when you were providing him

25   information and meeting with him?

Veritext Legal Solutions
866 299-5127

ATTORNEYS' EYES ONLY

1       A.   I would say it was in the ballpark -- a range

2  of six months.

3       Q.   Did you meet anyone else from Corellium, LLC

4  during that time period?  For instance, Ms. Gorton?

5       A.   Yes, I would have met Amanda Gorton through

6  the same course and timeframe that you mentioned -- or

7  I mentioned -- of six months.  I would have met

8  Amanda.

9       Q.   Anyone else?

10      A.   No, not that I'm aware of.

11      Q.   So you became friendly with Mr. Wade and

12 maybe, to some extent, with Ms. Gorton.

13           How did that then transition into employment

14 by you at Corellium?

15      A.   Well, as I mentioned before, the time that I

16 spent with Chris and Amanda -- with Chris more

17 directly -- throughout that six-month timeframe, we

18 began to -- I began to share more information about

19 myself, my work history, what my goals were, and, more

20 or less, what my capacity was at Best Buy, which was

21 not just to sell and meet with clients regarding audio

22 equipment.

23           When I left Best Buy in late 2016, I took a

24 role with Office Depot Corporate Headquarters.  And,

25 at the same time, I am still friends or forming a

                                              Page 16

1    relationship with Chris.  And I explained what my

2    duties were -- not just at Best Buy -- where I worked

3    with some of our business-to-business folks, working

4    with kind of an entry-level enterprise sales

5    background, which is what I gathered at Best Buy.

6            When I worked with -- transitioned and

7    recruited into Office Depot, I built on that.  I

8    formulated more of skill set in the enterprise

9    business sector, as well as advancing my skill set

10   from a people manager, trainer mentality.  And with

11   this being built with the goal of continuing to move

12   into a B-to-B or business-to-business career set.

13           And throughout my time at Office Depot, I

14   again, with the relationship that I had with Chris, I

15   found out that he was -- him and Amanda were starting

16   a company.  To me, that sounded very attractive,

17   because I typically always worked for large, large

18   corporations.  As I mentioned earlier, Walmart -- that

19   was left off the resume due to spacing -- Best Buy,

20   Office Depot.  These are large, large organizations.

21           There's a certain attraction to a small

22   business or a startup mentality.  Just feedback that I

23   received from friends or just common knowledge that I

24   have, it seemed exciting and it seemed different than

25   what I had been accustomed to for so many years.

Page 17

ATTORNEYS' EYES ONLY

```
 1           Chris was always very encouraging that I
 2   continue to progress my career, learn more about the
 3   business-to-business sector, do what I can to learn
 4   about the technology piece because it's constantly
 5   evolving.
 6           So, I want to say, I asked for a position --
 7   many times, actually, I asked if there was a spot or a
 8   role or a sales position in this new company that they
 9   were forming; that I would be interested in
10   potentially applying or applying myself in that
11   position.
12           Throughout the course of 2018, I would say,
13   as I was asking Chris -- I don't know the frequency at
14   which I asked -- I did ask on more than one occasion,
15   "Do you have a position available?  I'd like to -- be
16   interested in applying for that or going after that
17   position."
18           It was very, very late 2018 that Chris said
19   there may be a potential for a position, at which,
20   again, I was still very interested in.  In 2019, I
21   officially came aboard in a position.
22      Q.  Are you still employed by Office Depot or
23   only by Corellium at this point?
24      A.  I'm only employed by Corellium.
25      Q.  Your CV says "September 2016 to the present"
```

Page 18

ATTORNEYS' EYES ONLY

1    for Office Depot, so I wasn't certain.

2          At what point did you leave Office Depot?

3          A.  Thank you for calling that out, first of all.

4    Apparently, obviously, I need to have that updated.

5          I left Office Depot potentially in the April

6    or May timeframe.  It's possible that that was the

7    timeframe that I left.

8          Q.  Of 2019?

9          A.  2019.

10         Q.  It looks like your start date at Corellium

11   was April 2019.

12         Would that have been around the same time you

13   left Office Depot?

14         A.  Yes.  My official start date may have even

15   been in April of 2019 with Corellium, which would have

16   coincided with the exiting of Office Depot.

17         Q.  Let's talk about your job at Corellium.  You

18   mentioned a moment ago that you worked on getting

19   yourself a more technical understanding of the product

20   in advance of coming to Corellium.

21         Was that of the Corellium product or of

22   products like Corellium -- computer products more

23   generally -- or both?

24         MR. VINE:  Objection.  To the extent you

25      can answer, you can answer the question.

Page 19

ATTORNEYS' EYES ONLY

1    BY MS. BINA:

2        Q.  To be clear, I'm only asking what you were

3    learning about in that time period.

4            MR. VINE:  Objection.

5        A.  In general, technology just in general.  Per

6    my resume, you can see that I have no formal

7    background in the technical aspect of technology.  My

8    experience has been more focused on a sales aspect,

9    whether that be from a business-to-business

10   standpoint, enterprise sales, or from a retail

11   standpoint of the products.

12           So, just in general, keeping up-to-date with

13   technology.  And this is very broad.  It's nothing

14   specific.

15   BY MS. BINA:

16       Q.  At the time you came to Corellium, did you

17   understand what the Corellium CORSEC product was?

18           MR. VINE:  Objection.

19       A.  No, not necessarily.  I didn't know the ins

20   and outs of the product line in specifics of what it

21   was capable of -- capable of doing.

22   BY MS. BINA:

23       Q.  Do you understand those better now, having

24   worked there for a year and a half or, I guess, a year

25   and a quarter?

Page 20

ATTORNEYS' EYES ONLY

1            MR. VINE:  Objection.

2       A.  No.  Not necessarily, no.  I have a better

3   understanding of the product now, in essence, in the

4   specifics of how to present the product to somebody

5   with a specific use case.  But when it comes to the

6   engineering aspect, the formal technical aspect, even

7   what certain acronyms mean, I don't have a firm

8   understanding, even after my timeframe of being here

9   around the product line.

10  BY MS. BINA:

14            MR. VINE:  Objection.

17  BY MS. BINA:

18       Q.  Is that it?

19       A.  Yes.

20       Q.  Turning back to Exhibit 16, you describe here

21   your role at Corellium and you describe a little bit

22   about the Corellium Apple product.

                                            Page 21

ATTORNEYS' EYES ONLY

████████████████████████████████████████

████████████████████████████

██████████████████████████████ of the advanced

4    capabilities that are provided?  Again, I know you're

5    not a technical expert.  I'm asking for your

6    understanding in your role.  What are --

7         MR. VINE:  Objection, to the extent you

8         know.

9    BY MS. BINA:

10        Q.  All I'm asking is your knowledge, Mr. Dyer.

11   This is your CV.

████   ████   ██████████████████████████████

████████████████████████████████████████████

████   ██████████████████████████

15        Q.  Do you know what those tools are?

16             MR. VINE:  Objection.

17        A.  I do not.

18   BY MS. BINA:

19        Q.  The next sentence here says, "Our platform is

20   ideal for a number of direct use cases within the

21   security field," and then you provide some categories.

22             What is pen testers or what are pen testers?

23        A.  To my knowledge, pen testers are folks who

24   perform penetration tests -- again, at a very high

25   level -- are folks that are testing applications for

                                              Page 22

ATTORNEYS' EYES ONLY

1    reliability from a security standpoint.  This is what

2    these folks focus on.

3         Q.   What are forensics in this context?

4         A.   Forensics, to my understanding, is folks that

5    are primarily interested in attempting to look at or

6    investigate certain data on the phone, but I don't

7    know more than that.

 

 

 

11             MR. VINE:  Objection.

12        A.   I don't understand the question.

13   BY MS. BINA:

 

 

16             MR. VINE:  Objection.

17   BY MS. BINA:

 

 

20

 

 

 

 

25   BY MS. BINA:

Page 23

ATTORNEYS' EYES ONLY

```
 1        Q.   What is vulnerability research?
 2             MR. VINE:   Objection.
 3        A.   To my understanding, those are folks who just
 4   want to research the operating system.
 5   BY MS. BINA:
 6        Q.   Research it to find vulnerabilities in it?
 7        A.   You know, without answering definitively --
 8   that sounds like a very technical question -- I
 9   wouldn't feel comfortable answering.
10        Q.   Again, just to be clear, I'm not looking for
11   technical information.  I'm looking for your best
12   understanding as a person who sells this product.  So
13   I'm not going to hold you to the technical
14   explanation, but I am entitled to your best
15   understanding of what the product that you sell does.
16             Anything to add on vulnerability research to
17   your understanding?
18        A.   No.
19        Q.   What about automation; what is that?
20        A.   To my understanding, this would be
21   individuals who may want to test an application as
22   well, and automate said testing across a number of
23   mobile devices.
```

Page 24

ATTORNEYS' EYES ONLY



Page 25

ATTORNEYS' EYES ONLY



Page 26

ATTORNEYS' EYES ONLY



23        Q.   I'm going to ask you some more questions

24    about that in a moment, but, first, a little more

25    background.

Page 27

ATTORNEYS' EYES ONLY

```
 1              Do you know anyone who works at Apple Inc.?
 2         A.   I do not know anybody personally that works
 3    for Apple Inc.
 4         Q.   What do you mean by personally?  Why that
 5    qualification?
 6         A.   I couldn't name names or individuals that I
 7    have had conversations with and call them in context
 8    with Apple on a daily basis, is what I meant by
 9    personal.
10              I have met Apple employees at times
11    throughout the course of this position, but they're
12    not contacts that I would say -- when I meant
13    personal, maybe I would have their cell phone number
14    or something to that effect.
15
```

Page  28



Page 29

ATTORNEYS' EYES ONLY

1　██████████████████　██████████████████

2　██████████████

3　　　Q.　Were you involved in organizing that list of

4　attendees?

5　　　　MR. VINE:　Objection.　He didn't say

6　　　there was a list.

7　　　　MS. BINA:　I'm sure he'll tell me if

8　　　there wasn't.

9　　　A.　I played a role in sending out invitations to

10　prospective clients, as well as clients, to attend the

11　event.

12　BY MS. BINA:

13　　　Q.　Do you know if you were the only one at

14　Corellium who sent out invitations to the event or did

15　other people at Corellium do so?

16　　　A.　I don't know.　I couldn't -- I don't know

17　with confidence if somebody else played a role or not

18　outside of mine.

19　　　Q.　How did you decide who to invite?

20　　　A.　Given my role and the relationships that I

21　started to form or have formed between onboarding in

22　the company to the date in which this party was, I

23　chose to invite folks that were current clients, as

24　well as potential clients.

25　　　Q.　With potential clients, were those people

Page 30

ATTORNEYS' EYES ONLY

1    that you had already had interactions with or people

2    that Corellium hoped to have interactions with in the

3    future?

4        A.   I would say, it was mainly people that we had

5    some form of interaction with.  To the extent which

6    those interactions were, I don't know.  But there were

7    names, when I looked through a potential client that

8    maybe I had an intersection with months earlier and

9    may have never met face to face, those were the

10   primary individuals, because I wanted to build rapport

11   with individuals that were potential clients.

12       Q.   Let me go back to that conference in a bit.

13            Just to close out, have you ever personally

14   applied to work for Apple?

15       A.   I don't recall personally applying to work

16   for Apple Inc.

17       Q.   Has anyone at Apple ever provided any

18   non-public or confidential information to you,

19   information that you understood was not public or

20   confidential?

21       A.   Not to my knowledge.

22       Q.   You testified a moment ago that your job has

23   many parts, but you would broadly describe it as

24   inspecting qualified leads and facilitating the

25   potential of the sales process with prospective

Page 31

ATTORNEYS' EYES ONLY

1    customers.

2         So, I guess, my first question is, how do you

3    identify target customers of Corellium?

4         MR. VINE:  Objection.



Page 32

ATTORNEYS' EYES ONLY



17          MR. VINE:  Objection.

19     BY MS. BINA:

Page 33

ATTORNEYS' EYES ONLY



5          MR. VINE:  Objection.

8      BY MS. BINA:

9

20          MR. VINE:  Objection.

21      BY MS. BINA:

34

ATTORNEYS' EYES ONLY



19    BY MS. BINA:

Page 35

ATTORNEYS' EYES ONLY



Page 36

ATTORNEYS' EYES ONLY



Page  37

ATTORNEYS' EYES ONLY



Page 38

ATTORNEYS' EYES ONLY



Page  39

ATTORNEYS' EYES ONLY



ATTORNEYS' EYES ONLY



9        Q.   What is [ ] last name?

18            MR. VINE:  Jessica, whenever you have a

19      chance where we could take a break?  We've

20      been going about an hour.

21            MS. BINA:  I was just going to say, we

22      should take our first break.

23            MR. VINE:  Perfect.

24            MS. BINA:  Let's go off the record.  Do

25      you want five minutes, Jonathan, or ten?

Page 41

ATTORNEYS' EYES ONLY

```
 1            MR. VINE:  We can say five, but you know
 2        what happens.
 3            MS. BINA:  Let's take, tentatively, five
 4        minutes.
 5            MR. VINE:  All right.  Perfect.
 6            THE VIDEOGRAPHER:  Stand by, everyone.
 7        This marks the end of media number two.
 8        Going off the record at 10:38 a.m.
 9            (Brief recess.)
10            THE VIDEOGRAPHER:  We're back on the
11        record at 10:47 a.m.  This marks the
12        beginning of media number three in the
13        deposition of Stephen Dyer.
14            You may proceed, Counsel.
15   BY MS. BINA:
16        Q.  Mr. Dyer, given our weird remote situation,
17   I'm just going to ask you after every break if you can
18   identify everybody in the room with you, please.
19        A.  Yeah.  No problem.  It's also a good time to
20   make sure my audio is coming through.
21            In the room here, I have Amanda Gorton.
22        Q.  Okay.  A moment before we broke, you were
23   talking about ████████████████████████████████████
     ██  ████████████████████████████████
25            Do you have an understanding in your mind of
```

Page 42

ATTORNEYS' EYES ONLY

1  what constitutes good faith security research?

2         MR. VINE:  Objection.

3      A.  My understanding of a good faith security

4  researcher would be somebody whose work is used for,

5  obviously, good of the public, whether that be safety

6  and security, but that benefits that of the public.

7  BY MS. BINA:

8      Q.  When you say, "benefit of the public," do you

9  mean individuals, governments?  Who do you include in

10  that category?

11         MR. VINE:  Objection.

12      A.  I would say, the public, as in the benefit

13  for all.  That could include -- that may include

14  government.  It may include an enterprise.  It may

15  include mass individuals.

16  BY MS. BINA:

17      Q.  Anyone else?

18         MR. VINE:  Objection.

19      A.  No.  Just the masses.

20  BY MS. BINA:

21      Q.  We were discussing your initial vetting

22  process.  Again, qualifying this to the initial

23  vetting process at this point.

Page 43

ATTORNEYS' EYES ONLY



 7      Q.  Sorry, Mr. Dyer.  I couldn't hear that answer

 8   at all.

 9

16           MR. VINE:  Objection.

17      A.  Could you repeat the question?

18   BY MS. BINA:

22           MR. VINE:  Objection.

24   BY MS. BINA:

                                        Page 44

ATTORNEYS' EYES ONLY



6          MR. VINE:  Objection.

17   BY MS. BINA:

20          MR. VINE:  Objection.

23   BY MS. BINA:

24      Q.  You don't have any interaction with Azimuth

25   personally.  Is that what you said?

Page 45

ATTORNEYS' EYES ONLY



```
 3          THE REPORTER:  I'm sorry.  I didn't hear
 4     the last part.
 5     A.  I'll state it again.  I apologize.




13     A.  No, not to my knowledge.




21          MR. VINE:  Objection.
```

Page 46

ATTORNEYS' EYES ONLY

1    BY MS. BINA:



Page 47

ATTORNEYS' EYES ONLY



Page 48

ATTORNEYS' EYES ONLY



```
12        Q.  Do you take notes electronically or by hand?
13        A.  I don't recall.  Maybe jotting down by hand
14   probably more so.
15        Q.  Do you save those notes anywhere?  Do you
16   have a notepad or anything along those lines?
17        A.  No, I don't.  I typically have scratch paper
18   that I jot things down on.
19        Q.  Then how would you follow up with the
20   engineering team?  Would that be by e-mail typically?
21        A.  Not necessarily.  Not necessarily.  You know,
22   we're a rather small team.  If I needed to call
23   someone or ask, maybe, Chris, who's in the office ten
24   feet away from me, I may just ask him.  If he's maybe
25   not available, I may have to call somebody on the team
```

Veritext Legal Solutions
866 299-5127

ATTORNEYS' EYES ONLY

1    directly.

2         I always feel that calling is better, just

3    because it's typically quicker for the response.  In

4    my line of work, I like to try to be attentive and

5    respond attentively -- to be attentive to my clients.



14        Q.  And Corellium offers both a cloud product and

15   an on-premises product; right?

16        A.  Yes, that's correct.

Page 50

ATTORNEYS' EYES ONLY

███████████████████████

    ███  █████████████████████ of different

3   versions of the on-premises product; right?  A couple

4   of different tiers, I guess, would be the best way to

5   say it.

6      A.   Yes.   Thank you for clarifying.   Yes.   There

7   are a few different tiers that are available for

8   on-prem clients.

███  ██████████████████████████████

████████████████████████████████

██████

12      MR. VINE:  Objection.

███  ███████████████████████████

████████████████████████████████

██████

16  BY MS. BINA:

███  ███  ███████████████████████

████████████████████████████

█████████████

20      MR. VINE:  Objection.

███  ████████████████████████

███████████████████████████████

███████████████████████████████

█████████████████████████████

████████████████████████████████

                                                       Page 51

ATTORNEYS' EYES ONLY

████████████████████

2  BY MS. BINA:

██  ████████████████████████████

███████████████████████

5         MR. VINE:  Objection.

██  ████████████████████████████

██████████████████████████████████

██████████████████████████████

████████████████  ██████████████████

████████████████████████████████████████

████████████████████████████████

███████████████████████████

13  BY MS. BINA:

14       Q.  Can you give me an example -- sorry.  I think

15  I lost connectivity for a moment.

16           Can you give me an example of a use case that

17  would not be a Corellium use case?

██  ████████████████████████████

██████████████████████████████████

███████████████████████████████

████████████  ██████████████████

███████████████████████████████

████████████████████████████████████

██████████████████████████████

███████████████████

                                    Page 52

ATTORNEYS' EYES ONLY

```
 1            THE VIDEOGRAPHER:  Counsel, can I go off

 2       the record a second?  Just one moment.  Stand

 3       by.  Going off the record at 11:05 a.m.

 4            (Off record.)

 5            THE VIDEOGRAPHER:  We are back on the

 6       record at 11:07 a.m. and this marks the

 7       beginning of media number four in the

 8       deposition of Stephen Dyer.

 9            You may proceed, Counsel.

10  BY MS. BINA:

11       Q.  Mr. Dyer, I think we had talked about the

12  next step in the process, which was to ask the

13  customer for a date in which the trial period should

14  begin.
```

Page 53

ATTORNEYS' EYES ONLY



22          MR. VINE:   Objection.

25     BY MS. BINA:

Page 54

ATTORNEYS' EYES ONLY



ATTORNEYS' EYES ONLY



```
 6          MR. VINE:  Objection.

 7   BY MS. BINA:

 8       Q.  To your understanding?

 9          MR. VINE:  Objection.
```

Page 56

ATTORNEYS' EYES ONLY



VINE:  Objection.

ledge, I would be

BY MS. BINA:

Page 57

ATTORNEYS' EYES ONLY



23          MR. VINE:  Objection.  If you know.

ATTORNEYS' EYES ONLY

2    BY MS. BINA:

8           MR. VINE:  Objection.

12   BY MS. BINA:

25           Q.  Understood.  At the point that the trial

Page 59

ATTORNEYS' EYES ONLY

```
1    period expires, it would seem to me that there are
2    three possibilities.  The user could not become a
3    customer, they could become a cloud customer, or they
4    could move forward with steps to become an on-premises
5    customer.
6            Is that right?
7        A.  If you don't mind, could you just repeat it
8    one more time?
9        Q.  Sure.  So it would seem to me, when a trial
10   period ends, the trial customer has three
11   possibilities.  One, they could not become a customer;
12   two, they could become a cloud-based customer; or,
13   three, they could start the process of or continue the
14   process to become an on-premises customer.
15           Is that right?
16       A.  I would say, yeah, that's fairly accurate.
17   Those are their three choices.
```

Page 60

ATTORNEYS' EYES ONLY



e majority of our clients that end

16    trial do not --

17         THE REPORTER:  Sorry.  You broke up.

18    BY MS. BINA:

19         Q.  You're cutting out.

20         A.  Sorry.  Just to be safe, would you mind

21    repeating the question?

22         MS. BINA:  Sure.  Madam Court Reporter,

23         would you mind just reading back the

24         question?

ATTORNEYS' EYES ONLY



14    BY MS. BINA:

15         Q.   As between the second and third buckets, do

16    you have an estimate?

17              MR. VINE:   Objection.

24    BY MS. BINA:

Page 62



21   BY MS. BINA:

Page 63



2          MR. VINE:  Objection.

5   BY MS. BINA:

8          MR. VINE:  Objection.

13  BY MS. BINA:

14      Q.  Can you describe for me what the current

15  pricing is?

Page 64



6          MR. VINE:  No worries.  Weird.

7    BY MS. BINA:

17          MR. VINE:  Objection.

20    BY MS. BINA:

21          Q.  Why don't you walk me through the current

22    on-premises products that Corellium offers and the

23    prices for each?

24          A.  Sure.  I apologize.  Did you say on-prem?

25          Q.  Yes.  Let's start with on-prem.

Page 65

ATTORNEYS' EYES ONLY



1      A.  For on-prem, we offer the same tiers of

2   licensing as the name of the license, so we offer a

3   standard, an enterprise, and a premium on-premises

4   license.

9      A.  That's correct.

19     Q.  Do you know -- scratch that, actually.

22     A.  That's accurate.  If you were a potential

23   client looking to purchase a standard license, those

24   fees are our posted retail fees.

25     Q.  Have those been your fees for the entirety of

Page 66

ATTORNEYS' EYES ONLY

1   your time at Corellium for the standard product or

2   have they changed?

3          MR. VINE:  Objection.



6   BY MS. BINA:

ATTORNEYS' EYES ONLY

1    BY MS. BINA:



6        Q.   The next tier listed here is the enterprise

7    tier.

18       Q.   What about for the premium product?

Page 68

ATTORNEYS' EYES ONLY

5        Q.   Then down below, there is hosted and cloud

6   pricing.

7            So my first question is, do you have four

8   different tiers for what's listed as -- actually, my

9   very first question -- what's the difference between

10  hosted and cloud?

11       A.   That's a good question.  I don't know.  I

12  don't use the terminology "hosted."  I use the

13  terminology "cloud" when referring to selling the

14  non-on-prem solution.

15       Q.   Are there different tiers of the cloud

16  product?

17       A.   Yes.

18       Q.   Are they four different tiers of essential,

19  standard, enterprise, and premium, or something else?

20       A.   Something else.  We offer two tiers of

21  licensing for the cloud solution, which --

22       Q.   I just lost you completely.

23            THE REPORTER:  The answer was, "something

24       else.  We offer two tiers of licensing for

25       the cloud solution, which" --

Page 69

ATTORNEYS' EYES ONLY

1    BY MS. BINA:

2         Q.   If you can finish the answer?   Thank you.

3         A.   -- which are standard and enterprise.   Those

4    are the tiers.

5         Q.   What's the pricing for the standard tier?

17        Q.   I'll turn back to pricing in a moment.

18             What are the differences in features between

19   the standard and enterprise versions of the cloud

20   product?

Page 70

ATTORNEYS' EYES ONLY



4          MR. VINE:  Objection.

7    BY MS. BINA:

8

ATTORNEYS' EYES ONLY



18          MR. VINE:  Objection.

23     BY MS. BINA:

Page 72

ATTORNEYS' EYES ONLY



6           MS. BINA:  Jonathan, just in terms of

7       timing here, my plan is to go until noon

8       Eastern and then take a 30-minute break,

9       unless someone would like a longer break for

10      lunch; in which case, I'm happy to break for

11      a longer period of time.  If anyone needs a

12      break sooner than that, please, just let me

13      know.

14           MR. VINE:  Noon is good from the defense

15      side.

16    BY MS. BINA:

Veritext Legal Solutions
866 299-5127

ATTORNEYS' EYES ONLY



3       A.   Okay.   I think I'm there.

12      A.   Okay.   Give me just one moment.

13      Q.   Yeah, sure.

Page  74

ATTORNEYS' EYES ONLY



6          MR. VINE:  Objection.

7

Page  75

ATTORNEYS' EYES ONLY



Page 76

ATTORNEYS' EYES ONLY

8           MR. VINE:  Objection.

9      A.  No, not to my knowledge.

10  BY MS. BINA:

11

13      A.  No, not to my knowledge.

17      A.  No, not to my knowledge.

18      Q.  No, you're not aware, or, no, there aren't

19  any to your knowledge?  Sorry.  It was a bad question.

Page 77

ATTORNEYS' EYES ONLY



1

12       A.  I was not.

17       A.  No.  I don't have any idea who that is.

Page 78

ATTORNEYS' EYES ONLY



2       A.   Okay.

3       Q.   Thank you.   The next sale, Lockheed Martin,

15           MR. VINE:   Objection.

18   BY MS. BINA:

Page 79

ATTORNEYS' EYES ONLY



Page 80

ATTORNEYS' EYES ONLY



11          MR. VINE:   Objection.

24          MR. VINE:   Objection.

Page 81

ATTORNEYS' EYES ONLY

██  ████████████████████████████████

2  BY MS. BINA:

██       ██   ████████████████████████████████

██       ██   ████████████████████████   ██████████████

██   ██████████████████████████████████████████

██   ████████████

7       Q.  It's okay.  I'm only asking for your best

8   recollection.  So, if you recall something, you recall

9   it; if you don't, you don't.

██           ████████████████████████████████████

██   ██████████████████   ████████████████████████

██   ██████████████████████████   ████████████████████

██   ██████████

14           MR. VINE:  Objection.

██       ██   ██████████████████████████████

██   ████████████████████████████████████

17  BY MS. BINA:

██       ██   ████████████████████████████

██   ████████████████████████████████████

██       ██   ████████

██       ██   ████████████████████████████

██       ██   ████████████████████████████

██   ████████████████████████████████████████

██   ████████████████████████████████████████████

██   ████████████████████████████████████

                                    Page 82

ATTORNEYS' EYES ONLY



14          MS. BINA:  I think, at this time, we

15      should go off the record for lunch/breakfast.

16          MR. VINE:  Perfect.  So we'll be back at

17      12:30.

18          MS. BINA:  Does that work for you,

19      Mr. Dyer, 1230?

20          THE WITNESS:  Yes.  That sounds fine.

21          THE VIDEOGRAPHER:  Stand by, please.

22      This marks the end of media number four.

23      Going off the record at 12:00 p.m.

24          (Lunch recess.)

25          THE VIDEOGRAPHER:  We are back on the

Page 83

ATTORNEYS' EYES ONLY

```
 1              record at 12:33 p.m.  This marks the

 2              beginning of media number five in the

 3              deposition of Stephen Dyer.

 4                   You may proceed, Counsel.

 5      BY MS. BINA:

 6              Q.  Good afternoon, Mr. Dyer.

 7              A.  Good afternoon.

 8              Q.  Just to confirm, are you still in the room

 9      with Amanda Gorton and no one else?

10              A.  Yes.  It's myself and Amanda in the room.

11              Q.  Mr. Dyer, over the lunch break, did you speak

12      with anyone other than your attorneys regarding your

13      deposition?

14              A.  I did not speak with anybody other than my

15      attorney.
```

██     ██     ████████████████████████████

██     ██████████████████████████████████████

██     ██████████████████████████████████████

██     █████████████████████

██          ███████████████████████████

██     ████████████████████████████████████████

██     ██████████████████████

██     ██     █████████████████████████████████

██     █████████████████

```
25              Q.  Sure.
```

Page 84

ATTORNEYS' EYES ONLY



15          MR. VINE:  Objection.

18    BY MS. BINA:

Page 85

ATTORNEYS' EYES ONLY



Page 86

ATTORNEYS' EYES ONLY



14          MR. VINE:   Objection.

18     BY MS. BINA:

Page 87

ATTORNEYS' EYES ONLY



Page 88

ATTORNEYS' EYES ONLY



Page 89



9    BY MS. BINA:

ATTORNEYS' EYES ONLY



20        MR. VINE:  Objection.

22   BY MS. BINA:

25        MR. VINE:  Objection.

Page 91



4    BY MS. BINA:

ATTORNEYS' EYES ONLY



Page 93

ATTORNEYS' EYES ONLY



Page 94

ATTORNEYS' EYES ONLY



13          MR. VINE:  Objection.

Page 95

ATTORNEYS' EYES ONLY



Page  96

ATTORNEYS' EYES ONLY



3          THE REPORTER:   What was that word?

Page 97

ATTORNEYS' EYES ONLY



Page  98

ATTORNEYS' EYES ONLY

3          MR. VINE:  Steve, I don't want you -- I

4      just want to give him an instruction.  I

5      don't want you to make any assumptions or

6      guess.  If you recall, by all means, you have

7      to be honest and provide that testimony.  I

8      don't believe Jessica wants you to speculate

9      or assume anything.  Thanks.

10  BY MS. BINA:

11      Q.  That's true.  I don't want you to speculate

12  or assume, but I'm entitled to your best recollection.

13  If you recall something with even less than perfect

14  certainty, you can testify to what you recall and

15  provide whatever qualifications are necessary to that

16  testimony.

17          Do you understand?

18          MR. VINE:  I couldn't agree with you

19      more, Jessica.  He said the words "I'll

20      assume," which led me to believe he didn't

21      remember and he was just guessing.  If he

22      didn't, by all means, if he has a vague

23      recollection, he can provide what his vague

24      recollection is.

Page 99

ATTORNEYS' EYES ONLY



25              MR. VINE:  Objection.

                                              Page 100

ATTORNEYS' EYES ONLY



Page 101

ATTORNEYS' EYES ONLY



Page 102

ATTORNEYS' EYES ONLY



1

                

                

4          MR. VINE:   Objection.

6

13         MR. VINE:   Objection.

                              Page 103

ATTORNEYS' EYES ONLY



Page 104

ATTORNEYS' EYES ONLY



19          MR. VINE:  Objection.

25          MR. VINE:  Objection.

Page 105

ATTORNEYS' EYES ONLY



7          MR. VINE:  Objection.

15          MR. VINE:  Objection.  I'm not sure of

16     the relevance either.  I think this might be

17     outside of what the judge has ordered.  Over

18     objection, I'll allow him to answer if he can

23     BY MS. BINA:

Page 106

ATTORNEYS' EYES ONLY



16          MR. VINE:   Same objection.

          You personally attended Blackhat in 2019?

23     A.   I did.

24     Q.   Have you attended any other Corellium

25  conferences or conferences where Corellium was

                                        Page 107

ATTORNEYS' EYES ONLY

```
 1    presenting or sponsoring?
 2         A.  I attended a conference in Miami, Florida.
 3    That conference is called Infiltrate.
 4         Q.  Did Corellium give a talk at Infiltrate or
 5    was it just a sponsor?
 6         A.  To my understanding, it was just a
 7    sponsorship.
 8         Q.  They did give a presentation at Blackhat
 9    2019, correct, or a private talk?
10         A.  I believe the talk in which you're
11    referencing wasn't official or endorsed by Blackhat.
12    I believe it was an off-premises gathering.
13         Q.   It was done during the Blackhat conference,
14    though, and amongst primarily attendees to that
15    conference?
16              MR. VINE:  Objection.
17         A.  That's accurate.
18    BY MS. BINA:
```

Page 108

ATTORNEYS' EYES ONLY



```
10          MR. VINE:  Objection; asked and answered.
11          MS. BINA:  I believe, earlier, we
12      discussed the party, not the private talk.
13      A.  I recall sending out invites to the event.
14  BY MS. BINA:
15      Q.  Who did you invite?
16      A.  I don't recall names offhand, but it's most
17  likely that it would've been current clients or folks
18  that, at that time, would have potentially been
19  clients.
20      Q.  Did you attend the talk?
21      A.  No.
22      Q.  Do you know whether there were live
23  demonstrations made as part of the talk?
24      A.  I wouldn't know the specifics of how the talk
25  started or finished.
```

Page 109

ATTORNEYS' EYES ONLY

```
1        Q.  That wasn't my question.  It was just whether
2    there were any live demonstrations.  If the answer is
3    that you don't know, that's fine.  But if you know one
4    way or the other as to whether there were live
5    demonstrations?
6        A.  I don't know.
```

Page 110

ATTORNEYS' EYES ONLY



ATTORNEYS' EYES ONLY



ATTORNEYS' EYES ONLY



Page 113

ATTORNEYS' EYES ONLY



Page 114

ATTORNEYS' EYES ONLY



25          MR. VINE:  Objection.

Page 115



Page 116

ATTORNEYS' EYES ONLY



Page 117

ATTORNEYS' EYES ONLY



Page 118



Veritext Legal Solutions
866 299-5127

ATTORNEYS' EYES ONLY



22

Page 120

ATTORNEYS' EYES ONLY



Page 121

ATTORNEYS' EYES ONLY



Page 122

ATTORNEYS' EYES ONLY



Page 123

ATTORNEYS' EYES ONLY



Page 124

ATTORNEYS' EYES ONLY



Page 125



21

Page 126

ATTORNEYS' EYES ONLY



11          MR. VINE:   Objection.

15   BY MS. BINA:

18          MR. VINE:   Objection.

Page 127

ATTORNEYS' EYES ONLY

1          MR. VINE:   Objection.



16          Q. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

22          Q.  Have you heard it since?

23          A.   No, I haven't.

24          Q.  Is it fair to say that you, yourself, have

25    never accessed, purchased, or attempted to purchase a

                                        Page 128

ATTORNEYS' EYES ONLY

```
 1   dev-fused iPhone?

 2        A.   Yes, I would say that's accurate, that I have

 3   never attempted to purchase one or research one or

 4   anything of that nature.

 5        Q.   Are you aware of anyone at Corellium who has

 6   accessed, purchased, or attempted to purchase a

 7   dev-fused iPhone?

 8             MR. VINE:   Objection.

 9        A.   I'm not aware of anyone within Corellium that

10   has either had access or attempted to buy one or use

11   one or anything of that nature.

12   BY MS. BINA:
```

Page 129

ATTORNEYS' EYES ONLY



Page 130

ATTORNEYS' EYES ONLY



15          MR. VINE:  Objection.

Page 131

ATTORNEYS' EYES ONLY



12          MR. VINE:  Objection.

22    BY MS. BINA:

24          MR. VINE:  Objection.

Page 132

ATTORNEYS' EYES ONLY

4    BY MS. BINA:

21        Q.  I want to look at another document.  Let me

22   see if it's already on the system or not.  I think

23   not.  Bear with me one moment.

Page 133

ATTORNEYS' EYES ONLY



4   BY MS. BINA:

23          MR. VINE:  Objection.

                                    Page 134

ATTORNEYS' EYES ONLY



3    BY MR. BINA:

Page 135

ATTORNEYS' EYES ONLY



Page 136

ATTORNEYS' EYES ONLY



16          MR. VINE:  Objection.

17     A.   Could you repeat the question again?

18          MS. BINA:  Could we have it read back?

Page 137

ATTORNEYS' EYES ONLY



25            MR. VINE:   Objection.

Page 138

ATTORNEYS' EYES ONLY



Page 139

ATTORNEYS' EYES ONLY



Page 140

ATTORNEYS' EYES ONLY



```
 8        Q.  Do you recall -- sorry.

 9            MS. BINA:  Madam Court Reporter, did you

10       catch the answer?

13            MS. BINA:  I couldn't hear anything at

14       all, which I was trying to explain.

15            So, Mr. Dyer, would you mind giving your

16       answer again, please?

17            THE WITNESS:  No problem.  Lisa, could

18       you just do me one favor and re-read the

19       question and I'll give my answer right away?
```

ATTORNEYS' EYES ONLY



```
 9          THE WITNESS:  For the first time, I think
10     I had somebody cut out on me.  Could you
11     re-read the question again?
```

Page 142

ATTORNEYS' EYES ONLY



Page 143

ATTORNEYS' EYES ONLY



Page 144



14          MR. VINE:  Objection.

Page 145

ATTORNEYS' EYES ONLY



19      Q.  So you may have exaggerated a little bit your

20  experience working with police around the world?

21      A.  I don't recall exactly why I wrote that.

22      Q.  Once Corellium sells an on-premises product,

23  do you know whether it tracks that product in any way?

24      A.  I don't know.  That sounds more technical.

25      Q.  Yeah -- and I mean in technical or

Page 146



Page 147



Page 148

ATTORNEYS' EYES ONLY



Page 149

ATTORNEYS' EYES ONLY



10          THE REPORTER:  I'm sorry.

Page 150



Page 151

ATTORNEYS' EYES ONLY



Page 152

ATTORNEYS' EYES ONLY



```
23   if I use the restroom?  I'm on my third ginger ale.
24        MS. BINA:  That's exactly what I was
25        going to ask.  I plan to take a break after
```

Page 153

ATTORNEYS' EYES ONLY

```
 1        that, but why don't we take a break before

 2        that?  Given that it's 20 til 12 my time, I'd

 3        like to take 15 minutes so I can grab a

 4        snack.

 5             Does that work for the group?

 6             (Response in the positive.)

 7             MS. BINA:  Let's go off the record and

 8        come back in 15.

 9             THE VIDEOGRAPHER:  Going off the record

10        at -- excuse me -- this marks the end of

11        media number six.  Going off the record at

12        2:37 p.m.

13             (Brief recess.)

14             THE VIDEOGRAPHER:  We're back on the

15        record at 2:55 p.m.  This marks the beginning

16        of media number seven in the deposition of

17        Stephen Dyer.

18             You may proceed, Counsel.

19   BY MS. BINA:

20        Q.  Mr. Dyer, it's yourself and Ms. Gorton in the

21   room with you at your remote location?

22        A.  That's correct.  I have myself and Amanda in

23   the room.

24        Q.  And no one else?

25        A.  And no one else.
```

Page 154

ATTORNEYS' EYES ONLY



Page 155

ATTORNEYS' EYES ONLY



Page 156

ATTORNEYS' EYES ONLY



Page 157

ATTORNEYS' EYES ONLY



Page 158

ATTORNEYS' EYES ONLY



Page 159

ATTORNEYS' EYES ONLY



23        Q.   Mr. Dyer, do you have any understanding one

24   way or another as to whether Apple has copyrights in

25   iOS?

Page 160

```
 1        A.   That sounds like a legal conversation.   I

 2   don't have the knowledge of that.

 3        Q.   Do you have any understanding that,

 4   generally, companies like Apple have legal protections

 5   for their intellectual property?

 6             MR. VINE:   Objection.

 7        A.   It sounds like legal jargon and I don't know.

 8   BY MS. BINA:

 9        Q.   I'm not meaning it to be legal jargon.   I'm

10   asking for your lay understanding, just as a person

11   that works in the world, whether companies in general

12   have some type of legal protection over their

13   intellectual property rights.

14        A.   I don't know.

15        Q.   You don't know.   Have you ever had any

16   discussions outside the presence of a lawyer with

17   anyone at Corellium regarding Apple's intellectual

18   property?

19        A.   No, not to my knowledge.

20        Q.   Have you ever had any discussions one way or

21   the other whether Corellium has any licenses from

22   Apple?   Again, for all of these questions, please

23   don't tell me any conversations you've had with an

24   attorney.   I'm only asking for conversations you had

25   outside of with an attorney.
```

Page 161

ATTORNEYS' EYES ONLY

```
1              THE WITNESS:  Lisa, could you re-read the
2         question?
3              THE REPORTER:  Sure.  "Have you ever had
4         any discussions one way or the other whether
5         Corellium has any licenses from Apple?"
6         A.  No, I don't recall having any conversations.
7    BY MS. BINA:
8         Q.  Fair to say that you've never personally done
9    any investigation into Apple's IP or copyrights?
10             MR. VINE:  Objection.
11        A.  I don't recall doing any investigation into
12   Apple copyrights.
13   BY MS. BINA:
14        Q.  Have you ever reviewed Apple's standard
15   software license agreement for iOS?
16             MR. VINE:  Objection.
17        A.  Not to my knowledge, no.
18   BY MS. BINA:
19        Q.  Do you personally have an iPhone?
20        A.  I use an iPhone.
21        Q.  Do you know whether you agreed to a license
22   when you set up the phone the first time?
23        A.  I'm not sure if I did.
24        Q.  Where you aware of whether you agreed to any
25   licenses when you've upgraded your iPhone, if you've
```

                                        Page 162

ATTORNEYS' EYES ONLY

1   upgraded it?

2        A.   I'm not aware.



Page 163

ATTORNEYS' EYES ONLY



Page 164

ATTORNEYS' EYES ONLY



17      Q.  Do you recall any other customers ever asking

18  you about potential violations of agreements with

19  Apple?

20      A.  No.

21      Q.  Without revealing any communications with

22  your attorneys, at any point since this lawsuit was

23  filed, have you personally searched for or collected

24  documents related to anything to do with the lawsuit?

25      A.  No.

Page 165

```
 1            MR. VINE:  Objection.
 2       A.  -- I don't.
 3  BY MS. BINA:
 4       Q.  I'm sorry, Mr. Dyer.  Counsel objected so I
 5  didn't catch your answer.
 6       A.  I said, no, I don't recall searching for
 7  documents that relate to the lawsuit.
 8       Q.  Do you have any handwritten notes or other
 9  hard copy files related to your work at Corellium that
10  you haven't made available to your attorneys?
11            MR. VINE:  Objection.
12       A.  No, not to my knowledge.
13  BY MS. BINA:
14       Q.  Do you have any involvement -- and I think
15  the answer is no -- but reviewing or providing source
16  code relating to the Corellium product?
17       A.  No, absolutely not.
18            MS. BINA:  I think that I am very close
19       to done.  I'd like to go off the record for a
20       few minutes to go back through my notes and
21       make sure that I don't unwittingly let you go
22       early.
23            Mr. Vine, okay to go off the record?
24            MR. VINE:  Yes.
25            THE VIDEOGRAPHER:  Stand by, we're going
```

Page 166

ATTORNEYS' EYES ONLY

```
 1        off the record on media number seven at

 2        3:15 p.m.

 3             (Brief recess.)

 4             THE VIDEOGRAPHER:  We are back on the

 5        record at 3:20 p.m.  This marks the beginning

 6        of media number eight in the deposition of

 7        Stephen Dyer.

 8   BY MS. BINA:

 9        Q.  Mr. Dyer, is there anything that you do in

10   your work at Corellium as part of your ordinary tasks

11   and duties that we haven't discussed today?

12        A.  None to my knowledge.

13        Q.  Can you give me a very high-level description

14   of what you do day in and day out?
```

Page 167



4          I would say that that sums up the majority of

5    my average workday.

Page 168

ATTORNEYS' EYES ONLY

 9          MS. BINA:  At this time, I've completed

10      my questions for you.  Your counsel and I

11      have a disagreement regarding whether we can

12      leave your deposition open.

13          I'm going to state on the record, my

14      intention is to leave it open subject to a

15      need for additional testimony after documents

16      have been produced to us that I understand

17      are forthcoming.  I may not need or seek

18      additional deposition testimony.

19          If and when I want it, I will confer with

20      Mr. Vine, who has objected to any further

21      deposition based on my proceeding today.

22          Mr. Vine, anything you want to add to

23      that?

24          MR. VINE:  Yeah.  I mean, once again, for

25      the record, we offered Mr. Dyer to be

                                            Page 169

1      available from April 1st through April 20th.

2      Apple turned that suggestion down.  We are

3      where we are we.  We believe, and our

4      position remains, that they have waived any

5      ability for a second deposition; however,

6      we'll consider their request if one is made.

7           MS. BINA:  My position remains as my

8      e-mail yesterday.  I don't want to belabor

9      the point with the witness.  I think we can

10     deal with that offline if and when that needs

11     to be dealt with.

12          Mr. Vine, do you have any questions?

13          MR. VINE:  I don't have any questions.  I

14     just need -- can we have the total time,

15     Brandon, for the deposition today?

16          THE VIDEOGRAPHER:  Yes.  Stand by,

17     please.  It looks like five hours exactly.

18          MR. VINE:  Okay.

19          MS. BINA:  Mr. Dyer, before we go off the

20     record, after this transcript -- after this

21     deposition is concluded --

22          MR. VINE:  Jessica, he'll read.  I

23     actually just said -- he'll read.

24          MS. BINA:  Your counsel has stated you

25     don't want to waive your right to read your

Page 170

ATTORNEYS' EYES ONLY

```
 1        deposition and make corrections to it, so,

 2        based on your counsel's representation, I

 3        understand you will be reading and we will

 4        get any edits that are made.

 5             I'm good to go off the record.

 6             Mr. Vine?

 7             MR. VINE:  Yes.

 8             THE VIDEOGRAPHER:  Stand by, please.

 9        This concludes today's deposition of Stephen

10        Dyer.  The total number of media used is

11        eight.  Going off the record at 3:26 p.m.

12             (The reading and signing of the

13        transcript were not waived, and these

14        proceedings concluded at 3:26 p.m.)

15

16

17

18

19

20

21

22

23

24

25
```

Page 171

ATTORNEYS' EYES ONLY

```
 1                      CERTIFICATE OF OATH

 2

 3    STATE OF FLORIDA

 4    COUNTY OF PALM BEACH

 5

 6

 7            I, Lisa Gerlach, the undersigned Notary

 8    Public, in and for the State of Florida, hereby

 9    certify that Stephen Dyer personally appeared before

10    me and was duly sworn.

11

12            WITNESS my hand and official seal this

13    April 1, 2020.

14

15

16

17

18

19

20    Lisa Gerlach, Court Reporter

21    Commission #GG023652

22    Expires 9/8/2020

23

24

25
```

Veritext Legal Solutions
866 299-5127

ATTORNEYS' EYES ONLY

```
 1                    CERTIFICATE OF REPORTER
 2              I, Lisa Gerlach, Court Reporter, do hereby
 3    certify that I was authorized to and did
 4    stenographically report the foregoing deposition; and
 5    that the transcript is a true and correct
 6    transcription of the testimony given by the witness.
 7              I further certify that I am not a relative,
 8    employee, attorney or counsel of any of the parties,
 9    nor am I a relative or employee of any of the parties'
10    attorney or counsel connected with the action, nor am
11    I financially interested in the action.
12              Dated this April 1, 2020
13
14
15
16
17
18
19              Lisa Gerlach, Court Reporter
20
21    The foregoing certification of this transcript does
22    not apply to any reproduction of the same by any means
23    unless under the direct control and/or discretion of
24    the certifying reporter.
25
```

Page 173

ATTORNEYS' EYES ONLY

```
1                          ERRATA SHEET

2

3

4

5      Under penalties of perjury, I declare that I have read

6      the foregoing document and that the facts stated in it

7      are true.

8

9      _____

10     DATE                      STEPHEN DYER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 174
```