# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. 9:19-cv-81160-RS

APPLE INC.,

                Plaintiff,

    v.

CORELLIUM, LLC,

                Defendant.

## PLAINTIFF APPLE INC.'S OPPOSITION TO DEFENDANT CORELLIUM, LLC'S MOTION SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    RELEVANT FACTS ............................................................................................1

       A.     Apple's Copyrighted Works .....................................................................2

       B.     Chris Wade's Use of iOS .........................................................................3

       C.     The Corellium Apple Product ...................................................................4

       D.     Corellium's Business ................................................................................6

III.    SUMMARY JUDGMENT STANDARD.............................................................7

IV.    CORELLIUM IS NOT ENTITLED TO JUDGMENT ON INFRINGEMENT ................8

       A.     The Corellium Apple Product Infringes Apple's Copyrighted Works ...................8

       B.     Corellium's Infringements Are Not Fair Use .......................................11

       C.     The Copyright Misuse Defense Is Inapplicable Here ...........................17

       D.     Corellium Cannot Establish The Defense Of Equitable Estoppel .........................18

V.     CORELLIUM VIOLATES THE DMCA'S ANTI-TRAFFICKING PROVISIONS ...................................................................................................19

       A.     Apple's TCMs Effectively Control Access to and Protect Apple's Works...........19

       B.     Fair Use Is Not a Defense to Anti-Trafficking Claims Under the DMCA ...........20

VI.    CONCLUSION....................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*321 Studios v. MGM Studios, Inc.*,
   307 F. Supp. 2d 1085 (N.D. Cal. 2004) ................................................................20

*A&M Records, Inc. v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001) ......................................................................13, 18

*Allen v. Tyson Foods Inc.*,
   121 F.3d 642 (11th Cir. 1997) ............................................................................7

*Apple Inc. v. Psystar Corp.*,
   673 F. Supp. 2d 931 (N.D. Cal. 2009) ...........................................................18, 20

*Authors Guild v. Google, Inc.*,
   804 F.3d 202 (2d Cir. 2015)...............................................................................15

*Bailey v. Allgas, Inc.*,
   284 F.3d 1237 (11th Cir. 2002) ...........................................................................7

*Bosarge v. U.S. Dep't of Educ.*,
   5 F.3d 1414 (11th Cir. 1993) ........................................................................8, 20

*Cable/Home Commc'n Corp. v. Network Prods., Inc.*,
   902 F.2d 829 (11th Cir. 1990) .............................................................................8

*Cambridge Univ. Press v. Patton*,
   769 F.3d 1232 (11th Cir. 2014) ...............................................................12, 16, 17

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994).................................................................................12, 13, 17

*Castle Rock Entm't v. Carol Publ'g Grp.*,
   150 F.3d 132 (2nd Cir. 1998).........................................................................13, 17

*Compulife Software Inc. v. Newman*,
   __ F.3d __, Nos. 18-12004, 18-12007, 2020 WL 2549505 (11th Cir. May 20,
   2020) ............................................................................................................11

*Disney Enters., Inc. v. Hotfile Corp.*,
   798 F. Supp. 2d 1303 (S.D. Fla. 2011) ...............................................................8

*Disney Enters. Inc. v. VidAngel, Inc.*,
   371 F. Supp. 3d 708 (C.D. Cal. 2019) ...............................................................20

*Fonar Corp. v. Domenick*,
    105 F.3d 99 (2d Cir. 1997)..........................................................................................9, 11

*Fontenot v. Upjohn Co.*,
    780 F.2d 1190 (5th Cir. 1986) ...............................................................................................7

*Harper & Row Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985)..........................................................................................................12, 14

*Infinity Broad. Corp. v. Kirkwood*,
    150 F.3d 104 (2d Cir. 1998)..................................................................................................13

*Katz v. Google, Inc.*,
    802 F.3d 1178 (11th Cir. 2015) .............................................................................................12

*Kienitz v. Sconnie Nation LLC*,
    766 F.3d 756 (7th Cir. 2014) .................................................................................................13

*Latimer v. Roaring Toyz, Inc.*,
    601 F.3d 1224 (11th Cir. 2010) ...............................................................................................8

*LEGO A/S v. Best-Lock Constr. Toys, Inc.*,
    404 F. Supp. 3d 583 (D. Conn. 2019)....................................................................................18

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    387 F.3d 522 (6th Cir. 2004) .................................................................................................20

*Micro Star v. Formgen Inc.*,
    154 F.3d 1107 (9th Cir. 1998) ...............................................................................................17

*Miller v. Gizmodo Media Grp., LLC*,
    407 F. Supp. 3d 1300 (S.D. Fla. 2019) ...................................................................................7

*Montgomery v. Noga*,
    168 F.3d 1282 (11th Cir. 1999) ..........................................................................................9, 11

*N. Atlantic Operating Co. v. Hammad Enters. Inc.*,
    No. 19-60200-CIV, 2020 WL 1286180....................................................................................7

*Odom v. Navarro*,
    No. 09-21480-CIV, 2010 WL 11505459 (S.D. Fla. Mar. 11, 2010) ......................................18

*Online Policy Grp. v. Diebold, Inc.*,
    337 F. Supp. 2d 1195 (N.D. Cal. 2004) .................................................................................20

*Oracle Am., Inc. v. Google LLC*,
    886 F.3d 1179 (Fed. Cir. 2018), *cert. granted*, 140 S. Ct. 520 (2019) ...................................13

*Ortega v. Bel Fuse, Inc.*,
    No. 15-21229-CIV, 2016 WL 1588393 (S.D. Fla. Apr. 20, 2016)............................7

*Pac. & S. Co. v. Duncan*,
    744 F.2d 1490 (11th Cir. 1984) ...........................................................................16

*Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters.*,
    533 F.3d 1287 (11th Cir. 2008) ...................................................................... *passim*

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
    572 U.S. 663 (2014)..............................................................................................18

*Princeton Univ. Press v. Michigan Document Servs., Inc.*,
    99 F.3d 1381 (6th Cir. 1996) ................................................................................15

*Realnetworks, Inc. v. DVD Copy Control Ass'n*,
    641 F. Supp. 2d 913 (N.D. Cal. 2009) ..................................................................20

*Sony Comput. Entm't, Inc. v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 2000) ................................................................................15

*Sony Comput. Entm't Am., Inc. v. Divineo, Inc.*,
    457 F. Supp. 2d 957 (N.D. Cal. 2006) ..................................................................20

*Stenograph L.L.C. v. Bossard Assocs., Inc.*,
    144 F.3d 96 (D.C. Cir. 1998) ..................................................................................9

*Telecom Tech. Servs. Inc. v. Rolm Co.*,
    388 F.3d 820 (11th Cir. 2004) ..............................................................................17

*Triad Sys. Corp. v. Se. Express Co.*,
    64 F.3d 1330 (9th Cir. 1995) ..................................................................................9

*Veeck v. S. Bldg. Code Cong. Int'l Inc.*,
    241 F.3d 398 (5th Cir. 2001) ................................................................................18

*Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.*,
    797 F.2d 1222 (3d Cir. 1986)..................................................................................2

## STATUTES

17 U.S.C. § 106................................................................................................................8

17 U.S.C. § 106(1) ...........................................................................................................4

17 U.S.C. § 106(2) ........................................................................................................5, 9

17 U.S.C. § 106(5) ......................................................................................................5, 10

17 U.S.C. § 107 ..............................................................................................................12, 20

17 U.S.C. § 107(3) ...............................................................................................................16

17 U.S.C. § 107(4) ...............................................................................................................17

17 U.S.C. § 410(c) .................................................................................................................9

17 U.S.C. § 501 ......................................................................................................................8

17 U.S.C. § 512 ....................................................................................................................20

17 U.S.C. § 1201(a)(2), (b)(1) ..............................................................................................19

## RULES

Fed. R. Civ. P. 56(e) ..............................................................................................................7

## REGULATIONS

37 C.F.R. § 202.20(c)(2)(vii) .................................................................................................2

## OTHER AUTHORITIES

Copyright Office, *Circular 61: Copyright Registrations of Computer Programs*
(Oct. 2019), https://www.copyright.gov/circs/circ61.pdf .........................................................2

## I.      INTRODUCTION

The parties agree on this much: Corellium sells a product which allows its customers to access and use working digital Apple iPhone replicas.  In reality that conduct is flagrant copyright infringement and a violation of related "anti-trafficking" laws.  Corellium's summary judgment motion urges the opposite result by misstating the law and the facts.

Take, for example, the suggestion that "Corellium developed its hardware virtualization, including the ability to run portions of . . . [Apple's] iOS [operating system], without the inclusion or use of any copyrighted Apple code."  Corellium's Motion for Summary Judgment ("Mot.") at 5. That material fact is not merely disputed, but outright false.  Corellium's product only works by modifying Apple's copyrighted software, hosting that software on Corellium's own servers, and publicly displaying it to Corellium's customers.  Each of those actions violates Apple's exclusive rights under U.S. copyright law.

As an alternative argument, Corellium contends that even if it is infringing Apple's copyrights, its conduct is "fair use."  It is not—but at the very least Apple is entitled to present its contrary case to the jury.  What the record actually shows is that Corellium sells its product in competition with Apple's, motivated by profit,



with the working, infringing versions of Apple's operating system that Corellium provides them.  Corellium's users have included, among others,

The record evidence is in fact so one-sided that summary judgment is warranted for Apple rather than Corellium on the issues Corellium has raised in its motion.  To the extent Corellium marshals evidence on reply that highlights *bona fide* material disputes, its motion must be denied.

## II.      RELEVANT FACTS

Notwithstanding Corellium's mischaracterizations, the evidentiary record is as follows.

## A.    Apple's Copyrighted Works

iOS is the proprietary operating system that Apple has created to run its mobile devices, including the iPhone.  Apple's Statement of Facts ("SOF"), ECF No. 455 ¶¶ 2, 4, 5; Apple's Response to Corellium's Statement of Facts ("SOFR") ¶¶ 1–2.  Apple distributes iOS to its customers both on Apple devices (*e.g.*, iPhone) and over the internet (in what are called "IPSW" files).  SOF ¶¶ 7–8; SOFR ¶¶ 5–6.  It continually updates iOS, releasing new versions of the software that add new functionalities and features and improve upon prior versions.  SOF ¶ 5.  Apple obtains registered copyrights for each major version of iOS it releases.  SOF ¶ 6.  To obtain those copyright registrations, Apple submits representative excerpts of the new source code in each iOS version to the U.S. Copyright Office.  SOFR ¶¶ 20–22; 37 C.F.R. § 202.20(c)(2)(vii) (permitting submission of "identifying portions of the program").  Each version of iOS is built on, and thus contains components of, prior versions of iOS.  SOFR ¶¶ 20–22; Plaintiff's Exhibit ("PEX") ¶ 5.  For example, iOS 10.0 is a derivative work of iOS 9.1, which in turn is a derivative work of iOS 9.0, and so on.  *See* SOF ¶¶ 5–6; PEX 5, 10–11, 19–27.  Although the copyright registration for iOS 10.0 covers only the new material (code, graphics, etc.) in iOS 10.0, a person who uses iOS 10.0 uses not only the material copyrighted in the registration for iOS 10.0, but also copyrighted materials from prior versions of iOS as well.  *See* SOF ¶¶ 5–6; PEX 10, 11, 13.

This lawsuit involves seventeen of Apple's registered copyrights—the copyrights in five visual works of art and every major version of iOS released since 2015 (when iOS 9.0 was released).  SOF ¶ 6; PEX 6–14, 19–27 (iOS versions 9.0, 9.1, 10.0, 11.0, 11.0.1, 11.2, 11.2.5, 11.3, 11.4, 12.0, 12.1.1, and 12.2).  Each one of the asserted iOS copyrights extends to the source code, object code, and visual art elements of iOS.  *See* Copyright Office, *Circular 61: Copyright Registrations of Computer Programs*, at 4–5 (Oct. 2019), https://www.copyright.gov/circs/circ61.pdf (computer program registration extends to screen displays); *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.*, 797 F.2d 1222, 1233 (3d Cir. 1986) (copyright extends to both source code and object code).  The balance of the registered copyrights covers the visual art that is contained within iOS.  Specifically, Apple has obtained separate copyright registrations for two compilations of the icons for Apple's built-in applications.  SOF ¶ 6; PEX 12, 14.  Apple has also obtained separate copyright registrations for the wallpaper artwork used in iOS.  PEX 6–9.  Apple includes these visual works of art with multiple versions of iOS.  SOFR ¶ 57.  As a result, anyone who uses an iOS version that contains this artwork is using not only the copyright-protected iOS

2

code but also those separately protected and registered works of visual art.

      **B.**      **Chris Wade's Use of iOS**

Corellium co-founder and Chief Technology Officer Chris Wade has a long history of (1) trying to commercialize technology that uses Apple's iOS and (2) running headlong into Apple's refusal to license iOS for commercialization by third parties.  In 2011, Wade created technology that emulated iOS as part of a project called iEmu.  Mot. at 3.  But after "discussing iEmu with various legal experts," he "came to the conclusion that accepting funding for it would only make [him] more of a target for certain companies," so he abandoned the project—a decision he later characterized as being "due to Apple lawsuit concerns."  SOFR ¶ 76.

After iEmu, Wade continued his efforts to incorporate iOS into emulation and virtualization technology, and in 2014, founded a company to do so called Virtual.  SOF ¶ 73; SOFR ¶¶ 26, 77.  Corellium asserts that Virtual, like iEmu, was a predecessor of sorts to Corellium.  Mot. at 3.  Wade spent months attempting to persuade Apple to acquire Virtual, during which time Apple Vice President of Software Sebastien Marineau-Mes specifically discussed with Wade the need for a license from Apple to commercialize the Virtual technology.  SOFR ¶ 77.  When Wade instead sold Virtual to Citrix Systems Inc. in 2014, he was *again* told he could not commercialize his iOS technology, this time at a meeting with then-Citrix CEO Mark Templeton, Marineau-Mes, and Apple executive Steve Smith.  SOF ¶ 74; SOFR ¶ 77.  A subsequent email from Templeton, copying Wade, acknowledged that Citrix could not commercialize Virtual's technology because "Apple does not license iOS."  SOF ¶ 74.  In 2017, Wade told Apple employee Jason Shirk that his venture with Citrix "essentially disintegrated over a lack of licensing with iOS."  SOFR ¶ 78.

After Wade left Citrix, he founded Corellium.  SOF ¶ 24; SOFR ¶ 29.  Launched in late 2017, Corellium's iOS product—referred to here as the "Corellium Apple Product" (and later branded by Corellium as "CORSEC iOS")—was designed to create virtual iPhones running "real iOS."  SOF ¶¶ 33, 63.  Again recognizing the need to license iOS in order to commercialize the product, Corellium spent seven months over the first half of 2018 attempting to sell itself to Apple. SOF ¶ 28; SOFR ¶ 33.  ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████  SOFR ¶ 79.  In June 2018, shortly before the talks failed, Corellium's CEO Amanda Gorton ████████████████████████████████████████████

████████████████████████████████████████████████████████

SOF ¶ 76; PEX 77.[1]  Then, when Apple ███████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████  SOF ¶ 32; PEX 39.  Four months later,

in January 2019, Corellium began openly selling the Corellium Apple Product.  SOFR ¶ 93.

> ### C.    The Corellium Apple Product

It is undisputed that the Corellium Apple Product creates virtual Apple devices, such as

iPhone and iPad, that run iOS.  SOFR ¶ 30; SOF ¶¶ 25, 33, 36.[2]  In fact, ███████████████

████ the Corellium Apple Product does not (and could not) work without iOS, which it obtains

from IPSW files created by Apple, and then modifies, copies, and publicly displays.  SOF ¶ 50;

SOFR ¶¶ 30, 87.  Corellium openly acknowledges that it "provides its users with a version of iOS."

Corellium's Statement of Material Facts ("Def. SOF") ¶ 47.

> **1.  Copies.**  Since the Corellium Apple Product runs "real iOS," it necessarily makes copies

of "real iOS."  *Cf.* 17 U.S.C. § 106(1) (affording the copyright owner the exclusive right to

reproduce a work in copies).  It does so by ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

Contrary to Corellium's claim that it "developed its hardware virtualization, including the



---

[1]  During 2018, Corellium ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████  SOFR ¶¶ 93, 98.

[2]  Although the Corellium Apple Product creates virtual versions of multiple mobile Apple hardware, including iPad and iPod, this brief refers solely to iPhones for ease of reference. Similarly, internal quotation marks and citations are omitted throughout this brief.

ability to run portions of . . . [Apple's] iOS [operating system], without the inclusion or use of any copyrighted Apple code," Mot. at 5, ██████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████

    2. **Public Displays**.  In addition to repeatedly copying iOS, the Corellium Apple Product also publicly displays iOS and Apple's visual works of art.  SOFR ¶¶ 30, 87, 90; *cf.* 17 U.S.C. § 106(5) (exclusive right to display work publicly).  ██████████████████████████ ██████ Corellium's product displays iOS's graphical user interface and other Apple copyrighted works, including iOS wallpapers and icon compilations.  SOFR ¶ 57; PEX 85 ¶ 9, PEX 86 ¶ 22. ████████████████████████████████████████████████████████████

    3. **Modifications.**  In the ordinary course, Apple has technical control measures ("TCMs") in place that prevent iOS from running on non-Apple hardware, and that prevent Corellium from copying, distributing, displaying, and modifying iOS.  SOF ¶¶ 10–23, 40–48.  Corellium modifies iOS to remove these protections so it can provide a functional version of iOS to its customers.  *See* SOFR ¶ 43 (no dispute that "█████████████████████████████████.");  SOFR ¶¶ 48, 66; *see also* SOF ¶ 40; *cf.* 17 U.S.C. § 106(2) (exclusive right to create derivative works).

    4. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████, which it made available shortly thereafter.  SOFR ¶¶ 84–86.

### D.    Corellium's Business

Corellium has since its inception touted the Corellium Apple Product's ████████████ ████████████████████████ SOFR 56; PEX 103 at 4.  Although Corellium now offers support for non-Apple operating systems, it has only done so for about a year, and its product still centers around its provision of access to "real iOS."  SOF ¶ 63; PEX 57 at 2; SOFR ¶ 93.

Corellium makes no secret that the Corellium Apple Product competes directly with Apple products.  Corellium ██████████████, just as it has told this Court, that the Corellium Apple Product can replace "racks of physical" iPhone devices, ECF No. 64 at 3—devices ██ ██████████████ would otherwise have to purchase from Apple.  SOF ¶ 72; SOFR ¶ 59. Corellium promotes its product as a direct competitor of, and alternative to, Apple's iOS Simulator, which Apple offers through the Apple Developer Program, as part of a $99-per year membership. SOF ¶ 72; SOFR ¶ 58.  And Corellium has conceded that its product will compete with Apple's forthcoming Security Research Device Program.  ECF No. 64 at 11–12.

Contrary to Corellium's claims that its product is used solely for "good faith" security research, Corellium ████████████████████████████████████████ ████████████████ SOF ¶ 66.  Indeed, Corellium ████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████ SOF ¶ 67; SOFR ¶¶ 69, 114.  To the contrary, Corellium specifically advertises that its product makes it easier for customers to find and develop "exploits"—software programs that can be used to break into a user's iPhone without the consent of the owner—██ ████████████████████████████████████████████.  SOFR ¶¶ 105, 110–114. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Corellium promotes such activity even though exploits have been used by authoritarian governments to spy on citizens and engage in other civil rights violations.  SOFR ¶ 106.

Far from the lofty goals espoused in its moving papers, when it comes to selling the Corellium Apple Product, Corellium has one goal and one goal only—████████████████████ ████████████████████ SOFR ¶ 99.  In service of that goal, ████████████████████

—which Corellium's own expert has labeled "unethical" and a "bad actor," and ███████████████████████████████. SOFR ¶ 101. Its customers include ██████████████████████████████████████████████ ███████ SOFR ¶ 102. And Corellium has also provided trial accounts to ███████████ ████████████████████████████████████████████████████ ██████████ SOFR ¶ 103. Separately, Corellium has contracted further sales out to a reseller— Azimuth Security, which is an Australian-based government contractor in the business of developing, buying, and selling software exploits. SOFR ¶¶ 94, 109. Corellium professes not to know who Azimuth's customers are and has ███████████████████████████████ ██████████████████████████████ SOF ¶¶ 66–68; SOFR ¶¶ 96–97. While Corellium contends it also sells its product ████████████████████████ Mot. at 1, it provides no evidence to support that claim, and the actual evidence— ██████████████ ████████████████████—contradicts it. SOFR ¶¶ 62, 96.

## III.  SUMMARY JUDGMENT STANDARD

"At summary judgment, the moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party." *N. Atlantic Operating Co. v. Hammad Enters.  Inc.*, No. 19-60200-CIV, 2020 WL 1286180, at * 2 (citing *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)). Only if this burden is satisfied does the burden then shift "to the non-moving party to come forward with evidence that a genuine issue of material fact precludes summary judgment." *Id.* (citing *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002)); Fed. R. Civ. P. 56(e).  If there are "any genuine issues of material fact, the Court must deny summary judgment and proceed to trial." *Id.*

When a defendant moves for summary judgment on an affirmative defense, the defendant "has the burden of showing beyond peradventure *all* of the essential elements of the . . . defense to warrant judgment in [its] favor." *Miller v. Gizmodo Media Grp., LLC*, 407 F. Supp. 3d 1300, 1307 (S.D. Fla. 2019) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).  To prevail on such a motion, the defendant "must produce[] credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Ortega v. Bel Fuse, Inc.*, No. 15-21229-CIV, 2016 WL 1588393, at *6 (S.D. Fla.  Apr. 20, 2016).

Where the record demonstrates that it is the plaintiff, and not the moving defendant, that is entitled to summary judgment, the Court may enter judgment for the nonmoving plaintiff.  *See Bosarge v. U.S. Dep't of Educ.*, 5 F.3d 1414, 1416 n.4 (11th Cir. 1993) ("Although Bosarge never moved for summary judgment, a district court may enter judgment for a nonmovant.").

## IV.   CORELLIUM IS NOT ENTITLED TO JUDGMENT ON INFRINGEMENT

The Copyright Act provides the owner of a copyrighted work "the exclusive rights to" reproduce it, prepare derivative works based on it, distribute it, and display it publicly.  17 U.S.C. § 106.  "Anyone who violates any of [these] exclusive rights of the copyright owner . . . is an infringer of the copyright." *Disney Enters., Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303, 1307 (S.D. Fla. 2011) (quoting 17 U.S.C. § 501).  To establish a *prima facie* case of direct copyright infringement, a plaintiff must show (1) ownership of a valid copyright, and (2) copying of (or violation of another exclusive right in) protected elements of the work.  *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1232–33 (11th Cir. 2010).  Once that showing has been made, the defendant is liable unless it demonstrates that the infringement was justified through invocation of an affirmative defense such as fair use.  *See, e.g.*, *Latimer*, 601 F.3d at 1238–39.

### A.   The Corellium Apple Product Infringes Apple's Copyrighted Works

Corellium advances two arguments why, in its view, Apple cannot prove at trial that Corellium engages in *prima facie* acts of copyright infringement.  Both are meritless, and Corellium's motion with respect to Apple's three infringement claims must be denied.[3]  Indeed, summary judgment is warranted in *Apple*'s favor, not Corellium's, based on the undisputed facts.

#### 1.   Corellium Uses Apple's Copyrighted Works

Corellium argues that its product does not contain any "copyrighted Apple code."  Mot. at 8.  But it plainly does—to the point that Corellium has elsewhere admitted that the material facts are at least disputed.  *See id.* at 1 n.1 (conceding that "the portions of code downloaded, the duration each one is kept there, and the creativity versus utilitarianism of the portions used, pose questions for the finder of fact").  In reality, the uncontroverted evidence demonstrates that Corellium infringes Apple's copyrighted code, many times over.

---

[3] Corellium has failed to specifically address the elements of Apple's separate claim that it is secondarily liable for copyright infringement based on its contribution to infringing acts of its customers, and thus its motion must be denied outright with respect to that claim.  *See, e.g.*, *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845–47 (11th Cir. 1990).

It is undisputed that Apple has valid copyrights in iOS and its GUI elements.  Apple has registered copyrights in each work,[4] and its registrations create a presumption those copyrights are valid.  *See* 17 U.S.C. § 410(c); *see Montgomery v. Noga*, 168 F.3d 1282, 1289 (11th Cir. 1999).  Corellium has "presented no evidence" that the copyrighted works are "entirely unoriginal," that they were completely "copied from another program," or otherwise casting doubt on the copyrightability of iOS, Apple's icon compilations, or iOS's wallpapers.  *See Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997).

In the absence of any legitimate dispute over whether Apple owns valid copyrights in the works at issue, Corellium contends that its product is akin to a DVD player or similar technology, in that it merely works *with* iOS rather than copying iOS itself.  Mot. at 8–9.  Corellium, however, offers no evidence supporting this claim—because it is false—and there is overwhelming evidence to the contrary, *including Corellium's own admission that it "provides . . . iOS" to its customers*.  Def. SOF ¶ 47.  That concession aside, Apple's expert, Dr. Nieh, confirmed that the Corellium Apple Product makes a ████████████████████████████████████████████████ ███████████████ for every single virtual device it creates.  SOFR ¶¶ 53, 87; PEX 86 ¶ 13.  Corellium does not dispute this point.  Instead its own expert, Professor Alexander Stamos, acknowledged that Corellium's product copies substantially all of iOS.  *See* SOFR ¶ 88 (DEX 11, Stamos Tr. at 196:14–197:5) ("Full access to iOS is needed . . . .  [I]f you're going to run a virtualization environment, . . . you cannot do so without the entire operating system available.").

Corellium thus infringes each version of iOS.  Corellium violates Apple's exclusive right to make reproductions because it copies the entirety of iOS.  Where, as here, a copyright defendant uses "entire programs, there is no doubt that protected elements of the software were copied."  *Stenograph L.L.C. v. Bossard Assocs., Inc.*, 144 F.3d 96, 100 (D.C. Cir. 1998) (quoting *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1335 (9th Cir. 1995)); *see also Fonar Corp.*, 105 F.3d at 106 (same).  Corellium violates Apple's exclusive right to make derivative works because it "██████████████████████████████████ and ███████████████████████████████████████ ████████████████████████  Def. SOF ¶¶ 43, 64–66; *see* 17 U.S.C. § 106(2).  And Corellium's unsupported

---

[4] Apple pleaded its claim based on 22 works that it believed in good faith Corellium was infringing.  Upon completion of discovery, Apple has determined that Corellium infringes 17 of those 22 works; accordingly, Apple has separately moved to amend its complaint to remove the remaining five works—four iTunes registrations and the "abstract ink" wallpaper.  *See* ECF 506.

assertion that its product "does not contain Apple's graphical user interface," Mot. at 8—and thus does not violate Apple's exclusive right to display its copyrighted works, 17 U.S.C. § 106(5)—is demonstrably false: Corellium displays iOS's graphical user interface, as shown here at left, in a



SOF ¶ 37; PEX 107 at 13.  Accordingly, the record supports summary judgment in *Apple's* favor on the fact of Corellium's *prima facie* infringements.

Corellium also argues that it "did not use Apple's copyrighted code to create" its product. Mot. at 8.  But Corellium admits that it has ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ its product.  SOFR ¶ 91.  Again, the undisputed facts support Apple's position, not Corellium's.

### 2.    Corellium Infringes Apple's Asserted Copyrights

Corellium argues that "Apple cannot show that Corellium infringes the specific registered copyrights that Apple asserts here."  Mot. at 16.  First, it asserts that, because Corellium does not support iOS versions prior to version 10.3, it could not have infringed earlier works.  Second, it claims that Corellium did not copy *any* elements of the registered works at issue.  Both claims fail.

Corellium's argument with respect to prior versions of iOS is wrong on two fronts: (1) it is disputed whether, in fact, Corellium supported earlier versions of iOS; and (2) due to the derivative nature of each version of iOS over the predecessor versions, there is extensive evidence that Corellium actually infringed every version of iOS identified in the complaint.  On the first point, whether Corellium's product has supported versions of iOS starting at 9.0 is a disputed issue of material fact because Corellium itself has shared images of its product showing its use of iOS

9.0.  SOFR ¶ 56.  On the second point, even if the Corellium Apple Product only ever supported versions of iOS starting at 10.3, Corellium still infringes iOS 9.0, 9.1, and 10.0 because each version of iOS is a derivative work of the previous versions of iOS and, as a result, iOS 10.3 (as well as all later versions of iOS) contains portions of the copyrighted code from those earlier versions.  SOFR ¶ 20; *see, e.g.*, *Montgomery*, 168 F.3d at 1292–93.  Put differently, running version 10.3 necessarily entails using copyrighted material from prior versions—so Corellium infringes the copyrights in those prior versions as well.

For the same reasons, Corellium infringes the rights in Apple's separately registered works of visual art—specifically (1) "Apple icons - iOS 9 compilation"; (2) "Apple Bokeh (bubble) Wallpaper iOS 7"; (3) "Apple Wallpaper - Flower magenta (iOS 8)"; and (4) "Apple Wallpaper - Flower Chrysanthemum purple (iOS 8)."  The first of these is found in iOS versions 10.3 and above; and the second is included in iOS 10.3 through iOS 11.0.1—all of which Corellium admittedly supports.  *See* SOFR ¶¶ 56–57.  The third and fourth are both included in iOS 9.0—a version that Apple's evidence demonstrates Corellium has supported.  SOFR ¶ 56.

Finally, Corellium asserts that it is entitled to summary judgment because "Apple has not identified the 'new and revised computer program' allegedly covered by each of the registrations for iOS that it chose to assert."  Mot. at 17.  This contention is nonsensical and unsupported.  It is *Corellium's* burden to rebut the validity of Apple's copyright registrations, which it has not attempted to do.  *See supra* at 9.  The evidence demonstrates that Corellium copies the *entirety* of each of iOS 10.3 and above, and this evidence of Corellium's "wholesale copying" of Apple's copyrighted works is more than enough to carry Apple's burden to prove infringement.  *See, e.g.*, *Fonar Corp.*, 105 F.3d at 106.[5]  Furthermore, and contrary to Corellium's claims, Apple's expert Dr. Nieh did in fact ███████████████████████████████████████████ ███████████████████████████ through the Corellium Apple Product.  SOFR ¶ 90; PEX 86 ¶¶ 24–25.

## B.     Corellium's Infringements Are Not Fair Use

Corellium devotes a substantial portion of its brief to arguing that, even if it has committed *prima facie* acts of infringement, it is entitled to summary judgment on its fair-use defense because

---

[5] To the extent Corellium intended to argue that the portions of iOS it copied are not protected by Apple's copyrights, Corellium "had the burden to demonstrate that the copied elements were unprotectable," *Compulife Software Inc. v. Newman*, __ F.3d __, Nos. 18-12004, 18-12007, 2020 WL 2549505, at *10 (11th Cir. May 20, 2020)—which Corellium has entirely failed to do.

its product is transformative and socially beneficial.  Mot. at 10–15.  Corellium is wrong as a matter of law.  The relevant fair-use factors overwhelmingly tilt in *Apple's* favor, warranting summary judgment on this issue *against* Corellium.  At worst, there are material factual disputes that preclude summary judgment here.

The Copyright Act codifies the defense of fair use and sets forth four factors that "provide courts with tools to determine—through a weighing of the four factors in light of the facts of a given case—whether a finding of fair use is warranted in that particular instance."  *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1259 (11th Cir. 2014).  Those factors are "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107.  The proponent of a fair-use defense—here, Corellium—"bears the burden of proof in demonstrating it applies."  *Cambridge Univ. Press*, 769 F.3d at 1259.  Corellium cannot carry that burden.

### 1. Corellium's Purpose Is Commercial and Not Transformative

The first factor requires consideration of the character of the defendant's use of the copyrighted work, including "(1) whether the use serves a nonprofit educational purpose, as opposed to a commercial purpose; and (2) the degree to which the work is a transformative use, as opposed to a merely superseding use, of the copyrighted work."  *Katz v. Google, Inc.*, 802 F.3d 1178, 1182 (11th Cir. 2015).  "Also relevant to the 'character' of the use is the propriety of the defendant's conduct," since "[f]air use presupposes good faith and fair dealing."  *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985).

There is ample evidence that Corellium's conduct has been entirely *improper*—from , to the and beyond.  *See supra* at 5–7.  Corellium's bad faith, standing alone, is dispositive of its motion.  *Cf. Harper & Row*, 471 U.S. at 563 (not fair use to "

With respect to the balance of the first factor, commercial uses of a work "tend[] to weigh against a finding of fair use."  *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1309 (11th Cir. 2008) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585 (1994)).  And here, Corellium's use of iOS is unquestionably and unabashedly commercial.

Corellium infringes iOS specifically so that it can sell the Corellium Apple Product for ███████ █████████ dollars to anyone willing to pay.  SOFR ¶ 99.  Corellium has made ███████ ███████ from its sales of the Corellium Apple Product—blatantly advertised as providing access to and use of Apple's copyrighted operating system—all without paying Apple a cent.  SOF ¶ 69.

The commercial nature of Corellium's use compels a finding that the first factor weighs in Apple's favor, unless Corellium can demonstrate that its use is "transformative," as that term is understood in case law.  The question of transformativeness is not (as Corellium appears to believe) whether the original work was modified in some way.  *See Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 758 (7th Cir. 2014) (noting that allowing a "modified copy" to fall within the scope of the fair-use exception could "override" the protection of derivative works).  Instead, a work is transformative if it "adds something new, with a further purpose or different character, altering the first [work] with new expression, meaning, or message."  *Campbell*, 510 U.S. at 579.  Merely repackaging a copyrighted work or offering it in a new medium is not transformative for purposes of the fair-use analysis.  *See Oracle Am., Inc. v. Google LLC*, 886 F.3d 1179, 1201–02, 1210 (Fed. Cir. 2018), *cert. granted*, 140 S. Ct. 520 (2019) (rejecting contention that it was fair use to replicate material portions of copyrighted computer software in order to create a follow-on product containing elements that would be familiar to users); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001) ("Courts have been reluctant to find fair use when an original work is merely retransmitted in a different medium."); *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108–09 (2d Cir. 1998) (finding "total absence of transformativeness" in retransmission of radio broadcast over telephone lines).

The Corellium Apple Product's use of iOS merely offers the software in a different medium—virtually, rather than on a physical device.  SOFR ¶ 45; SOF ¶¶ 36, 40.  Courts have repeatedly concluded that such "medium shifting" is not "transformative" at all in the relevant sense.  *Peter Letterese*, 533 F.3d at 1311 (rejecting fair-use defense where infringing work "adopt[ed] a different format" and "condense[d] the material in" the original); *Castle Rock Entm't v. Carol Publ'g Grp.*, 150 F.3d 132, 142, 146 (2nd Cir. 1998) (rejecting fair-use defense for *Seinfeld* trivia book because purpose of the work was to "repackage *Seinfeld* to entertain *Seinfeld* viewers").  Corellium goes to great lengths to emphasize to its customers that ████████████ ███████████████████████████████████████████████ so that users of the Corellium Apple Product experience Apple's copyrighted works in the same way they would on a real iPhone.  SOF ¶ 62;

Def. SOF ¶ 51.  Indeed, Corellium's use cannot possibly be transformative given that, as discussed under the fourth factor below, it unquestionably "supplant[s] the market for the copyrighted work, fulfilling demand for the original."  *Peter Letterese*, 533 F.3d at 1310; *Harper & Row*, 471 U.S. at 562 (first factor favors infringement where the "use ha[s] not merely the incidental effect but the *intended purpose* of supplanting the copyright holder's" version).

Corellium attempts to avoid this common-sense conclusion by arguing that the Corellium Apple Product "is a specialty security research tool" "designed solely for security research," Mot. at 5, 10, which purportedly makes it "transformative" under fair-use doctrine, *id.* at 2–3, 13–14. That suggestion fails on the facts and the law alike.  On the facts, Corellium admits that it ██████ ███████████████████████████████████████████ with the Corellium Apple Product—a product that Corellium has offered to ████████████████████████████████████████████ ███████████████████ SOFR ¶¶ 101–104; SOF ¶ 67.  Corellium and its security expert admit that "security research" is "not the exclusive use" of the Corellium Apple Product and that "you can use it for other things."  SOFR ¶ 63 (██████████████████████████████████ ██████████████████████ And its reseller explains that, in fact, Corellium ████████ ███████████████████████████ it. SOFR ¶ 99.  Only *after* this lawsuit was filed—and a ██████████████████████████—did Corellium suddenly start asserting its product was "transformative" and used solely for salutary purposes.[6]

Corellium's suggestion that, through this lawsuit, Apple is somehow attempting to quash security research is both wrong and beside the point.  Apple strongly supports security research, *see* ECF No. 453 at 2.  Moreover, to establish fair use, the burden is on *Corellium* to demonstrate that its blatant infringement of Apple's copyrights is necessary for some socially beneficial purpose.  But—outside the narrow confines of this lawsuit—Corellium does not even pretend that is the case.  For example, Corellium urges its customers to █████████████████████ █████████████ which Corellium's own expert ████████████████████████ ██████████ rather than encouraging its customers to report vulnerabilities to Apple so they can be fixed.  SOFR ¶¶ 108, 111.  And the actual users of the Corellium product certainly include ████

---

[6] ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████

██████████████████████████████████████████████████   *See supra* at 7;
SOFR ¶¶ 63, 101–111.

Furthermore, even if Corellium's *users* were engaging in conduct with a socially redeeming dimension—████ ████████████████████—that would not provide *Corellium* with a shield for its *own* acts of infringement.   The relevant use of iOS for purposes of the fair-use inquiry is Corellium's use, not its customers' uses.   *See Peter Letterese*, 533 F.3d at 1310 (analyzing use by defendants rather than downstream users of infringing product to assess fair-use defense); *see also Princeton Univ. Press v. Michigan Document Servs., Inc.*, 99 F.3d 1381, 1386 (6th Cir. 1996). Apple has adduced ample evidence that Corellium's own use of Apple's copyrighted works is solely or primarily to advance its commercial objective—the making of ████████████ off of selling access to Apple's software.  SOF ¶ 69; SOFR ¶ 98.

Neither *Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015), nor *Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000), the sole cases cited by Corellium on this point, supports its assertion that selling customers the ability to run Apple's own software, without buying an Apple product, is "transformative" under the fair-use doctrine.   In *Authors Guild*, the defendant did not make entire copies of the books available to the public but rather provided the public with the ability to search the books' text and *then see only small snippets* of text from the books themselves.  804 F.3d at 217–18.  Here, Corellium makes *entire copies* of Apple's copyrighted works available to users of the Corellium Apple Product—the exact opposite of what the defendant was doing in *Authors Guild*.  In *Connectix*, the defendant created a computer program that emulated the Sony PlayStation video game console so that PlayStation games could be played on a regular computer.  203 F.3d at 598.  The claim for infringement was as to the *console*, not any individual games users actually played.  *Id.*  The court explained that, since the defendant's console did not actually "contain any of Sony's copyrighted material," and because the defendant only made "intermediate" copies to study the unprotected functional elements of Sony's product, its actions constituted fair use.  *Id.* at 598, 603–04.  Here by contrast, Corellium copies, displays, and ███████████████ Apple's copyrighted versions of iOS—*i.e.*, the actual content that users engage with.  SOF ¶¶ 33–39, 50–56, 62–63; SOFR ¶¶ 43, 47, 87–90.

At bottom, what Corellium does is strip out Apple's TCMs and resell Apple's own product to Corellium's customers.  That is not "transformative" in the least.  The first fair-use factor overwhelmingly favors Apple.

### 2.     iOS and the Works of Visual Art Are Highly Creative

The second factor looks at the nature of the copyrighted works to determine how close they are "to the core of intended copyright protection." *Peter Letterese*, 533 F.3d at 1312. "[B]ecause works that are highly creative are closer to the core of copyright—that is, such works contain the most originality and inventiveness—the law affords such works maximal protection, and hence it is less likely that use of such works will be fair use." *Cambridge Univ. Press*, 769 F.3d at 1268. This factor, too, cuts decidedly against Corellium. iOS is one of the most sophisticated and popular pieces of computer software in the world, and its development necessarily involved significant creativity. SOF ¶¶ 1–5. And Corellium has not even argued that Apple's visual works, which it also infringes, are anything short of highly creative. Mot. at 1 (referring to iOS's "creative elements"); *see id.* at 12–13.

### 3.     Corellium Copies All of iOS

The third factor looks at the "amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). Corellium is making complete copies of iOS. It is copying, modifying, distributing, and publicly displaying the computer code, the visual art, the interactive graphical user interface—everything—to provide "████████████████" to iOS. Def. SOF ¶ 51. Corellium's own expert concedes that Corellium copies substantially all of iOS. SOFR ¶ 88. Corellium attempts to minimize the importance of this factor by making the unsupported claim that security researchers using its product simply use those portions of iOS that are "necessary for those users' research into the functional elements of iOS security." Mot. at 1. But even if true, that is unhelpful to Corellium, since its product copies *the entirety* of iOS—*i.e.*, *all* of the work. SOF ¶¶ 50, 53–55; SOFR ¶ 87–90. To the extent users are only interested in some subset of iOS, as Corellium claims, Corellium is infringing portions of the work that do not even further its goals.[7] The third factor thus favors Apple. *See, e.g.*, *Cambridge Univ. Press*, 769 F.3d at 1274 ("[T]he wholesale reproduction of an entire work will not generally be considered fair unless the use is highly transformative."); *Pac. & S. Co. v. Duncan*, 744 F.2d 1490, 1497 (11th Cir. 1984) ("Because TV News Clips uses virtually all of a copyrighted work, the fair use defense drifts even further out of its reach.").

---

[7] For example, Corellium asserts its product does not make telephone calls or take pictures, but it nonetheless copies the *entire* IPSW file, including code supporting those functions. SOFR ¶ 46.

### 4.    Corellium Harms Apple's Markets

The final factor in the fair-use analysis looks at "the effect of the use upon the potential market or value of the copyrighted work." 17 U.S.C. § 107(4).  Under this factor, courts "consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590.  Also relevant is whether the infringer is exploiting a market that the copyright owner could, but has chosen not to, enter.  *Castle Rock Entm't*, 150 F.3d at 145–46.  The right protected by the Copyright Act is the "right to enter" the market; whether a copyright owner "chooses to do so is entirely its business." *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1113 (9th Cir. 1998).  As the Eleventh Circuit has explained, "it is appropriate . . . to afford relatively great weight to the fourth factor" where the defendant's use is "nontransformative and hence the threat of market substitution is severe." *Cambridge Univ. Press*, 769 F.3d at 1275 n.31.

Corellium specifically markets its product as an alternative to the purchase of physical iPhone devices.  SOF ¶¶ 62, 72.  There could be no more direct form of cognizable market harm under the fourth fair-use factor.  Corellium also lists Apple's "iOS Simulator" as a direct competitor of the Corellium Apple Product.  SOF ¶ 72.  And Corellium admits that its product will also compete with Apple's Security Research Device Program, under which Apple will be licensing devices running iOS to security researchers in return for the disclosure of security vulnerabilities and related discoveries to Apple.  ECF No. 64 at 11–12; SOFR ¶ 74.  Moreover, the evidence shows that Apple has previously been asked to consider (and rejected) the option of licensing exactly this kind of software—something that demonstrates both such a license's commercial value to Apple *and* Apple's own determination that granting such a license was not in its business interests.  *See* SOF ¶¶ 74–75; SOFR ¶¶ 77–79.  The best understanding of this uncontroverted evidence is that the fourth factor favors Apple as a matter of law—but to the extent Corellium contests any of it with more than *ipse dixit*, Apple is entitled to present its side to a jury.

### C.    The Copyright Misuse Defense Is Inapplicable Here

Corellium's assertion of a copyright misuse defense, in a single paragraph, is equally infirm.  "Copyright misuse" is a judicially created equitable defense to copyright infringement that the Eleventh Circuit has not recognized.  *See Telecom Tech. Servs. Inc. v. Rolm Co.*, 388 F.3d 820, 831 (11th Cir. 2004).  Even if such a defense exists in this jurisdiction, Corellium cannot establish

that it applies here.  Copyright misuse "forbids the use of the copyright to secure an exclusive right or limited monopoly not granted by the Copyright Office and which is contrary to public policy to grant." *Veeck v. S. Bldg. Code Cong. Int'l Inc.*, 241 F.3d 398, 409 (5th Cir. 2001).  Corellium has identified *no* evidence that Apple's enforcement of its copyrights in any way threatens to encroach on rights outside the scope of those copyrights.  *See* Mot. at 15.  Apple seeks only to prevent Corellium's infringement of Apple's actual copyrighted works—iOS and related visual works—exercising the very exclusive rights afforded under copyright law.  *See A&M Records,* 239 F.3d at 1027 (rejecting misuse defense where "plaintiffs seek to control reproduction and distribution of their copyrighted works"); *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 931, 939 (N.D. Cal. 2009).

**D.**      **Corellium Cannot Establish The Defense Of Equitable Estoppel**

Corellium's defense of equitable estoppel likewise fails.  Estoppel is available only "when a copyright owner engages in intentionally misleading representations concerning his abstention from suit, and the alleged infringer detrimentally relies on the copyright owner's deception." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 684 (2014).  Mere *inaction*, standing alone, does not create estoppel.  *Id.* at 683–84; *LEGO A/S v. Best-Lock Constr. Toys, Inc.*, 404 F. Supp. 3d 583, 619–20 (D.  Conn. 2019).  Corellium concedes that, to prevail on its defense of equitable estoppel, it must adduce undisputed evidence showing both that it "was ignorant of the true facts" and that it "relie[d] on [Apple's] conduct to [its] detriment."  Mot. at 16.

Corellium has done neither.  The *only* evidence cited for its claim that it was "ignorant of the true facts" is its CEO's testimony that Corellium "████████████████████████████████████████████████████████████████. SOFR ¶ 71 (citing DEX 25 177:9–178:8).  If Ms. Gorton indeed believed ████████████████████████████████████████████████████████████████████████ ████████████████ ████████████████.  *See Odom v. Navarro*, No. 09-21480-CIV, 2010 WL 11505459, at *4 (S.D. Fla. Mar. 11, 2010) ("Importantly, . . . implied licenses are terminable at will.").  But more importantly, ██████████████████████████████████████████ █████████████████████████████████████████████████████████████████████; *see LEGO A/S*, 404 F. Supp. 3d at 619–20 (inaction cannot create estoppel).  And in any event, her testimony that ████████████████████████████████ is squarely contradicted by an email she sent at the end of those very talks: "██████████████████████████████████████ ████████████████████████████████████████████████████

Corellium also claims that no one at Apple informed Corellium that its product infringed Apple's copyrights or violated the DMCA.  Def. SOF ¶ 72.  But it is undisputed that Apple *did* tell Corellium, over and over, that it could not commercialize iOS without a license, and that its principal Chris Wade understood the same for over seven *years*.  SOFR ¶¶ 76–79; SOF ¶¶ 26–30, 74–78.  There is also overwhelming evidence that Wade understood full well that his iOS virtualization tools required licenses from Apple, leading him to shut down one Corellium predecessor because of "Apple lawsuit concerns."  SOFR ¶ 76.  That same understanding prompted Citrix CEO Mark Templeton to tell Apple that he and Wade understood they could not commercialize the Corellium predecessor Citrix acquired "because Apple does not license iOS," after which Wade *admitted* that the Citrix venture fell apart over Apple's refusal to license iOS.  SOFR ¶¶ 77–78; PEX 37.

## V.   CORELLIUM VIOLATES THE DMCA'S ANTI-TRAFFICKING PROVISIONS

Finally, Corellium fails to establish it is entitled to summary judgment on Apple's DMCA anti-trafficking claim.  To the contrary, the Court should award summary judgment to Apple.  *See* ECF No. 453 at 9–20.  The DMCA prohibits trafficking in tools that protect access to, or rights in, copyrighted material, if the tools are primarily designed or marketed for circumventing the operative controls.  17 U.S.C. § 1201(a)(2), (b)(1).  Corellium violates the DMCA by distributing a tool—the Corellium Apple Product—that strips out Apple's TCMs and allows unauthorized access to, and infringement of, Apple's copyrighted works.

### A.   Apple's TCMs Effectively Control Access to and Protect Apple's Works

Corellium's principal defense to Apple's DMCA claim is that Apple's TCMs do nothing to prevent iOS from being installed on non-Apple hardware.  As Corellium's own expert acknowledges, this is simply not true: Corellium "ha[d] to circumvent what you might call security protections since Apple has designed their systems to make it very . . . difficult to run iOS except on authorized Apple hardware."  SOF ¶ 64.  Corellium also contends that, because Apple makes IPSW files available for download on the internet, the versions of iOS contained on those files are not protected by any TCMs.  Mot. at 17.  But it is undisputed that an ordinary user who downloads an IPSW file *cannot load iOS from that file* on any device other than on authorized Apple hardware.  SOF ¶¶ 9; SOFR ¶¶ 19, 43.  That user *cannot use iOS, cannot display iOS on her computer,* and *cannot make a "clone" copy of iOS.*  SOF ¶¶ 9, 11.  Furthermore, that user must accept Apple's standard license agreement for iOS, or iOS will shut down.  SOF ¶ 19; SOFR ¶ 13.

The undisputed evidence thus overwhelmingly demonstrates Apple's TCMs protect both access to and rights in its works, and Corellium's product works *only* by circumventing those TCMs.  *See* ECF No. 453 at 4–5; Apple SOF ¶¶ 10–23, 40–48; SOFR ¶¶ 15–18, 43.   These facts compel summary judgment for Apple, not Corellium.  *See Psystar*, 673 F. Supp. 2d at 940–42 (holding as much for TCMs protecting another Apple operating system, OS X).

### B.  Fair Use Is Not a Defense to Anti-Trafficking Claims Under the DMCA

Corellium also asserts a fair-use defense to Apple's DMCA claim, but this defense fails as a matter of law.  "Neither the text of § 107 [which codifies the fair-use defense to a copyright infringement claim] nor the nature of the conduct targeted by the DMCA (circumvention) supports applying the fair use defense to a DMCA violation."  *Disney Enters. Inc. v. VidAngel, Inc.*, 371 F. Supp. 3d 708, 715 (C.D. Cal. 2019); *see also Realnetworks, Inc. v. DVD Copy Control Ass'n*, 641 F. Supp. 2d 913, 942 (N.D. Cal. 2009) ("Fair use is not a defense to trafficking . . . under sections 1201(a) or (b), respectively.").   Thus, as many courts have recognized, even if downstream users of the product might have a fair-use defense to a copyright infringement claim, fair use simply does not apply to DMCA claims.  *See*, *e.g*., *Sony Computer Entm't Am., Inc. v. Divineo, Inc.*, 457 F. Supp. 2d 957, 965 (N.D. Cal. 2006); *accord 321 Studios v. MGM Studios, Inc.*, 307 F. Supp. 2d 1085, 1097 (N.D. Cal. 2004).

Both of the cases Corellium cites are entirely inapposite.  The Sixth Circuit's decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004), says nothing about whether fair use applies to a claim under the DMCA, *id.* at 545–51, and does not find that fair use applies to the copyright claim at issue.  *See* 387 F.3d at 544–45.  And the decision in *Online Policy Group v. Diebold, Inc.*, 337 F. Supp. 2d 1195 (N.D. Cal. 2004), addresses a completely different statute, 17 U.S.C. § 512.  *Id.* at 1199–1200, 1204.  Furthermore, even if fair use were to apply to DMCA claims, Corellium's defense would fail for the reasons discussed above with respect to Apple's copyright infringement claims.  *See supra* at 12–18.

### VI.  CONCLUSION

On the material facts that are genuinely undisputed, the Court should grant summary judgment in *Apple*'s favor on (a) Corellium's *prima facie* infringement, (b) Corellium's defenses of fair use, estoppel, and copyright misuse, and (c) Apple's DMCA claims.  *See Bosarge*, 5 F.3d at 1416 n.4.  In the alternative, to the extent that Corellium newly marshals competent evidence that the relevant material facts are disputed, the Court should simply deny Corellium's motion.

Dated: May 26, 2020

Michele D. Johnson*
*michele.johnson@lw.com*
LATHAM & WATKINS LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
(714) 540-1235 / (714) 755-8290 Fax

Sarang Vijay Damle*
*sy.damle@lw.com*
Elana Nightingale Dawson*
*elana.nightingaledawson@lw.com*
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200 / (202) 637-2201 Fax

Andrew M. Gass*
*andrew.gass@lw.com*
Joseph R. Wetzel*
*joe.wetzel@lw.corm*
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600 / (415) 395-8095 Fax

Jessica Stebbins Bina*
*jessica.stebbinsbina@lw.com*
LATHAM & WATKINS LLP
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
(424) 653-5500 / (424) 653-5501 Fax

Gabriel S. Gross*
*gabe.gross@lw.com*
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
(650) 463-2628 / (650) 463-2600 Fax

*Admitted pro hac vice*

Respectfully Submitted,

*s/ Martin B. Goldberg*

Martin B. Goldberg
Florida Bar No. 0827029
*mgoldberg@lashgoldberg.com*
*rdiaz@lashgoldberg.com*
Emily L. Pincow
Florida Bar.  No. 1010370
*epincow@lashgoldberg.com*
LASH & GOLDBERG LLP
100 Southeast Second Street
Miami, FL 33131
(305) 347-4040 / (305) 347-4050 Fax

*Attorneys for Plaintiff* APPLE INC.