# Plaintiff Exhibit 87

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Civil Action No. 9:19-cv-81160-RS

APPLE INC.,

                Plaintiff,

v.

CORELLIUM, LLC,

                Defendant.

**APPLE INC.'S VERIFIED SECOND AMENDED RESPONSES AND OBJECTIONS TO CORELLIUM, LLC'S SECOND SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Apple Inc. ("Apple") hereby provides its first amended responses and objections to Defendant Corellium, LLC's ("Corellium") Second Set of Interrogatories (Nos. 13–18)[1] (the "Interrogatories").

**DEFINITIONS**

**Apple**: Apple objects to the definition of "Apple" to include "any and all agents, representatives, and persons purporting to act on behalf of" Apple as overly broad, unduly burdensome and not proportional to the needs of this case. Apple will respond to the Interrogatories on behalf of itself, including its employees in their capacity as such, subject to Apple's knowledge after a reasonable investigation.

---

[1] Corellium served its First Set of Interrogatories, containing Interrogatory Nos. 1–12, on November 8, 2019. Corellium's Second Set of Interrogatories does not acknowledge the existence of Corellium's first 12 Interrogatories, and restarts the numbering scheme at 1. To avoid confusion with respect to Corellium's Interrogatories served in this case, Apple refers to Corellium's Interrogatories in its Second Set of Interrogatories as continuing the original number scheme, starting with 13.

**Corellium**: Apple objects to the definition of "Corellium" to include "any agents, officers, directors, shareholders, members or persons purporting to act on behalf of" Corellium as vague and ambiguous. Corellium has not produced any organizational charts or otherwise identified all of its agents, officers, directors, shareholders, or members. As a result, for purposes of responding to these requests, Apple will respond with respect to the Corellium employees that Corellium has identified in its initial disclosures and in communications with counsel for Apple.

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 13 (SECOND SET NO. 1):**

List the names of all Corellium's employees that Apple has accessed their iCloud account(s) and include the date(s) Apple accessed such iCloud accounts.

**Response:**

Apple objects to this Interrogatory as written as violating the privacy rights of its users. As a matter of regulation, policy, and practice, Apple may only access the contents of individual user iCloud accounts pursuant to legal process or with the consent of the user. However, upon conferring with counsel for Corellium, Apple understands that Corellium seeks by this Interrogatory only to confirm that Apple has not accessed Corellium employees' iCloud accounts in connection with this litigation, the parties' previous negotiations, or otherwise as a way for Apple to gain information about Corellium or its employees. Apple has not done so. As noted above, as a matter of regulation, policy, and practice, Apple cannot and does not access the contents of individual user iCloud accounts absent legal process or the consent of its users.

**INTERROGATORY NO. 14 (SECOND SET NO. 2):**

Identify each Apple employee who has previously "informed Christopher Wade that his Corellium Apple Product violated Apple's exclusive rights and that it could not be made and sold commercially without permission from Apple," as stated by Apple in response to Interrogatory No. 2 of its Amended Answers.

**Response:**

Apple responds that Apple employee Sebastien Marineau-Mes informed Christopher Wade that an iOS virtualization service could not be sold commercially without permission from Apple. Apple employee Ivan Krstić informed Christopher Wade that an iOS virtualization service, if sold commercially without permission from Apple was legally dubious at best. *E.g.,* Krstić Dep. Rough Tr. 60:8–13 (Mar. 19, 2020).

Apple expressly reserves all rights to supplement, revise, and/or amend this response. Apple is continuing to investigate the subject matter of this Interrogatory and reserves all rights to supplement this response if it discovers any response, relevant, non-privileged documents or information.

**INTERROGATORY NO. 15 (SECOND SET NO. 3):**

Identify every intended commercial use of iOS.

**Response:**

Apple responds as follows: every Apple-authorized use of iOS is a "commercial use" as defined by Corellium. iOS is a mobile operating system which powers Apple's mobile devices, including iPhones, iPod Touches, and older generations of iPads. Apple continuously works to update and to modify iOS in order to improve user experiences, advance the performance of devices, software, and applications, and safeguard privacy and security. iOS is protected by

copyright, and Apple intends to exploit its copyrighted works in every way that Apple determines is appropriate for the growth and development of Apple's business.

Given the foregoing, Apple cannot provide an exhaustive list of all intended commercial uses of iOS, as new uses are continually being identified and developed, and Apple's overriding purpose is to grow and develop its business, including by allowing its authorized users to put iOS to use in ways that they see fit (consistent with their license to do so from Apple). However, the following is an illustrative list of some of the intended commercial uses of iOS:

- Provide a mobile operating system for Apple's physical devices
- Provide a visually appealing and intuitive-to-use user experience via navigation through touch, voice, and graphical user interfaces
- Seamlessly integrate into the larger environment of Apple products
- Facilitate communications between individuals
- Facilitate commerce and global business
- Deliver information relevant to user interests and everyday life
- Create and store user memories
- Entertain users
- Provide users with access to a vast third-party applications ecosystem through the App Store
- Provide user confidence in a secure app environment
- Provide developers with an environment to develop and test new applications
- Provide researchers with the ability to refine and improve iOS and make it more secure and more useful for Apple customers
- Protect privacy and security for personal and business data
- Promote development of internet applications, tools, and the worldwide technology ecosystem

4

Apple expressly reserves all rights to supplement, revise, and/or amend this response. Apple is continuing to investigate the subject matter of this Interrogatory and reserves all rights to supplement this response if it discovers any response, relevant, non-privileged documents or information.

**INTERROGATORY NO. 16 (SECOND SET NO. 4):**

List every "technological protection measure" referred to in paragraph 73 of Apple's First Amended Complaint and Demand for Jury Trial [D.E. 56], when Apple states, "Apple has implemented technological protection measures that . . ." and for each technological protection measure listed, explain how each protects the access and copying of the work or works that each measure is protecting.

**Response:**

Apple designs security into the core of its platforms. Every Apple device combines hardware, software, and services designed to work together for maximum security. The following features of Apple software and devices may comprise of Apple's "technological protection measures" referred to in paragraph 73:

The iOS kernel is compiled by Apple to run on Apple hardware which has certain features in the instruction set architecture ("ISA") that are not present on a non-Apple platform. Some of those types of CPU features are specifically for security, such as, for example, extensions to the pointer authentication code ("PAC") mechanism. Though PAC is part of the standard ARM specification, Apple hardware provides custom features in the ISA to enhance the security of PAC to meet Apple security requirements which are not met by the base specification. Apple implements other changes from the base PAC specification. Apple

5

implements other changes from the base PAC specification, including using custom cryptographic primitives.

During upgrade or restore of iOS on a device, a connection is made to the Apple installation authorization server, which includes a list of cryptographic measurements for each part of the installation bundle to be installed (for example, iBoot, the kernel, and OS image), a random anti-reply value (nonce), and the device's unique Exclusive Chip Identification (ECID). The nonce prevents an attacker from saving the server's response and using it to later trick a device into installing out-of-date or insecure system software that the server no longer authorizes for installation.

The authorization server checks the presented list of measurements against versions for which installation is permitted and, if it finds a match, adds the ECID to the measurement and signs the result. The server passes a complete set of signed data to the device as part of the upgrade or restore process. Adding the ECID "personalizes" the authorization for the requesting device. By authorizing and signing only for known measurements, the server ensures that the update takes place exactly as Apple provided.

When the user then powers on the device for the first time (and each time it is powered on afterwards), each step of the startup process contains components that are cryptographically signed by Apple to ensure integrity and that proceed only after verifying the chain of trust. This includes the bootloaders, the kernel, kernel extensions, and baseband firmware. This secure boot chain helps ensure that the version of iOS is what it says it is, and that iOS is installed on hardware that is what it says it is.

When an iOS device is turned on, its application processor immediately executes code from read-only memory referred to as "Boot ROM." This immutable code, known as the

hardware root of trust, is laid down during chip fabrication and is implicitly trusted. The Boot ROM code contains the Apple Root CA public key—used to verify that the iBoot bootloader is signed by Apple before allowing it to load. This is the first step in the chain of trust, in which each step ensures that the next is signed by Apple. When the iBoot finishes its tasks, it verifies and runs the iOS kernel.

At each stage in the boot-time chain of trust, the signed data from Apple's authorization server is verified to make sure that the signature comes from Apple and that the measurement of the item loaded from the storage device, combined with the device's ECID, matches what was covered by the signature. These steps ensure that the specific version of iOS loads on the specific hardware authorized by Apple and that older versions of iOS or firmware cannot be copied from one device and executed on another.

A failure to verify the device at any stage in this process will result in an error and the device must then be connected to iTunes or the macOS Finder in order to restore the device to its factory settings.

The Secure Enclave co-processor also utilizes a secure boot process that ensures its separate software is verified and signed by Apple.

All running code in iOS must be cryptographically signed by Apple, or otherwise authorized by Apple to run. At runtime, code signature checks of all executable memory pages are made as they are loaded to ensure that an app has not been modified since it was installed or last updated. This mandatory code signing extends the concept of chain of trust from the hardware all the way up to apps and prevents third-party apps from loading unsigned code resources or using self-modifying code.

Additionally, upon install or upgrade, iOS presents the Software License Agreement ("SLA") relevant to that version of iOS to the user, and the user must affirmatively agree to the terms of the SLA in order for the installation to complete.

Apple expressly reserves all rights to supplement, revise, and/or amend this response. Apple is continuing to investigate the subject matter of this Interrogatory and reserves all rights to supplement this response if it discovers any response, relevant, non-privileged documents or information.

**INTERROGATORY NO. 17 (SECOND SET NO. 5):**

In response to Interrogatory No. 5 in Apple's Amended Answers, Apple states that Corellium "had an interesting product that, if brought in-house to Apple and properly licensed so as to be non-infringing, could have been useful technology within Apple. . . ." Explain in detail how the "product" would be properly licensed so as to not be allegedly infringing and otherwise violate Apple's exclusive rights.

**Response:**

Apple specifically objects to this Interrogatory because it seeks, at least in part, information that is protected by attorney-client privilege and/or the work-product doctrine. Apple further objects to this Interrogatory because it calls, at least in part, for pure legal conclusions. Apple will answer with respect to non-privileged information, and will log any privileged documents upon which it relies appropriately.

Pursuant to 17 U.S.C. § 106, "the owner of copyright . . . has the exclusive rights to do and authorize any of" a number of acts, including reproduction of the copyrighted work, preparation of derivative works based on the copyrighted work, distribution of copies of the copyrighted work, an in the case of pictorial and graphic works, public display of the

copyrighted work. Accordingly, prior to commercially marketing and distributing the Corellium Apple Product, Corellium should have sought a license from Apple to reproduce, prepare derivative works from, distribute, and/or display iOS, iTunes, and the GUI Elements as described in Apple's First Amended Complaint (ECF No. 56).

The terms of Apple's software license agreements are available at www.apple.com/legal/sla. Apple's Guidelines for Using Apple Trademarks and Copyrights are available at https://www.apple.com/legal/intellectual-property/guidelinesfor3rdparties.html. Apple's form for questions regarding rights and permissions for further use of Apple's copyrighted materials is available at https://www.apple.com/legal/contact/rights-permissions.html. Pursuant to Federal Rule of Civil Procedure 33(d), Apple identifies that it has produced these licenses and other documentation bearing on Apple's intellectual property terms. They are contained at:

APL-CORELLIUM_00040672; APL-CORELLIUM_00041082; APL-CORELLIUM_00041500; APL-CORELLIUM_00041736; APL-CORELLIUM_00042142; APL-CORELLIUM_00042563; APL-CORELLIUM_00043012; APL-CORELLIUM_00043167; APL-CORELLIUM_00043618; APL-CORELLIUM_00043763; APL-CORELLIUM_00043778; APL-CORELLIUM_00044014; APL-CORELLIUM_00044020; APL-CORELLIUM_00044037

To discuss any questions regarding Apple's rights or possible licenses for the Corellium Apple Product, Corellium should have contacted Apple's Copyright Team.

Because Apple carefully protects the use of its intellectual property and guards against misuse or misleading use of its software or graphical elements, Apple would have leveraged its exclusive rights in its copyrighted works in order to ensure that Apple approved and agreed with

the way in which the Corellium Apple Product, incorporated within Apple, used, copied, displayed, or modified Apple's copyrighted works.

Apple expressly reserves all rights to supplement, revise, and/or amend this response. Apple is continuing to investigate the subject matter of this Interrogatory and reserves all rights to supplement this response if it discovers any response, relevant, non-privileged documents or information

**INTERROGATORY NO. 18 (SECOND SET NO. 6):**

Describe each technology that Apple has developed, or is currently developing, that is parallel (or similar) to the Corellium Apple Product.

**Response:**

Apple objects to this Interrogatory and specifically to the extent that the Interrogatory could be read to include Apple's internal testing and development, as well as within-Apple-only technologies that are not offered to the public by Apple and thus not competitive with the Corellium Apple Product. The Court already denied Corellium discovery regarding "Apple's internal development of hypervisor, emulation, simulation, and virtualization hardware and software, including the names, relevant dates for such development projects" and Apple's "virtualization of the iOS operating system." *See* ECF No. 148 ¶ 2 (denying Corellium's motion to compel Interrogatory No. 12); ECF No. 152 ¶ 3 (denying Corellium's motion to compel Request for Production Nos. 20–23). Other discovery related to the same products is therefore inappropriate. For the same reason, Apple objects to this Interrogatory to the extent it calls for internal, not-offered-to-the-public technologies as irrelevant and calling for confidential or proprietary information pertaining to Apple's business, trade secrets, and/or economic relationships. Apple will, however, respond to this Interrogatory in part (maintaining its

objections as to the remainder), and in particular with respect to the technologies that Apple offers to the public, or has announced it will offer to the public, and which it contends are competitive with the Corellium Apple Product. For clarity, it is not Apple's position that these technologies are parallel or similar to the Corellium Apple Product. The products described below are not emulation or virtualization products; rather, they are products that compete in the same spaces as the Corellium Apple Product—*i.e.*, application testing and development and product security.

Apple responds as follows:

Apple sells a service called the Apple Developer Program for $99 a year. The Apple Developer Program provides third-party developers with access to a range of Apple-created software development tools that allow the creation and testing of iOS apps. An example is TestFlight, a development tool which allows app developers to publish "beta" versions of their apps to testers, who can then download and test the app for a limited period of time.

Apple also distributes a software product called Xcode that allows app developers to create and test iOS apps. Among the features of Xcode is one called "Simulator," which gives an app developer the ability to test the app on a "virtual" iOS device. In addition, Xcode makes it possible to test apps on actual physical Apple devices. Although Xcode is provided without charge, use of the software requires agreement to specific and detailed terms and conditions of use, including agreement not to use Xcode to "decompile, reverse engineer, disassemble, attempt to derive the source code of, modify, decrypt, or create derivative works of" Apple-created software.

Apple has also announced the "iOS Security Research Device Program," under which Apple will provide custom versions of the iPhone to legitimate security researchers, to allow

them to find and report bugs to Apple.

      Apple expressly reserves all rights to supplement, revise, and/or amend this response. Apple is continuing to investigate the subject matter of this Interrogatory and reserves all rights to supplement this response if it discovers any response, relevant, non-privileged documents or information.

Dated: April 6, 2020					Respectfully Submitted,

							*s/ Martin B. Goldberg*

Kathryn Ruemmler*					Martin B. Goldberg
*kathryn.ruemmler@lw.com*				Florida Bar No. 0827029
Sarang Vijay Damle*					*mgoldberg@lashgoldberg.com*
*sy.damle@lw.com*					*rdiaz@lashgoldberg.com*
Elana Nightingale Dawson*				LASH & GOLDBERG LLP
*elana.nightingaledawson@lw.com*			100 Southeast Second Street
LATHAM & WATKINS LLP				Miami, FL  33131
555 Eleventh Street NW, Suite 1000			(305) 347-4040 / (305) 347-4050 Fax
Washington, DC 20004
(202) 637-2200 / (202) 637-2201 Fax

Andrew M. Gass*
*andrew.gass@lw.com*
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600 / (415) 395-8095 Fax

Jessica Stebbins Bina*
*jessica.stebbinsbina@lw.com*
LATHAM & WATKINS LLP
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
(424) 653-5500 / (424) 653-5501 Fax

Gabriel S. Gross*
*gabe.gross@lw.com*
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
(650) 463-2628 / (650) 463-2600 Fax

*Admitted pro hac vice


*Attorneys for Plaintiff* APPLE INC.

## **VERIFICATION**

I, Ivan Krstić, an employee and authorized representative for Apple Inc., declare under penalty of perjury under the laws of the United States of America that the responses in Apple Inc.'s Verified Second Amended Responses and Objections to Corellium, LLC's Second Set of Interrogatories dated April 6, 2020, are true and correct to the best of Apple Inc.'s knowledge.

Executed on April 6, 2020 in Cupertino, CA.

_____
Ivan Krstić
On behalf of Apple Inc.

**CERTIFICATE OF SERVICE**

I, Elana Nightingale Dawson, do hereby certify that on April 7, 2020, I caused a copy of the foregoing Apple Inc.'s Verified Second Amended Responses and Objections to Corellium LLC's Second Set of Interrogatories to be served via email upon:

S. Jonathan Vine
Justin B. Levine
Lizza C. Constantine
Michael Alexander Boehringer
COLE, SCOTT & KISSANE, P.A.
Esperante Building
222 Lakeview Avenue, Suite 120
West Palm Beach, Florida 33401
jonathan.vine@csklegal.com
justin.levine@csklegal.com
lizza.constantine@csklegal.com
michael.boehringer@csklegal.com

David L. Hecht
Maxim Price
Minyao Wang
HECHT PARTNERS LLP
20 West 23rd St. Fifth Floor
New York, NY 10010
dhecht@hechtparntersllp.com
mprice@hechtpartnersllp.com
mwang@hechtpartnersllp.com

Gavin Cunningham Gaukroger
BERGER SINGERMAN LLP
350 East Las Olas Blvd.
Suite 1000
Fort Lauderdale, FL 33301
ggaukroger@bergersingerman.com

  *s/ Elana Nightingale Dawson*
  Elana Nightingale Dawson