# EXHIBIT A

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF FLORIDA

3

4     APPLE, INC.,                    )

5               Plaintiff,            )

6           vs.                       ) Case NO.

7     CORELLIUM, LLC,                 ) 9:19-cv-81160-RS

8               Defendant.            )

9     _____)

10

11

12

13

14            CONFIDENTIAL - ATTORNEYS' EYES ONLY

15

16    VIDEOTAPED DEPOSITION OF PROFESSOR CLARK DOUGLAS ASAY

17                 Virtual Zoom Deposition

18               Wednesday, April 22, 2020

19            10:04 a.m. EST - 6:25 p.m. EST

20

21    Reported by:

22    ASHALA TYLOR, CSR #2436, CLR, CRR, RPR

23    JOB NO. 4082359

24

25    PAGES 1 - 259

                                              Page 1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF FLORIDA

 3

 4   APPLE, INC.,                    )

 5            Plaintiff,            )

 6         vs.                       ) Case NO.

 7   CORELLIUM, LLC,                 ) 9:19-cv-81160-RS

 8            Defendant.             )

 9   _____)

10

11

12

13

14

15

16       Videotaped deposition of PROFESSOR CLARK DOUGLAS

17   ASAY, taken by Zoom virtual on Wednesday, April 22,

18   2020, commencing at 10:04 a.m. (EST), and ending at

19   6:25 p.m., on Wednesday, April 22, 2020, before Ashala

20   Tylor, CSR No. 2436, RPR, CRR, CLR.

21

22

23

24

25
```

Page  2

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1   APPEARANCES OF COUNSEL:

2

3   FOR THE PLAINTIFF APPLE, INC.:

4        LATHAM & WATKINS, LLP

5        BY:  SARANG (SY) DAMLE, ESQ.

6             ELANA NIGHTENGALE DAWSON, ESQ.

7        555 Eleventh Street NW, Suite 1000

8        Washington, DC  20004

9        202.637.3332

10       sy.damle@lw.com

11       Elana.NightengaleDawson@lw.com

12

13  FOR THE DEFENDANT CORELLIUM, LLC:

14       HECHT PARTNERS LLP

15       BY:  CONOR MCDONOUGH, ESQ.

16       20 West 23rd Street, Fifth Floor

17       New York, New York  10010

18       cmcdonough@hechtpartners.com

19

20  Also Present Julian Shine, Videographer

21

22

23

24

25
```

Page 3

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | that you are holding yourself out as a source -- | 11:07 |
| 2 | sorry.  Let me restart that, if that's okay.  Is | 11:07 |
| 3 | that okay? | 11:08 |
| 4 |      A.   Yeah, yeah. | 11:08 |
| 5 |      Q.   In your expert report do you explain that | 11:08 |
| 6 | you're holding yourself out as a expert in reviewing | 11:08 |
| 7 | source code files in the way you just described? | 11:08 |
| 8 |      A.   I don't -- I think it's not as -- as | 11:08 |
| 9 | explicit as it could be.  I think it's more implicit | |
| 10 | based on my practice experiences. | |
| 11 |      Q.   Are you holding yourself out as an expert | 11:09 |
| 12 | in security research? | 11:09 |
| 13 |      A.   No. | 11:09 |
| 14 |      Q.   Are you holding yourself out as an expert | 11:09 |
| 15 | in computer science? | 11:09 |
| 16 |      A.   No. | 11:09 |
| 17 |      Q.   So you are holding yourself out here as a | 11:09 |
| 18 | copyright law expert; is that correct? | 11:09 |
| 19 |      A.   Yeah. | 11:09 |
| 20 |      MR. DAMLE:  Okay.  We've been going about | 11:09 |
| 21 | an hour.  Why don't we take a quick break.  Can we, | 11:09 |
| 22 | Conor, say ten minutes? | 11:09 |
| 23 |      MR. MCDONOUGH:  Yeah, that's fine.  I'm | 11:10 |
| 24 | trying to adjust the microphone on these headphones | 11:10 |
| 25 | so you folks can hear me. | 11:10 |

Page 45

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | general overview, right.  I mean, there are | 11:53 |
| 2 | obviously plenty more facts in the case that touch | 11:53 |
| 3 | on my reports, but that's the -- I think that's the | 11:53 |
| 4 | general overview. | 11:53 |
| 5 | Q.   And what's the basis of your understanding | 11:53 |
| 6 | of the facts of this case? | 11:53 |
| 7 | A.   Well, I mean, so when Brett contacted me | 11:54 |
| 8 | and discussed the assignment, he obviously described | 11:54 |
| 9 | the nature of the dispute between the parties and | 11:54 |
| 10 | the product.  I -- once I -- or, you know, before I | 11:54 |
| 11 | agreed to the assignment and then subsequently also | 11:54 |
| 12 | just poked around the web to see -- find out more | 11:54 |
| 13 | about the Corellium product and -- and then | 11:54 |
| 14 | obviously I eventually was given access to it, and | 11:54 |
| 15 | so spent some time using the product and on the | 11:54 |
| 16 | Corellium website. | 11:55 |
| 17 | Q.   Who gave you access to the Corellium | 11:55 |
| 18 | product? | 11:55 |
| 19 | A.   It was through Brett.  But I think the -- | 11:55 |
| 20 | obviously the Corellium folks that enabled that. | 11:55 |
| 21 | Q.   Anything else you looked at in developing | 11:55 |
| 22 | your understanding of the facts of this case? | 11:55 |
| 23 | A.   Like I said, I looked around the Internet, | 11:55 |
| 24 | watched some YouTube videos about the product, and | 11:55 |
| 25 | then eventually, like I mentioned, used the product | 11:55 |

Page 65

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | to get a hands-on experience as to how it works and | 11:55 |
| 2 | what it does. | 11:55 |
| 3 | Q.   Anything else that you can think of? | 11:56 |
| 4 | A.   No. | 11:56 |
| 5 | Q.   Can I ask when you were first given access | 11:56 |
| 6 | to the Corellium product? | 11:56 |
| 7 | A.   I don't know.  I mean, I could look in my | 11:56 |
| 8 | email, find the specific date.  I think it was | 11:56 |
| 9 | sometime in November -- | 11:56 |
| 10 | Q.   Of 20 -- | 11:56 |
| 11 | A.   2019. | 11:56 |
| 12 | Q.   And did you -- can you describe how many | 11:56 |
| 13 | times you used the product? | 11:56 |
| 14 | A.   I don't know exactly.  I -- I logged in | 11:56 |
| 15 | and played with it several times.  Yeah, at least | 11:56 |
| 16 | several. | 11:56 |
| 17 | Q.   Do you have an estimate of how many times | 11:56 |
| 18 | it was that you logged in? | 11:57 |
| 19 | A.   Two or three times. | 11:57 |
| 20 | Q.   And about how much time did you spend | 11:57 |
| 21 | playing around with the product each time you logged | 11:57 |
| 22 | in? | 11:57 |
| 23 | A.   I mean, I didn't spend hours on it.  I'm | 11:57 |
| 24 | not sure.  I mean, again, I could go back and look. | 11:57 |
| 25 | I would assume that the product itself can -- tracks | 11:57 |

Page 66

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | that.  So probably, I don't know, 15 minutes to half | 11:57 |
| 2 | an hour. | 11:57 |
| 3 | Q.   That's 15 minutes to half an hour each | 11:57 |
| 4 | time you logged in? | 11:57 |
| 5 | A.   I think so, yeah. | 11:58 |
| 6 | Q.   When is the last time you logged into the | 11:58 |
| 7 | Corellium product? | 11:58 |
| 8 | A.   Probably around the time I was given | 11:58 |
| 9 | access to it.  And so I -- if I recall correctly, | 11:58 |
| 10 | it's in November. | 11:58 |
| 11 | Q.   So you haven't accessed the Corellium -- | 11:58 |
| 12 | the Corellium product since November; is that fair? | 11:58 |
| 13 | A.   I think so, yeah.  I don't recall doing it | 11:58 |
| 14 | since. | 11:58 |
| 15 | Q.   Okay.  I am going to mark our first | 11:58 |
| 16 | exhibit, which will be your opening report. | 11:58 |
| 17 | (Exhibit 1 was marked for | 11:58 |
| 18 | identification and attached | 11:58 |
| 19 | hereto.) | 11:58 |
| 20 | BY MR. DAMLE: | 11:59 |
| 21 | Q.   Professor Asay, do you have the Exhibit | 11:59 |
| 22 | Share window open on your web browser? | 11:59 |
| 23 | A.   I do.  Sorry.  It says for me the folder | 11:59 |
| 24 | is empty. | 11:59 |
| 25 | Q.   Let's just give it a second. | 11:59 |

Page 67

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | law firm? | 12:03 |
| 2 | A.   Did I receive any facts about this case | 12:04 |
| 3 | from Norton Rose? | 12:04 |
| 4 | Q.   Correct, about this case or about the | 12:04 |
| 5 | Corellium product. | 12:04 |
| 6 | A.   Yeah, preliminarily, and then I used the | 12:04 |
| 7 | product to sort of, I guess, confirm some of that | 12:04 |
| 8 | orient -- some of those orienting discussions. | 12:04 |
| 9 | Q.   Can we flip to page 84 -- sorry, paragraph | 12:04 |
| 10 | 84 of your opinion?  I think that's page 22. | 12:04 |
| 11 | A.   Yes. | 12:04 |
| 12 | Q.   So in paragraphs 84 through 88, you | 12:04 |
| 13 | discussed the facts or data that you considered in | 12:05 |
| 14 | forming the opinions discussed in your report; is | 12:05 |
| 15 | that correct? | 12:05 |
| 16 | A.   Yes. | 12:05 |
| 17 | Q.   Is that an accurate and complete list of | 12:05 |
| 18 | the facts or data you considered in forming the | 12:05 |
| 19 | opinions discussed in your report? | 12:05 |
| 20 | A.   Do you mean is it exhaustive? | 12:05 |
| 21 | Q.   Correct.  I -- I think my question is, is | 12:05 |
| 22 | it accurate and complete? | 12:05 |
| 23 | A.   Yeah, it's -- I mean, it's accurate. | 12:05 |
| 24 | There's -- you know, like I just mentioned, when | 12:05 |
| 25 | coming on the case I did Internet research, watched | 12:05 |

Page 70

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | some YouTube videos.  Those aren't specified here, | 12:05 |
| 2 | nor the conversations I had with Norton Rose. | 12:05 |
| 3 | I guess I just assumed in putting this | 12:06 |
| 4 | together that those were sort of assumed to have | 12:06 |
| 5 | happened.  Otherwise, how do you come on to a case? | 12:06 |
| 6 | And then, you know, like my -- my | 12:06 |
| 7 | reference to "Is Transformative Use Eating the | 12:06 |
| 8 | World?" my article -- in that article I reviewed | 12:06 |
| 9 | sort of the background literature regarding | 12:06 |
| 10 | empirical studies on fair use.  And so there's the | 12:06 |
| 11 | Barton Beebe study.  There's the Matthew Sag study. | 12:06 |
| 12 | There's -- | 12:06 |
| 13 | (Reporter clarification.) | 12:06 |
| 14 | A.   I can just start over. | 12:06 |
| 15 | There's -- there's a number of empirical | 12:06 |
| 16 | studies that I review in that article of mine that I | 12:06 |
| 17 | relied on in coming to the conclusions that I do or | 12:06 |
| 18 | the opinions that I do in the report. | 12:07 |
| 19 | So I don't -- you know, I referenced my | 12:07 |
| 20 | article there which incorporates a discussion of all | 12:07 |
| 21 | of those different empirical studies.  But I | 12:07 |
| 22 | don't -- I don't pull out, for instance, every | 12:07 |
| 23 | citation in every article and list them separately, | 12:07 |
| 24 | if that makes sense. | 12:07 |
| 25 | Q.   I understand what you're saying. | 12:07 |

Page 71

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | I recall.  I mean, I think there was -- when I first | 12:11 |
| 2 | talked to Brett Govenger and we were discussing | 12:11 |
| 3 | whether I was going to take part in this, he | 12:11 |
| 4 | suggested I, you know, just go look around.  I think | 12:12 |
| 5 | he suggested that there were some YouTube videos | 12:12 |
| 6 | that might be useful in sort of informing or | 12:12 |
| 7 | informing me about what -- what this product is | 12:12 |
| 8 | about. | 12:12 |
| 9 | So, like I mentioned before, I looked at | 12:12 |
| 10 | some of those and just Internet research in general. | 12:12 |
| 11 | Q.   Did you ever review Apple's complaint in | 12:12 |
| 12 | this matter? | 12:12 |
| 13 | A.   Yes.  I think there was an initial one and | 12:12 |
| 14 | then amended. | 12:12 |
| 15 | Q.   And did you rely on any of the facts as | 12:12 |
| 16 | described in Apple's complaint in forming the | 12:12 |
| 17 | opinions in your report? | 12:12 |
| 18 | A.   I mean, I think -- I think the complaint | 12:13 |
| 19 | obviously provided context about what Apple's | 12:13 |
| 20 | claiming, and so I -- I think inevitably in forming | 12:13 |
| 21 | an opinion about the dispute, you take the complaint | 12:13 |
| 22 | into account and the facts and arguments presented | 12:13 |
| 23 | there. | 12:13 |
| 24 | Q.   And just to be clear, you haven't listed | 12:13 |
| 25 | either the complaint or the first amended complaint | 12:13 |

Page 74

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | in your report; is that correct? | 12:13 |
| 2 | A.   Yeah, I don't -- I don't recall doing so. | 12:13 |
| 3 | I mean, I think I -- in the subsequent | 12:13 |
| 4 | report, I do reference some of the documentation | 12:13 |
| 5 | from Apple. | 12:13 |
| 6 | Q.   Did you ever review Corellium's answer, | 12:14 |
| 7 | affirmative defenses and counterclaims document? | 12:14 |
| 8 | A.   Yes. | 12:14 |
| 9 | Q.   And did you review Corellium's answer, | 12:14 |
| 10 | affirmative defenses and counterclaims to Apple's | 12:14 |
| 11 | first amended complaint? | 12:14 |
| 12 | A.   Yes. | 12:14 |
| 13 | Q.   And did you rely on any of the facts in | 12:14 |
| 14 | either of those documents in forming your opinions | 12:14 |
| 15 | in this report? | 12:14 |
| 16 | A.   I mean, I think there was some information | 12:14 |
| 17 | in those about Apple's pre-hacked devices, that it | 12:14 |
| 18 | was announced, was making available.  And so | 12:14 |
| 19 | that's -- I don't think that that's a -- something | 12:15 |
| 20 | that's been -- that information that's been broadly | 12:15 |
| 21 | disseminated; so -- | 12:15 |
| 22 | I'm just trying to recall.  I think that | 12:15 |
| 23 | that type of information is something that -- just | 12:15 |
| 24 | the existence of that program that I otherwise may | 12:15 |
| 25 | not have known about helped inform my opinions. | 12:15 |

Page 75

```
 1        Q.   And can you point me to where in this        12:15
 2   report you listed the -- either of the documents       12:15
 3   just discussed, the answer, affirmative defenses and   12:15
 4   counterclaims or the answer, affirmative defenses      12:15
 5   and counterclaims to Apple's first amended             12:15
 6   complaint?                                             12:15
 7        A.   Yeah, I don't think I explicitly reference   12:15
 8   them in there.  I guess I assumed that they are part   12:15
 9   of the dispute and so they -- they -- yeah, I          12:16
10   didn't -- I didn't put them in there.                 12:16
11        Q.   Did you consider any other documents in      12:16
12   preparing this report?                                 12:16
13        A.   No, I don't think so.                        12:16
14        Q.   So you didn't review any documents           12:16
15   produced by either Apple or Corellium or any third     12:16
16   parties in relation to this litigation; is that        12:16
17   correct?                                               12:16
18        A.   No, not that I recall.                       12:16
19        Q.   You've read the opening report of            12:16
20   Dr. Siegel, correct?                                   12:16
21        A.   Yes.                                         12:16
22        Q.   And do you understand that Dr. Siegel        12:16
23   cited a number of documents in his report?            12:16
24        A.   Yeah.                                        12:16
25        Q.   Did you request copies of any of the         12:17
```

Page 76

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | or citations.  I may have peeked at some of them. | |
| 2 | Q.   Do you recall which ones you may have | 12:18 |
| 3 | peeked at? | 12:18 |
| 4 | A.   I don't recall specifically, no. | 12:18 |
| 5 | Q.   So you haven't reviewed any of Corellium's | 12:18 |
| 6 | contracts with its customers, have you? | 12:18 |
| 7 | A.   No, just -- just the language that I think | 12:18 |
| 8 | Dr. Siegel references in his report. | 12:18 |
| 9 | Q.   And you haven't reviewed any Corellium's | 12:18 |
| 10 | emails with its customers, have you? | 12:19 |
| 11 | A.   No, not -- no, no. | 12:19 |
| 12 | Q.   Do you know the identities of Corellium's | 12:19 |
| 13 | customers? | 12:19 |
| 14 | A.   I don't. | 12:19 |
| 15 | Q.   Have you reviewed Corellium's | 12:19 |
| 16 | communications with domestic governments? | 12:19 |
| 17 | A.   No. | 12:19 |
| 18 | Q.   Have you reviewed any Corellium | 12:19 |
| 19 | communications with foreign governments? | 12:19 |
| 20 | A.   No. | 12:19 |
| 21 | Q.   Have you reviewed any of Corellium's | 12:19 |
| 22 | communications with government contractors? | 12:19 |
| 23 | A.   No. | 12:19 |
| 24 | Q.   Are you familiar with the company called | 12:19 |
| 25 | Azimuth? | 12:19 |

Page 78

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   I'm not, no.                              12:19

2      Q.   Have you reviewed any communications      12:19

3  between Corellium and potential customers?         12:19

4      A.   No.  I have seen some of the tweets that,  12:19

5  I think, Dr. Nieh references in his report.  I guess  12:20

6  those could be considered communications between    12:20

7  potential customers.                                12:20

8      Q.   Do you think Corellium's tweets are a way  12:20

9  of marketing itself to potential customers?         12:20

10     A.   I -- they could be, right.  People have    12:20

11 all sorts of reasons why they tweet things.  I'm not  12:20

12 in a position to know what their motivation was      12:20

13 in -- in maintaining the Twitter account.           12:20

14     Q.   And you haven't reviewed any of the bugs   12:20

15 that Corellium submitted to Apple; is that correct?  12:20

16     A.   That's right.                              12:20

17     Q.   Are you aware whether or not Corellium has 12:20

18 submitted bugs to Apple?                            12:21

19     A.   I think in Corellium's answer, they        12:21

20 reference some of those.  That's -- so -- I have     12:21

21 some awareness based on that.                        12:21

22     Q.   Have you reviewed any of Corellium's       12:21

23 marketing materials?                                 12:21

24     A.   No.                                         12:21

25     Q.   And you haven't reviewed any of            12:21

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Corellium's conference presentations; that's | 12:21 |
| 2 | correct, right? | 12:21 |
| 3 | A.   That's right. | 12:21 |
| 4 | Q.   And you haven't reviewed any of | 12:21 |
| 5 | Corellium's invoices to its customers; is that | 12:21 |
| 6 | correct? | 12:21 |
| 7 | A.   That's correct. | 12:21 |
| 8 | Q.   Are you aware whether or not Corellium has | 12:21 |
| 9 | sold bugs to anyone other than Apple? | 12:21 |
| 10 | A.   Sold bugs? | 12:21 |
| 11 | MR. MCDONOUGH:  Objection.  Foundation. | 12:21 |
| 12 | BY MR. DAMLE: | 12:21 |
| 13 | Q.   Let me repeat the question. | 12:21 |
| 14 | Are you aware whether or not Corellium has | 12:22 |
| 15 | sold bugs to anyone other than Apple? | 12:22 |
| 16 | MR. MCDONOUGH:  Same objection. | 12:22 |
| 17 | THE WITNESS:  I have no idea. | 12:22 |
| 18 | BY MR. DAMLE: | 12:22 |
| 19 | Q.   Have you reviewed any of Corellium's | 12:22 |
| 20 | technical manuals? | 12:22 |
| 21 | A.   I mean, when I've used the product, I | 12:22 |
| 22 | don't know if they consider them their technical | 12:22 |
| 23 | manuals, but sort of the overviews that they provide | 12:22 |
| 24 | and just on the website. | 12:22 |
| 25 | Q.   Anything else other than that? | 12:22 |

Page 80

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Beyond that, I wasn't really asked to | 12:31 |
| 2 | opine on how he's described the technology and how | 12:31 |
| 3 | it works.  But I -- I don't have any specific | 12:31 |
| 4 | comments about that at this time.  I guess if we're | 12:31 |
| 5 | doing a deep dive into it, then I may think about it | 12:31 |
| 6 | more.  Maybe I would have no objections, but maybe I | 12:31 |
| 7 | would.  I think I'm too uninformed at this point in | 12:31 |
| 8 | having not thought a lot about it to really say one | 12:31 |
| 9 | way or the other. | 12:31 |
| 10 | MR. MCDONOUGH:  So, Sy, we've been going | 12:31 |
| 11 | about an hour.  Is a bio break an appropriate time? | 12:31 |
| 12 | MR. DAMLE:  Yeah, can I just ask one more | 12:31 |
| 13 | question?  Is that fine? | 12:32 |
| 14 | Q.   Are you doing all right, Professor? | 12:32 |
| 15 | A.   Yeah, I'm fine. | 12:32 |
| 16 | Q.   Just a couple more minutes, I promise. | 12:32 |
| 17 | A.   Okay.  No worries. | 12:32 |
| 18 | Q.   Did you speak with anyone at Corellium in | 12:32 |
| 19 | preparing your -- either this report or your | 12:32 |
| 20 | rebuttal report? | 12:32 |
| 21 | A.   There was a conference call on which some | 12:32 |
| 22 | Corellium employees were on that call.  I'm trying | 12:32 |
| 23 | to remember the nature.  I mean, obviously -- so, I | 12:32 |
| 24 | mean, so -- so that call is part of the general | 12:33 |
| 25 | background, I guess, in terms of, you know, my -- my | 12:33 |

Page 86

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    preparation of my opinions.                          12:33

 2         Q.   When did that call occur?                  12:33

 3         A.   Subsequent to my initial report, but       12:33

 4    before the rebuttal.  I don't have an exact date.  I 12:33

 5    could get it, but I don't -- I don't remember        12:33

 6    exactly.  So sort of in the twilight zone now,       12:33

 7    losing track of days with the quarantine.  But it    12:33

 8    was sometime in early March.                         12:33

 9         Q.   So the facts from that call, by            12:33

10    definition, did not inform the opinions in your      12:33

11    initial report.  Is that fair?                       12:34

12         A.   Yes.                                        12:34

13         Q.   Who was on that call?                       12:34

14         A.   I'm not 100 percent sure.  David Hecht     12:34

15    was.  I believe Chris Wade.  And the CEO of          12:34

16    Corellium, and I forget her name.  And I think there 12:34

17    were -- there was maybe another lawyer on the call   12:34

18    that I -- I don't recall who it was.                 12:34

19         Q.   You mentioned the existence of this call   12:34

20    in your rebuttal report?                             12:34

21         A.   I don't think so.                          12:34

22         Q.   But I believe you said that facts that you 12:35

23    learned from that call informed your opinions in the 12:35

24    rebuttal report.  Is that fair?                      12:35

25         A.   I don't know --                            12:35
```

Page 87

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | research, too).  In my opinion, this subfactor of | 01:49 |
| 2 | the overall fair use test thus weighs heavily in | 01:49 |
| 3 | Corellium's favor." | 01:49 |
| 4 | Did I read that paragraph correctly? | 01:49 |
| 5 | A.  Yes. | 01:49 |
| 6 | Q.  What is the factual basis for your | 01:50 |
| 7 | conclusion that Corellium's use of Apple's | 01:50 |
| 8 | copyrighted material, quote, "easily fits into the | 01:50 |
| 9 | research category," closed quote? | 01:50 |
| 10 | MR. MCDONOUGH:  Objection.  Foundation. | 01:50 |
| 11 | THE WITNESS:  Based on my use of the | 01:50 |
| 12 | product, my understanding of the product, based on, | 01:50 |
| 13 | right, the Internet research that I conducted that I | 01:50 |
| 14 | mentioned before. | 01:50 |
| 15 | BY MR. DAMLE: | 01:50 |
| 16 | Q.  Can you describe the Internet research | 01:50 |
| 17 | that you did before that informed you that the Apple | 01:50 |
| 18 | products easily fit into the research category? | 01:50 |
| 19 | A.  Yeah.  There were -- I mentioned before | 01:50 |
| 20 | some YouTube videos that I watched that sort of | 01:50 |
| 21 | described how the product worked, what its uses are, | 01:50 |
| 22 | what you can do with it.  And then I -- and then I | 01:51 |
| 23 | followed that up with, once I got access to the | 01:51 |
| 24 | Corellium product, actual usage. | 01:51 |
| 25 | Q.  Did you talk to any -- let me start that | 01:51 |

Page 124

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | work, which, my understanding, Corellium has in this | 02:24 |
| 2 | case, tends to be another factor that, in my mind, | 02:24 |
| 3 | pushes in favor of the transformative nature of the | 02:24 |
| 4 | use here. | 02:24 |
| 5 | Q.   So those people that you mentioned, were | 02:24 |
| 6 | they excited because they could use Corellium's | 02:24 |
| 7 | product instead of having to purchase physical iOS | 02:24 |
| 8 | devices? | 02:25 |
| 9 | A.   I haven't talked to those people | 02:25 |
| 10 | obviously, so I don't know exactly what the nature | 02:25 |
| 11 | of their excitement is. | 02:25 |
| 12 | What I took it to be was that you can do | 02:25 |
| 13 | with the Corellium product things that is just | 02:25 |
| 14 | really, really hard, if not impossible, to do with a | 02:25 |
| 15 | bunch of physical devices.  But I haven't -- I | 02:25 |
| 16 | haven't discussed that with any of the people that | 02:25 |
| 17 | seem to be suggesting that. | 02:25 |
| 18 | There's another -- there's a source in my | 02:25 |
| 19 | report that's cited -- I think it's called Apple | 02:25 |
| 20 | Device Management -- where something similar is | 02:25 |
| 21 | referenced by the -- by the authors of that book | 02:25 |
| 22 | with the same enthusiasm or pointing to the same | 02:26 |
| 23 | improved capabilities of the Corellium technology. | 02:26 |
| 24 | Q.   And so -- but do you have any independent | 02:26 |
| 25 | knowledge of whether Corellium's product is a more | 02:26 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | walk through it. | 02:34 |
| 2 | Q.   Do you know whether Billy Ellis has any | 02:34 |
| 3 | sort of relationship with Corellium? | 02:34 |
| 4 | A.   I have no idea. | 02:34 |
| 5 | Q.   Do you know who Billy Ellis is? | 02:34 |
| 6 | A.   Appears to be -- I don't.  I mean, he has | 02:34 |
| 7 | a lot of YouTube videos about various software | 02:34 |
| 8 | products and security research and such; so... | 02:34 |
| 9 | Q.   You have no idea whether this was an | 02:34 |
| 10 | independent view that Billy Ellis was expressing | 02:34 |
| 11 | about the benefits of the Corellium product? | 02:35 |
| 12 | A.   I don't, no. | 02:35 |
| 13 | Q.   Okay.  So you've now mentioned YouTube | 02:35 |
| 14 | videos by Billy Ellis.  Any other sources that you | 02:35 |
| 15 | relied on for these third-party indications? | 02:35 |
| 16 | A.   Well, the Apple Device Management book | 02:35 |
| 17 | that's referenced in my report. | 02:35 |
| 18 | Q.   Okay.  And what did that say? | 02:35 |
| 19 | A.   It talks about the same sort of benefit, | 02:35 |
| 20 | if I recall correctly.  I'd have to go back to get | 02:35 |
| 21 | the exact language, but just the improved efficiency | 02:35 |
| 22 | and ability to -- to research the iOS products | 02:35 |
| 23 | rather than, you know, some of the more inefficient | 02:35 |
| 24 | means, according to these authors. | 02:35 |
| 25 | Q.   And do you know who "these authors" are? | 02:35 |

Page 150

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | efficient way to conduct the research. | 03:28 |
| 2 | But I can't really speculate on without, | 03:28 |
| 3 | you know, talking to these people in great depth | 03:28 |
| 4 | about what -- what they may or may not choose in | 03:28 |
| 5 | that regard. | 03:28 |
| 6 | BY MR. DAMLE: | 03:28 |
| 7 | Q.   So you haven't done any sort of market | 03:28 |
| 8 | research to assess the degree to which Corellium's | 03:28 |
| 9 | product would compete with these pre-hacked security | 03:28 |
| 10 | research devices that Apple has announced; is that | 03:28 |
| 11 | correct? | 03:28 |
| 12 | A.   Yeah.  I haven't conducted market | 03:28 |
| 13 | research.  The analysis that I've conducted is -- | 03:28 |
| 14 | with respect to that question is -- is the type of | 03:29 |
| 15 | analysis the courts engage in.  They also don't go | 03:29 |
| 16 | out and necessarily conduct market research in terms | 03:29 |
| 17 | of this economic substitution question.  They -- | 03:29 |
| 18 | they -- they assess -- they focus more on the -- the | 03:29 |
| 19 | distinct purposes between the products as well as | 03:29 |
| 20 | sort of the additional expression or transformation | 03:29 |
| 21 | that has occurred between the original product and | 03:29 |
| 22 | the -- and a subsequent one.  So that's the type of | 03:29 |
| 23 | analysis I've done. | 03:29 |
| 24 | Q.   Would it be relevant to that analysis if | 03:29 |
| 25 | Corellium admitted that the security research device | 03:29 |

Page 163

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | yeah, so it's relevant who you're licensing to as | 04:14 |
| 2 | well as, you know, what restrictions you might | 04:14 |
| 3 | impose contractually on a party.  Obviously, you | 04:15 |
| 4 | can't always discern or know how a party might use | 04:15 |
| 5 | it.  Parties rely on contracts to try to address | 04:15 |
| 6 | some of those concerns. | 04:15 |
| 7 | BY MR. DAMLE: | 04:15 |
| 8 | Q.    Okay.  Just to be clear, you didn't | 04:15 |
| 9 | actually speak to any of Corellium's actual | 04:15 |
| 10 | customers and ask them how they used it, right? | 04:15 |
| 11 | A.    I didn't, no. | 04:15 |
| 12 | Q.    And you've never seen a customer list from | 04:15 |
| 13 | Corellium? | 04:15 |
| 14 | A.    I haven't, no. | 04:15 |
| 15 | Q.    And other than the license agreement that | 04:15 |
| 16 | you mentioned that states that it restricts use of | 04:15 |
| 17 | the Corellium product for illegal purposes, are you | 04:15 |
| 18 | aware of any other restrictions that Corellium puts | 04:15 |
| 19 | in place on its customers? | 04:15 |
| 20 | A.    I haven't seen -- I haven't seen the | 04:15 |
| 21 | license agreement, no. | 04:16 |
| 22 | Q.    Would you still say that Corellium's | 04:16 |
| 23 | product benefits society if it were sold by | 04:16 |
| 24 | Corellium to the FBI to break into the phones of | 04:16 |
| 25 | criminal suspects? | 04:16 |

Page 191

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE REPORTER:  The opinions of your -- | 05:16 |
| 2 | BY MR. DAMLE: | 05:16 |
| 3 | Q.   -- of your rebuttal report? | 05:16 |
| 4 | A.   Not directly.  I mean, I guess to the | 05:16 |
| 5 | extent that they inform the Nieh and Siegel | 05:16 |
| 6 | opinions, yes, but not directly. | 05:16 |
| 7 | Q.   Can you recall any references that you | 05:16 |
| 8 | looked at specifically? | 05:16 |
| 9 | A.   No, unfortunately, not really. | 05:16 |
| 10 | Q.   And they're not listed anywhere in your | 05:16 |
| 11 | rebuttal report.  Is that fair? | 05:16 |
| 12 | A.   That's fair. | 05:16 |
| 13 | Q.   And we mentioned earlier that you had a | 05:16 |
| 14 | conference call with Chris Wade and Amanda Gorton | 05:16 |
| 15 | and the counsel for this case prior to your | 05:16 |
| 16 | submission of this rebuttal report.  Do you recall | 05:17 |
| 17 | that conversation? | 05:17 |
| 18 | A.   Yes. | 05:17 |
| 19 | Q.   Did you have any other conversations with | 05:17 |
| 20 | the Corellium employees prior to the submission of | 05:17 |
| 21 | this rebuttal report? | 05:17 |
| 22 | A.   No. | 05:17 |
| 23 | Q.   And did you look at any documents that | 05:17 |
| 24 | were produced by Apple in this litigation in | 05:17 |
| 25 | preparing your rebuttal report? | 05:17 |

Page 221

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    No. | 05:17 |
| 2 | Q.    Did you look at any documents that were | 05:17 |
| 3 | produced by Corellium in this litigation in | 05:17 |
| 4 | preparing your rebuttal report? | 05:17 |
| 5 | A.    No. | 05:17 |
| 6 | Q.    Did you look at any documents that were | 05:17 |
| 7 | produced by any third party in this litigation in | 05:17 |
| 8 | preparing your rebuttal report? | 05:18 |
| 9 | A.    "By any third party," what?  Sorry. | 05:18 |
| 10 | Q.    I'll -- sure.  I'll be more specific. | 05:18 |
| 11 | Did you look at any documents that were | 05:18 |
| 12 | produced by Azimuth in this litigation in preparing | 05:18 |
| 13 | your rebuttal report? | 05:18 |
| 14 | A.    No. | 05:18 |
| 15 | Q.    And so in your rebuttal report, the | 05:18 |
| 16 | portion that addresses Dr. Nieh's initial report, is | 05:18 |
| 17 | it fair to say that you take issue with Dr. Nieh's | 05:18 |
| 18 | application of U.S. copyright law to this case?  Is | 05:18 |
| 19 | that -- is that fair? | 05:18 |
| 20 | A.    Yes. | 05:18 |
| 21 | Q.    Okay.  I'd like to turn your attention to | 05:18 |
| 22 | paragraph 9. | 05:18 |
| 23 | A.    Okay. | 05:19 |
| 24 | Q.    And here you say that "Dr. Nieh is a | 05:19 |
| 25 | computer science expert, not an expert on the | 05:19 |

Page 222

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | meaning of the rights of reproduction, preparation | 05:19 |
| 2 | of derivative works, distribution, and/or public | 05:19 |
| 3 | display established under copyright law." | 05:19 |
| 4 | Is that correct? | 05:19 |
| 5 | A.   Yes. | 05:19 |
| 6 | Q.   And so if you look at the end you say, "I | 05:19 |
| 7 | do not believe that it is appropriate to credit | 05:19 |
| 8 | his" -- meaning Dr. Nieh's -- "legal conclusions | 05:19 |
| 9 | that Corellium has violated the reproduction, | 05:19 |
| 10 | derivative work, distribution, and public display | 05:19 |
| 11 | rights under copyright law," correct? | 05:19 |
| 12 | MR. MCDONOUGH:  Just object to the lack of | 05:19 |
| 13 | the foundation for the rest of the paragraph. | 05:19 |
| 14 | THE WITNESS:  All right.  Yes, that's -- | 05:20 |
| 15 | that was what I wrote. | 05:20 |
| 16 | BY MR. DAMLE: | 05:20 |
| 17 | Q.   Okay.  So I have a few questions. | 05:20 |
| 18 | You're not a computer scientist, correct? | 05:20 |
| 19 | A.   Correct. | 05:20 |
| 20 | Q.   You're not an expert in computer science; | 05:20 |
| 21 | is that right? | 05:20 |
| 22 | A.   That's right. | 05:20 |
| 23 | Q.   Are you an expert in virtualization | 05:20 |
| 24 | technologies? | 05:20 |
| 25 | A.   No. | 05:20 |

Page 223

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   So you're not offering an opinion here on | 05:20 |
| 2 | how Corellium's technology works as a technical | 05:20 |
| 3 | matter; is that correct? | 05:20 |
| 4 | A.   That's right. | 05:20 |
| 5 | Q.   And you're not qualified to offer such an | 05:20 |
| 6 | opinion, is that fair? | 05:20 |
| 7 | A.   That's fair. | 05:20 |
| 8 | Q.   And Dr. Nieh does offer an opinion on how | 05:20 |
| 9 | Corellium's technology works; is that correct? | 05:21 |
| 10 | A.   Yeah. | 05:21 |
| 11 | Q.   And you're not qualified to dispute | 05:21 |
| 12 | Dr. Nieh's conclusions about how that technology | 05:21 |
| 13 | works; is that correct? | 05:21 |
| 14 | MR. MCDONOUGH:  Objection.  Form. | 05:21 |
| 15 | THE WITNESS:  Yeah, that's correct. | 05:21 |
| 16 | BY MR. DAMLE: | 05:21 |
| 17 | Q.   And so you don't dispute any of Dr. Nieh's | 05:21 |
| 18 | conclusions regarding the technical operation of the | 05:21 |
| 19 | Corellium product; is that right? | 05:21 |
| 20 | MR. MCDONOUGH:  Same objection. | 05:21 |
| 21 | THE WITNESS:  Yeah, that wasn't really | 05:21 |
| 22 | what I was asked to opine on.  I don't -- I don't | 05:21 |
| 23 | know if they're accurate or not, but it wasn't my -- | 05:21 |
| 24 | it wasn't my -- it wasn't the request that I | 05:21 |
| 25 | received, so I didn't -- I didn't engage in that | 05:22 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | analysis. | 05:22 |
| 2 | BY MR. DAMLE: | 05:22 |
| 3 | Q.   So you have no basis to know whether | 05:22 |
| 4 | Dr. Nieh is correct or not with respect to how | 05:22 |
| 5 | Corellium's technology works; is that correct? | 05:22 |
| 6 | A.   I mean, I have the basis -- yeah, a | 05:22 |
| 7 | limited basis of using the product.  The specific | 05:22 |
| 8 | internal mechanics that he sort of describes in | 05:22 |
| 9 | terms of how the virtualization works, and how | 05:22 |
| 10 | things are modified and reproduced and so forth, | 05:22 |
| 11 | yeah, the technical aspects of that, I'm not really | 05:22 |
| 12 | in a position to -- just to discuss those. | 05:22 |
| 13 | Q.   So is it fair to say that all you dispute | 05:22 |
| 14 | in Dr. Nieh's report are what you have said are his | 05:23 |
| 15 | legal conclusions?  Is that fair? | 05:23 |
| 16 | MR. MCDONOUGH:  Object to form. | 05:23 |
| 17 | THE WITNESS:  Yeah, so -- so, yes, I'm -- | 05:23 |
| 18 | I'm -- in the report, I am -- as it indicates, I | 05:23 |
| 19 | think, I am disputing his ability to render opinions | 05:23 |
| 20 | about how copyright law applies based on the | 05:23 |
| 21 | functionality of the Corellium product because he | 05:23 |
| 22 | appears to not have a sufficient foundation of | 05:23 |
| 23 | understanding of copyright law and the DMCA to | 05:23 |
| 24 | provide those opinions. | 05:23 |
| 25 | | |

Page 225

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        A.   Yes.                                      05:57

2        Q.   Your rebuttal to Dr. Siegel's report     05:58

3   focuses on the concept of good faith security      05:58

4   research as defined by the DMCA; is that correct?  05:58

5            (Reporter clarification.)                 05:58

6            THE REPORTER:  I'm sorry, could you repeat 05:58

7   that, please?                                      05:58

8            MR. DAMLE:  Sorry about that.             05:58

9        Q.   Your rebuttal to Dr. Siegel's report     05:58

10  focuses on the concept of good faith security      05:58

11  research as defined by the DMCA; is that correct?  05:58

12           MR. MCDONOUGH:  Objection.                05:58

13           THE WITNESS:  That's correct.             05:58

14  BY MR. DAMLE:                                       05:58

15       Q.   Okay.  Can we open up Dr. Siegel's expert 05:58

16  report, which we have marked as Exhibit 5.         05:58

17       A.   Okay.  I have it open.                   05:59

18       Q.   Can you point me to where Dr. Siegel     05:59

19  purports to be interpreting the term "good faith   05:59

20  security research" as it's defined in the DMCA?    05:59

21       A.   I don't believe that he's doing that.  I 05:59

22  think that's part of the problem.                  05:59

23       Q.   Does the concept of good faith security  05:59

24  research exist outside the DMCA?                   05:59

25       A.   I believe so.                            05:59
```

Page 245

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              CERTIFICATE OF REPORTER
 2        I, ASHALA TYLOR, CSR No. 2436, in and for the State
 3   of California, do hereby certify:
 4        That the foregoing proceedings were taken before me
 5   at the time and place herein set forth; that any
 6   witnesses in the foregoing proceedings, prior to
 7   testifying, were placed under oath; that a verbatim
 8   record of the proceedings were made by me using machine
 9   shorthand which was thereafter transcribed under my
10   direction; further that the foregoing is an accurate
11   transcription thereof.
12        That before the completion of the deposition,
13   review of the transcript was not requested.
14        I further certify that I am neither financially
15   interested in this action nor a relative or employee of
16   any attorney or any of the parties hereto.
17        In compliance with Section 8016 of the Business and
18   Professions Code, I certify under penalty of perjury
19   that I am a Certified Shorthand Reporter with
20   California License No. 2436 in full force and effect.
21   WITNESS my hand this 27th day of April, 2020.
22
23
24
25        Ashala Tylor, CSR #2436, RPR, CRR, CLR
```

Page 259