UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO: 9:19-cv-81160-RS

APPLE INC.,

    Plaintiff,

v.

CORELLIUM, LLC,
    Defendant.

_____/

**CORELLIUM'S REPLY TO PLAINTIFF APPLE'S RESPONSE TO CORELLIUM'S MOTION TO EXCLUDE LEGAL OPINIONS AND CORRESPONDING TESTIMONY OF APPLE'S EXPERT DAVID CONNELLY**

    Defendant, CORELLIUM, LLC ("Corellium"), pursuant to Federal Rule of Evidence 702, files this Reply to Plaintiff, APPLE, INC.'s ("Apple") Response in opposition to Corellium's Daubert Motion to Exclude the Reports and Expert Testimony of David B. Connelly ("Daubert Motion"), and states as follows:

## I. OVERVIEW

Apple attempts to reframe Corellium's Daubert Motion by mischaracterizing Corellium's arguments. The ultimate thrust of Corellium's Daubert Motion, however, is that an expert is required to provide opinions based upon *reliable methods* and Mr. Connelly repeatedly fails to fulfill this obligation. Expert witness testimony is unique because of the outsized deference that jury's place on expert testimony. *Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1335, 1340 (S.D. Fla. 1999), aff'd, 333 F.3d 1248 (11th Cir. 2003) ("Therefore, given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded"). As opposed to a lay witness, the expert usually lacks first-hand knowledge so his or her testimony or evidence must be "not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).

Apple incorrectly asserts that Corellium does not dispute Mr. Connelly's "methodology for calculating Corellium's gross revenues." *See*, Apple's Response [D.E. 503], at 6. However, Mr. Connelly's methodologies are exactly what Corellium is disputing:

1. Mr. Connelly's **methodology** in determining Corellium's gross revenue is unreliable because it improperly attributes 100% of Corellium's gross revenue to iOS.
2. Mr. Connelly's **methodology** to conclude that 97% of Corellium's gross revenue is attributable to iOS is unreliable because there is absolutely no valid evidentiary support for the 97% figure.
3. Mr. Connelly's **methodology** of projecting Corellium's gross revenue from April 2020 to October 2020 is unreliable because it relies on Corellium's informal and internal aggregate business projections with no scientific basis.
4. Mr. Connelly's alternative **methodology** for projecting Corellium's 2020 gross revenue is unreliable because it simply copies Corellium's revenue from 2019 with no substantiation.
5. Mr. Connelly's **methodology** for calculating the statutory damages pursuant to 17 U.S.C. § 1203 is unreliable because it relies on unsubstantiated assumptions that were not investigated or replicable.

*See*, Corellium's Daubert Motion [D.E. 454], at 3 (emphasis added). This is key because under the *Daubert* standard, an expert's conclusions are to be supported by reliable grounds. If any step of the expert's testimony renders the analysis unreliable, then the expert's testimony is inadmissible. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005). Determining whether an expert's testimony is admissible "require[s] the trial court to conduct an exacting analysis of the proffered expert's methodology." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257

(11th Cir. 2002). Under the weight of such scrutiny, Mr. Connelly's methodologies fail the *Daubert* analysis.

## II. CONNELLY'S FAILURES ARE NOT ATTRIBUTABLE TO CORELLIUM.

Apple tries to blame Mr. Connelly's methodological shortcomings on Corellium by complaining that it did not have enough information due to supposed discovery issues. *See*, Apple's Response [D.E. 503], at 4. Yet, despite its complaints, Apple at the same time concedes that Mr. Connelly was able to perform "an in-depth analysis of Corellium's claimed gross revenue . . ." and was "able to further identify and corroborate Corellium's gross revenue." *Id.* at 5-6. Finally, Apple stated that Mr. Connelly, "conducted an exhaustive analysis of Corellium's costs, determining which were supported, which were supportable, and which are not reasonable." *Id.* at 6. Yet, despite these apparent exhaustive analyses, Apple still tries to contend that Corellium is to blame for Mr. Connelly's methodological shortcomings.

### A. Corellium Has Been Complied with All Rule 26 Obligations.

Pursuant to Rule 26, Corellium was required to supplement its discovery responses when the information in the responses is no longer accurate. Throughout the discovery phase in this case, Corellium continued to operate its business. Thus, financial information like gross revenue and cost of goods sold changed as Corellium's business progressed. Corellium, pursuant to Federal Rule 26(e)(1), therefore, was obligated to supplement its interrogatory responses with current and accurate financial and other information as current information became available, or as it was otherwise determined that prior information was no longer responsive to the request.

Both of the Interrogatory responses that allegedly hindered Mr. Connelly, Interrogatory No. 9 (customer list with amounts paid by each) and No. 10 (gross revenue and cost of goods sold), were amended a final time before Mr. Connelly filed his final report. Corellium filed its final amended response to Interrogatories Nos. 9 and 10 on April 18. 2020. *See*, Corellium's Fifth Amended Answers to Apple's Interrogatories, attached as **Exhibit 1**. Mr. Connelly filed his final report on April 27, 2020. Apple simply cannot argue that Corellium's Interrogatory responses somehow hindered Mr. Connelly's efforts as those amendments were simply reflective of the current information and progression of discovery, and further, that Corellium was obligated, per Rule 26, to keep the opposing side current on any material changes.

### B. Mr. Connelly Chose Not to Engage In Expert Discovery.

Apple's assertion that discovery is to blame for Mr. Connelly's poor methodologies is baseless and diversionary given that Corellium has provided nearly every document that could conceivably relate to anything iOS, and thousands more. Apple, with unlimited resources, aggressively engaged in months of discovery, and notably, had access to Corellium's full customer list from the beginning. Further, Mr. Connelly had access to Apple's market data, resources, and personnel to perform any comparative studies, discovery, or analysis needed, as well as *four opportunities* to provide reports. None of this occurred. Instead, Mr. Connelly simply relied on "conservative estimates," yet that are still utterly devoid of any factual basis, or otherwise, on Dr. Nieh's reports, (the findings of which are also up for debate on summary judgment) and simply extrapolated assumptions based on Dr. Nieh's findings. Such assumptions include that Corellium's customers were using every bit of space or cores available on each server sold[1] and also that each of Corellium's customers were replicating a new device every month[2]—both assumptions are entirely pulled from thin air. Yet, they are both central to Mr. Connelly's opinions.

Had Mr. Connelly, required additional documents or discovery, he could have performed expert discovery. He did not. Apple had the opportunity to subpoena and depose each of Corellium's customers. In fact, Apple did subpoena three customers and deposed one of them— ▮▮▮▮▮▮▮▮▮▮▮. *See*, ▮▮▮▮▮▮ Deposition, **Exhibit 2**. However, Mr. Connelly chose not to conduct any further investigation, but instead, opted to rely upon supposedly conservative guesses, that have absolutely zero basis in fact. Surprisingly, Apple as an alleged competitor of Corellium, would have market-share data as to the ratios of use of iOS versus other operating systems in the United States and internationally. None of this available data was reviewed by Mr. Connelly.

---

[1] Logic dispels this assumption as when one buys an electronic device, almost never is the perfect full capacity of that device used. For example, when one has 8GB of data, they do not buy a 8GB iPhone, they buy the 16GB iPhone. While this practical reality has not been factually established for this case, neither has Mr. Connelly's assumption, that if ▮ cores are available on a server are available, then ▮▮▮▮▮▮▮▮ on every server is being used. If fact, that assumption has been disproven. *See*, ▮▮▮▮▮ Deposition, attached as **Exhibit 2**, at 166:20-167:1, 167:17-20, 174:1-21, 176:5-177:2.

[2] To simply assume that every single one of ▮▮▮▮▮▮▮, in perfect harmony and unison, each generate a new virtual machine once per month, at the same frequency, is simply baseless and has been proven as such. *See*, ▮▮▮▮▮ Deposition, attached as **Exhibit 2**, at 166:20-167:1, 167:17-20, 174:1-21, 176:5-177:2. Thus, both of these material assumptions are critically flawed.

Mr. Connelly had a lengthy opportunity to conduct any expert discovery or analyses needed, yet he chose to ultimately rely upon guesses and approximations that he simply felt were reasonable, yet none of which were grounded in fact. These choices resulted in the unreliable methods presented by Mr. Connelly's reports and testimony.

### III. MR. CONNELLY'S SERIES OF UNRELIABLE METHODS.

Throughout his reports, Mr. Connelly provides multiple alternatives for his methods. This, in and of itself, is indicative that Mr. Connelly fails to set forth one cohesive reliable method, backed by fact, and in line with industry guidelines. Instead, Mr. Connelly repeatedly leans on his disclaimer that his methods are on the conservative side. *See*, Connelly Errata Supplemental and Rebuttal Report ("Rebuttal Report"), attached as **Exhibit 3**, at 11, 20, 21, 22, 23. While Mr. Connelly may believe that his use of the term "conservative" may somehow insulate his methods from *Daubert's* requirements, the fact is that it is unknown whether his "conservative numbers," have any accuracy at all. In all likelihood, they are entirely inaccurate. The problem rests in the lack of a reliable method upon which to makes such a determination.

#### A. Mr. Connelly's Inclusion of All Gross Revenue is Improper.

Apple's portrayal of the law in the Eleventh Circuit was not accurate. The Eleventh Circuit has explained, with respect to profits, that "the plaintiff must show a causal relationship between the infringement and profits, and must also present proof of the infringer's gross revenue." *Pronman v. Styles*, 645 Fed. Appx. 870, 873 (11th Cir. 2016); *see also Montgomery v. Noga*, 168 F. 3d 1282, 1296 (11th Cir. 1999) (citing to the Copyright Act to explain that, "the copyright owner is entitled to recover . . . any *profits* of the infringer that are *attributable to the infringement*.") (emphasis added). As it relates to showing a causal connection, the Eleventh Circuit follows the pattern of the cases relied upon by Corellium whereby the statute contemplates that a plaintiff is required to present a causal relationship between the allegedly infringing activity and the gross profits. It is Apple's burden to "allege a causal connection between the infringement and the profits claimed, and may not 'seek gross revenues based entirely on a *speculative connection* to the plaintiff's claim.'" *Microsoft Corp. v. Technology Enterprises, LLC*, 805 F.Supp.2d 1330, 1333 (S.D. Fla. 2011); *see also Thornton v. J Jargon Co*., 580 F.Supp.2d 1261, 1280 (reasoning that Plaintiff is required to show a "'reasonable relationship' between the infringing activity and the *infringer's gross revenue*."). Plaintiff's burden is further supported by the policy of the statute that provides that defendant's profits are not awarded to compensate the plaintiff, but rather "to

- 4 -

prevent the infringer from unfairly benefiting from a wrongful act." H.R. REP. No. 94–1476 at 161 (1976).  For Apple to obtain Android-related profits would be improper, and thus, under the law, Apple must present some causal nexus between the infringing activity and the gross profits.

In this case, Corellium provides one product that can virtualize iOS, but also virtualizes other operating systems as well.  It is noteworthy that the Corellium product is <u>entirely independent of any operating system</u>—when a Corellium customer spins up an Android virtual device, nothing iOS is implicated whatsoever, and vice versa. In fact, some customers may only use the Android component of the product, in which case there would be zero connection to anything iOS—thus why such a requirement for the nexus exists—to keep the infringer from benefiting from the *wrongful* acts, *i.e.*, iOS. *Id.*

Moreover, Apple in its Response, added that Mr. Connelly is a member of the American Institute of Certified Public Accountants ("AICPA"). *See*, Apple's Response [D.E. 503], at 3. Mr. Connelly further admitted that he always complies with the AICPA standards for public accountants. *See*, Connelly Deposition, attached as **Exhibit 4**, at 45:13-18.  However, as a member of AICPA who apparently complies with such guidelines, Mr. Connelly should have been aware of the AICPA's Forensic & Valuation Services Practice Aid on Calculating Damages in Intellectual Property Disputes ("Practice Aid") which provides methods for assessing gross revenues in intellectual property cases. *See*, AICPA Practice Aid, attached as **Exhibit 5**. The Practice Aid includes the relevant statute and case law in order to further an expert's understanding of gross revenue and profits.  *See e.g.*, AICPA Practice Aid, **Exh. 5**, at 20.  Notably, the Practice Aid makes clear that "once a copyright owner establishes a ***causal link*** between the alleged infringement and some loss of anticipated revenue, a court may allow estimation regarding the amount lost within a reasonable range of certainty. Uncertainty about the precise amount of damages does not preclude recovery of damages ***if*** the ***causal relationship and the fact of damages are established***." *Id.* at *29 (emphasis added). Thus, if Mr. Connelly admittedly follows the guidelines as set out by his own industry, then he is similarly in violation of the same.

Finally, Apple cites in its Response a number of cases, including those previously cited by Corellium, for the proposition that a causal connection is not needed. However, the common denominator in those cases, whether the infringing subject matter is a building, certain lines of clothing out of many, or an anthology, is that the burden shifts when a causal connection is drawn between the gross revenue and the infringing subject matter. *See*, *Bonner v. Dawson*, 404 F.3d 290

(4th Cir. 2005) (where the entire building was built on infringing plans, the entire building was inherently tied to and dependant upon the infringement); *Oravec v. Sunny Isles Luxury Ventures L.C.*, 469 F. Supp. 2d 1148, 1175 (S.D. Fla. 2006), *aff'd*, 527 F.3d 1218 (11th Cir. 2008) (similar circumstances); *On Davis v. The Gap, Inc.*, 246 F.3d 152, 160–61 (2d Cir. 2001) (where it was not sufficient to state global gross revenues because a causal connection to the certain infringing products was needed, and, where the Court also addressed the example of an anthology, whereby an infringing poem within that anthology would implicate the entire anthology because the identity of an anthology is inherently dependant on each piece within it—if you remove a piece from within the anthology, the anthology is now different).

In Corellium's case, the Product at issue has no dependency on any operating system, and as stated, when one operating system *is* in use, the others are not implicated in the slightest. It is entirely possible to exclusively use one operating system on the Corellium Platform and never touch any other operating system, ever. The Corellium Product, and it's Android and Linux components are entirely independent of the iOS component. Apple, has not met its burden and has not provided a reliable "causal connection" between the profits its claiming and the alleged infringing activity.

### B. Mr. Connelly's Allocation has No Basis as it is Unreliable.

Mr. Connelly ultimately conceded that the allocation of Corellium's gross revenue as it relates to the alleged *infringing activity* was appropriate when it was pointed out that his initial report lacked such an allocation and thereafter attempted an allocation in his subsequent reports. However, when Mr. Connelly does attempt to allocate the percentage of the gross revenues that have a causal nexus to the infringing activity, he simply selects bits of information from the case and draws what he believes to be logical conclusions from the same. None of these "facts," however, go to establishing actually how much the iOS component of the product was actually used (*i.e.*, the alleged infringing activity), or whether each purchase of the product was even due to its iOS component (*i.e.*, alleged the infringing activity) versus the Android or Linux components. Next, and without *any* causal evaluation, Mr. Connelly then somehow concludes that attribution is either 97% or conservatively 90%. Mr. Connelly arrives at his percentages from the following "facts":

(a) ██████████████████████████████████████

(b) Each and every unit of or subscription to the Product enables Corellium's customers to create virtual iOS devices;

(c) Even today, the Corellium Apple Product has a ███████████████

(d) Corellium's brochures demonstrate support for a substantially larger number of iOS than Android devices; and

(e) ███████████████

See, Apple's Response [D.E. 503], at 13. While these "facts" might appear to suggest on their face that there is a greater use of the iOS version of the product versus the Android or Linux versions, none of these are actually indicative of either 1) the amount the iOS version was actually used (*i.e.*, the alleged infringing activity) or 2) whether the motivating factor behind each purchase (*i.e.*, the alleged infringing activity) was iOS driven versus Android or Linux, or, 3) whether the product was ultimately used at all. See, ███ Deposition, attached as **Exhibit 2**, at 166:20-167:1[3], 167:17-20[4], 174:1-21, 176:5-177:2. Mr. Connelly never asked these questions. For example, merely because the Android version was not fully operational prior to March 2019, it was always known that Android would be a significant portion of the product and thus, merely because a license may have been purchased prior to March 2019, does not, in any authoritative capacity, establish that a particular purchase was solely motivated by iOS, versus the other operating systems. See, Amanda Gorton Deposition, attached as **Exhibit 6**, at 51:13-52:7 ███████████████

Indeed, Corellium's customers are not the average market consumer, but instead, generally sophisticated business entities that make calculated decisions when making purchases such as

---

[3] ███████████████

[4] ███████████████

these—thus, a pre-purchase of a license for the purpose of Android, but a couple of months before Android was necessary available, is entirely likely. *See*, ▇▇▇▇ Deposition, attached as **Exhibit 2**, at 177:8-14 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇.

Yet despite this lack of reliable facts, Mr. Connelly then somehow still reaches his conclusion(s) that an attribution of the gross revenues to the alleged infringing activity should be 90%--or 97%. These numbers are literally pulled from thin air. Even if one was to consider 90% and 97% as a range, there is still no basis for Mr. Connelly coming to this conclusion. What is the reason that Mr. Connelly did not ascribe 99% to Apple's copyrights, or 4%? How much did the price decrease change the calculus? How did he conclude that an alleged ▇▇ "entries" also somehow correlates to use?[5] It is impossible to know any of these questions because Mr. Connelly did not do any substantive research or analysis and there is simply no method for how the allocation numbers came to be. Notwithstanding Mr. Connelly's citation to the above facts, and *even assuming* they are true, there is still no *methodology* that permits a reliable arrival at his opinions, which will ultimately be the numbers presented by him to the jury. These significant shortcomings in reliability cause Mr. Connelly's opinions to fail under Daubert.

### C. Mr. Connelly's Projections for Future Gross Revenues are Unreliable.

In contrast to Apple's claim in its Response, Corellium also challenges Mr. Connelly's methodology for calculating future gross revenues. *Compare* Apple's Response [D.E. 503], at 15 *to* Corellium's Daubert Motion [D.E. 454], at 14-15. Specifically, Corellium argued that Mr. Connelly provided two different projections for Corellium's future gross revenue from the close of discovery to trial in October 2020. *See*, Corellium's Daubert Motion [D.E. 454], at 14-18. For his first method, Mr. Connelly uses Corellium's prior marketing projections for 2019 revenue and simply doubles them to obtain 2020 revenue. *Id.* In his second method, Mr. Connelly uses Corellium's actual 2019 revenue and doubles that number to obtain the 2020 future revenue. *Id.* Both methods are fatally flawed.

As it relates to the first method, Mr. Connelly based his opinion on Corellium's previous marketing projections from years prior (which still accounted for Android support, even though

---

[5] This assumption fails to account for the relative complexity of virtualizing iOS in contrast to the much more open and accessible Android platform, which is fully open source.

- 8 -

Android was not fully available at that time). *See*, Rebuttal Report, **Exh. 3**, at 10-11. As discussed in Corellium's Daubert Motion, courts are skeptical of simply using a company's projections because the projections are best case scenarios that are not necessarily grounded in reality. *MasForce Europe, BVBA v. MEC3 Co.*, 2013 WL 12156469, at *6 (M.D. Fla. Dec. 4, 2013). Projections during the beginning life-cycle of a start-up business is akin to mere puffery. They can be attributed to ways of getting the consumers and potential investors excited about the possibilities of the business. The projections cannot form the foundation of the expert's method. *JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc.*, 1998 WL 175888, at *8 (E.D. Pa. Apr. 15, 1998), *aff'd*, 178 F.3d 1279 (3d Cir. 1999).

While the very facts upon which Mr. Connelly bases his opinion are clearly unreliable, so is the method by which he makes the leap from the "facts" to his opinion. In doing so, Mr. Connelly fails to take into account the actual reality of the information available to him. For example, Mr. Connelly failed to take into account that the pendency of this very lawsuit has ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Mr. Connelly never even considered this and never asked the question. Similarly real, is COVID-19, whereby discretionary spending is dramatically down across the globe. At the time of Mr. Connelly's final report, the nation was in the height of the COVID-19 pandemic, thus, it was a very real consideration that could not have been foreseen by the 2018/2019 numbers that Mr. Connelly bases his opinions on—Corellium's early marketing projections and Corellium's 2019 revenue. These failures of Mr. Connelly to consider reality fatally undermine *both* of his methods to determine future projections. And, similar to the rest of Mr. Connelly's opinions, Mr. Connelly never even asked the questions and he never conducted an actual analysis, in an effort to take at least these significant factors into consideration. Even further, Mr. Connelly's methods to determine future revenues are similarly plagued by his failure to attribute iOS versus non-iOS uses and purchases of the product. Accordingly, Mr. Connelly's methods for determining future projections are inherently flawed.

### D.   Mr. Connelly's Methods for Calculating DMCA Damages are Unreliable.

Again, Apple attempts to state that Corellium has no issue with another aspect of Mr. Connelly's opinion that Corellium does in fact challenge. *Compare* Apple's Response [D.E. 503],

at 17 *to* Corellium's Daubert Motion [D.E. 454], at 15-18. In this case Mr. Connelly's DMCA damages testimony and reports make numerous assumptions regarding the way Corellium's customers interact with the product that has no foundation in reality. According to Mr. Connelly's report, all of Corellium's customers apparently use the product to the ▮▮▮▮▮ ▮▮▮▮▮▮▮ available, create the same amount of virtual Apple devices, and all replace a device exactly once each month. None of this has been investigated, substantiated, or is frankly, true. Mr. Connelly's baseless assumptions do not account for customers such as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See*, ▮▮▮▮▮ Deposition, **Exh. 2**, at 174:1-21. Moreover, Mr. Connelly based his methods on conclusions by Dr. Nieh, whose opinions are currently disputed on summary judgment. The summary judgment motions between the Parties contest whether the Corellium product actually does circumvent iOS measures, thus, there is a risk, that Mr. Connelly's opinion may be deflated upon the outcome of summary judgment. An expert's method should not be so dependant on a ruling rather than facts. That is the idea behind reliability.

### IV. MR. CONNELLY'S UNRELIABLE METHODS WILL CONFUSE THE JURY

The effect of Mr. Connelly's multiple theories on damages will be confusing to the jury. *Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 664 (S.D. Fla. 2012)[6]. Mr. Connelly provides numerous "alternative" opinions and methodologies, which in and of themselves, will likely obstruct the jury. Further, Mr. Connelly's opinions all suffer from the same deficiency: a lack of any reliable analysis, which will inherently confuse the jury.

### V. MR. CONNELLY'S HISTORY LENDS LESS CREDENCE TO HIS UNRELIABILTY

Finally, even Mr. Connelly's previous copyright expert witness experience is misstated by Apple. In the *Reinsdorf v. Skechers* matter, *w*hile Mr. Connelly's report was stricken because it was produced untimely, the Court agreed that the report should also be stricken because of Mr. Connelly's unreliable methods. *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 881 (C.D. Cal. 2013) ("Furthermore, even if the CSR had been timely produced, it suffers from serious methodological and factual deficiencies that raise serious questions as to its admissibility and relation to Reinsdorf's indirect profits claim.").

---

[6] "Because of the powerful and potentially misleading effect of expert evidence, judges must take care not to allow misleading and prejudicial opinions to influence the finder of fact."

## VI. CONCLUSION

For the reasons discussed above and those discussed in Corellium's Daubert Motion, this Court should enter an order precluding Mr. Connelly from testifying at trial as an expert regarding on damages pursuant to 17 U.S.C. §§ 504(b), (c), 1203(b)(3), and (c)(2).

Dated: June 2, 2020                                        Respectfully submitted,

                          COLE, SCOTT & KISSANE, P.A.
*Counsel for Defendant*
Esperante Building
222 Lakeview Avenue, Suite 120
West Palm Beach, Florida 33401
Telephone (561) 612-3459
Facsimile (561) 683-8977
Primary e-mail: justin.levine@csklegal.com
Secondary e-mail: lizza.constantine@csklegal.com

By:   *s/ Justin Levine*
JONATHAN VINE
Florida Bar. No.: 10966
JUSTIN B. LEVINE
Florida Bar No.:  106463
LIZZA C. CONSTANTINE
Florida Bar No.:  1002945
MICHAEL A. BOEHRINGER
Florida Bar No.: 1018486

    *and*

HECHT PARTNERS LLP
*Counsel for Defendant*
20 West 23rd St. Fifth Floor
New York, NY 10010
Tel: (212) 851-6821
David L. Hecht *pro hac vice*
Email: dhecht@hechtpartners.com
Minyao Wang *pro hac vice*
Email: mwang@hechtpartners.com
Conor McDonough pro hac vice
Email: cmcdonough@hechtpartners.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 2, 2020, a true and correct copy of the foregoing has been transmitted by electronic filing with the Clerk of the court via CM/ECF, which will send notice of electronic filing to all counsel of record.

/s/ Justin B. Levine
Justin B. Levine