```
 1                   UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                     WEST PALM BEACH DIVISION
                     CASE NO. 19-81160-CIVIL-SMITH
 3

 4  APPLE, INC.,                      West Palm Beach, Florida

 5              Plaintiff,            July 24, 2020

 6          vs.

 7  CORELLIUM, LLC,                   10:03 a.m.

 8              Defendant.            Pages 1 to 164
   _____
 9

10            MOTION HEARING VIA VIDEOCONFERENCE
            BEFORE THE HONORABLE WILLIAM MATTHEWMAN,
11             UNITED STATES MAGISTRATE JUDGE
            (TRANSCRIBED FROM THE AUDIO RECORDING)
12

13  APPEARANCES:

14

15  FOR THE PLAINTIFF:     JESSICA STEBBINS BINA, ESQ.
                           LATHAM & WATKINS, LLP
16                         10250 Constellation Boulevard
                           Suite 1100
17                         Los Angeles, California 90067

18                         GABRIEL S. GROSS, ESQ.
                           LATHAM & WATKINS, LLP
19                         140 Scott Drive
                           Menlo Park, California 94025
20

21                         ANDREW M. GASS, ESQ.
                           LATHAM & WATKINS, LLP
22                         505 Montgomery Street
                           Suite 2000
23                         San Francisco, California 94111

24

25
```

```
 1   APPEARANCES, CONT'D:

 2   FOR THE PLAINTIFF:        ELANA NIGHTINGALE DAWSON, ESQ.
                               LATHAM & WATKINS, LLP
 3                             555 Eleventh Street, Northwest
                               Suite 100
 4                             Washington, DC 20004

 5
                               MARTIN B. GOLDBERG, ESQ.
 6                             LASH & GOLDBERG
                               100 Southeast Second Street
 7                             Suite 1200
                               Miami, Florida 33131
 8

 9                             JESSE KOEHLER, ESQ.
                               IN-HOUSE COUNSEL FOR APPLE, INC.
10

11   FOR THE DEFENDANT:        JUSTIN B. LEVINE, ESQ.
                               LIZZA CAROLA CONSTANTINE, ESQ.
12                             COLE, SCOTT & KISSANE
                               222 Lakeview Avenue
13                             Suite 120
                               West Palm Beach, Florida 33401
14

15                             DAVID L. HECHT, ESQ.
                               CONOR B. McDONOUGH, ESQ.
16                             HECHT PARTNERS, LLP
                               200 West 23rd Street
17                             Fifth Floor
                               New York, New York 10010
18

19                             MAXIM PRICE, ESQ.
                               PIERCE, BAINBRIDGE, BECK,
20                               PRICE & HECHT, LLP
                               277 Park Avenue
21                             45th Floor
                               New York, New York 10172
22

23   FOR THE UNITED STATES:    DEXTER LEE, ESQ.
                               ASSISTANT UNITED STATES ATTORNEY
24                             99 Northeast Fourth Street
                               Miami, Florida 33132
25
```

<u>APPEARANCES, CONT'D:</u>

FOR THE UNITED STATES          SERENA M. ORLOFF, ESQ.
DEPARTMENT OF JUSTICE:         ANTHONY COPPOLINO, ESQ.
                               UNITED STATES DEPARTMENT OF JUSTICE
                               CIVIL DIVISION
                               555 Fourth Street, Northwest
                               Washington, DC 20530


TRANSCRIBED BY:                LISA EDWARDS, RDR, CRR
                               Reporterlisaedwards@gmail.com
                               (305) 439-7168

1          THE COURTROOM DEPUTY:  Calling Case No. 19-81160-CV-

2    Smith/Matthewman, Apple, Inc., against Corellium, LLC.

3          THE COURT:  All right.  So let's go ahead and get

4    appearances of counsel.  Who do we have here on behalf of

5    Apple?

6          MS. STEBBINS BINA:  Good morning, your Honor.  Jessica

7    Stebbins Bina of Latham Watkins.

8          THE COURT:  All right.  So we have Ms. Stebbins.

9          Who else do we have here on behalf of Apple?

10          MR. GROSS:  Good morning, your Honor.  My name is

11    Gabriel Gross on behalf of Apple.

12          With us today is Mr. Jesse Koehler, in-house counsel

13    from Apple, as well, and a couple of our colleagues from the

14    outside counsel group who I'll let introduce themselves.

15          THE COURT:  So let me see if I have it right.  We have

16    Ms. Stebbins and we have also have -- is it Mr. Gross, Gabe

17    Gross?

18          MR. GROSS:  That's correct, your Honor.

19          THE COURT:  And then you said -- is it Mr. Koehler?

20          MR. KOEHLER:  Yes, your Honor.  Yes, your Honor,

21    pronounced "Koehler."

22          THE COURT:  "Koehler."  And you are an in-house

23    counsel?

24          MR. KOEHLER:  That's correct.

25          THE COURT:  All right.  And I'm hearing some echo.  I

```
 1  don't know, Ken, if that's from us or if it's somebody who's
 2  not known to you.  It's a little annoying.
 3          So if anybody is hearing that, if they can mute
 4  themselves when they are not talking, that might prevent that.
 5          All right.  Ms. Stebbins, Mr. Gross, Mr. -- "Koehler"?
 6  How did you say that?
 7          MR. KOEHLER:  "Koehler."  Yes.
 8          THE COURT:  "Koehler."  All right.  I'll get it
 9  straight by the end of the day.
10          Anybody else here on behalf of Apple?
11          MR. GASS:  Yes, your Honor.  Andrew Gass from Latham
12  Watkins on behalf of Apple.
13          THE COURT:  All right.  Mr. Gass.  Anyone else?
14          MS. NIGHTINGALE DAWSON:  Yes.  Elana Nightingale
15  Dawson, also on behalf of Apple.
16          THE COURT:  All right.
17          MS. NIGHTINGALE DAWSON:  I think that rounds us out.
18  Thank you.
19          MR. GOLDBERG:  Except for me.  Martin Goldberg on
20  behalf of Apple.
21          THE COURT:  All right.  Great.  So I think that's
22  enough.
23          MR. GOLDBERG:  It is.
24          THE COURT:  Mr. So Mr. Koehler, Ms. Gass and then
25  Ms. Nightingale Dawson; and finally, Mr. Goldberg.  Okay.
```

```
 1   Great.

 2           So who do we have on behalf of the Defendant?

 3           MR. LEVINE:  Good morning, your Honor.  Justin Levine

 4   from Cole, Scott & Kissane on behalf of Corellium.

 5           THE COURT:  And who else do we have?

 6           MR. HECHT:  This is David Hecht on behalf of Corellium.

 7   And I have with me my colleagues, Maxim Price and Conor

 8   McDonough, who will both be arguing various of the *Daubert*s

 9   with me.

10           Thank you, your Honor.

11           THE COURT:  And that's Mr. Price and who else?

12           MS. CONSTANTINE:  Good morning, your Honor.  Lizza

13   Constantine on behalf of Corellium.

14           THE COURT:  Ms. Constantine.

15           And I think, Mr. Hecht, you had mentioned someone else

16   other than Mr. Price?

17           MR. LEVINE:  Yes, your Honor.  Conor McDonough.

18           THE COURT:  All right.  McDonough.

19           Mr. McDonough, if you could, your name is listed as

20   Conor.  It really helps on these hearings if each counsel has

21   their last name included underneath their video picture.  Thank

22   you.

23           Anybody else on behalf of Corellium?

24           MR. LEVINE:  I do not believe so, your Honor.

25           THE COURT:  All right.  Thank you, Mr. Levine.
```

 1              Now, we also have a prosecutor from the Southern

 2     District of Florida here, Mr. Lee.  How are you doing?

 3              MR. LEE:  I'm very well.  Good morning.

 4              THE COURT:  All right.  Is anybody else here on behalf

 5     of the Government?

 6              MR. COPPOLINO:  Yes, your Honor.  Good morning.  This

 7     is Anthony Coppolino with the Department of Justice, Civil

 8     Division.

 9              THE COURT:  All right.  Good morning.

10              MS. ORLOFF:  And good morning, your Honor.  This is

11     Serena Orloff, also with the Department of Justice, Civil

12     Division, for the United States as well.

13              THE COURT:  Let me see if I can find you here.

14              There we go.  Ms. Orloff.  All right.  Good morning.

15              All right.  So on behalf of the United States, then,

16     it's Mr. Lee, Ms. Orloff and Mr. Coppolino.  Correct?

17              MR. LEE:  Correct.

18              THE COURT:  All right.  Do we have anybody else who's

19     appearing in this case as counsel for any of the parties or the

20     interested Government?

21              No.  Okay.  Great.

22              So then we're ready to get started.

23              What I would do is just lay some ground rules here:  If

24     you could, please mute your microphones if you're not talking.

25     I know that makes it difficult.  Sometimes you start talking

     1    and you forget to unmute.  But we'll all get better at that as
     2    time goes on.  But it helps avoiding the background noise if
     3    you all mute while we're -- while somebody else is talking.
     4         The other thing is, I ask counsel not to interrupt
     5    other counsel.  I'll give everybody a chance to speak.  But on
     6    these Zoom hearings especially, they work very well, but if
     7    counsel are trying to interrupt or speak over another counsel,
     8    it makes it quite difficult.
     9         So I will always ask on each motion who's going to
    10    argue it.  I'll go to the other side.  I'll see if the
    11    Government has a position or anything they want to add.  And
    12    I'll give everybody a chance.  But let's avoid talking over
    13    each other.  These hearings are difficult enough by Zoom
    14    without that problem being added in.  And I'm using Zoom
    15    constantly, on a daily basis.  And actually, it works pretty
    16    well.
    17         So let me just talk about what we're on for today.
    18    We've got, I believe, six motions regarding seven experts.  The
    19    first one is Defendant Corellium, LLC's, *Daubert* motion to
    20    preclude certain testimony by Dr. Michael Siegel, Docket Entry
    21    444.  This doesn't mean necessarily the order I'm going to take
    22    them in.  I'll tell you the order I'm going to take them in.
    23    But I just want to list what we're dealing with today.
    24         The second motion is Apple's motion to exclude legal
    25    opinions and corresponding testimony of Corellium's expert,

```
 1    Stewart Appelrouth.
 2            The next is Apple's motion to exclude certain opinions
 3    and corresponding testimony of Corellium's expert James
 4    Olivier.
 5            The fourth motion is Apple's motion to exclude legal
 6    opinions and corresponding testimony of Corellium's experts,
 7    Clark Asay and Alexander Stamos.
 8            The fifth motion is Corellium's Daubert motion to
 9    preclude certain testimony of Dr. Jason Nieh.
10            And then the sixth motion is Corellium's motion to
11    preclude certain testimony by David B. Connelly.
12            And there are public and sealed versions of the
13    motions.
14            So what we're going to do today is I want to start off
15    first dealing with the damages experts.  And the damages
16    experts are Stewart Appelrouth on behalf of Corellium and David
17    B. Connelly on behalf of Apple.
18            And as far as Mr. Appelrouth, Apple has filed a motion
19    to exclude legal opinions and corresponding testimony of
20    Corellium's expert Appelrouth, Stewart Appelrouth.  That's at
21    Docket Entries 448 and 466-1.
22            So we'll take that motion first.  And then we will --
23    when we finish that motion, we'll go to the motion regarding
24    Mr. Connelly.
25            So let's start off.  And just keep in mind that we have
```

1    a finite amount of time today.  I have read everybody's

2    extensive pleadings and attachments, et cetera, and the reports

3    of these experts.

4         So since this is Plaintiff's motion to exclude

5    Mr. Appelrouth, let me go ahead and hear.  Who's going to argue

6    that motion on behalf of Apple?

7         MS. STEBBINS BINA:  Good morning, your Honor.  I'll be

8    arguing on behalf of Apple.  This is Ms. Bina.

9         THE COURT:  All right, Ms. Bina.  So let me just ask

10   you before you get started, as far as Mr. Appelrouth, are you

11   making any challenge that he is not qualified to testify

12   competently regarding the matter he intends to address?

13        MS. STEBBINS BINA:  Only with respect to the legal

14   opinions, your Honor.  We're not challenging his general

15   competency as an accounting expert.

16        THE COURT:  Okay.  And second, are you challenging the

17   methodology that he used as being unreliable as determined in a

18   *Daubert* inquiry?

19        MS. STEBBINS BINA:  Your Honor, our challenge is not

20   really to methodology; it's to the qualification and the

21   helpfulness.

22        THE COURT:  All right.  So then basically it would be

23   any until opinions that he's giving since's not a lawyer and

24   then whether or not the testimony would assist the trier of

25   fact through the application of expertise to understand the

```
 1    evidence or determine a fact in this case.  Would that be
 2    correct?
 3              MS. STEBBINS BINA:  That's correct, your Honor.
 4              THE COURT:  All right.  So let's talk about the legal
 5    opinions first, because they bother me.
 6              And I'm looking in the report.  And, for example, we
 7    have Mr. Appelrouth at Page 4 of 24 of his report and he's
 8    done -- when I say "his report," one of the problems in this
 9    case is there's numerous reports.  So Mr. Appelrouth has done a
10    report dated 4-13-2020, which is at 466-2.  At least these are
11    the reports that were filed.  That's his second expert report.
12    He's done a report dated 4-20-2020, which is his third expert
13    report, at 466-3.  And he's done a report dated 4-27-2020,
14    which is his fourth expert report, at Docket Entry 466-4.
15              Now, in looking at these reports, for example, in
16    looking at 466-4, his 4-27-20 report, at Page 4 of 24, he
17    states, "It is Connelly's opinion that Corellium has not met
18    its burden under 17 USC 504(b)" -- let's see.  It is
19    Connelly's -- no.  Right.  He talks about Connelly's opinion
20    that Corellium has not met its burden under 17 USC 504(b) to
21    prove deductible expenses.  Then he talks about his
22    understanding of 17 USC 504(b).  Then at Page 4, he talks about
23    how his counsel has provided him with case law.
24              There are some other comments made in his reports.  And
25    I'm not sure, for example, what the complete difference is
```

1    between his first report dated 4-13-2020 at 466-2 and his

2    second report dated 4-20-2020 at 466-3.  When I'm reading them,

3    they seem to be almost exact copies of the prior one with

4    adding a few things in.

5         But anyway, when we're talking about either expert,

6    either damages expert, talking about burdens of proof under 17

7    USC 504(b), what his understanding of the law is or,

8    conversely, what Connelly's understanding of the law is, and

9    any other legal analysis or opinions, I'm concerned about that

10   and troubled by that.

11        So let me just talk about that first issue,

12   Ms. Stebbins Bina.

13        MS. STEBBINS BINA:  Yes, your Honor.  And, frankly,

14   we're concerned and troubled by it as well.

15        Mr. Connelly did reference the statute, but only as a

16   framework for explaining leading into his calculations, as is

17   typically done by an expert.  For instance, he described the

18   burden under Section 504 of the Copyright Act only for the

19   purpose of then saying, "And here's the calculation I am

20   making."  He doesn't intend to testify as to the law.

21        However, in response to Mr. Connelly, actually, even in

22   advance of Mr. Connelly, I believe, Mr. Appelrouth went quite a

23   bit beyond that.  He enunciated a legal standard.  He then

24   disputed the plain language of the statute and said, Well, the

25   statute says the burden is on Corellium, but actually the case

1  law says the burden is on Apple; and here are the three cases

2  I'm citing.  And I really just think all of that is

3  inappropriate.

4        The Court will determine the appropriate burden and

5  will instruct on that.  And the experts certainly will have to

6  refer to how they did their calculation.  But they should not

7  be arguing in any way, shape or form on what the law is or what

8  the appropriate burden of proof is here.

9        THE COURT:  Let me ask you a question.  Is it your

10  understanding that the parties' counsel in this case are going

11  to be seeking to introduce these reports or simply are going to

12  be calling their experts to testify in refreshing their memory

13  with these reports?

14        MS. STEBBINS BINA:  I don't know that that's been

15  decided, your Honor.  I would anticipate that with

16  Mr. Connelly, I would be -- I would not be introducing the

17  reports themselves.  But I might be introducing some of the

18  exhibits and the calculations appurtenant thereto.  But I would

19  intend to call him live and ask him questions.

20        I don't know what Corellium is intending to do with

21  Mr. Appelrouth.

22        THE COURT:  Who's going to argue this motion on behalf

23  of Corellium?

24        MR. LEVINE:  I will.  Justin Levine, your Honor.  Good

25  morning.

1          THE COURT:  Good morning.

2          So, Mr. Levine, let's just confine ourselves to this

3     legal opinion issue.  First of all, let me ask you the same

4     question.  Does Corellium plan on introducing or seeking to

5     introduce these expert reports at the time of trial?

6          MR. LEVINE:  I think my answer, your Honor, would echo

7     that of Ms. Bina.  It has not been discussed at the time, but I

8     think to respond to your Honor right now, giving you a

9     ballpark, I think we would similarly not introduce the reports

10    so long as some of the evidentiary and demonstrative exhibits,

11    you know, showing some of the calculations can be entered.  And

12    we intend to call Mr. Appelrouth.

13         THE COURT:  Okay.  And, you know, again, I've been

14    involved in so many trials that I've lost count, as a trial

15    lawyer and as a judge.  And I can tell you that these expert

16    reports, going through them, are replete with things that are

17    improper; and introducing them or seeking to introduce them at

18    a trial would probably be met with denial or alternatively an

19    extensive redaction.  And I think that a lot of the information

20    in these reports is probably inadmissible hearsay or unfairly

21    prejudicial under 403 or other standards.

22         So I think that I'm going to proceed with the

23    understanding that the parties are not going to be seeking to

24    introduce their reports of their experts and will be calling

25    their experts live and, of course, can use their reports if

1    they wish to refresh memory of their expert; and they may be

2    seeking to introduce some exhibits which don't have the same

3    problem.

4         But let me hear from you about this legal issue,

5    because when I'm going through Mr. Appelrouth's report, it

6    seems to me he's qualified as a damages expert.  But why in the

7    world he has to talk about case law and why in the world he has

8    to talk about -- I believe he may have talked about burden, if

9    I'm remembering correctly.  I mean, that is absolutely not for

10   a damages expert to talk about.  That's for the Court to

11   decide, instruct the jury, and then make the -- the jury makes

12   the determination.

13        So are you seeking to introduce legal opinions through

14   Mr. Appelrouth?

15        MR. LEVINE:  No, your Honor.

16        Again, I think probably Ms. Bina and I agree on the law

17   here.  At no point does Corellium nor Mr. Appelrouth intend to

18   introduce any legal opinions.

19        If I may, your Honor, read a portion of his deposition,

20   obviously, it was his testimony under oath that Ms. Bina

21   actually took.  Mr. Appelrouth states that, "Again" -- I quote:

22   "Again, I'm not really comfortable getting into the legalities

23   of this stuff.  I'm not a lawyer.  I'm not engaged as a lawyer

24   and I'm not going to answer questions.

25        "You asked me a general, overall, and that's fine.  But

1    I'm not going to get into the legal side of this.  That is for

2    you two lawyers to fight out."

3          And he says -- Ms. Bina then goes on.  I'm sorry, your

4    Honor.  For the record, I'm at Page 51 of Mr. Appelrouth's

5    report, Lines 5 and then ongoing.  Ms. Bina then follows with

6    the --

7          THE COURT:  You say "his report."  Which --

8          MR. LEVINE:  Excuse me.  His deposition.

9          THE COURT:  His deposition.  Okay.

10         MR. LEVINE:  Ms. Bina then follows with a question:

11    "And again, I'm not trying to get you to give an opinion on the

12    law" -- and that's critical here -- "there's just different

13    methods of calculating damages under different statutes.  So

14    I'm trying to understand your understanding of the various

15    claims."

16         And indeed, in his report, Mr. Appelrouth is clear that

17    he says "This is merely my understanding" of some of these

18    legal parameters of these assignments.

19         On Page 81 of his deposition, Ms. Bina asked -- let me

20    back up for some context, your Honor.  So my understanding is

21    that Mr. Connelly first put into his report that the burden

22    shifts after a gross revenue analysis.

23         THE COURT:  Right.  And my finding is that that's

24    improper, too.  I don't want that in there either.  The Court's

25    going to instruct the jury on the burden and on the statute.

1   These experts on damages can address factors that they believe

2   are relevant.  And if they are relevant, great.  But they're

3   not going to be instructing on what the burden is or anything

4   of that nature.  They can simply state their opinions, state

5   the facts that underlie their opinions without telling the jury

6   who has the burden, how the burden shifts or anything of that

7   nature.  That's for the Court to instruct.

8        So that's going to be my ruling on both Appelrouth and

9   Connelly.

10       But go ahead.

11       MR. LEVINE:  I --

12       MS. STEBBINS BINA:  Briefly, your Honor --

13       MR. LEVINE:  Your Honor, so just to continue briefly

14   for the record, so he continues with his depo.

15       Ms. Bina states, so you -- oh, so after Mr. Connelly

16   mentioned the burden aspect, Mr. Appelrouth reached out to us

17   just for his understanding.  And we provided him with that case

18   law.  And so Ms. Bina in talking about that asked him, "So you

19   reviewed the case law."

20       Mr. Appelrouth responded, "Yes, I did.  I read it."

21       And Ms. Bina asked, "And you clearly relied on that

22   case law for opinion.  Right?"

23       And he says, "Well, no.  I knew what I was doing

24   before.  But again, once Mr. Connelly brought it up, I simply

25   asked for the case law pertaining to -- relating to that."

1          And so I just want to put one more point on there as to

2    why the case law is included in the report.  At Page 182,

3    Ms. Bina asked, "So your supplemental report will include all

4    of this case law that" -- and she says "you relied upon."  He

5    already testified that that's not the case.

6          And he said, "The supplemental will have it in it,

7    probably."

8          So it was -- it was upon Ms. Bina's question that --

9    and we had this discussion with him that we would include that

10   for their reference.  So I think the parties as well as the

11   Court agree that legal opinions are simply not proper.  And

12   while --

13        THE COURT:  Right.  And this is one of the reasons why

14   the reports should not be introduced or sought to be

15   introduced, in my view.

16        Let me tell you another problem I have while I have

17   you, Mr. Levine, and then I'll go back to Ms. Stebbins Bina.

18        For example, in Page 4 of 26 of the 4-20-2020 report,

19   it states, "Mr. Connelly states that Corellium has made it

20   difficult to identify gross revenue from sales of its

21   infringing Apple product by presenting a moving target of

22   repeatedly modified interrogatory responses."

23        And again, I think it's improper for either expert to

24   make opinions about the fulsomeness of the other side's

25   discovery.  That's not lawyers' to make.  The lawyers are to

1    make motions; and if they get an order from the Court, they can

2    rely upon it.

3          But I don't want to hear any testimony where an expert

4    is testifying and saying:  Well, you know, the problem here is,

5    the other side didn't produce discovery, so I can't make an

6    evaluation.  Certainly an expert can say:  I wasn't provided

7    with A, B and C, and therefore it makes it difficult to make an

8    opinion on this matter.  But an expert can't say:  I wasn't

9    provided with A, B and C because the other side is dilatory or

10   frustrating discovery or acting improperly in the discovery

11   process, and these are my opinions.

12         If the Court makes that finding, that's one thing.  But

13   I don't want an expert making that finding.  And I see that

14   in -- we'll get to him in a minute -- Mr. Connelly's report and

15   then I see it in Mr. Appelrouth's report.

16         So I wanted to just raise that issue as well.

17         MS. STEBBINS BINA:  Your Honor.

18         THE COURT:  Yes.

19         MS. STEBBINS BINA:  If I could respond on a few points:

20   With respect to Mr. Appelrouth, part of the issue -- and it

21   sounds like Mr. Levine is saying he's not going to do this.

22   But part of the reason we brought this motion is that

23   Mr. Appelrouth not only opined on what the law is, but also has

24   a specific opinion that he was unable to provide any

25   apportionment himself because Apple didn't do it first and that

```
 1    was a result of Apple's supposed failure to meet its burden.

 2    Obviously --

 3           THE COURT:  Right.  And that's just not admissible.

 4    The expert here in my view don't get to testify about who has a

 5    burden under the statute.  They get to testify about what their

 6    opinion is based on the facts that they analyze, and that's it.

 7    The Court will tell the jury what the burden is, who has the

 8    burden, whether the burden shifts or not.

 9           So go ahead.

10           MS. STEBBINS BINA:  With respect to Mr. Connelly and

11    the moving target -- and I may be getting ahead of myself

12    here -- I believe that was included in his report merely to

13    explain supplementation.  For instance, you know, there was

14    some difficulty initially in quantifying the damages because

15    Plaintiffs served four different interrogatories responses with

16    different figures and the number were going up and down.

17           I don't -- you know, at trial, I think he may need to

18    explain that there is not consistency necessarily in the

19    evidence he's been presented with.  But he's not planning on

20    opining in any way, shape or form on diligence or lack thereof

21    on Corellium's part.

22           THE COURT:  Listen, I think if it's in his report, he

23    can testify, for example, that he believes that there are

24    inconsistent interrogatory answers.  He can certainly say that.

25    But he can't say that Corellium -- and I'm talking here
```

1    specifically about Mr. Connelly, because we jumped ahead a

2    little bit and we'll come back to Mr. Appelrouth.   But

3    Mr. Connelly can't say:   Corellium violated its discovery

4    obligations and therefore I don't have enough documents to

5    reach an opinion.

6         That's much different than saying:   I read

7    Interrogatory 9 and I read Interrogatory 11; and to me they are

8    inconsistent, and that affects my damage calculation.   That's a

9    different matter.   That's commenting on the evidence or the

10   facts as opposed to ascribing this conduct to the other side.

11        So just so we're clear on that.

12        MS. STEBBINS BINA:   Yes, sir.

13        THE COURT:   So let's talk about Mr. Appelrouth.   I know

14   one ground was the legal opinions.   The second ground would be

15   the -- any issues about the burden-shifting or moving target of

16   discovery or discovery violations, anything of that nature.

17        What else do you object to as far as Mr. Appelrouth?

18        MS. STEBBINS BINA:   Well, I think the remainder, your

19   Honor, was related to the burden issue, which is, you know, he

20   has this entire opinion that, you know, Connelly's opinion is

21   worthless because he didn't undertake the statutory allocation.

22   And I think you've covered all of it, because it's my

23   understanding all of that is out.

24        He can testify to the calculations he performed.   He

25   can speak to Mr. Connelly's calculations, but he can't comment

1    on what the law is.  The Judge will instruct on what the burden

2    is under this issue.  Because the back half of our brief, your

3    Honor, addresses the legal standard and why we believe that in

4    fact this burden does lie with Corellium rather than Apple.

5         I don't know that it's necessary for your Honor to rule

6    on that issue, if your Honor's excluding all testimony on that

7    subject.  But that's the reason we contend it unhelpful, is

8    because it's not only beyond his expertise; it's wrong as a

9    matter of law.

10        THE COURT:  I don't need to rule on the burden issue

11   now because they're just not going to talk about it.  And you

12   as counsel and opposing counsel can argue to the Court what the

13   burden is.  And then the Court will decide how the statute

14   operates and what the burden is and instruct the jury.

15        So that is something that, you know, you can't have an

16   expert get involved in discovery violations, allegedly, or

17   burden-shifting or legal opinions when you're talking about a

18   damage expert.

19        So I think that probably resolves the issue as to

20   Mr. Appelrouth from your view before I go back to Mr. Levine.

21   Is that correct, Ms. Stebbins?

22        MS. STEBBINS BINA:  Yes, your Honor.

23        THE COURT:  All right.  Let me go back to Mr. Levine or

24   Appelrouth before we go to Connelly.

25        Anything else you'd like to add?

1              MR. LEVINE:  I think we've resolved it.

2          Just one comment:  I think Ms. Bina mischaracterizes

3      Mr. Appelrouth's opinion in that she says that Mr. -- she says

4      that he says that Mr. Connelly's opinion is completely

5      worthless.  And I just don't think that's an opinion of

6      Mr. Appelrouth.  But otherwise, I think we've resolved this

7      issue, your Honor.

8              THE COURT:  Right.  I think she was probably

9      paraphrasing.  But I did read all that back-and-forth.  And

10     that's again -- for all of these reasons, the legal opinions,

11     the burden-shifting, the alleged discovery violations, that's

12     why I believe that the case law is pretty consistent that you

13     don't introduce experts' reports, because in this case there

14     would be a real 403 problem if the expert reports came in.  And

15     all of these improper matters were testified to by an expert,

16     citing case law and all types of things of that nature.

17             So as far as Mr. Appelrouth, the legal opinions would

18     be excluded.  And understand both sides are basically saying at

19     this point they don't intend to introduce Appelrouth's reports

20     at this point and that they don't intend to get into legal

21     opinions through him.  Burden-shifting, moving target, improper

22     discovery:  All that would not be permitted.

23             But I do find that Mr. Appelrouth is qualified and he

24     is qualified to provide opinions on damages.  And I don't think

25     Apple disputes that.

1          Correct, Ms. Stebbins?

2          MS. STEBBINS BINA:  No, your Honor.  I mean, our

3     challenges on these *Daubert*s in general were very targeted.

4     We're not seeking to exclude all of Plaintiff's -- Defendant's

5     experts.  It's early here.  And, you know, I think theirs are

6     somewhat broader.  But ours are really intended just to prevent

7     improper legal opinions and things of that nature.

8          THE COURT:  Okay.  So let's go to Mr. Connelly.  And

9     regarding Mr. Connelly, the appropriate motion is Corellium's

10    motion to preclude certain testimony by David B. Connelly,

11    Docket Entries 454 and 468.  And I have reviewed that.  And in

12    going through Mr. Connelly's reports -- and for the record,

13    Mr. Connelly has a report dated 3-3 of 2020, an expert report

14    at Docket Entry 468-3; a supplemental and rebuttal report dated

15    4-20-2020 at Docket Entry 526-2; and an expert supplemental

16    rebuttal report dated 4-26-2020 at Docket Entry 468-1; and then

17    a second supplemental report dated 4-27-2020 at Docket Entry

18    526-3.

19          And there are concerns that I have in going through

20    Mr. Connelly's reports.  And I'll point them out to counsel.

21          In his first report, March 3rd, 2020, 468-3, Pages 2 to

22    3, he says, "I've not been able to fully assess Corellium's

23    deduction costs because Corellium has not produced invoices,"

24    et cetera, et cetera.

25          Again, I don't want any testimony that Corellium has

1    not produced.

2           And then he goes on and he says -- I believe it's also

3    on Pages 2 to 3 -- that he questions the integrity of

4    Corellium's reported expenditures.

5           I don't think questioning integrity of the other side

6    is appropriate for an expert.

7           And then he goes on on Page 3.  He says, "Corellium's

8    recent financial records and document production have not

9    provided significant information that has been requested."

10          My feeling is that the Court needs to -- the expert

11   needs to focus on his opinions, damages, not on his opinion of

12   the completeness of Corellium's document production.

13          Additionally, he talks about the legal provisions of

14   the statutes.  Again, I don't think it's appropriate.  It's

15   dangerous for a damages expert to talk about statutes.  He can

16   focus on his damages and what he believes the elements are.

17   But I don't think it's appropriate for him to state what 17 USC

18   504(b) and 1203(c)(2) provide or which side has the burden of

19   proof as discussed at Pages 4 to 5 of his report.

20          His moving target comment at Page 5.

21          At Page 7:  The fact that Corellium has not provided

22   sufficient information to enable our corroboration of its gross

23   revenue.

24          At Page:  8 burden.

25          At Page 8 through 11:  That Corellium's not produced

1      sufficient records.

2             At Page 11:  Corellium's not produced.

3             And then on -- when you go to the 4-20-2020 report at

4      Docket Entry 526-2 at Page 2, he states, "In an apparent effort

5      to harmonize its prior inconsistencies."  I don't -- you know,

6      I don't think it's appropriate for an expert to allege an

7      apparent effort to harmonize.  That's legal argument that a

8      lawyer can make to the jury or the Court.

9             And then he states at Page 2 of that 4-20 report, "I

10     believe Corellium still has not provided significant financial

11     information that has been requested."

12            And then in the other reports, it's very similar.  I

13     don't need to go through all of them.  So those are my thoughts

14     on -- just initially on Connelly.

15            So since it's Corellium's motion, is it Mr. Levine?  Do

16     you want to go ahead and argue that?

17            MR. LEVINE:  Yes, your Honor.  Thank you.

18            So in addition to those, we challenge Mr. Connelly's

19     methods as far as the reliability of them.  And I will go

20     through those now, as well as whether these methods and the

21     results of those --

22            THE COURT:  Well, let me ask you before you get

23     started, do you challenge his competency to testify regarding

24     the matter he intends to address, such as damages?

25            MR. LEVINE:  As far as being a CPA and a forensic

```
1    damages expert, at this time we are not challenging his
2    qualification in that capacity.
3            THE COURT:  Okay.  But you're saying that you challenge
4    his methodology, that it's not reliable.  Is that correct?
5            MR. LEVINE:  Yes, your Honor.
6            THE COURT:  And are you challenging the helpfulness-to
7    the-trier-of-fact prong?
8            MR. LEVINE:  That is correct, your Honor.
9            THE COURT:  All right.  So go ahead.
10           MR. LEVINE:  Okay.  So that was the second prong, the
11   helpfulness as well.
12           Page 1 of his report states that he was -- and I
13   quote -- "retained to perform investigation and analyses."
14           And I think the theme throughout our motion and
15   throughout Mr. Connelly's methods is that there's just simply a
16   lack of investigation.  Mr. Connelly simply reviewed the
17   documents that were provided.  And I'll address the
18   inconsistencies --
19           THE COURT:  But let me ask you a question.  He's a
20   damages expert.  What else is he going to do other than review
21   financial documents and try and make a determination?  I know
22   you have this whole argument that he didn't consider other
23   products.  But it seems to me that for a long period of time,
24   the only product Corellium had was the Corellium Apple product,
25   from their inception to sometime in at least 2019.  Isn't that
```

1    correct?

2         MR. LEVINE:  Sort of.  So it's not as simple as that.

3    And I think that's the issue here, your Honor.

4         THE COURT:  Well, I don't know.  I don't know if it's

5    as simple as that or if you're making it more complicated than

6    it needs to be.  So that's what I'm trying to decide.

7         MR. LEVINE:  Fair point, your Honor.

8         So the case law we think is very clear that the gross

9    revenue is not as simple and as straightforward as Statute 504

10   states and that there must be a causal nexus to the actual

11   infringing activity.

12        Now, you know, it's not disputed that there are other

13   platforms on Corellium's product.  Now, I'd like to be clear

14   that Corellium's product is not dependent upon any operating

15   system.  It's not dependent upon IOS; it's not dependent upon

16   Android; it's not dependent upon anything.  It's merely its own

17   product.  And so the infringing activity is only when that

18   product is paired with IOS.

19        And --

20        THE COURT:  Let me just stop you, because I would guess

21   that Apple disagrees with your assessment.

22        MR. LEVINE:  I don't know how they can, your Honor.

23        THE COURT:  We'll hear from them shortly.

24        MR. LEVINE:  Okay.  And I think maybe where you're

25   getting at is probably a question for some of the more

1   substantive experts or maybe I should say some of the more

2   technical experts, which is not my area.

3          But as I mentioned, you know, the hypervisor in itself

4   or the Corellium product again is just entirely independent of

5   IOS.  So if somebody purchases the product and they do security

6   research for an Android platform, nothing IOS and nothing Apple

7   is implicated at all.  Not in any stretch.

8          So --

9          THE COURT:  What about bypassing security features?

10         MR. LEVINE:  So, one, we deny that happens.  But even

11  under the assumption that it does, no.  Again, that's -- it

12  doesn't -- if someone wants to do Android, nothing IOS is

13  even -- it doesn't exist in that context.  It just doesn't.

14         You know, I have in my mind this analogy of a DVD

15  player.  And it's like if Sony made a DVD or if Apple made a

16  DVD and Android made a DVD, and you put the Android DVD in the

17  DVD player.  Then we can't say that anything Apple is

18  circumvented or bypassed or -- it's only when the Apple DVD

19  goes in that there becomes this question.

20         And so the problem is that Mr. Connelly is attributing

21  100 percent of all revenues when we recognize that it may be

22  one product.  But it's -- the infringing activity, which is the

23  buzzwords in the case law, is what's relevant here.  And

24  there's got to be a nexus.  And I have a litany of cases that I

25  can cite for your Honor.

```
 1                 THE COURT:  No.  I've read them in your briefing.
 2                 MR. LEVINE:  Well, actually, so I have a number of
 3       additional cases that we did not cite in the briefing that I'd
 4       like to --
 5                 THE COURT:  It's a little late now.
 6                 MR. LEVINE:  Okay.
 7                 THE COURT:  And I've been reading case law and I've
 8       been reading numerous pages of sealed and unsealed reports and
 9       motions and responses and replies.  And, you know, I think I'm
10       pretty up on the case law, you know.
11                 But the case law also says that under Daubert, a
12       District Court must take on the role of a gatekeeper.  But this
13       role is not intended to supplant the adversary system or the
14       role of the jury.
15                 Why can't all of this be taken care of on
16       cross-examination?  If you're so sure of your position, why
17       can't you cross-examine the expert and establish that his
18       damage calculation is just wrong because he is using the wrong
19       product or the wrong income stream or whatever it is you're
20       alleging?
21                 MR. LEVINE:  Because, your Honor, the weight that an
22       expert gives to certain testimony, even under
23       cross-examination, can be very prejudicial to a jury.  And
24       while it can be addressed on cross-examination, there's some
25       testimony and there's some opinions that are just so
```

1   fundamentally wrong that even portraying them to the jury would

2   prejudice the entire issue.

3        THE COURT:  All right.  So give me two of

4   Mr. Connelly's opinions that are so fundamentally wrong that

5   they unfairly prejudice this jury.  Just give me two.

6        MR. LEVINE:  So in his opinion, he mentions that he

7   reads Dr. Nieh's report and he finds that there are 3900

8   entries that relate to IOS versus 30 database entries that he

9   finds that relate to Android.

10        And he says, extrapolating from this idea, "This

11   clearly shows that there is a voluminous amount of IOS devices

12   being made versus a very, very *de minimis* amount of Android or

13   other devices that are being made."

14        The problem with this opinion is that the 3900 number

15   is a white list number.  It's an amount or it's a list -- it's

16   almost like a table of contents that was simply downloaded from

17   the website ipsw.me that basically is a list of all IOS

18   softwares in existence.  Corellium only supports a handful,

19   somewhere about ten or twelve of them.

20        This 3900, this includes Apple Watch, IOS -- or Apple

21   Watch Operating Systems, Apple TV Operating Systems, numerous

22   iPad and iPhone operating systems that Corellium doesn't

23   support.

24        The other reason why there's 3900 versus 30 is that

25   Apple releases their operating systems in small increments.

1     So, for example, there would be an operating system called IOS

2     10.4.1.  And it does those small increments.  And Corellium

3     doesn't support an overwhelming majority of these that are just

4     listed in this table of contents that was downloaded, versus

5     Android, where Corellium only supports the major new

6     iterations; for example, Android 7 or Android 8 or Android 9.

7          And I spoke to the clients, and they looked up the

8     actual -- let me pull it up here.  They looked up the actual

9     numbers.  As it relates to IOS 12, for example, on this white

10    list that Mr. Connelly is citing as 3900 examples, there were

11    5 -- 953 IOS versions to one relevant Android version.  And a

12    lot of these IOS versions are Beta versions that aren't in

13    production or don't -- aren't supported by Corellium or are not

14    actually used.  Again, it's just a table of contents.

15         And so getting back to your question, your Honor,

16    Dr. Nieh, but my position there is that Dr. Connelly, who's

17    relying upon Dr. Nieh, is fundamentally basing his opinion on

18    this 3900 versus 30.  And he ultimately ends up with this 97

19    percent number which is literally pulled from thin air based

20    upon that thing.

21         And had he done further investigation -- and what we

22    mean by that is contacting Corellium's customers, because

23    Corellium doesn't track these numbers.  If your Honor recalls,

24    Corellium's customers and the things that -- the research that

25    this product is being used for is highly proprietary and the

```
 1   customers do not want these things tracked and they want their

 2   uses private.  So Corellium doesn't track this stuff.  But that

 3   doesn't mean that this information is unattainable.  And under

 4   Corellium's position, that it's Apple's burden to obtain that.

 5   So that's one --

 6          THE COURT:  So what would be the second one?

 7          MR. LEVINE:  Another example would be that 97 number.

 8   But I guess more specifically, Mr. Connelly relies upon, you

 9   know, marketing brochures, for example.  This was just another

10   example.  And I can come up with several here.

11          He comes up with marketing brochures.  And merely

12   marketing brochures, from these marketing brochures, he derives

13   the projected revenues for 2019 and 2020.  He derives the

14   number of devices that were somehow developed at that point in

15   time.

16          All of this --

17          THE COURT:  Doesn't he also rely on interrogatory

18   answers?

19          MR. LEVINE:  He cannot, because Corellium doesn't know

20   the information as to how many devices were developed.  So

21   that --

22          THE COURT:  No.  I thought that Corellium had made some

23   interrogatory responses that he relied upon in calculating

24   future projections.

25          MR. LEVINE:  So future projections -- so let me address
```

1    that.  Maybe this is a third example.  Future projections by

2    Corellium that were made in 2018 and the first quarter of 2019,

3    long before this lawsuit, that Corellium put into marketing

4    projections, he relied upon those that were just simply also

5    stated in interrogatories, because the question was asked.  And

6    so he relied upon those.

7         But the problem is -- and this goes back to the

8    unreliability of his methods -- when he came up with his

9    report, relying upon 2018 and 2019 projections, this lawsuit

10   itself has had a disastrous effect on the business of

11   Corellium, north of over $500,000 at the very least, just on a

12   facial review.

13        COVID is another example.  When these reports came out,

14   they were in April.  We were at the height of the COVID

15   pandemic or at least the first wave of it.  And so large

16   expenditures like $200,000 purchases for a research tool or a

17   new cutting-edge research tool, these kind of things are often

18   the first expenses that go.

19        Corellium has had issues closing some of the contracts

20   and has lost major contracts because of COVID, because of this

21   lawsuit.  And these were all hard numbers that contradicted the

22   projections that Corellium had projected months and months

23   prior that Mr. Connelly could have, which is what he should

24   have done, conducted market studies under the case law.  And

25   that is how forensic experts are supposed to be doing their

1    projections, not simply relying upon internal marketing

2    projections that frankly can be -- can be proven false at that

3    point in time.

4              And --

5              THE COURT:  So basically what you're saying is

6    Connelly's opinions are based on bad information, they're

7    unreliable, and therefore they will not assist the trier of

8    fact?

9              MR. LEVINE:  100 percent.  Let me give you one more

10   quick example, your Honor.

11             THE COURT:  All right.  Quick, because we have a lot of

12   motions today and we only have a limited amount of time.  I

13   have another lengthy hearing later this afternoon.  So go

14   ahead.

15             MR. LEVINE:  Yes, your Honor.

16             In 2018, Corellium projected $3.5 million of revenue

17   for the 2019 year.

18             In 2019, they actually pulled in 1.6 million, less than

19   half of that projection.  Based upon that projection, in his

20   report, he opted to double the projection and prorate it.  If

21   anything, he should be cutting it in half.  But it's just yet

22   another example of --

23             THE COURT:  And I understand your position.

24             But why -- again, because, again, I go back to the case

25   law, which says that, you know, under *Daubert*, a District Court

1    may take on the role of -- must take on the role of the

2    gatekeeper.  But this role is not intended to supplant the

3    adversary system or the role of the jury.

4         Why can't that be handled on cross-examinations?  I've

5    seen a lot of trials where experts give opinions on direct, and

6    on cross they look like fools because of the cross-examination.

7    So why can't the adversary system take this issue and handle it

8    rather than a *Daubert* motion seeking to exclude all his

9    opinions?

10        MR. LEVINE:  Well, we believe, your Honor, that the

11   cross-examination can go to credibility.  These opinions do not

12   meet the *Daubert* standard.  The *Daubert* standard seeks to

13   exclude improper opinions when the opinions are unreliable.

14        These opinions, we believe, are unreliable.  And I

15   don't want to belabor this because --

16        THE COURT:  And I understand.

17        Let me do this:  Let me go to Ms. Stebbins Bina and

18   hear what your position and response is.

19        MR. LEVINE:  Thank you, your Honor.

20        MS. STEBBINS BINA:  Thank you, your Honor.

21        Briefly, before I respond to Mr. Levine, I want to

22   address what your Honor said with respect to the reports.

23        We don't intend to have Mr. Connelly testify about

24   discovery or what was produced.  The quotes you read I think

25   from his initial report were, We're laying the groundwork

1    essentially for a supplemental report and explaining why it was

2    not complete at that time.

3         That's not something that's going to be part of trial.

4    And he may have to ultimately testify that he didn't have full

5    information in certain areas.  But it won't be in that way.  So

6    I just want to clear up that issue.

7         With respect to Mr. Levine, you know, your Honor's 100

8    percent correct.  These are all challenges to inputs, not to

9    methodology.  You know, he talks for instance about the 3900

10   files versus the 30 files.  I mean, that's subject to

11   cross-examination by counsel for Corellium, both with respect

12   to Dr. Nieh, who created that number, and Mr. Connelly.

13        And it's not -- you know, counsel is now suggesting

14   that, you know, it's absolutely unreasonable to associate

15   revenue with Corellium.

16        Well, their own verified interrogatory responses, you

17   know, associated all of this revenue with the Corellium Apple

18   product.

19        Their witness specifically testified that she excluded

20   anything that didn't come from the Corellium Apple product.

21        Now they're saying:  Well, that really didn't meet the

22   Apple product.  But that's a subject for cross-examination.

23        The same is true with everything that Mr. Levine said.

24   You know, for instance, he quibbles -- Mr. Connelly has two

25   alternate future problems.  One is based on Corellium's own

 1    projections.  The other is based on Corellium's own historic

 2    income.  He may testify to both of those at trial.  He may

 3    decide that one or the other is better.  Either way, it's

 4    subject to cross-examination.

 5         You know, Mr. Levine can ask:  Why didn't you make a

 6    COVID adjustment?  And Mr. Connelly might say:  Well, you know,

 7    tech companies in my experience don't suffer that much during

 8    pandemics or, It's impossible to calculate an adjustment in the

 9    first time in a century or, Hey, maybe I should have made a

10    COVID adjustment.  Those are all possible -- that's part and

11    parcel of cross-examination, your Honor.

12         So I don't see anything -- you know, I'm happy to

13    respond to anything specifically your Honor is concerned about.

14    But under the case law, this is exactly the kind of evidence

15    that is considered.

16         If you look at the *Lorenz* and *Andreas* cases, the very

17    things that Mr. Connelly considered in allocating revenue to

18    Apple, things like advertising, the fact that the price didn't

19    change when Android was introduced, the percent of supported

20    products, those are part and parcel of the things that an

21    expert can reasonably consider and be cross-examined on.

22         THE COURT:  All right.  Before I go back to Mr. Levine,

23    briefly, I know, Mr. Lee and Ms. Orloff and Mr. Coppolino,

24    you're here.  But I assume you don't have any dog in the

25    damages fight.

1           Would that be correct, Mr. Lee?

2           MR. LEE:  That is correct, your Honor.

3           THE COURT:  All right.  Thank you.

4           Mr. Levine?

5           MR. LEVINE:  Briefly, your Honor.

6           So I disagree with Ms. Bina that this is -- that these

7    relate to inputs and not methodology.  That is 100 percent

8    Mr. Connelly's methodology.

9           And I would contend, your Honor, that every conceivable

10   issue could be addressed on cross-examination.  Every single

11   issue, ever.

12          But under *Daubert*, as your Honor mentioned, the Court

13   is to act as the gatekeeper when there are unreliable methods.

14          Now, we could of course cross-examine him on his

15   methods.  But under *Daubert*, that is the whole purpose of

16   *Daubert*, is to remove this cross-examination from the jury.

17          And I will contend that in light of who the Plaintiff

18   is in this case, it's at least plausible that a fair amount of

19   credibility will be provided to Apple's expert just under the

20   general assumption that the broad public understands that Apple

21   has, you know, unlimited resources, that they're going to have

22   the best of the best.  Indeed, they have the best lawyers in

23   the world here.  And I mean that as a compliment.

24          THE COURT:  I'm sure Ms. Bina is glad to hear that.

25          MR. LEVINE:  They're competent indeed, your Honor.

1          But I think the general consuming public would

2     attribute the same amount of credibility to the witnesses that

3     Apple brings in support of it.

4          And when you have things that you're relying upon

5     simply fake numbers or marketing efforts, I do not think that

6     goes to input.  I believe that more so goes to methodology,

7     which is exactly what the *Daubert* standard is designed for.

8          Briefly, your Honor, and I'll wrap up, because I know

9     there's more things:  So I just wanted to make a point.  I just

10    wanted to state on the record for your Honor's reference that

11    in the matter -- the Eleventh Circuit matter *Home Design*

12    *Services, Inc., versus Turner Heritage* at 101 F.Supp. 3rd 1201

13    out of the Northern District of Florida, that court stood for

14    the proposition that a causal relationship between the

15    infringement and profits is necessary.  And that was affirmed

16    by the Eleventh Circuit.  The cases that Mr. Appelrouth cited

17    in his report get into that.

18         Also, again, there's another line of cases, your Honor,

19    where -- in the Fifth Circuit which talks about the Fourth

20    Circuit and there's Tenth Circuit cases.  But particularly, the

21    Fifth Circuit case --

22         THE COURT:  But I mean, we're in the Eleventh Circuit.

23    So that is pretty much what I'm interested in, unless it's a

24    *Bonner versus Pritchard* Fifth Circuit case or a Supreme Court

25    case.

1          But again, I mean, Mr. Appelrouth is not -- or

2    Mr. Connelly is not going to testify about legal opinions or

3    anything of that nature.

4          MR. LEVINE:  Well, this is as it relates to your

5    Honor's decision as to whether Mr. Connelly's opinion was

6    reliable.

7          And we believe that it's not reliable because he, just

8    like he did in his prior *Reinsdorf* case, where his -- this

9    portion of his opinion was rejected, he simply attributes 100

10   percent and just fails to come up with a reliable opinion

11   that's actually based on fact.  Nothing in his opinion is

12   anything that couldn't have been stated by any attorney.  And

13   I'll leave it there.

14         But there's lines of cases, your Honor, that follow the

15   *Bonner* -- and I'll -- just for my own record, I'll put in this

16   *Looney* case, which is another Fifth Circuit case.  It's 2020

17   Westlaw 5175173 at 2, your Honor.

18         And there's -- your Honor, from following the citations

19   in those cases and the headnotes in those cases, you can come

20   to a full line of cases across almost every single circuit that

21   follows this causal nexus or causal connection position, your

22   Honor.

23         Thank you.

24         THE COURT:  Well, I will point out that the methodology

25   by which the expert reaches his conclusions is -- has to be

```
 1    sufficiently reliable.  It doesn't have to be perfectly

 2    reliable; it has to be sufficiently reliable.

 3            But let me just hear very quickly, Ms. Bina, about the

 4    Reinsdorf cases that he mentioned and just a brief response.

 5            MS. STEBBINS BINA:  Sure, your Honor.

 6            Mr. Connelly, as noted, has been qualified as an expert

 7    in dozens of cases.  He's testified in state and federal court.

 8            The Reinsdorf case was a case where there was -- and we

 9    footnoted this in our reply:  A portion of his opinion was

10    struck, as with every other expert in the case.  There was a

11    massive discovery deficit in that case.  All --

12            THE COURT:  What circuit or where was that case?

13            MS. STEBBINS BINA:  It was the Central -- either

14    Central or Northern District of California.  It was a District

15    Court case.

16            THE COURT:  That's right.  Now I remember.

17            MR. LEVINE:  Ninth Circuit, your Honor.

18            THE COURT:  Ninth Circuit.

19            MS. STEBBINS BINA:  But it was at the District Court

20    level that the opinion was addressed.

21            THE COURT:  Right.

22            MS. STEBBINS BINA:  The case was very unusual.  It

23    devolved -- outside of Mr. Connelly's involvement, the person

24    whose opinions were excluded then sued his lawyers for failing

25    to properly, you know, include discovery.  In fact, the very
```

attorneys who had Mr. Connelly's opinions struck in that case
have since hired him.  It's not some kind of black mark on his
career.  It's not indicative of some broader methodological
issue and it has nothing whatsoever to do with this case.

The methods in this case were not at issue in that
case.  And the methods that Mr. Connelly used in this case have
been specifically endorsed.  You know, Plaintiffs --
Corellium, for instance, you know, cites these accounting
standards and they say:  Well, you need to find a nexus.

But there is a nexus here.  The nexus is Corellium's
verified discovery responses attribute this revenue to Apple.
For the first two years of the Corellium Apple product or the
corsack [phonetic] products, as they call it, it supported only
Apple product.

And now they're saying, Well, maybe people paid
$200,000 a year for two years where they could only do Apple
because someday they might want to do Android.

That doesn't make any sense, your Honor.  And the case
law -- even the case law that Mr. Levine is citing states that
the nexus burden is very light.  You simply have to have some
relationship between infringing activity and the income stream.
And that's more than established here.

And that again is not the law in this circuit at this
point.  But even were this circuit -- and most district courts
in this circuit have assumed, without deciding that there is a

```
 1   nexus requirement -- some have decided -- some have come out

 2   the other way.  But even assuming there is a nexus requirement,

 3   you know, the image in one of the cases was, you know, well, if

 4   there's a building and the building infringes on the

 5   architecture, obviously, all of the revenues in the building

 6   aren't attributable to the architecture.  But once you

 7   establish that the building is claimed to be infringing, then

 8   the burden shifts to the Defendants under Section 504 to

 9   identify the offsetting revenues.

10        We have certainly done more than associate, you know.

11   Assuming the Corellium product is the building, Apple's

12   position is that each and every version of that product that is

13   distributed is an infringing product, is designed to be

14   infringing, is marketed to be infringing.  And that's -- you

15   know, that's a dispute of fact that Mr. Levine I'm sure will

16   vigorously contest at trial.  But that is not a gatekeeping

17   issue under *Daubert*.  And your Honor is exactly right:  These

18   are challenges to inputs.  They can be subject to

19   cross-examination.

20        THE COURT:  All right.  Mr. Levine, if you want one

21   minute.

22        MR. LEVINE:  One minute.  I think I can do it in one

23   minute.

24        Initially, the building analogy, your Honor, is simply

25   not applicable here because a building that is built upon
```

1    infringed architectural or construction plans, inherently the

2    entire building is based upon the infringing activity.  You

3    cannot separate the two.

4         I've already stated that the Corellium hypervisor is

5    100 percent independent of any operating system, IOS included.

6    So if Android is being used on that, there is no implication of

7    anything Apple at all.  And so there is a distinction here.

8         I do want to say also that as it relates to the

9    *Reinsdorf* case, I think Ms. Bina made my point by saying that

10   it was a discovery issue and that there wasn't enough discovery

11   that was provided across all parties.

12        Well, then, the proper opinion should have been:  I

13   cannot render an opinion.  But the improper course of action is

14   to say:  Well, I didn't get enough discovery, so let me take a

15   guess.  And let me take a stab at it.

16        And that's --

17        THE COURT:  I understand your position.

18        All right.  Let's do this.  Let's go to the next group

19   of experts, which is -- I categorize them as the computer

20   science experts.  And those are Mr. Olivier, who is Corellium's

21   computer science expert, and Mr. Nieh, who is Apple's computer

22   science expert.

23        So the first one, Mr. Olivier, there is a motion to

24   exclude.  It is -- here it is.  It is Apple's motion to exclude

25   certain opinions and corresponding testimony of Corellium's

1    expert, James Olivier.  At it's at Docket Entries 449 and

2    465-1.

3            And then the corresponding computer science expert for

4    Apple is Mr. -- is Dr. Jason Nieh, N-I-E-H, and of course

5    there's a motion to exclude that expert.

6            So let's start out by talking about Apple's motion to

7    exclude Mr. Olivier.  Who's going to argue that for Apple?

8            MR. GROSS:  Thank you, your Honor.  This is Gabe Gross

9    for Apple.  I'll be handling both of these motions on the --

10           THE COURT:  All right.  Hold on just a second.

11           Okay.  In looking at Mr. -- at Dr. Olivier's report, I

12   know he's a Ph.D.  I'm having some concerns.  For example, I

13   want to talk about some of his opinions and whether they are

14   proper or not.

15           For example, at one point, I think early on in his

16   report, Page 1 -- and there are two reports of Dr. Olivier,

17   just for the record.  One is the March 3, 2020, expert report

18   at Docket Entry 465-2.  The second is a rebuttal expert report

19   dated 4-13-2020 at Docket Entry 465-3.

20           And he says, for example, on Page 1, "Corellium's

21   product falls outside the scope of the DMCA's exclusion, so

22   Corellium is free from liability."

23           Now, I'm trying to understand how an expert is opining

24   whether or not Corellium is free from liability or opining

25   that -- well, that's the first one I want to address.

1          And I'm just wondering, isn't that invading the

2    province of the Judge or the jury if an expert takes the stand

3    to say:  Well, I've looked at everything here on the DMCA

4    count; they're not guilty?

5          I mean, you know, for example, in a criminal case, you

6    can have an expert come in and testify that "I found

7    fingerprints on the gun; I found DNA on the gun."  But if the

8    expert tried to say, based on that, "He's guilty of the crime

9    charged" or "He's not guilty of the crime charged based on

10   their absence," that's not going to fly.  So that's the first

11   issue that I wanted to address.

12         And I know that there are -- he's also addressing fair

13   use.  And I'm concerned about some of the legal opinions in

14   Mr. Olivier's report addressing the Copyright Act, what he

15   understands from counsel.  You know, I think he can certainly

16   testify tentatively, I'm saying, as to what factors go into

17   fair use and whether he believes those factors exist or perhaps

18   what factors go into issues under the DMCA.  But to come out

19   and say that Corellium's free from liability or in effect is

20   not guilty of a complaint alleged against them, I think that

21   might be going just a bit too far.

22         So I've gone through these reports and made some notes.

23   And there are, you know, legal opinions throughout the reports

24   that I read of Mr. Olivier.  And it's possible that Corellium's

25   not going to seek to introduce those.  But those are some of

1    the concerns I have.

2         Let me hear, then, from Mr. Gross about what Apple's

3    position is, what you're seeking to exclude.  Are you seeking

4    to exclude everything on Olivier or a part of Olivier?  And as

5    I've asked and I'll ask on every expert, do you believe he's

6    qualified to testify competently regarding the matter he or she

7    intends to address?  That's the first issue I'll ask you,

8    Mr. Gross.

9         MR. GROSS:  Sure.

10        And the short answer to that is yes.

11        THE COURT:  Okay.  I like short answers.

12        MR. GROSS:  He's competent in his field.

13        THE COURT:  I like short answers.  Thank you.

14        The second is the methodology used, whether it's

15   sufficiently reliable.  And then third was whether it'll assist

16   the trier of fact.

17        Where are you going with your argument on this expert,

18   Mr. Olivier?

19        MR. GROSS:  Well, let me address the issue you just

20   raised, your Honor, about the ability to opine on issues of

21   law.  And I'll turn to the more specific issue raised in our

22   *Daubert*, which is more of a rifle shot approach than a shotgun

23   approach.  We're not moving to bar all of his testimony, all of

24   his opinions.

25        Before I get to the precise issue in our motion that is

1    addressing Dr. Olivier's particular testimony on a topic, let

2    me just spend a few words addressing the legal conclusions.

3           There's a theme, I think, to the motions in front of

4    you right now that is going to come up.  It's already come up

5    so far and it'll come up in the remainder of our time together,

6    which is that there are a number of legal opinions, like the

7    one you just mentioned about the scope of a particular federal

8    statute, the DMCA, or about whether a particular set of facts

9    is a fair use that exempts somebody from infringement

10   liability.  Those aren't appropriate for expert witnesses.

11          Dr. Olivier has a very specialized area of technical

12   expertise.  We think it's fair that he's allowed to testify

13   about the facts and the opinions he's reached based on facts

14   within his wheelhouse, so to speak, within his technical area

15   of expertise.  But legal conclusions on statutory

16   interpretation, on fair use, are simply inappropriate.

17          So the ruling that I think your Honor was inclined to

18   give about the damages experts earlier we think is one that

19   really can carry over to all of the experts who will be

20   testifying in this case.  None of them should be instructing

21   the jury on the law, should be reaching legal conclusions, or

22   giving testimony of that nature.  We have a legal expert.

23   That's the Court.  And the jury can rely on the instructions

24   that they will receive from the Court.

25          THE COURT:  Let me ask you, Mr. ...

1          MR. GROSS:  "Gross," your Honor.

2          THE COURT:  Mr. Gross.  Correct.

3          Are you seeking -- again, it's the same question as to

4     the damages expert.  Are you seeking to introduce either -- any

5     of these reports such as either Dr. Nieh's report or

6     Dr. Olivier's report or are you not seeking to introduce the

7     reports and you'll call the witnesses live and if necessary

8     refresh their memory with the reports?

9          MR. GROSS:  It's the latter, your Honor, with perhaps

10    some exceptions as to particular exhibits or particular facts

11    they relied on that are subsumed within the report.  But we

12    will call these witnesses live.  We don't expect to give the

13    jury hundreds of pages of reports and have the Court admit them

14    in evidence.

15         THE COURT:  All right.  Well, I mean, if somebody wants

16    to -- if either side wants to lose the jury, all they have to

17    do is submit technical 50-, 60-, 70-page reports.  That's --

18    there's no question about that.

19         All right.  So go ahead with your argument.

20         MR. GROSS:  Okay.  Well, let me switch gears slightly

21    to the topic of the motion.  And this one I think actually --

22    there may be some agreement with -- between the parties that we

23    can use to get to a resolution rather quickly.

24         The particular opinions that concern Apple, that led to

25    the *Daubert* motion about Dr. Olivier's opinions, have to do

1   with some very cursory opinions, short opinions that we saw in

2   his reports and that he testified about in his deposition about

3   what parts of Apple's code for the copyrighted IOS operating

4   system Corellium is actually using; the amount of it, the

5   substantiality of it, how it's using it.

6          And the reason we made this an issue in the *Daubert*

7   motion is the source of the information that Dr. Olivier relied

8   on.  He talked to one of Corellium's founders, Mr. Wade, and he

9   got all of his information about those topics from Mr. Wade.

10          We then deposed Mr. Wade, who just didn't have detailed

11   information or really much information at all on these topics.

12   And that made it clear that there just wasn't a reliable source

13   of facts for Dr. Olivier to rely on to make sweeping

14   conclusions about how and to what extent the Apple operating

15   system, IOS, is being used by the Corellium product.

16          Now, the reason I say we might have some agreement here

17   is because in their opposition brief -- and this is at Docket

18   No. 514 on Page 5 -- Corellium stated that as to the amount --

19   I'm actually quoting now:  "As to the amount of IPSW files" --

20   and that's an acronym that stands for the type of file that

21   contains IOS -- Corellium said as to the amount of IPSW files

22   that Corellium uses -- "it is undisputed and Apple agrees that

23   Dr. Olivier does not intend to offer opinion testimony on the

24   actual amount or substantiality of the portions that Corellium

25   allegedly used in relation to the copyrighted work."

1          THE COURT:  Okay.  And which docket entry and page is

2     that?

3          MR. GROSS:  That is Docket Entry 514, on Page 5.

4          THE COURT:  All right.  Go ahead.

5          MR. GROSS:  And so I was pleased to see that.  I was a

6     little surprised to see that Corellium described it as

7     undisputed and something Apple agrees with and something that

8     Dr. Olivier confirmed under oath, because I don't think the

9     record is anywhere near that clear.  As a matter of fact, he

10    has reports that contain opinions titled The Amount and

11    Substantiality of the Portions of the Copyrighted Work.  So I

12    was surprised to see that Corellium does not in fact plan to

13    offer this sort of testimony at trial.

14          But if that's the case, then I think, despite what's in

15    the reports and what was in the deposition testimony, your

16    Honor has everything the Court needs to grant this motion.

17    What we ask the Court to exclude, because of the insufficiently

18    reliable basis for the opinions, was any testimony before the

19    jury about the amount of IOS code and the substantiality of the

20    IOS code that Corellium uses and how it uses that code in its

21    Apple product.

22          So it may be that there's no dispute here in light of

23    that concession or a very narrow one.  But the issue's rather

24    narrow and it's fairly well briefed.

25          And so I'd like of course to reserve the opportunity to

 1    respond to my colleague for Corellium.  But I think we're close

 2    to submitting this on the briefs.

 3         THE COURT:  All right.  So in effect, what your

 4    position is is aside from the other issues I've mentioned such

 5    as legal opinions, which is a theme throughout, your position

 6    is that you raise the *Daubert* motion as to Mr. Olivier's

 7    possible testimony about the amount of IPSW files that

 8    Corellium uses, the amount of IOS code and substantiality of

 9    the IOS code.

10         What else is it that's part of that that you say that

11    you're seeking to exclude and that you believe now that

12    Corellium may have agreed to?

13         MR. GROSS:  Your Honor, the particular relief that

14    we're seeking hasn't changed since we filed the motion.  And

15    the way we phrased it in the papers before the Court is to

16    exclude opinion testimony at trial about how and to what extent

17    Corellium's product uses portions of Apple's IPSW files.

18         THE COURT:  All right.  So let me go -- who's going to

19    argue this for Corellium?

20         MR. HECHT:  Your Honor, this is David Hecht.  I'll be

21    arguing for Corellium.

22         THE COURT:  Go ahead, Mr. Hecht.

23         MR. HECHT:  Thank you.

24         First, as to the theme -- and I do agree that it's a

25    theme -- that, you know, there have been what should probably

1    not be admissible statements in the reports regarding legal

2    opinions and also summaries of law -- and I think honestly both

3    sides are guilty of this, because I've seen it even in

4    Dr. Nieh's report where --

5           THE COURT:  I agree.  I agree.  I'm not pointing the

6    finger at one side or the other.  I've seen it throughout.  And

7    even when one side does it, then the other side feels they have

8    to respond.  So basically, you have these computer science

9    experts or damage experts or other types of experts basically

10   telling me what the law is or telling the jury what the law is.

11   And that just doesn't fly.  So I agree with you there,

12   Mr. Hecht.

13          MR. HECHT:  And we do -- thank you, your Honor.  And we

14   do intend to call Dr. Olivier live and, you know, right in line

15   with what we were discussing previously.

16          I will tell you that we do not dispute and Dr. Olivier

17   testified that he didn't do an analysis as to the amount or

18   substantiality of any alleged uses of IOS code.  And neither

19   did Dr. Nieh for that matter in terms of, you know, a

20   percentage or anything like that.

21          But what I can say is the one thing we dispute -- which

22   is very narrow, and I won't belabor this point -- it was just

23   the basis on which this should be excluded we do not agree

24   with, because Dr. Olivier did have conversations with Chris

25   Wade, as he testified, but he also testified that there may

1    have been others on the conversations.

2         THE COURT:  I read that in your papers, that it's

3    possible that there may have been other people on the

4    conversation informing Mr. Olivier of whatever information or

5    facts they might have done.

6         MR. HECHT:  Yeah.  And I thought that the testimony was

7    sufficient, which is why we didn't put it in a declaration.  I

8    was on those calls.

9         I can represent that there was an engineer that was on

10   those calls.  Apple hadn't asked various fact witnesses aside

11   from I think Olivier whether they had spoken to others.  So for

12   example, you know, some of the technical folks at Corellium

13   were not asked, Did they speak to experts.

14        But I'm not going to -- I think considering that we

15   agree that Dr. Olivier is not going to opine on the amount or

16   substantiality, I think that this -- that the motion either is

17   moot or, you know, we could just agree that, you know,

18   Dr. Olivier will not testify as to those topics.  But it's a

19   very narrow amount.

20        And when I say amount in substantiality, you know, he

21   doesn't know.  He doesn't know if it's a majority, a minority.

22   Just that analysis was not undertaken in my view by any expert,

23   including Dr. Olivier.

24        THE COURT:  Let me ask Mr. Hecht and Mr. Gross, is it

25   possible for you to agree to a stipulation as to what it is

1    specifically that you're both agreeing that Mr. Olivier will

2    not testify to?  I know you've explained it here that he won't

3    opine on the amount or the substantiality, the amount of IPSW

4    files that Corellium uses, the amount of IOS code and

5    substantiality of IOS today.  Am I phrasing it right or do I

6    need to phrase it better than that?

7            MR. GROSS:  Your Honor, this is Mr. Gross.

8            I would phrase it just a little differently.

9            THE COURT:  Mr. Gross.

10           MR. GROSS:  And here's why:  The amount in

11   substantiality, of course, pertains to particular facts about

12   how much code and how important is it?  And that's all well and

13   good, and I do think we agree that he won't be testifying about

14   that.

15           But my only hesitation about using that particular

16   language for the scope of an order resolving this motion is

17   that that's also a phrase that is used with respect to a

18   particular fair use factor in the law.  And the factual topic

19   is not that limited.

20           How much of the code they use, how they use it and to

21   what extent they use it also speaks to whether Corellium

22   infringes or not.

23           So with that much qualification that the order would

24   exclude testimony about how and to what extent Corellium uses

25   portions of the Apple IPSW files, I think we can stipulate to

1    that.  I would just not want to leave the impression that the

2    exclusion order is limited to a particular fair use factor.

3         MR. HECHT:  Your Honor, I think that is a different

4    inquiry.  And I'm not prepared to assent to that, because how

5    Corellium uses allegedly the IOS code, that is central to the

6    case.  That's the entire -- that's the entirety of the

7    technical analysis that Dr. Olivier would be opining on, you

8    know, how the Corellium product works.  And so I think the

9    "how" is way too broad.

10        And I think that the amount and substantiality is

11   extremely limited, as Mr. Gross said.  If they're trying to

12   take a rifle shot here, you know, asking how -- trying to

13   exclude how certain functionality -- how the product works is

14   just way too broad.

15        THE COURT:  So let me ask you, how would you phrase it,

16   Mr. Hecht?

17        MR. HECHT:  I think it was exactly what Mr. Gross said

18   initially, was that we don't disagree as to the amount and

19   substantiality, that Dr. Olivier would not testify as to those

20   topics.

21        But he would testify --

22        THE COURT:  When you say "amount and substantiality,"

23   you mean amount and substantiality of the IPSW files?

24        MR. HECHT:  Yes.  Any alleged infringement.  The amount

25   and substantiality of any of Corellium's use of, you know,

1   portions of IPSW files that are allegedly covered by copyright.

2        MR. GROSS:  Your Honor, if I may, I would just

3   appreciate the opportunity to respond to one of the things that

4   Mr. Hecht said.

5        THE COURT:  Sure.  Go ahead.

6        MR. GROSS:  Dr. Olivier was very clear in his reports

7   itemizing what he relied on.  In his deposition under oath,

8   when I asked him who else, if anyone, joined these calls you

9   had with Mr. Wade, he identified no one.

10       Now --

11       THE COURT:  Didn't he say "I don't know"?  Didn't he

12  say "I don't recall"?

13       MR. GROSS:  Well, that's right; after identifying only

14  Mr. Wade in his reports and at his deposition.  He has no

15  memory of talking to anyone else for this sort of technical

16  detail.

17       THE COURT:  All right.  But that doesn't mean no one

18  else was -- that doesn't mean he spoke to no one else, if he

19  has no memory.  Right?

20       MR. GROSS:  Well, what it means, according to his

21  reports and his testimony, is that he didn't rely on anyone

22  else.  He might not remember anyone else in the room, but he

23  disclosed the facts that he relied on and the sources of those

24  facts; and that source was exclusively Mr. Wade.

25       So what I want to make sure we're being clear about is

1    that Dr. Olivier had every opportunity in expert discovery to

2    explain what he relied on and whether it was a reliable source

3    of information to inform his opinion; and that was just

4    Mr. Wade, who in turn under oath, you know, explained the

5    limits of his actual knowledge.

6          So --

7          THE COURT:  So what you're saying -- let me just

8    clarify, Mr. Gross.  You're saying that all that Dr. Olivier or

9    Mr. Olivier did was rely on the words of Mr. Wade and nothing

10   else and therefore that means what?  His entire opinion is

11   excluded?  Or just his opinion on the amount of IPSW files or

12   how and to what extent Corellium uses portions of IPSW files?

13         MR. GROSS:  It's the latter.

14         There are other opinions he's offered that relied on

15   other materials.  He did look at code, for example.  But he

16   looked at it for only one issue that I'm aware of, which is

17   whether the code from Corellium that he examined showed that

18   Corellium supported early versions of Apple's operating system,

19   IOS.  And he looked at the code for that purpose, and we're not

20   challenging that part of his opinion.

21         So there are certainly other materials that he reviewed

22   in this case to support other opinions.

23         But on this issue, of how and to what extent they're

24   actually using the Apple code and the IPSW files, he relied on

25   Mr. Wade.  And it was -- it's a little late to disclose that he

```
 1    might have relied on some other unnamed engineers.  He had the
 2    opportunity to explain what he relied on in his reports and at
 3    his deposition.
 4            THE COURT:  So let me ask you what I asked Mr. Levine
 5    earlier, I believe it was.  Why is this a Daubert issue where
 6    the Court has to exclude it as opposed to letting the adversary
 7    process and the jury resolve the issue?
 8            MR. GROSS:  Well, I acknowledge it's a close call, your
 9    Honor, here.
10            But when an expert says, "I have one source of
11    information" and then you have the opportunity to depose and
12    have that source testify under oath and he says, "I don't have
13    that information," that puts us in a unique situation where we
14    know now from sworn testimony that the source of the
15    information on which the opinions was based is not a reliable
16    one.
17            THE COURT:  All right.  Thank you.
18            Mr. Hecht, do you want to respond to that?
19            MR. HECHT:  Yeah, your Honor.
20            Obviously, I disagree.  I mean, in the briefing I had
21    described it as a mischaracterization.  I think that's fair.
22    It's not the main calling or -- you know, in terms of the
23    intention of the parties.  But it's really reading the
24    transcript, understanding, you know, in the broader context
25    what was asked.
```

1          Also, the fact that the -- in the reports, I think the

2     footnote said "Telephone conference with Mr. Wade."  And so

3     having been there and, you know, representing to the Court that

4     there was another person on the line, you know, and also in the

5     context of reading, you know, the testimony, looking at the

6     report, I think that there was more than just, you know,

7     Mr. Wade who allegedly didn't know -- because if Mr. Wade

8     didn't know the answers to the questions, then obviously

9     Dr. Olivier couldn't have relied on them.  He wouldn't have

10    gotten the information.

11         So, you know, there's -- that's really where we are.

12         THE COURT:  So let's do this:  Let's pop over to

13    Dr. Nieh, because that's the next issue here, which is the

14    other side of this coin on the computer science experts.

15         Dr. Jason Nieh is Apple's computer science expert.  And

16    Corellium has filed a *Daubert* motion to preclude certain

17    testimony of Dr. Jason Nieh at Docket Entries 452 and 469.  And

18    Dr. Nieh has done three reports from what I can see in the

19    record:  a 3-3-2020 expert report at Docket Entry 469-2; a

20    4-13-2020 rebuttal expert report at Docket Entry 469-3; and a

21    May 1st, 2020, supplemental expert report at Docket Entry

22    469-4.

23         And in going through Dr. Nieh's report, I did note, for

24    example, in his March 3rd, 2020, report Section 5 is almost

25    exclusively talking about relevant legal principles, which I

```
 1    think is not accurate for a computer science expert to opine

 2    about.

 3         And I know that I read through Corellium's motion

 4    regarding what they seek to exclude.

 5         And so who's going to argue that?  Is that you,

 6    Mr. Hecht?

 7         MR. HECHT:  It is, your Honor.

 8         THE COURT:  All right.  So what is it you're seeking to

 9    exclude on Dr. Nieh?

10         MR. HECHT:  With Dr. Nieh, actually, everything,

11    because we think that -- and in the alternative, we also -- I

12    mean, given that Mr. Gross represented that the reports would

13    only be used, you know, as kind of -- for the limited purpose

14    of exhibits, I think this may not have been as serious.  But I

15    will represent that the supplemental report was problematic,

16    and I will get to that.

17         Dr. Nieh's analyses in this case are misguided, because

18    he confuses the issues.  This case involves copyright claims

19    and DMCA claims.  But Dr. Nieh is not focused on the

20    copyrighted material or the alleged anti-circumvention

21    technology that controls access to those [indiscernible] or the

22    corresponding [indiscernible].  Instead, he presents highly

23    technical, very macro views that are prejudicial because they

24    focus on irrelevant subject matter.

25         A jury listening to Dr. Nieh will assume that what he's
```

1    saying is true and that they should adopt the conclusions he

2    presents because they're extremely technical.

3           THE COURT:  Like what?  Give me an example.

4           MR. HECHT:  So, for example, let's say -- I think

5    actually a comparison might be helpful here.  If this case was

6    about -- I don't know if you're a Lord of the Rings fan -- but

7    if we were focused on, say, the third chapter of Lord of the

8    Rings, Return of the King, the last of the trilogy, and the

9    copyright holder did not assert copyrights on the first two

10   volumes, in which characters were developed, for example, then

11   what we're looking at here is Apple has only asserted, you

12   know, say, the last of the trilogy.  They haven't asserted the

13   entirety of all of their IOS copyrights.

14          And in fact, what's special about Apple's copyrights in

15   IOS starting with -- I believe it's 9.0 in this case or that --

16   this claim of protectable elements that came in the prior

17   works.

18          So that's why I kind of made that comparison of

19   characters that had popped up in the first two volumes.  But

20   here, Dr. Nieh inflates everything.  He's opined on the entire

21   trilogy and maybe even The Hobbit, because he has -- even

22   though Apple has not asserted all the works.

23          If he never sussed out the source code, which is the

24   big problem in his methodology, the creative and protectable

25   elements could be in the code prior to IOS 9.0, the first of

1    the registration.

2         The problem is the trier of fact will not understand

3    where to start and where to stop.  And this is where 403 and

4    your Honor's assessment of whether the probative value of his

5    testimony is substantially outweighed by the danger of unfair

6    prejudice from the confusion of issues.

7         This is not a question of law versus fact, as Apple

8    suggests.  It's a question of a completely unfocused set of

9    opinions.

10        And Dr. Nieh even testified he didn't even look at many

11   of these copyrights.  He certainly didn't understand what the

12   bounds of these copyright registrations are that are in issue

13   are.  And the report is not limited to the copyrights at issue.

14   And that's a huge problem.

15        THE COURT:  Let me ask you, Mr. Hecht, before I

16   forget --

17        MR. HECHT:  Yeah.

18        THE COURT:  -- you're not arguing that he's not

19   qualified to render opinions in the area of computer science,

20   are you?

21        MR. HECHT:  I am not.

22        The fact that he has never testified in a copyright

23   case is suggestive, because, you know, here -- yes, he has the

24   technical knowledge, but he really did not know what to do in

25   this case as far as looking at the elements of infringement and

1    then looking at the DMCA allegations and tying copyright

2    registrations or the rights related to them to alleged

3    anti-circumvention methodologies.

4          So, you know, Apple says Dr. Nieh opined and explained

5    that Corellium's alleged wholesale copying of the entirety of

6    IOS necessarily includes all of Apple's copyrighted code.  But

7    the approach "It must be in here somewhere" does not work.  And

8    that's not a reliable methodology.  And so that's why those

9    bounds are important.

10          In the Eleventh Circuit case *Allison versus McGhan*

11    *Medical*, the Court described the second prong of *Daubert*

12    regarding reliability in order to ensure that the proposed

13    expert testimony is relevant to the task at hand.  There must

14    be a fit, that case said, a connection to the facts of the

15    case.

16          Here, we submit that Dr. Nieh has gone down so many

17    different rabbit holes and has just such a broad view of what

18    is in the case that it's highly prejudicial and misleading and

19    irrelevant to the ultimate questions in this case.

20          And, you know, focusing also on the DMCA, Dr. Nieh

21    assumes that this package -- we'll call it the IPSW file, as

22    you're aware.  It's really a zip file that can be extracted,

23    just like a zip file where sometimes you double-click on a zip

24    file and it asks you for the password.

25          That didn't happen here.  Not in the copyrights at

1    issue, not in the IPSWs that the -- actually, I shouldn't say

2    not in the copyrights issue, because there actually was an IOS

3    version that did have an encryption to its package and

4    Corellium could not run it.  But that's a question of fact,

5    though.  You know, it's not totally relevant here.  But I will

6    say that Apple's desire to restrict IOS to the iPhone is not a

7    statutory right.

8            Dr. Nieh's methodology assumes that that is something

9    that is relevant to this inquiry.  And it's not.  That's why

10   Dr. Nieh's methodology is flawed, because it doesn't tie to the

11   technological protections to the copyright work itself.  It's

12   tied to a different set of technological protections that are

13   not covered by statute.  Right?

14           And that's also why, you know, he goes off the rails.

15   He talks about the bootloader, for example.  That is not

16   circumvented by Corellium.  Corellium loads a -- and this is

17   testimony from fact witnesses.  It loads the kernel directly

18   into memory.  And I think that's highly technical.

19           But that's the problem here.  It is so easy for

20   Dr. Nieh to say something.  The eyes of the jury will gloss

21   over and they'll say:  It sounds right because he's using all

22   these big words and this is, you know, really above my head.

23   And that's the problem.

24           He's tied even things like -- what I thought was

25   totally outrageous is the service license agreement.  So just

```
 1    so you kind of understand this, let's say the IPSW is a zip
 2    file.  You go into the zip file.  If you dig enough, somewhere
 3    in there there's a text file that's a service license
 4    agreement.
 5          At no point does a user who's downloading the IPSW file
 6    ever see that file.  At no point does the Corellium user ever
 7    see that file.  That file only pops up on an official Apple
 8    device.
 9          So here, Dr. Nieh says that that service license
10    agreement that's buried in the zip file somewhere is being
11    circumvented.
12          That just makes no sense.  Right?
13          THE COURT:  Doesn't he address that in reference to the
14    buddy program, that in the ordinary course presents users of
15    IOS with the Apple SLA and requires them to agree to it to use
16    IOS?  Isn't that the context that he's using that in?
17          MR. HECHT:  It is, but it's also irrelevant.  It's
18    completely irrelevant.
19          So the buddy program is something that is not at issue
20    in this case.  That has nothing to do with the circumvention.
21    He's actually argued that the SLA is a circumvention device or
22    circumvention methodology, something, that Corellium has
23    overcome.  That's just not right.
24          And so there's one case that I thought was on point.
25    This is a very unique -- as you know, a very unique set of
```

1    circumstances here, because this is very specific.  This is not

2    like the [indiscernible] *Star* case, for example, where you have

3    a clone computer.  This is a virtual device running IOS and --

4    you know, for purposes of security research.

5            But in the context --

6            THE COURT:  That's your view.  The other side has a

7    much different view than that.  Right?

8            MR. HECHT:  Yes.  And that's not entirely relevant.

9    I'm just kind of providing background.  That is not, you know,

10   relevant to why we're seeking to exclude Nieh.  But, you know,

11   in comparing to other -- I was just kind of making the

12   comparison because it is very hard to find a case on point.

13           But here --

14           THE COURT:  Well, I've looked, and it is -- I mean,

15   specifically on point, it is very difficult to find a case

16   that's specifically right on point.  But, you know, when you're

17   dealing with new technologies, that's not necessarily something

18   that I would be surprised about.

19           MR. HECHT:  No.  That's absolutely fair.

20           So there was a case that was involving actually

21   friction readings on a pool deck.  And it's the *Sorrels* case.

22   We cited it in our brief, I think, in our opening brief.  There

23   was an engineering expert.  An engineer had great credentials;

24   and the Court took issue with the reliability of his method,

25   where he tested the friction around the pool.  That was an

1    issue.  And that's kind of analogous to this case:  The scope

2    is an issue here.

3            The parallel is that, you know, testimony in this case,

4    if we're talking about the other case, testimony regarding,

5    say, a different deck, is wholly irrelevant.  That would be

6    excluded, right, on its face.

7            It's similar here.

8            THE COURT:  What's the different deck here?

9            MR. HECHT:  The different deck here is, instead of

10    looking at, for example, the code covered by, say, the first of

11    their registrations that's asserted, right, or any of their

12    registrations asserted, we're not looking at code.  There's no

13    geographic bound.  There's no bounds whatsoever.

14            Instead we're saying:  Okay.  Well, let's just look at

15    the whole ship, because there's something somewhere about

16    friction.

17            And then this way, you know, having an expert opine on

18    it is not relevant.  That's just not -- it's so overbroad that

19    it doesn't make sense.

20            And if you look at kind of what I'm saying about the

21    property rights at issue here, that's why it's very important

22    to focus on those rights and that's why Dr. Nieh has become so

23    far afield that his testimony just can't be introduced, because

24    it's so prejudicial.

25            And then also, on the subject of supplemental briefing,

1    you know, we definitely agree with Apple, and this is part of

2    the reason we withdrew some of our argument on this, because

3    there was a trail of emails that made it very clear that

4    because Corellium had produced certain discovery in April, that

5    there would be a supplemental briefing.

6          But what Dr. Nieh actually had submitted, which

7    unfortunately you have not seen the entirety of, was the

8    290-page report on March 1st -- sorry -- May 1st, just -- I

9    think it was a week and a half earlier when he was deposed.  He

10   didn't even know whether he was -- what the topics of his

11   report were going to be.  He didn't remember the last time he

12   was logged into the system for Corellium.  And so out of the

13   blue comes this huge report, which Apple describes as a

14   combined supplemental and supplemental rebuttal report.  Apple

15   says it contains no new opinions.

16         But the report is improper because it doesn't just

17   submit new evidence; it includes citations to testimonies from

18   Apple's witnesses who were deposed.  And nothing had stopped

19   Dr. Nieh from speaking with those same Apple employees prior to

20   this report.  And he could have included it in his, you know,

21   initial or rebuttal report.  This was just really another bite

22   at the apple.

23         And this is specifically prohibited in this district,

24   you know, under the *QBE* case, where a party submits, you know,

25   an untimely expert report and the opposing party is foreclosed

1     from conducting additional discovery.

2          THE COURT:  I thought you withdrew that objection.

3          MR. HECHT:  As to the untimeliness.

4          I think the bigger issue is --

5          THE COURT:  So why are we arguing it?

6          MR. HECHT:  Because the timeliness is a different issue

7     from the fact that this supplemental briefing was just

8     inappropriate, is all-encompassing.  It's just too -- too long

9     and it had too many references that were just not appropriate.

10    And so that's why it was fundamentally unfair to include all

11    that material.

12          To the extent there was just new material based on, you

13    know, produced documents or code, that's an entirely different

14    issue.  It was really difficult for us to parse that out.  But

15    I think we did mention to the Court that, you know, for

16    example, there were these references to an Apple employee that

17    were there and superfluous but, you know, have an impact

18    because we couldn't -- we didn't have a chance to rebut it or

19    to examine, you know, at deposition.

20          So those are the bigger issues.  I think the biggest is

21    really the scope of this expert.  It is really troubling and

22    problematic, I believe, to the jury.

23          THE COURT:  All right.  Thank you, Mr. Hecht.

24          Who's going to argue Dr. Nieh on behalf of Apple?

25          MR. GROSS:  Your Honor, I will again.  This is Gabe

1    Gross on behalf of Apple.

2              THE COURT:  All right, Mr. Gross.  Go ahead.

3              MR. GROSS:  Thank you.

4              What I'd like to start with is the last point that

5    Mr. Hecht raised about his problem with the supplemental

6    report.  And I will try to be brief here.

7              But number one, you're completely correct, your Honor,

8    that Corellium withdrew any arguments based on timeliness in

9    writing on the record before the Court.  That's Docket Entry

10   489.  It was the May 20th, 2020, submission.

11             And the reason Corellium filed the submission was

12   because their opening *Daubert* brief about Mr. Nieh contained

13   pages and pages attacking Apple for allegedly submitting some

14   untimely, improper supplemental report.  And it was replete

15   with factual misrepresentations.  It mischaracterized the

16   parties' agreement and it flatly got wrong the state of

17   discovery that led to the needs to the supplemental reports.

18             We pointed this out.  We met and conferred.  We showed

19   them the misrepresentations.  They withdrew this argument.  And

20   they did it before Apple opposed the motion, meaning Apple

21   didn't need to address those timeliness arguments.

22             So to hear Mr. Hecht say right now that they've

23   preserved this argument, when it's entirely wrong and they

24   withdrew it before the Court, is highly improper.  And just to

25   put a final nail in it, a quote from what Corellium told this

```
 1    Court was that it, quote, "withdraws those portions of its

 2    Daubert motions regarding Dr. Nieh and Dr. Siegel that raise

 3    objections based on timeliness."

 4         They've waived this argument.  If you would care to

 5    hear the details about the agreement between the parties and

 6    the negotiations that led to it and the facts that were the

 7    state of play of discovery at the time that led to the need for

 8    the supplemental report, my colleague Ms. Nightingale Dawson

 9    will be happy to address that.

10         THE COURT:  No.  I don't need it.  I don't need to get

11    into that.

12         MR. GROSS:  Okay.  Thank you.

13         Let me turn, then, to the substance of what I

14    understand Mr. Hecht's argument to be.  And I think he

15    addressed just about everything that he raised in his motion

16    and his arguments.  So I'll try to take each piece one at a

17    time.

18         We're sort of back to where we started with the theme

19    here about legal opinions when it comes to the issue of whether

20    Dr. Nieh properly understood and applied the scope of Apple's

21    copyright protection under the law here.

22         What Corellium is doing is actually challenging and

23    criticizing Dr. Nieh and trying to exclude all his opinions

24    because they're faulting him for having not formed a legal

25    conclusion about what is protected under law by the copyright
```

1   registrations versus what is not protected under law by those

2   copyright registrations.

3          That's not his job for all the reasons we've discussed

4   earlier, that experts shouldn't be opining on the law.

5          And the law is fairly clear on this -- the *Copy Life*

6   [phonetic] case we cited demonstrates it -- that the scope of

7   copyright protection is really a question of law.  At most,

8   it's a mixed question of law and fact.  But Dr. Nieh is not a

9   lawyer, not a copyright expert.  This is outside his realm of

10  expertise.  There's no reason he should or should be entitled

11  to provide legal conclusions.

12         But if we go to the facts, the facts that actually

13  underpin what Apple applied for and received copyright

14  protection on through its registrations, we see that Dr. Nieh

15  did address those facts, despite what Corellium has argued to

16  the Court in its papers and in the hearing today.

17         And he did this in each of his reports.  In his opening

18  report, for example, before Corellium had even divulged how its

19  product works and what its code is, when Apple and Dr. Nieh

20  didn't have the opportunity to look under the hood, so to

21  speak, Dr. Nieh looked at the release notes for every single

22  version of IOS that the company had by a copyright

23  registration.  And what release notes are are Apple's way of

24  telling its customers what is the new content in a particular

25  release of an operating system.

1           And he looked at that new content, at the features and

2    functionalities that they embody; and from his expertise and

3    his perspective as a computer scientist, he provided opinions

4    that there's lots of ways to write code that achieves these

5    goals.  What Apple did reflects creativity and originality, and

6    that of course is the fact underpinning what is protected by

7    copyright.

8           He didn't try to suggest or even analyze what had come

9    before.  He looked specifically at the new things that were

10   added with the versions of IOS that are the subject of the

11   copyright registration.

12          And then again, in his rebuttal report, after he had

13   the opportunity to see what Dr. Olivier thought formed the

14   basis for a noninfringement position, he for example pointed to

15   some parts of the code that he contended were not protectable

16   because they were open source code.

17          Dr. Nieh looked at that and said:  Okay.  Well, I see

18   what you're talking about, Dr. Olivier.  But look at all this

19   other original creative content that was added in these

20   versions of IOS.

21          And then in the supplemental report, when he had access

22   to even more of Corellium's technical information and could

23   identify with more specificity what Apple code Corellium was

24   copying or modifying, then Dr. Nieh got to the same level of

25   specificity with the Apple code and said:  Here is the new code

1      that was added and here's what's being copied.

2            So this idea that he didn't tie the code to the

3      copyright registration is factually wrong.  But the broader

4      point, that he should be expected to provide the jury or the

5      Court with a legal opinion about what is legally protected or

6      not is -- it shouldn't even be the subject of a *Daubert* motion.

7            So I'll move to the other points, but let me stop for a

8      moment in case your Honor has any questions on that point.

9            THE COURT:  No.  Go ahead.

10           MR. GROSS:  Okay.  Mr. Hecht addressed Dr. Nieh's

11     opinions on DMCA violations.

12           There are two claims here under the anti-trafficking

13     provisions of the law which generally make illegal the

14     marketing or selling of products that technologically

15     circumvent security measures that would either protect access

16     to a copyrighted work or protect the copyright owner's rights

17     in that work.

18           And Corellium's whole argument is:  Hey, the things

19     that Dr. Nieh points to, things like the secure boot chain and

20     the trust cache, really intricate, sophisticated technologies

21     that keep any ordinary user from doing what Corellium does, and

22     that means running IOS on a non-Apple device, their point is,

23     those aren't, quote-unquote, "effective security measures" as

24     the statute uses the word "effective."

25           They're making a statutory interpretation argument and

1    they're faulting Dr. Nieh for not agreeing with their statutory

2    interpretation.  It's another legal argument.  It's not grounds

3    to exclude an opinion under *Daubert*.

4         And so what Dr. Nieh actually did is point to these

5    particular security measures.  And if we're going to fight

6    about among the lawyers whether the statute covers these

7    security measures, that's fine.  That's the subject of summary

8    judgment-type arguments.  But it's not grounds to exclude

9    Dr. Nieh's technology.

10        And the real question here -- and --

11        THE COURT:  So --

12        MR. GROSS:  Please, your Honor.

13        THE COURT:  No.  Go ahead.

14        MR. GROSS:  The real question here that the Court does

15   need to grapple with, I suppose, as a legal matter is whether

16   the security measures that Corellium allegedly circumvents

17   would prevent intrusion by ordinary consumers, not by

18   hyper-sophisticated computer hackers, but by ordinary

19   consumers.

20        And I don't think it's really genuinely disputed in

21   this case that an ordinary user of an iPhone like you or me

22   would not be able to run and install IOS on anything other than

23   an authorized Apple device.  But Corellium makes that happen by

24   going around these security measures.

25        Now, this point actually relates --

1          THE COURT:  Why is that important?

2          MR. GROSS:  Well, if I understand Corellium's argument

3     here, the argument is that there are no security measures that

4     stop Corellium from doing what it's doing because anyone can

5     download an IPSW file for a particular version of IOS for free.

6     And because you can download it for free and Corellium figured

7     out a way to exploit it, there must not be any sufficient -- or

8     "effective," to use the word of the statute -- effective

9     security measures on it.

10          And that's just wrong because of the ordinary consumer

11     standard that courts have to apply.  An ordinary consumer, yes,

12     can download it for free.  But you can't access it.  You can't

13     use it.  You can't run it.  You can't put it on a non-Apple

14     device because of all the security measures, including the

15     buddy program you mentioned, among others, that prevent you

16     from doing that.

17          So Corellium's legal argument that the very fact that

18     the IPSW files are made available for free fails because the

19     fact that it's available does not mean it's accessible or that

20     any user can violate or exercise the rights of the copyright

21     holder, if you will.

22          Now, this does relate to the buddy program and the SLA

23     or software license agreement argument that Corellium has made.

24     And here, their attack again really sounds like a legal issue

25     to me.  Dr. Nieh explains this buddy program.  It's one of the

1   technological measures that protects Apple's copyrighted IOS.

2   And it's the program that would force any ordinary user to be

3   confronted with, presented with, a software license agreement

4   before he can access and actually use IOS.

5        And the user has to click "accept and agree" to that

6   agreement or you're shut out of it.  You can't do the things

7   that Corellium does.

8        Now, Corellium's argument is:  Hey, there's no

9   breach-of-contract claim in this case.  So to the extent

10  Dr. Nieh is talking about this contract, it's irrelevant, not

11  helpful to the jury.  You've got to exclude any opinion on it.

12       But as I think your Honor already pointed out, that's

13  not the point that Apple has made.  It's not the point that

14  Dr. Nieh makes.  He's pointed out the technological measure,

15  the buddy program, that presents the contract to a user and

16  forces one to assent to it in order to proceed with using IOS

17  that Corellium avoids.  And that in and of itself is a DMCA

18  violation.

19       Now --

20       THE COURT:  All right.  Anything else, Mr. Gross?

21       MR. GROSS:  Just briefly.

22       There was a catch-all argument in the motion that

23  struck me as, if the Court is not inclined to grant the *Daubert*

24  motion and exclude all of Dr. Nieh's testimony for the first

25  couple of grounds, then do it under Rule 403.

 1              I think that's just a nonstarter of an argument.

 2     Dr. Nieh is -- he is a scientist.  There's no dispute about his

 3     qualifications.  There's no dispute that the jury's going to be

 4     confronted with some pretty technical facts.  And they could

 5     use help from experts like him and maybe Dr. Olivier to

 6     understand them.

 7              There's just nothing unduly prejudicial about his

 8     opinions.  They're helpful to the jury.  They're bad for

 9     Corellium because they expose what it's been doing.  But that

10     doesn't make it unfairly prejudicial so much so that it would

11     outweigh the probative value of his opinions.

12              THE COURT:  All right.  Thank you.

13              So, Mr. Hecht, I take it one of your arguments is that

14     you believe that Dr. Nieh's testimony is going to lead the jury

15     to believe that other materials not identified in the complaint

16     as being subject to the copyright in this lawsuit are somehow

17     at issue.  Is that what your concern, in part?

18              MR. HECHT:  That is, your Honor, a big concern.

19              THE COURT:  Well, let me ask you this.  And let me just

20     ask you, why can't you at the time of trial request a limiting

21     instruction, something to the effect that Dr. Nieh's going to

22     be testifying about A, B and C, and for purposes of his

23     testimony to explain his opinions, he'll be testifying as to

24     these issues; however, the lawsuit involves only those

25     copyrights claimed?  Why does this have to be resolved on a

1  *Daubert* issue as opposed to asking for either a limiting

2  instruction or something of that nature?

3       MR. HECHT:   I think it comes back to confusing the

4  issues and the fact that if you have an expert that doesn't

5  know what to opine on in an intellectual property case or a

6  property case -- you know, if we had a tangible property case,

7  that has nothing to do with the law or the definition of, you

8  know, how a property right is defined.   It has to do with the

9  registration.   Or say in another type of intellectual property

10  case, a patent, there, you have claims.

11       Here in the copyright registrations you have an example

12  of the code, but also a disclaimer that all earlier code was

13  not included.   That's really important, because if you had an

14  expert that's testifying on, say, you know, whether there was a

15  problem in a house and he then focuses on an entire, you know,

16  building, for example, that's adjacent to the house, that's not

17  relevant.   Right?   Or, you know, an entire community of houses.

18  That's not relevant.

19       Apple screwed up here.   And Apple did not assert all of

20  its copyrights.   And I think they should be called to task,

21  because they chose to focus on copyrights -- I think it's

22  pretty clear that Apple didn't even look at which copyright

23  registrations they were bringing in this lawsuit because they

24  dropped the iTunes registrations.   That never even came up.

25  Corellium has nothing to do with iTunes.   Right?   And so I

1    think what they did was they threw a whole bunch of

2    registrations against the wall, saw what might work without

3    really developing this.  And that's exactly what Dr. Nieh has

4    done in his opinions.

5         Also, to be very clear, I think the DMCA issue is

6    really very tough.  That's why it was the subject of a lot of

7    briefing.

8         Corellium is not going around any security measures.

9    If you have a bank vault that is open and someone goes in and

10   there's no security around and someone goes in and, you know,

11   looks at kind of the inner workings of, you know, what's going

12   on, what's being held there, maybe they do or they don't take

13   anything out.  Maybe it's not even, you know, protected.  It's

14   not a bank.  It's just, you know, a house that's open and --

15   for everyone to see what's in there.  You know, an amusement

16   park like Disney with an open door for any people to come in.

17        That doesn't mean that there's some kind of

18   circumvention device because there is a lock on the door.

19   Right?

20        THE COURT:  Let me ask you this:  What if I walk into

21   the bank and the vault's there and it's locked, but I've got a

22   device that allows me to unlock it and walk in?  Isn't that

23   circumventing a security protection?

24        MR. HECHT:  That would be an example of

25   anti-circumvention.

1          Here, there is no tool that, you know, goes around.

2     It's literally opening up a file that has IOS contained and

3     running it.  Right?

4          So it is not a copyright violation to execute a

5     program.  It is not a DMCA violation to execute a program.

6     There is no -- that's the problem that Dr. Nieh has.  He has

7     no -- he has no evidence and he has not presented anything that

8     actually shows that Corellium circumvented anything or offers

9     any device that circumvents.

10          The first access here is the only relevant access.  And

11     the first access is opening up the IPSW file and then loading

12     it into memory, loading the important parts, the kernel, into

13     memory.  And that's the problem here.  There's just no analysis

14     of that.  I don't even think Dr. Nieh knows how that's done.

15     And that's a huge problem.

16          Everything he says --

17          THE COURT:  Isn't your argument or your quibble here

18     really that he just disagrees with your theory of what's

19     happening?  You're saying there is no security being bypassed.

20     They're saying there is.  I mean, isn't that really what we're

21     talking about here and just disagree with what Dr. Nieh is

22     opining on?

23          MR. HECHT:  So even if there was any kind of

24     circumvention, we still have the problem, as Mr. Gross said.

25     That anti -- the anti-trafficking and the anti-circumvention

1    needs to be tied to access to work or the copyright owner's,

2    you know, rights relating to that work.  That's the problem.

3    The problem is, once again, we don't know what it is.  And in

4    fact, Dr. Nieh testified he didn't compare the various version

5    of IOS.

6              So it is --

7              THE COURT:  But don't the various versions of IOS just

8    incorporate the prior one and add things?

9              MR. HECHT:  That's exactly right.  And that's why it's

10   starting with 9.0.  We don't know what was contained and

11   Dr. Nieh doesn't know what was contained in earlier versions.

12   Yes.  He looked at release notes.  Release notes are not a

13   copyright registration.  They don't protect anything.  They

14   talk about new features.  But who's to say that those features

15   weren't tethered to earlier code?  Right?  That's the problem.

16   We don't know.

17             THE COURT:  So let me ask you, Mr. Hecht, because I'm

18   going to need to break at noon to give my staff lunch and we'll

19   come back at 1:00.  So I want to finish up on the computer

20   science experts.  We've gone through Dr. Olivier, Dr. Nieh.  So

21   just finishing up here on Dr. Nieh, anything else that you want

22   to add, Mr. Hecht?

23             MR. HECHT:  That's all.  That's all we have, your

24   Honor.

25             THE COURT:  Great.

1          Mr. Gross, anything you wanted to very quickly respond

2     to?

3          MR. GROSS:  Thank you, your Honor.

4          Briefly, yes.  Mr. Hecht said that the scope of the

5     intellectual property, if I understood him correctly, is

6     something that has nothing to do with the law.

7          It has everything to do with the law.  The

8     interpretation of the bounds of the property, real or imaginary

9     or intellectual or otherwise, is a classic legal question.  In

10    patent cases, this is claim interpretation, *Markman*

11    proceedings, done by the Court as an issue of law.

12         If this were a property dispute where we are looking at

13    the local instrument that is a deed, the Court would interpret

14    that legal instrument as a matter of law.  Interpreting the

15    scope of the copyrights here is a matter of law.

16         Mr. Hecht made a number of forceful factual arguments

17    and I advise him to make them to the jury.  They don't undercut

18    Dr. Nieh's opinions or the reliability of them.

19         Second, he said it's not a direct violation of

20    copyright law or of the DMCA to execute a program.

21         It absolutely is if executing that program requires

22    making a copy of someone else's copyrighted program.  And it

23    absolutely is a violation of the DMCA if executing that program

24    circumvents a security measure.

25         It then violates the DMCA.  That's what we're arguing

1    and debating here and those are exactly the type of factual

2    disputes that need to go to the jury.

3         And finally, your Honor, I believe Mr. Hecht was

4    referring to the access controls that can't be circumvented

5    under one type of DMCA claim, one of Apple's DMCA claims, as

6    though that's the entire thing.  That's the whole DMCA claim.

7         But the access controls can be violated in a number of

8    ways.  Perhaps he's right that there's no violation when

9    somebody downloads a free IPSW file.  But to access it and run

10   it, you need to satisfy Apple's security measures.  They don't

11   satisfy them; they circumvent them.  They go around them

12   entirely and run the copyrighted program on non-authorized

13   software.

14        So I'll close with that, your Honor.  I think we're

15   ready to submit on the brief.

16        Oh, I'm sorry.  I did have one point I just wanted to

17   mention for the Court's sake, that there is ample law on the

18   idea of when the entirety of a copyrighted work is copied, it's

19   sufficient to establish the fact that there's been infringement

20   even if only parts of that work are protected by copyright.

21   That's the *Stenograph, LLC*, case, 144 F.3d 96, and there are --

22   that's from the DC Circuit.  There is cases from the Ninth

23   Circuit like *Triad Systems*, 64 F.3d 1330, and the *Fonar* case

24   from the Second Circuit, 105 F.3d 99.  We cite those at

25   Footnote 5 of our opposition brief.

1         I'm ready to conclude with those thoughts.

2         Thank you, your Honor.

3         THE COURT:  All right.  So here's what we're going to

4    do:  We've concluded the damage -- arguments on the damages

5    experts Appelrouth and Connelly.  We've concluded argument on

6    the computer science experts, Olivier and Nieh.

7         There's three experts left.  The way I sort of

8    categorize them would be the security research experts, which

9    would be Professor Stamos, who is Corellium's -- seems to be

10   Corellium's security research expert, and I know that Apple is

11   challenging that expert in part, not in total.  And then

12   there's Dr. Siegel, Apple's security research expert, which --

13   we'll discuss those two folks next.  And then the last expert

14   is Professor Asay, who's apparently Corellium's copyright law

15   and policy expert.

16        So what we'll do is we'll take a break.  Just before I

17   do, I just want to ask one question:  Regarding Dr. Asay,

18   that's Corellium's purported copyright law and policy expert,

19   does Apple have a copyright law and policy expert who is a law

20   professor or is Apple not seeking that?

21        MS. STEBBINS BINA:  We do not, your Honor.  Our

22   position is that Professor Asay's testimony is wholly

23   inappropriate; and rather than rebut it, we just move to

24   exclude it.

25        THE COURT:  All right.  So we'll address that after the

```
 1    break.
 2           So let's come back at 1:05 today.  1:05 p.m.  I want to
 3    give my staff enough time to have lunch and relax.  And we'll
 4    finish up with those three experts.  I will tell the parties I
 5    have another --
 6           What time is my next hearing, Ken?
 7           THE COURTROOM DEPUTY:  The next hearing is at 3:00, but
 8    you have a 2:00 p.m. magistrate meeting.
 9           THE COURT:  Oh, we have the 2:00 p.m. magistrate judge
10    meeting?
11           THE COURTROOM DEPUTY:  Yes.
12           THE COURT:  That's by phone.  I may have to miss that.
13    I'll call -- I'll contact them.  Thanks for reminding me of
14    that.
15           Okay.  So we'll start at 1:05 on these next motions and
16    we'll see how quickly we can get through them.  And even if I
17    miss the judges' conference call, I still have to terminate
18    soon enough in advance of the 3:00 so I can review a few more
19    materials about that.
20           So I'll see everybody back at 1:05.  All right?  Thank
21    you.
22           MS. STEBBINS BINA:  Thank you, your Honor.
23           MR. HECHT:  Thank you, your Honor.
24           (Pause in the audio recording.)
25           THE COURT:  All right.  So we're back on the Apple
```

1    case.  It looks like everybody is here.  The only one I don't

2    see is Mr. Hecht.

3             Is Mr. Hecht, are you there?

4             MR. HECHT:  I'm here, your Honor.

5             THE COURT:  Okay.  It looks like everybody else is

6    here.  Good.  All right.

7             So let's get started with the rest of these experts.

8    The next one I want to address is Dr. Michael Siegel, who is

9    Apple's security research expert, and then we'll go to

10   Professor Stamos.

11            So talking about Dr. Siegel, who is Apple's security

12   research -- who is a security research expert, we have a

13   motion, the Defendant Corellium's motion, *Daubert* motion, to

14   preclude certain testimony by Dr. Siegel at Docket Entry 444.

15   And I've reviewed that.

16            And it looks like Dr. Siegel has done four reports.

17   The first one is dated March 3rd, 2020, an expert report at

18   Docket Entry 525-1.  The next report is an expert rebuttal

19   report dated April 13, 2020, at Docket Entry 525-2.  The next

20   one is an expert supplemental report dated 4-20-2020 at Docket

21   Entry 504-3.  And then the last one is a second supplemental

22   report dated April 28th, 2020, at Docket Entry 525-3.

23            And I've read through the parties' papers, and it

24   appears that this goes to the good-faith issue that he and

25   Dr. -- Professor Stamos proposed to talk about.  So let me hear

1  from Corellium about what your problem is with Dr. Michael

2  Siegel.

3       Who's going to argue on behalf of Corellium?

4       MR. PRICE:  Your Honor, this is Maxim Price.  I'll be

5  arguing this motion.

6       THE COURT:  All right, Mr. Price.  Go ahead.

7       MR. PRICE:  So Corellium is seeking to exclude

8  Dr. Siegel's testimony specifically where he applies his own

9  personal definition of good faith to [indiscernible] research

10 to the documents and facts of this case and tells the jury how

11 to come out on whether it's good-faith or not, because it's

12 irrelevant -- it's confusing and it's not helpful to the jury.

13      So the testimony is irrelevant because Dr. Siegel is

14 adding requirements to a statutory term.  So if we're talking

15 about the statute or the regulations where that term is used,

16 his added definition means nothing.  It shouldn't -- the jury

17 shouldn't hear it.

18      THE COURT:  Isn't he talking about industry standards?

19      MR. PRICE:  If he were talking about industry

20 standards, that would -- you know, he would be using different

21 terminology.  So he wouldn't be using almost exactly the same

22 language as is found on the regulation, changing it a little

23 bit and adding a new term at the end requiring responsible

24 disclosure.

25      So this is going to be confusing to the jury.  They're

1        going to be sitting in potentially with three different

2        definitions in three different contexts for the same term and

3        having to suss out:  In this case, there is not responsible

4        disclosure; in this case, there may be responsible disclosure;

5        in this case, there definitely is required responsible

6        disclosure because this expert says that there is.

7               So it's the use of that term in the majority of the

8        regulatory definition that is at the heart of this problem.  So

9        it's not a term of art; it's a statutory term.  It's not

10       industry practice or custom.  It's used in 1201.  And it's used

11       in the regulatory exemptions that are tied to that statute.

12              But he goes ahead and he adds responsible disclosure as

13       a requirement that would -- you know, the requirement that

14       would be good for software manufacturers, not necessarily

15       researchers.  He is not acknowledging the debate in the

16       industry and he's not helping the jury suss out what it means

17       to do something socially beneficial in this industry.  He's

18       defining the statutory term.

19              He forms -- then he forms a conclusion and then applies

20       it to the facts for the jury saying:  Okay.  Look at this

21       tweet.  And look at this document and look at this contract.

22       And they mean that not only are their customers not necessarily

23       abiding but this definition, but it was not even Corellium's

24       intent to create a product whereby their customers would abide

25       by this extra requirement.

1          So it's confusing because he wants to take the jury

2     through these documents and the technology and the facts with

3     this extra definition with the added weight of, Hey, this

4     sounds like the statutory requirement.  And it's going to be a

5     knot created -- it's going to be impossible to untie with the

6     jury instruction or closing argument.

7          THE COURT:  Let me ask you a question:  Isn't good

8     faith or bad faith a question of fact?

9          MR. PRICE:  As a general matter, if he was just coming

10    in and saying:  Okay --

11         THE COURT:  Well, I was asking for a yes or no.

12         MR. PRICE:  Yes.  Yes.  Good faith by itself.  That's a

13    completely separate term.

14         And what they're conflating is the good faith of

15    creating a product designed for X with the good faith of

16    security researchers.  Right?  The -- what they do with the

17    knowledge that they gain from using the product, that good

18    faith is what is defined in the statute.  And the term that

19    he's using and the full definition of it, that refers to the

20    customers' use in the long run.  And they're conflating that

21    and saying:  Well, good faith is this big overall term and so

22    he's allowed to comment on it.

23         I would agree with you, your Honor, that if his report

24    came in and said:  Okay.  There's an industry custom or

25    practice wherein these -- this is what would be socially

1    beneficial and in general considered to be good faith.

2          But he's coming in and his entire -- both of his

3    reports, his report and his rebuttal report, are:  This is what

4    good-faith security research needs.  It requires responsible

5    disclosure.

6          That's not helping the jury figure out what good faith

7    is for the product, for the tool that they are using.  It's

8    just advocating on behalf of Apple from the witness stand for

9    each document or contract that he goes through that -- he takes

10   three steps:  First, the good-faith security research requires

11   responsible disclosure.  That step is confusing to the jury.

12         Then he says the individual customers are not or

13   probably not or likely not abiding by that definition.

14         And then the third step is, you know, the intent of

15   Corellium in creating their product was not for them to do that

16   good-faith security research.  And he's definitely not

17   qualified or any more qualified than a juror to say what

18   Corellium's intent was.

19         So having him --

20         THE COURT:  Well, I agree as far as the intent.  But

21   isn't -- it seems to me good faith or bad faith is a question

22   of fact.  Corellium has raised a good-faith defense in this

23   case and Apple has a right to rebut it.  And Corellium is

24   calling an expert regarding good faith.

25         Now, since Corellium is putting its good faith at issue

1    in this case, I mean, isn't Dr. Siegel's assessment or opinion

2    of the framework of the cybersecurity industry a proper subject

3    matter of testimony?  He seems to be highly qualified in the

4    cybersecurity industry.  As I recall, he is an MIT -- he's the

5    principal research scientist at MIT, director of cybersecurity,

6    Sloane -- it seems like he's highly qualified.  You're not

7    challenging his qualifications, are you?

8         MR. PRICE:  No, not at all.

9         But I think this brings me to the main -- the main

10   contract between the Siegel report and the Stamos report.  I

11   agree it would be a great help to the jury to understand -- to

12   give them the tool to understand the debate within the industry

13   about what's beneficial in security research and what isn't,

14   what kinds of things protect the end users, what kind of things

15   don't.  The jury's job then is to determine based on what their

16   understanding is from the facts and the documents whether it

17   was Corellium's intent to create such product.

18        What Stamos doesn't do that Dr. Siegel does do is go

19   through the documents and the facts in the case and tell the

20   jury how to come out on each one based on his understanding of

21   what -- of where the industry debate needs to come out.

22        And the other thing Stamos doesn't do is he doesn't

23   take a statutory term, at least in his opening report.  He does

24   in his rebuttal report because he's rebutting this new

25   definition.  But in his opening report he's not defining this

 1    particular statutory term.  He's talking about the industry

 2    standards and practices.  And I think we're not moving to

 3    exclude the entirety of Dr. Siegel's report.

 4            So there could be a debate from the witness stand

 5    from -- to those two experts about what the industry -- what's

 6    good for the industry, what's socially beneficial, what

 7    protects the end user.

 8            There's a lot in Dr. Siegel's report that is not tied

 9    to the definition of good-faith security research that goes to

10    this.  But when he starts confusing the jury with this

11    definition, they're going to have to go back to the

12    deliberation room with three different definitions for the same

13    term, one of which --

14            THE COURT:  What definition are you talking about that

15    he's providing that's so confusing?

16            MR. PRICE:  So in our opening motion of Docket 444 on

17    Page 4, you have the two definitions side by side.  There's the

18    regulatory definition for good-faith security research and

19    Dr. Siegel's definition.  So you see there's -- it's nearly

20    identical, but he's adding a couple of things that are not in

21    the regulatory definition.

22            And then there's also the definition of 1201(j).  And

23    now you have the issue of, Well, 1201(a)(1) refers to the acts

24    of the customers.  1201(a)(2) and (b) refer to the acts of

25    Corellium.  And the regulatory exemption refers to the acts of

1    the customers as well.

2         And then his overall good-faith security research

3    opinion with respect to, you know, fair use, which is nowhere

4    in his reports and nowhere in his deposition that they're

5    trying -- that they're saying in their response that he can

6    give is going to use the same definition.  And now it looks

7    like the regulatory definition.  It looks like the statutory

8    definition.

9         But it has this extra term that says, "And finally, and

10   most critically, the information derived from the research must

11   be properly and responsibly disclosed to the vendor of the

12   product that contains this software [indiscernible]

13   vulnerability."  It's just -- he agreed at his deposition that

14   that was the definition of his own creation based on his

15   experience working with the software vendor company.

16        It's what they would like to see in there.  But it's

17   not in there.

18        THE COURT:  All right.  I think I understand your

19   position.

20        Who's going to argue this on behalf of Apple?

21        MR. GROSS:  Your Honor, I will.  This is Gabe Gross.

22        Can I just first ask, please, if the Court can hear me

23   all right?  I have had a microphone problem in the recess.

24        THE COURT:  Yes.  I can hear you fine.

25        MR. GROSS:  Okay.  Good.  Well, I'll begin, then.

```
 1              I have to confess we're a little confused by this
 2     motion.  And part of it is because the regulatory exception --
 3     or exemption; excuse me -- that Corellium is saying is confused
 4     by Dr. Siegel's testimony isn't applicable.  They say in their
 5     motion it's an inapplicable regulatory exemption.  And when you
 6     look at the statute -- or excuse me; the regulation -- in the
 7     Code of Federal Regulations, it actually says that the
 8     exemption applies to DMCA claims under Section 1201(a)(1)(A).
 9     And the two DMCA claims that Apple brought aren't under (a)(1);
10     they're under (a)(2) --
11              THE COURT:  Okay.
12              MR. GROSS:  And (b).
13              THE COURT:  So are you saying that the regulation is
14     irrelevant?
15              MR. GROSS:  I don't think it applies at all.  It could
16     potentially be useful in showing that the Library of Congress
17     looked at industry standards to address how to issue
18     regulations on a particular issue.  But it's -- even though
19     Corellium invoked that defense here, it is by its own terms not
20     applicable to Apple's claims.
21              So --
22              THE COURT:  So will Dr. Siegel opine as to the
23     regulation?
24              MR. GROSS:  Pardon me?
25              THE COURT:  Will Dr. Siegel opine as to the regulation?
```

```
1            MR. GROSS:  No.  I don't think he intends to, other
2   than to make that ancillary point that there are industry
3   standards that inform the Library of Congress in its
4   rulemaking.  That may come up tangentially.
5            THE COURT:  So let me ask you about that, because I had
6   a problem with that.  I had read in there that you had stated,
7   Apple, that -- you said Apple -- Siegel referenced the DMCA
8   exemption once to demonstrate that the exemption resulted from
9   an industry-wide dialogue which consequently borrows from
10  industry standards.
11           And I'm just wondering:  What difference does it make
12  what the dialogue was or what the industry-wide dialogue was
13  that resulted in the DMCA or the exemption?  I mean, it says
14  what it says.  I'm trying to understand why it even matters,
15  what the policy behind it was or what the industry -- you know,
16  what the industry-wide dialogue was which resulted in it.
17           So I'm trying to understand, why is that opinion even
18  necessary?
19           MR. GROSS:  It's a fair question, your Honor.
20           And it's not a central opinion.  It's color or context,
21  if you will, to his opinions about how the industry views
22  good-faith security research.  And it's not an essential point,
23  but it is one that he made to show that even the Library of
24  Congress looks to folks in the industry to try to get their
25  hands around these topics.
```

```
1            Now, Dr. Siegel's informed, experienced-based
2     definition of good-faith security research, his opinions about
3     what that means to the industry, is different from the
4     regulatory language.  And it has to do with doing good-faith
5     security research in a way that, as Mr. Price mentioned,
6     involves disclosing any vulnerabilities one finds to the vendor
7     of the software so it can be fixed because there's an overall
8     beneficial use of security --
9            THE COURT:  Why is that important?  In other words, why
10    is that important?  Why do you need to call Dr. Siegel to say
11    that he believes that if a company's engaged in good-faith
12    security research, they would disclose any bugs or whatever to
13    the company?
14           MR. GROSS:  I think it's important for a number of
15    reasons, your Honor.  Corellium has put its own state of mind,
16    its good faith, at issue here by saying:  Our product, our
17    Corellium Apple product, isn't infringing because anything that
18    might be infringing should be excused by the fair use doctrine,
19    and good faith is an element of fair use.  That's one way they
20    put it at issue.
21           And Dr. Siegel can provide expert testimony to explain
22    that:  Look, if this really were a good-faith use of a security
23    research platform as the industry understands it, it would
24    involve reporting vulnerabilities back to the vendor.  And
25    Corellium doesn't do that; its users don't do that.  It doesn't
```

1    require them to do it.

2         Corellium and its people have been engaged in the

3    opposite sort of contact -- or sort of conduct, selling

4    exploits for personal gain rather than reporting them to Apple.

5    So it goes directly to good faith in the context of fair use.

6         But fair use is not the only context in which Corellium

7    has put this at issue.  Corellium in its first pleading, in its

8    answer, defended its conduct by saying it wasn't willful; its

9    actions were done in good faith, not willful, with innocent

10   intent.  It's relevant to that, too.

11        If they were truly acting in good faith and with

12   innocent intent, then Dr. Siegel's opinion about how someone

13   acting in the industry with such good faith would act is highly

14   relevant as to whether their allegations that they've acted

15   with good faith and innocence are true.

16        And they've also asserted a number of other defenses,

17   apart from the regulatory one we discussed, that have to do

18   with good faith.  There are other DMCA defenses.  Corellium

19   said in its answer, for example, that it developed its

20   technology to perform good-faith encryption research solely for

21   the purpose of security testing.

22        And Dr. Siegel from his industry perspective goes

23   through a number of the facts and points out that in his view,

24   that's just not the case.  There are a number of other purposes

25   to which the Corellium Apple product can be put and likely has

 1    been put that are not at all reflective of one's good faith and

 2    could even show bad faith in certain circumstances.

 3         THE COURT:  Is he primarily talking about what he

 4    believes are the industry standards?

 5         MR. GROSS:  Yes, he is.  And --

 6         THE COURT:  What about Corellium's argument that that's

 7    going to confuse the jury with the exemption under the DMCA?

 8         MR. GROSS:  Well, I disagree that it will, in part

 9    because as a matter of law that exemption doesn't apply.  It's

10    inapplicable.  There is not a DMCA claim under (a)(1) to which

11    the regulatory exemption would apply.  So it shouldn't be an

12    issue at trial.  They should not be instructed on the law on

13    that regulatory exemption.

14         And even if somehow it made its way into the case,

15    there's a difference between opinion testimony from a qualified

16    expert who can explain what industry norms are and industry

17    practices are and how the Judge will instruct the jury on the

18    law.  So even if that defense were to stay in, I don't think

19    the risk of confusion is as great as Corellium has suggested.

20         I think it's worth mentioning, too, that Corellium

21    itself has hired Mr. Stamos or engaged him to provide expert

22    testimony in a similar if not the same industry about

23    cybersecurity.  And they've asked him to, and he has, provided

24    opinions about what he thinks is good faith and useful to the

25    security research community and whether it will do harm or good

1    to that community if Corellium's conduct is estopped because

2    it's found to infringe or to violate the DMCA.

3          So it's a little bit in our view speaking out of both

4    sides of one mouth to on one hand say that Dr. Siegel can't

5    opine from his industry perspective on the issue of good-faith

6    security research while Mr. Stamos certainly is.

7          And this is an issue that's before the Court right now

8    on summary judgment.  Corellium has claimed in its motion that

9    its product is designed solely for security research, nothing

10   else, as though it can't be used for bad purposes or nefarious

11   purposes.  They've claimed that it's a highly socially

12   beneficial thing that its product provides and that it only

13   exists for that purpose, as though it can never be used to find

14   exploits that could be put to ill intent, like hacks that

15   compromise people's personal data.

16         So this is an issue before the Court as a matter of

17   law.  And again, it's sort of reminiscent of the theme we've

18   been talking about all day so far, which is that there are

19   issues of law that the Court can resolve on summary judgment,

20   that the Court can resolve in post-trial motions or through

21   jury instructions.  But it is not the stuff that *Daubert*

22   motions are made of or should get resolved on.

23         So now --

24         THE COURT:  So let me just ask you, what -- can you

25   just describe briefly and clarify what the opinions are that

1    Dr. Siegel plans to testify to at trial?  There seems to be

2    some confusion between the two sides.

3            MR. GROSS:  Sure.  Sure.  Let me try to shed some light

4    on that.

5            I think his reports are helpful because we don't

6    anticipate his opinion testimony at trial really deviating from

7    the scope of what he's already disclosed to Corellium here.

8            He talks about the background of the industry, what

9    cybersecurity is and the different types of players in it.

10   There's some colloquial terms called white hat and black hat

11   and gray hat researchers that he explains, white hat being sort

12   of the good type or good-faith type of research where

13   vulnerabilities are identified and they're disclosed promptly

14   and responsibly to the provider of the software so they can be

15   fixed without doing harm to anyone.

16           On the other end of the spectrum there's black hat

17   security researchers who have nefarious goals in mind who look

18   for vulnerabilities in software to exploit them, to compromise

19   personal data, to make money, to do other bad or possibly even

20   illegal things.

21           He talks about that industry, the different uses to

22   which security research can be put, and then in light of that

23   experience, he describes what to him and what he believes to

24   the industry is good-faith security research.

25           And he provides his definition that Mr. Price went

1    through before.  It's not entirely unlike the one in the

2    regulatory exemption.

3              But according to Dr. Siegel, one of the most important

4    aspects of true good-faith security research is that it

5    involves this responsible disclosure to the maker of the

6    software.  So he'll go through that industry expertise.

7              And then he takes a look at Corellium's business.  And

8    he looks at who they sell their product to, who they provide it

9    to on a free basis, like trial runs of the software, and

10   whether these are known good-faith actors or malicious actors,

11   whether there are any restrictions that Corellium imposes on

12   its customers to make sure as it claims that it's used solely

13   for good faith.

14             And after applying his industry perspective to these

15   facts, he reaches the conclusion that this is not a product

16   that's intended or used or sold or marketed solely for

17   good-faith security research.  It just isn't.  There are no

18   restrictions that would ensure that's the case.

19             And explaining that, I think, will help the jury make

20   factual decisions about whether or not Corellium's allegations

21   are true that it's acted in good faith and that it's entitled

22   to a fair use defense and whether its infringement was willful.

23             THE COURT:  Does -- let me ask you, why if at all does

24   Dr. Siegel need to testify about the DMCA and why the DMCA is

25   instituted?  I'm -- I don't understand why that's necessary and

```
 1     whether he intends to testify about that.
 2            MR. GROSS:  We do not intend to have Dr. Siegel provide
 3     legal conclusions or -- about why the DMCA is there or opine on
 4     Congress's wisdom, necessarily, in enacting it or how it was
 5     enacted.  What we do expect him to testify about is how the
 6     industry views good-faith security research.
 7            THE COURT:  He's more of an industry expert.  Would
 8     that be correct?
 9            MR. GROSS:  That's exactly right, right, your Honor.
10            THE COURT:  I'm looking at his report, Docket Entry
11     525-1.  On Page 8, he talks about in Paragraph 16 he'll provide
12     an overview of the security research industry and opine on what
13     constituted good-faith security research, referencing industry
14     examples and regulations.
15            Now, what about the regulations?  I think opposing
16     counsel said that's going to be confusing.  Do you intend to
17     have him discuss regulations or just the industry examples?
18            MR. GROSS:  Industry examples, your Honor.  Industry
19     standards, what's good faith, what's not.
20            THE COURT:  Not the regulations?
21            MR. GROSS:  No.  We didn't mean to imply he'd be
22     speaking to the law or come to legal conclusions.  And that's
23     not his goal, nor is he qualified to do that.
24            THE COURT:  And then in Paragraph 17, it says, "Provide
25     a high-level overview of Corellium's business and in particular
```

1    the Corellium Apple product with attention to agreements with

2    its customers and any restrictions on use put in place and

3    opine on whether Corellium is ensuring that the Corellium Apple

4    product is used specifically for good-faith security research."

5              He intends to opine on that?

6              MR. GROSS:  100 percent, your Honor.  And I think that

7    goes to Apple's right to test the allegations that Corellium

8    has made through this case that it's only acting in good faith

9    and for good-faith security purposes, which Dr. Siegel came to

10   the conclusion it is not the case.

11             THE COURT:  Now, in Section 2, Paragraph 22, A through

12   D, I think it is -- yes -- he talks about a summary of his

13   opinions.  Are those opinions that he intends to give in the

14   case?

15             MR. GROSS:  Your Honor, I'm sorry.  Give me one moment,

16   please, to find it.

17             THE COURT:  Sure.  It's Section 2, Paragraph 22.

18             MR. GROSS:  Yes, your Honor.  For example, in 22A, he

19   defines what the industry views good-faith security research to

20   be.  That's something we do expect him to explain to the jury

21   so the jury can decide for itself whether Corellium has engaged

22   in the good conduct that it claims to be or whether its product

23   could be used for other purposes.

24             THE COURT:  Anything else you wanted to add, counsel?

25             MR. GROSS:  Your Honor, just one point I'll close with:

1    We see, you know, continuing with the theme we discussed today,

2    an argument by Corellium here that they're actually faulting

3    him for not using statutory language in his opinions.  They're

4    faulting him for not providing an opinion on the legal language

5    and using that legal language in his testimony that we

6    contemplate being presented to the jury.  And it's got the law

7    entirely backwards.

8         And there's a particular case from this court that I

9    think is useful.  It's the *Cordoves* case.  The citation is 104

10   F. Supp. 3d 1350.  It's around Page 1365 where I think the

11   Court can take some helpful guidance.  It was an ADA disability

12   discrimination case; and the issue there was whether an expert,

13   an ADA consultant, was offering opinion testimony that was

14   admissible.  And the Court pointed out there that that expert

15   in his report was quoting and summarizing relevant statutory

16   provisions and regulations and held that that's not helpful to

17   the jury because it's just impermissible testimony about legal

18   standards.

19        But that's exactly what it seems Corellium would have

20   wanted Dr. Siegel to do.  If you're going to opine about good

21   faith, you must use the regulatory language, is what I

22   understand Corellium's argument to be.  And it's just got the

23   law backwards.

24        So I wanted to leave the Court that guidance from the

25   *Cordoves* case.  And with that, I'll stop for now.

```
 1          THE COURT:  I mean, I think that if an expert is being

 2    called on industry standards, he should confine himself to

 3    industry standards and not get into statutes.  The statutes

 4    again are what the Court instructs on.  And if any party is

 5    concerned that there's going to be some confusion to the jury,

 6    they can always request a limiting instruction from the Court

 7    during trial.  Those are given routinely during trial.

 8          But let me go back to Mr. Price and hear what you have

 9    to say in response.

10          MR. PRICE:  So I'll take the last point first.

11          It's -- we're not asking -- we're not asking Mr. --

12    Dr. Siegel to use the statutory language.  Quite the opposite.

13    What we're saying is that by using that statutory term,

14    "good-faith security research," as one whole thing in quotes,

15    in his report, what he's done is he's disclosed his opinion

16    that that should mean in all contexts something that includes

17    responsible disclosure.

18          And I'll illustrate how that will become confusing --

19          THE COURT:  Well, let me just stop you for a second,

20    Mr. Price.

21          I mean, we all agree his report's not coming into

22    evidence.

23          MR. PRICE:  But his report is where we get the metes

24    and bounds of what he's allowed to testify to.

25          THE COURT:  Right.  But the jury's not going to
```

1    necessarily hear that.  The jury's going to hear him talking

2    about the industry standards and what he believes the industry

3    standards are based on his experience and research.

4         I don't see how that gets into in any way harming the

5    jury when they get a jury instruction telling them what good

6    faith may or may not be.  I mean, I'm not following your

7    argument.

8         MR. PRICE:  Certainly.  Because they will have heard

9    his definition, which sounds awfully like the definition

10   they're going to get from your Honor.

11        THE COURT:  It's not really a definition.  His opinion

12   is as to what the industry standards talk about.  That's

13   different than a definition in the statute, isn't it?

14        MR. PRICE:  But there is no industry standard that

15   talks about good-faith security research.  That's something

16   that's entirely his creation.

17        If we were talking about something that's socially

18   beneficial, that would be fine.  If we're talking about this

19   statutorily defined term, they're going to have that particular

20   defined term.  The only other place they're going to see it is

21   when we talk about the regulatory exemption and we talk about

22   1201(j)(11) -- sorry -- 1201(j).

23        And then they're going to say, Oh, I remember hearing

24   that there was this disclosure requirement and they're going to

25   have these three different definitions to go by.

1          So if he wants to talk about industry standards, we

2    have no problem with that.  What we have a problem with is

3    using this term and applying this term to the facts invading

4    the province of the jury to say:  Okay.  This fact means X and

5    this fact means Y, based on this definition that I came up

6    with.

7          THE COURT:  Well, isn't Mr. Stamos -- isn't Professor

8    Stamos -- aren't you trying to call him to testify that

9    Corellium has engaged in fair use under the Copyright Act?

10   Isn't that what you're trying to call him for?

11         MR. PRICE:  But his opinion -- he never goes -- he

12   doesn't know about the technology.  He never looks at the

13   source code.  He never looks at the internal documents.  What

14   he's saying --

15         THE COURT:  So what does he look at?

16         MR. PRICE:  He looks at -- okay.  There is a tool that

17   allows people to perform research.  And his opinion is that the

18   ability to do this research in the United States is more

19   beneficial than not having the ability in the United States

20   because people in other countries will have this ability.

21   They're not going to have these laws stopping them from doing

22   it.  They're going to create their own virtualization.

23         So it will be overall more socially beneficial if

24   everyone has this tool than it would be if it were not allowed

25   in the United States.

1        That's a very, very different frame of argument than

2   going through the facts and the documents and the contracts and

3   tweets in this case and providing the jury with how they should

4   come out on each based on his definition.

5        THE COURT:  Well, in Professor Stamos, he was provided

6   by your side with a copyright case and apparently intends to

7   testify regarding his conclusions that Corellium has engaged in

8   fair use under the Copyright Act and does not violate the DMCA.

9        It seems like he's -- you're trying to get him to

10  testify to a lot more than what you're saying.  And isn't

11  really -- isn't Professor Stamos and Dr. Siegel two sides of

12  the same coin?  I mean, aren't they both discussing the

13  computer security research and fair use?  Isn't that really

14  what's going on here?

15       MR. PRICE:  So first of all, well, Dr. Stamos did

16  discuss fair use in his report -- sorry.  Mr. Stamos.

17  Dr. Siegel did not.  So he's -- he has this overall concept.

18  We have no idea how he's applying it to fair use, only how he's

19  applying it to this definition, which looks an awful lot like

20  the regulatory definition.

21       THE COURT:  Isn't good faith an element of fair use?

22       MR. PRICE:  In order for us to get discovery on it, we

23  need to know how he's applying it.

24       So Mr. Stamos has the law that we gave him, and now

25  he's applying his understanding of the industry to that law.

1    Dr. Siegel never does that in his report.  He only talks

2    about --

3            THE COURT:  I know.  But I don't want an expert to

4    testify about what the law is.  I mean, that's what I'm having

5    trouble with.  We've been talking about this for hours today.

6            Where does a nonlawyer like Professor Stamos get off

7    talking -- reading a case and talking about what the law says?

8    I mean, that is absolutely invading the jurisdiction of the

9    Court to provide jury instructions.

10           MR. PRICE:  That's exactly what Dr. Siegel is trying to

11   do here.  And I believe, you know -- I believe Stamos -- maybe

12   Mr. McDonough -- he's the one that's going to be arguing

13   Dr. Stamos.  I don't want to speak for him.

14           But I think there's a really big difference, because

15   we -- we're not necessarily saying that he's going to testify,

16   that this is what the law is and how you should apply it.

17   We're saying:  This is how he understands it, which is normal.

18   We've said before today that an expert is permitted to say what

19   is his understanding of the law as provided to him by counsel.

20           THE COURT:  But where do you get that from?  Where do

21   you have a case that says that?  I don't think anything could

22   be more confusing than an expert getting on the stand and

23   saying, I understand the Copyright Act or the DMCA to say this,

24   when it's at odds with what the Judge is instructing the jury.

25           I mean, I disagree with you.  I think the experts can

1    talk about facts; they can talk about facts that are relevant

2    to good faith; they can talk about their opinions based on

3    facts.  But you can't have an expert who's not a lawyer and

4    who's in the computer research area or security research area

5    opine on case law and what case law tells him he's supposed to

6    be doing.  That's for the Judge to do.  So I mean, I disagree

7    with you there.

8                MR. PRICE:  Absolutely I agree.  You're right about

9    that.

10               THE COURT:  All right.  So as far as --

11               MR. PRICE:  The --

12               THE COURT:  But as far as Dr. Siegel getting -- just

13   getting back to him, I've been told by opposing counsel that

14   they're not getting into the regulation.  They're not getting

15   into regulations.  They're basically going to have him testify

16   about industry standards.

17               You're certainly able to argue to the Court or point

18   out that perhaps his belief on what the industry standards are

19   may or may not be covered by an applicable statute when you're

20   doing argument or whatever.

21               But I don't understand why an industry standards expert

22   wouldn't be appropriate in a case like this where, really, I

23   don't think the average civilian would understand what the

24   industry standards are when you're talking about security

25   research and black hats and white hats and all the other things

1   that go into it.

2         I mean, I'll let you respond to that.  But it seems to

3   me that, you know, in the area of security research, if you're

4   talking about industry standards, it seems to me like that's an

5   appropriate area for an expert to get involved in, especially

6   one who seems to be highly qualified from MIT.

7         MR. PRICE:  Absolutely, your Honor.  We have not moved

8   here to exclude his opinions about what black hat is, what gray

9   hat is, the background in the industry.  That's not encompassed

10  in this motion.

11        What this motion is about is specifically the term

12  "good-faith security research," the definition of it and the

13  application of that definition to the facts and documents in

14  this case.  All of that other stuff is not part of this motion.

15        And just to illustrate how the regulatory exemption is

16  going to come in, because we can look at Apple's amended

17  complaint, which is Docket 53.  Paragraphs 40 and 41 really

18  spell out how this will come in and how the jury's going to see

19  it.

20        So in Paragraph 40, you have Apple alleging that

21  Corellium has admitted not only that its product is designed to

22  circumvent technological protection measures Apple puts in

23  place to prevent access to and infringe its copyright works in

24  IOS, but it has aided and abetted the creation of trafficking

25  of other [indiscernible] designed to circumvent those same

1    technological measures.

2          So Corellium raised the regulatory defense to counter

3    this aiding-and-abetting allegation.  Right?  And so we're

4    going to have this discussion if they're intending to bring

5    this evidence of aiding and abetting.

6          And even without the regulatory language, you still

7    have 1201(j), which has its own definition of good-faith

8    security research.  And it also doesn't include disclosure.

9    And so in Paragraph 41, Apple says, "Corellium contends in its

10   answer that Corellium and its founders do business with those

11   working in software security to protect end users."

12         So that is the language we're using.  We're saying it's

13   for the protection of end users or we're saying that -- so it's

14   socially beneficial.

15         "On information and belief," Apple says, "Corellium

16   actually makes no effort whatsoever to confine use of its

17   product to good-faith research and testing."

18         So now they've changed the onus.  They're switching --

19   it's a sneaky switch that the jury is not going to be able to

20   follow that says that we're saying it's socially beneficial,

21   but Apple is changing the focus to "good-faith security

22   research," in quotes.

23         So they're not going to be able to separate

24   [indiscernible] wants to discuss what's socially beneficial and

25   not.  That's very, very different from discussing what's

 1    good-faith security research and not in this context, because

 2    we have the statutory language and the regulatory language.

 3            THE COURT:  All right.  You know, in Corellium's

 4    papers, I believe that Corellium was asserting that Professor

 5    Stamos must be prepared to testify as to his understanding of

 6    the intent of the DMCA.  Is that Corellium's position?

 7            MR. PRICE:  I will let Mr. McDonough handle that.

 8            THE COURT:  Oh, okay.  All right.

 9            So let me just go, then, to finish up on Siegel, and go

10    back if there's anything briefly, Mr. Gross, you need to

11    respond to.

12            MR. GROSS:  Yes.  Thank you, your Honor.  Very briefly.

13            I think the crux of Corellium's argument here was

14    summed up when Mr. Price said that there is no industry

15    standard in Corellium's view about what good-faith security

16    research is.  And, of course, Dr. Siegel disagrees.  That again

17    is the stuff of cross-examination; it's not the stuff of

18    exclusion under *Daubert*.

19            And, of course, this idea that Dr. Siegel was required

20    to describe his opinions in the legal context of the fair use

21    doctrine rather than focusing on the facts that pertain to good

22    faith, which is one of the considerations that courts and

23    juries consider in the fair use defense, is I think just off

24    the mark.  He wasn't required and shouldn't be opining on legal

25    doctrines.  He opined on the facts here.  And that's the

1   industry standards about what constitutes good-faith security

2   research testing.

3          Mr. Price mentioned some other statutory exemptions

4   that he thinks relate to this concept of the industry norms for

5   good-faith security research.  And he mentioned -- I think it

6   was 1201(j).  It doesn't use the term "good-faith security

7   research."  That's about something called security testing.

8   It's a different topic.  And I think that argument misses the

9   mark, too.

10          So I think, your Honor, that you've got the issue clear

11   in your own mind, judging by your questions, about experts

12   being allowed to and expected to testify on the industry norms.

13          And with that, we're ready to submit.

14          MR. PRICE:  Just one second.

15          THE COURT:  Mr. Price, go ahead.

16          MR. PRICE:  1201(j) definitely uses it.  1201(j)

17   definitely uses the term "good faith."  And I can find it for

18   you.

19          THE COURT:  But good faith what?

20          MR. PRICE:  In definition -- so the definition of

21   (j)(1):  "For the purposes of this subsection, the term

22   'security testing' means" -- I'll skip -- but it says "the

23   purpose of good-faith testing."

24          THE COURT:  Okay.  But it's dealing with testing.

25          MR. PRICE:  Then it goes on to define what that means

1    in Subparagraph 3.

2         MR. GROSS:  I think we're in agreement on that point,

3    your Honor.

4         THE COURT:  Listen, in any event, the Court's going to

5    instruct the jury on what the appropriate statutes are at the

6    appropriate time.  So, you know, if it's applicable, it'll be

7    instructed on it.  If it's not applicable, it won't be

8    instructed on it.

9         And I know you're concerned, Mr. Price, about the jury.

10   But my experience with tons of jurors over the years, probably

11   being in front of hundreds, if not thousands of them, is that

12   they usually get it right and they follow the Court's

13   instructions.  So I understand your position.

14        Let's go on -- let's move on to --

15        MR. PRICE:  Thank you, your Honor.

16        THE COURT:  Thank you.

17        Let's move on to Alexander Stamos.  Mr. Stamos or

18   Professor Stamos is Corellium's -- I'm sorry -- Professor

19   Stamos is Corellium's security research expert.  And he did one

20   report February 28th, 2020, an expert report and declaration at

21   Docket Entry 451-6.

22        And the Stamos briefing is interesting because I think

23   it may have narrowed down the issues.  But let me just find the

24   motion regarding Mr. Stamos.  It is Apple's motion to exclude

25   legal opinions and corresponding testimony of Corellium's

1    expert Clark Asay -- we'll talk about him in a moment -- and

2    Alexander Stamos, Docket Entry 451.

3           Now, in going through the issue on Stamos, it seems

4    that after going back and forth, Apple agrees as to certain

5    issues that can come in.  And Apple states -- and I want to

6    hear from both sides on this -- the parties agree on the

7    following issues:  One, Stamos is qualified; two, that the

8    portions of Stamos's opinions that focus on his stated area of

9    expertise, security research, are the proper subject of expert

10   testimony; three, that Stamos can permissibly respond to Apple

11   expert Dr. Siegel's industry analysis of what constitutes

12   good-faith security research; and, four, that a number of

13   Stamos's assertions constitute impermissible legal conclusions.

14          And then when you go further into the weeds, it appears

15   that Apple is objecting to -- it looks like six opinions of

16   Stamos.

17          And the first one is where he talks about the Supreme

18   Court explaining in *Campbell*.

19          The second one is how he fails to see how Apple can

20   make this claim that Corellium violates the DMCA based on his

21   understanding of the DMCA.

22          The third one is his opinion and understanding that

23   such an effect was never the intent behind the DMCA.

24          The fourth:  that the Corellium Apple product does not

25   fit the criteria set in Section 1201 with some subparagraphs.

1          No. 5 is a security researcher reading the DMCA

2    provisions at issue and understanding their applicability, "I

3    see no violations."

4          And six, finally I'm aware of 17 USC 1201(c)(1) stating

5    that nothing in this section shall affect the rights, remedies,

6    limitations or defenses to copyright infringement.

7          So those seem to be the six areas that Apple is

8    objecting to.  There seem to be areas that the parties may not

9    be in agreement on.  So who's going to argue Apple's position

10   as to Professor Stamos?

11         MS. STEBBINS BINA:  That's me, your Honor, Ms. Bina.

12         THE COURT:  All right.  So, Ms. Bina, if you could go

13   ahead as to Stamos.  What's at issue and what's agreed upon in

14   your view?  And then I'll hear from Corellium if they agree or

15   not.

16         MS. STEBBINS BINA:  So, your Honor, I think in terms of

17   the motions, you summarized it correctly.  We're not objecting

18   to him as a witness, as an expert in the area of security

19   research, as a counterpoint to Dr. Siegel.

20         Where we do have concerns is his opining on the law and

21   interpreting the law for the jury.

22         In opposition, Corellium withdrew a number of the

23   offensive statements, including things like "It is my firm

24   opinion that the Corellium product represents fair use," but

25   did not in our view withdraw all of the problematic statements

1    which your Honor has summarized above.

2           Of course, we would extend our opinion to things that

3    sound like this.  In other words, if he were at trial, to opine

4    on, you know, "In my opinion, Apple -- you know, Corellium

5    doesn't violate the DMCA" or "In my opinion, this is clearly

6    within the fair use doctrine," anything where he's purporting

7    to interpret the law in our view is problematic.

8           I do want to raise one additional issue that we've only

9    just become aware of, that Mr. Stamos is tweeting about this

10   case.  For instance, on Wednesday, he tweeted, "If Apple wins

11   this battle, which includes their lawsuit against

12   virtualization platforms, then we can kiss impactful public

13   security research in the US good-bye.  Only private bounty

14   [indiscernible] in lawsuit prove foreign adversaries will be

15   able to do IOS security research."

16          I am concerned about jury prejudice and problems in

17   that sense, if a retained expert is publicly tweeting about the

18   case.  So that's a sort of separate issue that's only just

19   arisen.

20          THE COURT:  Well, on that issue, I would say two

21   things:  Number one is, if you believe that there's a

22   violation, file a motion.

23          And number two, it sounds like he's giving you

24   impeachment material to show alleged bias if it's true.

25          MS. STEBBINS BINA:  Thank you, your Honor.

1          But yes.  In terms of the legal opinions, we're in

2    complete agreement.  We want to strike him opining on the law.

3    We're not looking to strike him altogether.

4          THE COURT:  All right.  So let's hear from Corellium.

5    And who's going to argue this Professor Stamos on behalf of

6    Corellium?

7          MR. McDONOUGH:  That would be me, your Honor, Conor

8    McDonough.

9          THE COURT:  I'm sorry.  I couldn't hear you.

10         MR. McDONOUGH:  Conor McDonough.

11         THE COURT:  All right, Mr. McDonough.  So what about

12   this?  It looks like you're in agreement on some issues and not

13   in agreement on others.  Are you trying to get Professor Stamos

14   to talk about his interpretation of the DMCA and Section 1201

15   and how he sees no violation of the statute?  I mean, aren't

16   those things that the Judge and the jury decide, not Professor

17   Stamos?

18         MR. McDONOUGH:  They are, your Honor.  And we don't

19   intend to have Professor Stamos opine that, for example,

20   product X falls within fair use or there is some legal

21   conclusion about the nature of the DMCA violation.

22         I think your Honor made an analogy earlier to the

23   testimony one might offer in criminal case:  We have the

24   fingerprints.  I have the murder weapon.  I have various facts

25   and circumstances that sit in a certain context.  The jury is

1    then given the opportunity to interpret that evidence as

2    needed.

3         We expect Professor Stamos to be opining on issues that

4    relate to fair use, for example, and relate to DMCA violations.

5    But his opinion testimony is expected to be in the form of

6    things like, I understand the product operates and does in

7    such-and-such a way.  I understand that the product has

8    such-and-such characteristics.  It is used in these contexts.

9    It is used for these purposes.

10        I think the bullet list in Apple's reply of offensive

11   statements is probably a combination of statements that are

12   just somewhat inartful expressions of what Mr. -- what

13   Professor Stamos understands the law to be, which I think, as

14   you and Ms. Stebbins Bina commented earlier, is one way to

15   provide the framework of an expert's testimony in their report.

16   But as is true for most of the other experts here as far as I

17   know, Corellium doesn't intend to submit Professor Stamos's

18   report into evidence.  He'll be testifying live and subject to

19   cross-examination.

20        THE COURT:  So if he stays away -- I mean, for example,

21   on those six issues that Apple raises in their reply, I have to

22   say that it seems to me that those six issues should not come

23   in.

24        So I'm just trying to understand:  Does Corellium think

25   any of those six points need to come in?  I mean, for example,

1     the first one is the Supreme Court explained in *Campbell* to the

2     extent of permissible copying varies with the purpose and

3     character of the use.  First of all, you know, he shouldn't be

4     opining on what the Supreme Court said in *Campbell*.

5          Then he goes on with Corellium:  The purpose and

6     character of the use of security research [indiscernible]

7     design and testing.  Full access to IOS is needed to do those

8     things, which weighs in favor of fair use.

9          I mean, how far are you trying to go?  I mean, he

10    certainly can address industry standards and he can address

11    facts which may or may not relate to fair use.  But how far do

12    you plan on trying to go with Professor Stamos?

13         MR. McDONOUGH:  Well, I think this point is a really

14    good example of exactly where the confusion might lie.  I think

15    the first sentence is what I described maybe as a slightly

16    awkward phrasing of what Mr. -- Professor Stamos understood the

17    law to be.  That is not going to be the basis of his testimony.

18    The basis of his testimony will likely be confined to most of

19    the second sentence, for example, where "other than which

20    weighs in favor of fair use," a statement that I would note we

21    withdrew previously.

22         So really the sentence that he would be talking about

23    deals with the purpose and character of what the product is

24    for, how it is used, by whom it is used, but not a statement

25    about what the law says or directing the jury on what they

 1    should find in terms of defense or otherwise.

 2         THE COURT:  What about in 2, where he says, "I fail to

 3    see how Apple can make this claim that Corellium violates the

 4    DMCA in light of my analysis above"?  I mean, isn't that

 5    getting into the ultimate fact?  He can't testify Corellium's

 6    guilty or not guilty or whether Apple has proved their case.

 7         MR. McDONOUGH:  Agreed, your Honor.  And we don't

 8    believe that he would be making those sorts of statements at

 9    trial.  This is something that was included in the report, I

10    believe to reflect or summarize what he had analyzed

11    previously.  But it's not the sort of statement that we would

12    introduce as testimony at trial about whether or not the jury

13    should find that there has or hasn't been violation.

14    Obviously, that is up to the jury.

15         THE COURT:  Let me just ask you, Mr. McDonough, in the

16    third one, he talks about the intent behind the DMCA and that

17    his opinion -- he understands that such an effect was never the

18    intent behind the DMCA.  And I've seen this in several of these

19    different expert reports and motions.

20         And I'm trying to understand.  To me, it's totally

21    irrelevant what the intent behind the statute is.  I mean, to

22    me, the statute says what the statute says.  And, for example,

23    going back to the example that I alluded to and you just did,

24    you know, an expert comes in and testifies about fingerprints

25    or DNA on a gun.  And you can't give the ultimate opinion

1   whether the Defendant is guilty or not.  But also, if somebody

2   tried to introduce what the intent behind carrying a concealed

3   firearm by a felon is or what the intent behind use of a

4   firearm in connection with a drug charge is, the intent is to

5   me completely irrelevant.  What's relevant is what the statute

6   says.

7          So is he going to be trying to get into what the intent

8   behind the DMCA is?

9          MR. McDONOUGH:  No, your Honor.  And I think this is

10  probably an expression of what he understood the law to be from

11  counsel as a framework for his further analysis.  But no.  He

12  would not be opining on what the law is or make any sort of

13  assertions or testify about the intent.

14         And I think that goes a long way to resolving a lot

15  of --

16         THE COURT:  It does.

17         MR. McDONOUGH:  -- the confusion.  That is continuing

18  to be true for the remaining portions of the bullet points

19  where we don't expect Professor Stamos to be opining, for

20  example, about ultimate issues of whether it is or isn't a

21  violation, but rather discuss the characteristics of the

22  product that's being accused and understand or offer opinion

23  testimony in that context of how it's used, by whom it's used

24  and what its characteristics are.

25         The jury then is obviously going to be able to rely on

1   the Court's instruction on how to -- how the law should be

2   applied and then make their findings on that basis.

3          THE COURT:  Let me ask you, it seems to me like

4   Professor Stamos is the other side of the coin of Dr. Siegel.

5   And they're both -- I assume they're both going to talk about

6   industry standards and facts that might influence what is fair

7   use, what isn't fair use, what is good faith, what isn't good

8   faith.  Is that pretty much the way you see it?

9          MR. McDONOUGH:  Well, I can't speak to Dr. Siegel's

10  expected testimony.  But I can say that, yes --

11         THE COURT:  Okay.

12         MR. McDONOUGH:  -- again, not opining or whether there

13  is or is not, for example, fair use, but again in the context

14  of those defenses and claims, offering opinion testimony about

15  the facts of industry standards, industry policy, certainly

16  would be within the purview of Professor Stamos's expected

17  testimony.

18         THE COURT:  All right.  So is there any issue really

19  that we're disputing over Professor Stamos then?  It seems to

20  me like both sides seem to be now in agreement on Stamos.  And

21  I'm just trying to understand, is there any disagreement that

22  we need to address before we go to Professor Asay?

23         MR. McDONOUGH:  Not wanting to step on opposing

24  counsel, but I guess the Court observed that Corellium had

25  tried to withdraw statements that seemed like they were

```
 1    being -- causing issues.

 2            THE COURT:  Right.

 3            MR. McDONOUGH:  So we understood that that was meant to

 4    try to resolve this issue.

 5            But yeah.  It appears to me that there is not a dispute

 6    here where Professor Stamos will not be testifying at trial

 7    about legal conclusions.  He will not be directing the jury on

 8    what to find.  He would not be offering his statements about

 9    what the intent of the law is.  But his testimony will fit

10    within those contexts, obviously.

11            THE COURT:  Right.  And then I think the other issue is

12    since he's going to be testifying live and this report's not

13    being introduced, any side can lodge an objection if any

14    testimony goes what they believe it too far afield; and then

15    the Court can decide in the crucible of trial what is

16    permissible or not.

17            So let me turn to Ms. Bina and see if there's any issue

18    in dispute that needs to get resolved before we go to the last

19    expert.

20            MS. STEBBINS BINA:  I don't think so, your Honor, other

21    than that we would request that the order be clear enough to

22    reflect that this kind of testimony isn't to be permitted from

23    any expert.

24            THE COURT:  From any expert.  I agree.  From both

25    sides, any expert.
```

1          You know, I think experts need to testify about the

2     facts and their opinions based on those facts and stay away

3     from talking about what the law is or what -- how you

4     burden-shift or what the intent is behind a statute.  I mean, I

5     just don't think that's appropriate for experts.

6          MS. STEBBINS BINA:  One thing that strikes me to do in

7     listening to all these arguments, your Honor, we do have

8     vigorous disagreements over the law in some instances.  And a

9     lot of those are teed up in the pending motions for summary

10    judgment.

11         THE COURT:  Right.

12         MS. STEBBINS BINA:  In my view, *Daubert* motions should

13    not be decided on those bases.  Those should be decided by

14    Judge Smith, who will then issue his opinions.  Maybe he'll

15    grant summary judgment or, if not, he'll decide there's triable

16    issues of fact.  And then these opinions are relevant to

17    weighing on those facts.  Those are all outside of this issue.

18         THE COURT:  Right.  The issue is going to get narrowed

19    down.  I just wanted to make sure we're not going to have a

20    problem depending on what ends up going to trial with these

21    experts opining on things that are improper.

22         MS. STEBBINS BINA:  Yes.  Agreed.

23         THE COURT:  All right.  So let's go to Professor Asay.

24    And that's the final expert.  And Professor Clark Asay is

25    Corellium's copyright law and policy expert.  And Apple has

1    filed the same motion which was addressed to Stamos, the motion

2    to exclude legal opinions and corresponding testimony of

3    Corellium's expert Clark Asay at Docket Entry 451.

4          Professor Asay filed a declaration and expert report

5    February 24th, 2020, which is found at Docket Entry 451-3.  And

6    then he filed an expert report dated April 13, 2020, which is

7    found at Docket Entry 451-4.

8          So who's going to argue this on behalf of Apple?

9          MS. STEBBINS BINA:  That's me again, your Honor.

10         THE COURT:  All right.  Go ahead, Ms. Bina.

11         MS. STEBBINS BINA:  Your Honor, I don't see, frankly,

12    any role for Professor -- I believe it's pronounced "Asay,"

13    actually; it took me a while to get that -- for Professor Asay

14    to testify in this case.

15         If you look at his opinions, he doesn't have any

16    factual knowledge.  He played with the Corellium Apple product

17    once.  He spoke to counsel and I think he said he spoke once to

18    Chris Wade and Amanda Gorton.  But he hasn't reviewed

19    discovery.  He hasn't reviewed the factual issues in this case.

20         His opinion, he says, is as a copyright expert.  And as

21    Defendant's opposition says, they want him to opine on policies

22    underlying copyright law and underlying the DMCA.

23         But the jury is not Congress.  They're not the

24    copyright office.  They're not choosing the best copyright

25    policy to apply in the case.  They're going to be applying the

```
 1   law as they are instructed by the presiding Judge in this case.
 2         And I think that Professor Asay's opinions are
 3   tremendously confusing because they literally read like a legal
 4   brief.  They are pages and pages of law, analysis, his
 5   interpretation of legislative history, his interpretation of
 6   various cases, all of which are vigorously disputed by Apple.
 7   But they're quintessentially legal issues.
 8         Corellium's opposition brief cites a number of
 9   authorities that they claim support this, but they actually
10   don't.  They cite cases that talk about how -- one of them is
11   Ass Armor v. Under Armour.  Another is Cods Enterprises v.
12   U-Haul.
13         Those cases say:  Well, you can talk about the general
14   process and procedures of applying to the Patent and Trademark
15   Office, but you can't opine on the law.  You can't offer legal
16   conclusions.  You can't describe that something isn't or isn't
17   generic and you can't most importantly offer nothing more than
18   what an attorney could offer in closing argument.
19         And there's nothing in Mr. Asay's report that is
20   anything more than legal commentary on the case and ultimate
21   conclusions that are not appropriate.
22         Just to give some examples, you know, he says
23   Corellium's use of Apple products is a fair use.  He goes
24   through the fair use framework as he understands it.
25         He follows by legal argument that the Corellium Apple
```

 1    product does not violate the DMCA.

 2          He specifically, you know -- he talks about how

 3    violations of the DMCA must have a nexus to a protected right

 4    under the Copyright Act.  And he then cites one body of law

 5    without citing the other body of law.

 6          But none of this is appropriate testimony.  And

 7    Corellium has not identified anything in opposition that shows

 8    industry expertise or factual expertise.  And they concede that

 9    he's opining on copyright policy which is not appropriate.

10          As you say, your Honor, it's not:  Why is the law how

11    it is or what the law should be.  It is:  What is the law?  And

12    then the jury applies what they're instructed to do.

13          So I could continue, but that's -- it's pretty

14    straightforward.

15          THE COURT:  No.  That's fine.

16          Who's going to argue this on behalf of Corellium?

17          MR. McDONOUGH:  Again, that's me, your Honor.

18          THE COURT:  Mr. McDonough.  Let me ask you,

19    Mr. McDonough, because I'm very aware in this area of case law

20    and I've read a lot of cases.  And you've got a law professor

21    here who's a copyright expert.

22          And one case that comes to mind is a case, *RCTV*

23    *International Corp. versus Rosenfeld*, which is a Southern

24    District of Florida case, 13-23611-CIV.  The Docket Entry is

25    194, striking an expert report offered by Professor David

1    Nimmer, an extremely qualified copyright law expert, because it

2    in essence is another legal brief and does not assist the Court

3    in understanding the factual issues presented but rather

4    presents a legal argument on the relevant copyright-related

5    issues.

6         So I'm -- in going through the report, the two reports

7    of Dr. -- or Professor Asay, it seems to me that this is really

8    your closing argument or argument to the Court.

9         And so I'm having a -- I'll be very direct with you:

10   Out of all these motions, I'm having a very hard time trying to

11   understand why any of Dr. Asay's opinions should be introduced

12   in this lawsuit.

13        MR. McDONOUGH:  That's a fair point, your Honor.  And

14   we agree it's certainly a close call.

15        I would note that with respect to the *RCTV* case in

16   which Professor Nimmer's opinion testimony was excluded, the

17   facts of that case are distinct, where Professor Nimmer was

18   offering an opinion in opposition to another expert over

19   what -- whether Venezuelan copyright or US copyright law should

20   apply.

21        So the context of that analysis was really about what

22   choice of law the Court would be adopting.

23        And the Court found that that is well within the

24   Court's ability and it's not something that the Court needs

25   expert testimony on.

1          And that context is different than, I think, what we're

2     looking at here, just as one point.

3          THE COURT:  Okay.

4          MR. McDONOUGH:  The other issue is where -- and again,

5     this is a close call -- but where in the *Corwin* case, which we

6     cited in the -- we cited in our reply, that is an example of a

7     Court in the Eleventh Circuit allowing expert testimony in on

8     the issue of substantial similarity in copyright infringement,

9     which is one of the elements.  Expert testimony is admissible

10    for that purpose.

11         And in that expert's report, the expert explained

12    various legal precedents and governing precedents in the

13    Eleventh Circuit and then applied the facts and circumstances

14    before him to the analysis.

15         And it comes close, but the Court allowed that

16    testimony in because the expert was not directing and not

17    testifying as to what finding the jury should make and

18    therefore not impermissibly intruding into the role of the

19    jury.

20         That is the sort of testimony that we would expect

21    Professor Asay to offer about the policy considerations here.

22    He would be offering policy considerations where this is a case

23    of first impression in the Eleventh Circuit.  In particular,

24    Ms. Stebbins alluded to out-of-circuit findings about whether

25    there needs to be this nexus to the protected right for

1    purposes of DMCA violation.  And that's treated differently in

2    California as opposed to other states.  The Eleventh Circuit

3    does not appear to have ruled on it.  And where the jury is

4    going to be given the role of potentially finding this, having

5    the policy context for the various statutes at issue would

6    certainly be appropriate.

7           But drawing the line, of course, is where Professor

8    Asay cannot opine on what the jury should find and he should

9    not and cannot purport to testify as to what the law actually

10   is.  Obviously, that is the role of the Court.

11          THE COURT:  Thank you, Mr. McDonough.

12          Let me ask you, Ms. Bina, what about the *Corwin* case

13   that Mr. McDonough cites?

14          MS. STEBBINS BINA:  Sure, your Honor.

15          In the *Corwin* case, and there's several other similar

16   cases as cited by Corellium, *Team Play*, *La Tele Television*, are

17   all cases addressing the law regarding substantial similarity

18   experts.

19          And so in the copyright world, there is an analysis

20   that is sometimes done to determine whether two works are

21   substantially similar; and there's a framework where you have

22   to break down each constituent element and compare the two.

23          And courts have allowed expert testimony in that

24   limited area even though it has a nexus to legal issues.  And

25   sometimes the experts are law experts and sometimes they're

 1   other kinds of experts.

 2        Those cases should be read in conjunction with *B2A,*

 3   *LLC, v. CommLog*, which is an out-of-district case, as are some

 4   of the ones cited by Corellium.  But they lay out -- it

 5   addresses the full standard and the reasoning behind these

 6   kinds of cases, which is to say -- improperly stated, you know,

 7   you can have a factual analysis comparing two works within a

 8   legal framework, which is what the substantial similarity cases

 9   allow.

10        What you can't have is a finding that the works are

11   substantially similar because that usurps the role of the jury.

12   You can't have ultimate conclusions like "The copyrights are

13   valid, the works are original, Plaintiff's works are entitled

14   to copyright protection."

15        And none of the cases that Corellium relies upon come

16   anywhere close to that.  In fact, the *Corwin* case itself says,

17   "A mere bald assertion of law without application of law to

18   fact would be admissible."

19        And in that particular case, the Court determined that

20   the substantial similarity analysis breaking down these

21   constituent elements was helpful to the Court on summary

22   judgment.  It didn't make some widespread rule that copyright

23   law professors are helpful to juries.

24        Specifically, with respect to what Mr. McDonough

25   finished with, he said the Eleventh Circuit hasn't decided an

1   issue and somehow the jury would be deciding that issue.

2          But that's just wrong as a matter of law.  The parties

3   presumably will present competing versions of a jury

4   instruction on that point and the presiding Judge will adopt

5   the language that he believes is appropriate and the jury will

6   be instructed on the law as a District Court has decided it is

7   for purposes of this case, and then maybe we'll fight about

8   that on appeal.

9          But the jury's not going to be determining whether the

10  Eleventh Circuit should follow the Ninth or the Fifth or

11  whatever different circuits.  And there's just no role for

12  Mr. Asay's testimony here.  There's nothing that he offers that

13  actually relates to the facts or helps the jury understand the

14  facts at all.

15         THE COURT:  I think I asked you before, but Apple is

16  not calling a law professor expert.  Is that right?

17         MS. STEBBINS BINA:  No, your Honor.  Our view is this

18  is entirely inappropriate.  We do not have a rebuttal to this

19  expert.

20         THE COURT:  All right.  Thank you.

21         Anything else you want to add, Ms. Bina?

22         MS. STEBBINS BINA:  No, your Honor.  With that, I can

23  submit.

24         THE COURT:  All right, sir.  Mr. McDonough, I'll give

25  you the last word on this motion.

1          MR. McDONOUGH:  Judge, I just wanted to make one point

2     of clarification, because I think I may have misspoken or maybe

3     I inartfully phrased my point.

4          I certainly wouldn't suggest that the jury was going to

5     be making a legal determination, but rather that their factual

6     determinations would lead to a conclusion dealing with an

7     unfamiliar or a new area of law in the circuit.

8          Ms. Bina is correct, of course, that the Court's going

9     to instruct the jury on that point.

10          THE COURT:  All right.  I think that takes care of all

11     of the experts.

12          I did have one question, and it's going back to

13     Mr. Connelly.  And I believe that as far as Mr. Connelly, I

14     believe Mr. Levine was handling that.

15          In the motion that was filed as to Connelly -- I

16     believe it's Docket Entry 454 -- it seemed to be really heavily

17     sealed.  And I didn't see that in a lot of the other motions.

18          Was there a reason?  Do you know why, Mr. Levine, that

19     that motion had to be so heavily sealed?

20          MR. LEVINE:  I don't have the motion in front of me.

21     But my belief, your Honor, is that he, as he was supposed to,

22     discusses quite a bit the precise finances of Corellium.

23          THE COURT:  All right.  I'm going to ask you to take a

24     look at 454 and see if a more public version can be filed.  In

25     other words, I'll give you some time to look at it and then let

```
 1    the Court know if 454 needs to be so heavily sealed.

 2            MR. LEVINE:  Okay, your Honor.

 3            THE COURT:  It just stood out when I was reading

 4    through all the motions and responses and replies.  It seemed

 5    to be so much more sealed than, for example, Stewart

 6    Appelrouth, those pleadings.  And I don't like sealing, and in

 7    this case it's been necessary.  And you'll find that most

 8    Judges in this district don't like sealing because the public

 9    has a right to know what's going on.  However, there are

10    certain exceptions allowed under the law.  And this case has

11    had heavy, heavy sealing.  But take a look at --

12            MR. LEVINE:  Thank you.

13            THE COURT:  -- 454 and just advise the Court.  You can

14    do that either by a notice or whatever as to whether a more

15    public version can be filed that's not so heavily sealed.  All

16    right?

17            MR. LEVINE:  Yes, sir.

18            THE COURT:  All right.  With that being said, is there

19    anything else that I need to address today from the Plaintiff's

20    side?

21            MS. STEBBINS BINA:  No, your Honor.  I think all we

22    have on calendar is the Daubert motions.

23            I would just offer the concluding thought that I think

24    a lot of these motions really do address legal issues.  But

25    ultimately, most of this should go to the jury unless it's
```

 1    ruled on in advance by the Judge, other than the opinions of

 2    law.  So that's sort of my theme for these six motions and how

 3    the Court should consider them.

 4         THE COURT:  All right.  Thank you.

 5         Anything else that I need to address from the defense?

 6    Corellium?

 7         MR. LEVINE:  Other than our points that were stated on

 8    the record, your Honor.

 9         David, do you have anything from your firm?

10         MR. HECHT:  We do not.  Thank you, your Honor.

11         THE COURT:  Thank you.  I know, Mr. Lee, you've been --

12    you've done an excellent job today, really.

13         MR. LEE:  (Laughing.)

14         THE COURT:  Excellent.  Anything that you need to

15    address before we adjourn this afternoon?

16         MR. LEE:  I believe not.  Let me defer to my colleague,

17    Mr. Coppolino.  I believe not, your Honor.  Thank you very

18    much.

19         THE COURT:  Mr. Coppolino's done an even better job

20    than you have.

21         MR. LEE:  (Laughing.)

22         THE COURT:  Ms. Orloff as well.

23         Anything that the Government needs to raise today?

24         MR. LEE:  No, your Honor.  Thank you.

25         THE COURT:  All right.  Everybody have a good

```
 1    afternoon.  Stay safe and healthy.  And I'll take the matters
 2    under advisement.
 3              Thank you all.
 4              MS. STEBBINS BINA:  Thank you, your Honor.
 5              MR. LEVINE:  Thank you, your Honor.
 6              MR. GROSS:  Thank you, your Honor.
 7              MR. HECHT:  Thank you.
 8              MR. PRICE:  Thank you.
 9              (Proceedings concluded.)
10
11
12
13
14                    C E R T I F I C A T E
15
16         I hereby certify that the foregoing is an
17    accurate transcription of the proceedings in the
18    above-entitled matter to the best of my ability.
19
20                          /s/Lisa Edwards
      _____         _____
21       DATE               LISA EDWARDS, RDR, CRR
                            Reporterlisaedwards@gmail.com
22                          (305) 439-7168
23
24
25
```

## $

**$200,000** [2] - 34:16, 43:16
**$500,000** [1] - 34:11

## '

**'security** [1] - 117:22

## /

**/s/Lisa** [1] - 141:20

## 1

**1** [4] - 1:8, 27:12, 46:16, 46:20
**1.6** [1] - 35:18
**10.4.1** [1] - 32:2
**100** [9] - 2:3, 2:6, 29:21, 35:9, 37:7, 39:7, 41:9, 45:5, 106:6
**1001** [1] - 2:17
**101** [1] - 40:12
**10172** [1] - 2:21
**10250** [1] - 1:15
**104** [1] - 107:9
**105** [1] - 86:24
**10:03** [1] - 1:7
**11** [3] - 21:7, 25:25, 26:2
**1100** [1] - 1:16
**12** [1] - 32:9
**120** [1] - 2:13
**1200** [1] - 2:7
**1201** [4] - 40:12, 91:10, 119:25, 122:14
**1201(a)(1** [1] - 95:23
**1201(a)(1)(A)** [1] - 97:8
**1201(a)(2** [1] - 95:24
**1201(c)(1** [1] - 120:4
**1201(j** [3] - 115:7, 117:16
**1201(j)** [3] - 95:22, 109:22, 117:6
**1201(j)(11** [1] - 109:22
**1203(c)(2** [1] - 25:18
**13** [2] - 89:19, 130:6
**13-23611-CIV** [1] - 132:24
**1330** [1] - 86:23
**1350** [1] - 107:10
**1365** [1] - 107:10

## 2

**2** [8] - 24:21, 25:3, 26:4, 26:9, 41:17, 106:11, 106:17, 125:2
**200** [1] - 2:16
**2000** [1] - 1:22
**20004** [1] - 2:4
**2018** [3] - 34:2, 34:9, 35:16
**2019** [6] - 27:25, 33:13, 34:2, 34:9, 35:17, 35:18
**2020** [15] - 1:5, 24:13, 24:21, 33:13, 41:16, 46:17, 61:21, 61:24, 72:10, 89:17, 89:19, 89:22, 118:20, 130:5, 130:6
**20530** [1] - 3:4
**20th** [1] - 72:10
**22** [1] - 106:11, 106:17
**222** [1] - 2:12
**22A** [1] - 106:18
**23rd** [1] - 2:16
**24** [3] - 1:5, 11:7, 11:16
**24th** [1] - 130:5
**26** [1] - 18:18
**277** [1] - 2:20
**28th** [2] - 89:22, 118:20
**290-page** [1] - 70:8
**2:00** [1] - 88:8, 88:9

## 3

**3** [5] - 24:22, 25:3, 25:7, 46:17, 118:1
**3-3** [1] - 24:13

**3-3-2020** [1] - 61:19
**3.5** [1] - 35:16
**30** [4] - 31:8, 31:24, 32:18, 37:10
**305** [2] - 3:7, 141:22
**33131** [1] - 2:7
**33132** [1] - 2:24
**33401** [1] - 2:13
**3900** [7] - 31:7, 31:14, 31:20, 31:24, 32:10, 32:18, 37:9
**3:00** [2] - 88:7, 88:18
**3d** [1] - 107:10
**3rd** [4] - 24:21, 40:12, 61:24, 89:17

## 4

**4** [6] - 11:7, 11:16, 11:22, 18:18, 25:19, 95:17
**4-13-2020** [4] - 11:10, 12:1, 46:19, 61:20
**4-20** [1] - 26:9
**4-20-2020** [6] - 11:12, 12:2, 18:18, 24:15, 26:3, 89:20
**4-26-2020** [1] - 24:16
**4-27-20** [1] - 11:16
**4-27-2020** [2] - 11:13, 24:17
**40** [2] - 114:17, 114:20
**403** [4] - 14:21, 23:14, 64:3, 79:25
**41** [2] - 114:17, 115:9
**439-7168** [2] - 3:7, 141:22
**444** [3] - 8:21, 89:14, 95:16
**448** [1] - 9:21
**449** [1] - 46:1
**451** [2] - 119:2, 130:3
**451-3** [1] - 130:5
**451-4** [1] - 130:7
**451-6** [1] - 118:21
**452** [1] - 61:17
**454** [5] - 24:11, 138:16, 138:24, 139:1, 139:13
**45th** [1] - 2:21
**465-1** [1] - 46:2
**465-2** [1] - 46:18
**465-3** [1] - 46:19
**466-1** [1] - 9:21
**466-2** [1] - 11:10, 12:1
**466-3** [2] - 11:13,

12:2
**466-4** [2] - 11:14, 11:16
**468** [1] - 24:11
**468-1** [1] - 24:16
**468-3** [2] - 24:14, 24:21
**469** [1] - 61:17
**469-2** [1] - 61:19
**469-3** [1] - 61:20
**469-4** [1] - 61:22
**489** [1] - 72:10

## 5

**5** [9] - 16:5, 25:19, 25:20, 32:11, 51:18, 52:3, 61:24, 86:25, 120:1
**50** [1] - 50:17
**504** [3] - 12:18, 28:9, 44:8
**504(b** [4] - 11:18, 11:20, 12:7, 25:18
**504(b)** [1] - 11:22
**504-3** [1] - 89:21
**505** [1] - 1:22
**51** [1] - 16:4
**514** [2] - 51:18, 52:3
**5175173** [1] - 41:17
**525-1** [2] - 89:18, 105:11
**525-2** [1] - 89:19
**525-3** [1] - 89:22
**526-2** [2] - 24:15, 26:4
**526-3** [1] - 24:18
**53** [1] - 114:17
**555** [2] - 2:3, 3:4

## 6

**60** [1] - 50:17
**64** [1] - 86:23

## 7

**7** [2] - 25:21, 32:6
**70-page** [1] - 50:17

## 8

**8** [4] - 25:24, 25:25, 32:6, 105:11
**81** [1] - 16:19

## 9

**9** [2] - 21:7, 32:6
**9.0** [3] - 63:15, 63:25, 84:10
**90067** [1] - 1:16
**94025** [1] - 1:19
**94111** [1] - 1:23
**953** [1] - 32:11
**96** [1] - 86:21
**97** [2] - 32:18, 33:7
**99** [2] - 2:24, 86:24

## A

**a)(1** [2] - 97:9, 101:10
**a)(2** [1] - 97:10
**a.m** [1] - 1:7
**abetted** [1] - 114:24
**abetting** [2] - 115:3, 115:5
**abide** [1] - 91:24
**abiding** [2] - 91:23, 93:13
**ability** [6] - 48:20, 110:18, 110:19, 110:20, 133:24, 141:18
**able** [7] - 24:22, 77:22, 113:17, 115:19, 115:23, 121:15, 126:25
**above-entitled** [1] - 141:18
**absence** [1] - 47:10
**absolutely** [8] - 15:9, 37:14, 68:19, 85:21, 85:23, 112:8, 113:8, 114:7
**accept** [1] - 79:5
**access** [14] - 62:21, 75:21, 76:15, 78:12, 79:4, 83:10, 83:11, 84:1, 86:4, 86:7, 86:9, 114:23, 124:7
**accessible** [1] - 78:19
**according** [2] - 58:20, 104:3
**accounting** [2] - 10:15, 43:8
**accurate** [2] - 62:1, 141:17
**accused** [1] - 126:22
**achieves** [1] - 75:4
**acknowledge** [1] - 60:8

**acknowledging** [1] - 91:15

**acronym** [1] - 51:20

**act** [2] - 39:13, 100:13

**Act** [6] - 12:18, 47:14, 110:9, 111:8, 112:23, 132:4

**acted** [2] - 100:14, 104:21

**acting** [4] - 19:10, 100:11, 100:13, 106:8

**action** [1] - 45:13

**actions** [1] - 100:9

**activity** [5] - 28:11, 28:17, 29:22, 43:21, 45:2

**actors** [2] - 104:10

**acts** [3] - 95:23, 95:24, 95:25

**actual** [5] - 28:10, 32:8, 51:24, 59:5

**ADA** [2] - 107:11, 107:13

**add** [6] - 8:11, 22:25, 84:8, 84:22, 106:24, 137:21

**added** [6] - 8:14, 75:10, 75:19, 76:1, 90:16, 92:3

**adding** [4] - 12:4, 90:14, 90:23, 95:20

**addition** [1] - 26:18

**additional** [3] - 30:3, 71:1, 121:8

**additionally** [1] - 25:13

**address** [24] - 10:12, 17:1, 26:24, 27:17, 33:25, 36:22, 46:25, 47:11, 48:7, 48:19, 67:13, 72:21, 73:9, 74:15, 87:25, 89:8, 97:17, 124:10, 127:22, 139:19, 139:24, 140:5, 140:15

**addressed** [6] - 30:24, 39:10, 42:20, 73:15, 76:10, 130:1

**addresses** [2] - 22:3, 136:5

**addressing** [5] - 47:12, 47:14, 49:1, 49:2, 135:17

**adds** [1] - 91:12

**adjacent** [1] - 81:16

**adjourn** [1] - 140:15

**adjustment** [3] - 38:6, 38:8, 38:10

**admissible** [5] -

20:3, 54:1, 107:14, 134:9, 136:18

**admit** [1] - 50:13

**admitted** [1] - 114:21

**adopt** [2] - 63:1, 137:4

**adopting** [1] - 133:22

**advance** [3] - 12:22, 88:18, 140:1

**adversaries** [1] - 121:14

**adversary** [4] - 30:13, 36:3, 36:7, 60:6

**advertising** [1] - 38:18

**advise** [2] - 85:17, 139:13

**advisement** [1] - 141:2

**advocating** [1] - 93:8

**affect** [1] - 120:5

**affects** [1] - 21:8

**affirmed** [1] - 40:15

**afield** [2] - 69:23, 128:14

**afternoon** [3] - 35:13, 140:15, 141:1

**agree** [15] - 15:16, 18:11, 53:24, 54:5, 54:11, 54:23, 55:15, 55:17, 55:25, 56:13, 67:15, 70:1, 79:5, 92:23, 93:20, 94:11, 108:21, 113:8, 119:6, 120:14, 128:24, 133:14

**agreed** [5] - 53:12, 96:13, 120:13, 125:7, 129:22

**agreeing** [2] - 56:1, 77:1

**agreement** [16] - 50:22, 51:16, 66:25, 67:4, 67:10, 72:16, 73:5, 78:23, 79:3, 79:6, 118:2, 120:9, 122:2, 122:12, 122:13, 127:20

**agreements** [1] - 106:1

**agrees** [3] - 51:22, 52:7, 119:4

**ahead** [21] - 4:3, 10:5, 17:10, 20:9, 20:11, 21:1, 26:16, 27:9, 35:14, 50:19, 52:4, 53:22, 58:5, 72:2, 76:9, 77:13, 90:6, 91:12, 117:15,

120:13, 130:10

**aided** [1] - 114:24

**aiding** [2] - 115:3, 115:5

**aiding-and-abetting** [1] - 115:3

**air** [1] - 32:19

**Alexander** [3] - 9:7, 118:17, 119:2

**all-encompassing** [1] - 71:8

**allegation** [1] - 115:3

**allegations** [4] - 65:1, 100:14, 104:20, 106:7

**allege** [1] - 26:6

**alleged** [8] - 23:11, 47:20, 54:18, 57:24, 62:20, 65:2, 65:5, 121:24

**allegedly** [7] - 22:16, 51:25, 57:5, 58:1, 61:7, 72:13, 77:16

**alleging** [1] - 30:20, 114:20

**Allison** [1] - 65:10

**allocating** [1] - 38:17

**allocation** [1] - 21:21

**allow** [1] - 136:9

**allowed** [8] - 49:12, 92:22, 108:24, 110:24, 117:12, 134:15, 135:23, 139:10

**allowing** [1] - 134:7

**allows** [2] - 82:22, 110:17

**alluded** [2] - 125:23, 134:24

**almost** [5] - 12:3, 31:16, 41:20, 61:24, 90:21

**alternate** [1] - 37:25

**alternative** [1] - 62:11

**alternatively** [1] - 14:18

**altogether** [1] - 122:3

**Amanda** [1] - 130:18

**amended** [1] - 114:16

**Amount** [1] - 52:10

**amount** [29] - 10:1, 31:11, 31:12, 31:15, 35:12, 39:18, 40:2, 51:4, 51:18, 51:19, 51:21, 51:24, 52:19, 53:7, 53:8, 54:17, 55:15, 55:19, 55:20,

56:3, 56:4, 56:10, 57:10, 57:18, 57:22, 57:23, 57:24, 59:11

**ample** [1] - 86:17

**amusement** [1] - 82:15

**analogous** [1] - 69:1

**analogy** [3] - 29:14, 44:24, 122:22

**analyses** [2] - 27:13, 62:17

**analysis** [15] - 12:9, 16:22, 54:17, 55:22, 57:7, 83:13, 119:11, 125:4, 126:11, 131:4, 133:21, 134:14, 135:19, 136:7, 136:20

**analyze** [2] - 20:6, 75:8

**analyzed** [1] - 125:10

**ancillary** [1] - 98:2

**Andreas** [1] - 38:16

**Andrew** [1] - 5:11

**ANDREW** [1] - 1:21

**Android** [15] - 28:16, 29:6, 29:12, 29:16, 31:9, 31:12, 32:5, 32:6, 32:11, 38:19, 43:17, 45:6

**Angeles** [1] - 1:16

**annoying** [1] - 5:2

**answer** [1] - 14:6, 15:24, 48:10, 100:8, 100:19, 115:10

**answers** [5] - 20:24, 33:18, 48:11, 48:13, 61:8

**Anthony** [1] - 7:7

**ANTHONY** [1] - 3:2

**anti** [7] - 62:20, 65:3, 76:12, 82:25, 83:25

**anti-circumvention** [4] - 62:20, 65:3, 82:25, 83:25

**anti-trafficking** [2] - 76:12, 83:25

**anticipate** [2] - 13:15, 103:6

**anyway** [1] - 12:5

**apart** [1] - 100:17

**apparent** [2] - 26:4, 26:7

**appeal** [1] - 137:8

**appear** [1] - 135:3

**appearances** [1] - 4:4

**APPEARANCES** [3] - 1:13, 2:1, 3:1

**appearing** [1] - 7:19

**Appelrouth** [33] -

9:1, 9:16, 9:18, 9:20, 10:5, 10:10, 11:7, 11:9, 12:22, 13:21, 14:12, 15:14, 15:17, 15:21, 16:16, 17:8, 17:16, 17:20, 19:20, 19:23, 21:2, 21:13, 21:17, 22:20, 22:24, 23:6, 23:17, 23:23, 40:16, 41:1, 87:5, 139:6

**Appelrouth's** [5] - 15:5, 16:4, 19:15, 23:3, 23:19

**APPLE** [2] - 1:4, 2:9

**apple** [1] - 70:22

**Apple** [117] - 4:2, 4:5, 4:9, 4:11, 4:13, 5:10, 5:12, 5:15, 5:20, 9:17, 9:18, 10:6, 10:8, 13:1, 18:21, 19:25, 22:4, 23:25, 27:24, 28:21, 29:6, 29:15, 29:17, 29:18, 31:20, 31:21, 31:25, 37:17, 37:20, 37:22, 38:18, 39:20, 40:3, 43:11, 43:12, 43:14, 43:16, 45:7, 46:4, 46:7, 46:9, 50:24, 51:14, 51:22, 52:7, 52:21, 55:10, 56:25, 59:24, 63:11, 63:22, 64:7, 65:4, 67:7, 67:15, 70:1, 70:13, 70:14, 70:19, 71:16, 71:24, 72:1, 72:13, 72:20, 74:13, 74:19, 75:5, 75:23, 75:25, 76:22, 77:23, 78:13, 79:13, 81:19, 81:22, 87:10, 87:19, 87:20, 88:25, 93:8, 93:23, 96:20, 97:9, 98:7, 99:17, 100:4, 100:25, 106:1, 106:3, 114:20, 114:22, 115:9, 115:15, 115:21, 119:4, 119:5, 119:10, 119:15, 119:19, 119:24, 120:7, 121:4, 121:10, 123:21, 125:3, 125:6, 129:25, 130:8, 130:16, 131:6, 131:23, 131:25, 137:15

**Apple's** [33] - 8:24, 9:2, 9:5, 20:1, 33:4, 39:19, 44:11, 45:21, 45:24, 46:6, 48:2,

51:3, 53:17, 59:18, 61:15, 63:14, 65:6, 66:6, 70:18, 73:20, 74:23, 79:1, 86:5, 86:10, 87:12, 89:9, 89:11, 97:20, 106:7, 114:16, 118:24, 120:9, 123:10

**applicability** [1] - 120:2

**applicable** [6] - 44:25, 97:4, 97:20, 113:19, 118:6, 118:7

**application** [3] - 10:25, 114:13, 136:17

**applied** [4] - 73:20, 74:13, 127:2, 134:13

**applies** [5] - 90:8, 91:19, 97:8, 97:15, 132:12

**apply** [6] - 78:11, 101:9, 101:11, 112:16, 130:25, 133:20

**applying** [8] - 104:14, 110:3, 111:18, 111:19, 111:23, 111:25, 130:25, 131:14

**apportionment** [1] - 19:25

**appreciate** [1] - 58:3

**approach** [3] - 48:22, 48:23, 65:7

**appropriate** [19] - 13:4, 13:8, 24:9, 25:6, 25:14, 25:17, 26:6, 49:10, 71:9, 113:22, 114:5, 118:5, 118:6, 129:5, 131:21, 132:6, 132:9, 135:6, 137:5

**appurtenant** [1] - 13:18

**April** [5] - 34:14, 70:4, 89:19, 89:22, 130:6

**architectural** [1] - 45:1

**architecture** [2] - 44:5, 44:6

**area** [13] - 29:2, 49:11, 49:14, 64:19, 113:4, 114:3, 114:5, 119:8, 120:18, 132:19, 135:24, 138:7

**areas** [3] - 37:5, 120:7, 120:8

**argue** [16] - 8:10, 10:5, 13:22, 22:12, 26:16, 46:7, 53:19,

62:5, 71:24, 90:3, 96:20, 113:17, 120:9, 122:5, 130:8, 132:16

**argued** [2] - 67:21, 74:15

**arguing** [9] - 6:8, 10:8, 13:7, 53:21, 64:18, 71:5, 85:25, 90:5, 112:12

**argument** [35] - 26:7, 27:22, 48:17, 50:19, 70:2, 72:19, 72:23, 73:4, 73:14, 76:18, 76:25, 77:2, 78:2, 78:3, 78:17, 78:23, 79:8, 79:22, 80:1, 83:17, 87:5, 92:6, 101:6, 107:2, 107:22, 109:7, 111:1, 113:20, 116:13, 117:8, 131:18, 131:25, 133:4, 133:8

**arguments** [8] - 72:8, 72:21, 73:16, 77:8, 80:13, 85:16, 87:4, 129:7

**arisen** [1] - 121:19

**Armor** [1] - 131:11

**Armour** [1] - 131:11

**art** [1] - 91:9

**Asay** [14] - 9:7, 87:14, 87:17, 119:1, 127:22, 129:23, 129:24, 130:3, 130:4, 130:12, 130:13, 133:7, 134:21, 135:8

**Asay's** [4] - 87:22, 131:2, 131:19, 133:11

**asay's** [1] - 137:12

**ascribing** [1] - 21:10

**aside** [2] - 53:4, 55:10

**aspect** [1] - 17:16

**aspects** [1] - 104:4

**Ass** [1] - 131:11

**assent** [2] - 57:4, 79:16

**assert** [2] - 63:9, 81:19

**asserted** [6] - 63:11, 63:12, 63:22, 69:11, 69:12, 100:16

**asserting** [1] - 116:4

**assertion** [1] - 136:17

**assertions** [2] - 119:13, 126:13

**assess** [1] - 24:22

**assessment** [3] - 28:21, 64:4, 94:1

**assignments** [1] - 16:18

**assist** [4] - 10:24, 35:7, 48:15, 133:2

**ASSISTANT** [1] - 2:23

**associate** [2] - 37:14, 44:10

**associated** [1] - 37:17

**assume** [3] - 38:24, 62:25, 127:5

**assumed** [1] - 43:25

**assumes** [2] - 65:21, 66:8

**assuming** [2] - 44:2, 44:11

**assumption** [2] - 29:11, 39:20

**attachments** [1] - 10:2

**attack** [1] - 78:24

**attacking** [1] - 72:13

**attention** [1] - 106:1

**attorney** [2] - 41:12, 131:18

**ATTORNEY** [1] - 2:23

**attorneys** [1] - 43:1

**attributable** [1] - 44:6

**attribute** [2] - 40:2, 43:11

**attributes** [1] - 41:9

**attributing** [1] - 29:20

**audio** [1] - 88:24

**AUDIO** [1] - 1:11

**authorities** [1] - 131:9

**authorized** [2] - 77:23, 86:12

**available** [2] - 78:18, 78:19

**Avenue** [2] - 2:12, 2:20

**average** [1] - 113:23

**avoid** [1] - 8:12

**avoiding** [1] - 8:2

**avoids** [1] - 79:17

**aware** [5] - 59:16, 65:22, 120:4, 121:9, 132:19

**awful** [1] - 111:19

**awfully** [1] - 109:9

**awkward** [1] - 124:16

# B

**b)** [1] - 97:12

**B2A** [1] - 136:2

**back-and-forth** [1] - 23:9

**background** [4] - 8:2, 68:9, 103:8, 114:9

**backwards** [2] - 107:7, 107:23

**bad** [7] - 35:6, 80:8, 92:8, 93:21, 101:2, 102:10, 103:19

**BAINBRIDGE** [1] - 2:19

**bald** [1] - 136:17

**ballpark** [1] - 14:9

**bank** [3] - 82:9, 82:14, 82:21

**bar** [1] - 48:23

**based** [25] - 20:6, 32:19, 35:6, 35:19, 37:25, 38:1, 41:11, 45:2, 47:8, 47:9, 49:13, 60:15, 71:12, 72:8, 73:3, 94:15, 94:20, 96:14, 99:1, 109:3, 110:5, 111:4, 113:2, 119:20, 129:2

**bases** [1] - 129:13

**basing** [1] - 32:17

**basis** [8] - 8:15, 52:18, 54:23, 75:14, 104:9, 124:17, 124:18, 127:2

**battle** [1] - 121:11

**BEACH** [1] - 1:2

**Beach** [2] - 1:4, 2:13

**BECK** [1] - 2:19

**become** [3] - 69:22, 108:18, 121:9

**becomes** [1] - 29:19

**BEFORE** [1] - 1:10

**begin** [1] - 96:25

**behalf** [27] - 4:4, 4:9, 4:11, 5:10, 5:12, 5:15, 5:20, 6:2, 6:4, 6:6, 6:13, 6:23, 7:4, 7:15, 9:16, 9:17, 10:6, 10:8, 13:22, 71:24, 72:1, 90:3, 93:8, 96:20, 122:5, 130:8, 132:16

**behind** [10] - 98:15, 119:23, 125:16, 125:18, 125:21, 126:2, 126:3, 126:8, 129:4, 136:5

**belabor** [2] - 36:15,

54:22

**belief** [3] - 113:18, 115:15, 138:21

**believes** [8] - 20:23, 25:16, 47:17, 99:11, 101:4, 103:23, 109:2, 137:5

**beneficial** [12] - 91:17, 93:1, 94:13, 95:6, 99:8, 102:12, 109:18, 110:19, 110:23, 115:14, 115:20, 115:24

**best** [5] - 39:22, 130:24, 141:18

**Beta** [1] - 32:12

**better** [4] - 8:1, 38:3, 56:6, 140:19

**between** [8] - 12:1, 40:14, 43:21, 50:22, 73:5, 94:10, 101:15, 103:2

**beyond** [2] - 12:23, 22:8

**bias** [1] - 121:24

**big** [5] - 63:24, 66:22, 80:18, 92:21, 112:14

**bigger** [2] - 71:4, 71:20

**biggest** [1] - 71:20

**BINA** [37] - 1:14, 4:6, 10:7, 10:13, 10:19, 11:3, 12:13, 13:14, 17:12, 19:17, 19:19, 20:10, 21:12, 21:18, 22:22, 24:2, 36:20, 42:5, 42:13, 42:19, 42:22, 87:21, 88:22, 120:11, 120:16, 121:25, 128:20, 129:6, 129:12, 129:22, 130:9, 130:11, 135:14, 137:17, 137:22, 139:21, 141:4

**Bina** [29] - 4:7, 10:8, 10:9, 12:12, 14:7, 15:16, 15:20, 16:3, 16:5, 16:10, 16:19, 17:15, 17:18, 17:21, 18:3, 18:17, 23:2, 36:17, 39:6, 39:24, 42:3, 45:9, 120:11, 120:12, 123:14, 128:17, 135:12, 137:21, 138:8

**bina** [1] - 130:10

**Bina's** [1] - 18:8

**bit** [6] - 12:23, 21:2,

47:21, 90:23, 102:3, 138:22
**bite** [1] - 70:21
**black** [5] - 43:2, 103:10, 103:16, 113:25, 114:8
**blue** [1] - 70:13
**body** [2] - 132:4, 132:5
**Bonner** [2] - 40:24, 41:15
**boot** [1] - 76:19
**bootloader** [1] - 66:15
**borrows** [1] - 98:9
**bother** [1] - 11:5
**Boulevard** [1] - 1:15
**bound** [1] - 69:13
**bounds** [5] - 64:12, 65:9, 69:13, 85:8, 108:24
**bounty** [1] - 121:13
**breach** [1] - 79:9
**breach-of-contract** [1] - 79:9
**break** [4] - 84:18, 87:16, 88:1, 135:22
**breaking** [1] - 136:20
**brief** [12] - 22:2, 42:4, 51:17, 68:22, 72:6, 72:12, 86:15, 86:25, 131:4, 131:8, 133:2
**briefed** [1] - 52:24
**briefing** [8] - 30:1, 30:3, 60:20, 69:25, 70:5, 71:7, 82:7, 118:22
**briefly** [11] - 17:12, 17:13, 36:21, 38:23, 39:5, 40:8, 79:21, 85:4, 102:25, 116:10, 116:12
**briefs** [1] - 53:2
**bring** [1] - 115:4
**bringing** [1] - 81:23
**brings** [2] - 40:3, 94:9
**broad** [4] - 39:20, 57:9, 57:14, 65:17
**broader** [4] - 24:6, 43:3, 60:24, 76:3
**brochures** [4] - 33:9, 33:11, 33:12
**brought** [3] - 17:24, 19:22, 97:9
**buddy** [6] - 67:14, 67:19, 78:15, 78:22, 78:25, 79:15
**bugs** [1] - 99:12

**building** [9] - 44:4, 44:5, 44:7, 44:11, 44:24, 44:25, 45:2, 81:16
**built** [1] - 44:25
**bullet** [2] - 123:10, 126:18
**bunch** [1] - 82:1
**burden** [35] - 11:18, 11:20, 12:18, 12:25, 13:1, 13:4, 13:8, 15:8, 16:21, 16:25, 17:3, 17:6, 17:16, 20:1, 20:5, 20:7, 20:8, 21:15, 21:19, 22:1, 22:4, 22:10, 22:13, 22:14, 22:17, 23:11, 23:21, 25:18, 25:24, 33:4, 43:20, 44:8, 129:4
**burden-shift** [1] - 129:4
**burden-shifting** [4] - 21:15, 22:17, 23:11, 23:21
**burdens** [1] - 12:6
**buried** [1] - 67:10
**business** [4] - 34:10, 104:7, 105:25, 115:10
**buzzwords** [1] - 29:23
**BY** [1] - 3:6
**bye** [1] - 121:13
**bypassed** [2] - 29:18, 83:19
**bypassing** [1] - 29:9

## C

**cache** [1] - 76:20
**calculate** [1] - 38:8
**calculating** [2] - 16:13, 33:23
**calculation** [4] - 12:19, 13:6, 21:8, 30:18
**calculations** [5] - 12:16, 13:18, 14:11, 21:24, 21:25
**calendar** [1] - 139:22
**California** [5] - 1:16, 1:19, 1:23, 42:14, 135:2
**Campbell** [3] - 119:18, 124:1, 124:4
**cannot** [4] - 33:19, 45:3, 45:13, 135:8, 135:9
**capacity** [1] - 27:2

**care** [3] - 30:15, 73:4, 138:10
**career** [1] - 43:3
**CAROLA** [1] - 2:11
**carry** [1] - 49:19
**carrying** [1] - 126:2
**case** [135] - 7:19, 11:1, 11:9, 11:23, 12:25, 13:10, 15:7, 17:17, 17:19, 17:22, 17:25, 18:2, 18:4, 18:5, 23:12, 23:13, 23:16, 28:8, 29:23, 30:7, 30:10, 30:11, 34:24, 35:24, 38:14, 39:18, 40:21, 40:24, 40:25, 41:8, 41:16, 42:8, 42:10, 42:11, 42:12, 42:15, 42:22, 43:1, 43:4, 43:5, 43:6, 43:18, 43:19, 45:9, 47:5, 49:20, 52:14, 57:6, 59:22, 62:17, 62:18, 63:5, 63:15, 64:23, 64:25, 65:10, 65:14, 65:15, 65:18, 65:19, 67:20, 67:24, 68:2, 68:12, 68:15, 68:20, 68:21, 69:1, 69:3, 69:4, 70:24, 74:6, 76:8, 77:21, 79:9, 81:5, 81:6, 81:10, 86:21, 86:23, 89:1, 90:10, 91:3, 91:4, 91:5, 93:23, 94:1, 94:19, 100:24, 101:14, 104:18, 106:8, 106:10, 106:14, 107:8, 107:9, 107:12, 107:25, 111:3, 111:6, 112:7, 112:21, 113:5, 113:22, 114:14, 121:10, 121:18, 122:23, 125:6, 130:14, 130:19, 130:25, 131:1, 131:20, 132:19, 132:22, 132:24, 133:15, 133:17, 134:5, 134:22, 135:12, 135:15, 136:3, 136:16, 136:19, 137:7, 139:7, 139:10
**CASE** [1] - 1:2
**Case** [1] - 4:1
**cases** [26] - 13:1, 29:24, 30:3, 38:16, 40:16, 40:18, 40:20,

41:14, 41:19, 41:20, 42:4, 42:7, 44:3, 85:10, 86:22, 131:6, 131:10, 131:13, 132:20, 135:16, 135:17, 136:2, 136:6, 136:8, 136:15
**catch** [1] - 79:22
**catch-all** [1] - 79:22
**categorize** [2] - 45:19, 87:8
**causal** [4] - 28:10, 40:14, 41:21
**causing** [1] - 128:1
**Central** [2] - 42:13, 42:14
**central** [2] - 57:5, 98:20
**century** [1] - 38:9
**certain** [16] - 8:20, 9:2, 9:9, 9:11, 24:10, 30:22, 37:5, 45:25, 57:13, 61:16, 70:4, 89:14, 101:2, 119:4, 122:25, 139:10
**certainly** [15] - 13:5, 19:6, 20:24, 44:10, 47:15, 59:21, 64:11, 102:6, 109:8, 113:17, 124:10, 127:15, 133:14, 135:6, 138:4
**certify** [1] - 141:16
**cetera** [3] - 10:2, 24:24
**chain** [1] - 76:19
**challenge** [5] - 10:11, 10:19, 26:18, 26:23, 27:3
**challenges** [3] - 24:3, 37:8, 44:18
**challenging** [8] - 10:14, 10:16, 27:1, 27:6, 59:20, 73:22, 87:11, 94:7
**chance** [3] - 8:5, 8:12, 71:18
**change** [1] - 38:19
**changed** [2] - 53:14, 115:18
**changing** [2] - 90:22, 115:21
**chapter** [1] - 63:7
**character** [2] - 124:3, 124:6, 124:23
**characteristics** [3] - 123:8, 126:21, 126:24
**characters** [2] - 63:10, 63:19
**charge** [1] - 126:4
**charged** [2] - 47:9

**choice** [1] - 133:22
**choosing** [1] - 130:24
**chose** [1] - 81:21
**Chris** [2] - 54:24, 130:18
**circuit** [7] - 41:20, 42:12, 43:23, 43:24, 43:25, 134:24, 138:7
**Circuit** [21] - 40:11, 40:16, 40:19, 40:20, 40:21, 40:22, 40:24, 41:16, 42:17, 42:18, 65:10, 86:22, 86:23, 86:24, 134:7, 134:13, 134:23, 135:2, 136:25, 137:10
**circuits** [1] - 137:11
**circumstances** [4] - 68:1, 101:2, 122:25, 134:13
**circumvent** [4] - 76:15, 86:11, 114:22, 114:25
**circumvented** [5] - 29:18, 66:16, 67:11, 83:8, 86:4
**circumventing** [1] - 82:23
**circumvention** [9] - 62:20, 65:3, 67:20, 67:21, 67:22, 82:18, 82:25, 83:24, 83:25
**circumvents** [3] - 77:16, 83:9, 85:24
**citation** [1] - 107:9
**citations** [2] - 41:18, 70:17
**cite** [4] - 29:25, 30:3, 86:24, 131:10
**cited** [7] - 40:16, 68:22, 74:6, 134:6, 135:16, 136:4
**cites** [4] - 43:8, 131:8, 132:4, 135:13
**citing** [5] - 13:2, 23:16, 32:10, 43:19, 132:5
**CIVIL** [1] - 3:3
**Civil** [2] - 7:7, 7:11
**civilian** [1] - 113:23
**claim** [9] - 63:16, 79:9, 85:10, 86:5, 86:6, 101:10, 119:20, 125:3, 131:9
**claimed** [4] - 44:7, 80:25, 102:8, 102:11
**claims** [12] - 16:15, 62:18, 62:19, 76:12, 81:10, 86:5, 97:8,

97:9, 97:20, 104:12, 106:22, 127:14

**clarification** [1] - 138:2

**clarify** [2] - 59:8, 102:25

**Clark** [4] - 9:7, 119:1, 129:24, 130:3

**classic** [1] - 85:9

**clear** [15] - 16:16, 21:11, 28:8, 28:13, 37:6, 51:12, 52:9, 58:6, 58:25, 70:3, 74:5, 81:22, 82:5, 117:10, 128:21

**clearly** [3] - 17:21, 31:11, 121:5

**click** [2] - 65:23, 79:5

**clients** [1] - 32:7

**clone** [1] - 68:3

**close** [8] - 53:1, 60:8, 86:14, 106:25, 133:14, 134:5, 134:15, 136:16

**closing** [4] - 34:19, 92:6, 131:18, 133:8

**Code** [1] - 97:7

**code** [33] - 51:3, 52:19, 52:20, 53:8, 53:9, 54:18, 56:4, 56:12, 56:20, 57:5, 59:15, 59:17, 59:19, 59:24, 63:23, 63:25, 65:6, 69:10, 69:12, 71:13, 74:19, 75:4, 75:15, 75:16, 75:23, 75:25, 76:2, 81:12, 84:15, 110:13

**Cods** [1] - 131:11

**coin** [1] - 61:14, 111:12, 127:4

**Cole** [1] - 6:4

**COLE** [1] - 2:12

**colleague** [3] - 53:1, 73:8, 140:16

**colleagues** [2] - 4:13, 6:7

**colloquial** [1] - 103:10

**color** [1] - 98:20

**combination** [1] - 123:11

**combined** [1] - 70:14

**comfortable** [1] - 15:22

**coming** [3] - 92:9, 93:2, 108:21

**comment** [4] - 21:25, 23:2, 25:20, 92:22

**commentary** [1] -

131:20

**commented** [1] - 123:14

**commenting** [1] - 21:9

**comments** [1] - 11:24

**CommLog** [1] - 136:3

**community** [3] - 81:17, 101:25, 102:1

**companies** [1] - 38:7

**company** [3] - 74:22, 96:15, 99:13

**company's** [1] - 99:11

**compare** [2] - 84:4, 135:22

**comparing** [2] - 68:11, 136:7

**comparison** [3] - 63:5, 63:18, 68:12

**competency** [2] - 10:15, 26:23

**competent** [2] - 39:25, 48:12

**competently** [2] - 10:12, 48:6

**competing** [1] - 137:3

**complaint** [3] - 47:20, 80:15, 114:17

**complete** [3] - 11:25, 37:2, 122:2

**completely** [6] - 23:4, 64:8, 67:18, 72:7, 92:13, 126:5

**completeness** [1] - 25:12

**complicated** [1] - 28:5

**compliment** [1] - 39:23

**compromise** [2] - 102:15, 103:18

**computer** [16] - 45:19, 45:21, 46:3, 54:8, 61:14, 61:15, 62:1, 64:19, 68:3, 75:3, 77:18, 84:19, 87:6, 111:13, 113:4

**concealed** [1] - 126:2

**concede** [1] - 132:8

**conceivable** [1] - 39:9

**concept** [2] - 111:17, 117:4

**concern** [3] - 50:24, 80:17, 80:18

**concerned** [7] - 12:9, 12:14, 38:13, 47:13, 108:5, 118:9, 121:16

**concerns** [4] - 24:19, 46:12, 48:1, 120:20

**concession** [1] - 52:23

**conclude** [1] - 87:1

**concluded** [3] - 87:4, 87:5, 141:9

**concluding** [1] - 139:23

**conclusion** [6] - 73:25, 91:19, 104:15, 106:10, 122:21, 138:6

**conclusions** [15] - 41:25, 49:2, 49:15, 49:21, 51:14, 63:1, 74:11, 105:3, 105:22, 111:7, 119:13, 128:7, 131:16, 131:21, 136:12

**conduct** [5] - 21:10, 100:3, 100:8, 102:1, 106:22

**conducted** [1] - 34:24

**conducting** [1] - 71:1

**conference** [2] - 61:2, 88:17

**conferred** [1] - 72:18

**confess** [1] - 97:1

**confine** [3] - 14:2, 108:2, 115:16

**confined** [1] - 124:18

**confirmed** [1] - 52:8

**conflating** [2] - 92:14, 92:20

**confronted** [2] - 79:3, 80:4

**confuse** [1] - 101:7

**confused** [2] - 97:1, 97:3

**confuses** [1] - 62:18

**confusing** [11] - 81:3, 90:12, 90:25, 92:1, 93:11, 95:10, 95:15, 105:16, 108:18, 112:22, 131:3

**confusion** [6] - 64:6, 101:19, 103:2, 108:5, 124:14, 126:17

**Congress** [4] - 97:16, 98:3, 98:24, 130:23

**Congress's** [1] - 105:4

**conjunction** [1] - 136:2

**connection** [3] - 41:21, 65:14, 126:4

**Connelly** [39] - 9:11, 9:17, 9:24, 12:15, 12:21, 12:22, 13:16, 16:21, 17:9, 17:15, 17:24, 18:19, 20:10, 21:1, 21:3, 22:24, 24:8, 24:9, 24:10, 24:13, 26:14, 27:16, 29:20, 32:10, 32:16, 33:8, 34:23, 36:23, 37:12, 37:24, 38:6, 38:17, 41:2, 42:6, 43:6, 87:5, 138:13, 138:15

**Connelly's** [18] - 11:17, 11:19, 12:8, 19:14, 21:20, 21:25, 23:4, 24:12, 24:20, 26:18, 27:15, 31:4, 35:6, 39:8, 41:5, 42:23, 43:1

**CONOR** [1] - 2:15

**conor** [1] - 122:10

**Conor** [4] - 6:7, 6:17, 6:20, 122:7

**consequently** [1] - 98:9

**consider** [4] - 27:22, 38:21, 116:23, 140:3

**considerations** [3] - 116:22, 134:21, 134:22

**considered** [3] - 38:15, 38:17, 93:1

**considering** [1] - 55:14

**consistency** [1] - 20:18

**consistent** [1] - 23:12

**CONSTANTINE** [2] - 2:11, 6:12

**Constantine** [2] - 6:13, 6:14

**constantly** [1] - 8:15

**Constellation** [1] - 1:15

**constituent** [2] - 135:22, 136:21

**constitute** [1] - 119:13

**constituted** [1] - 105:13

**constitutes** [2] - 117:1, 119:11

**construction** [1] - 45:1

**consultant** [1] -

107:13

**consumer** [2] - 78:10, 78:11

**consumers** [2] - 77:17, 77:19

**consuming** [1] - 40:1

**CONT'D** [2] - 2:1, 3:1

**contact** [2] - 88:13, 100:3

**contacting** [1] - 32:22

**contain** [1] - 52:10

**contained** [4] - 72:12, 83:2, 84:10, 84:11

**contains** [3] - 51:21, 70:15, 96:12

**contemplate** [1] - 107:6

**contend** [3] - 22:7, 39:9, 39:17

**contended** [1] - 75:15

**contends** [1] - 115:9

**content** [3] - 74:24, 75:1, 75:19

**contents** [3] - 31:16, 32:4, 32:14

**contest** [1] - 44:16

**context** [17] - 16:20, 29:13, 60:24, 61:5, 67:16, 68:5, 98:20, 100:5, 100:6, 116:1, 116:20, 122:25, 126:23, 127:13, 133:21, 134:1, 135:5

**contexts** [4] - 91:2, 108:16, 123:8, 128:10

**continue** [2] - 17:13, 132:13

**continues** [1] - 17:14

**continuing** [2] - 107:1, 126:17

**contract** [6] - 79:9, 79:10, 79:15, 91:21, 93:9, 94:10

**contracts** [3] - 34:19, 34:20, 111:2

**contradicted** [1] - 34:21

**controls** [3] - 62:21, 86:4, 86:7

**conversation** [1] - 55:4

**conversations** [2] - 54:24, 55:1

**conversely** [1] - 12:8

**copied** [2] - 76:1, 86:18

**copies** [1] - 12:3

**COPPOLINO** [2] - 3:2, 7:6

**Coppolino** [4] - 7:7, 7:16, 38:23, 140:17

**Coppolino's** [1] - 140:19

**Copy** [1] - 74:5

**copy** [1] - 85:22

**copying** [3] - 65:5, 75:24, 124:2

**Copyright** [6] - 12:18, 47:14, 110:9, 111:8, 112:23, 132:4

**copyright** [48] - 58:1, 62:18, 63:9, 64:12, 64:22, 65:1, 66:11, 73:21, 73:25, 74:2, 74:7, 74:9, 74:13, 74:22, 75:7, 75:11, 76:3, 76:16, 78:20, 80:16, 81:11, 81:22, 83:4, 84:1, 84:13, 85:20, 86:20, 87:14, 87:18, 87:19, 111:6, 114:23, 120:6, 129:25, 130:20, 130:22, 130:24, 132:9, 132:21, 133:1, 133:4, 133:19, 134:8, 135:19, 136:14, 136:22

**copyright-related** [1] - 133:4

**copyrighted** [9] - 51:3, 51:25, 62:20, 65:6, 76:16, 79:1, 85:22, 86:12, 86:18

**Copyrighted** [1] - 52:11

**copyrights** [12] - 63:9, 63:13, 63:14, 64:11, 64:13, 65:25, 66:2, 80:25, 81:20, 81:21, 85:15, 136:12

**Cordoves** [2] - 107:9, 107:25

**CORELLIUM** [1] - 1:7

**Corellium** [160] - 4:2, 6:4, 6:6, 6:13, 6:23, 8:19, 9:16, 11:17, 11:20, 12:25, 13:20, 13:23, 14:4, 15:17, 18:19, 20:25, 21:3, 22:4, 24:23, 24:25, 25:21, 26:10, 27:24, 29:4, 31:18, 31:22, 32:2, 32:5, 32:13, 32:23, 33:2, 33:19, 33:22, 34:2, 34:3,

34:11, 34:19, 34:22, 35:16, 37:11, 37:15, 37:17, 37:20, 43:8, 43:12, 44:11, 45:4, 46:22, 46:24, 51:4, 51:15, 51:18, 51:21, 51:22, 51:24, 52:6, 52:12, 52:20, 53:1, 53:8, 53:12, 53:19, 53:21, 55:12, 56:4, 56:21, 56:24, 57:5, 57:8, 59:12, 59:17, 59:18, 61:16, 66:4, 66:16, 67:6, 67:22, 70:4, 70:12, 72:8, 72:11, 72:25, 73:22, 74:15, 74:18, 75:23, 76:21, 77:16, 77:23, 78:4, 78:6, 78:23, 79:7, 79:17, 80:9, 81:25, 82:8, 83:8, 90:1, 90:3, 90:7, 93:15, 93:22, 93:23, 93:25, 95:25, 97:3, 97:19, 99:15, 99:17, 99:25, 100:2, 100:6, 100:7, 100:18, 100:25, 101:19, 101:20, 102:8, 103:7, 104:11, 106:1, 106:3, 106:7, 106:21, 107:2, 107:19, 110:9, 111:7, 114:21, 115:2, 115:9, 115:10, 115:15, 116:4, 119:20, 119:24, 120:14, 120:22, 120:24, 121:4, 122:4, 122:6, 123:17, 123:24, 124:5, 125:3, 127:24, 130:16, 131:25, 132:7, 132:16, 135:16, 136:4, 136:15, 138:22, 140:6

**Corellium's** [64] - 8:25, 9:3, 9:6, 9:8, 9:10, 9:20, 20:21, 24:9, 24:22, 25:4, 25:7, 25:12, 25:25, 26:2, 26:15, 28:13, 28:14, 32:22, 32:24, 33:4, 37:25, 38:1, 43:10, 45:20, 45:25, 46:20, 47:19, 47:24, 51:8, 53:17, 57:25, 62:3, 65:5, 75:22, 76:18, 78:2, 78:17, 79:8, 87:9, 87:10, 87:14, 87:18, 89:13, 91:23, 93:18, 94:17, 101:6, 102:1, 104:7,

104:20, 105:25, 107:22, 116:3, 116:6, 116:13, 116:15, 118:18, 118:19, 118:25, 125:5, 129:25, 130:3, 131:8, 131:23

**Corp** [1] - 132:23

**correct** [18] - 4:18, 4:24, 7:16, 7:17, 11:2, 11:3, 22:21, 24:1, 27:4, 27:8, 28:1, 37:8, 39:1, 39:2, 50:2, 72:7, 105:8, 138:8

**correctly** [3] - 15:9, 85:5, 120:17

**corresponding** [9] - 8:25, 9:3, 9:6, 9:19, 45:25, 46:3, 62:22, 118:25, 130:2

**corroboration** [1] - 25:22

**corsack** [1] - 43:13

**Corwin** [4] - 134:5, 135:12, 135:15, 136:16

**costs** [1] - 24:23

**COUNSEL** [1] - 2:9

**counsel** [25] - 4:4, 4:12, 4:14, 4:23, 6:20, 7:19, 8:4, 8:5, 8:7, 11:23, 13:10, 22:12, 24:20, 37:11, 37:13, 47:15, 105:16, 106:24, 112:19, 113:13, 126:11, 127:24, 130:17

**count** [2] - 14:14, 47:4

**counter** [1] - 115:2

**counterpoint** [1] - 120:19

**countries** [1] - 110:20

**couple** [3] - 4:13, 79:25, 95:20

**course** [13] - 14:25, 39:14, 45:13, 46:4, 52:25, 56:11, 67:14, 75:6, 116:16, 116:19, 121:2, 135:7, 138:8

**court** [3] - 40:13, 42:7, 107:8

**COURT** [208] - 1:1, 4:3, 4:8, 4:15, 4:19, 4:22, 4:25, 5:8, 5:13, 5:16, 5:21, 5:24, 6:5, 6:11, 6:14, 6:18, 6:25, 7:4, 7:9, 7:13, 7:18, 10:9, 10:16, 10:22,

11:4, 13:9, 13:22, 14:1, 14:13, 16:7, 16:9, 16:23, 18:13, 19:18, 20:3, 20:22, 21:13, 22:10, 22:23, 23:8, 24:8, 26:22, 27:3, 27:6, 27:9, 27:19, 28:4, 28:20, 28:23, 29:9, 30:1, 30:5, 30:7, 31:3, 33:6, 33:17, 33:22, 35:5, 35:11, 35:23, 36:16, 38:22, 39:3, 39:24, 40:22, 41:24, 42:12, 42:16, 42:18, 42:21, 44:20, 45:17, 46:10, 48:11, 48:13, 49:25, 50:2, 50:15, 52:1, 52:4, 53:3, 53:18, 53:22, 54:5, 55:2, 55:24, 56:9, 57:15, 57:22, 58:5, 58:11, 58:17, 59:7, 60:4, 60:17, 61:12, 62:8, 63:3, 64:15, 64:18, 67:13, 68:6, 68:14, 69:8, 71:2, 71:5, 71:23, 72:2, 73:10, 76:9, 77:11, 77:13, 78:1, 79:20, 80:12, 80:19, 82:20, 83:17, 84:7, 84:17, 84:25, 87:3, 87:25, 88:9, 88:12, 88:25, 89:5, 90:6, 90:18, 92:7, 92:11, 93:20, 95:14, 96:18, 96:24, 97:11, 97:13, 97:22, 97:25, 98:5, 99:9, 101:3, 101:6, 102:24, 104:23, 105:7, 105:10, 105:20, 105:24, 106:11, 106:17, 106:24, 108:1, 108:19, 108:25, 109:11, 110:7, 110:15, 111:5, 111:21, 112:3, 112:20, 113:10, 113:12, 116:3, 116:8, 117:15, 117:19, 117:24, 118:4, 118:16, 120:12, 121:20, 122:4, 122:9, 122:11, 123:20, 125:2, 125:15, 126:16, 127:3, 127:11, 127:18, 128:2, 128:11, 128:24, 129:11, 129:18, 129:23,

130:10, 132:15, 132:18, 134:3, 135:11, 137:15, 137:20, 137:24, 138:10, 138:23, 139:3, 139:13, 139:18, 140:4, 140:11, 140:14, 140:19, 140:22, 140:25

**Court** [68] - 13:4, 15:10, 17:7, 18:11, 19:1, 19:12, 20:7, 22:12, 22:13, 25:10, 26:8, 30:12, 35:25, 39:12, 40:24, 42:15, 42:19, 49:23, 49:24, 50:13, 52:16, 52:17, 53:15, 60:6, 61:3, 65:11, 68:24, 71:15, 72:9, 72:24, 73:1, 74:16, 76:5, 77:14, 79:23, 85:11, 85:13, 96:22, 102:7, 102:16, 102:19, 102:20, 107:11, 107:14, 107:24, 108:4, 108:6, 112:9, 113:17, 119:18, 124:1, 124:4, 127:24, 128:15, 133:2, 133:8, 133:22, 133:23, 133:24, 134:7, 134:15, 135:10, 136:19, 136:21, 137:6, 139:1, 139:13, 140:3

**Court's** [7] - 16:24, 86:17, 118:4, 118:12, 127:1, 133:24, 138:8

**COURTROOM** [3] - 4:1, 88:7, 88:11

**courts** [4] - 43:24, 78:11, 116:22, 135:23

**covered** [5] - 21:22, 58:1, 66:13, 69:10, 113:19

**covers** [1] - 77:6

**COVID** [5] - 34:13, 34:14, 34:20, 38:6, 38:10

**CPA** [1] - 26:25

**create** [3] - 91:24, 94:17, 110:22

**created** [2] - 37:12, 92:5

**creating** [2] - 92:15, 93:15

**creation** [3] - 96:14, 109:16, 114:24

**creative** [2] - 63:24,

75:19
  **creativity** [1] - 75:5
  **credentials** [1] - 68:23
  **credibility** [3] - 36:11, 39:19, 40:2
  **crime** [2] - 47:8, 47:9
  **criminal** [2] - 47:5, 122:23
  **criteria** [1] - 119:25
  **critical** [1] - 16:12
  **critically** [1] - 96:10
  **criticizing** [1] - 73:23
  **cross** [19] - 30:16, 30:17, 30:23, 30:24, 36:4, 36:6, 36:11, 37:11, 37:22, 38:4, 38:11, 38:21, 39:10, 39:14, 39:16, 44:19, 116:17, 123:19
  **cross-examination** [14] - 30:16, 30:23, 30:24, 36:6, 36:11, 37:11, 37:22, 38:4, 38:11, 39:10, 39:16, 44:19, 116:17, 123:19
  **cross-examinations** [1] - 36:4
  **cross-examine** [2] - 30:17, 39:14
  **cross-examined** [1] - 38:21
  **CRR** [2] - 3:6, 141:21
  **crucible** [1] - 128:15
  **crux** [1] - 116:13
  **cursory** [1] - 51:1
  **custom** [2] - 91:10, 92:24
  **customers** [11] - 32:22, 32:24, 33:1, 74:24, 91:22, 91:24, 93:12, 95:24, 96:1, 104:12, 106:2
  **customers'** [1] - 92:20
  **cutting** [2] - 34:17, 35:21
  **cutting-edge** [1] - 34:17
  **cybersecurity** [5] - 94:2, 94:4, 94:5, 101:23, 103:9

## D

  **daily** [1] - 8:15
  **damage** [5] - 21:8, 22:18, 30:18, 54:9,

87:4
  **damages** [19] - 9:15, 12:6, 15:6, 15:10, 16:13, 17:1, 20:14, 23:24, 25:11, 25:15, 25:16, 26:24, 27:1, 27:20, 38:25, 49:18, 50:4, 87:4
  **danger** [1] - 64:5
  **dangerous** [1] - 25:15
  **data** [2] - 102:15, 103:19
  **database** [1] - 31:8
  **DATE** [1] - 141:21
  **dated** [11] - 11:10, 11:12, 11:13, 12:1, 12:2, 24:13, 24:14, 24:16, 24:17, 46:19, 89:17, 89:19, 89:20, 89:22, 130:6
  **Daubert** [31] - 8:19, 9:8, 10:18, 30:11, 35:25, 36:8, 36:12, 39:12, 39:15, 39:16, 40:7, 44:17, 48:22, 50:25, 51:6, 53:6, 60:5, 61:16, 65:11, 72:12, 73:2, 76:6, 77:3, 79:23, 81:1, 89:13, 102:21, 116:18, 129:12, 139:22
  **Dauberts** [2] - 6:8, 24:3
  **DAVID** [1] - 2:15
  **David** [7] - 6:6, 9:11, 9:16, 24:10, 53:20, 132:25, 140:9
  **DAWSON** [3] - 2:2, 5:14, 5:17
  **Dawson** [3] - 5:15, 5:25, 73:8
  **DC** [3] - 2:4, 3:4, 86:22
  **de** [1] - 31:12
  **dealing** [5] - 8:23, 9:15, 68:17, 117:24, 138:6
  **deals** [1] - 124:23
  **debate** [4] - 91:15, 94:12, 94:21, 95:4
  **debating** [1] - 86:1
  **decide** [8] - 15:11, 22:13, 28:6, 38:3, 106:21, 122:16, 128:15, 129:15
  **decided** [6] - 13:15, 44:1, 129:13, 136:25, 137:6

  **deciding** [2] - 43:25, 137:1
  **decision** [1] - 41:5
  **decisions** [1] - 104:20
  **deck** [4] - 68:21, 69:5, 69:8, 69:9
  **declaration** [3] - 55:7, 118:20, 130:4
  **deductible** [1] - 11:21
  **deduction** [1] - 24:23
  **deed** [1] - 85:13
  **Defendant** [4] - 6:2, 8:19, 89:13, 126:1
  **DEFENDANT** [1] - 2:11
  **defendant** [1] - 1:8
  **Defendant's** [2] - 24:4, 130:21
  **Defendants** [1] - 44:8
  **defended** [1] - 100:8
  **defense** [8] - 93:22, 97:19, 101:18, 104:22, 115:2, 116:23, 125:1, 140:5
  **defenses** [4] - 100:16, 100:18, 120:6, 127:14
  **defer** [1] - 140:16
  **deficit** [1] - 42:11
  **define** [1] - 117:25
  **defined** [4] - 81:8, 92:18, 109:19, 109:20
  **defines** [1] - 106:19
  **defining** [1] - 91:18, 94:25
  **definitely** [5] - 70:1, 91:5, 93:16, 117:16, 117:17
  **definition** [35] - 81:7, 90:9, 90:16, 91:8, 91:23, 92:3, 92:19, 93:13, 94:25, 95:9, 95:11, 95:14, 95:18, 95:19, 95:21, 95:22, 96:6, 96:7, 96:8, 96:14, 99:2, 103:25, 109:9, 109:11, 109:13, 110:5, 111:4, 111:19, 111:20, 114:12, 114:13, 115:7, 117:20
  **definitions** [4] - 91:2, 95:12, 95:17, 109:25
  **deliberation** [1] - 95:12
  **demonstrate** [1] - 98:8

  **demonstrates** [1] - 74:6
  **demonstrative** [1] - 14:10
  **denial** [1] - 14:18
  **deny** [1] - 29:10
  **DEPARTMENT** [2] - 3:2, 3:3
  **Department** [2] - 7:7, 7:11
  **dependent** [4] - 28:14, 28:15, 28:16
  **depo** [1] - 17:14
  **depose** [1] - 60:11
  **deposed** [3] - 51:10, 70:9, 70:18
  **deposition** [12] - 15:19, 16:8, 16:9, 16:19, 51:2, 52:15, 58:7, 58:14, 60:3, 71:19, 96:4, 96:13
  **DEPUTY** [3] - 4:1, 88:7, 88:11
  **derived** [1] - 96:10
  **derives** [2] - 33:12, 33:13
  **describe** [3] - 102:25, 116:20, 131:16
  **described** [5] - 12:17, 52:6, 60:21, 65:11, 124:15
  **describes** [2] - 70:13, 103:23
  **design** [1] - 124:7
  **Design** [1] - 40:11
  **designed** [6] - 40:7, 44:13, 92:15, 102:9, 114:21, 114:25
  **desire** [1] - 66:6
  **despite** [2] - 52:14, 74:15
  **detail** [1] - 58:16
  **detailed** [1] - 51:10
  **details** [1] - 73:5
  **determination** [3] - 15:12, 27:21, 138:5
  **determinations** [1] - 138:6
  **determine** [4] - 11:1, 13:4, 94:15, 135:20
  **determined** [2] - 10:17, 136:19
  **determining** [1] - 137:9
  **developed** [4] - 33:14, 33:20, 63:10, 100:19
  **developing** [1] - 82:3
  **deviating** [1] - 103:6

  **device** [9] - 67:8, 67:21, 68:3, 76:22, 77:23, 78:14, 82:18, 82:22, 83:9
  **devices** [4] - 31:11, 31:13, 33:14, 33:20
  **devolved** [1] - 42:23
  **DEXTER** [1] - 2:23
  **dialogue** [4] - 98:9, 98:12, 98:16
  **difference** [4] - 11:25, 98:11, 101:15, 112:14
  **different** [30] - 16:12, 16:13, 20:15, 20:16, 21:6, 21:9, 57:3, 65:17, 66:12, 68:7, 69:5, 69:8, 69:9, 71:6, 71:13, 90:20, 91:1, 91:2, 95:12, 99:3, 103:9, 103:21, 109:13, 109:25, 111:1, 115:25, 117:8, 125:19, 134:1, 137:11
  **differently** [2] - 56:8, 135:1
  **difficult** [7] - 7:25, 8:8, 8:13, 18:20, 19:7, 68:15, 71:14
  **difficulty** [1] - 20:14
  **dig** [1] - 67:2
  **dilatory** [1] - 19:9
  **diligence** [1] - 20:20
  **direct** [3] - 36:5, 85:19, 133:9
  **directing** [3] - 124:25, 128:7, 134:16
  **directly** [2] - 66:17, 100:5
  **director** [1] - 94:5
  **disability** [1] - 107:11
  **disagree** [7] - 39:6, 57:18, 60:20, 83:21, 101:8, 112:25, 113:6
  **disagreement** [1] - 127:21
  **disagreements** [1] - 129:8
  **disagrees** [3] - 28:21, 83:18, 116:16
  **disastrous** [1] - 34:10
  **disclaimer** [1] - 81:12
  **disclose** [2] - 59:25, 99:12
  **disclosed** [5] - 58:23, 96:11, 103:7, 103:13, 108:15

**disclosing** [1] - 99:6
**disclosure** [11] -
90:24, 91:4, 91:6,
91:12, 93:5, 93:11,
104:5, 108:17,
109:24, 115:8
**discovery** [24] -
18:25, 19:5, 19:10,
21:3, 21:16, 22:16,
23:11, 23:22, 36:24,
42:11, 42:25, 43:11,
45:10, 45:14, 59:1,
70:4, 71:1, 72:17,
73:7, 111:22, 130:19
**discrimination** [1] -
107:12
**discuss** [5] - 87:13,
105:17, 111:16,
115:24, 126:21
**discussed** [5] - 14:7,
25:19, 74:3, 100:17,
107:1
**discusses** [1] -
138:22
**discussing** [3] -
54:15, 111:12, 115:25
**discussion** [2] -
18:9, 115:4
**Disney** [1] - 82:16
**dispute** [9] - 44:15,
52:22, 54:16, 54:21,
80:2, 80:3, 85:12,
128:5, 128:18
**disputed** [4] - 12:24,
28:12, 77:20, 131:6
**disputes** [2] - 23:25,
86:2
**disputing** [1] -
127:19
**distinct** [1] - 133:17
**distinction** [1] - 45:7
**distributed** [1] -
44:13
**DISTRICT** [2] - 1:1,
1:1
**District** [9] - 7:2,
30:12, 35:25, 40:13,
42:14, 42:19, 132:24,
137:6
**district** [4] - 43:24,
70:23, 136:3, 139:8
**DIVISION** [2] - 1:2,
3:3
**Division** [2] - 7:8,
7:12
**divulged** [1] - 74:18
**DMCA** [46] - 47:3,
47:18, 49:8, 62:19,
65:1, 65:20, 76:11,
79:17, 82:5, 83:5,

85:20, 85:23, 85:25,
86:5, 86:6, 97:8, 97:9,
98:7, 98:13, 100:18,
101:7, 101:10, 102:2,
104:24, 105:3, 111:8,
112:23, 116:6,
119:20, 119:21,
119:23, 120:1, 121:5,
122:14, 122:21,
123:4, 125:4, 125:16,
125:18, 126:8,
130:22, 132:1, 132:3,
135:1
**DMCA's** [1] - 46:21
**DNA** [2] - 47:7,
125:25
**Docket** [34] - 8:20,
9:21, 11:14, 24:11,
24:14, 24:15, 24:16,
24:17, 26:4, 46:1,
46:18, 46:19, 51:17,
52:3, 61:17, 61:19,
61:20, 61:21, 72:9,
89:14, 89:18, 89:19,
89:20, 89:22, 95:16,
105:10, 114:17,
118:21, 119:2, 130:3,
130:5, 130:7, 132:24,
138:16
**docket** [1] - 52:1
**doctrine** [3] - 99:18,
116:21, 121:6
**doctrines** [1] -
116:25
**document** [4] - 25:8,
25:12, 91:21, 93:9
**documents** [11] -
21:4, 27:17, 27:21,
71:13, 90:10, 92:2,
94:16, 94:19, 110:13,
111:2, 114:13
**dog** [1] - 38:24
**done** [19] - 11:8,
11:9, 11:12, 11:13,
12:17, 32:21, 34:24,
44:10, 55:5, 61:18,
82:4, 83:14, 85:11,
89:16, 100:9, 108:15,
135:20, 140:12,
140:19
**door** [2] - 82:16,
82:18
**double** [2] - 35:20,
65:23
**double-click** [1] -
65:23
**down** [6] - 20:16,
65:16, 118:23,
129:19, 135:22,
136:20

**download** [3] - 78:5,
78:6, 78:12
**downloaded** [2] -
31:16, 32:4
**downloading** [1] -
67:5
**downloads** [1] - 86:9
**dozens** [1] - 42:7
**Dr** [137] - 8:20, 9:9,
31:7, 32:16, 32:17,
37:12, 46:4, 46:11,
46:16, 49:1, 49:11,
50:5, 50:6, 50:25,
51:7, 51:13, 51:23,
52:8, 54:4, 54:14,
54:16, 54:19, 54:24,
55:15, 55:18, 55:23,
57:7, 57:19, 58:6,
59:1, 59:8, 61:9,
61:13, 61:15, 61:17,
61:18, 61:23, 62:9,
62:10, 62:17, 62:19,
62:25, 63:20, 64:10,
65:4, 65:16, 65:20,
66:8, 66:10, 66:20,
67:9, 69:22, 70:6,
70:19, 71:24, 73:2,
73:20, 73:23, 74:8,
74:14, 74:19, 74:21,
75:13, 75:17, 75:18,
75:24, 76:10, 76:19,
77:1, 77:4, 77:9,
78:25, 79:10, 79:14,
79:24, 80:2, 80:5,
80:14, 80:21, 82:3,
83:6, 83:14, 83:21,
84:4, 84:11, 84:20,
84:21, 85:18, 87:12,
87:17, 89:8, 89:11,
89:14, 89:16, 89:25,
90:1, 90:8, 90:13,
94:1, 94:18, 95:3,
95:8, 95:19, 97:4,
97:22, 97:25, 99:1,
99:10, 99:21, 100:12,
100:22, 102:4, 103:1,
104:3, 104:24, 105:2,
106:9, 107:20,
108:12, 111:11,
111:15, 111:17,
112:1, 112:10,
112:13, 113:12,
116:16, 116:19,
119:11, 120:19,
127:4, 127:9, 133:7,
133:11
**drawing** [1] - 135:7
**Drive** [1] - 1:19
**dropped** [1] - 81:24
**drug** [1] - 126:4

**during** [3] - 38:7,
108:7
**DVD** [7] - 29:14,
29:15, 29:16, 29:17,
29:18

# E

**early** [3] - 24:5,
46:15, 59:18
**easy** [1] - 66:19
**echo** [2] - 4:25, 14:6
**edge** [1] - 34:17
**Edwards** [1] - 141:20
**EDWARDS** [2] - 3:6,
141:21
**effect** [6] - 34:10,
47:19, 53:3, 80:21,
119:23, 125:17
**effective** [4] - 76:23,
76:24, 78:8
**effort** [3] - 26:4, 26:7,
115:16
**efforts** [1] - 40:5
**either** [13] - 12:5,
12:6, 16:24, 18:23,
38:3, 42:13, 50:4,
50:5, 50:16, 55:16,
76:15, 81:1, 139:14
**ELANA** [1] - 2:2
**elana** [1] - 5:14
**element** [3] - 99:19,
111:21, 135:22
**elements** [6] - 25:16,
63:16, 63:25, 64:25,
134:9, 136:21
**Eleventh** [11] - 2:3,
40:11, 40:16, 40:22,
65:10, 134:7, 134:13,
134:23, 135:2,
136:25, 137:10
**emails** [1] - 70:3
**embody** [1] - 75:2
**employee** [1] - 71:16
**employees** [1] -
70:19
**enable** [1] - 25:22
**enacted** [1] - 105:5
**enacting** [1] - 105:4
**encompassed** [1] -
114:9
**encompassing** [1] -
71:8
**encryption** [2] -
66:3, 100:20
**end** [7] - 5:9, 90:23,
94:14, 95:7, 103:16,
115:11, 115:13
**endorsed** [1] - 43:7

**ends** [2] - 32:18,
129:20
**engaged** [4] - 15:23,
99:11, 100:2, 101:21,
106:21, 110:9, 111:7
**engineer** [2] - 55:9,
68:23
**engineering** [1] -
68:23
**engineers** [1] - 60:1
**ensure** [2] - 65:12,
104:18
**ensuring** [1] - 106:3
**entered** [1] - 14:11
**Enterprises** [1] -
131:11
**entire** [10] - 21:20,
31:2, 45:2, 57:6,
59:10, 63:20, 81:15,
81:17, 86:6, 93:2
**entirely** [9] - 29:4,
68:8, 71:13, 72:23,
86:12, 104:1, 107:7,
109:16, 137:18
**entirety** [6] - 57:6,
63:13, 65:5, 70:7,
86:18, 95:3
**entitled** [4] - 74:10,
104:21, 136:13,
141:18
**entries** [2] - 31:8
**Entries** [4] - 9:21,
24:11, 46:1, 61:17
**entry** [1] - 52:1
**Entry** [27] - 8:20,
11:14, 24:14, 24:15,
24:16, 24:17, 26:4,
46:18, 46:19, 52:3,
61:19, 61:20, 61:21,
72:9, 89:14, 89:18,
89:19, 89:21, 89:22,
105:10, 118:21,
119:2, 130:3, 130:5,
130:7, 132:24, 138:16
**enunciated** [1] -
12:23
**especially** [2] - 8:6,
114:5
**ESQ** [14] - 1:14, 1:18,
1:21, 2:2, 2:5, 2:9,
2:11, 2:11, 2:15, 2:15,
2:19, 2:23, 3:2, 3:2
**essence** [1] - 133:2
**essential** [1] - 98:22
**essentially** [1] - 37:1
**establish** [3] - 30:17,
44:7, 86:19
**established** [1] -
43:22
**estopped** [1] - 102:1

**et** [3] - 10:2, 24:24
**evaluation** [1] - 19:6
**event** [1] - 118:4
**evidence** [11] - 11:1,
20:19, 21:9, 38:14,
50:14, 70:17, 83:7,
108:22, 115:5, 123:1,
123:18
**evidentiary** [1] -
14:10
**exact** [1] - 12:3
**exactly** [12] - 38:14,
40:7, 44:17, 57:17,
82:3, 84:9, 86:1,
90:21, 105:9, 107:19,
112:10, 124:14
**examination** [14] -
30:16, 30:23, 30:24,
36:6, 36:11, 37:11,
37:22, 38:4, 38:11,
39:10, 39:16, 44:19,
116:17, 123:19
**examinations** [1] -
36:4
**examine** [3] - 30:17,
39:14, 71:19
**examined** [2] -
38:21, 59:17
**example** [48] - 11:6,
11:15, 11:25, 18:18,
20:23, 32:1, 32:6,
32:9, 33:7, 33:9,
33:10, 34:1, 34:13,
35:10, 35:22, 46:12,
46:15, 46:20, 47:5,
55:12, 59:15, 61:24,
63:3, 63:4, 63:10,
66:15, 68:2, 69:10,
71:16, 74:18, 75:14,
81:11, 81:16, 82:24,
100:19, 106:18,
122:19, 123:4,
123:20, 123:25,
124:14, 124:19,
125:22, 125:23,
126:20, 127:13,
134:6, 139:5
**examples** [5] -
32:10, 105:14,
105:17, 105:18,
131:22
**excellent** [2] -
140:12, 140:14
**except** [1] - 5:19
**exception** [1] - 97:2
**exceptions** [2] -
50:10, 139:10
**exclude** [34] - 8:24,
9:2, 9:5, 9:19, 10:4,
24:4, 36:8, 36:13,

45:24, 46:5, 46:7,
48:3, 48:4, 52:17,
53:11, 53:16, 56:24,
57:13, 60:6, 62:4,
62:9, 68:10, 73:23,
77:3, 77:8, 79:11,
79:24, 87:24, 90:7,
95:3, 114:8, 118:24,
130:2
**excluded** [7] - 23:18,
37:19, 42:24, 54:23,
59:11, 69:6, 133:16
**excluding** [1] - 22:6
**exclusion** [3] -
46:21, 57:2, 116:18
**exclusively** [2] -
58:24, 61:25
**excuse** [3] - 16:8,
97:3, 97:6
**excused** [1] - 99:18
**execute** [2] - 83:4,
83:5, 85:20
**executing** [2] -
85:21, 85:23
**exemption** [14] -
95:25, 97:3, 97:5,
97:8, 98:8, 98:13,
101:7, 101:9, 101:11,
101:13, 104:2,
109:21, 114:15
**exemptions** [2] -
91:11, 117:3
**exempts** [1] - 49:9
**exercise** [1] - 78:20
**exhibits** [5] - 13:18,
14:10, 15:2, 50:10,
62:14
**exist** [2] - 29:13,
47:17
**existence** [1] - 31:18
**exists** [1] - 102:13
**expect** [6] - 50:12,
105:5, 106:20, 123:3,
126:19, 134:20
**expected** [5] - 76:4,
117:12, 123:5,
127:10, 127:16
**expenditures** [2] -
25:4, 34:16
**expenses** [2] -
11:21, 34:18
**experience** [5] -
38:7, 96:15, 103:23,
109:3, 118:10
**experienced** [1] -
99:1
**experienced-based**
[1] - 99:1
**expert** [130] - 8:25,
9:3, 9:20, 10:15,

11:11, 11:12, 11:14,
12:5, 12:6, 12:17,
14:5, 14:15, 15:1,
15:6, 15:10, 18:23,
19:3, 19:6, 19:8,
19:13, 20:4, 22:16,
22:18, 23:14, 23:15,
24:13, 24:15, 25:6,
25:10, 25:15, 26:6,
27:1, 27:20, 30:17,
30:22, 38:21, 39:19,
41:25, 42:6, 42:10,
45:21, 45:22, 46:1,
46:3, 46:5, 46:17,
46:18, 46:23, 47:2,
47:6, 47:8, 48:5,
48:17, 49:10, 49:22,
50:4, 55:22, 59:1,
60:10, 61:15, 61:19,
61:20, 61:21, 62:1,
65:13, 68:23, 69:17,
70:25, 71:21, 74:9,
81:4, 81:14, 87:10,
87:11, 87:12, 87:13,
87:15, 87:18, 87:19,
89:9, 89:12, 89:17,
89:18, 89:20, 91:6,
93:24, 99:21, 101:16,
101:21, 105:7,
107:12, 107:14,
108:1, 112:3, 112:18,
112:22, 113:3,
113:21, 114:5,
118:19, 118:20,
119:1, 119:9, 119:11,
120:18, 121:17,
125:19, 125:24,
128:19, 128:23,
128:24, 128:25,
129:24, 129:25,
130:3, 130:4, 130:6,
130:20, 132:21,
132:25, 133:1,
133:18, 133:25,
134:7, 134:9, 134:11,
134:16, 135:23,
137:16, 137:19
**expert's** [2] - 123:15,
134:11
**expertise** [10] -
10:25, 22:8, 49:12,
49:15, 74:10, 75:2,
104:6, 119:9, 132:8
**experts** [45] - 8:18,
9:6, 9:15, 9:16, 10:3,
13:5, 13:12, 14:24,
14:25, 17:1, 24:5,
29:1, 29:2, 34:25,
36:5, 45:19, 45:20,
49:18, 49:19, 54:9,
55:13, 61:14, 74:4,

80:5, 84:20, 87:5,
87:6, 87:7, 87:8, 88:4,
89:7, 95:5, 112:25,
117:11, 123:16,
129:1, 129:5, 129:21,
135:18, 135:25,
136:1, 138:11
**experts'** [1] - 23:13
**explain** [8] - 20:13,
20:18, 59:2, 60:2,
80:23, 99:21, 101:16,
106:20
**explained** [5] - 56:2,
59:4, 65:4, 124:1,
134:11
**explaining** [4] -
12:16, 37:1, 104:19,
119:18
**explains** [2] - 78:25,
103:11
**exploit** [2] - 78:7,
103:18
**exploits** [2] - 100:4,
102:14
**expose** [1] - 80:9
**expression** [1] -
126:10
**expressions** [1] -
123:12
**extend** [1] - 121:2
**extensive** [2] - 10:2,
14:19
**extent** [9] - 51:14,
53:16, 56:21, 56:24,
59:12, 59:23, 71:12,
79:9, 124:2
**extra** [3] - 91:25,
92:3, 96:9
**extracted** [1] - 65:22
**extrapolating** [1] -
31:10
**extremely** [3] -
57:11, 63:2, 133:1
**eyes** [1] - 66:20

## F

**F.3d** [3] - 86:21,
86:23, 86:24
**F.Supp** [1] - 40:12
**face** [1] - 69:6
**facial** [1] - 34:12
**fact** [37] - 10:25,
11:1, 22:4, 25:21,
27:7, 35:8, 38:18,
41:11, 42:25, 44:15,
48:16, 52:9, 52:12,
55:10, 61:1, 63:14,
64:2, 64:7, 64:22,

66:4, 66:17, 71:7,
74:8, 75:6, 78:17,
78:19, 81:4, 84:4,
86:19, 92:8, 93:22,
110:4, 110:5, 125:5,
129:16, 136:16,
136:18
**factor** [2] - 56:18,
57:2
**factors** [4] - 17:1,
47:16, 47:17, 47:18
**facts** [44] - 17:5,
20:6, 21:10, 49:8,
49:13, 50:10, 51:13,
55:5, 56:11, 58:23,
58:24, 65:14, 73:6,
74:12, 74:15, 80:4,
90:10, 91:20, 92:2,
94:16, 94:19, 100:23,
104:15, 110:3, 111:2,
113:1, 113:3, 114:13,
116:21, 116:25,
122:24, 124:11,
127:6, 127:15, 129:2,
129:17, 133:17,
134:13, 137:13,
137:14
**factual** [11] - 56:18,
72:15, 85:16, 86:1,
104:20, 130:16,
130:19, 132:8, 133:3,
136:7, 138:5
**factually** [1] - 76:3
**fail** [1] - 125:2
**failing** [1] - 42:24
**fails** [3] - 41:10,
78:18, 119:19
**failure** [1] - 20:1
**fair** [39] - 28:7, 39:18,
47:12, 47:17, 49:9,
49:12, 49:16, 56:18,
57:2, 60:21, 68:19,
96:3, 98:19, 99:18,
99:19, 100:5, 100:6,
104:22, 110:9, 111:8,
111:13, 111:16,
111:18, 111:21,
116:20, 116:23,
120:24, 121:6,
122:20, 123:4, 124:8,
124:11, 124:20,
127:6, 127:7, 127:13,
131:23, 131:24,
133:13
**fairly** [2] - 52:24,
74:5
**faith** [77] - 89:24,
90:9, 90:11, 92:8,
92:12, 92:14, 92:15,
92:18, 92:21, 93:1,

93:4, 93:6, 93:10,
93:16, 93:21, 93:22,
93:24, 93:25, 95:9,
95:18, 96:2, 98:22,
99:2, 99:4, 99:11,
99:16, 99:19, 99:22,
100:5, 100:9, 100:11,
100:13, 100:15,
100:18, 100:20,
101:1, 101:2, 101:24,
102:5, 103:12,
103:24, 104:4,
104:10, 104:13,
104:17, 104:21,
105:6, 105:13,
105:19, 106:4, 106:8,
106:9, 106:19,
107:21, 108:14,
109:6, 109:15,
111:21, 113:2,
114:12, 115:7,
115:17, 115:21,
116:1, 116:15,
116:22, 117:1, 117:5,
117:6, 117:17,
117:19, 117:23,
119:12, 127:7, 127:8
**fake** [1] - 40:5
**falls** [2] - 46:21,
122:20
**false** [1] - 35:2
**fan** [1] - 63:6
**far** [19] - 9:18, 10:10,
21:17, 23:17, 26:19,
26:25, 47:21, 49:5,
64:25, 69:23, 93:20,
102:18, 113:10,
113:12, 123:16,
124:9, 124:11,
128:14, 138:13
**faulting** [4] - 73:24,
77:1, 107:2, 107:4
**favor** [2] - 124:8,
124:20
**features** [4] - 29:9,
75:1, 84:14
**February** [2] -
118:20, 130:5
**federal** [2] - 42:7,
49:7
**Federal** [1] - 97:7
**felon** [1] - 126:3
**few** [4] - 12:4, 19:19,
49:2, 88:18
**field** [1] - 48:12
**Fifth** [6] - 2:17,
40:19, 40:21, 40:24,
41:16, 137:10
**fifth** [1] - 9:8
**fight** [4] - 16:2,

38:25, 77:5, 137:7
**figure** [1] - 93:6
**figured** [1] - 78:6
**figures** [1] - 20:16
**file** [18] - 51:20,
65:21, 65:22, 65:23,
65:24, 67:2, 67:3,
67:5, 67:6, 67:7,
67:10, 78:5, 83:2,
83:11, 86:9, 121:22
**filed** [11] - 9:18,
11:11, 53:14, 61:16,
72:11, 130:1, 130:4,
130:6, 138:15,
138:24, 139:15
**files** [14] - 37:10,
51:19, 51:21, 53:7,
53:17, 56:4, 56:25,
57:23, 58:1, 59:11,
59:12, 59:24, 78:18
**final** [2] - 72:25,
129:24
**finally** [4] - 5:25,
86:3, 96:9, 120:4
**finances** [1] - 138:22
**financial** [3] - 25:8,
26:10, 27:21
**findings** [2] - 127:2,
134:24
**fine** [5] - 15:25, 77:7,
96:24, 109:18, 132:15
**finger** [1] - 54:6
**fingerprints** [3] -
47:7, 122:24, 125:24
**finish** [4] - 9:23,
84:19, 88:4, 116:9
**finished** [1] - 136:25
**finishing** [1] - 84:21
**finite** [1] - 10:1
**firearm** [2] - 126:3,
126:4
**firm** [2] - 120:23,
140:9
**first** [38] - 8:19, 9:15,
9:22, 11:5, 12:1,
12:11, 14:3, 16:21,
19:25, 24:21, 34:2,
34:15, 34:18, 38:9,
43:12, 45:23, 46:25,
47:10, 48:7, 53:24,
63:9, 63:19, 63:25,
69:10, 79:24, 83:10,
83:19, 87:7, 93:10,
96:22, 100:7, 108:10,
111:15, 119:17,
124:1, 124:3, 124:15,
134:23
**fit** [3] - 65:14,
119:25, 128:9
**fixed** [2] - 99:7,

103:15
**flatly** [1] - 72:16
**flawed** [1] - 66:10
**Floor** [2] - 2:17, 2:21
**FLORIDA** [1] - 1:1
**Florida** [7] - 1:4, 2:7,
2:13, 2:24, 7:2, 40:13,
132:24
**fly** [2] - 47:10, 54:11
**focus** [7] - 25:11,
25:16, 62:24, 69:22,
81:21, 115:21, 119:8
**focused** [2] - 62:19,
63:7
**focuses** [1] - 81:15
**focusing** [2] - 65:20,
116:21
**folks** [3] - 55:12,
87:13, 98:24
**follow** [4] - 41:14,
115:20, 118:12,
137:10
**following** [3] - 41:18,
109:6, 119:7
**follows** [4] - 16:5,
16:10, 41:21, 131:25
**Fonar** [1] - 86:23
**fools** [1] - 36:6
**footnote** [1] - 61:2
**Footnote** [1] - 86:25
**footnoted** [1] - 42:9
**FOR** [6] - 1:14, 2:2,
2:9, 2:11, 2:23, 3:2
**force** [1] - 79:2
**forceful** [1] - 85:16
**forces** [1] - 79:16
**foreclosed** [1] -
70:25
**foregoing** [1] -
141:16
**foreign** [1] - 121:14
**forensic** [2] - 26:25,
34:25
**forget** [2] - 8:1, 64:16
**form** [3] - 13:7,
20:20, 123:5
**formed** [2] - 73:24,
75:13
**forms** [1] - 91:19
**forth** [2] - 23:9, 119:4
**founders** [2] - 51:8,
115:10
**four** [3] - 20:15,
89:16, 119:12
**fourth** [3] - 9:5,
11:14, 119:24
**Fourth** [3] - 2:24,
3:4, 40:19
**frame** [1] - 111:1
**framework** [7] -

12:16, 94:2, 123:15,
126:11, 131:24,
135:21, 136:8
**Francisco** [1] - 1:23
**frankly** [3] - 12:13,
35:2, 130:11
**free** [9] - 46:22,
46:24, 47:19, 78:5,
78:6, 78:12, 78:18,
86:9, 104:9
**friction** [3] - 68:21,
68:25, 69:16
**FROM** [1] - 1:11
**front** [3] - 49:3,
118:11, 138:20
**frustrating** [1] -
19:10
**full** [5] - 37:4, 41:20,
92:19, 124:7, 136:5
**fully** [1] - 24:22
**fulsomeness** [1] -
18:24
**functionalities** [1] -
75:2
**functionality** [1] -
57:13
**fundamentally** [4] -
31:1, 31:4, 32:17,
71:10
**future** [4] - 33:24,
33:25, 34:1, 37:25

## G

**Gabe** [4] - 4:16, 46:8,
71:25, 96:21
**GABRIEL** [1] - 1:18
**Gabriel** [1] - 4:11
**gain** [2] - 92:17,
100:4
**Gass** [3] - 5:11, 5:13,
5:24
**GASS** [1] - 1:21, 5:11
**gatekeeper** [3] -
30:12, 36:2, 39:13
**gatekeeping** [1] -
44:16
**gears** [1] - 50:20
**general** [8] - 10:14,
15:25, 24:3, 39:20,
40:1, 92:9, 93:1,
131:13
**generally** [1] - 76:13
**generic** [1] - 131:17
**genuinely** [1] - 77:20
**geographic** [1] -
69:13
**given** [4] - 62:12,
108:7, 123:1, 135:4

**glad** [1] - 39:24
**gloss** [1] - 66:20
**goal** [1] - 105:23
**goals** [2] - 75:5,
103:17
**GOLDBERG** [4] -
2:5, 2:6, 5:19, 5:23
**Goldberg** [2] - 5:19,
5:25
**good-bye** [1] -
121:13
**good-faith** [39] -
89:24, 90:11, 93:4,
93:10, 93:16, 93:22,
95:9, 95:18, 96:2,
98:22, 99:2, 99:4,
99:11, 99:22, 100:20,
102:5, 103:12,
103:24, 104:4,
104:10, 104:17,
105:6, 105:13, 106:4,
106:9, 106:19,
108:14, 109:15,
114:12, 115:7,
115:17, 115:21,
116:1, 116:15, 117:1,
117:5, 117:6, 117:23,
119:12
**Gorton** [1] - 130:18
**governing** [1] -
134:12
**Government** [4] -
7:5, 7:20, 8:11,
140:23
**grant** [3] - 52:16,
79:23, 129:15
**grapple** [1] - 77:15
**gray** [2] - 103:11,
114:8
**great** [8] - 5:21, 6:1,
7:21, 17:2, 68:23,
84:25, 94:11, 101:19
**Gross** [5] - 4:11,
4:17, 46:8, 72:1,
96:21
**GROSS** [52] - 1:18,
4:10, 4:18, 46:8, 48:9,
48:12, 48:19, 50:1,
50:9, 50:20, 52:3,
52:5, 53:13, 56:7,
56:10, 58:2, 58:6,
58:13, 58:20, 59:13,
60:8, 71:25, 72:3,
73:12, 76:10, 77:12,
77:14, 78:2, 79:21,
85:3, 96:21, 96:25,
97:12, 97:15, 97:24,
98:1, 98:19, 99:14,
101:5, 101:8, 103:3,
105:2, 105:9, 105:18,

105:21, 106:6, 106:15, 106:18, 106:25, 109:12, 118:2, 141:6

**gross** [22] - 4:16, 5:5, 16:22, 18:20, 25:22, 28:8, 48:2, 48:8, 50:1, 50:2, 55:24, 56:7, 56:9, 57:11, 57:17, 59:8, 62:12, 72:2, 79:20, 83:24, 85:1, 116:10

**ground** [3] - 7:23, 21:14

**grounds** [3] - 77:2, 77:8, 79:25

**groundwork** [1] - 36:25

**group** [2] - 4:14, 45:18

**guess** [4] - 28:20, 33:8, 45:15, 127:24

**guidance** [2] - 107:11, 107:24

**guilty** [8] - 47:4, 47:8, 47:9, 47:20, 54:3, 125:6, 126:1

**gun** [3] - 47:7, 125:25

---

## H

**hackers** [1] - 77:18

**hacks** [1] - 102:14

**half** [4] - 22:2, 35:19, 35:21, 70:9

**hand** [2] - 65:13, 102:4

**handful** [1] - 31:18

**handle** [2] - 36:7, 116:7

**handled** [1] - 36:4

**handling** [2] - 46:9, 138:14

**hands** [1] - 98:25

**happy** [2] - 38:12, 73:9

**hard** [3] - 34:21, 68:12, 133:10

**harm** [2] - 101:25, 103:15

**harming** [1] - 109:4

**harmonize** [2] - 26:5, 26:7

**hat** [7] - 103:10, 103:11, 103:16, 114:8, 114:9

**hats** [2] - 113:25

**Haul** [1] - 131:12

---

**head** [1] - 66:22

**headnotes** [1] - 41:19

**healthy** [1] - 141:1

**hear** [21] - 10:5, 15:4, 19:3, 28:23, 36:18, 39:24, 42:3, 48:2, 72:22, 73:5, 89:25, 90:17, 96:22, 96:24, 108:8, 109:1, 119:6, 120:14, 122:4, 122:9

**heard** [1] - 109:8

**HEARING** [1] - 1:10

**hearing** [7] - 4:25, 5:3, 35:13, 74:16, 88:6, 88:7, 109:23

**hearings** [3] - 6:20, 8:6, 8:13

**hearsay** [1] - 14:20

**heart** [1] - 91:8

**heavily** [4] - 138:16, 138:19, 139:1, 139:15

**heavy** [2] - 139:11

**HECHT** [33] - 2:15, 2:16, 2:20, 6:6, 53:20, 53:23, 54:13, 55:6, 57:3, 57:17, 57:24, 60:19, 62:7, 62:10, 63:4, 64:17, 64:21, 67:17, 68:8, 68:19, 69:9, 71:3, 71:6, 80:18, 81:3, 82:24, 83:23, 84:9, 84:23, 88:23, 89:4, 140:10, 141:7

**Hecht** [22] - 6:6, 53:20, 53:22, 54:12, 55:24, 57:16, 58:4, 60:18, 62:6, 64:15, 71:23, 72:5, 72:22, 76:10, 80:13, 84:17, 84:22, 85:4, 85:16, 86:3, 89:2, 89:3

**hecht** [1] - 6:15

**Hecht's** [1] - 73:14

**height** [1] - 34:14

**held** [2] - 82:12, 107:16

**help** [3] - 80:5, 94:11, 104:19

**helpful** [9] - 63:5, 79:11, 80:8, 90:12, 103:5, 107:11, 107:16, 136:21, 136:23

**helpfulness** [3] - 10:21, 27:6, 27:11

**helpfulness-to** [1] - 27:6

**helping** [2] - 91:16,

---

93:6

**helps** [3] - 6:20, 8:2, 137:13

**hereby** [1] - 141:16

**Heritage** [1] - 40:12

**hesitation** [1] - 56:15

**high** [1] - 105:25

**high-level** [1] - 105:25

**highly** [10] - 32:25, 62:22, 65:18, 66:18, 72:24, 94:3, 94:6, 100:13, 102:11, 114:6

**himself** [2] - 19:25, 108:2

**hired** [2] - 43:2, 101:21

**historic** [1] - 38:1

**history** [1] - 131:5

**Hobbit** [1] - 63:21

**hold** [1] - 46:10

**holder** [2] - 63:9, 78:21

**holes** [1] - 65:17

**Home** [1] - 40:11

**honestly** [1] - 54:2

**Honor** [145] - 4:6, 4:10, 4:18, 4:20, 5:11, 6:3, 6:10, 6:12, 6:17, 6:24, 7:6, 7:10, 10:7, 10:14, 10:19, 11:3, 12:13, 13:15, 13:24, 14:6, 14:8, 15:15, 15:19, 16:4, 16:20, 17:12, 17:13, 19:17, 21:19, 22:3, 22:5, 22:22, 23:7, 24:2, 26:17, 27:5, 27:8, 28:3, 28:7, 28:22, 29:25, 30:21, 32:15, 32:23, 35:10, 35:15, 36:10, 36:19, 36:20, 36:22, 38:11, 38:13, 39:2, 39:5, 39:9, 39:12, 39:25, 40:8, 40:18, 41:14, 41:17, 41:18, 41:22, 42:5, 42:17, 43:18, 44:17, 44:24, 46:8, 48:20, 49:17, 50:1, 50:9, 52:16, 53:13, 53:20, 54:13, 56:7, 57:3, 58:2, 60:9, 60:19, 62:7, 71:25, 72:7, 76:8, 77:12, 79:12, 80:18, 84:24, 85:3, 86:3, 86:14, 87:2, 87:21, 88:22, 88:23, 89:4, 90:4, 92:23, 96:21, 98:19, 99:15,

---

105:9, 105:18, 106:6, 106:15, 106:18, 106:25, 109:10, 114:7, 116:12, 117:10, 118:3, 118:15, 120:11, 120:16, 121:1, 121:25, 122:7, 122:18, 122:22, 125:7, 126:9, 128:20, 129:7, 130:9, 130:11, 132:10, 132:17, 133:13, 135:14, 137:17, 137:22, 138:21, 139:2, 139:21, 140:8, 140:10, 140:17, 140:24, 141:4, 141:5, 141:6

**Honor's** [5] - 22:6, 37:7, 40:10, 41:5, 64:4

**HONORABLE** [1] - 1:10

**hood** [1] - 74:20

**hours** [1] - 112:5

**HOUSE** [1] - 2:9

**house** [5] - 4:12, 4:22, 81:15, 81:16, 82:14

**houses** [1] - 81:17

**huge** [3] - 64:14, 70:13, 83:15

**hundreds** [2] - 50:13, 118:11

**hyper** [1] - 77:18

**hyper-sophisticated** [1] - 77:18

**hypervisor** [2] - 29:3, 45:4

---

## I

**idea** [5] - 31:10, 76:2, 86:18, 111:18, 116:19

**identical** [1] - 95:20

**identified** [4] - 58:9, 80:15, 103:13, 132:7

**identify** [3] - 18:20, 44:9, 75:23

**identifying** [1] - 58:13

**ill** [1] - 102:14

**illegal** [2] - 76:13, 103:20

**illustrate** [2] - 108:18, 114:15

**image** [1] - 44:3

---

**imaginary** [1] - 85:8

**impact** [1] - 71:17

**impactful** [1] - 121:12

**impeachment** [1] - 121:24

**impermissible** [2] - 107:17, 119:13

**impermissibly** [1] - 134:18

**implicated** [1] - 29:7

**implication** [1] - 45:6

**imply** [1] - 105:21

**important** [10] - 56:12, 65:9, 69:21, 78:1, 81:13, 83:12, 99:9, 99:10, 99:14, 104:3

**importantly** [1] - 131:17

**imposes** [1] - 104:11

**impossible** [2] - 38:8, 92:5

**impression** [2] - 57:1, 134:23

**improper** [12] - 14:17, 16:24, 18:23, 23:15, 23:21, 24:7, 36:13, 45:13, 70:16, 72:14, 72:24, 129:21

**improperly** [2] - 19:10, 136:6

**IN** [1] - 2:9

**in-house** [2] - 4:12, 4:22

**IN-HOUSE** [1] - 2:9

**inadmissible** [1] - 14:20

**inapplicable** [2] - 97:5, 101:10

**inappropriate** [5] - 13:3, 49:16, 71:8, 87:23, 137:18

**inartful** [1] - 123:12

**inartfully** [1] - 138:3

**Inc** [2] - 4:2, 40:12

**INC** [2] - 1:4, 2:9

**inception** [1] - 27:25

**inclined** [2] - 49:17, 79:23

**include** [5] - 18:3, 18:9, 42:25, 71:10, 115:8

**included** [7] - 6:21, 18:2, 20:12, 45:5, 70:20, 81:13, 125:9

**includes** [5] - 31:20, 65:6, 70:17, 108:16, 121:11

**including** [3] - 55:23,

78:14, 120:23
**income** [3] - 30:19, 38:2, 43:21
**inconsistencies** [2] - 26:5, 27:18
**inconsistent** [2] - 20:24, 21:8
**incorporate** [1] - 84:8
**increments** [2] - 31:25, 32:2
**indeed** [3] - 16:16, 39:22, 39:25
**independent** [2] - 29:4, 45:5
**indicative** [1] - 43:3
**indiscernible** [8] - 62:21, 68:2, 90:9, 96:12, 114:25, 115:24, 121:14, 124:6
**indiscernible]** [1] - 62:22
**individual** [1] - 93:12
**industry** [68] - 90:18, 90:19, 91:10, 91:16, 91:17, 92:24, 94:2, 94:4, 94:12, 94:21, 95:1, 95:5, 95:6, 97:17, 98:2, 98:9, 98:10, 98:12, 98:15, 98:16, 98:21, 98:24, 99:3, 99:23, 100:13, 100:22, 101:4, 101:16, 101:22, 102:5, 103:8, 103:21, 103:24, 104:6, 104:14, 105:6, 105:7, 105:12, 105:13, 105:17, 105:18, 106:19, 108:2, 108:3, 109:2, 109:12, 109:14, 110:1, 111:25, 113:16, 113:18, 113:21, 113:24, 114:4, 114:9, 116:14, 117:1, 117:4, 117:12, 119:11, 124:10, 127:6, 127:15, 132:8
**industry-wide** [3] - 98:9, 98:12, 98:16
**inflates** [1] - 63:20
**influence** [1] - 127:6
**inform** [2] - 59:3, 98:3
**information** [21] - 14:19, 25:9, 25:22, 26:11, 33:3, 33:20, 35:6, 37:5, 51:7, 51:9, 51:11, 55:4, 59:3,

60:11, 60:13, 60:15, 61:10, 75:22, 96:10, 115:15
**informed** [1] - 99:1
**informing** [1] - 55:4
**infringe** [2] - 102:2, 114:23
**infringed** [1] - 45:1
**infringement** [8] - 40:15, 49:9, 57:24, 64:25, 86:19, 104:22, 120:6, 134:8
**infringes** [1] - 44:4, 56:22
**infringing** [12] - 18:21, 28:11, 28:17, 29:22, 43:21, 44:7, 44:13, 44:14, 45:2, 99:17, 99:18
**inherently** [1] - 45:1
**initial** [2] - 36:25, 70:21
**inner** [1] - 82:11
**innocence** [1] - 100:15
**innocent** [2] - 100:9, 100:12
**input** [1] - 40:6
**inputs** [3] - 37:8, 39:7, 44:18
**inquiry** [3] - 10:18, 57:4, 66:9
**install** [1] - 77:22
**instance** [6] - 12:17, 20:13, 37:9, 37:24, 43:8, 121:10
**instances** [1] - 129:8
**instead** [3] - 62:22, 69:9, 69:14
**instituted** [1] - 104:25
**instruct** [9] - 13:5, 15:11, 16:25, 17:7, 22:1, 22:14, 101:17, 118:5, 138:9
**instructed** [6] - 101:12, 118:7, 118:8, 131:1, 132:12, 137:6
**instructing** [3] - 17:3, 49:20, 112:24
**instruction** [7] - 80:21, 81:2, 92:6, 108:6, 109:5, 127:1, 137:4
**instructions** [4] - 49:23, 102:21, 112:9, 118:13
**instructs** [1] - 108:4
**instrument** [2] - 85:13, 85:14

**insufficiently** [1] - 52:17
**integrity** [2] - 25:3, 25:5
**intellectual** [4] - 81:5, 81:9, 85:5, 85:9
**intend** [13] - 12:20, 13:19, 14:12, 15:17, 23:19, 23:20, 36:23, 51:23, 54:14, 105:2, 105:16, 122:19, 123:17
**intended** [4] - 24:6, 30:13, 36:2, 104:16
**intending** [2] - 13:20, 115:4
**intends** [8] - 10:12, 26:24, 48:7, 98:1, 105:1, 106:5, 106:13, 111:6
**intent** [20] - 91:24, 93:14, 93:18, 93:20, 94:17, 100:10, 100:12, 102:14, 116:6, 119:23, 125:16, 125:18, 125:21, 126:2, 126:3, 126:4, 126:7, 126:13, 128:9, 129:4
**intention** [1] - 60:23
**interested** [2] - 7:20, 40:23
**interesting** [1] - 118:22
**internal** [2] - 35:1, 110:13
**International** [1] - 132:23
**interpret** [3] - 85:13, 121:7, 123:1
**interpretation** [8] - 49:16, 76:25, 77:2, 85:8, 85:10, 122:14, 131:5
**interpreting** [2] - 85:14, 120:21
**interrogatories** [2] - 20:15, 34:5
**interrogatory** [5] - 18:22, 20:24, 33:17, 33:23, 37:16
**Interrogatory** [2] - 21:7
**interrupt** [2] - 8:4, 8:7
**intricate** [1] - 76:20
**introduce** [16] - 4:14, 13:11, 14:5, 14:9, 14:17, 14:24, 15:2, 15:13, 15:18, 23:13,

23:19, 47:25, 50:4, 50:6, 125:12, 126:2
**introduced** [6] - 18:14, 18:15, 38:19, 69:23, 128:13, 133:11
**introducing** [4] - 13:16, 13:17, 14:4, 14:17
**intruding** [1] - 134:18
**intrusion** [1] - 77:17
**invading** [3] - 47:1, 110:3, 112:8
**investigation** [3] - 27:13, 27:16, 32:21
**invoices** [1] - 24:23
**invoked** [1] - 97:19
**involve** [1] - 99:24
**involved** [3] - 14:14, 22:16, 114:5
**involvement** [1] - 42:23
**involves** [4] - 62:18, 80:24, 99:6, 104:5
**involving** [1] - 68:20
**IOS** [50] - 28:15, 28:18, 29:5, 29:6, 29:12, 31:8, 31:11, 31:17, 31:20, 32:1, 32:9, 32:11, 32:12, 45:5, 51:3, 51:15, 51:21, 52:19, 52:20, 53:8, 53:9, 54:18, 56:4, 56:5, 57:5, 59:19, 63:13, 63:15, 63:25, 65:6, 66:2, 66:6, 67:15, 67:16, 68:3, 74:22, 75:10, 75:20, 76:22, 77:22, 78:5, 79:1, 79:4, 79:16, 83:2, 84:5, 84:7, 114:24, 121:15, 124:7
**iPad** [1] - 31:22
**iPhone** [3] - 31:22, 66:6, 77:21
**IPSW** [18] - 51:19, 51:21, 53:7, 53:17, 56:3, 56:25, 57:23, 58:1, 59:11, 59:12, 59:24, 65:21, 67:1, 67:5, 78:5, 78:18, 83:11, 86:9
**ipsw.me** [1] - 31:17
**IPSWs** [1] - 66:1
**irrelevant** [11] - 62:24, 65:19, 67:17, 67:18, 69:5, 79:10, 90:12, 90:13, 97:14, 125:21, 126:5

**issue** [82] - 12:11, 14:3, 15:4, 19:16, 19:20, 21:19, 22:2, 22:6, 22:10, 22:19, 23:7, 28:3, 31:2, 36:7, 37:6, 39:10, 39:11, 43:4, 43:5, 44:17, 45:10, 47:11, 48:7, 48:19, 48:21, 48:25, 51:6, 59:16, 59:23, 60:5, 60:7, 61:13, 64:12, 64:13, 66:1, 66:2, 67:19, 68:24, 69:1, 69:2, 69:21, 71:4, 71:6, 71:14, 73:19, 78:24, 80:17, 81:1, 82:5, 85:11, 89:24, 93:25, 95:23, 97:17, 97:18, 99:16, 99:20, 100:7, 101:12, 102:5, 102:7, 102:16, 107:12, 117:10, 119:3, 120:2, 120:13, 121:8, 121:18, 121:20, 127:18, 128:4, 128:11, 128:17, 129:14, 129:17, 129:18, 134:4, 134:8, 135:5, 137:1
**issue's** [1] - 52:23
**issues** [27] - 21:15, 34:19, 47:18, 48:20, 53:4, 62:18, 64:6, 71:20, 80:24, 81:4, 102:19, 118:23, 119:5, 119:7, 122:12, 123:3, 123:21, 123:22, 126:20, 128:1, 129:16, 130:19, 131:7, 133:3, 133:5, 135:24, 139:24
**it'll** [3] - 48:15, 49:5, 118:6
**itemizing** [1] - 58:7
**iterations** [1] - 32:6
**itself** [8] - 29:3, 34:10, 66:11, 79:17, 92:12, 101:21, 106:21, 136:16
**iTunes** [2] - 81:24, 81:25

## J

**j)(1** [1] - 117:21
**James** [2] - 9:3, 46:1
**Jason** [4] - 9:9, 46:4, 61:15, 61:17
**JESSE** [1] - 2:9

**Jesse** [1] - 4:12
**JESSICA** [1] - 1:14
**Jessica** [1] - 4:6
**job** [4] - 74:3, 94:15, 140:12, 140:19
**joined** [1] - 58:8
**judge** [3] - 14:15, 88:9, 138:1
**Judge** [10] - 22:1, 47:2, 101:17, 112:24, 113:6, 122:16, 129:14, 131:1, 137:4, 140:1
**JUDGE** [1] - 1:11
**Judges** [1] - 139:8
**judges'** [1] - 88:17
**judging** [1] - 117:11
**judgment** [6] - 77:8, 102:8, 102:19, 129:10, 129:15, 136:22
**judgment-type** [1] - 77:8
**July** [1] - 1:5
**jumped** [1] - 21:1
**juries** [2] - 116:23, 136:23
**jurisdiction** [1] - 112:8
**juror** [1] - 93:17
**jurors** [1] - 118:10
**jury** [84] - 15:11, 16:25, 17:5, 20:7, 22:14, 26:8, 30:14, 30:23, 31:1, 31:5, 36:3, 39:16, 47:2, 49:21, 49:23, 50:13, 50:16, 52:19, 54:10, 60:7, 62:25, 66:20, 71:22, 76:4, 79:11, 80:8, 80:14, 85:17, 86:2, 90:10, 90:12, 90:16, 90:25, 91:16, 91:20, 92:1, 92:6, 93:6, 93:11, 94:11, 94:20, 95:10, 101:7, 101:17, 102:21, 104:19, 106:20, 106:21, 107:6, 107:17, 108:5, 109:5, 110:4, 111:3, 112:9, 112:24, 115:19, 118:5, 118:9, 120:21, 121:16, 122:16, 122:25, 124:25, 125:12, 125:14, 126:25, 128:7, 130:23, 132:12, 134:17, 134:19, 135:3, 135:8, 136:11,

137:1, 137:3, 137:5, 137:13, 138:4, 138:9, 139:25
**jury's** [6] - 80:3, 94:15, 108:25, 109:1, 114:18, 137:9
**Justice** [2] - 7:7, 7:11
**JUSTICE** [2] - 3:2, 3:3
**JUSTIN** [1] - 2:11
**Justin** [2] - 6:3, 13:24

## K

**keep** [2] - 9:25, 76:21
**Ken** [2] - 5:1, 88:6
**kernel** [2] - 66:17, 83:12
**kind** [15] - 34:17, 38:14, 43:2, 62:13, 63:18, 67:1, 68:9, 68:11, 69:1, 69:20, 82:11, 82:17, 83:23, 94:14, 128:22
**kinds** [3] - 94:14, 136:1, 136:6
**King** [1] - 63:8
**kiss** [1] - 121:12
**Kissane** [1] - 6:4
**KISSANE** [1] - 2:12
**knot** [1] - 92:5
**knowledge** [4] - 59:5, 64:24, 92:17, 130:16
**known** [2] - 5:2, 104:10
**knows** [1] - 83:14
**Koehler** [8] - 4:12, 4:19, 4:21, 4:22, 5:5, 5:7, 5:8, 5:24
**KOEHLER** [4] - 2:9, 4:20, 4:24, 5:7

## L

**lack** [2] - 20:20, 27:16
**Lakeview** [1] - 2:12
**language** [14] - 12:24, 56:16, 90:22, 99:4, 107:3, 107:4, 107:5, 107:21, 108:12, 115:6, 115:12, 116:2, 137:5
**large** [1] - 34:15
**LASH** [1] - 2:6
**last** [10] - 6:21, 63:8,

63:12, 70:11, 72:4, 87:13, 89:21, 108:10, 128:18, 137:25
**late** [2] - 30:5, 59:25
**LATHAM** [4] - 1:15, 1:18, 1:21, 2:2
**Latham** [2] - 4:7, 5:11
**latter** [2] - 50:9, 59:13
**laughing** [2] - 140:13, 140:21
**law** [114] - 11:23, 12:7, 12:8, 12:20, 13:1, 13:7, 15:7, 15:16, 16:12, 17:18, 17:19, 17:22, 17:25, 18:2, 18:4, 19:23, 22:1, 22:9, 23:12, 23:16, 28:8, 29:23, 30:7, 30:10, 30:11, 34:24, 35:25, 38:14, 43:19, 43:23, 48:21, 49:21, 54:2, 54:10, 56:18, 64:7, 73:21, 73:25, 74:1, 74:4, 74:5, 74:7, 74:8, 76:13, 81:7, 85:6, 85:7, 85:11, 85:14, 85:15, 85:20, 86:17, 87:14, 87:18, 87:19, 101:9, 101:12, 101:18, 102:17, 102:19, 105:22, 107:6, 107:23, 111:24, 111:25, 112:4, 112:7, 112:16, 112:19, 113:5, 120:20, 120:21, 121:7, 122:2, 123:13, 124:17, 124:25, 126:10, 126:12, 127:1, 128:9, 129:3, 129:8, 129:25, 130:22, 131:1, 131:4, 131:15, 132:4, 132:5, 132:10, 132:11, 132:19, 132:20, 133:1, 133:19, 133:22, 135:9, 135:17, 135:25, 136:17, 136:23, 137:2, 137:6, 137:16, 138:7, 139:10, 140:2
**laws** [1] - 110:21
**lawsuit** [9] - 34:3, 34:9, 34:21, 80:16, 80:24, 81:23, 121:11, 121:14, 133:12
**lawyer** [7] - 10:23,

14:15, 15:23, 26:8, 74:9, 113:3
**lawyers** [5] - 16:2, 18:25, 39:22, 42:24, 77:6
**lawyers'** [1] - 18:25
**lay** [2] - 7:23, 136:4
**laying** [1] - 36:25
**lead** [2] - 80:14, 138:6
**leading** [1] - 12:16
**least** [6] - 11:10, 27:25, 34:11, 34:15, 39:18, 94:23
**leave** [3] - 41:13, 57:1, 107:24
**led** [4] - 50:24, 72:17, 73:6, 73:7
**LEE** [8] - 2:23, 7:3, 7:17, 39:2, 140:13, 140:16, 140:21, 140:24
**Lee** [5] - 7:2, 7:16, 38:23, 39:1, 140:11
**left** [1] - 87:7
**legal** [69] - 8:24, 9:5, 9:19, 10:13, 11:4, 12:9, 12:23, 14:3, 15:4, 15:13, 15:18, 16:1, 16:18, 18:11, 21:14, 22:3, 22:17, 23:10, 23:17, 23:20, 24:7, 25:13, 26:7, 41:2, 47:13, 47:23, 49:2, 49:6, 49:15, 49:21, 49:22, 53:5, 54:1, 61:25, 73:19, 73:24, 74:11, 76:5, 77:2, 77:15, 78:17, 78:24, 85:9, 85:14, 105:3, 105:22, 107:4, 107:5, 107:17, 116:20, 116:24, 118:25, 119:13, 122:1, 122:20, 128:7, 130:2, 131:3, 131:7, 131:15, 131:20, 131:25, 133:2, 133:4, 134:12, 135:24, 136:8, 138:5, 139:24
**legalities** [1] - 15:22
**legally** [1] - 76:5
**legislative** [1] - 131:5
**lengthy** [1] - 35:13
**less** [1] - 35:18
**letting** [1] - 60:6
**level** [3] - 42:20, 75:24, 105:25
**Levine** [21] - 6:3,

6:25, 13:24, 14:2, 18:17, 19:21, 22:20, 22:23, 26:15, 36:21, 37:7, 37:23, 38:5, 38:22, 39:4, 43:19, 44:15, 44:20, 60:4, 138:14, 138:18
**LEVINE** [44] - 2:11, 6:3, 6:17, 6:24, 13:24, 14:6, 15:15, 16:8, 16:10, 17:11, 17:13, 23:1, 26:17, 26:25, 27:5, 27:8, 27:10, 28:2, 28:7, 28:22, 28:24, 29:10, 30:2, 30:6, 30:21, 31:6, 33:7, 33:19, 33:25, 35:9, 35:15, 36:10, 36:19, 39:5, 39:25, 41:4, 42:17, 44:22, 138:20, 139:2, 139:12, 139:17, 140:7, 141:5
**liability** [4] - 46:22, 46:24, 47:19, 49:10
**Library** [3] - 97:16, 98:3, 98:23
**license** [5] - 66:25, 67:3, 67:9, 78:23, 79:3
**lie** [2] - 22:4, 124:14
**Life** [1] - 74:5
**light** [6] - 39:17, 43:20, 52:22, 103:3, 103:22, 125:4
**likely** [3] - 93:13, 100:25, 124:18
**limitations** [1] - 120:6
**limited** [7] - 35:12, 56:19, 57:2, 57:11, 62:13, 64:13, 135:24
**limiting** [3] - 80:20, 81:1, 108:6
**limits** [1] - 59:5
**line** [5] - 40:18, 41:20, 54:14, 61:4, 135:7
**Lines** [1] - 16:5
**lines** [1] - 41:14
**LISA** [3] - 3:6, 141:21
**list** [6] - 8:23, 31:15, 31:17, 32:10, 123:10
**listed** [2] - 6:19, 32:4
**listen** [2] - 20:22, 118:4
**listening** [2] - 62:25, 129:7
**litany** [1] - 29:24
**literally** [3] - 32:19,

83:2, 131:3
**live** [7] - 13:19, 14:25, 50:7, 50:12, 54:14, 123:18, 128:12
**LIZZA** [1] - 2:11
**Lizza** [1] - 6:12
**LLC** [4] - 1:7, 4:2, 86:21, 136:3
**LLC's** [1] - 8:19
**LLP** [6] - 1:15, 1:18, 1:21, 2:2, 2:16, 2:20
**loading** [2] - 83:11, 83:12
**loads** [2] - 66:16, 66:17
**local** [1] - 85:13
**lock** [1] - 82:18
**locked** [1] - 82:21
**lodge** [1] - 128:13
**logged** [1] - 70:12
**look** [22] - 36:6, 38:16, 59:15, 64:10, 69:14, 69:20, 74:20, 75:18, 81:22, 91:20, 91:21, 97:6, 99:22, 103:17, 104:7, 110:15, 114:16, 130:15, 138:24, 138:25, 139:11
**looked** [12] - 32:7, 32:8, 47:3, 59:16, 59:19, 68:14, 74:21, 75:1, 75:9, 75:17, 84:12, 97:17
**looking** [14] - 11:6, 11:15, 11:16, 46:11, 61:5, 63:11, 64:25, 65:1, 69:10, 69:12, 85:12, 105:10, 122:3, 134:2
**looks** [14] - 82:11, 89:1, 89:5, 89:16, 96:6, 96:7, 98:24, 104:8, 110:12, 110:13, 110:16, 111:19, 119:15, 122:12
**Looney** [1] - 41:16
**Lord** [2] - 63:6, 63:7
**Lorenz** [1] - 38:16
**Los** [1] - 1:16
**lose** [1] - 50:16
**lost** [2] - 14:14, 34:20
**lunch** [2] - 84:18, 88:3

**M**

**macro** [1] - 62:23
**magistrate** [2] - 88:8, 88:9
**MAGISTRATE** [1] - 1:11
**main** [3] - 60:22, 94:9
**major** [2] - 32:5, 34:20
**majority** [3] - 32:3, 55:21, 91:7
**maker** [1] - 104:5
**malicious** [1] - 104:10
**manufacturers** [1] - 91:14
**March** [5] - 24:21, 46:17, 61:24, 70:8, 89:17
**mark** [3] - 43:2, 116:24, 117:9
**market** [1] - 34:24
**marketed** [2] - 44:14, 104:16
**marketing** [8] - 33:9, 33:11, 33:12, 34:3, 35:1, 40:5, 76:14
**Markman** [1] - 85:10
**MARTIN** [1] - 2:5
**Martin** [1] - 5:19
**massive** [1] - 42:11
**material** [4] - 62:20, 71:11, 71:12, 121:24
**materials** [4] - 59:15, 59:21, 80:15, 88:19
**matter** [20] - 10:12, 19:8, 21:9, 22:9, 26:24, 40:11, 48:6, 52:9, 54:19, 62:24, 77:15, 85:14, 85:15, 92:9, 94:3, 101:9, 102:16, 137:2, 141:18
**matters** [3] - 23:15, 98:14, 141:1
**MATTHEWMAN** [1] - 1:10
**Maxim** [2] - 6:7, 90:4
**MAXIM** [1] - 2:19
**mcDONOUGH** [1] - 138:1
**McDonough** [31] - 2:15, 6:8, 6:17, 6:18, 6:19, 112:12, 116:7, 122:7, 122:8, 122:10, 122:11, 122:18, 124:13, 125:7, 125:15, 126:9,

126:17, 127:9, 127:12, 127:23, 128:3, 132:17, 132:18, 132:19, 133:13, 134:4, 135:11, 135:13, 136:24, 137:24
**McGhan** [1] - 65:10
**mean** [42] - 8:21, 15:9, 24:2, 32:22, 33:3, 37:10, 39:23, 40:22, 41:1, 47:5, 50:15, 57:23, 58:17, 58:18, 60:20, 62:12, 68:14, 78:19, 82:17, 83:20, 91:22, 94:1, 98:13, 105:21, 108:1, 108:16, 108:21, 109:6, 111:12, 112:4, 112:8, 112:25, 113:6, 114:2, 122:15, 123:20, 123:25, 124:9, 125:4, 125:21, 129:4
**meaning** [1] - 72:20
**means** [10] - 58:20, 59:10, 76:22, 90:16, 91:16, 99:3, 110:4, 110:5, 117:22, 117:25
**meant** [1] - 128:3
**measure** [2] - 79:14, 85:24
**measures** [14] - 76:15, 76:23, 77:5, 77:7, 77:16, 77:24, 78:3, 78:9, 78:14, 79:1, 82:8, 86:10, 114:22, 115:1
**Medical** [1] - 65:11
**meet** [3] - 20:1, 36:12, 37:21
**meeting** [2] - 88:8, 88:10
**memory** [8] - 13:12, 15:1, 50:8, 58:15, 58:19, 66:18, 83:12, 83:13
**Menlo** [1] - 1:19
**mention** [2] - 71:15, 86:17
**mentioned** [11] - 6:15, 17:16, 29:3, 39:12, 42:4, 49:7, 53:4, 78:15, 99:5, 117:3, 117:5
**mentioning** [1] - 101:20
**mentions** [1] - 31:6
**mere** [1] - 136:17
**merely** [4] - 16:17,

20:12, 28:16, 33:11
**met** [4] - 11:17, 11:20, 14:18, 72:18
**metes** [1] - 108:23
**method** [1] - 68:24
**methodological** [1] - 43:3
**methodologies** [1] - 65:3
**methodology** [14] - 10:17, 10:20, 27:4, 37:9, 39:7, 39:8, 40:6, 41:24, 48:14, 63:24, 65:8, 66:8, 66:10, 67:22
**methods** [9] - 16:13, 26:19, 26:20, 27:15, 34:8, 39:13, 39:15, 43:5, 43:6
**Miami** [2] - 2:7, 2:24
**Michael** [3] - 8:20, 89:8, 90:1
**microphone** [1] - 96:23
**microphones** [1] - 7:24
**might** [15] - 5:4, 13:17, 38:6, 43:17, 47:21, 51:16, 55:5, 58:22, 60:1, 63:5, 82:2, 99:18, 122:23, 124:14, 127:6
**million** [2] - 35:16, 35:18
**mind** [6] - 9:25, 29:14, 99:15, 103:17, 117:11, 132:22
**minimis** [1] - 31:12
**minority** [1] - 55:21
**minute** [4] - 19:14, 44:21, 44:22, 44:23
**mischaracterizatio n** [1] - 60:21
**mischaracterized** [1] - 72:15
**mischaracterizes** [1] - 23:2
**misguided** [1] - 62:17
**misleading** [1] - 65:18
**misrepresentations** [2] - 72:15, 72:19
**miss** [2] - 88:12, 88:17
**misses** [1] - 117:8
**misspoken** [1] - 138:2
**MIT** [3] - 94:4, 94:5, 114:6

**mixed** [1] - 74:8
**modified** [1] - 18:22
**modifying** [1] - 75:24
**moment** [3] - 76:8, 106:15, 119:1
**money** [1] - 103:19
**Montgomery** [1] - 1:22
**months** [2] - 34:22
**moot** [1] - 55:17
**morning** [12] - 4:6, 4:10, 6:3, 6:12, 7:3, 7:6, 7:9, 7:10, 7:14, 10:7, 13:25, 14:1
**most** [9] - 43:24, 74:7, 96:10, 104:3, 123:16, 124:18, 131:17, 139:7, 139:25
**MOTION** [1] - 1:10
**motion** [64] - 8:9, 8:19, 8:24, 9:2, 9:5, 9:8, 9:10, 9:18, 9:22, 9:23, 10:4, 10:6, 13:22, 19:22, 24:9, 24:10, 26:15, 27:14, 36:8, 45:23, 45:24, 46:5, 46:6, 48:25, 50:21, 50:25, 51:7, 52:16, 53:6, 53:14, 55:16, 56:16, 61:16, 62:3, 72:20, 73:15, 76:6, 79:22, 79:24, 89:13, 90:5, 95:16, 97:2, 97:5, 102:8, 114:10, 114:11, 114:14, 118:24, 121:22, 130:1, 137:25, 138:15, 138:19, 138:20
**motions** [21] - 8:18, 9:13, 19:1, 30:9, 35:12, 46:9, 49:3, 73:2, 88:15, 102:20, 102:22, 120:17, 125:19, 129:9, 129:12, 133:10, 138:17, 139:4, 139:22, 139:24, 140:2
**mouth** [1] - 102:4
**move** [4] - 76:7, 87:23, 118:14, 118:17
**moved** [1] - 114:7
**moving** [7] - 18:21, 20:11, 21:15, 23:21, 25:20, 48:23, 95:2
**MR** [179] - 4:10, 4:18, 4:20, 4:24, 5:7, 5:11, 5:19, 5:23, 6:3, 6:6, 6:17, 6:24, 7:3, 7:6, 7:17, 13:24, 14:6,

15:15, 16:8, 16:10, 17:11, 17:13, 23:1, 26:17, 26:25, 27:5, 27:8, 27:10, 28:2, 28:7, 28:22, 28:24, 29:10, 30:2, 30:6, 30:21, 31:6, 33:7, 33:19, 33:25, 35:9, 35:15, 36:10, 36:19, 39:2, 39:5, 39:25, 41:4, 42:17, 44:22, 46:8, 48:9, 48:12, 48:19, 50:1, 50:9, 50:20, 52:3, 52:5, 53:13, 53:20, 53:23, 54:13, 55:6, 56:7, 56:10, 57:3, 57:17, 57:24, 58:2, 58:6, 58:13, 58:20, 59:13, 60:8, 60:19, 62:7, 62:10, 63:4, 64:17, 64:21, 67:17, 68:8, 68:19, 69:9, 71:3, 71:6, 71:25, 72:3, 73:12, 76:10, 77:12, 77:14, 78:2, 79:21, 80:18, 81:3, 82:24, 83:23, 84:9, 84:23, 85:3, 88:23, 89:4, 90:4, 90:7, 90:19, 92:9, 92:12, 94:8, 95:16, 96:21, 96:25, 97:12, 97:15, 97:24, 98:1, 98:19, 99:14, 101:5, 101:8, 103:3, 105:2, 105:9, 105:18, 105:21, 106:6, 106:15, 106:18, 106:25, 108:10, 108:23, 109:8, 109:14, 110:11, 110:16, 111:15, 111:22, 112:10, 113:8, 113:11, 114:7, 116:7, 116:12, 117:14, 117:16, 117:20, 117:25, 118:2, 118:15, 122:7, 122:10, 122:18, 124:13, 125:7, 126:9, 126:17, 127:9, 127:12, 127:23, 128:3, 132:17, 133:13, 134:4, 138:1, 138:20, 139:2, 139:12, 139:17, 140:7, 140:10, 140:13, 140:16, 140:21, 140:24, 141:5, 141:6, 141:7, 141:8

**MS** [40] - 4:6, 5:14, 5:17, 6:12, 7:10, 10:7, 10:13, 10:19, 11:3, 12:13, 13:14, 17:12, 19:17, 19:19, 20:10, 21:12, 21:18, 22:22, 24:2, 36:20, 42:5, 42:13, 42:19, 42:22, 87:21, 88:22, 120:11, 120:16, 121:25, 128:20, 129:6, 129:12, 129:22, 130:9, 130:11, 135:14, 137:17, 137:22, 139:21, 141:4
**murder** [1] - 122:7
**must** [10] - 28:10, 30:12, 36:1, 65:7, 65:13, 78:7, 96:10, 107:21, 116:5, 132:3
**mute** [3] - 5:3, 7:24, 8:3

## N

**nail** [1] - 72:25
**name** [3] - 4:10, 6:19, 6:21
**narrow** [4] - 52:23, 52:24, 54:22, 55:19
**narrowed** [2] - 118:23, 129:18
**nature** [9] - 17:4, 17:7, 21:16, 23:16, 24:7, 41:3, 49:22, 81:2, 122:21
**near** [1] - 52:9
**nearly** [1] - 95:19
**necessarily** [9] - 8:21, 20:18, 65:6, 68:17, 91:14, 91:22, 105:4, 109:1, 112:15
**necessary** [6] - 22:5, 40:15, 50:7, 98:18, 104:25, 139:7
**need** [23] - 20:17, 22:10, 26:13, 43:9, 56:6, 72:21, 73:7, 73:10, 77:15, 84:18, 86:2, 86:10, 99:10, 104:24, 111:23, 116:10, 123:25, 127:22, 129:1, 139:19, 140:5, 140:14
**needed** [2] - 123:2, 124:7
**needs** [13] - 25:10, 25:11, 28:6, 52:16, 72:17, 84:1, 93:4, 94:21, 128:18,

133:24, 134:25, 139:1, 140:23
**nefarious** [2] - 102:10, 103:17
**negotiations** [1] - 73:6
**never** [10] - 63:23, 64:22, 81:24, 102:13, 110:11, 110:12, 110:13, 112:1, 119:23, 125:17
**new** [14] - 32:5, 34:17, 68:17, 70:15, 70:17, 71:12, 74:24, 75:1, 75:9, 75:25, 84:14, 90:23, 94:24, 138:7
**New** [4] - 2:17, 2:21
**next** [10] - 9:2, 45:18, 61:13, 87:13, 88:6, 88:7, 88:15, 89:8, 89:18, 89:19
**nexus** [12] - 28:10, 29:24, 41:21, 43:9, 43:10, 43:20, 44:1, 44:2, 132:3, 134:25, 135:24
**NIEH** [1] - 46:4
**Nieh** [53] - 9:9, 32:16, 32:17, 37:12, 45:21, 46:4, 54:19, 61:13, 61:15, 61:17, 61:18, 62:9, 62:10, 62:19, 62:25, 63:20, 64:10, 65:4, 65:16, 65:20, 66:20, 67:9, 68:10, 69:22, 70:6, 70:19, 71:24, 72:12, 73:2, 73:20, 73:23, 74:8, 74:14, 74:19, 74:21, 75:17, 75:24, 76:19, 77:1, 77:4, 78:25, 79:10, 79:14, 80:2, 82:3, 83:6, 83:14, 83:21, 84:4, 84:11, 84:20, 84:21, 87:6
**Nieh's** [13] - 31:7, 50:5, 54:4, 61:23, 62:17, 66:8, 66:10, 76:10, 77:9, 79:24, 80:14, 80:21, 85:18
**NIGHTINGALE** [3] - 2:2, 5:14, 5:17
**Nightingale** [3] - 5:14, 5:25, 73:8
**Nimmer** [2] - 133:1, 133:17
**Nimmer's** [1] - 133:16

ninth [2] - 42:17, 42:18
**Ninth** [2] - 86:22, 137:10
**NO** [1] - 1:2
**noise** [1] - 8:2
**non** [3] - 76:22, 78:13, 86:12
**non-Apple** [2] - 76:22, 78:13
**non-authorized** [1] - 86:12
**none** [3] - 49:20, 132:6, 136:15
**noninfringement** [1] - 75:14
**nonlawyer** [1] - 112:6
**nonstarter** [1] - 80:1
**noon** [1] - 84:18
**normal** [1] - 112:17
**norms** [3] - 101:16, 117:4, 117:12
**north** [1] - 34:11
**Northeast** [1] - 2:24
**Northern** [2] - 40:13, 42:14
**Northwest** [2] - 2:3, 3:4
**note** [3] - 61:23, 124:20, 133:15
**noted** [1] - 42:6
**notes** [5] - 47:22, 74:21, 74:23, 84:12
**nothing** [18] - 29:6, 29:12, 41:11, 43:4, 59:9, 67:20, 70:18, 80:7, 81:7, 81:25, 85:6, 90:16, 102:9, 120:5, 131:17, 131:19, 137:12
**notice** [1] - 139:14
**nowhere** [2] - 96:3, 96:4
**number** [21] - 20:16, 30:2, 31:14, 31:15, 32:19, 33:7, 33:14, 37:12, 49:6, 72:7, 85:16, 86:7, 99:14, 100:16, 100:23, 100:24, 119:12, 120:22, 121:21, 121:23, 131:8
**numbers** [4] - 32:9, 32:23, 34:21, 40:5
**numerous** [3] - 11:9, 30:8, 31:21

## O

**oath** [5] - 15:20, 52:8, 58:7, 59:4, 60:12
**object** [1] - 21:17
**objecting** [3] - 119:15, 120:8, 120:17
**objection** [2] - 71:2, 128:13
**objections** [1] - 73:3
**obligations** [1] - 21:4
**observed** [1] - 127:24
**obtain** [1] - 33:4
**obviously** [9] - 15:20, 20:2, 44:5, 60:20, 61:8, 125:14, 126:25, 128:10, 135:10
**odds** [1] - 112:24
**OF** [3] - 1:1, 3:2, 3:3
**offensive** [2] - 120:23, 123:10
**offer** [9] - 51:23, 52:13, 122:23, 126:22, 131:15, 131:17, 131:18, 134:21, 139:23
**offered** [2] - 59:14, 132:25
**offering** [5] - 107:13, 127:14, 128:8, 133:18, 134:22
**offers** [2] - 83:8, 137:12
**Office** [1] - 131:15
**office** [1] - 130:24
**official** [1] - 67:7
**offsetting** [1] - 44:9
**often** [1] - 34:17
**Olivier** [36] - 9:4, 45:20, 45:23, 46:1, 46:7, 46:16, 47:24, 48:4, 48:18, 49:11, 51:7, 51:13, 51:23, 52:8, 54:14, 54:16, 54:24, 55:4, 55:11, 55:15, 55:18, 55:23, 56:1, 57:7, 57:19, 58:6, 59:1, 59:8, 59:9, 61:9, 75:13, 75:18, 80:5, 84:20, 87:6
**Olivier's** [6] - 46:11, 47:14, 49:1, 50:6, 50:25, 53:6
**once** [6] - 17:24, 44:6, 84:3, 98:8, 130:17

**one** [91] - 8:19, 11:8, 12:3, 18:1, 18:13, 19:12, 21:14, 23:2, 29:10, 29:22, 32:11, 33:5, 33:6, 35:9, 37:25, 38:3, 44:3, 44:20, 44:22, 45:23, 46:15, 46:17, 46:25, 49:7, 49:18, 50:21, 51:8, 52:23, 54:6, 54:7, 54:21, 58:3, 58:9, 58:17, 58:18, 59:16, 60:10, 60:16, 67:24, 72:7, 73:16, 78:25, 79:16, 80:13, 84:8, 86:5, 86:16, 87:17, 89:1, 89:8, 89:17, 89:20, 89:21, 94:20, 95:13, 98:23, 99:6, 99:19, 100:17, 102:4, 104:1, 104:3, 106:15, 106:25, 108:14, 112:12, 114:6, 116:22, 117:14, 118:19, 119:7, 119:17, 119:19, 119:22, 121:8, 121:21, 122:23, 123:14, 124:1, 125:16, 129:6, 131:10, 132:4, 132:22, 134:2, 134:9, 138:1, 138:12
**one's** [1] - 101:1
**ones** [1] - 136:4
**ongoing** [1] - 16:5
**onus** [1] - 115:18
**open** [4] - 75:16, 82:9, 82:14, 82:16
**opening** [8] - 68:22, 72:12, 74:17, 83:2, 83:11, 94:23, 94:25, 95:16
**operates** [2] - 22:14, 123:6
**Operating** [2] - 31:21
**operating** [9] - 28:14, 31:22, 31:25, 32:1, 45:5, 51:3, 51:14, 59:18, 74:25
**opine** [20] - 48:20, 55:15, 56:3, 62:1, 69:17, 81:5, 97:22, 97:25, 102:5, 105:3, 105:12, 106:3, 106:5, 107:20, 113:5, 121:3, 122:19, 130:21, 131:15, 135:8
**opined** [4] - 19:23, 63:20, 65:4, 116:25

**opining** [16] - 20:20, 46:23, 46:24, 57:7, 74:4, 83:22, 116:24, 120:20, 122:2, 123:3, 124:4, 126:12, 126:19, 127:12, 129:21, 132:9
**opinion** [61] - 11:17, 11:19, 14:3, 16:11, 17:22, 19:8, 19:24, 20:6, 21:5, 21:20, 23:3, 23:4, 23:5, 25:11, 31:6, 31:14, 32:17, 41:5, 41:9, 41:10, 41:11, 42:9, 42:20, 45:12, 45:13, 51:23, 53:16, 59:3, 59:10, 59:11, 59:20, 76:5, 77:3, 79:11, 94:1, 96:3, 98:17, 98:20, 100:12, 101:15, 103:6, 107:4, 107:13, 108:15, 109:11, 110:11, 110:17, 119:22, 120:24, 121:2, 121:4, 121:5, 123:5, 125:17, 125:25, 126:22, 127:14, 130:20, 133:16, 133:18
**opinions** [87] - 8:25, 9:2, 9:6, 9:19, 10:14, 10:23, 11:5, 12:9, 15:13, 15:18, 17:4, 17:5, 18:11, 18:24, 19:11, 21:14, 22:17, 23:10, 23:17, 23:21, 23:24, 24:7, 25:11, 30:25, 31:4, 35:6, 36:5, 36:9, 36:11, 36:13, 36:14, 41:2, 42:24, 43:1, 45:25, 46:13, 47:13, 47:23, 48:24, 49:6, 49:13, 50:24, 50:25, 51:1, 52:10, 52:18, 53:5, 54:2, 59:14, 59:22, 60:15, 64:9, 64:19, 70:15, 73:19, 73:23, 75:3, 76:11, 80:8, 80:11, 80:23, 82:4, 85:18, 98:21, 99:2, 101:24, 102:25, 106:13, 107:3, 113:2, 114:8, 116:20, 118:25, 119:8, 119:15, 122:1, 129:2, 129:14, 129:16, 130:2, 130:15, 131:2, 133:11, 140:1
**opportunity** [8] -

52:25, 58:3, 59:1, 60:2, 60:11, 74:20, 75:13, 123:1
**opposed** [5] - 21:10, 60:6, 72:20, 81:1, 135:2
**opposing** [5] - 22:12, 70:25, 105:15, 113:13, 127:23
**opposite** [2] - 100:3, 108:12
**opposition** [7] - 51:17, 86:25, 120:22, 130:21, 131:8, 132:7, 133:18
**opted** [1] - 35:20
**order** [10] - 8:21, 8:22, 19:1, 56:16, 56:23, 57:2, 65:12, 79:16, 111:22, 128:21
**ordinary** [8] - 67:14, 76:21, 77:17, 77:18, 77:21, 78:10, 78:11, 79:2
**original** [2] - 75:19, 136:13
**originality** [1] - 75:5
**ORLOFF** [2] - 3:2, 7:10
**Orloff** [5] - 7:11, 7:14, 7:16, 38:23, 140:22
**otherwise** [3] - 23:6, 85:9, 125:1
**ourselves** [1] - 14:2
**out-of-circuit** [1] - 134:24
**out-of-district** [1] - 136:3
**outrageous** [1] - 66:25
**outside** [5] - 4:14, 42:23, 46:21, 74:9, 129:17
**outweigh** [1] - 80:11
**outweighed** [1] - 64:5
**overall** [6] - 15:25, 92:21, 96:2, 99:7, 110:23, 111:17
**overbroad** [1] - 69:18
**overcome** [1] - 67:23
**overview** [2] - 105:12, 105:25
**overwhelming** [1] - 32:3
**own** [12] - 28:16, 37:16, 37:25, 38:1, 41:15, 90:8, 96:14,

97:19, 99:15, 110:22, 115:7, 117:11
**owner's** [2] - 76:16, 84:1

## P

**p.m** [3] - 88:2, 88:8, 88:9
**package** [2] - 65:21, 66:3
**page** [1] - 52:1
**Page** [23] - 11:7, 11:16, 11:22, 16:4, 16:19, 18:2, 18:18, 25:7, 25:20, 25:21, 25:24, 25:25, 26:2, 26:4, 26:9, 27:12, 46:16, 46:20, 51:18, 52:3, 95:17, 105:11, 107:10
**pages** [6] - 30:8, 50:13, 72:13, 131:4
**Pages** [4] - 1:8, 24:21, 25:3, 25:19
**paid** [1] - 43:15
**paired** [1] - 28:18
**PALM** [1] - 1:2
**Palm** [2] - 1:4, 2:13
**pandemic** [1] - 34:15
**pandemics** [1] - 38:8
**papers** [5] - 53:15, 55:2, 74:16, 89:23, 116:4
**Paragraph** [6] - 105:11, 105:24, 106:11, 106:17, 114:20, 115:9
**paragraphs** [1] - 114:17
**parallel** [1] - 69:3
**parameters** [1] - 16:18
**paraphrasing** [1] - 23:9
**parcel** [2] - 38:11, 38:20
**pardon** [1] - 97:24
**park** [1] - 82:16
**Park** [2] - 1:19, 2:20
**parse** [1] - 71:14
**part** [15] - 19:20, 19:22, 20:21, 37:3, 38:10, 38:20, 48:4, 53:10, 59:20, 70:1, 80:17, 87:11, 97:2, 101:8, 114:14
**particular** [21] - 49:1, 49:7, 49:8, 50:10,

50:24, 53:13, 56:11, 56:15, 56:18, 57:2, 74:24, 77:5, 78:5, 95:1, 97:18, 105:25, 107:8, 109:19, 134:23, 136:19
**particularly** [1] - 40:20
**parties** [11] - 7:19, 14:23, 18:10, 45:11, 50:22, 60:23, 73:5, 88:4, 119:6, 120:8, 137:2
**parties'** [3] - 13:10, 72:16, 89:23
**PARTNERS** [1] - 2:16
**parts** [4] - 51:3, 75:15, 83:12, 86:20
**party** [3] - 70:24, 70:25, 108:4
**password** [1] - 65:24
**Patent** [1] - 131:14
**patent** [2] - 81:10, 85:10
**pause** [1] - 88:24
**pending** [1] - 129:9
**people** [6] - 43:15, 55:3, 82:16, 100:2, 110:17, 110:20
**people's** [1] - 102:15
**percent** [9] - 29:21, 32:19, 35:9, 37:8, 38:19, 39:7, 41:10, 45:5, 106:6
**percentage** [1] - 54:20
**perfectly** [1] - 42:1
**perform** [3] - 27:13, 100:20, 110:17
**performed** [1] - 21:24
**perhaps** [4] - 47:17, 50:9, 86:8, 113:18
**period** [1] - 27:23
**permissible** [2] - 124:2, 128:16
**permissibly** [1] - 119:10
**permitted** [3] - 23:22, 112:18, 128:22
**person** [2] - 42:23, 61:4
**personal** [4] - 90:9, 100:4, 102:15, 103:19
**perspective** [4] - 75:3, 100:22, 102:5, 104:14
**pertain** [1] - 116:21
**pertaining** [1] -

17:25
**pertains** [1] - 56:11
**Ph.D** [1] - 46:12
**phone** [1] - 88:12
**phonetic** [2] - 43:13, 74:6
**phrase** [4] - 56:6, 56:8, 56:17, 57:15
**phrased** [2] - 53:15, 138:3
**phrasing** [2] - 56:5, 124:16
**picture** [1] - 6:21
**piece** [1] - 73:16
**PIERCE** [1] - 2:19
**place** [3] - 106:2, 109:20, 114:23
**plain** [1] - 12:24
**Plaintiff** [1] - 1:5, 39:17
**PLAINTIFF** [2] - 1:14, 2:2
**Plaintiff's** [4] - 10:4, 24:4, 136:13, 139:19
**Plaintiffs** [2] - 20:15, 43:7
**plan** [3] - 14:4, 52:12, 124:12
**planning** [1] - 20:19
**plans** [2] - 45:1, 103:1
**platform** [2] - 29:6, 99:23
**platforms** [2] - 28:13, 121:12
**plausible** [1] - 39:18
**play** [1] - 73:7
**Play** [1] - 135:16
**played** [1] - 130:16
**player** [2] - 29:15, 29:17
**players** [1] - 103:9
**pleading** [1] - 100:7
**pleadings** [2] - 10:2, 139:6
**pleased** [1] - 52:5
**point** [42] - 15:17, 18:1, 23:19, 23:20, 24:20, 28:7, 33:14, 35:3, 40:9, 41:24, 43:24, 45:9, 46:15, 54:22, 67:5, 67:6, 67:24, 68:12, 68:15, 68:16, 72:4, 76:4, 76:8, 76:22, 77:4, 77:25, 79:13, 86:16, 98:2, 98:22, 106:25, 108:10, 113:17, 118:2, 124:13, 133:13, 134:2, 137:4,

138:1, 138:3, 138:9
**pointed** [5] - 72:18, 75:14, 79:12, 79:14, 107:14
**pointing** [1] - 54:5
**points** [7] - 19:19, 76:7, 76:19, 100:23, 123:25, 126:18, 140:7
**policies** [1] - 130:21
**policy** [11] - 87:15, 87:18, 87:19, 98:15, 127:15, 129:25, 130:25, 132:9, 134:21, 134:22, 135:5
**pool** [2] - 68:21, 68:25
**pop** [1] - 61:12
**popped** [1] - 63:19
**pops** [1] - 67:7
**portion** [3] - 15:19, 41:9, 42:9
**portions** [8] - 51:24, 57:6, 56:25, 58:1, 59:12, 73:1, 119:8, 126:18
**Portions** [1] - 52:11
**portraying** [1] - 31:1
**position** [18] - 8:11, 30:16, 32:16, 33:4, 35:23, 36:18, 41:21, 44:12, 45:17, 48:3, 53:4, 53:5, 75:14, 87:22, 96:19, 116:6, 118:13, 120:9
**possible** [5] - 38:10, 47:24, 53:7, 55:3, 55:25
**possibly** [1] - 103:19
**post** [1] - 102:20
**post-trial** [1] - 102:20
**potentially** [3] - 91:1, 97:16, 135:4
**practice** [2] - 91:10, 92:25
**practices** [2] - 95:2, 101:17
**precedents** [2] - 134:12
**precise** [2] - 48:25, 138:22
**preclude** [6] - 8:20, 9:9, 9:11, 24:10, 61:16, 89:14
**prejudice** [4] - 31:2, 31:5, 64:6, 121:16
**prejudicial** [7] - 14:21, 30:23, 62:23, 65:18, 69:24, 80:7, 80:10

**prepared** [2] - 57:4, 116:5
**present** [1] - 137:3
**presented** [5] - 20:19, 79:3, 83:7, 107:6, 133:3
**presenting** [1] - 18:21
**presents** [5] - 62:22, 63:2, 67:14, 79:15, 133:4
**preserved** [1] - 72:23
**presiding** [2] - 131:1, 137:4
**presumably** [1] - 137:3
**pretty** [8] - 8:15, 23:12, 30:10, 40:23, 80:4, 81:22, 127:8, 132:13
**prevent** [5] - 5:4, 24:6, 77:17, 78:15, 114:23
**previously** [3] - 54:15, 124:21, 125:11
**Price** [2] - 6:7, 90:4
**PRICE** [28] - 2:19, 2:20, 90:4, 90:7, 90:19, 92:9, 92:12, 94:8, 95:16, 108:10, 108:23, 109:8, 109:14, 110:11, 110:16, 111:15, 111:22, 112:10, 113:8, 113:11, 114:7, 116:7, 117:14, 117:16, 117:20, 117:25, 118:15, 141:8
**price** [12] - 6:11, 6:16, 38:18, 90:6, 99:5, 103:25, 108:8, 108:20, 116:14, 117:3, 117:15, 118:9
**primarily** [1] - 101:3
**principal** [1] - 94:5
**principles** [1] - 61:25
**Pritchard** [1] - 40:24
**private** [2] - 33:2, 121:13
**probative** [2] - 64:4, 80:11
**problem** [29] - 8:14, 15:3, 18:16, 19:4, 23:14, 29:20, 31:14, 34:7, 63:24, 64:2, 64:14, 66:19, 66:23, 72:5, 81:15, 83:6, 83:13, 83:15, 83:24, 84:2, 84:3, 84:15, 90:1, 91:8, 96:23,

98:6, 110:2, 129:20
**problematic** [4] - 62:15, 71:22, 120:25, 121:7
**problems** [3] - 11:8, 37:25, 121:16
**procedures** [1] - 131:14
**proceed** [2] - 14:22, 79:16
**proceedings** [2] - 85:11, 141:17
**Proceedings** [1] - 141:9
**process** [3] - 19:11, 60:7, 131:14
**produce** [1] - 19:5
**produced** [7] - 24:23, 25:1, 25:25, 26:2, 36:24, 70:4, 71:13
**product** [55] - 18:21, 27:24, 28:13, 28:14, 28:17, 28:18, 29:4, 29:5, 29:22, 30:19, 32:25, 37:18, 37:20, 37:22, 43:12, 43:14, 44:11, 44:12, 44:13, 46:21, 51:15, 52:21, 53:17, 57:8, 57:13, 74:19, 91:24, 92:15, 92:17, 93:7, 93:15, 94:17, 96:12, 99:16, 99:17, 100:25, 102:9, 102:12, 104:8, 104:15, 106:1, 106:4, 106:22, 114:21, 115:17, 119:24, 120:24, 122:20, 123:6, 123:7, 124:23, 126:22, 130:16, 132:1
**production** [3] - 25:8, 25:12, 32:13
**products** [5] - 27:23, 38:20, 43:13, 76:14, 131:23
**Professor** [40] - 87:9, 87:14, 87:22, 89:10, 89:25, 110:7, 111:5, 111:11, 112:6, 116:4, 118:18, 120:10, 122:5, 122:13, 122:16, 122:19, 123:3, 123:13, 123:17, 124:12, 124:16, 126:19, 127:4, 127:16, 127:19, 127:22, 128:6, 129:23, 129:24, 130:4,

130:12, 130:13, 131:2, 132:25, 133:7, 133:16, 133:17, 134:21, 135:7
**professor** [3] - 87:20, 132:20, 137:16
**professors** [1] - 136:23
**profits** [1] - 40:15
**program** [14] - 67:14, 67:19, 78:15, 78:22, 78:25, 79:2, 79:15, 83:5, 85:20, 85:21, 85:22, 85:23, 86:12
**prohibited** [1] - 70:23
**projected** [3] - 33:13, 34:22, 35:16
**projection** [3] - 35:19, 35:20
**projections** [9] - 33:24, 33:25, 34:1, 34:4, 34:9, 34:22, 35:1, 35:2, 38:1
**promptly** [1] - 103:13
**prong** [3] - 27:7, 27:10, 65:11
**pronounced** [2] - 4:21, 130:12
**proof** [3] - 12:6, 13:8, 25:19
**proper** [5] - 18:11, 45:12, 46:14, 94:2, 119:9
**properly** [3] - 42:25, 73:20, 96:11
**property** [9] - 69:21, 81:5, 81:6, 81:8, 81:9, 85:5, 85:8, 85:12
**proposed** [2] - 65:12, 89:25
**proposition** [1] - 40:14
**proprietary** [1] - 32:25
**prorate** [1] - 35:20
**prosecutor** [1] - 7:1
**protect** [5] - 76:15, 76:16, 84:13, 94:14, 115:11
**protectable** [3] - 63:16, 63:24, 75:15
**protected** [8] - 73:25, 74:1, 75:6, 76:5, 82:13, 86:20, 132:3, 134:25
**protection** [7] - 73:21, 74:7, 74:14, 82:23, 114:22,

115:13, 136:14
**protections** [2] - 66:11, 66:12
**protects** [1] - 79:1, 95:7
**prove** [2] - 11:21, 121:14
**proved** [1] - 125:6
**proven** [1] - 35:2
**Provide** [1] - 105:24
**provide** [12] - 19:24, 23:24, 25:18, 74:11, 76:4, 99:21, 101:21, 104:8, 105:2, 105:11, 112:9, 123:15
**provided** [14] - 11:23, 17:17, 19:6, 19:9, 25:9, 25:21, 26:10, 27:17, 39:19, 45:11, 75:3, 101:23, 111:5, 112:19
**provider** [1] - 103:14
**provides** [2] - 102:12, 103:25
**providing** [4] - 68:9, 95:15, 107:4, 111:3
**province** [2] - 47:2, 110:4
**provisions** [4] - 25:13, 76:13, 107:16, 120:2
**public** [7] - 9:12, 39:20, 40:1, 121:12, 138:24, 139:8, 139:15
**publicly** [1] - 121:17
**pull** [1] - 32:8
**pulled** [2] - 32:19, 35:18
**purchases** [2] - 29:5, 34:16
**purport** [1] - 135:9
**purported** [1] - 87:18
**purporting** [1] - 121:6
**purpose** [11] - 12:19, 39:15, 59:19, 62:13, 100:21, 102:13, 117:23, 124:2, 124:5, 124:23, 134:10
**purposes** [11] - 68:4, 80:22, 100:24, 102:10, 102:11, 106:9, 106:23, 117:21, 123:9, 135:1, 137:7
**purview** [1] - 127:16
**put** [16] - 16:21, 18:1, 29:16, 34:3, 41:15, 55:7, 72:25, 78:13, 99:15, 99:20, 100:7,

100:25, 101:1, 102:14, 103:22, 106:2
**puts** [2] - 60:13, 114:22
**putting** [1] - 93:25

## Q

**QBE** [1] - 70:24
**qualification** [3] - 10:20, 27:2, 56:23
**qualifications** [2] - 80:3, 94:7
**qualified** [16] - 10:11, 15:6, 23:23, 23:24, 42:6, 48:6, 64:19, 93:17, 94:3, 94:6, 101:15, 105:23, 114:6, 119:7, 133:1
**quantifying** [1] - 20:14
**quarter** [1] - 34:2
**questioning** [1] - 25:5
**questions** [7] - 13:19, 15:24, 25:3, 61:8, 65:19, 76:8, 117:11
**quibble** [1] - 83:17
**quibbles** [1] - 37:24
**quick** [2] - 35:10, 35:11
**quickly** [4] - 42:3, 50:23, 85:1, 88:16
**quintessentially** [1] - 131:7
**quite** [4] - 8:8, 12:22, 108:12, 138:22
**quote** [5] - 15:21, 27:13, 72:25, 73:1, 76:23
**quote-unquote** [1] - 76:23
**quotes** [3] - 36:24, 108:14, 115:22
**quoting** [2] - 51:19, 107:15

## R

**rabbit** [1] - 65:17
**rails** [1] - 66:14
**raise** [5] - 19:16, 53:6, 73:2, 121:8, 140:23
**raised** [6] - 48:20, 48:21, 72:5, 73:15, 93:22, 115:2
**raises** [1] - 123:21

**rather** [10] - 22:4, 36:8, 50:23, 52:23, 87:23, 100:4, 116:21, 126:21, 133:3, 138:5
**RCTV** [2] - 132:22, 133:15
**RDR** [2] - 3:6, 141:21
**reach** [1] - 21:5
**reached** [2] - 17:16, 49:13
**reaches** [2] - 41:25, 104:15
**reaching** [1] - 49:21
**read** [16] - 10:1, 15:19, 17:20, 21:6, 21:7, 23:9, 30:1, 36:24, 47:24, 55:2, 62:3, 89:23, 98:6, 131:3, 132:20, 136:2
**reading** [8] - 12:2, 30:7, 30:8, 60:23, 61:5, 112:7, 120:1, 139:3
**readings** [1] - 68:21
**reads** [1] - 31:7
**ready** [4] - 7:22, 86:15, 87:1, 117:13
**real** [4] - 23:14, 77:10, 77:14, 85:8
**really** [42] - 6:20, 10:20, 13:2, 15:22, 24:6, 37:21, 49:19, 51:11, 60:23, 61:11, 64:24, 65:22, 66:22, 70:21, 71:14, 71:21, 74:7, 76:20, 77:20, 78:24, 81:13, 82:3, 82:6, 83:18, 83:20, 99:22, 103:6, 109:11, 111:11, 111:13, 112:14, 113:22, 114:17, 124:13, 124:22, 127:18, 133:7, 133:21, 138:16, 139:24, 140:12
**realm** [1] - 74:9
**reason** [9] - 19:22, 22:7, 31:24, 51:6, 51:16, 70:2, 72:11, 74:10, 138:18
**reasonably** [1] - 38:21
**reasoning** [1] - 136:5
**reasons** [4] - 18:13, 23:10, 74:3, 99:15
**rebut** [3] - 71:18, 87:23, 93:23
**rebuttal** [11] - 24:14, 24:16, 46:18, 61:20,

70:14, 70:21, 75:12, 89:18, 93:3, 94:24, 137:18
**rebutting** [1] - 94:24
**receive** [1] - 49:24
**received** [1] - 74:13
**recent** [1] - 25:8
**recess** [1] - 96:23
**recognize** [1] - 29:21
**record** [10] - 16:4, 17:14, 24:12, 40:10, 41:15, 46:17, 52:9, 61:19, 72:9, 140:8
**recording** [1] - 88:24
**RECORDING** [1] - 1:11
**records** [2] - 25:8, 26:1
**redaction** [1] - 14:19
**refer** [2] - 13:6, 95:24
**reference** [4] - 12:15, 18:10, 40:10, 67:13
**referenced** [1] - 98:7
**references** [2] - 71:9, 71:16
**referencing** [1] - 105:13
**referring** [1] - 86:4
**refers** [3] - 92:19, 95:23, 95:25
**reflect** [2] - 125:10, 128:22
**reflective** [1] - 101:1
**reflects** [1] - 75:5
**refresh** [2] - 15:1, 50:8
**refreshing** [1] - 13:12
**regarding** [16] - 8:18, 9:23, 10:12, 24:9, 26:23, 48:6, 54:1, 62:4, 65:12, 69:4, 73:2, 87:17, 93:24, 111:7, 118:24, 135:17
**registration** [6] - 64:1, 74:23, 75:11, 76:3, 81:9, 84:13
**registrations** [11] - 64:12, 65:2, 69:11, 69:12, 74:1, 74:2, 74:14, 81:11, 81:23, 81:24, 82:2
**regulation** [6] - 90:22, 97:6, 97:13, 97:23, 97:25, 113:14
**Regulations** [1] - 97:7
**regulations** [8] - 90:15, 97:18, 105:14, 105:15, 105:17,

105:20, 107:16, 113:15
**regulatory** [20] - 91:8, 91:11, 95:18, 95:21, 95:25, 96:7, 97:2, 97:5, 97:5, 99:4, 100:17, 101:11, 101:13, 104:2, 107:21, 109:21, 111:20, 114:15, 115:2, 115:6, 116:2
**Reinsdorf** [4] - 41:8, 42:4, 42:8, 45:9
**rejected** [1] - 41:9
**relate** [8] - 31:8, 31:9, 39:7, 78:22, 117:4, 123:4, 124:11
**related** [3] - 21:19, 65:2, 133:4
**relates** [5] - 32:9, 41:4, 45:8, 77:25, 137:13
**relating** [2] - 17:25, 84:2
**relation** [1] - 51:25
**relationship** [2] - 40:14, 43:21
**relax** [1] - 88:3
**release** [5] - 74:21, 74:23, 74:25, 84:12
**releases** [1] - 31:25
**relevant** [21] - 17:2, 29:23, 32:11, 61:25, 65:13, 66:5, 66:9, 68:8, 68:10, 69:18, 81:17, 81:18, 83:10, 100:10, 100:14, 107:15, 113:1, 126:5, 129:16, 133:4
**reliability** [4] - 26:19, 65:12, 68:24, 85:18
**reliable** [13] - 27:4, 41:6, 41:7, 41:10, 42:1, 42:2, 48:15, 51:12, 52:18, 59:2, 60:15, 65:8
**relied** [15] - 17:21, 18:4, 33:23, 34:4, 34:6, 50:11, 51:7, 58:7, 58:23, 59:2, 59:14, 59:24, 60:1, 60:2, 61:9
**relief** [1] - 53:13
**relies** [2] - 33:8, 136:15
**rely** [7] - 19:2, 33:17, 49:23, 51:13, 58:21, 59:9, 126:25
**relying** [4] - 32:17, 34:9, 35:1, 40:4

**remainder** [2] - 21:18, 49:5

**remaining** [1] - 126:18

**remedies** [1] - 120:5

**remember** [4] - 42:16, 58:22, 70:11, 109:23

**remembering** [1] - 15:9

**reminding** [1] - 88:13

**reminiscent** [1] - 102:17

**remove** [1] - 39:16

**render** [2] - 45:13, 64:19

**repeatedly** [1] - 18:22

**replete** [2] - 14:16, 72:14

**replies** [2] - 30:9, 139:4

**reply** [4] - 42:9, 123:10, 123:21, 134:6

**report** [103] - 11:6, 11:7, 11:8, 11:10, 11:11, 11:12, 11:13, 11:14, 11:16, 12:1, 12:2, 15:5, 16:5, 16:7, 16:16, 16:21, 18:2, 18:3, 18:18, 19:14, 19:15, 20:12, 20:22, 24:13, 24:14, 24:16, 24:17, 24:21, 25:19, 26:3, 26:9, 27:12, 31:7, 34:9, 35:20, 36:25, 37:1, 40:17, 46:11, 46:16, 46:17, 46:18, 47:14, 50:5, 50:6, 50:11, 54:4, 61:6, 61:19, 61:20, 61:21, 61:23, 61:24, 62:15, 64:13, 70:8, 70:11, 70:13, 70:14, 70:16, 70:20, 70:21, 70:25, 72:6, 72:14, 73:8, 74:18, 75:12, 75:21, 89:17, 89:18, 89:19, 89:20, 89:22, 92:23, 93:3, 94:10, 94:23, 94:24, 94:25, 95:3, 95:8, 105:10, 107:15, 108:15, 108:23, 111:16, 112:1, 118:20, 123:15, 123:18, 125:9, 130:4, 130:6, 131:19, 132:25, 133:6, 134:11

**report's** [2] - 108:21, 128:12

**reported** [1] - 25:4
Reporterlisaedwards@gmail.com [2] - 3:6, 141:21

**reporting** [1] - 99:24, 100:4

**reports** [51] - 10:2, 11:9, 11:11, 11:15, 11:24, 13:11, 13:13, 13:17, 14:5, 14:9, 14:16, 14:20, 14:24, 14:25, 18:14, 23:13, 23:14, 23:19, 24:12, 24:20, 26:12, 30:8, 34:13, 36:22, 46:16, 47:22, 47:23, 50:5, 50:7, 50:8, 50:13, 50:17, 51:2, 52:10, 52:15, 54:1, 58:6, 58:14, 58:21, 60:2, 61:1, 61:18, 62:12, 72:17, 74:17, 89:16, 93:3, 96:4, 103:5, 125:19, 133:6

**represent** [2] - 55:9, 62:15

**represented** [1] - 62:12

**representing** [1] - 61:3

**represents** [1] - 120:24

**request** [3] - 80:20, 108:6, 128:21

**requested** [2] - 25:9, 26:11

**require** [1] - 100:1

**required** [3] - 91:5, 116:19, 116:24

**requirement** [7] - 44:1, 44:2, 91:13, 91:25, 92:4, 109:24

**requirements** [1] - 90:14

**requires** [4] - 67:15, 85:21, 93:4, 93:10

**requiring** [1] - 90:23

**research** [66] - 29:6, 32:24, 34:16, 34:17, 68:4, 87:8, 87:10, 87:12, 89:9, 89:12, 90:9, 93:4, 93:10, 93:16, 94:5, 94:13, 95:9, 95:18, 96:2, 96:10, 98:22, 99:2, 99:5, 99:12, 99:23, 100:20, 101:25, 102:6, 102:9, 103:12,

103:22, 103:24, 104:4, 104:17, 105:6, 105:12, 105:13, 106:4, 106:19, 108:14, 109:3, 109:15, 110:17, 110:18, 111:13, 113:4, 113:25, 114:3, 114:12, 115:8, 115:17, 115:22, 116:1, 116:16, 117:2, 117:5, 117:7, 118:19, 119:9, 119:12, 120:19, 121:13, 121:15, 124:6

**researcher** [1] - 120:1

**researchers** [4] - 91:15, 92:16, 103:11, 103:17

**reserve** [1] - 52:25

**resolution** [1] - 50:23

**resolve** [4] - 60:7, 102:19, 102:20, 128:4

**resolved** [5] - 23:1, 23:6, 80:25, 102:22, 128:18

**resolves** [1] - 22:19

**resolving** [2] - 56:16, 126:14

**resources** [1] - 39:21

**respect** [10] - 10:13, 19:20, 20:10, 36:22, 37:7, 37:11, 56:17, 96:3, 133:15, 136:24

**respond** [12] - 14:8, 19:19, 36:21, 38:13, 53:1, 54:8, 58:3, 60:18, 85:1, 114:2, 116:11, 119:10

**responded** [1] - 17:20

**response** [5] - 12:21, 36:18, 42:4, 96:5, 108:9

**responses** [7] - 18:22, 20:15, 30:9, 33:23, 37:16, 43:11, 139:4

**responsible** [9] - 90:23, 91:3, 91:4, 91:5, 91:12, 93:4, 93:11, 104:5, 108:17

**responsibly** [2] - 96:11, 103:14

**rest** [1] - 89:7

**restrict** [1] - 66:6

**restrictions** [3] - 104:11, 104:18, 106:2

**result** [1] - 20:1

**resulted** [3] - 98:8, 98:13, 98:16

**results** [1] - 26:21

**retained** [2] - 27:13, 121:17

**Return** [1] - 63:8

**revenue** [9] - 16:22, 18:20, 25:23, 28:9, 35:16, 37:15, 37:17, 38:17, 43:11

**revenues** [4] - 29:21, 33:13, 44:5, 44:9

**review** [3] - 27:20, 34:12, 88:18

**reviewed** [7] - 17:19, 24:11, 27:16, 59:21, 89:15, 130:18, 130:19

**rifle** [2] - 48:22, 57:12

**rights** [7] - 65:2, 69:21, 69:22, 76:16, 78:20, 84:2, 120:5

**Rings** [2] - 63:6, 63:8

**risk** [1] - 101:19

**role** [13] - 30:12, 30:13, 30:14, 36:1, 36:2, 36:3, 130:12, 134:18, 135:4, 135:10, 136:11, 137:11

**room** [2] - 58:22, 95:12

**Rosenfeld** [1] - 132:23

**rounds** [1] - 5:17

**routinely** [1] - 108:7

**Rule** [1] - 79:25

**rule** [3] - 22:5, 22:10, 136:22

**ruled** [2] - 135:3, 140:1

**rulemaking** [1] - 98:4

**rules** [1] - 7:23

**ruling** [2] - 17:8, 49:17

**run** [6] - 66:4, 77:22, 78:13, 86:9, 86:12, 92:20

**running** [1] - 68:3, 76:22, 83:3

**runs** [1] - 104:9

## S

**safe** [1] - 141:1

**sake** [1] - 86:17

**sales** [1] - 18:20

**San** [1] - 1:23

**satisfy** [2] - 86:10, 86:11

**saw** [2] - 51:1, 82:2

**science** [11] - 45:20, 45:21, 45:22, 46:3, 54:8, 61:14, 61:15, 62:1, 64:19, 84:20, 87:6

**scientist** [3] - 75:3, 80:2, 94:5

**scope** [10] - 46:21, 49:7, 56:16, 69:1, 71:21, 73:20, 74:6, 85:4, 85:15, 103:7

**Scott** [2] - 1:19, 6:4

**SCOTT** [1] - 2:12

**screwed** [1] - 81:19

**sealed** [7] - 9:12, 30:8, 138:17, 138:19, 139:1, 139:5, 139:15

**sealing** [3] - 139:6, 139:8, 139:11

**Second** [2] - 2:6, 86:24

**second** [18] - 8:24, 10:16, 11:11, 12:2, 21:14, 24:17, 27:10, 33:6, 46:10, 46:18, 48:14, 65:11, 85:19, 89:21, 108:19, 117:14, 119:19, 124:19

**section** [1] - 120:5

**Section** [8] - 12:18, 44:8, 61:24, 97:8, 106:11, 106:17, 119:25, 122:14

**secure** [1] - 76:19

**security** [77] - 29:5, 29:9, 68:4, 76:15, 76:23, 77:5, 77:7, 77:16, 77:24, 78:3, 78:9, 78:14, 82:8, 82:10, 82:23, 83:19, 85:24, 86:10, 87:8, 87:10, 87:12, 89:9, 89:11, 89:12, 92:16, 93:4, 93:10, 93:16, 94:13, 95:9, 95:18, 96:2, 98:22, 99:2, 99:5, 99:8, 99:12, 99:22, 100:21, 101:25, 102:6, 102:9, 103:17, 103:22, 103:24, 104:4, 104:17, 105:6, 105:12, 105:13, 106:4, 106:9, 106:19, 108:14, 109:15, 111:13, 113:4,

113:24, 114:3, 114:12, 115:8, 115:11, 115:21, 116:1, 116:15, 117:1, 117:5, 117:6, 117:7, 118:19, 119:9, 119:12, 120:1, 120:18, 121:13, 121:15, 124:6

**see** [34] - 4:15, 7:13, 8:10, 11:18, 19:13, 19:15, 38:12, 52:5, 52:6, 52:12, 61:18, 67:6, 67:7, 74:14, 75:13, 75:17, 82:15, 88:16, 88:20, 89:2, 95:19, 96:16, 107:1, 109:4, 109:20, 114:18, 119:19, 120:3, 125:3, 127:8, 128:17, 130:11, 138:17, 138:24

**seek** [2] - 47:25, 62:4

**seeking** [19] - 13:11, 14:4, 14:17, 14:23, 15:2, 15:13, 24:4, 36:8, 48:3, 50:3, 50:4, 50:6, 53:11, 53:14, 62:8, 68:10, 87:20, 90:7

**seeks** [1] - 36:12

**seem** [4] - 12:3, 120:7, 120:8, 127:20

**sees** [1] - 122:15

**sell** [1] - 104:8

**selling** [2] - 76:14, 100:3

**sense** [4] - 43:18, 67:12, 69:19, 121:17

**sentence** [3] - 124:15, 124:19, 124:22

**separate** [4] - 45:3, 92:13, 115:23, 121:18

**Serena** [1] - 7:11

**SERENA** [1] - 3:2

**serious** [1] - 62:14

**served** [1] - 20:15

**service** [3] - 66:25, 67:3, 67:9

**Services** [1] - 40:12

**set** [5] - 49:8, 64:8, 66:12, 67:25, 119:25

**seven** [1] - 8:18

**several** [3] - 33:10, 125:18, 135:15

**shall** [1] - 120:5

**shape** [2] - 13:7, 20:20

**shed** [1] - 103:3

**shift** [1] - 129:4

**shifting** [4] - 21:15, 22:17, 23:11, 23:21

**shifts** [4] - 16:22, 17:6, 20:8, 44:8

**ship** [1] - 69:15

**short** [4] - 48:10, 48:11, 48:13, 51:1

**shortly** [1] - 28:23

**shot** [2] - 48:22, 57:12

**shotgun** [1] - 48:22

**show** [3] - 98:23, 101:2, 121:24

**showed** [2] - 59:17, 72:18

**showing** [2] - 14:11, 97:16

**shows** [3] - 31:11, 83:8, 132:7

**shut** [1] - 79:6

**side** [19] - 8:10, 16:1, 19:5, 19:9, 21:10, 25:5, 25:18, 50:16, 54:6, 54:7, 61:14, 68:6, 95:17, 111:6, 127:4, 128:13, 139:20

**side's** [1] - 18:24

**sides** [8] - 23:18, 54:3, 102:4, 103:2, 111:11, 119:6, 127:20, 128:25

**Siegel** [35] - 8:20, 73:2, 87:12, 89:8, 89:11, 89:14, 89:16, 90:2, 90:13, 94:10, 94:18, 97:22, 97:25, 98:7, 99:10, 99:21, 100:22, 102:4, 103:1, 104:3, 104:24, 105:2, 106:9, 107:20, 108:12, 111:11, 111:17, 112:1, 112:10, 113:12, 116:9, 116:16, 116:19, 120:19, 127:4

**Siegel's** [10] - 90:8, 94:1, 95:3, 95:8, 95:19, 97:4, 99:1, 100:12, 119:11, 127:9

**significant** [2] - 25:9, 26:10

**similar** [6] - 26:12, 69:7, 101:22, 135:15, 135:21, 136:11

**similarity** [4] - 134:8, 135:17, 136:8, 136:20

**similarly** [1] - 14:9

**simple** [3] - 28:2, 28:5, 28:9

**simply** [14] - 13:11, 17:4, 17:24, 18:11, 27:15, 27:16, 31:16, 34:4, 35:1, 40:5, 41:9, 43:20, 44:24, 49:16

**since's** [1] - 10:23

**single** [3] - 39:10, 41:20, 74:21

**sit** [1] - 122:25

**sitting** [1] - 91:1

**situation** [1] - 60:13

**six** [8] - 8:18, 119:15, 120:4, 120:7, 123:21, 123:22, 123:25, 140:2

**sixth** [1] - 9:10

**skip** [1] - 117:22

**SLA** [3] - 67:15, 67:21, 78:22

**slightly** [2] - 50:20, 124:15

**Sloane** [1] - 94:6

**small** [2] - 31:25, 32:2

**Smith** [1] - 129:14

**Smith/Matthewman** [1] - 4:2

**sneaky** [1] - 115:19

**socially** [9] - 91:17, 92:25, 95:6, 102:11, 109:17, 110:23, 115:14, 115:20, 115:24

**software** [12] - 78:23, 79:3, 86:13, 91:14, 96:12, 96:15, 99:7, 103:14, 103:18, 104:6, 104:9, 115:11

**softwares** [1] - 31:18

**sold** [1] - 104:16

**solely** [4] - 100:20, 102:9, 104:12, 104:16

**someday** [1] - 43:17

**someone** [6] - 6:15, 29:12, 82:9, 82:10, 85:22, 100:12

**sometime** [1] - 27:25

**sometimes** [5] - 7:25, 65:23, 135:20, 135:25

**somewhat** [2] - 24:6, 123:12

**somewhere** [5] - 31:19, 65:7, 67:2, 67:10, 69:15

**Sony** [1] - 29:15

**soon** [1] - 88:18

**sophisticated** [2] - 76:20, 77:18

**Sorrels** [1] - 68:21

**sorry** [8] - 16:3, 70:8,

86:16, 106:15, 109:22, 111:16, 118:18, 122:9

**sort** [14] - 28:2, 52:13, 58:15, 73:18, 87:7, 100:3, 102:17, 103:11, 121:18, 125:11, 126:12, 134:20, 140:2

**sorts** [1] - 125:8

**sought** [1] - 18:14

**sound** [1] - 121:3

**sounds** [6] - 19:21, 66:21, 78:24, 92:4, 109:9, 121:23

**source** [10] - 51:7, 51:12, 58:24, 59:2, 60:10, 60:12, 60:14, 63:23, 75:16, 110:13

**sources** [1] - 58:23

**Southeast** [1] - 2:6

**SOUTHERN** [1] - 1:1

**Southern** [2] - 7:1, 132:23

**speaking** [3] - 70:19, 102:3, 105:22

**speaks** [1] - 56:21

**special** [1] - 53:14

**specialized** [1] - 49:11

**specific** [3] - 19:24, 48:21, 68:1

**specifically** [15] - 21:1, 33:8, 37:19, 38:13, 43:7, 56:1, 68:15, 68:16, 70:23, 75:9, 90:8, 106:4, 114:11, 132:2, 136:24

**specificity** [2] - 75:23, 75:25

**spectrum** [1] - 103:16

**spell** [1] - 114:18

**spend** [1] - 49:2

**spoken** [1] - 55:11

**stab** [1] - 45:15

**staff** [2] - 84:18, 88:3

**Stamos** [48] - 9:7, 87:9, 89:10, 89:25, 94:10, 94:18, 94:22, 101:21, 102:6, 110:7, 110:8, 111:5, 111:11, 111:15, 111:16, 111:24, 112:6, 112:11, 112:13, 116:5, 118:17, 118:18, 118:19, 118:22, 118:24, 119:2, 119:3, 119:7, 119:10, 119:16,

120:10, 120:13, 121:9, 122:5, 122:13, 122:17, 122:19, 123:3, 123:13, 124:12, 124:16, 126:19, 127:4, 127:19, 127:20, 128:6, 130:1

**Stamos's** [4] - 119:8, 119:13, 123:17, 127:16

**stand** [4] - 47:2, 93:8, 95:4, 112:22

**standard** [9] - 12:23, 22:3, 36:12, 40:7, 78:11, 109:14, 116:15, 136:5

**standards** [26] - 14:21, 43:9, 90:18, 90:20, 95:2, 97:17, 98:3, 98:10, 101:4, 105:19, 107:18, 108:2, 108:3, 109:2, 109:3, 109:12, 110:1, 113:16, 113:18, 113:21, 113:24, 114:4, 117:1, 124:10, 127:6, 127:15

**stands** [1] - 51:20

**Star** [1] - 68:2

**start** [7] - 7:25, 9:14, 9:25, 46:6, 64:3, 72:4, 88:15

**started** [5] - 7:22, 10:10, 26:23, 73:18, 89:7

**starting** [2] - 63:15, 84:10

**starts** [1] - 95:10

**state** [8] - 17:4, 25:17, 40:10, 42:7, 72:16, 73:7, 99:15

**statement** [3] - 124:20, 124:24, 125:11

**statements** [8] - 54:1, 120:23, 120:25, 123:11, 125:8, 127:25, 128:8

**STATES** [6] - 1:1, 1:11, 2:23, 2:23, 3:2, 3:3

**states** [12] - 11:17, 15:21, 17:15, 18:19, 26:4, 26:9, 27:12, 28:10, 43:19, 119:5, 135:2

**States** [5] - 7:12, 7:15, 110:18, 110:19, 110:25

**stating** [1] - 120:4
**Statute** [1] - 28:9
**statute** [23] - 12:15, 12:24, 12:25, 16:25, 20:5, 22:13, 49:8, 66:13, 76:24, 77:6, 78:8, 90:15, 91:11, 92:18, 97:6, 109:13, 113:19, 122:15, 125:21, 125:22, 126:5, 129:4
**statutes** [7] - 16:13, 25:14, 25:15, 108:3, 118:5, 135:5
**statutorily** [1] - 109:19
**statutory** [18] - 21:21, 49:15, 66:7, 76:25, 77:1, 90:14, 91:9, 91:18, 92:4, 94:23, 95:1, 96:7, 107:3, 107:15, 108:12, 108:13, 116:2, 117:3
**stay** [3] - 101:18, 129:2, 141:1
**stays** [1] - 123:20
**Stebbins** [1] - 4:7, 4:8, 4:16, 5:5, 12:12, 18:17, 22:21, 24:1, 36:17, 123:14, 134:24
**STEBBINS** [37] - 1:14, 4:6, 10:7, 10:13, 10:19, 11:3, 12:13, 13:14, 17:12, 19:17, 19:19, 20:10, 21:12, 21:18, 22:22, 24:2, 36:20, 42:5, 42:13, 42:19, 42:22, 87:21, 88:22, 120:11, 120:16, 121:25, 128:20, 129:6, 129:12, 129:22, 130:9, 130:11, 135:14, 137:17, 137:22, 139:21, 141:4
**Stenograph** [1] - 86:21
**step** [3] - 93:11, 93:14, 127:23
**steps** [1] - 93:10
**Stewart** [4] - 9:1, 9:16, 9:20, 139:5
**still** [4] - 26:10, 83:24, 88:17, 115:6
**stipulate** [1] - 56:25
**stipulation** [1] - 55:25
**stood** [2] - 40:13, 139:3

**stop** [6] - 28:20, 64:3, 76:7, 78:4, 107:25, 108:19
**stopped** [1] - 70:18
**stopping** [1] - 110:21
**straight** [1] - 5:9
**straightforward** [2] - 28:9, 132:14
**stream** [2] - 30:19, 43:21
**Street** [6] - 1:22, 2:3, 2:6, 2:16, 2:24, 3:4
**stretch** [1] - 29:7
**strike** [2] - 122:2, 122:3
**strikes** [1] - 129:6
**striking** [1] - 132:25
**struck** [3] - 42:10, 43:1, 79:23
**studies** [1] - 34:24
**stuff** [6] - 15:23, 33:2, 102:21, 114:14, 116:17
**subject** [15] - 22:7, 37:10, 37:22, 38:4, 44:18, 62:24, 69:25, 75:10, 76:6, 77:7, 80:16, 82:6, 94:2, 119:9, 123:18
**submission** [2] - 72:10, 72:11
**submit** [7] - 50:17, 65:16, 70:17, 86:15, 117:13, 123:17, 137:23
**submits** [1] - 70:24
**submitted** [1] - 70:6
**submitting** [2] - 53:2, 72:13
**Subparagraph** [1] - 118:1
**subparagraphs** [1] - 119:25
**subsection** [1] - 117:21
**substance** [1] - 73:13
**substantial** [4] - 134:8, 135:17, 136:8, 136:20
**substantiality** [15] - 51:5, 51:24, 52:19, 53:8, 54:18, 55:16, 55:20, 56:3, 56:5, 56:11, 57:10, 57:19, 57:22, 57:23, 57:25
**Substantiality** [1] - 52:11
**substantially** [3] - 64:5, 135:21, 136:11

**substantive** [1] - 29:1
**subsumed** [1] - 50:11
**such-and-such** [2] - 123:7, 123:8
**sued** [1] - 42:24
**suffer** [1] - 38:7
**sufficient** [5] - 25:22, 26:1, 55:7, 78:7, 86:19
**sufficiently** [3] - 42:1, 42:2, 48:15
**suggest** [2] - 75:8, 138:4
**suggested** [1] - 101:19
**suggesting** [1] - 37:13
**suggestive** [1] - 64:23
**suggests** [1] - 64:8
**Suite** [5] - 1:16, 1:22, 2:3, 2:7, 2:13
**summaries** [1] - 54:2
**summarize** [1] - 125:10
**summarized** [2] - 120:17, 121:1
**summarizing** [1] - 107:15
**summary** [7] - 77:7, 102:8, 102:19, 106:12, 129:9, 129:15, 136:21
**summed** [1] - 116:14
**superfluous** [1] - 71:17
**Supp** [1] - 107:10
**supplant** [2] - 30:13, 36:2
**supplemental** [20] - 18:3, 18:6, 24:14, 24:15, 24:17, 37:1, 61:21, 62:15, 69:25, 70:5, 70:14, 71:7, 72:5, 72:14, 72:17, 73:8, 75:21, 89:20, 89:21
**supplementation** [1] - 20:13
**support** [5] - 31:23, 32:3, 40:3, 59:22, 131:9
**supported** [4] - 32:13, 38:19, 43:13, 59:18
**supports** [2] - 31:18, 32:5
**suppose** [1] - 77:15

**supposed** [4] - 20:1, 34:25, 113:5, 138:21
**Supreme** [4] - 40:24, 119:17, 124:1, 124:4
**surprised** [3] - 52:6, 52:12, 68:18
**suss** [2] - 91:3, 91:16
**sussed** [1] - 63:23
**sweeping** [1] - 51:13
**switch** [2] - 50:20, 115:19
**switching** [1] - 115:18
**sworn** [1] - 60:14
**system** [11] - 28:15, 30:13, 32:1, 36:3, 36:7, 45:5, 51:4, 51:15, 59:18, 70:12, 74:25
**Systems** [3] - 31:21, 86:23
**systems** [2] - 31:22, 31:25

## T

**table** [3] - 31:16, 32:4, 32:14
**talks** [16] - 11:19, 11:21, 11:22, 25:13, 37:9, 40:19, 66:15, 103:8, 103:21, 105:11, 106:12, 109:15, 112:1, 119:17, 125:16, 132:2
**tangentially** [1] - 98:4
**tangible** [1] - 81:6
**target** [5] - 18:21, 20:11, 21:15, 23:21, 25:20
**targeted** [1] - 24:3
**task** [2] - 65:13, 81:20
**Team** [1] - 135:16
**tech** [1] - 38:7
**technical** [13] - 29:2, 49:11, 49:14, 50:17, 55:12, 57:7, 58:15, 62:23, 63:2, 64:24, 66:18, 75:22, 80:4
**technological** [6] - 66:11, 66:12, 79:1, 79:14, 114:22, 115:1
**technologically** [1] - 76:14
**technologies** [2] - 68:17, 76:20
**technology** [5] -

**62:21, 77:9, 92:2, 100:20, 110:12
**teed** [1] - 129:9
**Tele** [1] - 135:16
**telephone** [1] - 61:2
**Television** [1] - 135:16
**ten** [1] - 31:19
**tentatively** [1] - 47:16
**Tenth** [1] - 40:20
**term** [24] - 90:14, 90:15, 90:23, 91:2, 91:7, 91:9, 91:18, 92:13, 92:18, 92:21, 94:23, 95:1, 95:13, 96:9, 108:13, 109:19, 109:20, 110:3, 114:11, 117:6, 117:17, 117:21
**terminate** [1] - 88:17
**terminology** [1] - 90:21
**terms** [7] - 54:19, 60:22, 97:19, 103:10, 120:16, 122:1, 125:1
**test** [1] - 106:7
**tested** [1] - 68:25
**testified** [11] - 18:5, 23:15, 37:19, 42:7, 51:2, 54:17, 54:25, 64:10, 64:22, 84:4
**testifies** [1] - 125:24
**testify** [39] - 10:11, 12:20, 13:12, 20:4, 20:5, 20:23, 21:24, 26:23, 36:23, 37:4, 38:2, 41:2, 47:6, 47:16, 48:6, 49:12, 55:18, 56:2, 57:19, 57:21, 60:12, 103:1, 104:24, 105:1, 105:5, 108:24, 110:8, 111:7, 111:10, 112:4, 112:15, 113:15, 116:5, 117:12, 125:5, 126:13, 129:1, 130:14, 135:9
**testifying** [10] - 19:4, 49:20, 56:13, 80:22, 80:23, 81:14, 123:18, 128:6, 128:12, 134:17
**testimonies** [1] - 70:17
**testimony** [78] - 8:20, 8:25, 9:3, 9:6, 9:9, 9:11, 9:19, 10:24, 15:20, 19:3, 22:6, 24:10, 24:25, 30:22, 30:25, 45:25, 48:23,

49:1, 49:22, 51:23, 52:13, 52:15, 52:18, 53:7, 53:16, 55:6, 56:24, 58:21, 60:14, 61:5, 61:17, 64:5, 65:13, 66:17, 69:3, 69:4, 69:23, 79:24, 80:14, 80:23, 87:22, 89:14, 90:8, 90:13, 94:3, 97:4, 99:21, 101:15, 101:22, 103:6, 107:5, 107:13, 107:17, 118:25, 119:10, 122:23, 123:5, 123:15, 124:17, 124:18, 125:12, 126:23, 127:10, 127:14, 127:17, 128:9, 128:14, 128:22, 130:2, 132:6, 133:16, 133:25, 134:7, 134:9, 134:16, 134:20, 135:23, 137:12

**testing** [7] - 100:21, 115:17, 117:2, 117:7, 117:23, 117:24, 124:7
**testing'** [1] - 117:22
**tethered** [1] - 84:15
**text** [1] - 67:3
**THE** [217] - 1:10, 1:11, 1:14, 2:2, 2:11, 2:23, 3:2, 4:1, 4:3, 4:8, 4:15, 4:19, 4:22, 4:25, 5:8, 5:13, 5:16, 5:21, 5:24, 6:5, 6:11, 6:14, 6:18, 6:25, 7:4, 7:9, 7:13, 7:18, 10:9, 10:16, 10:22, 11:4, 13:9, 13:22, 14:1, 14:13, 16:7, 16:9, 16:23, 18:13, 19:18, 20:3, 20:22, 21:13, 22:10, 22:23, 23:8, 24:8, 26:22, 27:3, 27:6, 27:9, 27:19, 28:4, 28:20, 28:23, 29:9, 30:1, 30:5, 30:7, 31:3, 33:6, 33:17, 33:22, 35:5, 35:11, 35:23, 36:16, 38:22, 39:3, 39:24, 40:22, 41:24, 42:12, 42:16, 42:18, 42:21, 44:20, 45:17, 46:10, 48:11, 48:13, 49:25, 50:2, 50:15, 52:1, 52:4, 53:3, 53:18, 53:22, 54:5, 55:2, 55:24, 56:9, 57:15, 57:22,

58:5, 58:11, 58:17, 59:7, 60:4, 60:17, 61:12, 62:8, 63:3, 64:15, 64:18, 67:13, 68:6, 68:14, 69:8, 71:2, 71:5, 71:23, 72:2, 73:10, 76:9, 77:11, 77:13, 78:1, 79:20, 80:12, 80:19, 82:20, 83:17, 84:7, 84:17, 84:25, 87:3, 87:25, 88:7, 88:9, 88:11, 88:12, 88:25, 89:5, 90:6, 90:18, 92:7, 92:11, 93:20, 95:14, 96:18, 96:24, 97:11, 97:13, 97:22, 97:25, 98:5, 99:9, 101:3, 101:6, 102:24, 104:23, 105:7, 105:10, 105:20, 105:24, 106:11, 106:17, 106:24, 108:1, 108:19, 108:25, 109:11, 110:7, 110:15, 111:5, 111:21, 112:3, 112:20, 113:10, 113:12, 116:3, 116:8, 117:15, 117:19, 117:24, 118:4, 118:16, 120:12, 121:20, 122:4, 122:9, 122:11, 123:20, 125:2, 125:15, 126:16, 127:3, 127:11, 127:18, 128:2, 128:11, 128:24, 129:11, 129:18, 129:23, 130:10, 132:15, 132:18, 134:3, 135:11, 137:15, 137:20, 137:24, 138:10, 138:23, 139:3, 139:13, 140:11, 140:14, 140:19, 140:22, 140:25
**the-trier-of-fact** [1] - 27:7
**theirs** [1] - 24:5
**theme** [9] - 27:14, 49:3, 53:5, 53:24, 53:25, 73:18, 102:17, 107:1, 140:2
**themselves** [3] - 4:14, 5:4, 13:17
**theory** [1] - 83:18

**therefore** [5] - 19:7, 21:4, 35:7, 59:10, 134:18
**thereof** [1] - 20:20
**thereto** [1] - 13:18
**they've** [7] - 72:22, 73:4, 100:14, 100:16, 101:23, 102:11, 115:18
**thin** [1] - 32:19
**thinks** [2] - 101:24, 117:4
**third** [7] - 11:12, 34:1, 48:15, 63:7, 93:14, 119:22, 125:16
**thoughts** [2] - 26:13, 87:1
**thousands** [1] - 118:11
**three** [10] - 13:1, 61:18, 87:7, 88:4, 91:1, 91:2, 93:10, 95:12, 109:25, 119:10
**threw** [1] - 82:1
**throughout** [5] - 27:14, 27:15, 47:23, 53:5, 54:6
**tie** [2] - 66:10, 76:2
**tied** [5] - 66:12, 66:24, 84:1, 91:11, 95:8
**timeliness** [4] - 71:6, 72:8, 72:21, 73:3
**titled** [1] - 52:10
**today** [15] - 4:12, 8:17, 8:23, 9:14, 10:1, 35:12, 56:5, 74:16, 88:2, 107:1, 112:5, 112:18, 139:19, 140:12, 140:23
**together** [1] - 49:5
**tons** [1] - 118:10
**took** [3] - 15:21, 68:24, 130:13
**tool** [7] - 34:16, 34:17, 83:1, 93:7, 94:12, 110:16, 110:24
**topic** [4] - 49:1, 50:21, 56:18, 117:8
**topics** [6] - 51:9, 51:11, 55:18, 57:20, 70:10, 98:25
**total** [1] - 87:11
**totally** [3] - 66:5, 66:25, 125:20
**tough** [1] - 82:6
**track** [2] - 32:23, 33:2
**tracked** [1] - 33:1
**Trademark** [1] -

131:14
**trafficking** [3] - 76:12, 83:25, 114:24
**trail** [1] - 70:3
**TRANSCRIBED** [2] - 1:11, 3:6
**transcript** [1] - 60:24
**transcription** [1] - 141:17
**treated** [1] - 135:1
**tremendously** [1] - 131:3
**triable** [1] - 129:15
**Triad** [1] - 86:23
**trial** [23] - 14:5, 14:14, 14:18, 20:17, 37:3, 38:2, 44:16, 52:13, 53:16, 80:20, 101:12, 102:20, 103:1, 103:6, 104:9, 108:7, 121:3, 125:9, 125:12, 128:6, 128:15, 129:20
**trials** [2] - 14:14, 36:5
**tried** [3] - 47:8, 126:2, 127:25
**trier** [5] - 10:24, 27:7, 35:7, 48:16, 64:2
**trilogy** [3] - 63:8, 63:12, 63:21
**trouble** [1] - 112:5
**troubled** [2] - 12:10, 12:14
**troubling** [1] - 71:21
**true** [8] - 37:23, 63:1, 100:15, 104:4, 104:21, 121:24, 123:16, 126:18
**truly** [1] - 100:11
**trust** [1] - 76:20
**try** [7] - 27:21, 72:6, 73:16, 75:8, 98:24, 103:3, 128:4
**trying** [23] - 8:7, 16:11, 16:14, 28:6, 46:23, 57:11, 57:12, 73:23, 96:5, 98:14, 98:17, 110:8, 110:10, 111:9, 112:10, 122:13, 123:24, 124:9, 124:12, 125:20, 126:7, 127:21, 133:10
**turn** [4] - 48:21, 59:4, 73:13, 128:17
**Turner** [1] - 40:12
**TV** [1] - 31:21
**tweet** [1] - 91:21
**tweeted** [1] - 121:10

**tweeting** [2] - 121:9, 121:17
**tweets** [1] - 111:3
**twelve** [1] - 31:19
**two** [24] - 16:2, 31:3, 31:5, 37:24, 43:12, 43:16, 45:3, 46:16, 63:9, 63:19, 76:12, 87:13, 95:5, 95:17, 97:9, 103:2, 111:11, 119:7, 121:20, 121:23, 133:6, 135:20, 135:22, 136:7
**tying** [1] - 65:1
**type** [7] - 51:20, 77:8, 81:9, 86:1, 86:5, 103:12
**types** [3] - 23:16, 54:9, 103:9
**typically** [1] - 12:17

## U

**U-Haul** [1] - 131:12
**ultimate** [6] - 65:19, 125:5, 125:25, 126:20, 131:20, 136:12
**ultimately** [3] - 32:18, 37:4, 139:25
**unable** [1] - 19:24
**unattainable** [1] - 33:3
**Under** [1] - 131:11
**under** [46] - 11:18, 11:20, 12:6, 12:18, 14:21, 15:20, 16:13, 20:5, 22:2, 29:11, 30:11, 30:22, 33:3, 34:24, 35:25, 38:14, 39:12, 39:15, 39:19, 44:8, 44:17, 47:18, 52:8, 58:7, 59:4, 60:12, 70:24, 73:21, 73:25, 74:1, 74:20, 76:12, 77:3, 79:25, 86:5, 97:8, 97:9, 97:10, 101:7, 101:10, 110:9, 111:8, 116:18, 132:4, 139:10, 141:2
**undercut** [1] - 85:17
**underlie** [1] - 17:5
**underlying** [2] - 130:22
**underneath** [1] - 6:21
**underpin** [1] - 74:13
**underpinning** [1] - 75:6

**understood** [5] - 73:20, 85:5, 124:16, 126:10, 128:3

**undertake** [1] - 21:21

**undertaken** [1] - 55:22

**undisputed** [2] - 51:22, 52:7

**unduly** [1] - 80:7

**unfair** [2] - 64:5, 71:10

**unfairly** [3] - 14:20, 31:5, 80:10

**unfamiliar** [1] - 138:7

**unfocused** [1] - 64:8

**unfortunately** [1] - 70:7

**unhelpful** [1] - 22:7

**unique** [3] - 60:13, 67:25

**UNITED** [6] - 1:1, 1:11, 2:23, 2:23, 3:2, 3:3

**United** [5] - 7:12, 7:15, 110:18, 110:19, 110:25

**unless** [2] - 40:23, 139:25

**unlike** [1] - 104:1

**unlimited** [1] - 39:21

**unlock** [1] - 82:22

**unmute** [1] - 8:1

**unnamed** [1] - 60:1

**unquote** [1] - 76:23

**unreasonable** [1] - 37:14

**unreliability** [1] - 34:8

**unreliable** [5] - 10:17, 35:7, 36:13, 36:14, 39:13

**unsealed** [1] - 30:8

**untie** [1] - 92:5

**untimeliness** [1] - 71:3

**untimely** [2] - 70:25, 72:14

**unusual** [1] - 42:22

**up** [33] - 16:20, 17:24, 20:16, 30:10, 32:7, 32:8, 32:18, 33:10, 33:11, 34:8, 37:6, 40:8, 41:10, 49:4, 49:5, 63:19, 67:7, 81:19, 81:24, 83:2, 83:11, 84:19, 84:21, 88:4, 98:4, 110:5, 116:9, 116:14, 125:14, 129:9, 129:20

**US** [2] - 121:13,

133:19

**USC** [6] - 11:18, 11:20, 11:22, 12:7, 25:17, 120:4

**useful** [3] - 97:16, 101:24, 107:9

**user** [9] - 67:5, 67:6, 76:21, 77:21, 78:20, 79:2, 79:5, 79:15, 95:7

**users** [5] - 67:14, 94:14, 99:25, 115:11, 115:13

**uses** [15] - 33:2, 51:22, 52:20, 53:8, 53:17, 54:18, 56:4, 56:24, 57:5, 59:12, 76:24, 103:21, 117:16, 117:17

**usurps** [1] - 136:11

---

# V

**valid** [1] - 136:13

**value** [2] - 64:4, 80:11

**varies** [1] - 124:2

**various** [9] - 6:8, 16:14, 55:10, 84:4, 84:7, 122:24, 131:6, 134:12, 135:5

**vault** [1] - 82:9

**vault's** [1] - 82:21

**vendor** [4] - 96:11, 96:15, 99:6, 99:24

**Venezuelan** [1] - 133:19

**verified** [2] - 37:16, 43:11

**version** [8] - 32:11, 44:12, 66:3, 74:22, 78:5, 84:4, 138:24, 139:15

**versions** [10] - 9:12, 32:11, 32:12, 59:18, 75:10, 75:20, 84:7, 84:11, 137:3

**versus** [12] - 31:8, 31:12, 31:24, 32:4, 32:18, 37:10, 40:12, 40:24, 64:7, 65:10, 74:1, 132:23

**VIA** [1] - 1:10

**video** [1] - 6:21

**VIDEOCONFEREN CE** [1] - 1:10

**view** [15] - 18:15, 20:4, 22:20, 55:22, 65:17, 68:6, 68:7,

100:23, 102:3, 116:15, 120:14, 120:25, 121:7, 129:12, 137:17

**views** [4] - 62:23, 98:21, 105:6, 106:19

**vigorous** [1] - 129:8

**vigorously** [2] - 44:16, 131:6

**violate** [5] - 78:20, 102:2, 111:8, 121:5, 132:1

**violated** [2] - 21:3, 86:7

**violates** [3] - 85:25, 119:20, 125:3

**violation** [12] - 79:18, 83:4, 83:5, 85:19, 85:23, 86:8, 121:22, 122:15, 122:21, 125:13, 126:21, 135:1

**violations** [7] - 21:16, 22:16, 23:11, 76:11, 120:3, 123:4, 132:3

**virtual** [1] - 68:3

**virtualization** [2] - 110:22, 121:12

**volumes** [2] - 63:10, 63:19

**voluminous** [1] - 31:11

**vs** [1] - 1:6

**vulnerabilities** [4] - 99:6, 99:24, 103:13, 103:18

**vulnerability** [1] - 96:13

---

# W

**Wade** [14] - 51:8, 51:9, 51:10, 54:25, 58:9, 58:14, 58:24, 59:4, 59:9, 59:25, 61:2, 61:7, 130:18

**waived** [1] - 73:4

**walk** [2] - 82:20, 82:22

**wall** [1] - 82:2

**wants** [6] - 29:12, 50:15, 50:16, 92:1, 110:1, 115:24

**Washington** [2] - 2:4, 3:4

**Watch** [2] - 31:20, 31:21

**WATKINS** [4] - 1:15,

1:18, 1:21, 2:2

**Watkins** [2] - 4:7, 5:12

**wave** [1] - 34:15

**ways** [2] - 75:4, 86:8

**weapon** [1] - 122:24

**website** [1] - 31:17

**Wednesday** [1] - 121:10

**weeds** [1] - 119:14

**week** [1] - 70:9

**weighing** [1] - 129:17

**weighs** [2] - 124:8, 124:20

**weight** [2] - 30:21, 92:3

**WEST** [1] - 1:2

**West** [3] - 1:4, 2:13, 2:16

**Westlaw** [1] - 41:17

**whatsoever** [3] - 43:4, 69:13, 115:16

**wheelhouse** [1] - 49:14

**whereby** [1] - 91:24

**wherein** [1] - 92:25

**white** [5] - 31:15, 32:9, 103:10, 103:11, 113:25

**whole** [7] - 27:22, 39:15, 69:15, 76:18, 82:1, 86:6, 108:14

**wholesale** [1] - 65:5

**wholly** [2] - 69:5, 87:22

**wide** [3] - 98:9, 98:12, 98:16

**widespread** [1] - 136:22

**willful** [3] - 100:8, 100:9, 104:22

**WILLIAM** [1] - 1:10

**wins** [1] - 121:10

**wisdom** [1] - 105:4

**wish** [1] - 15:1

**withdraw** [2] - 120:25, 127:25

**withdraws** [1] - 73:1

**withdrew** [7] - 70:2, 71:2, 72:8, 72:19, 72:24, 120:22, 124:21

**witness** [4] - 37:19, 93:8, 95:4, 120:18

**witnesses** [7] - 40:2, 49:10, 50:7, 50:12, 55:10, 66:17, 70:18

**wondering** [2] - 47:1, 98:11

**word** [3] - 76:24,

78:8, 137:25

**words** [6] - 49:2, 59:9, 66:22, 99:9, 121:3, 138:25

**workings** [1] - 82:11

**works** [12] - 8:15, 57:8, 57:13, 63:17, 63:22, 74:19, 114:23, 135:20, 136:7, 136:10, 136:13

**world** [4] - 15:7, 39:23, 135:19

**worth** [1] - 101:20

**worthless** [2] - 21:21, 23:5

**wrap** [1] - 40:8

**write** [1] - 75:4

**writing** [1] - 72:9

---

# Y

**year** [2] - 35:17, 43:16

**years** [3] - 43:12, 43:16, 118:10

**York** [4] - 2:17, 2:21

---

# Z

**zip** [6] - 65:22, 65:23, 67:1, 67:2, 67:10

**Zoom** [3] - 8:6, 8:13, 8:14