UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO: 9:19-cv-81160-RS

APPLE INC.,

    Plaintiff,

v.

CORELLIUM, LLC,

    Defendant.

_____/

**DEFENDANT'S OBJECTION TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANT CORELLIUM LLC'S *DAUBERT* MOTION TO PRECLUDE CERTAIN TESTIMONY BY DAVID B. CONNELLY**

Defendant, CORELLIUM, LLC ("Defendant" or "Corellium"), pursuant to Federal Rule of Civil Procedure 72(b) and 28 U.S.C. § 636(b)(1)(C), respectfully submits this objection to a portion of the Magistrate Judge's Report and Recommendation on Defendant Corellium, LLC's *Daubert* Motion to Preclude Certain Testimony by David B. Connelly [D.E. 610] (the "R&R"), and in support thereof, states as follows:

**I.   FACTUAL BANKGROUND**

1. On May 11, 2020 Corellium filed its Daubert Motion to Preclude Certain Testimony by David B. Connelly and Incorporated Memorandum of Law [DEs 454, 468] (the "Motion"). Therein, *inter alia*, Corellium sought to exclude the testimony by Apple's damages expert, Mr. Connelly, on the basis that his methods for reaching his opinions were far too unreliable to admit at trial.

2. On May 26, 2020, Plaintiff, Apple Inc. ("Apple") filed its Response to Corellium's Motion [D.E. 503] (the "Response").

3. On June 2, 2020, Corellium filed its Reply to Apple's Response [D.E. 543] ("Reply").

4. On July 24, 2020, the Court held a hearing on the Motion, among the multiple other *Daubert* Motions pending at the time.

5.      On July 29, 2020, the Court issued its Report and Recommendation on Defendant Corellium, LLC's *Daubert* Motion to Preclude Certain Testimony by David B. Connelly [D.E. 610] (the "R&R").

6.      For the reasons stated herein, Corellium submits this objection to portions of the R&R. Specifically, Corellium objects to the portions of the R&R that find that i) a nexus exists between Mr. Connelly's damages findings and the alleged infringing activity (*see*, R&R at 10), and ii) Mr. Connelly's methods are reliable (*see*, R&R at 10).

## II. LEGAL MEMORANDUM

### A. Legal Standard

A district court conducts a *de novo* review of any disputed portions of a Magistrate Judge's Report and Recommendation. *U.S. v. Powell*, 628 F.3d, 1254, 1256 (11th Cir. 2010); Fed. R. Civ. P. 72(b); *see also* 28 U.S.C. § 636(b). "In order to challenge the findings and recommendations of the magistrate [judge], a party must . . . file... written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection ... Upon receipt of objections meeting the specificity requirement set out above, a United States District Judge shall make a *de novo* determination of those portions of the report ... to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate [judge]." *Heath v. Jones*, 863 F.2d 815, 822 (11th Cir. 1989).

### B. No Nexus Exists Between Mr. Connelly's Damages Numbers And The Alleged Infringing Activity.[1]

In its R&R, the Court found "for purposes of this *Daubert* Motion, that Mr. Connelly has sufficiently demonstrated a causal nexus between Corellium's gross revenues and the infringement, given his understanding of how the Corellium Apple Product technology functions." *See*, R&R, at 10.  The Court then concluded that "[f]or purposes of this *Daubert* challenge, such a nexus does exist. Thus, the Court finds Mr. Connelly's methodologies to be reliable for *Daubert*

---

[1] Corellium acknowledges that the Court, in its R&R, states that "[i]f Corellium chooses to make future legal argument about the causal nexus issue, such issue is properly raised on summary judgment or before the District Judge at trial." However, Corellium here, seeks only to assert its objection to the language as stated in the R&R.

and gatekeeping purposes." *See*, R&R, at 10. Respectfully, however, Corellium objects to this portion of the R&R because the existence of a causal nexus between at least some of Mr. Connelly's claimed gross profits is an impossibility.

"With respect to profits, the plaintiff must show a *causal relationship* between the *infringement* and *profits*, and must also present proof of the infringer's gross revenue." *Home Design Servs., Inc. v. Turner Heritage Homes, Inc.*, 101 F. Supp. 3d 1201, 1217 (N.D. Fla. 2015), *aff'd*, 825 F.3d 1314 (11th Cir. 2016) (emphasis added) ("*If* the plaintiff meets its burden, the infringer must then prove "his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.") (emphasis added); *see also*, *Pronman v. Styles*, 645 Fed. Appx. 870, 873 (11th Cir. 2016) ("the plaintiff must show a causal relationship between the *infringement* and *profits*, and must also present proof of the infringer's gross revenue.") (emphasis added); *see also*, *Montgomery v. Noga*, 168 F. 3d 1282, 1296 (11th Cir. 1999) (citing to the Copyright Act to explain that, "the copyright owner is entitled to recover . . . any *profits* of the infringer that *are attributable to the infringement*.") (emphasis added). Numerous other jurisdictions follow this same reasoning, whereby while the burden may be low, there must be some connection between the infringement and the profit—not necessarily the product and the profit. *See*, *Alifax Holding SPA v. ALCOR Sci. Inc.*, 2019 WL 1579503, at *1 (D.R.I. Apr. 12, 2019) ("In the context of this statute, the phrase 'gross revenue' has been interpreted as 'gross revenue *reasonably related to the infringement, not unrelated revenues*.'") (emphasis added); *New Atlas Dot Com, Inc. v. Pizza Inn I-40 W., Inc.*, 2012 WL 12863152, at *7 (W.D. Okla. Nov. 9, 2012) ("Rather, 'gross revenue' refers only to revenue *reasonably related to the infringement*.") (emphasis added); *Bonner v. Dawson*, 404 F.3d 290, 294 (4th Cir. 2005) (" . . . requirement of a 'causal connection' between the *infringement* and the profit stream") (emphasis added).

The distinction between the "infringing activity" and the "product" is particularly critical in this case because, while Corellium does only sell one product, that product by itself is not the focus of this litigation—the focus is when that product is being used in connection with iOS. This distinction between iOS and non-iOS usage is precisely why the term "Corellium Apple Product" has been coined in this case—to refer to the specific activity at issue in this case (when that product is being used in connection with iOS)—and why the product's commercial name, CORSEC, has not been used. The CORSEC product is too encompassing and does not entirely relate to Apple's

claims—in fact, it stands completely independent of same. Indeed, there is no allegation that relates to when one of Corellium's customers is conducting Android research, because such activity is not the allegedly infringing activity at issue in this case. Yet, Mr. Connelly failed to apportion the use of the CORSEC product between iOS and non-iOS use. He simply attributed all of Corellium's gross profits as iOS related. However, as CORSEC is used to study non-iOS platforms, a causal nexus between the allegedly infringing activity and all of Corellium's gross profits cannot exist.

Accordingly, Corellium respectfully objects to the Court's finding in its R&R that a causal nexus exists between the infringing activity and the gross revenues found by Mr. Connelly. *See*, R&R, at 10. Mr. Connelly's numbers are not tied, whatsoever, to any apportionment of iOS usage (the allegedly infringing activity), as required by law. In fact, when asked in his deposition, "And you can't state with personal knowledge what revenues of the CORSEC product related to the virtualization of Android products?," Mr. Connelly squarely admits "No." *See*, Daubert Motion, at 14. This admission alone, Corellium argues, precludes a finding that a reasonable nexus exists between all of Corellium's gross profits and the allegedly infringing activity (research of iOS). If Mr. Connelly cannot separate when the product was used for iOS versus other non-infringing operating systems, then he naturally cannot conclude that a causal relationship exists between the alleged infringing iOS activity and the gross profits derived from same.

As stated in Corellium's Reply brief, the Product itself is entirely independent of iOS, or any other operating system for that matter. Reply, at 6. CORSEC can be used to test other operating systems, such as Android—and when a user is conducting Android research, exactly zero percent of anything iOS is implicated. Thus, by definition, not all uses of the CORSEC product are alleged "infringing activity" and accordingly, any gross profit considered in this case, under the law, must have a causal relationship with the alleged infringement. Such an analysis was simply not done in this case—no formal analysis was done by Mr. Connelly to determine how much of the CORSEC product was used for iOS, and therefore, the alleged infringing activity was never actually quantified in this case. In fact, Courts have denied recovery where the profits are even "remotely or speculatively attributable to infringement." *Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004) (quoting 4 Nimmer on Copyright § 14.03, 14-34 (2004)). For those reasons, Corellium respectfully submits this objection to the Court's R&R as

it relates to the finding of a causal nexus between the allegedly infringing activity and the gross profits asserted by Mr. Connelly.

### C. Mr. Connelly's Methods Are Unreliable.

As to the second issue, Corellium respectfully objects to the Court's recommendation that Mr. Connelly's opinions are "reliable for *Daubert* and gatekeeping purposes." *See*, R&R, at 10. Corellium argues that there are numerous ways in which Mr. Connelly's opinions are grounded in unreliable facts and analyses. Under the reliability prong of the Daubert analysis, the testimony "must be 'scientific,' meaning grounded in the methods and procedures of science, and must constitute 'knowledge,' meaning something more than subjective belief or unsupported assumptions." *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (emphasis added). *Daubert* requires that the district court "assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue" and observes "that the expert's bald assurance of validity is not enough." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). If any step of the expert's testimony renders the analysis unreliable, then the expert's testimony is inadmissible. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005). Determining whether an expert's testimony is admissible "require[s] the trial court to conduct an exacting analysis of the proffered expert's methodology." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002).

Here, Corellium's Motion argues that almost no portion of Mr. Connelly's opinions are reliable. As it relates to Mr. Connelly's attempts to attribute iOS versus non-iOS use of the CORSEC product, Mr. Connelly somehow arrives at 97% iOS usage—a number that has zero basis in fact. As explained on page 11 of Corellium's Motion, Mr. Connelly relied upon i) Dr. Nieh's "3900 iOS / 30 Android" analysis of "file entries," ii) a marketing brochure, and iii) a decrease in price of the CORSEC product to somehow arrive at a 90-97% range of Corellium's customer's using the CORSEC product for iOS purposes. *See*, Motion, at 11. None of these bases relied upon by Mr. Connelly have any connection to such an apportionment of CORSEC usage, nor shed any insight into the same. His methods are unreliable.

As explained during the July 24, 2020 hearing, the 3900 "entries" is simply a lengthy list of iOS and versions that exist, the overwhelming majority of which, Corellium does not support

5

or otherwise have any relation to. *See*, Hearing Transcript, dated July 24, 2020, D.E. 615, at 31-32. The list of 3900 contains beta versions of iOS, Apple Watch OS, Apple TV OS, and certain iPads, all of which CORSEC does not support. The 3900/30 number has no relevance to, or have any impact on the iOS usage of CORSEC. Similarly, a simple marketing brochure also has no connection to, nor provide any insight into, such alleged usage of iOS versus Android. A marketing brochure is simply an improper record to rely upon for this purpose and is by no means determinative. The same logic applies to Mr. Connelly's reliance upon Corellium's decrease in price. Such a fact bears no insight as to how many Corellium customers may have used the CORSEC product for iOS versus non-iOS purposes.

Moreover, as is explained in the Motion, Mr. Connelly, in an effort to attribute iOS versus non-iOS use of the CORSEC product, assumes that each customer is using the product at the same rate. *See*, Motion, at 17; *see also*, Connelly, Errata Supp. & Rebuttal Report at 20-21, attached to the Motion as Exhibit 1. Clearly, this is not reliable. As proof, the single customer Apple deposed in this case, testified that they barely use the product, and on the rare instances they do, it is for troubleshooting, not for developing new virtual devices and researching.



, attached to the Reply as Exhibit 2.



, attached to the Reply as Exhibit 2. It is clear that the only firm evidence that was obtained from any of Corellium's customers relative to their use of the product, reveals a significant lack of use. Yet, this was ignored by Mr. Connelly, who instead, opted to provide an arbitrary estimation based upon a marketing brochure and a list of 3900 iOS versions that simply exist—not necessarily supported by CORSEC, but just exist in the world. When asked in his deposition how he specifically determined that only 10% would be attributable to non-iOS revenues, Mr. Connelly responded that he was "[j]ust trying to conservatively estimate how much to assign to Corellium for purposes of -- or to assign to Android for purposes of the post March 2019 sales" and that he could not identify any document that reflected a ten percent number. *See*, Connelly Depo. at 214:4-11, attached to the Motion as Exhibit 2.

Next, as it relates to Mr. Connelly's efforts to determine Corellium's projected revenue, his methods were similarly unreliable. Mr. Connelly fails to conduct any investigation into market studies or other proper analyses in order to properly determine projected revenue. Instead, Mr. Connelly relied upon Corellium's own internal and marketing projections, ▆▆▆▆▆▆▆▆▆▆. *See*, Motion, at 14-16. In *MasForce Europe, BVBA v. MEC3 Co.*, the court rejected the expert's simple adoption of a company's business plan to calculate future profits. 2013 WL 12156469, at *6 (M.D. Fla. Dec. 4, 2013) ("Put differently, it does not appear that Wiggins actually

made any calculations, but instead simply accepted MasForce's own statements regarding what it would have earned but for the incident").

In his first attempt, Mr. Connelly simply doubled Corellium's gross revenue from 2019. *See*, Motion, at 14. However, as discussed in Corellium's Reply, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, before one considers the likely loss of revenue due to the effects of COVID. *See*, Reply, at 9. Mr. Connelly, however, did not consider any of this—he simply doubled the 2019 gross revenue. This is not reliable, nor did it turn out to be accurate.

In his alternative attempt as to projections, Mr. Connelly opted to rely upon Corellium's prior sales projections from 2018. Using those projections, Mr. Connelly determined a daily projected income rate based upon those prior projections, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. As stated in the Motion, "In Q1 of 2018, Corellium also projected that its gross revenues would total ▓▓▓▓▓▓ in 2019. However, Corellium ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ as its gross revenues in 2019 equaled ▓▓▓▓▓▓ according to Dr. Connelly." *See* Motion, at 15; *see also*, Connelly, Errata Supp. & Rebuttal Report at EXHIBIT C, attached to Corellium's Motion, at Exhibit 1. Again, clearly this method falls well short of any scientific method, as required by *Daubert*.

Finally, as another example of the unreliability in Mr. Connelly's methods, when determining statutory damages under 17 U.S.C. §1203 (Motion, at 16-18), Mr. Connelly assumes, based upon absolutely no document, fact, or other basis, that each Corellium customer creates a new virtual device every month. *See*, Motion, at 18. Mr. Connelly simply arbitrarily selects once per month. It is based upon nothing. *See*, Connelly Deposition, at 210:2-6, attached to the Motion as Exhibit 2. By way of example, clearly, ▓▓▓▓▓ and the licenses it purchased are not creating one device a month. Other customers may be creating more. The bottom line is that the number is unknown, and thus, Mr. Connelly's arbitrary damages multiplier of "a new device every month," is unreliable, which goes directly against the grain of Daubert.

**D. Conclusion.**

For these reasons, Corellium respectfully submits this objection to the portions of the R&R that relate to i) Mr. Connelly establishing a nexus between the alleged infringing activity and gross profits, and ii) Mr. Connelly's opinions being reliable. For the reasons, laid out in more detail in

Corellium's Motion and Reply, as well as herein, the Court should grant Corellium's Motion in full.

Dated: August 12, 2020                     Respectfully submitted,

                        COLE, SCOTT & KISSANE, P.A.
                        *Counsel for Defendant*
                        Esperante Building
                        222 Lakeview Avenue, Suite 120
                        West Palm Beach, Florida 33401
                        Telephone (561) 612-3459
                        Facsimile (561) 683-8977
                        Primary e-mail: justin.levine@csklegal.com
                        Primary e-mail: lizza.constantine@csklegal.com

By: *s/ Justin Levine*
      JONATHAN VINE
      Florida Bar. No.: 10966
      JUSTIN B. LEVINE
      Florida Bar No.:  106463
      LIZZA C. CONSTANTINE
      Florida Bar No.:  1002945

            *and*

HECHT PARTNERS LLP
*Counsel for Defendant*
125 Park Ave, 25th Floor
New York, NY 10017
Tel: (212) 851-6821
David L. Hecht *pro hac vice*
Email: dhecht@hechtpartners.com
Minyao Wang *pro hac vice*
Email: mwang@hechtpartners.com
Conor McDonough pro hac vice
Email: cmcdonough@hechtpartners.com

CASE NO.: 9:19-CV-81160-RS

# **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 12, 2020, a true and correct copy of the foregoing has been transmitted by electronic filing with the Clerk of the court via CM/ECF, which will send notice of electronic filing to all counsel of record.

/s/ Justin B. Levine
Justin B. Levine