**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 9:19-cv-81160-RS

APPLE INC.,

                    Plaintiff,

    v.

CORELLIUM, LLC,

                    Defendant.

**PLAINTIFF APPLE INC.'S RESPONSE TO DEFENDANT CORELLIUM, LLC'S OBJECTION TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANT CORELLIUM, LLC'S *DAUBERT* MOTION TO PRECLUDE CERTAIN TESTIMONY BY DAVID B. CONNELLY**

**TABLE OF CONTENTS**

**Page**

I. Mr. Connelly Should Be Permitted to Testify Regarding Corellium's Revenues. ............... 1

    A. Corellium Misstates the Law, Attempting to Place on Apple a Burden That Corellium Bears. ............................................................................................................ 2

    B. Mr. Connelly's Opinions Link the Revenues to Infringing Activity Sufficiently for *Daubert* Purposes. ............................................................................ 4

II. The Court Should Adopt the Recommendation With Respect to Reliability. ..................... 7

    A. Mr. Connelly's Allocation of Usage to iOS Versus Android Is Not the Product of Unreliable Methodology. ............................................................................ 7

    B. Mr. Connelly's Methodology for Projecting Future Revenues Is Reliable. .......... 10

    C. Mr. Connelly's Conservative Estimates Regarding Section 1203 Damages Are Likewise Sufficiently Reliable. ........................................................................ 12

III. Conclusion. ........................................................................................................................ 13

<~~~ ~~~>
<~~~~~~>
<~~~ ~~~>
<~~~~~~>
<~~~~~~>
<~~~~~~>
<~~~~~~>
<~~~~~~>
<~~~~~~>
<~~~~~~>

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Aerospace Servs. Int'l v. LPA Grp., Inc.*,
  57 F.3d 1002 (11th Cir. 1995) ........................................................................................3

*Alifax Holding SPA v. ALCOR Sci. Inc.*,
  No. CV-14-440 WES, 2019 WL 1579503 (D.R.I. Apr. 12, 2019) ........................................4, 5

*Andreas v. Volkswagen of Am., Inc.*,
  336 F.3d 789 (8th Cir. 2003) ...........................................................................................3

*Armstrong v. HRB Royalty, Inc.*,
  No. 03-0148-WS-C, 2005 WL 6007684 (S.D. Ala. Oct. 14, 2005) ...........................7, 11, 13

*Blizzard Ent., Inc. v. Bossland GmbH*,
  No. CV 16-1236, 2017 WL 7806600 (C.D. Cal. Mar. 31, 2017) .............................................13

*Blizzard Ent., Inc. v. Reeves*,
  No. CV-09-7621, 2010 WL 4054095 (C.D. Cal. Aug. 10, 2010).............................................13

*Bonner v. Dawson*,
  404 F.3d 290 (4th Cir. 2005) .......................................................................................3, 4, 6

*Bostick v. State Farm Mut. Auto. Ins. Co.*,
  No. 8:16-cv-1400, 2017 WL 2644616 (M.D. Fla. June 20, 2017) ..........................................11

*Craigslist, Inc. v. Kerbel*,
  No. C-11-3309, 2012 WL 3166798 (N.D. Cal. Aug. 2, 2012) ................................................13

*Digit. Filing Sys., L.L.C. v. Aditya Int'l*,
  323 F. App'x 407 (6th Cir. 2009) ............................................................................................10

*Home Design Servs., Inc. v. Turner Heritage Homes, Inc.*,
  101 F. Supp. 3d 1201 (N.D. Fla. 2015), *aff'd*, 825 F.3d 1314 (11th Cir. 2016)........................4

*MasForce Europe, BVBA v. MEC3 Co.*,
  No. 8:11-CV-1814, 2013 WL 12156469 (M.D. Fla. Dec. 4, 2013) ........................................11

*Montgomery v. Noga*,
  168 F.3d 1282 (11th Cir. 1999) ......................................................................................3, 5, 9

*Netdragon Websoft Inc. v. Toft*,
  No. CV-11-1037, 2012 WL 13008123 (C.D. Cal. Apr. 24, 2012) ........................................13

*New Atlas Dot Com, Inc. v. Pizza Inn I-40 W., Inc.*,
  No. CIV-11-149-D, 2012 WL 12863152 (W.D. Okla. Nov. 9, 2012)......................................5

*Oceans of Images Photography, Inc. v. Foster & Smith, Inc.*,
  No. 8:11-CV-1160-T-30AEP, 2012 WL 5878092 (M.D. Fla. Nov. 21, 2012) .........................5

*On Davis v. The Gap, Inc.*,
  246 F.3d 152 (2d Cir. 2001)...................................................................................................3

*Oravec v. Sunny Isles Luxury Ventures L.C.*,
  469 F. Supp. 2d 1148 (S.D. Fla. 2006), *aff'd*, 527 F.3d 1218 (11th Cir. 2008).................3, 4, 6

*Pleasant Valley Biofuels, LLC v. Sanchez-Medina, Gonzalez, Quesada, Lage, Crespo, Gomez & Machado LLP*,
  No. 13-23046-CIV, 2014 WL 2855062 (S.D. Fla. June 23, 2014)..........................................11

*Polar Bear Prods. v. Timex Corp.*,
  384 F.3d 700 (9th Cir. 2004) ...............................................................................................3, 9

*Pronman v. Styles*,
  645 F. App'x 870 (11th Cir. 2016) ..........................................................................................5

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
  326 F.3d 1333 (11th Cir. 2003) ..................................................................................7, 11, 13

*Sensonics, Inc. v. Aerosonic Corp.*,
  81 F.3d 1566 (Fed. Cir. 1996)................................................................................................10

*Southpoint Condo. Ass'n, Inc. v. Lexington Ins. Co.*,
  No. 19-CV-61365, 2020 WL 3581611 (S.D. Fla. July 1, 2020)...............................................5

*Thornton v. Jargon Co.*,
  580 F. Supp. 2d 1261 (M.D. Fla. 2008)...................................................................................5

*In re Trasylol Prods. Liab. Litig.*,
  No. 08-MD-01928, 2010 WL 1489793 (S.D. Fla. Feb. 24, 2010) ...............................7, 11, 13

**STATUTES**

17 U.S.C. § 504(b) ........................................................................................................... *passim*

17 U.S.C. § 1203....................................................................................................................12

Corellium's Objection to the Magistrate Judge's Report and Recommendation on Corellium's *Daubert* Motion to Preclude Certain Testimony by David B. Connelly, ECF No. 610 ("Recommendation"), is predicated on the same flawed legal arguments advanced in its initial *Daubert* motion. As it did in that motion, Corellium again mischaracterizes the applicable law and attacks only Mr. Connelly's inputs, rather than his methodology, and thus again identifies no basis for exclusion under *Daubert*. The Court should overrule Corellium's objection and adopt Magistrate Judge Matthewman's well-reasoned Report and Recommendation in full.

Mr. Connelly is Apple's damages expert. He is a Certified Public Accountant, as well as a licensed attorney, with nearly 40 years' experience. ECF No. 503-4 at 4–5. He has been qualified repeatedly to testify in state and federal court. *Id.* at 7–8. Corellium does not challenge Mr. Connelly's general qualifications or his specific expertise as it relates to opining on damages in this copyright and Digital Millennium Copyright Act case. Instead, Corellium advances two principal arguments in support of its Objection. First, Corellium challenges Mr. Connelly's apportionment of revenues for purposes of the Copyright Act's profits-of-the-infringer standard as unreliable. *See* ECF No. 622 ("Objection" or "Obj.") at 2–5. Second, Corellium argues that Mr. Connelly's opinions generally are "unreliable" because Corellium disagrees with the substance of Mr. Connelly's evaluation of (a) revenues apportionable to Corellium's infringing activity, *see id.* at 5–7; (b) Corellium's projected revenues, *see id.* at 7–8; and (c) Mr. Connelly's calculation of statutory damages under the Digital Millennium Copyright, *see id.* at 8.

Both of Corellium's objections lack merit in their entirety. Furthermore, because Corellium challenges the evidence Mr. Connelly relied upon, rather than the methods he applied to that evidence, Corellium's objections go to the weight, not the admissibility, of his testimony, under established case law. The Court should reject Corellium's Objection and adopt Magistrate Judge Matthewman's Recommendation in full.

## I. MR. CONNELLY SHOULD BE PERMITTED TO TESTIFY REGARDING CORELLIUM'S REVENUES.

Corellium's first objection, to Mr. Connelly's calculation of Corellium's gross profits under a "profits-of-the-infringer" damages standard, fails for multiple reasons. First, it is wrong as a matter of law. Corellium asserts that *Apple* bears the burden of determining the precise amount of Corellium's revenues that are attributable to its infringing activities, but that is simply wrong. The Copyright Act expressly places the burden of apportioning revenues on *Corellium*, the accused infringer, not on Apple. *See* 17 U.S.C. 504(b). As Corellium concedes, Apple is required only to

1

demonstrate a minimal "nexus" connecting Corellium's gross revenues to its infringement. Obj. at 3. Furthermore, as explained below, exclusion is appropriate under *Daubert* only if there is *no* evidence of such a nexus; disputes in the evidence are disputes over inputs and go to weight, not admissibility. Magistrate Judge Matthewman correctly determined that Mr. Connelly's demonstration of this nexus was sufficient to meet this minimal burden and permit him to testify at trial regarding Corellium's revenues. *See* ECF No. 610 at 10–12.

### A. Corellium Misstates the Law, Attempting to Place on Apple a Burden That Corellium Bears.

Corellium's first error is that it reverses the parties' respective burdens of proof, attempting to place on *Apple* a burden Congress put squarely on accused infringers like *Corellium*, to apportion revenues between infringing and non-infringing activity. Section 504(b) of the Copyright Act provides, in pertinent part:

> In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and *the infringer is required to prove* his or her deductible expenses and *the elements of profit attributable to factors other than the copyrighted work*.

17 U.S.C. § 504(b) (emphasis added). Apple alleges that Corellium infringes Apple's copyrights in its operating system, iOS, by selling, distributing, and licensing a product, known in this litigation as the Corellium Apple Product, that reproduces, modifies, and publicly displays iOS without a license from Apple. Apple contends that each and every sale or license of the Corellium Apple Product infringes its copyrights in iOS. *See* ECF No. 589 ¶¶ 25–44. To determine Apple's damages under the profits-of-the-infringer standard, Mr. Connelly thus calculated Corellium's gross revenues related to the Corellium Apple Product as the starting point for his damages analysis.

Corellium does not dispute that, in calculating Corellium's gross revenues for purposes of Section 504, Mr. Connelly included **only** revenues linked specifically to the Corellium Apple Product. *See* Obj. at 3–4; *see also* ECF Nos. 526-5 at 23–31; 526-6 at 22–31; 526-7 at 22–31; 526-8 at 24–32; 526-9 at 23–34; 526-10 at 24–35; 526-12 at 200:13–25, 203:12–204:13. This fact is of critical importance because the Corellium Apple Product was defined, for discovery purposes, as "[a]ll products developed, offered for sale, or sold by Corellium that create virtual versions of iOS-operated devices." ECF No. 249 at 8. Thus, by definition, revenues received for sale or use of the Corellium Apple Product are directly linked to Apple's copyrighted operating system, iOS.

2

Nonetheless, Corellium asserts that Mr. Connelly erred in using all Corellium Apple Product revenues, and instead should have used a lesser amount, because some versions of the Corellium Apple Product are capable of virtualizing the separate Android operating system, as well as Apple's iOS. *See* Obj. at 3–4. Corellium, in effect, argues that *Apple* is required to apportion revenues "attributable to factors other than the copyrighted work." But under the plain text of Section 504(b), the burden of apportionment is *Corellium*'s. *See* 17 U.S.C. § 504(b). At trial, Apple is required only to demonstrate a non-speculative "nexus" between Corellium Apple Product revenues and Apple's infringement claims at a high level.[1]

Courts interpreting Section 504 have universally held that where, as here, there is a single allegedly infringing product line, it is sufficient for the plaintiff to identify revenues from that product line, and the burden shifts to the *defendant* to attempt to allocate within-product-line revenues. *See, e.g.*, *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 796 (8th Cir. 2003) (holding burden of proving initial "nexus" is plaintiff's; "burden of proving apportionment (i.e., the contribution to profits of elements other than the infringed property), is the defendant's"); *see also On Davis v. The Gap, Inc.*, 246 F.3d 152, 160 (2d Cir. 2001) (explaining that author of copyrighted poem could satisfy initial burden by identifying revenues from a single infringing anthology, even though that anthology contained hundreds of non-infringing poems); *Bonner v. Dawson*, 404 F.3d 290, 294 (4th Cir. 2005) (reversing trial court's finding that lease revenues were not sufficiently connected to infringing design because district court "misinterpreted the level of connection between infringement and profits that is required" to shift the burden under Section 504(b)); *Polar Bear Prods. v. Timex Corp.*, 384 F.3d 700, 712 (9th Cir. 2004) ("Polar Bear was not required to separate the gross profits resulting from the infringement from the profits resulting from other sources."); *Oravec v. Sunny Isles Luxury Ventures L.C.*, 469 F. Supp. 2d 1148, 1175–76 (S.D. Fla. 2006), *aff'd*, 527 F.3d 1218 (11th Cir. 2008) (finding causal link easily met by demonstration of

---

[1] It is actually an open question in this Circuit whether Apple has *any* burden to tie gross revenues to infringement, *compare Montgomery v. Noga*, 168 F.3d 1282, 1293–96 (11th Cir. 1999) (finding that plaintiff "went well beyond" statutory obligation by presenting evidence of total sales of four CD-ROM titles and profits after expenses), *with Aerospace Servs. Int'l v. LPA Grp., Inc.*, 57 F.3d 1002, 1004 (11th Cir. 1995) (finding that actual damages were properly measured as portion of total fees that defendants received from the use of two documents containing the infringing material), but the majority of District Courts in this Circuit have followed other Circuits in holding that there is a very minimal burden to demonstrate that the revenues in question are related in some way to the infringing activity. *See infra* at 4–5.

3

the defendant's leasing revenue of a single building, which the plaintiff alleged was built based on an infringing design).

None of the authorities cited by Corellium in its Objection stands for the proposition that the copyright plaintiff bears the burden of apportioning between infringing and non-infringing elements or uses of a *single* infringing product. To the contrary, where there is only one product at issue, as here, courts have consistently held that the burden of apportionment falls on the defendant, not the plaintiff. *See, e.g.*, *Oravec*, 469 F. Supp. 2d at 1175–76; *Home Design Servs., Inc. v. Turner Heritage Homes, Inc.*, 101 F. Supp. 3d 1201, 1219 (N.D. Fla. 2015), *aff'd*, 825 F.3d 1314 (11th Cir. 2016) (finding sufficient causal nexus demonstrated between profits from sale of home and infringing floor plan to support jury's actual damages award even though profits may have derived from other factors, including rising land values, location, and square footage); *Bonner*, 404 F.3d at 294 (finding copyright plaintiff satisfied initial burden by identifying defendant's leasing revenue of a single building which allegedly incorporated infringing design). Those cases where courts have found no nexus at all involve plaintiffs who attempted to attribute revenue from *multiple* product lines to the infringing activity for purposes of infringement damages, something indisputably not at issue here. *See, e.g.*, *Alifax Holding SPA v. ALCOR Sci. Inc.*, No. CV-14-440 WES, 2019 WL 1579503, at *1–2 (D.R.I. Apr. 12, 2019).

### B. Mr. Connelly's Opinions Link the Revenues to Infringing Activity Sufficiently for *Daubert* Purposes.

From this initial mistaken legal premise, Corellium compounds its error by claiming that there is no "nexus" at all between Corellium's gross revenues and the alleged infringement because, in Corellium's view, the evidence relied upon by Mr. Connelly does not sufficiently link the revenues to infringing activity.

As Magistrate Judge Matthewman correctly found, Corellium is making a summary judgment or trial argument about the merits, and not a proper *Daubert* challenge to the admissibility of Mr. Connelly's testimony. *See* ECF No. 610 at 10–11 (noting that the nexus "issue is properly raised on summary judgment or before the District Judge at trial"). Corellium does not challenge Mr. Connelly's "methodology"—it does not argue he incorrectly calculated Corellium's gross revenues, that he used unknown or inappropriate methodology to do so, or that his arithmetic was wrong. Rather, Corellium's entire argument centers on its assertion that Mr. Connelly's "gross revenues" figure lacks a sufficient nexus under Section 504(b) of the Copyright Act. But as even Corellium concedes, for profits-of-the-infringer damages, the copyright holder has a minimal

4

burden—it need only show some causal connection between the defendant's gross revenues and the defendant's infringement under Section 504(b).  Obj. at 3; *see also Oceans of Images Photography, Inc. v. Foster & Smith, Inc.*, No. 8:11-CV-1160-T-30AEP, 2012 WL 5878092, at *8 (M.D. Fla. Nov. 21, 2012) ("A low initial burden is placed on the copyright holder to make a showing of some causal connection between the infringement and the profits claimed."); *Thornton v. Jargon Co.*, 580 F. Supp. 2d 1261, 1279–80 (M.D. Fla. 2008) (holding that a plaintiff must only introduce *some* non-speculative evidence that the revenues are related; it is not required to prove causation).

As Corellium's own authorities demonstrate, at the *Daubert* stage, Apple need only identify some evidence from which Mr. Connelly could demonstrate that the revenues are reasonably related to infringement. *See* ECF No. 610 at 11–12. Whether to credit his testimony is the jury's job at trial. *Id.* at 12; *see also infra* at 7 (collecting cases). The Court's gate-keeping role under *Daubert* is "not intended to supplant the adversary process." ECF No. 610 at 11 (citing *Southpoint Condo. Ass'n, Inc. v. Lexington Ins. Co.*, No. 19-CV-61365, 2020 WL 3581611, at *3 (S.D. Fla. July 1, 2020)). Corellium cites only one case where a party brought a successful *Daubert* challenge based on the expert's allocation of revenues—and that case itself demonstrates that Corellium's *Daubert* motion must fail. In *Alifax Holding SPA*, an expert provided a gross revenues figure based on numerous products, all but four of which were **conceded** to be unrelated to infringement. *See* 2019 WL 1579503, at *2. There was thus **no** evidence at all linking the gross revenues to the alleged infringement. *Id*. There are no such facts, and no such concessions, in this case; Apple is entitled to present its evidence to the jury. *See New Atlas Dot Com, Inc. v. Pizza Inn I-40 W., Inc.,* No. CIV-11-149-D, 2012 WL 12863152, at *7–8 (W.D. Okla. Nov. 9, 2012) (denying summary judgment where parties disputed link between alleged infringing product and gross revenues; dispute made matter appropriate for trial rather the pre-trial resolution).[2]

Contrary to Corellium's claims, Mr. Connelly's opinion relies on ample evidence linking revenue from the Corellium Apple Product to Corellium's infringement. From Corellium's founding in 2017 through the first part of 2019, the Corellium Apple Product's *sole* use was to virtualize iOS, infringing Apple's copyrights in iOS in the process: it had no other functions. *See*

---

[2] *Montgomery*, 168 F.3d 1282, and *Pronman v. Styles*, 645 F. App'x 870 (11th Cir. 2016), also cited by Corellium, Obj. at 3, are inapposite; both cases addressed loss-of-income damages, not profits-of-the-infringer damages under section 504.

Ex. A (Corellium's Fifth Amended Answers to Apple's First Set of Interrogatories, No. 1) at 4–6; Ex. B (Gorton Tr.) at 51:13–52:7. Corellium customers paid ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for this functionality. *See* ECF No. 526-10 at 24–34. The Corellium Apple Product was marketed as "CORSEC *iOS*"—emphasizing its connection to Apple's copyrighted operating system, iOS—and specifically advertised by Corellium as offering the ability to "[r]un any version of iOS." *See* Ex. C at APL-CORELLIUM_00045655. And Corellium still offers iOS virtualization in ***every single unit*** of the CORSEC product sold or licensed. *See* Ex. A at 4–10; *see also* ECF No. 470-2 ¶¶ 34–36; 526-2 at 15, 24–26. Corellium makes much of the fact that it added Android functionality to the product in 2019, *see* Obj. at 3–4, but ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—and it has never offered an "Android-only" version of its product. Every single version of its product virtualizes Apple's copyrighted operating system, iOS. *See* Ex. A at 4-10; ECF No. 470-2 ¶¶ 34–36.

      In evaluating the "nexus," it is significant that, as Magistrate Judge Matthewman explained, "for much of the time period when Corellium allegedly committed copyright violations, it had only one product—the Corellium Apple Product." ECF No. 610 at 11. Even Corellium's own expert concedes that these revenues—more than ▮▮▮▮▮▮▮ of Corellium's total receipts—could *only* relate to the alleged infringing product as no other products were offered. *See* Ex. D (Appelrouth Tr.) at 183:21–184:14; 193:2–194:10; *see also* ECF No. 468 at 13. Furthermore, there is overwhelming and undisputed evidence to support Apple's contention that *all* sales of the Corellium Apple Product constitute revenues attributable to Corellium's infringement because every single unit of, or license to, the Corellium Apple Product results in infringement of iOS. *See* ECF Nos. 526-1 at 4–7, 9; 526-2 at 6–10, 12, 15–16, 24–26; 526-3 at 5–8, 10–11 & n.5. Corellium itself, through its own verified interrogatory responses and the testimony of its CEO, attributes the disputed revenues to the Corellium Apple Product. *See* ECF Nos. 526-5 at 23–31; 526-6 at 22–31; 526-7 at 22–31; 526-8 at 24–32; 526-9 at 23–34; 526-10 at 24–35; 526-12 at 200:13–25, 203:12–204:13. This provides a more than sufficient basis to link Corellium's revenues from the Corellium Apple Product to Corellium's infringing activity, and the burden to "parse out which revenues are attributable to [infringement of Apple's iOS] and which are attributable to other elements . . . falls on Defendant[] by operation of the burden shifting mechanism of § 504(b)." *Oravec*, 496 F. Supp. 2d at 1176; *see also Bonner*, 404 F.3d at 294.

Magistrate Judge Matthewman's Recommendation correctly determines that there is a sufficient nexus between Corellium's revenues from the Corellium Apple Product and Apple's infringement claims for Mr. Connelly to testify regarding those revenues at trial. This Court should adopt the same in full.

## II. THE COURT SHOULD ADOPT THE RECOMMENDATION WITH RESPECT TO RELIABILITY.

Likewise, the Court should adopt Magistrate Judge Matthewman's Recommendation that Mr. Connelly's opinions are "reliable for *Daubert* and gatekeeping purposes." ECF No. 610 at 10. Each of Corellium's objections to the reliability of Mr. Connelly's methodology lacks merit. Indeed, the information Corellium challenges as "unreliable" includes its own verified interrogatory responses, the concessions of its own expert, and its own pre-lawsuit estimates of income. Moreover, Corellium's challenge attacks the factual underpinnings of Mr. Connelly's opinions, not his calculations or his technical methods. Corellium's objections goes to credibility or weight, not admissibility. *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345–46 (11th Cir. 2003) ("[F]ailure to include variables will affect the analysis' probativeness, not its admissibility" as the "identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination.") (internal quotations omitted); *Armstrong v. HRB Royalty, Inc.*, No. 03-0148-WS-C, 2005 WL 6007684, *6–7 (S.D. Ala. Oct. 14, 2005) ("[P]lugging incorrect numbers into a reliable formula serves only to impugn the accuracy of [the expert's] results," and such "a dispute over variables" is "an inappropriate basis for exclusion.") (alterations in original and internal quotations omitted); *see also In re Trasylol Prods. Liab. Litig.*, No. 08-MD-01928, 2010 WL 1489793, at *6 (S.D. Fla. Feb. 24, 2010) (discussing "general rule that the 'factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility'").

Magistrate Judge Matthewman correctly determined that Mr. Connelly's methods were sufficiently reliable to be presented to the jury under *Daubert*, ECF No. 610 at 11–12, and the Court should adopt his Recommendation in full.

### A. Mr. Connelly's Allocation of Usage to iOS Versus Android Is Not the Product of Unreliable Methodology.

In addition to calculating Corellium's gross revenues attributable to the Corellium Apple Product, discussed above, Mr. Connelly also analyzed revenues attributable to Corellium's virtualization of Android. Mr. Connelly opined that this was a low amount, no more than about ▬▬▬ of Corellium's revenues from the Corellium Apple Product during the period Corellium

7

offered Android virtualization, and thus no more than ▮▮▮▮ of Corellium Apple Product revenues overall.

Corellium argues that this ▮▮▮▮ figure is unduly speculative because Mr. Connelly cannot state, with precision, exactly how much each of Corellium's customers value the Android portion of their products. But the law permits an expert to make reasonable estimations, and the evidence relied upon by Mr. Connelly to support the ▮▮▮▮ figure is not unduly speculative.

As a threshold matter, Corellium's Objection misleads the Court as to the factual bases for his opinion regarding apportionment. The opinion was based not only on the materials cited by Corellium, but also on (a) Corellium's verified interrogatory responses attributing the relevant revenues *fully* to the sale or licensing of the Corellium Apple Product;[3] (b) Corellium CEO Amanda Gorton's testimony that ▮▮▮▮[4] and (c) the fact that each and every unit of or subscription to the Corellium Apple Product enables Corellium's customers to create virtual iOS devices.[5] In addition, as explained above, it is *undisputed* that Corellium's product, as launched and marketed from inception in Fall 2017 through March 2019, supported iOS *only*. ECF No. 526-2 at 25. As noted above, Corellium's **own expert** conceded that all revenues earned by Corellium prior to March 2019—approximately ▮▮▮▮ of Corellium's total revenues—could **only** have related to iOS because that was the only product Corellium offered during that time. *See* Ex. D (Appelrouth Tr.) at 183:21–184:14; 193:2–194:10; *see also* ECF No. 468 at 13.

Mr. Connelly further based his opinion on the fact that (a) even today, the Corellium Apple Product ▮▮▮▮ (b) Corellium's ▮▮▮▮ and (c) Corellium's prices ▮▮▮▮

---

[3] Corellium's verified responses incorporate this Court's definition of Corellium Apple Product, *see* ECF Nos. 526-5 at 23–31; 526-6 at 22–31; 526-7 at 22–31; 526-8 at 24–32; 526-9 at 23–34; 526-10 at 24–35, which includes only "products developed, offered for sale, or sold by Corellium that create virtual versions of iOS-operated devices." *See* ECF No. 249 at 8.

[4] *See* ECF No. 526-12 at 203:12–204:25.

[5] *See* Ex. A at 4–10; *see also* ECF No. 470-2 ¶¶ 34–36; 526-2 at 15, 24–26.

████   ECF No. 526-2 at 26.  Based on these facts, Mr. Connelly concluded that the most it would be reasonable to attribute ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████  *Id.*

The evidence relied upon by Mr. Connelly is typical of evidence a damages expert relies upon in assessing the impact of changes in a product on its revenue stream.  *See, e.g., Montgomery*, 168 F.3d at 1296 (determining percentage of files on each CD-ROM that could be viewed using infringing material); *Polar Bear Prods.*, 384 F.3d at 712 (evaluating impact of promotional materials containing infringing material on overall sales).  The ████████████████████ ████████████████████████ reflects, in part, the portion of the product dedicated to each use (with ████████████████████████████████████).[6]  Corellium's marketing brochures demonstrate ████████████████████████████████████ and the impact of the additional Android functionality on the product's advertising (████████████████████ ████████, as well as the relative value and use of the Apple and Android functionalities.  And the change in price (████████████████████) reflects the relative value of and demand for the Apple and Android functionalities, respectively, within the post-March-2019 Corellium Apple Product.

Corellium supports iOS virtualization far more than Android virtualization.  It advertises iOS more.  And it charges ████████████████████ for iOS virtualization and ████████ ████████  Corellium may urge at trial that Mr. Connelly should have apportioned a greater amount to Android virtualization, and present evidence supporting its claim.  But that does not mean that Mr. Connelly's opinion is unfounded or unreliable, or warrant its exclusion.  Moreover, Corellium's overall argument—that Apple's expert should be prevented from providing reasonable estimates regarding *Corellium's* customers—rings hollow in the face of Corellium's own failure to produce countervailing evidence.  The value that Corellium's users attribute to various aspects of its product is something much more accessible to *Corellium*, not Apple.  *See supra* at 8.  Yet Corellium ████████████████████████████████  *See* ECF No. 526-10 at 35 (verified responses stating ████████████████████████████████████

---

[6] Corellium states that it "explained" certain information related to these entries at the *Daubert* hearing, Obj. at 5–6, but Corellium did not cite any evidence at the hearing, and the arguments of its counsel are not evidence.  *See* 7/24/20 Hr'g Tr. at 30–33 (ECF No. 615).

███████████████████████████████████████████████"). Corellium should not be able to bar Apple, under the guise of a challenge to the reliability of its expert's opinions, from presenting expert testimony regarding damages attributable to Corellium's infringing product simply because Corellium has made those damages more difficult to calculate. *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1572–73 (Fed. Cir. 1996) ("[If] evidence available from the infringer is inadequate, damages may be estimated on the best available evidence, taking cognizance of the reason for the inadequacy of proof and resolving doubt against the infringer."); *see also Digit. Filing Sys., L.L.C. v. Aditya Int'l*, 323 F. App'x 407, 418–19 (6th Cir. 2009) (applying *Sensonics* to copyright case, "[p]laintiff should not otherwise be penalized in assessing damages where it does not have the ability to verify or contest representations by the liable infringer."). Magistrate Judge Matthewman's Recommendation regarding this evidence is sound and should be adopted.

### B. Mr. Connelly's Methodology for Projecting Future Revenues Is Reliable.

To opine on future damages, Mr. Connelly provided two alternative calculations to project Corellium's revenues for the period between the close of discovery and trial. Corellium challenges these as "unreliable" as well. But contrary to Corellium's assertion, the first method did not consist of "simply doubl[ing] Corellium's gross revenue from 2019." Obj. at 8. Instead, Mr. Connelly relied on Corellium's *own projections* cited in its verified interrogatory responses. ECF Nos. 526-1 at 7–8; 526-2 at 10–11. Those projections, made in second quarter 2019 (shortly before this action was filed), anticipated that Corellium's revenues from the Corellium Apple Product in 2020 would be ███████████████. ECF No. 526-6 at 31. Using that projection as a base, Mr. Connelly calculated Corellium's 2019 revenues, ███████████ and then adjusted the amount to prorate it to account both for income received from January to April 2020 and from October 2020 to December 2020. ECF Nos. 526-1 at 7–8; 526-2 at 10–11. Mr. Connelly also offered an alternative, more conservative, analysis that assumed that Corellium's revenues for 2020 would be flat relative to Corellium's 2019 revenues. ECF No. 526-2 at 11. Again, Mr. Connelly prorated that number for the period from April to October 2020. *Id.* Mr. Connelly did not choose the 2019 revenue figure out of a vacuum; he considered using the 2018 revenues as well, but ████████ ████████████████████████████████████████████████████████ *See* ECF Nos. 526-16 at APL-CORELLIUM_00055813; 526-2 at 11.

Corellium's objections to Mr. Connelly's projections lack merit. Again, Corellium is merely challenging the inputs selected by Mr. Connelly to calculate future revenues, not his methodology in actually calculating those revenues based on those inputs. Corellium's challenge thus is not appropriately made in a *Daubert* motion, as it goes to credibility or weight, not reliability, and is—as Magistrate Judge Matthewman correctly found—for the jury to determine. *See* ECF No. 610 at 11–12; *see also Quiet Tech.*, 326 F.3d at 1345–46; *Armstrong*, 2005 WL 6007684, at \*6–7; *In re Trasylol*, 2010 WL 1489793, at \*6.

Corellium's arguments also fail on the merits. Corellium argues that it was error for Mr. Connelly to use its historic income *or* its own revenues to estimate its future income—essentially, Corellium appears to believe there is no legitimate way for Mr. Connelly to estimate its future income at all. But both methods employed by Mr. Connelly are, in fact, typical methods regularly employed by damages experts. With respect to revenue projections, it is perfectly appropriate for Mr. Connelly to rely on *Corellium's* verified interrogatory responses and its own pre-litigation projections. *See, e.g.*, *Armstrong*, 2005 WL 6007684, at \*7 (finding it was appropriate for expert to rely on opposing company's testimony that it planned to open ten offices in the next ten years, without conducting an independent feasibility analysis, when such testimony was not "facially unreasonable"); *see also Pleasant Valley Biofuels, LLC v. Sanchez-Medina, Gonzalez, Quesada, Lage, Crespo, Gomez & Machado LLP*, No. 13-23046-CIV, 2014 WL 2855062, at \*6 (S.D. Fla. June 23, 2014) ("Though [the expert's] reliance upon [plaintiff's] own projections again provides fodder for cross-examination, a damages expert's reliance upon data provided by the parties generally does not require exclusion of the resulting opinions."). The case cited by Corellium, in which an expert relied upon his client's *own* projections, thus is inapposite. *See MasForce Europe, BVBA v. MEC3 Co.*, No. 8:11-CV-1814, 2013 WL 12156469, at \*6 (M.D. Fla. Dec. 4, 2013).

Mr. Connelly's second calculation, based on Corellium's historical income, is likewise reasonable. Indeed, it is routine for financial experts to base estimates of future income on recent past income. *See, e.g.*, *Bostick v. State Farm Mut. Auto. Ins. Co.*, No. 8:16-cv-1400, 2017 WL 2644616, at \*2 (M.D. Fla. June 20, 2017) ("[Experts] have calculated the expected value of [plaintiff's] future lost income by looking at W–2 tax forms, merit increase forms, and pay stubs from the University of Tampa. Their methodology is a standard one, generally used by forensic economists in litigation matters.") (internal citation omitted). Corellium mistakenly asserts that Mr. Connelly relied on prior sales projections from 2018 in this second calculation. Obj. at 8.

11

That is incorrect. For this second calculation, Mr. Connelly calculated Corellium's actual 2019 revenues, which he calculated to be ▬▬▬▬. See ECF No. 526-3 at Ex. C (Suppl). Mr. Connelly then adopted the assumption that Corellium's 2020 revenues would be flat compared to 2019 revenues (a significantly more conservative assumption than Corellium's own projections that its revenues would ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.

Mr. Connelly's actual projection is manifestly reasonable and not subject to exclusion under *Daubert*, as Magistrate Judge Matthewman correctly determined.

    **C.**    **Mr. Connelly's Conservative Estimates Regarding Section 1203 Damages Are Likewise Sufficiently Reliable.**

Corellium's final challenge is to Mr. Connelly's calculation of statutory damages for Apple's claims under the Digital Millennium Copyright Act pursuant to 17 U.S.C. Section 1203. Corellium asserts that Mr. Connelly improperly assumed that each Corellium Apple Product customer used the product at the same rate. Obj. at 8. This contention likewise lacks merit. For this opinion, Mr. Connelly adopted *extremely* conservative estimates: he assumed that each trial or paying customer used the product fully at least once, and alternatively that those who had subscriptions that lasted months (and in many instance cost ▬▬▬▬▬▬▬▬▬▬▬▬) used it fully at least once a month. *See* ECF No. 526-4 at 19–23.

Corellium may, of course, dispute these conservative estimates at trial, but Corellium offers no evidence that they are unfounded or unreasonable. Mr. Connelly based his estimates on Corellium's historic sales and customer data, the exact capacity of each Corellium Apple Product unit to create virtual devices, and the specific length of service for each customer. *See* ECF No 526-2 at 18–23 & Exs. E, E1, E2, E3-1, E3-2, E3-3. Corellium does not dispute any of this or claim that it was incorrect. *See* Obj. at 6–7. Rather, Corellium cites testimony from Azimuth Security—which served as Corellium's ▬▬▬▬ reseller of the Corellium Apple Product—and attempts to argue that because Azimuth, as a reseller, did not itself regularly use the Corellium Apple Product, none of the other customers who bought the product actually used it either. *Id.* at 6, 8. This argument is nonsensical, and belied by overwhelming evidence that Corellium customers regularly and frequently use the product they paid ▬▬▬▬▬▬▬▬▬ for. *See, e.g., id.* at 6 (Azimuth customers were using the product); *see also* ECF Nos. 470-2 ¶¶ 53–54 (identifying ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬); 472 ¶ 63 (identifying use cases for Corellium's current customers). The law does not require that Mr. Connelly have firsthand knowledge of *exactly* how many virtual iOS devices were created by Corellium's

12

customers,[7] and his estimate of one new virtual device each month is reasonable. The Court has "wide discretion in determining the amount of statutory damages to be awarded," and courts regularly allow estimates of exactly this kind. *See, e.g.*, *Netdragon Websoft Inc. v. Toft*, No. CV-11-1037, 2012 WL 13008123, at *4 (C.D. Cal. Apr. 24, 2012) (finding it reasonable to conclude that each customer used the defendant's product "on at least one occasion"); *accord Blizzard Ent., Inc. v. Bossland GmbH*, No. CV 16-1236, 2017 WL 7806600, at *9–10 (C.D. Cal. Mar. 31, 2017) (discussing DMCA damages estimate based on percentage of downloads attributable to infringement); *Craigslist, Inc. v. Kerbel*, No. C-11-3309, 2012 WL 3166798, at *17 (N.D. Cal. Aug. 2, 2012) (awarding statutory DMCA damages based on estimate of website offers); *Blizzard Ent., Inc. v. Reeves*, No. CV-09-7621, 2010 WL 4054095, at *3 (C.D. Cal. Aug. 10, 2010) (using snapshots of usage to conclude that it was reasonable to estimate that all users circumvented technical protection measures).

Corellium suggests that "market studies" should have been conducted. Obj. at 7. But Corellium is a three-year-old company. Many of Corellium's customers are ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. *See* Ex. E (Dyer Tr.) at 74:4–106:10. Moreover, Corellium *itself* has been unable to ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. *See* ECF No. 470-2 ¶ 71; *see also* Ex. B (Gorton Tr.) at 165:17–171:7. Corellium does not suggest how any expert could possibly have conducted a "market study" of Corellium's customers or why such a study would be more accurate than the careful, historical analysis Mr. Connelly actually performed. Furthermore, because Mr. Connelly's inputs and analysis can be readily challenged on cross-examination, Corellium's objections once again go to credibility and weight, not admissibility. *See Quiet Tech.*, 326 F.3d at 1345–46; *Armstrong*, 2005 WL 6007684, at *6–7; *In re Trasylol*, 2010 WL 1489793, at *6.

Magistrate Judge Matthewman correctly recommended that Mr. Connelly be permitted to testify to this opinion as well.

### III. CONCLUSION.

For the foregoing reasons, the Court should reject Corellium's Objection and adopt the Magistrate Judge's Report and Recommendation in full.

---

[7] Nor could Mr. Connelly possess that information as Corellium ▉▉▉▉▉▉▉▉. *See* ECF No. 526-10 at 35.

Dated: August 26, 2020

Michele D. Johnson*
*michele.johnson@lw.com*
LATHAM & WATKINS LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
(714) 540-1235 / (714) 755-8290 Fax

Sarang Vijay Damle*
*sy.damle@lw.com*
Elana Nightingale Dawson*
*elana.nightingaledawson@lw.com*
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200 / (202) 637-2201 Fax

Andrew M. Gass*
*andrew.gass@lw.com*
Joseph R. Wetzel*
*joe.wetzel@lw.com*
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600 / (415) 395-8095 Fax

Jessica Stebbins Bina*
*jessica.stebbinsbina@lw.com*
LATHAM & WATKINS LLP
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
(424) 653-5500 / (424) 653-5501 Fax

Gabriel S. Gross*
*gabe.gross@lw.com*
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
(650) 463-2628 / (650) 463-2600 Fax

*Admitted pro hac vice

Respectfully Submitted,

*s/ Martin B. Goldberg*

Martin B. Goldberg
Florida Bar No. 0827029
*mgoldberg@lashgoldberg.com*
*rdiaz@lashgoldberg.com*
Emily L. Pincow
Florida Bar No. 1010370
*epincow@lashgoldberg.com*
*gizquierdo@lashgoldberg.com*
LASH & GOLDBERG LLP
100 Southeast Second Street
Miami, FL  33131
(305) 347-4040 / (305) 347-4050 Fax

*Attorneys for Plaintiff* APPLE INC.

14