**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

|  |
|---|
| APPLE INC.,<br><br>    Plaintiff,<br><br>v.<br><br>CORELLIUM, LLC,<br><br>    Defendant. |

Case No. 9:19-cv-81160-RS

**EXPERT REPORT OF MICHAEL D. SIEGEL, PH.D**

**MARCH 3, 2020**

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................... ███.3

    A.  Qualifications .................................................................3

    B.  Case Background ............................................................5

    C.  Assignment ...................................................................7

    D.  Materials Relied Upon ....................................................7

    E.  Substantial Limitations Of Report ...................................7

II.  SUMMARY OF OPINIONS ..........................................................8

III.  OVERVIEW OF THE SECURITY RESEARCH INDUSTRY ...................9

    A.  Security Researchers Conduct Research To Discover Vulnerabilities
        And Exploits In Software.................................................10

    B.  Software Vulnerabilities And Exploits Can Be Used For Offensive Or
        Defensive Purposes ........................................................12
        1.  Offensive Uses Of Vulnerabilities And Exploits.................16
        2.  Defensive Uses Of Vulnerabilities And Exploits ................18

IV.  PRACTICING GOOD-FAITH SECURITY RESEARCH IS ESSENTIAL
     FOR THE SOFTWARE INDUSTRY AND FAILING TO DO SO WILL
     REDUCE SECURITY AND SAFETY .................................................19

    A.  Good-Faith Security Research Requires Responsible Disclosure ...............19

    B.  Industry Standards For Good-Faith Research Require Responsible
        Disclosure ....................................................................22

    C.  Incentive Systems Like Bug Bounty Programs Promote Good-Faith
        Security Research And Responsible Disclosure ......................25

V.  CORELLIUM'S BUSINESS PRACTICES DO NOT ENSURE GOOD-
    FAITH SECURITY RESEARCH .....................................................27

    A.  Background Of The Corellium Apple Product ...........................28

    B.  Corellium Recognizes The Potential For Bad-Faith, Offensive Use Of
        Its Product, And Encourages Rather Than Stops Such Conduct ...............29
        1.  Corellium Does Not Require Or Encourage Responsible Disclosure To
            Apple   .....................................................................30
        2.  Corellium Does Not Limit What Users May Do With Vulnerabilities ...............31
        3.  Corellium Openly Advocates For Uses Inconsistent With Good-Faith
            Research .................................................................33

## I.   INTRODUCTION

### A.  Qualifications

1.   I am a Principal Research Scientist in the Information Technology Group at MIT's Sloan School of Management. I am currently Director of Cybersecurity at MIT Sloan, a research consortium focused on management, strategy and organizational issues related to cybersecurity. I have also been a Senior Lecturer at the Sloan School of Management.

2.   I have been a research faculty member in MIT's Information Technologies Group for more than thirty years. I have also been co-director of MIT's International Finance Research Center, a Senior Lecturer for courses in Finance and Information Technology, and the Director of the Digital Health Special Interest Group at the MIT Center for Digital Business.

3.   I hold degrees in Engineering (B.S. and M.S.) from Trinity College (Hartford, CT) and University of Wisconsin (Madison) respectively, and Computer Science (M.A. and Ph.D.) from Boston University. In addition to my thirty years on the research faculty at MIT, I have been a Visiting Professor at Northeastern University, a Research Associate at Boston University, and a Research Assistant at the Solar Energy Laboratory at the University of Wisconsin at Madison.

4.   I have researched and lectured extensively on subjects relating to information technologies, information integration, distributed software systems, and management of information systems and cybersecurity. I am the author or co-author of over 70 journal articles and reports related to these areas. My research has been applied to a number of business areas including, but not limited to, Financial Services, Digital Business, Healthcare, Cybersecurity, Software Development and Maintenance, Industrial Controls Systems Cyber Security, Systems Integration, and Risk Management.

3

5.   As a Principal Research Scientist at the Sloan School of Management, I have focused on issues that combine the use of information technology with business strategy and operations, with a particular emphasis on security.

6.   I have extensive experience on the management, strategy, technology, and organizational issues related to cybersecurity with specific interest in database, distributed systems, vulnerability markets, cyber risk metrics, bug bounty programs, business models connected to cyberattacks, "Internet of Things" endpoint security, cybersecurity workforce development, and educating management in cybersecurity. I have also conducted extensive research into social media, information, and its effects on society. For example, I have examined the effect of Twitter on state stability. I have numerous publications in these and related areas.

7.   My research at MIT Sloan School of Management keeps me in close contact with industry and governmental leaders on issues related to cybersecurity. Cybersecurity at MIT Sloan has had over 40 different industrial partners, most from Fortune 500 companies, and my research related to national security is relevant for numerous US government organizations, governments around the world, and non-government organizations (NGOs). As part of this activity, I have had discussions with hundreds of Chief Information Security Officers (CISOs) or equivalent from Fortune 500 companies and government agencies, as well as many small and medium-sized enterprises, concerning cybersecurity. Through these interactions, I have gained extensive insight into cybersecurity practices and standards at a wide variety of leading companies.

8.   I have developed and presented numerous lectures related to cybersecurity. These have been attended by a wide range of audiences including undergraduate and graduate students,

executives, government organizations, and NGOs. I have been part of several executive education programs offered by MIT including three specifically in cybersecurity. These and other lectures have been viewed by students, academics, industry, and governments worldwide.

9.   I am the co-inventor on three patents related to distributed systems, metadata, web-based data extraction, and information integration:

- U.S. Patent No. 6,282,537, entitled "Querying and Retrieving Semi-Structured Data from Heterogeneous Sources by Translating Structured Queries." This patent issued in 2001.
- U.S. Patent No. 5,913,214, entitled "Data Extraction from World Wide Web Pages." This patent issued in 1999.
- U.S. Patent No. 5,953,716, entitled "Querying Heterogeneous Data Sources Distributed over a Network Using Context Interchange." This patent issued in 1999.

10.   Appendix A provides my Curriculum Vitae, which includes my publications.

## B. Case Background

11.   Apple Inc. ("Apple") is a leading designer and manufacturer of mobile communication devices, personal computers, and media devices. Apple's products and services include mobile devices such as iPhone® and iPad®, as well as software that is used on those devices, including the iOS operating system. I understand that Apple has alleged that its iOS operating system is protected under federal copyright law.[1]

---

[1]   FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL, *Apple Inc. v. Corellium, LLC,* Case 9:19-cv-81160-RS, December 20, 2019, ¶ 17.

12.     Corellium, LLC ("Corellium") offers a product that creates virtual versions of Apple's iOS-operated devices that are accessible on a web browser or via an on-premises platform.[2] This product is referred to in this report as the Corellium Apple Product. I understand that Apple alleges in its complaint that the Corellium Apple Product uses Apple's copyrighted works, including the iOS operating system.

13.     I further understand that Apple has alleged that it has not licensed use of its copyrighted works to Corellium and that Corellium's use of Apple's copyrighted works constitutes infringement of Apple's copyrights.[3] I also understand that Apple alleges that Corellium's trafficking of the Corellium Apple Product also violates federal law.[4]

14.     I understand that one of Corellium's defenses in this litigation is based on Corellium's claim that the Corellium Apple Product is designed, marketed, and used for good-faith security research.[5]

15.     I am being compensated at the rate of $850 per hour for the time I incur on this matter. In preparation of this report, I have been assisted by certain employees of Analysis Group, who provided me support and assistance under my direction. The positions articulated herein are my own. My payment is not contingent on my opinions or on the outcome of this case.

---

[2]     Lorenzo Franceschi-Bicchierai, "The Prototype iPhones That Hackers Use to Research Apple's Most Sensitive Code," *Motherboard Tech by Vice*, March 6, 2019, available at https://www.vice.com/en_us/article/gyakgw/the-prototype-dev-fused-iphones-that-hackers-use-to-research-apple-zero-days.

[3]     FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL, *Apple Inc. v. Corellium, LLC*, Case 9:19-cv-81160-RS, December 20, 2019, ¶¶ 51–57.

[4]     FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL, *Apple Inc. v. Corellium, LLC*, Case 9:19-cv-81160-RS, December 20, 2019, ¶¶ 74–77.

[5]     DEFENDANT'S NOTICE OF SERVING AMENDED ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, *Apple Inc. v. Corellium, LLC,* Case 9:19-cv-81160-RS, January 16, 2020, p. 46.

### C.  Assignment

16.    Provide an overview of the security research industry and opine on what constitutes "good-faith" security research, referencing industry examples and regulations.

17.    Provide a high-level overview of Corellium's business and, in particular, the Corellium Apple Product, with attention to agreements with its customers and any restrictions on use put in place, and opine on whether Corellium is ensuring that the Corellium Apple Product is used specifically for "good-faith" security research.

### D.  Materials Relied Upon

18.    In preparation for this report, I have reviewed the materials listed in Appendix B.

### E.  Substantial Limitations Of Report

19.    I have prepared this report to the best of my ability, based on the documents provided to me by Apple. I note, however, that there are a number of documents about Corellium and its business practices that I have not been provided with and that, if made available by Corellium, may be relevant to and inform my opinion.

20.    In particular, I have been provided with few, if any, of the following materials: (1) Corellium's agreements with its customers; (2) Corellium's communications with its customers; (3) Corellium's agreements with the resellers of its product; (4) Corellium's communications with the resellers; and (5) Corellium's marketing and pitch materials for potential customers. These materials, if provided, would likely shed substantial light on Corellium's practices with respect to good-faith security research, including Corellium's endorsed uses of its product, and its lack of restrictions regarding the use of its product.

21.   The opinions I have given herein are thus necessarily limited to the materials I have had available to me. I thus reserve the right to amend or supplement this report based on additional documents produced by Corellium or to the extent such further materials are otherwise made available for my review.

## II.   SUMMARY OF OPINIONS

22.   Based on my expertise, review of Corellium's business practices, and the materials described in Appendix B, I have reached the following opinions:

a.   It is my opinion that, for security research to be considered "good-faith security research," it must be done solely for the purpose of testing, investigating, and/or correcting a security flaw or vulnerability; it must be carried out in an environment designed to avoid any harm to individuals or the public; the information derived from the research must not be used or maintained in a manner that facilitates illegal activity; and finally, and most critically, the information derived from the research must be properly and responsibly disclosed to the vendor of the product that contains the software flaw or vulnerability.

b.   Security research that does not result in responsible disclosure of security flaws or vulnerabilities to the researched company would not be considered good-faith security research.

c.   I have considered Corellium's business practices and concluded that the do not ensure good-faith security research. Specifically, Corellium recognizes the potential for bad-faith uses of the Corellium Apple Product but has chosen to do nothing to stop such bad-faith uses, either contractually or through other restrictions. To the

contrary, in many instances Corellium has specifically encouraged conduct that is contrary to the requirements of good-faith security research.

d.  It is my opinion that Corellium's business practices are not designed to ensure that the Corellium Apple Product is used solely for good-faith security research, and Corellium's actual business activities confirm that Corellium cannot represent that its product is used only or even primarily for good-faith security research. This conclusion is based on the fact that I have seen no evidence to date that Corellium limits the sale of the Corellium Apple Product to only those engaged in good-faith security research, and I also have not seen any evidence to date that Corellium places meaningful restrictions on how the product is used. Also relevant is the fact that Corellium does not require that vulnerabilities discovered with its product be disclosed back to anyone, let alone to Apple. This contradicts one of the core principles of good-faith security research: responsible disclosure for the purpose of facilitating the correction of security flaws and vulnerabilities. Finally, several public statements made by the founder and Chief Technology Officer of Corellium, Chris Wade, are contrary to the tenets of good-faith security research and thus support my conclusion.

## III.   OVERVIEW OF THE SECURITY RESEARCH INDUSTRY

23.  Cyber-attacks are a tremendous threat to today's digital society, targeting individuals, companies, governments and NGOs. In order to contextualize how tools such as the Corellium Apple Product may be used within this landscape, it is important to understand the security research industry. This involves understanding what software vulnerabilities

and exploits are, how they can be used, and the offensive and defensive markets in which

vulnerabilities can be disclosed, bought, and sold.

24.     In this section, I give an overview of the security research industry and vulnerabilities.

Specifically, in Section III.A I describe the discovery of vulnerabilities and the participants

in the industry. In Section III.B I describe offensive and defensive uses of vulnerabilities

and exploits, and opine on the responsibilities of security researchers who wish to contribute

to ensuring software security.

### A.  Security Researchers Conduct Research To Discover Vulnerabilities And Exploits In Software[6]

25.     A software **bug** is an error, mistake, defect, or fault that may cause a failure or deviation

from the software's expected results.[7] **Vulnerabilities** are software bugs that create a

security weakness in the design, implementation, or operation of a system or application.[8]

The two are not always the same thing, as software can have a bug without that bug creating

an opening for that software to be hacked or exploited. For example, if a website allowed

users to add items to their shopping cart by clicking a button, but the item was not added to

the cart, this would be a bug. The code would fail to operate as expected—but the failure

may not have any security implications.

26.     Cyber-attacks rely not just on the existence of vulnerabilities, but also on the mechanism

with which they are used. Once a vulnerability is discovered, an **exploit** must be developed

---

[6]   Although vulnerabilities can exist in both software and hardware, this report focuses specifically on vulnerability in software.

[7]   "Software Bug Definition," *techopedia*, January 27, 2017, available at https://www.techopedia.com/definition/24864/software-bug.

[8]   "The Defender's Dilemma: Charting a Course Toward Cybsersecurity," *RAND Corporation* (2015), p. 42.

to take advantage of the weakness and turn the vulnerability into an actual way to breach a system. This turns a vulnerability into a viable method to launch a cyber-attack.[9] For example, a vulnerability might exist such that unauthorized users can see records in a database system. A successful exploit of the vulnerability could provide an attacker with the means to collect or extract all of the records from that database.[10]  For example, in 2017, hackers from China exploited a vulnerability in an Equifax web application system to hack into Equifax's system and gain access to personal data on over 145 million Americans in what has been described as a "historic data breach."[11]

27.    A **security researcher** is someone who finds flaws or vulnerabilities in software, and conducts research on known vulnerabilities.[12] Security researchers can take a variety forms, including individual independent researchers, small academic teams, security firms, large tech companies, and governments.[13] There are a wide range of reasons why people and entities engage in security research. Some are looking to improve the security and stability of consumer products; some are looking to further their own interests, such as governments that use vulnerabilities and exploits to breach privacy protections; some are looking to profit from the sale of information about vulnerabilities and exploits for financial gain; and some

---

[9]    "The difference between and exploit and vulnerability," *Live Hacking*, November 20, 2012, available at http://www.livehacking.com/2012/11/20/the-difference-between-an-expoit-and-vulnerability/.

[10]   "Threats, Vulnerabilities and Exploits - oh my!," *ICANN*, August 10, 2015, available at https://www.icann.org/news/blog/threats-vulnerabilities-and-exploits-oh-my.

[11]   "What Equifax Is Still Teaching Us About Security," *Dice*, February 18, 2020, available at https://insights.dice.com/2020/02/18/what-equifax-still-teaching-us-cybersecurity/.

[12]   Wilson et al., "Bugs in the System," *New America*, July 2006, p. 6.

[13]   Wilson et al., "Bugs in the System," *New America*, July 2006, p. 2.

are interested in using vulnerabilities and exploits to do harm in other ways (e.g., cyber-attacks).

28.     The existence of vulnerabilities is inevitable, and the vulnerabilities discovered by security researchers can vary in their complexity, difficulty to remediate, and security risk. Once a vulnerability is found, it can either be patched (i.e., fixed), exploited (i.e., used in an attack), bought/sold/rented (i.e., purchase/sale of vulnerability details), or stockpiled (i.e., saved for later use).[14] Which of these happens depends greatly upon the action taken by the security researcher who discovers the vulnerability, and to whom they choose to disclose the vulnerability.

29.     For example, some security researchers may disclose the presence of a vulnerability to the software vendor—the entity that developed the product and is responsible for maintaining it—so that it can be fixed. Others may choose to disclose the vulnerability to state actors. Others may choose to disclose the vulnerability to criminals. And still others may choose not to disclose the vulnerability to anyone. Each of these choices has real-world consequences, and only one of them—disclosure to the organization that developed the product so that it can be fixed—is consistent with good-faith security research.

### B.  Software Vulnerabilities And Exploits Can Be Used For Offensive Or Defensive Purposes

30.     To understand what can happen with vulnerabilities and exploits after they are discovered, it is important to understand the offensive and defensive marketplaces for them. The market

---

[14]   Lillian Ablon, Andy Bogart, "Zero Days, Thousands of Nights: The Life and Times of Zero-Day Vulnerabilities and Their Exploits," *RAND Corporation* (2017). p. 2, 6, 22, 23.

for software vulnerabilities has existed as long as software itself, but it has seen significant changes over time.[15] When early security researchers found and reported vulnerabilities to the vendors of early software, the process was often done less for financial gain and more for recognition from other industry participants and a desire to make software more secure.[16] However, over time, software has become more complex, the pool of qualified security researchers has grown, and economic incentives for finding vulnerabilities have increased rapidly.[17] Vulnerability markets have developed so that vulnerabilities (and their associated exploits) can also be bought, sold, traded, or rented.[18]

31. Vulnerabilities "can be used to craft new malicious attacks and exploits (offense), or they can be fixed through patches and updates (defense)."[19] Much of cybersecurity can be seen as a race between two parties: software developers and security researchers discovering and patching vulnerabilities, on the one hand, and groups that want to discover and exploit vulnerabilities to do harm or use them for personal benefit, on the other. One major shortcoming in the race is the asymmetry: black-hat researchers (explained further below) need only one unknown vulnerability to do harm, while software developers need to protect against all vulnerabilities.

---

[15] Adam Segal, "Using Incentives to Shape the Zero-Day Market," *Council on Foreign Relations*, September 19, 2016, available at https://www.cfr.org/report/using-incentives-shape-zero-day-market.

[16] Adam Segal, "Using Incentives to Shape the Zero-Day Market," *Council on Foreign Relations*, September 19, 2016, available at https://www.cfr.org/report/using-incentives-shape-zero-day-market.

[17] Adam Segal, "Using Incentives to Shape the Zero-Day Market," *Council on Foreign Relations*, September 19, 2016, available at https://www.cfr.org/report/using-incentives-shape-zero-day-market.

[18] "The Defender's Dilemma: Charting a Course Toward Cybsersecurity," RAND Corporation (2015), p. 45.

[19] Ryan Ellis, Keman Huang, Michael Siegel, Katie Moussouris, James Houghton, "Chapter 4 - Fixing a Hole: The Labor Market for Bugs," *New Solutions for Cybersecurity*, 2017, p. 143.

32.     The offense uses its capabilities, researchers, tools, and techniques to discover vulnerabilities to stockpile for later or to deploy for exploitation (either directly or by transferring to others). Similarly, the defense uses its capabilities, researchers, tools, and techniques to discover undisclosed vulnerabilities and patch them before they are discovered by the offense, or to discover undisclosed vulnerabilities stockpiled by the offense and to patch them before they are deployed for harm.[20]

33.     Competing "offensive" and "defensive" markets have been created for the exchange of these vulnerabilities. The main difference between these two markets "relates to how—or *if*—the newly discovered vulnerability is disclosed to the impacted vendor and patched."[21]

34.     Traditionally, security researchers are thought about in three categories, depending on the types of activities they undertake. Security researchers may act in the interest of ensuring the security of software and the public (white-hat researchers), maliciously (black-hat researchers), or somewhere in between (grey-hat researchers).[22]

    a.   **White-hat security researchers** participate in defensive marketplaces for security vulnerabilities. Upon finding a vulnerability or exploit, they nearly always disclose the issue directly to the vendor who will be able to fix it, and at times work directly with the vendor. They may participate in bug bounty programs and other contests, and often receive recognition for their contributions to improving security.[23]

---

[20]   Ryan Ellis, Keman Huang, Michael Siegel, Katie Moussouris, James Houghton, "Chapter 4 - Fixing a Hole: The Labor Market for Bugs," *New Solutions for Cybersecurity*, 2017, p. 143.

[21]   Ryan Ellis, Keman Huang, Michael Siegel, Katie Moussouris, James Houghton, "Chapter 4 - Fixing a Hole: The Labor Market for Bugs," *New Solutions for Cybersecurity*, 2017, p. 143.

[22]   "The Defender's Dilemma: Charting a Course Toward Cybsersecurity," *RAND Corporation* (2015), p. 44.

[23]   "The Defender's Dilemma: Charting a Course Toward Cybsersecurity," *RAND Corporation*, (2015), pp. 44-45, 48.

b. **Black-hat researchers** search for vulnerabilities or exploits for malicious, and often criminal purposes.[24] They perform security research with the intent of identifying exploits that they or their associates can deploy via cyber-attacks, or to stockpile and sell or rent vulnerabilities and exploits in offensive markets for financial gain. Vulnerabilities and exploits discovered by black-hat researchers have great potential to do harm, as these vulnerabilities are usually kept secret from those with the power to fix them.[25]

c. **Grey-hat security researchers**, as the name suggests, are between white-hat and black-hat researchers on the spectrum of security researchers. Grey-hat security researchers typically focus on how they can personally benefit from their discoveries.[26] They may work for various clients in the offensive market, such as "nation states looking to develop sophisticated exploits and attacks in the service of espionage and sabotage, criminals looking to develop intrusions for profit, and brokers that serve as middle-men between relevant parties," in order to sell exploits for profit.[27] Such buyers may require vulnerabilities be kept private and not be disclosed to the original product developer in order for the researcher to receive a

---

[24]  "The Defender's Dilemma: Charting a Course Toward Cybsersecurity," *RAND Corporation*, (2015), p. 44.

[25]  "The Defender's Dilemma: Charting a Course Toward Cybsersecurity," *RAND Corporation*, (2015), pp. 44-45, 48.

[26]  "What is the Difference Between Black, White, and Grey Hat Hackers?," *Norton*, available at https://us norton.com/internetsecurity-emerging-threats-what-is-the-difference-between-black-white-and-grey-hat-hackers.html.

[27]  Ryan Ellis, Keman Huang, Michael Siegel, Katie Moussouris, James Houghton, "Chapter 4 - Fixing a Hole: The Labor Market for Bugs," *New Solutions for Cybersecurity*, 2017, p. 143.

payment.[28] In addition, if a grey-hat researcher finds a vulnerability, it may become part of the offensive stockpile, waiting to be used against an unsuspecting party. One example of grey-hat researchers is the agencies within the United States government. While an agency might inform an affected company of the vulnerability in some instances, it might instead "save the secret weakness in order to use it to launch attacks against enemies."[29]

35.   Below, I discuss offensive and defensive marketplaces and incentives for vulnerability and exploit disclosure in more detail.

### 1.   *Offensive Uses Of Vulnerabilities And Exploits*

36.   The "offensive" market is the place where black-hat and grey-hat researchers sell vulnerabilities and exploits to interested parties, such as parties looking for exploits to use in an attack or for building their offensive stockpile. The "offensive market" is characterized by non-disclosure. Purchased vulnerabilities are not disclosed to the relevant vendor, "but rather are kept secret for later use as part of an exploit or attack."[30] In the offensive market, vulnerabilities and their fully developed exploits can also be provided as a service offering paid for on a commission basis.[31]

---

[28]   *E.g.,* Zerodium, a company that describes themselves as "the world's leading exploit acquisition platform" for zero-day vulnerabilities will only pay a bounty for "original and previously unreported" vulnerabilities. "Our Exploit Acquisition Program," *Zerodium,* available at https://zerodium.com/program.html.

[29]   James Doubek, "Government Outlines When It Will Disclose Or Exploit Software Vulnerabilities," *NPR,* November 17, 2017, available at https://www.npr.org/sections/alltechconsidered/2017/11/17/564755961/ government-outlines-when-it-will-disclose-or-exploit-software-vulnerabilities.

[30]   Ryan Ellis, Keman Huang, Michael Siegel, Katie Moussouris, James Houghton, "Chapter 4 - Fixing a Hole: The Labor Market for Bugs," *New Solutions for Cybersecurity,* 2017, p. 143.

[31]   Keman Huang, Michael Siegel, and Stuart Madnick, "Systematically Understanding the Cyber Attack Business: A Survey ACM Computer Surveys," *ACM Computing Surveys* Vol. 51, No. 4 (2018): 70:27.

37.     Attacks that target an unknown software vulnerability are known as "zero-day" (or 0day)

exploits.[32] Because the attacker finds the vulnerability before the software vendor, these

exploits are highly likely to succeed as "[a]ttacks and exploits that take advantage of a

previously unknown and undisclosed flaw can be very difficult to detect or prevent."[33]

Finding these zero-day exploits can also be quite lucrative. For example, exploit-trade

companies, like Zerodium, will offer security researchers up to $2.5 million for their zero-

day exploits.[34]

38.     When multiple participants in the offensive market have access to the same tool or tools that

facilitate the discovery of vulnerabilities, the speed at which vulnerabilities are exploited is

likely to increase. The reason for this is that, when particularly effective tools for

vulnerability discovery proliferate, the likelihood that another participant in the offensive

market will also find the same vulnerability increases as well—a concept known as

rediscovery.[35] Increased chances of rediscovery place pressure on offensive players (who

may be aware that other offensive players have the same tool and understand the increase in

likelihood of rediscovery) to more quickly exploit those vulnerabilities so they can take

advantage of the vulnerability before someone else does so.[36]

---

[32]   "The Defender's Dilemma: Charting a Course Toward Cybersecurity," *RAND Corporation* (2015), p. xvi.

[33]   Ryan Ellis, Keman Huang, Michael Siegel, Katie Moussouris, James Houghton, "Chapter 4 - Fixing a Hole:
The Labor Market for Bugs," *New Solutions for Cybersecurity*, 2017, p. 143; "What is a zero-day (0day)
exploit," *imperva*, 2020, available at https://www.imperva.com/learn/application-security/zero-day-exploit/.

[34]   "Our Exploit Acquisition Program," *Zerodium*, available at https://zerodium.com/program html.

[35]   Kim Zetter, "Malware Attacks Used By The U.S. Government Retain Potency For Many Years, New Evidence
Indicates," *The Intercept*, March 10, 2017, available at https://theintercept.com/2017/03/10/government-zero-
days-7-years/.

[36]   Bruce Schneier, "Disclosing vs. Hoarding Vulnerabilities," *Schneier on Security*, May 22, 2014, available at
https://www.schneier.com/blog/archives/2014/05/disclosing_vs_h.html.

### 2. *Defensive Uses Of Vulnerabilities And Exploits*

39.    In the "defensive" market, bug bounty programs work to incentivize the disclosure and subsequent patching of discovered vulnerabilities. These programs offer financial rewards to researchers that disclose vulnerabilities directly to the vendors they affect and create a safe environment for disclosure.[37] White-hat security researchers participate in these marketplaces and work to find bugs before black-hat or grey-hat researchers find them (or rediscover those already found). These programs became mainstream and continue to develop because there is "a competing offensive market in play," and so bug bounty programs exist to bolster the defensive market against the offensive force.[38]

40.    As of 2017, over 100 different companies offered bug bounty programs and thousands of researchers participated in these programs, earning anywhere from a few dollars to hundreds of thousand dollars for a single bug.[39] Some security researchers have made in excess of $1 million through bug bounty programs.[40] The goal of these bug bounty programs is to limit the offensive stockpile of vulnerabilities and thus improve security and safety of the public at large.

---

[37]    "History of Bug Bounties," *bugcrowd*, available at https://web.archive.org/web/20161208162145/https://bugcrowd.com/resources/history-of-bug-bounties.

[38]    "On Bounties and Boffins," *Trail of Bits Blog*, January 14, 2019, available at https://blog.trailofbits.com/2019/01/14/on-bounties-and-boffins/.

[39]    Ryan Ellis, Keman Huang, Michael Siegel, Katie Moussouris, James Houghton, "Chapter 4 - Fixing a Hole: The Labor Market for Bugs," *New Solutions for Cybersecurity*, 2017, p. 124; "Microsoft Bug Bounty Program," *Microsoft*, available at https://www.microsoft.com/en-us/msrc/bounty

[40]    "Six Hackers Break Bug Bounty Record, Earning over $1 Million Each on Hackerone," *HackerOne*, August 29, 2019, available at https://www.hackerone.com/press-release/six-hackers-break-bug-bounty-record-earning-over-1-million-each-hackerone.

### IV.  PRACTICING GOOD-FAITH SECURITY RESEARCH IS ESSENTIAL FOR THE SOFTWARE INDUSTRY AND FAILING TO DO SO WILL REDUCE SECURITY AND SAFETY

41.   The interaction of these offensive and defensive markets is important to the concept of good-faith security research, as essentially good-faith security research is research that enables the fixing of security flaws or vulnerabilities, rather than the exploitation of them.

### A.  Good-Faith Security Research Requires Responsible Disclosure

42.   This case involves a tool, the Corellium Apple Product, that its creator states can be used for security research of iOS. But when such a research tool is made available to those engaged in security research, steps must be taken to ensure it is used only for good-faith security research. This requires placing restrictions on who the tool is given to and how it is used. Such restrictions are particularly important because the financial rewards for participants in offensive markets—that is black-hat and grey-hat researchers—are as many as ten times those available in the defensive market, and so affirmative restrictions must be in place to protect against the use of research tools for the offensive market.[41] Companies that impose little to no restrictions are not, in my opinion, providing research tools solely for good-faith security research nor can such companies say that their tools are being used solely for good-faith security research.

43.   Rather, it is my opinion, based on my experience, that for research to qualify as "good-faith security research," the research must satisfy at least the following criteria:

---

[41]   "The Defender's Dilemma: Charting a Course Toward Cybsersecurity," *RAND Corporation* (2015), p. 44.

     a. The research is done solely for the purpose of testing, investigating, and/or correcting a security flaw or vulnerability.

     b. The research is carried out in an environment designed to avoid any harm to individuals or the public.

     c. The information derived from the research is not used or maintained in a manner that facilitates illegal activity.

     d. The information derived from the research is properly and responsibly disclosed to the vendor of the product that contains the software flaw or vulnerability.

44. My opinion regarding good-faith research is supported by the security research industry. As described further below, industry standards and published materials establish that "responsible disclosure" of vulnerabilities to the impacted software vendor is a critical requirement for good-faith security research, and security research that does not include this critical requirement cannot be considered good-faith security research. That is because finding these vulnerabilities and informing affected parties is "essential to protect our economy and citizens."[42]

45. In the security research industry, it is generally understood that responsible disclosure involves the following essential steps:

     a. "The security researcher who found the vulnerability to confidentially report it to the impacted company.

     b. The security researcher and company work in good faith to establish an agreed upon period of time for the vulnerability to be patched.

---

[42] "Vulnerability Disclosure Attitudes and Actions," *National Telecommunications and Information Administration* (2016).

c. Once the agreed upon time period expires and the vulnerability is patched or the patch is available for installation by the users of the software, the security researcher can publicly disclose the vulnerability."[43]

46.   It is also generally understood that, during the agreed-upon period allowed for the affected company to fix the vulnerability, the security researcher will not notify other parties of the vulnerability, but rather will maintain confidentiality so that the vulnerability can be fixed without harm to the software company or its users.[44]

47.   Disclosure of vulnerabilities directly to an affected technology company, rather than to the public at large, is particularly important because black-hat security researchers "can typically exploit the vulnerability when publicly disclosed much more quickly than those who are attacked can fix the issue."[45] Responsible disclosure is thus critical because it ensures that such companies can keep their products safe and operational, which in turn protects the users of those companies' technology. That is why many companies actively encourage responsible disclosure in sponsored security research or testing operations like bug bounty programs.

48.   While good-faith research requires responsible disclosure, by contrast, black-hat researchers do not typically disclose vulnerabilities to affected companies *at all*. Grey-hat researchers, in turn, may disclose certain vulnerabilities to affected companies, they may sell

---

[43]   Jonathan Trull, "Responsible Disclosure: Cyber Security Ethics," *CSO Online*, February 26, 2015, available at https://www.csoonline.com/article/2889357/responsible-disclosure-cyber-security-ethics html.

[44]   *E.g.,* Tesla's responsible disclosure guidelines ask that security researchers "[g]ive Tesla a reasonable time to correct the issue before making any information public." "Product Security," *Tesla*, available at https://www.tesla.com/about/security.

[45]   Jonathan Trull, "Responsible Disclosure: Cyber Security Ethics," *CSO Online*, February 26, 2015, available at https://www.csoonline.com/article/2889357/responsible-disclosure-cyber-security-ethics html

vulnerabilities on the offensive market, or they may stockpile vulnerabilities for later use. But a grey-hat researcher's decision to save vulnerabilities for its own use, even if not intended to harm the public, may nevertheless lead to public harm. As discussed above, when security researchers use the same set of research tools, the chance for rediscovery of vulnerabilities increases. In other words, if a grey-hat researcher (like agencies of the U.S. government) can find such vulnerabilities with commonly available tools, there is a higher likelihood that malicious actors using the same tool will find such vulnerabilities too (if they have not already) and will develop exploits based on those vulnerabilities. In such cases, a grey-hat hacker acting in good faith should disclose the vulnerability to the vendor, because the alternative—simply stockpiling the vulnerability—creates a high risk of public harm. If these researchers fail to disclose the vulnerability to the affected company, then security researchers in these markets are not engaged in good-faith security research.

### B.  Industry Standards For Good-Faith Research Require Responsible Disclosure

49.   Because of the importance of good-faith security research, and the corresponding harm that can result when research is not undertaken in good faith, technology companies and policy makers alike, both domestic and abroad, have made significant efforts to study and develop standards that inform what it means to be engaged in good-faith security research, including standards that govern responsible disclosure of vulnerabilities.

a.   One such policy making entity is the National Telecommunications and Information Administration (NTIA) of the Department of Commerce—the "Executive Branch agency that is principally responsible by law for advising the President on

telecommunications and information policy issues."[46] As part of that mandate, NTIA has undertaken significant efforts to study and develop policies to improve cybersecurity.[47] Particularly relevant here, in 2015, NTIA convened a "multi-stakeholder process to investigate software vulnerability disclosure and handling practices."[48]  That process resulted in a published report, detailing responsible disclosure (which NTIA called "coordinated vulnerability disclosure"), which is defined as follows.

 i.  "[S]ecurity researchers report vulnerabilities either directly to the relevant technology provider/operator or to a coordinating third party, such as an appropriate government entity.

 ii.  The technology provider/operator then coordinates and communicates with the reporter of the vulnerability throughout the investigation and remediation of the vulnerability.

 iii.  Finally, the researcher and technology provider/operator coordinate in disclosing the vulnerability publicly."[49]

b.  Similarly, in 2017, the Forum of Incident Response and Security Teams (FIRST), an NGO that had worked with the NTIA on its efforts related to responsible

---

[46]  "National Telecommunications and Information Administration," *U.S. Department of Commerce*, available at https://www.commerce.gov/bureaus-and-offices/ntia.

[47]  "Cybersecurity," *National Telecommunications and Information Administration*, available at https://www.ntia.doc.gov/category/cybersecurity.

[48]  "Vulnerability Disclosure Attitudes and Actions," *National Telecommunications and Information Administration* (2016), p. 2.

[49]  "Vulnerability Disclosure Attitudes and Actions," *National Telecommunications and Information Administration* (2016), p. 5.

disclosure, released "Guidelines and Practices for Multi-Party Vulnerability Disclosure." These Guidelines focus extensively on the critical role disclosure plays in addressing vulnerabilities and the ways industry stakeholders can support best practices with respect to disclosure.[50]

c. In 2018, the International Organization for Standardization (ISO), "an independent, non-governmental organization with a membership of 164 national standards bodies,"[51] likewise released standards that provide a number of new "normative provisions" to help ensure proper vulnerability disclosure, again reinforcing the importance of responsible disclosure to good-faith security research.[52]

50. Actions within the technology industry likewise reinforce the critical role that responsible disclosure plays in any understanding of good-faith security research. In 2018, for example, disclose.io was launched as a "cross-industry, vendor-agnostic standardization project for safe harbor best practices to enable good-faith security research."[53] disclose.io thus provides templates for policies that encourage good-faith security research. Notably, its templates include in the "ground rules" the requirement to "[r]eport any vulnerability you've discovered promptly," and to "[a]void violating the privacy of others, disrupting our systems, destroying data, and/or harming user experience."[54]

---

[50] "Guidelines and Practices for Multi-Party Vulnerability Coordination and Disclosure," *Forum of Incident Response and Security Teams*, 2017, available at https://www.first.org/global/sigs/vulnerability-coordination/multiparty/FIRST-Multiparty-Vulnerability-Coordination-latest.pdf?20180320.

[51] "About Us," *the International Organization for Standardization*, available at https://www.iso.org/about-us.html.

[52] "Information technology — Security techniques — Vulnerability disclosure," *International Standard*, ISO/IEC 29147:2018(E).

[53] "disclose.io Home Page," *disclose.io*, available at https://disclose.io/.

[54] "disclose.io Core Terms," *Github*, available at https://github.com/disclose/disclose/blob/master/terms/core-terms-USA/core-terms-USA.md

51.     In sum, significant effort has been invested into the development of policy infrastructure surrounding security research. The results of these efforts reinforce and confirm my opinion of what constitutes good-faith security research, including the critical importance of vulnerability disclosure to good-faith security research.

### C. Incentive Systems Like Bug Bounty Programs Promote Good-Faith Security Research And Responsible Disclosure

52.     The role good-faith security research plays in protecting companies as well as consumers, along with the central role responsible disclosure plays in good-faith security research, are perhaps best seen in the bug-bounty programs that many companies have created to incentivize good-faith security research. These programs are often run by software companies to encourage the discovery and responsible disclosure of vulnerabilities.

53.     Bug bounty programs can vary considerably, "including how they define market access (who can participate as a seller), program duration (when will sales be accepted), and compensation (what is offered as a reward)."[55] Programs also vary as to whether they are in-house or third-party. However, the paramount feature of all such programs is responsible disclosure.

54.     A current example of a third-party platform that encourages responsible disclosure is HackerOne, which provides researchers with the resources to test for bugs and partners with vendors to ensure that any discovered bugs get properly disclosed and addressed.[56] HackerOne's website states that "more security teams use HackerOne to manage

---

[55]   Ryan Ellis, Keman Huang, Michael Siegel, Katie Moussouris, James Houghton, "Chapter 4 - Fixing a Hole: The Labor Market for Bugs," *New Solutions for Cybersecurity*, 2017, p. 125.

[56]   "Hackerone Home Page," *hackerone*, available at https://www.hackerone.com/.

vulnerability disclosure and bug bounty programs than any other platform."[57] Its goal is not just to help researchers get rewarded, but to help ensure that responsible disclosure to the proper parties is carried out.

55.  Figure 1 demonstrates the structure of in-house and third-party bug bounty programs, and where the security researcher fits into the flow of responsible disclosure. In each case, the security researcher is agreeing to legal terms that their testing will result in disclosure, which helps assure good-faith security research.

**Figure 1 –**
**Flow from security researcher to vendor, given the existence of a third-party provider**



56.  Bug bounty programs can vary in many ways, but all reflect the same expectation of good-faith research and responsible disclosure. This can be seen in the companies' terms and conditions, which lay out the actual rules. For example, I analyzed the Terms and Conditions of the bug bounty programs for Facebook, Github, and Tesla: one company that produces software, one company that hosts software, and one car manufacturer that relies

---

57   "Hackerone Home Page," *hackerone*, available at https://www.hackerone.com/.

heavily on software for the operation of its vehicles. Each of these programs specifically requires responsible disclosure back to the respective company. For example, within the "Responsible Disclosure of Security Vulnerabilities" subsection of its site policy, Github notes that after discovering a security vulnerability, the next step for security researchers should be "disclosing it to [Github] in a responsible manner."[58] As a prerequisite for security researchers to report vulnerabilities through its program, Facebook outlines its "Responsible Research and Disclosure Policy," which includes giving the company reasonable time to investigate and mitigate reported issues before publicly disclosing any information related to the report.[59] Furthermore, Tesla's terms are grounded in its "Responsible Disclosure Guidelines," highlighting disclosure as the *key* for good-faith security research under its program.[60]

57.   By requiring responsible disclosure and specifying the goals of the programs, bug bounty programs are effectively monitoring the use of the program's services and engaging in practices that support good-faith security research.

## V.   CORELLIUM'S BUSINESS PRACTICES DO NOT ENSURE GOOD-FAITH SECURITY RESEARCH

58.   As explained in Section I.E, the following analysis is necessarily preliminary given the limited information provided to date. However, the information that is available demonstrates that the Corellium Apple Product is not a tool limited to good-faith security research. Because Corellium does not require responsible disclosure, and indeed publicly

---

[58]   "Responsible Disclosure of Security Vulnerabilities," *Github*, available at https://help.github.com/en/github/site-policy/responsible-disclosure-of-security-vulnerabilities.

[59]   "Whitehat Information," *Facebook*, October 15, 2019, available at facebook.com/Whitehat/info/.

[60]   "Product Security," *Tesla*, available at https://www.tesla.com/about/security.

encourages its users *not* to engage in responsible disclosure, the Corellium Apple Product cannot be considered a good-faith security research tool.

### A. Background Of The Corellium Apple Product

59.   Corellium provides a "mobile device virtualization" tool[61]—the Corellium Apple Product—that allows users to run Apple's iOS software on "virtual" hardware. Virtualization involves "creating a virtual version of any [o]perating system, storage, server, network, network resources, or desktop rather than the actual version."[62] Corellium promotes its product as an effective tool for uncovering security vulnerabilities.[63]

60.   Corellium offers the Corellium Apple Product in two forms. It offers an on-premises version, which allows an on-site installation of a server running the Corellium Apple Product, and a cloud-based version, which allows the user to log in to Corellium's servers and create a virtual iPhone.[64] Corellium charges prices of up to ███████████ ███████████████████████████████████████████.[65] For purposes of this section, I will refer to both the on-premises and the cloud version of Corellium's product as the Corellium Apple Product.

---

[61]   "Corellium Home Page," *Corellium*, available at https://corellium.com/.

[62]   Deeksha Agarwal, "What Happens When You Use Virtualization In Software Testing?," *LambdaTest*, October 12, 2017, available at https://www.lambdatest.com/blog/happens-use-virtualization-software-testing/.

[63]   *See, e.g.*, Twitter, "@cmwdotme Tweet," January 7, available at https://twitter.com/cmwdotme/status/1082293278840508416, Correllium-015318 ("If you're doing vulnerability research and haven't tried [Corellium] now is a great time.").

[64]   FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL, *Apple Inc. v. Corellium, LLC*, Case 9:19-cv-81160-RS, December 20, 2019, p. 7.

[65]   ████████████████████████████████ Corellium-016999.

61.  In my opinion, Corellium's business practices with respect to the Corellium Apple Product do not constitute or ensure good-faith security research. Rather, as described below, Corellium recognizes the potential for its product to be used for offensive purposes rather than good-faith security research, and does nothing to stop such uses. Nor does Corellium require that its users engage in responsible disclosure by reporting vulnerabilities found using its product back to Apple. Instead, Corellium has taken steps to encourage uses of its product that are contrary to the key tenets of good-faith security research. Consistent with that encouragement, I have seen no evidence to date that Corellium limits the sale of its product to only those engaged in good-faith security research or that it places any material restrictions on the use of its product whatsoever.

### B.  Corellium Recognizes The Potential For Bad-Faith, Offensive Use Of Its Product, And Encourages Rather Than Stops Such Conduct

62.  The materials I have reviewed to date, though limited, indicate that Corellium is well aware of the potential for misuse of the Corellium Apple Product and is familiar with the market for vulnerabilities for those who do not engage in responsible disclosure. Rather than take steps to encourage such disclosure, Corellium has instead made statements that actively encourage the non-disclosure and monetization of vulnerabilities. This is contrary to good-faith security research.

63.  Specifically, based on the materials I have reviewed to date:  (i) Corellium does not require or encourage responsible disclosure to Apple; (ii) Corellium does not impose any requirements regarding what users of its products may do with the vulnerabilities they uncover using the Corellium Apple Product; and (iii) Corellium openly advocates for uses of its product that are inconsistent with good-faith security research.

### 1.  *Corellium Does Not Require Or Encourage Responsible Disclosure To Apple*

64.     As discussed above, a critical element of any good-faith security research product or

program is responsible disclosure. However, I have seen no evidence to date that Corellium

requires responsible disclosure to Apple or encourages such disclosure in any way.

65.     It is my understanding that Corellium has not yet produced the majority of its customer

contracts in discovery. However, I was able to review one such agreement, ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████[66]

66.     Corellium is almost certainly aware that there are users of its product that have *never*

reported a bug back to Apple. The co-founder of Corellium's first ███████████████

Azimuth Security, has publicly admitted that it has never reported a bug found in iOS to

Apple.[67] In light of public statements like that one, it is clear that Corellium's ████████

████████ has no intention of engaging in responsible disclosure of discovered vulnerabilities

to Apple. Yet Corellium ████████████████████████████████████████████

████████████████

67.     As a point of comparison, I have reviewed the terms of use for Metasploit—a security

research tool used to verify vulnerabilities, manage security assessments, and organize

---

[66]     Corellium, "Corellium Purchase and License Agreement," Correllium-014309.

[67]     Lorenzo Franceschi-Bicchierai, "iPhone Emulation Company Sued by Apple Says It's Making iPhones Safer," *Motherboard Tech by Vice*, October 29, 2019, available at https://www.vice.com/en_us/article/8xw7gx/iphone-emulation-company-sued-by-apple-says-its-making-iphones-safer.

penetration testing.[68] The software is used to simulate attacks on a network using a database of exploits.[69] Metasploit's end user license agreement explicitly states that its software "may only be used for the purposes of good-faith testing, investigation, and/or correction of security flaws, exposures, or vulnerabilities in order to advance the security or safety of devices, machines, or networks of those who use such devices, machines, or networks."[70] Metasploit's license agreement demonstrates that, if Corellium wanted to, it could license its product in such a way that comports with the requirements of good-faith research.

████████████████████████████████████████████████

████████████████████████████████████████ further demonstrates that Corellium is not taking the steps necessary to ensure that users of its product are engaged in good-faith security research.

### 2. *Corellium Does Not Limit What Users May Do With Vulnerabilities*

68.   I have not seen any evidence to date that Corellium limits its customer base to those who use the Corellium Apple Product for good-faith security researchers.

69.   I likewise have seen no evidence to date that Corellium imposes any requirements regarding what users of its products do with the vulnerabilities they uncover using the Corellium Apple Product. To the contrary, as Corellium itself has stated in briefing in this litigation, "the bugs that are found by any clients of Corellium are not then given back to Corellium.

---

[68]   "metasploit Home Page," *metasploit*, available at https://www metasploit.com/.

[69]   "metasploit Product," *rapid7*, available at https://www rapid7.com/products/metasploit/.

[70]   Metasploit is owned by the analytics company Rapid7. "Rapid7 End User License Agreement," *rapid7*, available at https://www.rapid7.com/legal/eula/.

Corellium gives its clients the ability to find these bugs through its virtualization program but does not require disclosure back to them of what is found."[71]

70. 

71. Corellium's lack of limits on product use is showcased in an article by Forbes (based on interviews with Corellium's founders) where it is noted that Corellium's users can try "whatever they want" with the virtualization software.[72] Corellium's CEO, Amanda Gorton, then promoted the article on Twitter.[73]

72. 

---

[71]   DEFENDANT CORELLIUM, LLC'S, RESPONSE TO PLAINTIFF'S MOTION TO COMPEL TO PROVIDE COMPLETE RESPONSES TO INTERROGATORIES, *Apple Inc. v. Corellium, LLC*, Case 9:19-cv-81160-RS, January 21, 2020, p. 4.

[72]   Thomas Brewster, "This Super Stealth Startup Built An Apple Hacker's Paradise," *Forbes*, February 15, 2018, available at https://www forbes.com/sites/thomasbrewster/2018/02/15/corellium-virtual-apple-iphones-for-hacking/#19ee3e4a4a3b.

[73]   Twitter, "@amandalgorton Tweet," February 15, 2018, available at https://twitter.com/amandalgorton/status/964197366223040512, Correllium-015320.



73. In addition, ▮▮▮▮▮▮▮▮▮▮▮▮, Azimuth Security, ▮▮▮▮▮▮▮▮▮▮ of the Corellium Apple Product, is publicly reported to be in the business of developing, "zero-day exploits, according to six sources."[76] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

### 3. Corellium Openly Advocates For Uses Inconsistent With Good-Faith Research

74. Not only is Corellium aware of the offensive market for software vulnerabilities, but Corellium's founder Chris Wade has actually encouraged participation in that market. When appearing on a podcast, for example, Wade suggested that, if anyone is able to develop a particular type of exploit of iOS 12, "they might want to keep it to themselves, because it will be worth a lot of money to a lot of people."[77]

75. Wade again openly encouraged non-disclosure of vulnerabilities in favor of monetization in January 2019. At that time, Zerodium, a company that pays bounties for "premium zero-day exploits," tweeted: "We are increasing our bounties for almost every product. We're now paying $2,000,000 for remote iOS jailbreaks, $1,000,000 for

---

[74] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ January 26, 2018, APL-CORELLIUM_00018664.

[75] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ January 26, 2018, APL-CORELLIUM_00018664.

[76] Joseph Cox, Lorenzo Frenceschi-Bicchierai, "How a Tiny Startup Became The Most Important Hacking Shop You've Never Heard Of," *Motherboard Tech by Vice*, February 7, 2018, https://www.vice.com/en_us/article/8xdayg/iphone-zero-days-inside-azimuth-security.

[77] "Risky Business feature: iOS exploits just got a lot more expensive," *Risky.Biz*, September 21, 2018, available at https://risky.biz/RB514_feature/, 13:45 - 13:55.

WhatsApp/iMessage/SMS/MMS RCEs, and $500,000 for Chrome RCEs."[78] In response, Chris Wade tweeted "If you're doing vulnerability research and haven't tried [Corellium] now is a great time."[79]

76.  In light of all of the evidence that has been made available to me to date, along with my expertise and experience in this area, I am of the opinion that Corellium does not promote or sell the Corellium Apple Product solely (or even primarily) for good-faith security research. As noted above, this opinion is based on the evidence available to me to date, and will be supplemented upon the receipt of additional evidence for my review.

---

[78]  Twitter, "@cmwdotme Tweet", January 7, available at https://twitter.com/cmwdotme/status/1082293278840508416, Correllium-015318.

[79]  Twitter, "@cmwdotme Tweet", January 7, available at https://twitter.com/cmwdotme/status/1082293278840508416, Correllium-015318.

* * *

Signed on the 3rd day of March 2020.

Michael Siegel