## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 9:19-cv-81160-RS

APPLE INC.,

                              Plaintiff,

      v.

CORELLIUM, LLC,

                          Defendant.

---

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Apple Inc. hereby submits its proposed findings of fact and conclusions of law.

### OVERVIEW

In this lawsuit, Apple alleged that the Defendant, Corellium, violated the Digital Millennium Copyright Act by creating, providing to others, and selling a product—CORSEC iOS—that circumvents, or gets around, the technological measures that Apple uses to protect its copyrighted operating system for iOS.  Corellium denied these claims and asserted several affirmative defenses, including numerous defenses that are within the Court's equitable jurisdiction.  Corellium also brought claims against Apple arising out of Apple's alleged failure to pay rewards or "bounties" to Corellium in connection with the Apple Security Bounty Program. Apple asserted several legal defenses and one equitable defense, estoppel, to Corellium's counterclaims.

The Parties' primary claims, and many of their respective affirmative defenses, have been tried to a jury verdict, and the jury has found [INSERT POST-TRIAL].[1]  In addition, the jury has

---

[1] Some of the proposed findings of fact may require modification as a result of the jury's verdict. In addition, a finding by the jury against either party on the merits of its respective claims would moot the respective affirmative defenses.  Accordingly, Apple submits this draft based on the currently pleaded defenses applicable to both parties, but reserves the right to propose updated

offered advisory verdicts on Corellium's affirmative defense of estoppel, as well as Apple's affirmative defense of estoppel. Those advisory verdicts find: [INSERT POST-TRIAL]. The following issues remain for the Court's consideration and adjudication: [INSERT POST-TRIAL].

The Court presided over the presentation of evidence at trial from [DATES]. The Parties have presented briefing on the issues. [DESCRIBE POST-TRIAL BRIEFING AND CITE PERTINENT ECF NUMBERS]. The Court, having considered the briefing, evidence, and argument related to Corellium's pleaded affirmative defenses of estoppel, acquiescence, laches, restraint of trade, copyright misuse, free speech, and unclean hands, and Apple's pleaded affirmative defense of estoppel, makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### I.   THE PARTIES

#### A.  Plaintiff

1. Plaintiff Apple Inc. is a California corporation with its principal place of business at One Apple Park Way, Cupertino, California 95014. Apple designs, develops, and sells some of the world's most popular consumer electronics, computer software programs, and online services. iOS is Apple's operating system for the iPhone, iPad, and iPod Touch mobile devices ("iOS Devices"). iOS contains original, creative content developed by Apple that is continuously improved upon and released as new versions are developed.

#### B.  Defendant

2. Defendant Corellium, LLC is a limited liability company registered in Delaware with its principal place of business at 630 George Bush Boulevard, Delray Beach, Florida 33483. Corellium licenses and sells access to virtualized, running versions of iOS.

## FINDINGS OF FACT WITH RESPECT TO
## CORELLIUM'S AFFIRMATIVE DEFENSES TO APPLE'S CLAIMS

3. In August 2017, Chris Wade, Amanda Gorton, David Wang, and Stan Skowronek

---

findings of fact and conclusions of law consistent with the jury's verdict and any intervening rulings of law by the Court.

founded Corellium, a company that enables the creation of virtual, running versions of iOS, and licenses and sells access to these virtualized copies of iOS.  [TT_____; Ex. No(s)._____.][2]

4.  Corellium does not have authorization from Apple to license or sell iOS or virtualized versions of iOS.  [TT_____; Ex. No(s)._____.]

5.  Prior to founding Corellium, Gorton, Wade, and Skowronek founded a venture called Virtual, which developed iOS virtualization technology that was intended to operate in a manner similar to CORSEC iOS.  [TT_____; Ex. No(s)._____.]

6.  In 2014, Apple engaged in negotiations with Wade and Skowronek for a possible acquisition of Virtual.  In connection with these negotiations, senior Apple employees, including Sebastien Marineau-Mes and Ivan Krstić, warned Wade against selling an iOS virtualization technology without permission from Apple.  [TT_____; Ex. No(s)._____.]

7.  In August 2014, Citrix Systems, Inc. acquired Virtual.  Thereafter, Mark Templeton, the CEO of Citrix, and Wade, as Templeton's technical advisor, discussed potential partnerships with Apple for use of the Virtual technology.  [TT_____; Ex. No(s)._____.]  During these discussions, Apple again reiterated that iOS could not be virtualized commercially absent a license from Apple.  [TT_____; Ex. No(s)._____.]

8.  Citrix and Apple did not enter into an agreement, and further discussions ceased.

9.  In February 2015, Templeton emailed Marineau-Mes, copying Wade.  In this email, Citrix acknowledged that the "commercialization of the Virtual technology present[ed] a challenge" because "Citrix can't host the technology because Apple does not license iOS." [TT_____; Ex. No(s)._____.]

10. Neither Virtual nor Citrix ever obtained a license from Apple to use iOS.  Citrix ultimately abandoned the Virtual technology, and Templeton and Wade both left Citrix.

███████████████████████████████████████████████████

---

[2] Apple reserves the right to, and intends to, file updated proposed findings of fact and conclusions of law with trial transcript cites ("TT") as well as trial exhibit numbers ("Ex. No(s).") once the trial has concluded.

11. In the summer of 2017, Wade began engaging with Apple regarding his new virtualized iOS technology, Corellium.  [TT_____; Ex. No(s)._____.]  A few months later, on December 12, 2017, Wade contacted Krstić, head of Security Engineering and Architecture at Apple, regarding the launch of Corellium, his new iOS virtualization technology, and requested to provide a demonstration at Apple.  [TT_____; Ex. No(s)._____.]

12. Thereafter, between approximately January and July 2018, Apple and Corellium engaged in negotiations regarding a possible acquisition of Corellium by Apple.

13. As part of these discussions, Apple and Corellium entered into a non-disclosure agreement, which stated, "███████████████████████████████████████ ████████████████████████."  [TT_____; Ex. No(s)._____.]  Further, the non-disclosure agreement provided that "████████████████████████████████████ █████████████████████████████████████████████████  [TT_____; Ex. No(s)._____.]

14. In or around March 2018, Corellium agreed to the terms of the Apple Enterprise Developer Program.  The agreement provides "[a]ll licenses not expressly granted in this Agreement are reserved and *no other licenses*, immunity or rights, express or implied are granted by Apple, by implication, estoppel, or otherwise."  [TT_____; Ex. No(s)._____.]

15. In addition to the agreements between Apple and Corellium, Wade agreed to the terms of the Apple Developer Program.  These terms forbid reverse engineering of Apple software and do "not grant [a developer] any right or license to incorporate or make use of any Apple intellectual property" including copyrights.  [TT_____; Ex. No(s)._____.]

16. During multiple meetings with Apple employees, Wade and other Corellium employees demonstrated CORSEC iOS to Apple.

17. During these demonstrations, Corellium did not reveal to Apple the details of how Corellium's underlying technology worked or the specifics of how it circumvented Apple's technological control measures ("TCMs").  [TT_____; Ex. No(s)._____.]

18. Apple employees expressed enthusiasm about Corellium's technology, and its potential acquisition by Apple, during negotiations.  However, no Apple employee ever told Wade that it was acceptable to virtualize iOS commercially or circumvent iOS TCMs without Apple's authorization.  To the contrary, Krstić told Wade that Corellium's software was "legally dubious." [TT_____; Ex. No(s)._____.]  Marineau-Mes likewise informed Wade on at least two occasions that Corellium would "need to get a license from Apple" and that "in order to run iOS they'd need a license from us."  [TT_____; Ex. No(s)._____.]

19. Corellium was well aware that it did not have Apple's authorization to use iOS in its product.  In late June 2018, after multiple meetings with Apple to discuss a potential acquisition, ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ [TT_____; Ex. No(s)._____.]

20. Indeed,  Corellium's ██████████████████████████████████ ██████████████████████████████████████ [TT_____; Ex. No(s)._____.] For example, when Gorton was expressly asked whether she ████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████ [TT_____; Ex. No(s)._____.]

21. Corellium's principals were angry when Apple decided not to acquire Corellium at the price Corellium demanded.  When the acquisition talks between Apple and Corellium ended, Wade contacted Krstić via text, warning that "Apple ha[d] now been officially black listed by [Corellium].  Consider everything we have learned that is not under NDA now a public asset." [TT_____; Ex. No(s)._____.]

22. After negotiations ended, and despite knowing it did not have Apple's authorization to develop or commercialize its iOS virtualization product, Corellium continued to develop and commercialize CORSEC iOS, at first privately, and then publicly.

23. Corellium attempted to conceal its commercialization of CORSEC iOS from Apple to avoid Apple taking legal action against it.  [TT_____; Ex. No(s)._____.]  For example, on

October 25, 2018, ███████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████ [TT_____; Ex.
No(s)._____.]

    24. Further, on February 1, 2019, ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████ [TT_____; Ex. No(s)._____.] ███████████████████████
Corellium was operating without Apple's express or implicit consent.

## FINDINGS OF FACT WITH RESPECT TO
## APPLE'S AFFIRMATIVE DEFENSES TO CORELLIUM'S COUNTERCLAIMS

    25. Separate from any discussions with Apple about potentially acquiring Corellium, Wade also engaged with Apple on his own behalf in connection with the Apple Security Bounty Program.

    26. Apple announced its Security Bounty Program in August 2016 to incentivize security researchers to tell Apple about security bugs in iOS that they have found so that Apple can fix them.  Under the program, Apple offers cash rewards to external researchers who submit certain qualifying bugs.

    27. The Security Bounty Program is governed by the Apple Security Bounty Program Policy, which is incorporated by reference into the Developer Agreement.[4]  [TT_____; Ex.

---

[3] Pursuant to an exclusive reseller agreement, Dowd worked closely with Corellium such that he maintained an e-mail address bearing the company's name: mark@corellium.com.

[4] The Apple Developer Agreement states the following regarding additional terms, such as the Apple Security Bounty Program Policy: "You will be responsible for reviewing and becoming familiar with any such modifications (including new terms, updates, revisions, supplements, modifications, and additional rules, policies, terms and conditions) ('Additional Terms')

No(s)._____.]  The Policy was in effect from August 2016 through December 2019.  The Policy set forth the Program's parameters, including what made a bug eligible for a reward and the maximum potential value for reporting particular types of bugs.  The Policy also explained Apple's role in adjudicating whether and when reward payments for bug submissions would be made, and explained that the Program was limited to bugs related to iOS and iCloud only.  Bugs related to other Apple operating systems, including macOS (Apple's computer operating system), were ineligible for a reward under the Policy.  So too were bugs related to non-critical vulnerabilities. [TT_____; Ex. No(s)._____.]

28. To be eligible for a reward under the then-existing policy, a bug submission needed to meet certain criteria, including that (1) the reported bug was "[p]resent in the most recent shipping version of iOS," (2) the submission was "[a]ccompanied by a proof of concept," and (3) that the submission was the "[f]irst external report of a particular issue."  [TT_____; Ex. No(s)._____.] The Policy also made clear that "[p]ayments [were] at Apple's sole discretion" and that payment amounts would vary depending on certain discretionary factors such as the "[n]ovelty" of the issue reported, the "[l]ikelihood of exposure," and the "[q]uality of [the] report." The Policy further stated that "qualifying vulnerabilities" must be submitted to Apple via the email address product-security@apple.com.

29. On April 13, 2017, Wade contacted Krstić asking if Wade could submit bugs to Apple.  Krstić informed Wade that Apple only offered bounties for certain categories of bugs, and he shared with Wade the list of those categories.  [TT_____; Ex. No(s)._____.]

30. On April 25, 2017, Wade was formally added to the Apple Security Bounty Program.  To be added to the Program, Wade was required to login to his Apple Developer Account, which he had previously created on July 21, 2008.  [TT_____; Ex. No(s)._____.]  In doing so, Wade agreed to further terms from Apple, including the terms of the Apple Security Bounty Program Policy, incorporated by reference in the Apple Developer Agreement.  [TT_____; Ex. No(s)._____.]

---

communicated to you by Apple.  All Additional Terms are hereby incorporated into this Agreement by this reference and your continued use of the Site will indicate your acceptance of any Additional Terms."  [TT _____; Ex. No(s)._____.]

31. From April 2017 through September 2019, Chris Wade submitted multiple bugs through the Apple Security Bounty Program. Apple determined that some of these submissions were eligible for reward, while others were not.

32. Wade submitted eight bugs in April 2017, four of which Apple adjudicated as eligible for a reward, which Apple then paid.

33. On November 13, 2017, Wade submitted three bugs, each of which Apple adjudicated as not eligible for a reward based on the criteria established by the Policy.

34. A few months later, in January 2018, Wade purports to have submitted two additional bugs to Apple. But neither was eligible for an award under the Policy. With respect to one of those bugs, Apple records show that Google previously submitted a report of the same issue. As such, Wade's submission was not the "[f]irst external report of a particular issue" and did not qualify for a reward. [TT_____; Ex. No(s)._____.] Apple has no record of a second bug being submitted by Wade to the Apple Security Bounty Program in January 2018, and Wade acknowledges he did not submit it formally through the Program.

35. On August 28, 2019—after the commencement of the instant litigation—Wade contacted Apple's Product Security Team to ask whether the pending lawsuit involving Apple affected Corellium's ability to submit bugs. [TT_____; Ex. No(s)._____.] In response, the Apple Product Security Team assured Wade that Apple "welcome[s] reports from anyone to help protect our customers." [TT_____; Ex. No(s)._____.] Soon thereafter, in September 2019, Wade submitted two bugs to Apple, both of which Apple determined were eligible for awards under the Program. Indeed, Apple awarded Wade's "kernel execution bug" a bounty of $45,000. Wade designated this bounty for donation to the Electronic Frontier Foundation. Under the Policy, if a bounty recipient opts to donate an award to charity, Apple may choose to match that donation. Here, Apple chose to match Wade's donation, and paid a total of $90,000 to the Foundation for the bug. Apple awarded Wade's "memory leak bug" a bounty of $20,000. Because Wade likewise designated this bounty for donation to the Foundation, Apple chose to match it for a total of $40,000.

**CONCLUSIONS OF LAW WITH RESPECT TO**
**CORELLIUM'S DEFENSES TO APPLE'S ANTI-TRAFFICKING CLAIM**

## I.   CORELLIUM HAS NOT ESTABLISHED EQUITABLE ESTOPPEL

1.   Courts have assumed without deciding that equitable estoppel applies to claims brought under the Digital Millennium Copyright Act ("DMCA").  *See Disney Enters., Inc. v. Hotfile Corp.*, No. 11-cv-20427, 2013 WL 6336286, at *24 (S.D. Fla. Sept. 20, 2013).

2.   To establish an equitable estoppel defense, a defendant must establish both that the "copyright owner engage[d] in intentionally misleading representations concerning his abstention from suit" and that "the alleged infringer detrimentally relie[d] on the copyright owner's deception."  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 684 (2014).  Further, the party seeking to rely on estoppel cannot point to mere *inaction* as that, by itself, does not create estoppel. *Id.* at 683–84; *LEGO A/S v. Best-Lock Constr. Toys, Inc.*, 404 F. Supp. 3d 583, 619–20 (D. Conn. 2019).

3.   Corellium cannot establish that Apple engaged in intentionally misleading representations concerning its abstention from suit.  ███████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████  [TT_____; Ex. No(s)._____.]  Indeed, through its various written agreements, Apple made plain that any perceived inaction on its part should not be viewed as a waiver of its rights or as a license to develop, distribute, or sell a product that circumvents the TCMs protecting against unauthorized access to, or infringement of, iOS.  And the statements of Apple's employees affirmed the same.

4.   Given that it is undisputed that Apple never affirmatively authorized Corellium's development, distribution, or sale of a product that circumvents the iOS TCMs, Corellium's claim that Apple engaged in intentionally misleading misrepresentations regarding abstention from suit is unsupported.

5.   Nor can such misrepresentation be inferred from Apple's alleged silence.  The record reflects that Apple was not, in fact, silent, but rather told Corellium's principals at various points over a four-year period that Apple's view was that commercial use of iOS in virtualization technology was not permissible absent a license from Apple.  [TT_____; Ex. No(s)._____.]

6.   Even had Apple not affirmatively told Corellium that its product was not authorized by Apple, it would not be reasonable for Corellium to infer permission from Apple's purported silence in light of the Parties' history and the express agreements Corellium signed reflecting Apple's intention not to waive any of its rights with respect to its intellectual property.

7.   Moreover, Corellium's actions—and numerous statements—do not reflect that it reasonably relied on any alleged assurances by Apple regarding abstention from suit.  Indeed, the record reflects quite the opposite—it shows that Corellium knew it did not have permission from Apple to traffic a product that bypasses Apple's security measures and acted in anticipation of Apple's potential enforcement of its rights—which defeats an estoppel defense.  *See, e.g.*, *Adobe Systems Inc. v. NA Tech Direct Inc.*, No. 17-cv-05226, 2019 WL 5579472, at \*5 (N.D. Cal. Oct. 29, 2019) (concluding that "estoppel [was] not appropriate because Defendants were not ignorant of their infringement and did not rely on [Plaintiff's] apparent inaction" and noting that an email from Defendants "directing sales persons to stop unauthorized sales show[ed] that Defendants knew of the sales and acted in anticipation of [Plaintiffs]'s enforcement of its rights").  *See generally supra* ¶¶ 19–20, 23–24 (*e.g.*, ███████████████████████ ████████████████████████████████████████████).

8.   There is no evidence Apple made any intentionally misleading representations regarding its abstention from suit nor that Corellium detrimentally relied on any such representations.

9.   Because Corellium has failed to establish either that Apple intentionally misled it with respect to Apple's abstention from suit, or that Corellium reasonably relied to its detriment on misleading statements or conduct by Apple, Corellium has failed to establish its affirmative defense of estoppel.  Accordingly, I find that this defense fails based on the applicable law and the evidence presented at trial.

## II.   CORELLIUM HAS NOT ESTABLISHED ACQUIESCENCE

10. Corellium's acquiescence defense fails as a matter of law because acquiescence is not a defense to claims brought under the DMCA.  While district courts in this Circuit have considered the affirmative defense of acquiescence in the context of a copyright infringement action (not an anti-trafficking DMCA action), *see, e.g.*, *Malibu Media, LLC v. Zumbo*, No. 2:13-

cv-729, 2014 WL 2742830, at *3 (M.D. Fla. June 17, 2014), they have done so by relying on Eleventh Circuit case law involving trademark infringement, to which acquiescence is a statutory defense under 15 U.S.C. § 1115(b)(9), *see id.* (citing *SunAmerica Corp. v. Sun Life Assur. Co. of Can.*, 77 F.3d 1325, 1334 (11th Cir. 1996); *Univ. of Alabama Bd. of Trustees v. New Life Art, Inc.*, 683 F.3d 1266, 1281 (11th Cir. 2012). The DMCA contains no such statutory defense, and the Eleventh Circuit has never held that this defense is applicable in the context of an anti-trafficking claim brought under the DMCA.

11. Alternatively, even were acquiescence a legally cognizable defense, Corellium has failed to establish facts sufficient to support its application. To establish the defense of acquiescence, a defendant must establish that "(1) the plaintiff actively represented it would not assert a right or claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." *Univ. of Alabama Bd. of Trustees*, 683 F.3d at 1281 (internal quotation marks and citation omitted).

12. The Eleventh Circuit has made plain that "[t]he difference between acquiescence and laches is that laches denotes passive consent and acquiescence denotes active consent." *Id.* (internal quotation marks and citation omitted). While "[a]ctive consent does not necessarily mean an explicit promise not to sue," it does "require[] conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his trademark rights against the defendant." *Id.* at 1282 (internal quotation marks and citation omitted). In establishing this defense, "the relevant evidence . . . would be active behavior by the [the plaintiff]" during the time of the defendant's violations. *Id.*

13. Here, were the Court to consider Corellium's acquiescence defense on a factual basis, the defense would fail for principally the same reasons Corellium's estoppel defense fails. That is, Apple never affirmatively authorized Corellium's development, distribution, and sale of a product that circumvents the iOS TCMs [TT _____; Ex. No(s)._____] or engaged in any words or conduct that amounted to assurances that it would not enforce its rights in the face of Corellium's development, distribution, and sale of a product that circumvents the iOS TCMs. Indeed, the record shows that Apple employees told Corellium's principals at various points over

a four-year period that Apple's view was that commercial use of iOS in virtualization technology was not permissible absent a license from Apple.  [TT_____; Ex. No(s)._____.]

14. The record also shows that Corellium signed express agreements reflecting Apple's intention not to waive any of its rights with respect to its intellectual property.  Through its various written agreements, Apple made plain that any perceived inaction on its part should not be viewed as a waiver of its rights or as a license to develop, distribute, or sell a product that circumvents the TCMs protecting against unauthorized access to, or use of, iOS.  And the statements of Apple's employees affirmed the same.

15. Accordingly, I find that Corellium's acquiescence defense fails as a matter of law.  Alternatively, I find that even were it legally cognizable, the defense fails based on a failure of evidence supporting its application to the facts of this case.  Corellium has failed to establish either that Apple actively represented it would not assert a right or claim or that Apple actively consented to Corellium's actions.  Thus, Corellium has failed to establish its affirmative defense of acquiescence.

## III.    CORELLIUM HAS NOT ESTABLISHED LACHES

16. Apple filed its initial complaint in this matter on August 15, 2019.  It is undisputed that Apple did so within the relevant three-year statute of limitations established in 17 U.S.C. § 507(b) for copyright and anti-trafficking DMCA claims.

17. Pursuant to the Supreme Court's decision in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, Corellium cannot invoke laches as a bar to legal relief to claims that are brought under the DMCA within the three-year statute of limitations.  572 U.S. at 679 (holding that, "in face of a statute of limitations enacted by Congress, laches cannot be invoked to bar legal relief"); *see also id.* at 682 (explaining that there is "nothing untoward about waiting to see whether an infringer's exploitation undercuts the value of the copyrighted work, has no effect on the original work, or even complements it").  Accordingly, Corellium's laches defense fails as to Apple's legal claims for damages based on violations of the DMCA.

18. With respect to Apple's request for injunctive relief, precedent likewise precludes Corellium from invoking laches, as established law in this Circuit holds that laches can never be

used to preclude injunctive relief against *future* violations, as Apple seeks through this action. *See Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enterprises*, 533 F.3d 1287, 1321–22 (11th Cir. 2008) (holding that "[l]aches . . . does not preclude [a copyright holder] from seeking prospective relief" and explaining that "[p]ermitting laches to operate as a bar on post-filing . . . injunctive relief would encourage copyright owners to initiate much needless litigation in order to prevent others from obtaining effective immunity from suit with respect to future infringements"). The Supreme Court in *Petrella* likewise indicated that, so long as a copyright holder brings suit within the statute of limitations period, laches should not be used as a bar to prospective injunctive relief. *See Petrella,* 572 U.S. at 682–83 (explaining that the statute of limitations period "allows a copyright owner to defer suit until she can estimate whether litigation is worth the candle" and though the copyright owner will "miss out on damages for periods prior to the three-year look-back, . . . her right to prospective injunctive relief should, in most cases, remain unaltered [by any such deferral]").[5]   Accordingly, Corellium's invocation of laches likewise fails with respect to Apple's request for injunctive relief.

19. Furthermore, even were the Court to consider laches, it would fail here as Corellium cannot establish any of the necessary elements.  To establish a laches defense, a defendant must show "(1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Venus Lines Agency, Inc. v. CVG Int'l Am., Inc.*, 234 F.3d 1225, 1230 (11th Cir. 2000) (internal citations and quotations omitted).  These elements are similar to those outlined above with respect to estoppel, and would fail for the same reason. *See supra* ¶¶ 2–9.

20. Accordingly, I find that Corellium's laches defense fails as a matter of law. Alternatively, I find that, even were it legally cognizable, the defense fails based on a failure of evidence supporting its application to the facts of this case.

---

[5] The Supreme Court left open the possibility that laches may still be available "in extraordinary circumstances" to limit the equitable relief sought, but only at the outset of litigation. *See Petrella,* 572 U.S. at 667–68 (noting that, "[a]s to equitable relief, in extraordinary circumstances, laches may bar at the very threshold the particular relief requested by the plaintiff").

## IV.     CORELLIUM HAS NOT ESTABLISHED RESTRAINT OF TRADE

21. Corellium has provided no authority that restraint of trade is a standalone defense, as opposed to a species of copyright misuse, and has cited no authority applying "restraint of trade" as a defense in a copyright or DMCA action.  *Cf. Peter Pan Fabrics, Inc. v. Candy Frocks, Inc.*, 187 F. Supp. 334, 336 (S.D.N.Y. 1960) (finding that, "[i]f, indeed, plaintiffs had violated the antitrust laws by their trade practices, which the court does not find so to be true, in this case it would not be a defense to an action for copyright infringement").  Accordingly, I find that the defense fails based on the applicable law.

## V.      CORELLIUM HAS NOT ESTABLISHED COPYRIGHT MISUSE

22. It remains an open question in the Eleventh Circuit as to whether copyright misuse is a defense to copyright infringement claims.  *See Big Cat Rescue Corp. v. Big Cat Rescue Ent. Grp., Inc*., No. 8:11-cv-02014, 2013 WL 12158980, at *10 (M.D. Fla. Jan. 15, 2013)("The Eleventh Circuit has neither recognized nor rejected misuse as a defense for copyright infringement suits."); *see also Lorador v. Vasquez*, No. 8:14-cv-433, 2015 WL 300433, at *1 (M.D. Fla. Jan. 22, 2015) ("Unrecognized by the Eleventh Circuit as a defense, copyright misuse offers no basis for a claim for [declaratory] relief.").

23. Even so, there are no remaining copyright infringement claims in this action. Rather, there are only Apple's DMCA anti-trafficking claims, which plead violations of two sections of 17 U.S.C. § 1201.  Multiple courts have expressly concluded that—regardless of whether copyright misuse is a defense to infringement—it is not a defense to a claim arising under the DMCA.  *See 321 Studios v. Metro Goldwyn Mayer Studios, Inc*., 307 F. Supp. 2d 1085, 1107 (N.D. Cal. 2004) (stating that misuse is a defense "only to copyright infringement claims"); *MDY Indus., LLC v. Blizzard Ent., Inc*., 629 F.3d 928, 951 n.13 (9th Cir. 2010), *as amended on denial of reh'g* (Feb. 17, 2011), *opinion amended and superseded on denial of reh'g*, No. 09-15932, 2011 WL 538748 (9th Cir. Feb. 17, 2011) (finding that misuse is an equitable defense only for copyright infringement because "1201(a) creates a right distinct from copyright infringement").

24. Accordingly, this Court need not reach the question of whether the Eleventh Circuit does, or should, recognize the defense of copyright misuse with respect to infringement claims.

The law is established that copyright misuse is not a defense to alleged violations of the DMCA. Accordingly, I find that Corellium's copyright misuse defense fails as a matter of law.

25. Alternatively, I find that, even were it legally cognizable, the defense fails based on a failure of evidence supporting its application to the facts of this case. The doctrine of copyright misuse is "derived from the equitable defenses of patent misuse and unclean hands" and "forbids a copyright holder from using a copyright to secure an exclusive right or limited monopoly not granted by the Copyright Office and which it is contrary to public policy to grant." *Pk Studios v. R.L.R. Invest, LLC,* No. 2:15-cv-389, 2016 WL 4529323, at *5 (M.D. Fla. Aug. 30, 2016) (internal quotation marks and citation omitted). The defense aims "to prevent a litigant from securing an exclusive right which exceeds what has already been granted via the copyright" and "bar[s] recovery for a copyright owner who attempts to extend its limited copyright rights to property not covered by the copyright." *Id.* (internal quotation marks and citation omitted).

26. In addition to this defense simply being inapplicable to the separate and distinct prohibition of trafficking in tools of circumvention under the DMCA, Corellium's evidence does not establish that Apple engaged in copyright misuse with respect to its copyrights or that it otherwise sought to extend its rights to property not already covered by its copyrights, including the 15 specific, registered copyrights at issue in this litigation. Further, to the extent that Corellium contends its product "provides a public benefit," this argument is irrelevant under the applicable legal framework; the Court considers Apple's conduct in connection with copyright misuse, not Corellium's. Accordingly, I find that the defense fails based on the applicable law and the evidence presented at trial.

## VI.   CORELLIUM HAS NOT ESTABLISHED UNCLEAN HANDS

27. Under the doctrine of unclean hands, "[o]ne who has acted in bad faith, resorted to trickery and deception, or been guilty of fraud, injustice[,] or unfairness will appeal in vain to a court of conscience, even though in his wrongdoing he may have kept himself strictly within the law." *Ocean's 11 Bar & Grill, Inc. v. Indem. Ins. Corp. RRG,* No. 11-61577-civ, 2012 WL 5398625, at *17 (S.D. Fla. Nov. 2, 2012), *aff'd sub nom. Ocean's 11 Bar & Grill, Inc. v. Indem. Ins. Corp. of DC, Risk Retention Grp.,* 522 F. App'x 696 (11th Cir. 2013) (internal quotation marks and citation omitted).

28. To establish the defense of unclean hands, a defendant must demonstrate that: "(1) [p]laintiff's alleged wrongdoing is directly related to the claim against which it is asserted; and (2) [d]efendants were personally injured by [p]laintiff's conduct." *Thornton v. J Jargon Co*., 580 F. Supp. 2d 1261, 1283 (M.D. Fla. 2008). Indeed, the party asserting the defense must establish detrimental reliance. *See Ocean's 11 Bar,* 2012 WL 5398625 at *17 ("[T]hat a party's conduct is disreputable is entirely irrelevant where the party asserting unclean hands is not the target of, and has taken no action in reliance on that conduct, however disdainful of that conduct a court may be.") (internal quotation marks and citation omitted).

29. It is well established that the "application of the unclean hands doctrine rests with the discretion of the court." *Thornton,* 580 F. Supp. at 1283. And courts apply the defense only in the most extreme circumstances, such as when a "plaintiff misused the process of the courts by falsifying a court order, by falsifying evidence, or by misrepresenting the scope of his copyright to the court and opposing party," or "when the plaintiff obtained information as to the nature of defendant's work through unfair means," *id.*; *see also Energy Intel. Grp., Inc. v. Kayne Anderson Cap. Advisors, L.P.*, 948 F.3d 261, 267 n.4 (5th Cir. 2020) (explaining that "[c]ourts have recognized unclean hands when a party makes serious misrepresentations").

30. Unclean hands is applied only in the most exceptional circumstances, and Corellium has failed to establish any such circumstances here.

31. Corellium's allegations of wrongdoing are rooted in Apple's purported "knowledge of [CORSEC iOS] and its functionality" coupled with Apple's "failure to timely object or act." The record shows, however, that during Corellium's demonstrations of the CORSEC iOS, Corellium did not reveal to Apple the details of how Corellium's underlying technology worked or the specifics of how the product circumvented Apple's TCMs. [TT_____; Ex. No(s)._____.]

32. Further, while Apple employees expressed enthusiasm about Corellium's technology during negotiations, no one from Apple ever told Wade or anyone from Corellium that it was acceptable to virtualize iOS commercially or circumvent iOS TCMs without Apple's authorization. The record shows the opposite: several Apple employees raised to Wade the potential legal issues presented by CORSEC iOS. [TT_____; Ex. No(s)._____.]

16

33. Corellium was aware that it did not have Apple's authorization to use iOS in its product. Indeed, —*after* multiple meetings with Apple to discuss Apple's potential acquisition of Corellium—

[TT_____; Ex. No(s)._____.]

34. In addition, even were Corellium's allegations accurate, and the Court finds they are not, they would relate at most to Corellium's estoppel defense. The allegations do not come close to establishing the extreme conduct necessary to establish the defense of unclean hands. *Thornton,* 580 F. Supp. at 1283; *Energy Intel. Grp.*, 948 F.3d at 267 n.4.

35. Because Corellium has failed to establish either that Apple engaged in any wrongdoing or that it suffered any harm as a result, Corellium has failed to establish its affirmative defense of unclean hands. Accordingly, I find that defense fails based on the applicable law and the evidence presented at trial.

## VII.  CORELLIUM FAILED TO ESTABLISH THAT THE DMCA INFRINGES ON CORELLIUM'S RIGHT TO FREE SPEECH

36. The First Amendment is not implicated by this action. This is an intellectual property dispute between two private parties, to which the First Amendment ordinarily does not apply. *See, e.g.*, *Rendell-Baker v. Kohn*, 457 U.S. 830, 837 (1982) (recognizing "it is fundamental that the First Amendment prohibits governmental infringement on the right of free speech" and not infringement by private parties). The First Amendment "is not a license to trammel on legally recognized rights in intellectual property." *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 849 (11th Cir. 1990) (quoting *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5th Cir. 1979)). In *Cable/Home*, the Eleventh Circuit rejected a First Amendment defense and affirmed a permanent injunction against a private company engaged in the marketing and sale of technologies designed to intercept and unscramble satellite transmissions. *Id.* at 849. The same constitutional reasoning applies to bar Corellium's First Amendment defense to the later-enacted, but analogous, anti-trafficking provisions of the DMCA.

37. Since the DMCA's enactment, courts have consistently rejected arguments that Section 1201's anti-trafficking provisions facially violate the First Amendment. *See, e.g.*,

*Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 454 (2d Cir. 2001) (holding in a DMCA case that the "functional capability" of decryption technology "is not speech within the meaning of the First Amendment"); *321 Studios*, 307 F. Supp. at 1101 (parties challenging the DMCA "only offer [First Amendment] arguments that the previous courts considered and rejected"). Corellium has not seriously pursued a facial challenge to the constitutionality of the DMCA's anti-trafficking provisions in 17 U.S.C. § 1201, and has offered no authority to persuade this Court to diverge from reasoned precedent. I find that Corellium's facial First Amendment defense fails as a matter of law.

38. To the extent Corellium is attempting to assert an as-applied challenge to enforcement of the DMCA against the CORSEC iOS, that too fails. *See* Corellium's Affirmative Defenses, ECF No. 599 ¶ 18. Apple's DMCA claim is aimed at Corellium's conduct of trafficking in a product that enables circumvention of the TCMs that protect access to, and prevent infringement of, Apple's copyrighted iOS works. Apple's claim targets Corellium's conduct, not Corellium's speech. *See Disney Enters., Inc. v. VidAngel, Inc.*, 371 F. Supp. 3d 708, 715–16 (C.D. Cal. 2019) ("Section 1201(a) regulates conduct—the circumvention of TPMs—and not expression—the use to which a person puts TPM-protected works."); *accord Green v. U.S. Dep't of Just.,* 392 F. Supp. 3d 68, 93 (D.D.C. 2019) ("The code's functional capability—the target of the DMCA provisions—is not speech within the meaning of the First Amendment.") (internal quotation marks and citation omitted).

39. Finally, to the extent the First Amendment may be implicated by this Court enjoining the development, distribution, or sale of CORSEC iOS, those concerns are resolved by the injunction's specificity. At most, an injunction would trigger—and then satisfy—intermediate scrutiny under the First Amendment. *Cf. United States v. Elcom Ltd*., 203 F. Supp. 2d 1111, 1132 (N.D. Cal. 2002) ("[T]he DMCA does not burden substantially more speech than is necessary to achieve the government's asserted goals of promoting electronic commerce, protecting copyrights, and preventing electronic piracy."). The permanent injunction Apple seeks is limited in scope, encompassing only Corellium's actions that violate the anti-trafficking provisions of the DMCA with respect to the TCMs that protect Apple's copyrighted works. *See Cable/Home Commc'n Corp.*, 902 F.2d at 849 (affirming injunction against decoding technology due to its specificity). The injunction does not implicate any other Corellium product or offering, including those related

to Android, an open-source technology.  Corellium's affirmative defense related to the First Amendment fails as a matter of law.

## CONCLUSIONS OF LAW WITH RESPECT TO
## <u>APPLE'S ESTOPPEL DEFENSE TO CORELLIUM'S COUNTERCLAIMS</u>

**I.    CORELLIUM IS ESTOPPED FROM SUING APPLE REGARDING THE APPLE SECURITY BOUNTY PROGRAM**

40. To establish a defense of equitable estoppel, a defendant must establish four elements: "(1) [t]he party to be estopped must know the facts; (2) [the party] must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and, (4) he must rely upon the conduct to his injury."  *Ashou v. Liberty Mut. Fire Ins. Co.*, 41 Cal. Rptr. 3d 819, 832 (Cal. Ct. App. 2006) (internal quotation marks and citation omitted).

41. Here, Apple can establish each of the four necessary elements of estoppel.  First, the record shows that Corellium knew that payment for bugs submitted through the Apple Security Bounty Program was subject to and within Apple's discretion.  The Apple Security Bounty Program Policy made this clear.  Further, in Wade's initial conversations with Krstić about bug submissions, Krstić informed Wade that only certain bugs would be eligible for payment, underscoring Apple's discretion in awarding bounties.  Thus, Wade knew "the facts"— and the facts show that Wade knew that payment for bugs submitted through the Apple Security Bounty Program was subject to and within Apple's discretion.

42. Second, the record shows that the very purpose of submitting bugs to the Apple Security Bug Bounty Program was to permit Apple to improve the security of its products.  Chris Wade and Corellium intended for Apple to "act upon" the bugs and correct any problems identified in their submissions.

43. Third, the record shows that Apple did not know that Wade or Corellium submitted any bugs with an expectation of, and believing it was entitled to, payment regardless of whether Apple, exercising its discretion, chose to pay Corellium.  Indeed, in 2017 Wade submitted a number of bugs, some of which he was paid for and others for which he was not (as certain of his submissions were ineligible for a reward).  Wade made the decision to continue submitting bugs to

Apple, even after several of his prior submissions did not result in bounties.  It was in this context—after certain of his submissions did not qualify for payment—that Wade continued to submit bugs in 2018 and 2019.

44. Fourth, Apple was "injured" as a result of its acceptance of Corellium's continued submissions without knowing that Corellium would demand payment for the submissions regardless of whether Apple considered the submissions eligible for payment under the Apple Security Bounty Program Policy.  Further, if Apple had known this, Apple certainly would have responded differently to Wade's August 2019 e-mail seeking clarification as to whether Corellium could submit bugs notwithstanding the instant lawsuit.

45. Because Apple has established all four elements of estoppel, Corellium is estopped from pursuing its counterclaims related to the bugs submitted to Apple.

Dated: April 2, 2021

Michele D. Johnson*
*michele.johnson@lw.com*
LATHAM & WATKINS LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
(714) 540-1235 / (714) 755-8290 Fax

Sarang Vijay Damle*
sy.damle@lw.com
Elana Nightingale Dawson*
elana.nightingaledawson@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200 / (202) 637-2201 Fax

Andrew M. Gass*
andrew.gass@lw.com
Joseph R. Wetzel*
*joe.wetzel@lw.com*
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600 / (415) 395-8095 Fax

Jessica Stebbins Bina*
*jessica.stebbinsbina@lw.com*
LATHAM & WATKINS LLP
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
(424) 653-5500 / (424) 653-5501 Fax

Gabriel S. Gross*
*gabe.gross@lw.com*
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
(650) 463-2628 / (650) 463-2600 Fax

*Admitted pro hac vice*

Respectfully Submitted,

*s/ Martin B. Goldberg*

Martin B. Goldberg
Florida Bar No. 0827029
*mgoldberg@lashgoldberg.com*
*rdiaz@lashgoldberg.com*
LASH & GOLDBERG LLP
100 Southeast Second Street
Miami, FL 33131
(305) 347-4040 / (305) 347-4050 Fax

Emily L. Pincow
Florida Bar No. 1010370
*epincow@lashgoldberg.com*
*gizquierdo@lashgoldberg.com*
LASH & GOLDBERG LLP
Weston Corporate Center I
2500 Weston Road, Suite 220
Weston, FL 33331
(954) 859-5180 / (954) 384-2510 Fax

*Attorneys for Plaintiff* APPLE INC.