UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 9:19-cv-81160-RS

APPLE INC.,

                Plaintiff,

v.

CORELLIUM, LLC,

                Defendant.

**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

    Defendant Corellium, LLC hereby submits its proposed findings of fact and conclusions of law.

**OVERVIEW**

    In this lawsuit, Apple alleged that the Defendant, Corellium, violated two subsections of the Digital Millennium Copyright Act by creating, providing to others, and selling a product—CORSEC—that is primarily sold or marketed as a means to circumvent the supposed technological measures that Apple allegedly uses to protect its copyrighted operating system, iOS. Corellium denied these claims and asserted several factual and affirmative defenses, including statutory exemptions and defenses that are within the Court's equitable jurisdiction. Corellium also brought claims against Apple arising out of Apple's alleged failure to pay rewards or "bounties" to Corellium in connection with the Apple Security Bounty Program. Apple asserted several legal defenses and one equitable defense, estoppel, to Corellium's counterclaims.

*Apple Inc. v. Corellium, LLC*

The Parties' primary claims, and their respective affirmative defenses, were tried before this court on [INSERT DATES], and the jury has found [INSERT POST-TRIAL].[1] In addition, the jury has offered advisory verdicts on Corellium's affirmative defense of estoppel, as well as Apple's affirmative defense of estoppel. Those advisory verdicts find: [INSERT POST-TRIAL]. The following issues remain for the Court's consideration and adjudication: [INSERT POST-TRIAL].

The Court presided over the presentation of evidence at trial from [DATES]. The Parties have presented briefing on the issues. [DESCRIBE POST-TRIAL BRIEFING AND CITE PERTINENT ECF NUMBERS]. The Court, having considered the briefing, evidence, and argument related to Apple's claims under the Digital Millennium Copyright Act ("DMCA") and Corellium's counterclaims, Corellium's defenses to those claims and its pleaded affirmative defenses of estoppel, acquiescence, laches, copyright misuse, and unclean hands, and Apple's pleaded affirmative defense of estoppel, makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

**I. THE PARTIES**

    **A. Plaintiff**

1. Plaintiff Apple Inc. is a California corporation with its principal place of business at One Apple Park Way, Cupertino, California 95014. Apple designs, develops, and sells mobile devices called iPhone, iPad, and iPod Touch ("Apple Devices").

2. iOS is Apple's operating system for Apple Devices (and in the latest versions exclusively only to iPhone). iOS contains a combination of open-source software that is dedicated to the public and software developed by Apple.

3. Apple makes available to the public for download, for free and without license conditions, a repository of code constituting iOS. That repository of iOS code is known as IPSW.

---

[1] Some of the proposed findings of fact and conclusions of law may require modification as a result of the jury's verdict. Corellium reserves the right to propose updated findings of fact and conclusions of law consistent with the jury's verdict and any rulings of law by the Court.

**B.    Defendant**

4.     Defendant Corellium, LLC is a limited liability company registered in Delaware with its principal place of business at 1301 N. Congress Ave, Ste. 410, Boynton Beach, FL 33426,. Corellium licenses a security research platform that enables users to create a variety of virtual device models, including models capable of running versions of iOS and Android, with custom integrated research tools.

5.     The CORSEC product was developed, produced, distributed, and used for security research and testing.  [TT ; Ex. No(s). .]

6.     Corellium's customers include Fortune 500 companies and the United States government. [TT ; Ex.No(s). .]

## FINDINGS OF FACT WITH RESPECT TO
## CORELLIUM'S AFFIRMATIVE DEFENSES TO APPLE'S CLAIMS

7.     In August 2017, Chris Wade, Amanda Gorton, David Wang, and Stan Skowronek founded Corellium, a company that developed a security research platform that enables the creation of virtual devices capable of running certain versions of iOS, and that licenses such software through its CORSEC product.  [TT_____; Ex. No(s). _.][2]

8.     Corellium's CORSEC product provides its users with virtual devices that are able to run certain versions of iOS in a web browser and that are integrated with the CORSEC suite of security research tools.  The product adds features not available on retail iPhones that are useful for security research and testing, and removes features that are specific to mobile devices such as text messages, phone calls, video calls, cameras, the Apple app store, Bluetooth, and navigation. [TT_; Ex. No(s)._.]

9.     iOS, as it is made publicly available in IPSW files, does not include hardware or "firmware" (software permanently installed in hardware) and does not have to run on Apple Devices.

10.    Apple makes iOS software available online for public download, for free, unencrypted, and without any licensing terms or restrictions, through IPSW container files hosted on Apple's servers and linked to by third-party websites, including http://ipsw.me. As

---

[2] Corellium reserves the right to, and intends to, file updated proposed findings of fact and conclusions of law with trial transcript cites ("TT") as well as trial exhibit numbers ("Ex. No(s).") once the trial has concluded.

such, Corellium had no reason to believe that Apple intended to restrict the use of these IPSW files in any way. [TT_; Ex. No(s)._.]

11. A user is not presented with or required to agree to Apple's iOS End User License Agreement (the "EULA") or any other agreement before downloading an IPSW file from Apple's servers. As such, Corellium had no reason to believe that Apple intended to contractually restrict the use of these IPSW files. [TT_; Ex. No(s)._.]

12. Most of iOS in the IPSW files is not encrypted or scrambled in any way. As such, Corellium had no reason to believe that Apple intended to cryptographically restrict the use of the unencrypted portions IPSW files.

13. Corellium's CORSEC product does not virtualize or otherwise use any encrypted code from any IPSW files. [TT ; Ex. No(s). .]

14. All of the technological protection measures that Apple claims protect its copyright in iOS only exist on physical Apple Devices sold by Apple. As such, Corellium had no reason to believe that Apple intended to restrict the use of IPSWs with technological protective measures. [TT_; Ex. No(s)._.]

15. In the ordinary course of operation of the non-encrypted iOS code contained in the IPSW files, iOS does not check what "authorization" signature it receives or whether it receives a signature at all. It keeps on running. Only the physical iPhone or iPad hardware responds if a signature is obtained from Apple's "authorization server." [TT_; Ex. No(s)._.]

16. In the ordinary course of operation of the non-encrypted iOS code contained in the IPSW files, iOS will run on devices regardless of whether the device implements the "secure boot chain" that Apple hardware may apply on Apple Devices. The IPSW files continue running whether a secure boot chain is confirmed or not. Only certain iPhone or iPad hardware stops iOS from running in the event of a secure boot chain error.

17. In the ordinary course of operation of the non-encrypted iOS code contained in the IPSW files, iOS will continue to run regardless of whether the "Buddy" program runs. Only certain iPhone or iPad hardware is affected by whether the Buddy program runs. [TT_; Ex. No(s). .]

18. In the ordinary course of operation of the non-encrypted iOS code contained in the IPSW files, iOS does not check whether code modifications or apps are authorized by Apple via the "trust cache." iOS will run if the code modifications or apps are authorized by whatever

system iOS is then running on. Only certain iPhone or iPad hardware check whether Apple has approved modifications or apps. [TT_; Ex. No(s)._.]

19. In the ordinary course of operation of the non-encrypted iOS code contained in the IPSW files, iOS will accept any PAC code or no PAC code at all. Only specific iPhone and iPad hardware models run PAC, and iOS only uses the PAC exploit mitigation on these particular models – on other iPhone models the same version of iOS will not use the PAC exploit mitigation. [TT_; Ex. No(s)._.]

20. Prior to founding Corellium, in 2014, Chris Wade, Amanda Gorton, and Stan Skowronek founded a venture called Virtual, which developed iOS virtualization technology. [TT_; Ex. No(s)._.]

21. Apple was aware that Virtual had developed virtualization technology that included the ability to virtualize iOS. Apple was also aware in 2011 that prior to Virtual, Chris Wade had developed an emulator for iOS, called iEmu. [TT_; Ex. No(s)._.]

22. In 2014, Apple was aware that Virtual had access to the iOS code contained in Apple's freely available IPSW files and was using this code to run iOS in its virtualization product. [TT_; Ex. No(s)._.]

23. In 2014, Apple engaged in negotiations with Wade, Gorton, and Skowronek for a possible acquisition of Virtual. Apple and its employees never raised any issues relating to either (1) copyright law, or (2) the DMCA, with respect to Virtual. Apple never issued a cease-and-desist letter with respect to Virtual and it never requested that Virtual stop selling or offering to sell its iOS virtualization technology. [TT_; Ex. No(s)._.]

24. In August 2014, Citrix Systems, Inc. acquired Virtual. Thereafter, Mark Templeton, the CEO of Citrix at that time, and Wade, as Templeton's technical advisor, discussed potential partnerships with Apple for use of the Virtual technology. [TT___; Ex. No(s).____.] During these discussions, Apple and its employees never raised any issues relating to either (1) copyright law, or (2) the DMCA. [TT_; Ex. No(s)._.]

25. Citrix and Apple did not enter into an agreement. [TT_; Ex. No(s)._.]

26. In 2017, Apple became aware that Corellium had developed new iOS virtualization technology. [TT__; Ex. No(s).__.] On December 12, 2017, Wade contacted Krstić, head of Security Engineering and Architecture at Apple, regarding the launch of Corellium and Krstić asked Wade to come provide a demonstration at Apple. [TT_; Ex. No(s)._.]

*Apple Inc. v. Corellium, LLC*

27. During multiple meetings with Apple employees, Wade and other Corellium employees demonstrated CORSEC to Apple at least three times and showed them how it worked in detail, including much of its code. [TT ; Ex. No(s). .]

28. Apple encouraged Wade to continue CORSEC's development. [TT ; Ex. No(s). .] Between approximately January and July 2018, Apple and Corellium engaged in negotiations regarding the possible acquisition of Corellium by Apple. [TT ; Ex. No(s). .]

29. Apple employees expressed enthusiasm about Corellium's technology, and its potential acquisition by Apple, during negotiations. During these negotiations with Corellium, Apple employees never raised any issues relating to either (1) copyright law, or (2) the DMCA, with respect to Corellium's virtualization technology.

30. Apple never issued a cease-and-desist letter with respect to Corellium and it never requested that Corellium stop selling, offering to sell, using, or otherwise making available, its iOS virtualization technology. [TT ; Ex. No(s). .]

31. Internally, Apple discussed several potential uses for the Corellium technology involving testing and security research. [TT ; Ex. No(s). .]

32. Apple conducted technical due diligence with respect to Corellium and its virtualization technology to determine whether it would make an offer to purchase the company. [TT ; Ex. No(s). .]

33. Apple offered to purchase Corellium, including its technology and people, who would be onboarded to Apple as employees in the event of an acquisition of the company. However, Corellium was unwilling to accept the terms of Apple's offer. [TT ; Ex. No(s). .]

34. Ultimately, the two companies did not come to an agreement on the terms and Apple did not acquire Corellium. [TT; Ex. No(s). .]

35. Even after the failed acquisition of Corellium, Apple never raised any issues to Corellium relating to copyright law or the DMCA. Apple did not send a cease-and-desist letter or make any other communication indicating to Corellium that it should stop selling, offering to sell, using, or otherwise making available, the CORSEC product, or that it was allegedly violating the DMCA. [TT ; Ex. No(s). .]

36. Corellium's security research platform, including its suite of security research tools, allows security researchers to find vulnerabilities.

*Apple Inc. v. Corellium, LLC*

37. Apple has a bug bounty program where security researchers can submit those vulnerabilities, whereby Apple obtains a benefit. Mr. Wade, on behalf of himself personally and Corellium, has submitted several vulnerabilities to Apple, including after the failed acquisition of Corellium by Apple. Corellium's customers have also submitted vulnerabilities to Apple. [TT ; Ex.No(s). .]

38. Apple did not pay Mr. Wade the proper value for the submission of certain of these vulnerabilities to Apple, despite deriving benefit therefrom. [TT ; Ex. No(s). .]

39. The CORSEC product models certain device features relevant to security research with as much fidelity as possible, including processor architecture, the ability to execute with certain hardware drivers, and security mitigations. CORSEC runs Linux, an open-source operating system, as an administrative interface for virtual machines on the Corellium hypervisor. As such, modifications to IPSW are made for the purposes of enabling advanced research capabilities and interoperability with Linux and the Corellium hypervisor. [TT ; Ex. No(s). .]

40. The patches applied to iOS by CORSEC also enable interoperability with the third-party applications that run on iOS, as well as with third-party research tools. For example, patches that fix time-dependencies in iOS are specifically required to enable debugging. In this way, Corellium allows iOS to become part of a broad software ecosystem making it possible to integrate iOS with specialized software tools, automate testing, and gain insight with analysis tools. [TT ; Ex.No(s). .]

## FINDINGS OF FACT WITH RESPECT TO
## APPLE'S AFFIRMATIVE DEFENSES TO CORELLIUM'S COUNTERCLAIMS

41. Apple announced its Security Bounty Program in August 2016 to incentivize and compensate security researchers to inform Apple about security bugs in iOS that they have found so that Apple can fix them. Under the program, Apple offers cash rewards to external researchers who submit certain qualifying bugs for Apple's benefit. [TT ; Ex. No(s). .] In 2016, when Apple first announced the Apple Security Bounty Program, it offered a reward of up to $200,000 for submitting a critical vulnerability. [TT ; Ex. No(s). .]

42. In 2019, Apple increased that maximum to $1,000,000. [TT ; Ex. No(s). .]

43. Under the original 2016 Apple Security Bounty Program, Apple would pay up to: 1) $200,000 for bugs in secure boot firmware components; 2) $100,000 for extraction of confidential material protected by the Secure Enclave Processor; 3) $50,000 for the execution of

arbitrary code with kernel privileges; 4) $50,000 for unauthorized access to iCloud account data on Apple servers; and 5) $25,000 for access from a sandbox process to user data outside of that sandbox. [TT ; Ex. No(s). .]

44. From April 2017 through September 2019, Chris Wade submitted multiple bugs through the Apple Security Bounty Program. Apple determined that some of these submissions were eligible for reward. However, Apple did not reward Mr. Wade for other submissions even though Apple used the information in those submissions to fix the submitted bugs. [TT ; Ex. No(s). .]

45. Mr. Wade submitted eight bugs in April 2017, but Apple allegedly only concluded that half of them were eligible for a reward. [TT ; Ex. No(s). .]

46. Chris Wade submitted the "persona race condition" bug to Apple on November 13, 2017 from cmw@cmw.me. [TT ; Ex. No(s). .]

47. Chris Wade submitted the "posix_spawn issue" bug to Apple on November 13, 2017 from cmw@cmw.me. [TT ; Ex. No(s). .]

48. Chris Wade submitted the "nfssvc issue" bug to Apple on November 13, 2017 from cmw@cmw.me. [TT ; Ex. No(s). .]

49. Chris Wade submitted the "kernel execution bug" on behalf of Corellium to Apple on September 30, 2019 from chris@corellium.com. [TT ; Ex. No(s). .]

50. Apple notified Chris Wade as an agent of Corellium on February 10, 2020 that the "kernel execution bug" qualified for an award of $45,000. Chris Wade on behalf of Corellium designated the award for donation to the Electronic Frontier Foundation, and Apple matched the donation for a total of $90,000. [TT ; Ex. No(s). .]

51. Chris Wade submitted the "memory leak bug" on behalf of Corellium to Apple on September 30, 2019 from chris@corellium.com. [TT ; Ex. No(s). .]

52. Apple notified Chris Wade as an agent of Corellium in April 2020 that the "memory leak bug" qualified for an award of $20,000. Chris Wade on behalf of Corellium designated the award for donation to the Electronic Frontier Foundation, and Apple matched the donation for a total of $40,000. [TT ; Ex. No(s). .]

*Apple Inc. v. Corellium, LLC*

53. Chris Wade on behalf of Corellium submitted a write up of "checkm8" vulnerability on September 30, 2019. [TT ; Ex. No(s). .]

54. Apple derived benefit from the bugs that Mr. Wade submitted, including the bugs that they refused to award any money for. [TT ; Ex. No(s). .]

## CONCLUSIONS OF LAW WITH RESPECT TO CORELLIUM'S DEFENSES TO APPLE'S DMCA CLAIM

### I. CORELLIUM HAS ESTABLISHED EQUITABLE ESTOPPEL

1. Courts have assumed, without deciding, that equitable estoppel applies to claims brought under the Digital Millennium Copyright Act ("DMCA"). *See Disney Enters., Inc. v. Hotfile Corp.*, No. 11-cv-20427, 2013 WL 6336286, at *24 (S.D. Fla. Sept. 20, 2013).

2. To establish an equitable estoppel defense, a defendant must establish both that the plaintiff "engage[d] in intentionally misleading representations concerning his abstention from suit" and that the alleged violator "detrimentally relie[d]" on the plaintiff's representations. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 684 (2014). Even mere delay in bringing a lawsuit, when combined with other types of overt acts, can be sufficient to support an equitable estoppel defense. *See LEGO A/S v. Best-Lock Constr. Toys, Inc.*, 404 F. Supp. 3d 583, 619 (D. Conn. 2019) ("It is well-established in this Circuit that an infringement plaintiff's inaction, if accompanied by overt acts of particular characteristics, may combine to support the defense of equitable estoppel.") Corellium has met its burden on this defense as follows.

3. First, the record establishes unambiguously that Apple knew detailed facts of Corellium's development, sales, and distribution of its product, as well as access to the iOS code. The Parties engaged in discussions about Apple's potential acquisition of Corellium. In the course of those discussions and negotiations, Apple was given demonstrations of Corellium's technology and its applications as well as information about how the code functions.

4. Second, the evidence shows that Apple's repeated statements and actions toward Corellium led Corellium to reasonably believe that Apple would not pursue a claim against it. The parties had engaged in numerous discussions, demonstrations and other interactions focused on the merits and value of Corellium's technology to Apple. Apple never indicated or suggested during these interactions that it would potentially sue Corellium or that Corellium could not sustain its business model without Apple's consent. Instead, Apple conveyed the clear

9

*Apple Inc. v. Corellium, LLC*

impression that, if anything, it wished to collaborate with or acquire Corellium.

5. Third, the evidence demonstrates that, based on the nature of their repeated interactions, Corellium reasonably believed that Corellium was at no risk of a lawsuit from Apple. The parties engaged in willing and open negotiations and due diligence over Apple's possible acquisition of Corellium and Apple made express statements lauding Mr. Wade's skill as an engineer and CORSEC technology. Apple further communicated to Corellium its approval of the strengths and value of Corellium's technology.

6. Fourth, the evidence demonstrates that Corellium has been and will continue to be harmed as a result of its reliance on Apple's conduct, if Corellium were liable for damages here despite being encouraged to continue costly development of its product.

7. Where Corellium has met its burden of proof on this defense, I find that Apple is estopped from asserting claims under the DMCA against Corellium.

## II. CORELLIUM ESTABLISHED ACQUIESCENCE

8. To prevail on the defense of acquiescence, a defendant must establish three elements: "(1) [Plaintiff] actively represented that [he] would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." *Malibu Media, LLC v. Zumbo*, 2014 WL 2742830, at *3 (M.D. Fla. June 17, 2014)(citing to *SunAmerica Corp. v. Sun Life Assur. Co. of Can.*, 77 F.3d 1325, 1334 (11th Cir. 1996). Moreover, "active representation" does not necessarily mean an explicit promise not to sue. It only requires conduct on Apple's part that amounted to an assurance to Corellium, express or implied, that Apple would not assert its rights against Corellium. *Virtual Studios, Inc. v. Stanton Carpet Corp.*, No. 4:15-CV-0070-HLM, 2016 WL 5339360, at *12 (N.D. Ga. Aug. 1, 2016).

9. Here, Corellium can establish each of the three necessary elements of acquiescence. First, the record shows that Apple actively represented, through its conduct, that Apple would not assert its rights against Corellium. After Corellium's presentations of CORSEC to Apple's employees, Apple's employees expressed positive and encouraging feedback about CORSEC. More importantly, Jon Andrews, Apple's VP Core OS Software Engineering, emailed Chris Wade "I've been thinking about Corellium for some time and now have a good idea of how your team could have a big impact." Additionally, Apple's employees encourage Corellium to virtualize newer versions of iOS, *e.g.*, iOS 11 and 12. Corellium demonstrated to Apple's

employees the full SEP emulation using CORSEC. Apple did not express to Corellium that it was violating the DMCA; instead, Apple continued to actively represent to Corellium, through its conduct, that it would not assert any rights against Corellium.

10. Second, the record shows that Apple's delay between active representation and assertion of the right was not excusable. Corellium was founded on August 15, 2017. In August 2017, Corellium presented CORSEC at the Tensec 2017 Security Conference, which was attended by Apple. In December 2017, Ivan Krstic responded to a message from Chris Wade about Corellium with the request to "come demo" at Apple. On January 23, 2018, March 1, 2018, and June 7, 2018, Corellium demonstrated CORSEC during meetings with Apple employees. On June 2018, Jon Andrews received a CORSEC trial account. Apple continued to have negotiations and communications with Corellium until around July 2018. Only a year later, on August 15, 2019, Apple filed the instant lawsuit. Apple's delay is inexcusable, since Apple received a CORSEC demonstration on January 23, 2018 and actively encouraged Corellium to develop CORSEC—including the virtualization of newer versions of iOS—and then suddenly, without any notice to Corellium, Apple filed the instant lawsuit in August 2019.

11. Third, the record shows that Apple's delay to file the instant lawsuit has caused Corellium undue prejudice. Apple actively represented, through its conduct, that CORSEC was a beneficial product with several potential uses, including security testing and research. Corellium was unduly prejudiced because Corellium continued its operations, development, and commercialization of CORSEC since Apple's conduct assured Corellium that Apple would not assert any rights against Corellium.

12. Because Corellium has established all three elements of acquiescence, Apple's acquiescence to CORSEC exempts Corellium from liability.

### III. **CORELLIUM HAS ESTABLISHED LACHES**

13. Apple incorrectly asserts that laches is not an available defense to claims under the DMCA. Laches is an equitable remedy that is generally available as an equitable defense. Apple has not cited any authority rejecting laches as an available defense to DMCA claims. The Supreme Court's decision in *Petrella v. Metro-Goldwyn- Mayer, Inc.*, dealt only with claims for copyright infringement; it did not address the availability of laches as a defense to claims brought pursuant to the DMCA. *Petrella* does not, therefore, preclude the availability of laches for such

*Apple Inc. v. Corellium, LLC*

claims, and this District has implicitly allowed defendants to assert laches as a defense to DMCA claims. *See Pearson Educ., Inc v. Hotfile Corp.*, No. 14-CIV-20200, 2015 WL 11216708, at *3 (S.D. Fla. Jan. 27, 2015) (rejecting "counterclaim for declaratory judgment under the doctrine of laches" as "redundant and unnecessary" where defendant had raised laches as affirmative defense to DMCA claim). I therefore find that Corellium may assert laches as a defense to Apple's claims for damages pursuant to the DMCA.

14. To prevail on its defense of laches, Corellium has the burden to prove by a preponderance of the evidence "(1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Venus Lines Agency, Inc. v. CVG Int'l Am., Inc.*, 234 F.3d 1225, 1230 (11th Cir. 2000) (internal citations and quotations omitted). Corellium has met its burden on these elements.

15. First, the record establishes that Apple first learned that Chris Wade was developing virtualization systems to allow security research for platforms such as iOS in 2011 or, at the latest, in 2014. Apple continued to communicate with Mr. Wade over the subsequent years, while fully aware of his ongoing work into hardware virtualization and iOS security research and his access to the iOS code. Apple, in fact, discussed with Mr. Wade the possibility of acquiring his iOS virtualization technology on multiple occasions in 2014 and during the years following Apple's first awareness of this technology. After waiting for many years and actively encouraging Mr. Wade to continue development, Apple filed its initial complaint in this matter on August 15, 2019. Thus, Corellium has establish that Apple sat silently for many years and delayed asserting any of its alleged rights.

16. Second, the record establishes that the conduct of which Apple complains was largely ongoing from 2011 or, at the latest, from 2014, and despite Apple's established knowledge of such conduct, Apple has not presented evidence excusing its delay in asserting its rights.

17. Third, the record establishes that Apple's delay in asserting its rights unduly prejudiced Corellium. Corellium invested substantial time, effort, and resources into the development of its product. Corellium also undertook these efforts with knowledge of Apple's intent stemming in substantial part from Chris Wade's historical interactions with Apple over the virtualization technology at issue here. Corellium has therefore been unduly prejudiced by Apple's delay.

18. Accordingly, I find that Corellium has proven its laches defense and that Apple

is precluded from asserting its claims for damages under the DMCA.

## IV.   CORELLIUM HAS ESTABLISHED COPYRIGHT MISUSE

19.     Corellium may assert its defense of copyright misuse as defense to Apple's claim pursuant to 17 U.S.C § 1201(b).  While the Eleventh Circuit is silent on the availability of the defense, the weight of circuit authority recognizes the defense. *See, e.g., Assessment Techs. Of WI, LLC v. Wiredata,* 360 F.3d 640, 647 (7th Cir. 2003); *Video Pipeline v. Buena Vista Home Ent'mt*, 342 F.3d 191, 206 (3d Cir. 2003); *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1026-27 (9th Cir.2001); *DSC Communications Corp. v. DGI Technologies, Inc.,* 81 F.3d 597, 601-02 (5th Cir.1996); *Lasercomb America, Inc. v. Reynolds,* 911 F.2d 970, 976-79 (4th Cir.1990).  A recent decision from a sister district allowed the defense. *See, e.g.*, *Pk Studios, Inc. v. R.L.R. Investments, LLC*, 2016 WL 4529323, at *5 (M.D. Fla. Aug. 30, 2016) ("The undersigned previously refused to dismiss a copyright misuse defense where the basis asserted for dismissal was the defense's potential non-viability and will also decline to do so here.").

20.     Application of the copyright misuse defense is directly relevant to the claims Apple asserts under the DMCA.  Section 1201(a)(2) pertains to a technology that "effectively controls access to a work protected under this title."  Where a copyrighted work has been misused, the work is not "protected under this title" while the misuse occurs and persists.  "A successful defense of misuse of copyright bars a culpable plaintiff from prevailing on an action for infringement of the misused copyright."  Lasercomb America, Inc. v. Reynolds, 911 F.2d 970, 972 (4th Cir. 1990) (accepting copyright misuse defense. and finding anticompetitive clauses in a licensing agreement constituted misuse).

21.     Similarly, Section 1201(b) pertains to "a right of a copyright owner under this title in a work or a portion thereof."  Misuse of a copyrighted work nullifies the rights of the copyright owner during the period of the misuse.  Therefore, the defense of copyright misuse affects the application of Sections 1201(a)(2) and (b) as pertinent to this case.

22.     Moreover, application of the misuse defense is consistent with the policies with respect to the protection of copyrighted works and lawfully asserted copyright rights underlying the DMCA.  A June 2017 Report of the Register of Copyrights concerning Section 1201 of Title 17 observes in this regard that "principles underlying existing doctrines of antitrust law or misuse, and the permanent exemptions, such as section 1201(f)'s exception for interoperability, may

accommodate many anti-competitive concerns" arising from Section 1201 of Title 17: A Report of the Register of Copyrights at 49 (June 2017) (available at https://www.copyright.gov/policy/1201/section-1201-full-report.pdf).  I therefore find that the defense is available here as to Apple's DMCA claims under to 17 U.S.C § 1201(a)(2) and (b).

23. The defense aims "to prevent a litigant from securing an exclusive right which exceeds what has already been granted via the copyright" and "bar[s] recovery for a copyright owner who attempts to extend its limited copyright rights to property not covered by the copyright." *Id.* (internal quotation marks and citation omitted).  Corellium has met its burden as to Apple's Section1201(b) claim here.

24. The record establishes that Apple is seeking to assert protections in copyrighted materials over its technologies, the function of its software, and its hardware products that are not subject to copyright protection.  Apple sells iPhone hardware, not iOS software. Apple gives the iOS software away for free. Apple is seeking to use the rights granted to it for its copyrights to support the sale of its hardware, to which copyright protections do not extend. Apple is thus seeking to assert protection over rights not within the exclusive rights of a copyright owner under 17 U.S.C. § 106.  Accordingly, this improper attempt to expand its limited copyrights or to leverage copyright rights for purposes not protectable by copyright law is at odds with public policy embodied in the grant of a copyright.

25. Accordingly, I find that Corellium has met its burden of proof on its defense of copyright misuse, and that Apple's claims under 17 U.S.C. § 1201(a)(2) and (b) must fail.

V. **CORELLIUM HAS ESTABLISHED UNCLEAN HANDS**

26. As a threshold matter, I find that it is permissible for Corellium to assert the defense of unclean hands as a defense to claims arising under the Copyright Act. *Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors*, 786 F.2d 1400 (9th Cir. 1986).

27. "Under the doctrine of unclean hands, '[o]ne who has acted in bad faith, resorted to trickery and deception, or been guilty of fraud, injustice[,] or unfairness will appeal in vain to a court of conscience, even though in his wrongdoing he may have kept himself strictly within the law.'" *Ocean's 11 Bar & Grill, Inc. v. Indem. Ins. Corp. RRG*, No. 11-61577-CIV, 2012 WL 5398625, at *17 (S.D. Fla. Nov. 2, 2012), *aff'd sub nom. Ocean's 11 Bar & Grill, Inc. v. Indem. Ins. Corp. of DC, Risk Retention Grp.*, 522 F. App'x 696 (11th Cir. 2013).

28. First, the record establishes unambiguously that Apple knew that facts of

*Apple Inc. v. Corellium, LLC*

Corellium's development, sales, and distribution of its product, as well as Chris Wade's access to the iOS code as far back as 2014, where the Parties engaged in discussions about Apple's potential acquisition of the virtualization technology, including that by Corellium. Apple was given demonstrations of Corellium's technology and its applications, and even received bug submissions identified by use of Corellium's technology.

29. Second, Apple employees expressed enthusiasm and encouragement about Corellium's technology, and its potential acquisition by Apple, during negotiations. During these negotiations with Corellium, Apple employees never raised any issues relating to either (1) copyright law, or (2) the DMCA, with respect to Corellium's virtualization technology.

30. Third, despite the knowledge and encouragement, Apple never issued a cease-and-desist letter with respect to Corellium and it never requested that Corellium stop selling, offering to sell, using, or otherwise making available, its iOS virtualization technology without permission from Apple.

31. Apple's lack of action, and more so, enthusiasm and encouragement expressed to Chris Wade and Corellium about the development of the CORSEC product, only to file a lawsuit years later after acquisition talks failed, resulted in injury, injustice and unfairness to Corellium.

32. Accordingly, I find that Corellium has met its burden of proof on its defense of unclean hands, and that Apple's claims under 17 U.S.C. § 1201(a)(2) and (b) must, therefore, fail.

## CONCLUSIONS OF LAW WITH RESPECT TO
## APPLE'S ESTOPPEL DEFENSE TO CORELLIUM'S COUNTERCLAIMS

**I. CORELLIUM IS NOT ESTOPPED FROM SUING APPLE REGARDING THE APPLE SECURITY BOUNTY PROGRAM**

33. A claim under the Copyright Act can be waived if a defendant successfully establishes: "(1) the plaintiff [knows] the facts of the defendant's infringing conduct; (2) the plaintiff [intends] that its conduct shall be acted on or must so act that the defendant has a right to believe that it is so intended; (3) the defendant [is] ignorant of the true facts; and (4) the defendant [relies] on the plaintiff's conduct to its injury." *Disney Enterprises, Inc. v. Hotfile Corp.*, No. 11-20427-CIV, 2013 WL 6336286, at *24 (S.D. Fla. Sept. 20, 2013). Here, Apple cannot establish its estoppel defense.

15

*Apple Inc. v. Corellium, LLC*

34.     First, Corellium was not aware of Apple's intent or ability to withhold proper value or payment altogether for the submission of bugs because Chris Wade was directly instructed by Apple employees to submit bugs and that Apple would compensate for each bug submitted.

35.     Second, the record evidence clearly reflects that Corellium's submission of bugs to Apple was done with the expectation of compensation in return and that there was no indication that Corellium intended to provide the bugs with no compensation in return.

36.     Third, the evidence of the case shows that Apple was not ignorant of the true facts. Indeed, while the Apple Security Bounty Program policy might reflect that Apple has discretion of bug payouts, notwithstanding that policy, Apple, aware of its policy, still promised to Chris Wade that the submission of any bugs would be compensated.

37.     Fourth, Chris Wade and Corellium relied upon the promise of compensation made by Apple employees, and based upon that promise, submitted the bugs at issue to Apple.

38.     In addition, Apple cannot show that it was injured in any capacity given that it received information about bugs in its software and received such information without having to pay for it. The evidence shows that Apple clearly benefitted from these transactions.

<u>*/s/ Justin Levine*</u>
JONATHAN VINE
Florida Bar No.: 10966
JUSTIN LEVINE
Florida Bar No.: 106463
LIZZA CONSTANTINE
Florida Bar No.: 1002945

COLE, SCOTT & KISSANE, P.A.
*Counsel for Defendant*
Esperante Building
222 Lakeview Avenue, Suite 120
West Palm Beach, Florida 33401
Telephone (561) 383-9222
Facsimile (561) 683-8977
E-mail: jonathan.vine@csklegal.com
E-mail: justin.levine@csklegal.com
E-mail: lizza.constantine@csklegal.com

*and*

*Apple Inc. v. Corellium, LLC*

        HECHT PARTNERS LLP
        *Counsel for Defendant*
        125 Park Ave. 25th Floor
        New York, NY 10017
        Telephone (212) 851-6821
        David L. Hecht, *Pro hac vice*
        E-mail: dhecht@hechtpartners.com
        Maxim Price, *Pro hac vice*
        E-mail: mprice@hechtpartners.com
        Conor B. McDonough, *Pro hac vice*
        E-mail: cmcdonough@hechtpartners.com
        Minyao Wang, *Pro hac vice*
        E-mail: mwang@hechtpartners.com

*Attorneys for Defendant Corellium, LLC*